**A. 86**

LEXSEE 2006 US DIST LEXIS 5346

**In re NTL, INC. SECURITIES LITIGATION, This Document Relates to: All Cases**

**02 Civ. 3013 (LAK) (AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 5346; Fed. Sec. L. Rep. (CCH) P93,696*

**February 14, 2006, Decided**

**SUBSEQUENT HISTORY:** Stay denied by *In re NTL Secs. Litig., 2006 U.S. Dist. LEXIS 25310 (S.D.N.Y., May 3, 2006)*

**PRIOR HISTORY:** *In re NTL Inc. Sec. Litig., 347 F. Supp. 2d 15, 2004 U.S. Dist. LEXIS 24373 (S.D.N.Y., 2004)*

**COUNSEL:** [*1] For James Haber, Plaintiff: Cary L. Talbot, Daniel Bernard Scotti, Milberg, Weiss, Bershad & Schulman, L.L.P., New York, NY; David Arthur Scott, Scott & Scott, L.L.C., Colchester, CT; Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Liebhard & Lifshitz, LLP, New York, NY; Michael A. Swick, Scott & Scott, L.L.C., Bala Cynwyd, PA; Nadeem Faruqi, Faruqi & Faruqi, LLP, New York, NY; Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIs), Melville, NY; Steven G. Schulman, Milberg Weiss Bershad & Schulman LLP(NYC), New York, NY.

For NTL, Inc., Defendant: Seth Marc Schwatrz, Skadden, Arps, Slate, Meagher & Flom LLP(NYC), New York, NY.

For George S. Blumenthal, Defendant: Brooks Roy Burdette, Schwartz & Ballen LLP, Washington, NY.

For J. Barclay Knapp, Steven Carter, John F. Gregg, Defendants: Brooks Roy Burdette, Schwartz & Ballen LLP, Washington, NY; David Keith Momborquette, Schulte Roth & Zabel LLP(NY), New York, NY.

For Eric Hager, Sackett & Company, Xu Family, Richard Brand, Movants: Daniel W. Krasner, Gregory Mark Nespole, Gustavo Bruckner, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For Cheyne Fund LP, Lead Plaintiff: [*2] Andrei V. Rado, Cary L. Talbot, Daniel Bernard Scotti, Melvyn I. Weiss, Steven G. Schulman, Milberg, Weiss, Bershad & Schulman, L.L.P., New York, NY; Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Liebhard & Lifshitz, LLP, New York, NY; Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIs), Melville, NY.

For Fleck T.I.M.E. Fund L.P., Lead Plaintiff: Daniel Bernard Scotti, Milberg Weiss Bershad & Schulman LLP(NYC), New York, NY; Jeffrey Michael Haber, Jeffrey D. Lerner, Joseph R. Seidman, Jr., Sandy A Liebhard, Bernstein Liebhard & Lifshitz, LLP, New York, NY;

For Mike Atassi, Consolidated Plaintiff: Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Liebhard & Lifshitz, LLP, New York, NY; Jules Brody, Stull Stull & Brody, New York, NY.

For Harry Pariser, Consolidated Plaintiff: Frederick Taylor Isquith, Sr., Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY; Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Liebhard & Lifshitz, LLP, New York, NY.

For Addy Krebs, Consolidated Plaintiff: Cary L. Talbot, Daniel Bernard Scotti, Steven G. Schulman, Milberg, Weiss, Bershad & Schulman, L.L.P., Jeffrey Michael Haber, Jeffrey [*3] D. Lerner, Bernstein Liebhard & Lifshitz, LLP, New York, NY.

2006 U.S. Dist. LEXIS 5346, *3; Fed. Sec. L. Rep. (CCH) P93,696

For Randall Scott, Consolidated Plaintiff: Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Leibhard & Lifshitz, LLP, New York, NY; Jules Brody, Stull Stull & Brody, New York, NY.

For Progressive Casualty Insurance, Consolidated Plaintiff: Gregory M. Egelston, Bernstein Liebhard & Lifshitz, LLP, New York, NY; Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Leibhard & Lifshitz, LLP, New York, NY.

For Arthur J. Niebauer, Consolidated Plaintiff: Jeffrey Michael Haber, Jeffrey D. Lerner, Bernstein Leibhard & Lifshitz, LLP, New York, NY; Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman, & Robbins, LLP(LIs), Melville, NY.

JUDGES: ANDREW J. PECK, United States Magistrate Judge. The Honorable Lewis A. Kaplan, United States District Judge.

OPINION BY: ANDREW J. PECK

OPINION:

### REPORT AND RECOMMENDATION

ANDREW J. PECK, United States Magistrate Judge:

### To the Honorable Lewis A. Kaplan, United States District Judge:

Plaintiffs, seeking to represent a class of investors who bought securities of NTL, Inc. on the open market between August 10, 2000 and November 29, 2001 (the "Class Period"), [*4] allege that defendants NTL, George S. Blumenthal, J. Barclay Knapp, John F. Gregg, and Stephen Carter violated *Section 10(b)* of the Securities Exchange Act of 1934, *Rule 10b-5* promulgated thereunder, and *Section 20(a)* of the Exchange Act. (Consol. Am. Class Action Compl. ("Compl.") PP1-24, 181-187 .) See generally *In re NTL, Inc. Sec. Litig. 347 F. Supp. 2d 15, 19-20 (S.D.N.Y. 2004)* (Kaplan, D.J.), familiarity with which is assumed.

Presently before the Court is the motion of lead plaintiffs Cheyne Fund LP and Fleck T.I.M.E., LP for class certification pursuant to *Rule 23 of the Federal Rules of Civil Procedure.* (Dkt. No. 69: 9/7/05 Pls. Class Cert. Br.) Defendants oppose the motion on the ground that both Cheyne and Fleck are subject to unique

defenses and therefore cannot satisfy the typicality requirement under *Rule 23(a)*. (Dkt. No. 75: Defs. Opp. Br.) The Court heard oral argument on February 10, 2006. (See 2/10/06 Conf. Tr.) The major issue on the motion is whether the named plaintiffs are "typical" or are subject to unique defenses based on loss causation issues.

For the reasons set forth below, plaintiffs' motion [*5] for class certification should be GRANTED. The Court finds that the class complaint adequately alleges that certain negative information about NTL leaked out during the class period, and thus the named plaintiffs can show loss causation and are not atypical.

FACTS

### The Allegations in Plaintiffs' Consolidated Amended Class Action Complaint n1

> n1 The Court summarizes the allegations in the Consolidated Amended Class Action Complaint (hereafter, the "complaint" or "Compl.") (Dkt. No. 21), without use of the introductory phrase, "Plaintiffs allege."

During the Class Period, NTL was "a corporation, based in New York, that provided telephone, cable television, Internet, and broadband communications and services to the United Kingdom and the Republic of Ireland, telecommunications services to Switzerland, France, and Australia, and made strategic investments in broadband cable operations in Germany and Sweden." (Compl. P2; see also id. P15.) See *In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 19 (S.D.N.Y. 2004)* [*6] (Kaplan, D.J.). "NTL's common stock successively traded in two efficient markets: (i) the Nasdaq National Market System ('NASDAQ'), until October 27, 2000, at which time NTL's common stock was delisted from that exchange; and (ii) the New York Stock Exchange ('NYSE'), until March 28, 2002, at which time NTL's common stock was delisted from that exchange." (Compl. P15(a).)

Between 1998 and 2000, NTL acquired eleven companies (id. P3), primarily through debt financing (id. P5). See *In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d at 19.* During that time, "NTL's gross debt increased from $

2006 U.S. Dist. LEXIS 5346, *6; Fed. Sec. L. Rep. (CCH) P93,696

8.9 billion to $ 15.1 billion." (Compl. P5.) Defendants made numerous positive statements to the investing public regarding NTL's growth strategy, suggesting "that they were exploiting NTL's scale to manage NTL's balance sheet to increase its flexibility and liquidity." (Id. P7.) Defendants also represented to the public that "through the successful integration of the acquired businesses, NTL would, among other things, increase its subscriber base, generate more revenue, produce better margins, and lower costs and expenses." (Id.)

In spite of defendants' positive public [*7] statements, NTL's larger scale did not result in functional efficiencies. (Id. P8.) To the contrary, NTL's growth strategy "caused a significant financial strain on the Company, thereby impairing its ability to service its debts." (Id. P8.) To mask the lack of progress in meeting their stated goals, "defendants were manipulating the size of NTL's customer base by, among other means, refusing to honor customer requests to terminate their accounts; acquiring new subscribers through false pretenses . . .; reconnecting customers whose accounts were previously terminated for non-payment; recruiting customers with poor credit histories by waiving credit requirements; and falsifying customer information to facilitate credit approval by frustrating the credit verification process." (Id.) Because of defendants' manipulation of subscriber growth numbers, NTL did not generate sufficient revenue to support its growth strategy. (Id.) As a result, this "impaired Defendants' capacity to refinance NTL's enormous debt at more favorable terms and/or access the capital markets to secure additional financing." (Id.) As Judge Kaplan described plaintiffs' claims:

> This for the most [*8] part is not a case involving outright falsehoods. Most of plaintiffs' allegations are to the effect that otherwise routine statements by NTL were materially misleading because defendants failed to disclose NTL's alleged internal problems in order to inflate NTL stock price. These alleged problems fall into two major categories, the allegations of which are premised entirely upon information and belief: (1) difficulties in integrating acquired companies, and (2) problems with the customer base. In addition, plaintiffs in a few instances allege that defendants themselves made affirmative statements or are responsible for affirmative misstatements or material omissions made in third-party analyst reports.

*In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d at 20* (fn. omitted).

During the Class Period, defendants made numerous positive public statements regarding the status of NTL's businesses, causing the stock to rise to artificially high prices. (Compl. PP72-74, 77, 85-88, 96-97, 99, 104, 113-14, 120, 140, 142-44, 146.) However, the underlying problems also were revealed in part to the public during the class period through various means, including reports on a public [*9] internet bulletin board about subscribers' frustrations with the company (id. PP64-67), n2 news reports (id. PP118, 147-49), and analysts' reports of downgrades on NTL's debt (id. P137: 8/21/01 Moody's report). NTL's stock declined throughout the class period, dropping from $ 48.0625 on August 5, 2000 (id.P 70), to $ 28.0625 on December 1, 2000 (id. P99), to $ 7.30 on July 19, 2001 (id. P126), to $ 1.60 on November 29, 2001 (id. P156). See *In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d at 20*. By April 2002, the stock had decreased to under a dollar and NTL filed for Chapter 11 protection on May 8, 2002. See *In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d at 19 & n.2.* n3

[*10]

n2 Paragraph 64, for example, states that "among the most common posts to [the wesite] nthellworld.com *during* the Class Period were . . ." (Id. P64, emphasis added.) Paragraph 67 notes that *"throughout the Class Period*, Defendants monitored the [nthell] website and were extremely displeased by it." (Id. P67, emphasis added.)

n3 NTL's reorganization plan was confirmed by the bankruptcy court on September 5, 2002 and became effective on January 10, 2003. Id. The bankruptcy court allowed plaintiffs to "pursue claims against NTL to the extent of its available insurance coverage only." Id.

Page 4

2006 U.S. Dist. LEXIS 5346, *10; Fed. Sec. L. Rep. (CCH) P93,696

Cheyne and Fleck "purchased the common stock and debt securities of NTL at artificially inflated or distorted prices during the Class Period, . . . and were damaged thereby." (Compl. P14.) Plaintiffs claim that defendants violated *Section 10(b)* of the Exchange Act and *Rule 10b-5* because they: "(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of NTL publicly traded securities during the Class Period." (Id. P183.) Cheyne and Fleck also claim [*11] that defendants Blumenthal, Knapp, Gregg and Carter (the "Individual Defendants") were controlling persons of NTL under *Section 20(a)* of the Exchange Act and caused NTL to engage in the above-described wrongful conduct. (Id. P187.)

**Procedural History**

Plaintiffs filed their Consolidated Amended Class Action Complaint on or about October 30, 2002. By Stipulation and Order dated July 31, 2002, Judge Kaplan appointed Cheyne and Fleck as "Lead Plaintiffs pursuant to *15 U.S.C. §§ 78u-4(a)(3)*, and the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Bernstein Liebhard & Lifshitz, LLP are appointed Lead Counsel pursuant to *15 U.S.C. § 78u-4(a)(3)(B)(iv)*." (Dkt. No. 19.)

Defendants moved to dismiss. (Dkt. Nos. 30-32, 39: Defs. Mot. to Dismiss Papers.) By Opinion & Order dated December 6, 2004, Judge Kaplan granted defendants' motion in part and sustained the complaint in part. *In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 38 (S.D.N.Y. 2004)*, familiarity with which is assumed. (Dkt. No. 46.)

Plaintiffs filed their original motion for class certification on May 10, 2005. (Dkt. Nos. 60-62.) On May 19, 2005, Judge [*12] Kaplan referred this case to me for decision of the class certification motion and supervision of discovery relating thereto. (Dkt. No. 63.) On June 27, 2005, plaintiffs withdrew their May 2005 motion without prejudice to renewal after discovery related to class certification. (Dkt. No. 67: 6/27/05 Stip. & Order.) Plaintiffs moved to renew their motion for

class certification on September 7, 2005. (Dkt. No. 69.)

**Lead Plaintiffs' Motion for Class Certification**

Lead Plaintiffs seek "an order that this case be maintained as a class action, on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the publicly traded securities of [NTL] on the open market (the 'Class') during the period August 10, 2000 and continuing through and including November 29, 2001 (the 'Class Period')." n4 (Dkt. No. 69: Pls. Class Cert. Br. at 1.) Defendants oppose the motion, asserting that class certification is improper because both Cheyne and Fleck are subject to unique defenses and therefore cannot satisfy the typicality requirement under *Rule 23(a)*. (Dkt. No. 75: Defs. Opp. Br. at 1-2.) The Court heard oral argument on February 10, 2006. (See 2/10/06 Conf. [*13] Tr.)

> n4 "Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants . . ., any subsidiary or affiliate of NTL and the directors and senior officers of NTL or its affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person." (Pls. Class Cert. Br. at 1.)

**ANALYSIS**

**I. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED**

The Second Circuit requires a liberal, rather than restrictive, interpretation of *Rule 23 of the Federal Rules of Civil Procedure*, particularly in securities cases. See, e.g., *Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997)* ("'*Rule 23* is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility. . . .'"); accord, e.g., *In re Natural Gas Commodities Litig., 231 F.R.D. 171, 178 (S.D.N.Y. 2005)*; [*14] *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 178-79 (S.D.N.Y. 2005)*; *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 90 (S.D.N.Y. 2004)*; *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.) ("The

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 6 of 34

Page 5
2006 U.S. Dist. LEXIS 5346, *14; Fed. Sec. L. Rep. (CCH) P93,696

Second Circuit has announced its preference for class certification in securities fraud litigation, and has directed district courts to liberally interpret *Rule 23* class certification requirements.") (citing cases); *5 Moore's Federal Practice § 23.03* (2005). Nevertheless, district courts must undertake a "rigorous analysis" to ensure that *Rule 23*'s requirements have been satisfied. *Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982)*; accord, e.g., *Heerwagen v. Clear Channel Communs., F.3d , 435 F.3d 219, 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *4 (2d Cir. Jan. 10, 2006)*; *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.), 280 F.3d 124, 134-35 (2d Cir. 2001)*, cert. denied, *536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002)*; [*15] *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 179.*

"In ruling on class certification, a district court may not simply accept the allegations of plaintiffs' complaint as true." *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 179*; accord, e.g., *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. at 91-93.* "Sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. v. Falcon, 457 U.S. at 160, 102 S. Ct. at 2372*; accord, e.g., *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 179*; *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. at 91.* "In deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class." *Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999)* (citing *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 2152, 40 L. Ed. 2d 732 (1974)*), cert. denied, *529 U.S. 1107, 120 S. Ct. 1959, 146 L. Ed. 2d 791 (2000)*; accord, e.g., [*16] *Heerwagen v. Clear Channel Commc'ns, 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *4*; *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 58 (2d Cir. 2000)*; *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. at 93*; *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 154-55 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.). "In order to pass muster, plaintiffs - who have the burden of proof at class certification - must make 'some showing' [that the class comports with *Rule 23*]. That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint." *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. at 93*; accord, e.g., *Heerwagen v. Clear Channel Commc'ns, 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *9-10*; *Fogarazzo v. Lehman Bros., Inc., 232*

*F.R.D. at 179.*

"In order to maintain a [securities] class action, Plaintiffs must first establish that they have a valid claim with respect to the shares that they purchased. If the named plaintiffs have no cause of action in [*17] their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 2005 U.S. Dist. LEXIS 19506, 05 Civ. 1898, 2005 WL 2148919 at *4 (S.D.N.Y. Sept. 6, 2005).*

### A. The Requirements of *Rule 23(a)*

*Rule 23(a)* sets forth the requirements for class certification: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims . . . of the representative parties are typical of the claims . . . of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)*. n5 "A class must satisfy all four requirements [of *Rule 23(a)*] before it may be certified under *Rule 23*." *5 Moore's Federal Practice § 23.20* at 23-46 (2005).

> n5 See generally, e.g., *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.), 280 F.3d 124, 132-33 (2d Cir. 2001)*, cert. denied, *536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002)*; *Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 155-56 & n.1 (2d Cir. 2001)*, cert. denied, *535 U.S. 951, 122 S. Ct. 1349, 152 L. Ed. 2d 251 (2002)*; *Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999)*, cert. denied, *529 U.S. 1107, 120 S. Ct. 1959, 146 L. Ed. 2d 791 (2000)*; *Marisol A. v. Giuliani, 126 F.3d 372, 375-76 & n.3 (2d Cir. 1997)*; *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 152 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 169 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.).

[*18]

### 1. Numerosity

*Rule 23(a)* requires that the class be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1).* "Joinder of all members need not be impossible, but only impracticable in the sense that joinder would 'needlessly complicate and hinder efficient resolution of the litigation.'" *In re Avon Sec. Litig., 1998 U.S. Dist. LEXIS 18642, 91 Civ. 2287, 1998 WL 834366 at *5 (S.D.N.Y. Nov. 30, 1998);* accord, e.g., *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 179 (S.D.N.Y. 2005); In re Indep. Energy Holdings PLC Sec. Litig., 210 F.R.D. 476, 479 (S.D.N.Y. 2002);* see generally 5 *Moore's Federal Practice § 23.22[1].*

"Although precise calculation of the number of class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement." *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 179;* see also, e.g., *Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997);* [*19] *Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir.)* ("numerosity is presumed at a level of 40 members"), cert. denied, *515 U.S. 1122, 115 S. Ct. 2277, 132 L. Ed. 2d 281 (1995); Korn v. Franchard Corp., 456 F.2d 1206, 1209 (2d Cir. 1972); The Presbyterian Church v. Talisman Energy, Inc., 226 F.R.D. 456, 466 (S.D.N.Y. 2005)* ("Numerosity is presumed when a class consists of forty or more members."); *In re Avon Sec. Litig, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366 at *5* ("In general, 'numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.'"); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.) (certifying class of "several thousand investors"); *Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992);* 5 *Moore's Federal Practice § 23.22[1][b].*

Plaintiffs claim that during the Class Period, "NTL had more than 276 million shares of stock outstanding." (Pls. Class Cert. Br. at 8.) In addition, "NTL common stock was traded [*20] on the NYSE and the NASDAQ and was held by thousands of shareholders geographically located throughout the United States and abroad." (Id.; see also Compl. P15(a).) "In securities litigation, courts generally assume that the numerosity requirement is satisfied for classes of sellers or buyers of nationally traded securities . . ." 5 *Moore's Federal Practice § 23.22[3]* at 23-72. Defendants do not dispute that the proposed class is sufficiently numerous and that joinder would be impractical. (2/10/06 Oral Arg. Tr. at 19-20; see generally Dkt. No. 75: Defs. Opp. Br.) Plaintiffs plainly satisfy the *Rule 23(a)(1)* numerosity requirement.

### 2. Commonality

Commonality requires a showing that "there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2).* "'The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.'" *Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 155 (2d Cir. 2001)* (quoting *Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir.1997)),* cert. denied, *535 U.S. 951, 122 S. Ct. 1349, 152 L. Ed. 2d 251 (2002).* [*21] n6 This requisite "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Kamean v. Local 363, International Brotherhood of Teamsters, 109 F.R.D. 391, 394 (S.D.N.Y.),* appeal dismissed, *833 F.2d 1002 (2d Cir. 1986),* cert. denied, *481 U.S. 1024, 107 S. Ct. 1911, 95 L. Ed. 2d 517 (1987).* n7 The "commonality requirement [is] satisfied if the class shares even one common question of law or fact," and "factual differences in the claims of the class do not preclude a finding of commonality." 5 *Moore's Federal Practice § 23.23[2];* accord, e.g., *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 153.*

> n6 See also, e.g., *In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir.1987),* cert. denied, *484 U.S. 1004, 108 S. Ct. 695, 98 L. Ed. 2d 648 (1988); Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 153 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.).

[*22]

> n7 Accord, e.g., *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 153; In re Towers Fin. Corp.*

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 8 of 34

Page 7

2006 U.S. Dist. LEXIS 5346, *22; Fed. Sec. L. Rep. (CCH) P93,696

*Noteholders Litig., 177 F.R.D. at 170; In re Chase Manhattan Corp. Sec. Litig, 1992 U.S. Dist. LEXIS 6896, 90 Civ. 6092, 1992 WL 110743 at *1 (S.D.N.Y. May 13, 1992).*

"The commonality requirement has been applied permissively in securities fraud litigation." *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005)*; accord, e.g., *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004)*. "In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 180*; accord, e.g., *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. at 87*. "This "common question" requirement has been characterized as a 'low hurdle.'" *In re Natural Gas Commodities Litig., 231 F.R.D. 171, 180 (S.D.N.Y. 2005)* (citing cases); [*23] see also 5 *Moore's Federal Practice § 23.23[2]* at 23-74.

Plaintiffs state that the common legal and factual issues include whether:

> (i) defendants violated the Securities Exchange Act of 1934; (ii) defendants omitted and/or misrepresented material facts about NTL, its subscribers, operations, and financial condition; (iii) defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (iv) defendants knew or recklessly disregarded that their statements were materially false and misleading; (v) the prices of NTL's publicly-traded securities were artificially inflated; and (vi) Lead Plaintiffs and the Class sustained damages, and, if so, the appropriate measure of damages.

(Dkt. No. 69: Pls. Class Cert. Br. at 10; see Compl. P27.) Defendants do not dispute that plaintiffs' claims share common questions of law and fact. (2/10/06 Oral Arg. Tr. at 19-20; see generally Dkt. No. 75: Defs. Opp. Br.)

Plaintiffs clearly satisfy the *Rule 23(a)(2)*

commonality requirement.

### 3. Typicality

Typicality under *Rule 23(a)* "requires [*24] that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)* (quoting *In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992))*. n8 "The commonality and typicality requirements of *Rule 23(a)* tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. v. Falcon, 457 U.S. 147, 158 n.13, 102 S. Ct. 2364, 2371 n.13, 72 L. Ed. 2d 740 (1982)*. n9

> n8 Accord, e.g., *Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 155 (2d Cir. 2001)*, cert. denied, *535 U.S. 951, 122 S. Ct. 1349, 152 L. Ed. 2d 251 (2002)*; *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.).

[*25]

> n9 Accord, e.g., *Marisol A. v. Giuliani, 126 F.3d at 376*; *Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999)*, cert. denied, *529 U.S. 1107, 120 S. Ct. 1959, 146 L. Ed. 2d 791 (2000)*; *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 155*; *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. at 170*.

> n10 Accord, e.g., *In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 95 (S.D.N.Y. 2004)*; *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 156*;

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 9 of 34

Page 8

2006 U.S. Dist. LEXIS 5346, *25; Fed. Sec. L. Rep. (CCH) P93,696

*Koppel v. 4987 Corp., 191 F.R.D. 360, 365 (S.D.N.Y. 2000); 5 Moore's Federal Practice § 23.24[5].*

"'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000).* [*26] n10 "However, 'the rule barring certification of plaintiffs subject to unique defenses is not rigidly applied in this Circuit'; it has generally been applied only where a full defense is available against an individual plaintiff's action." *Koppel v. 4987 Corp., 191 F.R.D. at 365* (quoting *In re Frontier Ins. Group Secs. Litig., 172 F.R.D. 31, 41 (E.D.N.Y. 1997)).* The unique defense rule is "intended to protect [the] plaintiff class - not to shield defendants from a potentially meritorious suit." *Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200-01 (S.D.N.Y. 1992);* accord, e.g., *Koppel v. 4987 Corp., 191 F.R.D. at 365.* "It is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members." *Trief v. Dun & Bradstreet Corp., 144 F.R.D. at 200-01;* accord, e.g., *Koppel v. 4987 Corp., 191 F.R.D. at 365; In re Frontier Ins. Group Inc. Sec. Litig., 172 F.R.D. at 41.* "For example, the possibility that proof of injury might [*27] require separate evaluations of the artificiality of a commodities [or stock] price at the moments affecting each of the class members need not defeat class certification." *In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 280 (S.D.N.Y. 2003).*

Lead Plaintiffs Cheyne and Fleck assert that their claims are typical of those of the class because "they arise out of the same uniform pattern of NTL's conduct, including the dissemination of materially false and misleading statements about NTL's business operations and financial condition." (Dkt. No. 69: Pls. Class Cert. Br. at 12.) Additionally, Cheyne and Fleck allege that, similar to the rest of the proposed class, they have been financially injured as a result of the defendants' actions. (Id.)

Defendants challenge class certification solely on the basis that Cheyne and Fleck both are purportedly subject to unique defenses that destroy their typicality under *Rule 23(a).* (Dkt. No. 75: Defs. Opp. Br. at 6.) Defendants claim that Cheyne "is subject to unique defenses concerning loss causation because it sold all of its NTL securities long before the alleged truth about NTL's financial condition was revealed and, thus, [*28] its claims are atypical of the putative class." (Id.) Defendants argue that Fleck is subject to two different unique defenses which destroy typicality under *Rule 23(a).* (Defs. Opp. Br. at 6.) First, Defendants state that Fleck cannot prove loss causation because it "sold all of its NTL securities before November 14, 2001, the latest date supported by the factual allegations of the Complaint with respect to the end point for the class period." (Id.) Second, because Fleck was a "net-seller of NTL securities during the class period," defendants claim that Fleck "therefore does not have standing to assert the class claims." (Id.)

### a. Loss Causation

"To state a claim for relief under *§ 10(b)* and *Rule 10b-5,* plaintiffs must allege that [defendants] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale or securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir.)* (quoting *In re IBM Corp. Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)),* [*29] cert. denied, *126 S. Ct. 421, 163 L. Ed. 2d 321 (2005);* see also, e.g., *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 161 L. Ed. 2d 577, 125 S. Ct. 1627, 1631 (2005).* To prove proximate cause, "a securities-fraud plaintiff 'must prove both transaction and loss causation.'" *Lentell v. Merrill Lynch & Co., 396 F.3d at 172* (quoting *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994),* cert. denied, *513 U.S. 1079, 115 S. Ct. 728, 130 L. Ed. 2d 632 (1995));* accord, e.g., *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 196-97 (2d Cir. 2003); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001); Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992).* Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d at 197;* accord, e.g., *Lentell v. Merrill Lynch & Co., 396 F.3d at 172; Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250*

Page 9

2006 U.S. Dist. LEXIS 5346, *29; Fed. Sec. L. Rep. (CCH) P93,696

*F.3d at 95-96*; [*30] *15 U.S.C. § 78u-4(b)(4)*.

To establish loss causation in a case involving allegations of material misrepresentations and omissions, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d at 95*; accord, e.g., *Lentell v. Merrill Lynch & Co., 396 F.3d at 173*; see also, e.g., *Dura Pharm., Inc. v. Broudo, 125 S. Ct. at 1633-34*. It is not enough for a plaintiff to merely allege that, at the time of plaintiff's purchase of a security, the price of that security was artificially inflated as a result of a defendant's misrepresentation. *Dura Pharm., Inc. v. Broudo, 125 S. Ct. at 1633-34*; *Lentell v. Merrill Lynch & Co., 396 F.3d at 174*; *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d at 198*. n11 Instead, a plaintiff "may do one of two things to sufficiently allege loss causation. 'Where the alleged misstatement conceals a condition or event which then occurs and causes the [*31] plaintiff's loss,' a plaintiff may plead that it is 'the materialization of the undisclosed condition or event that causes the loss.' Alternatively, a plaintiff may identify particular 'disclosing events' that reveal the false information, and tie dissipation of artificial price inflation to those events." *Catton v. Def. Tech. Sys., Inc., 2006 U.S. Dist. LEXIS 205, 05 Civ. 6954, 2006 WL 27470 at *5 (S.D.N.Y. Jan. 3, 2006)* (quoting *Liu v. Credit Suisse First Boston Corp. (In re Initial Pub. Offering Secs. Litig.), 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005))*. n12

> n11 "If the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d at 197*; accord, e.g., *Lentell v. Merrill Lynch & Co., 396 F.3d at 174*; see also, e.g., *Dura Pharm., Inc. v. Broudo, 125 S. Ct. at 1631-32*.
>
> n12 Accord, e.g., *In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 444 (S.D.N.Y. 2005)*; *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 2005 U.S. Dist. LEXIS 19506, 05 Civ. 1898, 2005 WL 2148919 at *6 (S.D.N.Y. Sept. 6, 2005)*; see, e.g., *In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 305-06*

*(S.D.N.Y. 2005)* (Kaplan, D.J.).

[*32]

The Complaint alleges that defendants made numerous positive statements to the public throughout the Class Period regarding NTL's subscriber numbers and ability to service its debt obligations, when, in fact, NTL had very serious subscriber retention problems, which in turn led to a lack of revenue with which to service the debt obligations. (See pages 3-4 above.) The Complaint also alleges that there were several "disclosing events" throughout the class period, which gradually alerted investors to the truth about NTL's underlying problems. (See page 4 above.) At least one or more of these disclosing events occurred prior to Cheyne's final sale of NTL securities on July 16, 2001, and several of these disclosing events occurred prior to Fleck's final sale of NTL securities on November 30, 2001. (See Compl. PP64-67, 137, 147-49; see page 4 above.) Plaintiffs have linked these gradual disclosing events to a slow dissipation in the value of NTL's stock, demonstrating that throughout the Class Period, NTL's stock dropped from a high of $ 48.0625 on August 5, 2000 (id. P70), to $ 1.60 on November 29, 2001 (id. P156). As a result of this decline, Cheyne claims losses [*33] of more than $ 1.8 million and Fleck claims losses of more than $ 1.4 million. (Dkt. No. 21: Compl. Exs.: Cheyne & Fleck Share Charts.)

Because Lead Plaintiffs have made "some showing" that these disclosing events slowly revealed the false information regarding NTL and have tied some if not all of the dissipation in the value of NTL's stock to those events, they have adequately plead loss causation. n13 E.g., *In re Bearingpoint, Inc. Sec. Litig., No. Civ. A. 1:05CV454, 232 F.R.D. 534, 2006 U.S. Dist. LEXIS 1718, 2006 WL 141667 (E.D. Va. Jan. 17, 2006)* ("Although in-and-out traders often have no associated damage because they purchased and sold at prices with the same artificial inflation, this is not always the case. In cases where, as here, there are multiple disclosures, in-and-out traders may well be able to show a loss. Moreover, it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation.") (citations omitted); see, e.g., *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d at 197-98* [*34] (loss causation properly

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 11 of 34

Page 10

2006 U.S. Dist. LEXIS 5346, *34; Fed. Sec. L. Rep. (CCH) P93,696

alleged where complaint suggested that defendants artificially inflated the stock prices of the companies, sold their own stock in those companies at high profits, and thereafter allowed the stock prices to decline, i.e., a "pump and dump" scheme); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d at 96-98* (loss causation properly alleged where complaint asserted that misrepresentations in a public announcement regarding ability to manage complex debt loads led plaintiffs to purchase the company's securities at artificially high prices, and company's eventual liquidity problems resulting from the debt loads caused plaintiffs' losses); *In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d at 453* (plaintiffs sufficiently plead loss causation where complaint alleged that pharmaceutical company made false or misleading statements regarding FDA approval of a new product, which caused artificial inflation of stock, followed by dissipation of that inflation after corrective disclosures); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 2005 U.S. Dist. LEXIS 19506, 2005 WL 2148919 at *12* (plaintiff adequately [*35] plead loss causation where complaint alleged that a "risk that was concealed by the defendants materialized in a foreseeable chain of events," that is, defendants conceded that "the collateral pool contained a substantial number of high risk loans," the "concealed risk materialized when the collateral pool experienced high delinquency rates," the company announced it wrote off the losses and as a result the value of plaintiff's investment declined.). n14

n13 Defendants claim that the complaint appeared to allege a single curative disclosure in November 2001, rather than "leakage" disclosure during the class period. (See 2/10/06 Oral Arg. Tr. at 3-12, citing, e.g., Compl. PP9, 22, 149, and the heading between PP154-55.) The Court believes the complaint adequately can be read to allege "leakage" during the class period. (See page 4 above.) The Court notes that the complaint was filed in October 2002, several years before the Supreme Court's 2005 decision in Dura, and its progeny, clarified the ways that loss causation needed to be proved. Plaintiffs, however, will be held to their current interpretation of their complaint, and will be required to prove (at summary

[*36]

judgment or at trial) "leakage" during the Class Period, as opposed to sudden revelation of the negative information in November 2001.

n14 See also, e.g., *Stumpf v. Garvey (In re TyCom Ltd. Sec. Litig.), 2005 U.S. Dist. LEXIS 19154, No. 03-CV-1352, 02-MDL-1335, 2005 WL 2127674 at *12-13 (D.N.H. Sept. 2, 2005)* (loss causation properly alleged where plaintiffs claimed that defendants made fraudulent misrepresentations regarding market demand for their product, plaintiffs purchased the company's stock at artificially high prices, and suffered losses when the company's stock declined over time as a result of a series of partial disclosures concerning reduced market demand); *In re Parmalat Sec. Litig., 375 F. Supp. 2d at 306-07* (loss causation properly alleged where plaintiffs claimed that their loss was caused by misrepresentations in the company's financial statements that significantly understated the company's debt and overstated its revenue and net assets); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., 2005 U.S. Dist. LEXIS 376, No. 04 C 1107, 2005 WL 61480 at *5 (N.D. Ill. Jan. 10, 2005)* (loss causation properly alleged where plaintiff claimed that information regarding defendants' price misrepresentations submissions slowly became public through partial disclosures, and company's stock price gradually dropped as the partial disclosures became public); *Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 244 (D. Mass. 2004)* (plaintiff sufficiently plead loss causation where she alleged that she purchased defendant company's stock at artificially high price resulting from fraudulent misrepresentations, and price fell as the truth slowly emerged to the market); *Danis v. USN Communs., Inc., 73 F. Supp.*

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 12 of 34

Page 11

2006 U.S. Dist. LEXIS 5346, *36; Fed. Sec. L. Rep. (CCH) P93,696

2d 923, 943 (N.D. Ill. 1999) (loss causation sufficiently plead where plaintiffs claimed that "the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented").

[*37]

Lead Plaintiffs therefore are not subject to a unique defense related to loss causation sufficient to destroy typicality for purposes of class certification. n15

> n15 Indeed, defendants' opposition to class certification on this ground essentially is a motion to dismiss on loss causation grounds. The Complaint adequately alleges the named plaintiffs' loss causation, and loss causation applicable to the class. The Second Circuit "prohibits weighing evidence in connection with *Rule 23* determinations to the extent those determinations are effectively identical to merits issues." *Heerwagen v. Clear Channel Commc'ns, No. 04-0699-CV,   F.3d   , 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *11 (2d Cir. Jan. 10, 2006).*

**b. Fleck's Sales During the Class Period**

Defendants assert that Fleck is an atypical lead plaintiff because it was a "net-seller" of NTL securities during the Class Period, and that therefore it suffered no injury and instead benefitted from the alleged fraud. (Dkt. No. 75: Defs. [*38] Opp. Br. at 15-17.) Assuming arguendo for purposes of this test that the class period runs, as defendants contend, from August 10, 2000 to only November 14, 2001, Fleck has suffered a loss, not a "benefit" from the alleged fraud. Indeed, at oral argument defendants conceded that their net loss argument is based on their view - which the Court is rejecting - that all declines in the stock price from the beginning of the class period until NTL's November 14, 2001 Form 10Q were caused by external market forces, and that if the "leakage" theory of causation is applicable, Fleck is able

to show loss causation, at least at this stage of the case. (See 2/10/06 Oral Arg. Tr. at 18-19.) As noted above, the Court has concluded that the complaint adequately alleges the "leakage" theory. The Court therefore need not further analyze and discuss this issue. Nevertheless, the Court will briefly further discuss Fleck's "net seller" losses.

Fleck purchased a total of 162,790 shares during "defendants' class period." (See Defs. Opp. Br. at 12; Dkt. No. 74: Momborquette Aff. Ex. B: Fleck Dep. Ex. 12 at 1; Compl. Ex.: Fleck Share Chart at 1-2.) Fleck's purchases of the 162,790 shares during [*39] "defendants' class period" cost $ 2,718,544.10. (Compl. Ex.: Fleck Share Chart.) Fleck sold 218,500 shares during the same period (id.), making it a "net seller" of 55,710 shares (those shares were purchased by Fleck before the "defendants' class period"). Even though Fleck sold more shares than it purchased, Fleck received only $ 1,434,331.50 for the 218,500 shares sold. (Id.) Thus, it lost $ 1,284,212.60 during the class period (id.), even if the pre-period shares sold during the period had a $ 0 basis (which of course they did not). n16

> n16 Lead Plaintiffs have properly used the "last-in, first-out" ("LIFO") accounting method rather than the "first-in, first-out" ("FIFO") accounting method to calculate their losses. Courts "have preferred LIFO and have 'generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases.'" *In re Espeed, Inc. Secs. Litig., 232 F.R.D. 95, at 101* (quoting *In re Cable & Wireless PLC Sec. Litig., 217 F.R.D. 372, 378-79 (E.D. Va. 2003)*; accord, e.g., *SEC v. Bear, Stearns & Co., 2005 U.S. Dist. LEXIS 6683, 03 Civ. 2937, 2005 WL 217018 at *7 (S.D.N.Y. Jan. 31, 2005)* (using LIFO to calculate plaintiffs' losses in securities case). "Under the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an off-set of class-period gains from a plaintiff's ultimate losses." *Thompson v. Shaw Group Inc., 2004 U.S. Dist. LEXIS 25641, No. Civ. A. 04-1685, 2004 WL 2988503 at *4*

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 13 of 34

Page 12

2006 U.S. Dist. LEXIS 5346, *39; Fed. Sec. L. Rep. (CCH) P93,696

*(E.D. La. Dec. 14, 2004).*

[*40]

Some of that loss may be attributable to general stock market declines or decreases in NTL's stock price unrelated to the alleged fraud. The Court cannot determine how much of Fleck's loss is attributable to the alleged fraud and how much is attributable to other factors for which defendants are not liable. (See discussion at pages 18-21 above.) But this same question will have to be determined for the class as a whole - it is not unique to Fleck (or Cheyne).

Defendants' "net seller" argument as to Fleck assumed that until the November 14, 2001 Form 10Q, all of the decline in NTL's share price was caused solely by market factors unrelated to the alleged fraud, so that Fleck was not harmed at all by the alleged fraud. (See 2/10/06 Oral Arg. Tr. at 18.) If plaintiffs' claims were based solely on a single triggering event (whether November 14 or November 29, 2001), defendants' argument would be valid. Plaintiffs, however, allege several disclosing events throughout the class period that gradually alerted investors to the truth about NTL. (See page 4 above.) Accordingly, Fleck's situation is typical of others in the class - a need to show the drop in NTL's share price [*41] during the class period was not attributable to general factors but to "dribbled" disclosures or "leakage" of truthful information regarding NTL's prior misrepresentations and/or omissions.

Defendants have not shown that Fleck's net sales of NTL stock destroys its typicality for the purposes of class certification.

Lead Plaintiffs have established typicality.

**4. Adequacy of Representation**

Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. "Under *Rule 23(a)(4)*, adequacy of representation is measured by two standards. First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. Second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992)*; accord, e.g., *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)*; *Marisol A. v. Giuliani, 126 F.3d 372,*

*378 (2d Cir. 1997).* n17 As a result of the 2003 amendments [*42] to the Federal Rules of Civil Procedure, however, the issue of appropriate class counsel is guided by *Rule 23(g)* rather than *Rule 23(a)(4)*. See 2003 Advisory Comm. Notes to *Rule 23* ("*Rule 23(a)(4)* will continue to call for scrutiny of the proposed class representative, while [*Rule 23(g)*] will guide the court in assessing proposed class counsel as part of the certification decision."); accord, e.g., *Jones v. Ford Motor Credit Co., 2005 U.S. Dist. LEXIS 5381, 00 Civ. 8330, 2005 WL 743213 at *18 (S.D.N.Y. Mar. 31, 2005)*; see *5 Moore's Federal Practice § 23.25[3]*. The Court nonetheless will briefly discuss both here.

> n17 See, e.g., *In re Natural Gas Commodities Litig., 231 F.R.D. 171, 185 (S.D.N.Y. 2005)*; *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005)*; *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 156 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 170-71 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.); see generally *5 Moore's Federal Practice § 23.25.*

[*43]

Class representatives cannot satisfy the adequacy requirement if they have "'so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d at 61* (quotation omitted); accord, e.g., *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 181*; see *5 Moore's Federal Practice § 23.25[2][c]*. "However, it is well established that 'in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected.'" *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 181* (quoting *In re AM Int'l, Inc. Sec. Litig., 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985)*); see *5 Moore's Federal Practice § 23.25[2][c][ii]*. "In determining the adequacy of counsel, the court looks beyond reputation built upon past practice [*44] and examines counsel's competence displayed by present performance." *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 156*

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 14 of 34

Page 13

2006 U.S. Dist. LEXIS 5346, *44; Fed. Sec. L. Rep. (CCH) P93,696

(internal quotations omitted); accord, e.g., *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. at 171; *In re Frontier Ins. Group Secs. Litig.*, 172 F.R.D. 31, 44 (E.D.N.Y. 1997).

Defendants do not challenge the adequacy of the Lead Plaintiffs, except as to the typicality issue discussed above. (See 2/10/06 Oral Arg. Tr. at 19-20; see generally Dkt. No. 75: Defs. Opp. Br.) Defendants also do not challenge the adequacy of class counsel. (See id.) The Court has closely supervised extensive discovery practice in this action; plaintiffs' counsel have shown that they are qualified and competent and have the ability to represent the class. n18

> n18 *Rule 23(g)* requires that the Court appoint class counsel based on a specific set of criteria. *Fed. R. Civ. P. 23(g)*. In appointing class counsel, the Court "must consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. at 182; accord, e.g., *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 90 (S.D.N.Y. 2004). Lead Plaintiffs' chosen counsel, the law firms of Bernstein Liebhard & Lifshitz, LLP and Milberg Weiss Bershad & Schulman LLP, are adequate to represent the interests of the class based on these criteria. Judge Kaplan approved those firms as lead counsel by stipulation and order dated July 31, 2002. (Dkt. No. 19.) Defendants have not sought to re-visit this issue.

[*45]

**B. The Requirements of *Rule 23(b)***

"In addition to satisfying *Rule 23(a)*'s prerequisites, parties seeking class certification must show that the action is maintainable under *Rule 23(b)(1), (2),* or *(3)*." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117

S. Ct. 2231, 2245, 138 L. Ed. 2d 689 (1997). n19

> n19 Accord, e.g., *Heerwagen v. Clear Channel Commc'ns*, No. 04-0699-CV, F.3d , 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *4 (2d Cir. Jan. 10, 2006); *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280 F.3d 124, 133 (2d Cir. 2001), cert. denied, 536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002); *Presbyterian Church v. Talisman Energy, Inc.*, 226 F.R.D. 456, 465 (S.D.N.Y. 2005); *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 152 (S.D.N.Y. 2002) (Berman, D.J. & Peck, M.J.); 5 *Moore's Federal Practice § 23.40[1]*.

Plaintiffs here [*46] seek certification under *Rule 23(b)(3)*. (Dkt. No. 69: Pls. Class Cert. Br. at 7, 20-24.) *Rule 23(b)(3)* states that: "An action may be maintained as a class action if the prerequisites of [*Rule 23(a)*] are satisfied, and in addition . . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)*; see generally *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 615-16, 117 S. Ct. at 2246; *Heerwagen v. Clear Channel Commc'ns*, 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *4; 5 *Moore's Federal Practice § 23.44*.

**1. Predominance**

"In order to meet the predominance requirement of *Rule 23(b)(3)*, a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), [*47] cert. denied, 536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002); accord, e.g., *Heerwagen v. Clear Channel Commc'ns*, No. 04-0699-CV, F.3d , 2006 U.S. App. LEXIS 524, 2006 WL 45859 at *4 (2d Cir. Jan. 10, 2006); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181-82 (S.D.N.Y. 2005). Ultimately, "the *Rule 23(b)(3)* predominance inquiry tests whether proposed classes are sufficiently

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 15 of 34

Page 14

2006 U.S. Dist. LEXIS 5346, *47; Fed. Sec. L. Rep. (CCH) P93,696

cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S. Ct. 2231, 2249, 138 L. Ed. 2d 689 (1997).* n20 "Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem Prods., Inc. v. Windsor, 521 U.S. at 625, 117 S. Ct. at 2250;* accord, e.g., *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. at 182.*

> n20 Accord, e.g., *Heerwagen v. Clear Channel Commc'ns, 2006 U.S. App. LEXIS 524, 2006 WL 45859 at \*4; Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 157 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 171 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.).

[*48]

"Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d at 139;* accord, e.g., *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 157.* "When determining whether common questions predominate courts 'focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.'" *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 114 F.R.D. 48, 52 (S.D.N.Y. 1987);* accord, e.g., *Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. at 158;* see 5 *Moore's Federal Practice § 23.45[2][a].*

Here, plaintiffs' class claims are based on defendants' alleged violations of *Section 10(b)* and *20(a)* of the Exchange Act and *Rule 10b-5* through misrepresentations and/or omissions to the market as a whole. (See page 5 above.) Defendants do not contest predominance. (See 2/10/06 Oral Arg. Tr. at 19-20; see generally Dkt. No. 75: Defs. Opp. [*49] Br.) The *Rule 23(b)(3)* predominance requirement is satisfied here.

**2. Superiority**

*Rule 23(b)(3)* sets forth a non-exclusive list of factors pertinent to the Court's inquiry into the superiority of a class action:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

*Fed. R. Civ. P. 23(b)(3)*; see generally 5 *Moore's Federal Practice § 23.46[2][a].*

The Court is not aware of any individual plaintiffs who are interested in "individually controlling the prosecution . . . of separate actions," or of any pending litigation by any class member against defendants, except the Gordon action (02 Civ. 7377) already consolidated with this action. The interests of justice will be well served by [*50] resolving the common disputes of potential class members in one forum. Judge Kaplan and I are familiar with the intricacies of this litigation, having ruled on various motions and having managed discovery. The action is manageable as a class action. See, e.g., *In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140-41 (2d Cir. 2001)* (failure to certify under *(b)(3)* is "disfavored and should be the exception rather than the rule") (internal quotations omitted), cert. denied, *536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002); Korn v. Franchard Corp., 456 F.2d 1206, 1214 (2d Cir. 1972); Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir.1968),* cert. denied, *395 U.S. 977, 89 S. Ct. 2131, 23 L. Ed. 2d 766 (1969); Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 158 (S.D.N.Y. 2002)* (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 172 (S.D.N.Y. 1997)* (Knapp, D.J. & Peck, M.J.). "The Court is not convinced that any unique manageability problems exist in this proceeding . . ." *In re Natural Gas Commodities Litig., 231 F.R.D. 171, 185 (S.D.N.Y. 2005).* [*51] Defendants do not contest the superiority of a class action to individual actions. (2/10/06 Oral Arg. Tr. at 19-20; see generally Defs. Opp. Br.) A class action is the superior method of adjudication

2006 U.S. Dist. LEXIS 5346, *51; Fed. Sec. L. Rep. (CCH) P93,696

here.

## C. Defendants' Request to Change the Class Period End Date Should Be Denied

Defendants assert that the end of the Class Period should be November 14, 2001, rather than Lead Plaintiffs' proposed end date of November 29, 2001. (Dkt. No. 75: Defs. Opp. Br. at 12-14.) Defendants argue that NTL's last corrective disclosure was its November 14, 2001 Form 10-Q; Moody's November 29, 2001 downgrade of NTL's rating was not a corrective disclosure because it did not introduce any more information about NTL to the public; and therefore the end date of the Class Period should be November 14, 2001. (Id. at 14.) Plaintiffs claim that there is no factual evidence demonstrating that the Moody's downgrade was based only on previously-released information regarding NTL in the Form 10Q, and suggest that the downgrade may have been based partially on confidential corporate information made available only to debt rating agencies such as Moody's, and therefore that the November 29, 2001 downgrade [*52] may have been a corrective disclosure. (Dkt. No. 77: Pls. Class Cert. Reply Br. at 9.) Plaintiffs also argue that the information released in the November 14, 2001 Form 10Q may not have been adequately "translated" for the market until the Moody's downgrade of NTL's rating. (Pls. Class Cert. Reply Br. at 9-10.)

"While the duration of the class period should be based on something more than the nonfrivolous allegations set forth in the complaint, this Court need not address the merits of the Plaintiff's individual claim in order to determine the period." *In re Oxford Health Plans, Inc., 191 F.R.D. 369, 378 (S.D.N.Y. 2000)*; accord, e.g., *Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir.)*, cert. denied, *459 U.S. 838, 103 S. Ct. 86, 74 L. Ed. 2d 80 (1982)*; *Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993)*. The Class Period properly ends "when the full truth has been disclosed to the market *and* the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security." *In re Oxford Health Plans, Inc., 191 F.R.D. at 378* [*53] (emphasis in original); accord, e.g., *Dorchester Investors v. Peak Trends Trust, 2002 U.S. Dist. LEXIS 3067, 99 Civ. 4696, 2002 WL 272404 at *5 (S.D.N.Y. Feb. 26, 2002)*. "[A] class period should not be cut off if questions of fact remain as to whether the

disclosures completely cured the market." *In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 307 (S.D.N.Y. 2003)*; see *Sirota v. Solitron Devices, Inc., 673 F.2d at 572*.

Factual questions clearly remain as to whether the November 14, 2001 Form 10Q alone or in combination with the November 29, 2001 Moody's disclosure completely cured the market. This Court accepts at this time, subject to later modification, the Class Period as set forth by Lead Plaintiffs, in preference to the shorter class period suggested by defendants, which would require this Court to adjudicate in advance of trial when the market had digested fully NTL's corrective disclosure.

## CONCLUSION

For the reasons set forth above, the Court should certify the class.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of the Federal Rules of Civil Procedure* [*54] , the parties shall have ten (10) days from service of this Report to file written objections. See also *Fed. R. Civ. P. 6*. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 1310, and to my chambers, 500 Pearl Street, Room 1370. Anyrequests for an extension of time for filing objections must be directed to Judge Kaplan. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993)*, cert. denied, *513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994)*; *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)*; *Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.)*, cert. denied, *506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992)*; *Small v. Sec'y of HHS, 892 F.2d 15, 16 (2d Cir. 1989)*; [*55] *Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988)*; *McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72, 6(a), 6(e)*.

DATED: New York, New York
February 14, 2006

2006 U.S. Dist. LEXIS 5346, *55; Fed. Sec. L. Rep. (CCH) P93,696

Andrew J. Peck                                    United States Magistrate Judge

A. 87

LEXSEE 2003 U.S. DIST. LEXIS 8114

**POSITRAN MANUFACTURING, INC., Plaintiff/Counter-Defendant, v. DIEBOLD, INC., Defendant/Counter-Claimant.**

**C.A. No. 02-466 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8114*

**May 15, 2003, Decided**

**DISPOSITION:** [*1] Diebold's Motion for Relief from Intentional Destruction of Evidence GRANTED; Positran's Motion to Exceed Its Answering Brief Page Limit declared MOOT.

**COUNSEL:** For Positran Manufacturing Inc, PLAINTIFF: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

For Diebold Inc, DEFENDANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Diebold Inc, COUNTER-CLAIMANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Positran Manufacturing Inc, COUNTER-DEFENDANT: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

**I. INTRODUCTION**

On May 31, 2002, the plaintiff, Positran Manufacturing Inc. ("Positran"), filed the above-captioned action asserting claims for breach of contract. In response, the defendant, Diebold, Inc. ("Diebold") has asserted counterclaims for breach of contract, fraud, and unjust enrichment. A two-day bench trial is scheduled to begin on June 16, 2003.

Presently before [*2] the court is Diebold's motion for relief from Positran's allegedly intentional destruction of evidence. For the following reasons, the court will grant Diebold relief, albeit not in the requested form.

**II. BACKGROUND**

In the first count of its counterclaim, Diebold asserts that Positran failed to make payments to Mosler as they became due for goods tendered by Mosler under its agreement with Positran. n1 Positran, however, argues that this obligation was "canceled out" under a supposed oral agreement between it and Mosler to "net" that obligation against amounts Mosler allegedly owed to Positran.

> n1 Diebold subsequently purchased Mosler's assets and accounts-receivable, including the roughly $ 1.3 million account-receivable against Positran.

Diebold now contends that, while its discovery requests were pending, and just days before his deposition, Positran's Vice-President, Joseph Uhl ("Uhl"), intentionally destroyed relevant evidence. Specifically, Diebold alleges that Uhl destroyed his handwritten [*3] notes which set forth his contemporaneous account of events that are the subject of both Positran's claim and

Diebold's counterclaim. This fact is not in contention because, at his July 11, 2002 deposition, Uhl admitted that, just before his deposition, he did, in fact, throw away his handwritten notes.

Diebold alleges that the destroyed notes reflected communications between Positran and Mosler regarding Mosler's product orders to Positran. According to Diebold, these communications are crucial to the issue of the scope of the implied license to make Mosler goods. Diebold further alleges that the destroyed notes contained information on the Positran-Diebold negotiations that led to the agreement upon which Positran bases its "netting" claim.

Additionally, Diebold maintains that, not only did Uhl destroy documents, he fabricated a typewritten document which was subsequently produced to Diebold in discovery. Uhl then falsely testified that the document was a verbatim, typed version of the destroyed handwritten notes. In support of its contention that this document is fraudulent, Diebold points to the following testimony taken from Uhl at his July 11, 2002 deposition. At that deposition, [*4] Uhl stated that the only documents to which he referred in creating the typed document were the handwritten notes that he destroyed. He further testified that the only difference between the documents is that, whereas the destroyed documents were handwritten, the produced document is typewritten.

Upon closer inspection of the produced document, however, Diebold noticed that it duplicates, often verbatim, excerpts from Positran's complaint. Additionally, while Uhl stated that his handwritten notes did not refer to exhibits, the typed document does refer to exhibits. Those exhibit references in turn exactly match the exhibit references in Positran's complaint.

## III. DISCUSSION

A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit. *See, e.g., Howell v. Maytag, 168 F.R.D. 502, 505 (M.D. Pa. 1996)* (citing *Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)); accord Shamis v. Ambassador Factors Corp., 34 F. Supp.2d 879, 888-89 (S.D.N.Y. 1999)* (asking whether the party "knew or should have known that the destroyed evidence was relevant [*5] to pending, imminent, or reasonably foreseeable litigation"); *Bass v. GMC, 929 F. Supp. 1287, 1288 (W.D. Mo. 1996)* (same). A party who

breaches this duty by destroying relevant evidence or by allowing relevant evidence to be destroyed may be sanctioned by the court. *See, e.g., Howell, 168 F.R.D. at 505; accord TeleCom Intn'l Am. Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999).* When this destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of them all--the outright dismissal of a claim or the entry of a default judgment. *See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991)* ("The even harsher sanction of default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser sanction is adequate."); *accord TeleCom, 189 F.R.D. at 81* (noting that the sanction of dismissal is a "drastic remedy" which should be imposed only in "extreme circumstances," such as [*6] when a party wilfully destroys evidence or otherwise acts in bad faith) (relying on *West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)); Baliotis, 870 F. Supp. at 1289* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.'") (citations omitted).

When determining whether to impose sanctions for the spoliation of evidence, the court must consider the following three factors:

> (1) the degree of fault and personal responsibility of the party who destroyed the evidence;
>
> (2) the degree of prejudice suffered by the other party; and
>
> (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); accord Indemnity Ins. Co. of N. Am. v. Liebert Corp., 1998 U.S. Dist. LEXIS 9475, 1998 WL*

2003 U.S. Dist. LEXIS 8114, *6

*363834, at * 3 (S.D.N.Y. June 29, 1998)* [*7] .

As the *Schmid* court emphasized, when determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case. *13 F.3d at 80; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)* ("It must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); *accord Collins v. Throckmorton, 425 A.2d 146, 150 (Del. 1980)* ("Where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.").

In addition, when considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence [*8] in question before it was destroyed. *See Thiele v. Oddy's Auto & Marine, Inc., 906 F. Supp. 158, 162 (W.D.N.Y. 1995).* As the *Thiele* court explained, when one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, sanctions for spoliation are generally appropriate. *Id. at 162-63* ("Without any ability to examine the boat, [the third-party defendant] will be greatly frustrated in its ability to defend its case. Since [the plaintiff] is plainly at fault for allowing the boat to be placed in a landfill, any claims against [the third-party defendant] must be dismissed."); *see also Baliotis, 870 F. Supp. at 1290-91* ("At a minimum ... an opportunity for inspection should be afforded ... before relevant evidence is destroyed.").

In the present case, it is clear that Uhl's destruction of his notes reflects an extreme degree of fault and personal responsibility. Indeed, he admits that he personally destroyed his contemporaneous account of events that are, at a minimum, relevant to the central issues in this case. Further, he destroyed the evidence, [*9] not before litigation ensued, but rather, months after Diebold served document requests in a related case, a month after Positran filed its complaint in the present case, and mere days before his own deposition. On these

facts, Positran cannot credibly claim that Uhl was unaware of his obligations.

More disturbing still, Positran now attempts to explain the similarities between Uhl's typewritten document and its complaint by arguing that the typewritten document is verbatim only to the extent that portions of the information were taken from Uhl's handwritten notes. Positran further explains that Uhl may have also referred to other documents in preparing his typewritten notes. Thus, Positran's explanation is basically that some of the typewritten document is a verbatim transcript of Uhl's handwritten notes, but not necessarily all of it reflects his notes. Moreover, although Uhl himself denied having referred to outside documents at his April 16, 2003 deposition, Positran takes the position that he was "intimidated" during the questioning, and was thus incorrect on this point.

While the problems with Positran's explanation are manifold, the court need only address one to make its [*10] point. Assuming that Positran's version is correct, this position merely exacerbates the problem because it makes it even less clear whether the typed document bears any resemblance to Uhl's handwritten notes. Neither the court, nor Diebold, can know what Uhl culled from his notes, what he pulled from other sources, and what may have been destroyed in notes he ultimately omitted from the typewritten document.

Likewise, because Diebold has no means of determining what Uhl's contemporaneous notes described, the prejudice to Diebold is not insignificant. There is no question that Diebold did not have the opportunity to examine Uhl's notes prior to their destruction. Additionally, Diebold has presented evidence that the information in Uhl's handwritten document would have been relevant to its case. For instance, focusing just on the May 7, 2001 entry in Uhl's typed document, the meeting that day allegedly related to a "credit hold," Positran's refusal to ship products, a production cut-back, quality issues, and a possible account "netting" arrangement. These are all issues in the present case and in its related companion case. Instead of Uhl's contemporaneous notes of this meeting, however, [*11] Diebold is left with Positran's assurance that Uhl completely and accurately transcribed all of his notes from that meeting. Moreover, Uhl's actions have deprived Diebold of the opportunity to use a contemporaneous record to cross-examine Positran's representative to

2003 U.S. Dist. LEXIS 8114, *11

determine what really occurred. Thus, given Positran's own inability to coherently and consistently explain what the typewritten document actually consists of, the court is compelled to conclude that Diebold has suffered prejudice through the loss of the handwritten document.

In light of the circumstances surrounding Uhl's destruction of his notes, the unavoidable inference is that the notes would have been helpful to Diebold's case. The court does not, however, believe that Diebold's requested sanction of dismissal is warranted in this case. Diebold has not argued that Uhl's handwritten notes are the only evidence available to prove its claims and adequately defend itself. Thus, while a sanction is clearly warranted, dismissal would be unjustly harsh. The court will, therefore, impose a "spoliation inference" in this case. This inference will allow the trier of fact, in this case, the court, to assume the destroyed evidence [*12] would have been unfavorable to the offending party. Such a sanction is sufficient to avoid substantial unfairness to Diebold, while at the same time serving as a deterrent to

Positran, as well as other future litigants who may consider engaging in similar dilatory tactics.

**IV. CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. Diebold's Motion for Relief from Intentional Destruction of Evidence (D.I. 25) is GRANTED.
>
> 2. Positran's Motion to Exceed Its Answering Brief Page Limit (D.I. 44) is declared MOOT.

Dated: May 15, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**A. 88**

LEXSEE 2000 US DIST LEXIS 3742

**RMED INTERNATIONAL, Inc., et al., Plaintiffs, - against - SLOAN'S SUPERMARKETS, Inc., and JOHN CATSIMATIDIS, Defendants.**

**94 Civ. 5587 (PKL) (RLE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 3742; Fed. Sec. L. Rep. (CCH) P90,926*

**March 24, 2000, Decided**
**March 24, 2000, Filed**

**DISPOSITION:** [*1] Defendants' motion to exclude testimony of plaintiffs' damages expert DENIED.

**COUNSEL:** For RMED INTERNATIONAL, INC., plaintiff: Arthur R. Lehman, Lehman & Gikow, P.C., New York, NY.

**JUDGES:** The Honorable Ronald L. Ellis, United States Magistrate Judge.

**OPINION BY:** Ronald L. Ellis

**OPINION:**

### MEMORANDUM OPINION & ORDER

**RONALD L. ELLIS, United States Magistrate Judge:**

This class action under Section 10(b) of the Securities and Exchange Act of 1934 n1 arises out of the purchase of the common stock of Sloan's Supermarket's, Inc. ("Sloan's") by a class of investors who bought Sloan's at allegedly inflated prices (the "Class") during the period of January 7, 1993, through June 2, 1994 (the "Class Period"). Plaintiffs in this "fraud on the market" case allege that during the Class Period, Sloan's and its chief executive officer, John A. Catsimatidis ("Catsimatidis"): (1) made representations that were materially false and misleading regarding Sloan's intention of pursuing a growth strategy through the acquisition of additional existing supermarkets; and (2) failed to disclose material facts regarding a Federal Trade Commission ("FTC") antitrust investigation of Sloan's

(together, "the alleged fraud"). [*2]

n1 Section 10(b) makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as necessary or appropriate . . . for the protection of investors." *15 U.S.C. § 78j*(b). Rule 10-b, a regulation promulgated under § 10(b), provides that "it shall be unlawful . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading. . . ." *17 C.F.R. § 240.10b-5(2).*

Pending before the Court is defendants' motion to exclude the testimony at trial of plaintiffs' damages expert, Candace L. Preston ("Preston"), on the grounds that it is insufficiently reliable to be admitted at trial under *Rule 702 of the Federal Rules of Evidence* and under the principles articulated in *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* [*3] For the reasons set forth below, defendants' motion is **DENIED.**

### I. BACKGROUND

2000 U.S. Dist. LEXIS 3742, *3; Fed. Sec. L. Rep. (CCH) P90,926

The pertinent facts alleged are as follows. Defendant Catsimatidis is the Chairman of the Board, Chief Executive Officer, and Treasurer of Sloan's, formerly known as Designcraft Industries, Inc. ("Designcraft"), and the sole shareholder, President, and Chief Executive Officer of Red Apple Companies, Inc. ("Red Apple"). Both companies are in the supermarket business. Compl. at PP 2, 3. n2 Prior to April 1991, all supermarkets in the New York City metropolitan area that operated under the name "Sloan's" were owned by a corporation then known as Sloan's Supermarket ("Old Sloan's"), which is unrelated to defendant Sloan's. In 1991, Red Apple acquired approximately twenty-one Sloan's Supermarkets from Old Sloan's. **Id.** at P 11. In March 1993, Designcraft, which at that time was a holding company with no assets, acquired eleven Sloan's Supermarkets from Old Sloan's. Designcraft subsequently changed its name to Sloan's Supermarkets, Inc., the defendant herein. **Id.** at P 12. Thus, as of early 1993, Catsimatidis owned thirty-two Sloan's Supermarkets in the New York metropolitan area, [*4] twenty-one operated by Red Apple, and eleven by Sloan's.

> n2 "Compl." refers to plaintiffs' Complaint in a Class Action, dated August 1, 1994.

Defendants, prior to and upon transforming Designcraft into an operating company through the purchase of eleven Sloan's Supermarkets, made several public announcements indicating that they were embarking on a strategy of growth through acquisitions of additional supermarkets. These representations were allegedly made despite management's knowledge that such a growth strategy was not feasible given an ongoing FTC antitrust investigation into Catsimatidis' market share that had begun in 1991. n3 Further, Sloan's did not report the FTC investigation in several public filings with the federal Securities and Exchange Commission ("SEC") and in communications with shareholders. Compl. at PP 16-21. It is plaintiffs' position that these misrepresentations and omissions concerned material facts, were made with intent to deceive and defraud the Class in violation of section 10(b) [*5] of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and caused an artificial inflation of Sloan's stock price during the Class Period.

n3 In September 1991, objecting to the concentration of Catsimatidis' ownership and control of supermarkets in Manhattan, the FTC began investigating whether he should be required to divest himself of certain Sloan's Supermarkets operated by Red Apple. After 1993, the investigation was extended to include supermarkets operated by Sloan's. In May 1994, the FTC filed a formal complaint against defendants, stating in its Notice of Contemplated Relief that it might order the divestiture of four supermarkets owned by Sloan's. In February 1995, defendants and the FTC entered into a consent decree. *See* Compl. at PP 13, 15; Defendants' Affidavit in Support of Motion to Exclude Testimony by Plaintiffs' Expert Witness [hereinafter "Honig Aff."], Exh. 6G, at 6; Exh. 7.

## II. DISCUSSION

### A. The Standard for Admissibility Under Federal [*6] Rule of Evidence 702

*Federal Rule of Evidence 702*, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In **Daubert**, the Supreme Court held that Rule 702 assigns federal district courts the task of ensuring that scientific expert testimony is both reliable and relevant. *509 U.S. at 597*. Recently, the Supreme Court made clear that the trial judge's general "gatekeeping" obligation with regard to scientific expert testimony outlined in **Daubert** extends to expert testimony based on technical or other specialized knowledge. *See **Kumho Tire Co., Ltd. v. Carmichael**, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999)*. Accordingly, **Daubert** applies to the evaluation of the admissibility of Preston's testimony on damages.

Case 1:99-cv-00371-GMS     Document 329-12     Filed 10/10/2006     Page 26 of 34

Page 3
2000 U.S. Dist. LEXIS 3742, *6; Fed. Sec. L. Rep. (CCH) P90,926

Under **Daubert,** the trial court's gatekeeping function is two-fold. [*7] First, the court must determine whether the proffered expert testimony is reliable. *509 U.S. at 590.* Second, the court must evaluate "whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Id. at 593.* This second step is essentially a relevancy determination. Here, defendants do not challenge the relevance of Preston's testimony, nor does the Court find any basis for such a challenge given the clear "fit" between Preston's testimony, which employs finance theory, and the issues presented in this case. *See General Electric Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512, 522, 139 L. Ed. 2d 508 (1997)* (Breyer, J., concurring). Rather, their complaint concerns the first part of the **Daubert** inquiry, that is, the reliability of Preston's reasoning and methodology.

In **Daubert,** the Supreme Court suggested four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable. These factors include (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect [*8] to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *509 U.S. at 593-94.* In assessing the reliability of expert testimony, the trial judge may consider one or more of the **Daubert** factors when doing so will help determine the expert's reliability. *See Kumho Tire, 119 S. Ct. at 1175.* However, "the test of reliability is 'flexible,' and **Daubert's** list of specific factors neither necessarily nor exclusively applies to all experts or in every case." **Id.** at 1171. Whether the factors identified in **Daubert** are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine, and will depend on "the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." **Id.** at 1175. A trial court's decision to admit or exclude expert testimony under **Daubert** is afforded great deference, and is reviewable [*9] by an appellate court for abuse of discretion. *See Joiner, 118 S. Ct. at 515.* With these tenets in mind, the Court now turns to an evaluation of the reliability of Preston's testimony.

**B. Preston's Proposed Testimony**

Plaintiffs have retained the services of Preston as an expert witness on the subjects of materiality, causation, and damages. n4 Preston is a chartered financial analyst and a managing director at the Bank of New York Capital Partners responsible for valuations of capital market transactions. At the time she was retained by plaintiffs, she was a member of Triumph Partners, a firm which she founded in 1998 and which specializes in securities and business valuations. *See* Preston Aff., Exh. B. n5 In June 1998, plaintiffs submitted Preston's report summarizing her proposed testimony as to the materiality of defendants' alleged misstatements and omissions, and damages incurred by the Class resulting from the alleged fraud (the "Report"). *See* Preston Aff., Exh. A.

n4 The basic elements of a Rule 10b-5 action are: (1) the sale or purchase of a security; (2) misrepresentation, misstatement or nondisclosure; (3) of a material fact; (4) scienter or intention to deceive or defraud; (5) reliance on the misstatement or nondisclosure; and (6) causation of the injury by the violation. *See Basic v. Levinson, 485 U.S. 224, 226, 231, 242-245, 260, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).* However, the element of reliance is presumed in a "fraud on the market" case. *Id. at 245-47.*

[*10]

n5 "Preston Aff. " refers to plaintiffs' Affidavit in Opposition to Defendants' Motion to Exclude Testimony by Plaintiffs' Expert Witness, filed July 29, 1999.

**1. Materiality**

Preston concluded in the Report that defendants' statements and omissions were material. In coming to this conclusion, Preston employed several methodologies. First, she relied upon her knowledge and experience as a professional securities analyst in forming her opinion that Sloan's statements regarding its growth strategy and nondisclosure of the FTC antitrust investigation would be material to the company's investors. **Id.** at P 6. Second, she reviewed documents and information about Sloan's, including, *inter alia,* court records, information publicly

filed with the SEC, press releases, newspaper reports, and industry publications covering Sloan's. **Id.** From this information, Preston concluded that defendants' alleged fraud led Sloan's investors and market observers to view Sloan's as a "growth stock," that is, a stock that was expected to exhibit faster than average growth in earnings. [*11] **Id.** at PP 9-24. She confirmed these findings by calculating the price to earnings ("P/E") ratio at which Sloan's traded during the Class Period -- a common measure of a stock's earnings potential and investor confidence -- and compared this ratio with that of the overall stock market. n6 She found that Sloan's common stock consistently traded at P/E levels higher than the overall market and other supermarket companies during the Class Period, supporting her conclusion that investors expected high future earnings and growth. **Id.** at P 31. Preston's opinion is that defendants' failure to report the FTC antitrust investigation in its public filings with the SEC, in communications with the press, and in reports to shareholders, when viewed in light of the market's perception of Sloan's as a growth stock, constituted material omissions.

> n6 The P/E ratio is defined as the current market price divided by the trailing twelve months' earnings per share. Because the beginning of the Class Period and Sloan's life as an operating company occurred at the same time, Preston estimated Sloan's trailing twelve months' earnings per share (the denominator of the P/E ratio) by annualizing the available per share information beginning with the first quarter of the Class Period. *See* Preston Aff., Exh. A, at PP 27-30.

[*12]

Preston also interviewed RMED's chairman several times and reviewed the deposition testimony of other shareholders, from which she concluded that defendants' alleged fraud was material. **Id.** at P 22. Finally, Preston examined the daily trading prices and reported trading volume of Sloan's common stock before, during, and after the Class Period, and, by correlating the dates of defendants' alleged misstatements and omissions to the company's stock price, concluded that defendants' alleged fraud was material and caused an artificial inflation in Sloan's stock price during the Class Period. **Id.** at P 24.

## 2. Damages

In the Report, Preston measured the alleged Class damages by comparing Sloan's stock price during the Class Period to what she determined should have been the stock's "true value," that is, the price at which the stock would have traded absent the alleged fraud. **Id.** at PP 36-37. In determining Sloan's true value, Preston started with the average closing price of Sloan's common stock for the five days following the June 2, 1994 publication by several newspapers of the FTC antitrust investigation and complaint, which revealed that the FTC [*13] would be seeking an administrative order requiring Catsimatidis to divest some of his supermarkets. **Id.** at P 36; Preston Aff., Exh. E, at 39. Preston chose this time-period because, in her view, "on this date . . . it should have been clear to investors that Sloan's had been inhibited in any plans for growth through acquisition as a result of antitrust concerns, and would not be able to grow unimpeded through acquisition in the future." Preston Aff. P 8. Preston then adjusted this average share price of $ 5.25 to account for general economic, market, and industry influences by applying the daily percentage change of an index of comparable small grocery stores compiled by Coopers & Lybrand (the "Index"). **Id.** at P 23 and Exh. A P 36. Preston used the resulting figures to construct a graphical "value line" representing Sloan's true value on each day of the Class Period.

Having controlled for the effects of general market and industry forces on Sloan's stock price with the Index, Preston proceeded to analyze company-specific events during the Class period which might have been the cause of the price movement of Sloan's stock. This "Event Analysis" included every piece [*14] of public information Preston could locate about Sloan's that was available during the Class Period, including Sloan's press releases and public filings, 13D filings of persons acquiring large interests in Sloan's, n7 and reports in the business press. *See* Preston Aff. P 12, Exh. E. By comparing the timing of each company-specific event against the value line, Preston determined that there were no events other than the alleged fraud that affected Sloan's stock price during the Class Period. n8

> n7 The Securities Exchange Act of 1934 requires the filing of a "Schedule 13D" statement by beneficial owners of more than five percent of a class of stock within ten days of acquiring such

ownership. *See 15 U.S.C. § 78m*(d)(1) (1997). The purpose of this requirement is to alert the market to transactions that might change or influence the control of the company. *See* **id.** § 78m(d)(6)(D).

n8 This determination was also informed by Preston's knowledge of generally accepted principles within the relevant economic literature regarding the effect of reported earnings on a stock's market price. *See* discussion *infra* Part D.1.

[*15]

From there, Preston calculated the inflation per share for each day of the Class Period, measured as the difference between the closing price and the "true value," that is, the average price of Sloan's stock for the five days following the revelation of the alleged fraud adjusted to the Index. *See* Preston Aff., Exh. A, at P 37. Finally, Preston calculated the aggregate class damages by (1) analyzing available but incomplete information about actual purchases and sales of Sloan's common stock during the Class Period and (2) estimating the remaining Class damages using a computerized trading model which simulates the number of shares affected by the fraud during the Class Period and takes into account factors such as the float, n9 trading volume, n10 and trading patterns of the stock. n11 **Id.** at PP 39-48.

n9 The "float" of a stock refers to the number of shares available for public trading. *See In re Gaming Lottery Securities Litigation, 2000 U.S. Dist. LEXIS 1558, 2000 WL 193125,* at *2 (S.D.N.Y. Feb. 16, 2000).

n10 "Trading volume" is the number of shares traded per day.

[*16]

n11 The trading pattern includes considerations such as the total number of shares purchased during the Class Period and held throughout the period ("Total Retained Shares"), the total number of

shares purchased during the Class Period and sold before the end of the Period ("In-and-Out Shares"), as well as an estimate of the probability that any given share purchased during the Class Period will be re-traded during the period. *See* Dean Furbush and Jeffrey W. Smith, *Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models, 49 Bus. Law. 527, 529 (1994).*

### C. Defendants' Challenge to Preston's Testimony

Defendants challenge the reliability of Preston's testimony on multiple grounds, but their primary complaint concerns the methodology by which Preston examined the influence of factors unrelated to the alleged fraud on Sloan's stock price. First, they assert that Preston failed to consider or subtract from her damages calculation the rise in Sloan's stock price attributable to legitimate, company-specific events, [*17] including announcements of Sloan's positive earnings, and reports of the acquisition of greater than five percent of Sloan's stock by several investor groups such as the named plaintiff RMED. *See* Defs.' Opp., at 6-7, 22-24, 28-29. n12 According to defendants, "the entire price movement [during the Class Period] is logically tied to earnings. . . .," and therefore, none is attributable to the alleged fraud. **Id.** at 28. More specifically, defendants contend that Preston's methodology is unreliable because she did not employ formal statistical methods -- and regression analysis in particular -- to isolate and exclude from her damages calculation the portion of the inflation in Sloan's stock price attributable to company-specific factors unrelated to the alleged fraud. **Id.** at 4, 28; *see also* Defs.' Reply, at 5, 7, 8. n13

n12 "Defs.' Opp." refers to defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Expert Testimony Regarding Damages, dated July 7, 1999.

n13 "Defs.' Reply" refers to defendants' Reply Memorandum of Law in Further Support of Motion to Exclude

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 29 of 34

Page 6
2000 U.S. Dist. LEXIS 3742, *17; Fed. Sec. L. Rep. (CCH) P90,926

Plaintiffs' Expert Testimony Regarding Damages, dated August 11, 1999.

[*18]

Defendants' second major challenge n14 to Preston's methodology concerns her use of the Index to account for market and industry factors in determining the true value of Sloan's common stock. Defendants contend that the Index was inappropriate because, as Preston concedes, there is no linear relationship between the movement of the Index and the price of Sloan's common stock during the Class Period. *See* Defs.' Opp., at 2, 4, 25. Defendants believe that the absence of such a correlation renders Preston's estimate of Sloan's true value unreliable.

> n14 Defendants also raise a laundry list of other challenges to Preston's methodology. Among them are that (1) Preston should have chosen an earlier period than the five days following the announcement of the FTC antitrust complaint as the determinative time frame for calculating Sloan's true value, since the market knew of the FTC investigation in 1993; (2) Preston should have interviewed shareholders as part of her materiality determination; (3) Preston's calculation of Sloan's P/E ratios was faulty, because it was based upon an inappropriate estimate of Sloan's earnings per share; and (4) the computerized "proportional decay" model which she employed to calculate aggregate class damages does not accurately model the trading patterns of Sloan's common stock. *See* Defs.' Opp., at 2, 7, 10, 26, 28. The Court finds these complaints insufficiently serious to exclude Preston's testimony because, *inter alia*: (1) a full disclosure of the fraud did not occur until June 2, 1999, rendering Preston's choice of that day as the close of the Class Period reasonable; (2) Preston did interview shareholders and review deposition testimony as part of her investigation; (3) the method Preston chose to estimate Sloan's trailing twelve month earnings in calculating its P/E ratios was reasonable, given the absence of a meaningful price

history for Sloan's stock; (4) the proportional decay model has been accepted by this Court, *see Lyons v. Scitex Corp., 987 F. Supp. 271, 277 (S.D.N.Y. 1997)*, and Preston modified the model to account for criticisms in the academic literature. *See* Preston Aff. PP 8, 22, 24, 36. To the extent that these issues have a bearing on Preston's damages estimate, the appropriate way to address them is through "vigorous cross examination." *Daubert, 509 U.S. at 596.*

[*19]

For support, defendants rely primarily on ***In re Executive Telecard, Ltd. Securities Litigation, 979 F. Supp. 1021 (S.D.N.Y. 1997)***, in which the court excluded the testimony of plaintiffs' damages expert in a similar fraud-on-the-market case because the expert failed to conduct a statistical event study and thereby rule out company-specific factors other than the alleged fraud that might have affected the corporation's stock price, and because the expert relied upon an index of telecommunications companies which was not reflective of the defendant corporation. Defendants also rely upon ***In re Oracle Securities Litigation, 829 F. Supp. 1176 (N.D. Cal. 1993)***, discussed in *Executive Telecard*, in which a proposed settlement of a securities fraud case was rejected by the court because, among other reasons, the plaintiffs' damages expert "failed to distinguish between the fraud-related and non-fraud related influences on the stock's price behavior." *Oracle, 829 F. Supp. at 1181.* Taken together, defendants' criticisms of Preston's methodology constitute a challenge under the third and fourth prongs of the [*20] *Daubert* analysis. That is, defendants essentially argue that Preston's methodology has a high potential rate of error and that it has not been generally accepted by the relevant scientific community. *See Daubert, 509 U.S. at 593-94.*

**D. General Principles for Assessing the Reliability of Preston's Proposed Testimony**

"Damages in a securities fraud case are measured by the difference between the price at which the stock sold and the price at which the stock would have sold absent the alleged misrepresentations and omissions. . . ." ***Executive Telecard, 979 F. Supp. at 1025.*** This requires the court to "eliminate that portion of the price [inflation]

Case 1:99-cv-00371-GMS     Document 329-12     Filed 10/10/2006     Page 30 of 34

Page 7

2000 U.S. Dist. LEXIS 3742, *20; Fed. Sec. L. Rep. (CCH) P90,926

that is the result of forces unrelated to the wrong," such as general market forces and legitimate company-specific events. **Id.** This approach recognizes the right of a plaintiff to be compensated for its net loss stemming from a defendant's fraud without making the defendant an insurer against market-related risk. Based upon these general principles specific to securities fraud actions, as well as the factors outlined in **Daubert**, the Court does not find [*21] Preston's methodology to exhibit the same serious flaws presented by the experts' methodology in **Executive Telecard** and **Oracle**.

The reliability of the expert witness' proposed testimony in **Executive Telecard** was "called into question by his failure to indicate . . . in his . . . Report whether he conducted an 'event study' to determine whether [the corporation's] stock price was affected by company-specific factors exclusive of the challenged fraud." **Id.** While the expert did suggest in his deposition testimony that he read press releases containing information specific to the defendant corporation, he admitted that he "did not read them side by side with the daily price history. . . .," leading the court to conclude that he "approached this issue in a rather cursory fashion." **Id.** at 1025-26 & n.1. Similarly, in **Oracle**, the court rejected the expert's testimony because he failed to employ any methodology to eliminate information specific to the defendant other than the alleged fraud that might have influenced the stock's price. **See Oracle, 829 F. Supp. at 1181.**

In contrast, Preston [*22] conducted a microanalysis of each company-specific event which could have influenced Sloan's stock price, methodically charting those events on a daily basis. The result is a seventy-page "Event Analysis" containing a textual summary of each event placed next to the daily closing price of Sloan's stock for a seven-year period spanning from 1990 to 1997, and including the Class Period. **See** Preston Aff., Exh. E. Based upon an examination of this analysis, Preston concluded that neither defendants' earnings announcements nor reports of the acquisition of greater than five-percent positions by certain investor groups explained the positive movement of Sloan's stock price during the Class Period.

**1. The Absence of a Statistical Event Study**

Defendants assert that Preston's analysis is unreliable, because it does not utilize statistical methods to isolate the influence of company-specific events or

market and industry factors on Sloan's common stock. In doing so, they emphasize the difference between Preston's "event analysis" and an "event study," a term of art in the relevant economic literature that refers to a regression analysis that examines the effect of an event [*23] on some dependent variable, such as a corporation's stock price. **See** *Jon Koslow, Estimating Aggregate Damages in Class Action Litigation Under Rule 10B, 59 Fordham L. Rev. 811, 822 & n.50* (citing studies). While such a statistical analysis would, all other things being equal, produce less subjective and more readily testable results than the methodology employed by Preston, this Court does not read either **Executive Telecard** or **Oracle** as requiring such an analysis as a predicate to admissibility under **Daubert**. As the court stated in **Oracle**, "Use of an event study *or similar analysis* is necessary more accurately to isolate the influences of information specific to Oracle which defendants allegedly have distorted." *Oracle, 829 F. Supp. at 1181* (emphasis added) (cited with approval in *Executive Telecard, 979 F. Supp. at 1026*).

Here, the expert was presented with a number of legitimate limitations that hindered her ability to estimate plaintiffs' damages using statistical methods, and it appears that the methodologies she chose, taken together, were a reasonable and generally [*24] accepted alternative. Most significantly, Sloan's life as an operating company and the alleged fraud began at approximately the same time. **See** Honig Aff., Exh. 6G, at 2, 7-8; Preston Aff., Exh. E, at 26-27. Accordingly, there did not exist a meaningful price history for Sloan's stock that Preston could designate as the control or "clean" period from which to estimate its true value using statistical analysis. In order to control for market and industry factors using a regression analysis, or to perform a statistical event study, Preston would have to have known the relationship of Sloan's stock price to the market (the "company-market relation") and to the industry (the "company-industry relation") before the alleged fraud. **See** Koslow, *supra* page 13, at 821. That is, she would have to know how, if at all, Sloan's stock price moved with respect to the overall stock market and with respect to the small grocery store industry absent the alleged fraud. This would have required the availability of Sloan's price history prior to the alleged fraud for a period of sufficient length to produce statistically significant estimates of Sloan's company-market and company-industry [*25] relationships. Such data would have produced "betas" or coefficients which could be

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 31 of 34

Page 8

2000 U.S. Dist. LEXIS 3742, *25; Fed. Sec. L. Rep. (CCH) P90,926

plugged into a mathematical formula and multiplied by the actual market and industry returns during the fraud period to calculate the portion of Sloan's stock movement attributable to market and industry factors. n15 To perform a statistical event study, the remaining portion of Sloan's price behavior, *i.e.*, that part not explained by general market and industry movements, would then be analyzed to determine which portion of these residual price changes might be explained by the effect of company-specific, but non-fraud related, information, and which might be attributed to the alleged fraud. *See Goldkrantz v. Griffin, 1999 U.S. Dist. LEXIS 4445, 1999 WL 191540, at *4 (S.D.N.Y. Apr. 6, 1999), aff'd, 201 F.3d 431 (2d Cir. 1999); Seagate Technology II Securities Litigation, 843 F. Supp. 1341, 1348 (N.D. Cal. 1994).*

> n15 This mathematical formula can be stated as $R = a + [\text{beta}] (M) + c(I) + [\text{epsilon}]$, where, for each day of the Class Period, "R" represents the total return on the stock; "a" represents a constant unique to the company that is equal to the average value of the stock over time not captured by "[beta] (M)" and "c(I)"; "[beta]" is a constant number representing the company-market relation; "M" represents the stock market's average return, *e.g.*, as measured by the Dow Jones Industrial Average; "c" is a constant number representing the company-industry relation; "I" represents the average performance of the relevant industry, *e.g.*, as measured by the Cooper's & Lybrand index of small grocery stores used by Preston; and "[epsilon]" represents the unexplained change in the price of the stock that might be attributable to the alleged fraud or to non-fraud related company-specific events. *See* Koslow *supra* page 13, at 821-22; Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases, 37 U.C.L.A. L. Rev. 883, 897-98 (1990);* Craig MacKinlay, *Event Studies in Economics and Finance,* J. of Econ. Lit., March 1997, at 18.

[*26]

Absent a control period, Preston was limited in her ability to perform a statistical event study, and thereby unable to isolate with mathematical certainty the effect of company-specific, market, or industry factors on Sloan's stock price. Such limitations are contemplated by the academic sources cited by both plaintiffs and defendants, and require alternative methodologies such as the ones Preston employed. *See* Koslow, *supra* page 13, at 821 ("There should be enough observations in [the control period] to permit the calculation of statistically valid estimates. . . ."); MacKinlay, *supra* note 15, at 18 ("The use of other models is dictated by data availability. . . . For some events, it is not feasible to have a pre-event estimation period for the normal model parameters."); Cornell & Morgan, *supra* note 15, at 898 ("It is important to select a sample period during which the fraud does not affect the normal relation between the security, the market, and the industry.").

A second limitation faced by Preston concerns the manner in which the alleged fraud was revealed. Defendants' alleged misrepresentations and omissions were not revealed to the market in a single [*27] clean announcement. Rather, Sloan's stock price declined gradually from December 1993 until June 1994, as Sloan's investors realized that the announced acquisitions of additional supermarkets were not materializing. Moreover, the FTC antitrust investigation of Sloan's was reported in March 1994 by FTC Watch, a publication covering the enforcement activities of the FTC. *See* Honig Aff., Exh. 5, at 120-21. Under such circumstances, where the fraud either leaks into or becomes apparent to the market slowly over time, use of a statistical event study may underestimate damages, since by the time of the full revelation of the fraud, the market price already reflects some or all of the information contained in the announcement. *See* Cornell & Morgan, *supra* note 15, at 904-05. The Court does not decide the question of whether this limitation arising in the context of facts different from those presented here would be sufficient justification for an expert's failure to perform a statistical event study, for the answer here is highly dependent on the unique circumstances of each case. However, where, as here, the expert also faced an absence of any data from a control period, [*28] it appears that the alternative non-statistical methods employed by Preston were reasonable and recognized in the relevant scientific community.

Case 1:99-cv-00371-GMS    Document 329-12    Filed 10/10/2006    Page 32 of 34

Page 9

2000 U.S. Dist. LEXIS 3742, *28; Fed. Sec. L. Rep. (CCH) P90,926

Finally, the Court notes that even a statistical event study involves subjective elements. A researcher performing an event study must identify which company-specific events to study, and in the process, categorize those events as fraud or non-fraud related. *See* MacKinlay, *supra* note 15, at 14. This is no different than what Preston did in conducting the Event Analysis. Preston defined Sloan's positive earnings announcements and 13D reports of the acquisition of greater than five-percent interests in Sloan's by certain investors as fraud-related, because, in her opinion, these company-specific events were inextricably intertwined with the alleged fraud. Preston reasoned that because the absence of information about the FTC antitrust investigation in Sloan's positive earnings announcements served to reinforce false investor confidence in Sloan's, and because the purchase of large interests in Sloan's by certain investors was induced by Sloan's announced growth-through-acquisition strategy, any positive effects on Sloan's price [*29] of these company-specific events are not properly subtractable from plaintiffs' damages. In making this decision, Preston drew upon her knowledge and experience gained over a two-decade career in the field of security valuation, and upon accepted principles within her field. One such principle is that, as a general matter, investors value stocks based on their future growth potential, not upon their past earnings as reflected in earnings announcements, particularly in the case of small growth stocks such as Sloan's. This principle has been recognized by other courts facing similar issues. *See Executive Telecard, 979 F. Supp. at 1027 n.3* ("In contrast to highly capitalized companies . . ., a 'small cap' stock . . . does not trade on reported earnings per share, but instead moves in accordance with the market's expectations and perceptions of its long term economic prospects. . . . Euphemistically, [such] stock[s] could be said to trade on 'hope.'"); *Oracle, 829 F. Supp. at 1181* ("Under the efficient capital market hypothesis endorsed by the plurality in **Basic**, a security's value does not fluctuate with reported earnings, [*30] but varies instead with the discounted value of future cash flows which are expected to accrue to the security."). n16 Accordingly, where Preston observed increases in Sloan's stock price following quarterly earnings announcements, such as in July 1993, she categorized those events as fraud-related. Because Preston's decision was informed by a detailed factual analysis and grounded on principles generally accepted within the relevant field, her testimony is sufficiently reliable to be admitted. *See In re MDL-731--Tax Refund Litigation, 989 F.2d 1290, 1299*

*(2d Cir. 1993).*

> n16 The academic article that defendants rely upon to refute Preston's conclusions regarding the significance of Sloan's earnings announcements on its stock price does not prove otherwise. Defs.' Reply, at 5 (citing MacKinlay, *supra* note 15). Even MacKinlay assumes that a corporation's earnings announcements will not necessarily affect its stock price unless the announcement is inconsistent with the market's expectations for the security. Thus, "higher than expected earnings should be associated with increases in the value of the equity and lower than expected earnings should be associated with decreases." **Id.** at 16. Accordingly, where there is little variance between the earnings expected and reported, a corporation's earnings announcement is generally considered "no news." **Id.** at 17. This is consistent with Preston's conclusions that Sloan's positive earnings do not explain the rise in its stock price, because the earnings were consistent with the market's expectations for Sloan's.

[*31]

## 2. The Expert's Reliance on the Coopers & Lybrand Index

Defendants contend that Preston's choice of the Index of small grocery stores to factor out general market and industry effects from plaintiffs' damages was inappropriate because, as Preston conceded at her deposition, there is no statistical linear relationship between the movement of the Index and the price of Sloan's common stock during the Class Period. *See Defs.' Opp., at 2, 4, 25.* Referring again to **Executive Telecard**, in which the Court found that "EXTL's stock price does not have a meaningful correlation with the . . . index," defendants suggest that Preston's testimony suffers from the same defects and should be similarly excluded. *Executive Telecard, 979 F. Supp. at 1027.* In making this argument, defendants appear to miss a key distinction between the two cases. In **Executive Telecard**, the index chosen by the expert bore no relationship to the plaintiffs' stock, because it was comprised of large, well-financed

2000 U.S. Dist. LEXIS 3742, *31; Fed. Sec. L. Rep. (CCH) P90,926

companies such as AT&T and MCI, whereas the defendant was a small telecommunications company.

In the instant case, there is evidence that the Index chosen [*32] by Preston is fairly representative of the way in which Sloan's would have traded absent the alleged fraud. It was comprised of a group of small supermarkets specifically chosen as representative of Sloan's by Coopers & Lybrand Securities ("C&L"), at the direction of defendants, as part of a fairness opinion C&L provided to Sloan's in connection with a merger of Catsimatidis' publicly and privately held supermarkets in 1997. *See* Preston Aff., Exh. A, at P36 n.4. To verify the appropriateness of the companies, Preston examined the profile of each one using Bloomberg Business News, a prominent provider of on-line financial information, and concluded from her analysis that they were reasonably similar to Sloan's based on the nature, size, and geographical mix of the companies. From this peer group contained in C&L's fairness opinion, she constructed an industry Index representing the average performance of the group. *See* Honig Aff., Exh. 5, at 93-95.

While Preston did admit during her deposition that there was no linear correlation between the Index and Sloan's stock, the unique facts presented here provide an explanation that supports Preston's use of the Index despite [*33] the absence of a statistical correlation. Prior to the Class Period, Sloan's was not in the supermarket business. Accordingly, the absence of a relationship between Sloan's stock and the Index during that time is irrelevant. Nor would a relationship between Sloan's stock and the Index be expected during the Class Period, when Sloan's stock price was allegedly inflated due to fraud. Following the FTC antitrust settlement and Class Period, Sloan's was known to be constrained in growth such that its stock would not necessarily move according to any linear relationship with an index of its peer group. Preston confirmed these expectations through the use of scatter diagrams, which demonstrated that there was no relationship between Sloan's stock and the Index. *See* Honig Aff., Exh. 4; Exh. 5, at 104. This problem is simply a manifestation of the absence of a control period untainted by fraud, discussed *supra*, not of a flaw in the Index. The pre-litigation selection of the companies in the Index, combined with Preston's independent confirmation that the companies were reasonably comparable to Sloan's, distinguish the Index used here from the one chosen by the expert in [*34] **Executive Telecard**, which was patently inapposite

given the nature of the defendant company in that case.

## III. CONCLUSION

The Court finds Preston's proposed testimony sufficiently reliable to be admitted under Rule 702 and the principles set forth in **Daubert**. Preston considered events peculiar to Sloan's, as well as market and industry factors, which may have influenced Sloan's stock price during the Class Period. She keyed her estimate of Sloan's true value to an industry index of comparable securities, conducted a detailed Event Analysis, applied her professional experience and knowledge to the unique circumstances presented by the facts in this case, and relied upon accepted principles articulated in the relevant economic literature. The Court finds that Preston "employed . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." **Kumho**, 119 S. Ct. at 1176. Moreover, Preston's methodology can be distinguished from that employed by the experts in **Executive Telecard** and **Oracle**, who did not give any methodical consideration whatsoever to company-specific events. That [*35] Preston's damages estimate cannot be measured with mathematical precision because she did not employ statistical methods is an insufficient basis to exclude her proposed testimony, particularly in light of the absence of data from a control period. In any event, "absolute certainty is not possible in complex economic determinations such as quantifying the influence of market factors on a stock's price. . . ." *In re Crazy Eddie Securities Litigation, 948 F. Supp. 1154, 1171 & n.14 (E.D.N.Y. 1996)* (citing critiques of stock trading models); *see also Chris-Craft Industries v. Piper Aircraft, 384 F. Supp. 507, 512 (S.D.N.Y. 1974), rev'd in part on other grounds, 516 F.2d 172 (2d Cir. 1975), rev'd, 430 U.S. 1 (1977)* ("Quantification of unliquidated damages is hardly an exact science; computation thereof is accomplished basically by estimation and inference."). Certainly, as in even the most technical scientific disciplines, Preston's economic analysis included both objective and subjective aspects. However, this is the basis for "vigorous cross examination, presentation of contrary evidence, [*36] and careful instruction on the burden of proof," not exclusion. **Daubert**, 509 U.S. at 596. Defendants' motion to exclude the testimony of plaintiffs' damages expert is **DENIED**.

**SO ORDERED this 24th day of March 2000**
**New York, New York**

2000 U.S. Dist. LEXIS 3742, *36; Fed. Sec. L. Rep. (CCH) P90,926

**The Honorable Ronald L. Ellis**                    **United States Magistrate Judge**