A. 89

LEXSEE 2004 US DIST LEXIS 26951

## In re SUREBEAM CORPORATION SECURITIES LITIGATION,

### CASE NO. 03 CV 1721 JM (FOR)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA

*2004 U.S. Dist. LEXIS 26951*

**December 30, 2004, Decided**
**January 3, 2005, Filed**

**PRIOR HISTORY:** *In re Surebeam Corp. Sec. Litig., 2003 U.S. Dist. LEXIS 25022 (S.D. Cal., Dec. 31, 2003)*

**DISPOSITION:** Defendants' motions to dismiss granted in part and denied in part.

**COUNSEL:** [*1] For EDWARD WEISS, On Behalf of Themselves and All Others Similarly Situated, RHONA CHASE, JAMES JANETTE, STEPHEN M STRACHAN, plaintiffs: Darren Jay Robbins, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA.

For DELAWARE CHARTER GTY. TRUST TR. MELVYN MANASTER IRA R/O, On Behalf of Themselves and All Others Similarly Situated, MICHAEL LAMPKIN, GENE P KIRBY, GARY BLEVINS, THEODORE MAKA, RICHARD M TORRE, JAMES CURRAN, MICHAEL BUSBICE, SR, JOHN A SAGE, plaintiffs: Kirk B Hulett, Hulett Harper Stewart LLP, San Diego, CA.

For JONATHAN DAVID DOBIS, plaintiff: Zev B Zysman, Weiss and Lurie, Los Angeles, CA.

For BERND BILDSTEIN, plaintiff: Marc L Godino, Braun Law Group, Los Angeles, CA.

For NANCY MENSCH, JOHN MENSCH plaintiffs: Rachele R Rickert, Wolf Haldenstein Adler Freeman and Herz, San Diego, CA.

For FMC LTD. PENSION PLAN & TRUST, SPEAR CAPITAL MANAGEMENT INC, SCARSDALE FABRICS, INC., plaintiffs: William S Lerach, Lerach Coughlin Stoia Geller, Rudman and Robbins, San Diego, CA.

For JAMERICA FINANCIAL INC., plaintiff: Travis E Downs, III, William S Lerach, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA.

For JOSEPH J BROGAN, [*2] plaintiff: William S Lerach, Travis E Downs, III, William S Lerach, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA.

For ANTHONY SEGALLE, GIN. HOY'HOM, plaintiffs: Jeffrey R Krinsk, Finkelstein and Krinsk, San Diego, CA.

For GLEN LEASON, OLIVE BRANCH-LEASON, MARY ANN RICHASON, PAUL BERGER, GREGORY LAVDANSKI, PAUL BERGER, GREGORY LAVDANSKI, plaintiff: Michael M Goldberg, Glancy and Blinkow, Los Angeles, CA.

For STEVEN MORROW, plaintiff: David B Zlotnick, Law Offices of David B Zlotnick, San Diego, CA.

For ALBERT J BERNI, EVA SEARCY, MANUEL E WILKEY, PAUL STRICK, ARSELLA STRICK, RICHARD SHAY, plaintiffs: Peter Arthur Binkow, Glancy and Binkow, Los Angeles, CA.

For JOHN TAYLOR, IRENE C HUANG, STEVEN MORROW, JAE OK JOO, LAWRENCE E ARONSON, ANDREW L YERRE, plaintiffs: Lionel Z Glancy, Glancy and Binkow, Los Angeles, CA.

2004 U.S. Dist. LEXIS 26951, *2

For THOMAS S DERIVATIVELY ON BEHALF OF NOMINAL DEFENDANT SUREBEAM CORPORATION, JR, plaintiff: Daniel L Germain, Rosman and Germain, Los Angeles, CA.

For GORDON REED, Derivatively on Behalf of surebeam Corporation, RICHARD E. RUCKSTUHL, plaintiffs: Venus Soltan, Soltan & Associates, Costa Mesa, CA.

For SUREBEAM CORPORATION, [*3] defendant: Darren Jay Robbins, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA.

For LAWRENCE A OBERKFELL, KEVIN K CLAUDIO, defendants: Russell Alan Gold, Luce Forward Hamilton and Scripps, San Diego, CA.

For DAVID A RANE, defendant: Darren Jay Robbins, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA; Shirli Fabbri Weiss, DLA Piper Rudnick Gray Cary US, San Diego, CA.

For TITAN CORPORATION, SUSAN GOLDING, GENE W RAY, defendants: Jeremy E Pendrey, Alschuler Grossman Stein and Kahan, Santa Monica, CA.

For MERRILL LYNCH PIERCE FENNER &. SMITH INC, CREDIT SUISSE FIRST BOSTON CORPORATION, WACHOVIA CORPORATION, defendants: Michael C Tu, Orrick Herrington and Sutcliffe, Los Angeles, CA.

For WILLIAM C HALE, MICHAEL J LICATA, ROBERT C ADERS, defendants: Shirli Fabbri Weiss DLA Piper Rudnick Gray Cary US, San Diego, CA.

For MARY VALLARIO, plaintiff: Jennifer R Liakos, Weiss and Lurie, Los Angeles, CA.

For PAUL BERGER, plaintiff: Peter Arthur Binkow, Glancy and Binkow, Los Angeles, CA.

For STEVE LEMON, plaintiff: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman and Herz, San Diego, CA.

For JOHN C ARME, KEVIN K CLAUDIO, [*4] defendants: Timothy R Pestotnik, Luce Forward

Hamilton and Scripps, San Diego, CA; Shirli Fabbri Weiss, DLA Piper Rudnick Gray Cary US, San Diego, CA.

For KEVIN K CLAUDIO, defendants: Timothy R Pestotnik, Luce Forward Hamilton and Scripps, San Diego, CA.

**JUDGES:** JEFFREY T. MILLER, United States District Judge.

**OPINION BY:** JEFFREY T. MILLER

**OPINION:**

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

This class action is brought on behalf of all purchasers of SureBeam Corporation ("SureBeam") common stock between March 16, 2001 and August 27, 2003 (the "Class Period"). Defendants Titan Corporation ("Titan"), Merrill Lynch Pierce, Fenner & Smith Inc., Wachovia Corporation, Credit Suisse First Boston LLC ("CSFB") n1, Gene W. Ray, Susan Golding, Lawrence K. Oberkfell, David A. Rane and Kevin K. Claudio move to dismiss the Complaint pursuant to *Fed. R.Civ.P. 12(b)(6)* and *9(b)*. Plaintiffs oppose the motions. Having carefully considered the papers submitted, the record before the court, the oral arguments of counsel and the applicable authority, the Court grants in part and denies in part Defendants' motions to dismiss and grants plaintiffs 45 days from the date of this order [*5] to file an amended complaint.

> n1 Collectively, Merrill Lynch, Wachovia and CSFB are referred to as the underwriters.

**I. Factual Background**

Initially, it should be noted that the well pled allegations of the Complaint are taken as true for the purpose of ruling on these motions. Defendant Titan is a San Diego-based company that creates, builds and launches technology-based businesses. SureBeam began as a wholly owned subsidiary of Titan. (Consolidated

Complaint (("CC") P 2). In 1998, SureBeam started building irradiators, machines that use electron beams to prevent contamination, spoilage, or disease in food. (CC P 14).

The essence of the Complaint is that Defendants made materially false statements in an attempt to create the illusion that SureBeam was a viable business. (CC PP 15-17). The Complaint asserts that Titan was losing money on its SureBeam subsidiary and sought to avoid continuing financial losses by spinning off SureBeam. (CC PP 15-16). But before Titan could effectively rid itself of [*6] SureBeam, it allegedly needed to create the appearance of financial stability in the subsidiary. Id. In order to create such an appearance, Titan allegedly set up international joint ventures involving its subsidiary and foreign food irradiation companies, and improperly recognized revenues from the joint ventures. (CC P 1).

The Tech Ion Venture

One such joint venture was with a Brazilian food irradiation company called Tech Ion Industrial Brasil S.A. ("Tech Ion"). The venture solidified in April of 2000 when Titan and Tech Ion agreed to form a joint venture called SureBeam Brasil. (CC PP 18-19). According to the agreement, the joint venture would purchase irradiators from SureBeam at prices that were, at most, market value. (CC P 20). Not long after forming the agreement, SureBeam began to recognize revenue from the venture and project millions in future revenue. (CC P 24). Despite Titan and SureBeam's optimistic portrayal of the venture, however, the Complaint alleges that Defendants were aware the Brazilian venture was doomed months before the Initial Public Offering ("IPO") on March 16, 2001. (CC P 5). When Tech Ion entered into the deal with Titan, the Brazilian [*7] company had only $ 418,000 in assets, less than $ 2,000 in available assets, and $ 2.2 million in current liabilities. (CC P 22). Titan contributed a $ 5 million line-of-credit to Tech Ion as part of the venture. Id. Because Tech Ion could not afford the systems, the parties agreed that Tech Ion and SureBeam Brasil would pay based on "the higher of 75% of profit or a fixed payment. . . ." (CC P 20).

At the time Titan and Tech Ion were solidifying their venture, in April of 2000, Defendants Lawrence Oberkfell and Kevin Claudio were executives at Titan. (CC P 19). Both men were working with Tech Ion Executive Jose Francisco Medeiros to secure funding for the project. Id. Titan and Tech Ion retained Delphos International ("Delphos") to assist in securing funding from the World Bank. (CC P 25). Shortly after hiring Delphos, in November 2000, Oberkfell and Claudio received several emails from Delphos informing them that investors were expressing concern that "the customer base is not well-defined and established enough" in Brazil and obtaining funding would be "EXTREMELY difficult." (CC PP 25-26).

Because the World Bank declined financing, Titan and Tech Ion looked to SUDAM, a Brazilian [*8] development agency that only provided funding to companies in the Amazonian region. (CC P 32). In order to convince SUDAM to provide funding, Oberkfell, Claudio, and Medeiros decided that SureBeam would ship two irradiation systems to Manaus, an Amazonian location. (CC P 33). In January of 2001, SureBeam shipped two such systems to Manaus over objections from project managers and despite the fact that the machines were eventually going to used in Rio, approximately 2,000 miles away. (CC PP 33, 35). Oberkfell also allegedly agreed to increase the price of the two irradiators beyond their market value, from $ 5 million per machine to $ 6.5 million, and falsify the invoice to indicate Tech Ion paid for the systems in full. (CC P 36). These changes were allegedly made in an attempt to increase the amount of financing from SUDAM. (CC P 33). But on March 12, 2001, SUDAM was disbanded by the Brazilian government amid allegations of high-level corruption. (CC P 37). With SUDAM's demise, Tech Ion allegedly witnessed its "last chance for funding disappear" and with it any possibility of SureBeam being paid on the contract. (CC PP 1, 38).

Four days after SUDAM's collapse, SureBeam went public. [*9] During the March 16, 2001 IPO, 6.7 million shares of SureBeam stock were sold at $ 10.00 per share. (CC P 38). Although SureBeam was an independent company following the EPO, Titan owned 84% of SureBeam's stock and the two companies had overlapping directors. (CC PP 59, 71-76). Oberkfell was named President and Chief Executive Officer ("CEO"), and Director, and Claudio was named Vice President and Chief Financial Officer ("CFO"). (CC PP 71-72). Defendants Susan Golding and Dr. Gene Ray, also Titan executives, were named Director and Chairman of the Board of Directors of SureBeam respectively. (CC PP 75-76). Oberkfell, Claudio, Golding, and Ray each signed the Registration Statement for the IPO. (CC PP 71-76).

After SureBeam went public, the Brazilian joint venture continued to deteriorate. (CC PP 41-45). In April 2001, Oberkfell traveled to Rio for a conference. (CC P 41). While there he visited the SureBeam systems that had been shipped to Manaus three months earlier. (CC PP 35,41). Because the irradiation plant had yet to be constructed, the systems were sitting in a customs warehouse. (CC P 41). In July of 2001, SureBeam employees traveled to Rio and visited Tech Ion's construction [*10] site. (CC P 42). They reported that Tech Ion had accomplished very little of the plant's construction; it only leased the land, laid a foundation, dug "little holes," and constructed a ceiling. Id. These SureBeam employees reported daily during their trip via e-mail to Oberkfell and Claudio, informing them of the status of the construction. Id. A project manager even sent them a photograph of an empty field. Id.

Despite all the above obstacles, SureBeam recognized revenue from the Tech Ion venture throughout 2000 and 2001. (CC PP 2-3). SureBeam recognized a total of $ 15.5 million in 2000 and $ 6.8 million in 2001 from the Brazilian project, using the percentage of completion method of accounting. Id.

The RESAL Venture

Following the IPO, SureBeam entered into a joint venture with RESAL, a sole proprietorship engaged in the construction of businesses in Saudi Arabia. (CC P 8). SureBeam and RESAL agreed that RESAL would build four irradiation facilities throughout Saudi Arabia and purchase ten SureBeam irradiation systems. Id RESAL was to pay for the systems with the profits from the venture. (CC P 49). Like the Tech Ion venture, the RESAL venture required [*11] funding before any profits could be generated and before any payment could be made to SureBeam. (CC P 47). In fact, the agreement provided that RESAL would transfer the purchase order to the joint venture only once it "received sufficient funding from investors . . . to finance the first processing facility." (CC P 46). RESAL had trouble securing funding, however. (CC P 48). Defendant David Rane, then SureBeam's CFO, was forced to renegotiate RESAL's payment schedule. (CC P 50). Despite the fact that payment was expressly contingent on outside funding that SureBeam executives allegedly knew was not forthcoming, SureBeam began to recognize revenue from the RESAL contract under a percentage of completion method. (CC P 48). Surebeam recognized $

6.8 million in the second quarter of 2001, $ 7.9 million in the third quarter, $ 5.1 million in fiscal year 2002, and $ 2.3 million in the first quarter of 2003. Id. In the end, RESAL never obtained the needed funding. (CC P 50). Although the contract called for $ 53 million and SureBeam recognized a total of $ 23.5 million, RESAL was only able to pay $ 7.5 million. Id.

The Domestic Operations

During the class period, SureBeam [*12] operated three irradiation service centers in the United States. (CC P 51). SureBeam irradiated meat in those facilities, but SureBeam's domestic plants had very few customers, and even fewer paying ones. (CC PP 56-57). SureBeam employees reported that the company was actually irradiating meat at no charge in an effort to introduce the product into the market. Id. The plants were generally operating at approximately 2%-3% of capacity. (CC P 54). During the class period, SureBeam repeatedly announced that demand had increased and that it expected demand to continue to increase. (CC P 52). In the end, however, SureBeam's expectations of demand never came to fruition and SureBeam's capacity to irradiate meat far exceeded demand for the product. (CC P 53).

Bankruptcy

Oberkfell resigned from SureBeam on March 6, 2003. (CC P 129). On July 30, 2003 and again on August 12, 2003, SureBeam announced that the company would delay its earning results for the second quarter of 2003 because the company's outside auditor, Deloitte & Touche LLC ("Deloitte") n2 was investigating contracts from the year 2000. (CC P 134). On August 21, 2003, SureBeam announced that it was firing Deloitte [*13] because the company refused to approve financial statements reflecting a contract from the year 2000. (CC P 136). SureBeam later revealed that the disputed contract was the Tech Ion contract. (CC P 137). Following the announcement, SureBeam's stock price dropped to $ 1.55 per share and never recovered. (CC P 136). SureBeam was forced to close its Los Angeles irradiation plant and NASDAQ delisted its stock. (CC P 138). On January 12, 2004, SureBeam filed for Chapter 7 bankruptcy. Id

n2 SureBeam had two prior outside auditors. Arthur Anderson was fired April

9, 2002 for unrelated reasons. SureBeam's second outside auditor KPMG was fired on June 3, 2003 due to a fee dispute. (CC P 133).

Misrepresentations and Omissions

The Complaint identifies several allegedly false statements made by some of the defendants, both in the registration statement or prospectus, and through press releases and direct statements by SureBeam officers. A sampling of the statements includes:

. "We began construction of [the [*14] systems for Tech Ion] in July 2000, and have recorded revenues of $ 15.5 million under the percentage-of-completion method for the year ended December 31, 2000" and our "accounting policies comply with the provisions of SAB 101." (CC PP 38, 85).

. ". . . we received purchase orders from Tech Ion Industrial Brazil S.A. for eleven electronic food irradiation systems which we expect to result in approximately $ 55.0 million in sales revenues to us over the next three years." (CC P 84).

. "we acquired a 19.9% equity interest in SureBeam Brasil without charge" and SureBeam Brasil was created "with no initial capital contribution from either party." (CC P 40).

. Announcing fourth quarter 2002 results, Oberkfell stated, "consumer demand is obviously growing, as folks are embracing this as an added measure of food safety. . . ." (CC P 52).

## II. Discussion

The first claim in the Complaint alleges Defendants Titan, Oberkfell, Claudio, Golding, Ray and the underwriters violated *Section 11 of the Securities Act of 1933*, by signing or preparing the misleading statements in the prospectus filed with the SEC on March 16, 2001. In the second claim, Plaintiffs allege that [*15] Titan violated *Section 15 of the 1933 Act* through its control of SureBeam. The third claim in the Complaint alleges that Oberkfell, Claudio and Rane violated *Section 10(b) of the*

*Securities Exchange Act of 1934*, and *Rule 10b-5*. Plaintiffs contend that the SureBeam executives disseminated or approved false statements that they knew were misleading. The fourth claim alleges that Titan violated *Section 20(a) of the 1934 Act* by controlling SureBeam.

### A. Legal Standards

#### Rule 12(b)(6)

When ruling on a motion to dismiss, the court must accept all material allegations of fact as true and must construe those allegations in the light most favorable to the plaintiff. *Burgert v. Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir. 2000)*. A complaint should not be dismissed unless it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her to relief. *Williamson v. General Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir. 2000)*.

When deciding a motion to dismiss, the court may consider the facts alleged in the complaint, as well as documents whose contents are alleged in the complaint. *Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)*. [*16] While ordinarily a *Rule 12(b)(6)* motion does not consider material outside of the pleadings, material properly submitted as a part of the complaint may be considered. *Sprewell v. Golden State Warriors, 266 F.3d 979, 988-89 (9th Cir. 2001)*.

#### 2. Rule 9(b)

*Rule 9(b)* requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. In order to comport with *Rule 9(b)*'s requirements the complaint must allege "the time, place, and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and the circumstances indicating falseness' or the manner in which [the] representations [or omissions at issue] were false and misleading.'" *In re Calpine Corp. Secs. Litig., 288 F. Supp. 2d 1054, 1074-75 (N.D. Cal. 2003)* (quoting *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 42 F.3d 1541, 1547-48 (9th Cir. 1994))*. Pursuant to *Rule 9(b)*, falsity must be pleaded with particularity, but scienter may be averred generally. *Fed. R. Civ. P. 9(b)* ("Malice, intent, knowledge, and other condition of mind of a person may [*17] be averred generally."); *Ronconi v. Larkin, 253 F.3d 423, 429 n.6 (9th Cir. 2001)*.

### 3. Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act ("PSLRA") imposes further pleading requirements in securities cases: falsity and scienter must be pleaded with particularity. No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 931 (9th Cir. 2003) (citing Janas v. McCracken (In re Silicon Graphics Sec. Litig.), 183 F.3d 970, 973 (9th Cir. 1999). The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4. The PSLRA also mandates that the complaint plead with particularity facts establishing "a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Courts in the Ninth Circuit incorporate the dual pleading requirements of sections 78u-4(b)(1) and [*18] (b)(2) into a single inquiry because falsity and scienter are generally inferred from the same set of facts. Ronconi, 253 F.3d at 429.

### B. Plaintiffs' Section 11 Claims

Count one alleges violations of Section 11 of the Securities Act of 1933 and is brought against all Defendants with the exception of Rane and SureBeam. n3 Section 11 establishes liability for false or misleading statements or omissions contained within a registration statement. 15 U.S.C. § 77k(a). The issuer of a security is absolutely liable for material misstatements and omissions within the registration statement. Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). All other defendants are prima facie liable, but may raise a defense of due diligence. Id Section 11 contains no scienter requirement and may be based on "innocent or negligent material misstatements or omissions." Anderson v. Clow (In re Stac Elecs. Sec. Litig.), 89 F.3d 1399, 1404 (9th Cir. 1996) (quoting Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994).

> n3 Although SureBeam is not a named defendant, in order for Titan to be vicariously liable as a control person of SureBeam under Section 15 of the 33 Act, the complaint must plead that SureBeam was primarily liable for a Section 11

violation. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).

[*19]

In order to state a claim under Section 11 the plaintiff must prove that (1) the registration statement contained a material omission or misrepresentation, (2) the plaintiff purchased a security that was part of a registered offering, and (3) the defendant falls into one of the enumerated classes. Stac, 89 F.3d at 1403; Huddleston, 459 U.S. at 381-82. Defendants argue that none of these requirements have been adequately pled in the consolidated Complaint.

### 1. Material Omissions or Misrepresentations In the Registration Statement

A Registration Statement may violate Section 11 in three ways: (1) containing "an untrue statement of material fact"; (2) omitting "a material fact required to be stated therein"; or (3) omitting a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k; Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1204 (1st Cir. 1996). Materiality is ordinarily a factual question eserved for the jury. Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995). Misstatements or missions within a registration statement are judged considering the circumstances [*20] at the time the registration statement becomes effective. 15 U.S.C. § 77k(a); GlenFed, 42 F.3d at 1549 .

In this case, Lead Plaintiffs allege that the Prospectus for the Registration Statement (1) contained a material misstatement, (2) omitted required information, and (3) omitted material facts necessary to make the statements not misleading.

### a. Applicability of Rule 9(b)

Defendants argue that Rule 9(b)'s particularity requirements should apply to Lead Plaintiff's Section 11 allegations because those allegations sound in fraud. Lead Plaintiffs argue that this court should limit the use of Rule 9(b) to the claims arising under Section 10(b).

Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Because Section 11 does not require fraudulent conduct, Rule 9(b) ordinarily does not apply to a Section 11 claims. See Kaplan, 49 F.3d at 1371. However, in Stac

the Ninth Circuit held that *Rule 9(b)*'s heightened pleading requirements apply to Section 11 claims that are "grounded in fraud." *Stac, 89 F.3d at 1404-05.* [*21] Where the "gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus," even the plaintiff's "nominal efforts" to disclaim the fraud allegations will not prevent the application of *Rule 9(b). Id. at 1405 n.2.*

The Ninth Circuit elaborated on the Stac holding in *Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103-05 (9th Cir. 2003).* The Vess court held that in cases in which fraud is not an element of the claim and plaintiff chooses nonetheless to allege "a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim" the claim sounds in fraud and the entire claim is subject to *Rule 9(b). Id. at 1103-04.* If, however, the plaintiff alleges some fraudulent and some non-fraudulent conduct, "only the allegations of fraud are subject to *Rule 9(b)*'s heightened pleading requirements." *Id at 1104.* In the latter situation, "if particular averments of fraud are insufficiently pled under *Rule 9(b)*, a district court should isregard' those averments, or trip' them" from the non-fraud-based claim and "then examine the [*22] allegations that remain to determine whether they state a claim." *Id. at 1105.*

In this case, Lead Plaintiffs have alleged a unified course of fraudulent conduct against the Titan and SureBeam Defendants. Nearly the entire Complaint alleges that the Titan Defendants and the SureBeam Defendants deliberately deceived the investing public into believing that SureBeam was financially sound and that the Tech Ion venture was generating a profit. The Complaint alleges that "Titan and Surebeam *knew* as of the date of the IPO [funding] would not be provided" and recognized revenue in the Prospectus despite this knowledge. (CC P 39 (emphasis added)). The Complaint also states that Titan and SureBeam misled the public about the structure of the joint venture. (CC P 40). Lead Plaintiffs' Section 11 and Section 10(b) claims are made up of a unified course of conduct alleging the Titan and SureBeam Defendants used fraudulent omissions and misrepresentations to convince the public that SureBeam was generating a profit from the Tech Ion venture.

Lead Plaintiffs assert that the Section 11 claims are based on a negligence or strict liability theory. In the portion of the Complaint [*23] raising a Section 11 claim, Lead Plaintiffs "expressly exclude and disclaim

any allegations that could be construed as alleging intentional or reckless misconduct or fraud" and maintain that all Section 11 claims are "based upon defendants' negligence or theories of strict liability." (CC P 176). However, the court in *Stac* expressly held that "nominal efforts" to disclaim fraud allegations are insufficient to avoid *Rule 9(b)* when the gravamen of the complaint is fraud. *89 F.3d at 1405 n.2.* See also *In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1104 (D. Nev. 1998)* ("Plaintiffs cannot avoid the more stringent requirements of *Rule 9(b)* by merely inserting boilerplate language into their Complaint stating that claims are based in negligence, not fraud."). Furthermore, Lead Plaintiffs do not plead any facts regarding this alleged negligence. The Complaint only contains the conclusory statement that the Section 11 claim is based in negligence. Because the gravamen of Lead Plaintiffs' allegations against the Titan and SureBeam Defendants is fraud, the Section 11 claims against Titan and the SureBeam Defendants are subject to *Rule 9(b)*'s pleading requirements. [*24]

Lead Plaintiffs' allegations against the Underwriter Defendants, on the other hand, do not contain any allegations of fraud or intentional behavior. In fact, the Underwriters are hardly mentioned in the factual allegations portion of the Complaint. Other than the allegation that they underwrote the IPO without conducting due diligence, see CC P 163-166, the only other instance an underwriter is mentioned in the Complaint is the portion in which Lead Plaintiffs allege that Merrill Lynch and First Union issued SureBeam a "buy" and "strong buy" rating. See CC P 88. But even this allegation is based in negligence: "Had First Union, or any of the other underwriters conducted even the slightest due diligence on the venture, First Union would have known that its statement (and the statements about the Brazilian venture) were materially false and misleading." (CC P 89). The Section 11 claims against the Underwriter Defendants are not subject to *Rule 9(b)*'s pleading requirements.

b. "We began construction of [the systems for Tech Ion] in July 2000, and have recorded revenues of $ 15.5 million under the percentage-of-completion method for the year ended December 31, 2000" and [*25] our "accounting policies comply with the provisions of SAB 101." (CC P 85)

Lead Plaintiffs allege that these statements were false

at the time of the March 16, 2001 IPO because SureBeam's revenue recognition violated Generally Accepted Accounting Principles ("GAAP") and SEC Staff Accounting Bulletins ("SAB") for recognizing revenue. GAAP allow revenue to be recognized under the percentage of completion method of accounting once services are rendered, even if payment has not actually been made. However, GAAP require that revenue can be recognized under the percentage of completion method only if "the buyer can be expected to satisfy his obligations under the contract." Titan Ex. A at 35. Like the GAAP, SAB 101 requires that collectability be "reasonably assured" before revenue is recognized. n4 Lead Plaintiffs allege that Titan and its employees were aware as of the date of the IPO that revenue from the Tech Ion project was far from reasonably assured.

> n4 he Underwriter Defendants argue that SEC SAB do not have the same force of law as SEC Rules, and therefore failure to follow SAB cannot constitute a Section 11 violation. See *Ganino v. Citizens Utilities Co., 228 F.3d 154, 163 (2d Cir. 2000)* (holding a SAB "does not carry with it the force of law"). However, Lead Plaintiffs are not asserting that SureBeam was required by law to follow SAB 101 in the Registration Statement. Rather, SureBeam's Prospectus claimed that all accounting complied with SAB 101.

[*26]

Defendants argue that Lead Plaintiffs are pleading falsity by hindsight. Defendants claim that while Tech Ion was ultimately unable to pay the amount owed under the contract and SureBeam's revenue was ultimately overstated, Lead Plaintiffs have not identified facts proving Tech Ion's inability to pay at the time the revenue was recognized. n5 Lead Plaintiffs respond that they have identified information available to Defendants at the time of the IPO, but never revealed to the investing public, proving Tech Ion's inability to pay for the systems under contract.

> n5 The parties seem to be disputing the exact date on which the statement must have been false. Lead Plaintiffs contend that although the revenue was recognized

in 2000, SureBeam had an obligation to disclose that previously recorded revenue was improperly recognized in order to keep the Prospectus from being misleading. Therefore, Lead Plaintiffs argue the statement must have been false as of March 16, 2001, the date of the IPO. The Titan Defendants, in contrast, argue that the recognition of the revenue need only have been true as of December 31, 2000, the date it was initially recognized. The Titan Defendants' argument, however, would authorize SureBeam to recognize revenue for the fiscal year 2000 and then, knowing it was incorrectly recognized, report it again in the Prospectus in 2001. Such an interpretation would conflict with *Section 11*, which provides a cause of action if any part of a registration statement is false or misleading *"when such part became effective." 15 U.S.C. § 77k(a)* (emphasis added).

[*27]

The Delphos Emails

On October 21, 2000, Oberkfell and Claudio received an email from Michael Telford at Delphos. The email stated,

> As we discussed, the meetings at the IIC and IFC [the World Bank] went very well. Both organizations are genuinely interested but expressed some of the same reservations. Specifically, SureBeam Brasil aims to provide a high technology service that is currently under-utilized (or non-existent) in Brazil. Although this is at the heart of its potential for success, lenders secured only by the project's assets need greater assurances that there will be customers to generate revenue to pay the debt. As presented in the information memorandum, the customer base is not well-defined and established enough to provide comfort . . . . convincing a lender that clients will line up for a new service when the doors are thrown open (what we

2004 U.S. Dist. LEXIS 26951, *27

refer to as the if you build it, they will come' or Field of Dreams' approach is EXTREMELY difficult." (CC P 25).

Again, on December 28, 2000 Oberkfell and Claudio received an email from Delphos regarding funding. The second email was from Alan Beard and stated,

> Attached is the information we had [*28] sent last week. We have highlighted within the Word document that specific questions and issues that need addressing. To reiterate them here more broadly, we need to justify the revenues and construct a plausible business case for marketing the SureBeam services (i.e., letters of interest from potential customers, alliances, etc.). Additionally, we need as many specifics on the construction of the project as possible. (CC P 27).

Lead Plaintiffs allege that Titan and SureBeam never provided the needed information. Lead Plaintiffs contend these emails are proof that financing from the World Bank was not "reasonably assured."

The Medeiros Memorandum

In December of 2000, Medeiros faxed a memorandum to Oberkfell and Claudio regarding major flaws in the concept for the joint venture. (CC P 29). Medeiros stated "Delphos' material needs enormous rewriting and deep changes in the concept and numbers." Id. Medeiros opined that "as it is now, I believe that it will not be approved, and if the World Bank asks for outside experts to examine the technical aspects, they will certainly locate our weak spots." Id. Medeiros went on to explain that the plan of servicing Brazil's [*29] CEASAs was deeply flawed. He stated "if we use only X-rays, the facility will surely go bankrupt . . ., if we go E-beams, numbers will improve but the market will be limited." (CC P 31). Medeiros suggested "let's change the image of Rio to a Center of Excelence [sic] to justify the presence of X-ray and E-beam there, and to enable us to obtain government funds -- hopefully grants -- to finance the project." (CC P 29). Lead Plaintiffs allege that this memorandum is evidence that financing from any party, especially the World Bank, was not likely because the entire design of the project was fundamentally flawed.

The Shipment of Irradiators and Invoice

On January 16, 2001 and January 25, 2001, SureBeam shipped two irradiation systems to Manaus. (CC para 35). The Complaint states that a project manager expressed concern to Oberkfell before the shipment was made, but was overruled. Id The project manager's concern stemmed from the fact that the irradiators were to be used in Rio, some 2,000 miles away from the Manaus shipping destination, in a building that had yet to be constructed. He feared the systems would deteriorate as they repeatedly traveled and waited for installation. [*30] Id. Lead Plaintiffs also emphasize that the invoices for the systems that indicated the systems were "prepaid," despite the fact that the term sheet stated the systems would be paid using the profits of the venture. Finally, Lead Plaintiffs cite an email sent on February 26, 2001, concerning the amount charged for these irradiators. The email sent by Medeiros stated, "please send me your proforma invoice for US $ 6.5 million ASAP. Otherwise, I will change the numbers to US $ 5.0 million. If I do not hear from you or receive the amend Proforma invoice, I will use the existing one of $ 5.0MMM." (CC P 36). Oberkfell replied "We should change the amount to $ 6.5 definitely. . . . Keep going as fast as you can to get the $ to prove to all that this is as we all claim it to be . . . Thank you." (CC P 37).

Lead Plaintiffs argue the shipment and alteration of the invoice prove the importance of securing financing from SUDAM. SureBeam would allegedly not have falsified an invoice and shipped the systems to Manaus had they not needed SUDAM's funding so badly.

The Collapse of SUDAM

Finally, four days before the IPO on March 12, 2001, SUDAM was disbanded by the Brazilian government [*31] due to high-level corruption. (CC P 37). The Associated Press reported the disbanding of the company. Id. Lead Plaintiffs allege that when SUDAM collapsed, SureBeam lost its last hope for funding. (CC P 38).

Defendants contend that no facts have been pleaded proving that SUDAM was the venture's last hope. Defendants contend that Lead Plaintiffs merely make the conclusory assumption that with SUDAM's undoing, SureBeam witnessed its "last chance for funding disappear." Defendants contend that the evidence pleaded in the Complaint actually proves that SUDAM was not the venture's last hope, pointing out that the emails from

Delphos indicate that meetings went "very well" and that while the lack of use of SureBeam's technology in Brazil scared some investors away, it was also "at the heart of its potential for growth." Furthermore, Medeiros' memorandum did not state that the flawed concept spelled doom for the venture. In fact, he stated that he was "ready with my team to rewrite the document" even if he had to work overnight. Finally, Medeiros expressed optimism about securing government grants once the project became a "Center of Excellence."

Because all reasonable inferences must [*32] be resolved in the plaintiff's favor when evaluating a motion to dismiss, *America West, 320 F.3d at 931*, Lead Plaintiffs have pleaded with sufficient particularity that the recognition of $ 15.5 million from Tech Ion was false and misleading at the time it was made. The facts and documents alleged in the Complaint identify with particularity events transpiring before the IPO that indicate SureBeam was recognizing revenue from an insolvent customer who was having extreme difficulty securing financing to pay its bills.

c. ". . . we received purchase orders from Tech Ion Industrial Brazil S.A. for eleven electronic food irradiation systems which we expect to result in approximately $ 55.0 million in sales revenues to us over the next three years."

Lead Plaintiffs allege that projecting $ 55 million from the Tech Ion venture was false and misleading for the reasons outlined above, including Tech Ion's insolvency and inability to secure funding. The Complaint contends that Tech Ion could not pay the contract price of $ 55 million, or any amount, as of the March 16, 2002 IPO. Defendants contend that this statement is forward-looking and not actionable as securities [*33] fraud.

Although the projection of future revenue is a statement of expectation, such a forward-looking statement can constitute securities fraud. *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989).* A "projection or statement of belief contains [an] implicit factual assertion [that] the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." Id; *Cooper v. Pickett, 137 F.3d 616, 629 (9th Cir. 1997).*

Lead Plaintiffs contend that the projection of $ 55 million in revenue contained the implicit factual assertion that the speaker was not aware of any undisclosed reason why the $ 55 million could not be collected. Despite the implicit factual assertion to the contrary, Lead Plaintiffs contend that SureBeam and Titan were aware that: (1) Tech Ion was insolvent, (2) Tech Ion had "no recorded historical revenues or profits that could be displayed at this time," (3) Tech Ion's payment of the $ 55 million was contingent on outside funding, and (4) all outside funding prospects had failed. The Prospectus failed to disclose any of this specific information and therefore, Lead Plaintiffs [*34] contend, the projection of $ 55 million was misleading.

### 1. The Bespeaks Caution Doctrine

Defendants argue that some of the allegedly misleading omissions were actually included in the Prospectus and that the projection of $ 55 million in future revenue from Tech Ion is a forward-looking statement protected by the Ninth Circuit's "bespeaks caution" doctrine. See *In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1415 n.3 (9th Cir. 1994)*. Pursuant to this doctrine, the court may hold as a matter of law that "defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims" based on those predictive statements. *Id. at 1413*. "A motion to dismiss for failure to state a claim will succeed only when the documents containing defendants' challenged statements include *enough* cautionary language or risk disclosure,' that reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht, 70 F.3d at 1082* (quoting *Worlds of Wonder. 35 F.3d at 1413*).

In this case, the Defendants argue that SureBeam's projection of $ 55 [*35] million in the Prospectus was forward-looking and accompanied by enough cautionary language regarding the Tech Ion venture to put the public on notice. Defendants point to the following cautionary disclosures in the Registration Statement and Prospectus:

. "You should not place undue reliance on these forward-looking statements." Titan Ex. 1 at 23.

. SureBeam Brasil is a "start up company that was created with no initial capital contribution." SureBeam Ex. 5 at 35.

. "We have entered into agreements to establish operations in both Japan and Brazil. Expansion of our

international operations could impose substantial burdens on our resources, divert management's attention from domestic operations and otherwise adversely affect our business. Furthermore, international operations are subject to several inherent risks that could increase our costs and decrease our profit margins including . . . changes in a specific country's or region's political or economic conditions." Id. at 10-11.

. "Our historical revenues are primarily attributable to the design and construction of systems for a limited number of third party service centers . . . Some of these systems are not [*36] yet installed or in operation and we expect to continue to derive system sales revenue as we complete construction of these systems. . . . We cannot assure you that we will continue to derive revenues from these customers, that revenues from these customers will continue at current or historical levels. . ." Id. at 12.

. "DELAYS IN THE CONSTRUCTION AND INSTALLATION OF OUR SYSTEMS COULD NEGATIVELY AFFECT OUR REVENUE." Id, at 15.

. "For example, the expected completion date of the first service center in Brazil was postponed from the fourth quarter of 2000 to the third quarter of 2001 as a result of unanticipated delays in the construction process. Any delay in the deployment of our systems could adversely affect our revenue and cash flow." Id.

. "The markets for pur SureBeam system are unproven." Id. at 7-8.

. "We expect to derive our future revenues from sales of our SureBeam systems and related food processing services. However, these revenues are highly uncertain." Id. at 7-8.

Lead Plaintiff argues that many of these cautionary statements are general, boilerplate warnings. A statement does not adequately bespeak caution if it is overly generalized [*37] and does not directly address the allegedly misleading future projection. *Provenz v: Miller, 102 F.3d 1478, 1494 (9th Cir. 1996)*. Lead Plaintiffs also argue that the Prospectus' omission of past problems -- including the failure to secure funding and the failure of the business plan -- cannot be remedied by forward-looking statements about potential similar problems. *Apple Computer, 886 F.2d at 1115* ( There is a difference between knowing that any

product-in-development may run into a few snags, and knowing that a particular product has already developed problems . . . ")

In this case, the Complaint adequately alleges that the Tech Ion venture had encountered problems that made recognition of revenue improper. Cautionary statements about future results cannot shield Defendants from liability for revenues already being improperly recognized. The motions to dismiss based upon the bespeaks caution doctrine are denied.

d. "we acquired a 19.9% equity interest in SureBeam Brasil without charge" and SureBeam Brasil was created "with no initial capital contribution from either party."

Lead Plaintiffs argue that this statement was untrue because Titan, [*38] then the sole shareholder of SureBeam, actually provided Tech Ion with $ 5 million dollars at the time the joint venture was created. Defendants argue that no misrepresentation was made regarding the $ 5 million line-of-credit because the loan was disclosed in the Prospectus.

The Complaint alleges that the "loan" concept was untrue and a guise for a contribution of capital to get the joint venture started. Lead Plaintiffs' only evidence that the money was a contribution is that no provision for repayment was included in the Prospectus, Tech Ion did not make any payments to Titan prior to the IPO, and Tech Ion ultimately could not repay the full $ 5 million.

Lead Plaintiffs' evidence that the money was a contribution rather than a loan is inadequate. The fact that Tech Ion ultimately could not pay the money back in 2001 does not prove that it was not a loan in 2000. In fact, information included in the Complaint actually contradicts Lead Plaintiffs' characterization of the money. Lead Plaintiffs admit that at the time Titan forgave the debt, the balance was only $ 3.5 million. Additionally, the $ 5 million payment to Tech Ion was disclosed in the Prospectus, which stated that Titan [*39] would "provide a $ 5 million working capital line of credit to Tech Ion." This statement was not materially misleading.

### e. Omissions: Item 303 of SEC Regulation S-K

Lead Plaintiffs allege that a Registration Statement must disclose all information required under SEC rules. SureBeam's registration statement allegedly failed to disclose information required under Item 303 of SEC

Regulation S-K ("Item 303"). Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *17 C.F.R. § 229.303.* The Ninth Circuit has held that because *Section 11* imposes liability if a registrant "omits to state a material fact required to be stated" in the registration statement, "any omission of facts required to be stated' under Item 303 will produce liability under *Section 11." Steckman v. Hart Brewing, 143 F.3d 1293, 1296 (9th Cir. 1998).* Lead Plaintiffs contend that more than one known adverse "trend, demand, commitment, event, or uncertainty" was not disclosed in SureBeam's Registration Statement, especially [*40] the collapse of SUDAM and the lack of funding.

Defendants argue nothing was omitted from the Prospectus because the document disclosed that the venture was "a start up company that was created with no initial capital contribution from either party." SureBeam Ex. 5 at 35. The Prospectus also informed customers that "international operations are subject to several inherent risks that could increase our costs and decrease our profit margins including . . . changes in a specific country's or region's political or economic conditions." Id. at 10-11. Defendants argue that, based on the above disclosures, investors were aware that the joint venture had no proven track record, no customer base, and no assets.

Adequacy of disclosure under Item 303 is a factual question and "adequacy of disclosure is normally a jury question." *Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir. 1987).* The Complaint sufficiently alleges enough facts from which a reasonable jury could conclude that the SureBeam prospectus violated *Section 303.* For these reasons, the motions to dismiss claims of misstatements under *Item 303* are denied.

### f. The Corporate Mismanagement Exclusion [*41]

The Underwriter Defendants contend that Lead Plaintiffs' allegations of omitted information are "nothing more than a corporate mismanagement claim" and therefore cannot form the basis of securities fraud. The Underwriter Defendants point to Santa Fe Indus., Inc. v. Green, where the Supreme Court held that a mere breach of corporate fiduciary duty or "corporate mismanagement" does not constitute securities fraud. *430 U.S. 462, 474-77, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977).*

However, Santa Fe does not stand for the proposition that when a breach of fiduciary duty and a misrepresentation in the sale of securities occur at the same time, only the former claim may be brought. See *In re Wells Fargo Sec. Litig., 12 F.3d 922, 927 (9th Cir. 1993)* (holding "we do not believe that the broad corporate management exclusion from *§ 10(b)* and *Rule 10b-5,* set forth in Santa Fe, is implicated when plaintiffs allege specific misrepresentations or material nondisclosures in violation of the federal securities laws."). The fact that Lead Plaintiffs' allegations could potentially state claims for corporate mismanagement or a breach of fiduciary duty does not negate the applicability of federal [*42] securities laws, if the statements in the Prospectus were materially false or misleading at the time they were made.

### 2. Securities Purchased Were Part of a Registered Offering

Defendants also move to dismiss the *Section 11* claims on the ground that Lead Plaintiffs have not established standing by showing that the Plaintiffs' shares are traceable to the IPO or by showing reliance on the registration statement.

### a. Securities Traceable to the IPO

Defendants argue that Lead Plaintiffs have not alleged that they purchased securities during the IPO or that the securities they purchased are traceable to the IPO and therefore have not established standing under *Section 11.*

Stock purchasers have standing under *Section 11* if they acquired their shares directly in the IPO or if they can trace their purchases to the IPO. *Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1080 n.4 (9th Cir. 1999).* The Complaint alleges that all three Lead Plaintiffs "purchased shares of SureBeam publicly-traded during the Class Period" and that two named, non-lead Plaintiffs, Delaware Charter Gty. Trust Tr. Melvyn Manaster IRA R/O and James Janette, "purchased shares of Surebeam [*43] publicly-traded stock during the Class Period, including shares directly from or traceable to SureBeam's Initial Public Offering." (CC P 69).

Defendants contend that these allegations of standing are insufficient. In particular, Defendants contend that Lead Plaintiffs must plead the particular dates of acquisition or facts establishing a connection to the IPO.

To support this assertion, Defendants cite two cases, *Lilley v. Charren, 936 F. Supp. 708, 715 (N.D. Cal. 1996)*, and *Guenther v. Cooper Life Sciences, Inc., 759 F. Supp. 1437, 1439 (N.D. Cal. 1990)*. Those cases require that the plaintiff set forth specific dates and facts in the Complaint that establish the representative plaintiffs' § 11 standing. Drawing on these cases, Defendants contend that the Complaint's conclusory statements that named Plaintiffs purchased "shares directly from or traceable to SureBeam's Initial Public Offering" are insufficient because they do not reveal the specific dates and facts of purchase.

Lead Plaintiffs maintain that they have adequately established standing under *§ 11* by filing certificates during the motion to be appointed lead plaintiff. They point out [*44] that both Lilley and Guenther were decided prior to the enactment of the PSLRA. In their motions to be appointed lead plaintiff, Lead Plaintiffs provided the court with certificates in which plaintiffs identified when they purchased their shares of SureBeam.

By asserting that the named plaintiffs bought shares directly from or traceable to SureBeam's IPO and by filing certificates detailing the transactions, the plaintiffs have established standing under *Section 11*. See *In re Seebeyond Techs. Corp. Secs. Litig., 266 F. Supp. 2d 1150, 1172 (C.D. Cal. 2003)* (holding allegation that "Lead Plaintiff and the members of the Class purchased [stock] issued pursuant to the Registration Statement/Prospectus filed by the Company with the SEC" is sufficient to plead § 11 standing).

### b. Reliance on the Registration Statement

Defendants argue that Plaintiffs' Section 11 claim should be dismissed because Lead Plaintiffs fail to plead reliance on the Registration Statement. Reliance is not required under *Section 11* unless the purchaser "acquired the security after the issuer has made generally available . . . an earnings statement covering a period of at least twelve [*45] months beginning after the effective date of the registration statement. . . ." *15 U.S.C. § 77k(a)*. Defendants allege that SureBeam filed a Form 10-K with the SEC on April 1, 2002 and a Form 10-Q on May 15, 2002, and claim that these two forms taken together constitute an earnings statement. The text of *15 U.S.C. § 77k(a)* requires a single earnings statement, so the filings on April 1, 2002 and May 15, 2002 cannot be linked to require Plaintiffs to prove reliance.

### 3. The Enumerated Classes of Defendants

Titan, sued as both primary violator of *Section 11* and as vicariously liable for SureBeam's Section 11 violation under *Section 15*, moves to dismiss on the ground that it is an improper Section 11 defendant. Titan argues that regardless of whether Lead Plaintiffs have stated a claim under *Section 11*, the Complaint fails to adequately state how Titan is primarily liable under *Section 11*. Plaintiffs did not respond to Titan's motion to dismiss the Section 11 claims against it.

*Section 11* authorizes suit against (1) "every person who signed the registration statement," (2) directors of the issuer, (3) individuals named in the registration [*46] statement as "being or about to become a director," (4) professionals named as having prepared or certified any part of the registration statement," and (5) every underwriter. *15 U.S.C. § 77k(a)*. Titan does not fall under any of the enumerated categories of *Section 11* defendants, so the Section 11 claim against Titan is dismissed.

The Underwriter Defendants have also moved to dismiss the Section 11 claims against them. As underwriters of a security, the Underwriter Defendants will be liable for material misstatements in the registration statement. *Section 11(b)* allows a defendant to avoid liability if the defendant proves he made a reasonable, independent investigation and believed the statement was true when made. Any dismissal of an Underwriter Defendant based upon a showing of a reasonable, independent investigation must come at a later time, not at this pleading stage. The motion of the Underwriter Defendants to dismiss the Section 11 claims against them is denied.

### 4. Section 11 Conclusion

Lead Plaintiffs have adequately pled a false or misleading statement or omission in the Registration Statement with respect to revenue recognition and projection [*47] for the Tech Ion venture but not with respect to the capitalization of SureBeam Brasil. It was not necessary for Lead Plaintiffs to plead reliance on the Registration Statement to present a valid Section 11 claim. Oberkfell, Claudio, Ray, Goiding and the Underwriter Defendants are proper Section 11 defendants and the claims against them remain. But the Section 11 claims against Titan are dismissed under *Fed. R.Civ.P. 12(b)(6)*.

## C. Count Three: Section 10(b) of the 34 Act and SEC Rule 10b-5

The third claim in the Complaint names Oberkfell, Claudio, and Rane and alleges that they are liable for violations of *Section 10(b)* and *Rule 10b-5*. *Section 10(b)* makes it unlawful to employ, in connection with the purchase or sale of any security, any manipulative or deceptive device contrary to SEC rules. *15 U.S.C. 78j*. *Rule 10b-5*, promulgated under *Section 10(b)*, provides it is unlawful for any person, by the use of any means of interstate commerce,

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the [*48] circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. In order to establish a violation of Section 10(b) or Rule 10b-5, a plaintiff must demonstrate the following elements: (1) a connection to the purchase or sale of a security, (2) defendants made a false statement or omission, (3) materiality, (4) scienter, (5) reliance, and (6) causation. *Broudo v. Dura Pharms., Inc., 339 F.3d 933, 937 (9th Cir. 2003)*.

Under the PSLRA both falsity and scienter must be stated with particularity. *Ronconi, 253 F.3d at 429*. The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)(B)*. The PSLRA also requires the complaint to "state with particularity facts giving rise to a strong [*49] inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*.

### 1. False Statement or Omission

In order to amount to a Section 10(b) violation, the statement or omission at issue must be false or

misleading. *Brody v. Transitional Hospital Corp., 280 F.3d 997, 1006 (9th Cir. 2002)*. The plaintiff may plead falsity with particularity by "pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Yourish v. Cal. Amplifier, 191 F.3d 983, 994 (9th Cir. 1999)* (quoting *GlenFed, 42 F.3d at 1549*).

### a. The Group Published Theory

The Complaint alleges that the SureBeam Defendants are liable for all written false statements, "as those statements were group-published' information." (CC para 74). Defendants argue that Lead Plaintiffs cannot rely on the "group published" doctrine to prove that they made a false statement or omission, in light of the PSLRA's particularized pleading requirements. This court previously held that the group published doctrine's inference of wrongdoing based on a [*50] defendant's status "cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant." *Allison v. Brooktree Corp., 999 F. Supp. 1342, 1350 (S.D. Cal. 1998)*. Lead Plaintiffs' counsel conceded this point during oral arguments.

### b. The Tech Ion Venture Statements

The Complaint alleges that SureBeam made several false statements and omissions regarding the Tech Ion Venture before the IPO, in the Prospectus, and following the Prospectus.

The Pre-IPO Statements

The only allegedly false statements made prior to the IPO were statements Oberkfell and Rane made at a roadshow in February 2001. The Complaint alleges that Oberkfell and Rane orally informed investors that SureBeam had recognized revenue of $ 15.5 million from the Tech Ion deal and was expecting $ 55 million in the future. (CC P 82). The roadshow occurred before the collapse of SUDAM and before the purported falsification of the invoice on the shipment to Manaus. Absent the problems with SUDAM, statements regarding the Tech Ion venture are far less misleading and do not support a claim for securities fraud

The IPO Statements [*51]

As outlined above in the portion of this decision

addressing the Section 11 claims, Lead Plaintiffs allege a number of statements in the Prospectus were false or misleading at the time of the IPO. As stated above, Lead Plaintiffs have adequately pleaded with particularity that the Prospectus contained misleading statements and omissions regarding revenue from the Tech Ion venture but not regarding the capitalization of SureBeam Brasil.

The Post-IPO Statements

On May 15, 2001, SureBeam filed a Form 10-Q with the SEC. In that report, SureBeam recognized $ 5.5 million in revenue for the first quarter of 2001, with $ 4.7 million of the revenue coining from Tech Ion. Lead Plaintiffs allege that this revenue recognition violated GAAP because payment for Tech Ion was not reasonably assured, as required under the percentage-of-completion accounting method. Financing was still unavailable and Tech Ion's construction of the irradiation facility was at least six months behind schedule. Oberkfell traveled to Brazil and witnessed that the irradiators he sent there in January of 2001 were sitting in a warehouse unused.

SureBeam again recognized almost $ 1 million in revenue from the [*52] Tech Ion venture in the company's 10-Q filed on August 14, 2001. However, SureBeam employees that had traveled to Rio prior to this announcement and witnessed that Tech Ion had done very little construction on the project. Tech Ion had merely laid a foundation, constructed a ceiling and dug "little holes." The project was nowhere near completion and SureBeam employees were skeptical as to how Tech Ion was using the $ 5 million loan from Titan.

Again in a 10-Q filed November 14, 2001, SureBeam recognized $ 1.3 million of revenue from Tech Ion. Prior to this recognition, the facility in Rio was only 40%-50% completed and was over twelve months behind schedule. In fact, Tech Ion was so far behind in construction by that time that SureBeam replaced Tech Ion with a different construction company and bought out Tech Ion's interest in October of that year.

Lead Plaintiffs have pleaded with particularity that the revenue recognition following the IPO was misleading for the same reasons revenue recognition was misleading in the IPO. Lead Plaintiffs have demonstrated that Tech Ion's financial situation and ability to pay only deteriorated after the IPO, yet SureBeam continued to recognize revenue [*53] from the venture.

Lead Plaintiffs allege that Oberkfell made other false statements after the SureBeam IPO. Oberkfell allegedly stated in a July 13, 2001 press release that SureBeam's "joint venture, SureBeam Brasil, will be supporting the new Food Irradiation Center of Excellence being instituted in the State of Rio de Janeiro" and the "joint venture between SureBeam Corporation and Tech Ion . . . expands our revolutionary, patented SureBeam(R) technology into one of the largest and most diversified food markets in the world." (CC P 97-98). On August 14, 2001, Oberkfell stated, "I am pleased with the progress we have made in executing our business strategy since our IPO just four months ago." (CC P 99). After resigning on March 6, 2003, the Complaint alleges that Oberkfell stated "My goal of moving SureBeam from an excellent idea to building a business foundation for its continued growth has been realized. I am excited by the success we've had." (CC P 129). These general statements of optimism are not actionable as securities fraud. See *Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d, 353, 372 (5th Cir. 2004); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996).* [*54]

Finally, the Complaint alleges that Oberkfell and Rane stated during a July 29, 2002 conference call that delays in Rio were attributable to "time needed to obtain regulatory permits and licensing." (CC P 115). Lead Plaintiffs have not alleged facts demonstrating that this statement was false.

#### c. The RESAL Venture Statements

Plaintiffs allege that SureBeam made misrepresentations relating to the agreement with RESAL to purchase ten irradiators. During the class period, SureBeam recognized $ 23.5 million on that contract: $ 6.8 million in Q2-0.1, $ 7.9 million in Q3-01, $ 5.1 million in fiscal year 2002, and $ 1.1 million in Q1-03. Defendants argue that although RESAL was ultimately only able to pay SureBeam $ 7.5 million of the $ 23.5 million recognized and $ 53 million projected, Lead Plaintiffs have not demonstrated that recognizing revenue from the project was improper *at the time* it was done.

While Lead Plaintiffs may have adequately pleaded that the success of the RESAL venture was dependant on outside funding, they do not plead any specific facts showing that funding was unavailable or unlikely. Lead Plaintiffs' only evidence of RESAL's inability to pay is the fact [*55] that Rane renegotiated the payment

schedule at some point. This is insufficient to plead with particularity that the SureBeam's Defendants' statements regarding revenue from RESAL were false or misleading at the time they were made.

#### d. The Domestic Operations Statements

The Complaint cites numerous statements by the SureBeam Defendants regarding current and future domestic demand for SureBeam's irradiated meat. Defendants contend that all statements made about domestic demand are not actionable as securities fraud.

Future Demand

The Complaint identifies several statements by some Defendants that projected that demand, revenue, and production from SureBeam's domestic meat processing would increase in the future. (CC PP 52, 90, 91, 99, 101). Oberkfell and Rane are also alleged to have projected $ 14 to $ 18 million from meat irradiation and a utilization rate of 20% during a July 29, 2002 conference call with analysts and investors. (CC P 115).

Lead Plaintiffs allege that these statements were misleading at the time they were made because they gave investors the impression that new facilities were needed to meet demand when in fact there was no current demand for SureBeam [*56] processed meat and no need to construct new plants.

Lead Plaintiffs have not sufficiently alleged that SureBeam's statements of expected growth were false when made. Although demand was low when the statements were made and never increased, Lead Plaintiffs have not demonstrated that SureBeam did not expect demand to increase. In fact, many of SureBeam's actions during this period indicate that the company did expect demand to increase and had some reason to be hopeful. The company was negotiating contracts with grocery stores for "roll-outs" of processed meat and building new facilities. The fact that SureBeam's expectations never materialized does not demonstrate that the company misled the public when it announced anticipated growth.

Current Demand

The Complaint alleges that some of the Defendants made statements that current demand for SureBeam's irradiated meat had grown. These statements include: (1)

Oberkfell and Rane's statements at the 2000 roadshow that demand is increasing; (2) Oberkfell's statement in a February 11, 2002 press release that "consumer acceptance grew"; (3) Oberkfell's statement in a February 20, 2003 press release that "consumer demand is obviously [*57] growing"; and (4) Oberkfell and Rane's statement during a February 20, 2003 conference call that "the consumer is buying [irradiated meat] and, in fact, demanding that the retailer supply irradiated products." (CC P 52, 82, 108, 124, 125). n6

> n6 None of the allegedly false statements regarding domestic demand are attributed to Claudio.

Lead Plaintiffs allege these statements were false because demand had not and was not increasing. The Complaint contends that during the class period, SureBeam's domestic plants were operating at 2%-3% of capacity company-wide and some plants were operating a .01% of capacity. Anonymous project managers report that there were very few paying customers and SureBeam was irradiating meat for free in an effort to introduce the product into the market.

While Lead Plaintiffs' allegations regarding statements of current demand are stronger than those of future demand, Lead Plaintiffs do not plead with particularity that these statements were false when made. Lead Plaintiffs simply [*58] point to the average class period capacity and anonymous reports that during the class period SureBeam had few customers. Lead Plaintiffs provide no information regarding capacity use or demand before or during the time the statements were made. Furthermore, they do not claim that sales never increased during the class period. Lead Plaintiff's inferences from the average capacity use over a two year period do not establish with particularity that the specific statements regarding demand were false at the particular time in which each statement was made.

#### 2. Scienter Allegations

In the Ninth Circuit, the requisite state of mind for a 10(b) claim, at a minimum, is deliberate or conscious recklessness. *In re Silicon Graphics, 183 F.3d at 979.* In the case of forward-looking statements, plaintiffs must allege facts creating a strong inference that defendants acted with "actual knowledge" that the statement is false

or misleading. Id Each allegation should be supported by particularized facts and corroborating details. *In re Silicon Graphics, 183 F.3d at 985.* Beyond each individual allegation, courts also consider "whether the total of plaintiffs' allegations, [*59] even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Lipton v. PathoGenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).*

**a. Scienter Allegations Relevant to All Three Ventures**

**1. Stock Sales**

The Complaint outlines a number of sales of SureBeam stock by Oberkfell and Claudio. Unusual or suspicious stock sales may serve as circumstantial evidence of scienter. *In re Silicon Graphics, 183 F.3d at 986.* Stock sales by insiders are only suspicious when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi, 253 F.3d at 435,* Factors to consider in making this determination are: 1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history. Id.

*Oberkfell*

The Complaint alleges that between March 4, 2002 and March 8, 2002, Oberkfell sold 350,000 shares of SureBeam stock, 37.5% of his total holdings, at $ 5.70-55.78 per share. [*60] (CC para 110). While the percentage of stock sold by Oberkfell is suspicious enough to question it further, see *Fischer v. Vantive Corp.(In re Vantive Corp. Secs. Litig.), 283 F.3d 1079 at 1095* (finding a sale of 32% of the executive's holdings worthy of further investigation), the timing of these sales is not suspicious. Lead Plaintiffs have not alleged why the timing of Oberkfell's sales from March 4, 2002 to March 8, 2002 supports an inference of scienter, and have not shown that the trades were made to capitalize on undisclosed inside information. At the time Oberkfell sold the stock, SureBeam had already taken over the Tech Ion project, a fact that was made public. SureBeam executives allegedly knew that the RESAL project and the domestic operations were doomed long before Oberkfell's sales as well. Lead Plaintiffs have not alleged a connection between any allegedly concealed inside

information and the stock sales. See *In re PETsMART, Inc. Secs. Litig., 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999)* ("Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious.").

Lead Plaintiffs point to the stock price before and after Oberkfell's sales as evidence that [*61] his behavior was improper. When Oberkfell sold his stock, SureBeam was valued at $ 6.00 per share. Following his sales, the stock descended to $ 1.62 per share. However, at the time Oberkfell sold, the market price had already began a descent from a high of $ 19.45 per share and continued to fluctuate following his sales.

Furthermore, although Rane, SureBeam's CFO, is alleged to have concealed information regarding SureBeam's financial woes as well, Lead Plaintiffs concede that he did not sell stock. The fact that "equally knowledgeable insiders" act inconsistently is evidence negating the inference of scienter. *Vantive, 283 F.3d 1079 at 1093* (citing *Ronconi, 253 F.3d at 436*). The Complaint does not allege that Oberkfell's sale was inconsistent with his prior trading history. In fact, nothing is alleged regarding Oberkfell's prior trading. Considering all the factors, Oberkfell's sale of SureBeam stock does not give rise to an inference of scienter. *Claudio*

The Complaint alleges that on November 1, 2001, Claudio sold 92,670 shares of Surebeam, 49.6% of his stock holdings, at $ 12.40 per share. (CC P 106). Between March 4, 2002 and March 8, 2002, Claudio [*62] also sold 30,000 shares of SureBeam at $ 6.20 per share. (CC P 110). This represented 31.8% of his remaining holdings. Id.

The above analysis of Oberkfell's March 2002 sales also applies to Claudio's March 2002 sales. However, Claudio also sold 31.8% of his remaining shares on November 1, 2001. Lead Plaintiffs allege that the time of this sale is suspicious because November 1, 2001 was one week after Surebeam executed its agreement with Tech Ion to take over the venture. (CC P 106). However, Lead Plaintiffs also allege that SureBeam disclosed the fact that it bought out Tech Ion and the details of that buy out. Lead Plaintiffs do not allege how this sale correlates with insider information. Furthermore, neither Rane nor Oberkfell sold during this time period. Lead Plaintiffs do not allege that this was inconsistent with Claudio's prior trading history. Claudio's sales of SureBeam stock do not appear "calculated to maximize the personal benefit from

undisclosed inside information." *Ronconi, 253 F.3d at 435.*

### 2. Accounting Errors

Lead Plaintiffs allege that scienter can be inferred from SureBeam's many accounting irregularities and troubles with outside auditors. [*63] Merely publishing inaccurate accounting figures, or failing to follow GAAP does not result in a strong inference of scienter. See *DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002).* To amount to securities fraud, the plaintiff must establish that defendants "knew or must have been aware of the improper revenue recognition, [or] intentionally or knowingly falsified the financial statements." *DSAM, 288 F.3d at 390-91* (citing *Worlds of Wonder, 35 F.3d at 1426-27*). The Complaint fails to sufficiently allege that the individual defendants charged with violating *Section 10(b)* acted knowingly, or with deliberate recklessness with respect to the accounting errors.

### 3. Job Duties

Lead Plaintiffs allege scienter based on Oberkfell, Claudio, and Rane's positions and job duties at SureBeam. (CC PP 139-40). Oberkfell, Claudio and Rane each attended a daily 7:30 a.m. meeting in which SureBeam's revenue recognition was discussed. (CC P 140).

Job duties and position in the corporation do not establish scienter in the particularized manner required by the PSLRA. See *In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 848-49 (9th Cir. 2003)* [*64] (holding job duty alone "does not satisfy the PSLRA's requirement that Plaintiffs allege particular facts that give rise to a strong inference' of scienter on part of the Defendants"); *Vantive, 283 F.3d at 1088* (vague allegations of attendance at meetings and a "hands-on" managerial style do not amount to scienter).

### b. Scienter Allegations Regarding the Tech Ion Venture

Lead Plaintiffs contend that Oberkfell, Claudio and Rane must have been aware at the time that they caused SureBeam to recognize revenue from the Tech Ion venture that the revenue would never be forthcoming. (CC para 140). Oberkfell and Claudio were at all the original meetings with Medeiros in which the venture's

parameters were established, and knew that Tech Ion was basically insolvent. Oberkfell and Claudio received the emails from Delphos indicating that funding would be "extremely difficult" and both men received the memorandum from Medeiros indicating the venture required "deep changes in design and concept." Allegedly desperate for funding, Oberkfell agreed to ship systems early and to the wrong part of Brazil. He even falsified the amount of the systems and indicated that Tech Ion [*65] had paid for them. SureBeam's hope for funding from SUDAM fell through when the organization was disbanded by the government prior to the IPO. Following the IPO, Oberkfell visited the systems in a warehouse in Manaus. Later, a number of other SureBeam representatives visited Tech Ion's construction site and discovered it woefully behind schedule. They repeatedly sent this information to Oberkfell and Claudio and even sent the men a photograph of an "empty field." Despite all of this information, SureBeam continued to recognize revenue from the Tech Ion venture every quarter.

From these allegations, a jury could reasonably conclude that Oberkfell and Claudio knowingly or recklessly misled the public when they caused SureBeam to recognize millions of dollars in revenue from the Tech Ion venture. The Complaint sufficiently pleads scienter allegations with respect to Oberkfell and Claudio for the Tech Ion venture. However, the Complaint does not adequately establish Rane's scienter in this area, especially considering the fact that he joined the company late in the sequence of events.

### c. Scienter Allegations Regarding the RESAL Venture and Domestic Demand

As discussed above, there [*66] is insufficient evidence in the Complaint to conclude that SureBeam materially misstated the results of the RESAL venture. Similarly, statements about domestic demand for SureBeam's services were not actionable misstatements when made. See *Demarco v. Depotech Corp., 149 F. Supp. 2d 1212, 1232 (S.D. Cal. 2001)* (holding if the statement is not false, "scienter entails the illogical inquiry into whether the defendant intended to deceive when, in fact, there was no deception").

### 3. Reliance

Ordinarily, a Section 10(b) plaintiff must prove reliance on the defendant's misleading statements or omissions. *Ambassador Hotel Co. v. Wei-Chuan Inv., 189*

*F.3d 1017, 1025 (9th Cir. 1999)*. However, a plaintiff is entitled to a presumption of reliance if he or she can establish "fraud-on-the-market." *Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999)*: see also *Basic v. Levinson, 485 U.S. 224, 247, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)*. The fraud-on-the-market presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and [*67] its business" so "misleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Binder. 184 F.3d at 1064* (quoting *Basic. 485 U.S. at 241-42*). To qualify for the fraud-on-the-market presumption of reliance, the plaintiff must establish that the defendant made a misstatement or omission regarding a security that is actively traded in an "efficient market." Id.

The Ninth Circuit has not decided what constitutes an efficient market. However, in Binder the court referred to *Cammer v. Bloom 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)*, in which the district court of New Jersey created a five-factor test for evaluating whether a market is efficient. *Binder. 184 F.3d at 1064*. The Cammer court listed five factors: 1) the weekly volume of trades in the security; 2) the extent of analyst coverage; 3) arbitrageurs and market makers in the security; 4) hether the company is eligible to file a registration form S-3; and 5) facts showing a cause and effect elationship between unexpected corporate events or financial releases and an immediate response in the [*68] stock price. *Cammer, 711 F. Supp. at 1286-87*.

In this case, none of the Cammer factors are included in the Complaint. The Complaint only alleges "SureBeam's stock traded in an efficient market on the Nasdaq National Market System under the symbol SURE" and investors purchased SureBeam "in reliance on the integrity of the market." (CC para 188). The Titan Defendants contend Lead Plaintiffs have failed to plead, with the particularity *Rule 9(b)* requires, that SureBeam traded in an efficient market. See *In re NationsMart Corp. Sec. Litie., 130 F.3d 309, 321-22 (8th Cir. 1997)* (holding *Rule 9(b)* applies to the reliance prong of *section 10(b)*); *In re Turbodyne Techs. Sec. Litig., 2002 U.S. Dist. LEXIS 25738, at *46 (C.D. Cal. Mar. 13, 2002)* (same).

Lead Plaintiffs also urge this court to apply Cammer,

They argue that under Cammer, stating that the fact that SureBeam's stock traded on the NASDAQ exchange is sufficient to establish that the market is efficient. The Cammer court ultimately held that "a rule which *per se* subjects a party to protracted litigation merely because a company's stock trades within a certain [*69] Nasdaq grouping (i.e., the National Market System) is also rejected." *Cammer, 711 F. Supp. at 1293*. The case cited by Plaintiff to prove they need only plead that the stock was traded on Nasdaq itself states that being listed on Nasdaq, while relevant to efficiency, is "not dispositive." *Levine v. SkyMall, Inc., 2001 U.S. Dist LEXIS 24705, *13*.

Because both parties agree that the Cammer factors should determine fraud on the market and Plaintiff has not addressed any of the Cammer factors, the Complaint does not adequately plead reliance through the fraud-on-the-market theory. Similarly, the Complaint does not set out any factors that would indicate direct reliance on the misstatements, so reliance is inadequately pled.

### 4. Conclusion of 10(b) Claims

Lead Plaintiffs have adequately pled that revenue recognition for the Tech Ion deal was false when made but have failed to establish that any statements regarding the RES AL venture or domestic operations were false or misleading. The Complaint establishes the requisite degree of scienter for Oberkfell and Claudio with respect to the Tech Ion venture. But the Complaint does not adequately plead [*70] the Plaintiffs' reliance on the misstatements allegedly made by Defendants.

### D. Counts Two and Four: Section 15 of the 33 Act and Section 20(a) of the 34 Act

The Complaint alleges that Titan violated *Section 15 of the 1933 Act* because it controlled SureBeam, a person liable under *Section 11*. *Section 15* provides:

> Every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under sections [11 or 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which

2004 U.S. Dist. LEXIS 26951, *70

the liability of the controlled person is alleged to exist.

*15 U.S.C. § 77o.*

The fourth claim alleges that Titan violated *Section 20(a) of the 1934 Act* because it controlled SureBeam, whom the Complaint asserts violated a rule or section of the 1934 Act. *Section 20(a)* provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable [*71] jointly and severally with and to the same extent as such controlled person . . .is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).*

The standard for establishing control liability is the same under both *sections 15* and *20(a). Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990).* Under both statutes, Plaintiff must prove (1) a primary violation of federal securities laws, and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir. 2000).*

The primary violator alleged in this case is SureBeam. SureBeam was the issuer of a security containing allegedly material misstatements its the registration statement, so Plaintiffs have stated a claim that SureBeam violated *Section 11.* The second prong of control person liability requires Lead Plaintiffs to plead facts establishing that Titan "exercised actual power or control over SureBeam." It is also "not necessary to show actual participation or the [*72] exercise of power," but Defendants are entitled to a good faith defense based upon no scienter and an effective lack of participation. *America West, 320 F.3d at 945.*

A defendant's status as a control person is "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan, 49 F.3d at 1382.* The Ninth

Circuit has also adopted the SEC's definition of control: "The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *Howard, 288 F.3d at 1065* (citing *17 C.F.R. § 230.405(f)*). The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board. *Paracor Finance. Inc. v. General Electric Capital Corp., 96 F.3d 1151, 1162 (9th Cir. 1996).*

In America West, the court found that shareholder relationships, majority stock ownership, power to elect the majority of the board, and presence [*73] of officers on board were sufficient to prove a prima facie case of control person liability. *320 F.3d at 945-46.* In this case, Lead Plaintiffs allege that Titan owned 100% of SureBeam at the time of the IPO and 84% of SureBeam following the IPO until the August 5, 2002 spin-off. The Prospectus stated that Titan has the power "to control the election of our directors and all other matters requiring stockholder approval" and to "ultimately control our management." Titan had a representative on SureBeam's Board of Directors; Defendant Ray served as Titan's CEO, and Board Chairman as well as a director on SureBeam's Board. These allegations are sufficient to establish a prima facie case of Titan's liability as a control person of SureBeam.

**III. Conclusion**

For the foregoing reasons, the Court **grants** Titan's motion to dismiss the Section 11 claims against it. The Underwriter Defendants' motion to dismiss the Section 11 claims against them is **denied.** All other Defendants' motions to dismiss the Section 11 claims are **denied.** Titan's motion to dismiss the Section 15 claims against it is **denied.** The SureBeam Defendants' motion to dismiss the [*74] Section 10(b) and Rule 10b-5 claims against them is **granted** for failure to adequately plead reliance. Titan's motion to dismiss the Section 20(a) claim against it is **denied.**

**IT IS SO ORDERED**

DATED: 12/30, 2004

**JEFFREY T. MILLER**

United States District Judge

108WN4

********** Print Completed **********

Time of Request: Monday, October 09, 2006  16:47:02 EST

Print Number:    1841:122881200
Number of Lines: 897
Number of Pages: 20

Send To:  ITRI, SHAUNA
          BERGER & MONTAGUE PC
          1622 LOCUST ST
          PHILADELPHIA, PA 19103-6305

**A. 90**

LEXSEE 1990 US DIST LEXIS 18394

**WILLIAM B. WEINBERGER, on behalf of himself and all others similarly situated, Plaintiff, v. DAVID JACKSON, et al., individually and as representative of a defendant underwriter class, Defendants**

**No. C-89-2301-CAL**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1990 U.S. Dist. LEXIS 18394; Fed. Sec. L. Rep. (CCH) P95,693*

**October 11, 1990, Decided**
**October 12, 1990, Filed**

**JUDGES:** [*1]

Charles A. Legge, United States District Judge.

**OPINION BY:**

LEGGE

**OPINION:**

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment or partial summary judgment. The motions and oppositions were supported by extensive fact records, and were argued and submitted for decision. The court has reviewed the record of the case, the moving and opposing papers, the fact records, and the applicable authorities.

The court concludes that summary judgment on some claims should be granted and some denied. This order will discuss those claims as to which this court believes there is no genuine issue of material fact and summary judgment or partial summary judgment should be entered. The motions for summary or partial summary judgment on all other claims are denied.

I.

Upon reviewing the earlier rulings on motions to dismiss and motions for summary judgment made by Judges Ingram and Aguilar, this court concludes that the following are the causes of action remaining in the case before the rulings made below: (1) Section 11 of the Securities Act; (2) Section 12(2) of the Securities Act. The Section 11 and Section 12(2) claims are based upon alleged false statements or omissions in the offering [*2] materials. (3) Section 10(b) of the Exchange Act and Rule 10(b)5, concerning alleged false statements or omissions in the offering materials, press releases, and "road shows." (4) California Corporations Code Section 25400.

The alleged false statements or omissions concern three subject matters: (1) Whether the 586 series and the 6800 series of products were shipped in quantity in November 1982. (2) Whether the statement in the prospectus that software was currently available for Altos' products was correct. (3) Whether defendants projected sales, particularly for fiscal year 1983, were actionably misleading.

II.

It is undisputed that defendants represented to the brokerage community that Altos would have projected gross revenue of eighty-five to ninety million dollars for fiscal year 1983. Plaintiffs contend that shortly before and shortly after the public offering, defendants were aware that Altos would not make that earnings projection. In fact, the company's gross revenue for fiscal year 1983

1990 U.S. Dist. LEXIS 18394, *2; Fed. Sec. L. Rep. (CCH) P95,693

was seventy-five million dollars.

Plaintiffs also complain that at the "road show" presentations defendants showed a chart of Altos' past net sales for fiscal years 1978 through 1982, demonstrating [*3] that earnings had more than doubled each year. However, that presentation was an accurate statement of historical information. There was no representation that the doubling of revenue each year would continue. And the investment community was advised that anticipated 1983 revenues would be in the seventy-five to ninety million dollar range, less than a doubling of the fifty-one million dollars of net sales for the prior fiscal year.

The projection of gross revenue for fiscal year 1983 was not a part of the prospectus or otherwise distributed to the investing public. Whether such projections are actionable misrepresentations is to be judged under the standard of 10(b). The Ninth Circuit's latest consideration of this issue is in *In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989)*. The Ninth Circuit said that a projection or expression of optimism is not actionable if (1) the statement was genuinely believed, (2) there was a reasonable basis for the belief, and (3) that the speaker was not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement (p. 1113).

This court believes that there is no genuine issue of material fact [*4] on the application of that standard to this case. The eight-five to ninety million dollar projection was reasonable and was genuinely believed. The company was constantly engaged in preparing and revising budgets, including sales estimates. In June 1982, the company projected revenue for fiscal year 1983 of 98.5 million. Company personnel examined that budget and believed that it was reasonable after assessing it against various factors. At the end of each quarter, the company reviewed the accuracy of the revenue estimates and revised its projections for future quarters. The company revised its 1983 fiscal year estimate downward to the eighty-five to ninety million range later in 1982, after considering the financial results for the quarter ending September 1982, and the production and sales plans of management. The company re-estimated in early January 1983 that its revenues would be in the seventy-two to seventy-eight million dollar range, after some difficulties with shipments in November and December and a power outage in December of 1982 --- all after the issuance of the prospectus.

Plaintiffs attempt to demonstrate a genuine issue of material fact by pointing to certain memos [*5] and testimony concerning a possible future slow down in gross sales in relation to budgets. However, the court does not believe that they show a genuine issue of material fact, or that they "seriously undermine the accuracy" of the projections. Such conservative statements internally, and to Altos' bank, were simply an ongoing part of the company's continuing analysis of its sales and budgets. That process is necessarily flexible, constantly changing, and an attempt by many persons to predict the future. Opinions about the future necessarily vary as various elements come into focus, fade from importance, and are replaced by other considerations. Management, particularly those in positions of financial control, would not be doing their job if they did not caution the company's senior management and board about the possibility of results being less favorable than some anticipated. But such statements and opinions are merely factors in the company's management evaluating its position and making projections on behalf of the company.

This court therefore concludes that the earnings projection was genuinely believed, that there was a reasonable basis for the belief, and that the company [*6] was not aware of any undisclosed facts tending to undermine the accuracy of the projection. The court also notes that the actual result of seventy-five million dollars of gross revenue was not far from the projection.

Summary judgment is therefore granted in favor of defendants and against plaintiffs on the claim of alleged misrepresentations with respect to sales projections.

III.

The underwriter defendants seek summary judgment on all claims against them.

A.

They contend that under section 11 they conducted a reasonable investigation and met the required standard of due diligence. Under section 12(2), they assert that they had no knowledge of any misrepresentations or omissions and exercised reasonable care. The standards under sections 11 and 12(2) are essentially the same in the context of this case. *Sanders v. John Nuven & Co., 619 F.2d 1222 (7th Cir. 1980)*.

Page 3

1990 U.S. Dist. LEXIS 18394, *6; Fed. Sec. L. Rep. (CCH) P95,693

After reviewing the record, this court concludes that there is no genuine issue of material fact that the underwriters did meet the standards required of them by section 11 and section 12(2). Their investigation of Altos was conducted primarily by the managing underwriters. It was conducted by experienced people, who [*7] were assisted by attorneys and accountants. The underwriters reviewed the industry, the company, the company's management, and the company's past and projected manufacturing, sales and financial performance. The underwriters had over twenty meetings with various management personnel, covering all aspects of the company's business. Company personnel were specifically questioned about the development and scheduled availability of products, related operating systems and applications software. The underwriters also contacted many of Altos' suppliers, customers, and distributors, who were asked extensive questions about the company's operations. The underwriters reviewed company documents including operating plans, product literature, corporate records, financial statements, contracts, and lists of distributors and customers. They examined trade journals and other industry-related publications to ascertain industry trends, market trends and competitive information. They also made physical inspections of the company's facilities. When any negative or questionable information was developed as a result of their investigation, the underwriters discussed it with the appropriate persons and arrived [*8] at informed decisions and opinions. The underwriters also obtained written representations from the selling stockholders and the company that as of the closing date of the public offering, there were no misstatements or omissions.

As a result of that investigation and due diligence, the underwriters reasonably believed the accuracy of the information contained in the prospectus, including the information alleged to be misrepresented or omitted here. The underwriters had no knowledge of any misrepresentations or omissions, and their work met the standards of due diligence and reasonable investigation required by sections 11 and 12(2). Summary judgment is therefore granted to the underwriter defendants and against plaintiffs on the section 11 and section 12(2) claims.

B.

The underwriters also seek summary judgment on the 10(b) claims because of the absence of scienter as to

the alleged misrepresentations about product shipments in November 1982 and the availability of software. As stated, the underwriters did a diligent investigation on all aspects of the company's business, including those subjects alleged to be misrepresented or omitted.

The underwriters focused on the scheduled [*9] shipment dates of the company's products. Plaintiffs argue that the underwriters saw certain weekly status summary reports from which they should have been aware that the scheduled shipments for November and December were going to be slow. However, "should have been aware" is not the standard, and the underwriters can be liable under section 10(b) only if their misconduct rose to a level of recklessness; Apple, p.1117; Hollings v. Titan, F.2d (9th Cir. 1990). The underwriters did focus on the issue, made diligent inquiries, and evaluated the information which they received. Their actions could not be held to be "reckless."

The underwriters did receive some information which indicated that the company's products might have some difficulties with respect to software. However, again the underwriters did make inquiries on that negative subject, discussed it with the appropriate people, and arrived at reasonable judgments. That level of inquiry cannot be called "reckless."

Summary judgment will therefore be granted in favor of the underwriters on the motion 10(b) claims.

IV.

Defendant Valentine was an outside director. The only cause of action now pending against him is under [*10] section 11.

Section 11(b)(3) provides the so called "due diligence" defense. That is an affirmation defense which requires that a defendant show that "he had, after reasonable investigation, reasonable ground to believe and did believe" that there were no material misstatements or omissions. Section 11(c) imposes the measure of "reasonableness" as that of a reasonably prudent person managing his own property. Valentine's motion for summary judgment contends that there is no genuine issue of material fact but that he met those standards. This court agrees.

Since Valentine was an outside director, he was not obliged to conduct an independent investigation into the

accuracy of all the statements contained in the registration statement. He could rely upon the reasonable representations of management, if his own conduct and level of inquiry were reasonable under the circumstances. He was reasonably familiar with the company's business and operations. He regularly attended board meetings at which the board discussed every aspect of the company's business. And he reviewed the company's financial statements. He was familiar with the company's development of its new product lines. He was involved [*11] with various company decisions. He reviewed six drafts of the registration statement and saw nothing suspicious or inconsistent with the knowledge that he had acquired as a director. And he discussed certain aspects of the registration statement with management.

With respect to the alleged misrepresentations about shipment of the lines of products, he could not reasonably have noticed any ambiguity in the phrase "in quantity" in light of his understanding of the company's business and its practice of increasing production from the time a new model is first introduced. With respect to alleged misrepresentations regarding the availability of software, Valentine knew what the prospectus stated, that is, that software was provided by outside vendors, and that application software might not be available for new models when they are first introduced.

Plaintiffs argue that Valentine did not make specific inquiries of the company's management with respect to the representations contained in the prospectus. But he had no duty to do so as long as the prospectus statements were consistent with the knowledge of the company which he had reasonably acquired in his position as director. He was also [*12] given comfort by the fact that the prospectus and the information in it were reviewed by underwriters, counsel and accountants. This met the standards of due diligence and reasonable inquiry. See *Laven v. Flanagan, 695 F. Supp. 800 (D.C. N.J. 1988); Goldstein v. Alodex Corp., 409 F. Supp. 1201 (E.D. Pa. 1976);* compared with *Escott v. Bar Chris, 283 F. Supp. 643 (S.D. N.Y. 1968).*

Judgment should therefore be granted in favor of defendant Valentine and against plaintiffs.

V.

Defendants also seek partial summary judgment to

the effect that no class member who sold his Altos shares at a price of $ 21 or above may recover damages under section 11(e). This court does believe from the briefs that plaintiffs seriously contest this. And indeed that result is consistent with the language of section 11(e). Partial summary judgment is therefore granted in favor of defendants and against those class members who sold their Altos shares at a price of $ 21 or above, for purposes of their claims under section 11.

VI.

Defendants have also moved for summary judgment on the following issues: The prospectus statements about the November shipments of the 586 and the 6800 lines were not misrepresentations; [*13] the prospectus statements regarding the availability of software were not misstatements; the materiality of the alleged misstatements; causation resulting from the alleged misstatements; damages resulting from the alleged misstatements; and scienter under section 10(b). This court has examined the fact record on each of these issues and concludes that plaintiffs have established sufficient evidence to show genuine issues of material fact. Summary judgment on those issues is therefore denied.

The court notes, however, that there does not appear to be any direct evidence in the present record of "leakage" in December 1982 and January 1983. If plaintiffs are unable to offer any further evidence on this claim, the court may deny admissibility of plaintiffs' present evidence on that issue.

The court does not understand that defendants have moved for summary judgment on the claims under the California Corporations Code.

VII.

The case is presently set for trial on February 25, 1991. A status conference will be held on October 26, 1990, at 11:00 a.m. to consider whether the trial date might be accelerated (which presently appears unlikely from this court's calendar), and to set a date [*14] for the pretrial conference and whatever other dates the parties believe are necessary.

IT IS SO ORDERED.

A. 91

Westlaw.

Not Reported in So.2d                                                                         Page 1
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

Briefs and Other Related Documents
Coleman (Parent) Holdings, Inc. v. Morgan Stanley
& Co., Inc.Fla.Cir.Ct.,2005.Only the Westlaw cita-
tion is currently available.
Florida Circuit Court, Fifteenth Judicial Circuit, Palm
Beach County..
COLEMAN (PARENT) HOLDINGS, INC.,
Plaintiff,
v.
MORGAN STANLEY & CO., INC., Defendant.
No. 502003CA005045XXOCAI.

March 1, 2005.

*ORDER ON COLEMAN (PARENT) HOLDINGS,
INC.'S MOTION FOR ADVERSE INFERENCE IN-
STRUCTION DUE TO MORGAN STANLEY'S DE-
STRUCTIONS OF E-MAILS AND MORGAN STAN-
LEY'S NONCOMPLIANCE WITH THE COURT'S
APRIL 16, 2004 AGREED ORDER, AND MOTION
FOR ADDITIONAL RELIEF AND ORDER ON
PLAINTIFF'S MOTION TO COMPEL FURTHER
DISCOVERY REGARDING MORGAN STANLEY'S
DESTRUCTION AND NON-PRODUCTION OF E-
MAILS*

MAASS, J.

**1** THIS CAUSE came before the Court on February
14, 2005 on Coleman (Parent) Holdings, Inc.'s
("CPH's") Motion for Adverse Inference Instruction
Due to Morgan Stanley's Destruction of E-Mails and
Morgan Stanley's Noncompliance with the Court's
April 16, 2004 Agreed Order, as modified by CPH's
February 14, 2005 *ore tenus* motion for additional re-
lief, and on February 28, 2005 on Plaintiff's Motion
to Compel Further Discovery Regarding Morgan
Stanley's Destruction and Non-Production of E-
Mails, with both counsel present. Based on evidence
introduced, the Court finds:

1. CPH has sued Defendant, Morgan Stanley & Co.,
Inc. ("MS & Co."), for fraud in connection with
CPH's sale of its stock in Coleman, Inc., to Sunbeam
Corporation in return for Sunbeam stock. Whether
MS & Co. had knowledge of the fraudulent scheme
undertaken by Sunbeam in 1997 and early 1998 and,

if so, the extent of that knowledge, is central to the
case. CPH has sought access to MS & Co.'s internal
files, including e-mails, since the case was filed.

2. Though MS & Co. instructed its investment
bankers to preserve paper documents in their posses-
sion in connection with the Sunbeam transaction in
February, 1999, it continued its practice of overwrit-
ing e-mails after 12 months, despite an SEC regula-
tion requiring all e-mails be retained in readily ac-
cessible form for two years. *See* 17 C.F.R. §
240.17a-4 (1997).

3. On April 16, 2004, the Court entered its Agreed
Order requiring MS & Co. to (1) search the oldest
full backup tape for each of 36 MS & Co. employees
involved in the Sunbeam transaction; (2) review e-
mails dated from February 15, 1998 through April
15, 1998 and e-mails containing any of 29 specified
search terms such as "Sunbeam" and "Coleman", re-
gardless of their date; (3) produce by May 14, 2004
all nonprivileged e-mails responsive to CPH's docu-
ment requests; (4) give CPH a privilege log; and (5)
certify its full compliance with the Agreed Order.

4. On May 14, 2004, MS & Co. produced approxim-
ately 1,300 pages of e-mails but failed to provide the
required certification. Finally, on June 23, 2004, after
inquiries by CPH, MS & Co. provided CPH with a
certificate of full compliance with the April 16
Agreed Order signed by Arthur Riel, the MS & Co.
manager assigned this task.

5. As organized by MS & Co., the effort to recover e-
mails from any remaining backup tapes had several
stages. First, the relevant backup tapes (in various
formats, such as "DLT" tapes and eight-millimeter
tapes) had to be located by searching the potential
storage locations. Second, the tapes were sent to an
outside vendor, National Data Conversion, Inc.
("NDC"), to be processed, and the data returned to
MS & Co. in the form of "SDLT" tapes. Third, MS &
Co. had to find a way to upload the contents of these
SDLT tapes into its new e-mail archive. Fourth, MS
& Co. would run "scripts" to transform this data into
a searchable form, so that it could later be searched

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                      Page 2
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

for responsive e-mails. MS & Co. personnel used the term "staging area" to describe the stage of the process when SDLT tapes remained in limbo, waiting to be uploaded to the archive.

*2 6. At some point prior to May 6, 2004, Arthur Riel and his team became aware that more than 1,000 backup tapes had been found at a MS & Co. facility in Brooklyn, New York. These 1,423 DLT tapes had not been processed by NDCI and thus had not been included in the archive or searched when MS & Co. made its supposedly complete production on May 14, 2004, and when Mr. Riel certified full compliance with the Agreed Order on June 23, 2004. Aware of the tapes' discovery, Mr. Riel knew when he executed the certification that it was false. He and others on MS & Co.'s e-mail archive team knew by July 2, 2004 that these "Brooklyn tapes" contained e-mail dating back at least to the late 1990's. MS & Co. neither withdrew its certification nor informed CPH about the potential for additional production of e-mails, however. During the summer of 2004, the Brooklyn tapes were processed and sent to the staging area, but they were not uploaded to the e-mail archive so as to be available to be searched until January 2004, at least eight months after they were found.

7. MS & Co. also failed to timely produce e-mails from 738 8-millimeter backup tapes found at a MS & Co. facility in Manhattan, in 2002. These 738 8-mm tapes, like the 1,423 Brooklyn tapes, had not been processed by NDCI and thus had not been included in the archive and searched when MS & Co. made its supposedly complete production on May 14, 2004, and when Mr. Riel certified full compliance with the Agreed Order on June 23, 2004. Mr. Riel and others were told by their vendor, NDCI, by July 2, 2004 that the 8-mm tapes contained e-mail dating back at least to 1998. MS & Co. neither withdrew its certification nor informed CPH about the potential for additional production of e-mails, though. During the summer of 2004, the 8-mm tapes were processed and sent to the staging area. Like the Brooklyn tapes, though, they also were not uploaded to MS & Co.'s e-mail archive.

8. In August 2004, Mr. Riel was relieved of his employment responsibilities. He and his team were re-

placed by a new team headed by Allison Gorman Nachtigal.

9. Ms. Gorman testified that she was instructed to describe the circumstances of Mr. Riel's replacement as his having been "placed on administrative leave." That same term appears by interlineation over the original typed description in MS & Co.'s memorandum addressing these issues. The typed language stated: "[Mr. Riel was] dismissed for integrity issues." MS & Co. presented no evidence to explain why Mr. Riel would have been placed on administrative leave rather than terminated. CPH argued that it may have been to deprive CPH of the ability to contact him directly.

10. Upon taking over Mr. Riel's responsibilities, Ms. Gorman did not initially make significant efforts to address the backlog of data in the staging area; indeed, she was not informed of the existence of this litigation until five months later, in January 2005. In October 2004, Ms. Gorman met with a group of MS & Co. attorneys. Following that meeting, Ms. Gorman gave the project somewhat greater priority, although even then it clearly did not move as expeditiously as possible. For example, MS & Co. gave no thought to using an outside contractor to expedite the process of completing the discovery, though it had certified completion months earlier; it lacked the technological capacity to upload and search the data at that time, and would not attain that capacity for months; and it knew trial was scheduled to begin in February, 2005. Even at this point, no one from MS & Co. or its outside counsel, Kirkland & Ellis LLP, gave CPH or this Court any hint that the June certification was false.

*3 11. On November 17, 2004, more than six months after the May 14, 2004 deadline for producing e-mails in response to the Agreed Order, MS & Co. sent CPH a letter revealing that its June 23 certificate of compliance was incorrect. The letter stated:
Morgan Stanley has discovered additional e-mail backup tapes since our e-mail production in May 2004. The data on some of [the] newly discovered tapes has been restored and, to ensure continued compliance with the agreed order, we have re-run the searches described in the order. Some responsive e-

Not Reported in So.2d
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

Page 3

mails have been located as a result of that process. We will produce the responsive documents to you as soon as the production is finalized.

The letter also foreshadowed further delays: "(s)ome of the backup tapes are still being restored. To ensure continued compliance with the agreed order, we intend to re-run the searches again when the restoration process is complete and will produce any responsive documents that result."

12. The next day, November 18, 2004, MS & Co. produced an additional 8,000 pages of e-mails and attachments. MS & Co.'s November 2004 letter stated that the 8,000 pages came from "newly discovered" tapes; but the testimony now makes clear that this statement was false because Ms. Gorman's team did not figure out how to upload and make searchable the materials from the staging area until January, 2005.

13. MS & Co. has failed to offer any explanation to reconcile the obvious conflict between its assertions at the time of production that the 8,000 pages came from "newly discovered" tapes (*i.e.,* the "Brooklyn tapes") and the testimony of its own witness, Ms. Gorman, that data from those newly discovered tapes were not capable of being searched until two months later, in January.

14. After a follow-up inquiry by CPH, on December 17, 2004, MS & Co. produced a privilege log and told CPH that "[n]o additional responsive e-mails have been located since our November production." MS & Co. refused to answer CPH's questions about whether MS & Co. had restored all the backup tapes described in its November 17 letter and why the tapes had not been located earlier, however.

15. On December 30, 2004, CPH sought confirmation that MS & Co. had reviewed all e-mail backup tapes and produced all responsive e-mails and, if not, asked when the review would be completed. On January 11, 2005, MS & Co. informed CPH that the "restoration of e-mail back tapes is ongoing. Restoration of the next set of backup tapes is estimated to be completed at the end of January. We intend to re-run the searches described in the agreed order at that time."

16. On January 19, 2004, CPH wrote asking MS & Co. to explain the circumstances under which MS & Co. located the "newly discovered" backup tapes and to disclose when the tapes were located. CPH also asked MS & Co. to explain why the backup tapes could not be restored sooner.

17. On January 21, 2005, MS & Co. sent CPH a letter that failed to answer CPH's questions. Instead, MS & Co. described its efforts to restore the backup tapes as "ongoing"; informed CPH that "there is no way for MS & Co. to know or accurately predict the type or time period of data that might be recovered"; and stated that MS & Co. "cannot accurately estimate when all of the tapes will be restored or whether any recoverable data will be found on the remaining tapes."

*4 18. On January 26, 2005, CPH filed the Motion at issue here, asking the Court to instruct the jury that MS & Co.'s destruction of e-mails and other electronic documents and MS. & Co.'s noncompliance with the April 16, 2004 Agreed Order can give rise to an adverse inference that the contents of the missing e-mails would be harmful to MS & Co.'s defense in this case.

19. Meanwhile, MS & Co. found another 169 DLT tapes in January, 2005, that allegedly had been misplaced by its New Jersey storage vendor, Recall. Again, MS & Co., chose to provide no specifics to CPH or to the Court.

20. At a February 2, 2005 hearing on CPH's Motion, Thomas A. Clare of Kirkland & Ellis, LLP, representing MS & Co., stated that "late October of 2004 ... [is] the date I represent to Court is the first time that anyone knew that there was recoverable e-mail data" on the Brooklyn tapes. Hr'g Tr. (2/2/05) at 133-34. The actual date, however, was at least three months earlier, by July 2, 2004. Furthermore, MS & Co. refused to provide the Court with definitive answers about when its e-mail production would be complete, merely stating that it would proceed with "all deliberate speed." *Id.* at 139. Also at the February 2 hearing, Mr. Clare neglected to inform the Court about the 8-mm tapes that had been located in 2002, and told the Court that the 1,423 DLT tapes had been found in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

Brooklyn "sometime during the summer" of 2004. The truth of this assertion is belied by the evidence showing that the tapes were found before May 6, 2004.

21. On February 3, 2005, the Court ordered further discovery and set an evidentiary hearing for February 14, 2005. The discovery took place on February 9 and 10, when CPH deposed the three e-mail witnesses identified by MS. & Co.

22. On Saturday afternoon, February 12, 2005, MS & Co. informed the Court that it had, in the previous 24 hours, discovered additional tapes. Also, MS & Co. stated that its recent production omitted certain "attachments" to e-mails. MS & Co. did not attempt to clarify or substantiate either of these statements to CPH or to the Court until the Monday, February 14, 2005 hearing.

23. At the February 14 hearing, none of the witnesses MS & Co. presented was involved in or familiar with the actual electronic searches conducted using the parameters specified in this Court's April 16, 2004 Agreed Order, and none explained where the 8,000 pages produced in November, 2004 had come from. MS & Co.'s witnesses did, however, describe three new developments. First, Robert Saunders, a Morgan Stanley executive director in the Information Technology Division, testified that he returned to New York after his February 10 deposition and, concerned about his unqualified assertion that the was "confident" that a complete search for backup tapes had been conducted, decided finally to undertake a personal search of MS & Co.'s "communication rooms," going to the areas he thought most obvious first. By doing so, he and two contractors discovered more than 200 additional backup tapes openly stored in locations known to be used for tape storage. Those discoveries were made on Friday and Saturday, February 11 and 12, 2005. As of the February 14 hearing, NDCI had not yet determined which, if any, of these newly discovered backup tapes contained e-mails. Second, Ms. Gorman reported that on Friday, February 11, 2005 she and her team had discovered that a flaw in the software they had written had prevented MS & Co. from locating all responsive e-mail attachments. Third, Ms. Gorman reported that MS & Co. dis-

covered on Sunday evening, February 13, 2005, that the date-range searches for e-mail users who had a Lotus Notes platform were flawed, so there were at least 7,000 additional e-mail messages that appeared to fall within the scope of the Agreed Order had yet to be fully reviewed by MS. & Co.'s outside counsel for responsiveness and privilege. As counsel for MS & Co. admitted, this problem "dwarf[s]" their previous problems. Hr'g Tr. (2/14/05) at 13. Ms. Gorman indicated she was "90 percent sure" that the problem infected MS & Co.'s original searches in May, which means that even they failed to timely produce relevant materials that had been uploaded into the archive by that point. *Id.* at 82-83. The bulk of the employees using the Lotus Notes platform in the relevant time period came from the Investment Banking Division, the division responsible for the transaction under review here.

*5 24. On February 19, 2005 MS & Co. informed counsel for CPH that "additional boxes of back up tapes" have been located "in a security room" and that, "(a)s of this morning, Morgan Stanley has identified four (unlabled) DLT tapes among the collection. Those four tapes will be sent to NDCI for further analysis." The disclosure did not state when the discovery was made. MS & Co.'s counsel represented to the Court that it was his understanding that about 73 bankers' boxes of tapes were discovered. No explanation for the late discovery was offered.

25. Throughout this entire process, MS & Co. and its counsels' lack of candor has frustrated the Court and opposing counsel's ability to be fully and timely informed.

26. MS & Co.'s failure during the summer and fall of 2004 to timely process a substantial amount of data that was languishing in the "staging area," rather than being put into searchable form and then searched, was willful and a gross abuse of its discovery obligations.

27. MS & Co.'s failure to time notify CPH of the existence of the DLT and 8-mm tapes, which it had located as early as 2002 and certainly prior to the June 23, 2004 certification, and its failure to timely process those raw backup tapes was willful and a gross

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                    Page 5
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

abuse of its discovery obligations.

28. MS & Co.'s failure to produce all e-mail attachments was negligent, and it was discovered and revealed only as a result of CPH's hiring a third-party vendor, pursuant to the Court's February 4, 2005 Order, to double-check MS & Co.'s compliance with the April 16, 2004 Agreed Order.

29. MS & Co.'s failure to produce all of the Lotus Notes e-mails was negligent, and it was discovered and revealed only as result of CPH's hiring a third-party vendor, pursuant to the Court's February 4, 2005 Order, to double-check MS & Co.'s compliance with the April 16, 2004 Agreed Order.

30. MS & Co.'s failure to locate other potentially responsive backup tapes before Saturday, February 12, 2005 was grossly negligent.

31. Given the history of the discovery, there is no way to know if all potentially responsive backup tapes have been located.

32. In sum, despite MS & Co.'s affirmative duty arising out of the litigation to produce its e-mails, and contrary to federal law requiring it to preserve the e-mails, MS & Co. failed to preserve many e-mails and failed to produce all e-mails required by the Agreed Order. The failings include overwriting e-mails after 12 months; failing to conduct proper searches for tapes that may contain e-mails; providing a certificate of compliance known to be false when made and only recently withdrawn; failing to timely notify CPH when additional tapes were located; failing to use reasonable efforts to search the newly discovered tapes; failing to timely process and search data held in the staging area or notify CPH of the deficiency; failing to write software scripts consistent with the Agreed Order; and discovering the deficiencies only after CPH was given the opportunity to check MS & Co.'s work and the MS & Co.'s attorneys were required to certify the completeness of the prior searches. Many of these failings were done knowingly, deliberately, and in bad faith.

*6 It is clear that e-mails existed which were requested by CPH that have not been produced because of the deficiencies discussed above. Electronic data are

the modern-day equivalent of the paper trail. Indeed, because of the informalities of e-mail, correspondents may be less guarded than with paper correspondence. In this case, the paper trail is critical to CPH's ability to make out its prima facie case. Thus, MS & Co.'s acts have severely hindered CPH's ability to proceed. The only way to test the potentially self-serving testimony of MS & Co. personnel is with the written record of the events.

The failures outlined in this Order are of two types. First, by overwriting e-mails contrary to its legal obligation to maintain them in readily accessible form for two years and with knowledge that legal action was threatened, MS & Co. has spoiled evidence, justifying sanctions. *See Martino v. Wal-Mart Stores, Inc.,* 835 So.2d 1251 (Fla. 4th DCA 2003). "The appropriateness of sanctions for failing to preserve evidence depends on: (1) willfulness or bad faith of the responsible party, (2) the extent of prejudice suffered by the other party, and (3) what is required to cure the prejudice." *Nationwide Lift Trucks, Inc. v. Smith,* 832 So.2d 824, 826 (Fla. 4th DCA 2002). Second, MS & Co.'s willfull disobedience of the Agreed Order justifies sanctions. *See* Rule 1 .380(b)(2), Fla. R. Civ. P. The conclusion is inescapable that MS & Co. sought to thwart discovery *in this specific case.*

Sanctions in this context are not meant to be punitive. They are intended, though, to level the playing field.

A reasonable juror could conclude that evidence of MS & Co.'s misconduct demonstrates its consciousness of guilty. It is relevant to the issues before the jury. Further, CPH should not be penalized by being forced to divert the jurors' attention away from the merits of its claim to focus on highly technical facts going to MS & Co.'s failures here, facts that are not reasonably disputed. Evidence of that failure, though, alone does not make CPH whole. Indeed, it can be said it is not a "sanction" at all, but merely a statement of unrefuted facts that the jury may find relevant. Shifting the burden of proof, though, forces MS & Co. to accept the practical consequence of its failures-that some information will never be known. Obviously, this sanction is of consequence only in the marginal case. If there is overwhelming proof of MS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

Page 6

& Co.'s knowledge of the fraud and collusion with Sunbeam, CPH would have prevailed on those elements in any event. And, to the contrary, if there is overwhelming evidence MS & Co. did not know of the fraud or conspire with or aid Sunbeam in its commission, it would have prevailed in any event. If the case is close on those issues, though, MS & Co., not CPH, should bear the burden of persuasion. Further, shifting the burden on the fraud issue does not relieve CPH of its obligation to establish the other elements of its claims, most notably reliance, proof of which is independent of the MS & Co. e-mails. Thus, the sanctions chosen are the most conservative available to the Court to address the spoilation of evidence and willfull violation of the Agreed Order. FN1FN2

> FN1. MS & Co.'s bad acts and pocket book may not be used to gain the continuance it has sought from the beginning. Further, the Court has no confidence that, even if a continuance were granted, MS & Co. would fully comply with discovery in this case.

> FN2. The undersigned notes that the sanctions imposed are not enumerated in Rule 1.380(b)(2), and is aware of the concern expressed in the 2000 Handbook on Discovery Practice, Joint Committee of the Trial Lawyers Section of the Florida Bar and Conferences of Circuit and County Court Judges ("(f)or the trial court to be on solid footing, it is wise to stay within the enumerated orders" [*Handbook* at p. 4] ). However, MS & Co.'s violations involve both the violation of a discovery order and the intentional spoiliation of evidence. The sanction imposed is *less* severe than that provided in Rule 1.380(b)(2)(B), under which the Court could preclude MS & Co. from presenting evidence of its lack of knowledge of or collusion with the Sunbeam fraud, which the Court finds is the least severe enumerated sanction appropriate to place the parties on a level playing field.

**\*7** Finally, the Court notes that CPH has requested the e-mails since May of 2003. MS & Co. was supposed to comply with the April 16, 2004 Order by May 14, 2004. Fact discovery in this case closed November 24, 2004. MS & Co.'s actions have resulted in the diversion of enormous amounts of resources, by both the parties and the Court, into a fact discovery dispute that should have never arisen and which would have long ago been put to bed had MS & Co. timely recognized its obligations to CPH and this Court. Opening argument in this complex case is set for March 21, 2005. Preliminary jury selection has begun. MS & Co. has controlled the timetable of this portion of the litigation long enough. Consequently, CPH should have the ability to continue to require MS & Co. to attempt to comply with the Agreed Order and the February 4, 2005 Order on Coleman (Parent) Holdings Inc.'s *ore tenus* Motion to Participate in Search of Additional E-Mail Back Up Tapes or Appoint Third Party to Conduct Search, or to elect to terminate the e-mail discovery and concentrate on trial preparation.

Based on the foregoing, it is

ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Adverse Interference Instruction Due to Morgan Stanley's Destructions of E-Mails and Morgan Stanley's Non-Compliance with the Court's April 16, 2004 Agreed Order and Motion for Additional Relief is GRANTED.

2. MS & Co. shall continue to use its best efforts to comply with the April 16, 2004 Agreed Order and shall continue to comply with the February 4, 2005 Order on Coleman (Parent) Holdings Inc.'s *ore tenus* Motion to Participate in Search of Additional E-Mail Back Up Tapes or Appoint Third Party to Conduct Search until March 21, 2005 or written notice from CPH, which ever first occurs. Either party shall notify the other in writing of its intention to offer into evidence e-mails actually produced to CPH prior to termination of e-mail discovery in conformity with this Order, within 72 hours of the e-mail's production to CPH. The Court shall hear and determine any objections to use of the e-mails.

3. The Court shall read to the jury the statement of facts attached as Exhibit A during whatever evidentiary phase of CPH's case that it requests. These find-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

ings of fact shall be conclusive. *See* Rule 1.380(b)(2)(A). No instruction shall be given to the jury regarding inferences to be drawn from these facts. However, counsel may make such argument to the jury in favor of whatever inferences that evidence may support. No other evidence concerning the production of e-mails, or lack thereof, shall be presented absent further Court order.

4. CPH will be allowed to argue that MS & Co.'s concealment of its role in the Sunbeam transaction is evidence of its malice or evil intent, going to the issue of punitive damages. *See,* e.g., *General Motors Corp. v. McGee,* 837 So.2d 10120.

5. MS & Co. shall bear the burden of proving to the jury, by the greater weight of the evidence, that it lacked knowledge of the Sunbeam fraud and did not aid and abet or conspire with Sunbeam to defraud MS & Co. The traditional order of proof shall remain unaffected, however.

*8 6. MS & Co. shall compensate CPH for costs and fees associated with the Motion. The amount shall be determined at an evidentiary hearing to be held after the completion of the trial.

7. Plaintiff's Motion to Compel Further Discovery Regarding Morgan Stanley's Destruction and Non-Production of E-Mails is Denied.

DONE AND ORDERED.

### EXHIBIT A

A federal regulation in effect in 1997 and all times since required Morgan Stanley to preserve e-mails for three years and to preserve them in a readily accessible place for two years. Beginning in no later than 1997, Morgan Stanley had a practice of overwriting e-mails after 12 months. E-mails could no longer be retrieved once they were overwritten. This practice was discontinued in January, 2001. CPH has sought access to Morgan Stanley's e-mails relating to this transaction since the case was filed in May, 2003.

Prior to 2003, Morgan Stanley recorded e-mails and other electronic data on back up tapes. On April 16, 2004, the Court ordered Morgan Stanley to (1) search

the oldest full backup tape for each of 36 Morgan Stanley employees involved in the Sunbeam transaction; (2) review e-mails dated from February 15, 1998 through April 15, 1998 and e-mails containing any of 29 specified search terms such as "Sunbeam" and "Coleman", regardless of their date; (3) produce by May 14, 2004 all e-mails relating to this case found by the search I have just described; and (4) certify its full compliance with the Court's order.

On May 14, 2004, Morgan Stanley produced approximately 1,300 pages of e-mails. It did not produce the required certification. On June 23, 2004, after inquiries by CPH, Morgan Stanley provided CPH with a certificate of full compliance with the April 16 Order signed by Arthur Riel, the Morgan Stanley manager assigned this task.

As organized by Morgan Stanley, the effort to recover e-mails from the backup tapes had several stages. First, the relevant backup tapes had to be located by searching the potential storage locations. Second, the tapes were sent to an outside vendor, National Data Conversion, Inc., which I will call "NDCI", to be processed, and the data returned to Morgan Stanley. Third, Morgan Stanley had to upload the processed data into its e-mail archive. Fourth, Morgan Stanley had to run scripts, or pieces of computer code, to transform this data into a searchable form. Finally, Morgan Stanley had to search the data for e-mails related to this case. Morgan Stanley personnel used the term "staging area" to describe the stage of the process when the processed data returned by NDCI remained in limbo, waiting to be uploaded to Morgan Stanley's archive.

At some point prior to May 6, 2004, Arthur Riel and his team became aware that 1,423 backup tapes had been found at a Morgan Stanley facility in Brooklyn, New York. These 1,423 tapes had not been processed by NDCI and thus had not been included in the archive or searched when Morgan Stanley made its production to CPH on May 14, 2004. Aware of the tapes' discovery, Mr. Riel knew when he executed the certification of full compliance with the Court's April 16, 2004 Order that it was false. He and others on Morgan Stanley's e-mail archive team knew by July 2, 2004 that these "Brooklyn tapes" contained e-mail

Not Reported in So.2d
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

Page 8

dating back at least to the late 1990's. During the summer of 2004, the Brooklyn tapes were processed and the data sent to the staging area. The scripts were not written and tested to permit the search for e-mails relating to this case to begin until the middle of January, 2004. Such a search, even if perfectly done, can take weeks.

**\*9** Morgan Stanley also failed to timely produce e-mails from 738 backup tapes found at a Morgan Stanley facility in Manhattan in 2002. These 738 tapes, like the 1,423 Brooklyn tapes, had not been processed by NDCI and thus had not been included in the archive and searched by either on May 14, 2004 or June 23, 2004. Mr. Riel and others were told by NDCI by July 2, 2004 that these tapes contained e-mail dating back at least to 1998. During the summer of 2004, the these tapes were processed and sent to the staging area. Like the Brooklyn tapes, though, they also were not searched.

In August 2004, Mr. Riel was relieved of his employment responsibilities. He and his team were replaced by a new team headed by Allison Gorman Nachtigal. At that time, the staging area contained about 600 gigabytes of e-mail data that had not yet been uploaded into the Morgan Stanley archive and had not been searched for e-mails relating to this case.

Upon taking over Mr. Riel's responsibilities, Ms. Gorman did not initially make significant efforts to address the backlog of data in the staging area. Indeed, she was not informed of the existence of this litigation until five months later, in January 2005. In October 2004, Ms. Gorman gave the project somewhat greater priority, although even then it did not move as expeditiously as possible. Morgan Stanley did not consider using an outside contractor to expedite the process.

Morgan Stanley found another 169 DLT tapes in January, 2005, that had been misplaced by its New Jersey storage vendor. Morgan Stanley discovered more than 200 additional backup tapes openly stored in locations known to be used for tape storage on February 11 and 12, 2005. On February 11, 2005 Morgan Stanley discovered that a flaw in the software it had written had prevented Morgan Stanley

from locating all e-mail attachments about the Sunbeam transaction. Morgan Stanley discovered on February 13, 2005, that the date-range searches for e-mail users who had a Lotus Notes platform were flawed, so that additional e-mail messages that appeared to fall within the scope of the April 16, 2004 Order had not been given to CPH. Further, it appears that the problem infected Morgan Stanley's original searches in May of 2004. The bulk of the employees using the Lotus Notes platform in the relevant time period came from the Investment Banking Division, the division responsible for the transaction under review here. On February 16, 2005, Morgan Stanley withdrew its certificate of compliance with the April 16, 2004 Order. On February 19, 2005 Morgan Stanley notified CPH that it had found boxes of additional tapes that have not been uploaded into its archive or searched for responsive e-mails. Morgan Stanley did not tell CPH it had found any tapes that it had not searched until November 17, 2004. Even then, it did not tell CPH how many tapes were found, when they were found, or when they would be searched. MS & Co. did not provide all of this information to CPH until February of 2005. The searches had not yet been completed when this trial was begun, when they were terminated without completion.

Fla.Cir.Ct.,2005.
Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc.
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4755541 (Trial Motion, Memorandum and Affidavit) Morgan Stanley & Co. Incorporated's Motion to Strike Coleman (Parent) Holdings Inc.'s Response to Morgan Stanley & Co. Incorporated's Proposed Findings of Fact and Conclusions of Law in Support of Its Motion for Summary Judgment (Jan. 12, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3957747 () Videotape Deposition of Mark Grinblatt (Jan. 7, 2005) Original Image of this Document (PDF)
• 2004 WL 4979332 (Trial Motion, Memorandum and Affidavit) Coleman (Parent) Holdings Inc.'s Mo-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                    Page 9
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**


tion to Strike Morgan Stanley & co. Incorporated's
Proposed Findings of Fact and Conclusions of Law in
Support of Its Motion for Summary Judgment (Dec.
21, 2004) Original Image of this Document (PDF)
• 2004 WL 4979331 (Trial Motion, Memorandum
and Affidavit) Morgan Stanley & Co. Incorporated's
Motion for Summary Judgment (Dec. 10, 2004) Ori-
ginal Image of this Document (PDF)
• 2003 WL 24303790 () (Transcript) (2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 9th day of October, 2006, I caused **APPENDIX OF EXHIBITS AND UNREPORTED AUTHORITIES CITED IN PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO ADAMS GOLF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com