# EXHIBIT B

1       IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3                    - - -
4    IN RE: ADAMS GOLF, INC. :
5    SECURITIES LITIGATION    :
6
                              X
7
                    ORAL DEPOSITION
8
                          OF
9
               CHRISTOPHER M. JAMES
10
             Friday, August 11, 2006
11
                    - - -
12
        Oral deposition of CHRISTOPHER M.
13
    JAMES, held at the offices of AKIN GUMP
14
    STRAUSS HAUER & FELD, LLP, 590 Madison Avenue,
15
    New York, New York, commencing at 8:30 a.m.,
16
    reported by Pamela Harrison, RMR, CRR, CSR and
17
    Notary Public.
18
                    - - -
19
20
21
22
            RSA/VERITEXT COURT REPORTING COMPANY
23           1845 Walnut Street, 15th Floor
                Philadelphia, PA   19103
24          (215) 241-1000  (888) 777-6690

Page 2

1  APPEARANCES:
2
3  TODD S. COLLINS, ESQUIRE
   and ELIZABETH W. FOX, ESQUIRE
4  BERGER & MONTAGUE, P.C.
   1622 Locust Street
5  Philadelphia, Pennsylvania 19103-6305
   215.875.3000
6  tcollins@bm.net
   efox@bm.net
7  For the Plaintiff
8
9
   MICHELLE A. REED, ESQUIRE
10 AKIN GUMP STRAUSS HAUER & FELD, LLP
   300 West 6th Street
11 Suite 2100
   Austin, Texas 78701-3911
12 512.499.6200
   mreed@akingump.com
13 For the Adams Golf Defendants
14
15
   THOEDORE J. McEVOY, ESQUIRE
16 SIMPSON THACHER & BARTLETT, LLP
   425 Lexington Avenue
17 New York, New York 10017-3954
   212-455-2831
18 tmcevoy@stblaw.com
   rkane@stblaw.com
19 For the Underwriter Defendants
20
21
22
23
24

Page 3

1
2       EXAMINATION INDEX
3  CHRISTOPHER M. JAMES
4     BY MR. COLLINS . . . . . . . . . .  5
5
6
7       EXHIBIT INDEX
8                                PAGE
   ** 335            Rebuttal Expert Report
9  of R. Alan  **87
      Miller with attachments
10 336  Expert Report of Christopher M. James      5
       with attachments
11
   337  Rebuttal Expert Report of Christopher     5
12      M. James
13 338  E-mail from Terpsma to James, 8/3/06;      5
       e-mail from Phillips to Goodman
14      8/2/06, Bates stamped CMJ 0562
15 339  Graph analysis, Bates stamped CMJ 0560     5
16 340  Analysis of Peer Performance Around        5
       July Purchase Order Dates, Bates
17      stamped CMJ 0561
18 341  Adams Golf, Inc., Integrated               5
       Chronology, Bates stamped CMJ 0563
19
20 342  Memorandum to Collins from Reed dated     72
       7/20/06 with attachments
21
22
23
24

Page 4

1       DEPOSITION SUPPORT INDEX
2
3  Direction to Witness Not to Answer:
4            Page Line
5            (NONE)
6
7
8  Request for Production of Documents:
9            Page Line
10           103/6
11           121/4
12
13
14     Stipulations:
15           Page Line
16           (NONE)
17
18
19     Questions Marked:
20           Page Line
21           (NONE)
22
23
24

Page 5

1       (Whereupon, documents were        08:51:07a
2  premarked, for identification purposes,  08:51:07a
3  as Exhibits 336 through 341.)           08:51:07a
4       THE COURT REPORTER:  Are there     09:02:05a
5  any stipulations today?                 09:02:05a
6       MS. REED:  No, there are not.      09:02:08a
7       THE COURT REPORTER:  Are you       09:02:19a
8  having him read and sign?               09:02:19a
9       MS. REED:  Yes.  Sorry.            09:02:22a
10      - - -                              09:02:23a
11      CHRISTOPHER M. JAMES, after        09:02:23a
12 having been duly affirmed, was examined  09:02:23a
13 and testified as follows:               09:02:23a
14      - - -                              09:02:34a
15      E X A M I N A T I O N              09:02:34a
16      - - -                              09:02:34a
17 BY MR. COLLINS:                         09:02:34a
18   Q.   Dr. James, thank you very much   09:02:34a
19 for coming.                             09:02:36a
20   A.   My pleasure.                     09:02:38a
21   Q.   Michelle had sent me an e-mail   09:02:41a
22 last night, which I couldn't open, and when I  09:02:43a
23 walked in this morning, I see she was good  09:02:46a
24 enough to give an extra copy of what she  09:02:49a

2 (Pages 2 to 5)

Page 90

```
1    Q.  Adams declined some, and the S&P      11:19:10a
2    small cap and Callaway declined more -- is that   11:19:14a
3    right so far? -- on or about July 23rd.          11:19:20a
4        A.  If you said Callaway and the       11:19:23a
5    peer group?                    11:19:26a
6        Q.  Yes.                 11:19:27a
7        A.  I think you may have said --       11:19:27a
8        Q.  You know what, let me start        11:19:29a
9    again.  You are quite right.              11:19:30a
10       Am I reading this correctly        11:19:31a
11   that on July 23rd both Callaway and the peer     11:19:33a
12   group went down sharply and roughly in tandem?  11:19:36a
13       A.  Yes.  I think if you go to the      11:19:42a
14   next exhibit, it might be easier.          11:19:45a
15       Q.  Okay.                11:19:49a
16       A.  340.                  11:19:49a
17       Q.  Okay.                11:19:50a
18       A.  Which has the dates and the       11:19:51a
19   price decline.  So on 7/23/1998, Adams is down   11:19:57a
20   13 percent -- about roughly 13 percent; Callaway  11:20:05a
21   is down 33 percent; and Miller's peer group is   11:20:08a
22   down 28.2 percent.                  11:20:12a
23       Q.  I see.               11:20:14a
24       Now, Miller's peer group, do          11:20:19a
```

Page 91

```
1    you know whether it included Callaway?         11:20:22a
2        A.  It did.                 11:20:23a
3        Q.  And was the peer group -- the       11:20:24a
4    peer group was comprised of how many companies?  11:20:26a
5        A.  I believe it was -- it consisted   11:20:37a
6    of Callaway, Teardrop, Aldila --           11:20:42a
7        THE COURT REPORTER: Callaway,          11:20:54a
8    comma Teardrop?                     11:20:54a
9        THE WITNESS: It might help,            11:20:54a
10   it's on the top line on the first page of       11:20:54a
11   Mr. Miller's report.              11:21:02a
12   BY MR. COLLINS:                     11:21:04a
13       Q.  Okay.                11:21:04a
14       A.  I can read these off, but it may   11:21:04a
15   be helpful for the court reporter just to look   11:21:08a
16   at them.                      11:21:10a
17       It would be Callaway, Teardrop,        11:21:10a
18   Aldila, Coastcast, Arnold Palmer, and Golden    11:21:14a
19   Bear.                     11:21:18a
20       Q.  Now, as you used the peer group     11:21:27a
21   on Exhibits 339 and 340, was it a weighted group  11:21:41a
22   or was it unweighted, based on the size or the   11:21:51a
23   market caps or some other characteristics of the  11:22:01a
24   companies making up the peer group?          11:22:06a
```

Page 92

```
1        A.  I used the peer group return as    11:22:08a
2    reported by Mr. Miller in his rebuttal report.   11:22:13a
3        My recollection is I could come        11:22:18a
4    close but not exactly match the peer returns    11:22:21a
5    by taking the -- the peer group return by       11:22:26a
6    taking a value weighted average of the         11:22:31a
7    individuals within the group.              11:22:37a
8        Q.  What do you mean by "value         11:22:39a
9    weighted average"?                 11:22:42a
10       A.  I was responding to the question    11:22:43a
11   you just asked, was it a value weighted average  11:22:44a
12   or an equally weighted average of the returns.   11:22:49a
13       I can come close to, if I use         11:22:54a
14   value weights, come close to the returns that   11:22:56a
15   he had.                       11:22:57a
16       Q.  That's fine.  And I'm just         11:22:58a
17   asking you what you did in using the value       11:23:00a
18   weights, what process did you go through and     11:23:01a
19   what specifically, specifically what value did   11:23:03a
20   you weight.                     11:23:07a
21       A.  The market value of the common     11:23:09a
22   stock.                       11:23:12a
23       THE WITNESS: And I apologize,          11:23:20a
24   but I need to take a short break.          11:23:20a
```

Page 93

```
1        MR. COLLINS: Off the record.          11:23:24a
2        (A recess was had from          11:33:46a
3    11:23 a.m. to 11:33 a.m.; and then the         11:33:46a
4    proceedings continued as follows:)            11:33:46a
5    BY MR. COLLINS:                     11:33:46a
6        Q.  Exhibit 339.              11:33:46a
7        A.  Okay.                 11:33:48a
8        Q.  Why did you do this just for the    11:33:49a
9    month of July?                   11:33:56a
10       A.  Because Mr. Miller indicated in    11:33:59a
11   his rebuttal report that it is his conjecture   11:34:05a
12   that the price decline, particularly in the     11:34:11a
13   latter part of July, was attributable to, I     11:34:15a
14   think he refers to it as leakage regarding gray  11:34:20a
15   market activities.                11:34:26a
16       Q.  Is there something about Exhibit    11:34:27a
17   339 or Exhibit 340 that leads you to question    11:34:28a
18   that conclusion on his part?              11:34:33a
19       A.  I think that -- yes, I think       11:34:35a
20   that this analysis demonstrates, using his data,  11:34:41a
21   that the decline in Adams Golf during this      11:34:43a
22   period of time was certainly in line with the   11:34:51a
23   decline experienced by its -- the firms        11:34:55a
24   identified by Mr. Miller as being peers to Adams  11:35:01a
```

24 (Pages 90 to 93)

Page 94

```
 1   Golf, and that consistent with the discussion in      11:35:07a
 2   my report, the decline appears to be a result          11:35:18a
 3   principally of softness in the golf industry as        11:35:25a
 4   reflected by the earnings miss and discussion of       11:35:29a
 5   difficulties in the market that Callaway               11:35:36a
 6   disclosed, and then the peer group -- I think          11:35:44a
 7   Coastcast has a news article during that same          11:35:48a
 8   period of time indicating same weakness in             11:35:53a
 9   product demand, which I think is consistent with       11:36:00a
10   the announcement of Callaway, since Coastcast is       11:36:06a
11   a major supplier to Callaway.                          11:36:09a
12       Q.   Did you undertake -- the                       11:36:15a
13   analysis of these various stock prices, did you        11:36:20a
14   do any work taking it out beyond July 31st?            11:36:25a
15       A.   No. I -- you mean --                           11:36:33a
16       Q.   Did you run the chart beyond                    11:36:37a
17   July 31st?                                             11:36:39a
18       A.   No, I just focused on the dates               11:36:41a
19   in -- the dates that he identified as being           11:36:43a
20   associated with price declines in late July that      11:36:53a
21   he contends may be associated with information        11:36:59a
22   disclosures regarding -- or leakage of                11:37:03a
23   information regarding, say, purchase orders by        11:37:07a
24   Costco.                                                11:37:10a
```

Page 95

```
 1       Q.   And in that regard you are             11:37:16a
 2   referring to the information he has -- perhaps       11:37:17a
 3   other places as well, but you are referring to      11:37:21a
 4   the information he has in Paragraph 22(A) of his     11:37:23a
 5   rebuttal report?                                     11:37:26a
 6       A.   22(A), yes.                               11:37:28a
 7       Q.   Now, how long ago did you               11:37:39a
 8   prepare exhibits or did you create the documents    11:37:41a
 9   that are now 339 and 340?                            11:37:43a
10       A.   Within the last week.                    11:37:49a
11       Q.   Did counsel ask you to do so?           11:37:55a
12       A.   No.                                       11:37:58a
13       Q.   Did you tell counsel you were           11:37:58a
14   doing this?                                          11:38:00a
15       A.   Yes.                                       11:38:00a
16       Q.   Did you run any other charts            11:38:10a
17   beyond 339 either within the last week or since     11:38:13a
18   the rebuttal report?                                 11:38:18a
19       A.   I don't believe so. I don't             11:38:24a
20   recall doing any.                                    11:38:26a
21       Q.   And did you undertake an                11:38:28a
22   analysis of peer performance with respect to        11:38:30a
23   August or September?                                 11:38:35a
24       A.   No, my focus was only on late --        11:38:39a
```

Page 96

```
 1   late July, is the period that he focuses in on        11:38:45a
 2   his report.                                            11:38:49a
 3       Just to add that he -- and the                      11:38:51a
 4   other reason is that he has a chart, I believe        11:38:55a
 5   it's -- if you don't mind, I'll take it off.          11:39:00a
 6       (The witness takes the clip off                     11:39:08a
 7   the document.)                                         11:39:10a
 8   BY MR. COLLINS:                                       11:39:10a
 9       Q.   Please.                                    11:39:10a
10       A.   That is a -- that has a somewhat          11:39:15a
11   different pegging in the sense that it's pegged      11:39:23a
12   to 1. It's his Exhibit A. It's entitled ADGO        11:39:28a
13   versus XLC(4), Adams Golf versus Comparable         11:39:35a
14   Index. He carries it out to -- 12/23/1999 is        11:39:43a
15   the last date.                                        11:39:55a
16       Q.   You are referring to the page            11:39:57a
17   immediately after the page that says Exhibit A,      11:40:01a
18   or are you referring to a later?                      11:40:07a
19       Which chart are you referring                   11:40:17a
20   to, please?                                           11:40:18a
21       A.   I know this is -- it doesn't             11:40:24a
22   make the record look particularly good because      11:40:26a
23   I'm holding something up, but it is this chart      11:40:30a
24   (indicating), and I believe you are looking at     11:40:34a
```

Page 97

```
 1   it.                                                   11:40:36a
 2       MS. FOX: Let me just check                        11:40:37a
 3   that. I'll come around and see whether              11:40:39a
 4   it's the same.                                        11:40:42a
 5       THE WITNESS: Just so you are                      11:40:45a
 6   clear, there appears to be two charts               11:40:46a
 7   in his Exhibit A. One is -- it looks                11:40:48a
 8   like they are the same chart. One is               11:41:00a
 9   simply, in my version, a smaller                     11:41:03a
10   version of the other.                                11:41:06a
11   BY MR. COLLINS:                                     11:41:09a
12       Q.   Okay. Well, the chart --                 11:41:09a
13       A.   This you can identify --                 11:41:23a
14       Q.   Not a problem.                            11:41:24a
15       A.   Okay.                                      11:41:26a
16       Q.   Do you see the page that says on         11:41:26a
17   it Exhibit A? It's probably in your left hand.      11:41:28a
18       A.   Yeah, the problem I'm having is          11:41:35a
19   that there are a number of pages that say          11:41:37a
20   Exhibit A on it. Okay? Maybe we can make this       11:41:40a
21   easier.                                              11:41:43a
22       This is Exhibit A (indicating),                11:41:44a
23   it only has Exhibit A on it. Then there is a        11:41:46a
24   page that follows it which is a --                  11:41:50a
```

Page 98

1    MS. FOX: Comparables?                11:41:57a
2         THE WITNESS: Comparables. But        11:41:58a
3    it's not pegged to 1. It has -- it's     11:42:00a
4    not -- the individual series are not     11:42:05a
5    pegged to a particular number.           11:42:11a
6  BY MR. COLLINS:                            11:42:13a
7    Q.   Okay.                          11:42:13a
8    A.   Okay?                          11:42:14a
9         That's followed by a smaller        11:42:17a
10   version of the same chart and then data.  11:42:18a
11   Okay?                         11:42:22a
12   Q.   Okay. I'm with you now.             11:42:22a
13   A.   Then following that is another     11:42:24a
14   colored chart in my version that is referred to   11:42:30a
15   as Exhibit A and it says Adams Golf versus   11:42:35a
16   Comparables indexed to 1 at 7/10/98. So it's   11:42:40a
17   similar to the chart that I prepared where there   11:42:46a
18   is -- it's pegged at a particular point in   11:42:48a
19   time. He's pegging to 1. I pegged to 16.   11:42:52a
20   Q.   Just so we are clear, the last     11:42:58a
21   document that you referred to is a chart that   11:43:01a
22   says "Exhibit A" on it and it follows a page   11:43:06a
23   which gives information on the last line,   11:43:13a
24   "19991231," for Adams and the small cap index,   11:43:24a

Page 99

1  Callaway, Teardrop, Aldila, and Coastcast?   11:43:33a
2    A.   Yes, but what will be           11:43:35a
3  distinguishable from the other chart that has   11:43:38a
4  similar information is that it should say up at   11:43:41a
5  the top Adams Golf, Inc., indexed to 1 on   11:43:43a
6  7/9/98, and then there are three asterisks.   11:43:47a
7    Q.   Okay. Great.                   11:43:51a
8         Now, so I now know what          11:43:53a
9  document you are referring to and I thank you.   11:43:58a
10        Do I understand that this chart    11:44:00a
11  that we are now referring to, which says   11:44:05a
12  indexed to 1, motivated you to prepare Exhibit   11:44:08a
13  339 and 340?                      11:44:17a
14   A.   What -- not the chart -- not     11:44:21a
15  necessarily the chart itself, but the discussion   11:44:24a
16  in Mr. Miller's report regarding what he   11:44:30a
17  conjectures to be leakage regarding gray   11:44:47a
18  marketing activity, particularly in the mid to   11:44:53a
19  late part of July. I believe he mentions that   11:44:57a
20  in his first report, and then he expands on it   11:45:02a
21  in the current report by contending, as in   11:45:08a
22  Paragraph 22: "In fact, information concerning   11:45:14a
23  gray marketing activity which existed in the   11:45:17a
24  marketplace was available to various parties   11:45:20a

Page 100

1  including the following."              11:45:22a
2         That's on Paragraph 22 of his     11:45:27a
3  report.                       11:45:28a
4    Q.   Okay. You are quite right.       11:45:29a
5         Now, if I understand correctly,   11:45:31a
6  Exhibits 339 and 340 include in the Miller's   11:45:39a
7  peer group Teardrop, Aldila, Coastcast, and   11:45:46a
8  Callaway --                     11:45:54a
9    A.   Right.                       11:45:56a
10   Q.   -- together with Arnold Palmer   11:45:56a
11  and Golden Bear.                   11:45:59a
12   A.   That is my understanding.        11:46:00a
13   Q.   Okay.                        11:46:01a
14        And it's your understanding      11:46:02a
15  that the Miller's peer group included Arnold   11:46:03a
16  Palmer and Golden Bear?                 11:46:08a
17   A.   I would have to go back and       11:46:10a
18  check that.                      11:46:12a
19   Q.   Well, it is what it is. You are   11:46:22a
20  not responsible for what he included in Miller's   11:46:24a
21  peer group, I'm just asking what you included in   11:46:29a
22  yours. So let me just ask you.            11:46:31a
23        In 339 and 340 you included in    11:46:33a
24  what you referred to as Miller's peer group or   11:46:37a

Page 101

1  Miller peer group, you include Arnold Palmer   11:46:41a
2  and Golden Bear; correct?              11:46:44a
3    A.   No, I think it would be         11:46:47a
4  incorrect to refer to that as my peer group. My   11:46:48a
5  recollection is that --              11:46:51a
6    Q.   Let me stop you. Yeah, let me    11:46:52a
7  stop you because I didn't mean to mislead you on   11:46:54a
8  the question.                    11:46:57a
9         There is a reference on 339 to    11:46:57a
10  Miller's peer group, and then there's a line   11:46:59a
11  that runs across this page, not that I as a   11:47:02a
12  color-blind person can read it, but there's a   11:47:05a
13  line that runs across this page for peer   11:47:08a
14  group.                        11:47:11a
15   A.   That is Mr. Miller's peer        11:47:14a
16  group.                        11:47:16a
17   Q.   Okay. Does that peer group       11:47:16a
18  include or exclude, as set forth on 339, Arnold   11:47:18a
19  Palmer and Golden Bear?                 11:47:23a
20   A.   My recollection is that the peer  11:47:26a
21  group returns that were used in constructing 339   11:47:28a
22  and 340 are the returns as reported in   11:47:36a
23  Mr. Miller's report.               11:47:43a
24   Q.   You and I can argue about a      11:47:44a

26 (Pages 98 to 101)

Page 114

1    stock returns.                          12:06:49p
2        Q.    Now, you used an event window or      12:06:50p
3    event windows in this work; correct?           12:06:53p
4        A.    Yes.                          12:06:59p
5        Q.    And the event window you used,        12:07:00p
6    for all aspects of your work here, was one day?   12:07:01p
7        A.    No.                           12:07:08p
8        Q.    Okay.  You used, at least in         12:07:09p
9    some parts of your work, a one-day event window;   12:07:14p
10   is that --                              12:07:18p
11       A.    That is correct.                 12:07:18p
12       Q.    Okay.  In what part of your work      12:07:19p
13   did you use a one-day event window?            12:07:24p
14       A.    As is indicated in my report,        12:07:26p
15   when I was able to identify when a piece of       12:07:36p
16   information was either published or became       12:07:42p
17   available to market participants, I utilized --    12:07:46p
18   I used the day on which that information was       12:07:53p
19   first available during trading hours.           12:07:55p
20       Q.    Okay.                          12:07:58p
21       A.    Now, on -- the one I remember in       12:07:59p
22   particular was the April -- I'm sorry, the April    12:08:07p
23   -- the August 28th Lehman Brothers report.  It     12:08:09p
24   has a date on it, but not a time stamp, so then    12:08:15p

Page 115

1    the question becomes is it a -- was it available    12:08:19p
2    to market participants during trading hours.       12:08:26p
3    And, as I indicate in my report, I look at both    12:08:33p
4    the 28th and the 31st and see whether either one   12:08:37p
5    of those days is statistically significant.        12:08:41p
6    Now --                                 12:08:43p
7        Q.    Can I stop you?  Forgive me.          12:08:46p
8              With regard to that, when you         12:08:48p
9    did that work regarding the Lehman report and      12:08:49p
10   you looked at the 28th and you looked at the       12:08:52p
11   31st, you looked at each on a one-day event       12:08:54p
12   window basis; correct?                     12:08:57p
13       A.    And I also calculated the            12:08:59p
14   statistical significance on a two-day basis.       12:09:04p
15       Q.    Okay.  With respect to Lehman,        12:09:07p
16   that Lehman August 28th report?             12:09:12p
17       A.    Yes.                          12:09:14p
18       Q.    All right.  And why with regard       12:09:20p
19   to the Lehman report did you use a two-day event   12:09:23p
20   window?                                12:09:26p
21       A.    Well, I think it would be a mis       12:09:28p
22   -- it would be a mischaracterization to say that    12:09:31p
23   -- I investigated a two-day event window to        12:09:37p
24   determine whether the conclusions that I was       12:09:40p

Page 116

1    reaching regarding the materiality of that        12:09:41p
2    information would be changed if I used a broader    12:09:44p
3    window than one day.                      12:09:51p
4        Q.    Okay.  How did you investigate?       12:09:56p
5        A.    In the manner that I just            12:09:59p
6    described, that I looked at each day             12:10:00p
7    individually in the combination of those two       12:10:02p
8    days.                                  12:10:06p
9              In addition, even though the         12:10:06p
10   Lehman report has no time stamp on it, I          12:10:10p
11   believe, both in reading Mr. Lantier's           12:10:14p
12   deposition, and it's my understanding, having     12:10:18p
13   worked with buy and sell side analysts, that      12:10:21p
14   typically the written report will be disclosed     12:10:25p
15   to market participants and the content would      12:10:33p
16   be disclosed to the market participants in the    12:10:36p
17   day -- on the day on which the report is          12:10:39p
18   dated, during trading hours, or before the       12:10:42p
19   start of trading on the day that it is dated.      12:10:51p
20             Consistent with that, I also         12:10:51p
21   looked at what the closing price was referred     12:10:52p
22   to in the August 28th report for Adams Golf to     12:10:55p
23   determine whether the closing price pertained     12:11:01p
24   to the 28th or the day before, and it            12:11:04p

Page 117

1    pertained to the day before, which is            12:11:10p
2    consistent with the report being published on      12:11:13p
3    the 28th.                              12:11:16p
4        Q.    I asked you a question a moment       12:11:19p
5    ago about what you did to investigate a two-day    12:11:22p
6    event window and you said you already answered     12:11:26p
7    that.                                  12:11:28p
8        A.    Yes.                          12:11:29p
9        Q.    Tell me, again, what you did to       12:11:29p
10   investigate a two-day event window consisting of   12:11:32p
11   the 28th and the 31st.  Did you run regressions    12:11:37p
12   on it?                                 12:11:41p
13       A.    I aggregated the abnormal            12:11:44p
14   returns or the residual returns.              12:11:46p
15       Q.    Okay.                          12:11:49p
16       A.    And then used -- and then tested      12:11:51p
17   whether they were significant based upon a        12:11:53p
18   standard error that was estimated to be          12:11:57p
19   consistent with a two-day return.  So this -- I    12:12:01p
20   have used and others use in published work an      12:12:07p
21   estimate of the two-day standard error is simply   12:12:12p
22   the square root of two times the daily standard    12:12:16p
23   error.                                 12:12:19p
24       Q.    When you did so, what did you         12:12:27p

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 254

1    Q.   Are there models that can be    05:21:20p
2  used that test materiality on the basis of    05:21:21p
3  volume or some combination of volume and price  05:21:25p
4  movement?    05:21:29p
5    A.   I mean, I have not seen that    05:21:37p
6  analysis done in the context of, say, a damage    05:21:40p
7  analysis. I have seen some academic studies    05:21:43p
8  that ask the question of whether information has    05:21:49p
9  an effect on trading volume.    05:22:01p
10    Q.   And do you have any opinion as    05:22:11p
11  to the usability or appropriateness of those    05:22:13p
12  models?    05:22:17p
13    A.   I think the appropriateness    05:22:20p
14  would depend on the purpose of their being    05:22:23p
15  used. I would have to go back and look at some    05:22:31p
16  of those papers. Most of the paper -- the    05:22:36p
17  academic literature in finance is more focused    05:22:40p
18  on how information impacts value as opposed to    05:22:48p
19  trading volume. Although, there are a few    05:22:53p
20  papers out there that look at trading volume. I    05:22:55p
21  just don't recall what the conclusions are.    05:22:58p
22    Q.   The famous Golf Pro article    05:22:59p
23  allegedly of August or August 1, 1998, when was    05:23:03p
24  that available to the market?    05:23:08p

Page 255

1    A.   As I indicate in my report, it's    05:23:10p
2  my opinion that it's available to the market on    05:23:16p
3  August 1st.    05:23:19p
4    Q.   Well, surely you're not offering    05:23:19p
5  an opinion on that now, Dr. James, are you?    05:23:21p
6    A.   Yes, I am.    05:23:23p
7    Q.   You might be making an    05:23:24p
8  assumption, but you are offering -- are you an    05:23:26p
9  expert with regard to when Golf Pro appeared in    05:23:29p
10  1998?    05:23:32p
11    A.   I'm not representing myself to    05:23:33p
12  be an expert in when Golf Pro appeared. I am    05:23:35p
13  representing myself to be an expert in, first of    05:23:40p
14  all, knowing what the publication date and the    05:23:43p
15  convention of using publication dates. I    05:23:50p
16  believe your own expert uses the publication    05:23:52p
17  date as the date referenced in his chronology.    05:23:55p
18       Second, I undertook an    05:23:59p
19  investigation to determine whether there was    05:24:01p
20  any evidence that suggests that the Golf Pro    05:24:03p
21  article was available prior to the cover day    05:24:06p
22  and concluded based on that analysis that    05:24:12p
23  there was none.    05:24:14p
24    Q.   Okay. Do you know of any    05:24:15p

Page 256

1  evidence, apart from what you've put in your    05:24:16p
2  reports, to indicate when that Golf Pro article    05:24:21p
3  was available?    05:24:24p
4    A.   Yes.    05:24:26p
5    Q.   When?    05:24:26p
6    A.   In response to the Miller report    05:24:28p
7  where he conjectures that it might have been    05:24:32p
8  available earlier, I performed the following    05:24:37p
9  test. Based upon communications that I'm aware    05:24:40p
10  of between Cornerstone and the publishers of    05:24:46p
11  Golf Pro, which is now not currently published,    05:24:53p
12  they were unable to answer the question as to    05:25:04p
13  whether it was available before or after the    05:25:05p
14  cover price -- cover date.    05:25:08p
15       So I conducted a Factiva search    05:25:11p
16  between 1995 and 2000 in which I used the    05:25:15p
17  keywords "Golf Pro magazine," and then I    05:25:22p
18  looked at all of the articles that were    05:25:26p
19  available on Factiva that reference Golf Pro    05:25:29p
20  magazine and asked the question of whether    05:25:34p
21  there was any reference in the public press to    05:25:36p
22  a Golf Pro magazine article prior to the    05:25:41p
23  stated publication date on the cover, and I    05:25:46p
24  was able to identify several instances in    05:25:50p

Page 257

1  which there is a reference to a particular    05:25:53p
2  issue of Golf Pro magazine, and all of the    05:25:57p
3  references were after the publication date    05:26:01p
4  which is consistent with -- which is    05:26:04p
5  inconsistent with the conjecture by Mr. Miller    05:26:09p
6  that the information was available to the    05:26:13p
7  market prior to the cover date.    05:26:19p
8    Q.   Did you save those searches?    05:26:27p
9    A.   No.    05:26:29p
10    Q.   Did you communicate with your    05:26:30p
11  office about providing to us information with    05:26:34p
12  regard to the additional regressions you said    05:26:35p
13  you would have?    05:26:38p
14    A.   I have -- it's not my office.    05:26:41p
15    Q.   Cornerstone. Whomever you had    05:26:43p
16  to communicate with.    05:26:44p
17    A.   Yes, and the individual that is    05:26:46p
18  available -- the individual who undertook that    05:26:53p
19  analysis is not available, he's -- that's Amir    05:26:59p
20  Rosen, and I believe he's attending a deposition    05:27:07p
21  today.    05:27:10p
22    Q.   Not in this case?    05:27:11p
23    A.   Yes, I believe he's downstairs,    05:27:12p
24  two stories down.    05:27:14p

65 (Pages 254 to 257)