# CORRECTED

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE: ADAMS GOLF, INC. :
SECURITIES LITIGATION :

ORAL DEPOSITION
OF
EDWARD NECARSULMER, III
Monday, August 7, 2006

- - -

Oral deposition of EDWARD NECARSULMER, III, held at the offices of SIMPSON THACHER & BARTLETT, LLP, 425 Lexington Avenue, New York, New York, commencing at 12:08 p.m., reported by Pamela Harrison, RMR, CRR, CSR and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215) 241-1000 (888) 777-6690

EDWARD NECARSULMER, III

variables. Some of the ones you've mentioned are variables -- are valid ones, but there are -- just the existence of the fact that it was a fast growing company or it was a new company would not be enough for me to direct the team to do something different.

BY MR. LEWIS:

Q. What variables, if any, would cause you to direct the team to do something different in due diligence?

MR. GLUCKOW: I'm going to object to the form and object on the ground that it's vague and ambiguous and quite overbroad.

But you can answer.

THE WITNESS: I mean it's a situation-by-situation issue. I think that -- and I can only, you know, really respond to it anecdotally if I can think of some appropriate anecdotes. But I guess my point is, without belaboring this, is you look at

EDWARD NECARSULMER, III

each situation and hopefully -- you know, if you are managing the process, you look at each situation and hopefully you figure out, you know, what you need to do to satisfy your commitment committee, yourself, and the marketplace. And there are really no other rules specific -- you know, templates I can honestly look at you and offer beyond that.

BY MR. LEWIS:

Q. Have you ever had the experience of adjusting the due diligence that you were conducting on a company because the company had management that had not had long experience in running a public company?

A. Yes.

Q. And why did you do that?

A. Well, because simply as a matter of mechanics. In many cases if a company had done other offerings or was -- let's say had done other offerings or had significant -- had done private equity financings or other transactions, typically they might be more

EDWARD NECARSULMER, III

organized in terms of your ability to get documents and things that were on point that would go right to your organizational outline, where if they hadn't, you might have to really help them set up the process.

Q. Would you agree that in an initial public offering there is a strong affirmative duty of disclosure?

MR. GLUCKOW: Object to the form. Vague and ambiguous. Calls for a legal conclusion.

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Would you agree that in conducting due diligence it is necessary for the due diligence team to continue its investigation of the issuer up to and including the effective date of the registration statement?

A. Yes.

Q. And a due diligence investigation would be inadequate if the underwriter did not do that?

MR. GLUCKOW: Object to the

EDWARD NECARSULMER, III

form. It calls for a legal conclusion.

You can answer.

THE WITNESS: I mean, the easy answer is yes, but -- well, okay, let me just leave it at yes.

BY MR. LEWIS:

Q. Is it your understanding as a non-lawyer that one of the duties of underwriters is to deal fairly with the investing public?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: Absolutely.

BY MR. LEWIS:

Q. Isn't that sometimes referred to as the shingle theory?

A. I'm not familiar with that.

Q. I take it from your initial report that one of your beliefs is that an underwriter has an obligation to conduct a reasonable investigation in an IPO?

A. Yes.

Q. And there is a long tradition since the securities laws were enacted in the

'30s of underwriters conducting due diligence investigations?

MR. GLUCKOW: Object to the form. Vague and ambiguous.

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. To your knowledge, how far back in time have due diligence investigations been conducted by underwriters?

A. I think they were formalized by the 33 Act, but I don't go back quite that far, but it's certainly my understanding that particularly, you know, throughout history, you know, you committed your own capital to a greater extent I think than -- now things come full cycle, but in the beginning I think people did due diligence as, you know -- it's my understanding that a lot of due diligence -- what due diligence was done was, in fact, you know, a matter of, you know, of self-protection as opposed to any responsibility -- as opposed to exclusively a responsibility to, you know, investors.

Q. Did your work in the securities industry begin in 1967 with Hallgarten?

A. Correct.

Q. In the time that you've been in the industry, have you become aware of any changes in practical standards for due diligence investigations?

MR. GLUCKOW: Objection. Vague and ambiguous. Overbroad.

You can answer.

BY MR. LEWIS:

Q. Let me reframe the question.

Have you become aware of changes in practice with respect to due diligence investigations over the time since 1967 that you've been employed in the industry?

MR. GLUCKOW: The same objection.

You can answer.

THE WITNESS: None to the basic tenets of how the business or the process is done. I think one of the main changes that I've seen is that to the extent that the managing

underwriter has taken an even larger responsibility or has been delegated -- I don't like the word delegated, but has been delegated a responsibility by the other comanagers to a greater extent.

And the other -- if I can just illuminate. The process has gotten better to the extent that investment banks began to specialize in either certain industries or had groups that did certain industries; whereas, in my life, everybody was a generalist and so that if you were doing a telecommunications deal, it would be done by the telecommunications group in Lehman Brothers or Goldman Sachs or something, who really became quite expert.

I know we had a significant technology practice and management would often tell me that some of the people in that group are as knowledgeable -- not as they were, of

course, but as their competitors were about the business.

MR. GLUCKOW: I think we've been going a little bit over an hour. If there's a point in your outline where we could take a short break.

MR. LEWIS: We can take it right now.

MR. GLUCKOW: That would be great.

(A recess was had from 1:18 p.m. to 1:26 p.m.; and then the proceedings continued as follows:)

BY MR. LEWIS:

Q. Mr. Necarsulmer, outside of this litigation, before you did your work in this case, did you ever hear it said that underwriters were required to act as a prudent man would in the management of his own property?

MR. GLUCKOW: Those words?

MR. LEWIS: Yes.

THE WITNESS: I've certainly heard of the prudent man rule, but I thought it referred to trust companies

EDWARD NECARSULMER, III

BY MR. LEWIS:

Q. At the risk of beating the horse dead, again, to your knowledge, is there anyplace in any of the pages referred to in your rebuttal report which touched on gray marketing or Costco distribution?

MR. GLUCKOW: And again, you are focused on the UND production which we have in front of us and 325 and 326, not on deposition testimony?

MR. LEWIS: That is correct.

THE WITNESS: Then I would say -- I was thinking aloud; excuse me. Let me just make sure.

To the best of my knowledge, that is correct.

BY MR. LEWIS:

Q. Moving forward chronologically, I will show you Exhibit 215 which is a Lehman Brothers memorandum, facsimile, suggested outline, and list of concerns. The transmittal date on the fax is July 29, 1998.

Did you review this document?

A. I did see this document.

EDWARD NECARSULMER, III

Q. And did you see, on the third page of the exhibit, the item "Discounting - Tight Lies have been seen in many Costcos for $146? How is product getting there? What is Adams Golf doing about it?"

A. I have seen that.

Q. Have you seen any documents that explain to you how that information came into the possession of the underwriters?

A. I had not seen a document documentary of it, no.

Q. Do you recall any testimonial evidence?

A. It is my recollection that either Picchi or Lantier, who were the two Lehman equity research analysts, did refer to this in their deposition testimony. I can't tell you which one. I would say Lantier, if I had to make a determination.

L-A-N-T-I-E-R. P-I-C-C-I, I think. It may be P-I-C-C-H-I.

Q. So that other than the deposition transcripts of the equity analysts, you are unaware of any means by which one could

EDWARD NECARSULMER, III

determine how the information came into Lehman's possession that caused someone to write the words that appear on the page I read to you?

MR. GLUCKOW: Objection to the form. It mischaracterizes the testimony.

But you can answer.

THE WITNESS: I would add that, you know, since this is post IPO, it's highly plausible that's -- that this came through an investor or type of question to the research analyst.

BY MR. LEWIS:

Q. Can you explain why you say that?

A. Well, what happens often is that as you are talking about the story or the stock, particularly if the stock is, you know, either going up or down a lot and therefore is the subject, research analysts are constantly talking to their customers who are the -- they're counterpart analysts or portfolio managers at usually large financial institutions, or it could be an officer manager

EDWARD NECARSULMER, III

someplace, and a lot of the process is feedback, and somebody said, you know, what do you think is going on? I heard, you know, from my golf pro or a guy at Fidelity asked me about... I mean, in my experience a lot of the information is actually incoming, so it could very well have come through that way as well.

Q. Let me show you what I've marked previously as 217. This is a teleconference script dated August 5, 1998, sent to Olga Pulido-Crowe and Pat Walravens, W-A-L-R-A-V-E-N-S, from the desk of Patty Walsh. And at Page 40671, you will see a reference, under the heading of Discounting, to "Tight Lies have been seen in many Costcos for $146. How is the product getting there?" and an answer is given.

Does anything in this document -- strike that.

Do you have any reason to believe that the information that's contained on Page 40670, which is similar to the information we saw in the "concerns" box on Exhibit 215, came as a surprise to the