# EXHIBIT 3

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE: ADAMS GOLF, INC. :
SECURITIES LITIGATION :

ORAL DEPOSITION
OF
EDWARD NECARSULMER, III
Monday, August 7, 2006

- - -

Oral deposition of EDWARD NECARSULMER, III, held at the offices of SIMPSON THACHER & BARTLETT, LLP, 425 Lexington Avenue, New York, New York, commencing at 12:08 p.m., reported by Pamela Harrison, RMR, CRR, CSR and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215) 241-1000 (888) 777-6690

APPEARANCES:

DONALD B. LEWIS, ESQUIRE
5 Cynwyd Road
Bala Cynwyd, Pennsylvania 19004
610-668-0331
For the Plaintiff

LAURA MORIATY, ESQUIRE
AKIN GUMP STRAUSS HAUER & FELD, LLP
300 West 6th Street
Suite 2100
Austin, Texas 78701-3911
512-499-6200
lmoriaty@akingump.com
For the Adams Golf Defendants

PAUL C. GLUCKOW, ESQUIRE
and
RYAN ANTHONY KANE, ESQUIRE
SIMPSON THACHER & BARTLETT, LLP
425 Lexington Avenue
New York, New York 10017-3954
212-455-3056
pgluckow@stblaw.com
rkane@stblaw.com
For the Underwriter Defendants

EXAMINATION INDEX

WITNESS: EDWARD NECARSULMER, III

BY MR. LEWIS . . . . . . . . . . . 6, 188
BY MR. GLUCKOW . . . . . . . . . . 177
BY MS. MORIATY . . . . . . . . . . 184

- - -

EXHIBIT INDEX

320 Cover letter, 7/24/06, to Collins, Esq., from McEvoy plus attachments NECARS 00001-00029 — 7
321 Adams Golf Inc. Securities Litigation Expert Report of Edward Necarsulmer, III — 10
322 Adams Golf Securities Litigation Rebuttal Report of Edward Necarsulmer, III — 10
323 E-mail, 4/28/04, to "Ted" from "Paul" — 13
324 AMF Bowling Securities Litigation Expert Report of Edward Necarsulmer, III — 20
325 Adams Golf, Inc. Customer Due Diligence Questionnaire — 144
326 Fax dated 8/7/06 plus attachment — 144
327 Document entitled Exhibit VII — 153
328 Deposition of Olga A. Pulido-Crowe — 176

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer:
Page Line
(NONE)

Request for Production of Documents:
Page Line
(NONE)

Stipulations:
Page Line
5/1

Questions Marked:
Page Line
(NONE)

EDWARD NECARSULMER, III

MR. LEWIS: The stipulations that we have been proceeding under, as I understand it, are waiving, sealing, certification, and filing of the transcript, and otherwise proceeding under the federal rules.
MR. GLUCKOW: Give me those again.
MR. LEWIS: Sealing.
MR. GLUCKOW: Right.
MR. LEWIS: Certification.
MR. GLUCKOW: Okay.
MR. LEWIS: And filing.
MR. GLUCKOW: Okay.
MR. LEWIS: Some of which probably are already mooted by the latest federal rules.
MR. GLUCKOW: Right.
MR. LEWIS: And I suppose you want to reserve read and sign for Mr. Necarsulmer?
MR. GLUCKOW: Exactly. Yes.
THE WITNESS: Perfect.
- - -

EDWARD NECARSULMER, III, after having been duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

BY MR. LEWIS:

Q. Would you state your name and address for the record.

A. Edward Necarsulmer, III, P.O. Box 1173, Quogue, Q-U-O-G-U-E, New York, 11959.

MR. LEWIS: As a preliminary, since there is a simultaneous deposition going on in this case in Houston today, Mr. Collins suggested to me that I pick up with numbering today at 320, leaving a gap between the end of the last deposition and his, which might result in a few blank numbers but will keep us from having two exhibits with the same number.

So I'm going to pick up at 320, and I'm just going to mark for the record as Exhibit 320 a document -- a

letter from Ted McEvoy to Todd Collins, enclosing documents NECARS 1 through 29.

(Whereupon, a document was marked, for identification purposes, as Exhibit 320.)

MR. LEWIS: I guess my question really is to Mr. Gluckow. Has there been any other production of documents from this witness that you are aware of?

MR. GLUCKOW: Yes, there was a subsequent production I think just on the heels of the rebuttal report.

MR. KANE: Yes.

MR. GLUCKOW: Ryan probably has the Bates numbers. I think it was just a half dozen more pages. We can probably get a copy for you, but I think it's NECARS 30 through 33 or 35 or 37, or something like that.

MR. LEWIS: Somehow that seems to have slipped through the cracks. If I could see a copy of that before.

MR. KANE: I can get it to you during the break. It was sent to Mr. Collins.

MR. LEWIS: Okay.

BY MR. LEWIS:

Q. Mr. Necarsulmer, my name is Don Lewis. I represent the plaintiffs in this action, and I'm going to be asking you some questions this afternoon. If I drop my voice, garble my words, let me know and I'll have the question read back to you. If I ask the question in an incomprehensible way to you, let me know and I'll reframe the question for you.

A. Fine.

Q. How did you come to be retained in this litigation?

A. I have worked -- I have done some prior work with the law firm, Simpson Thacher.

Q. Was that in the AMF Bowling litigation?

A. Correct.

Q. Have you done other work as an expert witness for Simpson Thacher?

A. I did work as a consulting expert in a confidential matter prior to the AMF.

Q. A confidential matter involving due diligence?

A. Correct. Similar situation, just never -- it was settled.

Q. Is there some reason that you can't disclose the name of the client in that matter?

MR. GLUCKOW: Why don't I take it up with Mr. Necarsulmer. It may well be that it was a confidential engagement. My understanding is that there was no report and that it was just a consulting behind the scenes.

MR. LEWIS: All right.

BY MR. LEWIS:

Q. Is that your understanding as well?

A. That's correct.

Q. So have you generated expert witness reports for the Simpson Thacher firm before accepting the AMF litigation?

EDWARD NECARSULMER, III

A. No.

MR. GLUCKOW: Object -- you've got to give me a chance just to object in general before you give your answer.

Objection to the form of the question.

You can answer.

THE WITNESS: The answer is no.

(Whereupon, documents were marked, for identification purposes, as Exhibit 321 and Exhibit 322.)

BY MR. LEWIS:

Q. Let me hand you what I'm marking as Exhibits 321 and 322. 321 is a copy of your expert report, and 322 is a copy of your rebuttal report.

Am I correct that Exhibit 321 is a copy of the expert report you rendered in this litigation?

A. Yes.

Q. And that 322 is a copy of your rebuttal report?

A. Yes.

Q. When were you retained in this

EDWARD NECARSULMER, III

litigation, approximately?

A. I believe in April.

Q. Were you given any specific instructions with respect to putting together an expert report in this case?

A. No.

Q. What kind of guidance were you given, if any?

A. Basically to review the material, make my own determination as to how I felt about the issue to which I was going to opine. Really nothing further than that.

Q. When did you start to review the materials and to make your determination as to what you thought about them?

A. I think -- I'm not a hundred percent certain that I remember the dates I received them, but as soon as I began to get the materials, which I believe was probably in April, also.

Q. Did anyone assist you in drafting either of your reports?

A. No.

Q. Between the time of your initial

EDWARD NECARSULMER, III

contact with Simpson Thacher in this litigation and the time you generated your first expert report, did you participate in any meetings with respect to the report?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: Yes; however, it was really after the report was written.

BY MR. LEWIS:

Q. Okay. And where was the meeting?

A. We did a conference call, a web-based conference call.

Q. Was that a type of call in which you can see each other?

A. No, it was a type of call in which you could see a document.

Q. And had you completed the final touches on your expert report by the time that web-based conference call was held?

MR. GLUCKOW: Objection to the form.

EDWARD NECARSULMER, III

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Who participated in that call?

A. Mr. Gluckow and perhaps one of his associates and a firm called Cornerstone, and I don't actually recall if anyone from Akin Gump was on the call or not. I think they were not on the call, so I would limit -- rephrase the answer to someone from Cornerstone and from Simpson Thacher.

(Whereupon, a document was marked, for identification purposes, as Exhibit 323.)

BY MR. LEWIS:

Q. I'll show you next what has been marked as Exhibit 323, which appears to be an e-mail from Mr. Gluckow to yourself, dated April 28, 2006.

Did you receive some version of that e-mail from Mr. Gluckow?

A. I did.

Q. The first line of the e-mail reads: "It looks like the person from Lehman

EDWARD NECARSULMER, III

will not be able to make a meeting on May 8th (and in fact will be out that entire week)."

What do you understand the reference to a meeting on May 8th to be?

A. It was a meeting to meet with the ultimate client and just to have them look me over and shake my hand.

Q. Was that meeting to occur before you've completed your expert witness report?

A. Yes.

Q. Would it be fair to say your expert witness report was completed on the date you signed it?

A. Correct.

Q. Did you ever attend a meeting with a person from Lehman to make the determination you referred to?

A. Yes.

Q. And when did that take place?

A. I don't recall the date.

Q. Sometime in the month of May?

A. Yes.

Q. Was the person from Cornerstone who participated in the web-based conference

EDWARD NECARSULMER, III

call someone named Adel Turki?

A. Yes.

Q. Am I mispronouncing his name?

MR. GLUCKOW: It's Adel.

MR. LEWIS: Adel.

BY MR. LEWIS:

Q. Who was Mr. Turki?

A. He is the -- I believe he is the manager of the project, the expert project, working with Simpson Thacher.

Q. Did you have an understanding as to why he was participating in a web-based conference call that dealt with your expert witness report?

A. To the best of my knowledge, he was coordinating all the expert material and he also was the facilitator.

Q. Did Mr. Turki provide you with any thoughts regarding your report?

A. I don't believe he did.

Q. Did anyone from Cornerstone supply you with any materials relating to your project before you completed your report?

A. No.

EDWARD NECARSULMER, III

Q. At the time the web-based call took place, was your expert report in exactly the same form as it now appears --

A. Yes.

Q. -- as Exhibit 321?

A. Yes.

Q. Including your signature?

A. No.

Q. So when was the report actually finished but for your signature?

A. Either July 10th or July 11th, I entered the date of the signature line.

Q. And the web-based conference call took place a month earlier?

A. No. Maybe a week earlier, that sort of a time period.

Q. Between the time of your -- between the date July 12, on which your first report was signed, and the date of July 26th, 2006, on which your rebuttal report was signed, did you have any meetings with anyone concerning your rebuttal report?

A. We had a similar conference call on the rebuttal report.

EDWARD NECARSULMER, III

Q. Can you recall any of the participants in the similar conference call?

A. I think it was a -- with the exception of the associates from Cornerstone whose name I just don't know, it would have been the same cast of characters as the first conference call.

Q. And do you believe there was someone from Akin Gump on that second call?

A. Yes.

Q. And who was it?

A. I don't know.

MR. LEWIS: Off the record.

(A discussion was held off the record.)

BY MR. LEWIS:

Q. How long did it take you to write your initial expert report?

MR. GLUCKOW: You mean --

MR. LEWIS: Drafting terms.

MR. GLUCKOW: So you're not including all the time he spent reviewing materials, you are just talking about sitting at the computer

EDWARD NECARSULMER, III

drafting?

MR. LEWIS: Drafting.

THE WITNESS: I mean, I would estimate between, you know, four and six hours of actual time, but my method of working is I go back at this thing -- you know, I'll write the report, I'll go back at it, I'll think about it, I might move things around a little bit, so it may have been a longer period than that, but, you know.

BY MR. LEWIS:

Q. How long had you spent reviewing the materials before you sat down to write the report?

A. I'm going to estimate 40-plus hours.

Q. Can you describe as you recall it the process you went through in reviewing the materials?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: I usually do it box



EDWARD NECARSULMER, III

by box, and what I'll do is I'll try to order the boxes, actually just in physical stack, as to the things that I want to look at again or want to, you know, give more scrutiny to. But I just go through things, documents one after another, and I try to do it for as long a period as I can and still remain able to retain the material.

BY MR. LEWIS:

Q. As you were doing that, did you make notes?

A. I did not.

Q. Did you make notations on Post-its?

A. No.

Q. You just segregated the materials that you wanted to look back at?

A. Yes. The only indication I would ever make is I would make a checkmark to show that I've read it, and sometimes I put a date on it to show that I've read it.

Q. Is there some reason that you didn't make notes on materials like that?



EDWARD NECARSULMER, III

A. It's -- I will always -- I've been under the impression from when I've worked on these cases that that's not -- that drafts and notes are not the best things for expert witnesses to do.

Q. Did you receive instructions to that effect in this case?

A. No, no instructions in this particular case, that's just my understanding of the responsibilities.

Q. When you actually wrote up your report, did you use the AMF Bowling report as a template --

A. Yes.

Q. -- for the report that you were writing?

A. Yes.

MR. LEWIS: Let me just mark that as Exhibit 324.

(Whereupon, a document was marked, for identification purposes, as Exhibit 324.)

BY MR. LEWIS:

Q. Do you recognize this as a copy



EDWARD NECARSULMER, III

of an expert witness report that you generated in the AMF case?

A. Yes.

Q. I'll try to put the questions together for speed, but we'll break them apart if it becomes a problem.

In drafting either the expert report or the rebuttal expert report, did you create any drafts?

A. No.

Q. Before you actually -- would it be fair to say that before you actually signed either of the reports, you participated in one of these web-based conference calls in which the text of the report was shown to your -- to the attorneys who retained you before you actually signed the document?

MR. GLUCKOW: Can I just have that one read back? I missed the beginning.

(The court reporter read the record as follows:

"QUESTION: Before you actually -- would it be fair to say that before

EDWARD NECARSULMER, III

you actually signed either of the reports, you participated in one of these web-based conference calls in which the text of the report was shown to your -- to the attorneys who retained you before you actually signed the document?")

MR. GLUCKOW: You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Were any changes made to either of the reports after the web-based conference calls?

A. The only change -- and it's true of both reports -- were one of punctuation and one of numbering. I can't tell you on which report was which.

Q. Fair enough.

But no substantive changes?

A. Nothing of substance.

Q. So after the punctuation or numbering changes were made, you edited the document in whatever word processing system you had, finalized it, and never had a different

EDWARD NECARSULMER, III

hard copy draft?

A. No. I mean, that is correct.

Q. You never -- you had it only on your screen before the final version was printed out?

A. That is correct.

Q. And approximately how many hours in total have you devoted to this litigation so far?

A. I would have to look in my time book, but right up around 60 before today.

Q. In your expert report numbered 321 you have listed as Exhibit B Materials Considered. Can you explain what the heading Materials Considered means to you?

A. Basically all the documents involved in the case that I reviewed.

Q. In rendering your opinion, did you consider any information from sources other than the items that are listed in Exhibit B to your expert report?

MR. GLUCKOW: You mean specific to this litigation?

MR. LEWIS: Specific -- well --

EDWARD NECARSULMER, III

THE WITNESS: No.

MR. LEWIS: -- of any source.

BY MR. LEWIS:

Q. Just -- I'm not trying to be vague here. Did you receive any information from Lehman Brothers --

A. No.

Q. -- regarding its due diligence process other than what you saw in the transcripts, court filings, exhibits?

A. The answer is no.

Q. And did you receive any information from your -- from the counsel who retained you, Simpson Thacher, about the due diligence process or their views as to what had happened in due diligence?

A. No.

MR. GLUCKOW: Other than what's set forth in the exhibit.

THE WITNESS: I thought that was the question.

BY MR. LEWIS:

Q. I'm sorry, I have a tendency to try to sharpen at the end and it sometimes will

EDWARD NECARSULMER, III

change the direction of the question, so you will probably be better served if you wait for me, and I'll try to wait for you and try not to overspeak you on these questions.

Did you receive anything in the nature of deposition summaries from anyone related to this litigation?

A. I -- no.

Q. Did you receive any legal analysis from counsel in this litigation other than what may be reflected in Exhibit B?

A. No.

Q. Did anyone from Lehman Brothers discuss the due diligence process with you at all?

A. No.

Q. Have you, as an expert witness, heard the term work product as relating to lawyers?

A. Yes.

Q. Did you receive any work product from your counsel in connection with your work on the Adams Golf engagement?

A. No.

EDWARD NECARSULMER, III

Q. Let me turn to the report, 321. Just some basic things. I see that you have listed your hourly rate as $600 per hour. Is that the current rate?
A. That is accurate.
Q. Am I correct that in 2004 it was $450, back in the AMF case?
A. That's correct.
Q. When did the rate change?
A. In 2005.
Q. What was the circumstance of that?
A. I was discussing being retained in another case and discussed the going rate and was informed that $600 was a fair rate.
Q. In Paragraph 3 of the report, in the category of Prior Testimony, you write: "I am also currently retained as an expert in a matter before the United States District Court in the Northern District of Texas."
What is that matter, in general terms?
A. It is a -- it's a similar type of case. The company is called Flowserve, and

EDWARD NECARSULMER, III

it is plaintiffs coming after the company and underwriter defendants based on a number of issues which due diligence is one.
Q. And what underwriters have retained you in that case?
A. The --
MR. GLUCKOW: Objection to the form. It assumes facts not in evidence.
MR. LEWIS: I'll withdraw the question.
BY MR. LEWIS:
Q. Who has retained you in that case?
A. The firm of Jenkens & Gilchrist.
Q. And what underwriters are the defendants in that case whose due diligence, among other things, you are considering?
A. CSFB and Banc of America Securities.
Q. Have you yet rendered any opinions in that case?
A. I have not.
Q. Have you testified in that case?

EDWARD NECARSULMER, III

A. I have not.
Q. Have you -- as a technical matter, have you yet been found by any court either qualified or unqualified to render an expert witness opinion on any subject?
MR. GLUCKOW: Objection to the form.
You can answer.
THE WITNESS: No.
BY MR. LEWIS:
Q. Have you ever been retained as an expert on matters of discloser?
MR. GLUCKOW: Objection to the form.
You can answer.
THE WITNESS: Not specifically. The assignment is usually phrased as due diligence; however, you tend to get asked whether the due diligence led to the proper disclosure.
BY MR. LEWIS:
Q. Have you ever, other than in this present litigation, included an opinion in one of your reports on the subject of whether

EDWARD NECARSULMER, III

something should have been disclosed as a result of due diligence?
MR. GLUCKOW: Objection to the form.
I think you've already established the only other report is the Exhibit 324.
But you can answer.
THE WITNESS: No.
BY MR. LEWIS:
Q. I note in your description of your experience that both presently and between March of '98 and May of 2000 you have acted as a consultant to the financial services industry. Is that fair?
MR. GLUCKOW: Just for the record here, you are looking at what now?
MR. LEWIS: I'm looking at Exhibit A to Court Exhibit 321, and this is the part that includes Mr. Necarsulmer's CV or biography.
BY MR. LEWIS:
Q. Am I correct that between March of 1998 and May 2000 you were a consultant to

EDWARD NECARSULMER, III

the financial services industry?

A. Yes.

Q. And also between May of 2002 and the present you have been a consultant to that industry --

A. That is correct.

Q. -- is that fair?

In the course of your work as a consultant, have you been asked by any underwriters to render them an opinion outside of court on whether something they did in due diligence was appropriate or inappropriate?

A. No. The scope of my work, just if it's useful, the scope of my work has traditionally been -- and I don't do much of it anymore -- has been an operating practice, should we -- how do we organize a sales group, how do we organize a research group, will this client's -- things like that.

Q. So in what -- I'll try to ask this fairly.

In the course of your career in the financial industry, leaving aside your expert witness work of the last several years,

EDWARD NECARSULMER, III

have you been called upon to evaluate due diligence investigations?

A. Absolutely.

Q. And when did that -- when was that first the case in your practice?

A. Through my whole career, I mean. Either as practitioner or running a deal, but most importantly as a commitment committee chair or member, which I did for a number of years, the heart of the work was evaluating your own investment banker's due diligence or if you were comanager, the due diligence done by whoever was the book-running manager, so that was a significant part of certainly the last 20 years of my career in banking.

Q. Just by way of terminology, you used the phrase book-running manager. Can you explain what you mean by that?

A. In virtually all offerings one manager -- one of the underwriters -- one of the managing underwriters is designated as the book runner and he will be the responsible party. Like Lehman was in this situation versus what a Banc of America -- Nations Banc I guess in this

EDWARD NECARSULMER, III

case or a Ferris Baker Watts did, they were comanagers. So the primary responsibility is based on the -- is in the arms of the book-running manager.

Q. So were there times while you were working in the industry, say, on the commitment committee that you had to send your investment banking team back to do more due diligence on a subject?

A. Absolutely.

Q. Have you ever authored any publications with respect to due diligence investigations?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: Not external, not things for general use. I certainly was part of, in firms, making sure that our standard due diligence procedure, adding and editing to that, but nothing for external use.

BY MR. LEWIS:

Q. You helped create standard due diligence procedures for one or more firms?

EDWARD NECARSULMER, III

A. Yes.

Q. Which firms were they?

A. For CJ Lawrence, which then became Morgan Grenfell and then became Deutsche Bank.

And Wasserstein Perella, I certainly didn't create it, but as head of the equity area I altered it to meet my own practices and standards.

Q. In the course of your work in the financial industry, did you ever receive any legal training?

A. None.

Q. Did you ever teach due diligence?

A. Let me make sure I phrase this properly.

Particularly in my Deutsche Bank life, we had a significant number of training classes, whether they were for MBAs or for people from other parts of the world, and I would do -- I would usually run the equity capital markets classes. Due diligence was certainly a part of that, would be a subject underneath the general heading of

EDWARD NECARSULMER, III

investment banking or equity capital markets and that would be my responsibility.

Q. As best you can recall it, sitting here today, what in general did you -- by way of materials did you present to your instructees about due diligence?

MR. GLUCKOW: You are asking him to recall the sum and substance of the lectures?

BY MR. LEWIS:

Q. Not the sum and substance, but the nature of the materials that were given. Were they case studies in due diligence, were they outlines of or checklists, were they discussions of cases, discussions of industry standards? What, in general, did you present when you were teaching due diligence?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: I would usually include the most recent checklist that the firm -- the appropriate firm was using, and I might have some discussion

EDWARD NECARSULMER, III

of how industry standards might have changed or might be at the moment, but I'm really not -- can't be any more specific than that.

BY MR. LEWIS:

Q. Do you recall whether the checklist was annotated with legal authorities?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: No.

BY MR. LEWIS:

Q. Since I didn't ask the question very well, I'm not sure whether you don't recall whether it was, or recall that it wasn't. To the best of your knowledge, did you provide your instructees with a checklist that was keyed to cases --

A. No.

Q. -- that established requirements?

I ask you to look to Paragraph B on Page 2 of Exhibit 321. In the middle of the paragraph you use the phrase: "Although

EDWARD NECARSULMER, III

the registration statement is the issuer's, the underwriting team," dash, "including its counsel is also responsible for the completeness, materiality, and veracity of this information."

Why do you say that the registration statement is the issuer's?

A. It's a fact. They file it, they are the only ones who could make changes to it, respond to comments.

Q. Okay. Have you ever heard anyone express the view that as a matter of law under the 1933 Act that both the underwriters and the issuer are equally legally responsible for the content of the document subject to the due diligence defense?

MR. GLUCKOW: Objection to the form. Calls for a legal conclusion.

You can answer.

THE WITNESS: I do understand that. I guess my response would be to the first -- back to the first part of what the question is, as a matter of business practice, the registration

EDWARD NECARSULMER, III

statement, and certainly in the many deals that I've worked on, is the issuer's document. Issuer's counsel, you know, is the first name on the agents for service. It's just the way things are done.

BY MR. LEWIS:

Q. If you would just look for a second and maybe keep by you the report from the AMF litigation, Exhibit 324.

If you look to the same Paragraph B in that report, you will see there is no -- unless I miss it -- statement in that paragraph to the effect that the registration statement is the issuer's.

MR. GLUCKOW: You mean those words are not in Exhibit 324?

MR. LEWIS: They are not on it. Not that I see.

MR. GLUCKOW: The document speaks for itself.

MR. LEWIS: Correct me if it's somewhere else.

MR. GLUCKOW: Is there a

EDWARD NECARSULMER, III

question?

BY MR. LEWIS:

Q. Well, was there some reason that you added that reference -- strike that.

Is there some reason that in writing your report in this litigation you felt it useful to include a reference that the registration statement is the issuer's?

A. There's no particular reason. These are conclusions that I drew from reading the material and thought that they were relevant.

Q. Getting back to 321 at Paragraph 6 on Page 3, describing the due diligence process in this case, you write: "The process was enhanced by the book-running firm's commitment process. A complete memo was prepared and presented to a group of senior firm members. This group further reviewed and validated the deal team's due diligence efforts."

MR. GLUCKOW: Excuse me. If you wouldn't mind, I think you lost the witness in terms of where you were

EDWARD NECARSULMER, III

reading from. Would you mind going back and redirecting us to where you are.

MR. LEWIS: We are on Page 3, Paragraph 6.

MR. GLUCKOW: And we are on 321; correct?

MR. LEWIS: Right, 321.

BY MR. LEWIS:

Q. "The process was enhanced by the book-running firm's commitment process. A complete memo was prepared and presented to a group of senior firm members. This group further reviewed and validated the deal team's due diligence efforts."

When you wrote that, were you referring to the commitment memo that appears at Exhibit 74?

A. Yes.

MR. GLUCKOW: When you said -- just for the record, I'm assuming your question is referring to the complete memo as opposed to the process referred to in Paragraph 6?

EDWARD NECARSULMER, III

MR. LEWIS: Right.

BY MR. LEWIS:

Q. Exhibit 74 is the complete memo that you referred to in Paragraph 6?

A. To the best of my recollection.

Q. Did you receive any information from Lehman about the commitment process other than appears in the documents that are listed in your report?

A. No.

Q. Did you read Exhibit 74 from cover to cover in the process of your work on this case?

A. Yes.

Q. Did you find someplace in Exhibit 74 where there is reference to either potential gray marketing or to potential Costco distribution?

A. Not that I recall.

Q. Do you have any reason to believe that either gray marketing or Costco distribution were mentioned orally to the commitment committee, although those terms don't appear in the memo?

EDWARD NECARSULMER, III

A. I wouldn't know.

Q. From your experience working in the industry, would you expect that the commitment committee would be provided with facts at a commitment committee meeting that did not appear in the memorandum that was being presented to them?

MR. GLUCKOW: Objection. Calls for speculation.

You can answer.

THE WITNESS: I just wasn't there. Certainly, from a practice matter, you might ask questions -- you do ask questions; you frankly grill the team -- the presenters. That's the process.

BY MR. LEWIS:

Q. What is the purpose of a commitment committee memorandum, as you understand it?

A. It's really to generally familiarize people who are not actively involved with the transaction as to what they are going to hear, the subject, and, maybe, hopefully --

EDWARD NECARSULMER, III

it doesn't always work this way -- they'll think about it before they walk in the door.

Q. The "they" being the commitment committee itself?

A. The commitment committee, correct.

Q. Now, getting to Paragraph 7 of your report, which includes a summary of your opinions -- this is Paragraph 7, Summary, Page 4, the next page. Let me take this in pieces.

The first sentence reads: "Based on my long industry experience and the information presented to me, it is my opinion that the underwriters of this offering performed due diligence in line with normal industry standards and practice."

Can you explain to me, sir, what you mean by "in line with normal industry standards and practice"?

A. The years of experience that I had actually doing this leads me to believe -- leads me to think I understand, you know, what is required and what is expected for the process, and when I opine that it's in line with

EDWARD NECARSULMER, III

that, it means simply that, that I think they complied with what I think is necessary to have complete due diligence.

Q. Are the industry standards that you refer to in your opinion something that is written down in some industry publication or guideline?

A. It's business practice.

Q. An actual business practice that you have observed in your years of working in the financial industry, correct?

A. Yes.

Q. That experience was gained at the firms that are mentioned -- that you've already mentioned in your testimony and also Hallgarten, H-A-L-L-G-A-R-T-E-N, and Company?

A. Yes.

Q. Hallgarten and Company was at one point Moseley and Hallgarten?

A. Actually, the opposite. Hallgarten and Company was a firm of which there were a great number. It was actually founded in 1850 and had a significant business but then became part of Moseley and Hallgarten, and there

EDWARD NECARSULMER, III

was a period in the '70s when there was a huge conglomeration of firms.

Actually, I did a fair amount of due diligence where I was the guy who actually went and visited the factory at that point in my career.

Q. Opened the boxes?

A. Correct.

Q. Now, the next sentence of your opinion, immediately following the one I read previously, reads: "Their actions were consistent with a standard of reasonableness as I understand it, and were more than sufficient to satisfy me as to their adequacy and completeness."

Again, words are the heart of all depositions, I guess. What do you mean by "a standard of reasonableness as I understand it"?

A. As we've already established, I have no legal training, but it's certainly my business understanding or concept that the underwriters are supposed to conduct reasonable due diligence, and, again, in compliance with what I've done in my own career, I've felt and

EDWARD NECARSULMER, III

feel that this meets those standards -- that their efforts meet those standards. Let me phrase that better.

Q. The standard that you refer to then in that sentence is a standard based on your empirical observation and personal work in the financial industry rather than anything that is written down in text anywhere?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Have you been a member of any industry committees or associations at which representatives of underwriting firms sit down to discuss principles of due diligence?

A. I've participated in numerous industry panels and study groups and the like, commented on rules, changing the department of corporate financing's rules, et cetera. Due diligence is certainly part of it, but I couldn't cite you a time when I attended a special seminar on due diligence, but I was an

active participant in Securities Industry Association, Investment Bankers Association, NASD, Group of Corporate Finance, I did a lot of that kind of thing, yes.

Q. You believe you've at least heard people talk at such meetings, in such context about due diligence?

A. I do.

Q. Have you read any publications about due diligence?

MR. GLUCKOW: Ever?

MR. LEWIS: Ever.

THE WITNESS: Yes, but I can't really recall -- I can't cite any, but I know that I've done so.

BY MR. LEWIS:

Q. Do you recall anything you've seen in writing about due diligence in the last five years?

MR. GLUCKOW: Object to the form. You can answer.

THE WITNESS: No.

BY MR. LEWIS:

Q. In the first sentence of this

summary you refer to the underwriters of this offering having performed due diligence in line with normal industry standards and practice.

Are you referring there to Lehman Brothers rather than to Ferris Baker Watts or Nations Banc?

A. I'm referring to all three managers.

Q. Do you believe that the underwriters other than Lehman Brothers satisfied their due diligence by delegating that function to Lehman which, in your view, satisfactorily performed it?

MR. GLUCKOW: Objection to form. Assumes facts not in evidence. Mischaracterizes the testimony.

You can answer.

THE WITNESS: I don't believe they -- look, the practical reality is that the managing underwriter is responsible for the process, but I think there's ample reference to the fact that the other firms kept their own files, participated in various

parts of this, were present at meetings, so I would not use the word -- I think the word you used was advocated or --

BY MR. LEWIS:

Q. Delegated.

A. Delegated, I think to the extent that it's industry standard to clearly delegate the lead to the book-running manager, but I think they performed in line with what I would have expected.

Q. What were you referring to with respect to the other underwriters keeping their own files?

A. I have production from Nations Banc; I've seen some of their work; I've seen the fact that they participated in meetings.

Q. As part of the overall Underwriter Defendants Document Production Pages 1 to 11636?

A. That's correct.

Q. Can you recall anything that Nations Banc did with respect to an evaluation of possible gray marketing or Costco

distribution of Adams clubs?

A. No.

Q. Can you recall anything that Ferris Baker Watts did with respect to gray marketing or possible Costco distribution of Adams clubs?

A. No.

Q. Just to be clear in terms of your reading, have you ever read case law regarding the legal standards for due diligence?

MR. GLUCKOW: Object to the form. You can answer.

THE WITNESS: Not that I recall.

BY MR. LEWIS:

Q. Have you heard of any cases, legal cases, in the field of due diligence that you consider to be important cases?

A. No.

Q. Have you ever heard of a decision in a case called Escott, E-S-C-O-T-T, versus Bar Chris, B-A-R capital C-H-R-I-S?

A. I've heard of the case, but it was in an earlier time.

Q. Have you heard of a decision in

Feit, F-E-I-T, versus Leasco, L-E-A-S-C-O, by Judge Weinstein?

A. No.

Q. Have you heard that a decision was rendered in the Worldcom litigation by Judge Denise Cote, C-O-T-E, on the subject of due diligence?

A. Yes.

Q. Have you read that decision?

A. I have not.

Q. Have you been told anything about the contents of the decision?

A. Only what I've read.

Q. And what have you read?

A. Just in terms of general press coverage of the matter.

Q. Do you know any principles that she referred to in her opinion?

A. No.

Q. Would you agree with the general proposition -- and, please, if you don't agree, tell me -- that over the years the underwriter has been regarded as a type of gatekeeper to the capital marketplace?

MR. GLUCKOW: Object to the form. You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. You do agree with that?

A. I do.

Q. And would you agree that an underwriter's reputation has helped small companies gain access to capital markets?

MR. GLUCKOW: Object to the form. You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Do you believe that it is true that underwriters have been considered responsible for assuring the accuracy of an issuer's offering materials?

A. I don't believe that to be true.

Q. And can you tell me why?

A. I think among -- let me make sure I phrase this properly. I think among sophisticated investors, it's well-known that the company is, in fact, you know, the better source about its business and that underwriters

will certainly do -- are certainly important in the process; but I don't believe that it's -- it completely -- that it's generally recognized that that is part of the underwriters' responsibility.

Q. Do you believe that in initial public offerings underwriters are heavily relied upon by the investing public?

A. I do believe that.

Q. Do you believe that's true especially where the companies doing the IPOs are experiencing rapid growth and change just before the IPO?

MR. GLUCKOW: Object to the form. You can answer.

THE WITNESS: I don't think there's any difference from your last question. I think your last question is true, I wouldn't modify it.

BY MR. LEWIS:

Q. Okay.

A. The first question is true, excuse me.

Q. Do you agree that the

reasonableness of a due diligence investigation varies with the factual circumstances of each offering?

A. I do.

Q. To what extent do you believe expense is a determinant in how thorough due diligence should be?

MR. GLUCKOW: Object to the form. You can answer.

THE WITNESS: Virtually not at all.

BY MR. LEWIS:

Q. And why is that?

A. I think people's reputation and their relationship with their clients -- I'm talking about from an underwriter's point of view now -- is priceless and cost, just for better or worse, was never an issue.

Q. Now, do you believe that in the securities industry the standards for due diligence are more rigorous in an IPO than in a follow-on offer?

MR. GLUCKOW: Object to the form. You can answer.

EDWARD NECARSULMER, III

THE WITNESS: I have a difficult -- I think your concept is correct, but I'm not sure rigorous -- I guess what I'm trying to say is since there is less information in the public domain, more work is traditionally done, but I think the standards are pretty much the same.

BY MR. LEWIS:

Q. So the standards are the same but the work is more rigorous in the IPO than in the follow-on offerings?

MR. GLUCKOW: Object to the form. Mischaracterizes the testimony.

You can answer.

THE WITNESS: What I'm trying to say -- maybe I didn't say it properly -- is that if you are working on the second, third, or fourth offering for a company, A, you are knowledgeable, assuming you have the same team in place or parts of the same team in place; and, B, the body of information has been organized and is more easily

EDWARD NECARSULMER, III

-- easy to digest and to process. An IPO you tend -- sometimes have to really break new ground to get information.

BY MR. LEWIS:

Q. Would you agree that the securities industry as a whole expects more due diligence work in an IPO than in a follow-on offering?

MR. GLUCKOW: Object to the form. Vague and ambiguous.

You can answer.

THE WITNESS: I wouldn't agree to that.

BY MR. LEWIS:

Q. I think -- strike that.

Is it true in an IPO that because securities have not been previously publicly traded, information about an issuer is often not readily available to the public as a whole?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: It's too hard to

EDWARD NECARSULMER, III

generalize. I mean, Google, there were no secrets, yet I'm sure on some small companies there are secrets, or that may be the wrong way to phrase it, but information that is not as available.

BY MR. LEWIS:

Q. Would you disagree then that the standards for due diligence are higher than usual where a company going through an IPO is experiencing rapid growth and change?

MR. GLUCKOW: Objection to the form.

You can answer.

It's vague and ambiguous.

THE WITNESS: I don't think I can answer. I'm not unwilling to, I just don't think I can answer that. I don't think the standards -- you are faced with the same issue when you agree to commit your capital and your reputation to underwrite securities and there may be a number of, you know, intensity, or whatever the proper phrase would be, someplace within the same scale and I

EDWARD NECARSULMER, III

don't think it's just because it's an initial public offering or just because it's a company that's a rapidly growing company.

BY MR. LEWIS:

Q. So in the past when you -- I take it you have performed -- you have participated in some way or other in due diligence investigations both of companies going through IPOs and companies going through follow-on offerings. Is that correct?

A. That is correct.

Q. And in those situations you did not expect the due diligence team to adjust its level of due diligence to take into account the newness of the one company versus the previous offering of the other?

MR. GLUCKOW: Object to the form. Mischaracterizes the testimony.

You can answer.

THE WITNESS: I don't think that's what I said, or if I did say that, that's not what I meant. What I meant was there are a whole set of

EDWARD NECARSULMER, III

variables. Some of the ones you've mentioned are variables -- are valid ones, but there are -- just the existence of the fact that it was a fast growing company or it was a new company would not be enough for me to direct the team to do something different.

BY MR. LEWIS:

Q. What variables, if any, would cause you to direct the team to do something different in due diligence?

MR. GLUCKOW: I'm going to object to the form and object on the ground that it's vague and ambiguous and quite overbroad.

But you can answer.

THE WITNESS: I mean it's a situation-by-situation issue. I think that -- and I can only, you know, really respond to it anecdotally if I can think of some appropriate anecdotes. But I guess my point is, without belaboring this, is you look at

EDWARD NECARSULMER, III

each situation and hopefully -- you know, if you are managing the process, you look at each situation and hopefully you figure out, you know, what you need to do to satisfy your commitment committee, yourself, and the marketplace. And there are really no other rules specific -- you know, templates I can honestly look at you and offer beyond that.

BY MR. LEWIS:

Q. Have you ever had the experience of adjusting the due diligence that you were conducting on a company because the company had management that had not had long experience in running a public company?

A. Yes.

Q. And why did you do that?

A. Well, because simply as a matter of mechanics. In many cases if a company had done other offerings or was -- let's say had done other offerings or had significant -- had done private equity financings or other transactions, typically they might be more

EDWARD NECARSULMER, III

organized in terms of your ability to get documents and things that were on point that would go right to your organizational outline, where if they hadn't, you might have to really help them set up the process.

Q. Would you agree that in an initial public offering there is a strong affirmative duty of disclosure?

MR. GLUCKOW: Object to the form. Vague and ambiguous. Calls for a legal conclusion.

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Would you agree that in conducting due diligence it is necessary for the due diligence team to continue its investigation of the issuer up to and including the effective date of the registration statement?

A. Yes.

Q. And a due diligence investigation would be inadequate if the underwriter did not do that?

MR. GLUCKOW: Object to the

EDWARD NECARSULMER, III

form. It calls for a legal conclusion.

You can answer.

THE WITNESS: I mean, the easy answer is yes, but -- well, okay, let me just leave it at yes.

BY MR. LEWIS:

Q. Is it your understanding as a non-lawyer that one of the duties of underwriters is to deal fairly with the investing public?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: Absolutely.

BY MR. LEWIS:

Q. Isn't that sometimes referred to as the shingle theory?

A. I'm not familiar with that.

Q. I take it from your initial report that one of your beliefs is that an underwriter has an obligation to conduct a reasonable investigation in an IPO?

A. Yes.

Q. And there is a long tradition since the securities laws were enacted in the

EDWARD NECARSULMER, III

'30s of underwriters conducting due diligence investigations?

MR. GLUCKOW: Object to the form. Vague and ambiguous.

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. To your knowledge, how far back in time have due diligence investigations been conducted by underwriters?

A. I think they were formalized by the 33 Act, but I don't go back quite that far, but it's certainly my understanding that particularly, you know, throughout history, you know, you committed your own capital to a greater extent I think than -- now things come full cycle, but in the beginning I think people did due diligence as, you know -- it's my understanding that a lot of due diligence -- what due diligence was done was, in fact, you know, a matter of, you know, of self-protection as opposed to any responsibility -- as opposed to exclusively a responsibility to, you know, investors.

EDWARD NECARSULMER, III

Q. Did your work in the securities industry begin in 1967 with Hallgarten?

A. Correct.

Q. In the time that you've been in the industry, have you become aware of any changes in practical standards for due diligence investigations?

MR. GLUCKOW: Objection. Vague and ambiguous. Overbroad.

You can answer.

BY MR. LEWIS:

Q. Let me reframe the question.

Have you become aware of changes in practice with respect to due diligence investigations over the time since 1967 that you've been employed in the industry?

MR. GLUCKOW: The same objection.

You can answer.

THE WITNESS: None to the basic tenets of how the business or the process is done. I think one of the main changes that I've seen is that to the extent that the managing

EDWARD NECARSULMER, III

underwriter has taken an even larger responsibility or has been delegated -- I don't like the word delegated, but has been delegated a responsibility by the other comanagers to a greater extent.

And the other -- if I can just illuminate. The process has gotten better to the extent that investment banks began to specialize in either certain industries or had groups that did certain industries; whereas, in my life, everybody was a generalist and so that if you were doing a telecommunications deal, it would be done by the telecommunications group in Lehman Brothers or Goldman Sachs or something, who really became quite expert.

I know we had a significant technology practice and management would often tell me that some of the people in that group are as knowledgeable -- not as they were, of

EDWARD NECARSULMER, III

course, but as their competitors were about the business.

MR. GLUCKOW: I think we've been going a little bit over an hour. If there's a point in your outline where we could take a short break.

MR. LEWIS: We can take it right now.

MR. GLUCKOW: That would be great.

(A recess was had from 1:18 p.m. to 1:26 p.m.; and then the proceedings continued as follows:)

BY MR. LEWIS:

Q. Mr. Necarsulmer, outside of this litigation, before you did your work in this case, did you ever hear it said that underwriters were required to act as a prudent man would in the management of his own property?

MR. GLUCKOW: Those words?

MR. LEWIS: Yes.

THE WITNESS: I've certainly heard of the prudent man rule, but I thought it referred to trust companies

EDWARD NECARSULMER, III

and mutual funds.

BY MR. LEWIS:

Q. Okay. Have you heard anything else said about whether underwriters had to act as a prudent man in the management of his own property?

A. I've never heard that.

Q. Do you believe that underwriters are entitled to rely solely on the representations of a company's officers or counsel?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: No.

BY MR. LEWIS:

Q. And why do you not believe that they can do so?

A. In my experience, when possible, and when relevant, it always -- it wasn't always the case. If there are independent checks, you can do formal or informal, it's a useful part of the process.

Q. Do you believe that verification of information is a critical step in the due

EDWARD NECARSULMER, III

diligence process?

A. Yes.

Q. And do you believe that that is necessary because even honest clients can make mistakes?

MR. GLUCKOW: Objection to the form.

You can answer.

BY MR. LEWIS:

Q. Do you believe that one reason that verification is necessary is because even honest clients can make mistakes?

MR. GLUCKOW: Same objection.

You can answer.

THE WITNESS: Yes. I don't enthusiastically agree, but I will concede that.

BY MR. LEWIS:

Q. Okay. Do you agree that another reason that it may be necessary is because honest clients can be overenthusiastic or overoptimistic?

A. Yes.

MR. GLUCKOW: The "it" being

EDWARD NECARSULMER, III

verification?

MR. LEWIS: Yes.

BY MR. LEWIS:

Q. And is it your belief that on rare occasions statements may be made by company officers to induce an underwriter to underwrite an offering where those statements are deliberately false?

MR. GLUCKOW: Objection to the form. Vague and ambiguous.

You can answer.

THE WITNESS: It certainly has happened.

BY MR. LEWIS:

Q. Can you think of any situations where it has happened?

MR. GLUCKOW: In his own experience?

BY MR. LEWIS:

Q. Either in your own experience or those you have heard of?

A. I can't give you a specific example.

Q. Do you agree with the

EDWARD NECARSULMER, III

proposition that underwriters must be alert to exaggerations by an issuer?

MR. GLUCKOW: Object to the form and object to the ground that like these other questions, that it's vague and ambiguous and overbroad.

But you can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Now, do you believe that there are any industry standards relating to verification of information supplied by an issuer?

A. No.

MR. GLUCKOW: I offer a belated objection to the form.

BY MR. LEWIS:

Q. Have there been instances in your career where to verify information you or people working for you interviewed lower level employees of a corporation?

A. I can't answer that yes or no. I've seen it done, not in a verification sense, but if I may, for example, in a business where

EDWARD NECARSULMER, III

one particular product line, geographic line, factory is critical or critical to driving growth of sales and revenues, I've seen it done where you've asked to be exposed to the actual hands-on people in that area, but it's not customary, except for, again, you might meet a plant manager if you go look at a facility, that kind of thing, but he would more be a tour guide and you would generally speak to the designated heads of marketing, finance, manufacturing, whatever the traditional department heads of the company are. That's certainly my experience.

Q. In the instances you gave of dealing with lower level employees, would it be fair to say you were giving examples of situations where the contacts were made for evaluation of those people or examination of facilities?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: The latter, not the former.

BY MR. LEWIS:

EDWARD NECARSULMER, III

Q. Okay. But not as a verification on information that had been supplied by management?

A. Correct.

Q. Have there been instances in your career when either in participating in or conducting a due diligence investigation you asked a company to give you access to files that they had not provided to you?

A. I don't recall ever having done that.

Q. Do you believe that use of industry experts in due diligence is a desirable thing in general terms?

A. Yes, with a qualification. I think it's important to -- I think it's important when there's something you don't understand -- or, again, I'm a practical character, so I can remember working on an insurance company deal where there's no way we would be able to understand actuarial assumptions, so we would hire our own actuary.

But would I encourage the use of an outside expert to look at somebody's

EDWARD NECARSULMER, III

manufacturing process or something? Typically not. So oil and gas is the usual example where you get your independent petroleum engineer to verify reserves, or something like that.

Q. Do you believe that there are instances in which verification may require reviewing internal documents of a company that the company has not voluntarily supplied?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: I'm not really comfortable with the hypothetical. I'm sure there are situations, I just have never run into one.

BY MR. LEWIS:

Q. Do you believe that it's true that during the due diligence process the positions of the underwriters and the company's officers should become somewhat adverse?

MR. GLUCKOW: Object to the form.

You can answer.

THE WITNESS: In an ideal world there ought to be a nice balance

EDWARD NECARSULMER, III

between friendly or, you know, cooperation, but you still need to have the ability to get the answers, and if that causes adversity, so be it.

BY MR. LEWIS:

Q. But would you agree that the due diligence process often fosters a collaborative atmosphere between the issuer and the underwriters?

A. It certainly always starts out that way. Or I should rephrase, usually starts out that way.

Q. In fact, in your report in the AMF case --

A. Mm-hmm.

Q. -- Exhibit 324, Page 2, Paragraph B --

MR. GLUCKOW: Hold on; just let us get there.

Okay.

BY MR. LEWIS:

Q. -- the last sentence, you wrote: "While the process often fosters a collaborative atmosphere between issuer and

EDWARD NECARSULMER, III

underwriters, it is essential for due diligence efforts to be thorough and their conclusions factually supportable."

Do you believe that as a general proposition?

A. I think that's just what I just said, but, yes.

Q. Is there a reason that in writing your report in this case you took out the reference to the fostering of a collaborative atmosphere?

A. No. I said to you before that I used this as a template, but it was more in the process of ordering things and what I wanted to cover, but I frankly rethought what I would want to include in my opinion.

MR. GLUCKOW: By the way, for the record, you are comparing B of 324 with B of 321?

MR. LEWIS: Yes.

MR. GLUCKOW: And comparing collaborative versus cooperation?

MR. LEWIS: Right.

MR. GLUCKOW: Okay.

EDWARD NECARSULMER, III

BY MR. LEWIS:

Q. In your report in 321 you have written: "While the process requires cooperation between issuer and underwriters, it is essential for due diligence efforts to be thorough and their conclusions factually supportable."

I don't have a question, but if you want to respond, you are free.

MR. GLUCKOW: Wait for a question.

BY MR. LEWIS:

Q. Do you believe that in the due diligence process the underwriters are frequently required to play devil's advocate?

A. Yes.

Q. When, in your opinion, does that become necessary?

A. It's hard to be specific. I mean, it could be from the first meeting to the bringdown call right before you price. I mean, it's just part of the ongoing process.

Q. Do you agree in principle that the underwriters must employ a high degree of

EDWARD NECARSULMER, III

care in their investigations?

A. I certainly do.

Q. Do you agree that the underwriters must independently verify the company's representations?

MR. GLUCKOW: Objection to the form. Asked and answered.

You can answer.

THE WITNESS: I don't think all of the representations. I think -- you know, the basic description of their business and their business plan and these kinds of things are -- if you are going to do business with these people, you traditionally accept those at face value.

BY MR. LEWIS:

Q. Do you believe that in each case in which an underwriter conducts due diligence it must conduct a meaningful investigation of the company?

MR. GLUCKOW: Objection to the form.

You can answer.

EDWARD NECARSULMER, III

THE WITNESS: I agree with that.

BY MR. LEWIS:

Q. Would you agree that in the due diligence context the term investigation can be defined as conducting a searching inquiry?

A. I don't really have a response to that. I think that's a matter of semantics. I think you -- whatever procedure and process you use and you feel is adequate and reasonable, you do.

Q. Is there a definition that you have in your own mind for what an investigation, a due diligence investigation, means?

A. Yes, but it can vary from company to company and project to project.

Q. Would you agree that to investigate means to inquire into a subject matter with attention to detail?

A. That's a fair definition.

Q. That's a...?

A. Fair definition.

Q. Fair definition?

MR. GLUCKOW: Delayed objection to the form.

EDWARD NECARSULMER, III

You can answer. And you have.

BY MR. LEWIS:

Q. Is it your view that if an underwriter receives negative information from a company of some sort, it's required -- it becomes necessary to follow up on that information?

MR. GLUCKOW: Objection to the form. Vague and ambiguous.

You can answer.

THE WITNESS: I think it's necessary to follow up on all information - negative, positive, or sideways.

BY MR. LEWIS:

Q. And noninformation, also?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: If something is self-evident or that's just a fact, no, you don't need to follow up on it, but...

BY MR. LEWIS:

EDWARD NECARSULMER, III

Q. Do you use the term red flags in your work?

A. Yes.

Q. How do you use that term?

A. To define issues that either require further attention or are not -- or perhaps inconsistent with what we -- our, you know, prior impression would be.

Q. Is it your opinion that it is necessary for an underwriter to follow up on any red flag that suggests that a registration statement may not be complete and accurate?

A. I mean, the general answer to the question is yes, but it's very hard just to -- let me leave it there. Yes.

Q. Would you agree that merely spending a lot of time on an investigation, meeting a lot of times with management, and reviewing a lot of documents is not necessarily sufficient in a due diligence investigation?

MR. GLUCKOW: Vague and ambiguous.

You can answer.

THE WITNESS: It doesn't -- it's

EDWARD NECARSULMER, III

not -- it's not the final answer.

BY MR. LEWIS:

Q. Have you been involved in due diligence investigations where a great amount of time and money was spent in the investigation and the investigation was not to your satisfaction?

A. Yes.

Q. And can you give any anecdotal examples of that?

A. Well, all I can tell you is I have been in situations where, either as a commitment committee or as just a man heading up a department, I didn't feel we had adequate information to -- either in one specific area or in general or that we had gone far enough to sign off on underwriting the or presenting it to whoever needed to sign off on it, so the answer is yes.

Q. What did you do in that instance or instances?

A. You go back and you do more work.

Q. Did you ever hold up an offering

EDWARD NECARSULMER, III

to do more work?

A. Yes.

Q. How recently was that, in general?

A. I would say that would have been pre-1998.

Q. Do you have an opinion on whether that portion of the due diligence investigation which the underwriters in this case did with respect to possible gray marketing or Costco distribution of Adams products satisfied industry standards?

MR. GLUCKOW: Objection to the form. Vague and ambiguous. The report speaks for itself.

You can answer.

THE WITNESS: I believe it does.

BY MR. LEWIS:

Q. So you do in fact believe that the underwriters in this case did investigate possible gray marketing or Costco distribution of Adams products?

A. I believe that underwriters were aware of the situation, made a judgment about

EDWARD NECARSULMER, III

how impactful it was upon the company, and acted accordingly.

Q. And the opinion you have on that subject is based, as is your overall opinion, on industry standards rather than legal standards?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. You are not relying on any cases with respect to that?

A. Right.

Q. It's your observation of industry norms?

A. Correct.

Q. Do you know of any investigation that the underwriters conducted of gray marketing or Costco issues other than what is reflected in the writings that you have listed in the attachment to your report?

MR. GLUCKOW: Object to the form.

You are referring to Exhibit A to 321?

EDWARD NECARSULMER, III

MR. LEWIS: 321.

MR. GLUCKOW: Exhibit B?

MR. LEWIS: Exhibit B.

THE WITNESS: Those were the materials that I reviewed, solely and completely.

BY MR. LEWIS:

Q. Do you believe that the best record of what actions the underwriters take in a due diligence investigation is what they preserve in writing?

MR. GLUCKOW: Objection to the form. Vague and ambiguous.

You can answer.

THE WITNESS: I don't know how to answer the question.

The written record is certainly, you know, significant in the part that lasts, but when you sit in a commitment committee or when you sit with your boss and you say, you know, these are important issues, that could be equally important, but certainly the only thing I can refer to is what I've seen.

EDWARD NECARSULMER, III

BY MR. LEWIS:

Q. Based on your experience in the industry, is it customary to record in writing any significant activities you undertake as part of a due diligence investigation?

MR. GLUCKOW: Objection to the form. Vague and ambiguous.

You can answer.

THE WITNESS: Customary but not exclusive.

BY MR. LEWIS:

Q. Can you explain what you mean by that?

A. What I mean by that is that you obviously want to write down and memorialize as much as you possibly can, but this is a process and you go out and you talk to people and you are working with the CFO and you are talking about an issue and you are -- you know, there are things that you hope that the people on your team are getting a feel for and digesting about the company, and whether that all gets written down or not, I can't tell you.

Q. Is it customary in your

EDWARD NECARSULMER, III

experience for an underwriter to document discussions regarding determinations of materiality?

MR. GLUCKOW: Objection to the form. Vague and ambiguous.

You can answer.

THE WITNESS: I would say no.

BY MR. LEWIS:

Q. Why is that?

A. Because if, you know, again, you are determining something is not material, you probably move on.

Q. In your experience, is it customary to document information which leads to the decision to exclude something from a prospectus?

MR. GLUCKOW: Object to the form. Vague and ambiguous.

You can answer.

THE WITNESS: I'll answer again no.

BY MR. LEWIS:

Q. Now, is it customary in the industry to keep notes regarding a due diligence

EDWARD NECARSULMER, III

investigation, in your experience?

A. Again, customary but not exhaustive. I mean, anecdotally, you -- someone tells you you have currency exposure to some kind of currency, so you investigate and you find out that in fact the contracts are written in dollars -- I mean, I'm making this -- I'm using an example -- so therefore I would never expect for someone to write down, gee, I checked out whether we were exposed to the Zambian kwacha and found out the contracts were written in dollars. Because we had already reviewed the contracts or we had the contracts as another part of our thing, I wouldn't have expected that to be a separate analysis or separate record.

Q. Is it your opinion that it is desirable for an underwriter to prepare a list of facts to be verified and then to address them in a systematic fashion?

A. Desirable? Absolutely.

Q. What do you believe, as you sit here and as you can recall, that the underwriters did to investigate possible gray marketing or Costco distribution of Adams

EDWARD NECARSULMER, III

products?

MR. GLUCKOW: Objection to the form. Overbroad.

In addition to what's in his reports or in summarized reports?

BY MR. LEWIS:

Q. As you sit here, can you recall anything that Adams did to investigate possible gray marketing or Costco distribution of Adams products? And if you need to refer --

THE WITNESS: May I ask a question?

MR. GLUCKOW: Let me object to the form. I think you said what did Adams do.

THE WITNESS: Yeah, that's what I was going to ask.

MR. GLUCKOW: Do you want to have it read back or fix it?

MR. LEWIS: I'll fix it.

BY MR. LEWIS:

Q. As you sit here, can you recall anything that the underwriters did to investigate possible gray market distribution or

EDWARD NECARSULMER, III

Costco distribution of Adams products?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: They did a number of things. They spent time with the marketing people at Adams and the subject was discussed. They participated in the customer survey process where that was, to the best of my recollection, never mentioned as an issue by a group of their -- a group of customers.

BY MR. LEWIS:

Q. Anything else that you can recall?

A. Those would be the two main things that I can recall at this time.

Q. Incidentally, maybe I can short-circuit some paper, you referred in your rebuttal report to a number of specific pages at Pages 1 and 2 of the rebuttal report --

A. Mm-hmm.

Q. -- under underwriting document

EDWARD NECARSULMER, III

pages, Paragraph B, Paragraph C.

Am I correct that none of those pages specifically referred to the terms gray marketing or Costco?

MR. GLUCKOW: You mean the UND document production pages as opposed to the deposition transcripts?

MR. LEWIS: Yes, correct.

THE WITNESS: I don't recall. I can't tell you what said what. I know they were both used and -- I can certainly tell you in the deposition transcripts it came up often. I just don't recall.

MR. LEWIS: Okay, if we may go through them.

BY MR. LEWIS:

Q. Are you seeking to be qualified in this case as an expert on the subject of what disclosures were legally required?

MR. GLUCKOW: Objection to the form.

You can answer.

THE WITNESS: To the extent that

Page 90

EDWARD NECARSULMER, III

it's part of the due diligence assignment, I guess the answer is yes, but I wasn't specifically -- to the best of my knowledge, I'm not specifically trying to get there. I think that it's all basically the same issue to the investigation and I'm sure that it was properly disclosed.

BY MR. LEWIS:

Q. But you say in your rebuttal report that the defendants made a reasonable judgment on disclosure?

MR. GLUCKOW: Where are you referring?

MR. LEWIS: The rebuttal report.

MR. GLUCKOW: What page? What paragraph?

MR. LEWIS: Let's go to Paragraph C. "After doing proper due diligence, the underwriters made a reasonable judgment related to disclosure of this issue."

MR. GLUCKOW: Maybe we are on different pages. I'm not finding what

Page 91

EDWARD NECARSULMER, III

you are referring to. 322, what paragraph?

MR. LEWIS: 3.

MR. GLUCKOW: Oh, he said C.

THE WITNESS: I thought you said C, I'm sorry.

BY MR. LEWIS:

Q. Let me read it in full: "To the extent that either expert is opining that the underwriters were unreasonable in concluding that a disclosure regarding gray marketing was not necessary, I disagree with that contention and believe, that after doing proper due diligence, the underwriters made a reasonable judgment related to disclosure of this issue."

You do not contend, do you, that you are an expert in gray markets?

A. Absolutely not.

Q. Did you ever have experience with gray market issues before this litigation?

A. I actually did once. I worked on a significant case for Daimler-Benz, and it was -- one of the issues they were facing was importation of cars not through their regular

Page 92

EDWARD NECARSULMER, III

channels --

Q. Okay.

A. -- and then the dealers would be responsible for the cars. And one of the issues was dealer relations and, you know, the whole -- how the US network hung together. So I certainly was, you know, involved in that particular case, and, you know, we determined that it wasn't material to what we were doing, but it was out there.

I can't think of others, but I suspect there have been others.

Q. When was that Daimler-Benz matter?

A. I guess that was a '93 offering. There were two or three, the rights offering and an equity offering and all around the -- that offering all around the same time. I just remember it being brought up and us discussing it and then doing a little research on it at the time.

Q. Well, is it your testimony that if in this case there was in fact a serious gray marketing issue and the underwriters did not

Page 93

EDWARD NECARSULMER, III

detect it, they are excused for overlooking it?

MR. GLUCKOW: Objection to the form. It assumes facts not in evidence. It calls for speculation and an incomplete hypothetical. Overbroad.

THE WITNESS: I'd be happy to try to answer your question, I'm just not sure I can.

BY MR. LEWIS:

Q. Well, let's take the hypothetical assumption that -- not so hypothetical -- that there was a serious potential problem that existed, that the underwriters conducted the investigation -- let me reframe it.

Are you saying anything by your opinion other than if the underwriters did a diligent investigation, they were not required to disclose something they didn't find?

MR. GLUCKOW: The same objections.

THE WITNESS: I fundamentally agree with that, yes.

BY MR. LEWIS:

Q. Your opinion does not rest on