Page 94

EDWARD NECARSULMER, III
1
2  materiality standards or SEC disclosure
3  standards, it's based in the reasonableness of
4  the investigation?
5      A.   Yes.
6      Q.   And nothing else?
7          MR. GLUCKOW:  Objection to the
8  form.
9          The report speaks for itself.  I
10  don't know if you want to engage in any
11  dialog on this.
12          In the conclusion section here,
13  the last section on Page 2, Summary
14  Number 4, it talks about both the
15  reasonableness of the investigation and
16  the reasonableness of the belief.  If
17  you want to lump that all into the
18  reasonableness of the investigation,
19  that's fine.  I just don't want there
20  to be an unclear record; that there's
21  clearly at least two pieces of it in
22  terms of the written opinion.
23  BY MR. LEWIS:
24      Q.   Let me back up a different way.
25          In a case in which a problem

Page 95

EDWARD NECARSULMER, III
1
2  exists, the underwriters conduct a diligent
3  investigation, and notwithstanding having
4  conducted an investigation in full accordance
5  with reasonable industry standards, the
6  problem is still out there and it's not
7  disclosed in the prospectus or registration
8  statement and the problem then thereafter
9  bites the company, are you saying that the
10  underwriters have no disclosure obligation
11  because they conducted a reasonable
12  investigation?
13          MR. GLUCKOW:  The same objections
14  as before.  Incomplete hypothetical.
15  It calls for speculation.  It calls for
16  a legal conclusion.  Incomplete
17  hypothetical.  Assumes facts not in
18  evidence.
19          You can answer.
20          THE WITNESS:  I mean, here's what
21  I would say.  I would say that to the
22  extent that the underwriters made a
23  reasonable and diligent investigation,
24  they discovered -- and in this
25  investigation they discovered whatever

Page 96

EDWARD NECARSULMER, III
1
2  this thing is out there, they decided
3  it wasn't significant to the company's
4  sales and earnings, and then they
5  decided to move on, I would support
6  that, I think that's -- I think that's
7  proper.
8  BY MR. LEWIS:
9      Q.   And if that happened, do you
10  believe that excuses the company from any
11  disclosure obligation?
12          MR. GLUCKOW:  Objection to the
13  form.  Outside the scope of the
14  opinion.  He's not offering any expert
15  testimony as to the company's
16  disclosure obligations; he's offering
17  expert testimony with respect to the
18  underwriters' investigation and the
19  reasonableness of the underwriters'
20  beliefs in light of that investigation.
21  BY MR. LEWIS:
22      Q.   Well, let me back up and ask
23  that question, and that is at the heart of what
24  my question is about.  Does your opinion in any
25  way purport to address the company's disclosure

Page 97

EDWARD NECARSULMER, III
1
2  obligation, to your knowledge?
3      A.   No, I wasn't asked -- it's not
4  within the scope of my assignment.
5      Q.   And your opinion with respect to
6  disclosure such as it is relates only to the
7  underwriters' disclosure obligations, is that
8  fair?
9          MR. GLUCKOW:  Objection to the
10  form.  It's not the underwriters'
11  disclosure obligations; it's the
12  underwriters' investigation and the
13  reasonableness of their belief in the
14  accuracy and completeness of the
15  registration statement.
16          I'm not sure what you're getting
17  at with your parsing disclosure
18  obligations of the company --
19          MR. LEWIS:  I'm sitting here and
20  letting you filibuster, but you can
21  object to the questions, and you have,
22  and you've done it fully, on this whole
23  subject matter.  You don't have to
24  supply what his opinion is about.  He
25  knows what his opinion is about, and he

25 (Pages 94 to 97)

EDWARD NECARSULMER, III

1 EDWARD NECARSULMER, III
2 can tell me that, he can correct me,
3 but --
4         MR. GLUCKOW: I just think your
5     question is inherently misleading, and
6     I'm trying to make sure that both I and
7     the witness understand what it is you
8     are trying to ask.
9 BY MR. LEWIS:
10     Q.    Let's look at Paragraph F of
11 your rebuttal report, Exhibit 322.
12         You write, starting in the
13 second sentence of Paragraph F: "While
14 Ochoa's report is not clear on this point,
15 although underwriters often review filings of
16 other companies in the same industry, as they
17 did here, the mention of a risk in such
18 filings is not necessarily determinative of
19 whether the risk needs to be included in the
20 issuing company's registration statement."
21         Can you explain what you mean
22 by that?
23     A.    Sure.
24         What I'm saying is basically
25 that it's certainly good practice to look at

EDWARD NECARSULMER, III

1 EDWARD NECARSULMER, III
2 what the competition is doing, what they are
3 filing, the most recent, whatever, 10-K,
4 whatever they are filing with the SEC. The
5 fact that you see something doesn't
6 necessarily mean that it's a requirement to be
7 included in either your documents or in your
8 opinion.
9         I guess what I'm trying to say
10 in a broader sense is there's a huge body of
11 information out there, both things you learn
12 from the company and the things you might
13 learn from the industry and whatever else, and
14 when it comes down to it, the underwriter's
15 job is to go through those things and make a
16 decision as to what is material and what is
17 not.
18     Q.    You went on to say: "Each
19 factual situation is different and the
20 underwriters must evaluate appropriate
21 disclosure on an individual basis," correct?
22     A.    Correct.
23     Q.    Would it be fair to say that
24 your position is that because gray marketing
25 affects different companies in different ways,

EDWARD NECARSULMER, III

1 EDWARD NECARSULMER, III
2 each case has to be separately evaluated?
3         MR. GLUCKOW: Objection to the
4     form. Vague and ambiguous.
5         You can answer.
6         THE WITNESS: I think that's
7     fair.
8 BY MR. LEWIS:
9     Q.    After the due diligence
10 investigation in the Daimler case that you
11 mentioned, did gray marketing later affect the
12 results of Daimler-Benz?
13     A.    No, or not to my knowledge.
14 I... Not to my knowledge.
15     Q.    What information do you
16 understand the underwriters received from Adams
17 itself about gray marketing or Costco by the
18 time of the effective date of the IPO?
19     A.    They -- they -- you know,
20 there's a number of items. They knew that an
21 action -- I'm not sure if there was for it and if
22 action is the right word for it, but there had
23 been a legal challenge. I think they had
24 records from talking to marketing people, you
25 know, that they had discussed it. Certainly

EDWARD NECARSULMER, III

1 EDWARD NECARSULMER, III
2 Lehman in deposition, I believe from
3 Pulido-Crowe, they discussed whether they should
4 talk to Costco. Those are the types of things.
5     Q.    Do you think that Lehman should
6 not have talked to Costco because Barney Adams
7 purportedly stated that it was unnecessary to do
8 so?
9         MR. GLUCKOW: Objection to the
10     form. Calls for speculation.
11     Incomplete hypothetical.
12         You can answer.
13         THE WITNESS: I think probably
14     not necessarily. I think there's
15     another problem with talking to the
16     Costcos of the world, is you don't
17     normally -- it's pretty hard -- almost
18     by definition of who they are, they are
19     not going to tell you anything, and
20     that is part of their MO which is
21     relatively well-known. So whether they
22     are right for that reason or right
23     because that's what they heard from
24     Adams, I don't -- I think, it's my
25     opinion, that they were adequate in

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 102

EDWARD NECARSULMER, III

1    what they did.
2
3    BY MR. LEWIS:
4        Q.    Do you agree that it would have
5    been better to try calling Costco to see what
6    could be found, if anything?
7        A.    I don't know that hindsight is
8    particularly useful for me in this case.
9        Q.    Well, if you apply it, with the
10   benefit of hindsight, do you think it would have
11   been a better thing to do?
12           MR. GLUCKOW: Objection. Asked
13       and answered.
14           You can answer it now.
15           THE WITNESS: I still don't think
16       they would have found anything
17       significant.
18   BY MR. LEWIS:
19       Q.    Now, you referred in Paragraph C
20   of your rebuttal report to the underwriters
21   having conducted 11 telephonic interviews.
22           Let me show you Exhibit 198.
23           MR. LEWIS: I'm sorry; this says
24       160, is it not?
25           MR. GLUCKOW: 160.

Page 103

EDWARD NECARSULMER, III

1
2           THE WITNESS: Mine says 198.
3    BY MR. LEWIS:
4        Q.    They were marked -- the same
5    document was marked several times. Just so we
6    are all looking at the same thing, you have in
7    front of you one numbered 160?
8        A.    I gave you back 198, which I
9    had.
10       Q.    Okay.
11       A.    Now I have 160.
12       Q.    Were the 11 calls that you
13   referred to in your rebuttal report the 11 calls
14   that are enumerated on the second page of this
15   exhibit under the heading of Customer Calls,
16   summaries circulated to underwriters by caller
17   and supplier calls?
18       A.    That is correct.
19       Q.    Do you know if any of these
20   calls were selected by the underwriters to be
21   made on a geographic basis?
22       A.    I don't.
23       Q.    Do you know how the calls were
24   selected to be made?
25       A.    It -- what -- how this list was

Page 104

EDWARD NECARSULMER, III

1
2    compiled; is that the question?
3        Q.    Not how the list was compiled,
4    but how when the customer calls were made by the
5    underwriters, the underwriters figured out who
6    they were going to call?
7           MR. GLUCKOW: And which
8       underwriters are going to call which
9       party, or...?
10           Objection to form.
11           THE WITNESS: I'm not sure.
12   BY MR. LEWIS:
13       Q.    Well, Adams had a large universe
14   of suppliers; is that fair to say?
15       A.    Yes.
16       Q.    And it had a large universe of
17   customers also, correct?
18       A.    Correct.
19       Q.    Do you know how the underwriters
20   made the determination of which customers they
21   would call?
22       A.    A list was provided by the
23   company.
24       Q.    Was that based on the size of
25   the customers' business with Adams?

Page 105

EDWARD NECARSULMER, III

1
2        A.    I don't know for sure, but I
3    assume so. That is traditionally the way it is
4    done.
5        Q.    Traditionally which -- what
6    level of customers of a company does an
7    underwriter call in due diligence?
8        A.    There's no magic to this, but
9    traditionally, you know, you say, "Give me your
10   top ten customers." It could be out of the top
11   50, the top five, but the top ten sticks in my
12   memory.
13       Q.    Is that a practice you have used
14   yourself?
15       A.    Yes, it is.
16       Q.    I'll show you what's previously
17   been marked as Exhibit 162. Was this one of the
18   documents that you reviewed in your work on this
19   case?
20       A.    It was.
21       Q.    Did you see in reviewing it that
22   on the right-hand column of the page for a
23   period of 1998, the firm of WDC Mackenzie,
24   M-A-C-K-E-N-Z-I-E, was listed as the third
25   largest customer of Adams?

27 (Pages 102 to 105)

Page 106

EDWARD NECARSULMER, III

1    A.    I do.
2    Q.    Do you believe that there was
3  any reason why the underwriter should not have
4  called Mackenzie in the due diligence process?
5         MR. GLUCKOW:  Objection to the
6    form.  Mischaracterizes the document in
7    the record.
8         You can answer.
9  BY MR. LEWIS:
10   Q.    Let me back up.  Do you know who
11  Mackenzie is?
12   A.    From reading the documents, I
13  know who they are; yes, I do.
14   Q.    Do you know that they are a
15  retailer who had spoken to Adams about a
16  potential gray market Costco problem in Canada?
17        MR. GLUCKOW:  Objection to the
18    form.  Mischaracterizes the record.
19        You can answer.
20        THE WITNESS:  I know they were
21    the Canadian, I'll say, distributor or
22    retailer of Adams.
23  BY MR. LEWIS:
24   Q.    And what, if any, communications

Page 107

EDWARD NECARSULMER, III

1  can you recall between Mackenzie and Adams on
2  the subject of gray market or Costco?
3         MR. GLUCKOW:  Between Mackenzie
4    and Adams?
5         MR. LEWIS:  Right, between
6    Mackenzie and Adams.
7         THE WITNESS:  I saw a series of
8    documentation -- faxes, memos, whatever
9    you want to call them -- going back and
10   forth suggesting that they were having
11   questioning of how these clubs -- were
12   they in Costco and how they got there
13   and what the company is going to do
14   about it.
15  BY MR. LEWIS:
16   Q.    Are you aware of any contact
17  between the underwriters and Mackenzie as part
18  of the due diligence process?
19   A.    None.
20   Q.    Did you have any understanding
21  as to why there was no contact between the
22  underwriters and Mackenzie in the due diligence
23  process?
24   A.    I don't.  I don't.

Page 108

EDWARD NECARSULMER, III

1    Q.    Do you believe that there should
2  have been contact between the underwriters and
3  Mackenzie as part of due diligence?
4    A.    No.
5    Q.    And why is that?
6    A.    I'll say that I don't know
7  whether they were given, you know -- the list of
8  customers that they were given simply didn't
9  include them.
10        I guess I would also add that
11  it's okay -- I wouldn't necessarily think --
12  and, again, it's very hard to put yourself
13  back in their place, but I wouldn't
14  necessarily think if I was trying to uncover
15  or discover or investigate, that Canada would
16  be a place that I would, you know, spend a lot
17  of time looking for issues relative to
18  southern California or Florida or someplace
19  where I would intuitively have thought may
20  have been more important to a golf club
21  company.
22   Q.    You have seen the questionnaire
23  that Adams sent to -- strike that; that the
24  underwriters sent to Adams' retailers as part of

Page 109

EDWARD NECARSULMER, III

1  the due diligence process?
2         MR. GLUCKOW:  Objection to the
3    form.  It assumes facts not in
4    evidence.
5         You can answer.
6  BY MR. LEWIS:
7    Q.    Have you seen questionnaires --
8    A.    Yes.
9    Q.    -- that were used in connection
10  with the underwriters' investigation of
11  retailers?
12   A.    I have.
13   Q.    And would it be fair to say that
14  those questionnaires did not include any
15  specific questions relating to gray marketing or
16  Costco?
17        MR. GLUCKOW:  Objection to the
18    form.  Vague and ambiguous.
19        You can answer.
20        THE WITNESS:  The answer is yes,
21    but I would think that the statement,
22    "Are there any other issues (legal,
23    contractual, or otherwise) which you
24    feel are important" would certainly

Page 110

EDWARD NECARSULMER, III
1 take care of that responsibility.
2 MR. LEWIS: I move to strike the
3 latter part of that. We'll get to the
4 overall -- the larger question within
5 the questionnaires.
6 BY MR. LEWIS:
7 Q. Have you seen Exhibit 193?
8 A. Yes, I've seen it.
9 Q. Is it your understanding that
10 this is a blank copy of a Customer Due Diligence
11 Questionnaire that was used by the underwriters
12 in connection with the due diligence
13 investigation?
14 A. That's my understanding.
15 Q. Now, you mentioned, in response
16 to an earlier question, that the underwriters
17 had received information about gray marketing
18 from marketing people at Adams.
19 Can you tell me when in your
20 understanding that information was received?
21 MR. GLUCKOW: Objection to the
22 form. It mischaracterizes the
23 testimony.
24 You can answer.
25

Page 111

EDWARD NECARSULMER, III
1 THE WITNESS: I can't tell you
2 when. I know there was a press release
3 in June, I believe it was June.
4 BY MR. LEWIS:
5 Q. June --
6 A. I assume it was coincident or
7 before that time. I just can't tell you from
8 not having the documents; my memory isn't that
9 good.
10 Q. Well, do you recall any
11 testimony by Ms. Pulido-Crowe that the subject
12 of gray marketing came up during drafting
13 sessions?
14 A. I do recall that testimony. I
15 actually recall, to be exact, she said she
16 believed that it came up.
17 Q. In the drafting sessions?
18 A. Yes.
19 Q. And the drafting sessions were
20 all held in April?
21 A. Correct.
22 Q. Do you know -- strike that.
23 Can you recall, as you sit
24 here, any inquiries made by the underwriters
25

Page 112

EDWARD NECARSULMER, III
1 to Adams concerning Costco or gray marketing
2 after Adams issued the press release that it
3 had filed a proceeding against Costco?
4 MR. GLUCKOW: Can I have that one
5 back, please. Thank you.
6 (The court reporter read the
7 record as follows:
8 "QUESTION: Can you recall, as
9 you sit here, any inquiries made by the
10 underwriters to Adams concerning Costco
11 or gray marketing after Adams issued
12 the press release that it had filed a
13 proceeding against Costco?")
14 MR. GLUCKOW: Vague and
15 ambiguous.
16 You can answer.
17 THE WITNESS: I don't recall.
18 BY MR. LEWIS:
19 Q. Have you, in your long career in
20 the securities industry, been the person who had
21 to ask a customer information that was set forth
22 on a questionnaire?
23 A. I've done it but not in recent
24 memory or recent history.
25

Page 113

EDWARD NECARSULMER, III
1 Q. When you were --
2 A. Younger.
3 Q. -- younger and I was younger and
4 we all were browner on top.
5 Can you describe how difficult or
6 easy you found it to get a customer to answer
7 the questions on a due diligence questionnaire?
8 MR. GLUCKOW: Vague and
9 ambiguous.
10 You can answer.
11 THE WITNESS: My best
12 recollection is it's sort of both ends
13 of the spectrum. There are people who
14 like to talk; they are very
15 enthusiastic about XYZ's product; it's
16 important to them. There are other
17 people who basically tell you that they
18 don't talk much about, you know, their
19 suppliers. So it's -- people are
20 usually pretty cooperative, they are
21 usually -- but the value of the
22 information varies greatly.
23 BY MR. LEWIS:
24 Q. And you never know when exactly
25

29 (Pages 110 to 113)

Page 114

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2    you are getting someone and what kind of mood
3    he's in or she is in at the time you catch them,
4    is that fair?
5        MR. GLUCKOW: Vague and
6        ambiguous.
7            You can answer.
8            THE WITNESS: It's fair, with the
9        exception that you hope that, you know,
10       that you are good enough and you
11       understand enough about the subject to
12       qualify the responses.
13   BY MR. LEWIS:
14       Q.    Was it your practice to actually
15   send customers questionnaires before you spoke
16   to them about the contents of them?
17       A.    No.
18       Q.    You used the questionnaire as a
19   guide to your conversation with the client and
20   pulled the information out of them as best you
21   could?
22           MR. GLUCKOW: Objection to the
23       form.
24           You can answer.
25           THE WITNESS: That's correct.

Page 115

1    EDWARD NECARSULMER, III
2    BY MR. LEWIS:
3        Q.    Do you know how the
4    questionnaires were completed in this case?
5        A.    They were -- it's my
6    understanding that they were -- there were
7    telephone or other conversations and they were
8    recorded by the questioner, the results were
9    recorded by the questioner.
10       Q.    So that the questionee did not
11   necessarily -- did not have the questionnaire in
12   front of him?
13       A.    I do not know that for a fact,
14   but that's my understanding.
15       Q.    Now, I showed you the blank
16   questionnaire and that questionnaire contains
17   the question that you alluded to in the portion
18   of your testimony that I asked to strike, which
19   is Question 13: "Are there any other issues
20   (legal, contractual or otherwise) which you feel
21   are important?"
22           That is Question 13, correct?
23       A.    Correct.
24       Q.    If you wanted to determine in a
25   due diligence investigation whether there was

Page 116

1    EDWARD NECARSULMER, III
2    ongoing gray marketing distribution or ongoing
3    Costco distribution, would you agree that
4    Question 13 would not be a very direct way to
5    find that out?
6            MR. GLUCKOW: Objection to the
7        form. Incomplete hypothetical.
8        Assumes facts not in evidence. Vague
9        and ambiguous.
10           You can answer.
11           THE WITNESS: I would not agree
12       to that. Often these -- whether they
13       are a list of questions or they are a
14       questionnaire, you sent them out there
15       to set a framework to find out what you
16       can find out, and often it's more
17       useful to ask a question like this one
18       than -- sometimes it is -- than a more
19       direct "Are you doing this?" or "Are
20       you seeing that?" Because you might
21       get a more helpful response.
22   BY MR. LEWIS:
23       Q.    Well, if the recipient of this
24   questionnaire had heard from Adams previously
25   that Adams was aware of some Costco distribution

Page 117

1    EDWARD NECARSULMER, III
2    and was taking steps to address it, the person
3    answering the questions might not think that
4    mentioning gray marketing was of any
5    importance. Is that fair?
6            MR. GLUCKOW: The same
7        objections.
8            You can answer.
9            THE WITNESS: I'm not trying to
10       be difficult; I just don't know how to
11       answer and the hypothetical is too far
12       out there for me.
13           It's certainly -- if someone
14       specifically told you, "Don't worry
15       about it; we are taking care of it,"
16       I'm not sure that would deter you from
17       saying there's an issue but the company
18       is taking care of it. I just don't
19       know.
20   BY MR. LEWIS:
21       Q.    In any event, there was no
22   specific question about Costco or gray marketing
23   on that questionnaire --
24           MR. GLUCKOW: Objection.
25   BY MR. LEWIS:

Page 118

1              EDWARD NECARSULMER, III
2         Q.    -- the document that we just
3    looked at, 193?
4              MR. GLUCKOW:  The document speaks
5         for itself.
6              You can answer.
7              THE WITNESS:  I agree.
8    BY MR. LEWIS:
9         Q.    Do you believe that between the
10   time of the filing of the draft registration
11   statement with the SEC, which was on May the 4th
12   of 1998, and the effective date of the IPO,
13   which was July 10, 1998, the underwriters
14   received any information from Adams that gray
15   marketing was occurring at any location other
16   than in Canada?
17             MR. GLUCKOW:  Can I get that read
18        back, please.
19             (The court reporter read the
20        pending question.)
21             MR. GLUCKOW:  Objection to the
22        form.  It assumes facts not in
23        evidence.
24             You can answer.
25             THE WITNESS:  I don't recall the

Page 119

1              EDWARD NECARSULMER, III
2    dates.  I know there was discussion,
3    but I can't tell you whether they were
4    between -- what periods they were or
5    what the dates were.
6    BY MR. LEWIS:
7         Q.    Well, are you aware of any
8    communication from Adams to the underwriters
9    that gray marketing was occurring other than at
10   a single location?
11             MR. GLUCKOW:  The same
12        objections.
13             THE WITNESS:  I'm not aware of
14        any communication.
15   BY MR. LEWIS:
16        Q.    Do you believe, as you sit here,
17   that it was true at the effective date that a
18   small set of Tight Lies clubs had reached Costco
19   at only one location?
20             MR. GLUCKOW:  Objection to the
21        form.  Mischaracterizes the record --
22             THE WITNESS:  I really don't
23        know.
24             MR. GLUCKOW:  Let me just finish.
25             -- vague and ambiguous.

Page 120

1              EDWARD NECARSULMER, III
2             You can answer.
3    BY MR. LEWIS:
4         Q.    Do you believe, as you sit here,
5    that is was true at the time of the
6    effective date a group of Adams' clubs had
7    reached the market through Costco as a result of
8    the efforts of a single Adams' retailer?
9             MR. GLUCKOW:  Objection.  Vague
10        and ambiguous.  Incomplete
11        hypothetical.  Mischaracterizes the
12        record.
13             You can answer.
14             THE WITNESS:  In the materials
15        that I reviewed, there were references
16        to a number of potential sources, and I
17        don't know if it was ever determined as
18        to it was one or more than one.
19   BY MR. LEWIS:
20        Q.    Well, isn't it true that by the
21   time of the offering that there had been citings
22   of Adams' clubs at Costco locations in Canada,
23   in California, in Idaho?
24             MR. GLUCKOW:  Objection to the
25        form.  It mischaracterizes the record.

Page 121

1              EDWARD NECARSULMER, III
2             You can answer.
3             THE WITNESS:  I think that's
4        true.
5    BY MR. LEWIS:
6         Q.    How did you learn that?
7         A.    It was in the documentation that
8    I read.
9         Q.    Did you see that in any other
10   place than in the attachments to Mr. Grace's
11   report?
12        A.    Yes.
13        Q.    Where did you see it?
14        A.    I'm not sure I can recall the
15   document.  I'm not -- it may have been in a
16   deposition, either -- I'm not sure.  I don't
17   want to speculate.  I think Beebe's deposition,
18   but I'm not sure.  I'm just not certain.
19        Q.    Would you agree that by the time
20   of the initial public offering Adams had been
21   unable to put a complete stop to gray marketing?
22             MR. GLUCKOW:  Vague and
23        ambiguous.
24             You can answer.
25             THE WITNESS:  I would agree with

31 (Pages 118 to 121)

Page 122

EDWARD NECARSULMER, III

1  that.
2  BY MR. LEWIS:
3
4      Q.    Have you seen any evidence that
5  the underwriters were aware of new or increased
6  distribution of Adams' products in Costco
7  locations between the time of Ms. Pulido-Crowe's
8  discussion with Barney Adams and the time of the
9  IPO?
10         MR. GLUCKOW: Objection. Vague
11     and ambiguous. Incomplete.
12         THE WITNESS: Not during that
13     period, no.
14 BY MR. LEWIS:
15     Q.    And do you have any reason to
16 believe, as you sit here, that the underwriters
17 learned anything about the changes in gray
18 market distribution between Ms. Pulido-Crowe's
19 discussion with Barney Adams and the IPO?
20         MR. GLUCKOW: Objection to the
21     form. It mischaracterizes the record
22     particularly with respect to the
23     reference to a discussion.
24         You can answer.
25         THE WITNESS: At some point, the

Page 123

EDWARD NECARSULMER, III

1
2  process of these pro shop surveys began
3  by the equity research analyst. I
4  believe that did start before the IPO.
5  I'm not certain that information would
6  have been -- in my experience, it was
7  unlikely that information would
8  have been shared with the banking team.
9  BY MR. LEWIS:
10     Q.    Why do you say it's unlikely it
11 would have been shared?
12     A.    Because in most cases as they --
13 that the research that was done out of the
14 equity department would not likely to be, you
15 know, shared with; it was not normal practice to
16 share it with the people in the investment
17 banking side.
18     Q.    Did that have to do with the
19 existence of so-called Chinese walls between
20 the investment banking and the research side,
21 the brokerage firms, in those days?
22     A.    Partially; although, there would
23 be nothing specifically prohibited of
24 information going that way.
25     Q.    "That way" meaning...?

Page 124

EDWARD NECARSULMER, III

1
2      A.    The direction from research to
3  banking. So it wasn't a normal -- to me, it
4  wouldn't have been a normal practice, normal
5  procedure.
6      Q.    There would have been a
7  prohibition on information going the other
8  direction, from banking to research?
9      A.    That is correct.
10         MR. GLUCKOW: Don, again, we've
11     been going another hour, so whenever
12     there is a convenient break.
13         MR. LEWIS: We can stop this
14     second.
15         MR. GLUCKOW: Okay.
16         (A recess was had from 2:31 p.m.
17     to 2:43 p.m.; and then the proceedings
18     continued as follows:)
19 BY MR. LEWIS:
20     Q.    Let me back up to go forward.
21 In your expert report in this case, the first
22 page --
23     A.    So this is also the rebuttal
24 report.
25         MR. GLUCKOW: Here we are, 321.

Page 125

EDWARD NECARSULMER, III

1
2         THE WITNESS: First page, yes.
3  BY MR. LEWIS:
4      Q.    The first page, Paragraph 6(A),
5  Summary of Opinions. You begin by saying: "In
6  my experience in the process of adequate due
7  diligence, the underwriters should gather and
8  review the following types of information. The
9  contents and scope of this review may vary
10 greatly depending on the issuer, but in general,
11 these are the categories that should be
12 considered."
13         In your expert report in the AMF
14 case --
15         MR. GLUCKOW: 324?
16         MR. LEWIS: 324.
17 BY MR. LEWIS:
18     Q.    -- you used the same words
19 except that instead of "should be considered,"
20 you had used the words "must be considered."
21     A.    Semantics.
22     Q.    Is there any significance to the
23 change in your report?
24     A.    Semantics.
25     Q.    Did you think it was more

Page 126

EDWARD NECARSULMER, III

1              EDWARD NECARSULMER, III
2 correct to say "should" than "must"?
3     A.   I candidly can't answer that. I
4 think of -- I thought of the -- I tried to
5 conceive of the thought and I really didn't
6 refer to this much past -- the prior report,
7 much past kind of using it for form, and I knew
8 there was some boilerplate that would be
9 acceptable to be used in the beginning, and then
10 I kind of just went ahead and drafted as I saw
11 fit.
12     Q.   In the same Paragraph 6, the
13 next page --
14     A.   On AMF or Adams?
15     Q.   In Adams.
16          Well, let's look at -- do you
17 have AMF there?
18          MR. GLUCKOW: We have both, 321
19 and 324.
20 BY MR. LEWIS:
21     Q.   In AMF, among the steps you
22 listed was number 6: "Review of work performed
23 or reports prepared by underwriters' counsel and
24 the issuer's auditors."
25          Your Paragraph 6 in this case

Page 127

EDWARD NECARSULMER, III

1              EDWARD NECARSULMER, III
2 simply read: "Meeting with the issuer's counsel
3 and public accountants."
4          Can you explain whether there was
5 a difference that caused you to change your
6 report?
7          MR. GLUCKOW: Object to the
8       characterization.
9 BY MR. LEWIS:
10    Q.   Is there any significance to the
11 change in terminology between the two reports?
12    A.   I thought in -- that the way I
13 said it in 321 was a better representation of
14 what the process really is.
15    Q.   Can you explain that thought?
16    A.   Because it occurred to me -- and
17 again, I didn't think it was a major thing -- it
18 sort of occurred to me that you weren't
19 necessarily just reviewing their work, you were
20 meeting with them, you were talking with them,
21 you were trying to understand, let's say, there
22 was a patent issue or an inventory issue, so it
23 wasn't just the report but you are trying to
24 have a dialog as part of your understanding of
25 the company; that was what I was really trying

Page 128

EDWARD NECARSULMER, III

1              EDWARD NECARSULMER, III
2 to get at.
3     Q.   Okay. Would you agree with the
4 general proposition that in due diligence an
5 underwriter should be skeptical of rosy outlooks
6 by the issuer's management?
7          MR. GLUCKOW: Object to the
8       form. Vague and ambiguous. Asked and
9       answered.
10       You can answer.
11       THE WITNESS: I don't think --
12       just because someone is optimistic
13       doesn't necessitate skepticism. We've
14       come to learn to live with rapid growth
15       in our -- once we got out of the '60s
16       and '70s, rapid growth was a big part
17       of our lives. So I would have to say
18       even though intuitively I would agree
19       with you, I think the right answer is
20       no.
21 BY MR. LEWIS:
22    Q.   Now, in Paragraph 6(C)(2) of
23 your report, you state that "An extensive due
24 diligence outline and materials request list was
25 prepared and presented to company management at

Page 129

EDWARD NECARSULMER, III

1              EDWARD NECARSULMER, III
2 the organizational meeting."
3          Just to make sure we are on the
4 same page: Are you referring to Exhibit
5 153? Specifically, to the due diligence -- due
6 diligence outline and request list that begins
7 at Page 8741?
8     A.   Yes, that is to what I was
9 referring.
10    Q.   And would it be fair to say that
11 there was no specific request in the due
12 diligence outline or materials request for data
13 relating to either Costco or gray marketing?
14          MR. GLUCKOW: Objection to the
15       extent the document speaks for itself.
16       You can answer.
17       THE WITNESS: That's correct. If
18       I could add, in this type of a list it
19       doesn't surprise me at all that there
20       isn't specific caption items. It's
21       usually given to let the company know
22       what the work ahead of them is.
23 BY MR. LEWIS:
24    Q.   Okay. Is there any item on the
25 due diligence list or materials request list

33 (Pages 126 to 129)

Page 130

```
1              EDWARD NECARSULMER, III
2   that you believe should have caused the company
3   to provide the underwriters with any data
4   regarding either Costco or gray market
5   distribution?
6              MR. GLUCKOW:  Object to the
7         form.  The document speaks for itself.
8         It calls for speculation.
9              You can answer.
10             THE WITNESS:  No.
11  BY MR. LEWIS:
12        Q.   Let me show you Exhibit 154,
13  previously marked, and this is a document with a
14  file folder tab Organization Meeting and some
15  handwritten notes that may be beyond my eyesight
16  or cryptography skills at this point.
17        A.   I'm with you.
18        Q.   Did you review a version of
19  Exhibit 154 in the course of your work?
20        A.   I did see this document.
21        Q.   Did you work your way through it
22  at the time?
23        A.   To the best of my ability.
24        Q.   Did you find any reference in it
25  that you thought was to gray marketing or Costco
```

Page 131

```
1              EDWARD NECARSULMER, III
2   distribution?
3              MR. GLUCKOW:  Object to the
4         extent the document speaks for itself.
5              You can answer.
6              THE WITNESS:  No.
7   BY MR. LEWIS:
8         Q.   Let me show you what has been
9   marked as Exhibit 228.  Did you review Exhibit
10  228 in the course of your work?
11        A.   I've seen this article before,
12  so the answer is yes.
13        Q.   If you just look at the last
14  page of the document, you'll see there's a
15  reference to Edwin Watts and some commentary
16  about various subjects.  Did you read that
17  paragraph?
18             MR. GLUCKOW:  Take your time and
19        make sure you read it before you
20        answer.
21             (Witness reviewing document.)
22             THE WITNESS:  I don't recall
23        reading that paragraph.
24  BY MR. LEWIS:
25        Q.   Okay.  Do you have any reason to
```

Page 132

```
1              EDWARD NECARSULMER, III
2   believe that the underwriters had a copy of
3   Exhibit 228 prior to the effective date of the
4   offering in their due diligence files?
5              MR. GLUCKOW:  Objection to the
6         form.
7              You can answer.
8              THE WITNESS:  I wouldn't know.
9   BY MR. LEWIS:
10        Q.   Let me show you Exhibit 197, and
11  this is a copy of what purports to be a Customer
12  Due Diligence Questionnaire completed with
13  respect to Edwin Watts.  Have you reviewed this
14  as part of your expert work in this case?
15        A.   Yes, it was in the material that
16  I was provided.
17        Q.   If you had been conducted --
18  strike that.
19             Do you have any reason to believe
20  that Mr. Watts was asked any specific questions
21  about Costco in the course of his interview,
22  which was, according to this date, on April 21,
23  1998?
24             MR. GLUCKOW:  The document speaks
25        for itself.
```

Page 133

```
1              EDWARD NECARSULMER, III
2              You can answer.
3              THE WITNESS:  I have no knowledge
4         of that question or response to it.
5   BY MR. LEWIS:
6         Q.   And you have no knowledge of
7   there being questions asked that are not
8   contained or commented on in this document
9   itself?
10        A.   I could respond that it would be
11  unusual that the conversation would just --
12  would you mind answering the following nine
13  questions; but I certainly couldn't support
14  that, I mean, cite any evidence of that.
15        Q.   Why do you say it would be
16  unusual?
17        A.   Well, the purpose of these type
18  of exercises is to engage the person you are
19  talking to in some sort of a dialog about the
20  company you are checking on.  Sometimes they are
21  expansive; sometimes they are not.  Usually the
22  questionnaire is, you know, an outline, a way to
23  memorialize the conversation, but, hopefully,
24  it's -- you know, there's some dialog, but I
25  don't know because I haven't seen it, and I have
```

34 (Pages 130 to 133)

Page 134

EDWARD NECARSULMER, III
1
2  no evidence to prove or no documentation to
3  prove that that's what took place.
4        Q.    In your experience, is it
5  customary for notes to be taken during customer
6  questionnaires?
7        A.    Customary, yes.
8        Q.    Are you aware of any customary
9  practices in the industry with respect to the
10 disposition of drafts and notes that were made
11 prior to an IPO?
12       MR. GLUCKOW: Objection to the
13       form. I also object to the extent it's
14       overbroad.
15       Do you mean at any point in his
16       career? Are you talking about a
17       specific time frame?
18 BY MR. LEWIS:
19       Q.    Let's talk about the period
20 since 1998, do you believe that it is customary
21 in the industry for underwriters to dispose of
22 notes that they made during the due diligence
23 process?
24       MR. GLUCKOW: The same
25       objections.

Page 135

EDWARD NECARSULMER, III
1
2        Go ahead.
3        THE WITNESS: I wouldn't say
4        specific to due diligence process.
5        There certainly was a movement among
6        all of our client -- compliance
7        departments to be much more cognizant
8        of what we kept and didn't keep and at
9        what point, you know, like how long you
10       have to keep your tax-return-type
11       standards. So I think people were more
12       careful to keep what they were supposed
13       to keep and more careful to keep -- not
14       to keep what didn't need to be kept.
15 BY MR. LEWIS:
16       Q.    And when did that begin?
17       A.    I couldn't give you a specific
18 date, but it was an evolving thing throughout --
19 certainly throughout the '90s, it would be a
20 more evolving practice.
21       Q.    So that by 1998 your people were
22 more careful to do what you said --
23       A.    Yes.
24       Q.    -- in your last answer?
25       Since 1998 you worked both at

Page 136

EDWARD NECARSULMER, III
1
2  Wasserstein Perella Securities and Dresdner
3  Kleinwort Wasserstein. Did either of those
4  firms have a practice of disposing of notes of
5  due diligence after an IPO?
6        A.    Not a specific policy, no.
7        Q.    Let me start with a broad
8  question, and if I need to, I'll go to more
9  specific ones.
10       We've talked several times about
11 the Customer Due Diligence Questionnaires. Did
12 you find reference to either gray marketing or
13 Costco distribution appearing in any of the
14 customer due diligence questionnaires?
15       A.    I don't believe I did.
16       Q.    Would you like to see them now
17 to check your answer, or --
18       MR. GLUCKOW: The documents speak
19       for themselves.
20       THE WITNESS: I don't think I
21       need to check my answer.
22 BY MR. LEWIS:
23       Q.    Okay.
24       A.    I'm not necessarily ready for a
25 memory test, but I believe that's the case; I'm

Page 137

EDWARD NECARSULMER, III
1
2  confident that that's the case.
3        Q.    Okay. In Paragraph 5 on Page 3
4  of your expert report, Exhibit 321 --
5        A.    I'm sorry, Paragraph...?
6        Q.    5.
7        A.    Which is on Page 3. Okay.
8        Q.    "The underwriters prepared lists
9  of potential investor questions," dash, "in my
10 experience this was always an effective
11 mechanism for raising and responding to relevant
12 issues."
13       When you wrote that, were you
14 referring to Exhibit 210?
15       A.    That's correct.
16       Q.    Were there any other lists of
17 investor questions that you were referring to in
18 Paragraph 5 of your opinion?
19       A.    This is what I was referring
20 to.
21       Q.    Do you know when this was
22 prepared, "this" being Exhibit 210?
23       A.    I don't know the specific date.
24 I know where in the process, which was prior to
25 the company going on the road to seek potential

Page 138

EDWARD NECARSULMER, III
1
2 investors.
3      Q.    Sometime by June of 1998?
4      A.    By June, I don't -- we can look
5 at the road show schedule and have an exact
6 date, but I don't recall it.
7      Q.    Would you agree with me that
8 nothing in Exhibit 210 refers either to gray
9 marketing or to Costco?
10          MR. GLUCKOW:  The document speaks
11     for itself.
12          You can answer.
13          THE WITNESS:  That's correct.
14 BY MR. LEWIS:
15     Q.    It is correct that there's no
16 reference?
17     A.    It is correct that there's no
18 reference.
19     Q.    Let me show you what has been
20 marked as Exhibit 204, a memo to the file from
21 Joe Hoffman, dated June 25, 1998.  Do you recall
22 this document?
23     A.    I do.
24     Q.    Do you have any understanding of
25 how this document came to be in the

Page 139

EDWARD NECARSULMER, III
1
2 underwriters' files as reflected by the page
3 number in the bottom right-hand corner?
4      A.    As a matter of practice, if
5 there is dialog usually between the assigned
6 examiner of the commission and usually issuer's
7 counsel, they'll provide the underwriters a copy
8 of any information that comes of that source.
9      Q.    From your review of documents
10 and testimony, are you aware of any dialog
11 between Adams and the underwriters with respect
12 to this exhibit?
13     A.    I'm not.
14     Q.    Are you aware of any
15 communications between the underwriters and the
16 SEC related to this exhibit, based on your
17 review of the transcripts and exhibits?
18     A.    I don't recall any.
19     Q.    I would next like to show you
20 what has been marked as Exhibit 159, and this is
21 a two-page exhibit, the first page of which is
22 entitled Additional Due Diligence Material.
23          Do you have any understanding of
24 what this exhibit is?
25     A.    I believe right before -- really

Page 140

EDWARD NECARSULMER, III
1
2 prior to pricing, street practice is to have a
3 so-called bringdown due diligence call where you
4 just make sure there are no -- you try to ensure
5 there are no issues -- I don't know if the word
6 is material, but no significant change between
7 what you know and as you go to become effective
8 the next morning.  And this looks to me --
9 appears to be the notes from that type of
10 meeting.
11     Q.    Now, at the companies that
12 you've worked at, is bringdown due diligence
13 recorded more formally than by a set of notes?
14          MR. GLUCKOW:  Objection to the
15     form.
16          You can answer.
17          THE WITNESS:  No.  I mean, I
18 guess I would have assumed maybe the
19 notes were typed up, but basically this
20 is the form I'd be used to.
21          It is often pro forma, if that's
22 the -- you know.  Unless there's some
23 significant issue that comes up.  In
24 many cases, you know, people are on the
25 road at different places; often the

Page 141

EDWARD NECARSULMER, III
1
2 management -- you know, the CFO is in
3 San Francisco, the CEO is in London
4 making presentations and sometimes they
5 are not even on the call, and it's
6 usually just an update of where you are
7 in terms of the effectiveness, has it
8 gotten NASD approval, that kind of
9 stuff.  So this doesn't surprise me,
10 no.
11 BY MR. LEWIS:
12     Q.    Do you have any understanding as
13 to whose notes these are?
14     A.    I could guess, but I don't know.
15     Q.    As a general proposition, as you
16 were doing your work looking at documents and
17 transcripts, if you had a question about the
18 documents, did you from time to time consult
19 with Simpson Thacher about the significance of a
20 document or the author of a document?
21     A.    I don't believe we ever had -- I
22 mean, we were certainly in touch talking about
23 my progress and where -- you know, but I don't
24 -- it didn't really arise.  I mean, the answer
25 is no, it really did not -- it didn't come up.

36 (Pages 138 to 141)

EDWARD NECARSULMER, III

1
2    Q.    Okay. Is it your understanding
3  that these are notes of a telephone conversation
4  rather than that of a meeting?
5    A.    That would be my surmise, but
6  it's only that.
7    Q.    And what is that based on?
8    A.    Based on the way it's almost
9  always a so-called bringdown call because the
10  people are not usually in the same place.
11    Q.    Is there, in your experience, a
12  standard format for a bringdown call?
13    A.    No. In my experience, it's
14  quite informal; it's tick off three or four
15  points, anything we ought to be aware of. It
16  can be combined with an update of where you are
17  in terms of effectiveness, other forms need to
18  be filed. So generally it kind of takes this
19  form.
20    Q.    Did you see anything in this
21  document when you reviewed it that you believe
22  referred either to Costco or to gray marketing
23  more broadly?
24    MR. GLUCKOW: The document speaks
25  for itself.

EDWARD NECARSULMER, III

1
2    But you can answer.
3    THE WITNESS: No.
4  BY MR. LEWIS:
5    Q.    I previously showed you Exhibit
6  160 which was the July 14, 1998, summary of due
7  diligence conducted by the Lehman Brothers Adams
8  Golf team.
9    Did you see anything in Exhibit
10  198 which referred to either gray marketing or
11  Costco distribution?
12    MR. GLUCKOW: You said 198.
13  BY MR. LEWIS:
14    Q.    I'm sorry; that was the one that
15  has been variously numbered as 160 and 198.
16    So the question is, since you
17  have 160 in front of you, whether you saw
18  anything in the summary of due diligence
19  contained in Exhibit 160 that you believe
20  referred to either Costco or gray marketing
21  issues?
22    MR. GLUCKOW: The document speaks
23  for itself.
24    But you can answer it.
25    THE WITNESS: I'm assuming Page 3

EDWARD NECARSULMER, III

1
2  that there's nothing that I'm not
3  seeing. Correct?
4  BY MR. LEWIS:
5    Q.    I think your assumption is
6  absolutely correct.
7    A.    With that assumption, the answer
8  is there's nothing referring to either of those
9  subjects.
10    (Whereupon, documents were
11  marked, for identification purposes, as
12  Exhibit 325 and Exhibit 326.)
13  BY MR. LEWIS:
14    Q.    I'm going to hand you two
15  exhibits together, 325 and 326.
16    MR. LEWIS: Off the record.
17    (A discussion was held off the
18  record.)
19  BY MR. LEWIS:
20    Q.    325 is a copy of documents that
21  you referred to in your rebuttal report and some
22  of those pages -- there were a few pages not
23  included because some of the Adams advertising
24  materials were double-sided and someone, not
25  doing their due diligence in the copying

EDWARD NECARSULMER, III

1
2  process, left those pages out when the document
3  was compiled, so those missing pages are
4  contained in Exhibit 326.
5    You'll see that the documents
6  that are compiled in this exhibit include due
7  diligence questionnaires, sales data,
8  advertising data, and, to the best of my
9  knowledge, these are all the pages that you
10  referred to in your rebuttal report.
11    MR. GLUCKOW: Just to be clear,
12  we haven't obviously checked to make
13  sure this is the case, but what you are
14  saying is when you combine 325 and 326,
15  all of the documents cited in the
16  rebuttal report should be included in
17  325 and 326.
18    MR. LEWIS: They should be. And
19  the ones in 326 are all
20  advertising-type documents which go
21  sort of into the span of documents in
22  the middle that have Adams Tight Lies
23  advertisements and humorous items about
24  Barney and a press release here and
25  there.

Page 146

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2 BY MR. LEWIS:
3    Q.   At the risk of beating the horse
4 dead, again, to your knowledge, is there
5 anyplace in any of the pages referred to in your
6 rebuttal report which touched on gray marketing
7 or Costco distribution?
8    MR. GLUCKOW:  And again, you are
9    focused on the UND production which we
10    have in front of us and 325 and 326,
11    not on deposition testimony?
12    MR. LEWIS:  That is correct.
13    THE WITNESS:  Then I would say --
14    I was thinking aloud; excuse me.  Let
15    me just make sure.
16    To the best of my knowledge, that
17    is correct.
18 BY MR. LEWIS:
19    Q.   Moving forward chronologically,
20 I will show you Exhibit 215 which is a Lehman
21 Brothers memorandum, facsimile, suggested
22 outline, and list of concerns.  The transmittal
23 date on the fax is July 29, 1998.
24    Did you review this document?
25    A.   I did see this document.

Page 147

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2    Q.   And did you see, on the third
3 page of the exhibit, the item "Discounting -
4 Tight Lies have been seen in many Costcos for
5 $146?  How is product getting there?  What is
6 Adams Golf doing about it?"
7    A.   I have seen that.
8    Q.   Have you seen any documents that
9 explain to you how that information came into
10 the possession of the underwriters?
11    A.   I had not seen a document
12 documentary of it, no.
13    Q.   Do you recall any testimonial
14 evidence?
15    A.   It is my recollection that
16 either Picchi or Lantier, who were the two
17 Lehman equity research analysts, did refer to
18 this in their deposition testimony.  I can't
19 tell you which one.  I would say Lantier, if I
20 had to make a determination.
21    L-A-N-T-I-E-R.  P-I-C-C-I, I
22 think.  It may be P-I-C-C-H-I.
23    Q.   So that other than the
24 deposition transcripts of the equity analysts,
25 you are unaware of any means by which one could

Page 148

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2 determine how the information came into Lehman's
3 possession that caused someone to write the
4 words that appear on the page I read to you?
5    MR. GLUCKOW:  Objection to the
6    form.  It mischaracterizes the
7    testimony.
8    But you can answer.
9    THE WITNESS:  I would add that,
10    you know, since this is post IPO, it's
11    highly plausible that's -- that this
12    came through an investor or type of
13    question to the research analyst.
14 BY MR. LEWIS:
15    Q.   Can you explain why you say
16 that?
17    A.   Well, what happens often is that
18 as you are talking about the story or the stock,
19 particularly if the stock is, you know, either
20 going up or down a lot and therefore is the
21 subject, research analysts are constantly
22 talking to their customers who are the --
23 they're counterpart analysts or portfolio
24 managers at usually large financial
25 institutions, or it could be an officer manager

Page 149

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2 someplace, and a lot of the process is feedback,
3 and somebody said, you know, what do you think
4 is going on?  I heard, you know, from my golf
5 pro or a guy at Fidelity asked me about... I
6 mean, in my experience a lot of the information
7 is actually incoming, so it could very well have
8 come through that way as well.
9    Q.   Let me show you what I've marked
10 previously as 217.  This is a teleconference
11 script dated August 5, 1998, sent to Olga
12 Pulido-Crowe and Pat Walravens,
13 W-A-L-R-A-V-E-N-S, from the desk of Patty
14 Walsh.  And at Page 40671, you will see a
15 reference, under the heading of Discounting, to
16 "Tight Lies have been seen in many Costcos for
17 $146.  How is the product getting there?" and an
18 answer is given.
19    Does anything in this document --
20 strike that.
21    Do you have any reason to
22 believe that the information that's contained
23 on Page 40670, which is similar to the
24 information we saw in the "concerns" box on
25 Exhibit 215, came as a surprise to the

38 (Pages 146 to 149)

**Page 150**

                    EDWARD NECARSULMER, III
1
2  underwriters?
3           MR. GLUCKOW: Objection to the
4      form. Just to clean up the record, I
5      think you said 40670. I'm assuming you
6      must have meant 40671.
7           MR. LEWIS: I tried to say
8      40671. I probably sputtered it.
9           MR. GLUCKOW: And then you are
10     comparing the language at the bottom of
11     40671 with the language in 215?
12          MR. LEWIS: Correct.
13          MR. GLUCKOW: And what's the
14     question?
15 BY MR. LEWIS:
16     Q.    Looking at those two documents
17 together, do you recall -- strike that.
18          Seeing those two documents
19 together, do you have any recollection of any
20 explanation that you learned during your
21 investigation in this case of how the
22 underwriters came to learn of gray marketing
23 distribution through Costco after the IPO?
24          MR. GLUCKOW: Vague and
25     ambiguous.

**Page 151**

                    EDWARD NECARSULMER, III
1
2      But you can answer.
3      Asked and answered as well.
4      Go ahead.
5           THE WITNESS: Again, I can only
6      surmise that it came through investor
7      feedback or through the surveys that
8      the equity research analyst did.
9  BY MR. LEWIS:
10     Q.    You referred earlier to the
11 surveys. I'll place before you a copy of
12 Exhibit 180, previously marked, and specifically
13 I'll direct your attention to Page 27.
14          Is the survey that appears on
15 that page the survey you are referring to in
16 your testimony?
17     A.    Yes.
18     Q.    And do you have any reason to
19 believe that Lehman learned of Costco
20 distribution or gray market distribution through
21 the pro shop survey before the IPO date?
22          MR. GLUCKOW: Objection to the
23     form. Vague and ambiguous. Asked and
24     answered.
25          You can answer.

**Page 152**

                    EDWARD NECARSULMER, III
1
2           THE WITNESS: Absolutely not.
3      There's no reference that that happened
4      in any of the material that I reviewed.
5  BY MR. LEWIS:
6      Q.    Do you recall Mr. Lantier being
7  unable to date precisely when his pro shop
8  survey calls were made?
9           MR. GLUCKOW: Objection. The
10     deposition record speaks for itself.
11          You can answer.
12          THE WITNESS: I do recall that in
13     the deposition.
14 BY MR. LEWIS:
15     Q.    Would it be fair to say that to
16 the best of your recollection Mr. Lantier
17 couldn't speak to that subject one way or the
18 other?
19          MR. GLUCKOW: The same objection.
20          You can answer.
21          THE WITNESS: I don't have an
22     appropriate response. I don't know.
23          MR. LEWIS: Off the record.
24          (A discussion was held off the
25     record.)

**Page 153**

                    EDWARD NECARSULMER, III
1
2           (Whereupon, a document was
3      marked, for identification purposes, as
4      Exhibit 327.)
5  BY MR. LEWIS:
6      Q.    I've marked as Exhibit 327 a
7  document with the heading Exhibit VII. Do you
8  recognize this document?
9      A.    I've seen the document.
10     Q.    And where have you seen it?
11     A.    It was within the underwriter
12 production, I believe. It was within the
13 documents that I referred to in Schedule B.
14     Q.    Of your --
15     A.    Of 321.
16     Q.    Well, to be fair to you, sir,
17 this was an exhibit to the expert report of
18 Mr. Grace.
19     A.    Okay. I accept that as a fact.
20 As I said in my rebuttal report, I did review
21 that report as well, I just don't remember.
22     Q.    Did you review this -- did you
23 review the entirety of Mr. Grace's report in
24 preparation of your rebuttal report?
25     A.    "Preparation" is not the right

39 (Pages 150 to 153)

EDWARD NECARSULMER, III
1
2   word. I read it as something related to the
3   case, related to what I -- you know, to what my
4   role was as well.
5          MR. GLUCKOW: But in terms of the
6      entirety, just to be clear, as the
7      attachment to the rebuttal report
8      indicates, we sent Mr. Necarsulmer
9      copies of all the expert reports
10     including the exhibits so this
11     (indicating) would have been included
12     in what we sent Mr. Necarsulmer.
13         MR. LEWIS: Right; but he
14     wouldn't have seen it before it was
15     issued.
16         MR. GLUCKOW: Correct.
17         MR. LEWIS: And this was in the
18     -- oh.
19         MR. GLUCKOW: I'm saying in the
20     rebuttal report.
21         THE WITNESS: Right. That's why
22     I said in Exhibit B to my rebuttal
23     report. Or Exhibit A, I guess it is,
24     in my rebuttal report.
25  BY MR. LEWIS:

EDWARD NECARSULMER, III
1
2      Q.    Did you read through this?
3      A.    I did look through this.
4      Q.    Did you specifically look at the
5   first six pages of this?
6          MR. GLUCKOW: Objection to the
7      form. He said he's read the entire
8      document, but -- you can answer.
9   BY MR. LEWIS:
10     Q.    Well, when you read the entire
11  document, did you have any reason in your own
12  mind to focus on the first six pages of this?
13     A.    I had no particular reason to do
14  that, no.
15     Q.    Did you read through the
16  complaints to Adams Golf regarding Costco that
17  are listed in the chronological order that
18  Mr. Grace listed them in this report?
19     A.    I did.
20     Q.    And the solutions purportedly
21  implemented by Adams Golf as also listed on
22  this?
23     A.    Correct.
24     Q.    Had you previously seen the
25  complaints, the Adams numbered complaints, that

EDWARD NECARSULMER, III
1
2   were listed by Mr. Grace in this report?
3          MR. GLUCKOW: You mean had he
4      seen reference to them in the materials
5      in Exhibit A -- or Exhibit B, rather,
6      to his report which included all the
7      depositions and the exhibits to the
8      depositions, or has he seen them in
9      this format (indicating)? I'm not sure
10     what the question is.
11  BY MR. LEWIS:
12     Q.    Let me try a simple question.
13         MR. LEWIS: Off the record.
14         (A discussion was held off the
15     record.)
16  BY MR. LEWIS:
17     Q.    Let me take you to Page 2 of
18  this -- of this report. You'll see that under
19  the date of May 6, 1998, according to this
20  table, Pro Golf Discount in Fairfax, Virginia,
21  canceled an order because Adams' clubs are in
22  Costco.
23         Do you recall seeing a reference
24  to that in any of the depositions or exhibits
25  that you had read in your work?

EDWARD NECARSULMER, III
1
2      A.    I don't.
3      Q.    On May 7, 1998, according to
4   Mr. Grace, Adams Golf clubs were found in Costco
5   in Modesto, California.
6          Do you recall having seen a
7   reference to that in your work?
8      A.    I can't recall.
9      Q.    May 21, according to Mr. Grace,
10  Pro Golf complains that Costco is selling Adams
11  Golf product.
12         Do you recall having learned of
13  that in your investigation?
14     A.    I don't recall that either.
15     Q.    On May 29, 1998, according to
16  the table, "WDC Mackenzie reports that a new
17  shipment of Adams Golf clubs have hit Canadian
18  Costcos."
19         Do you remember seeing
20  reference to that in the --
21     A.    I do remember seeing that in the
22  correspondence between the two.
23     Q.    June 1, 1998, according to
24  Mr. Grace, "Centerville Golf in Centerville,
25  Virginia, complained about Adams clubs in

Page 158

EDWARD NECARSULMER, III

1 Costco."
2 Do you recall having learned that
3 in your work in the case prior to seeing
4 Dr. Grace's -- Mr. Grace's report?
5 A. I don't recall that
6 specifically, no.
7 Q. All right. How about the item
8 for June 8, 1998; Merrifield Golf in Fairfax,
9 Virginia, called regarding Adams clubs seen at
10 Costco."
11 Do you recall learning that?
12 A. I don't recall learning that.
13 Q. June 11, 1998, Jack Tone,
14 T-O-N-E, Golf in Ripon, R-I-P-O-N, California,
15 called regarding Adams' clubs in Costco.
16 Do you remember seeing that?
17 A. I don't.
18 Q. June 24, Green River Golf Club
19 in Corona, California, called to complain about
20 clubs in Costco. Do you recall learning that?
21 A. I don't recall learning that
22 either.
23 Q. June 25, two items, "Pro Golf
24 Discount in Boise, Idaho, called regarding their

Page 159

EDWARD NECARSULMER, III

1 problem selling clubs due to Costco," and
2 "Centerville Golf Center in Centerville,
3 Virginia, called to complain again about
4 Costco."
5 A. I do recall -- I do recall the
6 one in Idaho. I don't recall the other one in
7 California.
8 Q. Just a couple more.
9 A. Fine.
10 Q. June 29, Tierneys,
11 T-I-E-R-N-E-Y-S, Golf in Walnut Creek,
12 California, called regarding a customer
13 returning clubs after seeing Adams Golf clubs in
14 Costco.
15 A. I do recall seeing that.
16 Q. July 3, '98, "Customer requests
17 Adams Golf hat offer after buying clubs at a
18 Costco in Livonia, Michigan."
19 A. I don't recall that.
20 Q. Would you agree that the
21 portions of the summary that we've just gone
22 over contain information that was different with
23 respect to gray marketing and Costco than the
24 information that Mr. Adams had originally

Page 160

EDWARD NECARSULMER, III

1 supplied to Ms. Pulido-Crowe?
2 MR. GLUCKOW: Objection to the
3 form. It mischaracterizes the record.
4 It mischaracterizes the testimony.
5 You can answer.
6 THE WITNESS: If I recall from
7 Pulido-Crowe's deposition, the -- his
8 characterization of the problem was
9 that there was some problem with
10 Costco, they didn't believe it was
11 significant, and they were handling
12 it. I mean, that was my summary of
13 what I believe was said. And I don't
14 know that this is enough to tell me
15 that that's different, but it is a
16 little vague, my memory of same.
17 BY MR. LEWIS:
18 Q. I'll show you this in a second.
19 At Page 47 of her deposition Ms. Pulido-Crowe
20 was asked the question: "How did you determine
21 whether the gray marketing was material or not?"
22 "Answer: We of course first
23 spoke to the company, talked about the
24 distribution channels. The issue of -- the

Page 161

EDWARD NECARSULMER, III

1 discussion of Costco came up because of discount
2 warehouses. And we asked, was it much of a
3 problem? They said no, there was -- it was an
4 isolated incident -- I recall something to that
5 effect. My interpretation was it was an
6 isolated incident and that that person or
7 distributor, whoever it was that got those clubs
8 there, they were going to pursue that and put an
9 end to that."
10 MR. GLUCKOW: Are you
11 representing to the witness that that
12 is the only time that Ms. Pulido-Crowe
13 testified about her discussions with
14 the company concerning Costco and/or
15 gray marketing?
16 I certainly hope not.
17 MR. LEWIS: I'm not saying it's
18 the only time, but I'm not saying --
19 MR. GLUCKOW: The inference of
20 your question is that that is the
21 record as to the conversations.
22 MR. LEWIS: I haven't asked a
23 question, so I can't have an inference
24 to my question.

41 (Pages 158 to 161)

Page 162

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2  BY MR. LEWIS:
3      Q.    My question is --
4          MR. GLUCKOW:  I suggest
5  otherwise, but proceed.
6          MR. LEWIS:  You suggest I have a
7  question out there?
8          MR. GLUCKOW:  No.  I suggest that
9  the way you just read that into the
10  record following the exchange that we
11  have had is misleading.  But proceed.
12  BY MR. LEWIS:
13      Q.    The first question is, was that
14  the testimony of Ms. Pulido-Crowe that you were
15  referring to?
16      A.    Partially.
17      Q.    Okay.  Is there something else
18  that you recall?
19          You have the volume in front of
20  you and an index to it, if there's something
21  else you would like to refer my attention to.
22          Do you recall her ever telling --
23  strike that.
24          Do you recall her ever saying
25  that Barney Adams told her that Costco

Page 163

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2  distribution was other than an isolated
3  incident?
4          MR. GLUCKOW:  Objection to the
5  form.
6          THE WITNESS:  I don't recall him
7  saying -- her saying anything besides
8  that, no.
9  BY MR. LEWIS:
10      Q.    Okay.  Would you agree that the
11  chart to Mr. Grace's report reflects that by the
12  time of the IPO, Costco distribution, whatever
13  it was, was not an isolated incident?
14          MR. GLUCKOW:  It mischaracterizes
15  the record.  It mischaracterizes the
16  testimony.
17          You can answer.
18          THE WITNESS:  I mean, I just
19  don't know --
20          MR. GLUCKOW:  Asked and answered
21  as well.
22          THE WITNESS:  -- I just don't
23  know.  If these were all coming from
24  the same source, then I suspect you
25  could characterize it as one -- you

Page 164

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2  know, one event.  If they were coming
3  from multiple sources, I think it
4  wouldn't be.
5  BY MR. LEWIS:
6      Q.    All right.  Do you have any
7  reason to believe based on your investigation in
8  this case as part of your expert work -- let me
9  reframe that.
10          Do you have any reason to believe
11  based on your work in this case that the
12  underwriters reviewed the complaints that were
13  listed between the dates of May 6th and I guess
14  I stopped reading at July 3?
15          MR. GLUCKOW:  Objection to the
16  form.
17          You can answer.
18          THE WITNESS:  I know that they
19  certainly -- I shouldn't say
20  certainly.  I believe they knew about
21  the Canadian one.  And I don't know to
22  the extent they knew about the others.
23  BY MR. LEWIS:
24      Q.    Forgive me if I'm asking you
25  something I've already asked you.  Did I read

Page 165

EDWARD NECARSULMER, III
1    EDWARD NECARSULMER, III
2  you the entry for July 8, 1998: "Golfdom in
3  McLean, Virginia, called regarding a credit for
4  clubs they had purchased at Costco"?
5          MR. GLUCKOW:  The question is did
6  you already ask him about that one?
7          MR. LEWIS:  Right.
8          MR. GLUCKOW:  The record will
9  speak for itself, but...
10          THE WITNESS:  I don't know; I
11  just don't.
12  BY MR. LEWIS:
13      Q.    Whether or not I read it to you
14  before, the entry here in Mr. Grace's report for
15  July 8, 1998, states that Golfdom in McLean,
16  Virginia, called regarding a credit for clubs
17  they had purchased at Costco.
18          Do you remember learning of that
19  prior to -- as a result of your work in this
20  case prior to the receipt of Dr. Grace's or
21  Mr. Grace's report?
22          MR. GLUCKOW:  He's on Page 6.
23          THE WITNESS:  I'll get to Page
24  6.  I'm sorry, I went back to the
25  beginning.

42 (Pages 162 to 165)

Page 166

```
 1              EDWARD NECARSULMER, III
 2         MR. LEWIS: Take your time.
 3         MR. GLUCKOW: This one
 4    (indicating).
 5    A.    I don't -- I don't recall this
 6  specific one.
 7    Q.   Okay.  Based on your work in
 8  this case, do you know of any reason why the
 9  complaints -- the written complaints that are
10  listed by Mr. Grace in his report would not have
11  been available to the underwriters as part of
12  their due diligence investigation if they had
13  asked to see them?
14         MR. GLUCKOW: Objection to the
15    form.  It assumes facts not in
16    evidence.
17         You can answer.
18         THE WITNESS: I don't know why it
19    wouldn't have been available had they
20    asked to see them.
21  BY MR. LEWIS:
22    Q.   You don't know why it wouldn't
23  have been?
24    A.    Correct.
25    Q.   Do you have any knowledge, as
```

Page 167

```
 1              EDWARD NECARSULMER, III
 2  you sit here, that the underwriters contacted,
 3  as part of the due diligence investigation, any
 4  of the retailers who made the complaints about
 5  Costco that are listed between the dates of
 6  March 23, 1998, and July 8, 1998?
 7         MR. GLUCKOW: Objection to the
 8    form.  Are you asking him to compare
 9    this list of complaints with the list
10    of customer calls that we've looked at
11    previously?
12         MR. LEWIS: Sure, if you want to;
13    but none of them were on the list of
14    customer calls, so I don't think he has
15    to do that.
16  BY MR. LEWIS:
17    Q.   Do you have any knowledge that
18  any of the complaining retailers were contacted
19  by Lehman Brothers or any of the comanagers
20  during due diligence?
21    A.    I have no knowledge of that.
22    Q.   You have opined in your rebuttal
23  report on the subject of the disclosure that was
24  made in this case.  Would you agree that in
25  matters of disclosure that an underwriter should
```

Page 168

```
 1              EDWARD NECARSULMER, III
 2  err on the side of inclusion of fact rather than
 3  exclusion of fact?
 4         MR. GLUCKOW: Objection to the
 5    characterization of the report.
 6         But you can answer.
 7         THE WITNESS: I'm not sure that's
 8    accurate.  I think it's important to
 9    have a complete document, but I think
10    part of making it a useful document,
11    and for the benefit of the investors,
12    is making sure that the -- the things
13    that are -- the things that are
14    included are, you know, significant to
15    the company, and I think one of the --
16    having gone through this drafting
17    process a million times, one of the
18    great problems is what do you put in,
19    what do you put out, what do you leave
20    out, and it does start -- you know, can
21    strike likely debate, and I think
22    striking some balance is really the
23    goal.
24  BY MR. LEWIS:
25    Q.    Would you agree that if by the
```

Page 169

```
 1              EDWARD NECARSULMER, III
 2  time of the IPO the underwriters were unable to
 3  make a studied assessment of the scope of the
 4  risk of gray marketing that the risk of gray
 5  marketing should have been included as a risk
 6  disclosure?
 7         MR. GLUCKOW: Objection to the
 8    form.  Incomplete hypothetical.
 9    Assumes facts not in evidence.
10         You can answer.
11         THE WITNESS: I don't agree with
12    that.  I think, again, this is a
13    process, you make a judgment as to
14    those things you think are significant
15    and relevant, and those are the things
16    you include.
17  BY MR. LEWIS:
18    Q.   What if you concluded by the
19  time of the effective date that you just didn't
20  know what the scope of gray marketing was?
21         MR. GLUCKOW: Objection.  The
22    same objections, and it
23    mischaracterizes the evidence.
24         THE WITNESS: My interpretation
25    of what I read, what I reviewed, was
```

43 (Pages 166 to 169)

Page 170

EDWARD NECARSULMER, III

1
2    that they did make a judgment, and
3    their judgment was that they did know
4    enough and it was not material.
5  BY MR. LEWIS:
6       Q.    When was that judgment made, to
7  the best of your knowledge?
8       A.    Prior to the effective date of
9  the registration statement.  I couldn't tell
10  you -- I couldn't make it any more specific than
11  that.
12      Q.    Prior to the Costco press
13  release?
14           MR. GLUCKOW: Objection to the
15        form.  It mischaracterizes the record.
16        It mischaracterizes the testimony.
17           You can answer.
18  BY MR. LEWIS:
19      Q.    When I say the Costco press
20  release, I mean the Adams June 9, 1998, press
21  release relating to Costco.
22      A.    I don't know I would make -- you
23  know, the assumption I make from the data that I
24  reviewed is that that was their conclusion.
25      Q.    But are you aware of any meeting

Page 172

EDWARD NECARSULMER, III

1
2  after the effective date of a registration
3  statement?
4       A.    I would have -- I would say yes,
5  but it's more usual on the date.  But it could
6  be -- it could be shortly thereafter, not long
7  thereafter.
8       Q.    Are you aware of any limitation
9  to how long after the effective date a
10  prospectus can be stickered?
11      A.    I'm not aware of that, if there
12  is one.
13      Q.    Do you believe that's a legal
14  issue rather than a practice issue?
15           MR. GLUCKOW: Objection.  It
16        calls for a legal conclusion.
17           But you can answer.
18           THE WITNESS: I don't know.  I
19        don't know.
20  BY MR. LEWIS:
21      Q.    Do you know if any consideration
22  was given in this case to stickering the
23  registration statement?
24      A.    I don't know.
25           MR. LEWIS: Let's take a

Page 171

EDWARD NECARSULMER, III

1
2  or meetings at which that conclusion was
3  reached?
4       A.    Not specifically, no.
5       Q.    Are you familiar with the term
6  stickering in the context of a prospectus or
7  registration statement?
8       A.    I am.
9       Q.    What does that term mean to you?
10      A.    You can add information via a
11  label, a long label, onto the cover of a
12  prospectus.
13      Q.    And under what circumstances in
14  your opinion does one sticker a registration
15  statement or a prospectus?
16      A.    Some fact coming out subsequent
17  to the printing of that prospectus that, you
18  know, you deem is material.  Sometimes the SEC
19  will ask you to sticker if something comes up.
20  If effectiveness gets delayed for some reason
21  and, you know, a quarter ends or a contract gets
22  canceled or something like that, they'll often
23  allow that as a -- or recommend that as a way to
24  make sure the disclosure is complete.
25      Q.    Have you seen stickering done

Page 173

EDWARD NECARSULMER, III

1
2  five-minute break and I may be done.
3           (A recess was had from 3:46 p.m.
4        to 4:00 p.m.; and then the proceedings
5        continued as follows:)
6  BY MR. LEWIS:
7       Q.    A point of clarification.  When
8  we referred to a file memo from Joe Hoffman
9  relating to the SEC, I believe you used the term
10  signing official at the SEC?
11      A.    Examining official.
12      Q.    Examining?
13      A.    Sorry.
14      Q.    I think you actually used the
15  word sign at one point.  Is that a synonym for
16  the examining official?
17           MR. GLUCKOW: I don't recall
18        those words being used, but the record
19        will speak for itself.
20           THE WITNESS: Should I respond?
21           MR. GLUCKOW: Yes, if you --
22           THE WITNESS: If I said it, I
23        didn't mean to say it.  I meant to say
24        examiner.
25  BY MR. LEWIS:

44 (Pages 170 to 173)

Page 174

EDWARD NECARSULMER, III
1
2      Q.   A point of clarification. You
3  have reached no conclusion as a result of your
4  work in this case with respect to issuer
5  disclosure obligations, is that fair?
6      A.   That is fair.
7      Q.   In Exhibit 321 --
8          MR. GLUCKOW: Hold on; I've got
9      the official copy here.
10         MR. LEWIS: It's hopefully the
11     last time we'll go back to it.
12  BY MR. LEWIS:
13     Q.   -- in your enumeration of
14  categories of things to be considered, Item 7
15  was: "Understanding of material outstanding
16  litigation, regulatory or environmental
17  issues."
18         Is it your opinion that the
19  underwriters had any obligation to evaluate the
20  litigation between Adams and Costco --
21         MR. GLUCKOW: Objection to the
22     form.
23  BY MR. LEWIS:
24     Q.   -- for materiality?
25     A.   No. Practice is that you ask --

Page 175

EDWARD NECARSULMER, III
1
2  you know, you ask that question of your counsel,
3  and if they give you a clean bill of health on
4  what you've done so far, you typically keep
5  going.
6      Q.   "Your counsel" meaning the
7  issuer's counsel or the underwriter's counsel?
8      A.   The underwriter's counsel.
9      Q.   Going back to Exhibit-7 to
10  Mr. Grace's report, l take it that in the course
11  of your --
12         MR. GLUCKOW: Hold on, let me
13     just get it.
14         THE WITNESS: Got it.
15  BY MR. LEWIS:
16     Q.   In the course of your work on
17  this engagement, did you ever try to go through
18  the exhibits to collect complaints related to
19  gray marketing and line them up chronologically?
20     A.   I did not.
21     Q.   Do you have any reason to
22  believe that the underwriters were aware of the
23  identities of the retailers who complained to
24  Adams about Costco's appearing -- Tight Lies
25  appearing at Costco locations?

Page 176

EDWARD NECARSULMER, III
1
2      A.   With the exception of WDC
3  Mackenzie, I don't.
4          MR. LEWIS: I have no further
5      questions at this time.
6          MR. GLUCKOW: Okay.
7          I'm going to have a few
8      questions, but I just need five
9      minutes, so if we can take a
10     five-minute break. Is that okay?
11         MR. LEWIS: Okay. I'll ask you
12     what you discussed with the witness.
13         MR. GLUCKOW: No, I'm going to
14     sit right here. I'm not going
15     anywhere.
16         MR. LEWIS: Okay; fine. Take
17     your time.
18         MR. GLUCKOW: I just need to
19     compare two things quickly.
20         MR. LEWIS: Take your time.
21         (A recess was had from 4:04 a.m.
22     to 4:13 p.m.; and then the proceedings
23     continued as follows:)
24            - - -

Page 177

EDWARD NECARSULMER, III
1
2       (Whereupon, a document was
3   marked, for identification purposes, as
4   Exhibit 328.)
5            - - -
6          EXAMINATION
7            - - -
8  BY MR. GLUCKOW:
9      Q.   This is a copy of the deposition
10  transcript of Olga Pulido-Crowe. Mr. Lewis
11  mentioned this deposition during his examination
12  and in fact read from it but didn't mark it,
13  which is why I'm marking it now.
14         Mr. Necarsulmer, let me ask you,
15  first, do you recall reviewing
16  Ms. Pulido-Crowe's deposition as part of your
17  work in this matter?
18     A.   I do.
19     Q.   Did you rely on her testimony?
20     A.   Heavily.
21     Q.   Why?
22     A.   In my experience, the captain of
23  the underwriting team takes particular weight --
24  or deserves particular weight, I should say.
25     Q.   Let me direct your attention to

EDWARD NECARSULMER, III

1
2  the top of Page 48, Line 6.
3      A.   The top of Page 48, Line 6.
4      Q.   The question is: "Do you recall
5  who spoke with Adams Golf about this issue?"
6          And the answer is: "It would
7  have been Barney or Mark -- or I don't recall
8  exactly who, but it was a group of many people
9  that were -- that would have been present."
10         Do you recall reading that when
11 you read Ms. Pulido-Crowe's deposition
12 transcript?
13     A.   Yes.
14     Q.   Did you rely on that in any way?
15     A.   I did.
16     Q.   Why?
17     A.   Because I think it was
18 demonstrative of the fact that there was an
19 ongoing process of the underwriters in the
20 company talking about this and other issues.
21     Q.   And I may have misinterpreted
22 some of Mr. Lewis's questions earlier, but I
23 couldn't help get the impression from some of
24 the questions that he was asking that the
25 impression that he was leaving on me anyway was

EDWARD NECARSULMER, III

1
2  that there was only one discussion between
3  Ms. Pulido-Crowe and Mr. Adams and that that one
4  discussion happened in April or May of '98.
5          Is that impression that I had
6  in my mind consistent with your review of the
7  materials in this matter?
8          MR. LEWIS:  Objection to form.
9          THE WITNESS:  I --
10         MR. LEWIS:  You can answer.
11         THE WITNESS:  I don't know who
12     has to tell me this in this case.
13     Absolutely not.  The one thing
14     that is clear to me throughout, and
15     this demonstration -- this deposition
16     is sort of important to that, is that
17     there was, as there normally should be
18     in these cases, a significant number of
19     -- amount of interaction between the
20     company's marketing people and the
21     underwriters.
22 BY MR. GLUCKOW:
23     Q.   Let me turn your attention to
24 Page 78, at the top, Line 3.
25         MR. LEWIS:  What is this?

EDWARD NECARSULMER, III

1
2          MR. GLUCKOW:  I'm sorry, Page 78,
3      Line 3 through Line 6.
4  BY MR. GLUCKOW:
5      Q.   The question is: "Did you have
6  any discussions with anyone at Adams concerning
7  the litigation between June 9 of '98 and July 9
8  of '98?"
9          The answer is: "I believe we
10 (sic) did."
11         Line 7: "Who did you have
12 those discussions with?"
13         "Answer: I don't recall.  I
14 can recall conversations.  I don't remember
15 who was actually there, but I recall
16 conversations."
17         Did you review this?
18     A.   I did.
19     Q.   Did you rely on it?
20         MR. LEWIS:  Objection to form.
21     Vague.  Overbroad.
22         THE WITNESS:  I did rely on it.
23 BY MR. GLUCKOW:
24     Q.   Why?
25     A.   Again, it was evidence of this

EDWARD NECARSULMER, III

1
2  ongoing discussion between the company and the
3  underwriters as part of the due diligence
4  process.
5      Q.   Let me actually have you turn
6  back to Page 77, the prior page.  I should have
7  started here; I apologize.
8          On Page 76, Exhibit 163 is marked
9  -- and then there's a question -- which is the
10 press release concerning the Costco action,
11 which Mr. Lewis asked you about, and on top of
12 Page 77, the question is: "Do you recall
13 whether you saw it," meaning this press release,
14 "prior to the IPO?"
15         And the answer is: "Yes."
16         Skipping down to Line 14, the
17 question is: "Did you discuss the litigation
18 with anyone at Adams prior to them filing
19 suit?"
20         The answer is, on Line 16: "I
21 believe it was prior, yes."
22         17.  "Who did you discuss this
23 with?"
24         18.  "Answer: I don't recall
25 exactly, but it would have -- it was a group

46 (Pages 178 to 181)

EDWARD NECARSULMER, III
1
2  of senior management at the company and/or our
3  counsel, underwriters' counsel or their
4  counsel. It was discussed."
5       Do you see what I've just read
6  there?
7       A.   I do.
8       Q.   Did you read that as part of
9  your evaluation of this matter?
10      A.   I did.
11      Q.   Did you rely on what I've just
12  read?
13           MR. LEWIS: Objection.
14           THE WITNESS: I did.
15  BY MR. GLUCKOW:
16      Q.   Please explain how and why.
17      A.   I relied on it because, again, I
18  was -- one of the things I was trying to
19  investigate as part of my project was, you know,
20  were the underwriters thorough and consistent in
21  trying to discuss, you know, these -- the
22  marketing issues, the distribution issues, legal
23  issues, with the company, and this is another
24  evidence that they did and that they followed up
25  on it.

EDWARD NECARSULMER, III
1
2       Q.   There are a number of documents
3  that Mr. Lewis showed you -- examples would be
4  the Lehman Brothers Commitment Committee
5  memorandum, Exhibit 74; the due diligence
6  memorandum, Exhibit 160, also marked as 198; the
7  notes of the bringdown diligence discussion,
8  Exhibit 159 -- where the questioning pointed out
9  that there was no reference in those documents
10  and other documents to gray marketing or Costco.
11      Do you recall that line of
12  questioning?
13      A.   I do.
14      Q.   Did it surprise you in any way
15  that there was no reference to gray marketing or
16  Costco in those documents?
17           MR. LEWIS: Objection. Vague and
18  overbroad.
19           THE WITNESS: It didn't surprise
20  me at all.
21  BY MR. GLUCKOW:
22      Q.   Why?
23      A.   Because the underwriters had
24  made a determination that this was not
25  significant to the company's sales and earnings;

EDWARD NECARSULMER, III
1
2  therefore, like many other issues, it just
3  wasn't part of the conversation.
4           MR. GLUCKOW: I have no further
5  questions at this time.
6           MS. MORIATY: I've got just a
7  few.
8           THE WITNESS: Sure.
9                    - - -
10          EXAMINATION
11                    - - -
12  BY MS. MORIATY:
13      Q.   I want to turn everybody back to
14  Exhibit I think it's 327 which was the exhibit
15  to Mr. Grace's report.
16           MR. GLUCKOW: Here it is.
17           THE WITNESS: Okay.
18  BY MS. MORIATY:
19      Q.   Well done, okay.
20      During your research for your
21  report in this case, did you learn how many
22  retailers Adams Golf had in 1998?
23      A.   The number 7,000 sticks in my
24  mind.
25      Q.   Do you know how many phone calls

EDWARD NECARSULMER, III
1
2  Adams Golf received to its call center in total
3  between about January 1st and July 8 of 1998?
4           MR. LEWIS: Objection to form.
5           THE WITNESS: A thousand -- I --
6  BY MS. MORIATY:
7       Q.   Did you read this information in
8  the course of your research for this report?
9       A.   Yes.
10           MR. LEWIS: Objection to form.
11           THE WITNESS: Yes, I did.
12  BY MS. MORIATY:
13      Q.   I'm going to represent to you
14  that -- you just told me it was 7,000
15  retailers.
16      A.   Right.
17      Q.   I'm going to represent to you
18  that they had 12,885 calls to this call center.
19  You can believe that or not. Based on whatever
20  impression you had during your research, based
21  on that.
22      So I'm going to look at Exhibit
23  327. And we discussed earlier the complaints
24  to Adams Golf regarding the Costco column, and
25  in this column by my count there are 12

47 (Pages 182 to 185)

Page 186

EDWARD NECARSULMER, III
1  
2  retailers complaining between the beginning of
3  this chart and the IPO -- the beginning of
4  this chart starts February 16th, '98; and
5  there are nine calls that come into the call
6  center.
7      So with all of your experience
8  working as an underwriter in various IPOs, and
9  in light of the information in Exhibit 327 and
10 the number of retailers -- 7,000 -- and calls
11 to the call center -- upwards of 12,000 -- do
12 you think gray marketing should have been
13 listed as a risk factor in the Adams Golf
14 prospectus?
15     MR. LEWIS: Objection to form and
16 foundation.
17     MR. GLUCKOW: I'll just --
18     MR. LEWIS: Beyond the scope of
19 his purpose in this litigation
20 according to his testimony.
21     THE WITNESS: Should I answer?
22     MR. LEWIS: You may answer, if
23 you can.
24     THE WITNESS: I mean, it seems to
25 me, again, as I just answered

Page 187

EDWARD NECARSULMER, III
1  
2  Mr. Gluckow, they made a determination
3  that while they knew of the issue, that
4  it simply wasn't -- didn't rise to the
5  level of, and I would rather use the
6  word significant than material because
7  I think material actually has a legal
8  connotation, also. So, therefore, like
9  many other issues, they made the
10 determination, the underwriters made
11 the determination, that there was no
12 benefit, no reason, you know, to take
13 it any further. And that's a judgment
14 you make when you are an underwriter,
15 when you do due diligence. There are
16 lots of factors to consider; you just
17 -- you make these decisions.
18 BY MS. MORIATY:
19     Q.   If you as an underwriter heard
20 that 12 retailers out of 7,000 complained, would
21 you think that this is a significant issue?
22     MR. LEWIS: Objection to form.
23     THE WITNESS: I would think that
24 it would be less than I would have
25 guessed the normal sample would be, so

Page 188

EDWARD NECARSULMER, III
1  
2  I think it would not be a significant
3  issue.
4  BY MS. MORIATY:
5      Q.   And if you heard that nine calls
6  out of more than 12,000 were regarding a certain
7  issue, would you have thought that issue
8  significant enough to investigate further or put
9  as a risk factor?
10     MR. LEWIS: Objection to form and
11 foundation.
12     THE WITNESS: It's hard to, you
13 know -- no, the answer is no, the
14 numbers are simply too small, putting
15 myself in that spot.
16     MS. MORIATY: Thanks. No further
17 questions here.
18     - - -
19     EXAMINATION
20     - - -
21 BY MR. LEWIS:
22     Q.   Mr. Necarsulmer, can you say
23 that as someone who is overseeing due diligence
24 investigations in the past if you had
25 Mr. Grace's report before you at the time of the

Page 189

EDWARD NECARSULMER, III
1  
2  IP -- just before the IPO was effective and saw
3  that Adams' clubs were appearing in Costco
4  warehouses in diverse locations in the country,
5  that that was something you wouldn't have asked
6  some questions about?
7      MR. GLUCKOW: Objection to form.
8  Incomplete hypothetical.
9  Mischaracterizes the record.
10     You can answer.
11     THE WITNESS: I mean, you know,
12 it's very hard to look back, but I
13 again think that -- I again think that
14 you -- the judgment -- I keep going
15 back -- the totality of this, it is my
16 opinion, and I certainly believe it,
17 that they made an informed -- given all
18 the facts that they knew, they made a
19 reasonable judgment that it was not --
20 did not rise to the level of being a
21 risk factor.
22 BY MR. LEWIS:
23     Q.   The underwriters could have kept
24 the offering from going forward any time up to
25 the effective date, could they not, if they were

48 (Pages 186 to 189)

Page 190

```
 1          EDWARD NECARSULMER, III
 2  not satisfied as to -- that all proper
 3  disclosures were being made?
 4          MR. GLUCKOW:  Incomplete
 5  hypothetical.  Assumes facts not in
 6  evidence.
 7          You can answer.
 8          THE WITNESS:  Sure; you can even
 9  do it after the effective date.
10  BY MR. LEWIS:
11      Q.   How late after the effective
12  date can you do it?
13          MR. GLUCKOW:  It calls for a
14  legal conclusion.
15  BY MR. LEWIS:
16      Q.   In your understanding, to the
17  best of your knowledge, how late after the
18  effective date can you stop an underwriting?
19          MR. GLUCKOW:  The same
20  objections.
21          THE WITNESS:  I don't remember --
22  I don't know if it's 30 or 40.  There's
23  a number, I just don't know what it is,
24  or I don't remember what it is, and it
25  may have changed since I was actively
```

Page 191

```
 1          EDWARD NECARSULMER, III
 2  doing this.  I thought there was some
 3  sort of -- I don't remember.  The
 4  answer is I don't remember whether it's
 5  30 days or 45 days or whether it's even
 6  a specific number any longer, but...
 7          MR. LEWIS:  Nothing further.
 8          MR. GLUCKOW:  Nothing further.
 9          MS. MORIATY:  No.  Good.
10          MR. GLUCKOW:  Thank you very
11  much.
12          (Deposition concluded at
13  4:26 p.m.)
14              -O-
15
16
17
18
19
20
21
22
23
24
```

Page 192

```
 1
 2          C E R T I F I C A T E
 3      I, Pamela Harrison, a Notary
 4  Public, do hereby certify:
 5      That EDWARD NECARSULMER, the
 6  witness whose testimony is hereinbefore set
 7  forth, was duly sworn by me and that such
 8  testimony given by the witness was taken down
 9  stenographically by me and then transcribed.
10      I further certify that I am not
11  related to any of the parties to this
12  action by blood or marriage, and that I am in
13  no way interested in the outcome of this
14  matter.
15
16
17      _____
        Pamela Harrison
18      Registered Merit Reporter
        Certified Realtime Reporter
19      CSR-NJ # 30XI00221600
        Notary Public
20      Date: August 8, 2006
21      (The foregoing certification of
22  this transcript does not apply to any
    reproduction of the same by any means, unless
23  under the direct control and/or supervision of
    the certifying shorthand
24  reporter.)
```

Page 193

```
 1
 2      INSTRUCTIONS TO WITNESS
 3          Please read your deposition
 4  over carefully and make any necessary
 5  corrections.  You should state the reason in
 6  the appropriate space on the errata sheet for
 7  any corrections that are made.
 8          After doing so, please sign the
 9  errata sheet and date it.
10          You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13          It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you.  If you fail
17  to do so, the deposition transcript may be
18  deemed to be accurate and may be used in court.
19
20
21
22
23
24
```

49 (Pages 190 to 193)

Page 194

```
 1
 2        - - - - - - - -
 3        E R R A T A
 4        - - - - - - - -
 5     PAGE   LINE   CHANGE
 6     ___    ___  _____
 7     ___    ___  _____
 8     ___    ___  _____
 9     ___    ___  _____
10     ___    ___  _____
11     ___    ___  _____
12     ___    ___  _____
13     ___    ___  _____
14     ___    ___  _____
15     ___    ___  _____
16     ___    ___  _____
17     ___    ___  _____
18     ___    ___  _____
19     ___    ___  _____
20     ___    ___  _____
21     ___    ___  _____
22     ___    ___  _____
23     ___    ___  _____
24     ___    ___  _____
25     ___    ___  _____
```

Page 195

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4     I,_____ , hereby certify
 5   that I have read the foregoing pages ___
 6   to ___ and that the same is a correct
 7   transcription of the answers given by me
 8   to the questions therein propounded,
 9   except for the corrections or changes
10   in form or substance, if any, noted in
11   the attached Errata Sheet.
12   _____
13   DATE          SIGNATURE
14
15
16   Subscribed and sworn to before me this
17   _____ day of _____,
18   200_.
19   My commission expires: _____
20
21   _____
22   Notary Public
23
24
```

50 (Pages 194 to 195)