IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

———————————————————x
                                                    :
IN RE ADAMS GOLF , INC.,             :        CONSOLIDATED
SECURITIES LITIGATION               :        C.A. NO. 99-371-KAJ
                                                    :
———————————————————x

CORRECTED
## PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO
## THE UNDERWRITER DEFENDANTS' MOTION TO EXCLUDE THE
## EXPERT OPINION OF R. ALAN MILLER

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

OF COUNSEL:

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**
Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900

Dated: October 9, 2006
Corrected Version Filed: October 16 2006

**ROSENTHAL, MONHAIT &
 GODDESS, P.A.**
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE   19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs
and the Class*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.      NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    Qualifications of Miller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.    Miller's Report and Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    Miller is a Highly Qualified Expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    Miller's Reports Have Been Appropriately Inclusive . . . . . . . . . . . . . . 15

        C.    Miller Rendered an Appropriate Opinion Regarding
              the Necarsulmer Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.    There is No Basis for Exclusion of Millers Testimony . . . . . . . . . . . . . 19

        E.    Miller's Views Are Based on Sufficient Facts and Data . . . . . . . . . . . . 23

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Air Crash Disaster at New Orleans, LA*
    795 F.2d 1230 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Berry v. Crown Equipment Corp.*,
    108 F. Supp. 2d 743 (E.D. Mich. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Betterbox Communications v. BB Tech. Inc.*,
    300 F.3d 325 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bonesmo v. Nemours Foundation*,
    253 F. Supp. 2d 801(D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Daisy Systems Corp.*,
    97 F.3d 1171 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Escott v. BarChris Construction Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Feit v. Leasco Data Processing Corp.*,
    332 F. Supp. 544 (E.D.N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Higgenbottom v. Noreen*,
    586 F.2d 719 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Highway Materials, Inc. v. Whitemarsh Township*,
    2004 U.S. Dist. LEXIS 19905 (E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McKinley Allsopp, Inc. v. Jetborne International, Inc.*
    1990 U.S. Dist. LEXIS 12405 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Mercado v. Wollard Aircraft Equipment, Inc.*,
    574 F.2d 654 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Minebea Co.,Ltd. v. Papst*,
    231 F.R.D. 3 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Paoli R.R. Yard PCB Litigation*,
  35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Paiva*,
  892 F.2d 148 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

*In re WorldCom, Inc. Sec. Litigation*
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

## UNREPORTED CASES

*Alpha Grove Consultants Ltd. v. Bear Stearns & Co.*,
  No. CV-91-00143-IEG (S.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

Fed. R. Civ. P. 26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## JOURNALS AND LAW REVIEWS

John C. Coffee, Jr., *A Statutory and Case Primer on Due Diligence Under
  the Securities Laws*, 886 P.L.I./Corp. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**I.     NATURE AND STAGE OF PROCEEDINGS**

Fact and expert discovery has been completed. On July 14, 2006, R. Alan Miller

("Miller") submitted his Expert Report in this litigation. D.I. 258 (hereinafter "Miller Report").

On July 28, 2006, after considering the Expert Reports of Christopher M. James, Edward

Necarsulmer III and others, Miller submitted his Rebuttal Expert Report. D.I. 266 (hereinafter

"Miller Rebuttal"). On August 11, 2006, Miller was deposed by defendants. On September

11, 2006, the underwriter defendants filed a Motion to Exclude Expert Opinion of R. Alan

Miller ("Motion," D.I. 293) and a supporting Brief. D.I. 294 (hereinafter "Def. Br."). Plaintiffs

submit this memorandum in opposition.

**II.     SUMMARY OF ARGUMENT**

1.     On the basis of his education, training and experience, Miller is highly qualified to

testify with respect to the standards applicable to participants in the underwriting process and to

due diligence issues, and as to whether the underwriter defendants conducted proper due

diligence. Under Fed. R. Evid. 702, a witness may qualify as an expert on the basis of

"knowledge, skill, experience, training or education." A witness may qualify on any one of

those listed grounds. United States v. Paiva, 892 F.2d 148, 160 (lst Cir. 1989). Miller's

qualifications to opine on due diligence matters arise from not one but several of those factors,

including his education, his early training and experience, his knowledge and his ongoing

experience in business transactions. Miller's background as an expert satisfies the flexible

standards enunciated in In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741(3d Cir.

1994).

2.    Miller's useful and instructive expertise gained in the course of a lifetime of experience in corporate finance matters and issues cannot be dismissed simply because his personal experience in due diligence (which represents only one portion of his relevant qualifications) is in any respect dated. The standards of due diligence have not changed in over thirty years. In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 674 (S.D.N.Y. 2004). The case law does not hold that the mere elapse of time from an expert's hands-on experience is a basis for excluding a qualified witness where, as here, his education and past experience truly qualify him as an expert.

3.    Miller's Report and Rebuttal Report were appropriately inclusive under Fed. R. Civ. P. 26(b)(4). In his first report, Miller outlined the principles that properly govern due diligence, and made clear that if a due diligence defense was later presented at trial by the underwriters, he would be prepared, as a rebuttal witness, to respond to evidence and opinions that might be offered. Miller also offered an opinion that addressed defects in defendants' due diligence, and later clarified it at his deposition.

4.    In his Rebuttal Report, Miller appropriately responded to the report of defendants' expert, Edward Necarsulmer III. Miller was forced to rebut a report which was highly unspecific. In so doing he did not improperly attempt to usurp any judicial function, but made clear his view that Necarsulmer had done nothing to establish defendants' affirmative "due diligence" defense.

5.    Miller testified fully and appropriately at his deposition, answering all questions posed to him regarding his opinions on any relevant matter. Miller's expressed opinion that,

2

based on the evidence he had seen, the underwriters did not conduct a reasonable due diligence investigation, was based on sufficient facts and data. Documents that he had not yet examined contained no information relating to the underwriters' investigation of gray marketing, since there was in fact no evidence of an investigation of gray marketing by the underwriters, other than the totally inadequate one described in testimony which Miller had in fact reviewed.

6.    If the Court were to find that either of Miller's reports suffered from any lack of specificity, exclusion of his opinions regarding their due diligence would be an extreme sanction unwarranted under In Re Paoli, 35 F.3d 717, since defendants have not been prejudiced or surprised and plaintiffs have exhibited no bad faith or wilfulness. Further, Miller should be permitted to discuss the proper principles of due diligence which were specifically discussed in his opening Report.

## III.    STATEMENT OF FACTS

### A.    Qualifications of Miller

Miller received a Bachelor of Science degree in Economics from Cornell University in 1970. He then earned an MBA degree from the Wharton School of Finance and Commerce of the University of Pennsylvania in 1974. Miller Report, p. 4.

From 1972 through 1976, Miller was employed by Howard & Company ("Howard"), a corporate finance research and consulting firm which provided advisory services to companies going public. While at Howard he participated in two offerings registered under the Securities Act of 1933. At Howard, Miller also began his lengthy career of studying and analyzing  initial public offerings, undertaking a detailed and comprehensive study of 550 recent

3

IPOs, for the purpose of preparing a series of writings concerning the determination of information important to investors. The writings were printed as articles, compiled as a draft of a book, and provided to companies for informational purposes as they considered going public. Miller generated a detailed CPM (Critical Path Methodology) chart of the going public process and conducted seminars for clients regarding that process. Thereafter, through the early 1980's, Miller wrote articles on corporate finance or valuation topics that appeared in some Pennsylvania CPA and legal publications. Miller Report, p. 4; Miller Dep. Tr., pp. 11-12, 19-22 (Ex. A hereto).

From 1976 to 1980, Miller was a Vice President of Corporate Finance at Butcher and Singer, a major regional investment banking firm headquartered in Philadelphia. There he worked on six to ten more offerings. Miller Report, pp. 4-5; Ex. A, pp. 12-13. Between 1980 and 1983 he was a senior vice president at Philadelphia Capital Advisors (the corporate services group of Philadelphia National Bank). This firm did consulting work for companies considering public offerings. Miller supervised and instructed other group members in corporate finance functions which were undertaken for a wide range of clients. Miller Report, p. 5; Ex. A, pp. 13-14.

In 1983 Miller founded the Philadelphia Investment Banking Company ("PIBC"). PIBC offers both corporate finance services and litigation and support service. Five to ten clients currently receive corporate finance services. A matter of weeks before his August 11th deposition, Miller was involved in a corporate merger and acquisition transaction, and he was involved in another that ended just two to three months before. Miller Report, p. 9; Ex. A, pp.

4

14-18.

In the course of his career, Miller has actually conducted due diligence on a number of occasions, including an offering of common stock and warrants, a convertible preferred security offering, and an offering of debt securities with an equity kicker. Ex. A, p. 217. He participated in due diligence in offerings in which his firm was not a lead or co-lead underwriter on as many as six occasions; he was on other occasions asked by his firm's syndicate department to consider due diligence questions; and he was substantially involved in several municipal leasing transactions in which his firm was engaged in due diligence in connection with public offerings. Ex. A, p. 218. One of the transactions in which Miller worked actively on the entire due diligence assignment was an IPO for Caesar's of New Jersey; he also participated in one or two IPOs where he did not have overall responsibility. Ex. A, p. 219.

Miller believes that in the 1970's he published articles on due diligence, some of which may have been from the perspective of officers and directors. Due diligence was part of the research that he had done on 550 IPOs from 1968 to 1972. Newsletters touching these subjects were sent to clients, prospective clients and paid subscribers. Ex. A, pp. 224-25, 227-28.

Miller also believes that he covered due diligence in at least three or four talks that he gave at the Wharton School in the late 1970's or early 1980's, and he attended PLI seminars on the subject at the time. Ex. A, pp. 228, 231. Over the past ten years, Miller's firm has regularly received (and does receive) publications and transcripts from seminars regarding due diligence, and Miller has subscribed to a service called "Due Diligence and Securities

5

Transactions" published by Robert Haft. Ex. A, pp. 230-31. Miller subscribes to and regularly reviews business, financial and legal publications addressing topics of investment banking, and underwriter performance, standards and practices. Miller Report, p. 9.

As a result, Miller has extensively researched and studied the applicable professional standards, customs and practices within the investment banking profession, and is familiar with those standards as they relate to the underwriting of corporate securities. Miller Report, p.8. He made clear that although he does not have legal training, he has read the Securities Act of 1933, relevant PLI materials and relevant case law and opinions. Ex. A, pp. 224-25. Miller will not purport to offer legal opinions, but instead will provide the jury with the benefit of the broad expertise that he has acquired through his understanding of the investment community. Ex. A, p. 19.

Miller has been accepted as an expert witness in various contested matters involving professional standards, customs and practices within the investment banking community.

One case involved whether the brokerage firm of McKinley Alsopp had adequately performed due diligence in connection with the issuance of a highly confident letter. Ex. A, p. 234. In that case, Judge Leval found that Miller "was both convincing and credible in his testimony to the effect that [the investment banker's] efforts did not measure up to the obligations that arose from the commitments it undertook." McKinley Allsopp, Inc. v. Jetborne Int'l, Inc., No. 89 Civ. 1489, 1990 U.S. Dist. LEXIS 12405, at *15 (S.D.N.Y. 1990).

Another case in which Miller was accepted as an expert involved whether the investment banking firm of Bear Stearns had properly advised Daisy Systems in issuing a highly

6

confident letter and in providing financing advice. Ex. A, pp. 234-35. In In re Daisy Systems

Corp., 97 F.3d 1171, 1175-76 (9th Cir. 1996), the court accepted the testimony of "Kenney's

expert" -- Miller -- on the duties of investment banker Bear Stearns & Co., and on the basis of

such testimony reversed a grant of summary judgment.

A third case, Alpha Grove Consultants Ltd. v. Bear Stearns & Co., No. CV-91-

00143-IEG (S.D. Cal. 1998), involved whether Bear Stearns had performed adequate due

diligence and ensured proper disclosure in a prospectus or offering materials in connection with

a bond placement. Ex. A, p. 235.

Quite clearly, on the basis of his education, training and experience, Miller is eminently

well-qualified to testify with respect to the standards applicable to participants in the

underwriting process and to due diligence issues.

## B. Miller's Report and Disclosures

Whether or not the underwriters conducted due diligence is, of course, not part of

plaintiffs' case-in-chief, but rather an affirmative defense that defendants may raise at trial.

Contrary to defendants' strident assertions, at all junctures of the expert discovery process,

considering his role as a rebuttal expert, Miller has rendered fully appropriate disclosures of his

opinions and views.

Miller's initial report (Miller Report) left no reasonable doubt that, if asked to do so,  he

would testify at trial regarding the general standards applicable to due diligence, and whether

the evidence adduced by defendants showed that they had in fact exercised appropriate due

diligence.

7

With respect to applicable due diligence standards and principles, the very first page of

Miller's initial report stated that he would provide a "description of the workings of the stock

market and the roles of various participants therein, including particularly underwriting firms,

and the standards and practices applicable thereto." Miller Report, p.1, ¶1(E). The Analysis

and Opinions section of the report stated that he would be prepared to testify at trial regarding

the participants in stock markets and how these market participants interact to evaluate and

trade securities, (Miller Report, pp. 6-7, ¶ 12), including "[h]ow stock in a company becomes

publicly traded, including the roles of underwriters." Miller Report, p. 7, ¶12B.

Further, in a three-page section of the report captioned Underwriter Due Diligence,

Miller described: (1) the "type of information normally required by prospective underwriters;"

(2) the need of underwriters to obtain sufficient detail in various important areas relating to an

issuer's business, including an issuer's channels of distribution, so that the underwriter can

understand how each will affect the ability of the issuer to generate revenues, earnings and cash

going forward; (3) the need of an underwriter to understand the critical elements of the issuer's

business; (4) the attitude of skepticism that must be adopted by an underwriter when reviewing

information provided to it by an issuer, particularly with respect to a new company experiencing

substantial and rapid growth; and (5) the need for an underwriter to independently confirm

representations made by an issuer. Miller Report, pp. 11-12, ¶19. Miller also offered his

views with respect to the standard in the investment banking industry regarding the appropriate

level of investigation. Miller Report, p.13, ¶20.

8

Recognizing that defendants bear the burden of asserting and establishing a due diligence defense, Miller clearly stated that "with further reference to my opinion as to whether defendants have met their burden of having performed a reasonable and adequate due diligence investigation, I will review any expert reports or evidence regarding that topic." Miller Report, p. 13, ¶21. He went further in one aspect, however, and affirmatively expressed the opinion that, on the basis of the information he had reviewed, which included the deposition transcripts and exhibits of all deponents to that date except plaintiffs, the Prospectus had been inadequate in at least the area of the risks and extent of gray marketing and their potentially significant negative effect on Adams Golf. Miller Report, p. 13, ¶22.

Contrary to defendants' claim, Miller did not simply copy the standards section of his report from an unrelated case. He testified that he started with language that he had drafted for reports in other cases, then went through that language, tailoring it to reflect the facts and attributes of this case and the factors that would have been relevant to the underwriters' work here.[1]  Miller explained that his work reflected his review of a series of publications on due diligence and materials on due diligence issues. Ex. A, pp. 246-51.

Miller provided a rebuttal report on July 28, 2006. On the same day that Miller supplied his opening report, defendants filed a report by Mr. Edward Necarsulmer III, maintaining, inter alia, that the underwriters' "actions were consistent with a standard of reasonableness as I understand it, and were more than sufficient as to their adequacy and

---

[1] Defendants' own expert followed a similar practice.

9

completeness." D.I. 257, p.4, ¶7 (hereinafter "Necarsulmer Report").[2]  In view of the

conclusory and summary nature of the Necarsulmer report,  Miller's ability to provided detailed

rebuttal was severely circumscribed.  Miller nonetheless discussed the inadequacies of

Necarsulmer's report in establishing the due diligence defense, explaining that the report in his

view did not establish that the underwriters had met their burden to demonstrate that their

investigation and/or the resulting disclosures in the Registration Statement were reasonable and

adequate.  Miller Rebuttal.

      Miller thereafter presented himself for deposition to clarify any and all aspects of his

reports.  Miller explained at that deposition (which continued for more than seven and one half

hours of actual questioning time) that the underwriters' due diligence was inadequate because of

the underwriters' failure to disclose in the Registration Statement the information regarding gray

marketing that they had learned.  Ex. A, pp. 251-53.

      He answered every question put to him by underwriters' counsel to clarify opinions and

statements in his reports.  When asked questions regarding due diligence, he made clear that:

(1) he did not believe that the defendants had established that an adequate due diligence

investigation had occurred; and (2) from what he had seen, he also did not believe that the

underwriters had performed such an investigation.  Ex. A., pp. 257-58.  He explained that what

he had thus far been asked to opine upon in his reports was whether the defendants had

---

[2] Defendants had served responses to contention interrogatories shortly before Miller's report
was due, but these answers offered no evidence regarding the investigation or evaluation of the
materiality of gray marketing beyond the evidentiary materials that had already been supplied
Miller.

established a due diligence defense, and that he had not yet been asked to include a specific opinion, beyond the one he had already offered (at Miller Report, p. 13, ¶22), on the related issue of whether the underwriters' due diligence was adequate. Ex. A, pp. 260-61.

Miller explained that it had been decided that he would review the underwriters' document production to the extent that Necarsulmer had provided documents from it to support his opinion, and that he had also reviewed all the underwriter documents utilized at depositions. Ex. A, pp. 262-64. He reviewed the depositions of the underwriter witnesses and the exhibits referred to therein. Ex. A, pp. 266-67.

Miller was asked substantive questions about his stated principles of due diligence and the basis for the views he had formed to date regarding the inadequacies of the underwriters' due diligence. He responded to each fully and appropriately, both with respect to whether Necarsulmer had established certain principles and as to Miller's own views based on the evidence he had seen. He discussed his views as to the adequacy of the staffing of the due diligence team. Ex. A, pp. 276-280. He explained why the management discussions and customer interviews conducted by the underwriters did not represent the type of independent verification that he felt was necessary. Ex. A, pp. 281-84. Miller also explained at some length that, (although his rebuttal opinion had focused upon whether Necarsulmer had demonstrated that a reasonable and adequate due diligence investigation had been conducted), he had also reached opinions about the inadequacies of what the underwriters appeared to have done in due diligence. Miller gave all these opinions freely and clearly. Ex. A, pp. 289-291; 293-94.

11

Miller's deposition was terminated at 6:30 on a Friday evening, because Miller had to catch a plane that night (which was the night after events in London had led to increased airport security throughout the United States and complicated air travel). By 6:30 p.m., the deposition had gone for 9 hours. Questioning time had exceeded by one half hour the maximum questioning time provided for by the Federal Rules, and defense counsel insisted that he had no less than thirty minutes of additional questioning remaining. Nonetheless, plaintiffs' counsel thereafter agreed to discuss ground rules for the resumption of the deposition for some reasonable amount of further questioning. Plaintiff's counsel initiated a call to underwriters' counsel on the subject of resumption of the deposition. Defendants' counsel responded that they would call back on this subject, but did not, and made no efforts to resume the deposition. Declaration of Donald B. Lewis, Esquire, ¶9-10, attached hereto as Ex. B.

## IV.    ARGUMENT

Although portions of the underwriters' memorandum suggest that their motion is simply to exclude a "new" opinion expressed by Miller at his deposition, there is no basis for the exclusion of any of Miller's opinions or testimony. Plaintiffs and Miller have proceeded appropriately with respect to the expression of Miller's opinions on due diligence, taking into account that he will be presented at trial as a rebuttal expert on matters of due diligence. Miller is highly qualified to testify and assist the jury with respect to underwriter due diligence and related matters. Miller's opinion is well-grounded on the relevant evidence.

12

### A.    Miller is a highly qualified expert.

Miller is highly qualified to opine with respect to the standards governing underwriter due diligence.

Fed. R. Evid. 702 expressly provides that a witness may qualify as an expert on the basis of "knowledge, skill, experience, training or education." The courts have made clear that a witness may qualify on any one of those listed grounds. Paiva, 892 F.2d at 160. Miller's qualifications to opine on due diligence matters arise from not just one but several of those factors, including his education, his training, his knowledge and his ongoing experience in business transactions. Miller's background as an expert easily satisfies the flexible standards enunciated in In re Paoli, 35 F.3d at 741.

Miller's useful and instructive expertise cannot be dismissed simply because his personal experience in due diligence (which represents only one portion of his broad qualifications) did not occur in the last few years. While Miller's hands-on involvement in IPOs may have ceased some time ago, he has established and is President of a firm that on an ongoing basis provides corporate finance services to clients, including in merger and acquisition transactions. Early on, he developed special expertise and familiarity with the standards of due diligence, and the record shows that he continues to keep current regarding the applicable standards through subscriptions to industry publications.

For over thirty years, Miller has engaged in continuing study of underwriting standards. Indeed, the courts have recognized that the standards of due diligence have not changed in over thirty years. As was held in In re WorldCom, 346 F. Supp. 2d at 674, two early federal

13

decisions, Escott v. BarChris Construction Corp., 283 F. Supp. 643 (S.D.N.Y. 1968), and

Feit v. Leasco Data Processing Corp., 332 F. Supp. 544 (E.D.N.Y. 1971), "remain 'the major

polestars' in defining what constitutes a reasonable investigation." (citing, John C. Coffee, Jr., A

Statutory and Case Primer on Due Diligence Under the Securities Laws, 886 P.L.I./Corp. 11,

17 (1995)).

The cases that defendants cite for the proposition that dated personal experience of

experts may provide a basis for exclusion of their testimony are easily distinguishable. None

stands for the proposition that the mere lapse of time from an expert's hands-on experience is a

basis in and of itself for excluding an expert's opinions.[3]  All concern a situation, not present

here, in which the expert had not established his ability to provide reliable testimony in the field

as to which he sought to testify.

In Mercado v. Wollard Aircraft Equipment, Inc., 574 F.2d 654, 655 (lst Cir. 1978),

the court declined to find manifestly erroneous a trial court determination that an individual who

had been an aircraft mechanic for the last 18 years, and who had serviced a dozen ground

support vehicles in the 1940's, was unqualified to testify that a ground cargo loading device was

defective.  The opinion shows that this "expert" made no showing that he had any education or

_____

[3] The Third Circuit recently rejected defendants' proposition under similar circumstances in
Betterbox Communications v. BB Tech. Inc., 300 F. 325, 329 (3d Cir. 2002) (noting a
qualifications challenge to expert whose relevant experience preceded trial by eight years denied
because "[defendant] has not explained why the passage of eight years between that period and
commencement of trial diminished [the expert's] qualifications. If [the expert] had been called to
testify as an expert regarding a field of knowledge that had changed greatly during the past few
years, [defendant's] argument might have force, but [defendant] has not called to our attention
any such changes. . . ."

14

experience in the area of his proposed testimony or that his experience in a related field made him competent to testify.

Similarly, in <u>Higgenbottom v. Noreen</u>, 586 F.2d 719 (9th Cir. 1978), the court determined that Arleth, a proposed expert witness, would not be permitted to testify on the proper installation of fireplaces. Arleth's expertise appeared to rest solely on having installed four fireplaces over a period of 13 years.

In <u>Berry v. Crown Equipment Corp.</u>, 108 F. Supp. 2d 743 (E.D. Mich. 2000), the Court prohibited a witness from testifying on the subject of forklift design, finding that his educational background was in speech, English, and personnel and human resources. The witness' only safety education was in training sessions related to a job he had held as a plant manager, and his only on-the-job safety experience was from jobs he had held briefly more than 20 years before. The court's ruling on his qualifications was, moreover, *dictum*, because it found the expert's opinions substantively unsupported.

Unlike the dubious "experts" excluded by the foregoing courts --"experts" who lacked actual expertise in the subject matters on which they asked to testify -- there can be no doubt that Miller is eminently qualified to testify as to matters relating to the offering of securities, most particularly issues of due diligence.

**B.    Miller's reports have been appropriately inclusive**.

The requirements of expert reports and testimony are established by Fed. R. Civ. P. 26(a)(2) and (4).  The purpose of the rules must be kept in mind when construing those provisions.  As held in <u>Minebea Co., Ltd. v. Papst</u>, 231 F.R.D. 3, 5-6 (D.D.C. 2005):

15

> The purpose of Rule 26(a)(2)(c) is to prevent unfair surprise at trial and
> to permit the opposing party to prepare rebuttal reports, to depose the
> expert in advance of trial, and to prepare for depositions and cross-
> examination at trial...

Here, Miller outlined principles in his initial report that properly govern due diligence,
and made clear that if a due diligence defense was presented at trial by the underwriters, he
would respond to the evidence and opinions that the underwriters might offer. Defendants were
placed on notice from the outset that among the several subjects Miller might be asked to
respond to was due diligence, though in the context of rebuttal, not as an element of plaintiffs'
case. Nonetheless, after reviewing the standards applicable to due diligence, Miller disclosed
an opinion he had formed through his factual review to that date as to the underwriters'
discharge of their duties: that they had improperly failed to require disclosure of gray marketing.
Miller Report, p. 13, ¶22; Ex. A, pp. 252-57.

Indeed, to have offered a further opinion would have been premature at the time of his
initial report, as fact discovery was ongoing. Miller awaited the development of expert opinion
that might cast light on the underwriters' defense and enable him to agree or disagree with it.
He did not receive one.

The report of defendants' due diligence expert, Edward Necarsulmer III, provided no
factual substance with respect to his opinion regarding due diligence. As noted above,
Necarsulmer's opinion was vague and conclusory, and identified no facts or principles relating
to defendants' investigation of gray marketing that enabled Miller to do more than rebut the
report in general terms.

16

When Miller was deposed, defendants had full opportunity to explore the principles set forth in Miller's reports, and to ascertain how he would apply them to any fact with which they wished to confront him. Miller clarified his earlier reports and in response to questioning explained that it was his view, based on the evidence he had examined, that the underwriters had failed to conduct a proper due diligence investigation. However, defendants barely probed his views on this subject, preferring instead to use their deposition time asking Miller questions about whether those opinions had been set forth in his earlier reports (which spoke for themselves). Ex. A, pp. 258-59, 261. Nonetheless, Miller clarified the matters set forth in his earlier reports by explaining why, in his view, the underwriters' actions had not been sufficient to investigate gray marketing, including how the underwriters failed properly to verify management assertions regarding supposed immateriality.

Defendants state that they are seeking by their motion "to exclude an opinion that is not in Miller's report or Rebuttal Report, but was offered for the first time at his deposition: that the Underwriters' due diligence investigation was not reasonable." On the facts of this case, in which the due diligence defense is an affirmative defense that must be shouldered by defendants, this position is unfounded. Miller's opening report did opine regarding the inadequacy of the underwriters' actions (Miller Report, p. 13, ¶22)-- specifically, their failure to require inclusion of gray marketing in the Registration Statement -- and further made clear that he might later render an additional opinion regarding defendants' due diligence defense, reviewing expert reports and evidence to do so. When the underwriters sought to clarify Miller's views on due diligence, he provided them at deposition with as full an explanation as they sought.

17

### C.    Miller rendered an appropriate opinion regarding the Necarsulmer Report.

Miller rendered an appropriate opinion in response to Necarsulmer's Report. Defendants try to chop logic by arguing that Miller did not substantively challenge Necarsulmer's opinion, but instead sought to opine as to the legal matter of whether the Necarsulmer report met "the requirements of Rule 26." This claim is misleading at several levels. Miller made no reference to Rule 26 or the rules of procedure in general, and did not propose directly or indirectly to assume a judicial function. A fair construction of Miller's comments is that Necarsulmer's vague and elusive opinion (e.g., "in my opinion defendants' conduct met what I understand is a standard of reasonableness," (Necarsulmer Report, ¶7) marshaled no meaningful opinion to rebut, and provided no factual evidence that would lead Miller to conclude that defendants had shouldered the due diligence defense.

The case in no way resembles Highway Materials, Inc. v. Whitemarsh Township, 2004 U.S. Dist. LEXIS 19905 (E.D. Pa. 2004). There, an issue before the court was whether plaintiff had been deprived of substantive due process by a land use decision of Whitemarsh Township. Reviewing the applicable facts and precedents, the court found no basis for concluding that defendants' actions violated the Fourteenth Amendment, which would have required actions that "shocked the conscience." However, in opposing summary judgment, plaintiff had submitted an affidavit of a land use attorney that described defendants' actions as "conscience-shocking." The court did not exclude the affidavit, but merely determined that it did not create a disputed issue of material fact, because the court had reviewed the identical facts and determined that the conduct could not have "shocked the conscience."

18

Here, if his words are fairly construed, Miller is not attempting to opine as to legal

standards. His statements regarding Necarsulmer's opinion have not been offered to exclude

the Necarsulmer opinion, are not offered to oppose summary judgment, and will not be offered

at trial, except (if necessary) in rebuttal. Nonetheless, there is nothing in Fed. R. Evid. 702 that

precludes a properly qualified expert from rendering an opinion with respect to the ultimate

issue in the case.

Indeed, as a rebuttal witness on due diligence issues, Miller's final view on due

diligence will necessarily have to await the presentation of evidence at trial. Given the

procedural posture of this case, the time has not yet come when it is even necessary to

determine whether Miller will need to testify at trial as to the ultimate issue of the

reasonableness of defendants' investigation, or instead as to applicable industry standards.

Clearly, however, he should be permitted at trial to comment on the applicable principles of due

diligence and whether defendants' actions satisfied them.

### D. There is no basis for exclusion of Miller's testimony.

Assuming arguendo that the Court were to find that Miller's reports were in any way

insufficiently particular, there is no fair basis for the exclusion of the opinion submitted by Miller

at deposition that defendants did not conduct a proper due diligence investigation.

Defendants have suffered no prejudice from any alleged ambiguity in any of Miller's

reports. At deposition they were permitted to avail themselves of the opportunity to ascertain

any views that Miller holds with respect to due diligence, and he fully and freely provided those

views. He expanded on the portion of his first report that set forth the opinion that the

19

underwriters' failure to require disclosure of gray marketing was inadequate. Miller Report, p. 13, ¶22. He also fully and freely offered his view on all subjects as to which underwriters' counsel asked him, including with respect to the adequacy of the staffing of the investigation and the appropriateness of the underwriters' efforts at verifying the information supplied by Adams Golf. Ex. A., pp. 276-95. Plaintiffs' counsel did not "elicit testimony" about any underwriter issues, and in fact had no opportunity to ask Mr. Miller any questions to clarify his testimony on that subject in light of defendants' extended questioning. Plaintiffs' counsel simply would not agree that Miller, at an appropriate time, might not be asked about his relevant opinions. Ex. A, p. 308.

Assuming arguendo that Miller's rebuttal testimony was in some way untimely or inadequate, exclusion would be an unwarranted remedy. In In re Paoli, 35 F.3d at 791-94, an expert submitted (for the first time) a detailed medical monitoring protocol after the deadline for expert witness disclosures. The trial court excluded this protocol on grounds of untimeliness, although the witness had already been identified and defendants were, by the relevant deadline, aware of the general substance of his testimony in the area. The Court of Appeals reversed, making clear that in evaluating whether the district court had properly exercised its discretion to exclude the protocol, it needed to consider:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.

20

35 F.3d at 791-92.

The Court also made clear that the exclusion of critical evidence is an "extreme sanction" that ought not be imposed absent a showing of willful deception or flagrant disregard of a court order by its proponent. Id. The Third Circuit pointed out that it had reversed the exclusion of expert witness testimony where there was "only a slight deviation from pre-trial notice requirements, and admitting the witness was likely to cause only slight prejudice to the defendants" -- even at trial -- where defendants were "already aware of the basic substance of the witness' testimony." Id. at 792. The Third Circuit found in the case before it that there was no basis for exclusion, a conclusion that this Court should also reach.

In this case, none of the factors listed above would justify exclusion of an opinion on the issue of whether the underwriter defendants had conducted proper due diligence. The issue arises from the parties' differing views of the exact specificity with which a rebuttal expert witness must set forth his opinion in advance of trial. Defendants were placed on clear notice by the initial report of Miller's general views regarding due diligence principles and the fact that he expected to testify at trial on whether the defendants had made out a due diligence defense.

Further, the problem, if any exists, has been wholly or partially cured. Miller laid out the operative principles in his first report and defendants have already examined him at length at deposition. If the Court determines that defendants have somehow been prejudiced, there is ample time before trial, scheduled over six months from now, to allow defendants to ask Miller

further questions.[4]  There was no bad faith or wilfulness in the formulation of the initial report,

and none in the rebuttal report, which was unable to address specific facts because defendants

made a tactical decision to restrict Necarsulmer's report to non-useful generality.

Refusal to exclude any of Miller's opinions and views  would offend no principles

articulated in this Court.  In Bonesmo v. Nemours Foundation, 253 F. Supp. 2d 801 (D. Del.

2003), Magistrate Judge Thynge found that an expert had failed to provide the Court with a full

statement of his testimony and qualifications, and stated that the opposing party is not required

to depose the expert to develop what his opinion is or the reasons for it.  However, in that case

the opinion was not a rebuttal opinion, but an opinion regarding defendant's alleged failure to

follow the standard of care, and it appears uncontested that that report failed to include

essential elements.  Further, the Court did not exclude the opinion, but instead found that

plaintiffs had failed to establish the applicable standard of care, rejecting the assertion by the

plaintiffs that it was defendants' burden to depose the expert to ascertain his opinion.

In Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp. 2d 431, 437 (D. Del. 2004),

a patent infringement case, this Court reviewed a report submitted by an expert for defendant

that it found was not helpful, because it did not provide a clear construction of each disputed

claim element.  In so doing, this Court cited Judge Thynge's opinion.  The court also excluded

part of the opinion, not simply because the opinion failed to satisfy Rule 26(a)(2)(B)

requirements, but also because it found that the opinion was unreliable under Daubert and

---

[4] However, note that, as discussed above, defendants failed to take the opportunity plaintiffs
offered for a continuation of Miller's deposition. Ex.B, para. 10.

would not be helpful to the trier of fact. Even so, it permitted the expert to testify as to a
portion of his opinion.

Even assuming arguendo that a specific opinion on whether defendants conducted a
reasonable investigation were considered a new opinion, Miller's initial Report made
unmistakably clear that he would be prepared to testify with respect to the standards properly
governing a due diligence investigation. Even if the Court were to conclude that Miller should
not be permitted to inform the jury with respect to his views on the ultimate issue of whether
defendants' conduct satisfied due diligence standards, there is no basis whatever for excluding
his opinion on any of these subjects.

**E.      Miller's views are based on sufficient facts and data.**

Miller's testimony is based on sufficient facts or data. Defendants' claim to the contrary
boils down to an argument that Miller should have examined each and every document
produced by the underwriters, whether or not he and plaintiffs' counsel deemed it relevant to
his analysis.

In fact, Miller received and reviewed all of the evidence that was actually relevant to
the underwriters' investigation of gray marketing, including all exhibits from merits depositions.
He reviewed the scant deposition testimony regarding the underwriter defendants' examination
of the gray marketing issue, which was contained in the transcripts of the two investment
banking personnel deposed on the subject, Olga Pulido-Crowe and Patrick Walravens. (The
latter had virtually no recall of anything having to do with gray marketing.)

23

Defendants complain that Miller did not review all of the pages of documents produced by the underwriters, and all documents and testimony cited by Necarsulmer in his rebuttal report (which was provided simultaneously with Miller's Rebuttal Report, and therefore could not have been commented upon in Miller's Rebuttal Report) prior to his deposition. This position is without merit-- in the several thousands of pages produced by the underwriters, there is not a single due diligence document that: (1) contains the words "gray marketing;" (2) supports defendants' claims that the subject was investigated; or (3) substantiates a claim that the underwriters conducted a proper due diligence investigation of gray marketing, its threat or its materiality. Necarsulmer himself acknowledged at deposition that none of the pages of documents attached to his rebuttal report dealt with the subject. Necarsulmer Dep. Tr., p **144-146**, attached hereto as Ex. C. The deposition transcripts and exhibits that Miller was provided and reviewed laid out the entirety of available evidence with respect to the underwriters' investigation and evaluation of gray marketing. The assertion that Miller ignored the "fundamental documents describing the Underwriters' due diligence" is frivolous.

Defendants have not shown that Miller failed to examine or take into proper account any meaningful piece of evidence regarding their investigation of gray marketing. Moreover, defendants have seriously mischaracterized Miller's testimony with respect to his review of deposition transcripts. They erroneously take his testimony that he read the Pulido-Crowe deposition and skimmed the Walravens deposition at the time he furnished his rebuttal report (which addressed Necarsulmer's testimony) to mean that those are the only transcripts he ever reviewed.

24

In fact, he testified that he reviewed all the transcripts of the underwriter defendants. Ex.

A, pp. 266-67. Further, his initial report disclosed that he had reviewed all non-plaintiff

deposition transcripts in the case. Defendants also ignore that Miller testified that before

drafting his rebuttal report he had had discussions with plaintiffs' counsel and determined that

there was no need to review the additional documents at that time. Ex. A, pp. 267-68.

Defendants complain that Miller did not read their answers to contention

interrogatories. However, as indicated above, those responses shed no light on the

investigation of gray marketing and iterated the underwriters' familiar position that, because they

spent time examining other (irrelevant) issues, the underwriters should be excused from their

failure to examine a key problem that was known to exist.

In any event, defendants were in an ideal position to confront and examine Miller with

any piece of evidence in their possession, (including documents not used as deposition exhibits,

documents referenced in Necarsulmer's rebuttal report, and their contention interrogatory

responses), to persuade him that he had overlooked something of significance, or to undermine

or cast doubt upon his views that the underwriters did not conduct proper due diligence. That

they chose not to do so is telling.

Defendants imaginatively try to liken this case to In Re Air Crash Disaster at New

Orleans, LA, 795 F.2d 1230 (5th Cir. 1986), which they describe as a case in which an expert

impermissibly ignored record facts in formulating his opinion. There, however, the expert, an

economist, reached "completely incredible" assumptions regarding future growth of the

decedent's salary, and his future tax rates. The case in no way resembles the present one, in

which Miller, after considering all documents that bore upon the investigation of gray marketing, reached a view that is obviously credible and reasonable, fully supported by the facts of the case, and fully consistent with legal precedent. There is <u>no</u> evidence that the underwriters made any proper effort to verify vague claims provided to them by the Adams Golf defendants that gray marketing was immaterial.

Defendants' approach should have been the conventional one of cross-examining Miller at trial to attempt to establish that the substance of his views is mistaken, not to exclude him from testifying.

## V.    CONCLUSION

For all the reasons stated above, the underwriters' motion to exclude the testimony of

R. Alan Miller should be denied in all respects.  There is no proper basis for the exclusion of

any of Miller's proposed testimony.

Dated: October 9, 2006                            **ROSENTHAL MONHAIT & GODDESS, P.A.**
Corrected Version Filed:
October 16, 2006                                  By:  /s/ Carmella P. Keener
                                                       Carmella P. Keener (DSBA No. 2810)
                                                        919 Market Street, Suite 1401
                                                       Citizens Bank Center
                                                       Wilmington, DE   19801
                                                       (301) 656-4433
                                                       ckeener@rmgglaw.com
                                                       *Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**
Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, WA  98101
(206) 623-1900
*Plaintiffs Counsel*

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 16th day of October, 2006, I caused

**CORRECTED PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO THE UNDERWRITER DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINION OF R. ALAN MILLER** to be electronically filed with the Clerk of Court using CM/ECF, which

will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the

following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com