# EXHIBIT A

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
2                       -   -   -
3

IN RE ADAMS GOLF, INC.   : CONSOLIDATED
4                        :
SECURITIES LITIGATION    : C.A. No. 99-371 KAJ
5
6            --------------------------
             Friday, August 11, 2006
7            --------------------------
8
9           Oral deposition of R. ALAN MILLER, taken
10   pursuant to notice, was held at the offices of AKIN,
11   GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison
12   Avenue, 18th Floor, New York, New York 10022-2524
13   commencing at 8:50 a.m. on the above date, before Beth
14   A. Barkocy, Certified Shorthand Reporter and Notary
15   Public.
16
17
18
19
20
21
22                      -   -   -
23        RSA/VERITEXT COURT REPORTING COMPANY
             1845 Walnut Street, 15th Floor
24             Philadelphia, PA   19103
             (215)241-1000      (888)777-6690
25

Page 2

```
 1  A P P E A R A N C E S:
 2     LAW OFFICES OF DONALD B. LEWIS
          BY:  DONALD B. LEWIS, ESQUIRE
 3     Five Cynwyd Road
       Bala Cynwyd, Pennsylvania  19004
 4     (610)668-0331
       Morrislewislaw@aol.com
 5     Representing the Plaintiffs
 6
       BERGER AND MONTAGUE, PC
 7     BY:  TODD S. COLLINS, ESQUIRE
       1622 Locust Street
 8     Philadelphia, Pennsylvania  19103-6365
       (215)875-3040
 9     Tcollins@bm.net
       Representing the Plaintiffs
10
11     SIMPSON, THACHER, AND BARTLETT, LLP
          BY:  PAUL C. GLUCKOW, ESQUIRE and
12     RYAN ANTHONY KANE, ESQUIRE
       425 Lexington Avenue
13     New York, New York  10017
       (212)455-2831
14     Pgluckow@stblaw.com
       Representing the Underwriter Defendants
15
16     AKIN, GUMP, STRAUSS, HAUER, AND FELD, LLP
          BY:  PAUL R. BESSETTE, ESQUIRE
17     300 West Sixth Street
       Suite 2100
18     Austin, Texas  78701-3911
       (512)499-6200
19     Pbessette@akingump.com
       Representing the Nonunderwriter Defendants
20
21
       ALSO PRESENT:
22     Amir Rozen
       Cornerstone Research
23
24
25
```

Page 3

```
 1           I N D E X
                - - -
 2
 3  Testimony of:  R. ALAN MILLER
 4  By Mr. Bessette  ..............  6
 5  By Mr. Gluckow  ..............  216
 6  By Mr. Lewis  ..............  308
 7
                - - -
 8      E X H I B I T S
                - - -
 9
    EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED
10    334   Expert Report of
                R. Alan Miller         5
11
      335   Rebuttal Expert Report
12          of R. Alan Miller          5
13    336   Expert Report of
                Christopher James      5
14
      337   Rebuttal Expert Report
15          of Christopher James       5
16    338   E-Mail from Allyson Terpsma
                dated 08/03/06         5
17
      339   Chart Bates Stamped
18          CMJ 0560                   5
19    340   Chart Bates Stamped
                CMJ 0561               5
20
      350   Fax dated 08/04/98         206
21
      351   Mr. Miller's AMF Report    247
22
      352   Document Bates Stamped
23          MIL 00090-00115            266
24    353   Mr. Miller's AMF
                Rebuttal Report        272
25
                - - -
```

Page 4

```
 1           DEPOSITION SUPPORT INDEX
 2
 3
 4   Direction to Witness Not to Answer
 5   Page    Line        Page    Line
 6          (NONE)
 7
 8
 9   Request for Production of Documents
10   Page    Line        Page    Line
11          (NONE)
12
13
14   Stipulations
15   Page    Line        Page    Line
16     5     12
17
18
19   Questions Marked
20   Page    Line        Page    Line
21          (NONE)
22
23
24
25
```

Page 5

```
 1            (Deposition commences with
 2   Mr. Collins not yet present.)
 3            MR. BESSETTE:  Let's mark these,
 4   please.
 5            (Exhibits-334 through 340 were
 6   marked for identification.)
 7               - - -
 8            R. ALAN MILLER, having been first
 9   duly sworn, was examined and testified as
10   follows:
11               - - -
12            EXAMINATION
13               - - -
14            MR. BESSETTE:  Read and sign for the
15   witness.
16            MR. LEWIS:  I'd like to make a very
17   brief statement, and that is that we agreed
18   to this sequencing of the depositions in
19   response to a request by the defendants that
20   depositions either take place in a different
21   order or take place simultaneously.  It's our
22   view that in this case, because of the legal
23   allocation of the burden of proof, that
24   certain burdens are on Mr. James rather than
25   on Mr. Miller, and for that reason we have to
```

2 (Pages 2 to 5)

Page 10

1  in that field.
2      Q.      How many courses, in total, involved
3  statistics, either undergrad or graduate?
4      A.      At least four, I believe. There was
5  one statistics and one operations research undergrad
6  that I can recall, and I believe one of each in
7  graduate school that I can recall. Operations
8  research is, in my view, primarily statistics in
9  content.
10     Q.      Any other statistics classes that
11 you can recall?
12     A.      No.
13     Q.      Let me hand you what has been marked
14 as Exhibits-334 and 335 (indicating). I trust you
15 will recognize those as your report and then your
16 rebuttal report, respectively; is that correct?
17     A.      That's what they appear to be, yes;
18 yes.
19     Q.      I want to talk a couple of minutes
20 about your background. In Exhibit-334, your report,
21 Paragraph 7, Page 4, you list some experience in the
22 investment banking field?
23     A.      Right.
24     Q.      Philadelphia Investment Bank
25 Company, can you describe for me what type of

Page 11

1  investment bank services that company provides?
2      A.      That's been a corporate finance
3  services firm. As a way to define which of --
4  services which may appear in a more full service
5  investment banking firm, we've provided those. We
6  don't have a retail sales or securities sales arm or
7  investment research, as that's commonly known, or
8  those sorts of things. We've been a corporate finance
9  provider, that is, service provider, not actually an
10 investor or lender of capital.
11     Q.      Howard and Company, where you
12 indicate you worked from 1972 to 1976, is it correct
13 you worked on only two offerings registered under the
14 Security Act of 1933 while at Howard and Company?
15         MR. LEWIS: Object to the form and
16     foundation.
17         THE WITNESS: That's a good
18     question. There are two I can recall
19     specifically, one which may not have been
20     completed at the time, if I recall correctly.
21     That might be correct.
22         One of the services we provided was
23     advisory in nature to companies considering
24     going public. In the course of that, I did a
25     lot of research and we had quite a number of

Page 12

1  clients who were investigating that option at
2  the time.
3          What I don't recall specifically,
4      whether any more of those resulted in working
5      on deals that were or would have been filed
6      under the '33 Act, but there are two I can
7      recall specifically that were like that.
8  BY MR. BESSETTE:
9      Q.      Moving to Butcher and Singer, where
10 you were from 1976 to 1980 -- again, I've told you
11 I've read other testimony, I'm just trying to boil
12 things down so we can get to the substance of this
13 case.
14     A.      Right.
15     Q.      Tell me if this squares with your
16 recollection, that you recall working on six to ten
17 public offerings while at Butcher and Singer but can
18 only specifically remember three.
19         MR. LEWIS: Objection to form and
20     foundation.
21 BY MR. BESSETTE:
22     Q.      Does that sound right?
23     A.      It sounds like it might have been
24 right at one point. Let me think a minute.
25         I've got three in mind where we were

Page 13

1  the lead or co-lead managing underwriter, actually,
2  and there were a number of other deals of that type on
3  which I worked where we were not either lead or
4  co-lead or where we were not taking primary role in
5  that function. I think that's probably an accurate
6  number.
7      Q.      Only one of those was an initial
8  public offering of stock; is that your recollection?
9          MR. LEWIS: Objection to the form.
10         THE WITNESS: One of the three was
11     an IPO of -- was actually stock and warrants,
12     which made up a unit at the time.
13     Technically, the offering was of units.
14 BY MR. BESSETTE:
15     Q.      That's the one I'm thinking of.
16     A.      Of the three, yes. Of the others, I
17 do believe there were other IPOs in that list.
18     Q.      Can you recall them as you sit here?
19     A.      No, I just recall vaguely having
20 some conversations within the firm of the type that
21 would have more likely applied to an IPO than another
22 type of an offering; no.
23     Q.      Turning the page of Exhibit-334,
24 your time at Philadelphia Capital Advisors, which was
25 1980 to 1983, you didn't work on any public offerings

4 (Pages 10 to 13)

Page 14

1 while at Philadelphia Capital Advisors; is that right?
2     A.    Certainly not as an underwriter, we
3 didn't perform that function there. I think there was
4 an advisory job that I did that involved an IPO where
5 we were basically consulting to a -- I don't know what
6 the right term would be -- to a party that was
7 associated with the issuer in one case.
8         We did do some other consulting work
9 for people considering public offerings at the time.
10 I just don't recall if they actually got to that point
11 while I was there or not.
12     Q.    Is it correct that you have not
13 worked on drafting an IPO prospectus since 1980, give
14 or take, in that time frame?
15     A.    Yeah, I think that's probably
16 correct.
17     Q.    How many IPO transactions has your
18 company, which is -- strike that.
19         Philadelphia Investment Banking
20 Company, that's a company you founded in or about
21 1983?
22     A.    Correct.
23     Q.    Or I should say cofounded, right?
24     A.    That's right.
25     Q.    You're still involved with, I'll

Page 15

1 call it, PIBC?
2     A.    Yes.
3     Q.    How many IPO transactions has PIBC
4 been involved in over the past, say, ten years?
5         MR. LEWIS: Objection to form.
6         THE WITNESS: In the corporate
7     finance role as we view it, probably none.
8 BY MR. BESSETTE:
9     Q.    How many clients does PIBC have
10 currently?
11     A.    That's hard to recall specifically,
12 in a sense, because some are at various levels of
13 activity, but probably -- my best estimate would
14 probably be 20 or 30 at this point. That's kind of a
15 squishy number.
16     Q.    I understand. I'd like to sort of
17 break up in segments real fast just the services that
18 PIBC provides. I know you provide litigation and
19 support services; that's one segment, right?
20     A.    Correct, that's the way we view it;
21 yes.
22     Q.    Investment banking services, is that
23 another segment?
24     A.    Sure. We call it corporate finance
25 services, but yes.

Page 16

1     Q.    What would be the other segments, if
2 any?
3     A.    For PIBC, none. That's basically
4 the way we look at the business.
5     Q.    Of the 20 or 30 clients you can
6 recall as you sit here, and I'm not holding you to
7 that number but that range, how many of those are
8 receiving litigation or support services, that
9 segment?
10     A.    Right; 20 or 25 of the 30, let's
11 say.
12     Q.    How many, if any, are receiving
13 corporate finance services?
14     A.    Five to ten.
15     Q.    Are there some that are receiving
16 both?
17     A.    There are some that have received
18 both at different points in time, but the reason the
19 numbers aren't clearer than that is that is the best I
20 can recall at the moment trying to estimate how many
21 clients we have in those categories.
22     Q.    As you sit here, you believe there
23 are five to ten clients of PIBC that are currently
24 receiving corporate finance services?
25     A.    Right.

Page 17

1     Q.    What was the last M and A
2 transaction in which you were involved, sir?
3         MR. LEWIS: Objection to form.
4         THE WITNESS: The last one, I don't
5     believe I can discuss with you. I don't
6     believe that our retention has been
7     publicly.
8 BY MR. BESSETTE:
9     Q.    I was looking for the timing, not
10 any of the details. Are you saying it's current?
11     A.    Yes, last couple weeks.
12     Q.    Prior to that one, when was your
13 last M and A transaction?
14     A.    Probably ended about two months ago,
15 I think, or I think our work ended about two months
16 ago, maybe three months ago.
17     Q.    The M and A transaction, that would
18 be subsumed in the corporate finance segment of the
19 business?
20     A.    Yes.
21     Q.    The litigation segment of the
22 business, that's currently -- and I think -- tell me
23 if this is correct -- has been true since the
24 late '90s and it's about 90 percent of PIBC's work?
25         MR. LEWIS: Objection to form.

5 (Pages 14 to 17)



Page 18

1  BY MR. BESSETTE:
2      Q.    Is that fair?
3      A.    Since the late '90s, I'd say it's at
4  least 80 percent. At any point in time, that number
5  can change pretty substantially in a short period
6  depending on where we're spending our time. There's
7  only a dozen of us, total, six or seven full-time
8  professionals, so if we're working in a concentrated
9  way on a deal for a month or two, that can skew things
10  for that quarter pretty well, but if we're taking from
11  the late '90s to today, I'm pretty confident we're
12  80 percent plus on the litigation side and the balance
13  corporate finance, and during certain periods it would
14  be higher, yeah.
15      Q.    Thanks for that answer, telling me
16  how many staff and professional people you have,
17  because I was going to go there, so I think we've got
18  that.
19          It is correct, is it not, that --
20  strike that.
21          You do not consider yourself to be
22  an expert concerning the legal aspects of SEC's
23  regulations concerning registration statements under
24  the 1933 Act; is that correct?
25          MR. LEWIS: Object to the form.

Page 19

1          THE WITNESS: Sure. I am not a
2  lawyer; I don't give legal opinions. I don't
3  consider myself an expert in the legal
4  aspects of that. Having said that, there are
5  -- certainly the entire context of things
6  under the '33 Act is legal in nature, and I
7  do think I have expertise with respect to
8  understanding the investment community with
9  respect to the meanings of those things as
10  they apply to investment bankers, issuers,
11  the contents of registration statements, and
12  those sorts of things, but that, like I said,
13  is from the point of view of understanding
14  the investment community as opposed to from a
15  legal perspective.
16  BY MR. BESSETTE:
17      Q.    We're going to explore that
18  expertise, the understanding you have about that, but
19  I just wanted to get on the record that the legal
20  aspect, you're not purporting to be an expert in.
21      A.    Except for what I just said.
22      Q.    I just wanted to ask real quick, on
23  Page 7, the research that you have done that you
24  indicate under Howard and Company, doing a detailed
25  comprehensive study of 550 IPOs, what was the purpose

Page 20

1  of that study, by the way?
2          MR. LEWIS: Just for the record,
3  it's Page 4, Paragraph 7.
4          MR. BESSETTE: Did I mix that up?
5          MR. LEWIS: I think you said Page 7.
6          MR. BESSETTE: Thank you.
7          MR. LEWIS: Just so we're looking at
8  the same thing.
9  BY MR. BESSETTE:
10      Q.    Do you remember any details about
11  the study, what the purpose was?
12          MR. LEWIS: Objection to the form,
13  overbroad.
14          THE WITNESS: I remember some things
15  about the study. Probably more of it comes
16  back to me as I think of it. We did that in
17  order to prepare a series of writings which
18  were printed as articles and compiled as a
19  draft of a book and which were being provided
20  at various forms and various stages to
21  clients for informational purposes as they
22  considered being public or going public. We
23  generated what was called a CPM report,
24  chart, of the process for people to use, and
25  all that was in the context of consulting to

Page 21

1  prospective issuers and providing
2  informational services and we conducted
3  seminars on that topic for clients at that
4  time.
5  BY MR. BESSETTE:
6      Q.    These are the newsletters and
7  presentations, the newsletters published by Howard and
8  Company and the presentations from Howard and Company
9  that are referred to in this bullet point?
10          MR. LEWIS: Objection to the form.
11          THE WITNESS: Right.
12  BY MR. BESSETTE:
13      Q.    Have you authored any other
14  publications other than those newsletters published by
15  Howard and Company?
16      A.    We did do the draft of the book. It
17  never got published, at least while I was there, to my
18  knowledge. I wrote some articles back in about that
19  time frame and afterwards, probably up through the
20  early '80s, generally on corporate finance or
21  valuation topics, that appeared in some Pennsylvania
22  CPA and legal publications.
23      Q.    What are those publications; can you
24  remember?
25      A.    One of them was called the

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 22

1  Pennsylvania CPA Journal. One was a legal trade
2  publication in the Philadelphia area; I don't remember
3  what that was called. I think there was another CPA
4  publication, but I don't remember what that was either
5  other than the Pennsylvania CPA Journal. I think
6  that's it.
7         MR. LEWIS: Excuse me. Had you
8      finished your answer about publications
9      before Mr. Bessette went to the actual
10     journals? I wasn't sure if he cut you off.
11        THE WITNESS: I think I finished.
12  BY MR. BESSETTE:
13     Q.    What time frame are these
14  publications you just referenced?
15     A.    Mid '70s through early '80s at the
16  latest.
17     Q.    Have you published any articles in
18  the last ten years?
19     A.    No.
20     Q.    Twenty years?
21     A.    Twenty years, I don't think so.
22     Q.    Have you published any articles that
23  have been peer reviewed?
24        MR. LEWIS: Object to the form.
25        THE WITNESS: In the sense of

Page 23

1      articles, I actually don't know who read the
2      ones I wrote so I couldn't tell you.
3  BY MR. BESSETTE:
4      Q.    Do you understand what I mean by
5  peer reviewed?
6      A.    I understand it. Peer reviewed is a
7  term that is used sometimes with a narrower meaning in
8  the academic community as describing a process by
9  which articles are submitted for publication and,
10  prior to publication, reviewed by a group of people in
11  the field.
12     Q.    With that understanding of what peer
13  reviewed means, have any of your articles been peer
14  reviewed prior to publication that you're aware of?
15     A.    I think the Howard and Company
16  articles were reviewed by Graham Howard, by and large.
17  The other articles, I don't believe were reviewed by
18  anybody prior to publication that I can recall.
19     Q.    How long have you been holding
20  yourself out as an expert witness in litigation,
21  providing expert services for litigation cases?
22        MR. LEWIS: Object to the form.
23        THE WITNESS: That began sometime in
24     the late '70s.
25  BY MR. BESSETTE:

Page 24

1      Q.    I know as a part of your report,
2  you've got your prior testimony and depositions and
3  retentions and all, so we've got the time frame. In
4  all of your time as an expert witness, has your
5  testimony ever been rejected by a court, that you're
6  aware of?
7         MR. LEWIS: Objection to the form.
8         THE WITNESS: I'm not sure what you
9      mean by the term rejected. I can think of
10     one instance in which a court was distinctly
11     unimpressed with it. I can think of one case
12     in which a portion of an affidavit, I
13     believe, was struck, if I remember the
14     process correctly or the result correctly.
15     Let me think here. I think there was another
16     case in which a portion of an affidavit was
17     struck for reasons of relevance.
18  BY MR. BESSETTE:
19     Q.    Do you recall any of the names of
20  those cases?
21     A.    The first one I referred to was
22  called Van de Walle versus Unimation. The second one
23  is Safeguard Scientifics. The third one was a case in
24  a Texas court involving a prospective class of holders
25  of securities; I cannot remember the name of the case.

Page 25

1      Q.    Krogman, does that sound familiar?
2      A.    That's not it, no. Krogman was the
3  case where the judge selected among factors advanced
4  by two different experts, me and another one, and
5  picked more factors favoring the other fellow's
6  opinion than mine.
7      Q.    That was a market efficiency case?
8      A.    Yes.
9         The other Texas case was not -- I
10  can't remember the name of that.
11     Q.    Aside from sort of --
12     A.    I think that's it.
13     Q.    -- courts criticizing or striking
14  portions, do you recall, as you sit here, whether
15  there has been a legal challenge to you based on your
16  opinion and the court refusing to accept you as an
17  expert witness in a case?
18        MR. LEWIS: Objection to form,
19     overbroad and vague.
20        Go ahead.
21        THE WITNESS: That has not occurred.
22  BY MR. BESSETTE:
23     Q.    Who is your client in this case,
24  sir?
25     A.    The plaintiff class.

R. ALAN MILLER

Page 214

1    Q.    Last question from me: Go to your
2  report, Paragraph 22 on Page 13.
3    A.    Right.
4    Q.    You state that it is my opinion that
5  disclosure in the prospectus was inadequate in at
6  least the area of the risks and extent of gray
7  marketing and their potential significantly negative
8  effect on the company. I'm curious about the words at
9  least. Are there other areas where you think and it's
10  your opinion that the prospectus was inadequate in its
11  disclosures?
12          MR. LEWIS: Objection to the form.
13          THE WITNESS: As a topic area, I
14      don't believe so. I think the reason I tend
15      to word things this way is that, particularly
16      prior to rebuttal reports and that sort of
17      thing, is that to the extent that at least a
18      portion of what I'm asked to do is rebuttal,
19      I don't always know what's going to come up
20      in that early stage. I also don't know
21      specifically what questions I might be asked
22      around the area of disclosures which may come
23      out of this whole process, and the area that
24      I'm expecting to be asked about is gray
25      marketing, as we've been discussing today.

Page 215

1          If in the course of describing a
2      process of how the market works and how a
3      company becomes publicly traded, and that
4      sort of thing, questions are asked about what
5      may appear to be different areas but relate
6      back to gray marketing, I suppose that could
7      become a topic of testimony. For example,
8      what impact on pricing the offering might I
9      have had had the gray marketing disclosure
10      been X, just one example I can think of.
11      Then that might evoke an opinion.
12          That's kind of the thinking in
13      having it worded that way, but I don't expect
14      it to go off in new areas of -- well, for
15      example, when you just asked about the --
16  BY MR. BESSETTE:
17    Q.    Questionable sales practices?
18    A.    -- questionable sales practices,
19  accounting related to that, all that kind of stuff.
20    Q.    As you sit here today, having
21  written your report and your rebuttal report and
22  seeing Mr. James' report and his rebuttal report, your
23  opinions concerning whether the prospectus was
24  inadequate are limited to the risks and extent of gray
25  marketing?

Page 216

1          MR. LEWIS: Object to the form.
2          THE WITNESS: And the rest of the
3      sentence in that paragraph.
4  BY MR. BESSETTE:
5    Q.    And, obviously, its potentially
6  significant negative effect, which is why you claim
7  there should have been a risk factor disclosure in the
8  prospectus?
9    A.    Yeah, that's essentially correct,
10  and subject to the last answer about what other
11  questions I may be asked; yeah, that's correct.
12          MR. BESSETTE: I'll pass the
13      witness.
14          Thank you.
15          THE WITNESS: You're welcome.
16          MR. GLUCKOW: I suggest we take five
17      minutes to get reorganized.
18          (Recess.)
19  BY MR. GLUCKOW:
20    Q.    Mr. Miller, good afternoon.
21    A.    Good afternoon.
22    Q.    I'm Paul Gluckow, with Simpson,
23  Thacher, and Bartlett. We represent the underwriter
24  defendants in this matter, so my questions this
25  afternoon will focus on those aspects of your reports

Page 217

1  that have dealt with the underwriters' due diligence
2  issue.
3    A.    Right.
4    Q.    Based on the discussion today with
5  Mr. Bessette and other testimony that I've seen you've
6  given in the past, I think I can just do a little bit
7  more background in terms of your experience with due
8  diligence. My understanding is that in your career
9  you've conducted due diligence in connection with an
10  IPO on one occasion; is that correct?
11          MR. LEWIS: Objection to conducted.
12          Go ahead.
13          THE WITNESS: I don't believe so;
14      that is, there's one on which I recall
15      specifically being involved that was an
16      offering of common stock and warrants or
17      units; there was one involving -- pretty sure
18      it was a convertible preferred; there was
19      another that involved a debt security with
20      some kind of equity kicker. I did due
21      diligence on all those offerings.
22          Then there were a specific -- sorry,
23      there were offerings in which the firm I was
24      with was not a lead or co-lead underwriter or
25      in which we were not taking the lead role in

R. ALAN MILLER

Page 222

```
1           (The pending question was read
2    back.)
3           THE WITNESS: Yeah, except for the
4    one or two, perhaps, in which I did specific
5    due diligence assignments as part of a group
6    but not with a primary responsibility for the
7    whole due diligence function.
8    BY MR. GLUCKOW:
9       Q.    Let's talk about those one or two.
10   Tell me what you recall about those.
11      A.    Just that we as a consequence of
12   being involved in a group of firms that acted together
13   to do offerings upon occasion where someone else may
14   have the primary responsibility for due diligence,
15   they may have asked for assistance or staffing on
16   follow-up on certain items or investigation of certain
17   items, so I'd get a phone call or a memo or something
18   that would say would you please look into the
19   following and identify some area or tasks that we were
20   asked to perform, then I would do that and then report
21   back to whoever was asking me.
22      Q.    That's when you were with Butcher?
23      A.    Yes.
24      Q.    What would have been the time frame
25   for those one or two that you have in mind?
```

Page 223

```
1       A.    They would have been -- well,
2    actually, '76 through '79.
3       Q.    Again, your employer -- just to be
4    clear on this, your employer, Butcher, was neither the
5    lead nor the co-lead on those transactions, correct,
6    the lead underwriter or the co-lead underwriter on
7    those two transactions we're talking about?
8       A.    Not that I'm thinking of. If we
9    were one of the leads, we were not taking primary
10   responsibility for due diligence in that sense.
11      Q.    Let me try and boil this down, then.
12          In your career, you've conducted due
13   diligence in connection with an initial public
14   offering where your employer was a lead or co-lead
15   underwriter on one occasion, and that was the Caesar's
16   New Jersey matter in the '78 to '79 time period,
17   correct?
18      A.    Yeah; again, I think that's correct
19   with the possible exception of one or two others in
20   which we were not taking primary role for due
21   diligence but may have appeared as the lead
22   underwriter.
23      Q.    Then it's also fair to say, I
24   believe, that you have not been involved in due
25   diligence in connection with an initial public
```

Page 224

```
1    offering where your employer was a lead or co-lead
2    underwriter since at least 1980, correct?
3       A.    Sure; that's correct.
4       Q.    Have you published any articles on
5    the topic of due diligence? I don't see any listed on
6    your CV but I just want to confirm.
7       A.    I don't recall exactly. We
8    published quite a number of articles in the series of
9    newsletters that I referred to earlier back in
10   the '70s which involved a variety of financing
11   techniques, a lot of which involved going public. I
12   would be surprised if there wasn't some articles
13   during that time on due diligence. Some of that might
14   have been from the perspective of the officers and
15   directors as opposed to the underwriters because our
16   clients at that time tended to be prospective issuers
17   as opposed to underwriters. That was a topic that was
18   part of the research I had done on the 550 IPOs from
19   '68 to '72 that I referenced earlier, and that,
20   therefore, appeared in some of our publications around
21   that time.
22      Q.    These newsletters you're talking
23   about would have been written in what time period, the
24   early '70s?
25      A.    '72 through '76.
```

Page 225

```
1       Q.    These were not -- were these
2    published to the world at large or were these client
3    newsletters sent to clients and prospective clients of
4    the firm?
5       A.    They were sent to clients,
6    prospective clients, and paid subscribers who tended
7    to be prospective issuers and service providers to
8    prospective issuers.
9       Q.    As you sit here today, can you
10   recall any newsletters that you worked on that
11   specifically dealt with the topic of underwriters' due
12   diligence?
13      A.    No, I can't recall specifically, but
14   as I said, it was part of the study that I did at that
15   time and there was fairly intensive -- we wrote about
16   just about every aspect of that study over a period of
17   years. I'd be surprised if it was not covered in
18   something we did but, again, the focus at that time
19   from our point of view was more on the prospective
20   issuer than on the underwriter, although we did cover
21   all the participants in the process. Again, I can't
22   recall specifically, but I would be surprised if it
23   was not among those articles.
24      Q.    Do you have copies of the articles?
25      A.    No, I don't.
```

**Page 226**

1    Q.   How would you go about finding these
2  articles or newsletters if you wanted to?
3    A.   I haven't been able to. I would
4  have asked the company or its successors but they are
5  now gone except for the group that publishes what's
6  now called, I believe, the IPO Reporter or the IPO
7  Journal, and the owner of that publication apparently
8  doesn't or wouldn't have them, but the group that
9  generates the editorial content, I've checked with and
10  they don't appear to have any of it either. As far as
11  I know, that's the last continuing thread of people.
12    Q.   The study that you referred to, was
13  that study reduced to writing and published?
14    A.   Not as one block of information like
15  that. It was presented in numerous client memos,
16  seminars, constituted a lot of the material for a
17  draft of a book that we didn't publish and that sort
18  of thing, but I don't recall that we ever put the
19  entire study together in one place like that.
20    We did publish at the time a CPM
21  chart of the process with annotated sections that
22  actually would have represented a summary of that, but
23  I don't think we actually ever produced the entire
24  work.
25    Q.   Do you have any versions of the

**Page 227**

1  study in your possession today?
2    A.   No.
3    Q.   Do you have any idea how to get that
4  document if it exists as a document?
5    A.   No, I'd give you the same answer as
6  the newsletters, same timing, same people.
7    Q.   Putting aside the newsletters, which
8  may or may not have had something specific on
9  underwriters' due diligence, can you think of any
10  other publications that you've authored on the topic
11  of underwriters' due diligence?
12    MR. LEWIS: Objection to form.
13    THE WITNESS: No.
14  BY MR. GLUCKOW:
15    Q.   I just want to confirm: On the
16  newsletters and the study we have talked about, to the
17  extent that there may have been at one time something
18  dealing with underwriters' due diligence, would that
19  have been something that you would have been a
20  principal author of, and if not, what would have been
21  your role?
22    MR. LEWIS: Objection to form.
23    THE WITNESS: I was either author or
24  editor of all of the articles that appeared
25  at that time, and of those, I would have been

**Page 228**

1    the author because I did the study.
2  BY MR. GLUCKOW:
3    Q.   Have you ever taught any courses
4  that addressed the topic of underwriters' due
5  diligence?
6    A.   Not as a topic in itself, no. I
7  believe that may have been a brief portion of a talk
8  or couple of talks that I gave at the Wharton School
9  back in mid to late '70s or early '80s where some of
10  the topics included various types of financing
11  including going public and the roles of the
12  participants, some of the work that underwriters did
13  and that sort of thing.
14    Q.   How many talks do you recall giving
15  at Wharton in the late '70s or early '80s that might
16  have addressed as a component underwriters' due
17  diligence?
18    A.   There were at least three or four, I
19  believe, such talks.
20    Q.   Any recollection as to what portion,
21  if any, of the talks would have addressed
22  underwriters' due diligence?
23    MR. LEWIS: Objection as to form.
24    THE WITNESS: In one sense, it was a
25  fairly small portion because the talks may

**Page 229**

1  have been 45 minutes to an hour and generally
2  covered the topics of the state of the public
3  markets for raising capital, the roles of
4  participants in the markets and those sort of
5  things, so as a part of the topic, I would
6  have thought, as part of the outline, it
7  would have been a fairly small portion;
8  however, the obsession of MBA students with
9  getting jobs in investment banking firms
10  tended to generate more questions in that
11  area than I would have expected and I did
12  spend more time on what underwriters do than
13  I probably otherwise would have.
14  BY MR. GLUCKOW:
15    Q.   The audience for these talks were
16  MBA students; is that correct?
17    A.   Yes.
18    Q.   Can you think of any other courses
19  that you've taught or public lectures that you've
20  given of any kind on the topic of underwriter due
21  diligence?
22    A.   I don't believe so.
23    Q.   If you wouldn't mind turning to 334,
24  your initial report, Page 4, Paragraph 6, the last
25  sentence refers to PLI and similar programs and

58 (Pages 226 to 229)

Page 230

1  seminars on topics such as corporate finance and due
2  diligence?
3      A.    Right.
4      Q.    Can you recall any specific PLI or
5  similar programs or seminars that specifically address
6  underwriter due diligence that you've attended in the
7  last ten years?
8      A.    No; in the last ten years, I don't
9  believe I've attended any seminars. We tend to get,
10  on an occasional basis, I guess I'd say, publications,
11  transcripts, and that sort of thing from those types
12  of seminars, and I get regular -- subscribe to a
13  service called due diligence and securities
14  transactions by Robert Haft. I don't recall the
15  publisher of that, but it's in a workbook-sized
16  publication, updated about every two years or so, or
17  at least I get the updates about that often. That
18  would be more the type thing we do in the last ten
19  years.
20          The PLI actual seminars I attended
21  would have been earlier; back in the '70s and
22  early '80s, I think, was when I did that kind of
23  thing.
24      Q.    You don't remember going to any
25  program such as that since the early '80s?

Page 231

1      A.    No, I don't recall attending them
2  since the early '80s. Since then, I primarily relied
3  on obtaining the transcripts or the workbooks from
4  them or subscribing to other such materials as I've
5  described here.
6      Q.    In the due diligence that you have
7  been involved in in your own career that you've
8  described, have you ever dealt with gray market
9  issues?
10      A.    Not that I can recall.
11      Q.    On Page 3 of your report -- again,
12  we're on 334 -- you state in Paragraph 3 that you've
13  been qualified or accepted as an expert on, among
14  other things, investment banking practices; is that
15  correct?
16      A.    Right.
17      Q.    Have you ever been qualified or
18  accepted as an expert concerning your opinions related
19  to underwriter due diligence specifically?
20      A.    Good question. The cases that come
21  to mind first are two in which investment banker due
22  diligence was at issue but not in connection with
23  public offerings necessarily. It would be in
24  connection with other functions investment bankers
25  were performing or purporting to perform.

Page 232

1          I'd have to go through the testimony
2  list here and see what other ones there may have been.
3  Those are the first two I can think of.
4      Q.    Just so I'm clear, I thought you
5  were referring to one matter but were you actually
6  referring to two different matters where investment
7  banker due diligence was at issue but it was not in
8  connection with an offering?
9      A.    Correct.
10      Q.    If you wouldn't mind looking at your
11  list of matters, tell me if you can think of any
12  others and we can go through them. Thank you.
13      A.    One of the first two I mentioned was
14  No. 14.
15      Q.    Which list are you on?
16      A.    I'm sorry, expert witness testimony
17  in court.
18      Q.    This is McKinley Allsop, Inc.?
19      A.    Right.
20          The second one I was thinking of was
21  No. 25.
22      Q.    Kenny v. Bear Stearns?
23      A.    Right.
24          Another one was 26, which was in
25  connection with an offering. I just don't recall if

Page 233

1  it was a public offering or a private placement at the
2  moment.
3          On the deposition and arbitration
4  testimony list, No. 1.
5      Q.    Shearson?
6      A.    Yes.
7          No. 8.
8      Q.    American Dental Laser?
9      A.    Right.
10          No. 12, No. 13, No. 15. I think
11  No. 18, as best I recall. I think No. 21, as best I
12  recall. No. 26, No. 50, No. 56. That's it.
13      Q.    The ones you just gave me most
14  recently off of the deposition and arbitration
15  testimony list starting with the Shearson matter and
16  going down to the CFS matter, which is 56, Shearson
17  was one, those are all matters, I take it, where you
18  either provided a report or were deposed or both but
19  not, which is where we started, where you'd been
20  qualified or accepted as an expert concerning your
21  opinions related to due diligence; is that correct?
22      A.    (No response.)
23      Q.    Because it didn't get to trial, in
24  other words?
25      A.    Correct.

Page 234

1    Q.    Going back to where we started in
2  terms of matters where you've been qualified or
3  accepted as an expert concerning your opinions related
4  to due diligence by underwriters, it would just be the
5  first three we started with, No. 14, No. 25, and
6  No. 26 off the expert witness testimony in court list,
7  correct?
8    A.    Right; that's correct.
9    Q.    No. 14, McKinley Allsop, that was
10  one of the matters you mentioned that involved
11  investment banker due diligence but did not involve
12  any kind of an offering; is that right?
13    A.    Right.
14    Q.    What was the issue in that case?
15    A.    Whether McKinley Allsop had
16  adequately done its work in connection with the
17  issuance of a highly confident letter regarding
18  financing for Jetborne.
19    Q.    No. 25, Kenny, was another one you
20  said where there was no offering involved but the
21  matter otherwise raised issues of due diligence; is
22  that correct?
23    A.    Correct.
24    Q.    What was the issue there?
25    A.    Whether Bear Stearns performed

Page 235

1  properly in its role as financial advisor to Daisy
2  Systems including in connection with issuing a highly
3  confident letter and financing commitment and
4  providing advice about financing to Daisy Systems.
5    Q.    No. 26, Alpha Group, you thought may
6  have involved a private placement but you weren't a
7  hundred percent sure?
8    A.    Yeah, it was either a public
9  offering or private placement of bonds. The more I
10  think about that, it might have been a private
11  placement but the issue was similar.
12    Q.    What was the issue, as you recall
13  it?
14    A.    As to whether or not Bear Stearns
15  had performed adequate due diligence and insured
16  proper disclosure in a prospectus or offering
17  materials in connection with the sale of bonds.
18    Q.    Do you have any materials related to
19  that matter?
20    A.    I don't know.
21    Q.    How would you find out?
22    A.    I would look in the office.
23    Q.    If you did, they would be maintained
24  at PIBC?
25    A.    Right.

Page 236

1    Q.    Now that you've thought about it
2  some more, you think that the matter involved the
3  private placement as opposed to a public offering?
4    A.    I think so. One of the reasons I'm
5  hesitating about that is that there were individual
6  purchasers involved as opposed to institutions, as
7  opposed to solely institutions, and it does raise that
8  question, but as best I can recall, it was a private
9  placement.
10    Q.    As I understand it, you've never
11  offered testimony on behalf of a defendant in a matter
12  involving the issue of whether investment bankers did
13  due diligence properly; is that correct?
14        MR. LEWIS: Objection as to form.
15        THE WITNESS: I think that's
16    correct.
17  BY MR. GLUCKOW:
18    Q.    As I understand it, you've never
19  written an expert report on behalf of a defendant in a
20  case involving the issue of whether the investment
21  bankers did due diligence properly; is that also
22  correct?
23        MR. LEWIS: Objection as to form.
24        THE WITNESS: That, I don't recall.
25    I don't recall testifying about that before.

Page 237

1    I don't recall if I may have written such a
2    report or not.
3  BY MR. GLUCKOW:
4    Q.    Can you recall writing an expert
5    opinion that underwriters performed adequate due
6    diligence?
7    A.    I can't recall whether I have or
8    not.
9    Q.    As you sit here, you can't recall --
10  I'm sure you can recall reports where you have written or
11  opinions you've offered that underwriters have not
12  performed adequate due diligence, correct?
13        MR. LEWIS: Objection to form.
14        THE WITNESS: At least the ones that
15    relate to matters printed on these lists, I
16    can jog my memory through the lists. Sitting
17    here, I can't recall others at the moment of
18    that type.
19  BY MR. GLUCKOW:
20    Q.    The ones we talked about earlier off
21  of the trial testimony list, No. 14, 25, and 26, and
22  off of the deposition and arbitration list, one,
23  eight, 12, 13, 15, 18, 21, 26, 50, 56, I take it from
24  your answers that in each of those cases you were
25  offering an expert opinion stating that the

Page 246

1 Castle Pines, CliniCorp, US Wireless?
2    A.    No, none of those.
3    Q.    New America securities litigation?
4    A.    No.
5    Q.    Zelcor, American Dental, Shearson?
6    A.    I can't recall.
7    Q.    Alpha Group, Kenny or Mackinley?
8 Those are the other ones we talked about.
9    A.    It wasn't Alpha Group. No, I don't
10 recall.
11    Q.    But you do recall that AMF Bowling
12 was the other one?
13    A.    Yes.
14    Q.    The AMF report, which we'll mark in
15 a minute, was a model or a template for the section of
16 your report in this matter beginning with Paragraph 19
17 that dealt with the underwriters' due diligence; is
18 that correct?
19        MR. LEWIS: Objection to form and
20    foundation.
21        THE WITNESS: I don't know that I'd
22    put it quite as broadly. I think with
23    respect to the type of information that was
24    required by prospective underwriters, the
25    type of information relevant to that

Page 247

1    examination, process issues as to how the
2    underwriter should go about the work, what
3    level of detail to obtain, factors that are
4    important in conducting the work. In those
5    source of factors, I used some of the
6    language which I also used in AMF Bowling as
7    it applied to this case but reviewing it to
8    make sure that it did apply to this case and
9    modifying it if necessary.
10        Again, some of the work here has
11    been generated over the years from reviewing
12    Mr. Haft's series, the due diligence and
13    securities transaction materials, and other
14    publications and materials that we get
15    regularly on due diligence issues.
16        MR. GLUCKOW: Let's mark your
17    initial report of AMF Bowling.
18        (Mr. Miller's AMF Report was marked
19    Exhibit-351 for identification.)
20 BY MR. GLUCKOW:
21    Q.    Mr. Miller, you have 351, which is
22 your initial report in AMF. Do you recognize that as
23 your initial report in the AMF Bowling matter?
24    A.    Yeah, it appears to be that.
25    Q.    If you would, compare Paragraphs 19

Page 248

1 and 20 from the Adams Golf initial report with
2 Paragraphs 6 and seven of the AMF Bowling report.
3    A.    Right.
4    Q.    They are very similar, correct?
5    A.    Yeah, many of the bullet points are
6 the same. There are a couple that differ given the
7 differing nature of the two companies involved in
8 these two matters.
9    Q.    The introductory language in 19 in
10 the Adams Golf report is the same as the introductory
11 language in six of the AMF report, correct?
12    A.    Yes.
13    Q.    The first bullet point is the same?
14    A.    Right.
15    Q.    The second bullet point is the same?
16    A.    Yes.
17    Q.    The third bullet point is the same?
18    A.    Yes.
19    Q.    The fourth bullet point is the same?
20    A.    Yes.
21    Q.    The fifth bullet point in Adams Golf
22 is new, correct?
23    A.    Correct.
24    Q.    Do you recall the process that led
25 to the adding of that bullet point and, specifically,

Page 249

1 did you think to add that yourself or was that a
2 suggestion from counsel or someone else?
3    A.    No, that was my input, and it
4 reflects the various -- the differing stages of the
5 two companies; that is, AMF Bowling was a more
6 established, longer term company and Adams was a new,
7 fast-growing company with comparatively inexperienced
8 management, particularly in the public company arena,
9 and with a rapidly evolving business plan, so it was
10 an appropriate one for Adams that didn't apply so much
11 to AMF.
12    Q.    The next bullet point is the same,
13 correct?
14    A.    Correct.
15    Q.    The next one is the same after that?
16    A.    Correct.
17    Q.    Then the -- I think the report of
18 Gerard Adams I read somewhere was a typo in your AMF
19 report, so we'll ignore that one.
20        MR. LEWIS: Objection to form.
21 BY MR. GLUCKOW:
22    Q.    The two paragraphs that follow the
23 list of bullet points --
24    A.    Continuing through the bullet points
25 after you left off there, the next one is different,

Page 250

1 the next one is different.
2    Q.    Which one did you say was different?
3    A.    The one that begins historical
4 financial statements and trends.
5    Q.    The first sentence is the same,
6 correct?
7    A.    The first sentence is the same. In
8 Adams, I've added a sentence that relates to Adams'
9 specific situation versus AMF's. The next bullet
10 point in the AMF does not appear in Adams, the next
11 bullet point is the same, and the report of Gerard
12 Adams we've talked about.
13    Q.    The next paragraph which begins in
14 both reports with respect to each of is the same,
15 correct?
16          MR. LEWIS: Off the record.
17          (Discussion held off the record.)
18          (Recess.)
19          (Mr. Rozen leaves the deposition.)
20 BY MR. GLUCKOW:
21    Q.    Mr. Miller, have you had a chance to
22 look at those paragraphs we were considering before
23 the break?
24    A.    Yes.
25    Q.    As best I can tell, they are the

Page 251

1 same except in the paragraph that begins the proper
2 attitude in Adams Golf, instead of a period after
3 issuer, there's a comma, and then there's a clause
4 particularly with respect to a new company
5 experiencing substantial and rapid growth, which is
6 additional language in Adams Golf that's not in
7 AMF Bowling, correct?
8    A.    Correct.
9    Q.    Otherwise, they are the same,
10 correct?
11    A.    Correct.
12    Q.    In the AMF report, specifically in
13 Paragraph 9, you actually offer an opinion that the
14 due diligence investigation with respect to the public
15 offering was inadequate, correct?
16          MR. LEWIS: Objection to form; it
17    speaks for itself.
18          THE WITNESS: Yeah, in Paragraph 9
19    of AMF, yeah, I give the opinion that the due
20    diligence investigation and pricing analysis
21    conducted by the QIU was inadequate.
22 BY MR. GLUCKOW:
23    Q.    Were you finished?
24    A.    Yes.
25    Q.    As we've discussed in the Adams Golf

Page 252

1 report, in your initial report you did not offer any
2 opinion regarding the adequacy or the inadequacy of
3 the underwriters' due diligence and instead awaited
4 receipt of the defendants' information, correct?
5          MR. LEWIS: Objection to the form.
6          THE WITNESS: Yes, except with
7    respect to the disclosure and the prospectus
8    issue, which I do address in the initial
9    report in Adams Golf.
10 BY MR. GLUCKOW:
11    Q.    You're referring to Paragraph 22 of
12 Adams Golf?
13    A.    Yes.
14    Q.    Just so I'm clear, that
15 Paragraph 22, which I recognize is your opinion, in
16 the initial report does not address the adequacy or
17 the inadequacy of the underwriters' due diligence
18 investigation, correct?
19    A.    It doesn't address it separate from
20 the publication in the prospectus of the information
21 at issue; that's correct. Again, I discussed that
22 topic a few minutes ago before the break. It does not
23 discuss the investigation itself separate from the
24 publication in the Adams Golf Paragraph 22.
25    Q.    I just have to make sure I

Page 253

1 understand this correctly. Twenty-two is saying that
2 it's your opinion that the disclosure in the
3 prospectus was inadequate in the area of gray
4 marketing and the effect that might have on the
5 company, correct?
6    A.    Right; right.
7    Q.    There's nothing in 22 that addresses
8 -- or anywhere else in the initial report that
9 addresses whether the underwriters' due diligence
10 investigation was or was not adequate, correct?
11          MR. LEWIS: Objection to the form
12    and foundation.
13          THE WITNESS: There's nothing else
14    that addresses that; that's correct. Having
15    said that, I don't believe that you can, on a
16    practical basis, have an adequate and
17    reasonable underwriters' due diligence
18    investigation resulting in the nonpublication
19    in the prospectus of the information that's
20    at issue.
21 BY MR. GLUCKOW:
22    Q.    Are you taking away the due
23 diligence defense from the underwriters? I'm not
24 following you.
25          MR. LEWIS: Objection to form.



Page 254

1    THE WITNESS: I don't think so.
2 That is, if the underwriter performs a
3 reasonable and adequate due diligence
4 investigation and discovers a problem, and it
5 does not then put in the prospectus, or
6 insist be put in the prospectus, I don't
7 believe he has conducted his necessary
8 reasonable and adequate due diligence
9 investigation to afford him the defense. It
10 just doesn't make any sense that that would
11 be the case, so with respect to the
12 publication part of that function, my
13 Paragraph 22 addresses that. It does not
14 address separately whether or not the
15 investigation part of the function was
16 performed adequately or reasonably in this
17 case.
18 BY MR. GLUCKOW:
19    Q.    Everything you just said is based on
20 what, because you're not a lawyer, right?
21    A.    That's correct.
22    Q.    You have no legal training, haven't
23 gone to law school?
24    A.    I don't have legal training. I have
25 not gone to law school. I have obviously read the

Page 255

1 Securities Act a number of times, read and reviewed
2 and attended PLI materials but that sort of, but
3 my expertise in the area is as I discussed before, in
4 the context of the investment banking and investment
5 community's understanding of these matters.
6    Q.    I just want to make sure --
7    A.    I also -- sorry -- further in that
8 area have reviewed case law and opinions and that sort
9 of thing in this area as well.
10    Q.    I'm just going to do this
11 hypothetically to find out whether I can understand
12 what you are saying.
13    Assume that there's a prospectus
14 that's defective, it has a misstatement or an omission
15 in it, a material misstatement or omission, and also
16 assume that the underwriters have conducted a
17 reasonable due diligence investigation where they've
18 identified an issue, and they actually believe and
19 have reasonable grounds to believe that the
20 registration statement and prospectus are complete and
21 accurate, don't have any material misstatements, don't
22 omit any material facts; you do recognize, I take it,
23 that in that circumstance the underwriters are
24 entitled to a due diligence defense even if the
25 prospectus is defective, correct?

Page 256

1    MR. LEWIS: Objection to form,
2 foundation, incomplete hypothetical,
3 argumentative.
4 BY MR. GLUCKOW:
5    Q.    I'm not trying to be argumentative,
6 I'm just trying to understand.
7    A.    I think not necessarily, I guess, is
8 the answer. I think that -- let me put it this way if
9 I can -- if I understand what you're asking, I believe
10 it is possible for underwriters to conduct a
11 reasonable and adequate due diligence investigation
12 and still be misled or defrauded in certain
13 circumstances, but I don't believe those circumstances
14 exist here, and at the time I prepared my initial
15 report I was prepared to say what I did in
16 Paragraph 22 but awaited the report of the defendants'
17 expert to see if they then established that they had
18 performed a reasonable and adequate due diligence
19 investigation, notwithstanding the omission from the
20 prospectus of what I considered to be material
21 information.
22    Q.    Let's assume that the report that
23 you then received from the defendants established a
24 reasonable and adequate due diligence investigation.
25 Okay?

Page 257

1    A.    Right.
2    Q.    You would then agree that the
3 underwriters could take advantage of their affirmative
4 defense, correct?
5    MR. LEWIS: Objection as to
6 foundation, incomplete hypothetical, vague
7 and indeterminate.
8    THE WITNESS: Yeah, if I understand
9 your question correctly, I think that's a
10 possibility.
11 BY MR. GLUCKOW:
12    Q.    They could still be entitled to
13 their due diligence defense, notwithstanding your
14 opinion in 22 that there was a problem with the
15 prospectus, correct?
16    MR. LEWIS: Objection to form.
17    THE WITNESS: I think that that is
18 possible, yes.
19 BY MR. GLUCKOW:
20    Q.    We may have to come back to that
21 later but let's leave it there for now.
22    A.    Just to be clear, I view that as a
23 hypothetical question. Having been through this
24 process so far in this case, I don't believe it
25 occurred.

65 (Pages 254 to 257)

Page 258

1    Q.    You don't believe there was a
2  reasonable investigation by the underwriters?
3    A.    Right. I don't believe there was
4  one and I don't believe the defendants have
5  established that there was one. Maybe I should do
6  that in reverse order. I don't believe -- perhaps
7  more importantly, I don't believe defendants have
8  established they performed such an investigation.
9  From what I have seen, I also believe they have not
10  performed such investigation.
11    Q.    The first point that you just made,
12  which is your point that in your view the underwriters
13  have not established that they conducted a reasonable
14  investigation, as we'll see, that opinion is in your
15  rebuttal report, correct?
16    A.    Right.
17    Q.    The other opinion that you just
18  articulated, which is that you have an opinion that,
19  in fact, the underwriters did not conduct a reasonable
20  investigation, show me where that is in any of your
21  reports in this case.
22    A.    I don't know that I've stated that
23  that way prior to this discussion here.
24    Q.    In fact, you haven't, correct?
25    A.    I don't recall whether I did or not.

Page 259

1    Q.    Take a look at your opening report
2  and your rebuttal report, and if you can find it, show
3  me where it is.
4        MR. LEWIS: Did you have something
5    else to say?
6        THE WITNESS: Yeah. I think in
7    connection with the discussion we've been
8    having is why this arose; that is, you asked
9    these questions and I'm answering them. You
10    asked if I had an opinion about that and I
11    gave it to you.
12        My understanding is the way this
13    works is that the defendants are afforded the
14    opportunity to establish such a defense, and
15    in my view, they have not done so, and that,
16    from a legal perspective, may be where it
17    ends. That's the area in which I was asked
18    to opine and that's the area about which I
19    have opined.
20        In the course of our conversation,
21    then, I believe you asked me if I had an
22    opinion about that and I said I do, but
23    whether or not I offer that is a matter of
24    what counsel decides to pursue.
25  BY MR. GLUCKOW:

Page 260

1    Q.    Have you been asked to form an
2  opinion on that question, that question being whether
3  in your opinion the underwriters conducted a
4  reasonable investigation?
5    A.    I don't think I've been specifically
6  asked so far to form that opinion. I think I've been
7  asked to address the issue of whether the defendants
8  established that. In the course of reviewing the
9  materials that I've reviewed, based on what I've seen
10  to date and as part of my work in determining whether
11  the defendants have met their burden in that regard, I
12  have formed an opinion about that but, again, I don't
13  know if I will be asked about that and have not
14  discussed that in that sense with counsel.
15    Q.    What's your current understanding
16  regarding whether you intend to offer an opinion at
17  trial concerning whether the underwriters conducted a
18  reasonable due diligence investigation?
19        MR. LEWIS: Objection, asked and
20    answered.
21        THE WITNESS: I don't have a current
22    understanding as to whether I would be asked
23    that or not. What I've been asked so far is
24    do I believe the defendants have established
25    that they conducted such an investigation.

Page 261

1    It's -- I don't know whether I would be asked
2    to go to the next step of your question and
3    determine whether I have an opinion on
4    whether the due diligence investigation was
5    adequate or not.
6  BY MR. GLUCKOW:
7    Q.    Just to be clear, you agree with me
8  that in your two written opinions to date, you have
9  not offered an opinion on that latter question,
10  namely, whether in your opinion the underwriters
11  conducted a reasonable due diligence investigation,
12  correct?
13        MR. LEWIS: Objection to form; the
14    documents speak for themselves.
15        THE WITNESS: I think that's
16    correct, but I'll be glad to check them and
17    see if I did say that or not.
18  BY MR. GLUCKOW:
19    Q.    Only if you feel the need to. I'm
20  quite sure you have not given that opinion, but if you
21  want to be comfortable with that, please take your
22  time to do so.
23    A.    No, in the way we've been
24  discussing, I have not offered that so far.
25    Q.    Thank you.

66 (Pages 258 to 261)

Page 262

1          In terms of the materials
2   considered, Mr. Bessette went over this with you a
3   little bit and I won't take much time on it, but if
4   you would turn to Page 6 of your initial report,
5   Paragraph 11, in connection with the underwriters' due
6   diligence, how did you decide what materials you
7   wanted to review?
8       A.    I asked counsel what underwriter
9   materials had been produced, if there was a document
10  production, and what testimony there was on that
11  topic, and they identified that for me as the
12  deposition transcripts and the related exhibits.
13      Q.    Did counsel explain to you that
14  there was, in fact, a separate underwriter production
15  referred to in Mr. Necarsulmer's report which I know
16  you've seen, UND1 through 11,636?
17          MR. LEWIS: Objection to form.
18          THE WITNESS: Yeah, there was -- we
19      had some discussion about that, yes.
20  BY MR. GLUCKOW:
21      Q.    What do you recall about the
22  discussion?
23      A.    I asked what there was in the way of
24  underwriter production. It was described to me there
25  was some amount of it; I don't recall how it was

Page 263

1   characterized to me. I asked what it was and if
2   anybody had gone through it, I believe. I don't
3   recall specifically what we discussed about it beyond
4   that. It was not a terribly long discussion about it.
5   I don't recall who suggested it, but I came to the
6   conclusion that I would see what it was that
7   Mr. Necarsulmer produced from that document production
8   to support his opinion, whatever it was going to be.
9       Q.    As you sit here today, you have
10  never received or reviewed the underwriters' document
11  production in this case; is that correct?
12          MR. LEWIS: Objection to form.
13          THE WITNESS: It's probably correct
14      with respect to all of it. I know there have
15      been some documents with UND numbers on them
16      and other documents referred to in deposition
17      transcripts and that sort of thing, but I
18      don't believe I have anywhere near the volume
19      that I understand exists.
20  BY MR. GLUCKOW:
21      Q.    In fact, at least according to the
22  list on Page 11, the only UND documents you would have
23  received from the underwriters' production would have
24  been those marked as exhibits at depositions, correct?
25      A.    From this list, that's correct, and

Page 264

1   I think that might be correct overall. I have seen
2   some underwriter documents or documents that have UND
3   markings on them that I don't recall necessarily being
4   referenced in transcripts, but I haven't tried to
5   match them up that way, so it may be that they are all
6   deposition transcripts, I don't know that.
7       Q.    In what connection did you see the
8   documents with the UND on them where you think there's
9   at least a possibility that they may not have been
10  deposition transcripts?
11      A.    Just in the normal course of
12  reviewing materials in the litigation.
13      Q.    You're not aware of any category of
14  documents or information received from the
15  underwriters' production, as you sit here now, other
16  than those marked as deposition transcripts, correct?
17          THE WITNESS: Can I have that back?
18          (The pending question was read
19      back.)
20          MR. LEWIS: Objection to form.
21          THE WITNESS: I think that's
22      correct. I'm not aware underwriters'
23      documents have been categorized otherwise.
24  BY MR. GLUCKOW:
25      Q.    For example, I'm looking at your

Page 265

1   bullet point listed on Page 6 and I'm just trying to
2   think is there any way that the underwriters' document
3   production could be captured in any of those other
4   bullet points, and I'm not able to come up with any
5   way and I'm asking you whether you can. These are the
6   materials that you considered, correct, at least as of
7   the time of your initial report?
8           MR. LEWIS: Objection to form.
9           THE WITNESS: No, I think you're
10      correct, and as we discussed earlier.
11  BY MR. GLUCKOW:
12      Q.    What about the underwriters'
13  responses and objections to the plaintiff's sixth set
14  of interrogatories, which were the underwriters'
15  responses to the plaintiff's so-called contention
16  interrogatories? Those are not listed here. Have you
17  ever reviewed those, to your knowledge?
18          MR. LEWIS: Objection to form.
19          THE WITNESS: I don't recall,
20      specifically. There is at least one set of
21      interrogatory answers that I have reviewed.
22      I do not recall off the top of my head if
23      those are underwriters or not.
24  BY MR. GLUCKOW:
25      Q.    Are those interrogatory answers that

Page 266

1  you're thinking of listed in the materials that you've
2  considered in any of your reports?
3      A.    No.
4          MR. GLUCKOW: Can we mark this,
5      please.
6          (Document Bates Stamped
7      MIL 00090-00115 was marked Exhibit-352 for
8      identification.)
9  BY MR. GLUCKOW:
10     Q.    I'm handing you what's been marked
11 as 352; it's from your production in this matter. Is
12 that the set of interrogatory responses you had in
13 mind?
14     A.    Yeah, I believe it is.
15     Q.    Those are the Adams Golf defendants'
16 responses to the plaintiff's fifth set of
17 interrogatories, correct?
18     A.    Correct.
19     Q.    Then to the best of your knowledge,
20 you have not reviewed the underwriters' responses and
21 objections to the plaintiff's sixth set of
22 interrogatories, correct?
23     A.    Yeah, I think that's correct.
24     Q.    Did you review the depositions of
25 the underwriter witnesses?

Page 268

1  exhibits from the reports -- the transcripts,
2  I'm sorry. I think I had a conversation with
3  counsel as to whether there was any factual
4  information I was missing in this context
5  from what I had reviewed and then wrote this
6  language, so that process may have taken five
7  to 15 hours -- I'm trying to give you some
8  decent estimate there -- maybe a little
9  longer than that, somewhere in that
10 neighborhood.
11 BY MR. GLUCKOW:
12     Q.    I think you anticipated my next
13 question because I believe the answer you just gave,
14 five to 15 hours, somewhere in that neighborhood,
15 maybe a little more than that, wasn't just in terms of
16 drafting these paragraphs but also included the time
17 you spent considering the issues discussed in those
18 paragraphs, correct?
19         MR. LEWIS: Objection to form.
20         THE WITNESS: Right.
21 BY MR. GLUCKOW:
22     Q.    In terms of that conversation with
23 counsel you just mentioned, do you recall anything
24 else about that other than what you testified to
25 already?

Page 267

1      A.    I did.
2      Q.    Did you review specifically the
3  deposition transcript of Olga Pulido-Crowe?
4      A.    I did.
5      Q.    Did you read the entire transcript
6  or just selected portions?
7      A.    No, I read it all.
8      Q.    Did you read the exhibits that were
9  referred to during that deposition?
10     A.    Yes.
11     Q.    In your rebuttal report, 335,
12 Pages 22 to 23 address Mr. Necarsulmer's report?
13     A.    Right.
14     Q.    I'm going to ask you the same
15 question I asked you about your initial report, which
16 is your best estimate for the amount of time it took
17 you to draft Paragraphs 23, 24, and 25 of the rebuttal
18 report.
19         MR. LEWIS: Objection to the form.
20         THE WITNESS: In this connection, I
21     read Mr. Necarsulmer's report, I reviewed
22     Ms. Pulido-Crowe's transcript, I reviewed
23     Mr. Walravens' transcript or -- I think prior
24     to writing this report, I skimmed
25     Mr. Walravens' transcript and reviewed the

Page 269

1          MR. LEWIS: Objection to form.
2          THE WITNESS: No, it was a fairly
3      brief conversation of the nature I said. I
4      had summarized what I had observed existed,
5      asked if there was anybody else involved in a
6      significant way in the process, other
7      information that might be missing of that
8      type, and I think that was the nature of the
9      conversation.
10 BY MR. GLUCKOW:
11     Q.    What was the answer to that
12 question?
13     A.    Basically, no.
14     Q.    The information that you had
15 indicated that you had focused on already, if I
16 understood your prior answers correctly, was the Olga
17 Pulido-Crowe deposition transcript and the Walravens'
18 transcript, correct?
19     A.    And the exhibits.
20     Q.    And the exhibits of those
21 depositions?
22     A.    Yeah. I maybe get your question.
23 That is the primary information I looked at related to
24 this topic.
25     Q.    Can you think of any other category

68 (Pages 266 to 269)

Page 274

1  Necarsulmer. I take it you don't recall reviewing any
2  other materials in connection with the preparation of
3  your rebuttal report?
4          MR. LEWIS: Objection to form.
5          THE WITNESS: I think that that's
6      correct. I don't recall any other materials
7      as I sit here.
8  BY MR. GLUCKOW:
9      Q.    I'm going to hand you
10  Mr. Necarsulmer's initial report, which has already
11  been marked as 321 (indicating). Keep your rebuttal
12  report open as well.
13          In the first two sentences of your
14  Paragraph 23 in your rebuttal, you address in a
15  general way the outline of responsibilities that
16  Mr. Necarsulmer has provided. I take it you do not
17  disagree with Mr. Necarsulmer's general outline of
18  what underwriters are supposed to do as part of their
19  due diligence; is that correct?
20          MR. LEWIS: Objection to form,
21      foundation.
22          THE WITNESS: No, I don't think I
23      have a problem with his outline. I think
24      enough areas of it are general enough to
25      cover most of the important areas you'd want

Page 275

1      to get into.
2  BY MR. GLUCKOW:
3      Q.    When you were responding to my
4  question, I'm assuming you were looking at 6A and 6B
5  of Mr. Necarsulmer's initial report where he provides
6  those general contours; is that correct?
7          MR. LEWIS: Objection to form.
8          THE WITNESS: Correct.
9  BY MR. GLUCKOW:
10      Q.    Then on Pages 3 and 4,
11  Mr. Necarsulmer gives a list of 11 areas of activity
12  that he believes the underwriters undertook as part of
13  their due diligence. I take it you don't dispute that
14  the activities reflected in one through 11 actually
15  took place; is that correct?
16          MR. LEWIS: Objection to form and
17      foundation.
18          THE WITNESS: I'm sorry, could I
19      have the question back?
20          (The pending question was read
21      back.)
22          THE WITNESS: There's some judgment
23      calls in here so I'm not sure I can answer
24      it, the way I understand you're asking, that
25      is.

Page 276

1  BY MR. GLUCKOW:
2      Q.    I'm sorry; go ahead.
3      A.    Paragraph 1 on Page 3, it appears to
4  be Mr. Necarsulmer's opinion that the offering process
5  was staffed by a team of sufficient size, experience,
6  and seniority to be appropriate for the project; the
7  offering process was staffed by a team. He then makes
8  the judgment as to the rest of the sentence.
9      Q.    Let's do it that way, then. Do you
10  disagree that the team was of sufficient size,
11  experience, and seniority to be appropriate to the
12  project or do you just not have an opinion one way or
13  the other on that, or do you agree?
14      A.    First off, I think what I've said
15  about this is that his descriptions of these things
16  are extremely general. They don't refer to people,
17  describe their backgrounds, refer to documents
18  reviewed, information discovered, much more
19  importantly independent analysis performed by the
20  underwriters, investigation work, and that sort of
21  thing except in the most general terms, so you can't
22  tell from his presentation what was done to discharge
23  the obligation to conduct a reasonable investigation
24  to come to the conclusions that they came to.
25          That was, at least at the first

Page 277

1  instance, the level of information that I was
2  responding to in my opinions, that is, that
3  specifically with respect to the gray marketing issue,
4  there's no mention of it in here, there's no
5  indication that the issue was uncovered, discussed,
6  analyzed, that independent information was obtained to
7  evaluate it, that the impact of it was considered in
8  any fashion, so I don't see where the generalities
9  that Mr. Necarsulmer describes in these various
10  categories established the adequacy of the
11  investigation conducted by the underwriters in this
12  matter.
13      Q.    Are you finished?
14      A.    Yeah, I think that responds to your
15  question.
16      Q.    Not at all. Move to strike.
17          MR. GLUCKOW: Read back my question.
18          (The preceding question was read
19      back as follows:
20          Question: Let's do it that, way
21      then. Do you disagree that the team was of
22      sufficient size, experience, and seniority to
23      be appropriate to the project or do you just
24      not have an opinion one way or the other on
25      that, or do you agree?)

70 (Pages 274 to 277)

Page 278

1    THE WITNESS: In terms of presenting
2    a defense theory, it does not discuss the
3    people, their backgrounds, their experience,
4    why he thinks they were qualified, what work
5    they did, how they were supervised, and that
6    sort of thing. There's no information
7    presented except the conclusion that he comes
8    to.
9    BY MR. GLUCKOW:
10    Q.    I'm asking you whether you agree
11    with that conclusion or whether you haven't formed any
12    opinion on it at all.
13    MR. LEWIS: Objection to form,
14    foundation, and scope of opinion.
15    Go ahead.
16    THE WITNESS: Regarding
17    Mr. Necarsulmer's work, I was asked to
18    determine if he established that the
19    underwriters had conducted an adequate
20    investigation as we've been discussing, and
21    what I'm saying is with respect to
22    Paragraph 1 specifically and then more
23    generally the rest of this work, that he has
24    not presented any information on which
25    someone could make that determination. What

Page 279

1    he's presented is his conclusions as to those
2    things.
3    BY MR. GLUCKOW:
4    Q.    I understand that you're not happy
5    with Mr. Necarsulmer's report, and that's fine, we'll
6    deal with that. What I'm asking you is whether you
7    have any opinion of your own regarding whether the
8    offering process was staffed by a team of sufficient
9    size, experience, and seniority to be appropriate for
10    the project, and if you haven't formed an opinion on
11    that, that's fine, just tell me that.
12    MR. LEWIS: Objection to form and
13    foundation.
14    Go ahead.
15    THE WITNESS: I've had thoughts
16    about that. I don't know that I've actually
17    formed a formal opinion on that as you're
18    asking me, as I think you may be asking me
19    here.
20    My thoughts in that area have been
21    that there was no managing director actually
22    involved in the process, as far as I could
23    tell. From the information I've reviewed so
24    far, Mr. Francis was a figurehead whose
25    fingerprints are not on the project, that

Page 280

1    Ms. Pulido-Crowe was hoping to become a
2    managing director and was at the time -- I
3    forget the next title, I think it was vice
4    president -- conducting oversight on the
5    work, much of which was delegated to
6    Mr. Walravens and a financial analyst whose
7    name, unfortunately, I can't recall, and that
8    I'm not sure I saw any evidence of
9    involvement by more senior personnel with
10    perhaps more business experience and
11    background with regard to critical issues
12    such as gray marketing, and if the team had
13    the experience to be appropriate for the
14    project, I saw no evidence of inclination to
15    perform independent analysis with respect to
16    the gray market issue specifically from that
17    team, which suggested either a lack of
18    experience in the area or a simple failure to
19    follow up on information that was obviously
20    deserving of follow-up.
21    BY MR. GLUCKOW:
22    Q.    You don't dispute that the
23    underwriters had discussions with senior management at
24    the company concerning the gray market issue, correct?
25    MR. LEWIS: Objection to form.

Page 281

1    THE WITNESS: No, I don't dispute,
2    from what I've seen, that they had
3    discussions with a couple of management
4    people about the topic.
5    BY MR. GLUCKOW:
6    Q.    You don't dispute that the
7    underwriters conducted telephone interviews with at
8    least seven of Adams' top customers concerning a
9    variety of topics, correct?
10    MR. LEWIS: Objection to form and
11    foundation.
12    THE WITNESS: No, I don't dispute
13    that from what I can see those interviews
14    took place; no.
15    BY MR. GLUCKOW:
16    Q.    Don't you consider those interviews
17    an example of the kind of independent verification
18    that you're referring to?
19    A.    No. That is that the conduct of
20    outside interviews absent management participation is
21    important, but when no specific questioning is made
22    about the gray marketing or the effect of gray
23    marketing, more importantly, no contact was made with
24    any of the people who had complained about gray
25    marketing, no documentation or correspondence was

71 (Pages 278 to 281)

R. ALAN MILLER

Page 282

1  reviewed with respect to the complaints about gray
2  marketing, no independent follow-up was made to
3  determine if it was a problem or what the impact of it
4  was other than the assurance that I believe it was
5  Mr. Adams gave to Ms. Pulido-Crowe with respect to
6  Costco by saying don't pursue your own independent
7  inquiry of Costco, I'll take care of them, or
8  something to that effect, and/or Ms. Pulido-Crowe's
9  assessment that since her husband wouldn't purchase
10 sporting goods items at Costco, that it was not likely
11 to be a threat to Adams Golf.
12         Those are what I remember about the
13 disposition of the issue with management, but that
14 seemed to end the inquiry, from what I can tell.
15     Q.    One of the things you said in that
16 answer was that there was no mention of the gray
17 marketing issue in the customer surveys; is that
18 correct?
19     A.    Right.
20     Q.    There was a specific question that
21 said are there any other issues, legal, contractual,
22 or otherwise, which you feel are important; isn't that
23 correct?
24         MR. LEWIS: Objection to form.
25         THE WITNESS: I understand that was

Page 283

1  a question on the outline.
2  BY MR. GLUCKOW:
3      Q.    You understand that was a question
4  that was asked of the customers who were interviewed
5  by the underwriters, correct?
6      A.    I understood it was a question on
7  the outline to be asked. I don't recall reading
8  enough detail about the actual conversations to know
9  if it was asked or how it was asked or what the
10 inclination of the customer would have been to provide
11 the information over the telephone, what their
12 attitude toward Adams was at that point as a customer
13 trying to acquire a hot club in that market. I don't
14 know a lot of those things about the customer
15 interviews over the telephone.
16     Q.    Did you review the actual record
17 reflecting the 11 interviews that the underwriters
18 conducted which show the responses received?
19     A.    I saw at least some of that
20 information in some exhibits, yes.
21     Q.    Isn't it true that in going through
22 each and every one of those 11 telephone interviews,
23 not a single one of the responses indicated any
24 concern about gray market or Costco?
25         MR. LEWIS: Objection to foundation

Page 284

1  and form; misstates the evidence.
2          THE WITNESS: I don't recall seeing
3      any mention in the responses of Costco or
4      gray marketing.
5  BY MR. GLUCKOW:
6      Q.    Mr. Necarsulmer says, in his
7  rebuttal report which I know you've seen, these kinds
8  of interviews with independent parties are the type of
9  work underwriters should engage in to confirm
10 discussions with company management. Don't you agree
11 with that?
12         MR. LEWIS: Objection to form.
13         THE WITNESS: Again, as a general
14     category, I certainly agree that underwriters
15     should conduct independent interviews with
16     outside parties to confirm information they
17     have received from management. Whether or
18     not the way these were done, the basis of the
19     selection of the parties to interview, and
20     all those sorts of things were adequate are,
21     I think, question marks at this point in that
22     area.
23 BY MR. GLUCKOW:
24     Q.    Again, the only deposition
25 transcripts of underwriters you can recall reading are

Page 285

1  Pulido-Crowe and Walravens', correct?
2          MR. LEWIS: Objection to form.
3          THE WITNESS: I believe that's
4      correct.
5  BY MR. GLUCKOW:
6      Q.    You've never reviewed the
7  underwriters' document production in this case,
8  correct?
9      A.    Other than those we've discussed.
10     Q.    Other than as marked as exhibits at
11 depositions, correct?
12     A.    I think that's correct.
13     Q.    You referred to a conversation
14 between Pulido-Crowe and Mr. Adams regarding gray
15 marketing and Costco. Is it your understanding that
16 the only discussions that the underwriters had
17 concerning the gray market issue took place between
18 Ms. Pulido-Crowe and Mr. Adams?
19         MR. LEWIS: Objection to form.
20         THE WITNESS: No, I don't think
21     that's necessarily right. I think there were
22     conversations with one of the other
23     management people at least, maybe two others,
24     of the salespeople --
25 BY MR. GLUCKOW:

72 (Pages 282 to 285)

R. ALAN MILLER

Page 286

1    Q.    Gonsalves?
2    A.    -- the sales executives, Gonsalves
3    and --
4    Q.    Beebe?
5    A.    -- possibly Beebe, about that topic.
6    Q.    How many conversations are you aware
7    of between the underwriters and Adams' management
8    concerning the gray marketing or Costco issue?
9    A.    As far as I can recall, I don't
10   recall reference to more than a few outside of the
11   Hoffman letter issue, if we can call it that, but with
12   respect to pursuing independent investigation and that
13   sort of thing, essentially none.
14             MR. LEWIS:  I want to back up and
15       retroactively object to the question
16       suggesting that there was a conversation with
17       Beebe since the record does not reflect any
18       such conversation.  It misstates --
19             MR. GLUCKOW:  I disagree with your
20       characterization, but the record will speak
21       for itself.
22   BY MR. GLUCKOW:
23   Q.    What's your basis for saying that
24   Mr. Francis's role was purely as a figurehead?
25   A.    Ms. Pulido-Crowe's testimony to that

Page 287

1    effect.
2    Q.    You take from Ms. Pulido-Crowe's
3    testimony that Francis was nothing more than a
4    figurehead?
5    A.    In very shorthand form, yes --
6    Q.    Do you have any other basis for
7    that?
8             MR. LEWIS:  Please don't cut him
9       off.
10   BY MR. GLUCKOW:
11   Q.    I'm sorry.
12   A.    She described, as I recall, his
13   attendance at certain meetings, his fronting the
14   presentations to the commitment committee, and what I
15   would describe as more of a political role in the
16   process than a substantive role in an investigatory
17   way or anything of that nature.
18   Q.    Any other basis for that statement?
19             MR. LEWIS:  Objection to form and
20       foundation.
21             THE WITNESS:  Only that in
22       discussing the functions that they were
23       performing, in the deposition I don't recall
24       either Pulido-Crowe or Walravens referring to
25       Francis having done anything in the process

Page 288

1    of conducting investigation or interviews or
2    any of those sorts of functions other than,
3    as Pulido-Crowe describes, in what I'll call
4    a more political role.
5    BY MR. GLUCKOW:
6    Q.    Is it your opinion the underwriters
7    should have contacted Costco?
8             MR. LEWIS:  Objection to form and
9       foundation.
10             THE WITNESS:  I don't know, I hadn't
11       thought about that specifically, but I
12       certainly think, backing up a step, in terms
13       of generality they certainly should have
14       investigated the Costco matter independently,
15       whether that involved contacting Costco,
16       which was certainly one possibility since
17       Lehman Brothers appeared to have some entree
18       to Costco, I don't recall specifically what
19       that was, but contacting Costco directly
20       seemed to be one choice, contacting an
21       industry expert with knowledge of those types
22       of things to conduct an independent analysis
23       is another choice; there may have been
24       different ways to accomplish that.  I haven't
25       thought further about how that should have

Page 289

1    been done, but something should have been
2    done along those lines to pursue that issue.
3    BY MR. GLUCKOW:
4    Q.    As you sit here today, what is it
5    that you think needed to be done to have what, in your
6    view, would have been a reasonable investigation?
7             MR. LEWIS:  Objection to form and
8       foundation, compound, and we've been over a
9       lot of this already.
10             Go ahead.
11             THE WITNESS:  Again, that's an area
12       I have not been asked for specific opinions
13       on to this time.  I have produced the opinion
14       so far that Mr. Necarsulmer has not
15       demonstrated that a reasonable and adequate
16       investigation was performed, which is what I
17       was asked to opine in to this area.
18             Having conducted some analysis of
19       this and reviewed the information we
20       discussed so far today, I have reached some
21       opinions about what I know so far appeared to
22       have been done or not done, and that's the
23       basis on which I am answering your questions
24       now.
25             In terms of what should have been

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

R. ALAN MILLER

Page 290

1  done to conduct a reasonable investigation,
2  at a minimum, the project should have been
3  staffed sufficiently to ensure that somebody
4  would take the responsibility to conduct an
5  independent investigation of potential
6  problem areas as they arose. The one I'm
7  concerned about, obviously, is gray
8  marketing.
9      When that appeared to be an issue,
10 based on the information that clubs were
11 appearing in Costco, the underwriters should
12 have conducted an independent investigation
13 as to what that meant, what effect it was
14 having on the retailers and distributors,
15 what effect it was having on customers, how
16 Costco was obtaining the clubs, whether it
17 was likely to continue, what effect gray
18 marketing had on companies that suffered from
19 it.
20     The red flag, I believe, had been
21 raised once the underwriters obtained
22 knowledge of the clubs' appearance in Costco.
23 The issue had been raised by appearance in
24 Callaway's 10-K and industry knowledge was
25 available, according to Mr. Magnussen, about

Page 291

1  gray marketing, so it doesn't seem as though
2  it should have been all that difficult to get
3  into the industry and get information about
4  that and, thereafter, determine what to do
5  about it.
6  BY MR. GLUCKOW:
7      Q.    Anything else, because we're going
8  to go through each of these, but I want to know if
9  there's anything else before we do?
10     MR. LEWIS: We're at five of six.
11 We started nine hours ago, which is okay.
12 We're all tired. The witness, I'm sure --
13 I'm tired, at least. Maybe everybody else
14 isn't, but I'm very tired. The witness is
15 tired. We're very close, if not past, the
16 seven-hour limit. I want to give you some
17 leeway, but we're going to have to cut off at
18 some point.
19     MR. GLUCKOW: If you're tired, the
20 witness is tired, I'm happy to pick this up
21 on Monday, but here's my point --
22     MR. LEWIS: We're not picking up
23 Monday.
24     MR. GLUCKOW: That's fine, we'll
25 just keep going; I'm not suggesting that we

Page 292

1  need to.
2      All I'm saying is you had as much
3  time as you needed with Mr. Necarsulmer,
4  right, and they had as much time as they
5  needed upstairs today with Mr. James.
6      MR. LEWIS: Right, but nobody has
7  gone past the seven-hour limit, as far as I'm
8  aware of, and that's established by the
9  rules. I'm not trying to be difficult about
10 it, but you don't get to go on until ten
11 o'clock because you have questions until ten
12 o'clock; you have your limit. I'm trying to
13 be flexible on it, but if you're not going to
14 be flexible with me and find a way to meet
15 some reasonable limit at this time of day,
16 then we're going to have to cut it off.
17     MR. GLUCKOW: I certainly intend to
18 be reasonable but I certainly also intend to
19 complete the examination, so hopefully that
20 will be something we can both live with.
21     MR. LEWIS: It's got to be pretty
22 soon.
23 BY MR. GLUCKOW:
24     Q.    I think I was asking you was there
25 anything else before we go back through these items.

Page 293

1      A.    I have not compared the outline of
2  Mr. Necarsulmer in here with the paragraphs that I had
3  submitted outlining an underwriter's responsibilities
4  in the context of due diligence to see how his
5  opinions stack up against those.
6          (Mr. Bessette leaves the
7  deposition.)
8          (Mr. Collins enters the deposition.)
9      THE WITNESS: Without having done
10 that, I think the additional red flag that
11 exists in these materials, to those I've
12 already discussed, would be in Paragraph 6,
13 which --
14 BY MR. GLUCKOW:
15     Q.    I'm sorry, Paragraph 6 of?
16     A.    I'm sorry, Page 3 of
17 Mr. Necarsulmer, which refers to the commitment
18 committee memo, I believe, which did have a line in it
19 referring to the importance of maintaining margins, I
20 believe it was, at Adams and how those could not be
21 allowed to deteriorate or something to that effect,
22 so, again, that identifies someone was aware of the
23 general issue of margin maintenance but not in the
24 specific wording of gray marketing.
25          Having said that, I think the answer

74 (Pages 290 to 293)

R. ALAN MILLER

Page 294

1  I gave you previously probably covers at least the
2  major areas of where I would be today on this issue
3  since you raised it and asked me.
4      Q.    Can you think of any other areas? I
5  don't want to say that they're just the major
6  ones. Can you think of any other areas as of today
7  that you think would have required follow-through --
8          MR. LEWIS: Objection.
9  BY MR. GLUCKOW:
10     Q.    -- in your opinion?
11         MR. LEWIS: Form, foundation, scope
12     of the opinion.
13         THE WITNESS: Again, I haven't been
14     asked to form an opinion on that prior to
15     this time and I've been giving you the
16     thoughts I have in this area in response to
17     your questions, and I think I hit on the
18     major area, particularly with respect to gray
19     marketing, and that being the lack of
20     independent investigation by the underwriters
21     of the issue and the willingness to accept
22     Mr. Adams' assertion he would take care of
23     the Costco problem and essentially leaving it
24     at that, so I think that probably covers it
25     with respect to that issue.

Page 295

1          I have not sat here and attempted to
2      go beyond that and think about every other
3      area they may have been deficient in their
4      work, and have not been asked to do that to
5      this point, but I think the major issue with
6      respect to gray marketing would be covered by
7      that topic.
8  BY MR. GLUCKOW:
9      Q.    Putting aside the gray market issue
10 or the Costco issue, however you want to phrase it,
11 you're not offering any opinion that the underwriters'
12 investigation was less than reasonable in any other
13 way, are you? I've never heard you suggest otherwise.
14         MR. LEWIS: Objection to form,
15     foundation, scope.
16 BY MR. GLUCKOW:
17     Q.    Am I correct?
18     A.    I haven't been asked that question.
19 I haven't been asked to focus on areas other than gray
20 marketing, so I couldn't answer that in that sense.
21     Q.    The margins issue you mentioned
22 before with respect to Paragraph 6 is reflected in the
23 prospectus, correct?
24     A.    Again, in a very general way, the
25 issue of maintenance of sales price margin is

Page 296

1  mentioned in the prospectus, but that's all it says in
2  the prospectus, is basically that one line.
3      Q.    Are you aware of Mr. Frazier's
4  opinion, Professor Frazier's opinion, in this case?
5      A.    I don't believe so.
6      Q.    You haven't seen the transcript of
7  his deposition from earlier this week?
8      A.    I have not.
9          MR. LEWIS: In five minutes, I'm
10     going to ask the court reporter to do a
11     calculation of time for us so we can reach
12     some conclusion here.
13 BY MR. GLUCKOW:
14     Q.    I think we've confirmed this, but if
15 you turn to Paragraph 25 on Page 23 of your rebuttal
16 report, in the last sentence you state in your opinion
17 the expert report of Mr. Necarsulmer does not meet the
18 underwriters' burden to demonstrate that the
19 investigation and/or resulting disclosures were
20 reasonable and adequate, correct?
21     A.    Right.
22     Q.    You're not offering an opinion in
23 this report, I've established, dealing with
24 whether in your opinion the underwriters'
25 investigation was reasonable, correct; you have not

Page 297

1  offered a written opinion on that question?
2          MR. LEWIS: Objection to form.
3          THE WITNESS: That's correct.
4  BY MR. GLUCKOW:
5      Q.    What are your qualifications to
6  opine on whether Mr. Necarsulmer has met the
7  underwriters' burden?
8          MR. LEWIS: Objection to form,
9      foundation; calls for legal conclusion.
10         THE WITNESS: I think we've
11     discussed those earlier today at some length.
12 BY MR. GLUCKOW:
13     Q.    You have nothing to add to the
14 qualifications that enable you to offer that opinion
15 other than what we talked about earlier?
16         MR. LEWIS: Objection to form,
17     foundation, legal conclusion.
18         THE WITNESS: Yeah, I think that's
19     probably correct in terms of background,
20     education, work experience, and that sort of
21     thing.
22         Having said that and having reviewed
23     the information that I've reviewed that we've
24     discussed, having reviewed Mr. Necarsulmer's
25     report, it's a fairly easy matter in the

75 (Pages 294 to 297)

R. ALAN MILLER

Page 306

BY MR. GLUCKOW:
Q.    Do you know whether there were any
discussions between the underwriters and Adams'
management concerning gray marketing or Costco in
connection with the Adams' press release in early June
concerning the Costco issue?
MR. LEWIS: Object to the form.
THE WITNESS: Again, I recall that
there was some discussion about that in
connection with the Costco issue as presented
in the press release and limited to that as
opposed to the overall problem of gray
marketing and sale of clubs through Costco
and the implications that that had for the
company.
BY MR. GLUCKOW:
Q.    What's the basis for your last
answer?
A.    My understanding of the conversation
-- the conversations that occurred around the Hoffman
letter with respect to addressing the SEC's inquiry
about whether the issue discussed in the Hoffman
letter had been investigated or examined by the
company according to materiality standard.
MR. LEWIS: We have to shut it down

Page 307

at this point. We're just at the time
lengths -- we're way past. This was
scheduled in this fashion at your guy's
request. There was no anticipation of going
after six o'clock on a Friday afternoon. We
all have different plans and travel plans.
I have one question, possibly the
famous one question, for Mr. Miller to get on
the record before we terminate.
MR. GLUCKOW: I'm going to object to
your shutting down the deposition because I
have not finished my examination, and I will
reserve all my rights.
MR. COLLINS: Any idea how much
more? We've been through this before and
asked you that question.
MR. GLUCKOW: Part of the problem is
every time I ask more questions, I'm getting
new opinions from the witness that are not
reflected in his written opinions in the
case.
MR. LEWIS: Because you're asking
him for them, you're asking what opinions that he
may have formed aside of the opinions that he
has been engaged to express, and so if you

Page 308

keep asking someone for views they have, it's
not going to be surprising if they have
views.
MR. GLUCKOW: If you were willing to
tell me he isn't going to offer any opinions
concerning the underwriters' due diligence
beyond that which is contained in his written
reports, I told you a long time ago this
could have been completed much sooner, but
you won't give me that, and because you won't
give me that, I need to know what opinions he
has formed on that topic.
MR. LEWIS: You still haven't
answered Todd's question of how much longer
do you have to go. We're talking about
travel arrangements at this point for people,
including the witness.
MR. GLUCKOW: Quite honestly, based
on this last exchange, I think I have
probably another half an hour, at least.
MR. COLLINS: Why don't you proceed
with your questioning.
BY MR. LEWIS:
Q.    Mr. Miller, aside from the opinions
that have been expressed in your various reports about

Page 309

underwriters' due diligence, are there any other
opinions that you have formed and believe you may
express in the litigation on the subject of due
diligence?
A.    If asked about the topic of due
diligence with respect to other parties besides the
underwriters, I would offer the same sort of opinion
with respect to the conduct of due diligence by other
parties being signatories or defendants in this matter
as well.
Q.    Can you describe briefly what the
basis of that opinion would rest upon?
A.    Basically, my understanding that the
opportunity afforded for the due diligence defense is
the same, or essentially the same, under Section 11,
that is, that a party can establish that he performed
a reasonable and adequate investigation and thereafter
had a reasonable basis to believe that the prospectus
was not misleading, and that that would be the primary
basis, that is, that the same essential standard
applies and the same result occurred here.
Q.    Have you formed any views,
preliminary or otherwise, as to whether the officer
and director defendants in this litigation are
entitled to avail themselves of the due diligence

78 (Pages 306 to 309)