# CORRECTED

# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

IN RE: ADAMS GOLF, INC.     :
SECURITIES LITIGATION       :

ORAL DEPOSITION

OF

EDWARD NECARSULMER, III

Monday, August 7, 2006

- - -

Oral deposition of EDWARD NECARSULMER, III, held at the offices of SIMPSON THACHER & BARTLETT, LLP, 425 Lexington Avenue, New York, New York, commencing at 12:08 p.m., reported by Pamela Harrison, RMR, CRR, CSR and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA   19103
(215) 241-1000   (888) 777-6690

Page 58

EDWARD NECARSULMER, III

1  variables. Some of the ones you've
2  mentioned are variables -- are valid
3  ones, but there are -- just the
4  existence of the fact that it was a
5  fast growing company or it was a new
6  company would not be enough for me to
7  direct the team to do something
8  different.
9  BY MR. LEWIS:
10      Q.   What variables, if any, would
11 cause you to direct the team to do something
12 different in due diligence?
13          MR. GLUCKOW: I'm going to object
14      to the form and object on the ground
15      that it's vague and ambiguous and quite
16      overbroad.
17          But you can answer.
18          THE WITNESS: I mean it's a
19 situation-by-situation issue. I think
20 that -- and I can only, you know,
21 really respond to it anecdotally if I
22 can think of some appropriate
23 anecdotes. But I guess my point is,
24 without belaboring this, is you look at

Page 59

EDWARD NECARSULMER, III

1  each situation and hopefully -- you
2  know, if you are managing the process,
3  you look at each situation and
4  hopefully you figure out, you know,
5  what you need to do to satisfy your
6  commitment committee, yourself, and the
7  marketplace. And there are really no
8  other rules specific -- you know,
9  templates I can honestly look at you
10 and offer beyond that.
11 BY MR. LEWIS:
12     Q.   Have you ever had the experience
13 of adjusting the due diligence that you were
14 conducting on a company because the company had
15 management that had not had long experience in
16 running a public company?
17     A.   Yes.
18     Q.   And why did you do that?
19     A.   Well, because simply as a matter
20 of mechanics. In many cases if a company had
21 done other offerings or was -- let's say had
22 done other offerings or had significant -- had
23 done private equity financings or other
24 transactions, typically they might be more

Page 60

EDWARD NECARSULMER, III

1  organized in terms of your ability to get
2  documents and things that were on point that
3  would go right to your organizational outline,
4  where if they hadn't, you might have to really
5  help them set up the process.
6      Q.   Would you agree that in an
7  initial public offering there is a strong
8  affirmative duty of disclosure?
9          MR. GLUCKOW: Object to the
10     form. Vague and ambiguous. Calls for
11     a legal conclusion.
12         You can answer.
13         THE WITNESS: Yes.
14 BY MR. LEWIS:
15     Q.   Would you agree that in
16 conducting due diligence it is necessary for the
17 due diligence team to continue its investigation
18 of the issuer up to and including the effective
19 date of the registration statement?
20     A.   Yes.
21     Q.   And a due diligence
22 investigation would be inadequate if the
23 underwriter did not do that?
24         MR. GLUCKOW: Object to the

Page 61

EDWARD NECARSULMER, III

1  form. It calls for a legal conclusion.
2          You can answer.
3          THE WITNESS: I mean, the easy
4      answer is yes, but -- well, okay, let
5      me just leave it at yes.
6  BY MR. LEWIS:
7      Q.   Is it your understanding as a
8  non-lawyer that one of the duties of
9  underwriters is to deal fairly with the
10 investing public?
11         MR. GLUCKOW: Object to the form.
12         You can answer.
13         THE WITNESS: Absolutely.
14 BY MR. LEWIS:
15     Q.   Isn't that sometimes referred to
16 as the shingle theory?
17     A.   I'm not familiar with that.
18     Q.   I take it from your initial
19 report that one of your beliefs is that an
20 underwriter has an obligation to conduct a
21 reasonable investigation in an IPO?
22     A.   Yes.
23     Q.   And there is a long tradition
24 since the securities laws were enacted in the

16 (Pages 58 to 61)

Page 142

EDWARD NECARSULMER, III
1
2   Q.  Okay. Is it your understanding
3 that these are notes of a telephone conversation
4 rather than that of a meeting?
5   A.  That would be my surmise, but
6 it's only that.
7   Q.  And what is that based on?
8   A.  Based on the way it's almost
9 always a so-called bringdown call because the
10 people are not usually in the same place.
11   Q.  Is there, in your experience, a
12 standard format for a bringdown call?
13   A.  No. In my experience, it's
14 quite informal; it's tick off three or four
15 points, anything we ought to be aware of. It
16 can be combined with an update of where you are
17 in terms of effectiveness, other forms need to
18 be filed. So generally it kind of takes this
19 form.
20   Q.  Did you see anything in this
21 document when you reviewed it that you believe
22 referred either to Costco or to gray marketing
23 more broadly?
24           MR. GLUCKOW: The document speaks
25       for itself.

Page 143

EDWARD NECARSULMER, III
1
2       But you can answer.
3           THE WITNESS: No.
4 BY MR. LEWIS:
5   Q.  I previously showed you Exhibit
6 160 which was the July 14, 1998, summary of due
7 diligence conducted by the Lehman Brothers Adams
8 Golf team.
9       Did you see anything in Exhibit
10 198 which referred to either gray marketing or
11 Costco distribution?
12          MR. GLUCKOW: You said 198.
13 BY MR. LEWIS:
14  Q.  I'm sorry; that was the one that
15 has been variously numbered as 160 and 198.
16      So the question is, since you
17 have 160 in front of you, whether you saw
18 anything in the summary of due diligence
19 contained in Exhibit 160 that you believe
20 referred to either Costco or gray marketing
21 issues?
22          MR. GLUCKOW: The document speaks
23      for itself.
24      But you can answer it.
25          THE WITNESS: I'm assuming Page 3

Page 144

EDWARD NECARSULMER, III
1
2 that there's nothing that I'm not
3 seeing. Correct?
4 BY MR. LEWIS:
5   Q.  I think your assumption is
6 absolutely correct.
7   A.  With that assumption, the answer
8 is there's nothing referring to either of those
9 subjects.
10          (Whereupon, documents were
11      marked, for identification purposes, as
12      Exhibit 325 and Exhibit 326.)
13 BY MR. LEWIS:
14  Q.  I'm going to hand you two
15 exhibits together, 325 and 326.
16          MR. LEWIS: Off the record.
17          (A discussion was held off the
18      record.)
19 BY MR. LEWIS:
20  Q.  325 is a copy of documents that
21 you referred to in your rebuttal report and some
22 of those pages -- there were a few pages not
23 included because some of the Adams advertising
24 materials were double-sided and someone, not
25 doing their due diligence in the copying

Page 145

EDWARD NECARSULMER, III
1
2 process, left those pages out when the document
3 was compiled, so those missing pages are
4 contained in Exhibit 326.
5       You'll see that the documents
6 that are compiled in this exhibit include due
7 diligence questionnaires, sales data,
8 advertising data, and, to the best of my
9 knowledge, these are all the pages that you
10 referred to in your rebuttal report.
11          MR. GLUCKOW: Just to be clear,
12      we haven't obviously checked to make
13      sure this is the case, but what you are
14      saying is when you combine 325 and 326,
15      all of the documents cited in the
16      rebuttal report should be included in
17      325 and 326.
18          MR. LEWIS: They should be. And
19      the ones in 326 are all
20      advertising-type documents which go
21      sort of into the span of documents in
22      the middle that have Adams Tight Lies
23      advertisements and humorous items about
24      Barney and a press release here and
25      there.

### Page 146

EDWARD NECARSULMER, III

BY MR. LEWIS:

Q. At the risk of beating the horse dead, again, to your knowledge, is there anyplace in any of the pages referred to in your rebuttal report which touched on gray marketing or Costco distribution?

MR. GLUCKOW: And again, you are focused on the UND production which we have in front of us and 325 and 326, not on deposition testimony?

MR. LEWIS: That is correct.

THE WITNESS: Then I would say -- I was thinking aloud; excuse me. Let me just make sure.

To the best of my knowledge, that is correct.

BY MR. LEWIS:

Q. Moving forward chronologically, I will show you Exhibit 215 which is a Lehman Brothers memorandum, facsimile, suggested outline, and list of concerns. The transmittal date on the fax is July 29, 1998.

Did you review this document?

A. I did see this document.

### Page 147

EDWARD NECARSULMER, III

Q. And did you see, on the third page of the exhibit, the item "Discounting - Tight Lies have been seen in many Costcos for $146? How is product getting there? What is Adams Golf doing about it?"

A. I have seen that.

Q. Have you seen any documents that explain to you how that information came into the possession of the underwriters?

A. I had not seen a document documentary of it, no.

Q. Do you recall any testimonial evidence?

A. It is my recollection that either Picchi or Lantier, who were the two Lehman equity research analysts, did refer to this in their deposition testimony. I can't tell you which one. I would say Lantier, if I had to make a determination.

L-A-N-T-I-E-R. P-I-C-C-I, I think. It may be P-I-C-C-H-I.

Q. So that other than the deposition transcripts of the equity analysts, you are unaware of any means by which one could

### Page 148

EDWARD NECARSULMER, III

determine how the information came into Lehman's possession that caused someone to write the words that appear on the page I read to you?

MR. GLUCKOW: Objection to the form. It mischaracterizes the testimony.

But you can answer.

THE WITNESS: I would add that, you know, since this is post IPO, it's highly plausible that's -- that this came through an investor or type of question to the research analyst.

BY MR. LEWIS:

Q. Can you explain why you say that?

A. Well, what happens often is that as you are talking about the story or the stock, particularly if the stock is, you know, either going up or down a lot and therefore is the subject, research analysts are constantly talking to their customers who are the -- they're counterpart analysts or portfolio managers at usually large financial institutions, or it could be an officer manager

### Page 149

EDWARD NECARSULMER, III

someplace, and a lot of the process is feedback, and somebody said, you know, what do you think is going on? I heard, you know, from my golf pro or a guy at Fidelity asked me about... I mean, in my experience a lot of the information is actually incoming, so it could very well have come through that way as well.

Q. Let me show you what I've marked previously as 217. This is a teleconference script dated August 5, 1998, sent to Olga Pulido-Crowe and Pat Walravens, W-A-L-R-A-V-E-N-S, from the desk of Patty Walsh. And at Page 40671, you will see a reference, under the heading of Discounting, to "Tight Lies have been seen in many Costcos for $146. How is the product getting there?" and an answer is given.

Does anything in this document -- strike that.

Do you have any reason to believe that the information that's contained on Page 40670, which is similar to the information we saw in the "concerns" box on Exhibit 215, came as a surprise to the