IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>) | Civil Action No. 99-371-KAJ<br>(CONSOLIDATED) |

# CORRECTED
**UNDERWRITER DEFENDANTS' ANSWERING BRIEF
IN OPPOSITION TO
PLAINTIFFS' MOTION TO STRIKE AND EXCLUDE
TESTIMONY OF EDWARD NECARSULMER III**

*Of Counsel:*

Michael J. Chepiga
Paul C. Gluckow
Theodore J. McEvoy
Ryan A. Kane
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
Tel. (212) 455-2831
Fax (212) 455-2502

Robert K. Payson (No. 274)
John E. James (No. 996)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
E-Mail: rpayson@potteranderson.com
E-Mail: jjames@potteranderson.com

*Attorneys for Underwriter Defendants*

Dated: October 9, 2006
Corrected Version Filed: October 19, 2006
756760/23310

# **TABLE OF CONTENTS**

                                                                                      **Page**

SUMMARY OF ARGUMENT ................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 2

        A.      Necarsulmer's Reports and Evidentiary Investigation ............................. 2

        B.      Necarsulmer's Extensive Experience in Due Diligence ........................... 4

        C.      Plaintiffs' Distortion of Necarsulmer's Deposition Testimony .................. 5

ARGUMENT ............................................................................................................... ~~7~~8

        I.      NECARSULMER'S TESTIMONY ABOUT THE STANDARD OF CARE EXERCISED BY UNDERWRITERS *WOULD* BE HELPFUL TO A JURY; A LEGAL OPINION BY NECARSULMER ABOUT THE MEANING OF VARIOUS CASES WOULD *NOT* BE HELPFUL ................................................. ~~7~~8

        II.     PLAINTIFFS' ATTACKS ARE MERELY CROSS-EXAMINATION QUESTIONS THAT — AT MOST — WOULD GO TO THE WEIGHT OF NECARSULMER'S TESTIMONY; THEY HAVE NOTHING TO DO WITH THE ADMISSIBILITY OF HIS TESTIMONY ................................................................. 9

        III.    NECARSULMER IS QUALIFIED — BECAUSE OF EXPERIENCE — TO SERVE AS AN EXPERT ON THE STANDARD PRACTICES OF UNDERWRITERS IN CONDUCTING DUE DILIGENCE ................................................... 10

CONCLUSION ........................................................................................................... ~~12~~13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astrazeneca LP v. TAP Pharm. Prod., Inc.*,
  No. Civ.A.04-1332 KAJ, 2006 WL 2338144 (D. Del. June 23, 2006) ............... ~~9~~10

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) .................................................................................................. ~~7~~8

*ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
  198 F. Supp. 2d 598 (E.D. Pa. 2002) ..................................................................... ~~8~~9

*In re Software Toolworks Inc.*,
  50 F.3d 615 (9th Cir. 1996) .................................................................................... ~~7~~8

*Oxford Gene Tech. v. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004) ..................................................... ~~8,~~ 9, ~~10~~10, 11

*Schneider v. Fried,*
  320 F.3d 396 (3d Cir. 2003) ................................................................................... 11

*Waldorf v. Shuta,*
  142 F.3d 601 (3d Cir. 1998) ................................................................................... 11

*Watkins v. New Castle County,*
  374 F. Supp. 2d 379 (D. Del. 2005) .................................................... ~~8,~~ 9, ~~10~~10, 11

**Statutes**

15 U.S.C. §77k .................................................................................................... 1, ~~7~~8

Fed. R. Evid. 702 ..................................................................................................... ~~1~~1, 2

## SUMMARY OF ARGUMENT

Section 11(b)(3) of the Securities Act of 1933 states that underwriters are not liable if — after reasonable investigation — they reasonably believed the prospectus was not misleading. Section 11(b)(3)(c) states:

> In determining, for purposes of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable grounds for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property.

This is essentially a negligence standard. And, like any other standard based on the reasonableness of conduct under the circumstances, it is primarily a factual inquiry. It can, like any other factual issue, be decided on summary judgment if there is no dispute about the facts. But it begins with a factual issue: how would a prudent man act.

Expert testimony may be used to assist the fact-finder to understand the standards used by prudent underwriters in conducting due diligence. That is why the Underwriters are offering Edward Necarsulmer to assist the fact finder in determining the standard of care followed by underwriters. He is not an expert on law; that is the Court's domain.

Plaintiffs have turned this standard on its head. They attack Necarsulmer because he only offered assistance on a factual issue. They complain that he did not offer a legal opinion. But if Necarsulmer had in fact offered a legal opinion — as did Plaintiffs' expert R. Alan Miller — that would have been an improper opinion.

In addition to ignoring the statutory statement that a reasonable investigation is based upon what a prudent manager would do, Plaintiffs have also ignored the provisions of Fed. R. Evid. 702. This Rule states that experts are to be used to assist the fact finder in determining factual issues. There is nothing in Rule 702 stating that experts are to be used to assist the

court in understanding the law. Ignoring the statute and Rule 702, Plaintiffs have reversed the actual role of experts. That inverted view is the basis for their motion.

There are portions of Plaintiffs' motion that appear to attack Necarsulmer's credentials and the factual basis for his opinions. But in both cases, the attacks are based on the mistaken claim that Necarsulmer was *required* to offer a legal opinion. Plaintiffs attack his credentials because he has not studied the law on due diligence. They attack the evidence supporting his opinion because it does not include an analysis of the law on due diligence. Indeed, the Table of Contents for Plaintiffs' motion shows that every point is based on Necarsulmer's refusal to offer a legal opinion.

The remainder of Plaintiffs' motion consists of a list of the various areas where the Plaintiffs disagree with Necarsulmer's opinions. But if an expert is qualified to offer an opinion, and his opinion rests on a review of the evidence, it should be accepted. Plaintiffs' disagreements are grist for cross-examination, not grounds for striking his testimony.

## STATEMENT OF FACTS

Plaintiffs, not content with their mistaken view of the law, also offer a mistaken view of the facts, misstating Necarsulmer's reports, deposition testimony, and experience.

### A.  Necarsulmer's Reports and Evidentiary Investigation

Plaintiffs claim that Necarsulmer did not conduct a sufficient investigation to provide an adequate evidentiary basis for his opinions. *See* Plaintiffs' Opening Brief in Support of Motion to Strike and Exclude Testimony of Edward Necarsulmer III ("Pl. Br.") at 12-17. In fact, Necarsulmer's initial report states that he read all the documents produced by the

Underwriters.  B 196; 202.[1]  He reviewed 28 depositions.  B 202-03.  He reviewed the complaint, the answers, and responses to the contention interrogatories of the parties.  B 202.

Necarsulmer's rebuttal report specifically listed each of his opinions, and provided even more detail about the documents that supported each of his opinions.  B 204-05.

This substantial investigation is in stark contrast to whatever minimal investigation Miller may have conducted.  Truly a renaissance expert, Plaintiffs offer him as an expert in (1) materiality, (2) damages, (3) loss causation, and (4) due diligence.  In particular, he filed a rebuttal report to the Necarsulmer report.  B 267-68.

Plaintiffs are thus representing that — whatever investigation Miller may have conducted — it was sufficient to provide an evidentiary basis for his opinions.  But a comparison of the factual investigation conducted by Miller and Necarsulmer shows that if Miller sets the standard, then Necarsulmer meets it with ease.

| **Necarsulmer's Investigation** | **Miller's Investigation** |
|---|---|
| Necarsulmer reviewed the responses to contention interrogatories filed by the Underwriters, Adams Golf, and Plaintiffs.  B 202. | Miller failed to read the Underwriters' responses to Plaintiffs' contention interrogatories.  B 444-45. |
| Necarsulmer reviewed all 28 deposition transcripts.  B 202-03. | As to the Underwriter witnesses, Miller read one transcript and "skimmed" another.  B 447-48. |
| Necarsulmer reviewed all the deposition exhibits.  B 196; 202-03. | Miller read a small group of deposition exhibits that were selected for him and provided to him by counsel.  B 442-45. |
| Necarsulmer reviewed all the documents produced by the Underwriters.  B 196; 202. | Apart from the deposition exhibits that were provided to him by counsel, Miller did not read any of the documents produced by the Underwriters.  B 464-65. |

---

[1]  Citations to "B" refer to the Appendix to this Brief.

Even if Miller is not the standard by which evidentiary support for an opinion is judged, there is no question that Necarsulmer engaged in substantial investigation and has substantial evidence for his opinions.

**B.    Necarsulmer's Extensive Experience in Due Diligence**

Necarsulmer's extensive experience was summarized in paragraph 2 of his report:

> I have more than 33 years of experience in the investment banking and securities business.  I have run the capital markets areas as well as the North American Equities Business for a major global investment bank.  I have also been in charge of all equity underwriting, sales, research and trading for two U.S. firms.
>
> I have been involved in all areas of due diligence from practitioner to supervisor over my career and additionally have had overall responsibility for the execution of numerous public offerings.  I have also been a member of and/or chaired commitment committees who serve as the "first consumer" of the firm's due diligence efforts and are ultimately responsible for the determination of its adequacy before the firm agrees to go forward with the underwriting of the securities.  B 196.

Remarkably, Plaintiffs have actually tried to attack these qualifications.  Pl. Br. at 8-12; 16.  Much of that attack is misguided, however, because the basis of their attack is that Necarsulmer is not qualified to offer a legal opinion.

To the extent Plaintiffs claim Necarsulmer lacks the experience to be an expert in due diligence, the summary of his experience in his report disproves that claim.  Not only is that claim wrong on its face, it is inconsistent with the qualifications of *their* due diligence expert, Miller.  It is worth comparing deposition testimony about Necarsulmer's experience to the deposition testimony about Miller's experience to see just how baseless Plaintiffs' claims are:

| Necarsulmer's Experience in Due Diligence | Miller's Experience In Due Diligence |
|---|---|
| Has been in the securities industry for over 33 years.  Over the course of his career, has been actively involved in performing due diligence on a number of occasions, including due diligence investigations of IPOs and companies going | Conducted due diligence in connection with an IPO *once*, almost 30 years ago. B 397-400. |

4

| Necarsulmer's Experience in Due Diligence | Miller's Experience In Due Diligence |
|---|---|
| through follow-on offerings. B 44; 57. His experience came from "[e]ither as a practitioner or running a deal, but most importantly as a commitment committee chair or member, which I did for a number of years, the heart of the work was evaluating your own investment banker's due diligence or if you were co-manager, the due diligence done by whoever was the book-running manager." B 31. | |
| Created standard due diligence procedures for several firms. B 32-33. | Has not written any materials about due diligence in at least 30 years. B 404-07. |
| Taught due diligence in training classes on equity capital markets. B 33. | Has not taught or attended any continuing education course on due diligence in the last 20 years. B 410-11. |
| Has been an active participant in industry panels and study groups, commenting on rules, including due diligence. He was "an active participant in Securities Industry Association, Investment Bankers Association, NASD, Group of Corporate Finance, I did a lot of that kind of thing, yes." B 45-46. | Has not been part of any industry panels or any regulatory agencies. B 222-33. |

**C.     Plaintiffs' Distortion of Necarsulmer's Deposition Testimony**

Not content with their baseless attacks on Necarsulmer's qualifications, Plaintiffs purport to quote — or describe — Necarsulmer's deposition transcript in attacking his qualifications. There are two problems with their citations to his deposition. First, every single citation to the deposition transcript is wrong. Second, many of their descriptions are incorrect or omit essential portions of the deposition testimony:

| Plaintiffs' Version | Deposition Text |
|---|---|
| Necarsulmer disagreed that underwriters have been considered responsible for assuring the accuracy of an issuer's offering materials. Pl. Br. at 10. | Q. Have you ever heard anyone express the view that as a matter of law under the 1933 Act that both the underwriters and the issuer are equally legally responsible for the content of the document subject to the due diligence defense?<br>A. I do understand that. B 36.<br>Q. Would you agree with the general proposition . . . that over the years the underwriter has been regarded as a type of gatekeeper to the capital marketplace?<br>A. Yes. B 50-51. |

5

| Plaintiffs' Version | Deposition Text |
|---|---|
|  | Q. Do you believe that in initial public offerings underwriters are heavily relied upon by the investing public? <br> A. I do believe that. B 52. <br> Q. Is it your understanding as a non-lawyer that one of the duties of underwriters is to deal fairly with the investing public? <br> A. Absolutely. B 61. <br> Q. I take it from your initial report that one of your beliefs is that an underwriter has an obligation to conduct a reasonable investigation in an IPO? <br> A. Yes. B 61. |
| Necarsulmer denies that the underwriters had an obligation to independently verify all of the representations of the issuer. Pl. Br. at 11. | Q. Do you believe that in the due diligence process the underwriters are frequently required to play the devil's advocate? <br> A. Yes. B 75. <br> Q. Do you agree with the principle that the underwriters must employ a high degree of care in their investigations? <br> A. I certainly do. B 75-76. <br> Q. Do you agree that the underwriters must independently verify the company's representations? <br> A. I don't think *all* of the representations. I think – you know, the basic description of their business plan and those kinds of things are – if you are going to do business with these people you traditionally accept those at face value. B 76 (emphasis added). <br> Q. Do you believe that in each case in which an underwriter conducts due diligence it must conduct a meaningful investigation of the company? <br> A. I agree with that. B 76-77. <br><br> *   *   * <br> Q. Do you believe that underwriters are entitled to rely solely on the representations of a company's officers or counsel? <br> A. No. B 66. <br> Q. Do you believe that verification of information is a critical step in the due diligence process? <br> A. Yes. B 66-67. |
| Necarsulmer would not even agree that as a general proposition in due diligence an underwriter should be skeptical of rosy outlooks. Pl. Br. at 11. | Q. Do you agree with the proposition that underwriters must be alert to exaggerations by an issuer? <br> A. Yes. B 68-69. <br> *   *   * <br> Q. Do you agree that another reason that [verification] may be necessary is because honest clients can be overenthusiastic or overoptimistic? <br> A. Yes. B 67. <br> Q. Would you agree with the general proposition that in due |

| Plaintiffs' Version | Deposition Text |
|---|---|
| | diligence an underwriter should be skeptical of rosy outlooks by the issuer's management?<br>A. I don't think – just because someone is optimistic doesn't necessitate skepticism. We've come to learn to live with rapid growth in our – once we got out of the '60s and '70s, rapid growth was a big part of our lives. So I would have to say even though intuitively I would agree with you, I think the right answer is no. B 128. |

Plaintiffs' Corrected Version of their Brief contains one egregious example of using a deposition answer out of context. Page 12 of the Corrected Version states:

> ~~A particularly instructive distortion is the Plaintiffs' statement that~~ "Mr. Necarsulmer even disagreed that the securities industry as a whole expects more due diligence work in an IPO than in a follow-on (subsequent) offering." ~~Pl. Br. at 12. That is *not* what he said. Necarsulmer said that the same *standards* of due diligence apply to an underwriting, no matter whether the offering was an IPO or a follow on offering. But he noted that applying these standards to IPOs generally involved more work than follow-on offerings. B 53-54.~~ (*Id.* at **55**)."

In preparing their Opposition Brief, the Underwriters assumed Plaintiffs were referring to pages 53-54, for an obvious reason. A citation to page 55 is at best incomplete, and at worst misleading. To avoid further misunderstanding, the key testimony from pages 53 to 57 puts Necarsulmer's testimony in context:

| | |
|---|---|
| Q. Now do you believe that in the securities industry the standards for due diligence are more rigorous in an IPO than in a follow-on offer?<br>A. I have a difficult – I think your concept is correct – I guess what I'm trying to say is since there is less information in the public domain, more work is traditionally done, but think the standards are pretty much the same. | 53-54 |
| Q. So the standards are the same but the work is more rigorous in the IPO than in the follow-on offering?<br>A. What I'm trying to say – maybe I didn't say it properly – is that if you are working on the second, third, or fourth offering for company, A, you are knowledgeable, assuming you have the same team in place or parts of the same team in place; and, B, the body of information has been organized and is more easily – easy to digest and to process. An IPO you tend – sometimes you have to really break new ground to get information. | 54-55 |
| Q. Would you agree that the securities industry as a whole expects more due | 55 |

7

| | |
|---|---|
| diligence work in an IPO than in a follow-on offering?<br>A.  I wouldn't agree to that. | |
| Q.  Would you disagree then that the standards for due diligence are higher than usual when a company going through an IPO is experiencing rapid growth and change?<br>A.  I don't think I can answer. . . . I don't think the standards – you are faced with the same issue when you agree to commit your capital and your reputation to underwrite securities and there may be a number of, you know, intensity of whatever the proper phrase would be, someplace within the same scale and I don't think it's just because it's an initial public offering or just because it's a company that's a rapidly growing company. | 56-57 |

Thus — contrary to Plaintiffs' claim — Necarsulmer testified that: (i) the *standards* for due diligence are the same for all offerings: (ii) IPO's usually require more work than a follow-on offering; and (iii) it is not possible to make blanket statements about what "the securities industry" believes.  Indeed, far from proving their claims, Plaintiffs' attacks show *their* lack of investigation. They show and the lack of evidence for *their* claims.  They do not support thePlaintiffs' motion to exclude Necarsulmer's testimony.

**ARGUMENT**

**I.    NECARSULMER'S TESTIMONY ABOUT THE STANDARD OF CARE EXERCISED BY UNDERWRITERS *WOULD* BE HELPFUL TO A JURY; A LEGAL OPINION BY NECARSULMER ABOUT THE MEANING OF VARIOUS CASES WOULD *NOT* BE HELPFUL**

Plaintiffs claim that an expert on due diligence must be an expert on the law.  But reasonableness is a question of fact, not law.  As the Supreme Court stated in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976), the issue of reasonable investigation under §11 is fundamentally a "negligence standard."  The Ninth Circuit stated in *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1996), that whether an investigation was "reasonable" was an issue of fact that normally would be determined by a jury.  The Ninth Circuit also held that

8

courts may "resolve questions of due diligence in those cases where no rational jury could conclude that the defendant had not acted reasonably." *Id.* at 622.

Thus, although summary judgment is appropriate in this case — because the facts are undisputed — whether an investigation was reasonable remains an issue of fact. If this case were to go to trial, that issue would be submitted to the jury. A factual expert on underwriter due diligence would assist the jury in understanding those factual issues. *See generally ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 622 (E.D. Pa. 2002) (expert in financing qualified to testify on due diligence matters because his "testimony would assist the jury in reaching a determination" on the due diligence issues in dispute).

But a legal opinion by Necarsulmer would not help the jury, because jurors are required to follow the law as established by this Court, not by an expert witness. In *Oxford Gene Tech. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004), this Court allowed an expert witness to testify about the factual issue of the "standard of reasonable commercial behavior" in a patent case. But this Court held that the expert "would not be permitted to testify as to the legal standard for willfulness." *Id.* at 443.

Similarly, in *Watkins v. New Castle County*, 374 F. Supp. 2d 379 (D. Del. 2005), this Court allowed an expert — whose expertise was based upon experience gained through 22 years of experience as a police officer — to testify about police training, methods and policies. But this Court held that "opinions in which he draws legal conclusions beyond the appropriate standard of reasonable conduct are unhelpful to the jury and he will be precluded from testifying to those." *Id.* at 392-93.

9

## II. PLAINTIFFS' ATTACKS ARE MERELY CROSS-EXAMINATION QUESTIONS THAT — AT MOST — WOULD GO TO THE WEIGHT OF NECARSULMER'S TESTIMONY; THEY HAVE NOTHING TO DO WITH THE ADMISSIBILITY OF HIS TESTIMONY

Plaintiffs devote a substantial portion of their motion to stating the areas where they disagree with Necarsulmer. They point out testimony they think is mistaken. They argue that the legal standard is different from the factual standard that is the subject of his opinion. These attacks are nothing more than cross-examination arguments, challenging the weight of Necarsulmer's testimony. They do not go to admissibility.

In *Astrazeneca LP v. TAP Pharm. Prod., Inc.*, No. Civ.A.04-1332 KAJ, 2006 WL 2338144 (D. Del. June 23, 2006), this Court rejected a similar claim. Defendants in that case moved to strike an expert report, claiming that the expert's testimony was "unsupported, and based on his own perceptions rather than research, and that those sections of the report are contrary to law and based on false medical assumptions." *Id.* at *9. This Court stated: "TAP's arguments here, like AstraZeneca's arguments in the motion to exclude Dr. Spilker's testimony, go to the weight, not the admissibility of Dr. Rappeport's opinion." *Id.*

Similarly, in *Oxford Gene Tech.*, 345 F. Supp. 2d at 443, and in *Watkins*, 374 F. Supp. 2d at 392, this Court noted that disagreements with an expert's opinion may be grounds for attacking the weight of the opinion, but they do not go to admissibility. There is no question about Necarsulmer's qualifications. Nor is there doubt about the substantial investigation he conducted, and the evidentiary basis for his opinions. Thus, there is no question about the admissibility of his testimony.

10

## III. NECARSULMER IS QUALIFIED — BECAUSE OF EXPERIENCE — TO SERVE AS AN EXPERT ON THE STANDARD PRACTICES OF UNDERWRITERS IN CONDUCTING DUE DILIGENCE

Plaintiffs claim that Necarsulmer is not qualified to be an expert. But this attack rests on the same flawed assumption as their other claims. They say Necarsulmer should be an expert on the standards of law, not issues of fact. They say that he lacks expertise because he does not know the case law on due diligence. Pl. Br. at 3, 8-9, 16-17. They say his opinion lacks evidentiary support, because he did not investigate the law. *Id.* In fact, as shown in Point I, these claims show a failure *by Plaintiffs* to investigate or understand the law.

The Plaintiffs' motion papers are unclear enough, however, for them to be read as claiming Necarsulmer lacks the qualifications to serve as a factual expert. But any such claim would be contrary to the record. As set forth in his report and his deposition, Necarsulmer has over 33 years of experience in due diligence, running equities operations for a major global investment bank and two U.S. firms. B 31; B 196. He has taught underwriters about due diligence. B 33. He has served on major securities regulatory bodies. B 45-46; B 201. As set forth in even more detail in the Statement of Facts, his experience fully qualifies him as an expert.

This Court's decisions in *Oxford Gene* and *Watkins* are instructive. In *Oxford Gene*, this Court accepted expert testimony on "the standard of behavior generally when a corporation is confronted with an allegation of infringement." 345 F. Supp. 2d at 443. The expert had 18 years of experience in patent law, and had served in various capacities at several major companies. *Id.* In *Watkins*, this Court accepted expert testimony from a police officer — based upon 22 years of experience — about customs, policies and practices of police officers. 374 F. Supp. 2d at 392.

An expert can thus be qualified on the basis of experience in the area of his expertise. *See generally Schneider v. Fried,* 320 F.3d 396, 399 (3d Cir. 2003) (cardiologist qualified to give expert opinion concerning sub-specialty different from his own "in view of his extensive experience working closely with" cardiologists in that sub-specialty); *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir. 1998) (basis of an expert's specialized knowledge "can be practical experience as well as academic training and credentials") (internal citations omitted). Necarsulmer easily meets this test. Indeed, Plaintiffs' attack on Necarsulmer's experience is truly remarkable in light of the meager expertise of Plaintiffs' experts. As shown in the Statement of Facts, Plaintiffs' expert Miller has not had any experience conducting or teaching due diligence in the last 25 years.

Plaintiffs' attack on Necarsulmer's qualifications is particularly remarkable in light of the qualifications of Plaintiffs' other "expert:" Ms. Ochoa. Although she is offered as an expert on gray marketing, she has no experience with gray marketing. She has never written anything on gray marketing, she has never made any presentations on gray marketing, and she has never done any research on gray marketing. B 501-02; 506. During the three years she has been teaching, her only exposure to gray marketing has been in teaching two or three classes as part of a general international business transactions course. B 495-500; 507.

Moreover, in contrast to Necarsulmer, who has repeatedly been retained as an expert, Ochoa has never served as an expert. B 493; 505. In fact, she did not know how to write an expert's report, B 512-513, and did not initially consider herself an expert. B 493-494; 503-504.

Although she offers an opinion about what should have been in the Risk Factors of the Prospectus, she admits that her only relevant experience was her involvement with an

12

IPO as a summer associate at Clifford Chance, B 508, and that she has no expertise in giving advice to clients about disclosure.  B 509-511.  Yet Plaintiffs claim that she is qualified to testify as an expert, while Necarsulmer is not.

Plaintiffs' motion is truly a trip through the looking glass.  They attack Necarsulmer's status as a factual expert because he offers a factual opinion, not a legal opinion.  They attack his qualifications although he is vastly *more* qualified than their own experts.  While it may be entertaining, it is time for this trip to end, and to return to the real world.

## CONCLUSION

Necarsulmer has met all of the requirements for an expert witness.  He is qualified to assist a fact finder in determining whether the Underwriters followed the standard of care expected by a prudent man in the circumstances.  Accordingly, Plaintiffs' Motion to Strike and Exclude his testimony should be denied in all respects.

| | |
|---|---|
| *Of Counsel*: | POTTER ANDERSON & CORROON LLP |
| Michael J. Chepiga | |
| Paul C. Gluckow | By:___/s/ John E. James_____ |
| Theodore J. McEvoy | Robert K. Payson (No. 274) |
| Ryan A. Kane | John E. James (No. 996) |
| SIMPSON THACHER & BARTLETT LLP | Hercules Plaza – Sixth Floor |
| 425 Lexington Avenue | 1313 N. Market Street |
| New York, NY 10017-3954 | Wilmington, DE  19801 |
| Telephone:  (212) 455-2831 | Telephone:  (302) 984-6000 |
| Facsimile:  (212) 455-2502 | Facsimile:   (302) 658-1192 |
| | *Attorneys for Underwriter Defendants* |

Dated:  October 9, 2006
Corrected Version Filed:  October 19, 2006
756760/23310

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, John E. James, hereby certify that on October 9,19, 2006, the within document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following attorneys of record stating that the document is available for viewing and downloading from CM/ECF:

>Carmella P. Keener, Esquire
>Rosenthal Monhait Gross & Goddess, P.A.
>919 Market Street, Suite 1401
>Wilmington, DE  19801

>Alyssa Schwartz, Esquire
>Richards Layton & Finger
>One Rodney Square
>Wilmington, DE  19801

>*/s/ John E. James*
>John E. James (No. 996)
>Potter Anderson & Corroon LLP
>Hercules Plaza – Sixth Floor
>1313 North Market Street
>Wilmington, DE  19801
>Telephone:  (302) 984-6000
>E-mail:  jjames@potteranderson.com