# EXHIBIT A

Case 1:99-cv-00371-GMS    Document 341-2    Filed 10/30/2006    Page 1 of 11

# Underwriter Due Diligence In Securities Offerings

By Cadwalader, Wickersham & Taft LLP

Underwriters have long played a crucial role in securities offerings. As the U.S. Court of Appeals for the Second Circuit noted in *Chris-Craft Industries, Inc., v. Piper Aircraft Corporation*, "[p]rospective investors look to the underwriter -- a fact well known to all concerned and especially to the underwriter -- to pass on the soundness of the security and the correctness of the registration statement and the prospectus."[1] Consistent with this important "gatekeeping" role in the offering process, Sections 11 and 12(a)(2) of the Securities Act of 1933 (the 1933 Act), respectively, subject underwriters to potential liability for any material misrepresentations or omissions contained in a registration statement or prospectus.[2] Under both sections, however, underwriters may assert a "due diligence" defense.[3]

The term "due diligence" encompasses both an underwriter's affirmative responsibilities and the defense that it may assert to avoid liability claims brought under Sections 11 and 12. The specific term "due diligence," however, appears nowhere in the 1933 Act, the Securities Exchange Act of 1934 (the 1934 Act) or any Securities Exchange Commission (SEC) rule.[4] Rather, it is a term of art derived from the language of Section 11 precluding liability where the underwriter reasonably believed, after "reasonable investigation" that no violation existed and the language of Section 12(a)(2) precluding liability where the underwriter, having exercised "reasonable care," did not or could not have known of the violation. The adequacy of an underwriter's due diligence efforts and, in turn, its ability to establish a due diligence defense is determined by "the standard of reasonableness [that is] required of a prudent man in the management of his own property."[5]

Despite the long-standing statutory requirements, caselaw and SEC guidance as to the nature and scope of the due diligence defense is relatively sparse. Indeed, courts have recognized that "[i]t is impossible to lay down a rigid rule suitable for every case defining the extent [of an underwriter's due diligence obligations]."[6] Accordingly, the conduct required of underwriters to meet their affirmative due diligence responsibilities and, if necessary, establish a due diligence defense depends on a variety of factors. In that regard, SEC Rule 176 sets out a number of general factors for courts to examine when determining the "reasonableness" of an investigation for purposes of Section 11.[7] Recently, in connection with its release proposing substantial changes in the registration of securities offerings -- referred to as the "Aircraft Carrier" -- the SEC has requested comment on proposed amendments to Rule 176 designed to address underwriter due diligence, under certain circumstances, in the context of both Sections 11 and 12(a)(2).[8]

**Due Diligence**

Underwriter due diligence investigations generally commence with inquiries into the issuer's business and operations. In most situations, such initial inquiries consist of an investigation into the issuer's industry in general and discussions with the issuer's management during which management provides the underwriter with information that management believes should appear in the registration statement. These discussions are helpful to the extent that they enable the underwriter to gain a general understanding of the issuer's business and to assess whether management is capable of carrying out its prospective goals.

An underwriter's investigation does not end with the receipt of information from management, but contemplates that the underwriter independently verify the information it has been given.[9] Indeed, courts have recognized that independent verification is a critical step in the due diligence process. For example, the court in *Escott v. BarChris Constr. Corp.* based its determination that the underwriters had not established a due diligence defense in large part on the fact that the lead underwriter delegated much of its diligence responsibility to counsel -- who merely took documents produced by the issuer and statements made by the issuer at face value, and made no independent verification. Similarly, the court in *University Hill Foundation v. Goldman, Sachs & Co.*, concluded when an underwriter possesses information that may indicate potential problems with the offering materials, its "normal due diligence procedures [are] inadequate and [ . . . ] require more concrete verification of management representations and projections."[10]

Underwriters will also examine the issuer's current financial health and its future financial prospects as part of their due diligence investigation. This step necessarily involves a review of the issuer's financial statements which, in turn, requires underwriters to refer to the analysis and opinions of the issuer's independent auditors. Underwriters should

nevertheless carefully scrutinize the auditor's report and letters to management to determine whether potential problem areas were uncovered during the audit. Moreover, underwriters should look at general financial issues -- including profits and revenue, budget concerns and the internal audit controls the issuer has in place -- to reach a sufficient comfort level with the issuer's overall financial condition. In addition, underwriters will address various legal issues that could potentially affect the accuracy of the registration statement and the adequacy of its disclosures.

While early cases, such as *BarChris, Chris-Craft and Feit v. Leasco Data Processing Equipment Corp.*, determined that the underwriters in those cases were unable to establish a due diligence defense due to deficiencies in their investigations, more recent cases have reviewed underwriters' due diligence practices more favorably. In *In re Software Toolworks*, for example, these practices included contacting customers and suppliers regarding their dealings with the issuer, inspecting one of the issuer's factories, reviewing the issuer's financial statements with its auditors and obtaining comfort letters from these auditors, obtaining written representations from the issuer and selling stockholders that the information contained in the registration was accurate and did not contain any material omissions, and having underwriter's counsel conduct a separate review of the issuer's records.[11]

The underwriters in *Weinberger v. Jackson* conducted similar efforts which led to the court's determination that their investigation was "reasonable." Specifically, the underwriters worked in tandem with accountants and attorneys throughout their investigation, conducted numerous interviews of the issuer's management and employees, conducted site visits and extensively questioned third parties such as the issuer's customers, suppliers and distributors.[12] And in *In re Rectifier Securities Litigation*,[13] the court found the underwriter's investigation to be "reasonable," focusing on the factors that various courts have examined when reviewing underwriter due diligence: (1) familiarity with the issuer's finances, management and operations; (2) knowledge of the issuer's industry; (3) conduct of employee interviews; (4) confirmation of data supplied by the issuer from the issuer's customers and other third parties; and (5) receipt of written verification from the issuer or outside accountants that the prospectus was accurate and contained no material omissions.

In 1992, the SEC attempted to provide guidance regarding factors that could be considered in assessing underwriter diligence. In adopting Rule 176, the SEC cited the following factors applicable in the context of Section 11: (1) the type of issuer, security and underwriting arrangement; (2) whether or not the person conducting the investigation has some relationship with the issuer other than as an underwriter; (3) reasonable reliance on officers and employees of the issuer and others who should have knowledge of the particular facts relied upon; (4) the availability of

information regarding the issuer; and (5) whether, when a fact or document is incorporated by reference into the registration statement, the person investigating had any responsibility for that fact or document at the time of the filing of the document from which it is incorporated.

### The Investigation

Courts often determine the standard of reasonableness by examining the context within which the underwriter is conducting its due diligence investigation. Indeed, "as a standard of conduct, 'reasonableness' is meaningless except in a specific factual context."[14] For example, underwriters' due diligence in the initial public offering context will be subjected to a greater degree of scrutiny than other offerings.[15] Courts have reasoned that this higher standard is necessary, as these securities have never been publicly traded and information about their issuer is often not readily available.

Similarly, underwriters that have long-standing relationships with an issuer may be held to a higher standard of care. Thus, the *University Hill* court held that the relationship between the underwriter and the issuer should be a central focus in determining the standard of "reasonableness" applied to an underwriter's due diligence investigation.[16] In that case, the underwriter's close relationship with the issuer and the fact that it was the exclusive dealer of the issuer's securities demanded application of a "fairly rigorous standard" in judging the adequacy of its due diligence investigation, and whether it had established a due diligence defense.

### 'Expertised' Portions

The "reasonableness" required of underwriters' due diligence investigations also depends upon the type of materials that they are reviewing. Specifically, Section 11(b)(3)(A) -- (D) divides the contents of the registration statement into two clearly-delineated portions -- "non-expertised" materials and "expertised" materials.[17] Underwriters seeking to establish a due diligence defense as to the "non-expertised" portions of the registration statement (that is, materials "not purporting to be made on the authority of an expert") must prove that, at the time of the registration's effective date, they had "reasonable grounds to believe and did believe . . . that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[18]

Underwriters can establish a due diligence defense as to "expertised" portions of the registration statement (that is, "[those portions] made on the authority of an expert") by demonstrating that after a "reasonable investigation" they had "no reasonable ground to believe and did not believe . . . that the statements [contained in the expertised section] were untrue or that [they omitted] a material fact."[19] Accordingly, the issue

with regard to the expertised portions is not "reasonable investigation," but "reasonable reliance" -- the underwriter must not have uncovered any facts that would give it a reason not to rely on an expert's representations.

Reports of auditors on audited financial statements of the issuer are examples of "expertised" opinions upon which underwriters typically rely.[20] Courts are divided, however, as to whether an underwriter's responsibilities simply end upon reviewing the auditor's audit opinion. In *BarChris*, the court found that the underwriter's mere review of the audit opinion established a due diligence defense as to the audited financial figures prepared by the issuer's independent auditor. By contrast, the Seventh Circuit in *Sanders v. John Nuveen & Co.*[21] took the opposite approach, criticizing the underwriters for not meeting with the auditors or reviewing any accounting work papers which might have revealed evidence of fraud between the issuer and the auditors. Significantly, unaudited financial statements are not considered to be expertised, requiring underwriters to conduct a reasonable investigation. This requirement can be met in large part, however, by obtaining comfort letters from the auditors concerning the unaudited information and an update of the issuer's financial condition.[22]

**Reliance on Others**

Underwriters commonly delegate certain aspects of due diligence investigations to others, such as attorneys, accountants and the lead underwriter. A major concern in relying on others to conduct certain aspects of diligence, however, is that an inadequate investigation by an underwriter's agents may prevent it from establishing a due diligence defense.[23] In this regard, it is not advisable for an underwriter to blindly rely on the people to whom it delegates responsibility. Rather, monitoring the entire due diligence process -- even those aspects that are delegated -- ensures that an underwriter's agents will more likely conduct an adequate investigation, thus protecting the underwriter from liability while decreasing the time it takes to complete the investigation.[24]

**Expedited Offerings**

Due diligence may also require a modified approach by the underwriter, as well as a modified analysis by a reviewing court, of Rule 415 shelf registrations and registration on forms such as Form S-2, Form S-3 and Form S-4 -- all of which involve an integrated disclosure system allowing issuers to incorporate information by reference to documents filed with the SEC pursuant to their obligations under the 1934 Act.[25] Shelf registration and an integrated disclosure system have had at least two significant effects on underwriter due diligence.[26]

First, issuers' ability to conduct offerings using documents that they have already filed pursuant to their 1934 Act reporting obligations

dramatically decreases the time it takes to complete the offering. This, in turn, often constrains underwriters in conducting a "traditional" due diligence investigation.[27] Even in light of these time limitations, underwriters can still make a thorough investigation "under the circumstances" by (1) updating material disclosures -- such as the accuracy of forward-looking statements or the existence of new trends in the issuer's business or industry in the Management Discussion and Analysis (MD&A) section of the issuer's Form 10-K -- as short form registration statements often merely consist of prospectus supplements containing abbreviated financial and business disclosures and (2) narrowing their investigation to identifying potential problem areas -- such as business prospects and liquidity that are not disclosed in prospectus supplements. Second, shelf registrations and an integrated disclosure system expose underwriters to potential 1933 Act liability for material misstatements or omissions in 1934 Act reporting documents. In that regard, the SEC has stated that information incorporated by reference must be materially true and complete and, if necessary, updated by the registration statement.[28]

Another facet of the reasonableness inquiry concerns an underwriter's continuing due diligence obligations. Specifically, a court will likely find that an underwriter's due diligence was inadequate if it failed to continue its investigation of the issuer up to and through the registration statement's effective date.[29] This was the court's position in *Shaw v. Digital Equipment Corp.*,[30] which involved a Rule 415 shelf registration. The plaintiffs in Shaw alleged that the underwriter-defendants failed to include negative inter-quarter financial results in a shelf registration statement filed 11 days before the end of the quarter. The underwriters responded that the policy behind permitting shelf registration and the integrated disclosure system relied on in connection with these offerings -- namely an issuer's high profile, provision of a steady stream of information, and large following by analysts which enable it to file under Form S-3 -- renders any continuing investigation obligation unnecessary. The court rejected defendants' arguments, noting that "the relevant inquiry [that the underwriter must focus on during a shelf registration] is whether the nondisclosure of interim facts render[s] the prospectus materially incomplete."

In November 1998, the SEC issued its Aircraft Carrier release setting forth significant proposals to alter the registration processes by which securities are offered and distributed. While the release addresses numerous issues, one aspect concerns proposed amendments to Rule 176's factors to be considered by courts in determining whether an underwriter has met its reasonable investigation obligations under Section 11 of the 1933 Act. In that regard, the proposed amendments would clarify that Rule 176 applies as well to the reasonable belief standard under Section 12(a)(2).

Specifically, the Aircraft Carrier release attempts to provide courts with

more comprehensive guidance as to whether an underwriter has established a due diligence defense in the context of expedited offerings which are anticipated in light of other proposals set forth in the release. The proposed amendments to Rule 176 -- applicable only to offerings of equity and non-investment grade debt securities marketed and sold in fewer than five days -- articulate six due diligence practices for courts to look at as "positive factors" when assessing whether an underwriter has established a due diligence defense: (1) an underwriter's review of the registration statement and reasonable inquiry into any "red flags," that is, facts or circumstances suggesting that the offering materials contain a material misstatement or omission; (2) any discussions between the underwriter and, at minimum, the issuer's Chief Financial Officer or Chief Accounting Officer in which the officer certifies that he has reviewed the registration statement and that, to the best of his knowledge, it contains no material misstatements or omissions; (3) the underwriter's receipt of a Statement on Auditing Standards (SAS) No. 72 comfort letter from the issuer's auditors; (4) the underwriter's receipt of a letter from issuer's counsel opining that the registration statement contains no "unfair or untrue" statements or omissions of material facts; (5) the issuance of an opinion letter by underwriter's counsel stating that nothing came to its attention during its review of the offering documents, leading it to believe that these documents contain untrue statements or omissions of material facts; and (6) the employment of and consultation with a research analyst who has either followed the issuer or its industry for at least six months prior to the offering or issued a report regarding the issuer or its industry within twelve months of the offering.[31]

In the release, the SEC particularly addressed what it viewed as the important role of research analysts in the underwriting process, observing that analysts who regularly follow the issuer or its industry typically have undertaken an assessment of the risks and prospects for the issuer's business, are familiar with and have vetted available public information concerning the issuer and its industry and have been in regular contact with the issuer or its competitors, thereby accumulating a "reservoir of information" that would assist in expediting the diligence process. The release acknowledged certain implications resulting from the more extensive use of analysts implicitly encouraged by the release, noting that many firms maintain "Chinese Walls" between their analysts and underwriters. These "walls" are established, along with adherence to other restrictions concerning analyst publications prior to an offering, to avoid allegations of "gun jumping" and the "tipping" of material non-public information concerning the issuer.[32] The release provides somewhat mixed signals with respect to this dilemma, stating that "[a]lthough we recognize the helpful role analysts perform in facilitating due diligence, we also recognize the wisdom of maintaining legitimate walls between analysts and underwriters that work for the same brokerage firm and share an interest in the same issuers." The release then appears to propose a solution consisting of a "one-way" wall between analysts and underwriters of the same firm that presumably contemplates the flow of

information from the analyst to the underwriting team but no disclosure of material non-public information flowing in the other direction. The release, however, does not elaborate on the logistical and practical difficulties of preserving such a "one-way" wall (indeed, even the knowledge of the proposed offering itself could constitute material non-public information) and the difficulties that would be encountered in documenting and proving the integrity of the "one-way" wall.

Finally, the release seeks public comments on the overall implications and relevance of the proposed amendments to Rule 176, including whether the Rule should be applicable to investment grade debt and whether the amendments should be more narrowly or more broadly applicable in scope. The release also seeks public comments concerning whether three other factors should be included in any final amendment to the Rule: (1) that the issuer's independent auditor conducted an interim review of the issuer's financial statements under SAS No. 71; (2) that the issuer's independent auditor conducted a review of the issuer's MD&A disclosure; and (3) that a year-end disclosure review was conducted by an appropriately qualified independent diligence professional.

**Conclusion**

Because the reasonableness inquiry is fact-specific, the courts have not provided clear guidance to underwriters as to what steps will be sufficient to satisfy the due diligence defense. Such guidance has become even more important in light of the increased use of expedited offerings. In that regard, the factors set out in the proposed amendments to Rule 176 are of limited assistance in that they reflect, in large part, standard practice, and, in the case of the use of analysts, create potential dilemmas to underwriters without a meaningful solution. Accordingly, underwriters should continue to review their diligence policies and practices and take appropriate steps to document their diligence during underwriting.

1. 480 F.2d 341 (2d Cir.), cert. denied, 414 U.S. 910 (1973).
2. See 15 U.S.C. § 77k (1998); 15 U.S.C. § 77l(a)(2) (1998).
3. See *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 696-98 (S.D.N.Y. 1968). Courts have recognized that the standards of reasonableness applicable to both sections are "similar, if not identical." See, e.g., *In re International Rectifier Securities Litigation* 1997 WL 529600 at *7 (C.D. Cal. March 31, 1997) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994)).
4. See Charles J. Johnson, Jr. and Joseph McLaughlin, *Corporate Finance and the Securities Laws*, 257 (1997).
5. 15 U.S.C. § 77k(c) (1988); Cf. *International Rectifier*, 1997 WL 529600 at *7 ("It is clear . . . that the diligence conducted must be reasonable, not perfect.") (citation omitted).
6. *BarChris*, 283 F. Supp. at 697.

7. See 17 C.F.R. § 230.176.
8. Regulation of Securities Offerings, Securities Act Release No. 33-7606A, [Current Binder] Fed. Sec. L. Rep. (CCH) 6 86,108 (November 13, 1998) (the "Aircraft Carrier"). The Release was issued in its final form on November 18, 1998 with minor changes, none of which were substantive.
9. See, e.g., *International Rectifier*, 1997 WL 529600 at *7-8; *Weinberger v. Jackson*, 1990 U.S. Dist. LEXIS 18394 at *6-9 (N.D. Cal. Oct. 11, 1990); *University Hill Foundation v. Goldman Sachs & Co.*, 442 F. Supp. 879, 898-99 (S.D.N.Y. 1976); *Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544, 582 (E.D.N.Y. 1971); *Chris-Craft* 480 F.2d at 372-73; *BarChris*, 283 F. Supp. at 696-97.
10. See also *Chris-Craft*, Id. at 372-73 (minutes from the issuer's board meeting in underwriter's possession "if not sufficient in themselves to lead a reasonable person to believe that the registration statement was misleading, certainly would have impelled a reasonable person to explore further").
11. *In Re Software Toolworks Securities Litigation*, 789 F. Supp. 1489, 1497 (N.D. Cal. 1992) (*Toolworks 1*), aff'd in part and rev'd in part, 38 F.3d 1078 (9th Cir. 1994), opinion amended and sup'd, 50 F.3d 615 (9th Cir. 1994).
12. 1990 U.S. Dist. LEXIS 18394 (N.D. Cal. Oct. 11, 1990).
13. *International Rectifier*, 1997 WL at *11.
14. Report of Task Force on Seller's Due Diligence and Similar Defenses Under the Federal Securities Laws ("Task Force Report"), 991 PLI/Corp. 123, 172, reprinted in 48 Bus. L. 1185 (May 1993).
15. See *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1202 ("Indeed, in the context of [an initial] public offering, there is a strong affirmative duty of disclosure.")
16. 422 F. Supp. at 899-901.
17. See 15 U.S.C. § 77k(b)(3)(A) -- (D).
18. 15 U.S.C. 77k(b)(3)(A) (1988).
19. 15 U.S.C. 77k(b)(3)(B) -- (C) (1988).
20. See, e.g., *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1424 (9th Cir., 1994), cert. denied sub. nom. *Miller v. Pezzani*, 116 S. Ct. 185 (1995). Only the audited, certified financial statements are "expertised" for Section 11 purposes. See *BarChris*, 283 F. Supp. at 643.
21. 619 F.2d 1222, 1227-28 (7th Cir. 1980), cert. denied, 101 S. Ct. 1719 (1981).
22. See *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 323

23. See *BarChris*, 283 F. Supp. at 696-97 (attorney's failure to adequately examine corporate minutes and contracts binding on underwriters).
24. See, e.g. *Competitive Assoc.'s Inc. v. Laventhal Kreckstein, Horwath and Horwath*, 516 F.2d 811, 813 (entire syndicate protected by managing underwriter's adequate due diligence); see also The Obligations of Underwriters, Brokers and Dealers in Distributing and Trading Securities, Securities Act Release No. 33-5275, [Securities Act/Exchange Act Binder Vol. 2] Fed. Sec. L. Rep. (CCH) 6 4506B at 4057 (July 26, 1972) (reliance on managing underwriter is reasonable if the participating underwriter is reasonable if the participating underwriter is satisfied that "the managing underwriter ma[de] the kind of investigation that the participant would have performed if it were the manager," and that "the manager's program of investigation and actual investigative performance are adequate.")
25. Issuers eligible for Rule 415 shelf-registration are also eligible to use a short-form registration statement when taking securities "down off of the shelf" -- and often do so. Accordingly, similar due diligence considerations apply to both.
26. Task Force report, 991 PLI/Corp. 154. The Task Force report discusses the impact of shelf registrations, the integrated disclosure system, and other "modernized" forms of offerings on the due diligence process.
27. 991 PLI/Corp. at 154-55 (citation omitted).
28. See Treatment of Information Incorporated by Reference into Registration Statements, Securities Act Release No. 33-6335 [1981 Special Reports Binder] Fed. Sec. L. Rep. (CCH) No. 926, 2d ed. at 65 (Aug. 6, 1981).
29. See, e.g., *Glassman*, 90 F.3d at 628.
30. 82 F.3d 1194; see also 17 C.F.R. § 230.415.
31. Aircraft Carrier release, Fed. Sec. L. Rep. at 81,547.
32. See e.g., 17 C.F.R. §§ 230.138, 230.139, McLaughlin, "Securities Distribution: the Changing Role Of The Securities Analysts In Initial Public Offerings," *Insights*, Aug. 1994, Vol. 8, No. 8 at 9, 11; Placenti, "When Securities Analysts Are Brought 'Over the Wall,'" *The National Law Journal*, Sept. 2, 1996, at B6-B8.

**Dennis J. Block and Jonathan M. Hoff** are members of Cadwalader, Wickersham & Taft. Associate **Joshua Bloomstein**, assisted in the preparation of this article.

This article is reprinted with permission from the May 27th issue of the New York Law Journal © 1999 NLP LP Company.