# EXHIBIT B

# Mechanics
# of
# Underwriting
# 1983

Robert Rosenman
Chairman

Practising Law Institute
50 YEARS OF CONTINUING LEGAL EDUCATION
1933-1983

ation with Corporate Financing

ns of the "Interpretation of the
nancing" relating to factors to be
riter's compensation, the value of
g to a previously established part-
red by such member or person
such reorganization, shall not be
pensation.

ncluded within the scope of this
he "Interpretation of the Board of
, and documents and filing fees
the Corporation pursuant to the
nsibility for filing the required
ssuing securities, or, in the case of
r of, if there is none, the member

are inconsistent with any other
ns of Fair Practice or Uniform
of or resolution of the Board of
evail.

ule E

of the Board of Governors, upon
usual circumstances, taking into
ber unconditionally or on specified
ule E which it deems appropriate.
ion, a hearing shall be held upon a
ttee, or a Subcommittee thereof

Schedule shall constitute conduct
al honor and just and equitable
II, Section 1 of the Corporation's
s, especially Sections 2 and 18, as

---

4

UNDERWRITERS' DUE DILIGENCE

Peter H. Darrow
Marilyn Sobel

October 10, 1983

423

Underwriters' Due Diligence

I.  Statutory Basis for Underwriters'
    Liability with Respect to Public
    Offerings of Securities

    A.  Section 11 - Basis for Liability

        1.  Section 11 of the Securities Act of
1933 (the "Act") imposes civil liability upon under-
writers for omissions or misstatements of material
information in an effective registration statement.

        2.  Section 11(a) provides "[i]n case any
part of the registration statement, when such part
became effective, contained an untrue statement of a
material fact or omitted to state a material fact
required to be stated therein or necessary to make
the statements therein not misleading, any person
acquiring such security (unless it is proved that at
the time of such acquisition he knew of such untruth
or omission) may, either at law or in equity, in any
court of competent jurisdiction, sue . . ." (Securi-
ties Act of 1933, § 11(a), 15 U.S.C. § 77k(a)
(1981)).

        a.  This Section expressly grants
purchasers of securities sold pursuant to a regis-
tration statement a private right of action against
specified persons (including underwriters) if the
registration statement has become effective and
contained, at its effective date, a material mis-

425

124

leading statement or omission.

b. Section 11 is only applicable to misleading statements in or omissions from a registration statement and does not apply to misleading statements or omissions in other documents or oral statements.

c. A Section 11 cause of action is only available to a purchaser whose securities trace back to those sold under the registration statement (see Barnes v. Osofsky, 373 F.2d 269 (2d Cir. 1967); Colonial Realty Corp. v. Brunswick Corp., 257 F. Supp. 875 (S.D.N.Y. 1966)).

B. Bringing a Section 11 Action

1. Persons liable.

a. Section 11 affords a purchaser the ability to sue and recover from any of the following persons:

"(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, or person performing similar functions, or partner;

(4) every accountant, engineer or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security . . ." (Securities Act of 1933, § 11(a), 15 U.S.C. § 77k(a) (1981)).

b. All or any one of the above-mentioned persons will be subject to joint and several liability (see In re Itel Sec. Litig., 89 F.R.D. 104, 111 (N.D. Cal. 1981)), and every person who becomes liable to make any payment may recover contribution from any person who if sued separately would have been liable to make the same payment unless the person who was held liable was, and the other person was not, guilty of fraudulent misrepresentation (Securities Act of 1933, § 11(f), 15 U.S.C. § 77k(f) (1981); (see Laventhol, Krekstein, Horwath & Horwath v. Horwitch, 637 F.2d 672 (9th Cir. 1980)).

2. Plaintiff's burden of proof.

a. Section 11(a) of the Act imposes an almost absolute liability for material misstate-

ments or omissions in a registration statement (see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208 (1976); Emmi v. First-Manufacturers Nat'l Bank of Lewiston and Auburn, 336 F. Supp. 629, 634 (S.D. 1971); Feit v. Leasco Data Processing Equip. Corp. 332 F. Supp. 544, 575 (E.D.N.Y. 1971)). A misleading statement in or omission from a registration statement is not actionable unless such statement or omission is material (Greenapple v. Detroit Edison Co., 468 F. Supp. 702, 708 (S.D.N.Y. 1979), aff'd 618 F.2d 198 (2d Cir. 1980)).

b.   The plaintiff's burden of proof is, in theory, not difficult to overcome. The plaintiff must be a person who has acquired a security as to which a false registration statement has become effective (see Barnes v. Osofsky, supra).

c.   The plaintiff is not required to establish privity. Thus a purchaser may recover from the issuer even though his securities were purchased from a member of an underwriting syndicate (see, e.g., Escott v. BarChris Constr. Corp., 283 F. Supp. 643 (S.D.N.Y. 1968)).

d.   In order to establish a cause of action under Section 11 the plaintiff need not show that he "relied" upon the misleading statement or

...ssion, and thus the existence of a causal connection between the misleading statement or omission and the purchaser's loss is not usually an issue (see Emmi v. First-Manufacturers Nat'l Bank of Lewiston and Auburn, supra, at 634; In re Gap Stores Sec. Litig., 79 F.R.D. 283, 297 (N.D. Cal. 1973)).

However, Section 11(a) specifically requires that the purchaser prove that he relied upon the misleading statement or omission in the registration statement if he purchased after the issuer had generally distributed an earnings statement covering at least the twelve month period from the effective date (Securities Act of 1933, § 11(a), 15 U.S.C. § 77k(a) (1981)) (see Emmi v. First-Manufacturers Nat'l Bank of Lewiston and Auburn, supra, at 634; In re Gap Stores Sec. Litig., supra, at 297 n.14; see also Securities Act Rel. No. 6485 (September 23, 1983), adopting Rule 158 under the Act, which Rule defines for purposes of § 11(a) the terms "earning statement," "made generally available to its security holders" and "effective date of the registration statement"). The basis of this provision is that in all likelihood the purchase and price of the security purchased after publication of such an earnings statement will be predicated on that statement

rather than upon the information disclosed in the registration statement (H.R. Rep. No. 1838, 73d Cong., 2d Sess. 41 (1934); see also Securities Act of 1933, § 11(e), 15 U.S.C. § 77k(e) (1981), which provides that if a defendant can establish that all or a portion of the plaintiff's damages were not the result of the misleading registration statement, such portion or all such damages shall not be recoverable).

e. Section 11 imposes liability on the persons designated therein without regard to the defendants' "intention" or "knowledge" of the misleading statements or omissions; thus the purchaser need not prove scienter in order to recover (see Ernst & Ernst v. Hochfelder, supra, at 208; Barnes v. Osofsky, supra, at 272; Straus v. Holiday Inns, Inc., 460 F. Supp. 729, 732 (S.D.N.Y. 1978); Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786-787 (2d Cir. 1951)).

f. The plaintiff must bring a Section 11 action within one year after the discovery of the untrue statement or the omission or after such discovery should have been made by the exercise of reasonable diligence (Securities Act of 1933, § 13, 15 U.S.C. § 77m (1981)).

C. Defenses under Section 11

1. Section 11(b) of the Act provides a number of additional defenses available to defendants other than the issuer (which has strict liability under Section 11) (Securities Act of 1933, § 11(b), 15 U.S.C. § 77k(b) (1981)). These defenses can be divided into two categories -- those related to "expertized" statements (which includes statements made on the authority of an expert (such as an accountant, engineer or appraiser) and statements made by an "official person" or extracts from or copies of a "public official document" (Securities Act of 1933, § 11(b)(3)(D), 15 U.S.C. § 77k(b)(3)(D) (1981)) and those related to "non-expertized" statements. (There are other defenses enumerated in Section 11(b) which are not applicable to underwriters, as such, and therefore will not be discussed in this outline; see Securities Act of 1933, § 11(b)(1), (2), (3)(B) and (3)(D), 15 U.S.C. § 77k(b)(1), (2), (3)(B) and (3)(D) (1981).)

a. As to the non-expertized portions of the registration statement, a defendant must prove that "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became

effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading" (Securities Act of 1933, § 11(b)(3)(A), 15 U.S.C. § 77k(b)(3)(A) (1981)). This defense is generally referred to as the "due diligence" defense since it requires the defendant to establish that after a "reasonable investigation" (commonly referred to as a "due diligence investigation") he had reasonable ground to believe and did believe that the registration statement was accurate and not misleading.

b. As to the "expertized" portions of the registration statement, a non-expert must show that "he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement of the expert or was not a fair copy of or extract from the report or valuation of the expert" (Securities Act of 1933, § 11(b)(3)(C), 15 U.S.C.

§ 77k(b)(3)(C) (1981)). With respect to expertized information, the non-expert has no duty of "reasonable investigation" nor is there any requirement of affirmative belief in the accuracy of the statements.

2. Another defense provided by Section 11(a) is that at the time of plaintiff's acquisition of the securities he "knew of such untruth or omission." Securities Act of 1933, § 11(a), 15 U.S.C. § 77k(a) (1981); see Feit v. Leasco Data Processing Equip. Corp., supra, at 575; Martin v. Hull, 92 F.2d 208, 210 (D.C. Cir. 1937), cert. denied, 302 U.S. 726 (1937).

D. Underwriters' Liability under Other Provisions of the Act and under the Securities Exchange Act of 1934

1. Section 12(2) of the Act provides that any person who offers or sells a security (whether or not exempted from the registration requirement by the provisions of Section 3 of the Act but not including securities exempted by virtue of Section 3(a)(2)) "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not

sleading (the purchaser not knowing of such untruth or omission)," shall be liable to the person purchasing such security from him (Securities Act of 1933, § 12(2), 15 U.S.C. § 77l(2) (1981)).

2. Section 12(2) of the Act does provide r a "due diligence" defense (only a seller "who all not sustain the burden of proof that he did t know, and in the exercise of reasonable care uld not have known, of such untruth or omission" all be liable (Securities Act of 1933, § 12(2), 15 S.C. § 77l(2) (1981)). The courts have held that ch a defense was unavailable to an underwriter who iled to make a reasonable investigation that would ve uncovered the fraud (see Sanders v. John Nuveen Co., 619 F.2d 1222, 1227-28 (7th Cir. 1980), cert. nied 101 S. Ct. 1719 (1981)). Whether the stan- rd of care that an underwriter is held to in order meet its due diligence defense under Section 11 the same as the standard it must meet to estab- sh a Section 12(2) defense is not clear (see John veen & Co. v. Sanders, 101 S. Ct. 1719, 1722 1981) (in Justice Powell's dissent from the Court's nial of certiorari, he expressed concern that the venth Circuit's opinion could be "read as recog- izing no distinction between the standards of care

applicable under §§ 11 and 12(2).").

3. Offerings of securities exempt from the registration requirements of the Act by virtue of Section 3(a)(2), which includes municipal securities, do not subject underwriters to potential liability under Section 11 or Section 12(2) of the Act. Although the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") do apply to such underwritings, a successful plaintiff must establish scienter (see Ernst & Ernst v. Hochfelder, supra). The ability to establish a successful defense based on lack of scienter clearly involves a lesser standard of care than the "reasonable investigation" standard of Section 11 and the "reasonable care" standard of Section 12(2).

4. This result has led some underwriters to question the need to conduct any investigation in small municipal security underwritings, not so much as a matter of law (since no investigation may be found to be reckless and so to constitute scienter) but as a matter of balancing cost and risk. To be prudent, underwriters should conduct a reasonable investigation in connection with any offering of securities (whether exempt or registered) so that,

if necessary, the underwriters will be able to es-
tablish a due diligence defense or a defense to an
allegation of scienter at a later date.

II. Establishing an Underwriters' Due Diligence
Defense

A. In General

1. Section 11 imposes civil liability on
underwriters for omissions or misstatements of a
material fact. Since underwriters, as such, are not
experts they cannot confine their liability to a
limited area of expertise (see Part I.C.1.b above)
but like the issuer and directors they have a gen-
eral liability for what appears in the registration
statement.

2. The defenses available to underwriters
under Section 11(b) of the Act are the same as those
available to directors and signers of the registra-
tion statement; underwriters must show that after
reasonable investigation they had reasonable ground
for believing that the non-expertized information in
the registration statement was accurate and that
they had no reasonable ground for disbelieving the
accuracy of the expertized portions (see Part I.C.1.
above). The underwriters cannot limit liability on
the ground that the issuer has sole responsibility
for the prospectus. (Escott v. BarChris, supra, at

696 ("The underwriters say that the prospectus is
the company's prospectus, not theirs. Doubtless
this is the way they customarily regard it. But the
Securities Act makes no such distinction. The un-
derwriters are just as responsible as the company if
the prospectus is false.")).

3. What constitutes a reasonable investi-
gation and what is a reasonable ground for belief is
far from clear. Although Section 11 provides that
the standard that must be utilized is "the standard
of reasonableness . . . required of a prudent man in
the management of his own property" (Securities Act
of 1933, § 11(c), 15 U.S.C. § 77k(c) (1981)), in
order to determine what conduct would meet this
test, one must turn to the sparse legislative his-
tory and administrative and court decisions.

B. Legislative History

1. The Act was intended to "put the bur-
den of telling the whole truth on the seller" of
securities in order to "bring back investor confi-
dence" (H.R. Rep. No. 85, 73d Cong., 1st Sess. 2
(1933)). At the time the Act was enacted Congress
believed that investment bankers were partially the
cause of the disarray in the capital markets. "The
flotation of such a mass of essentially fraudulent

securities was made possible because of the complete abandonment by many underwriters and dealers of those standards of fair, honest and prudent dealing that should be basic to the encouragement of invest-ment in any enterprise" (H.R. Rep. No. 85, supra, at 2).

Underwriters were said to have overstimulated demand for securities and to have "manufactured securities to meet the demand that they themselves had created" (H.R. Rep. No. 85, supra, at 2). Underwriters also provided deceptive and misleading information on securities in order to force dealers to take allotments and sell them to the public (H.R. Rep. No. 85, supra, at 3). Accordingly, the civil liabilities provisions under the Act were intended to impose the fiduciary duties of "[h]onesty, care and competence" upon "underwriters who sponsor the issue" (H.R. Rep. No. 85, supra, at 5).

C. Administrative Interpretation of the Definition of Reasonable Investigation

1. In In re Richmond Corp., 41 S.E.C. 398 (1963), the Securities and Exchange Commission, in dicta, discussed what steps the underwriters must take in connection with its investigation of the issuer. This proceeding involved a stop order in-stituted by the Division of Corporate Finance against the Richmond Corporation to suspend the

effectiveness of a registration statement. The underwriting was to be on a best efforts basis. The SEC found the registration statement to be false and misleading in that it failed to include a summary statement describing the speculative aspects of the offering and failed to disclose adequately the in-tended use of the proceeds, the existence of poten-tial conflicts of interest relating to competitive real estate practices of its officers and directors and the underwriters' inexperience and failure to form a selling group. In re Richmond Corp., supra, at 400-03.

2. In Richmond the underwriters were not a party to the proceedings. However, in view of the limited nature of the underwriters' investigation, the Commission deemed it appropriate to comment on "the importance which we [the Commission] attach[es] to the duties of underwriters in this respect" (In re Richmond Corp., supra, at 405). The underwrit-ers' investigation of the business of the issuer consisted of visiting two of the issuer's three tracts of land, examining its list of shareholders and obtaining a credit report on the president. As to all other matters in connection with the regis-tration statement, the underwriters relied on repre-

sentations of the issuer's management.

In Richmond the Commission found that this limited investigation by the underwriters was not sufficient;

"By associating himself with a proposed offering, an underwriter impliedly represents that he has made such an investiga-tion in accordance with professional stan-dards. Investors properly rely on this added protection which has a direct bear-ing on their appraisal of the reliability of the representations in the prospectus. The underwriter who does not make a rea-sonable investigation is derelict in his responsibilities to deal fairly with the investing public. Such dereliction, more-over, does not serve the statutory objec-tive of achieving a prospectus which, in all material respects, contains the information neces-sary for an informed evaluation of the securities offered" (In re Richmond Corp., supra, at 406).

D. The Courts' Interpretation of Underwriters' Due Diligence

1. In Escott v. BarChris, supra, the United States District Court for the Southern Dis-trict of New York defined what under the circum-stances in that case constituted "reasonable inves-tigation" for purposes of an underwriter's Section 11(b) due diligence defense. In BarChris the court rejected the "due diligence" defenses of all the participants in the securities offering, including the underwriters.

a. BarChris was in the business of constructing and equipping bowling alleys. To sat-isfy its working capital needs it publicly issued $3.5 million of subordinated convertible debentures in 1961. Eight investment banking firms partici-pated in distributing the debentures with Drexel & Co. acting as managing underwriter. The following year BarChris defaulted on the debentures and filed a petition in bankruptcy. Thereafter a class action was brought against the defendants (which included the underwriters) seeking recovery under Section 11 of the Act.

b. The court found that the regis-tration statement was false and misleading in sev-eral respects. The use of proceeds section failed to disclose that some of the proceeds were to be used to repay BarChris' debts and were not to be used for working capital. In addition, this section failed to disclose that the deteriorating credit of many of BarChris' customers might cause Barchris to have to repurchase $1.3 million of customers' notes held by BarChris' factor. The description of the issuer's business in the prospectus was also found to be inaccurate in failing to disclose that BarChris was also in the business of operating bowl-ing alleys, due in part to customer defaults, and

that this amounted to a "different business" involving "different problems and different risks" (Escott v. BarChris, supra, at 678). Finally, the court concluded that the prospectus overstated BarChris' net operating income, earnings per share, sales and backlog of unfilled orders and understated BarChris' contingent liabilities.

c. Joined as defendants were the issuer, the signers of the registration statement (including BarChris' president, vice-president, executive vice-president, treasurer, controller, secretary and four outside directors), the eight underwriters and the independent public accountants. The court evaluated in detail each of the defendants' conduct in relation to their asserted due diligence defenses. This outline will only discuss the court's evaluation of the underwriters' conduct (see Folk, Civil Liabilities under the Federal Securities Acts: The BarChris Case, 55 Va. L. Rev. 1 (1969), and Comment, "Due Diligence" and the Expert in Corporate Securities Registrations, 42 S. Cal. L. Rev. 293 (1969) for a discussion of the court's decision with respect to the other defendants).

(1) Drexel & Co. acted as managing underwriter for the syndicate of eight investment banking firms and Drexel's counsel served as counsel for the syndicate. In late 1960 a Drexel partner undertook a preliminary investigation of BarChris' financial position and in early 1961 BarChris and Drexel signed a letter of intent (Escott v. BarChris, supra, at 693).

(2) In March 1961 representatives from Drexel and BarChris met three times to discuss the draft prospectus. In these "due diligence" meetings Drexel and its counsel had an opportunity to discuss the adequacy of disclosure in the draft prospectus and a number of areas of BarChris' business including bad debts, the accuracy of backlog figures, the description of the use of proceeds, BarChris' experience in repurchasing customers' notes, whether BarChris operated bowling alleys and loans made by BarChris officers to the company. Many of the matters discussed in these meetings were subsequently misstated in the registration statement (supra, at 693-94).

(3) The partner in charge of the matter for Drexel & Co. became a director of BarChris in April 1961. After that he (and thus Drexel & Co.) made no further independent investigation

444

of the accuracy of the prospectus. Such investigation was done on Drexel's behalf by its counsel (supra, at 694). Counsel's review included reading BarChris' minutes for the prior five years, reading some minutes of BarChris' subsidiaries and reviewing an insurance policy. This review was primarily done by "a very junior associate" who had never before worked on a registration statement (supra, at 694 n.21).

(4)  The court, in concluding that the underwriters' investigation was unsatisfactory found that:

(a)  Counsel's review of minutes did not include certain executive committee meetings which were missing (which would have revealed some of the matters the company failed to disclose in the prospectus). When counsel inquired about the missing minutes, he was told that the missing minutes were insignificant (supra, at 695).

(b)  The review of the minutes revealed that because of customer defaults the company might find itself operating

bowling alleys. When counsel inquired about this, company officials replied that the chance the company would operate alleys was "merely hypothetical" (supra, at 695).

(c)  The review of BarChris' contracts only included a review of an insurance policy and did not include a review of BarChris' contract with its factor and certain other agreements and accounting records (supra, at 695).

(d)  Drexel's counsel did not review BarChris' schedule of delinquencies, the factor's notices with respect to such delinquencies or BarChris' correspondence with its factor (supra, at 695).

(e)  Drexel's counsel did not investigate whether the backlog figures were exaggerated although counsel warned the company against "puffy" figures (supra, at 695).

(f)  Drexel's counsel's legal opinion expressly relied on data submitted to counsel by the company and disclaimed any attempt to verify such data. The opinion

445

merely stated that counsel lacked reason to believe that the registration statement was inaccurate (supra, at 695-96).

    d.  The court found that the underwriters' investigation was inadequate. Counsel's investigation was deficient because counsel failed to read all the minutes and review all the contracts. The court, in finding that such investigation was inadequate, focused on the underwriters' failure to verify information supplied by the company. The court viewed the underwriters as being in an adverse position from that of the company and thus not justified in accepting as accurate the information supplied by the company without making an independent investigation to ascertain the accuracy of such information (supra, at 696).

"The purpose of Section 11 is to protect investors. To that end the underwriters are made responsible for the underwriters prospectus. If they may escape that responsibility by taking at face value that representations made to them by the company's management, then the inclusion of underwriters among those liable under Section 11 affords the investors no additional protection. To effectuate the statute's purpose, the phrase 'reasonable investigation' must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of 'data presented' to them by the company. It should make no difference that this data is elicited by questions addressed to the company officers by the underwriters, or that the underwriters at the time believe that the company's officers are truthful and reliable. In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them. They may not rely solely on the company's counsel. A prudent man in the management of his own property would not rely on them.

    e.  Since Drexel's "due diligence" investigation was conducted on its behalf by its counsel, Drexel's defense rested with the reasonableness of its counsel's investigation. The court also held that since the participating underwriters did not make an independent investigation, but relied on Drexel to do so, they were bound by Drexel's failure to conduct an investigation. The court did not decide whether participating underwriters would be protected from liability if the lead underwriter established its defense of an adequate investigation (supra, at 697 n.26; see Competitive Assoc., Inc. v. International Health Sciences, Inc., [1974-1975 Transfer Binder] Fed. Sec. L. Rptr. ¶ 94,966

It is impossible to lay down a rigid rule suitable for every case defining the extent to which such verification must go. It is a question of degree, a matter of judgment in each case. In the present case, the underwriters' counsel made almost no attempt to verify management's representations. I hold that that was insufficient" (supra, at 697).

448

(S.D.N.Y. 1975) (holding that since the lead under-writer established its due diligence defense, all underwriters in the syndicate were entitled to the defense).

f. The seriousness of the misstate-ments and omissions in the BarChris registration statement and the limited investigation conducted by the underwriters made it easy for the court to con-clude that the underwriters failed to meet the bur-den of showing that their investigation was a "rea-sonable" one. However, the decision does not shed a great deal of light on what procedures underwriters should follow in order to meet successfully the burden of establishing a "due diligence" defense under Section 11(b).

2. Three years after the BarChris deci-sion, the courts again interpreted what is meant by the phrase "a reasonable investigation." In Feit v. Leasco Data Processing Equip. Corp., supra, a class action was brought by former shareholders of Reli-ance Insurance Company against Leasco, its directors and dealer-managers.

a. In an exchange offer the plain-tiffs had exchanged their Reliance shares for Leasco shares registered pursuant to an effective registra-

tion statement. The plaintiffs alleged that Leasco's registration statement failed to provide an estimate of the amount of "surplus surplus" ("highly liquid assets of an insurance company which can be utilized in non-regulated enterprises" (supra, at 551)). The evidence indicated that Leasco was pri-marily interested in acquiring Reliance because of Reliance's large amount of surplus surplus although the prospectus for the exchange offer made only vague reference to Leasco's interest in Reliance's surplus surplus. The court found the prospectus to be false and misleading because it did not discuss in enough detail Leasco's plans for the insurance company nor did it provide an estimate of the amount of surplus surplus. The court, in rejecting Leasco's argument that it could not accurately esti-mate the amount of surplus surplus since Reliance was hostile to the tender offer, emphasized the fact that in another registration statement for a differ-ent offer filed by Leasco a few months after the tender period Leasco estimated the surplus surplus at $125 million (supra, at 560).

b. The court found Leasco's officers and directors liable under Section 11 and held that they failed to meet the burden of proof of estab-

449

lishing a due diligence defense. However, the court held that the dealer-managers were not liable under Section 11.

c. With respect to the issue of surplus surplus, the court found that the dealer-managers (who were treated by the court as under-writers for the purposes of Section 11) were "aware of the complexity of the computation problem" (supra, at 582) and had discussed the matter with company officials at several due diligence meetings and had examined pertinent documents (including an internal memorandum prepared by a Leasco vice-president estimating the surplus surplus). Leasco had told the dealer-managers and their counsel that reliance would neither verify Leasco's estimate of reliance's surplus surplus nor provide Leasco with the information necessary to verify the accuracy of the estimate. Although the dealer-managers were aware that Reliance and Leasco had entered into an agreement which terminated Reliance's hostility to the offer, Leasco substantiated its assertion that reliance would not supply the necessary information with a telegram from a Reliance official and a let-er from Leasco's counsel to the Securities and xchange Commission indicating that Reliance was

unwilling to furnish the information (supra, at 583). The court held that the dealer-managers rea-sonably investigated and reasonably verified Leasco's representations that access to the surplus surplus information was not possible (supra, at 583).

d. The Leasco decision held that, in evaluating the reasonableness of the dealer-managers' conduct, one must consider the nature of the transaction, the dealer-managers' relationship to the issuer and their access to information.

"Dealer-managers cannot, of course, be expected to possess the intimate knowl-edge of corporate affairs of inside direc-tors, and their duty to investigate should be considered in light of their more limited access. Nevertheless they are expected to exercise a high degree of care in investigation and independent verifica-tion of the company's representations" (supra, at 583).

e. Leasco must be read in light of its facts -- it involved a hostile tender offer. Thus, it was perhaps more "reasonable" for the dealer-managers to rely without independent verifi-cation on information supplied by Leasco since data required to verify the information was in the hands of a target company. Although the Leasco case may imply that there may be other situations in which the underwriters may, under the circumstances, be

justified in relying on information without verification, how far a court would be willing to go in extending the Leasco reasoning to other underwriting arrangements is not clear. See also Part III. C infra. for a discussion of recently adopted Rule 176 under the Act entitled "Circumstances Affecting the Determination of What Constitutes Reasonable Grounds for Belief Under Section 11 of the Securities Act."

III.   Due Diligence and the Integrated Disclosure System

A.   The Adoption of the Integrated Disclosure System

1.   On March 3, 1982, the SEC adopted a comprehensive revision of the rules and forms governing the registration of securities under the Act (see Securities Act Rel. No. 6383 (March 3, 1982) effective from March 16, 1982 until December 31, 1983). The SEC adopted new Act registration forms, designated S-1, S-2 and S-3, with Form S-2 generally replacing Form S-7 (which was rescinded) and Form S-3 generally replacing Form S-16 (which was also rescinded). Forms S-2 and S-3, like the rescinded Form S-16, permit the registrant to include much of

the information required by the form by incorporating such information by reference to reports filed by the registrant under the Exchange Act.

2.   As part of the new integrated disclosure system, the SEC adopted Rule 415 which permits "shelf registration" -- the registration of securities for continued or delayed offerings over time (17 C.F.R. § 230.415). Under the rule, a registrant can file a registration statement for a designated amount of securities and after it is declared effective, the registrant can sell the securities at any time during the course of a two year period. Each offering can be made pursuant a Rule 424 (17 C.F.R. § 230.424) prospectus supplement to reflect the final terms of the securities being offered and the plan for distribution. The information in a shelf registration statement can be updated by information filed by the registrant under the Exchange Act after the date the registration statement is filed or by filing a prospectus supplement pursuant to Rule 424 (see Item 512(a) of Regulation S-K; for a complete discussion of Rule 415 see Palm, The Underwriting of Securities in the Context of Shelf Registrations, Eli Mechanics of Underwriting, 71 (January 1983); Spencer, Rule 415. Delayed or Continuous Offering

and Sale of Securities, PLI Fourteenth Annual Institute on Securities Regulation, 169 (1982); Friedman, Integrated Disclosure Today, 15 Rev. of Sec. Reg. 937 (March 24, 1982)).

B. Integrated Disclosure from the Perspective of Underwriters' Due Diligence

1. The integrated disclosure system has reduced the underwriters' role in the preparation of registration statements and has made it more difficult for underwriters to conduct a thorough investigation in connection with an underwritten offering of securities. However, since Section 11 has not been amended to reflect this reduced role, the investment banking community is seriously concerned that the integrated disclosure system (and in particular Rule 415) has in effect expanded the potential liability for underwriters in connection with the offering of securities. See generally Greene, Determining the Responsibilities of Underwriters Distributing Securities Within an Integrated Disclosure System, 56 Notre Dame Law. 755 (1981) and Nicholas, The Integrated Disclosure System and Its Impact Upon Underwriters' Due Diligence: Will Investors Be Protected?, 11 Sec. Reg. L.J. 3 (1983).

2. The integrated disclosure system introduced by the SEC with the adoption initially of

Form S-16 and later Forms S-2 and S-3 has had the effect of extending the underwriters' liability for misstatements and omissions to the Exchange Act filings of the registrant which are incorporated by reference in the registration statement. This extension is particularly troubling since, generally, issuers prepare their Exchange Act filings without seeking advice or comments from underwriters. Unless a company has appointed an investment banking firm to act as managing underwriter in all of its offerings (in which case the firm could more easily participate in the preparation of the issuer's Exchange Act filings), an investment banking firm is usually not designated by the issuer as managing underwriter for a particular issue until shortly before the securities are offered. Thus the designated underwriter must accept liability for any misleading statements in the company's Exchange Act reports incorporated by reference in the registration statement without having the opportunity to participate in the preparation of those reports.

3. This problem is exacerbated in the case of shelf registration statements. Many issuers do not designate managing underwriters with respect to a shelf offering until shortly before securities

are offered. In such a situation, managing under-writers are responsible for the contents of the shelf registration statement (including all informa-tion incorporated by reference therein) which was prepared without their participation. The issuer's ability to sell off the shelf within a very short time frame can result in underwriters having very little time to conduct a due diligence investigation before the securities are offered.

4. Some issuers have attempted to allevi-ate these problems by designating underwriters' counsel (even though underwriters have not yet been designated) before the shelf registration is pre-pared. In this way counsel can participate in the preparation of the registration statement and con-duct a due diligence investigation on behalf of its yet undesignated client. Should the issuer decide to issue securities off the shelf through underwrit-ers, the designated underwriters are expected to rely (at least in part) on the due diligence con-ducted by underwriters' counsel. Although by desig-nating underwriters' counsel early in the process underwriters have the opportunity (through such counsel) to conduct a due diligence investigation and comment on the registration statement, it puts

counsel in the awkward position of acting on behalf of an anonymous client and requires underwriters to rely on counsel with which it may have no prior experience. Furthermore, not all areas of appropri-ate investigation are within the professional exper-tise of counsel.

C.  Rule 176 -- An Attempt to Clarify the "Due Diligence" Responsibility

1.  In Release No. 33-6335 (August 6, 1981) the SEC published for comment proposed Rule 176 identifying certain circumstances bearing on the reasonableness of an investigation for purposes of Section 11 of the Securities Act and on what consti-tutes reasonable grounds for belief under that sec-tion. Rule 176 was proposed as part of the SEC's integrated disclosure system (see Part III.A above). In that release the SEC stated that its proposal related to "concerns expressed by some members of the financial community regarding the ability of underwriters and others to undertake a reasonable investigation with respect to the adequacy of the information incorporated by reference from periodic reports filed under the Exchange Act into the short form registration statements utilized in an inte-grated disclosure system."

2. In that release the SEC reaffirmed its view that the integrated disclosure system, past and proposed, was not designed to modify the scope of the underwriters' investigation required to sustain a due diligence defense. "Information presented in the registration statement, whether or not incorpo- rated by reference, must be true and complete in all material respects and verified where appropriate. Likewise, nothing in the Commission's integrated disclosure system precludes conducting adequate due diligence." In the release the SEC addressed two of the concerns of the financial community concerning the underwriters' ability to conduct adequate due diligence within the integrated disclosure system framework. First, as to the concern that the short- time frame during which short form registration statements are typically prepared would make it difficult for underwriters to conduct a "reasonable investigation," the SEC noted that underwriters are never compelled to proceed with an offering until due diligence has been accomplished. Second, as to the concern that documents incorporated by reference in the registration statement are prepared by oth- ers, often at a much earlier date, the SEC stated

that underwriters have a duty to review such docu- ments and be certain that, if they contain material misstatements or omissions, they are corrected.

3. In the release the SEC specifically rejected the suggestion that underwriters need only read the incorporated materials and discuss them with representatives of the issuer and named ex- perts. "Because the registrant would be the sole source of virtually all information, this approach would not, in and of itself, include the element of verification required by the case law and contem- plated by the statute" (citing Escott v. BarChris, supra).

4. In Release No. 33-6383, effective for all documents filed on or after May 24, 1982, the SEC adopted Rule 176 entitled "Circumstances Affect- ing the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act." Rule 176, as adopted, provides:

"In determining whether or not the conduct of a person constitutes a reasonable in- vestigation or a reasonable ground for belief meeting the standard set forth in section 11(c), relevant circumstances include, with respect to a person other than the issuer,

(a) The type of issuer;

(b) The type of security;

(c) The type of person;

(d) The office held when the person is an officer;

(e) The presence or absence of another relationship to the issuer when the person is a director or proposed director or person with respect to the filing;

(f) Reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in the light of the functions and responsibilities of the particular person with respect to the issuer and the filing);

(g) When the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registration; and

(h) Whether, with respect to a fact or document incorporated by reference, the particular person had any responsibility for the fact or document at the time of the filing from which it was incorporated (17 C.F.R. § 230.176).

5. Rule 176 codifies Section 1704(g) of the American Law Institute's proposed federal securities code (ALI Fed. Sec. Code § 1704(g) (1980)). As originally proposed in the Federal Securities Code (before it was modified and endorsed by the SEC), the paragraph corresponding to paragraph (g) of Rule 176 read "the accessibility to information

with respect to the registrant" in lieu of "the availability of information with respect to the registration." In the SEC's proposed Rule 176 the language concerning "accessibility to information" was deleted from paragraph (g) and no language was inserted in its place (Rel. No. 33-6335 (August 6, 1981)). The SEC had objected to the phrase "on the ground that an issuer's refusal to grant access could be interpreted as a legitimate basis for not investigating" (Fortenbaugh, Underwriters' Due Diligence, 14 Rev. of Sec. Reg. 799, 804 (December 23, 1981)). The SEC included the phrase concerning availability of information in paragraph (g) in the final rule (Rel. No. 33-6383 (March 3, 1982)) apparently because it recognized that there are occasions when information cannot be investigated because of its unavailability.

6. Rule 176 is neither a safe harbor rule nor a mandatory rule which imposes liability if certain standards are not met. It merely sets forth circumstances which may bear on the determination of whether an underwriter conducted a reasonable investigation and had reasonable grounds to believe that the information in the registration statement was

accurate. What constitutes a reasonable investiga-
tion is left for the underwriter to determine and
largely depends on the facts and circumstances of
the particular offering.

IV. Conducting a Due Diligence Investigation

    A. In General

        1. This Part IV. sets forth a detailed
list of items that could be reviewed in connection
with an underwriters' due diligence investigation.
The list is not necessarily exhaustive, nor is it
indicative of those items that must, at a minimum,
be reviewed in connection with each due diligence
investigation.

        2. Whether a due diligence investigation
is sufficient will depend on what is a "reasonable
investigation" under the circumstances. The scope
investigation" (including both the items reviewed and the period of
time covered) of each due diligence investigation
will vary depending on the type of issuer and the
security being issued (whether debt or equity and,
if debt, its maturity), and when, if ever, the is-
suer did its last public offering of securities. In
addition, the scope of underwriters' counsel's in-
vestigation will vary depending on the nature of the

legal opinion it is being asked to render in connec-
tion with the offering.

        3. The checklist set forth in this Part
IV. is quite detailed and is generally designed for
circumstances in which the issuer is a new company,
the company has undergone significant changes since
its last public offering or the issue is the com-
pany's initial public offering.

    B. Early in the process (perhaps even before
the managing underwriters, the issuer and counsel
begin drafting the registration statement) the man-
aging underwriters or their counsel should:

        1. Check the issuer's credit rating (in-
cluding a review of any submissions to rating agen-
cies and reports regarding the issuer contained in
rating agency publications) and its general reputa-
tion with its creditors, customers and suppliers.

        2. Interview the issuer's accountants
regarding the issuer's accounting system and prac-
tices.

        3. Review research reports and signifi-
cant news/magazine stories on the issuer.

        4. If stock is to be sold, obtain his-
torical quotations for the issuer's securities and

examine issuer stock profile in CCH Capital Changes Reporter.

5. Review the issuer's annual reports on Form 10-K, quarterly reports on Form 8-K, proxy statements and annual/quarterly reports to shareholders for at least the last three years and determine whether the reports required to be filed with the SEC were so filed in a timely manner (particular attention should be paid as to whether the issuer may have been required to file a current report on Form 8-K as a result of a material acquisition/divestiture).

6. Review other filings made by the issuer under the Act and the Exchange Act.

C. Charter Documents

1. Counsel should review a long-form good standing certificate of the issuer (and, if applicable, parent holding company) and each material subsidiary and certified copies of each of the documents referred to therein to determine whether:

a. The issuer and such subsidiary are duly incorporated (which examination will also require review of the relevant state statutes).

b. The issuer and each subsidiary

---

are in good standing.

c. The name of the issuer (and, where applicable, each such subsidiary) and the place and date of incorporation referred to in the registration statement are correct.

d. Any shareholder has preemptive rights, and, if so, that they have been properly waived or preserved.

e. The equity capitalization/description of capital stock disclosed in the registration statement is correct.

f. The documents were properly adopted and amended.

g. The charter restricts stock issuance or transfer.

h. The charter contains any provisions (such as cumulative voting) that must be complied with or disclosed in the registration statement.

2. Counsel should review certified copies of the current by-laws of the issuer and each material subsidiary. The by-laws should be checked against the charter and any applicable state law provision to determine that they are not defective.

In addition the by-laws should be reviewed to determine whether:

    a. They contain any provisions limiting the powers of the officers and directors.

    b. They contain any provisions that should be disclosed in the registration statement.

  D. Minutes

    1. The official minutes of all the meetings of shareholders, board of directors and committees of the issuer (and, if applicable, parent holding company) and the material subsidiaries should be read to determine whether:

      a. Charter, by-law and statutory proceedings were followed (quorum, notice of meeting, percentage of votes, etc.).

      b. Events were discussed that should be disclosed in the registration statement (such as long term obligations, material litigation or other material transactions) or otherwise form the basis for further due diligence investigation.

    2. If stock is being issued, all the minutes of the issuer since the date of its incorporation should be reviewed to determine whether each share of the issuer's stock has been duly and val-

466

idly authorized and issued and fully paid for and is nonassessable. In this connection certificates of the transfer agent or registrar should be reviewed regarding the number of shares issued and certificates of the issuer's accountants should be reviewed concerning full payment for each share. In addition, compliance with relevant state statutes and conformity to charter and by-law requirements need be checked to ensure due and valid authorization and issuance.

    3. Counsel should be certain that the facts and figures in the minutes of the issuer match those in the registration statement concerning:

      a. Pension plans;

      b. Officers' remuneration;

      c. Options to purchase securities;

      d. Stock option plans; and

      e. Transactions between the issuer and its officers and directors.

  E. The following types of documents concerning the issuer (and, if applicable, parent holding company) and material subsidiaries should be reviewed (if appropriate):

    1. All proposed exhibits to the registration statement and all exhibits to each Exchange

467

Act document (see Part IV.B.5. and 6. above).

2. Material contracts.

3. Financial or operating plans or projections.

4. Pension and employee benefit plans and stock option, profit sharing and other employee or management compensation plans.

5. Management employment contracts and agreements not to compete.

6. Material labor contracts.

7. Material lease agreements, licensing and franchise agreements, joint venture agreements and distributor agreements.

8. Recent title and appraisal reports with respect to material properties and assets (including conducting UCC searches on major assets).

9. All debt instruments, including loan agreements, revolving credit agreements and indentures (the covenants should be reviewed carefully to determine if (i) the proposed offering would violate any covenant and (ii) the issuer or subsidiary is in violation of any financial covenant).

10. Material insurance policies.

11. Letters of counsel to the issuer's accountants delivered in connection with recent

audits.

12. "Management" letters (reports on weaknesses in or improvements to an issuer's accounting procedures/controls) from the issuer's accountants to the issuer's board of directors/audit committee in connection with recent audits.

13. Documentation concerning recent private placements of securities.

14. Any file concerning pending litigation, arbitration and administrative proceedings involving the issuer or such subsidiary.

15. Recent press releases relating to the issuer or such subsidiary.

16. Existing consent decrees and the like.

17. Other documents that will verify the information in the registration statement (such as reports showing projected construction costs/environmental program expenditures, occupancy rates, backlog orders, consultant/engineering/management reports, etc.).

F. Miscellaneous Matters

1. Counsel should determine that the registration statement conforms with the require-

ments of the Act form being used and that the issuer is qualified to use the form.

2. If the offering of the issuer's securities is subject to, or specially exempted from, regulatory approval, regulatory applications/orders should be reviewed and opinions of special counsel considered.

3. If there are material patents or trademarks, an opinion from patent and trademark counsel should be considered.

4. Counsel should consider the effect of pending legislation or litigation on the issuer and its material subsidiaries.

5. Counsel should review prospectuses and Exchange Act reports of competitors to determine if issues were discussed in such documents that are not covered by the issuer's draft registration statement.

6. Counsel should determine whether the issuer has complied with environmental, health, safety and civil rights laws.

7. Managing underwriters and their counsel should visit the issuer's major properties.

G. Due Diligence Meetings

1. The managing underwriters and counsel should meet with operating officers of the issuer to discuss issues related to the issuer's operations and management's projections of the issuer's future, what effects the economy and competition may have on operations and results in the future and plans the issuer may have concerning its present business or new areas of business.

2. Managing underwriters and counsel should meet with the issuer's accountants and financial officers to discuss the issuer's financial condition and prospects and its accounting practices, standards and controls.

3. Managing underwriters and counsel should meet with the issuer's in-house and, if appropriate, outside counsel to discuss existing litigation, arbitration and administrative proceedings, etc., and any other existing or potential contingencies.

4. After counsel has completed its investigation of the issuer's and material subsidiaries' contracts, minutes, etc. managing underwriters and counsel should discuss any/issues or questions

472

raised in the course of such review.

5. If possible, the due diligence inves-
tigation should be completed before the registration
statement is filed with the SEC. If there is a
substantial period of time between the initial fil-
ing of the registration statement and the date on
which the securities are issued, the managing under-
writers and counsel should have a discussion with
the issuer's officers and accountants to update
their prior discussions. In any event, review of
minute books of the issuer (and, if applicable,
parent holding company) and material subsidiaries
should be brought down to the closing date of the
offering of the securities. (For additional discus-
sion of due diligence procedures see NASD Notice of
the Board of Governors Concerning Due Diligence
Requirements for Public Offerings of Securities, SEC
File No. SR-NASD-76-9 (Form 19b-4B filed with the
SEC) (rescinded on February 22, 1977); Fortenbaugh,
Underwriters' Due Diligence, supra; Soderquist, Due
Diligence Examinations, 24 Practical Law. 33 (1978);
Riordan and Wragg, Examination of Corporate Books in
Connection with Stock Offerings and Acquisitions, 18
Bus. Law. 677 (1963).)

E. Recording the Due Diligence Investigation.

1. There is a difference of opinion con-
cerning the extent to which it is appropriate for
counsel or underwriters to record the scope and
results of their due diligence investigation. Some
investment banking and law firms have a general
policy of keeping detailed records of each investi-
gation and may also keep copies of each document
reviewed in the course of an investigation. Other
firms have adopted the opposite policy and generally
do not keep any records or documents with respect to
a due diligence investigation, except in unusual
circumstances.

2. In determining whether keeping a
record of an investigation is appropriate, and, if
so, how detailed such a record should be, counsel
and underwriters should keep in mind that such a
record may be used in a litigation to establish the
reasonableness, or lack thereof, of the underwrit-
ers' due diligence investigation.

I. Role of Counsel.

1. The role underwriters' counsel plays
in the course of a due diligence investigation will
vary depending on the extent to which the underwrit-

473

ers delegate the responsibility for due diligence to counsel, and the nature of the legal advice counsel is asked to give to its clients in connection with the offering.

    2. Generally, underwriters request underwriters' counsel to deliver an opinion to the underwriters concerning the valid existence and good standing of the issuer, the due authorization, execution and delivery and the binding nature of the underwriting agreement and of the indenture and debt securities or the due authorization and valid issuance of the issuer's common stock. In addition, underwriters generally request advice from counsel concerning the disclosure in the registration statement. Many lawyers feel that is is not appropriate to make any statement in a legal opinion concerning the disclosure made in the registration statement since the question of whether disclosure is accurate or adequate is more a factual rather than legal one. Thus, some law firms have adopted a policy pursuant to which any statement they may make concerning disclosure is put in a separate letter to the underwriters rather than in their legal opinion.

    a. Such a letter should describe

with specificity the scope of counsel's involvement in the due diligence investigation (for example, counsel participated in the preparation of the registration statement, read and discussed but did not participate in the preparation of the Exchange Act documents incorporated by reference therein, reviewed minutes (stating the period covered by such review) and attended meetings with representatives of the issuer, its counsel and its accountants).

    b. Such letters often state that in considering the adequacy of disclosure, counsel relied on information supplied by the issuer and did not verify any such information. Although counsel may have assisted their clients in attempting to verify some information, verification as such should not be within the scope of counsel's engagement since it bears no relation to counsel's professional skills.

    c. Such letters are generally phrased in the negative -- "on the basis of the above-described procedures, we have no reason to believe that the registration statement (except the financial statements and schedules and other financial and statistical data included therein, as to

which we express no view), at the time it became effective, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that the prospectus (except as aforesaid), as of the date thereof, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading."

J. Conducting a Due Diligence Investigation in Connection with an Offering by an Established Issuer.

1. In many situations, particularly in connection with offerings under a shelf registration statement, underwriters and their counsel will not have sufficient time to conduct an investigation of the scope outlined above. Depending on the nature of the issuer and the circumstances of the offering, it need not follow that an underwriter's due diligence defense is therefore lost. An offering by an issuer who has been in existence for a number of years, has filed Exchange Act reports for a number of years and frequently issues securities is quite

different from one by a newly established company or a new issuer. The "established" issuer is known in the marketplace. It is selling its securities on the basis of information reported by it in its Exchange Act documents and on the basis of its reputation and credit rating. The SEC's new integrated disclosure system (see Part III.A. above) recognizes this fact.

2. Thus, one may well conclude that what would be considered a reasonable due diligence investigation in connection with an offering by an established issuer is quite different from what would be considered reasonable in connection with a new issuer. An established issuer has an internal system of corporate governance (including financial controls) which the public has come to rely on and which underwriters should be permitted to rely on (unless circumstances are such that such reliance would be unreasonable). A reasonable investigation by the underwriters into an issuer's internal controls should, in many instances, be sufficient verification of certain facts with respect to such an issuer. Unlike a new issuer, the established issuer is selling its securities in large measure on

the basis of its own reputation (as may be enhanced by the rating agencies) and not on the basis of the underwriters' reputation. In the case of an offering by an established issuer, the public is not looking to the underwriters as fiduciaries assuring the integrity of the issuer.

3. This is not to say that underwriters need not conduct any due diligence when underwriting an offering by an established issuer. Underwriters should carefully review the registration statement and Exchange Act documents incorporated by reference. In addition, underwriters and their counsel should have due diligence meetings with the issuer, its accountants and its counsel and possibly others (see Part IV.D. above) and review certain minutes and documents. The underwriters should pay particular attention to developments in the issuer's affairs since the period covered by the last Exchange Act report filed with the SEC and to recent documents submitted to and discussions with the rating agencies. The scope of the investigation will depend on a number of factors, including the underwriters' familiarity with the issuer, the advice counsel is asked to give and the time period avail-

able to conduct an investigation. In these circumstances, counsel will have to make some particularly hard judgments about materiality.

V.  Comfort Letters:  The Due Diligence Function

A.  In General.

1.  The defenses available to underwriters under Section 11 can be divided into two categories -- defenses with respect to "expertized" information and defenses with respect to "non-expertized" information (see Part I.C.1. above).

a.  As to "expertized" information in the registration statement, a non-expert has an easier defense to establish, since it need only show that it had "no reasonable ground to believe and did not believe" that, as of the effective date, there were any misleading statements or omissions in the expertized portions of the registration statement. "Expertized" information is that information in the registration statement purporting to be made on the "authority of an expert" or purporting to be a "copy of or extract from a report or valuation of an expert" (Securities Act of 1933, § 11(b)(3)(C), 15 U.S.C. § 77k(b)(3)(C) (1981)) or purporting to be made by an "official person" or extracts from or

copies of a "public official document" (Securities Act of 1933, § 11(b)(3)(D), 15 U.S.C. § 77k(b)(3)(D) (1981)).

  b.  The term "expert" is not defined in the Act, but clearly includes accountants and certain other professionals (see Escott v. BarChris, supra, at 683, rejecting the defendants' contention that the entire registration statement was "expertised" since it was prepared by the issuer's and underwriters' counsel and holding that "neither the lawyer for the company nor the lawyer for the underwriters is an expert within the meaning of Section 11"). Generally, the information covered by an expert's report (e.g., an accountant's or appraiser's report) is the only expertised information in the registration statement. The benefit derived from "expertizing" financial information included or incorporated in a registration statement has led certain underwriters to request that an issuer's accountants furnish the report provided for by Statement on Auditing Standards No. 42 (August 1982) of the American Institute of Certified Public Accountants ("AICPA") on the five-year summary financial data required to be included or incorporated in

480

a registration statement by Item 301 of Regulation S-K.  See Johnson, Preparation of Registration Statements under the SEC's Integrated Disclosure System, PLI Mechanics of Underwriting, 51, 64 (January, 1983) and Hartig, Accounting Matters in Connection with Preparation of Registration Statements, PLI Mechanics of Underwriting, 257, 259-265 (January, 1983).

  2.  The underwriter's defense with respect to "non-expertised" information is more difficult to establish since it must show a "reasonable investigation", "reasonable ground to believe" and belief in fact that, as of the effective date, the statements in the registration statement were true and there were no misleading material omissions (Securities Act of 1933, § 11(b)(3)(A), 15 U.S.C. § 77k(b)(3)(A) (1981)).  Since the unaudited financial statements and other financial information not covered in the auditor's report in the registration statement are not expertized, if this information is misleading, the underwriters will have a more difficult due diligence defense to establish than if the misleading information had been contained in the audited financial information in the registration

481

statement.

3.  As part of their due diligence with respect to the financial information in the registration statement (both audited and unaudited), underwriters generally require the issuer's accountants to deliver a "comfort letter" to the underwriters in connection with each offering of securities.

4.  Current practice generally requires a comfort letter on the date the underwriting agreement is executed and again on the date of the closing. The comfort letter (which generally requires the accountants to review substantially all the financial information included or incorporated in the registration statement) together with discussions with the auditors and the issuer's financial officers (see Part IV.G. above), ordinarily constitutes the underwriters' effort to verify the financial information in the registration statement. (For additional discussion of comfort letters generally see Resnik, Understanding Comfort Letters for Underwriters, 34 Bus. Law. 1725 (1979).)

B.  The Text of Comfort Letters

1.  The text of comfort letters and the

procedures to be followed to prepare them have been deemed by the AICPA to comprise a part of generally accepted auditing standards (see Statement on Auditing Standards No. 38 (April 1981) ("SAS 38")). Thus, accountants are required to adhere to AICPA pronouncements relating to the scope, form and content of comfort letters.

2.  The accounting profession believes that a reasonable investigation of expertized financial information requires an audit. Accountants further believe that what constitutes a reasonable investigation of non-expertized financial information has not been authoritatively established and that therefore only the underwriters can determine what is sufficient for their purposes. Accordingly, it is ordinarily good practice to set forth in the underwriting agreement the form of comfort letter the underwriters are requesting on both the date the underwriting agreement is to be signed and the closing date. The receipt of these letters by the underwriters is generally a condition precedent to the underwriters' obligation to buy the securities. Of course, if the underwriters are not satisfied with the comfort letter delivered on the date the

underwriting agreement is executed, they should not sign the agreement until a satisfactory letter is received.

3. A typical form of comfort letter is annexed hereto as Appendix I. The standard form of comfort letter is prescribed by Statement on Auditing Standards No. 43 (August 1982)). Generally, the form of letter covers the following matters (paragraph references are to paragraphs of the letter attached as Appendix I):

a. A statement regarding the independence of the accountants (paragraph 1).

b. An opinion regarding whether the audited financial statements and schedules included or incorporated in the registration statement comply in form in all material respects with the applicable accounting requirements of the Act and (if a Form S-2 or S-3 registration statement) the Exchange Act and the respective published rules and regulations thereunder (paragraph 2).

c. Negative assurance with respect to whether the unaudited condensed consolidated financial statements included or incorporated by

reference in the registration statement:

(i) Comply in form with applicable accounting requirements of the Act, the Exchange Act and the respective published rules and regulations thereunder.

(ii) Are presented in conformity with generally accepted accounting principles applied on a basis substantially consistent with that of the audited financial statements and schedules included or incorporated in the registration statement (paragraphs 3 through 5).

d. Negative assurance with respect to whether, during the period from the date of the most recent financial statements included or incorporated by reference in the prospectus to a date occurring shortly (usually five business days) before the date of the comfort letter, there has been any change in capital stock or long-term debt or decreases in other specified financial statement accounts (paragraphs 5 and 6).

e. Additional procedures performed with respect to specified items, typically dollar amounts and percentages included or incorporated in the registration statement (e.g., as contained in

"The Company" section of the prospectus, the "Business" section of the incorporated annual report on Form 10-K and in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections of the incorporated annual report on Form 10-K and quarterly reports on Form 10-Q (paragraphs 7 through 9).

4. If a comfort letter is delivered on the date the underwriting agreement is signed, another letter is generally delivered at the closing reaffirming the information in the initial letter and bringing that information up to date (typically updating to a date five business days before the closing date). The "update" letter is usually quite short and merely refers to the initial letter rather than repeating all the information in the initial letter. A typical form of "update" letter is annexed hereto as Appendix II.

Appendix A

## Example of a Comfort Letter

The following letter is an example of a comfort letter delivered to the underwriters on the date the underwriting agreement is signed. It refers to a registration statement on Form S-3 in which is incorporated by reference the issuer's annual report on Form 10-K for the year ended December 31, 1982 and the issuer's quarterly reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 1983.

November 14, 1983

[name and address of
managing underwriters]

Dear Sirs:

We have examined the consolidated balance sheet of [name of issuer] (the "Company") and subsidiaries as of December 31, 1982 and 1981, and the related consolidated statements of earnings, stockholders' equity and changes in financial position for each of the three years in the period ended December 31, 1982, and the related schedules, all incorporated by reference or otherwise included in the Company's annual report on Form 10-K for the year ended December 31, 1982, and incorporated by reference in the Registration Statement (no. 2-___) on Form S-3 filed by the Company under the Securities Act of 1933 (the "Act"); our report with respect thereto dated _____, 1983 is also incorporated by reference in the Registration Statement and Prospectus. [Comfort letter would also refer to any report that may have been issued on the five-year summary financial data required by Item 301 of Regulation S-K. See Part V. A of text.]

Also, we have made reviews in accordance with standards established by the American Institute of Certified Public Accountants of the unaudited condensed consolidated balance sheets of the Company and its subsidiaries as of March 31, 1983, June 30, 1983, and September 30, 1983, and the unaudited condensed consolidated statements of (i) earnings for (a) the three-month periods ended March 31, 1983 and 1982, (b) the three- and six-month periods ended June 30, 1983 and 1982, and (c) the three- and nine-month periods ended September 30, 1983 and 1982, and (ii) changes in financial position for (a) the three-month periods ended March 31, 1983 and 1982, (b) the six-month periods ended June 30, 1983 and 1982, and (c) the nine-month periods ended September 30, 1983 and 1982, all of which are included in one of the Company's reports on Form 10-Q for the quarters ended (a) March 31, 1983, (b) June 30, 1983, or (c) September 30, 1983, and incorporated by reference in the Registration Statement and Prospectus as indicated in our reports to the Board of Directors of

the Company dated (a) _____, 1983, and (b) _____, 1983, and (c) _____, 1983, respectively. Such reviews of interim financial information are substantially less in scope than an examination in accordance with generally accepted auditing standards; accordingly, we did not examine and do not express an opinion on the unaudited condensed consolidated financial statements described above.

The Registration Statement [as amended] and the Company's Prospectus filed November __, 1983, are herein referred to as the Registration Statement and the Prospectus, respectively.

In connection with the Registration Statement and Prospectus:

1. We are independent public accountants with respect to the Company within the meaning of the Act and the Securities and Exchange Act of 1934 (the "Exchange Act") and the respective applicable published rules and regulations thereunder.

2. In our opinion, the consolidated financial statements examined by us and incorporated by reference in the Registration Statement and Prospectus comply in form in all material respects with the applicable accounting requirements of the Act and the Exchange Act and the related published rules and regulations.

3. We have not examined any financial statements of the Company and/or any of its subsidiaries as of any date or for any period subsequent to December 31, 1982. Although we have made an examination for the year ended December 31, 1982, the purpose (and therefore the scope) of such examination was to enable us to express our opinion on the consolidated financial statements as of December 31, 1982, and for the year then ended, but not on the consolidated financial statements for any interim period within that year.

Therefore, we are unable to and do not express any opinion on the unaudited condensed consolidated balance sheet of the Company and its subsidiaries as of March 31, 1983, June 30, 1983, and the unaudited condensed

consolidated statements of (i) earnings for (a) the three-month and six-month periods ended June 30, 1983 and 1982, and (c) the three- and nine-month periods ended September 30, 1983 and 1982, (ii) changes in financial position for (a) the three-month periods ended March 31, 1983 and 1982, (b) the six-month periods ended June 30, 1983 and 1982, all of which are included in one of the Company's quarterly reports on Form 10-Q for the quarters ended (a) March 31, 1983, (b) June 30, 1983, or (c) September 30, 1983, and are incorporated by reference in the Registration Statement and Prospectus, or on the financial position as of operations, or changes in financial position for any date or for any period subsequent to December 31, 1982.

4. For purposes of this letter, we have read the 1983 minutes of the meetings of the stockholders, board of directors and executive committees of the Company and certain of its subsidiaries, as set forth in the minute books at November 7, 1983, officials of the Company having advised us that the minutes of all such meetings through that date were set forth therein, and have carried out other procedures through November 7, 1983, (our work did not extend to the period from November 8, 1983 to November 14, 1983, inclusive), as follows:

    a. with respect to the three-month periods ended March 31, 1983 and 1982, the three- and six-month periods ended June 30, 1982, and the three- and nine-month periods ended September 30, 1983 and 1982, we have:

        i. read the unaudited condensed consolidated financial statements for these periods, described in 3, included in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1983, June 30, 1983, and

September 30, 1983, incorporated by reference in the Registration Statement and Prospectus.

        ii. made inquiries of certain Company officials who have responsibility for financial and accounting matters regarding (1) whether the unaudited condensed consolidated financial statements comply in form in all material respects with the applicable accounting requirements of the Exchange Act as it applies to Form 10-Q and the related published rules and regulations and (2) whether those unaudited condensed consolidated financial statements are presented in conformity with generally accepted accounting principles applied on a basis substantially consistent with that of the audited consolidated financial statements incorporated by reference in the Registration Statement and Prospectus.

    b. with respect to the period from October 1, 1983 to October 31, 1983, we have:

        i. read the unaudited consolidated financial statements of the Company and subsidiaries for October of both 1982 and 1983 furnished us by the Company, officials of the Company having advised us that no such financial statements as of any date or for any period subsequent to October 31, 1983 were available; and

ii. made inquiries of certain Company officials who have responsibility for financial and accounting matters regarding whether the unaudited financial statements referred to under b.(ii) are stated on a basis substantially consistent with that of the audited consolidated financial statements incorporated by reference in the Registration Statement and Prospectus.

The foregoing procedures do not constitute an examination made in accordance with generally accepted auditing standards. Also they would not necessarily reveal matters of significance with respect to the comments in the following paragraph. Accordingly, we make no representations about the sufficiency of the foregoing procedures for your purposes.

5. Nothing came to our attention as a result of the foregoing procedures, however, that caused us to believe that:

a. (i) the unaudited condensed consolidated financial statements described in 3. incorporated by reference in the Registration Statement and Prospectus, do not comply in form in all material respects with the applicable accounting requirements of the Exchange Act as it applies to Form 10-Q and the related published rules and regulations, or (ii) those unaudited condensed consolidated financial statements are not presented in conformity with generally accepted accounting principles applied on a basis substantially consistent with that of the audited consolidated financial statements incorporated by reference in the Registration Statement and Prospectus; or

b. (i) at October 31, 1983, there was any change in the common stock or long-term debt or decreases in stockholders' equity of the Company and subsidiaries as compared with amounts shown in the September 30, 1983 unaudited condensed consolidated balance sheet incorporated by reference in the Registration Statement and Prospectus; or (ii) for the period from October 1, 1983 to October 31, 1983 there were any decreases, as compared with the corresponding period in the preceding year, in consolidated net sales or in the total or per-share amounts of income before income taxes or of net income, except in all instances for changes or decreases that the Registration Statement and Prospectus disclose have occurred or may occur, and except as follows:

[insert changes]

6. As mentioned under 4.b., Company officials have advised us that no consolidated statements as of any date or for any period subsequent to October 31, 1983 are available; accordingly, the procedures carried out by us with respect to changes in financial statement items after October 31, 1983 have, of necessity, been even more limited than those with respect to the period referred to in 4. We have made inquiries of certain Company officials who have responsibility for financial and accounting matters regarding whether (i) there was any change at November 7, 1983 in the consolidated common stock or long-term debt of the Company and subsidiaries or decreases in stockholders' equity as compared with amounts shown on the September 30, 1983 unaudited condensed consolidated balance sheet incorporated by reference in the Registration Statement and Prospectus; or (ii) for the period from October 1, 1983 to November 7, 1983 there were any decreases, as compared with the corresponding period in the preceding year, in consolidated net sales or in the total or per-share amounts of income before income taxes or of net income. On

the basis of these inquiries and our reading of the minutes that are described in 4, nothing came to our attention that caused us to believe that there was any such change or decrease, except in all instances for changes or decreases that the Registration Statement and Prospectus disclose have occurred or may occur.

7. For the purposes of this letter, we have also read the following: the sections entitled "The Company" and "Capitalization" set forth on pages ___, respectively, in the Prospectus, the section entitled "Business" set forth on pages ___ in the Annual Report on Form 10-K for the year ended December 31, 1982, the sections entitled (in-sert titles) set forth on pages ___, respectively, in the Annual Report to Stockholders on pages ___, respectively, incorpo- rated by reference in the Form 10-K for the year ended December 31, 1982, and the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" set forth in the quarterly reports on Form 10-Q for the quarters ended March 31, June 30, and September 30, 1983.

8. Our examination of the consolidated financial statements for the period referred to in the introductory paragraph of this letter comprised the tests and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole. For neither the periods referred to therein nor any other period did we perform an audit tests for the purpose of expressing an opinion on individual balances of accounts or summaries of, selected transactions such as those enumerated above, and, accordingly, we express no opinion thereon.

9. However, for purposes of this letter, we have performed the following additional proce- dures, which were applied as indicated with respect to the items enumerated above:

| Item | Procedures and Findings |
| --- | --- |

[description of procedures and findings]

10. It should be understood that we make no representations regarding questions of legal

494

interpretation or regarding the sufficiency for your purposes of the procedures enumerated in the preced- ing paragraph; also, such procedures would not nec- essarily reveal any material misstatement of the amounts or percentages listed above. Further, we have addressed ourselves solely to the foregoing data as set forth or incorporated by reference in the Registration Statement and Prospectus and make no representations regarding the adequacy of disclo- sure or regarding whether any material facts have been omitted.

11. This letter is solely for the infor- mation of, and assistance to, the underwriters in conducting and documenting their investigation of the affairs of the Company in connection with the offering of the securities covered by the Registra- tion Statement, and it is not to be used, circu- lated, quoted, or otherwise referred to within or without the underwriting group for any other pur- pose, including but not limited to, the registration, purchase or sale of securities, nor is it to be filed with or referred to in whole or in part in the Registration Statement or any other document, except that reference may be made to it in the Underwriting Agreement or in any list of closing documents per- taining to the offering of the securities covered by the Registration Statement.

Very truly yours,

495

495

Appendix B.

<u>Example of "Update" Comfort Letter</u>

The following letter is an example of a comfort letter delivered to the underwriters on the closing date. It refers to and updates the information set forth in the comfort letter attached as Appendix I.

497

November 21, 1983

[name and address of
managing underwriters]

Dear Sirs:

We refer to our letter of November 14,
1983, relating to the Registration Statement (no. 2-
_____) and Prospectus of [name of issuer] (the
"Company") and subsidiaries. We reaffirm as of the
date hereof (and as though made on the date hereof)
all statements made in that letter, except that, for
the purposes of this letter:

1.    The Registration Statement and Pro-
spectus to which this letter relates were ef-
fective and final on November ___, 1983.

2.    The reading of minutes described in
Paragraph 4. of that letter has been carried
out through November 14, 1983 (our work did not
extend to the period from November 15, 1983 to
November 21, 1983, inclusive).

3.    The procedures and inquiries covered
in Paragraph 4. of that letter were carried out
through November 14, 1983 (our work did not
extend to the period from November 15, 1983 to
November 21, 1983, inclusive).

4.    The references to November 7, 1983, in
Paragraph 6. of that letter are changed to
November 14, 1983.

5.    This letter is solely for the informa-
tion of and assistance to, the underwriters in
conducting and documenting their investigation
of the affairs of the Company in connection
with the offering of the securities covered by
the Registration Statement and it is not to be
used, circulated, quoted or otherwise referred
to within or without the underwriting group for
any other purpose, including but not limited to
the registration, purchase, or sale of securi-
ties, nor is it to be filed with or referred to
in whole or in part in the Registration State-

ment or any other document, except that refer-
ence may be made to it in the Underwriting
Agreement or in any list of closing documents
pertaining to the offering of the securities
covered by the Registration Statement.

Very truly yours,

498

499