## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------- x
                                                     :
IN RE ADAMS GOLF , INC.,                             :     CONSOLIDATED
SECURITIES LITIGATION                                :     C.A. NO. 99-371-KAJ
--------------------------------------------------- x
```

## PLAINTIFFS' REPLY BRIEF IN SUPPORT
## OF MOTION TO STRIKE AND EXCLUDE
## TESTIMONY OF CHRISTOPHER JAMES, Ph.D.

**ROSENTHAL, MONHAIT & GODDESS, P.A.**
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE   19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for the Plaintiffs and the Class*

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

**KELLER ROHRBACK, LLP**
Juli F. Farris
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA  98101

Dated: October 30, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    James Applies Improper Statistical Methodology . . . . . . . . . . . . . . . . . . 2

            1.    James Arbitrarily Ignores The Evidence of "Leakage" . . . . . . . . . 2

            2.    James's Decision to Ignore "Leakage" Violates Accepted
                 Practice – Including His Own . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    James Violates Accepted Principles by his Arbitrary
          Choice of the NASDAQ Index Model . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    James's Opinions Apply Unreliable Principles
          with Respect to Monthly Regressions . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.    To Deflect Attention from James, Defendants Attack
          Miller, Ignoring James's Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.    Miller's Analysis Is Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            2.    James's Analysis Is Biased . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Adams Golf, Inc. Sec. Litigation*,
381 F.3d 267 (3d Cir. 2004) ............................................................................ 6

*Daubert v. Merrell D&W Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................................................................................... 15

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) .................................................................... *passim*

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999) ....................................................................................... 15

*In re Paoli R.R. Yard PCB Litigation,*
35 F.3d 717 (3d Cir. 1994) .......................................................................... *15*

*RMED International Inc. v. Sloan's Supermarkets, Inc.*,
2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. 2000) ....................................... *passim*

## FEDERAL STATUTES

Fed. R. Evid. 702 ............................................................................................. 16

## MISCELLANEOUS

Cottle, Murray and Block, GRAHAM AND DODD'S SECURITY ANALYSIS, 5th ed.
(McGraw Hill 1988) ..................................................................................... 11

Larry Y. Dann and Christopher M. James, *An Analysis of the Impact of Deposit
Rate Ceilings on the Market Values of Thrift Institutions*,
37 J. Fin. 1259, 1266 (Dec. 1982) ......................................................... 8, 9, 11

Jon Koslow, *Estimating Aggregate Damages in Class Action Litigation Under
Rule 10b-5 for Purposes of Settlement,*
59 FORDHAM L. REV. 811 (1991) ................................................................. 16

## INTRODUCTION

Defendants have tried to cloak Dr. Christopher James, their expert, in the raiments of science, extolling him for having supposedly conducted an "objectively verifiable statistical analysis." They have announced (but not shown) that James's methodology satisfies criteria for admissibility discussed in *Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000), while they have denigrated the analysis of plaintiffs' expert, R. Alan Miller, as "subjective personal opinion" that does not satisfy those criteria.

Nothing could be farther from the truth. James's analysis is hardly a run-of-the-mill "event study." It is not only unscientific but unreliable because of James's refusal to consider evidence of information "leakage" and his insistence upon curious monthly regressions long after the conclusion of the Class Period. It is permeated by a lack of objectivity. James employs this mishmash methodology to reach the untenable conclusion that gray marketing had no effect whatsoever on the price of Adams stock at any time.

There is no evidence that James's hybrid statistical approach on the facts of *this* case satisfies key *Elcock* standards for scientific testimony, including but not limited to being subject to peer review, having a known error rate, being subject to standards, being generally accepted, or having been put to uses other than the calculation of damages for defendants in litigation. Indeed, James's approach disregards basic principles and methodologies that routinely govern event studies. Of course, proof of negative causation is an issue on which defendants and James bear the burden of proof.

1

By contrast, in conducting his rebuttal analysis of Adams Golf stock performance, plaintiffs' expert, Miller, has applied generally accepted and reliable principles in the field. And he has applied them to the actual facts of this case using the same intellectual rigor as would any objective expert in the field.

## ARGUMENT

### A.    James Applies Improper Statistical Methodology

A fundamental methodological flaw that permeates James's so-called "event study" is his rigid insistence on conducting a statistical analysis of the market impact of disclosures, using only one- or at most two-day event windows, in a case in which, because of information "leakage," the method simply cannot produce reliable conclusions.

#### 1.    James Arbitrarily Ignores The Evidence of "Leakage"

James attempts to justify his refusal to consider the impact of "leakage" by simply denying that it ever occurred. To do so requires him to play with the relevant data.

According to James, Adams Golf's decline was not company-specific because a stock price decline in July 1998 cut across the golf equipment industry. To support this proposition, James cites to a six-day period in July 1998, when both purchases and sales by Costco spiked, and claims that Callaway Golf and what he calls the "Miller Peer Group" performed similarly from the beginning of this period to its end. *See* D.I 323, hereinafter "Def. Br.," p. 3. *See also* D.I. 328, pp. 13-14, 16 (hereinafter "Pl. Resp. Adams Mot. Sum. Jud.") (detailing Costco purchases and sales). What James unscientifically fails to point out is that for *every single day* of this six-day period, the returns for Adams Golf deviated dramatically from the returns for

2

*both* Callaway Golf and the Miller Peer Group:

-   On July 16, Adams Golf's return was strongly *negative* (-8.6%) when Callaway's and the Miller Peer Group's returns were strongly *positive* (7.1% and 4.6%, respectively).

-   On July 22, Adams Golf's return was *positive* (2.1%) when Callaway's and the Miller Peer Group's returns were *negative* (-1.6% and -1.0%, respectively).

-   On July 20, Adams Golf's return (-5.3%) was 152% *worse* than Callaway's return (-2.1%) and 152 % *worse* than the Miller Peer Group's return (-2.1%).

-   On July 21, Adams Golf's return (-10.5%) was 184% *worse* than Callaway's return (-3.7%) and 156% *worse* than the Miller Peer Group's return (-4.1%). Indeed, on this date, Adams Golf's stock suffered a sharp, unexplained price drop during the morning, which James does not even address. *See* Intraday Trading Reports, submitted herewith as Ex. A (price declined from $16.6875 to as low as $14.00, a drop of 16.1% from 9:51 a.m. to 11:11 a.m.).

-   On July 17, Adams Golf's return (6.0%) was 46% *better* than Callaway's return (4.1%) and 131% *better* than the Miller Peer Group's return (2.6%).

-   On July 23, Adams Golf's return (-12.7%) was 159% *better* than Callaway's return (-32.9%) and 124% *better* than the Miller Peer Group's returns (-28.5%).

*See* D.I. 326 (hereinafter "James Dec.").

Three facts stand out from the foregoing data. First, James cannot be unaware of these strikingly disparate returns, for he himself highlighted the underlying data in his Declaration. James Dec. ¶¶ 3-5. Second, James can hardly say that these wide variations in *daily* returns are insignificant or not company-specific – he himself insists that it is proper to analyze stocks on a day-to-day basis, or, as defendants put it, that "a one day event window is a correct and accepted practice." *See* Def. Br., p. 5. Third, Adams Golf returns were running at odds with

3

both Callaway and the Miller Peer Group. Thus, James can offer no rational explanation of

these movements, and certainly has not eliminated gray marketing as the cause for the Adams

Golf stock movements. That means that defendants cannot meet their burden on negative loss

causation.[1]

With respect to a different indicator of "leakage," Lehman's July 29, 1998 facsimile

warning management about investor concern over gray marketing (submitted herewith as Ex.

D), defendants rationalize that the warning was of no significance because it was non-public.

Def. Br., p. 3. This misses the point. The Lehman warning reflected what Lehman understood

the market was thinking, not what Lehman or Adams Golf conveyed to the market.[2]

---

[1] It is hardly surprising that Adams Golf stock price movements cannot be explained
by Callaway's movements. Callaway's price plunge on July 23 followed Callaway's
announcement of results that were disappointing in significant part as a result of Callaway's
loss of market share to Adams Golf. *See* Dow Jones Newswires, submitted herewith as Ex.
B; Adams Golf Interoffice Memo, submitted herewith as Ex. C.

[2] Defendants ignore an Adams Golf script for an upcoming investor conference, and
also a NationsBanc research report, each of which was created at about the same time as,
and was to exactly the same effect as, the Lehman warning. *See* August 6, 1998
Teleconference Script, p. ADAMS 040671-72, submitted herewith as Ex. E; NationsBanc
Report, submitted herewith as Ex. F. As the NationsBanc research report stated: "Callaway
shares were often volatile in response to concerns such as 'I saw a Big Bertha in Costco' . . .
. We expect Adams' stock to also be volatile." Ex. F, p. ADAMS 004242.

Defendants also ignore the Declaration of Ryan Magnussen, President of W.D.C.
Mckenzie, the Company's Canadian distributor, and an important Adams Golf customer.
Magnussen testified to the wide scope and serious impact of gray marketing before, at the
time of, and immediately after the IPO. *See* Declaration of Magnussen, ¶¶ 5-10, submitted
herewith as Ex. G. Magnussen also testified to the fact that gray marketing at Adams Golf
became widely known in parts of the golf industry during July 1998, reflecting the manner in
which word travels in that industry, and that golfers and investors in the golf equipment
industry overlap. *Id*. ¶¶ 12-13.

4

Defendants go on to say that, in any event, the Lehman warning must have been a false alarm,

because no investor actually asked about gray marketing during the August 6 conference call.

Def. Br., pp. 3-4. Defendants overlook the fact that of only eight questioners on the August 6

conference call, four were from Lehman or the other defendant underwriters. *See* Aug. 6,

1998 Second Quarter Earnings Conference Call, submitted herewith as Ex. H.[3]

## 2.    James's Decision to Ignore "Leakage" Violates Accepted Practice – Including His Own

Defendants have now enlisted Professor Craig MacKinlay to attempt to explain away

Professor MacKinlay's own common sense admonition: "In cases where the event date is

difficult to identify or the event date is partially anticipated, [event] studies have been less

successful." *See* Def. Br., pp. 4-5. *See also* D.I. 300 (hereinafter "Pl. Op. Br."), Ex. 6, p. 37.

To try to avoid application of that common sense principle, and to attempt to buttress

the flawed methodology of James, defendants argue that an event study with respect to the

impact of regulatory changes somehow differs from the event study in the present case. But

their arguments depend on the factually and legally unsupportable grounds that the probability

---

[3] In any event, it hardly seems to matter to James whether questioners at investor conference calls asked about gray marketing. The first two questioners during the October 23, 1998 Third Quarter Results conference call asked about gray marketing. *See* Transcript, p. ADAMS 004365-66, submitted herewith as Ex. I. Nevertheless, James asserts that the October 23 stock price drop – admittedly statistically significant – "was not attributable to 'leakage' or disclosure of information about the gray market." Def. Br., p. 4, n. 2. On this point, defendants appear to disagree with their expert. According to defendants, the price fell significantly on October 23 because "[t]he October 22 press release contained . . . new, material information about the gray market . . . . " D.I. 280, p. 26 (hereinafter "Adams Sum. Jud. Br.").

5

of gray marketing did not increase during the class period because it had already occurred pre-IPO. Def. Br., p. 5. Or, as MacKinlay posited: "the existence of a gray market was public information on July 10, 1998, when Adams Golf stock began trading." *See* D.I. 325 (hereinafter "Mac. Dec."), ¶4.

These assertions fly in the face of the Court of Appeals' observation that the June 9, 1998 press release, issued a month before the IPO, pre-dated the efficient market in Adams Golf stock. *See In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 277 n. 10 (3d Cir. 2004).[4] In addition, to the extent these assertions are somehow based on the market's awareness of some gray marketing elsewhere in the golf equipment industry, it also contravenes the opinion of defendants' own gray marketing expert, Gary Frazier, that gray marketing varied from company to company in the golf equipment industry and, indeed, that Adams Golf (unlike Callaway Golf) was not particularly at risk. *See* Frazier Dep. Tr., pp. 256, 280-281, submitted herewith as Ex. J.

Further, defendants' assertions in defense of James that gray marketing "had already occurred pre-IPO" contradicts defendants' assertion elsewhere that gray marketing pre-IPO was not material. Adams Sum. Jud. Br., pp. 40-47. Similarly, defendants' assertion that "the

---

[4] To the extent that any market participants might possibly have learned of the June 9 press release – despite the fact that no efficient market existed at the time of its issuance – they would have discounted it by the time of the IPO. This is because, one month later, the Registration Statement contained no risk disclosure concerning Costco or the extent of gray market distribution or risk. *See* Pl. Op. Br., Ex. 2, ¶ 13 (market participants understand that a registration statement and prospectus for a public offering are "required to contain all material information relevant to the issuer").

6

probability of gray marketing did not increase during the class period" contradicts their assertion elsewhere that gray marketing was material as of October 22, 1998 but not before. *Id.*, p. 26.

Not only do James and defendants show no basis for concluding that the gray market risk was fully absorbed by the market as of July 10, 1998, they also fail in attempting to establish particular dates on which the market purportedly absorbed two post-IPO disclosures about gray marketing. (It is necessary for James to attempt to do so in order to claim that these two disclosures had no market impact, especially since James insists on using one- or at most two-day event windows.)

The first of these two disclosures was the issuance of the <u>Golf Pro</u> article, which defendants ascribe to August 1, 1998. Yet James admits he does not know the day this article appeared, and, indeed, he cannot even be sure of the month. *See* James Dep. Tr, pp. 256-57, submitted herewith as Ex. K. The second disclosure was the Lehman research report with a cover date of August 28, 1998. The author of the research report does not know when the research report was disseminated to Lehman customers. *See* Lantier Dep. Tr., pp. 132-34, submitted herewith as Ex. L. Indeed, even the Adams Golf board of directors appeared unaware of the research report until October 19, 1998 (*see* Oct. 19, 1998 Board Meeting Notes, pp. ADAMS 002241-42, submitted herewith as Ex. M), which hardly supports defendants' notion that August 28 is "easily identified" as the date the market absorbed the research report. *See* Def. Br., p. 6.

7

Even with all these difficulties of pinpointing when disclosure events occurred, James

insists on running regressions with narrow one- and two-day event windows in the present

case. However, James himself has shown there is a better, more accepted way to run an event

study regression analysis under these circumstances. In a situation when he was not engaged

by a defendant in litigation, James himself used a *twenty-six* (26) day event window. *See*

Larry Y. Dann and Christopher M. James, *An Analysis of the Impact of Deposit Rate*

*Ceilings on the Market Values of Thrift Institutions*, 37 J. Fin. 1259, 1266 (Dec. 1982),

submitted herewith as Ex. N.[5]

James used this 26 day event window in studying the impact of changes in deposit

interest rate regulations on the common stock values of savings and loan institutions. For each

regulatory change investigated, the window (or analysis) period used by James began 15

trading days before the date the regulatory change was announced (which James labeled "Day

0"), and ended 10 trading days after Day 0. *Id.* James explained that this lengthy window

period was required for exactly the same reason a lengthy window period would be required

for any regression analysis in the present case. "Leakage" regarding regulatory actions that

affect a savings and loan's stock price, just like "leakage" regarding gray marketing that affects

---

[5] In addition, James used an estimation period consisting of 60 days *before* and 60
trading days *after* the 26 day window period. *Id.* at 1266. This avoided the problem of the
arbitrary and unscientific estimation period, running contemporaneously with the class period,
that James used in the present case. *See RMED Int'l Inc. v. Sloan's Supermarkets, Inc.,*
2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. 2000) (where, as in the present case, the class
period begins with an initial public offering, and where there was no meaningful price history
that investigator could use as "uncontaminated" estimation period from which to estimate the
stock's predicted returns during the class period).

Adams Golf's stock price, could not be precisely fixed in time:

> Although the security price response to the announcement of a
> ceiling change should be concentrated on Day 0, consideration of
> the immediate pre-announcement price behavior seems
> appropriate for two (related) reasons. First, although the
> regulatory decision process is generally not as lengthy as
> legislative processes, knowledge that regulators are meeting to
> consider regulatory changes may be available to investors prior to
> the actual announced change. If this is the case, and to the extent
> that investors can correctly forecast the nature of the impending
> change, then anticipation of the announcement may generate
> abnormal security returns in the pre-announcement period. Some
> support for this conjecture exists for the MMC announcement in
> that the Interagency Co-ordinating Committee, which authorized
> the MMC, first met five trading days prior to the announcement
> to discuss introduction of this instrument. A second reason for
> examining the returns behavior prior to the announcement is that
> Waud [22] finds a similar pattern of abnormal returns on the days
> immediately preceding the announcements of discount rate
> changes by Federal Reserve Banks, which suggests that perhaps
> investors anticipate forthcoming announcements by financial
> market regulatory agencies.

*Id*. at p. 1268 (emphasis added; footnote deleted).

It should be noted that MacKinlay commented favorably on aspects of James's article.

*See* Pl. Op. Br., Ex. 6, p. 37 (citing A. Craig MacKinlay, Event Studies in Economics and

Finance, JOURNAL OF ECONOMIC LITERATURE (March 1997)).

James's approach in this article contrasts starkly with the inflexible and unscientific

approach that he takes in the present case.[6] His approach to the study of regulatory action

---

[6] Defendants attack "use [of] multiple-day windows (some as large as five or six
days) to evaluate stock price. . . . Financial economists generally use single-day intervals to
measure stock-price reaction in an efficient market." D.I. 286 (hereinafter "Adams Br. To
Exclude Miller"), pp. 6-7. In support of this statement, defendants rely on James. *Id*.

shares common ground -- at least as to the need for a lengthy window period in "leakage"

cases -- with the regression analysis that Miller provides as part of plaintiffs' opposition to the

Adams Golf defendants' motion for summary judgment. *See* Miller Aff., submitted herewith as

Ex. O. Indeed, Miller's regression uses a 12-day window period, *Id.*, ¶ 7, pp. 2-3, which is

less than half the length of the window period James used in his analysis of savings and loans'

stock movements in response to regulatory changes. Miller's regression shows statistically

significant declines in Adams Golf's stock price during July 1998 as a result of "leakage"

regarding gray marketing.[7]

**B.      James Violates Accepted Principles by his Arbitrary
          Choice of the NASDAQ Index Model**

Defendants assert that "[t]he Miller Peer Group is an inferior model to the Nasdaq

model." Def. Br., p. 8. In fact, the reverse is true. As James illustrates in Exhibit 14 to his

Declaration, the NASDAQ Index declined only 3.0% during a critical six-day period in July

1998, when both Callaway and the Miller Peer Group more closely tracked (at least on an

---

[7] James's 1982 article supports the conclusion that, analytically, there is no difference
between "leakage" regarding regulatory action and "leakage" regarding gray marketing. In
1998, investors were aware that gray marketing threatened at least some golf equipment
manufacturers. Ex. F. Callaway considered it necessary to disclose the risk in its 1997 Form
10-K. *See* Excerpts of Callaway 1997 Form 10K, submitted herewith as Ex. P.
Accordingly, just as *anticipated* regulatory action might affect savings and loan stock prices,
so *actual* gray marketing moved Adams Golf's stock price.

According to both defendant Lehman and defendant NationsBanc in July and the first
days of August 1998, investors in Adams Golf did in fact take note of and show concern
about gray marketing. Ex D; Ex. F. If anything, such evidence of gray marketing affecting
Adams Golf's stock price is far stronger than the "conjecture" of a stock price impact in
James's 1982 study. *See* Ex. N, p. 1268.

overall, if not day-by-day basis) Adams Golf. Moreover, Adams Golf itself, in its 1999 proxy statement, selected as relevant indexes not the NASDAQ Index, but instead the Standard & Poor's Small Cap 600 Index and a "Peer Group" consisting of four industry participants (Callaway, Teardrop Golf Company, Aldila, Inc., and Coastcast Corp.). *See* Excerpts of Adams Golf 1999 Proxy Statement, submitted herewith as Ex. Q.

James's choice of the NASDAQ Index also conflicts with basic economic authorities. *See* Cottle, Murray and Block, GRAHAM AND DODD'S SECURITY ANALYSIS, 5th ed., 383-84 (McGraw-Hill 1988), submitted herewith as Ex. R (endorsing approach of comparing company stock to *peer group* consisting of companies from the same industry, and also comparing company stock to stocks in general).

### C.   James's Opinions Apply Unreliable Principles with Respect to Monthly Regressions

Neither James nor MacKinlay can explain why it is appropriate to use a measurement period of up to 18 months, when the period under study (the Class Period) consists of just three and one-half months.

Indeed, James admitted: "Since the revised class period contains only three months of data, I did not have a sufficient number of monthly data points to conduct a reliable statistical analysis." Pl. Op. Br., Ex. 5, p. 30 n. 29. And MacKinlay agreed: "the time period is too short to be relied on in isolation to estimate the regression model." Mac. Dec., ¶ 17, p. 5.

This absence of sufficient data points does not justify purportedly assessing trends over a period that is five times longer than the Class Period. James is using a yardstick to measure

11

an ant. That violates science, as well as common sense.

The monthly regressions are unreliable on further grounds. In running some of his monthly regressions, James tracked Adams Golf's stock price at month-end with monthly market share information for Orlimar, a competitor, provided by Golf Datatech. James asserted -- for purposes of this litigation-- that such market share information was useful and relevant. Defendants -- before any litigation was on the horizon -- disagreed. The Adams Golf defendants concluded as follows, in draft question and answer format, prepared August 5, 1998, for an investor teleconference scheduled for the next day), regarding the usefulness of Datatech numbers:

Q.    What were the golf Datatech numbers for June?

A.    We do not have that information. <u>We are not able to work from Datatech's numbers</u> as they don't break out fairway woods from the larger woods category, which includes drivers, and because the Datatech survey doesn't reflect any of our direct sales to consumers.

Ex. E, p. ADAMS 040669 (emphasis added).

There is no indication that, in using Golf Datatech information for purposes of his work on litigation, James considered this negative assessment of the usability of Golf Datatech information -- an assessment rendered during the Class Period, not for litigation purposes, by the Adams Golf defendants themselves. *See Elcock*, 233 F.3d at 745-46 (stating one factor regarding expert opinion admissibility is "the *non-judicial* uses to which the method has been put") (emphasis added).

12

This leads to further difficulty with James's work in this case. As of this date, August 5, 1998, Adams Golf had already declined 33%, closing at $9.75 from the IPO price of $16.00. Yet there was nothing in Orlimar market share reports available by this date that could possibly explain the stock price decline -- notwithstanding James's reliance on monthly regression using Orlimar market share data.

The most recent Golf Datatech report as of August 5, 1998 was for May 1998. Ex. E, p. ADAMS 040669; Datatech Report, submitted herewith as Ex. S. That report showed Orlimar in seventh place in relevant market share (behind Adams Golf, Callaway Golf, Cobra, Taylor Made, Top Flite, and "Other"). *See* Ex. S, p. ADAMS 006541. This represented no *significant change* from the information available at the time of the IPO. According to the April Golf Datatech report, the most recent report available at the time of the IPO, Orlimar occupied the very same market share position, seventh behind Adams Golf, Callaway, Cobra, Taylor Made, Top Flite, and "Other".[8]

---

[8]

Golf Datatech
Woods - Market Share
April and May 1998

|  | April | May |
|---|---|---|
| Adams | 10.8 | 10.4 |
| Callaway | 27.8 | 27.5 |
| Cobra | 7.1 | 7.6 |
| Taylor Made | 22.3 | 21.8 |
| Top Flite | 4.2 | 4.4 |
| Other | 13.3 | 13.9 |
| Orlimar | 2.4 | 3.2 |

*See* Ex. S, ADAMS 006542 - ADAMS 006544.

13

Accordingly, the price decline from the IPO through early August cannot be ascribed to material new market share information from Golf Datatech, because there was none. Under these circumstances, James's monthly regressions beginning in July are unscientific and plain misleading to the extent James asserts that his regressions could somehow explain the material price decline that occurred during the period through August 5, 1998.

**D.  To Deflect Attention from James, Defendants Attack Miller, Ignoring James's Bias**

**1.  Miller's Analysis Is Reliable**

To deflect attention from the weaknesses of James's own supposedly "scientific" approach, defendants attack Miller. Relying on irrelevant case law, defendants simply ignore *RMED,* 2000 U.S. Dist. LEXIS 3742 (cited at Pl. Op. Br., p. 10). But *RMED* teaches that fundamental analysis such as Miller's, and not a statistical event study analysis of the type that James purports to use, is appropriate, because there is no "meaningful price history for [the] stock that [the researcher] could designate as the control or 'clean' period from which to estimate its true value using statistical analysis," and because misrepresentation or omission is disclosed to the market through the mechanism of "leakage." *Id.* at *24, *27-28.

Substantial support for these and related concepts comes from defendants themselves. When they were not staking out litigation positions, defendants apparently used the same fundamental approach as Miller in attempting, at the time, to determine what had caused the plunge in Adams Golf's stock price in July 1998. *See* Adams Memo, submitted herewith as Ex. T (Lehman provided analysis on July 28, 1998, based on observation of general market

14

conditions, the stock performance of other golf manufacturers, and the effects of competition);

Ex. C (Adams Golf investor relations personnel's opinions on the price decline also not based

on regression analysis).

   *Elcock*, 233 F.3d at 745-46, *see* Def. Br., p. 1, further supports Miller and his

approach.  Miller's fundamental analysis is generally accepted.  *See* Pl. Op. Br., Ex. 7, p.6 and

n.11 (citing David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event

Studies in the Courtroom" (April 1999)) ("Sometimes a fundamental analysis is appropriate. . .

."). Defendants' fundamental analysis in July 1998 to examine the same phenomenon (the

Adams golf price decline), and GRAHAM AND DODD'S SECURITY ANALYSIS, Ex. R, pp. 383-

84, both confirm that Miller's fundamental analysis is used extensively for non-judicial

purposes.  Moreover, it is undisputed that numerous courts have considered Miller's analysis

helpful and his qualifications strong, since he has been permitted to render trial testimony in over

30 cases.  *See* Alan Miller Resume, submitted herewith as Ex. U.

   Thus, Miller's opinions satisfy the standards governing the admissibility of evidence set

forth in *Daubert v. Merrell D&W Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire*

*Co. Ltd. v. Carmichael*, 526 U.S. 137, 150, 151 (1999), and *In re Paoli R.R. Yard PCB*

*Litigation*, 35 F.3d 717, 741 (3d Cir. 1994).  Fed. R. Evid. 702 does not require that any

expert base his evidence in "scientific" methodology, and quantification of damages "is hardly

an exact science; computation thereof is accomplished basically by estimation and inference."

*RMED*, 2000 U.S. Dist. LEXIS 3742, at *35.  *Elcock*, on which defendants rely, reaffirmed

that, as *Kumho Tire* pointed out, the eight *Daubert* factors are non-exclusive, and it is not

15

necessary to apply or satisfy each factor in every case. This is especially true where the reliability of a "non-scientific" method is at issue. *Elcock*, 233 F.3d at 746-47; *RMED*, 2000 U.S. Dist. LEXIS 3742, at *22-25 (accepting expert opinion in IPO case using same fundamental analysis as Mr. Miller here, and holding that a statistical event study is *not* required).

Miller's analysis of causation and damage issues in this case is admissible because he applies accepted methodologies, informed by the same intellectual rigor as characterizes experts in this field. *RMED,* 2000 U.S. Dist. LEXIS 3742.

### 2.    **James's Analysis Is Biased**

James, by contrast, cannot meet *Elcock* or other applicable standards. His lack of objectivity destroys any possibility that his hypothesis is testable, that he employs standards controlling his technique's operations, that his approach is generally acceptable, or that his methods have non-judicial uses. *See Elcock*, 233 F.3d at 745-46.

Certainly, though it is never possible to "eliminate[ ] all subjective factors", "[c]areful factual analysis and informed judgment must leaven computer-driven models." *See* Jon Koslow, *Estimating Aggregate Damages in Class Action Litigation Under Rule 10b-5 for Purposes of Settlement*, 59 FORDHAM L. REV. 811, 822-3, 842 (1991). In the present case, James emphasizes such "subjective factors," leaving out "[c]areful factual analysis and informed judgment" by taking steps, as we have seen, such as:

-    Insisting on a one- or two-day window period, and yet ignoring the huge day-by-day variations in returns during a critical six day period in July 1998;

- Running statistical studies to measure returns with respect to a particular date, August 1, 1998, and yet failing to establish that it was on that particular date that the market absorbed new information;

- Extolling the efficiency of the market for Adams Golf stock <u>after</u> the IPO, and yet ignoring that the June 9, 1998 press release was issued <u>before</u> the IPO, which meant the IPO price could not absorb the gray marketing threat in the absence of appropriate risk disclosure in the Registration Statement;

- Rejecting undisputed evidence from numerous sources of "leakage" here, and yet embracing mere "*conjecture*" that "leakage" occurred in his 1982 study of savings and loans' stock returns;

- Using a window period of one or at most two days here, and yet using a 26 day window period in his 1982 study; and

- Relying on monthly regressions, and yet lacking any ability through those regressions to explain or even address the steep price decline during July and early August 1998.

James's opinions are not reliable, and they violate the very principles of science he purports to espouse.

17

## CONCLUSION

For all the reasons set forth here and in plaintiffs Opening Brief, James's opinion should

be stricken now and precluded at trial.

Dated: October 30, 2006

### ROSENTHAL, MONHAIT & GODDESS, P.A.


By:   /s/ Carmella P. Keener
    Carmella P. Keener (DSBA No. 2810)
    919 Market Street, Suite 1401
    Citizens Bank Center
    Wilmington, DE   19801
    (301) 656-4433
    ckeener@rmgglaw.com
    *Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**
Juli F. Farris
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA  98101

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 30th day of October, 2006, I caused

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO STRIKE AND EXCLUDE**

**TESTIMONY OF CHRISTOPHER JAMES, Ph.D.** to be electronically filed with the Clerk of

Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the

following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com