# EXHIBIT I

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 1

## ADAMS GOLF

### Moderator: Patty Walsh
### October 23, 1998
### 1:00 p.m. CT

Operator:     Good day and welcome to this Adams Golf third quarter results conference call.

Today's call is being recorded.  At this time for opening remarks and introductions I would

like to turn the call over to the Director of Investor Relations, Ms. Patty Walsh, please go

ahead ma'am.

Patty Walsh:     Good afternoon ladies and gentlemen and welcome to the Adams Golf third

quarter earnings release teleconference.  With me today are Mr. Barney Adams,

Chairman, Chief Executive Officer and President and Mr. Darl Hatfield, Senior Vice

President, Finance and Administration and Chief Financial Officer of Adams.  As a

formality, before we begin I need to point out that any comments made about future

performance reflect our best judgement today based on current market trends and

conditions.  Any such comments or forward looking statements should be understood in

the context of our publicly available report filed with the SEC including our prospectus

which contains a discussion of various factors we believe may affect our business.

Certain factors, which could be expected to affect future performance, include market

demand and acceptance of products and business conditions in the golf equipment

industry generally.  These factors could cause actual future performance to differ

materially from current expectations.  At this time I'd like to turn the meeting over to

Barney Adams.



EXHIBIT
106
Walsh

ADAMS 004361

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 2

Barney Adams:    Hello everyone.  Yesterday afternoon we announced our third quarter results

which Darl will elaborate out in a minute.  I'd like to make one comment before Darl gets

started and that is in light of the general softening of the golf market we are very positive

about those results and I'm going to elaborate on them later but I want to turn it over to

Darl just now.

Darl Hatfield:    Thanks Barney.  Although the third quarter was disappointing in terms of not

meeting analyst's original estimates it did however represent a significant increase over

the comparable period in 1997.  Sales for the third quarter were twenty-three million

compared to fourteen point two million in the third quarter of 1997.  Sales for the first nine

months were eighty-one point three million versus nineteen point seven million in the

comparable period of 1997.  Aggregate units sold in the third quarter were approximately

two hundred and ten thousand. A breakdown of sales by product category for the three

and nine months ended September 30th, 1998 is as follows, for the three months, the

original sixteen degree lofted tight ((inaudible)) club represented thirty-six point five

percent of our revenues.  Other lofted fairway woods represented fifty-nine point eight

percent and other products which are primarily represented by our custom fitting

operations, represented three point seven percent of our revenues.  Year to date the

original sixteen degree lofted club is forty-two point nine percent of revenues, other lofts

are fifty-three point nine and the other product category of three point two percent.  The

increase in the percentage of net sales represented by other lofted clubs category

continues the trend that has occurred over the last three quarters and has been

accelerated by the addition of the two wood and to a lessor degree, the eleven wood,

both of which were introduced in late August of this year.  A breakdown of our sales by

geographic territory on a broad basis is as follows, for the three months ended

September 30th, 1998, domestic sales represented eighty-five point seven percent of our

revenues.  International represented fourteen point three percent.  For the nine month

ADAMS 004362

period, domestic represented eighty-nine point two percent and international represented ten point eight percent. Of our domestic sales in the third quarter, direct response sales accounted for seven point eight percent of those revenues with the remainder primarily represented by sales to our retail customers. A further breakdown of our international sales shows that for the three months, Asia represented fifty point five percent, Europe, twenty-eight percent and the rest of the world represented primarily by Canada was twenty-one point five percent. For the nine month period, Asia represented thirty-four point eight percent, Europe was thirty-one point one and the rest of the world was thirty-four point one percent. Gross profit as a percentage of sales for the third quarter decreased to seventy-three point nine percent from seventy-four point seven in the comparable period in 1997 and seventy-seven percent in the second quarter of 1998. The decrease in gross profit is due primarily through a reduction in the average sales price of the tight (wise) club at the wholesale level due to increasing competition in the fairway wood segment and to the liquidation of our demo club inventory in the third quarter. Operating expenses as a percentage of sales equaled forty-six point eight percent and is composed of selling and royalty expense, general and administrative expenses and to a lessor extent, research and development. Selling and royalty expense equaled thirty-one point seven percent of sales for the third quarter of 1998 compared to thirty-nine point one percent in the comparable period in 1997. The biggest component of this expense is advertising which we break down into image based advertising and direct response advertising. Both types of advertising were somewhat higher then expected when expressed as a percentage of sales because of the lower then expected sales volume. In addition, the company incurred start up costs associated with the production of new commercials. General and administrative expenses equaled thirteen point one percent of sales for quarter three as compared to four point two percent for the comparable period in 1997 and ten point nine percent for the first six months of 1998. The increase in G&A expenses as a percentage of sales is primarily due to the lower level of sales in quarter three as compared to the first and second quarter of 1998

ADAMS 004363

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 4

considering the fixed nature of these expenses. Finally, R&D expense equaled two percent of sales for the third quarter. As a result, net income we eighteen point nine percent of sales or four point three million and year to date, for the first nine months was twenty point five percent of sales or sixteen point six million. That concludes my prepared remarks so I'll turn the call back over to Barney.

Barney Adams:    Thanks Darl. You know as I stated previously, if you took our third quarter results and forgetting the comparison of us to us, just took our third quarter results and looked at them in light of the industry my gamble is that an awful lot of companies would trade places with us. This does not mean that we're proud of missing our number but it does mean that we're still a very, very strong company. Now having said that, in our recent press release we talked about the fourth quarter that this market softness is going to continue, there's just a lot of factors out there. But the bottom line is that we'll probably come in at or slightly below break even. Now we knew months ago that we were going to sell our millionth (tight lie) sometime during Q4 of 98. And I think what's remarkable about that is the marketing for this club started less then eighteen months ago. We wanted to figure out a way to say thank you to the American golfers at the same time say thank you to our good retail accounts. So we've come up with a program, started October 15th, it runs for a month, anyone who purchases two (tight lies) during that period gets a one hundred and fifty dollar stand bag absolutely free. As I said, this not only allows us to thank the consumer but it allows us to work with our retail accounts and help them move merchandise off their shelves. At the same time, our new infomercial will view next week and it is going to be accompanied by a new ad campaign. And that's important because at the beginning, when we first did all of our ads, and you have to remember the ads you see for the most part and certainly the infomercial were done back in day one, eighteen months ago. And in those days the issue was big club versus small club. Well little did we know that we were going to change the way fairway woods were designed in the golf industry and that of course is what's happened. So now our issue is

ADAMS 004364

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 5

to differentiate ourselves from other manufacturers who come up with low profile fairway woods. And we've been able to do that on a technical basis that shows that we have a distinctive technical advantage with our design over anybody else on golf. You combine that with the fact that we are also more aggressively showing that we make seven different (lofts). We found out in some of our focus groups that people didn't realize we made all those (lofts) so we're being much more aggressive with the marketing of all of our (lofts). And we have a very strong marketing program going into Q4 of this year and of course will also go into the first quarter and so on of next year for just the (tight lies). Now the other obvious question is 1999, where are we, where are we going, etceteras. And as I've said back in the road show and continue, we're going to introduce a new driver early in 1999. Regardless of how soft the golf market gets the overall market for drivers is still, in the United States, approximately five hundred million dollars. So from our prospective that's what we're focusing on. We see a market opportunity for us, it's significant whether the market is up or down it's still a very significant number and that's what we're concentrating on to help us improve our sales and margin performance in 1999. That's the end of my remarks and we'll be glad to open the call to questions.

Operator:    Thank you sir. The question and answer session will be conducted electronically. If you would like to ask a question you may signal by firmly pressing the star key followed by the digit one on your touch tone telephone. We'll proceed in the order that you signal us and we'll take as many questions as time permits. Once again if you do have a question please press the star key followed by the digit one. And we'll take our first question from Brian Lantier of Lehman Brothers.

Brian Lantier:    Good afternoon gentlemen, Brian Lantier with Lehman Brothers. I was wondering if Barney if you could specifically comment to some of the ways you're going to address the sales in the gray market going through to the wholesale clubs which you mentioned in your press release?

ADAMS 004365

Barney Adams:    Yeah, we're going to do two things, we are going to have the ability shortly to

serialize clubs and the bottom line to that is that we're going to be able to track them any

place they go.  The second thing is that we are, you know we have legal restrictions, I

mean there's only a certain things we can do but within the guidelines and let's say,

pushing the guidelines of what we can do legally, we are rewriting all of our sales

contracts with our wholesalers to do whatever we can to discourage that action.

Brian Lantier:    Great.  Do you have any feedback so far on the consumer response to the two

wood?

Barney Adams:    Yeah it's been a, I have to be honest, I tell you it's been a pleasant surprise.

People are, people like their (tied lies) so much that they like to tee off with it and they're

raising this club as kind of a club I can hit off the fairway, a club I can hit off the tee.  So

it's been stronger then I expected.

Brian Lantier:    Great.  Quick question for Darl, day's sales outstanding, they seem to be inching

up a little bit is this in line with what you expected?

Darl Hatfield:    They are, have gone up a little bit but as of September 30th it's about forty-four

days so yes, we think that's right in line where we would expect.

Brian Lantier:    Okay, great.  Thank you.

Operator:    We'll take our next question from John Weiss at NationsBanc.

John Weiss:    Had a couple of questions if I may.  First who is the retailer that seems to be

obtaining your club in the gray market?  What retail price is that retailer offering it at?

ADAMS 004366

And why is that having such a significant affect on your sales? This is obviously a problem for a lot of golf club manufacturers. And I was also wondering if you could serialize the clubs in a way that those who diverted in the future aren't able to easily obliterate the serial number.

Barney Adams:    I'll answer your question in reverse. We think the answer to part B to your question is yes we can do that. We'll have pretty good control over that. Going back to the first part of your question, we have been, there's no secret here but we have been advised by our attorney that we shouldn't mention any names. So I can only say it begins with C and ends with O and it's a membership corporation that comes out of the West Coast United States. Middle initial is T if it helps you any.

John Weiss:    Yeah I think I can narrow it down to one or two.

Barney Adams:    Well you know, it's like jeopardy John. Here's what happened. I mean these guys have been calls from deviators for several months. This is not new information. But in the last couple of months it increased, not even the last couple of months, I'd say the in the last couple three weeks it increased dramatically. And it just upset a lot of our retail market. We got calls from retail markets saying hey we can't compete, they're selling this thing for, I think they're selling the thing on a graphite shaft for a hundred and forty-nine dollars. We can't make any money selling at that price. And you know, I'll tell you what the accusation was. The accusation really was, and I got this in writing from one of my customers, Oh you guys are a public company. You'll do anything to make your numbers and you guys are really selling to them. And there's a great irony here because we've actually turned down business in that marketplace because we said we weren't going to sell there. But they actually accuse us of it. So now we, now we're kind of in a when do you stop beating your wife situation here. We have to go back and convince our own retailers that even though our clubs are in those stores we didn't sell them to them.

ADAMS 004367

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 550194
Page 8

John Weiss:     Thank you.

Barney Adams:     You're welcome.

Operator:     And we'll take our next question from Dave Turner at Ferris Baker, Watts.

Joe Tecklets:     Hi guys, actually Joe (Tecklets) here.  Question first on gross margin, Darl can
you quantify what the liquidation of the demo clubs did to your gross margin in the
quarter?  Or how many clubs, I think you said there are two hundred and, how many units
in the quarter, two hundred and ten thousand?

Darl Hatfield:     Yeah we sold two hundred and ten thousand units in the quarter.  Demo clubs
represented about thirteen thousand units and they were sold at gross profit obviously
that's significantly below what we normally would sell our new clubs for.

Joe Tecklets:     But you can't quantify that in terms of basis points off of the, maybe the
normalized gross margin?

Darl Hatfield:     It would be about twenty points under normal gross margin.

Joe Tecklets:     Okay and you said there was a reduction in the average sale price at wholesale,
when did that go into affect and maybe how big of a reduction was there?

Darl Hatfield:     There was no formal date as to when any kind of a pricing policy went into affect
but our average price was somewhat lower this quarter then it has been in previous
quarters.

ADAMS 004368

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 9

Joe Tecklets:    Is that an ongoing strategy or has that leveled out?  Do you have a set price now?

Darl Hatfield:    No we think that that probably has leveled out and we don't think that that will be further reduced in the fourth quarter.

Joe Techlets:    And also is this a, was this more a direct response or a retail issue and is it across the board?  Are you giving discounts to certain retailers for quantity or?

Darl Hatfield:    Yes it's on a very selective specific basis.

Joe Techlets:    Okay.  And lastly Barney, when you say a driver in 1999 are you talking about January?  You said early 1999.

Barney Adams:    Right our goal is, was and continues to be to have it by January of 1999.  The only reason that I will not come out and say ((inaudible)) is because this product, again as I've said all along, is going to be a technically different and superior product.  And it has to meet certain standards before we're going to release it.  We're very optimistic but we aren't making any definitive comments.

Joe Tecklets:    Can you say if there's any titanium in it?

Barney Adams:    It's entirely possible Joe.

Joe Tecklets:    Okay.  Last question Darl, any extended terms out there in the channel as well or have you extended your terms at all?

ADAMS 004369

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 10

Darl Hatfield:    No as a general rule we have not ended our terms. There are some situations

where, when you view the overall transaction in terms of number of clubs and other terms

involved where we did extend the terms somewhat but that's in a very, very small portion

of our sales. And those cases it was simply to meet competitive situations.


Joe Techlets:    Okay thank you.


Operator:    We'll go next to Mitchell Spiegel at DLJ.


Mitchell Spiegel:    Yeah a couple quick questions just regarding the industry, could you

comment what you're seeing in terms of retail inventory levels and when you think, if

there is any sort of build up that should correct itself? And then on the competitive front,

in terms of pricing you've made some general comments and we've heard some other

golf club manufactures comment about a very difficult environment in terms of pricing.

Can you just give me a sense on where you see that, you know, when and whether you

see it stabilizing in the next six months?


Barney Adams:    Mitchell I wish I had a better crystal ball to be honest with you but I don't. You

know a lot of the data about the golf industry, in fact almost all the data about the golf

industry comes from people who sell woods, irons, wedges, putters, you know even golf

balls, etceteras. So the comments tend to be inclusive of all products. We only

concentrate on fairway woods. What we know about fairway woods as far as the market

is concerned is that at the very least all other manufactures have decided that our

methodology for making a fairway must be right because they're all doing the same thing

that we are. And that's caused a little confusion in the marketplace and it's caused a little

confusion with our retailers. And we, we anticipated this but I suppose the most honest

answer I can give you is I don't think we thought that every single company that makes

clubs was going to jump on our bandwagon. We knew some of them were but that's

ADAMS 004370

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 11

what's happened. Now from the same, but the answer to that, I mean the settling out for us, we're not so much looking for the settling out. And this is what I eluded to earlier is that we've put together a very clear and concise advertising program that shows that we don't care what they do we have a distinctive advantage in our design. And that's really our approach to the thing is that we have to differentiate and sell what we can do.

Mitchell Spiegel:    Okay and then I guess, while a small portion of your revenue has come from Europe, do you have any sense of there's been some comment as to there's a slow down in the golf market across Europe, some of it related to El Nino and just other general malaise. Can you comment on that?

Barney Adams:    I'm afraid it's the same answer. I'm afraid because we're so isolated that another company that would sell woods, irons, wedges, putters, etceteras would probably have a better feel for it then we would. We are just getting started in Europe and Asia as you can see by the significant increase in international sales. So again, it's more of our goals visavis what percentage of sales we want to accomplish in the next year.

Mitchell Spiegel:    Great, thank you very much.

Operator:    We'll go next to Fred Kull of Fred Kull Financial Advisors.

Fred Kull:    Yes sir, if you could tell me what your free cash flow was in the quarter just ended, what your guess pre-cash flow will be in Q4 assuming it's flat? And number three, the rational for using your precious cash as a young company fighting larger competitors in an uncertain future to buy in shares where there's simply no support what ever for virtually any of the smaller companies.

Darl Hatfield:    Concerning the cash flow we generated about two million dollars to cash flow from operations this quarter.  Next quarter, again we don't comment on specifics but as we indicated we'll be at or slightly above the breakeven level on earnings.  And as you might suspect our cash flow should be a positive amount based on that but will not be significant.

Barney Adams:    Fred I'll answer part three, this is Barney Adams.  I understand your question.  I don't think there's a good answer for it.  I can only tell you that from our prospective based on hundreds of phone calls from investors, from investment bankers, etceteras we were probably damned if we did and damned if we didn't.  And I wish I had a more intelligent answer for you then that but that's it.  I suppose that the best news is that thus far we're able to use a very small percentage of our cash in this objective.  But I mean, I still understand the, one of my very good friends who's a financial advisor expressed what you just expressed to me in much stronger terms.  So I understand your question.

Fred Kull:    I felt constrained.  What will the attitude going forward?  Is this an open question going forward or sort of what's the feeling, the next step on this issue?

Barney Adams:    It's still alive but our concentration is and always has been on doing a better job running the company.  And I guess, again giving the constraints I'm under and so on that the buy back program is still in affect but I suppose like all programs it's under constant scrutiny.

Fred Kull:    Thank you.

Operator:    We'll take our next question from Matthew Ziehl of Salomon Brothers Asset Management.

ADAMS 004372

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 13

Matthew Ziehl:     Yes, hi.  Just a following up a question about the share repurchase program, it's, obviously it's quite accretive to earnings per share to, or somewhat accretive to complete the program.  Is that your intent to complete the program especially with the stock around four dollars?

Darl Hatfield:     We still have an authorization in place by our board to repurchase up to two million shares.  We've purchased as we indicated six hundred and fifty-seven thousand to date and we'll re-evaluate that based on market conditions.  But that repurchase authorization does remain open and we will continue to consider it.

Matthew Ziehl:     Okay thanks.

Operator:     We'll go next to follow up question from John Weiss at NationsBanc.

John Weiss:     I had a couple of questions about the bag promotion, first what is the cost to you of providing a bag?  Second, how do you make sure the retailer really has sold two clubs to a customer?  And third, an ad you had I believe in the *Wall Street Journal* yesterday or two days ago encouraged the consumer to call you directly, how do the retailers respond to that suggestion as opposed to the alternative of the customer obtaining the bag through a retail purchase?

Barney Adams:     John suffice to say that when we did this program we did a serious amount of homework to obtain a very, very high quality bag at a very good price.  Secondly, as far as directing consumer inquiries into here, as in all of our efforts, what we try and do is deflect the sale to the retail level.  This is not, we don't want to do this in house but we have increased our capability significantly in the last six months with our investment in infrastructure to handle these calls to divert them to the right retail accounts, the participating retail accounts and so on.  So there is some value to directing calls in here.

ADAMS 004373

And then as far as making sure the retail actually sells the two bags, you know we do have a system in place, I mean we rehearsed this, I guess for a lack of a better word. I suppose if anybody really wanted to cheat us they could. I mean you can always cheat any system. But again, we're working with participating retailers and we have agreements with them.

John Weiss:    So Barney when a call comes in you automatically refer the caller to a retailer? What if the customer just wants to buy it over the phone?

Barney Adams:    Yeah if he's up in (DeBuke) and the nearest retailer is, you know, a hundred miles away we'll deal with them directly. But we try, our objective is to try and divert them to a retailer.

John Weiss:    Thank you.

Operator:    We'll go next to Roy McKay with Scudder Kemper.

Roy McKay:    Yeah I'm just a little bit concerned Barney to hear you back away from, what I hear you saying is that sure you've got a two million share repurchase in place but you don't have any intention in doing it. Then you dodge the question of whether or not you're going to complete that program. You know, you've seen the market value of your corporation, which the public invested in, drop a hundred and thirty million dollars. The stock is between three and four, I can't imagine why you wouldn't double the repurchase program, if you really had the interest of the shareholders in mind.

Barney Adams:    Well you know here I am, I'm damned if I do and I'm damned if I don't. We have a repurchase program in place. I don't think I heard anybody say we were going to

ADAMS 004374

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 15

stop it. I think what you heard us say is that if I called up twenty financial advisors, ten would tell me it's a good idea and ten would tell me it's a dumb idea.

Roy McKay:    Well that's why you're the CEO, you have to decide what's the best interest of the shareholders.

Barney Adams:    That's correct and I understand the emphasis of the word shareholders and there is a stock repurchase program in place and it has not been changed from when we first announced it.

Roy McKay:    You want to see the (shortness) just go to two million shares just cancel your program.

Barney Adams:    I appreciate your input.

Operator:    Once again if you would like to ask a question you may signal by pressing the star key followed by the digit one.  We'll go next to Jeff Klein, a private investor.

Jeff Klein:    Good afternoon. I'm just interested to know if there's any discussion or investment in iron technology that might mirror what you've done with the fairway woods?

Barney Adams:    Yeah, yeah there is Jeff. It's an ongoing project but our game plan has always been to introduce one category at a time so we can focus on it and focus on gaining market share. So you're absolutely right, there is a program internally on irons. In fact we've actually did prototypes as to when they're going to be running and when they're going to introduce I can't tell you because right now the first marketing emphasis is going to be on the driver.

ADAMS 004375

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 16

Jeff Klein:     Are these prototypes or the possibilities, are these going to be completely different looking or different reacting type of irons?

Barney Adams:     Yeah anything we introduce will be with a technically, technical, excuse me, with a technical story that's a benefit to the golfer.

Jeff Klein:     Okay very good, thanks.

Barney Adams:     Sure.

Patty Walsh:     Ladies and gentlemen we have time for just one more call, question before we end the call.

Operator:     Ms. Walsh it appears there are no further questions at this time. I'd like to turn the program back over to you.

Patty Walsh:     Okay. Thank you. On behalf of Barney Adams, Darl Hatfield and myself I'd like to thank all of you for participating in our teleconference today. We plan to continue to hold quarterly teleconferences following each earnings release and you'll be notified by fax a few days prior to the call. Thank you again and good afternoon.

Operator:     That concludes today's conference call, thank you everyone for your participation.

END

ADAMS 004376

# EXHIBIT J

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - - - - - -

4    IN RE:   ADAMS GOLF,      CA. NO.

5    INCORPORATED              99-371-KAJ

6

7    SECURITIES LITIGATION

8    - - - - - - - - - - - - - - - - - - - - -

9            Wednesday, August 9, 2006

10

11       Oral deposition of GARY L. FRAZIER,

12    was taken pursuant to Notice, at the

13    offices of SIMPSON THACHER & BARTLETT LLP,

14    425 Lexington Avenue, New York, NY

15    10017-3954 on the above date before

16    DEBRA G. JOHNSON-SPALLONE, CSR, RPR,

17    Notary Public, and a Federally Approved

18    Reporter of the United States District

19    Court commencing at or about 10:40 a.m.

20

21       RSA/VERITEXT COURT REPORTING COMPANY

22        1845 Walnut Street, 15th Floor

23           Philadelphia, PA  19103

24        (215) 241-1000   (888) 777-6690

Page 254

```
 1    before they sent memos out        02:43:38PM
 2    to channel members from           02:43:40PM
 3    Beebe or from Gonsalves or        02:43:42PM
 4    others talking about, or          02:43:47PM
 5    reclarifying, their position      02:43:49PM
 6    on gray marketing.                02:43:50PM
 7        I summarize later some        02:43:53PM
 8    of the steps -- this is on        02:43:56PM
 9    page 14 -- where I felt this      02:43:57PM
10    -- in paragraph 44, that I        02:44:04PM
11    feel these steps taken were       02:44:06PM
12    reasonable and effective.         02:44:07PM
13        So, I don't -- based          02:44:09PM
14    on the record, they may --        02:44:11PM
15    they obviously perceived it,      02:44:13PM
16    but I don't believe, as a         02:44:14PM
17    marketing expert, that they       02:44:16PM
18    were slow to react.               02:44:19PM
19        - - -                         02:44:19PM
20    BY MR. COLLINS:                   02:44:19PM
21        Q.  Okay.                     02:44:20PM
22        One more document,            02:44:20PM
23    Exhibit-299, which is a memo to Scott  02:44:22PM
24    Levins, Eddie Tate.               02:44:26PM
```

Page 255

```
 1        A.  Thank you.               02:44:29PM
 2        Q.  And the memo goes on awhile,  02:44:33PM
 3    but I am directing your attention to a  02:44:34PM
 4    particular paragraph on the second page.  02:44:36PM
 5        A.  Okay.                    02:44:38PM
 6        Q.  Paragraph at the bottom.  02:44:41PM
 7    Middle bottom; as the Costco issue  02:44:43PM
 8    worsened, retailers complained that Adams  02:44:45PM
 9    was both evasive and slow with their  02:44:47PM
10    response. Retailers will point out how  02:44:49PM
11    other manufacturers who were quick to  02:44:53PM
12    address, fix and remedy the problems,  02:44:56PM
13    while we appeared to be myered in a myriad  02:44:58PM
14    of other conflicts. With this delay  02:45:02PM
15    came less in support from many of our  02:45:03PM
16    retailers, especially once word of  02:45:05PM
17    Costco's inventories growth spread.  02:45:08PM
18        That statement by Eddie      02:45:11PM
19    Tate, who was Florida regional account  02:45:14PM
20    coordinator, as indicated here, that also  02:45:16PM
21    has no impact on your -- on your opinion  02:45:18PM
22    here?                            02:45:22PM
23        MR. GLUCKOW: Objection.      02:45:23PM
24        Vague and ambiguous.         02:45:23PM
```

Page 256

```
 1        You can answer.              02:45:25PM
 2        THE WITNESS: I read          02:45:25PM
 3    it. Everything I read I           02:45:26PM
 4    considered.                       02:45:28PM
 5        Ochoa had mentioned           02:45:32PM
 6    in her deposition, and I          02:45:34PM
 7    agree, that gray marketing        02:45:35PM
 8    effects different                 02:45:39PM
 9    manufacturers differently         02:45:39PM
10    in the same industry.             02:45:41PM
11        In my opinion, as a           02:45:43PM
12    marketing expert, the steps       02:45:46PM
13    taken by Adams to deal with       02:45:47PM
14    gray market sales were            02:45:50PM
15    effective, and that they          02:45:52PM
16    needed to focus elsewhere on      02:45:56PM
17    marketing challenges much         02:45:58PM
18    more important to the firm        02:46:01PM
19    in ensuring that it's going       02:46:03PM
20    to be successful in this          02:46:04PM
21    industry.                         02:46:06PM
22        - - -                         02:46:06PM
23    BY MR. COLLINS:                   02:46:06PM
24        Q.  All right.                02:46:06PM
```

Page 257

```
 1        I don't want to be           02:46:07PM
 2    argumentative, and I am not challenging in  02:46:08PM
 3    this deposition, sir.             02:46:12PM
 4        Your life background in       02:46:13PM
 5    marketing --                      02:46:17PM
 6        A.  I am used to dealing with my  02:46:17PM
 7    wife, so, go ahead.               02:46:18PM
 8        Q.  -- but you have said earlier  02:46:20PM
 9    today, Professor, that, unlike some pointy  02:46:22PM
10    headed intellectual in the classroom, whom  02:46:28PM
11    might not deal with real world situations,  02:46:30PM
12    you are somebody who rolls up your sleeves  02:46:35PM
13    and you dealt with corporate management  02:46:37PM
14    and you have tried to see the way  02:46:40PM
15    marketing theory works in the real world.  02:46:45PM
16        A.  Right.                    02:46:47PM
17        Q.  Is that fair?             02:46:47PM
18        A.  Right.                    02:46:49PM
19        Q.  I am struck by how        02:46:52PM
20    cavalierly, with all due respect, you are  02:46:57PM
21    introduced to a flood of statements by  02:46:59PM
22    Costco management -- now, that would be  02:47:05PM
23    shocking.                         02:47:07PM
24        I am struck by how you seem   02:47:07PM
```

65 (Pages 254 to 257)

Page 278

```
1   trenches in October '98 or        03:11:21PM
2   March '99, you don't have         03:11:24PM
3   all of the data. You don't        03:11:25PM
4   have time to really reflect       03:11:26PM
5   on things. You don't -- you       03:11:28PM
6   don't have two weeks to sit       03:11:31PM
7   down and only read documents      03:11:32PM
8   related to this one minor         03:11:33PM
9   issue when you have got so        03:11:34PM
10  many other issues bombarding      03:11:36PM
11  you in the marketing like         03:11:37PM
12  product, price, place,            03:11:38PM
13  promotion. It is not easy         03:11:40PM
14  to make the calls that they       03:11:41PM
15  did.                              03:11:43PM
16      I am not -- but the key       03:11:43PM
17  here for me is; I have the        03:11:46PM
18  luxury of having a lot of         03:11:50PM
19  information. I have the           03:11:51PM
20  background. I have the            03:11:52PM
21  experience. I have                03:11:53PM
22  expertise. I have facts           03:11:53PM
23  in this case to render my         03:11:55PM
24  opinions, and that is what        03:11:57PM
```

Page 279

```
1       I've have done.               03:11:58PM
2       - - -                         03:11:58PM
3   BY MR. COLLINS:                   03:11:58PM
4       Q. Okay.                      03:11:58PM
5       Now, are you familiar with    03:12:10PM
6   the fact that in 1997, 10K --     03:12:12PM
7       A. Of Callaway?               03:12:18PM
8       Q. Callaway.                  03:12:19PM
9       MR. GLUCKOW: Stop             03:12:20PM
10  reading his mind. Let him         03:12:21PM
11  get his question out.             03:12:23PM
12      THE WITNESS: Sorry.           03:12:24PM
13      - - -                         03:12:24PM
14  BY MR. COLLINS:                   03:12:24PM
15      Q. Callaway addressed gray    03:12:26PM
16  marketing as a risk factor of Callaway. 03:12:28PM
17      Are you generally familiar    03:12:36PM
18  with that?                        03:12:37PM
19      A. I know -- I know they raised 03:12:37PM
20  it as a negative.                 03:12:38PM
21      Q. Okay.                      03:12:39PM
22      At that time, how extensive   03:12:42PM
23  was gray marketing at Callaway, if you 03:12:44PM
24  know?                             03:12:46PM
```

Page 280

```
1       MR. GLUCKOW: Objection.       03:12:46PM
2       Overbroad, vague and          03:12:47PM
3   ambiguous. Calls for              03:12:48PM
4   speculation.                      03:12:50PM
5       But you can answer.           03:12:50PM
6       Outside the scope.            03:12:51PM
7       You can answer.               03:12:52PM
8       THE WITNESS: Yeah, I          03:12:52PM
9   don't know for sure.              03:12:53PM
10      - - -                         03:12:53PM
11  BY MR. COLLINS:                   03:12:53PM
12      Q. Now, what does it mean to  03:12:53PM
13  you that Callaway, in its '97 10K, raised 03:12:55PM
14  it as a negative?                 03:12:59PM
15      Does that have any impact on  03:13:00PM
16  your opinion?                     03:13:02PM
17      A. Yes, for Callaway or --    03:13:02PM
18      Let me put it this way.       03:13:04PM
19      And, again, you know, I do    03:13:06PM
20  agree with Ochoa on the point that, gray 03:13:09PM
21  market sales attract different firms from 03:13:12PM
22  the same industry differently.    03:13:14PM
23      Callaway had been the only    03:13:15PM
24  game in town for large head drivers since, 03:13:17PM
```

Page 281

```
1   like, '91. It was not until '97/'98 that 03:13:21PM
2   others started to introduce a lot of their 03:13:24PM
3   clubs.                            03:13:27PM
4       Callaway was it. They were    03:13:27PM
5   not only hot over a year or two. They 03:13:29PM
6   were there, and they had irons and putters 03:13:32PM
7   and drivers and balls and everything else. 03:13:34PM
8       A gray marketer, a diverter,  03:13:38PM
9   will always be more attracted to products 03:13:40PM
10  from a Callaway than they would to an 03:13:43PM
11  Adams, because they are easier to sell, 03:13:47PM
12  and as brand strength, it has brand 03:13:49PM
13  prestige. It has brand awareness. 03:13:53PM
14      If a golf shop did not         03:13:54PM
15  carry, Callaway; oh, my God, what did I do 03:13:56PM
16  to deserve this? Because they'd have no 03:14:00PM
17  credibility with many golfers.    03:14:03PM
18      So, is that surprising to me  03:14:05PM
19  with those characteristics that there be 03:14:06PM
20  tremendous pressure for diverters to 03:14:06PM
21  acquire Callaway clubs and get them to 03:14:09PM
22  anyone?                           03:14:11PM
23      So, given its level of         03:14:11PM
24  sales, over 900,000,000; given its brand 03:14:13PM
```

71 (Pages 278 to 281)

# EXHIBIT K

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3                       -  -  -
 4    IN RE: ADAMS GOLF, INC. :
 5    SECURITIES LITIGATION    :
 6
                               X
 7
                      ORAL DEPOSITION
 8
                           OF
 9
                  CHRISTOPHER M.  JAMES
10
                 Friday, August 11, 2006
11
                       -  -  -
12
          Oral deposition of CHRISTOPHER M.
13
     JAMES, held at the offices of AKIN GUMP
14
     STRAUSS HAUER & FELD, LLP, 590 Madison Avenue,
15
     New York, New York, commencing at 8:30 a.m.,
16
     reported by Pamela Harrison, RMR, CRR, CSR and
17
     Notary Public.
18
                       -  -  -
19
20
21
22
          RSA/VERITEXT COURT REPORTING COMPANY
23            1845 Walnut Street, 15th Floor
                 Philadelphia, PA  19103
24            (215) 241-1000   (888) 777-6690
```

CHRISTOPHER M. JAMES

Page 254

1    Q.    Are there models that can be    05:21:20p
2    used that test materiality on the basis of    05:21:21p
3    volume or some combination of volume and price    05:21:25p
4    movement?    05:21:29p
5    A.    I mean, I have not seen that    05:21:37p
6    analysis done in the context of, say, a damage    05:21:40p
7    analysis. I have seen some academic studies    05:21:43p
8    that ask the question of whether information has    05:21:49p
9    an effect on trading volume.    05:22:01p
10    Q.    And do you have any opinion as    05:22:11p
11    to the usability or appropriateness of those    05:22:13p
12    models?    05:22:17p
13    A.    I think the appropriateness    05:22:20p
14    would depend on the purpose of their being    05:22:23p
15    used. I would have to go back and look at some    05:22:31p
16    of those papers. Most of the paper -- the    05:22:36p
17    academic literature in finance is more focused    05:22:40p
18    on how information impacts value as opposed to    05:22:48p
19    trading volume. Although, there are a few    05:22:53p
20    papers out there that look at trading volume. I    05:22:55p
21    just don't recall what the conclusions are.    05:22:58p
22    Q.    The famous Golf Pro article    05:22:59p
23    allegedly of August or August 1, 1998, when was    05:23:03p
24    that available to the market?    05:23:08p

Page 255

1    A.    As I indicate in my report, it's    05:23:10p
2    my opinion that it's available to the market on    05:23:16p
3    August 1st.    05:23:19p
4    Q.    Well, surely you're not offering    05:23:19p
5    an opinion on that now, Dr. James, are you?    05:23:21p
6    A.    Yes, I am.    05:23:23p
7    Q.    You might be making an    05:23:24p
8    assumption, but you are offering -- are you an    05:23:26p
9    expert with regard to when Golf Pro appeared in    05:23:29p
10    1998?    05:23:32p
11    A.    I'm not representing myself to    05:23:33p
12    be an expert in when Golf Pro appeared. I am    05:23:35p
13    representing myself to be an expert in, first of    05:23:40p
14    all, knowing what the publication date and the    05:23:43p
15    convention of using publication dates. I    05:23:50p
16    believe your own expert uses the publication    05:23:52p
17    date as the date referenced in his chronology.    05:23:55p
18    Second, I undertook an    05:23:59p
19    investigation to determine whether there was    05:24:01p
20    any evidence that suggests that the Golf Pro    05:24:03p
21    article was available prior to the cover day    05:24:06p
22    and concluded based on that analysis that    05:24:12p
23    there was none.    05:24:14p
24    Q.    Okay. Do you know of any    05:24:15p

Page 256

1    evidence, apart from what you've put in your    05:24:16p
2    reports, to indicate when that Golf Pro article    05:24:21p
3    was available?    05:24:24p
4    A.    Yes.    05:24:26p
5    Q.    When?    05:24:26p
6    A.    In response to the Miller report    05:24:28p
7    where he conjectures that it might have been    05:24:32p
8    available earlier, I performed the following    05:24:37p
9    test. Based upon communications that I'm aware    05:24:40p
10    of between Cornerstone and the publishers of    05:24:46p
11    Golf Pro, which is now not currently published,    05:24:53p
12    they were unable to answer the question as to    05:25:04p
13    whether it was available before or after the    05:25:05p
14    cover price -- cover date.    05:25:08p
15    So I conducted a Factiva search    05:25:11p
16    between 1995 and 2000 in which I used the    05:25:15p
17    keywords "Golf Pro magazine," and then I    05:25:22p
18    looked at all of the articles that were    05:25:26p
19    available on Factiva that reference Golf Pro    05:25:29p
20    magazine and asked the question of whether    05:25:34p
21    there was any reference in the public press to    05:25:36p
22    a Golf Pro magazine article prior to the    05:25:41p
23    stated publication date on the cover, and I    05:25:46p
24    was able to identify several instances in    05:25:50p

Page 257

1    which there is a reference to a particular    05:25:53p
2    issue of Golf Pro magazine, and all of the    05:25:57p
3    references were after the publication date    05:26:01p
4    which is consistent with -- which is    05:26:04p
5    inconsistent with the conjecture by Mr. Miller    05:26:09p
6    that the information was available to the    05:26:13p
7    market prior to the cover date.    05:26:19p
8    Q.    Did you save those searches?    05:26:27p
9    A.    No.    05:26:29p
10    Q.    Did you communicate with your    05:26:30p
11    office about providing to us information with    05:26:34p
12    regard to the additional regressions you said    05:26:35p
13    you would have?    05:26:38p
14    A.    I have -- it's not my office.    05:26:41p
15    Q.    Cornerstone. Whomever you had    05:26:43p
16    to communicate with.    05:26:44p
17    A.    Yes, and the individual that is    05:26:46p
18    available -- the individual who undertook that    05:26:53p
19    analysis is not available, he's -- that's Amir    05:26:59p
20    Rosen, and I believe he's attending a deposition    05:27:07p
21    today.    05:27:10p
22    Q.    Not in this case?    05:27:11p
23    A.    Yes, I believe he's downstairs,    05:27:12p
24    two stories down.    05:27:14p

65 (Pages 254 to 257)

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------------------

IN RE: ADAMS GOLF, INC.          :          CONSOLIDATED

SECURITIES LITIGATION          :          C.A. NO. 99-371-KAJ

-------------------------------------------

ORAL DEPOSITION OF BRIAN LANTIER

Monday, June 5, 2006

The oral deposition of BRIAN LANTIER
was held at the Wyndham Syracuse Hotel,
6301 Route 298, East Syracuse, New York,
from 12:00 noon to 4:59 p.m., before
Cynthia A. Sanders, a Certified Shorthand
Reporter in and for the State of New York
and Registered Professional Reporter.

Page 130

130
1 marketplace.
2
3         I think some of the things that we wrote
4 here in August ultimately played out to the detriment
5 of Adams, that we were concerned about. Things like,
6 Orlimar really offering big rebates, leading better
7 placement in the golf shop. Callaway's product really
8 had some buzz in early August already, which surprised
9 us; I didn't think it was a very good club, and it
10 surprised me. And it clearly was a very successful
11 club in '99 and 2000, which we did not expect in 1998.
12    Q    Let's back up a moment to when this began.
13        At page 27 you write: We have spoken with
14 a number of leading on-and-off golf shops in the U.S.
15 over the past three months.
16        Before we go on, this report was written
17 August 28?
18    A    Um-hmm.
19    Q    Three months before August 28 was May 28?
20    A    Um-hmm.
21    Q    When did the pro shops survey actually
22 begin?
23    A    I don't remember the specific date, but
24 that sounds about right. Given the other timeline of
25 some of the meetings we had in April, the intensive

Page 131

131
1 due diligence would have occurred -- would have
2 started in May, June, time frame.
3        So it sounds like we were probably just
4 about right in starting our pro shop survey in the
5 middle to the end of May.
6    Q    Was there an event in the underwriting
7 process that triggered the beginning of the pro shop
8 survey?
9    A    I don't think so, I think it was more
10 seasonality. You know, we could have started earlier,
11 clearly in the spring, down south, but we wanted to
12 get a good cross section of the country, so we went
13 with the middle of May; people are going to be playing
14 golf everywhere by then.
15    Q    Now, mechanically, when did you actually
16 start putting together this lengthy report?
17    A    I can't recall the actual date, but we
18 would have started clearly before the date of the
19 first-call note, which was August 9th or something --
20    Q    4th?
21    A    -- August 4th. We would have started
22 somewhere around that time frame and used that as the
23 general outline and then expanded from there.
24    Q    When this was completed, how was it

Page 132

132
1 released?
2    A    This also has a very specific procedure by
3 which it's released, and I can't recall exactly what
4 that procedure is. But it's also a time-sensitive
5 document that's released broadly to the firm and the
6 public at the same time. But I can't recall if it's
7 released electronically, all at once, or -- And
8 clearly, I'm sure it's changed since 1998, but I can't
9 recall how we released it.
10        I know that, again, it was not something
11 that was disseminated separately and then, you know,
12 to certain individuals or investors or anything. The
13 release of a report is something that is done to
14 insure fairness among all investors, so it would have
15 gone out to everyone at the same time.
16    Q    Was there a hard copy mailing?
17    A    There was a hard copy mailing. It would be
18 done not by the research -- Well, I'll take that
19 back. We had our own mailing list; I didn't maintain
20 one, I didn't have enough contacts to maintain a
21 mailing list. But Mr. Picchi would have a mailing
22 list, they would have received a mailing. The -- And
23 the individual salespeople handling institutions, as
24 well as individuals, would have handled their own

Page 133

133
1 mailing; but I don't know the mechanism of how that
2 worked.
3        Once it was printed and it came back from
4 the printer, then we were able to, you know, just --
5 It was then available to all the salespeople and to
6 all of our investors at the same time.
7    Q    All right. Did it -- What significance
8 does the August 28th date have on this document?
9    A    That was the date that it, I would assume,
10 went to the printer. Usually the print turn-around
11 time is less than a day, especially for a document
12 like this; it's relatively small.
13    Q    And when, to the best of your knowledge,
14 was it first distributed?
15    A    It probably was on the sales floor that
16 day -- I don't know if this is a weekday or weekend
17 or what date that is?
18    A    That would have been the date that we
19 expected it to come back from the printer. It came
20 back, it appears on a Friday, when each individual
21 salesperson mailed it out is hard to say, because that
22 was something they handled themselves.
23    Q    Was it electronically distributed on the
24 28th?

Page 134

1    134
2    A    I don't believe at this time we were doing
3  electronic distributions, but I could be completely
4  wrong on that.
5    Q    Was -- In addition to the report, itself,
6  was something put on a first-call note or summary
7  electronic form on that date?
8    A    I don't believe so. The first-call note
9  would have been the down-sized version of this, the
10  August 4th note, because that was our initiation of
11  coverage, and this is just the extended version with
12  models.
13    Q    Now, on the survey, itself, did anyone
14  other than you and Mr. Picchi make calls?
15    A    In our research department; no, not that I
16  can recall. I don't know if the investment banking
17  group was still doing any due diligence at that point,
18  but in the research department -- And for the most
19  part, it would have been me making the calls. Bernie
20  may have attended -- listened in on some of the calls,
21  but for the most part, I was doing the pro shop
22  survey.
23    Q    And you called between 50 and 100 --
24    A    Yes --
25    Q    -- stores?

Page 135

1    135
2    A    Sorry.
3    Yes, I don't know how many responses we
4  would have gotten, but there were 50 to 100, and we
5  called them.
6    Q    And did you call some of them more than
7  once over the three-month period that the survey was
8  conducted?
9    A    I believe so, yes.
10    Q    How did you keep the records straight?
11    A    A lot of it was because they are subjective
12  answers; this is selling well, this isn't. It wasn't
13  something that you could say: Okay, you sold 38 Title
14  Lies, so we'll put that into a chart, and you sold 15
15  Warbirds; it was what's demand, what's good, bad,
16  different. Are people liking Orlimar? Is that
17  driving traffic? Do you like Orlimar? Do you like
18  the profit you're making off it? So it was a lot of
19  subjective questions and answers.
20    And I think you see that on our commentary
21  on the survey. That's what we used Golf Data Tech
22  for, because they had the physical numbers; ours was
23  more subjective in terms of what was working.
24    Q    Did you make notes of your telephone calls?
25    A    I would assume that we had notes of some

Page 136

1    136
2  sort, but I don't have the files, I don't know if
3  Lehman has the files.
4    Q    Okay. When you made notes in those days,
5  did you do it on a computer or on a yellow pad or
6  something?
7    A    For the most part it was handwritten.
8    Q    And by the time you were finished with the
9  pro shop survey, what kind of collection of notes did
10  you have?
11    A    I don't know. Every firm, every shop gave
12  you different amounts of information. Some might be
13  as simple as we're selling a lot of Orlimar, and you
14  might have made 50 calls and ended up with a page a
15  day, and some others might give you some valuable
16  information.
17    Q    I'm just talking about the physical paper,
18  if you got a quick response from someone.
19    A    Um-hmm.
20    Q    I assume you would use a piece of paper to
21  jot it down?
22    A    Yeah. I think that's safe to assume, but
23  there was no folder of pro shop survey results, that
24  was an inch thick or anything. There were probably a
25  few pages somewhere. But where they ever went, I have

Page 137

1    137
2  no idea.
3    Q    Did you consciously ever throw them out?
4    A    No. Like I said, when we resign it was
5  very much -- they packed up all my stuff that was
6  physically mine and mailed it to my new job, and that
7  was that.
8    Q    Now, on page 27 -- And I just want to
9  focus on the paragraph, for the moment,
10  margins/pricing.
11    A    Um-hmm.
12    Q    You write: One concern that we should
13  report is that Adams, Title Lies are appearing in
14  Costco wholesale stores with increasing regularity.
15    What was the increasing regularity, in
16  general terms, that you're referring to there?
17    A    I don't have a specific number to say they
18  were increasing from 20 stores to 50 stores; I don't
19  know what the numbers were, but we were hearing -- or
20  I was hearing of it more frequently. I don't know
21  what the increased frequency would be, but --
22    Q    And how were you hearing of it?
23    A    Again, through -- possibly from an investor
24  or from the pro shop survey.
25    Q    Had you surveyed pro shops in the pacific

35 (Pages 134 to 137)

# EXHIBIT M

10/19/98
Board Meeting Notes

Patchin, Casati, Murtland, Simpson, P? Brewer
Conner, Brown, Mulvoy

Costco - why problem? Demand issue
1. Team of diverters, will not disclose sources
no legal redress to identify
Have strong indications - 50 clubs, 30 clubs
Think it's series of small buyers, may be one
of our largest customers
$149 Letter from Edwin Watts - removes
retailers' margin or holding margin consumer
pays more.
What % of sales? Don't know - subjective on
magnitude
Callaway & Orlimar - w/ Callaway greater margin
on Adams ($259 Steelhead; Orlimar & 200)
    30-35% margin | $130-$135 after full rebate
    ~$150     |     50 pts.
    pts.   |   Orlimar in Costco for $199

Mag of shortfall in Q4 - probably 50% purely
                                            subjective

22 mm sales
revised to 18-19 mm w/ 12¢ per share          ADAMS 002238

Want Numbers given prior to/during roadshow - PA thinks
they went out. May have had @ last board mtg.



EXHIBIT
151
Brown
PENGAD 800-631-6989

<u>LB</u>        <u>FBW</u>         previous
21.993      20.7          Q4 estimates
19¢         14¢

Q3 report
Reduction in sales 43.1
Selling & Royalty exp. + 9.1

       costs
Q4/up
    new TV infomercial
    creative/prod. driver info.
    Bag promotion
<u>Variables</u>
Royalties
Bonuses & commissions
Incentive - mgs. level on up - discretionary, based
Travel expense - mktg, int'l.

ADAMS 002239

Castle  fou
Budget seems very conservative - per Bob this
budget will take a lot of work even @ this
level.
Actions will have to be taken publicly
to explain losses.
Budget does not reflect adjustments or conscious
action to make up for decrease in sales

1999 - proj'l. svcs under $1mm but $600K for
Q4 98? Significant IT expenses. Midwest
consultants. time. employment

18% add on for benefits

Casati - @ board mtg wants details

Is Q4 budget fixed? - Everyone in a key position

Selling & Royalty up 9% on 43% decrease
in sales
Increase in int'l sales costs add'l 5% Faldo

Morale is an issue
Are incentives paid if loss of 2¢/share? No excep
maybe at lowest level where $ are very
low.

Costco 20%.
Where is 80%?
   Poor market conditions (same for compe-
      Ortliman not as much        tition)
      Callaway will show
   Sales @ end of Q3 overloaded distributors
How much in sales @ 180-day terms? 3 per Bd
Will it continue? If Callaway continues
How are you
Chip working on letter to customers

ADAMS 002240

Orlimas still on upswing?
  Retailers say in 6-9 mos. they think
  Orlimas will crash big time.
  Returns are high, pricing policy is catching
  up; Costco is hurting them
  Predict by mid- to end 1999 Orlimas will
  be non-issue. Did better job for about 90
  days.
  Callaway - think there are problems

10/8 memo - revenue 20-25% due to Costco
Were you aware of Costco problem when stock
buy back was decided?
Wants board to meet when serious issues
such as Costco come up
Finis - thinks we should not buy back until
  street has info.
Paul - what did we say? If we had knowledge
  that would go up, cause it to go up,
9/29 - LB Q4 decreased from 23¢ to 13¢
$13mm will be a disaster

message on
conf. call Friday - market is very soft; Costco makes it
more difficult.

pg. 27 Ref. 8/28 LB analysts report outlining Costco
  issue

ADAMS 002241

In Q3 were in selected Costcos

Q4 increased dramatically
(Find out how many Costcos)
Heard July/Aug - pacific northwest
did not know it was material
Boug promotion also counteracts Costco
In last few weeks - were in many stores

19¢ results - what will you say?
Q3 came out on very high end of adjusted
expectations
Is there any way to show even 1¢ profit?
  increase sales, decrease expenses
Rework #'s

Paul - Q4 budget - costs don't run w/ expected
level of sales

# All analyst reports should go to Board

Increasing D&O insurance - $7.5mm currently
Met w/ carriers on Friday, will have waiting for quotes on
$15, 20, 30, 40 mm.

ADAMS 002242

① Bullish ① strong adv. program on TL
    ②
      ③ new drives (most technically superior but
        tough story to sell)

Non conversation?
Continuing to invest in R&D; we're on track to intro. in early 1999
When ready?
Teaser campaign in January.

Clear ack. of dist. channel
has created gray mkt. On track to resolving
&
will take thru end of year.
Make sure Joe hears prior to

Nick's name on new drives? & will partic. in advertising

10/27 Tues - dinner
10/28 Wed. meeting

New adv. — can Board see Wed.?
Dinner mtg in closed room?
How is Brush progressing w/ R&D? Very hands on currently. will he move to TX? Probably not.

$350 - $400:
Preview program that's about margin + working w/ retailer

Darl- fax conf. call # for Friday

ADAMS 002243