IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.              )
SECURITIES LITIGATION                )  Civil Action No. 99-371-KAJ
                                     )  (CONSOLIDATED)
                                     )

**REPLY BRIEF IN SUPPORT OF UNDERWRITER
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Of Counsel*:

SIMPSON THACHER & BARTLETT LLP
Michael J. Chepiga
Paul C. Gluckow
Theodore J. McEvoy
Ryan A. Kane
New York, NY  10017
Telephone:  (212) 455-2000

Robert K. Payson (No. 274)
John E. James (No. 996)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000

*Attorneys for the Underwriter Defendants*

Dated:  October 30, 2006
758779/23310

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT...................................................................................................2

    I.    Plaintiffs' Spurious Spoliation Claim Is An Admission That They Do
Not Have Any Evidence To Oppose Summary Judgment; But
Neither the Law Nor The Facts Support Their Attempt To Excuse
Their Lack of Evidence ........................................................................2

        A.    Under Third Circuit Law, Plaintiffs Must Prove That the
Underwriters Intentionally Destroyed Evidence In Order to Hide
the Truth....................................................................................3

        B.    Plaintiffs Have Not Met Their Burden As to Paper Documents .................4

        C.    Plaintiffs Have No Basis For Claiming That Any Emails or Other
Electronic Documents Were Destroyed, Other Than in the
Ordinary Course of Business or Through the Impact of
September 11 ...............................................................................5

            1.    The law does not require eternal storage of all electronic
documents; companies are allowed to dispose of or reuse
disaster recovery tapes and backup tapes .......................................6

            2.    As Plaintiffs know, many of the Underwriters' emails and
other electronic documents were eliminated in the ordinary
course of business .........................................................................8

            3.    Many of Lehman's computer systems and backup tapes
were destroyed due to the events of September 11 ........................9

    II.    Plaintiffs Oppose Summary Judgment By Asking This Court to
Ignore Multiple Cases Specifically Dealing With Due Diligence,
Ignore the Evidence Offered By the Underwriters, and Accept
Claims About the Evidence That the Record Does Not Support............................9

        A.    Plaintiffs Ask This Court to Ignore Multiple Cases, Saying That
They Are Too Recent, and That Those Cases Specifically Ruled on
What Constitutes Adequate Due Diligence .................................................9

        B.    Plaintiffs' Statements Of Fact Are Not Supported By the Record ...........10

            1.    The Research Analysts never said during due diligence that
sales to Costco were a significant issue for Adams Golf...............10

i

2.    The Plaintiffs' description of the bring-down due diligence
      in this case is mistaken and misleading ..........................................12

3.    The Underwriters' calls to Adams Golf's top retail
      customers  — calls that extended into late May — verified
      statements by Adams Golf management .......................................13

4.    The Underwriters knew everything Plaintiffs claim they
      should have discovered about the Costco sales, and
      reasonably determined that it was not relevant ............................16

III.    Plaintiffs Ignored, and Thus Conceded the Truth Of, Virtually Every
        Fact In the Underwriters' Opening Brief and Since They Did Not
        Offer Any Relevant Facts of Their Own, Summary Judgment Is
        Appropriate ...........................................................................................17

CONCLUSION...................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Brewer v. Quaker State Oil Ref. Corp.*,
  72 F.3d 326 (3d Cir. 1995) ...................................................................................3

*In re DaimlerChrysler AG Sec. Litig.*,
  No. Civ. A. 00-993-JJF, 2003 WL 22951696 (D. Del. Nov. 25, 2003) ...................................4

*Escott v. BarChris Construction Corp.*,
  283 F. Supp. 643 (S.D.N.Y. 1968) ...........................................................................9

*Feit v. Leasco Data Processing Equip. Corp.*,
  332 F. Supp. 544 (E.D.N.Y. 1971) ...........................................................................9

*In re Raymond James*,
  S.E.C. Release No. ID-296, 2005 WL 2237628 (Sept. 15, 2005) ...........................................7

*Rogers v. Exxon Research & Eng'g Co.*,
  550 F.2d 834, 843 (3d Cir.1977),
  *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978) ...........................................3

*Sears, Roebuck & Co.  v. Midcap*,
  893 A.2d 542 (Del. 2006) ...................................................................................4, 6

*In re Worldcom, Inc., Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ...........................................................................9, 10

### Rules

17 C.F.R. 240.17(a)-4(b)(4) ...................................................................................7

29 Am. Jur. 2d *Evidence* § 177 ...........................................................................3

31A C.J.S. Evidence §156(2) ...................................................................................3

Fed. R. Civ. P. 37(f) ...................................................................................6

## PRELIMINARY STATEMENT

A time-honored tactic for dealing with "difficult" facts is to ignore them, a tactic Plaintiffs here have adopted whole-heartedly. They have ignored most of the facts in the Underwriters' Brief. They completely ignore the affidavit of Olga Pulido-Crowe, even though they cite to her deposition constantly. But this evasive tactic pales in comparison to their main argument. They claim summary judgment should be denied because of evidence they *do not* have. They say they cannot oppose this motion because the Underwriters *must* have destroyed documents that would provide some support for Plaintiffs' case. And they devote almost 1/3 of their brief to this spurious spoliation claim.

### *Spoliation*

The Third Circuit requires that a party charging spoliation prove an intentional destruction of documents in order to hide the truth. There must be proof that documents existed and that their loss is prejudicial. Plaintiffs have identified none of these elements.

The Underwriters produced over 11,000 pages of documents to Plaintiffs, covering the due diligence period and beyond. Plaintiffs complain that they wanted more documents, but they cannot point to any evidence that any of the Underwriters intentionally destroyed any documents. Indeed, the party who is the main focus of their attack — Lehman — explained to Plaintiffs that to the extent any documents might have been destroyed, it most likely happened when Lehman's headquarters at Three World Financial Center were damaged on September 11, 2001. Debris from the collapse of the World Trade Center towers, directly across the street, damaged the building, destroying computer and paper files.

Lehman was forced to reconstruct its files from other sources, to the extent possible, and to recover its computer systems from backup tapes stored in New Jersey. Despite this damage,

Lehman produced thousands of pages of documents to Plaintiffs, including 374 pages of emails and electronically stored documents. Yet Plaintiffs now claim that Lehman engaged in intentional destruction of documents.

Plaintiffs also claim the other two Underwriters must also have destroyed documents. But Plaintiffs never even bothered to take the depositions of those two Underwriters. As a result the Plaintiffs have no basis for claims about what happened to those Underwriters' documents.

### *Summary Judgment*

Plaintiffs ignore, and thus concede, virtually all the facts in the Underwriters' Motion. They have chosen instead to focus on four narrow areas. But each area actually demonstrates the lack of a factual basis for Plaintiffs' claim. The Plaintiffs offer: (1) their own mistaken descriptions of the role of research analysts during the IPO and the results of their due diligence; (2) a mistaken description of what happened during bring-down due diligence; (3) mistaken descriptions of the customer calls made during the IPO; and (4) mistaken descriptions of what the Underwriters knew about the Costco sales.

Despite Plaintiffs' remarkably creative attempts to distinguish them, the legal principles in the cases cited by the Underwriters are valid. Based on those legal principles, and the undisputed facts, the Underwriters are entitled to summary judgment.

### **ARGUMENT**

### I. **PLAINTIFFS' SPURIOUS SPOLIATION CLAIM IS AN ADMISSION THAT THEY DO NOT HAVE ANY EVIDENCE TO OPPOSE SUMMARY JUDGMENT; BUT NEITHER THE LAW NOR THE FACTS SUPPORT THEIR ATTEMPT TO EXCUSE THEIR LACK OF EVIDENCE**

Plaintiffs' spoliation claims involve two areas: allegedly missing paper documents, and allegedly missing electronic documents. In both cases, they fail to establish intentional destruction of relevant documents. They never pursued in discovery any paper documents they

now claim are essential to their case.  They never took the depositions of any underwriters with respect to paper documents, nor did they move for their production.

As to electronic documents, they did not depose two of the three underwriters.  And as to all three underwriters, it was clearly established that any missing electronic files were either discarded in the ordinary course of business before this litigation began, or destroyed on September 11, 2001.

A.     **Under Third Circuit Law, Plaintiffs Must Prove That the Underwriters Intentionally Destroyed Evidence In Order to Hide the Truth**

Plaintiffs' spoliation claim rests on the proposition that if they can show there *might* have been relevant documents that no longer exist, they have met their burden.  In fact, the standard in the Third Circuit requires proof of intentional destruction of identifiable documents containing information that is not otherwise obtainable.  In *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995), the Third Circuit stated:

> Further, it must appear that there has been an actual suppression or withholding of the evidence.  No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for.  *See generally* 31A C.J.S. Evidence §156(2); 29 Am. Jur. 2d *Evidence* § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").

The Third Circuit went on to state that it was Plaintiffs' burden to show *how* the documents were destroyed, and that they were destroyed intentionally:

> The destruction or failure to produce the record could have been due to many reasons unrelated to the lawsuit.  *See, e.g., Rogers v. Exxon Research & Eng'g Co.,* 550 F.2d 834, 843 (3d Cir.1977) (refusing to draw an adverse inference where destruction of a diary could have been unrelated to the lawsuit), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978).

*Id.*

In order to show prejudice, the Plaintiffs must show what the documents were, rather than engage in speculation. In *In re DaimlerChrysler AG Sec. Litig.,* No. Civ. A. 00-993-JJF, 2003 WL 22951696, at *2 (D. Del. Nov. 25, 2003)[1], the Court stated:

> To establish prejudice, Defendants must show "'a reasonable possibility, based on concrete evidence rather than a fertile imagination' that access to the [lost material] would have produced evidence favorable to his cause." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 167 F.R.D. 90, 104, 109 (D. Colo.1996).

This same principle was recently applied by the Delaware Supreme Court in *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 548 (Del. 2006), where the Court noted that "an adverse inference is appropriate where a litigant intentionally suppresses or destroys pertinent evidence," but "absent evidence of intentional conduct, no such inference was warranted."

### B.    Plaintiffs Have Not Met Their Burden As to Paper Documents

This is the very first time in this case that Plaintiffs have claimed that non-electronic (*i.e.,* paper) documents existed that would be helpful to their case and were not produced. During the course of discovery, the Underwriters produced over 11,000 pages of documents. Plaintiffs never moved for additional production of paper documents, as opposed to electronic discovery. Plaintiffs never served interrogatories relating to the creation or retention of the written documents they now claim are crucial to their case. They *never* took depositions of the Underwriters about the production of paper documents, or served follow-up discovery demands or even letters seeking those documents.

The focus of Plaintiffs' sudden interest in paper documents is their claim that Lehman's research analysts kept notes of a survey of various pro shops. This survey took place during and after the IPO. Plaintiffs have copies of the reports that were based on those notes. But Plaintiffs say they must have the notes themselves.

---

[1]    Unreported cases are attached to the Appendix at C60-125.

In making this claim, Plaintiffs misstate the deposition testimony of the Lehman research analysts. Plaintiffs claim the analysts had files of information that must have been destroyed. In fact, the analysts testified they could not remember if they even *had* notes. C28-43. One testified that even if there were notes, it would have been at most 3 to 4 pages, and that the results of any calls would have been reflected in the research report. C34-37.

Plaintiffs "discovered" the existence of these notes at a deposition, and did nothing to follow up. They did not ask for these notes after the deposition, either by letter or by additional discovery demand. They did not move to seek production of those documents. They did not depose Lehman on whether those documents existed, or what happened to them. In short, they did not care about those documents until they needed a way to oppose this motion.

If Plaintiffs had pursued the issue, they would have been told that the most likely reason those notes were missing — if they ever existed — was that they were destroyed along with many other documents on September 11, 2001. C44-45, C52-59. This is — under any circumstances — "a reason unrelated to the lawsuit."[2]

### C.    Plaintiffs Have No Basis For Claiming That Any Emails or Other Electronic Documents Were Destroyed, Other Than in the Ordinary Course of Business or Through the Impact of September 11

Plaintiffs devoted most of their efforts during discovery to claims that the Underwriters failed to produce emails and other electronic documents. But Plaintiffs misstate the law, and what actually happened during discovery. The Underwriters were not required to keep documents indefinitely. And they had the right to discard and replace their disaster recovery backup tapes in the ordinary course of business.

---

[2]    Plaintiffs make a passing reference to documents from the other two underwriters. Plf. Br. 5. But they never even bothered to take the depositions of those underwriters. They have no basis for claiming that any documents were intentionally destroyed as to those underwriters.

Plaintiffs' major attack is on Lehman Brothers. Ironically, Lehman produced various emails and electronic documents despite the destruction of its main computer systems on September 11. C44-59. There is thus no basis for Plaintiffs' claims of intentional document destruction.

>    ### 1.    The law does not require eternal storage of all electronic documents; companies are allowed to dispose of or reuse disaster recovery tapes and backup tapes

The law on the retention of electronic documents, such as emails, has changed rapidly since 1998. But even today, companies have the right to discard and replace backup tapes in the ordinary course of business. Nor are companies required to retain all documents eternally on the possibility that litigation might arise that might call for those documents. As set forth in the new Fed. R. Civ. P. 37(f) (effective Dec. 1, 2006):

> Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.

In *Sears*, 893 A.2d at 548, the Delaware Supreme Court stated the same general rule:

> To fault Sears for failing to retain the record of that sale would create an inefficient incentive scheme, whereby all records that might ever become evidence in a legal dispute would have to be perpetually retained, in order to avoid an adverse inference instruction.

Plaintiffs nevertheless claim that the Underwriters were required to keep all electronic records of any kind from 1998 on, because they *should have* anticipated litigation. But the Third Circuit standard requires intent, which cannot be met by a claim the Underwriters should have anticipated litigation. And there is not a shred of evidence that any defendant anticipated that there would be litigation in 1998. Plaintiffs cite to letters of complaint from shareholders. But not one of those letters said there would be litigation.

Indeed, the most compelling proof that the Underwriters did not anticipate litigation in October 1998 is that the Plaintiffs did not sue until June 11, 1999. Given the rapid-fire practice of securities litigation in the past years, no one could have believed in 1998 that there would be litigation, when it took the plaintiffs over 9 months to actually bring suit.

Plaintiffs also rely heavily on SEC Rule 17a-4(b)(4), 17 C.F.R. 240.17(a)-4(b)(4). They say that under this regulation the Underwriters were required to keep all electronic documents for at least six years. They say that violation of this rule means that any destruction was intentional.

But, as Plaintiffs were informed during discovery, that Rule has been the subject of constant confusion since it was first promulgated. In *In re Raymond James*, S.E.C. Release No. ID-296, 2005 WL 2237628 (Sept. 15, 2005), the SEC claimed that Raymond James violated Rule 17a-4(b)(4) because, prior to January 2001, its system did not preserve all of its branch offices' electronic mail. The Chief Administrative Law Judge (ALJ) for the SEC refused to impose sanctions under that Rule, however, finding that as of 1999, it had not been enforced. Indeed, it was still unclear what the SEC's position would be with regard to retention of electronic documents. The ALJ found that

> [i]t is undisputed that in the relevant time period [*i.e.*, 1999 and 2000] Commission's staff was (1) informing the industry that Rule 17a-4(b)(4) would be modified, and (2) requesting that the NYSE not enforce the rule. The undisputed testimony . . . is that in 1999 and 2000, senior staff members of the Commission represented to the broker-dealer industry generally and openly that the Commission would likely modify and make less stringent the requirements of the 1997 Release. In these circumstances, it would be patently unfair and unacceptable . . . to find that Raymond James did not take steps to comply with Rule 17a-4(b)(4).

*In re Raymond James*, at *60.

7

### 2. As Plaintiffs know, many of the Underwriters' emails and other electronic documents were eliminated in the ordinary course of business

Plaintiffs' papers manage to avoid describing the long course of discovery over email and electronic documents. Briefly, Plaintiffs first demanded all emails and other electronic documents. Lehman informed them that it only had backup disaster recovery tapes, and that pulling information from those tapes would take many months.

Plaintiffs persisted in their demand for emails, and took the deposition of James Holderman of Lehman Brothers. Mr. Holderman confirmed that Lehman had only backup tapes, and that many of those were unreadable because of deterioration of the tapes and changes in software. He stated that Lehman was in possession of tapes that might cover the relevant period, and that Lehman would conduct a search of those tapes for relevant information.

On February 22, 2006, Lehman produced 374 pages of emails and attachments. Plaintiffs, not satisfied with the Holderman deposition, insisted on receiving multiple affidavits from all three underwriters about their electronic document retention practices.

The affidavits were produced. Compliance officers for Bank of America and Ferris Baker affirmed the nature of their banks' respective document retention policies for the relevant time periods. C24-25; C26-27. Additionally, Lehman stated that it had searched all of the monthly and bi-weekly backup tapes that still contained retrievable information. C47-50.

After receiving those affidavits, Plaintiffs did not seek any further information regarding paper or electronic discovery. They did not make any motions for further discovery, or for any other relief as to electronic discovery.

**3.    Many of Lehman's computer systems and backup tapes were destroyed due to the events of September 11**

Lehman produced 374 pages of emails and electronic documents.  That was a remarkable achievement in light of the damage to Lehman's computer systems.  C52-59.  In order to respond to Plaintiffs' discovery requests in this matter, Lehman was forced to try to recover electronic files from disaster recovery backup tapes stored in Jersey City, New Jersey.  C44-50.

Plaintiffs' spoliation motion is thus wrong on the law and the facts.  It is utterly wrong in its claim that the Underwriters intentionally sought to destroy documents in order to suppress the truth.  The only possible reason for such a claim by Plaintiffs is their desperation in seeking some basis for opposing the Underwriters' Motion for Summary Judgment.

**II.    PLAINTIFFS OPPOSE SUMMARY JUDGMENT BY ASKING THIS COURT TO IGNORE MULTIPLE CASES SPECIFICALLY DEALING WITH DUE DILIGENCE,  IGNORE THE EVIDENCE OFFERED BY THE UNDERWRITERS, AND ACCEPT CLAIMS ABOUT THE EVIDENCE THAT THE RECORD DOES NOT SUPPORT**

**A.    Plaintiffs Ask This Court to Ignore Multiple Cases, Saying That They Are Too Recent, and That Those Cases Specifically Ruled on What Constitutes Adequate Due Diligence**

In their Opening Brief, the Underwriters cited to several cases that specifically dealt with due diligence issues under § 11.  Plaintiffs ask this Court to ignore them -- Not because the Underwriters misstated the holdings of the cases and not because the cases were overruled.  Instead, they say *Escott v. BarChris Construction Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968), and *Feit v. Leasco Data Processing Equip. Corp.* 332 F. Supp. 544 (E.D.N.Y. 1971), set the standards and this Court should essentially ignore the more recent cases.  Plf. Br. 32.

There is really no possible response to this claim other than to note that a recent court decision can be just as valid as an early one.  Indeed, Plaintiffs cite *In re Worldcom, Inc., Sec. Litig.*, 346 F. Supp. 2d 628, 671 (S.D.N.Y. 2004), a 2004 decision.  And *Worldcom* is not even a

9

decision on § 11 due diligence. As Judge Cote specifically noted, the underwriters in that case were *not* moving for summary judgment on the due diligence defense, and she was not ruling on the scope of that defense. *Id.* at 684-85.

But the decision in *Worldcom did* discuss generally the standards for conducting a reasonable investigation. The Court surveyed the significant cases on the issue of due diligence. That list included most of the cases cited by the Underwriters, cases Plaintiffs say do not apply. *Id.* at 674-78.

Finally, Plaintiffs note that those cases had different facts. Plf. Br. at 32-34. That is true. But the principles of law in those cases apply to any § 11 due diligence claim. They apply here.

### B.    Plaintiffs' Statements Of Fact Are Not Supported By the Record

#### 1.    The Research Analysts never said during due diligence that sales to Costco were a significant issue for Adams Golf

The Plaintiffs rely heavily upon the due diligence efforts of the Lehman research analysts. But they then claim that although the analysts knew relevant information, the analysts' due diligence cannot be considered part of Lehman's due diligence.

In fact, as demonstrated in the Underwriters' Opening Brief, the research analysts played a major role in due diligence. Plaintiffs have not offered any facts that challenge the factual accuracy of any of these statements. Thus, Plaintiffs admit that:

> In addition to the investigation by the investment bankers, the research analysts from the Underwriters conducted their own separate and independent review of the company. Each of the three Underwriters had research analysts that analyzed Adams Golf. They also analyzed the golf club industry, including Adams' primary competitor, Callaway.

Und. Br. at 12.

And Plaintiffs admit that:

> Not one of these analysts identified any significant problems with Adams, or any significant risks that were not in the Prospectus. They did not say that any gray

10

market or Costco issue was material to Adams Golf. As Olga Pulido-Crowe stated, the IPO would not have gone forward if the research analysts had identified any serious issues.

*Id*.

So where did the Plaintiffs get the "proof" for their bald claim that the research analysts did *not* talk to the due diligence team? From a distortion of the deposition of Edward Necarsulmer, the Underwriters' due diligence expert. They claim that he said research analysts are not allowed to talk to the investment bankers. What he really said was that as a general rule there is a wall between research analysts and the investment bankers. B20. But he did *not* say that in *this case* the research analysts could not talk to the investment bankers. In fact, in his opinion he cites the work done by the research analysts as one of the elements of due diligence conducted by the Underwriters.[3] A1047.

But even if Necarsulmer *had* testified as Plaintiffs claim, that would not be *evidence*. Plaintiffs, who frequently cite Necarsulmer's deposition, have forgotten that they must cite evidence for their claims. The deposition of an expert witness about what he remembers from reading the documents is not evidence. The *evidence* comes from actual documents and testimony. The evidence here shows that the research analysts were part of the due diligence team, that the research analysts talked to the rest of the team, and that the research analysts did not believe there were any significant gray marketing problems at Adams as of the IPO.

---

[3]    Contrary to Plaintiffs' claims, there was no "wall" between analysts and bankers that would have prevented them from sharing information during the course of pre-IPO diligence in 1998. The Global Research Settlement, which imposes restrictions on communications between analysts and bankers, was not in place until May 2003, and even that settlement allows for information to be shared under certain circumstances in the context of the due diligence process. C2-23.

### 2. The Plaintiffs' description of the bring-down due diligence in this case is mistaken and misleading

Plaintiffs attack the "bring-down due diligence" conducted just before the Registration went effective. That attack reflects a misunderstanding so clear that it seems almost willful, coming from plaintiffs and firms with such extensive knowledge of corporate finance.

Plaintiffs complain that the Underwriters did not conduct any new investigation at the bring-down due diligence session. Plf. Br. 36. In fact, it would have been extremely surprising if they had left *any* investigation to the very last day. That is not the purpose of bring-down due diligence.

Bring-down due diligence is intended to have the company confirm that nothing has changed since the various investigations were conducted. In that context, the "scribbled notes" plaintiffs mockingly describe are quite extensive. Rather than a simple question — "has anything changed" — the notes reflect that the Underwriters specifically went down various areas and obtained specific assurance that nothing had changed in each of those areas. A568.

Moreover, on the day of closing, Adams Golf specifically represented and warranted that nothing had changed, and that the registration statement did not contain any materially misleading statements or omissions. A716-717. The auditors issued a letter confirming that the results of the audited financials had not changed. A682-711; A718.

Thus, instead of the sloppy and casual process painted by Plaintiffs, the final step of the due diligence process by the Underwriters involved repeated confirmations from Adams Golf management and from their auditors that the diligence conducted during the past three months was still valid.

> **3. The Underwriters' calls to Adams Golf's top retail customers — calls that extended into late May — verified statements by Adams Golf management**

Plaintiffs save much of their venom for the calls made by the Underwriters to various customers, calls that confirmed there were no significant issues. The Plaintiffs have admitted that no one in those calls stated that there was any issue with gray marketing or Costco. A1123 (Response No. 42).

Plaintiffs say that the calls were *not* to the top 10 customers of Adams Golf. This claim comes from playing games with words and ignoring crucial facts. The list the Underwriters were given by Adam's head of marketing comprised the top *retail* customers. A249-251; A1018-1019. Plaintiffs say the Underwriters should have called the top 10 retail and wholesale distributors, as measured by an internal Adams spreadsheet for the period of January 1997 to March 1998.

First, it made sense for the Underwriters to limit their calls to retail customers. As plaintiffs are fond of repeating, the retail customers were the ultimate sellers of Adams clubs, not the wholesale distributors.

Second, Plaintiffs are mistaken about the retailers that the Underwriters called. The Underwriters called 5 of the top 6 customers based on 1997 sales. They spoke to the Number Two retailer, Hank Haney, as part of their due diligence. Thus, they covered the top 6 customers based on 1997 sales. *Compare* A713-714 *with* C1.

The Plaintiffs, however, say that the Underwriters should have used another measure, the top sales for the period from January 1997 to March 1998. Plaintiffs offer no reason why adding this stub period — in a cyclical business — would have been more accurate. But using their measure, the Underwriters called 6 of the top 7 retail customers, 7 of the top 13 retail customers,

and representatives of the top 5 states in terms of sales. That is, by any definition, a representative sample. *Compare* A249-251; A713 *with* A162-163.

Plaintiffs are also mistaken about when the calls were made. They say the calls were made in April, too early to pick up the Costco sales. In fact, calls ranged from April into the last days of May, long enough to pick up Costco sales, if any of the customers cared to mention them. A292-296; A299-311; A436-443; A451-454.

Plaintiffs also state that the telephone questionnaires did not specifically use the words "gray market." But the questionnaires *did* ask if there were any concerns about knock-offs, and if there were other problems they wanted to raise. A269-274. Plaintiffs are thus arguing that — although these retailers were allegedly so upset about the presence of Adams clubs in Costco stores that they were thinking of dropping Adams — the retailers would not have mentioned their concerns unless asked about gray marketing, using the specific words "gray markets." Plaintiffs offer no reason why the retail customers would be such shrinking violets.

Indeed, Plaintiffs' entire attack on the questionnaires leaves one question unanswered. What would the retail customers have said if they had been specifically asked about gray market activities? Plaintiffs have absolutely no evidence that *any* of the customers the Underwriters called would have said anything, even if asked directly about gray marketing.

Certainly none of the retailers had any complaints that they considered important. Every one of them stated that they were planning on doing business with Adams in the future and continuing to buy their clubs. A296; A302; A307; A311; A439; A443; A454. If gray market clubs were a significant issue, they would not have given that answer.

Indeed, Plaintiffs rely on statements from Edward Watts, a large retailer, on one of these calls. But their description of what Watts said is different from the document recording the call.

14

The Plaintiffs say that "Watts informed the underwriters that he would abandon Adams Golf, and switch to clubs sold by Adams Golf's competitors, if retailer margins slipped."  Plf. Br. 8.  In fact, Watts said:

> How do you rank the Adams Golf clubs versus its competitors - better, worse or the same? *Adams is pretty good. Some of the larger players are over-distributed. As a result, their margins are low. Adams has higher margins, which makes our stores want to push their products. Adams has succeeded because they have a niche product, good marketing and good retailer margins. I worry that if they go public they will feel pressure to increase their sales and will overdistribute.*
>
> Do you expect to continue doing business with Adams Golf? *Yes. But they need to be careful about overdistributing and eroding margins. If the margins erode, we'll get off the bandwagon and start pushing other products with higher margins.*

A311.

Watts did *not* state that he would stop selling Adams clubs as soon as margins dropped.  He noted that there were other reasons to sell the clubs.  And he said nothing about any concerns that gray marketing could cause a drop in margins.  He pointed to possible overdistribution as his concern.  And if that happened, the only effect would be a change in which clubs Watts' salesmen openly pushed, not a decision to drop Adams clubs.

Moreover, the Watts call contradicts Plaintiffs' claim about the customer calls.  As they admit, Watts had no problem discussing an issue that was not the subject of a direct question.  Watts had no problem talking about margins, about possible concerns about future issues, and about the possible results of future actions.  Yet in all of this discussion, Watts never mentioned gray marketing or the Costco sales.

Thus, Plaintiffs' attacks on the phone calls fail because Plaintiffs are completely wrong.  They are wrong about the customer list, wrong about when the calls were made, and wrong about what kind of information the calls gathered.

15

      **4.**    **The Underwriters knew everything Plaintiffs claim they should have discovered about the Costco sales, and reasonably determined that it was not relevant**

The Plaintiffs list various things they say the Underwriters did *not* know. But not one of those claims is supported by the record. Instead, Plaintiffs cite selected bits and pieces of the deposition of Olga Pulido-Crowe. Rather than go through each one, the easiest response to all of their claims is to reference the Pulido-Crowe Affidavit submitted with the Underwriters' Motion. A1129-1130. That affidavit was ignored by the Plaintiffs. They do not claim it was wrong, or that it conflicts with other testimony, or that it was improper. They just ignore it. It states:

> The underwriting team for the Adams Golf IPO was fully aware that in the spring of 1998 Adams Golf had received complaints that Adams Golf clubs were appearing for sale in Costco stores in Canada. We discussed those sales thoroughly with the management of Adams Golf. I was also aware that a letter was prepared and sent to distributors in May 1998 informing them that they were not allowed to sell Adams Golf clubs to discount stores.

> We knew that the Canadian market, as a whole, was only a small fraction of Adams Golf's overall sales. We also understood that the Canadian market was less important for Adams Golf than other foreign markets, such as Asia.

> After learning that some Adams Golf Clubs had appeared in some Costco stores in Canada, I personally visited Costco stores in the San Francisco Bay area, which is a major market for high-end golf equipment, to determine whether Costco was offering Adams Golf clubs for sale in stores in this market. I also visited Costco stores in other areas, including Southern California. I did not observe any Adams Golf clubs for sale in any Costco store that I visited.

A1129-1130. This summary of the Underwriters' knowledge, a summary Plaintiffs cannot rebut — and thus must ignore — disproves Plaintiffs' claims about the Underwriters' supposed ignorance.[4]

---

[4] Plaintiffs resurrect their claim that some Adams Golf sales personnel booked shipments of clubs that had not been ordered by customers. The Underwriters rely on and incorporate the Adams Golf Defendants' demonstration of the lack of merit of this claim. Adams Golf Defendants' Opening Br. 48-54. Additionally, there is no evidence the Underwriters were aware of these shipments, and no evidence that they would have been told about them if they had spoken to the sales personnel in question.

### III. PLAINTIFFS IGNORED, AND THUS CONCEDED THE TRUTH OF, VIRTUALLY EVERY FACT IN THE UNDERWRITERS' OPENING BRIEF AND SINCE THEY DID NOT OFFER ANY RELEVANT FACTS OF THEIR OWN, SUMMARY JUDGMENT IS APPROPRIATE

Plaintiffs' Answering Brief follows one consistent tactic throughout: ignore most of the facts, focus on a few facts taken out of context, and manipulate those. But even those "factual" claims have no support in the record. And even more significant for purposes of this motion are all of the facts that Plaintiffs do not deny, facts that Plaintiffs chose to ignore rather than face.

Thus, Plaintiffs concede that Adams management and the Underwriters discussed the presence of Adams clubs in Costco stores. Und. Br. at 16. They concede that the Underwriters talked to the head of marketing, Mark Gonsalves, and other members of management about the Costco issue. *Id.* They concede that the Underwriters knew that Adams management was taking steps to deal with the issue, including suing Costco. *Id.* at 16, 19-20. They concede that Adams management never said the Costco issue was material. *Id.* at 17. And they concede that there is no evidence the Costco sales had any impact on Adams' earnings or sales during the due diligence investigation, or in the second and third quarters of Adams' fiscal years. *Id.* at 18-19, 21-22.

Beyond all of these omissions and mistakes in Plaintiffs' Brief, there is one gaping hole. They never explain how any of the steps they say should have been taken would have led to any information showing that the sales to Costco were material. They have no evidence that any of the retail customers would have said Costco sales were a material issue, even if they were asked directly. In fact, they have no evidence that *anyone* would have said that the Costco sales were having a material effect on Adams' overall sales.

The undisputed facts show that the Underwriters conducted a reasonable investigation. And they show that the Underwriters reasonably believed the Costco sales were not material.

17

## <u>CONCLUSION</u>

Plaintiffs' opposition to summary judgment consists of running away from the facts of record. Their response on the merits simply ignores most the Underwriters' Brief, and most of what actually happened. Even in those areas where Plaintiffs do try to deal with the facts, they offer no evidentiary support. Thus, based on the undisputed evidence before this Court, the Underwriters' Motion for Summary Judgment should be granted.

*Of Counsel*:                                       POTTER ANDERSON & CORROON LLP

Michael J. Chepiga
Paul C. Gluckow                                 By:___ */s/ John E. James*_____
Theodore J. McEvoy                                  Robert K. Payson (No. 274)
Ryan A. Kane                                        John E. James (No. 996)
SIMPSON THACHER & BARTLETT LLP                      Hercules Plaza – Sixth Floor
425 Lexington Avenue                                1313 N. Market Street
New York, NY 10017-3954                             Wilmington, DE  19801
Telephone:  (212) 455-2831                          Telephone:  (302) 984-6000
Facsimile:  (212) 455-2502                          Facsimile:   (302) 658-1192

                                                *Attorneys for Underwriter Defendants*

Dated:  October 30, 2006
758779/23310

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## <u>CERTIFICATE OF SERVICE</u>

I, John E. James, hereby certify that on October 30, 2006, the within document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following attorneys of record stating that the document is available for viewing and downloading from CM/ECF:

> Carmella P. Keener, Esquire
> Rosenthal Monhait Gross & Goddess, P.A.
> 919 Market Street, Suite 1401
> Wilmington, DE  19801
>
> Alyssa Schwartz, Esquire
> Richards Layton & Finger
> One Rodney Square
> Wilmington, DE  19801

> _____*/s/ John E. James*_____
> John E. James (No. 996)
> Potter Anderson & Corroon LLP
> Hercules Plaza – Sixth Floor
> 1313 North Market Street
> Wilmington, DE  19801
> Telephone:  (302) 984-6000
> E-mail:  jjames@potteranderson.com