# APPENDIX

# Part 1

**ADAMS GOLF, INC.**
Top 10 Customers by Sales
For the Periods Indicated

| | YTD 1997 | | |
|---|---|---|---|
| | Customer Name | Sales | % of Total Sales |
| 1 | Edwin Watts | 1,301,934 | 3.4% |
| 2 | Hank Haney | 400,734 | 1.0% |
| 3 | Sommerton Springs | 208,891 | 0.5% |
| 4 | Family Golf Center | 197,776 | 0.5% |
| 5 | Golfsmith International | 166,233 | 0.4% |
| 6 | Golf Day | 153,560 | 0.4% |
| 7 | Roots & Relics | 150,440 | 0.4% |
| 8 | Martins Golf & Tennis | 143,454 | 0.4% |
| 9 | Percentage Golf | 129,315 | 0.3% |
| 10 | Carl's Golf Land | 128,683 | 0.3% |
| | | 2,981,020 | 7.7% |

| | 1998 Through February 28th | | |
|---|---|---|---|
| | Customer Name | Sales | % of Total Sales |
| 1 | Golf Day | 506,949 | 3.6% |
| 2 | Edwin Watts | 462,851 | 3.3% |
| 3 | WDC Mackenzie Dist. L.T.D. - Canada | 391,293 | 2.8% |
| 4 | Golfsmith International | 289,905 | 2.1% |
| 5 | Family Golf Centers, Inc. | 266,250 | 1.9% |
| 6 | Percentage Golf - United Kingdom | 131,784 | 0.9% |
| 7 | Golf Technik - Germany | 129,245 | 0.9% |
| 8 | Palm Beach Golf Center Inc. | 105,050 | 0.8% |
| 9 | Manatco Golf | 93,039 | 0.7% |
| 10 | Professional Back Up Ab - Sweden | 92,968 | 0.7% |
| | | 2,469,334 | 17.7% |

Sales to top ten customers in 1997 represented 7.7% of total sales.  Sales to top ten customers in 1998
through February 28th represented 17.7% of total sales.

Due Diligence Package-Complete/Top Customers    4/4/98    1:34 PM

V-F-Business

**CONFIDENTIAL**

UND 04987

C1

Approved by Judge Farnley - 9/24/04

## Addendum A

## Undertakings

The firm shall comply with the following undertakings:

**I.    Separation of Research and Investment Banking**

1. <u>Reporting Lines</u>.  Research and Investment Banking will be separate units with entirely separate reporting lines within the firm – i.e., Research will not report directly or indirectly to or through Investment Banking. For these purposes, the head of Research may report to or through a person or persons to whom the head of Investment Banking also reports, provided that such person or persons have no direct responsibility for Investment Banking or investment banking activities.

   a. As used throughout this Addendum, the term "firm" means the Defendant, Defendant's successors and assigns (which, for these purposes, shall include a successor or assign to Defendant's investment banking and research operations), and their affiliates, other than "exempt investment adviser affiliates."

   b. As used throughout this Addendum, the term "exempt investment adviser affiliate" means an investment adviser affiliate (including, for these purposes, a separately identifiable department or division that is principally engaged in the provision of investment advice to managed accounts as governed by the Investment Advisers Act of 1940 or investment companies under the Investment Company Act of 1940) having no officers (or persons performing similar functions) or employees in common with the firm (which, for purposes of this Section I.1.b, shall not include the investment adviser affiliate) who can influence the activities of the firm's Research personnel or the content of the firm's research reports; provided that the firm (i) maintains and enforces written policies and procedures reasonably designed to prevent the firm, any controlling persons, officers (or persons performing similar functions), or employees of the firm from influencing or seeking to influence the activities of Research personnel of, or the content of research reports prepared by, the investment adviser affiliate; (ii) obtains an annual independent assessment of the operation of such

C2

policies and procedures; and (iii) does not furnish to its customers research reports prepared by the investment adviser affiliate or otherwise use such investment adviser affiliate to do indirectly what the firm may not do directly under this Addendum.

c. As used throughout this Addendum, the term "Investment Banking" means all firm personnel engaged principally in investment banking activities, including the solicitation of issuers and structuring of public offering and other investment banking transactions. It also includes all firm personnel who are directly or indirectly supervised by such persons and all personnel who directly or indirectly supervise such persons, up to and including Investment Banking management.

d. As used throughout this Addendum, the term "Research" means all firm personnel engaged principally in the preparation and/or publication of research reports, including firm personnel who are directly or indirectly supervised by such persons and those who directly or indirectly supervise such persons, up to and including Research management.

e. As used throughout this Addendum, the term "research report" means any written (including electronic) communication that is furnished by the firm to investors in the U.S. and that includes an analysis of the common stock, any security convertible into common stock, or any derivative thereof, including American Depositary Receipts (collectively, "Securities"), of an issuer or issuers and provides information reasonably sufficient upon which to base an investment decision; provided, however, that a "research report" shall not include:

    i. the following communications, if they do not include (except as specified below) an analysis, recommendation or rating (e.g., buy/sell/hold, under perform/market perform/outperform, underweight/market weight/overweight, etc.) of individual securities or issuers:

        1. reports discussing broad-based indices, such as the Russell 2000 or S&P 500 index;

2

2. reports commenting on economic, political or market (including trading) conditions;

3. technical or quantitative analysis concerning the demand and supply for a sector, index or industry based on trading volume and price;

4. reports that recommend increasing or decreasing holdings in particular industries or sectors or types of securities; and

5. statistical summaries of multiple companies' financial data and broad-based summaries or listings of recommendations or ratings contained in previously-issued research reports, provided that such summaries or listings do not include any analysis of individual companies; and

ii. the following communications, even if they include information reasonably sufficient upon which to base an investment decision or a recommendation or rating of individual securities or companies:

1. an analysis prepared for a current or prospective investing customer or group of current or prospective investing customers by a registered salesperson or trader who is (or group of registered salespersons or traders who are) not principally engaged in the preparation or publication of research reports; and

2. periodic reports, solicitations or other communications prepared for current or prospective investment company shareholders (or similar beneficial owners of trusts and limited partnerships) or discretionary investment account clients, provided that such communications discuss past performance or the basis for previously made discretionary investment decisions.

2. <u>Legal/Compliance</u>. Research will have its own dedicated legal and

3

compliance staff, who may be a part of the firm's overall
compliance/legal infrastructure.

3. <u>Budget</u>. For the firm's first fiscal year following the entry of the Final
   Judgment in the SEC's action against Defendant ("Final Judgment")
   and thereafter, Research budget and allocation of Research expenses
   will be determined by the firm's senior management (e.g.,
   CEO/Chairman/management committee, other than Investment Banking
   personnel) without input from Investment Banking and without regard
   to specific revenues or results derived from Investment Banking, though
   revenues and results of the firm as a whole may be considered in
   determining Research budget and allocation of Research expenses. On
   an annual basis thereafter, the Audit Committee of the firm's
   holding/parent company (or comparable independent persons/group
   without management responsibilities) will review the budgeting and
   expense allocation process with respect to Research to ensure
   compliance with this requirement.

4. <u>Physical Separation</u>. Research and Investment Banking will be
   physically separated. Such physical separation will be reasonably
   designed to prevent the intentional and unintentional flow of information
   between Research and Investment Banking.

5. <u>Compensation</u>. Compensation of professional Research personnel will
   be determined exclusively by Research management and the firm's
   senior management (but not including Investment Banking personnel)
   using the following principles:

   a. Investment Banking will have no input into compensation
      decisions.

   b. Compensation may not be based directly or indirectly on
      Investment Banking revenues or results; provided, however, that
      compensation may relate to the revenues or results of the firm as a
      whole.

   c. A significant portion of the compensation of anyone principally
      engaged in the preparation of research reports (as defined in this
      Addendum) that he or she is required to certify pursuant to
      Regulation AC (such person hereinafter a "lead analyst") must be

4

C5

based on quantifiable measures of the quality and accuracy of the lead analyst's research and analysis, including his or her ratings and price targets, if any. In assessing quality, the firm may rely on, among other things, evaluations by the firm's investing customers, evaluations by the firm's sales personnel and rankings in independent surveys. In assessing accuracy, the firm may use the actual performance of a company or its equity securities to rank its own lead analysts' ratings and price targets, if any, and forecasts, if any, against those of other firms, as well as against benchmarks such as market or sector indices.

d. Other factors that may be taken into consideration in determining lead analyst compensation include: (i) market capitalization of, and the potential interest of the firm's investing clients in research with respect to, the industry covered by the analyst; (ii) Research management's assessment of the analyst's overall performance of job duties, abilities and leadership; (iii) the analyst's seniority and experience; (iv) the analyst's productivity; and (v) the market for the hiring and retention of analysts.

e. The criteria to be used for compensation decisions will be determined by Research management and the firm's senior management (not including Investment Banking) and set forth in writing in advance.

f. Research management will document the basis for each compensation decision made with respect to (i) anyone who, in the last 12 months, has been required to certify a research report (as defined in this Addendum) pursuant to Regulation AC; and (ii) anyone who is a member of Research management (except in the case of senior-most Research management, in which case the basis for each compensation decision will be documented by the firm's senior management).

On an annual basis, the Compensation Committee of the firm's holding/parent company (or comparable independent persons/group without management responsibilities) will review the compensation process for Research personnel. Such review will be reasonably designed to ensure that compensation decisions have been made in a manner that is consistent with these requirements.

5

6. <u>Evaluations</u>. Evaluations of Research personnel will not be done by, nor will there be input from, Investment Banking personnel.

7. <u>Coverage</u>. Investment Banking will have no input into company-specific coverage decisions (i.e., whether or not to initiate or terminate coverage of a particular company in research reports furnished by the firm), and investment banking revenues or potential revenues will not be taken into account in making company-specific coverage decisions; provided, however, that this requirement does not apply to category-by-category coverage decisions (e.g., a given industry sector, all issuers underwritten by the firm, companies meeting a certain market cap threshold).

8. <u>Termination of Coverage</u>. When a decision is made to terminate coverage of a particular company in the firm's research reports (whether as a result of a company-specific or category-by-category decision), the firm will make available a final research report on the company using the means of dissemination equivalent to those it ordinarily uses; provided, however, that no final report is required for any company as to which the firm's prior coverage has been limited to purely quantitative analysis. Such report will be comparable to prior reports, unless it is impracticable for the firm to produce a comparable report (e.g., if the analyst covering the company and/or sector has left the firm). In any event, the final research report must disclose: the firm's termination of coverage; and the rationale for the decision to terminate coverage.

9. <u>Prohibition on Soliciting Investment Banking Business</u>. Research is prohibited from participating in efforts to solicit investment banking business. Accordingly, Research may not, among other things, participate in any "pitches" for investment banking business to prospective investment banking clients, or have other communications with companies for the purpose of soliciting investment banking business.

10. <u>Firewalls Between Research and Investment Banking</u>. So as to reduce further the potential for conflicts of interest or the appearance of conflicts of interest, the firm must create and enforce firewalls between Research and Investment Banking reasonably designed to prohibit all communications between the two except as expressly described below:

6

C7

a.  Investment Banking personnel may seek, through Research
    management (or an appropriate designee with comparable
    management or control responsibilities ("Designee")) or in the
    presence of internal legal or compliance staff, the views of Research
    personnel about the merits of a proposed transaction, a potential
    candidate for a transaction, or market or industry trends, conditions or
    developments.  Research personnel may respond to such inquiries on
    these subjects through Research management or its Designee or in the
    presence of internal legal or compliance staff.  In addition, Research
    personnel, through Research management or its Designee or in the
    presence of internal legal or compliance staff, may initiate
    communications with Investment Banking personnel relating to
    market or industry trends, conditions or developments, provided that
    such communications are consistent in nature with the types of
    communications that an analyst might have with investing customers.
    Any communications between Research and Investment Banking
    personnel must not be made for the purpose of having Research
    personnel identify specific potential investment banking transactions.

b.  In response to a request by a commitment or similar committee or
    subgroup thereof, Research personnel may communicate their views
    about a proposed transaction or potential candidate for a transaction to
    the committee or subgroup thereof in connection with the review of
    such transaction or candidate by the committee.  Investment Banking
    personnel working on the proposed transaction may participate with
    the Research personnel in these discussions with such committee or
    subgroup.  However, the Research personnel also must have an
    opportunity to express their views to the committee or subgroup
    outside the presence of such Investment Banking personnel.

c.  Research personnel may assist the firm in confirming the adequacy of
    disclosure in offering or other disclosure documents for a transaction
    based on the analysts' communications with the company and other
    vetting conducted outside the presence of Investment Banking
    personnel, but to the extent communicated to Investment Banking
    personnel, such communication shall only be made in the presence of
    underwriters' or other counsel on the transaction or internal legal or
    compliance staff.

7

d.  After the firm receives an investment banking mandate, or in connection with a block bid or similar transaction, Research personnel may (i) communicate their views on the structuring and pricing of the transaction to personnel in the firm's equity capital markets group, which group's principal job responsibility is the pricing and structuring of transactions (including by participating with the firm's equity capital markets group in the preparation of internal-use memoranda and other efforts to educate the sales force), and (ii) provide to such personnel other information obtained from investing customers relevant to the pricing and structuring of the transaction.

e.  Research personnel may attend or participate in a widely-attended conference attended by Investment Banking personnel or in which Investment Banking personnel participate, provided that the Research personnel do not participate in activities otherwise prohibited herein.

f.  Research and Investment Banking personnel may attend or participate in widely-attended firm or regional meetings at which matters of general firm interest are discussed.  Research management and Investment Banking management may attend meetings or sit on firm management, risk or similar committees at which general business and plans (including those of Investment Banking and Research) and other matters of general firm interest are discussed.  Research and Investment Banking personnel may communicate with each other with respect to legal or compliance issues, provided that internal legal or compliance staff is present.

g.  Communications between Research and Investment Banking personnel that are not related to investment banking or research activities may take place without restriction.

11. Additional Restrictions on Activities By Research and Investment Banking Personnel.

a.  Research personnel are prohibited from participating in company- or Investment Banking-sponsored road shows related to a public offering or other investment banking transaction.

8

C9

    b. Investment Banking personnel are prohibited from directing Research personnel to engage in marketing or selling efforts to investors with respect to an investment banking transaction.

12. <u>Oversight</u>.  An oversight/monitoring committee or committees, which will be comprised of representatives of Research management and may include others (but not personnel from Investment Banking), will be created to:

    a. review (beforehand, where practicable) all changes in ratings, if any, and material changes in price targets, if any, contained in the firm's research reports;

    b. conduct periodic reviews of research reports to determine whether changes in ratings or price targets, if any, should be considered; and

    c. monitor the overall quality and accuracy of the firm's research reports;

provided, however, that Sections I.12.a and I.12.b of this Addendum shall not be required with respect to research reports limited to purely quantitative analysis.

## II.    Disclosure/Transparency and Other Issues

1. <u>Disclosures</u>.  In addition to other disclosures required by rule, the firm must disclose prominently on the first page of any research report and any summary or listing of recommendations or ratings contained in previously-issued research reports, in type no smaller than the type used for the text of the report or summary or listing, that:

    a. "[Firm] does and seeks to do business with companies covered in its research reports.  As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report."

    b. With respect to Covered Companies as to which the firm is required to make available Independent Research (as set forth in Section III below): "Customers of [firm] can receive independent, third-party research on the company covered in this report, at no

9

cost to them, where such research is available. Customers can access this independent research at [website address/hyperlink] or can call [toll-free number] to request a copy of this research."

c. "Investors should consider this report as only a single factor in making their investment decision."

2. <u>Transparency of Analysts' Performance</u>. The firm will make publicly available (via its website, in a downloadable format), no later than 90 days after the conclusion of each quarter (beginning with the first full calendar quarter that commences at least 120 days following the entry of the Final Judgment), the following information, if such information is included in any research report (other than any research report limited to purely quantitative analysis) prepared and furnished by the firm during the prior quarter: subject company, name(s) of analyst(s) responsible for certification of the report pursuant to Regulation AC, date of report, rating, price target, period within which the price target is to be achieved, earnings per share forecast(s), period(s) for which such forecast(s) are applicable (e.g., 3Q03, FY04, etc.), and definition/explanation of ratings used by the firm.

3. <u>Applicability</u>. Except as specified in the second and third sentences of this Section II.3, the restrictions and requirements set forth in Section I [Separation of Research and Investment Banking] and Section II [Disclosure/Transparency and Other Issues] of this Addendum will only apply in respect of a research report that is both (i) prepared by the firm, and (ii) that relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market; provided, however, that such restrictions and requirements do not apply to Research activities relating to a non-U.S. company until the second calendar quarter following the calendar quarter in which the U.S. market became the principal equity trading market for such company. Notwithstanding the foregoing, Section I.7 [Coverage] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III [Independent, Third-Party Research] of this Addendum) that has been *furnished* by the firm to investors in the U.S., but not prepared by the firm, but only to the extent that the report relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market. Also notwithstanding the foregoing,

10

C11

Section II.1 [Disclosures] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III of this Addendum) that has been *furnished* by the firm to investors in the U.S., but not prepared by the firm, including a report that relates to a non-U.S. company for which a U.S. market is not the principal equity trading market, but only to the extent that the report has been furnished under the firm's name, has been prepared for the exclusive or sole use of the firm or its customers, or has been customized in any material respect for the firm or its customers.

a. For purposes of this Section II.3, the firm will be deemed to have furnished a research report to investors in the U.S. if the firm has made the research report available to investors in the U.S. or has arranged for someone else to make it available to investors in the U.S.

b. For purposes of this Section II.3, a "U.S. company" means any company incorporated in the U.S. or whose principal place of business or headquarters is in the U.S.

c. For purposes of this Section II.3, the calendar quarter in which a non-U.S. company's "principal equity trading market" becomes the U.S. market is a quarter when more than 50% of worldwide trading in the company's common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) takes place in the U.S. Trading volume shall be measured by publicly reported share volume.

4. General.

a. The firm may not knowingly do indirectly that which it cannot do directly under this Addendum.

b. The firm will adopt and implement policies and procedures reasonably designed to ensure that its associated persons (including but not limited to the firm's Investment Banking personnel) cannot and do not seek to influence the contents of a research report or the activities of Research personnel for purposes of obtaining or retaining investment banking business. The firm will adopt and implement procedures instructing firm personnel to report

11

C12

immediately to a member of the firm's legal or compliance staff any attempt to influence the contents of a research report or the activities of Research personnel for such a purpose.

5. Timing. Unless otherwise specified, the restrictions and requirements of this Addendum will be effective within 120 days of the entry of the Final Judgment, except that Sections I.5 [Compensation], I.6 [Evaluations], I.7 [Coverage], I.8 [Termination of Coverage], I.9 [Prohibition on Soliciting Investment Banking Business], I.11 [Additional Restrictions on Activities by Research and Investment Banking Personnel], and II.4.a [General (subpart a)] and II.7 [Superseding Rules and Amendments] of this Addendum will be effective within 60 days of the entry of the Final Judgment, and Sections II.1.b [Disclosures (subpart b)] and III [Independent, Third-Party Research] of this Addendum will be effective within 270 days of the entry of the Final Judgment.

6. Review of implementation.

a. The firm will retain, at its own expense, an Independent Monitor acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office to conduct a review to provide reasonable assurance of the implementation and effectiveness of the firm's policies and procedures designed to achieve compliance with the terms of this Addendum. This review will begin 18 months after the date of the entry of the Final Judgment. The Independent Monitor will produce a written report of its review, its findings as to the implementation and effectiveness of the firm's policies and procedures, and its recommendations of other policies or procedures (or amendments to existing policies or procedures) as are necessary and appropriate to achieve compliance with the requirements and prohibitions of this Addendum. The report will be produced to the firm and the Staff of the SEC, the NYSE and the NASD within 30 days from the completion of the review, but no later than 24 months from the date of entry of the Final Judgment. (The SEC Staff shall make the report available to the President of NASAA and the New York Attorney General's Office upon request.) The Independent Monitor shall have the option to seek an extension of time by making a written request to the Staff of the SEC.

12

C13

b. The firm will have a reasonable opportunity to comment on the Independent Monitor's review and proposed report prior to its submission, including a reasonable opportunity to comment on any and all recommendations, and to seek confidential treatment of such information and recommendations set forth therein to the extent that the report concerns proprietary commercial and financial information of the firm. This report will be subject to the protections from disclosure set forth in the rules of the SEC, including the protections from disclosure set forth in 5 U.S.C. § 552(b)(8) and 17 C.F.R. § 200.80(b)(8), and will not constitute a record, report, statement or data compilation of a public office or agency under Rule 803(8) of the Federal Rules of Evidence.

c. The firm will adopt all recommendations contained in the written report of the Independent Monitor; provided, however, that as to any recommendation that the firm believes is unduly burdensome or impractical, the firm may demonstrate why the recommended policy or procedure is, under the circumstances, unreasonable, impractical and/or not designed to yield benefits commensurate with its cost, or the firm may suggest an alternative policy or procedure designed to achieve the same objective, and submit such explanation and/or alternative policy or procedure in writing to the Independent Monitor and to the Staff of the SEC. The firm and the Independent Monitor shall then attempt in good faith to reach agreement as to any policy or procedure as to which there is any dispute and the Independent Monitor shall reasonably evaluate any alternative policy or procedure proposed by the firm. If an agreement on any issue is not reached, the firm will abide by the determinations of the Staff of the SEC (which shall be made after allowing the firm and the Independent Monitor to present arguments in support of their positions), and adopt those recommendations the Staff of the SEC deems appropriate.

d. The firm will cooperate fully with the Independent Monitor in this review, including making such non-privileged information and documents available, as the Independent Monitor may reasonably request, and by permitting and requiring the firm's employees and agents to supply such non-privileged information and documents as the Independent Monitor may reasonably request.

13

C14

e.  To ensure the independence of the Independent Monitor, the firm (i) shall not have the authority to terminate the Independent Monitor without the prior written approval of the SEC staff; and (ii) shall compensate the Independent Monitor, and persons engaged to assist the Independent Monitor, for services rendered pursuant to this Order at their reasonable and customary rates.

f.  For the period of engagement and for a period of three years from completion of the engagement, the Independent Monitor shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any entity with which the Independent Monitor is affiliated or of which he/she is a member, and any person engaged to assist the Independent Monitor in performance of his/her duties under this Order shall not, without prior written consent of the Staff of the SEC, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years after the engagement.

g.  Five years after the date of the entry of the Final Judgment, the firm shall certify to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office, that the firm has complied in all material respects with the requirements and prohibitions set forth in this Addendum or, in the event of material non-compliance, will describe such material non-compliance.

7.  <u>Superseding Rules and Amendments</u>. In the event that the SEC adopts a rule or approves an SRO rule or interpretation with the stated intent to supersede any of the provisions of this settlement, the SEC or SRO rule or interpretation will govern with respect to that provision of the settlement and such provision will be superseded. In addition, each of the SEC, NYSE, the NASD, the New York Attorney General's Office and any State that incorporates this Addendum (or equivalent document) into its settlement of related proceedings against the Defendant agrees that the SEC Staff may provide interpretive guidance with respect to the terms of the settlement as requested by the firm and that, subject to Court

14

approval, the SEC and the firm may agree to amend or modify any term of the settlement, in each case, without any further action or involvement by any other regulator in any related proceeding.  With respect to any term in Section I or II of this Addendum that has not been superseded (as set forth above) within five years of the entry of the Final Judgment, it is the expectation of Defendant, the SEC, NYSE, NASD, New York Attorney General's Office and the States that the SEC would agree to an amendment or modification of such term, subject to Court approval, unless the SEC believes such amendment or modification would not be in the public interest.

8. <u>Other Obligations and Requirements</u>.  Except as otherwise specified, the requirements and prohibitions of this Addendum shall not relieve the firm of any other applicable legal obligation or requirement.

## III.   Independent, Third-Party Research

1. <u>Obligation to Make Available</u>.  Each year, for the period ending five years after the effective date of this Section III (as set forth in Section II.5 [Timing] of this Addendum), the firm will be required to contract with no fewer than three independent providers of research ("Independent Research Providers") at a time in order to procure and make available Independent Research (as defined below) to the firm's customers in the U.S. as set forth below.  There is, however, no requirement that there be at least three Independent Research Providers for the Common Stock of each Covered Company (as those terms are defined below):

   a. For common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) listed on a U.S. national securities exchange or quoted in Nasdaq (such securities hereinafter, collectively, "Common Stock") and covered in the firm's research reports (other than those limited to purely quantitative analysis) (an issuer of such covered Common Stock hereinafter called a "Covered Company"), the firm, through an Independent Consultant (as discussed below) will use its reasonable efforts to procure, and shall make available to its customers in the U.S., Independent Research on such Covered Company's Common Stock.  (If the Independent Research

15

C16

Providers drop coverage or do not timely pick up coverage of the Common Stock of a Covered Company, the firm will not be in violation of any of the requirements in this Section III, and may continue to disseminate its own research reports on the Common Stock of the Covered Company without making available any Independent Research on the Common Stock of the Covered Company, if the firm takes reasonable steps to request that the Independent Consultant procure such coverage promptly.)

   i. For purposes of this Section III, the firm's research reports include research reports that have not been prepared by the firm, but only to the extent that such reports have been furnished under the firm's name, have been prepared for the exclusive or sole use of the firm or its customers, or have been customized in any material respect for the firm or its customers.

   ii. A non-U.S. company for which a U.S. market is not the principal equity trading market shall only be considered a Covered Company if, in the calendar quarter ended March 31, 2003, or in any subsequent calendar quarter during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the publicly reported, average daily dollar volume of U.S. trading in such company's Common Stock (measured by multiplying the publicly reported, average daily share volume of U.S. trading during the quarter by the closing price per share of the Common Stock on the last day of the quarter), exceeded $2.5 million, and (b) the outstanding total public float of the Common Stock as of the last day of such calendar quarter exceeded $150 million. Further, the firm's obligation to procure and make available Independent Research with respect to such company shall become effective at the later of: (a) 90 days after the end of the calendar quarter in which the company met the foregoing trading and public float tests; or (b) the effective date of this Section III.

16

C17

b. For purposes of this Section III, Independent Research means
   (i) a research report prepared by an unaffiliated person or entity,
   or (ii) a statistical or other survey or analysis of research reports
   (including ratings and price targets) issued by a broad range of
   persons and entities, including persons and entities having no
   association with investment banking activities, which survey or
   analysis has been prepared by an unaffiliated person or entity.

c. The firm will adopt policies and procedures reasonably
   designed to ensure that, in connection with any solicited order
   for a customer in the U.S. relating to the Common Stock of a
   Covered Company, and if Independent Research on the
   Covered Company's Common Stock is available, the registered
   representative will have informed the customer, during the
   solicitation, that the customer can receive Independent Research
   on the Covered Company's Common Stock at no cost to the
   customer (the "Notice Requirement").

d. Notwithstanding the foregoing, the Notice Requirement will not
   apply to (i) the solicitation of an institutional customer (an
   entity other than a natural person having at least $10 million
   invested in securities in the aggregate in its portfolio and/or
   under management) unless such customer, after due notice and
   opportunity, has advised the firm that it wishes to have the
   Notice Requirement apply to it (any customer who has not so
   advised the firm is hereinafter referred to as a "Non-
   Participating Institutional Customer"); (ii) orders as to which
   discretion was exercised, pursuant to a written discretionary
   account agreement or written grant of trading authorization; or
   (iii) a solicitation by an entity affiliated with the Defendant if
   such entity does not furnish to its customers research reports
   under the firm's name, prepared by the firm or for the exclusive
   or sole use of the firm or its customers, or research reports that
   have been customized in any material respect for the firm or its
   customers.

e. Each trade confirmation sent by the Defendant to a customer
   with respect to an order as to which the Notice Requirement
   applies will set forth (or will be accompanied by a separate
   statement, which shall be considered part of the confirmation,

17

C18

that will set forth), as of the time the trade confirmation is generated, the ratings, if any, contained in the firm's own research reports and in Independent Research procured for the firm with respect to the Common Stock of the Covered Company that is the subject of the order.

f.  Each periodic account statement sent by the Defendant to a customer in the U.S. that reflects a position in the Common Stock of a Covered Company will set forth (or will be accompanied by a separate statement, which shall be considered part of the periodic account statement, that will set forth), as of the end of the period covered by the statement, the ratings, if any, contained in the firm's own research reports and in the Independent Research made available by the firm on the Common Stock of each such Covered Company; provided, however, that this requirement will not apply to Non-Participating Institutional Customers or discretionary accounts.

g.  Notice of the availability of Independent Research on Covered Companies' Common Stock will also be included prominently in the periodic account statements of the Defendant's customers in the U.S., in the firm's research reports, and on the firm's website.

h.  The firm will make the Independent Research available to its customers in the U.S. using, for each customer, the means of dissemination equivalent to those it uses to provide the customer with the firm's own research reports, unless the firm and customer agree on another means of dissemination; provided, however, that nothing herein shall require or authorize the firm to comply with the Notice Requirement or make available or disseminate Independent Research at a time when doing so would violate Section 5 of the Securities Act of 1933 or the other provisions of the federal securities laws or the rules and regulations thereunder. If and to the extent the firm is able to make available or disseminate its own research reports on the Common Stock of a Covered Company pursuant to Rule 137, Rule 138(a) or Rule 139(a) under the Securities Act of 1933 and in reliance on Regulation M under the Securities Exchange Act of 1934, then the firm is also authorized and

18

C19

required to make available or disseminate Independent Research on the Common Stock of such Covered Company (even if the Independent Research does not meet the requirements of such Rule). Notwithstanding this Section III.1.h, if the firm determines, because of legal, compliance or similar concerns, not to furnish or make available its own research reports on the Common Stock of a Covered Company for a limited period of time, it shall not be required to make available the Independent Research on such Covered Company for such period of time.

i.   If, during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the firm terminates coverage of the Common Stock of a Covered Company, the firm, through its Independent Consultant, will make reasonable efforts to continue to procure and make available Independent Research on the Common Stock of such company for a period of at least 18 months after termination of coverage (subject to expiration of the firm's obligations under this Section III).

j.   The firm will not be responsible or liable for (i) the procurement decisions of the Independent Consultant (as discussed in Section III.2 [Appointment of Independent Consultant to Oversee the Procurement of Independent Research] of this Addendum) with respect to the Independent Research, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings. The firm will not be required to supervise the production of the Independent Research procured by the Independent Consultant and will have no responsibility to comment on the content of the Independent Research. The firm may advise its customers of the foregoing in its discretion.

k.   The Independent Consultant will not be liable for (i) its procurement decisions, (ii) the Independent Research or its

19

content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings, unless the Independent Consultant has carried out such duties in bad faith or with willful misconduct. The firm will indemnify the Independent Consultant for any liability arising from the Independent Consultant's good-faith performance of its duties as such.

2.  Appointment of Independent Consultant to Oversee the Procurement of Independent Research. Within 30 days of the entry of the Final Judgment, an Independent Consultant acceptable to the SEC Staff, the NYSE, the NASD, the President of NASAA, the New York Attorney General and the firm shall be named to oversee the procurement of Independent Research from Independent Research Providers. The Independent Consultant will have the final authority (following consultation with the firm and in accordance with the criteria set forth in Section III.3 [Selection of Independent Research Providers] of this Addendum) to procure the Independent Research. The Independent Consultant will not have had any significant financial relationship with the firm during the prior three years and may not have any financial relationship with the firm for three years following his or her work as the Independent Consultant. The Independent Consultant's fee arrangement will be subject to the approval of the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office. In the event that an Independent Consultant must be replaced, the replacement shall be acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, the New York Attorney General's Office and the firm, and shall be subject to these same conditions.

3.  Selection of Independent Research Providers. The Independent Consultant will seek to procure research reports on the Common Stock of all Covered Companies from Independent Research Providers. Independent Research Providers may not perform investment banking business of any kind and may not provide brokerage services in direct and significant competition with the firm. In addition, the Independent Consultant will use the following criteria in selecting and contracting with Independent Research Providers to provide Independent Research.

20

C21

a.  whether and to what extent the Independent Research Provider or any of its affiliates or associated persons is engaged in activities (including, but not limited to, activities involving Covered Companies or their securities), or has a business or other relationship with the firm or any of its affiliates or associated persons, that may conflict or create the appearance of conflict with its preparation and publication of the Independent Research;

b.  the desirability of multiple coverage of certain Covered Companies (e.g., by size of company, industry sector, companies underwritten by the firm, etc.);

c.  the extent to which the Independent Research Provider has a client base and revenue stream broad enough to ensure its independence from the firm;

d.  the utility of the Independent Research Provider's Independent Research to the firm's customers, including the inclusion of ratings and price targets in such research and the extent to which the firm's customers actually use the research; and with respect to surveys or analyses described above in Section III.1.b(ii), the extent to which the Independent Research provides customers with a means of comparing the firm's research reports to those published by other persons and entities, including persons and entities having no association with investment banking activities;

e.  the quality and accuracy of the Independent Research Provider's past research, including during the term of the Independent Consultant's tenure;

f.  the experience, expertise, reputation and qualifications (including, as appropriate, registrations) of the Independent Research Provider and its personnel; and

g.  the cost of the Independent Research, especially in light of the five-year period set forth in Section III.1 above for the firm to

21

make Independent Research available to its investing customers.

4. <u>Disclosure Language</u>.  Language substantially to the effect set forth below may be used by the firm and its registered representatives to inform the firm's customers of the availability of Independent Research:

    a.  {Disclosure to customers as required by Section III.1.c [Obligation to Make Available subpart c] of this Addendum.}

        "There is also independent, third-party research available on this company, which you can get at no cost [from our website/hyperlink] or by calling [toll-free number], or which I can arrange to send to you if you would like."

    b.  {General website and periodic customer account statement disclosure as required by Section III.1.g. [Obligation to Make Available subpart g] of this Addendum.}

        "Independent, third-party research on certain companies covered by the firm's research is available to customers of [firm] at no cost.  Customers can access this research at [our website/hyperlink] or can call [toll-free number] to request that a copy of this research be sent to them."

5. <u>Annual Reporting</u>.  The Independent Consultant will report annually to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office on its selection of Independent Research Providers, the Independent Research it has procured, the cost of the Independent Research it has procured to date, and the Independent Consultant's fees and expenses to date.

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

----------------------------------------------x
                          :

IN RE ADAMS GOLF, INC.        : CONSOLIDATED C.A.
SECURITIES LITIGATION       : No. 99-371 KAJ
                          :
                          :
                          :
                          :
                          :
----------------------------------------------x

## AFFIDAVIT OF RICHARD LEATHERBARROW

STATE OF MARYLAND   )
                    : ss.:
COUNTY OF BALTIMORE )

        I, Richard Leatherbarrow, being duly sworn, depose and say:

        1.  I am employed by Ferris Baker Watts, Inc., ("FBW") as Vice President and Director of Capital Markets Compliance, and make this affidavit in response to Plaintiffs' request regarding FBW's document retention policies applicable to its Research department and Corporate Finance department in 1998 and 1999.

        2.  FBW did not have written document retention policies for its Research department and Corporate Finance department for 1998 or 1999.

        3.  At that time, the practice of FBW's Research Department was to retain indefinitely the approved copy of all research reports.

        4.  Individual researchers maintained their own files, but they were not subject to any retention requirement, and their filing and retention practices varied by individual.

5. FBW is unaware of any research documents pertaining to Adams Golf ever having been discarded or destroyed.

6. After the researchers who followed Adams Golf left FBW, all of their files were retained.

7. In 1998 and 1999, the practice of FBW's Corporate Finance Department was to retain indefinitely all paper documents that the bankers created or used in bringing a deal to closure.

8. FBW is unaware of any corporate finance documents pertaining to Adams Golf ever having been discarded or destroyed.

9. All documents in FBW's possession that are responsive to claimants' requests for research or corporate finance documents have been produced.

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Richard Leatherbarrow
Senior Vice President - Director of Capital Markets Compliance

Sworn to before me this 23rd day of _May_ 2006:

_Sandra L. Fries_
Notary Public

My Commission Expires 6/1/2007

053110-0185-08731-NY02.2524871.1                    05/22/2006 12:17 PM

C25

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

------------------------------------------------------------x
                                          :
IN RE ADAMS GOLF, INC.                    : CONSOLIDATED C.A.
SECURITIES LITIGATION                     : No. 99-371 KAJ
                                          :
                                          :
                                          :
                                          :
                                          :
                                          :
                                          :
------------------------------------------------------------ x

## DECLARATION OF VINCENT M. FAUGHNAN

Vincent M. Faughnan hereby declares as follows:

1.  I am employed by Banc of America Securities LLC ("BAS") as a
Senior Vice President and Manager in the Compliance Group. I have been a member of
the BAS Compliance Group since October 1998. I make this Declaration in response to
Plaintiffs' request regarding document retention policies for 1998 and 1999 for
Nationsbanc Montgomery Securities LLC ("NMS"), a predecessor of BAS which
participated in the IPO at issue in this litigation.

2.  I became aware of the compliance policies of NMS in October 1998,
when my then employer, BancAmerica Securities, Inc., merged with and into NMS. At
the time of this merger, NMS had a compliance manual a copy of which I kept and have
reviewed. The NMS compliance manual I reviewed does not include document retention
policies.

3. In 1999. BAS developed a compliance manual for the combined firm that included written document retention policies.

Vincent M. Faughnan
Senior Vice President

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4     ------------------------------------------------

5

6     IN RE:  ADAMS GOLF, INC.      :     CONSOLIDATED

7

8     SECURITIES LITIGATION         :     C.A. NO. 99-371-KAJ

9

10

11    ---------------------------------------------

12

13

14              ORAL DEPOSITION OF BRIAN LANTIER

15

16                  Monday, June 5, 2006

17

18              The oral deposition of BRIAN LANTIER

19          was held at the Wyndham Syracuse Hotel,

20          6301 Route 298, East Syracuse, New York,

21          from 12:00 noon to 4:59 p.m., before

22          Cynthia A. Sanders, a Certified Shorthand

23          Reporter in and for the State of New York

24          and Registered Professional Reporter.

25

1    other than that, I'm sure we did regular calling.

2                                                        36

3        Q    Did you have contact with Patty Walsh

4    before the IPO was final?

5        A    Patty Walsh; the name sounds familiar.

6    Investment relations?

7        Q    Yes.

8        A    Yes, I would have spoke to her on the

9    phone.

10       Q    And before the IPO was final, what subjects

11   were you having contact with Adams Golf on?

12       A    I can't recall what the specific subjects

13   would have been.

14       Q    As you would obtain information about Adams

15   before the IPO was final, how did you keep track of

16   the information?

17       A    We didn't keep --  We probably had a

18   specific Adams file, but I don't recall.  There wasn't

19   a box for information or anything like that sitting

20   around.

21       Q    Did you, personally, keep a notebook about

22   Adams?

23       A    I remember having all of my post-IPO

24   research in a notebook, but I don't remember any

25   specific notebook of Adams notes or anything of that

1    nature.

2                                                    37

3        Q      Did you keep whatever information you had

4    collected about Adams in some kind of a computer

5    format?

6        A      I can remember collecting due diligence

7    calls and the feedback that I had received.  I

8    remember a word document or something along those

9    lines; but we had a lot of information, but where that

10   would be -- where that was, I don't know.

11       Q      When you say due diligence calls, what are

12   you talking about?

13       A      Calling up pro shops, calling up

14   Edwin Watts in Florida or The Golf Smith in Texas and

15   asking how is the Adams club selling, and just keeping

16   on top of their inventory levels.  Because it was a

17   retail product, it was easy to have a handle on how

18   the product was selling as opposed to any of the

19   other --  A company that's making Welbutrin in North

20   Carolina, it's hard to know how many pills of

21   Welbutrin the company is selling.

22       Q      Are the calls that you're referring to now

23   calls that were made by the investment banking team

24   or --

25       A      By me.

1       Q      -- by you?

2                                                              38

3       A      These would have been my calls.

4              MR. McEVOY:  Wait for him to finish

5          the question.

6       Q      And did you have a standard format that you

7   used when you made your due diligence calls?

8       A      It was pretty informal.

9       Q      But you kept records of the calls?

10      A      I don't have the records, but I assume

11  there was -- there would be -- there would have been a

12  form of some sort that I would have written things

13  down on.

14      Q      And did there ever come a time when you

15  disposed of those notes?

16      A      No.

17      Q      Were they, to the best of your knowledge,

18  in the files when you left Lehman Brothers?

19      A      They should have been.  When I resigned,

20  you just hand in your card key and you just leave, you

21  just walk out; you don't get to pack up or anything.

22      Q      Can you recall any other due diligence that

23  you did, that you wrote down in some form, other than

24  the calls to Edwin Watts and similar calls that you

25  just referred to?

```
 1      A      There were a number of calls.  I mentioned

 2                                                          39

 3    that was the retailer that stuck out in my head, but I

 4    do recall there being a list of 50 to 100 retailers,

 5    and we called a lot of them; we called the majority of

 6    them.  That was the primary due diligence, because it

 7    was a retail product, you could see it going into one

 8    side and coming out the other side.  So that was the

 9    primary due diligence that we did.

10      Q      Now, I don't want to skip too far ahead,

11    but do you recall your research report that you

12    generated on Adams in August of 1998?

13      A      Yes; I've seen a copy, yes.

14      Q      And it refers to, at some point, a pro shop

15    survey?

16      A      Yes.

17      Q      Were the calls to Edwin Watts and other

18    retailers that you just referred to part of what you

19    later described as a pro shop survey?

20      A      I believe so, yes.

21      Q      So when did the pro shop survey begin?

22      A      It was ongoing, it was something that we

23    did -- that I did pre-IPO, post-IPO into 1999.  We

24    would call as the club cycle began, mid-cycle when

25    it's January, February and everyone is buying their
```

1    clubs for the year, and then it continued on until

2                                                           40

3    when the actual season starts in the northeast, into

4    May.

5         Q    But at what point before the IPO had you

6    begun the pro shop survey?

7         A    I can't give you a specific date, but it

8    was before the IPO started.

9         Q    Sometime between the management meeting and

10   the IPO?

11        A    The April meeting?

12        Q    Yes.

13        A    I would assume it would be after the April

14   meeting.

15                  (Whereupon, Exhibit No. 226 was marked

16                  for identification.)

17   BY MR. LEWIS:

18        Q    I have marked as 226 a document numbered

19   UND-8587 through 8590 from Brian J. Lantier to

20   Bernard J. Picchi on the subject of Adams summary.

21                  (Document handed.)

22                  (Witness reviewed document.)

23        Q    Do you recognize this document?

24        A    Yes.

25        Q    What is it?

1    28th?

2                                                                    134

3        A      I don't believe at this time we were doing

4    electronic distributions, but I could be completely

5    wrong on that.

6        Q      Was --  In addition to the report, itself,

7    was something put on a first-call note or summary

8    electronic form on that date?

9        A      I don't believe so.  The first-call note

10   would have been the down-sized version of this, the

11   August 4th note, because that was our initiation of

12   coverage, and this is just the extended version with

13   models.

14       Q      Now, on the survey, itself, did anyone

15   other than you and Mr. Picchi make calls?

16       A      In our research department; no, not that I

17   can recall.  I don't know if the investment banking

18   group was still doing any due diligence at that point,

19   but in the research department --  And for the most

20   part, it would have been me making the calls.  Bernie

21   may have attended -- listened in on some of the calls,

22   but for the most part, I was doing the pro shop

23   survey.

24       Q      And you called between 50 and 100 --

25       A      Yes --

1      Q      -- stores?

2                                                          135

3      A      Sorry.

4             Yes, I don't know how many responses we

5      would have gotten, but there were 50 to 100, and we

6      called them.

7      Q      And did you call some of them more than

8      once over the three-month period that the survey was

9      conducted?

10     A      I believe so, yes.

11     Q      How did you keep the records straight?

12     A      A lot of it was because they are subjective

13     answers; this is selling well, this isn't.  It wasn't

14     something that you could say:  Okay, you sold 38 Title

15     Lies, so we'll put that into a chart, and you sold 15

16     Warbirds; it was what's demand, what's good, bad,

17     different.  Are people liking Orlimar?  Is that

18     driving traffic?  Do you like Orlimar?  Do you like

19     the profit you're making off it?  So it was a lot of

20     subjective questions and answers.

21            And I think you see that on our commentary

22     on the survey.  That's what we used Golf Data Tech

23     for, because they had the physical numbers; ours was

24     more subjective in terms of what was working.

25     Q      Did you make notes of your telephone calls?

Page 136

1     A     I would assume that we had notes of some

2                                                              136

3  sort, but I don't have the files, I don't know if

4  Lehman has the files.

5     Q     Okay.  When you made notes in those days,

6  did you do it on a computer or on a yellow pad or

7  something?

8     A     For the most part it was handwritten.

9     Q     And by the time you were finished with the

10  pro shop survey, what kind of collection of notes did

11  you have?

12     A     I don't know.  Every firm, every shop gave

13  you different amounts of information.  Some might be

14  as simple as we're selling a lot of Orlimar, and you

15  might have made 50 calls and ended up with a page a

16  day, and some others might give you some valuable

17  information.

18     Q     I'm just talking about the physical paper,

19  if you got a quick response from someone.

20     A     Um-hmm.

21     Q     I assume you would use a piece of paper to

22  jot it down?

23     A     Yeah.  I think that's safe to assume, but

24  there was no folder of pro shop survey results, that

25  was an inch thick or anything.  There were probably a

C36

```
 1    few pages somewhere.  But where they ever went, I have
```
137
```
 3    no idea.

 4       Q     Did you consciously ever throw them out?

 5       A     No.  Like I said, when we resign it was

 6    very much -- they packed up all my stuff that was

 7    physically mine and mailed it to my new job, and that

 8    was that.

 9       Q     Now, on page 27 --  And I just want to

10    focus on the paragraph, for the moment,

11    margins/pricing.

12       A     Um-hmm.

13       Q     You write:  One concern that we should

14    report is that Adams, Title Lies are appearing in

15    Costco wholesale stores with increasing regularity.

16             What was the increasing regularity, in

17    general terms, that you're referring to there?

18       A     I don't have a specific number to say they

19    were increasing from 20 stores to 50 stores; I don't

20    know what the numbers were, but we were hearing -- or

21    I was hearing of it more frequently.  I don't know

22    what the increased frequency would be, but --

23       Q     And how were you hearing of it?

24       A     Again, through -- possibly from an investor

25    or from the pro shop survey.
```

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2                    -   -   -

 3   IN RE ADAMS GOLF, INC.  : CONSOLIDATED
                             :
 4   SECURITIES LITIGATION   : C.A. No. 99-371 KAJ

 5

 6                ------------------------
                   Friday, June 9, 2006
 7                ------------------------

 8            Oral deposition of BERNARD PICCHI, taken

 9   pursuant to notice, was held at the offices of

10   SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington

11   Avenue, 29th Floor, New York, New York 10017,

12   commencing at 10:04 a.m., on the above date, before

13   Beth A. Barkocy, Certified Shorthand Reporter and

14   Notary Public.

15

16

17

18

19                    -   -   -

20         RSA/VERITEXT COURT REPORTING COMPANY
              1845 Walnut Street, 15th Floor
21               Philadelphia, PA   19103
              (215)241-1000     (888)777-6690
22

23

24

25
```

C38

BERNARD PICCHI

```
 1    not.  I can't recall that.
 2            Q.      You know Stuart Francis?
 3            A.      Yes, I know Stu Francis.
 4            Q.      You know Olga Pulido-Crowe?
 5            A.      I know who she is; I know the name.
 6    I don't think I'd recognize her if she walked in the
 7    room.
 8            Q.      Did you have any personal dealings
 9    with them with respect to the Adams offering?
10                    MR. McEVOY:  I'm sorry.  Personal
11            dealings?
12                    THE WITNESS:  Yes, what does that
13            mean?
14    BY MR. LEWIS:
15            Q.      Phone calls, correspondence,
16    meetings, any personal interaction.
17            A.      To my knowledge, I honestly don't
18    recall; I really don't remember.
19            Q.      Do you recall ever discussing gray
20    marketing or unauthorized distribution of Adams
21    products with either of them?
22            A.      No; no, I do not.
23            Q.      Prior to the IPO becoming final, did
24    you keep a file on Adams?
25            A.      I believe I did, but I don't know
```

C39

BERNARD PICCHI

Page 31

```
 1    that for a fact.  I think so.
 2            Q.      What, typically, did you place in a
 3    file on a company that was about to be underwritten by
 4    Lehman?
 5                    MR. McEVOY:  We're talking generally
 6            now?
 7                    MR. LEWIS:  Right.
 8                    THE WITNESS:  Generally, I would
 9            think just about anything I would think was
10            particularly relevant to the valuation of the
11            security, as well as any sort of historical
12            documents.  Things of this sort and so forth
13            would go into that file, certainly
14            (indicating).
15    BY MR. LEWIS:
16            Q.      In those days, did you use a
17    computer for your work?
18            A.      Yes.
19            Q.      Did you keep notes in computer
20    format?
21            A.      Can you clarify what you mean by
22    notes exactly?
23            Q.      If you had a telephone call and
24    obtained a piece of information that you thought was
25    of significance, would you enter it on a yellow
```

C40

BERNARD PICCHI

Page 32

1   scratch pad like I do or would you dictate it to a

2   secretary or would you enter it into a computer

3   database or something else?

4          A.      Probably would write it out

5   longhand.  I usually use the computer for just two

6   things, usually, and that's for doing Excel

7   spreadsheets and also for company reports, reports

8   I'll actually publish, so I'll use the word documents.

9   I don't use the computer for notes, usually.

10         Q.      As you took notes on Adams, did you

11  keep them in a master file that you kept at your desk

12  or accessible?

13                 MR. McEVOY:  To the extent you

14              recall taking notes, to make sure we know

15              what we're talking about.

16                 THE WITNESS:  Probably.  I don't

17              know that I would have actually put it in the

18              Adams Golf file.  Typically what I do, have

19              been doing for decades, is taking notes and

20              putting them into a ledger-like book, but

21              when I left Lehman Brothers, I threw out all

22              my ledgers.

23                 Even if I had the ledgers, quite

24              frankly -- I offer this gratuitously -- you

25              wouldn't be able to read them.  I don't think

C41

Page 33

```
 1              I'd be able to read them.  I'm not exactly
 2              the neatest writer.
 3                   Usually, at the time, at least up
 4              to, say, several days after I write my notes,
 5              I'm able to recall, and if they are
 6              particularly important, I'll go back and
 7              rewrite the notes, take something illegible
 8              and make it legible.  I don't recall in the
 9              case of Adams having done that.  The notes
10              are not there.
11     BY MR. LEWIS:
12              Q.      To the best of your knowledge, at
13     some point, you had such a ledger for Adams?
14                   MR. McEVOY:  If you recall.
15                   THE WITNESS:  I don't recall; I
16              really don't recall.
17     BY MR. LEWIS:
18              Q.      It was your usual practice to have
19     such a notebook?
20              A.      Typical practice, yeah.
21              Q.      At or about the time you left
22     Lehman, did you get rid of a bunch of notebooks at the
23     same time?
24                   MR. McEVOY:  Object to a bunch of.
25     BY MR. LEWIS:
```

C42

BERNARD PICCHI

Page 34

```
 1          Q.        At or about the time you left
 2   Lehman, did you get rid of several notebooks at the
 3   same time?
 4          A.        I don't really recall whether it was
 5   at that time that I left or six months before, a year
 6   earlier; I don't really recall what the sequence was.
 7          Q.        Did you have any policy personally
 8   with respect to when you would dispose of the
 9   notebooks that you typically put together with respect
10   to different companies?
11          A.        I have no such policy.
12          Q.        Practice?
13          A.        Practice, I guess.  It's when the
14   spirit moves me, I suppose.  Going to a completely
15   different job in another city seemed like a very
16   opportune time to rid myself of everything I wasn't
17   going to take to that job.  I think if I -- I suspect
18   if I did dispose of the ledger in which I had notes,
19   it was probably at that time, but I don't recall.
20          Q.        Let me show you what has been marked
21   as 226 previously, an e-mail from Mr. Lantier to you
22   dated April 28, 1998 attaching ADMSSUMM.doc.  Can you
23   tell me what this exhibit is?
24          A.        Yes, this is a sales document that
25   we typically did prepare as a kind of summarization of
```

C43

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

------------------------------------------------------x
                                                      :
IN RE ADAMS GOLF, INC.                                : CONSOLIDATED C.A.
SECURITIES LITIGATION                                 : No. 99-371 KAJ
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
------------------------------------------------------ x


## AFFIDAVIT OF JAMES HOLDERMAN

STATE OF NEW YORK)
                              : ss.:
COUNTY OF NEW YORK)

James Holderman, being duly sworn, deposes and says:

1. I am employed by Lehman Brothers, Inc., as Senior Vice President for Information and Records Management. I make this affidavit in further support of the Underwriter Defendants' Motion for Summary Judgment in the above-captioned matter.

2. In response to Plaintiffs' discovery requests, Lehman Brothers Inc. searched for and produced electronic documents, including emails, from disaster recovery tapes created in 1998 as set forth in my affidavit of August 2, 2006. A copy of my August 2 affidavit is annexed hereto as Exhibit A.

3. The disaster recovery tapes were used to take a short-term snapshot of data resident on a particular server in order to restore that data in the event of a catastrophic loss of records.

2

4.  Because the disaster recovery tapes were intended as a short-term back up system, they do not contain a complete record of every email or electronic document sent, received or created during calendar year 1998.

5.  Tapes are subject to deterioration over time. Due to the passage of time and deterioration, many of the 1998 disaster recovery tapes in Lehman Brothers' possession do not contain any retrievable data.

6.  Bernard Picchi and Brian Lantier were based in Lehman Brothers' New York office at 3 World Financial Center in 1998.

7.  A significant amount of Lehman Brothers' electronic and paper documents stored at 3 World Financial Center were destroyed on September 11, 2001.

8.  A copy of Lehman Brothers' November 9, 2001, response to the New York Stock Exchange regarding files believed to have been permanently destroyed on September 11, 2001, is attached as Exhibit B. These documents included records and files dating back to 1998 and earlier, including litigation files and copies of research reports.

James Holderman
Senior Vice President for Information and
Records Management

Sworn to before me this
25th day of October 2006

Notary Public

KRISTIN D. KOPPENHAVER
Notary Public, State of New York
No. 01KO6095686
Qualified in New York County
Commission Expires July 14, 2007

C53110-0185-08731-NY02.2554286.1                                      10/25/2006 1:36 PM

C45

A

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x
                                                       :
IN RE ADAMS GOLF, INC.                                 : CONSOLIDATED C.A.
SECURITIES LITIGATION                                  : No. 99-371 KAJ
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------x


## AFFIDAVIT OF JAMES HOLDERMAN

STATE OF NEW YORK)
                         : ss.:
COUNTY OF NEW YORK)

James Holderman, being duly sworn, deposes and says:

1.   I am employed by Lehman Brothers, Inc. as a Senior Vice President.
At the time the reviews detailed below were conducted, I was responsible for the
Information and Records Management Department. This affidavit supersedes my
affidavit of June 14, 2006, in this matter.

2.   In response to Plaintiffs' discovery requests, Lehman Brothers Inc. has
searched all monthly and bi-weekly e-mail disaster recovery tapes in its possession
created during calendar year 1998 for any and all e-mail documents received or sent by
the following current and former Lehman Brothers employees: J. Stuart Francis; Olga A.
Pulido-Crowe; Patrick Walravens; Sameet S. Mehta; Marc Paley; Tim Gould; M. Bradley
Smith; Bernard J. Picchi; Brian J. Lantier; Unni Mahany; Steven L. Berkenfeld; Kevin R.
Genirs; Arlene Salmonson; Andrea T. Ramlakan; Tim Gamso; Steve McManus.

3. A true and correct list of the monthly and bi-weekly e-mail disaster recovery tapes searched is attached hereto as Exhibit A.

4. Once Lehman located the emails recovered for each of the individuals listed above, it searched the emails using the terms "Adams Golf," "Adams" or "Golf" to locate potentially relevant documents.

5. All of the e-mail documents identified as a result of the search described in Paragraph 4 above were provided to counsel for Lehman Brothers Inc. and have been produced.

6. Lehman Brothers has also searched all file server disaster recovery tapes in its possession created during calendar year 1998 for electronic documents other than e-mail created or maintained by the following individuals: J. Stuart Francis; Olga A. Pulido-Crowe; Patrick Walravens; Sumeet S. Mehta; Marc Paley; Tim Gould; M. Bradley Smith; Bernard J. Picchi; Brian J. Lantier; Unni Mahany; Steven L. Berkenfeld; Kevin R. Genirs; Arlene Salmonson; Andrea T. Ramlakan; Tim Gamso; Steve McManus.

7. All electronic documents recovered for each of the individuals listed above were reviewed using the terms "Adams Golf," "Adams" or "Golf" to locate potentially relevant documents.

8. All of the electronic documents identified as a result of the search described in paragraph 7 above were provided to counsel for Lehman Brothers Inc. and have been produced.

3

_____
James Holderman
Senior Vice President for Information and
Records Management

Sworn to before me this
2nd day of August 2006

_____
Notary Public

CHRISTINE P. SEARL
Notary Public, State of New York
No. 02SE5083795
Qualified in New York County
Commission Expires August 25, 1999  10|19| 2009
Certificate Filed in New York     County

C49

| Server Loaded | Date Loaded | Retention Category |
|---|---|---|
| EXATL01 | 10/14/1998 | Bi-Weekly |
| EXLA01 | 9/17/1998 | Bi-Weekly |
| EXLA01 | 9/30/1998 | Sep-98 |
| EXLA01 | 10/14/1998 | Bi-Weekly |
| EXNYC02 | 4/30/1998 | Apr-98 |
| EXNYC02 | 5/29/1998 | May-98 |
| EXNYC02 | 6/30/1998 | May-98 |
| EXNYC02 | 7/31/1998 | Jul-98 |
| EXNYC02 | 9/14/1998 | Bi-Weekly |
| EXNYC02 | 10/14/1998 | Bi-Weekly |
| EXNYC02 | 10/31/1998 | Oct-98 |
| EXNYC03 | 4/30/1998 | Apr-98 |
| EXNYC04 | 5/29/1998 | May-98 |
| EXNYC04 | 7/31/1998 | Jul-98 |
| EXNYC04 | 10/1/1998 | Sep-98 |
| EXNYC04 | 10/14/1998 | Bi-Weekly |
| EXNYC04 | 10/31/1998 | Oct-98 |
| EXNYC06 | 3/31/1998 | Mar-98 |
| EXNYC06 | 4/15/1998 | Bi-Weekly |
| EXNYC06 | 4/30/1998 | Apr-98 |
| EXNYC06 | 5/29/1998 | May-98 |
| EXNYC06 | 9/16/1998 | Bi-Weekly |
| EXNYC06 | 9/17/1998 | Bi-Weekly |
| EXNYC06 | 10/15/1998 | Bi-Weekly |
| EXNYC06 | 10/16/1998 | Bi-Weekly |
| EXNYC06 | 11/2/1998 | Oct-98 |
| EXNYC08 | 11/2/1998 | Oct-98 |
| EXNYC10 | 11/2/1998 | Oct-98 |
| EXNYC12 | 10/1/1998 | Sep-98 |
| EXNYC12 | 10/14/1998 | Bi-Weekly |
| EXNYC12 | 11/2/1998 | Oct-98 |
| EXSF01 | 10/30/1998 | Oct-98 |

B

# LEHMAN BROTHERS

November 9, 2001

Ms. Sharon Moi
New York Stock Exchange, Inc.
20 Broad Street
New York, NY 10005

Dear Sharon:

Pursuant to New York Stock Exchange Information Memorandum  01-34, attached is Lehman Brothers' list of books and records (as defined under NYSE Rule 440 and SEA Rules 17a-3 and 17a-4) that we believe to be permanently destroyed and/or are inaccessible as a result of the events of September 11.

Please note that we have been more inclusive than what we believe the Rules require.  If you have any questions, please call me at 212-506-2192.

Sincerely,

Howard R. Plotkin
Director of Compliance

Attachment

C52

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| Equity Trade Tickets | 1997-2001 |
| Equity Derivative Trade Tickets | 1998-2001 |
| Fixed Income Trade Tickets | 1990-2001 |
| Fixed Income Derivative Trade Tickets. | 1993-2001 |
| Futures and Commodities Trade Tickets | 1999 |
| Equity Trade Blotters evidencing supervision | 1997-2001 |
| Fixed Income Trade Blotters evidencing supervision | 1990-2001 |
| Equity Derivatives Trade Blotters evidencing supervision | 1998-2001 |
| Private Client Services (retail) Trade Blotters evidencing supervisory review | 1998 to 2001 |
| J:Drive shared drive with Sales and Trading / London housing electronic trading and sales data. The info includes Trade Blotters and P&L Information . | 1999 - 2001 |
| Order Tickets and reports relating to various regulatory inquiries | 1/1995 to 9/2001 |
| Equity and Fixed Income Syndicate Deal Folders (Indication of Interests, allocations, tickets, etc) | 1994 to 2001 |
| Equity and Fixed Income Syndicate Registration Files (signed invitation wires, signed underwriting agreements in the files) | 8/1999 to 9/11/01 |
| Free riding and withholding documentation (Annex II signed by clients, Outside Counsel/Opinion of Counsel Letters, Outside Counsel/Carve-Out Letter) | 1/1999 thru 9/2001 |
| Customer/Dealer Agreements and corresponding Deal Files | 1985 to 2001 |
| Confidentiality Agreements | 1/1/98 to 9/11/01 |
| Engagement Letters | 1/1/98 to 9/11/01 |
| Mortgage and Loan Documents | 1999-2001 |
| Exchange Traded Funds Agreements | 2000-2001 |
| FORM X-17A-5 (Annual Audit) and all supporting documentation. | 11/00, 11/99, & 11/98 |
| Copies of Approved Subordinated Debt Agreements and related documentation and Approval Letters. | 7/31/01 and previous |
| Copies of All Final Month-end FOCUS Reports (For all Lehman Brothers Inc. and Predecessor Firms). | 11/95 - 7/31/01 |
| Copies of Approved Non Customer (Affiliated) Accounts Netting Agreements and related documentation and NYSE Approval Letters. | 7/31/01 and previous |
| Copies of Approved Subordinated Non Customer (Affiliated) Accounts and related documentations and NYSE Approval Letters. | 7/31/01 and previous |
| Daily Net Capital Estimates and Supporting Documentation. | 11/1/00 - 910/01 |
| Financial Regulatory Exam Supporting Documentation (NYSE/SEC/CBOT) | 7/31/01 and previous |

C53

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| Monthly FOCUS Report including All Supporting Documentation for the Balance Sheet, Income Statement, Net Capital Calculation and the Month-end Customer/PAIB Reserve Formula Computation worksheets. | 11/30/00 - 7/31/01 |
| Weekly Customer and PAIB Reserve Formula Computations and Supporting documentation. | 11/30/00 - 9/7/01 |
| Copies of Approved Sole Recourse Debt with LB Funding Corp. | 7/31/01 and previous |
| New Account forms with and without Series 8 Signatures | 1999 - 2001 |
| New Accounts Documents - includes account verification profile, address changes, completed updates, discretionary account authorization, investment suitability letters, letters of authorization, instructions, limited partnership applications, mail waivers, positive/negative responses, trust agreements, corporate documents, etc. | 1998-2001 |
| Correspondence/Presentations/Pitches/marketing materials (including evidence of supervisory review) - | 1994-2001 |
| Lehman Brothers Account Opening documents for ADP conversion | All active agreements; Historical agreements dating back to 1/1998 |
| Lehman Brothers Credit Agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Lehman Brothers Custodial Agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Lehman Brothers Daily Worksheets/Reconciliations/Foreign Exchange Settlements | 1998 |
| Fax Indemnity and SEC No Lien Agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Lehman Brothers Letter of Credit documentation | All active agreements; Historical agreements dating back to 1/1998 |
| Main Bank Account Agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Promissory Notes, Short Term facility agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Signed CFTC No Seg Letters | All active agreements; Historical agreements dating back to 1/1998 |

C54

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| Signed Bank Confidentiality Agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Special Letter of Credit Documents | All active agreements; Historical agreements dating back to 1/1998 |
| Standard Chartered custody agreements | All active agreements; Historical agreements dating back to 1/1998 |
| Employee Records | From early 1970's to 1990's and 5/1/01 to 9/10/01 |
| Employee Relations Files - disciplinary and employee surveillance records | 1/1/98 to 9/11/01 |
| Group Insurance paper records | 5/1/01 to 9/10/01 |
| Bill payment history and correspondence | 1/1/98 to 9/11/01 |
| Construction Contracts | 1/1/98 to 9/11/01 |
| Lease Files | 1/1/98 to 9/11/01 |
| Trade Tickets and Operational Daily Work for the PCS LA Branch office | 6/2001 and 7/2001 |
| Compliance Examination Workpapers | 1/1998 to 9/2001 |
| Audit workpapers | 1/1/98 to 9/2001 |
| All Corporate minutes | Since inception: Lehman Brothers Inc.-1965 and Lehman Brothers Holdings Inc.- 1983 |
| All Global Vendor Agreements/Contracts | All current/live agreements |
| Corporate documents (corporate articles) | Since inception: Lehman Brothers Inc.-1965 and Lehman Brothers Holdings Inc.- 1983 |
| Subsidiary Entity Transaction Files | All |
| Legal Transaction Files (promissory notes, MTNs, ESPP, ESOP, etc) | All |
| Customer Complaint Files/Litigation Files/Claims | 1/1994 to 2001 |
| Original, signed legal settlement agreements | 1/1998 to 9/2001 |
| Active Employee Registration Files (including signed U4's, prints, etc.) | All |
| Current Employee Termination Files (including fingerprints, signed U4, U5, etc.) | 1/2001 to 9/2001 |
| Employee Fingerprint records | All |
| State Lobbyist Licenses and Files | All |

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| State Registration Files | All |
| Private Equity Fund Financials/Portfolio Companies | 1986 to 2000 |
| Transaction Management Counterparty Files | 1/1994 to 7/1996 |
| Transaction Management Master Agreements | 1995 to 2001 |
| Swap Bank Reconciliation Files | 6/2000 to 9/2001 |
| Outside Account Approvals, Outside Account Statements approvals | All |
| Historical Restricted and Watch Lists | 1995-2001 |
| Mortgage License Files (LBHI Licenses, Applications, Certificates for various states) | 1/1994 to 9/2001 |
| Supervisory Log Files | 1/1/98 to 9/11/01 |
| Checkout sheets (reconciliations) and daily work | 1998 to 1999 |
| Position Blotters | 1999 |
| Private Placement Files | 1/1993 to 7/2001 |
| Client Relationship Folders | 1/1998 to 9/2001 |
| Cash Payment Statements/Records | 1997 to 1998 |
| Counterparty Files | 1998 to 1999 |
| Copies of research reports evidencing supervisory review | 1/1998 to 9/2001 |
| Paid Vendor Invoices | 2001 |
| Paper records for vendor invoices | 8/10/01 to 9/7/01 |
| Financial Reports and Workpapers | 1993 to 1995 |
| Firm Investment Reports and Files | 1/1989 to 1/1999 |
| Monthly Subsidiary Binders | 12/1993 to 10/1995 |
| Partnership Documentation | 6/1996 to 8/1998 |
| Tax and Audit Files | 1994 |
| Cashier Files - Cashier Cks/Receipts/Stk Pwrs/Cks distr/fed wire/Check Pick Up hand deliveries documentation | 1998-2001 |
| Casheir Files - TFR & SHIP/STP PYMNT Records | 1/1/00 - 12/31/00 |
| Cashier Files (documentation relating to daily cash, check and stock activity, IRA distributions as well as DVP reports, express mail receipts, late payment fees, margin work, prepayment documents and wires.) | 2/1/01 - 9/11/01 |
| EMG Options Trading Info. | 1997 |
| Bank Loan Deal files | 1/1992 to 6/2000 |
| Operational Daily Settlements work | 11/1997 to 1998 |

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| Break Recap Tickets / Written Description of Breaks / NYSE - AMEX | 1999 - 2001 |
| Listed Average Price Reports / Client Breaks | 1997 - 2001 |
| OATS / NASD reporting documentation | 1999 - 2001 |
| OMS Break Reports / Breaks with Listed Stocks | 1999 - 2001 |
| OTC break reports and hard copy wires received from branches | 1999 - 2001 |
| Program Trading Breaks | 1999 - 2001 |
| All CMTA receivables and payable files, bills and client files | 1998 - 2001 |
| Client Valuation Information | 1998 - 2001 |
| Conversion / Exchange reorg information | 1998 - 2001 |
| Documents / DTC, underwriting , term sheets, | 1998 - 2001 |
| Futures (Commodity) reconciliations | 1998 - 2001 |
| Reconciliation reports for structured products | 1998 - 2001 |
| OCC / DTC books clearing numbers | 1998 - 2001 |
| Reconciliation of Futures / Dividends / Average price accounts / Bank reconciliation's | 1/2/01 - 9/11/01 |
| Selling security holders questionnaire - used for registering our 144A positions | 1998 - 2001 |
| SIAC 41CB inquiry reports | 1998 - 2001 |
| Smart Tickets, Collateral reports (Cost of Carry) | 1998 - 2001 |
| Wire Transfer requests and documentation | 1/1998 to 9/7/2001 |
| Daily work folders: signed wire forms and all structured deals outside the normal trading flow. | 1999 - 2001 |
| Check requests | 1999 - 2001 |
| Journal Entry Records | 1994 to 1999 |
| P&L Files | 1997 |
| P & L packets | 5/2001 - 9/2001 |
| Customer draw/deposit requests/Daily Test and contracts | 1/1993 - 9/11/2001 |
| GIC Contracts and Customer draw/deposit requests | 1/1993 - 9/11/2001 |
| Federal reserve auction net long documentation | 12/1998 to 9/2001 |
| GSE syndicate & auction documentation folders | 9/1999 to 9/2001 |
| Client Confirmations | 2000-2001 |
| Reorg Notices | 1/2000 - 9/11/2001 |
| Delivery Notices | 1/1999 - 9/11/2001 |
| Structured Products Documentation | 1/1990 - 9/11/2001 |
| Cash Balance Reports for Cash, Derivatives and Futures products | 7/2001 - 9/2001 |
| Client Setup Information | 7/2001 - 9/2001 |
| Margin Reports for Cash, Derivatives and Futures products | 7/2001 - 9/2001 |
| Mark Reports for Cash, Derivatives and Futures products | 7/2001 - 9/2001 |
| Risk Reports for Cash, Derivatives and Future products | 7/2001 - 9/2001 |
| Trade Position Reports for Cash, Derivatives and Futures products | 7/2001 - 9/2001 |
| Emerging Market Pairoff Information | 9/2000 - 9/2001 |

C57

01/30/2006    12:48    LEHMAN BRNTHERS → 91212520014B    NO.724    P07

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| Emerging Markets Reprice Information | 9/2000 - 9/2001 |
| Forex bank statements | 1/2001 - 9/11/2001 |
| Hardcopy bank statements | 1/2001 - 9/11/2001 |
| Month-end Bank Rec and GL Recs | 1/2001 - 9/11/2001 |
| Settlement documentation and daily work | 1996-2001 |
| Option Contracts | 4/1995 to 6/1996 |
| EMG Trade Sheets | 1997 to 1999 |
| Defeasance Deal Contracts and Tickets | 1/1993 - 9/11/2001 |
| Trade correction documentation and Re-Rate reports. | 6/2001 - 6/2001 |
| Signed Representation Letters and QIB letters | 1/1996 - 9/11/2001 |
| Agency discount note trade documentation | 12/1998 to 9/2001 |
| Proprietary trading non-dollar trade documentation | 9/1998 to 9/2001 |
| 1099 / 1042s forms | 1995 to 2001 Tax years |
| 2001 deposit records to the IRS | 1995 to 2001 Tax years |
| B & C Notice of Incorrect client accts | 1995 to 2001 Tax years |
| Correction docs to the IRS | 1995 to 2001 Tax years |
| Correspondence with IRS | 1995 to 2001 Tax years |
| Internal spreadsheet -Executive summary tax forms | 1995 to 2001 Tax years |
| Reconciliation entry work on client accts (2001) | 1995 to 2001 Tax years |
| Retirement Plans/IRA Distribution forms | All |
| Retirement Plans/IRA transfers | All |
| Retirement Plans/IRAContribution forms | All |
| Retirement Plans/IRATax forms 1099R / 5498 | All |
| Cash Receipt Reports | 1994 to 1996 |
| Reorg Department Corporate Action records | 1995-2001 |
| Reorg Department Mergers /tenders/ redemption documentation | 1995-2001 |
| Reorg MTS redemption documentation | 1995-2001 |
| Order Room trade corrections and trade errors | 6/1/01 - 9/11/01 |
| NYSE 407 Letters | 1998-2001 |
| Affirmation of Non-Solicitation Forms | 1998-2001 |
| Broker Book Reviews | 1996-2001 |
| Client Activity Letters/Management Contact Memos | 1989-1993 and 1998-2001 |
| Client Contact Letters | 1/1995 to 9/2001 |
| Copies of signed U4's | 1999-2001 |
| Client Discretionary Forms | 1996-2001 |
| E-mail Surveillance | 1999-2001 |
| Gift Logs | 1996-2001 |
| Hold All Mail Customer Instructions and Files (HWR's) | 1998-2001 |
| Option Surveillance Follow-up Files | 1998-2001 |

C58

01/30/2006    12:48    LEHMAN BRNTHERS → 912125200148                    NO.724    P08

Lehman Brothers, Inc.
Response to Information Memo 01-34

| Item Description | Time Period Affected |
|---|---|
| Orders requiring prior Manager approval (Signed by brokers) | 12/2000 thru 9/2001 |
| Forms evidencing approvals for Outside Investments | 1996-2001 |
| Performance Reviews (staff, brokers etc.) | 2000-2001 |
| Plan of Solicitation | 1/1995 to 9/2001 |
| QIB Letters | 1999-2001 |
| Speaking Log | 1996-2001 |
| Spousal Letters | 1998-2001 |
| Various Supervisory Reports | 1/1995 to 9/2001 |
| Accredited Investor Letter signed by clients (Warrants) (10 UCV) | 1/2000 thru 9/2001 |
| Compliance Monthly Supervision Reports | 1998 - 2001 |
| Money Laundering Prevention Files | All |
| Numbered Account Documentation | All |
| Pledge Agreements | All |

C59

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22951696 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
In re DaimlerChrysler AGD.Del.,2003.Only the
Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: DAIMLERCHRYSLER AG Securities
Litigation
TRACINDA CORPORATION, a Nevada
Corporation, Plaintiff,
v.
DAIMLERCHRYSLER AG, a Federal Republic of
Germany corporation; Daimler-Benz AG, a Federal
Republic of Germany corporation; Jurgen
Schrempp, a citizen of the Federal Republic of
Germany; Manfred Gentz, a citizen of the Federal
Republic of Germany, Defendants.
**No. Civ.A. 00-993-JJF.**

Nov. 25, 2003.

A. Glichrist Sparks, III, Alan J. Stone, and Jessica
Zeldin, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, Terry Christensen, Mark G.
Krum, Eric P. Early, of Christensen, Miller, Fink,
Jacobs, Glaser, Weil & Shapiro, LLP, Los Angeles,
California. William G. McGuinness, Julie E. Kamps
, and Midwin Charles, of Fried, Frank, Harris,
Shriver & Jacobson, New York, New York, for
Plaintiff, of counsel.
Thomas J. Allingham II, and Robert S. Saunders, of
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, Jonathan J. Lerner, J.
Michael Schell, Lea Haber Kuck, and Joseph N.
Sacca, of Skadden, Arps, Slate, Meagher & Flom
LLP, New York, New York, for Defendants, of
counsel.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Pending before me is a Motion For Relief For
Spoliation Of Evidence (D.I.584) filed by
Defendants, DaimlerChrysler AG, Daimler-Benz
AG, Jürgen Schrempp and Manfred Gentz. By their

Motion, Defendants contend that Tracinda
deliberately destroyed relevant evidence thereby
prejudicing Defendants' ability to defend this action.
As relief, Defendants request the dismissal of
Tracinda's claims of common law fraud (Counts 7
and 8 of the Complaint) and violations of Section
10(b) of the Securities and Exchange Act of 1934
(Count 1 of the Complaint). In the alternative,
Defendants ask me to draw an adverse inference
against Tracinda at trial based on the destruction of
this evidence. For the reasons discussed, I will deny
Defendants' Motion.

I. THE PARTIES' CONTENTIONS

By their Motion, Defendants contend that Mr. Kirk
Kerkorian's personal assistant, Jaclyn Thode,
destroyed documents that she used to prepare a list
of meetings and/or conversations between Mr.
Kerkorian and Mr. Robert Eaton. Defendants
contend that Tracinda's general counsel, Richard
Sobelle, instructed Ms Thode to prepare the list,
but failed to instruct her to preserve the documents
used in making the list. Based on these allegations,
Defendants contend that Tracinda engaged in the
willful and systematic destruction of relevant
evidence.

In response to Defendants' allegations, Tracinda
contends that Ms. Thode did not engage in any
willful or intentional destruction of evidence.
Tracinda contends that Ms. Thode has no
knowledge of the underlying allegations of this
lawsuit beyond "coffee room talk," and that any
destruction of evidence was unintentional. Tracinda
contends that the underlying documents are no more
than 18 pieces of paper consisting primarily of
steno notes or "While You Were Out" pink message
notes. According to Tracinda, the substantive
content of these notes was transcribed by Ms.
Thode into a single list virtually verbatim. Tracinda
also contends that the notes did not contain anything
about the substance of the conversations between

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22951696 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Mr. Kerkorian and Mr. Eaton, and merely reflected the fact that a meeting or telephone conversation occurred. Tracinda further maintains that Ms. Thode followed her routine practice of destroying the notes after she documented them. Because the content of the documents was preserved by Ms. Thode's list and the destruction of the documents was unintentional, Tracinda contends that Defendants cannot establish that sanctions are warranted.

## II. DISCUSSION

In determining whether sanctions are an appropriate remedy for the alleged destruction of evidence, I must consider three factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and where the offending party is seriously at fault, will serve to deter conduct in the future. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir.1994). After considering Defendants' allegations and the evidence submitted on this issue in the context of the applicable law, I conclude that sanctions are not warranted as a result of the alleged spoilation of evidence in this case. The unrebutted deposition testimony and affidavit of Ms. Thode establish that she discarded her handwritten notes after converting them into typewritten form, consistent with her practice in the past.[FN1] (Thode Decl. at ¶ 8, Thode Tr. 15:6-9). Ms. Thode had no information or understanding about the substance of this litigation and no information as to the purpose of Mr. Sobelle's request, and thus she had no reason to alter or omit any information from the documents. (Thode Decl. at ¶ 2, 12-13, 15; Thode Tr. 41:16-25, 52:24-25, 53:2-23, 55:2-6). I am persuaded that Ms. Thode had every incentive to correctly and fully document the notes she was working from in order to comply with Mr. Sobelle's request for information. In these circumstances, I find that Ms. Thode acted unintentionally when she discarded the steno pads and pink message notes. *See S.C. Johnson & Son, Inc. v. Louis & Nashville R.R. Co.*, 695 F.2d 253, 259 (7th Cir.1982) (finding that destruction of evidence was not intentional

where handwritten notes were discarded after being typed and person handling evidence had no reason to omit or alter necessary information). I further find that Defendants have not suffered any prejudice as a result of Ms. Thode's actions, because they have a complete and accurate chronology of the contents of the documents that were discarded.

> FN1. *See e.g. Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir.1995) (recognizing that adverse inference is not warranted against party who destroyed evidence where destruction of evidence was a matter of routine with no fraudulent intent or otherwise innocently accounted for); *Ziegler v. Anesthesia Assoc. of Lancaster, Ltd.*, 2002 WL 387174 (E.D.Pa. Mar. 12, 2002) (holding that spoilation doctrine was inapplicable where president of defendant company destroyed voter list at conclusion of meeting consistent with his past personal practice).

*2 Defendants focus on the fact that the documents from which Ms. Thode made her typewritten list had been stored for two years prior to their destruction. However, Ms. Thode testified that those documents were packed and stored when her office was moved, and she did not have the opportunity to go through them either before or after the move until Mr. Sobelle's request for information. (Thode Decl. at ¶ 9, Thode Tr. at 41:5-15). Ms. Thode explained that when Mr. Sobelle asked her for any information about meetings between Mr. Eaton and Mr. Kerkorian, she initially doubted that she had anything relevant, but later remembered the two boxes that had been shipped from her previous office. (Thode Decl. at ¶ 10-11, Thode Tr. at 40:22-41:15). Ms. Thode also explained that the majority of the contents of the boxes did not contain anything relevant to this litigation, but that she did uncover her pink message notes and steno pads. (Thode Decl. at ¶ 12). In my view, the circumstances Ms. Thode described appear to be consistent with the type of events that occur during the often confusing and hectic move of an office. As such, I do not find anything sinister

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3

Not Reported in F.Supp.2d, 2003 WL 22951696 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

about the fact that the documents had been in storage for such a long period of time prior to their destruction.

Defendants also suggest that these documents may have contained information regarding the substance of the conversations between Mr. Kerkorian and Mr. Eaton, such that the destruction of these documents prejudiced Defendants' ability to defend this lawsuit and deprived them of relevant information. To establish prejudice, Defendants must show " 'a reasonable possibility, based on concrete evidence rather than a fertile imagination" that access to the [lost material] would have produced evidence favorable to his cause." ' [FN2] *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 167 F.R.D. 90, 104, 109 (D.Colo.1996); *Schmid,* 13 F.3d at 80 (overturning sanction of judgment in favor of defendant where defendant did not "come forward with plausible, concrete suggestions as to what that [lost] evidence might have been"). This standard is not satisfied where the evidence lost is merely "cumulative, insignificant or of marginal relevance." *Gates,* 167 F.R.D. at 104, 109.

> FN2. The burden of establishing prejudice must be shown by "direct evidence which is clear and convincing" when dispositive sanctions are sought, and by a preponderance of the evidence when non-dispositive sanctions are sought. *Gates,* 167 F.R.D. at 108.

After considering the facts and circumstances related to this issue, I conclude that Defendants have not met their burden of establishing prejudice under either a clear and convincing or preponderance of the evidence standard. Ms. Thode's unrebutted testimony is that she included all the information from her pink message notes and steno pads into the list she transcribed and that she discarded the pink message notes and steno pads consistent with her past practice of discarding such documents after she has looked through them. Ms. Thode also testified that she was not present for any meetings or conversations between Mr. kerkorian and Mr. Eaton, that she had no knowledge about the content of any such conversations or meetings, and

that the documents she discarded had no information regarding the substance or duration of any conversations or meetings. (Thode Decl. at ¶ 6,7, 9-15; Thode Tr. at 41:16-25, 52:24-25, 53:2-23, 55:2-6). Because the content of this evidence was preserved, and the nature of the discarded documents was unlikely to reveal anything regarding the content or duration of the conversations that took place, I conclude that Defendants have not been prejudiced by the destruction of these documents. *See e.g Mathias v. Jacobs,* 197 F.R.D. 29, 39 (S.D.N.Y.2001) (finding no prejudice where the substance of the discarded computer printout was transferred to plaintiff's palm pilot, which was produced), *vacated on other grounds,* 167 F.Supp.2d 606 (S.D.N.Y.2001). Further, I note that Defendants have represented Mr. Eaton throughout this litigation and have deposed Mr. Kerkorian regarding his conversations with Mr. Eaton. Thus, Defendants have had ample opportunity to garner the substance of these conversations from the actual participants, sources which are undoubtedly more accurate and more substantive than the telephone message notes of an assistant who was not present during the actual conversations.

*3 To the extent that Defendants suggest that Mr. Sobelle acted nefariously in failing to instruct Ms. Thode to preserve the documents, I find that Mr. Sobelle's conduct does not evidence any bad faith. I have read the testimony of Mr. Sobelle and Ms. Thode in this regard and find nothing beyond mere speculation to support Defendants' assertion that Mr. Sobelle made a deliberate choice not to assure the preservation of the phone message slips and steno pads. While it may have been a better litigation practice for Mr. Sobelle to have instructed Ms. Thode to preserve the documents, Defendants have not persuaded me that Mr. Sobelle acted intentionally to impair Defendants' ability to defend against Tracinda's claims. *See e .g. Brewer,* 72 F.3d at 334 (holding that negative inference arises " ' only when the spoliation or destruction [of evidence] was intentional, and indicates a desire to suppress the truth" ') (citations omitted); *Universe Tankships, Inc. v. United States,* 388 F.Supp. 276, 286 (E.D.Pa.1974), *aff'd,* 528 F.2d 73 (3d Cir.1975) (holding that negligence resulting in the destruction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2003 WL 22951696 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

of evidence is insufficient to require the court to draw an adverse inference).

With regard to the cases cited by Defendants to support their position that sanctions are warranted, I find the majority of those cases to be distinguishable from the circumstances in this case. The cases cited by Defendants involve the destruction of key pieces of evidence, without which the defendants could not establish a defense or refute the plaintiff's allegations. *See e.g. In re Wechsler,* 121 F.Supp.2d 404, 428-429 (D.Del.2000) (entering an interlocutory finding of liability against plaintiff where plaintiff destroyed his yacht, the central piece of evidence, before inspectors could determine if faulty wiring caused the fire, thereby preventing defendants from discovering the cause of the fire or establishing that the fire was started on plaintiff's yacht); *Bowman v. American Medical Systems,* 1998 WL 721079 (E.D.Pa. Oct. 9, 1998) (holding that defendants were prejudiced where they could not examine the prosthesis which was the subject of the action because plaintiff destroyed it, and they could not obtain the relevant information from the doctor because he died); *Walters v. General Motors Corp.,* 209 F.Supp.2d 481 (W.D.Pa.2002) (finding prejudice where plaintiff destroyed the vehicle that was the subject of her defective-manufacturing claim). By contrast, as I have observed, Defendants have had ample opportunity to gather the information they seek about the conversations between Mr. Eaton and Mr. Kerkorian from the participants themselves. Thus, I conclude that the destruction of the documents sought by Defendants will not impair their ability to defend this litigation.

In sum, I find that the destruction of the documents used by Ms. Thode in compiling her list of contacts between Mr. Eaton and Mr. Kerkorian was not intentional and did not result in any prejudice to Defendants. Once Ms. Thode discovered these documents, she handled them in a manner consistent with her past practice. The content of the documents has been fully preserved, and I am not persuaded that those documents, by their nature, would have contained the information which Defendants seek. In these circumstances, I conclude that sanctions are not appropriate, and therefore, I

will deny Defendants' Motion For Relief For Spoilation Of Evidence.

### III. CONCLUSION

*4 For the reasons discussed, Defendants' Motion For Relief For Spoilation Of Evidence will be denied.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this 25th day of November 2003, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion For Relief For Spoilation Of Evidence (D.I.584) is DENIED.

D.Del.,2003.
In re DaimlerChrysler AG
Not Reported in F.Supp.2d, 2003 WL 22951696 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1224634 (Trial Motion, Memorandum and Affidavit) Plaintiff Tracinda Corporation's Answering Post Trial Brief (May. 14, 2004)
• 2004 WL 1224637 (Trial Motion, Memorandum and Affidavit) Defendants' Responsive Post-Trial Brief (May 14, 2004)
• 2004 WL 1224635 (Trial Motion, Memorandum and Affidavit) Defendants' Post-Trial Memorandum of Law and Memorandum in Support of Their Motion for Judgment as a Matter of Law (Apr. 23, 2004)
• 2004 WL 1224636 (Trial Motion, Memorandum and Affidavit) Plaintiff Tracinda Corporation's Opening Post Trial Brief (Apr. 23, 2004)
• 2004 WL 481714 (Trial Pleading) Tracinda Corporation's Reply Memorandum in Support of its Motion for Award of Sanctions Against Defendants for Late Production of Documents (Feb. 20, 2004)
• 2004 WL 481715 (Trial Pleading) Defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C63

Not Reported in F.Supp.2d, 2003 WL 22951696 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Response to Tracinda Corporation's Objections to
the Report of the Special Master (Feb. 04, 2004)
• 2004 WL 481713 (Trial Pleading) Tracinda
Corporation's Memorandum of Points and
Authorities in Support of its Motion for Award of
Sanctions Against Defendants for Late Production
of Documents (Jan. 23, 2004)
• 2004 WL 353914 (Trial Motion, Memorandum
and Affidavit) Plaintiff Tracinda Corporation's
Objections to the Report and Recommendations of
Special Master Collins J. Seitz, Jr., Esq. (Jan. 21,
2004)
• 2003 WL 23180946 (Trial Filing) Statement of
Plaintiff Tracinda Corporation in Connection With
Proceedings Before the Special Master With
Respect to Certain Belatedly Produced Documents
(Dec. 19, 2003)
• 2003 WL 24282958 () Consolidated Action (Feb.
10, 2003) Original Image of this Document (PDF)
• 2003 WL 24282959 () Expert Report of Frederick
C. Dunbar (Jan. 10, 2003) Original Image of this
Document (PDF)
• 2003 WL 24282957 () Report of Expert Witness
Richard A. Wines (Jan. 9, 2003) Original Image of
this Document (PDF)
• 2003 WL 24337540 () Declaration of Rolf
St%20urner (Jan. 8, 2003) Original Image of this
Document (PDF)
• 2002 WL 32991955 () Report of Mark E.
Zmijewski in the matter of (Dec. 2, 2002) Original
Image of this Document (PDF)
• 2002 WL 32991956 () Daimlerchrysler Ag
Securities Litigation Preliminary Report of
Anticipated Testimony (Dec. 2, 2002) Original
Image of this Document (PDF)
• 2000 WL 34408517 (Trial Pleading) Class Action
Complaint for Federal Securities Law Violations
(Nov. 28, 2000)
• 2000 WL 34408518 (Trial Pleading) Class Action
Complaint for Federal Securities Law Violations
(Nov. 28, 2000)
• 1:00CV00993 (Docket) (Nov. 28, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.