# APPENDIX

# Part 2



Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)

S.E.C. Release No.
Initial Decision

**\*1 IN THE MATTER OF RAYMOND JAMES FINANCIAL SERVICES, INC., J. STEPHEN PUTNAM AND DAVID LEE ULLOM**
Administrative Proceeding File No. 3-11692

September 15, 2005

BEFORE: Brenda P Murray, Chief Administrative Law Judge
APPEARANCES:

Luke T. Cadigan, Ian D. Roffman, Bradford E. Ali, and Dawn A. Edick for the Division of Enforcement, Securities and Exchange Commission

Burton W. Wiand, Maya M. Wolfe, Lara Thyagarajan, Seth Rosner, Darren Farfante, and Peter King for Raymond James Financial Services, Inc.

Jerry A. Isenberg, Thomas J. McGonigle, Lindi L. Beaudreault, and J. Burton Hong for J. Stephen Putnam

The Securities and Exchange Commission (Commission) initiated this proceeding on September 30, 2004, pursuant to Section 8A of the Securities Act of 1933 (Securities Act), Sections 15(b) and 21C of the Securities Exchange Act of 1934 (Exchange Act), and Section 203(f) of the Investment Advisers Act of 1940 (Advisers Act). David Lee Ullom (Mr. Ullom) submitted an Offer of Settlement to the Commission in this proceeding on January 27, 2005, which the Commission accepted on January 28, 2005.[FN1] 84 SEC Docket 2866 (Jan. 28, 2005).

The thirteen days of hearing in January and February 2005 are reflected in 3,636 pages of transcript. The Division of Enforcement (Division) presented fifteen witnesses in its direct case and one expert witness in rebuttal.[FN2] Raymond James Financial Services, Inc. (Raymond James), presented eleven witnesses, including four experts. J. Stephen Putnam (Mr. Putnam) testified and presented one expert witness. The record contains approximately 510 exhibits. The final brief was submitted on April 28, 2005.

**ISSUES**

1. Whether Raymond James and Mr. Putnam failed reasonably to supervise Dennis Herula (Mr. Herula), a person subject to their supervision, with a view to preventing or detecting Mr. Herula's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

2. Whether, as a result of Mr. Herula's fraudulent conduct, Raymond James violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5.

3. Whether Raymond James willfully violated Section 17(a) of the Exchange Act and Rule 17a-4 thereunder.

**FINDINGS OF FACT**

The findings and conclusions herein are based on the entire record. I applied preponderance of the evidence as the standard of proof. See Steadman v. SEC, 450 U.S. 91, 102 (1981).[FN3]

**Brite Business Corporation**

Brite Business Corporation (Brite Business) was a non-public company set up to defraud investors. (Tr. 883, 1664-65.) Michael Clarke (Mr. Clarke) originated Brite Business in the United Kingdom. (R.J. Ex. 2642.) Mr. Clarke "began soliciting investors through Brite Business S.A., a British Virgin Islands company, which was established in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                                    Page 2

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

December 1997." (Id.) Mr. Clarke's acquaintance Johan C. Hertzog (Mr. Hertzog) brought in Martin D. Fife (Mr. Fife), who agreed to manage client funds. (Id.) Mr. Fife allegedly had influential friends and accoutrements of wealth, including a residence on Central Park West in New York City. In April 1999, Mr. Fife arranged for Charles Sullivan (Mr. Sullivan) to incorporate Brite Business. (Id.) In 2000, Mr. Fife, Mr. Hertzog, Robert M. Wachtel (Mr. Wachtel), and Mr. Clarke, represented that they were on Brite Business's board. (Putnam Ex. 2210.) Mr. Fife and Mr. Sullivan represented that they were Brite Business's president and vice president, respectively.[FN4] From April 1999 until it was dissolved around March 2001, Brite Business was a Delaware corporation with an office address in New York City. (Div. Ex. 480 at 3, R.J. Ex. 2210.) Beginning in October 1999, Brite Business maintained investor funds in brokerage accounts at Raymond James's Cranston, Rhode Island, branch office (Cranston branch office). (Tr. 883, 1145.)

*2 From 1999 through 2002, Brite Business engaged in a fraudulent offering scheme, run by Mr. Fife and others, in which it represented that investments of a minimum of one million dollars could earn double digit interest per month.[FN5] (Tr. 481-83.) Brite Business represented that when it accumulated $100 million it would "leverage" the funds to purchase T-bills, or some other government issue, and without leaving the Brite Business account those deposits would earn astronomical returns. (Tr. 480-81, 515, 559, 594.) It was not clear what Brite Business intended to do with the investment proceeds or how it would be able to pay such astronomical returns. (Tr. 230, 237.) Some understood that Brite Business intended to use the funds as a credit enhancer allowing it to borrow more funds, while others believed that international entities would pay astronomical sums to be allowed to show Brite Business's funds to " enhance their balance sheet." (Tr. 230.) At least one investor believed that Brite Business would deposit his funds at "Bank Raymond James," and would use pooled funds to buy T-bills, which would enable Brite Business to borrow from other sources and earn more than the T-bill rate on the pooled $100 million. (Tr. 234, 237.) All investors believed the investment involved no risk of capital. (Tr. 230, 483-84.)

**Raymond James**

Raymond James Financial, Inc. (the holding company), a diversified financial services holding company headquartered in St. Petersburg, Florida, and listed on the New York Stock Exchange, combined two of its wholly owned subsidiaries to create Raymond James.[FN6] In January 1999, a holding company subsidiary, Robert Thomas Securities (Robert Thomas), merged with Investment Management & Research (IMR), another subsidiary, and IMR changed its name to Raymond James. (Tr. 1297-98, 1610-11.) Raymond James is registered with the Commission as a broker-dealer and as an investment adviser pursuant to Section 15(b) of the Exchange Act and Section 203(a) of the Advisers Act, respectively.

Raymond James "is an independent contractor firm that introduces its business into Raymond James & Associates, Inc.," and its primary regulator is the National Association of Securities Dealers (NASD).[FN7] (Tr. 1601, 2153; R.J. Ex. 2665 at 10.) Raymond James & Associates, Inc., (R.J. & Associates), a member of the New York Stock Exchange, performs the research, execution, clearing, bookkeeping, and is responsible for servicing all customer accounts at Raymond James. (Tr. 1602, 1617-18, 2153, 2752, 2822; R.J. Ex. 2658.) R.J. & Associates has clearing relationships with forty-four other broker-dealers, in addition to Raymond James. (Tr. 2822.) These two broker-dealers conduct the majority of the business of the holding company. (Tr. 3423.)

Raymond James referred to its registered representatives as financial advisers. (Tr. 2048.) During the relevant period, August 1999 through December 2000, Raymond James had from 1,100 to 4,000 registered representatives, who were allowed to engage in business activities other than buying and selling securities. (Tr. 2034, 2325, 3530.) About fifty percent of Raymond James's registered representatives engaged in some type of business activity outside the firm, such as selling insurance or financial planning. (Tr. 1900.) Between ten to twenty percent of Raymond James's registered representatives worked outside their assigned offices regularly, and about five percent never went to the office. (Tr. 2337-38.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** The NASD applies the same rules to all registered representatives whether they are independent contractors or employees. (Tr. 2488-89.) This proceeding involves the Cranston branch office, part of the securities division of Raymond James.[FN8] (Tr. 1007, 1612; Div. Ex. 313 at 7.) Most of Raymond James's approximately 550 branch offices located throughout the United States were staffed by two or three registered representatives. (Tr. 1615-16, 1619.) Under NASD rules, Raymond James designated the Cranston branch office as an Office of Supervisory Jurisdiction (OSJ), which required that it have a registered principal. (Tr. 2325-27.)

### Mr. Putnam

Mr. Putnam, sixty-two years old, graduated from Bowdoin College in 1965, and served with the Army in Vietnam. (Tr. 1603-04; Putnam Ex. 1075.) Mr. Putnam was with his family's securities firm, F.L. Putnam, from 1968 until 1981, and in 1979 was chairman of the board of directors of the NASD. (Id.) Mr. Putnam's Form U-4 shows five items in the late 1970s or early 1980s: two offers of settlement and three acceptance, waiver & consents. (Tr. 1604; Div. Ex. 286.) These matters involved allegations of failure to supervise, failure to maintain net capital, "integration with respect to a tax incentive investment," and excessive mark-ups. The result in almost each instance was a censure and a fine of $1,000 or $1,500, which F.L. Putnam paid. (Div. Ex. 286; Tr. 1605-09.) Mr. Putnam did not pay anything personally. (Tr. 1604.)

In July 1983, Mr. Putnam became president and chief executive officer (CEO) of Robert Thomas. (Tr. 1610, 1872.) He became an executive vice president and board member of the holding company in about 1987. When Raymond James was created in January 1999, Mr. Putnam became president, chief operating officer, and a director. (Tr. 1601, 1611.) Mr. Putnam reported to the CEO. (Tr. 2046.) Mr. Putnam's responsibilities included direct oversight of the securities division, which included the Cranston branch office. (Tr. 1612, 1614-15.) Mr. Putnam supervised the activities of the branch offices in conjunction with Raymond James's Compliance Department (Compliance Department). (Tr. 1614, 2052.) In carrying out his responsibilities, Mr. Putnam relied on the

Compliance Department and the individual branch managers. (Id.) Raymond James's internal investigation did not find that Mr. Putnam was deficient in his supervision of Mr. Herula. (Tr. 1864.)

In April 2003, Mr. Putnam left Raymond James and is now executive vice president, special projects, at the holding company. (Tr. 1599-601.) Mr. Putnam has no supervisory responsibilities in his new position. (Tr. 3431.) The holding company made this move, in large part, because it believed the Commission wanted Mr. Putnam removed. (Tr. 3442.) Several witnesses who worked with Mr. Putnam testified of their high regard for his professional accomplishments, intelligence, honesty, drive, and loyalty to Raymond James. (Tr. 1864-65, 2917, 3430-31, 3445.)

### David Ullom

**\*4** Mr. Ullom, a graduate of Pennsylvania State University, began working in the securities industry in 1970. (Tr. 1002.) From 1974 until 1991, Mr. Ullom was an owner and the CEO of Barclay Investments, a broker-dealer with three offices and twenty registered representatives. (Tr. 1285.) Mr. Ullom first met Mr. Putnam in the 1970s when Mr. Ullom and some associates from Barclay Investments became a division of F.L. Putnam. (Tr. 1634.) Mr. Ullom considered Mr. Putnam a friend and contacted Mr. Putnam in 1991 when he was looking for a position. (Tr. 1013-14.)

Mr. Ullom had no significant regulatory violations when he signed a Registered Representative Agreement with Robert Thomas on June 7, 1992.[FN9] (Tr. 1287; R.J. Ex. 2016.) In 1994, when he became the principal of the Robert Thomas office in Rhode Island, Mr. Ullom held the following licenses: general securities, financial principal, general principal, options principal, municipal principal, and investment adviser. (Tr. 1002, 1293-94.) The Independent Sales Associate Agreement he signed with Robert Thomas in 1994 provided that Mr. Ullom was an independent contractor with Robert Thomas. (Tr. 1293; R.J. 2016 at 7.)

The terms of the Independent Sales Associate Agreement required Mr. Ullom to maintain an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

office, to bear the expenses, to be responsible for assuring that registered representatives in the office adhered to all applicable regulations, cooperated with audits, and to indemnify Raymond James against any liability arising from his conduct, or that of a registered representative in the office. (R.J. Ex. 2016 at 8; Tr. 1295-97.) Mr. Ullom managed Raymond James's Cranston branch office as an independent contractor, Foxhill Management (Foxhill), with a checking account in the name of "Foxhill d/b/a Raymond James Financial Services." (Tr. 1006-07.) The Foxhill account was the operating account for the Cranston branch office, and the account statements for 1999 and 2000 were in the Foxhill file at the Cranston branch office. FN[FN10] (Tr. 1280.) Foxhill, a Rhode Island C corporation, provided office space, utilities, staff support, employee benefits, and "interfaced with Raymond James for purposes of receiving commission dollars back that had been generated." (Tr. 1004-06.) Signs in the Cranston branch office identified only Raymond James (Tr. 1007, 1324.) All mailings, account documents, and client payments were to Raymond James. (Tr. 1008.) Mr. Ullom could hire registered representatives subject to Raymond James's approval. (Tr. 1295; R.J. Ex. 2016 at 8.)

In 1995, Mr. Ullom settled an allegation that a registered investment adviser he co-owned had mischaracterized revenue. David Lee Ullom, 59 SEC Docket 1375 (June 13, 1995). The Commission Order found that Mr. Ullom: (1) made false statements to a Rhode Island Department of Business Regulation examiner; (2) directed the investment adviser's bookkeeper to alter financial documents; (3) distributed a brochure with misleading information; (4) violated Section 207 of the Investment Advisers Act by making untrue statements of material fact in a report filed with the Commission; and (5) knew, or acted with reckless disregard for whether his actions were part of an overall activity that was improper and provided substantial assistance to the adviser's violations. (R.J. Ex. 2022.) When it accepted the settlement, the Commission knew Mr. Ullom was managing a broker-dealer branch office. (Tr. 1288-90; R.J. Ex. 2022 at FW 020432.) The Commission censured Mr. Ullom; ordered him to cease and desist; fined him $10,000; ordered him to retake and pass the general securities principal examination before any

future association with an investment adviser in a supervisory capacity; and attached conditions to Mr. Ullom's ownership of more than twenty percent of an investment adviser. (Id.) The Commission's Order did not restrict Mr. Ullom's activities with a broker-dealer or investment adviser. (Tr. 1290, 2468-69.)

*5 The Independent Sales Associate Agreement defined "Other Associates" as qualified registered representatives who enter independent contractor relationships with Raymond James. (R.J. Ex. 2016 at 6.) In the independent contractor relationship, each registered representative in the Cranston branch office had a direct contractual relationship with Raymond James, and a relationship with Foxhill. (Tr. 1004, 1309.) Raymond James took between ten and twenty-five percent of the commissions earned by registered representatives in the Cranston branch office. (Tr. 1311.) Raymond James forwarded the remainder monthly to the Foxhill account to be disbursed roughly twenty-five percent to Foxhill and fifty percent to the registered representatives. FN[FN11] (Tr. 1027-28; R.J. Ex. 109.) Raymond James terminated Mr. Ullom in November 2001 for failure to supervise. (Tr. 1273.)

I find Mr. Ullom totally lacking in credibility. He frequently changed his testimony after he was confronted with contradictory prior testimony or exhibits. Mr. Ullom lied and withheld information from Mr. Putnam, and he assisted Mr. Herula's fraudulent activities. (Tr. 1499-50, 1531-33.)

**Dennis Herula**

Mr. Herula is a fifty-eight-year-old high school graduate who attended college and served in the military. (Tr. 1737-38; Div. Ex. 82.) Mr. Herula claims to have been associated with "Kemper, Merrill Lynch, Shearson Lehman Brothers, Oppenheimer, W.C. Roney & Company, E.F Hutton" in his twenty or more years in the securities industry. (Tr. 1738.) Mr. Ullom forwarded Mr. Herula's application to become associated with Robert Thomas to the Compliance Department in August 1999. (Tr. 2303-04.) Robert Thomas checked Mr. Herula's criminal record, his financial background, and with his prior employers before hiring him. (Tr. 2109-10, 2432.) In the materials the Compliance Department reviewed, Mr. Herula had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

no serious reported complaints in ten years of industry experience. (Tr. 2369; R.J. Exs. 2004, 2005.) Mr. Ullom knew Mary Lee Capalbo (Ms Capalbo) was married to Mr. Herula. (Tr. 1044.) Mr. Putnam terminated Mr. Herula on December 26, 2000, effective the first business day of January 2001. (Tr. 1271, 1517.)

The Registered Representative Agreement (Agreement) between Raymond James and Mr. Herula provided that: (1) Mr. Herula was being retained by Mr. Ullom as an independent contractor pursuant to an Independent Sales Associate Agreement between Raymond James and Mr. Ullom; (2) the Agreement did not create an agency, employment, or joint venture relationship; and (3) Mr. Herula had "the right to solicit and engage in the purchase and sale for [Raymond James] approved securities with the general public, and engage in other business activities except to the extent such activities are subject to the rules, regulations and interpretations of Regulatory Authorities." (Div. Ex. 111; Tr. 1036-37.) As branch manager, Mr. Ullom was Mr. Herula's first-level supervisor in 1999 and 2000. (Tr. 989-90, 1345, 2048.)

*6 In August and September 1999, Mr. Herula worked in the Cranston branch office during normal business hours. (Tr. 1319.) For the remainder of 1999, Mr. Herula came to the office late in the day or at night because he said he was caring for his ill wife. (Tr. 1279, 1319-20.) Mr. Ullom claims that he allowed Mr. Herula to work from his home and other locations in accord with Raymond James's policies. (Tr. 990-92.) Beginning in January 2000, Mr. Ullom claims that Mr. Herula came to the office about once a month because he said he was traveling and raising funds for Brite Business, an outside business activity that Raymond James allowed. (Tr. 1091-93, 1179, 1206-07, 1543.) Mr. Herula came into the Cranston branch office about once a month in the first half of 2000, and a total of four times between May and December 2000. (Tr. 1091-92, 1206, 1280.) According to Mr. Ullom, this was unusual for a registered representative, but because the accounts Mr. Herula handled were very conservative accounts, they did not require frequent client contact. (Tr. 1092.)

This administrative proceeding follows a related

civil proceeding in the United States District Court for the District of Rhode Island. SEC v. Dennis S. Herula, et al., C.A. No. 02-154 ML (D.R.I.). On October 17, 2002, the district court entered a Final Judgment and enjoined Mr. Herula from further violations of the antifraud provisions of the federal securities laws and ordered him to pay disgorgement and prejudgment interest totaling $18,941,665.63 (Putnam Ex. 1116, R.J. Ex. 2642 at 54009.) On January 27, 2003, the district court entered a Final Judgment and enjoined Ms. Capalbo, from further violations of the antifraud provisions of the federal securities laws and ordered her to pay disgorgement and prejudgment interest totaling $19,292,102.14. The court also ordered Mr. Herula and Ms. Capalbo to each pay civil monetary penalties of $250,000. (R.J. Ex. 2642 at 54009.)

On October 18, 2004, Mr. Herula pleaded guilty to criminal charges of wire fraud that included misrepresentations to investors, money laundering, and bankruptcy fraud brought by the U.S. Attorney in Rhode Island.[FN12] (Tr. 1713; Div. Exs. 82, 83 at 7, 85) Mr. Herula was sentenced to 188 months and ordered to make restitution of more than $13 million. (Tr. 1719.)

### Raymond James and Brite Business

Mr. Ullom, on behalf of Mr. Herula, requested that Mr. Putnam meet with Brite Business, about a business opportunity for Raymond James from people with substantial assets.[FN13] Mr. Putnam had complete trust in Mr. Ullom and hired him in mid-1992. (Tr. 1014, 1965; Div. Ex. 106.) At the time, Mr. Herula had been associated with Raymond James for about two months and had fifteen to twenty client accounts, the largest with assets of about $2 million (Tr. 1047-48, 1051, 1349-50.)

Mr. Putnam was on the holding company's Capital Markets Committee, and was told that Brite Business would deposit $5 million in a Raymond James account. (Tr. 1638-39.) On October 19 and 20, 1999, Mr. Herula sent Mr. Putnam the resumes of Ian Doidge (Mr. Doidge), Principal & Practice Leader, Global Asset Services Group, Arthur Andersen Business Consulting (Arthur Andersen), Toronto, and Mr. Fife. (R.J. Exs 2423, 2424.) Mr. Putnam called Arthur Andersen and confirmed that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Doidge was at the phone number he provided (Tr. 1665, 2073.) Mr. Putnam believed that Brite Business was a legitimate business enterprise based on Mr. Doidge's position with Arthur Andersen, Mr. Fife's credentials, and Brite Business's $5 million deposit. (Tr. 1665-66, 1679.)

*7 During the week of October 20, 1999, Mr. Putnam, assembled an ad hoc committee composed of John C. Maynard (Mr. Maynard)[FN[FN14]] , a vice president with Raymond James Trust Company (R.J. Trust); Thomas R. Tremaine (Mr. Tremaine), vice president and treasurer at R.J. & Associates; Jeff Julien (Mr. Julien), chief financial officer at the holding company; John Kritsas (Mr. Kritsas) [FN[FN15]] and John Walsh (Mr. Walsh) from R.J. & Associates. This committee met with Mr. Herula and Mr. Doidge, representing Brite Business, at Raymond James's headquarters. (Tr. 1640-42, 2115, 2805-06.) Mr. Ullom was not invited but attended the meeting. (Tr. 1052.)

The meeting lasted less than an hour. (Tr. 1657.) Mr. Putnam understood that Brite Business was involved in construction in foreign jurisdictions. (Tr. 1647.) Brite Business proposed that Raymond James participate in its activities by: (1) loaning money for purchase of Treasuries; (2) holding a trust; (3) doing the transactions such as the purchase of Treasury bonds or securities; and (4) having R.J. Trust hold the assets in escrow as well as the trust receipt. (Tr. 1660-61.) Brite Business described a series of transactions in the range of $50 to $100 million each where United States Treasuries (Treasuries) would enter the United States from England and be leveraged so that the asset side of Brite Business's balance sheet would be increased. (Tr. 1649, 1666.) Brite Business proposed placing the Treasuries and other funds under a trust arrangement, which would protect the funds and allow the transaction to be unwound. (Tr. 1649, 1546.) These activities would supposedly allow Brite Business some tax advantages. (Tr. 1691, 1748.) Supposedly, the interest cost of the borrowing would be a tax benefit as it would offset income earned abroad. (Tr. 1650, 1656.) Mr. Doidge said that the offsetting increase in liabilities did not matter for this particular strategy. However, he claimed that he could not disclose the tax implications in detail because of confidentiality issues. (Tr. 1662-64, 1742.) The meeting

participants were told the strategy was proprietary to Arthur Andersen and that Raymond James did not have to be concerned about what happened inside the "black box." (Tr. 2663-64.) In his investigative testimony, Mr. Putnam acknowledged that there were several renditions of the "balance sheet enhancement," but that it was a tax strategy and involved "depositing money into some sort of an escrow, buying some treasuries, doing either a repo or a reverse repo with a bank." (Tr. 1652-53.) Mr. Putnam testified that one issue was whether Raymond James would be willing to make a loan. (Tr. 1655-56, 1760.) In an e-mail sent on January 17, 2000, Mr. Putnam described the transaction as follows:

> It involved moving treasuries from England to the U.S. and creating a loan from one group to another through [Raymond James] and then doing a repo on the instruments with the proceeds going into a trusteed bank account and the transactions being able to be unwound every ninety days. It was suggested that [Raymond James] would be the custodian of the bonds, do the transactions, trustee the account, and have an [Investment Management Program for Advisory Clients] arrangement with respect to the account. We were told this had something to do with a balance sheet for a deal or deals. Arthur Andersen's representative assured us that the money was not fraudulent and that the money came from good sources. The principal Martin Fife sits on the boards of several Dreyfus Funds and his wife has been the Deputy Mayor of NY and he appears to be quite connected.*8 (R.J. Ex. 2467.)

This transaction would have been very unusual for R.J. Trust, which provided only personal fiduciary trust services to Raymond James's clients. (Tr. 2684-85.) Mr. Maynard attended the meeting in place of his boss, David Ness (Mr. Ness), the head of R.J. Trust, and described Brite Business's proposal as a complicated tax shelter that involved debt-financed purchase of Treasuries. (Tr. 2703.)

The ad hoc committee met only once soon after the October 1999 meeting to discuss the proposal. (Tr. 2138.) Everyone was skeptical about the proposal and questioned Brite Business's motives. (Tr. 1668-70, 1848.) The consensus was that Raymond James should not get involved in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

something they did not fully understand. (Tr. 1355, 1662, 2861.) Mr. Putnam indicated that the transaction did not sound like something Raymond James would involve itself with. (Tr. 1054, 1061.) In an e-mail on October 29, 1999, Mr. Walsh wrote to Mr. Putnam and others, "My gut feeling on this deal is bad. Let's continue to proceed very cautiously." (Tr. 1690; Div. Ex. 240.)

Mr. Putnam testified that some people jumped to conclusions about what occurred in October but that the ad hoc committee: (1) did not take a formal vote and reject the transaction; (2) reached a consensus to do more discovery but would not commit to the transaction; and (3) had healthy skepticism, but was willing to look at subsequent proposals from Brite Business. The size of the transaction was beyond Raymond James's normal transaction size Brite Business also wanted to start the transaction before the end of 1999. (Tr. 1668-69.) Mr. Putnam testified that the proposal considered in October became moot within days because of its size, complexity, and Brite Business's desire to complete it by year end. (Tr. 1770, 1800, 1810-11; Div. Ex. 253.) Following the October meeting, Mr. Maynard and Mr. Tremaine looked at whether there were some parts of the transaction that Raymond James could be comfortable with. (Tr. 1675, 1683- 84.) For example, on October 25, 1999, Mr. Maynard reported that Brite Business thought "[Mr. Putnam's] suggestion will work" and R.J. Trust might be able to hold the cash for Brite Business. (Div. Ex. 238.)

On October 25, 1999, Brite Business opened a cash account at Raymond James with a $5 million deposit. Mr. Herula was the account representative, and Mr. Ullom approved the new account form. (R.J. Ex. 2342.) The Corporate Resolution accompanying the New Account Form was signed by Brite Business Assistant Secretary, Farouk Alam Khan; President, Mr. Fife; Chairman & CEO, Mr. Hertzog; and trader, Mr. Doidge. (R.J. Ex. 2342.) Mr. Putnam believed that Raymond James knew its client, Brite Business, "quite well." (Tr. 1956.) On October 26, 1999, Brite Business entered an Investment Management Program for Advisory Clients (IMPAC), which provided that Raymond James would be paid $250,000 for investment advisory services. (R.J. Ex. 2106.)

*9 On November 9, 1999, Mr. Ullom called Mr. Ness and yelled at him complaining that Raymond James would lose the Brite Business transactions to First Union Bank "because the folks in the home office were concerned about minor details." (Tr. 2709.) Mr. Ullom claimed that Mr. Maynard had behaved in an unprofessional manner at the October meeting with Brite Business and had lost Raymond James the business. (Tr. 2669-70, 2708.) Mr. Ullom also told Mr. Ness that Brite Business was a big client and that R.J. Trust had one more chance to get the job done. (Tr. 2708-09.)

Mr. Ness informed Mr. Maynard of Mr. Ullom's criticisms, which Mr. Maynard denied. (Tr. 2670.) Mr. Maynard was so taken aback by Mr. Ullom's actions that he learned through business contacts that Brite Business had contacted First Union Bank with the same deal and First Union Bank had "sent them packing." (Tr. 2669-71; Div. Ex. 244.) Contrary to the representations of Mr. Ullom and Mr. Herula, the deal made no sense to First Union Bank and it had "distinctly not" done the deal. (Id.) Mr. Maynard relayed this information to Mr. Ness, Mr. Putnam, Mr. Julien, Mr. Kritsas, and Mr. Tremaine. (Div. Ex. 244.)

On November 10, 1999, upon learning this information, Mr. Ness e-mailed Mr. Putnam and stated that he found the fact that First Union Bank had not done the deal "particularly disturbing since it potentially casts some question in the direction of [Brite Business's] principals." (Div. Ex. 245.) Mr. Tremaine was convinced that Raymond James should not

Mr. Putnam testified that some people jumped to conclusions about what occurred in October but that the ad hoc committee: (1) did not take a formal vote and reject the transaction; (2) reached a consensus to do more discovery but would not commit to the transaction; and (3) had healthy skepticism, but was willing to look at subsequent proposals from Brite Business. The size of the transaction was beyond Raymond James's normal transaction size. Brite Business also wanted to start the transaction before the end of 1999. (Tr. 1668-69.) Mr. Putnam testified that the proposal considered in October became moot within days because of its size, complexity, and Brite Business's desire to complete it by year end. (Tr. 1770, 1800, 1810-11; Div. Ex.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

253.) Following the October meeting, Mr. Maynard and Mr. Tremaine looked at whether there were some parts of the transaction that Raymond James could be comfortable with. (Tr. 1675, 1683- 84.) For example, on October 25, 1999, Mr. Maynard reported that Brite Business thought "[Mr. Putnam's] suggestion will work" and R.J. Trust might be able to hold the cash for Brite Business. (Div. Ex. 238.)

On October 25, 1999, Brite Business opened a cash account at Raymond James with a $5 million deposit. Mr. Herula was the account representative, and Mr. Ullom approved the new account form. (R.J. Ex. 2342.) The Corporate Resolution accompanying the New Account Form was signed by Brite Business Assistant Secretary, Farouk Alam Khan; President, Mr. Fife; Chairman & CEO, Mr. Hertzog; and trader, Mr. Doidge. (R.J. Ex. 2342.) Mr. Putnam believed that Raymond James knew its client, Brite Business, "quite well." (Tr. 1956.) On October 26, 1999, Brite Business entered an Investment Management Program for Advisory Clients (IMPAC), which provided that Raymond James would be paid $250,000 for investment advisory services. (R.J. Ex. 2106.)

*10 On November 9, 1999, Mr. Ullom called Mr. Ness and yelled at him complaining that Raymond James would lose the Brite Business transactions to First Union Bank "because the folks in the home office were concerned about minor details." (Tr. 2709.) Mr. Ullom claimed that Mr. Maynard had behaved in an unprofessional manner at the October meeting with Brite Business and had lost Raymond James the business. (Tr. 2669-70, 2708.) Mr. Ullom also told Mr. Ness that Brite Business was a big client and that R.J. Trust had one more chance to get the job done. (Tr. 2708-09.)

Mr. Ness informed Mr. Maynard of Mr. Ullom's criticisms, which Mr. Maynard denied. (Tr. 2670.) Mr. Maynard was so taken aback by Mr. Ullom's actions that he learned through business contacts that Brite Business had contacted First Union Bank with the same deal and First Union Bank had "sent them packing" (Tr. 2669-71; Div. Ex. 244.) Contrary to the representations of Mr. Ullom and Mr. Herula, the deal made no sense to First Union Bank and it had "distinctly not" done the deal. (Id.) Mr. Maynard relayed this information to Mr. Ness,

Mr. Putnam, Mr. Julien, Mr. Kritsas, and Mr. Tremaine. (Div. Ex. 244.)

On November 10, 1999, upon learning this information, Mr. Ness e-mailed Mr. Putnam and stated that he found the fact that First Union Bank had not done the deal "particularly disturbing since it potentially casts some question in the direction of [Brite Business's] principals." (Div. Ex. 245.) Mr. Tremaine was convinced that Raymond James should not participate "at any level." (Tr. 1845, 2810; Div. Ex. 244.) Mr. Tremaine's comment referred to the transaction Brite Business proposed in October. (Tr. 2810.)

Mr. Ness was "profoundly skeptical" and informed Mr. Putnam that Mr. Tremaine and Mr. Walsh opposed involvement in the transaction. (Div. Ex. 245.) Mr. Putnam did not believe that Mr. Ness, Mr. Tremaine, and Mr. Walsh thought that Raymond James should not do business with Brite Business, but, rather, that Raymond James should not do the transaction Brite Business proposed in October 1999. (Tr. 1763.)

On November 9, 1999, in an e-mail to Mr. Putnam, Mr. Julien, Mr. Kritsas, and Mr. Tremaine, Mr. Ness: (1) asked whether Mr. Ullom was a significant producer with experience in sophisticated transactions; (2) criticized the quality of the escrow agreement that Mr. Ullom had sent him for Brite Business; (3) stated that Brite Business's current proposal did not pass "the smell test either," i.e., as an aggressive tax shelter; and (4) stated it was too difficult "to understand the economic justification of the deal." (Tr. 2714-15, 2718, 2730; Div. Ex. 244.) Mr. Ness questioned the economic justification for the deal, the "C Team player" involved, and worried about being the only one with clean hands in a dirty deal and aggressive tax shelter. (Tr. 2716-18.) In a November 10, 1999, response, Mr. Putnam did not adopt Mr. Ness's concerns. (Tr. 1753; Div. Ex. 245.) Rather, Mr. Putnam stated that he understood that "the first deal was done with First Union"; that Mr. Ullom had " run a brokerage firm and been responsible for underwriting multi-million dollar deals"; and he questioned whether the reference to "C Team players" was to the English broker, an alleged participant, whom Raymond James was unable to identify. (Tr. 1693; Div. Exs. 240, 245.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*11 The fact that First Union Bank could not make sense of the Brite Business transaction did not concern Mr. Putnam because Raymond James "was not going to make the loan." (Tr. 1755.) Mr. Putnam and Michael J. DiGirolamo (Mr. DiGirolamo), who was head of compliance at IMR, believed that the ad hoc committee that met with Brite Business in October 1999 turned the transaction down. (Tr. 1870; Div. Ex. 253.) Mr. Putnam's position was that Raymond James should look at each transaction Brite Business presented, and do extensive due diligence on Brite Business if Raymond James decided to go forward with a transaction.

On November 10, 1999, Mr. Ness responded to a draft agreement from Mr. Ullom concerning a Brite Business transaction. In the transaction, Raymond James would act as an escrow agent where Brite Business borrowed funds from a bank. (Div. Ex. 246.) Mr. Ness viewed Brite Business's November proposal as only using R.J. Trust as an escrow agent, where Brite Business's October proposal would have had Raymond James lend funds, serve as an escrow agent, and do securities transactions. (Tr. 2716-18.)

On December 9, 1999, when Brite Business had about $12.3 million in its Raymond James brokerage account, Raymond James filled a Brite Business order to purchase $115 million of Treasuries on margin. (Tr. 1068-69, 1071, 2069, 2839, 2862.) In effect, Raymond James lent Brite Business approximately $103 million, with the United States Treasuries as security. (Tr. 2840-41.) Considering the liquidity of Treasuries, the risk to Raymond James was minimal. (Tr. 2841.) This purchase was a "highly unusual transaction" for Raymond James because of its size, and was likely the largest margin purchase of Treasuries that Raymond James had ever executed.[FN][FN16] (Tr. 1386, 1840.)

The transaction was unusual because of its size, but principally because it resulted in a loss to Brite Business, in that the coupon on the Treasuries was less than the lending rate, which created a negative spread. (Tr. 1841-43, 2125, 2813-14.) Mr. Putnam was satisfied that persons representing Brite Business were sophisticated investors who understood the transaction and wanted it to happen.

(Tr. 2125.) Kevin A. Carreno (Mr. Carreno), one of three Raymond James principals who could approve such a large trade, approved the transaction and subsequently informed Mr. Putnam of the transaction. (Tr. 2444-45.) Operating persons in Raymond James's government bond department handling the purchase were upset that the order arrived late on a Friday afternoon, without any advance notice, which gave them little time to arrange adequate financing to close the transaction.[FN][FN17] (Tr. 2184-85, 2811.) On December 13, 1999, Mr. Tremaine informed Mr. Putnam that "[a]t this point I do not want to do another trade of this size in this account. Once we fully contemplate the impact [on operations and the firm's cash and capital position] we can then discuss." (Tr. 1785; Div. Ex. 249.)

*12 Mr. Putnam was not concerned by the transaction, which he considered to be in the normal course of business (Tr. 1773-74, 2123; Div. Ex. 250.) Mr. Putnam was not concerned that the transaction was part of the balance sheet enhancement program because he understood the purchase was in connection with a repurchase agreement that Brite Business had with the Bank of New York, and that the securities were being delivered to that institution.[FN][FN18] (Tr. 1744, 1776, 1784; R.J. Ex. 2445.) Mr. Herula gave Mr. Putnam this information after the purchase of the Treasuries. (Tr. 1420; R.J. Ex. 2044.) On December 16, 1999, Mr. Herula mentioned that Mr. Fife would be depositing an additional $22 million in the Brite Business account, and that Mr. Fife had provided a reference to Bill Britt, who had a portfolio of $100 million. (R.J. Ex. 2044.) Mr. Putnam urged Mr. Fife to sell the Treasuries when the reverse repurchase transaction did not occur by January 1, 2000, because he was concerned that regulators might fault Raymond James for the margin interest Brite Business was paying. Mr. Fife, however, assured Raymond James that he wanted the arrangement to continue. (Tr. 1780-81, 1890, 2817.) Mr. Putnam, Mr. Augenbraun, Mr. Carreno, and Mr. Tremaine did not understand the purchase of Treasuries as indicating participation by Raymond James in the transactions that Brite Business proposed in October 1999. (Tr. 1776, 2203-05, 2456, 2849-50.)

Around December 13, 1999, Mr. Putnam told Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Carreno that Brite Business was involved in balance sheet enhancement and that Brite Business might bring some managed accounts to Raymond James. FN[FN19] (Tr. 1786.) On December 16, 1999, Mr. Putnam indicated to Mr. Tremaine, Dennis Zank (Mr. Zank) and Mr. Van Sayler, from R.J. & Associates, that Mr. Fife appeared to be using a tax strategy using Treasuries, and that if Mr. Fife's relationship with Raymond James was going to be more than a treasury trade, perhaps "Tom [James] or Tremaine and me" should meet with Mr. Fife. (Tr. 1791; Div. Ex. 250.)

On December 20, 1999, the Compliance and Standards Committee of the holding company (C&S Committee), chaired by Thomas James (Mr. James), the chairman and CEO of the holding company, discussed what standards should apply for processing large-size trades on margin. (Tr. 1793, 1874; Div. Ex. 251.) Mr. Putnam, who was also on the C&S Committee, was in London and missed the meeting.

On December 20, 1999, Mr. DiGirolamo informed Mr. Putnam, Mr. Greene, and Mr. Zank that the C&S Committee: (1) noted apparent failures on the bond desk and in the margin department in approving Brite Business's $115 million margin purchase of Treasuries; (2) questioned why the trade was done since the client was paying more in margin interest than it was receiving in interest; (3) questioned why the trade was placed after a committee declined an earlier strategy; and (4) questioned whether the trade should stay on Raymond James's books and wondered if "there was some sort of scam going on." (Tr. 1841-42; Div. Ex. 251.) Mr. DiGirolamo commented that without knowing all the details "this smells a little fishy." (Id.) Mr. Putnam believes the C&S Committee would have been satisfied if he had been present to explain that Mr. Fife was a sophisticated and knowledgeable client who was being advised by Arthur Andersen. (Tr. 1805.) However, several people who had looked at Brite Business's proposals were on the C&S Committee. (Tr. 1801.) Mr. Putnam had expressed concerns about Brite Business's motives for the Treasury transaction to Mr. DiGirolamo, Mr. Van Sayler, Mr. Zank, and Mr. James. (Tr. 1803-05.) On December 21, 1999, the C&S Committee approved a policy that any retail order for fixed income securities in

excess of $1 million must be referred by the trading desk to the Compliance Department for approval prior to execution. (Div. Ex. 438.) The policy was further modified by raising the amount to $5 million, substituting customer relations for the Compliance Department, and specifying the transaction referred to margin purchases. (Tr. 2193.)

*13 Mr. James informed Mr. Putnam on January 8, 2000, that he was strongly biased "to not do any trade or participate in any strategy that we do not understand. Thus, unless the Arthur Andersen and Holland [&] Knight people can convince the original committee to do the transaction, I want no other parts of it executed here." (Div. Ex. 253.) Mr. James understood that those who looked at the transaction in October concluded that Raymond James should not do the transaction, but "then the first phase occurred anyway." (Div. Ex. 253.) Mr. Putnam replied that: (1) he too was leery of doing any transaction that involves large number and appears illogical; (2) the original transaction Brite Business proposed in October was moot; (3) following his trip to New York the ad hoc committee would convene to consider Brite Business's proposals; and (4) the throw-off in personal business from Brite Business could be significant for the branch and the firm. (Id.) Mr. James replied that a participant on the ad hoc committee informed him that it had rejected the transaction, and Mr. James did not want another step taken without a super majority vote of the ad hoc committee, and that at least one person was "more than nervous." (Div. Ex. 253.)

On January 7, 2000, Mr. Herula sent Mr. Putnam an e-mail describing an additional transaction that Brite Business would like to do with Raymond James that included a trust account. (R.J. Ex. 2451.) On January 12, 2000, Mr. Putnam and Barry Augenbraun (Mr. Augenbraun), senior vice president and corporate secretary of the holding company, an attorney and C&S Committee member, met with Mr. Fife and others at Mr. Fife's home, a large penthouse on Central Park West in New York City. (Tr. 1075, 1657, 1974, 2173; Div. Ex. 257.) The purpose of the meeting was to learn more about Brite Business, the new Brite Business proposal, and to meet Mr. Fife and other Brite Business principals. (Tr. 1798, 2194; Div. Exs. 254, 503.) Mr. Augenbraun also wanted to determine why

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Brite Business had purchased Treasuries on margin in December 1999. (Tr. 2204, 2259.) At the January 2000 meeting, representatives of Brite Business presented an elaborate business plan from a package with Arthur Andersen's name on the cover. (Tr. 2200-01.) Brite Business's plan was to create new corporations, similar to Brite Business, to finance construction projects where Treasuries would be used to enhance the corporate balance sheets. (Tr. 2206- 08.) There was no discussion of high-yield trading programs or high rates of return. (Tr. 2261.) Farouk Khan represented that he was involved in a bank in the Middle East. Mr. Doidge and Nick Gatto, an attorney with Holland & Knight, represented that balance sheet enhancement had been used in other places, that Sunoco used it in a bidding process, and that it was done all the time. [FN20] (Tr. 1673, 1819, 1821, 2074-75, 2208; Putnam Ex. 1047.)

*14 On January 17, 2000, Mr. Putnam sent ten people at Raymond James a: (1) description of the New York meeting, which included a description of a complex transaction that involved an encumbered pool of cash that would convince certain people that Brite Business was large enough to bid on certain jobs; and (2) recommendation from himself and Mr. Augenbraun that Raymond James "not become any further involved in these transactions." (Tr. 1674; Div. Ex. 261.) Mr. Putnam believes that the transactions Raymond James rejected had nothing to do with Brite Business's purchase of Treasuries. (Tr. 1921.) Mr. James and Mr. Maynard informed Mr. Putnam that they agreed with the decision. (Tr. 1890-91; Div. Exs. 259, 260, 261.) Mr. Putnam informed Mr. Fife that Raymond James would not be interested in the transaction Brite Business proposed in January, and suggested that Mr. Fife contact Bear Stearns, because it did a lot of aggressive work in the fixed-income area. [FN21] (Tr. 2086.) Neither Mr. Augenbraun nor Mr. Putnam saw any need to terminate Brite Business's brokerage account at Raymond James based on the meeting in New York. (Tr. 2260.)

Mr. Putnam believed that Raymond James should continue to "see if there was something [Raymond James] could do that we would feel comfortable doing with" Brite Business. (Tr. 1764, 1807, 1892-93, 1906.) A relationship with Brite Business offered the potential of large fees for Raymond James and the possibility of additional advisory business from wealthy friends and associates of Mr. Fife. (Tr. 1666-67; Div. Ex. 253.) Mr. Putnam might have rejected Brite Business out of hand, except that the people associated with Brite Business appeared to have substantial wealth, which could translate into new business for Raymond James. (Tr. 1852.)

On January 18 and 19, 2000, Mr. Herula communicated with Mr. Putnam, advancing support for the balance sheet enhancement program and projected that Raymond James would receive a large new account as a referral. (Div. Ex. 466.) Mr. Putnam was not able to obtain confirmation on the legitimacy of balance sheet transactions from two references supplied by Mr. Herula and Brite Business. (Tr. 2083-84; Div. Ex. 467.) On January 19, 2000, Mr. Herula informed Mr Putnam that a new unnamed account was considering depositing $100 million to purchase an "RJ Bank CD," or another product that "we may wish to structure for him." "The purpose would be to assist Brite [Business] by margining or borrowing against the product." (R.J. Ex. 468.) Mr. Herula asked for Mr. Putnam's help in salvaging the relationship. (Div. Ex. 468.) Mr. Putnam responded on January 19, 2000, that "[i]f this is the only thing they would do I can't see a problem but you mentioned some other transactions including a loan to Brite Business." (Div. Ex. 469.) Mr. Putnam talked with the referral from this transaction, professional investors "who would be purchasing bonds in large amounts, keeping a very large balance with" Raymond James. (Id.) On January 28, 2000, Mr. Fife requested Mr. Putnam's assistance in establishing a line of credit at Raymond James or another institution for fixed income trading by a new special purpose corporation. (Div. Ex. 264.) Mr. Putnam rejected the request on February 1, 2000, because the note issued by a new special purpose corporation backed by assets in escrow and an insurance bond would not be considered a marginable security. (Tr 2091; Div. Ex. 265.)

*15 Mr. Ullom informed Mr. Putnam on February 29, 2000, that Mr. Fife was raising money and Brite Business would possibly sell the Treasuries it had purchased on margin. [FN22] (R.J. Ex. 2062.) Mr. Putnam approved the sale of the Treasuries on February 29, 2000, but he and Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Zank questioned whether it made sense to do so a week before the maturity date of March 9, 2000. (Tr. 1907, 2140; Div. Ex. 267.) Mr. Zank commented, "I'm not sure why one would sell with maturity so close. However, I haven't understood this trade from the get go, so a sale at this time wouldn't surprise me." (Div. Ex. 471.)

On March 5, 2000, Mr. Herula sent Mr. Putnam an e-mail informing him that: (1) Brite Business planned to deposit substantial funds into its Raymond James account and that it may need to escrow with a third party; (2) Brite Business may need to purchase T-bills; and (3) he was developing additional business from a money manager that may bring in a $100 million deposit. (Div. Ex. 268.) On March 7, 2000, at Mr. Putnam's request, Mr. Ness agreed to look at whether R.J. Trust would serve as an escrow for a portion of Brite Business funds. (Tr. 2724; Div. Ex. 269.)

On March 13, 2000, Mr. Fife directed Mr. Herula to buy $100 million in Treasuries in the "Brite Business margin account" for the purpose of offsetting a substantial tax benefit elsewhere. (Div. Ex. 140.) Mr. Putnam did not consider this proposed Treasury purchase as related to Brite Business's "balance sheet enhancement program." (Tr. 1923-24.) Mr. Putnam considered the March proposal as standing alone. Mr. Putnam would not allow Brite Business to purchase additional Treasuries on margin so he rejected the transaction. (Tr. 1122, 1450, 1924.) Mr. Putnam did not want another situation like December when Raymond James's books showed Brite Business paying margin interest on a Treasury purchase, a situation that lacked economic sense. (Tr. 1914.) On March 15, 2000, Mr. Van Sayler informed Mr. Putnam that he believed that Mr. Herula "misrepresented the facts on this situation to the desk." Mr. Putnam asked for details and Mr. Van Sayler did not provide them. (Tr. 1929-31; Div. Ex. 271.) At the same time, Mr. Putnam approved Brite Business's purchase of $10 million of Treasuries for cash. (Tr. 1129, 1927.)

**Investors in Brite Business**

**1. Rheaume Holdings Ltd. (Rheaume Holdings)**, an investment vehicle of Mr. and Mrs. Fitzhenry, Canadian citizens and residents of Barbados,

deposited $12.5 million in account No. 380 036-82 at Raymond James in the name of Brite Business on March 27, 2000. (Tr. 27-28; Div. Exs. 51, 52.) Mr. Fitzhenry relied on the due diligence investigation and recommendation of Robert Curl (Mr. Curl), his financial adviser since 1983. Mr. Fife represented to Mr. Fitzhenry's representative, Mr. Curl, that he had engaged in this type of private placement, and that his responsibilities with Brite Business were to provide the safety of deposits. It was represented that "the moneys are safeguarded so there is no risk of loss and verification is needed daily to participate in a transaction used to finance humanitarian or World Bank, Third World projects." (Div. Ex. 54.)

*16 Mr. Herula wrote a letter to Mr. Fitzhenry on Raymond James letterhead as Raymond James Investment Manager, dated March 10, 2000, in which he acknowledged that:

> Raymond James has received irrevocable instructions from Brite Business Corp. regarding the deposit from Rheaume Holdings Ltd., if and when received, in the amount of $12,500,000 USD for the purpose of completing a purchase of US Treasury Bills, Note or Bond
> Raymond James will follow these instructions with the full faith and backing of the company to assure that funds deposited by Rheaume Holdings Ltd. will not be withdrawn from the account without written instructions from Rheaume Holdings Ltd.
> Raymond James will return the funds in full, without delays or encumbrances, upon the maturity of the T-Bill, Note or Bond transaction. Accumulated interest on the funds deposited based upon the T-Bill, Note or Bond interest rate from the date of purchase will be included if the T-bill, Note or Bond are held to maturity.
> The maturity of the T-Bill, Note or Bond will be 90 days unless specific instructions are received from Rheaume Holdings Ltd. within 10 days of maturity to rollover the treasury instrument.(Div. Ex. 45.)

In a letter dated March 15, 2000, Mr. Sullivan gave Mr. Herula irrevocable instructions on behalf of Brite Business for the Rheaume Holdings Ltd. $12.5 million deposit when received into the Brite Business account.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Upon my instructions, purchase T-bills, Notes, or Bonds, with a maturity of 90 days from the execution of the order for the purpose of providing leverage for the Brite account at Raymond James.

At no time place these funds in harms way via an investment vehicle not authorized in writing by Robert Fitzhenry.

Upon written notice from Robert Fitzhenry, you are authorized irrevocably to liquidate his Treasury Bill, Note or Bond and return the balance to him upon the standard settlement date of the liquidation.

Accept no requests for these funds to be transferred out of the account except from Robert Fitzhenry.(Div. Ex. 46.)

Mr. Fitzhenry believed that he was investing in " T-bills" and that, at the least, he would realize the " T-bill" rate and anything additional would be extra. (Tr. 285.) He did not believe that Brite Business would be able to pay the promised ten percent a week interest rate. Mr. Fitzhenry became concerned when he did not receive a payment in twelve business days. He requested the return of funds from Mr. Herula and Mr. Fife after ninety days. (Tr. 289.) Rheaume Holdings never received a single interest payment and Brite Business did not return the $12.5 million investment. Mr. Fitzhenry only received about $3,500 from Mr. Fife (Tr. 245-46.) Mr. Fitzhenry did not contact Raymond James until 2002, when Rheaume Holdings brought a civil suit against Raymond James, Mr. Herula, Mr. Ullom, and others. That litigation was settled in June 2004. (Tr. 120.)

### 2. Rashed Mohamed Mahran Al Bloushi (Mr. Al Bloushi), a forty-six-year-old business man, is a citizen of Abu Dhabi, United Arab Emirates (UAE). Mohamed B. Hamad (Hamad), a former Sudanese diplomat with a Masters in Economics, is Mr. Al Bloushi's trusted friend and adviser who conducted business in English on behalf of Mr. Al Bloushi. (Tr. 315-16, 328, 388-89, 437, 490.)

*17 Mr. Al Bloushi started in the Brite Business trading program in May 1999. (Tr. 672.) In June 1999, Mr. Al Bloushi made the largest investment of his life when he signed several documents and transferred $10 million to a Brite Business account at SG Cowan Securities Corp. (SG Cowan). (Tr.

311-13, 319, 344-45; Div. Ex. 1.) Mr. Al Bloushi understood that he would control the account and no one could do anything with the funds without his consent. (Tr. 315; Div. Ex. 1.)

In August 1999, in response to Mr. Fife's request, Mr. Al Bloushi authorized the transfer of $7.5 million of his $10 million from SG Cowan to the Canadian Imperial Bank of Commerce (CIBC), for credit to CIBC Wood Gundy Securities, Inc., for credit to Brite Business on August 14, 1999, and $2.4 million of the $10 million was used to buy a new leverage note from Societe Generale. (Div. Exs. 3, 4, 5.) On October 19, 1999, Brite Business transferred $5 million of Mr. Al Bloushi's $7.5 million from the Brite Business account at CIBC to the Brite Business account at Raymond James. (Tr. 892-93, 958; Div. Ex. 99.) Mr. Clarke, Mr. Hertzog, Mr. Herula, and Mr. Sullivan reaffirmed there was no risk of principal. (Tr. 488, 582.) Mr. Hertzog and Mr. Clarke assured Mr. Bloushi that his funds would be "blocked" in the Brite Business account at CIBC, but CIBC gave no such assurance. (Tr. 587.)

Mr. Hamad first requested promised profits from Brite Business beginning in August 1999. (Tr. 406.) Beginning in the fall of 1999 or early 2000, Mr. Al Bloushi believed that Raymond James was in charge of investing the funds he transferred to Brite Business. (Tr. 330, 605, 607.) In September 1999, Mr. Clarke informed Mr. Hamad, on a confidential basis, that Raymond James was the major financial institution involved in the transaction. (Tr. 591-93, 598-99.) To confirm his oral representations, Mr. Clarke gave Mr. Hamad a copy of a letter on Raymond James letterhead on or about December 9, 1999, signed by Mr. Herula, Raymond James Financial Consultant, to Brite Business confirming the purchase of $115 million of Treasuries in the Brite Business account at Raymond James. (Tr. 426-28, 588-89; Div. Ex. 11:). Mr. Herula first wrote directly to Mr. Al Bloushi on January 21, 2000, using Raymond James letterhead. (Div. Ex. 12.) Mr. Hamad checked and found the information on Raymond James's website to be identical to the letterhead. (Tr. 428.) Mr. Al Bloushi and Mr. Hamad believed that participation by Raymond James, a company that described itself on the Internet as managing $15 billion, indicated that the transaction was legitimate. (Tr. 617.) In a letter on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Raymond James letterhead dated March 22, 2000, Mr. Herula told Mr. Al Bloushi that "the treasury account for Brite Business Corp. is in place and has been blocked under my control and supervision at Raymond James Financial Services. You can rest assured that the treasury package will stay in the account." (R.J. Ex. 39.) Mr. Al Bloushi and Mr. Hamad considered this statement a guarantee by Raymond James that Mr. Al Bloushi's $7.5 million was safe. (Tr. 654-55.)

*18 When he never received any of the promised profits, Mr. Al Bloushi demanded the return of his $7.5 million in a letter to Brite Business, Mr. Clarke, and Mr. Hertzog dated November 21, 1999. (R.J. Ex. 40.) Mr. Al Bloushi contacted Raymond James on March 27, 2001. (Tr. 631.) As late as March 2002, Mr. Sullivan represented to Mr. Al Bloushi that Raymond James was working on the transaction and the promised profits were coming. (Tr. 632.) Mr. Al Bloushi has not received his $7.5 million, or any profits or interest on his investment. (Tr. 333-34, 378, 466.) Mr. Al Bloushi has received approximately $1.3 million of the $2.4 million sent to Societe Generale in August 1999. (Tr. 379, 683-84.)

**3. Malcolm Joseph Monlezun (Mr. Monlezun),** a fifty-two-year-old certified registered nurse anesthetist, signed a new account form for a money market account with Raymond James on October 24, 2000. (Tr. 705, 707, 1257; Div. Ex. 60.) Mr. Ullom approved and signed the new account form. Mr. Herula was the financial adviser on the account. (Tr. 1258; Div. Ex. 60.) When he approved the new account form, Mr. Ullom knew that Mr. Monlezun was participating in transactions with Brite Business. (Tr. 1499-50.) Based on Mr. Herula's representations and instructions, Mr. Monlezun transferred $1 million, on October 26, 2000, for deposit in a money market account at Raymond James. (Tr. 711, 724; Div. Exs. 65, 66, 77, 105.)

Mr. Monlezun opened the account at Raymond James on the advice of Mr. Herula, and a company called ECCE.[FN][FN23] (Tr. 707, 853.) According to ECCE, trading in medium-term notes would take place outside the United States based on the fact that $100 million was on deposit at a specific location in the United States. Investors would earn returns of between ten and thirty percent a month

(Tr. 771; R.J. Ex. 2124.) Mr. Herula told Mr. Monlezun that he was gathering $100 million, in $1 million minimums, from investors for deposit with Raymond James. Mr. Herula represented to Mr. Monlezun that his funds would stay at Raymond James under Mr. Monlezun's control. Raymond James would issue a document to ECCE that would allow ECCE to facilitate a transaction, in which Mr. Herula was an expert. (Tr. 707.) Mr. Herula represented that Mr. Monlezun's funds would not be at risk, and returns would be ten to thirty percent a month once the transactions began. (Tr. 712, 730.)

Mr. Monlezun received monthly account statements from Raymond James for the period of October 25 through December 29, 2000. (Tr. 727; Div. Ex. 81.) He also received a statement on Raymond James letterhead dated October 30, 2000, for account No. 44902174 showing receipt of $1 million and the transfer of $1 million to Raymond James's Heritage Cash Trust, a money market account.

When the ECCE transaction did not materialize, Mr. Herula informed Mr. Monlezun that he and Mr. Fife, a well known investor with connections to the Dreyfus Funds, were gathering investors capable of pooling $100 million for similar high-yield transactions. (Tr. 731-32.) According to Mr. Herula, it was possible to make handsome profits based on documentation that deposits of $100 million were in place at Raymond James. (Tr. 741-42.) Mr. Herula represented that the transaction involved no risk, that Monlezun's funds would stay with Raymond James, and that monthly returns could be from ten to thirty percent but monthly returns of ten to twelve percent were more realistic. (Tr. 732-33, 737.) A short time later, Mr. Herula informed Mr. Monlezun that the deal was going forward and that his $1 million had to be transferred to an escrow account set up by Ms Capalbo, who Mr. Herula represented was an attorney working for Raymond James. (Tr. 733-34, 738.) On November 24, 2000, Mr. Monlezun, based on Mr. Herula's representations, authorized Raymond James to transfer $1 million from his account to the Mary Lee Capalbo, Esq., Special Client Account No. 49114444 at Raymond James.[FN][FN24] (Tr. 826, 853; Div. Exs. 73, 76, 105.)

*19 Mr. Herula did not tell Mr Monlezun that

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

Ms. Capalbo was his wife. (Tr. 734-35.) Mr. Herula and Ms. Capalbo assured Mr. Monlezun that transfers from the account would occur only with his written permission, however, $500,000 of the $1 million was immediately transferred out of the Mary Lee Capalbo, Esq., Special Client Account to the Abbot Capitol account.[FN25] (Tr. 743, 1513; Div. Ex. 75, R.J. Ex. 2390 at 14815.)

Mr. Monlezun received $20,117 from Mary Lee Capalbo Herula, Citizens Bank, on January 8, 2001, and $105,817.30 from Dennis Herula\Mary Lee Herula, at WMB FA bank, on February 6, 2001, which Mr. Herula represented were trading profits. (Tr. 750; Div. Exs. 78, 496.) In February, March, and October 2001, Mr. Monlezun attempted to organize investors willing to invest millions in high-yield investments organized by Mr. Herula. (Tr. 813-19; Div. Exs. 2142, 2145, 2146, 2158.) Mr. Monlezun demanded a return of his $1 million from Mr. Herula in February 2002. (R.J. Ex. 2179.) In that correspondence, Mr. Monlezun acknowledged that Mr. Herula had represented that his funds were in Ms. Capalbo's escrow account at Charles Schwab. (R.J. Ex. 2179.) Mr. Monlezun has not received any additional payments and he has not been able to obtain the return of his $1 million from Mr. Herula. (Tr. 753.) On August 1, 2002, Mr. Monlezun filed with Raymond James a claim for $3 million, plus other damages and attorney fees. (R.J. Ex. 2196.) Also, Mr. Monlezun initiated a civil suit against Raymond James but was ordered to pursue arbitration, which he has not done. (Tr. 2266.) Raymond James has not received a response to its settlement offer. (Tr. 2266.)

**Supervision and Compliance at Raymond James**

Pursuant to Rule 3030 of the NASD, Raymond James required persons conducting business outside the firm to file a form with the branch manager and the Compliance Department stating the nature of their outside activities. (Tr. 1898-99.) Mr. Putnam and Mr. Ullom knew in August 1999 that Mr. Herula was attempting to raise funds from commercial banks for Brite Business, and that this activity required that a form be filed. (Tr. 1900.) Raymond James has no form or memoranda on file showing that it was aware that Mr. Herula was conducting this outside business activity. (Tr. 1898-02, 2042, 2169-70.) Mr. Ullom did not file a

Request for a Non Branch Location for Mr. Herula, which Raymond James required when a registered representative was conducting business from his home. (Tr. 1332-33, 1444, 1723.) Mr. Ullom did not know of any special procedures or compliance policies that Raymond James had in place for supervising registered representatives who worked outside the office. (Tr. 992.) Raymond James had a long-standing policy that all outgoing written communications from registered representatives, including e- mails and facsimiles, had to be approved in advance by the branch manager. (Tr. 2371-72; R.J. Ex. 2640 at 12015, 111961.) Raymond James always prohibited the use of Raymond James stationery for business outside of Raymond James. (Tr. 2940.) Mr. Ullom never inspected or reviewed Mr. Herula's work locations outside the Cranston branch office. (Tr. 991.) Mr. Putnam did not know that Mr. Herula spent considerable or significant time away from the Cranston branch office. (Tr. 1966.)

*20 Excluding provisions of the money laundering statutes, Raymond James's procedures for disbursing funds from an account had the sole objective of assuring that the client authorized the transfer of funds.[FN26] (Tr. 2524-25, 2567, 2776.) The branch manager and registered representative are responsible for knowing the client and what type of business the client is conducting. (Tr. 2775.) Raymond James believes it has no right to question why a client is making a disbursement or whether the funds in the account belonged to the client. (Tr. 1951.)

Raymond James considered the transfer of funds to an unrelated or third-party account to be an out-of-the- norm transfer. (R.J. Ex. 2534 at 11514.) In these situations, Raymond James's Operations Manual required:

1. Client signature on a LOA;
2. Branch Manager signature;
3. Verbal verification with client for disbursements over $50,000; and
4. Verbal verification with escrow or title company for property closings. LOA should be sent to Customer Accounts to be stamped, reviewed, and imaged into the client's file; If approved, a letter of acknowledgement will be sent to the client confirming that the disbursement was made on their behalf.(R.J.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ex. 2534 at 11514.)

On transfers to a third-party account inside Raymond James, the Customer Accounts department at R.J. & Associates checked: (1) that the LOA matched the account registration; and (2) whether the account was restricted. On third-party transfers outside Raymond James, Customer Accounts would also check the designated account at the receiving bank.[FN27] Customer Accounts then sent the LOA back to Raymond James, where the Operations Department also verified the signatures on the LOA and personally contacted the client to verify.[FN28] The Operations Department then returned the LOA to the Customer Accounts Department at R.J. & Associates, which would accomplish the transfer. (Tr. 2155-58, 2427, 2581, 2754-57, 2765.) All third-party transfers were noted in exception reports provided to the Compliance Department. (Tr. 2531.) Transfers to an employee related account would be a third-party transfer, and were subjected to the same level of review. (Tr. 2531.) The Compliance Department received reports on funds transferred into employee or employee related accounts. (Tr. 2770.)

Trudy Bixby (Ms. Bixby), R. J. & Associates's Vice President, Customer Accounts Department, sees no problems with the way Raymond James handled the Brite Business account. Ms. Bixby believes that Customer Accountants questioned " compliance at some point, and they spoke with the branch and were comfortable with the type of business the client [was] conducting." (Tr. 2775-76.) Ms. Bixby testified:

A lot of business accounts do have money that flow through from one business to another or from a business to an escrow account or from a business out to make investments. So [the Brite Business transfers] doesn't look like an unusual pattern in terms of what we were dealing with then.*21 (Tr. 2779.)

Between January 1999 and March or April 2000, what had been Robert Thomas's and was now Raymond James's securities division and what had been IMR's and was now Raymond James's investment management division, operated two separate compliance departments. Mr. Carreno was director of compliance at Raymond James's securities division and financial institutions division

from January 1, 1999, until March 2000.[FN29] (Tr. 1628-29, 2058, 2295, 2296.) Mr. Carreno reported to Mr. Putnam. (Tr. 2047; R.J. Ex. 2003.) To monitor both the securities division and the financial institutions division, the Compliance Department was staffed with only sixteen employees.[FN30] (Tr. 2324-25.) Mr. Carreno testified that Robert Thomas had about 1,100 registered representatives located in 300 offices of supervisory jurisdiction. (Tr. 2325.)

Mr. Carreno considered the 1995 settlement Mr. Ullom entered with the Commission in 1995, and decided following discussions with Mr. Ullom and his counsel, that Robert Thomas should not subject Mr. Ullom to additional supervisory procedures. (Tr. 2437-38.) In making his decision, Mr. Carreno considered that Mr. Ullom's actions did not result in losses to clients, the bookkeeping entry involved was $1,800, and the Commission did not restrict Mr. Ullom's activities as a registered representative. (Tr. 2437-38, 2468-69.)

From January 2000 through the end of February 2000, Mr. Carreno spent about seventy percent of his time on compliance matters and he worked directly with Mr. Putnam, James Zahradnick (Mr. Zahradnick), and Mr. DiGirolamo.[FN31] (Tr. 2300-01.) Mr. Carreno did not know anything about Brite Business until January 2000, when Mr. Putnam mentioned briefly that he was going to meet with representatives of Brite Business in New York City.

When the Robert Thomas and IMR compliance departments merged in about April 2000, Mr. DiGirolamo became chief of compliance for all Raymond James divisions.[FN32] (Tr. 2473, 2935; Div. Ex. 309.) It appears that when Mr. DiGirolamo took charge, he applied the supervisory policies of IMR to the entire firm. Mr. DiGirolamo installed a new structure for the securities division in which a regional compliance officer reported to an associate director, who then reported to him. (Tr. 2474.) Mr. DiGirolamo reported to Tony Greene (Mr. Greene), Raymond James's CEO and chairman. (Tr. 2046.) Mr. DiGirolamo had no involvement with Mr. Herula or Brite Business in 1999 and 2000. (Tr. 2483.)

Raymond James used its branch managers as its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

first line of defense against illegal activities by registered representatives. (Tr. 2870; R.J. Ex. 2665 at 20.) Raymond James required that branch managers pass either the branch managers exam or the general securities principal exam. (Tr. 1010-11.)

Raymond James's Compliance Department had three major areas: (1) internal audits; (2) account monitoring, which included exceptions reports; and (3) dealing with customer complaints. (Tr. 2353.) The Compliance Department's role was to: (1) educate financial advisers and staff on rules, regulations, and policies; (2) conduct branch office audits; and (3) review exception reports and report results to supervisors. (Tr. 2868-69.) Raymond James conducted oversight of its branch offices by daily reviews of all business and an annual surprise audit conducted by its Branch Audit Department. (Tr. 1008-09; Div. Ex. 297.) Additional audits were performed if Raymond James had special concerns or special circumstances existed. (Tr. 2339.) The branch audit was the means of determining whether the supervisory practices were, in fact, being carried out. (Tr. 3156.) A compliance audit is not conducted by auditors and auditing standards are inapplicable. A compliance audit is really an inspection or an examination that should be conducted by a person with a questioning mind. (Tr. 3113-14) Broker-dealers depend on effective compliance audits to ensure their branch managers are supervising appropriately. (Tr. 3130.) The internal auditors are part of the Compliance Department. (Tr. 1963.)

*22 According to Mr. Carreno, Raymond James's Internal Supervisory Procedures (Supervisory Procedures) was a summary of the supervisory procedures at Raymond James. (Div. Ex. 321.) Raymond James had more detailed written procedures and there were also NASD rules. [FN33] (Tr. 2315.) The Supervisory Procedures provided that a branch manager was to review and approve any business communication written by a registered representative to a member of the public, and a copy was to be retained in the branch files for review by the Internal Audit Department. (Tr. 1089, 2315; Div. Ex. 321 at 1017, 1049.) Letters that were to be sent to three or more people were to be forwarded to the Compliance Department for review and approval. (Tr. 2327.) Registered representatives were to send all business related

e-mails from the Cranston branch office to Mr. Ullom for his review. (Tr. 1101.) Registered representatives were prohibited from acting as an agent for a client, or an individual, without permission in writing from Raymond James. Registered representatives were also prohibited from raising, or agreeing to raise, money for any company, or individual, other than as an independent contractor for Raymond James, without written permission. (Tr. 2321-23; Div. Ex. 321 at 1050.) The Supervisory Procedures also required branch offices to submit a monthly Compliance Report to the Compliance Department. (Div. Ex. 321 at 1095.) The Supervisory Procedures contained a single sheet of Procedures for Raymond James Financial Services, Inc., Outside Activity, and a Request to Engage in Outside Activity (Form 1790) to be submitted to the Compliance Department.[FN34] (Tr. 2519; Div. Ex. 321 at 1134-36.) In some cases, the Compliance Department reviewed the Form 1790. (Tr. 2329.) Mr. Herula's activities in raising funds for Brite Business was the type of business activity that required a Form 1790, however; he never filed one. (Tr. 2330, 2520-21.) Every registered representative, including Mr. Herula, certified annually that he or she knew and understood Raymond James's compliance policies. (Tr. 2394, 2434; R.J. Ex. 2533B, R.J. Ex. 2009.)

During the relevant period, the NASD and Raymond James required that any location where a registered representative worked as a primary or regular work location, other than the branch office, should be registered as a satellite office. (Tr. 3168.) In 1999-2000, the four room Cranston branch office had five or six registered representatives and only three desks. This space allocation was possible because Mr. Herula and three other registered representatives did not work at the branch office. [FN35] (Tr. 1031-32, 1280, 1389) The evidence is that only Mr. Ullom and Jason Ullom, his son, worked from the Cranston branch office in 1999-2000. (Tr. 1409.) Raymond James depended: (1) on the voluntary submission of requests for a non-branch location to inform them that a registered representative was working regularly from home; and (2) on the branch manager to make sure that correspondence and documentation for business activity conducted outside the office came through the office to which the registered representative was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assigned. (Tr. 2106, 2338.) The Compliance Department was never notified that Mr. Herula worked almost entirely from locations other than the Cranston branch office. (Tr. 2440.) In his investigative testimony, Mr. DiGirolamo testified that branch managers were not required to report that a registered representative worked regularly from home, and acknowledged that Raymond James did not know the number of registered representatives working from home. (Tr. 2499-50.) At the hearing, however, Mr. DiGirolamo changed his testimony based on his review of the auditor's questionnaire. He testified that branch managers were asked during the 2000 audit if any registered representatives were working regularly outside the branch office. (Tr. 2498.) Mr. DiGirolamo's present position is that if the registered representative was regularly working at a location other than a branch office in 1999 and 2000, Raymond James required disclosure so that it could register the location as a satellite office with the NASD. (Tr. 2459, 2600.) Donald Runkle (Mr. Runkle), who became Raymond James's chief compliance officer in May 2004, acknowledged that prior to 2003, Raymond James did not maintain a list of who it believed worked at unregistered locations. (Tr. 2865, 2938.)

*23 In accordance with Raymond James's policy, Mr. Ullom allowed Mr. Herula to work from locations other than the Cranston branch office. (Tr. 990-92.) Raymond James allowed this and, in keeping with NASD requirements, insisted that locations outside the branch office could not be advertised, that all correspondence be sent from the branch office, and all files be maintained at the branch office. (Tr. 2332, 2409-10.) Mr. Carreno testified during the investigation that Raymond James did not require a registered representative to obtain approval to work from home. (Tr. 2335.) At the hearing, however, Mr. Carreno testified that Raymond James asked branch managers to fill out a form when a registered representative was going to operate regularly from home. Mr. Ullom never inspected or reviewed Mr. Herula's work locations outside the Cranston branch office. He was also unaware of any special procedures or compliance policies that Raymond James had in place for supervising registered representatives who worked outside the office. (Tr. 991-92.)

The files in the Cranston branch office did not

contain copies of correspondence from Mr. Herula to B.B. Britt who operated Beehive International LLC, on Raymond James letterhead, sent from the Cranston branch office. (Tr. 1435, 1437-39.) The Cranston branch office files did not contain a facsimile Mr. Herula sent from the Cranston branch office to B.B. Britt on Raymond James letterhead, dated December 6, 1999, making unauthorized representations and guarantees concerning the $10 million deposit from Bill Britt. (Tr. 1409-10; R.J. Ex. 2035.) Jason Ullom notarized Mr. Herula's signature on the e-mail. (R.J. Ex. 2035.) The Cranston branch office files did not have a copy of a facsimile Mr. Herula sent from the office on Raymond James letterhead dated December 7, 1999, which included instructions from Mr. Fife to Mr. Herula concerning Mr. Britt's $10 million deposit. (Tr. 1407; R.J. Ex. 2036.) Mr. Herula was to deposit the funds into the Brite Business account to purchase "T-Bills, Notes or Bonds on margin, with a maturity of 90 days from the execution of the order, for the purpose of transacting a reverse repo using Sovereign Advisers, a Raymond James Advisory Services Group advisor." (R.J. Ex. 2036.) The Cranston branch office files did not contain: facsimiles sent to Mr. Herula by Mr. Britt on February 4, 2000; a letter from Mr. Britt to Mr. Clarke making demands on Raymond James related to the Brite Business transaction; or a letter from Mr. Herula on Raymond James letterhead to Mr. Britt dated February 16, 2000, stating the Raymond James had his funds in a T-bill. (R.J. Ex. 2054-2056, 2059-60, 2062, 2064.) Mr. Herula testified that he worked out of his home offices from mid-December 1999, until he left Raymond James, and that his files contained copies of all his unauthorized correspondence. (Tr. 1723-24.)

Mr. Ullom submitted monthly compliance reports to Raymond James's Compliance Department in 2000, indicating that the Cranston branch office had no compliance problems. (Tr. 1262; Div. Ex. 441-48, 450, 452-54, R.J. Ex. 2553.) From May 1999 through January 2001, Mr. Ullom represented that he had reviewed and initialed all outgoing correspondence, including e-mails pertaining to the solicitation or execution of securities transactions. (Tr. 1524; Div. Ex. 443, 447, R.J. Ex. 2553.) Mr. Carreno reviewed these compliance reports until the compliance departments merged, and Raymond James went to a regional structure for compliance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

oversight. (Tr. 2053-54.) The Compliance Department did not contact Mr. Ullom with inquiries on any compliance report in 2000. (Tr. 1262-64.)

\*24 Mr. Ullom and the registered representatives in the Cranston branch office signed a form annually representing that they observed the company's ethics policies, and its financial adviser business procedures. (Tr. 1303; R.J. Ex. 2018.) Mr. Ullom did not have Mr. Herula submit a Request to Engage in Outside Activity for his work raising funds for Brite Business. Mr. Ullom testified that this was because Raymond James knew of Mr. Herula's attempts to arrange loans for Brite Business. (Tr 1302.)

Raymond James's had Operations Manuals for compliance available in hard copy and online during the relevant period. (Tr. 2486-87; R.J. Exs. 2531, 2532, 2539, 2540, 2542.) The Compliance Department established parameters for situations that required review from a compliance perspective and the clearing firm produced computer generated exception reports showing these situations (exception reports). (Tr. 2425-26.) During the relevant period, R.J. & Associates periodically provided Raymond James's Compliance Department with over fifty different exception reports. (Tr. 2359, 2420-21.) On a monthly basis, the Compliance Department sent Mr Ullom and other branch managers, MARS reports, which were a summary of exception reports applicable to the specific branch. The branch manager was required to review the MARS reports and perform any investigation that was required. (Tr. 2418, 2770; R.J. Ex. 2559 at audit letter dated Aug. 6, 1997.)

Sending the MARS reports to the branch offices, "didn't relieve the [C]ompliance [D]epartment from doing what it needed to do with the exception report" from a compliance perspective (Tr. 2424.) The MARS reports for March, April, May, August, September, and October 2000, noted that the Brite Business and Mary Lee Capalbo, Esq., Special Client, a related account, issued third-party checks for millions of dollars, and/or transferred millions of dollars between accounts at Raymond James. (Div. Exs. 458, 459, 460, 462, 463, 464.) The Compliance Department's concern was that the transactions occurred pursuant to LOAs, and that

the client orally confirmed the authorization where the transfer was over a certain amount. (Tr. 2427.) Review by the Compliance Department consisted of ensuring that procedures were followed, that a LOA was authorized, and that operations and customer accounts had signed off on the transaction. (Tr. 2586.) The evidence is that the Compliance Department did nothing more with this information. (Tr. 2424.) Mr. DiGirolamo testified that, after the compliance departments merged in May 2000, compliance procedures that applied to transfers in the investment management division applied to the securities division as well. (Tr. 2588-89.)

Raymond James had the following standards in effect for infractions during the relevant period:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First offense: Letter of caution;

Second offense: Letter of caution and/or a fine; and

Third offense: Fine and potential termination.

*25 (Tr. 2565.)

Following the events that are the subject of this proceeding, Raymond James has taken steps to enhance its compliance efforts. (Tr. 2879.) In the last two years, the firm has changed structurally with new and increased numbers of people occupying key management positions at the firm. (Tr. 3429.) Chet Helck (Mr. Helck), the president and chief operating officer of Raymond James, maintains that supervision and compliance are among the firm's highest priorities and that the tone from the top is to always put the client's interest first. (Tr. 3427-28.) The events that are the subject of the proceeding have been a huge embarrassment for the firm and have strengthened its resolve that they never happen again. (Tr. 3439.) Mr. Helck testified that at the request of the holding company's audit committee, an outside consultant was considering the effectiveness of Raymond James's compliance and supervisory procedures. (Tr. 3439.) On August 19, 2003, following NASD guidance, Mr. DiGirolamo advised all branch managers and registered representatives that:

> Effective immediately, the firm will require audits of each location (home, vacation home, etc.) where any Financial Advisor regularly conducts business at least two or more days per week or 25 days in any quarter or 10 days in any month or for six consecutive weeks. (emphasis in original)(Tr. 3169; Div. Ex. 507.) Raymond James has also increased the number of "compliance professionals," to forty-eight, created a rapid response team, and instituted reviews in new areas. (Tr. 2878-82.) Raymond James has also implemented procedures which, among other things, require additional " assessment of who [its] customers are."

FN[FN36] (R.J. Ex. 2665 at 21.)

**Raymond James's Notice of Mr. Herula's Unauthorized Correspondence and Other Information**

Throughout the relevant period Mr. Herula signed and transmitted correspondence on Raymond James letterhead to investors in Brite Business.[FN37] (Tr. 1104-14; Div. Exs. 12-21, 23, 24.) Mr. Herula signed most of this correspondence on Raymond James letterhead as Financial Consultant or Investment Manager. (Id.) On November 28, 1999, Mr. Herula sent Brite Business, by facsimile, from the Cranston branch office, a form letter with three paragraphs of unauthorized representations and guarantees. This material appears in much of his later correspondence on behalf of Brite Business. (Tr. 1411; R.J. Ex. 2030.) Mr. Ullom denies he knew of this form letter, and agrees that no one at Raymond James was aware of it until a similar unauthorized letter appeared in March 2000. (Tr. 1411.)

**1. Provident letter**

On January 20, 2000, Mr. Herula informed Mr. Putnam that he had written a letter on December 8, 1999, on Raymond James letterhead to Provident Investment Counsel, Inc., (Provident), an independent investment adviser in the Raymond James Investment Advisor Group. (Div. Ex. 262.) In the Provident letter, Mr. Herula as a representative of Brite Business seeks to enlist Provident in a reverse repurchase agreement between Brite Business and the Bank of New York. (Id.) Mr. Putnam considered the letter questionable, but he does not consider it to be unauthorized

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

correspondence by Mr. Herula. (Tr. 1994.) Mr. Putnam thought it possible that Mr. Herula wrote this letter acting for Raymond James and not for Brite Business. (Tr. 1959-60.) Mr. Putnam assumed Mr. Ullom had approved the Provident letter. (Tr. 2146.) Mr. Putnam warned Mr. Ullom that letters had to accurately portray the relationship between Raymond James and Brite Business. (Tr. 1896-97.) Mr. Putnam did not inform the Compliance Department of the Provident letter. (Tr. 1904.)

## 2. Lancinno letter

*26 Hugh M. McGovern, Senior Vice President, Salomon Smith Barney, Inc., provided Joseph Tuorto (Mr. Tuorto), chief compliance officer at R.J. & Associates, a letter written by Mr. Herula on March 1, 2000, on Raymond James letterhead, to Lanciano Limited (Lanciano letter) at an address in Cyprus. (Tr. 1933; Div. Ex. 272.). Mr. Putnam received the letter on or about March 20, 2000. FN[FN38] (Tr. 1596; Div. Ex. 272.) In the letter Mr. Herula stated:

Please let me introduce Raymond James Financial, Inc. Raymond James was established in 1962 and is a publicly traded company since 1983. Raymond James Financial is listed on the New York Stock Exchange and manages in excess of $14 billion USD for individuals, pension plans and municipalities with more than 3200 financial advisers in over 1000 offices located throughout the United States.

Brite Business is a valued client of Raymond James, maintaining an account with an aggregate nine-figure balance. This letter is to confirm my review and understanding of the financial plans of Brite Business Corp. Upon extensive review and confirmation of the irrevocable instructions from Brite Business Corp. I am confident that the profits from their Treasury transactions will be used to honor their commitments and contract with you. Further, I know and have worked with our client, Brite Business, and can confirm that they are of the highest rank of moral character and business acumen.

Please be advised of the following acknowledgements:

Raymond James has received irrevocable instructions from Brite Business Corp. regarding the deposit from Lanciano Limited,

when received, in the amount of $25,000 USD (Twenty Five Million) for the purpose of completing a purchase of U.S. Treasury Bills, Notes or Bonds for leverage for Brite Business Corp.

Raymond James will follow these instructions with the full faith and backing of the company to guarantee the funds deposited by Lanciano Limited will not be withdrawn from the account without the express written instructions of Lanciano Limited....

I trust you will find this letter acts as a full faith undertaking and guarantee to Lanciano Limited that their funds will not be at risk at any time during or after the anticipated transaction, and as such the funds plus interest will be returned intact, as long as the T-Bills, Notes or Bonds are held to maturity (Div. Ex. 272.)

Mr. Putnam's initial concern on reading the Lanciano letter was whether the Brite Business account had funds deposited as a result of the letter. (Tr. 1949-50.) Another concern was that the letter gave the impression that Raymond James owed a duty to Lanciano Limited when its duty ran solely to Brite Business. Mr. Putnam was "plenty agitated," and called the Compliance Department immediately and asked that the Brite Business account be frozen. (Tr. 1943-44, 2092.) The representations in the Lanciano letter, especially the false representations and guarantees, are contrary to Raymond James's policies. (Tr. 1941-42.) Moreover, all the representations were inappropriate, because they were "representations and guarantees that Raymond James could not make" with respect to the Brite Business account. (Tr. 1941.) Mr. Putnam believed that the letter showed that Mr. Herula was conducting an outside business activity using Raymond James stationery. (Tr. 1960.)

*27 Mr. Putnam called Mr. Herula on March 24, 2000, to review the contents of the letter. (Tr. 1945-46, 2093.) Mr. Putnam also called Mr. Ullom, who claimed to have not seen the letter. (Tr.1964, 2094-95.) Mr. Putnam accepted Mr. Herula's representation that Brite Business did not receive funds as a result of the Lanciano letter, and he trusted and relied on Mr. Ullom to make sure this was true. (Tr. 1453, 1946-47.) Mr. Putnam presumed that Raymond James would have been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

notified if Lanciano Limited had deposited money as a result of the letter. (Tr. 1946.)

Mr. Putnam directed that a copy of the Lanciano letter be sent to Mr. DiGirolamo. (Div. Ex. 272; Tr. 1962.). Mr. Putnam did not inquire or ascertain whether Mr. Herula's statement that Brite Business maintained an account at Raymond James with an aggregate nine-figure balance was true. (Tr. 1935-36; Div. Ex. 403.) It was not. Mr. Putnam did not initiate a review of activity in the Brite Business account, nor did he direct anyone else to do so. (Tr. 1947.) He did not ask Mr. Herula for a copy of the irrevocable instructions referred to in the Lanciano letter. (Tr. 1960.) Mr. Putnam and Mr. Ullom each talked separately with Mr. Herula, who said he did not understand "the ins and outs of all of these things." (Tr. 1961.) Mr. Putnam accepted Mr. Herula's representations that this was the only letter of this type he had sent, and was not something Brite Business was doing on an on-going basis. (Tr. 1947, 1960-61.) Mr. Putnam did not fire Mr. Herula because Mr. Herula was contrite and Mr. Putnam believed Mr. Herula was naïve. (Tr. 1961, 2095.) Mr. Herula did not produce anything in response to Mr. Putnam's request for any additional correspondence of this type. (Tr. 1453.)

Mr. Herula was not put on formal heightened supervision status by Mr. Putnam or the Compliance Department. (Tr. 1272, 1961-62.) Mr. Putnam thought heightened supervision would have been unusual based on a single piece of unauthorized correspondence and where Mr. Herula, in Mr. Putnam's view, was naïve. (Tr. 1965.) Mr. Putnam directed Mr. Ullom to monitor Mr. Herula's activities closely and to review Mr. Herula's correspondence. (Tr. 1452, 1961.) Mr. Putnam believed that Mr. Ullom knew he had "to get on top of [Mr. Herula's] correspondence," and that Mr. Ullom had placed Mr. Herula on enhanced monitoring. (Tr. 2020, 2096.) Mr. Putnam did not follow up to assure that Mr. Ullom was supervising Mr. Herula appropriately. (Tr. 1964.) Mr. Putnam testified that he may have directed Mr. Ullom to tell Mr. Fife to make sure that Brite Business was not misrepresenting its relationship with Raymond James. (Tr. 1968-69.) Mr. Putnam did not contact Mr. Fife directly and he cannot recall whether he checked to see whether Mr. Ullom followed his instructions. (Tr. 1969.)

Mr. Putnam characterized the restriction that he placed on the account as a "little second check." (Tr. 1949-50.) The restriction required that Mr. Putnam review and approve any funds leaving the account. (Tr. 1130, 1453, 1944.) The account file contained a statement "NO WITHDRAWAL OF FUNDS OR SECURITIES OR ACATING WITHOUT CONTACTING STEVE PUTNAM." FN[FN39] (R.J. Ex. 2344.) The restriction also applied to transfers to other unaffiliated accounts at Raymond James. (Tr. 1456-57, 1569, 1944-45.) Considering that Raymond James had more than 500,000 accounts, the restriction on the account by the president of Raymond James was unusual. (Tr. 2788.) Mr. Putnam did not monitor the account, but relied on the Operations Department to call him when there was an issue. (Tr. 1949.) When the Operations Department contacted Mr. Putnam pursuant to the restriction, Mr. Putnam would simply ensure that Mr. Fife, or another person from Brite Business, had authorized the transfer. (Tr. 1949.) Mr. Putnam and Raymond James followed the directions of Mr. Fife or Brite Business as to disbursements from the account without any questions. FN[FN40] (Tr. 1958.)

*28 The Compliance Department was never informed about the Lanciano letter. Mr. DiGirolamo testified that he did not see the Lanciano letter and had no involvement with Mr. Herula or Brite Business through the end of 2000. (Tr. 2483.) Mr. Putnam did not instruct the internal auditors to take action because he was not responsible for compliance. (Tr. 2022-23.) Mr. Putnam never sent internal auditors to the Cranston branch office to review Mr. Herula's correspondence. (Tr. 1963, 2000.) Raymond James's auditors are instructed to look for correspondence like the Lanciano letter; unauthorized correspondence can be the basis for further investigation. (Tr. 1942-43.) No one from Raymond James's headquarters came to the Cranston branch office to interview Mr. Herula or review his correspondence file following Mr. Putnam's receipt of the Lanciano letter. (Tr. 1137.)

R.J. & Associates's Client Services Department informed Mr. Putnam of the transfers to and from the restricted Brite Business account. (Tr. 1144, 1153, 1160, 1166, 1169; Div. Exs. 187, 190, 195.) Raymond James followed its procedures and established that the person controlling the account

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

authorized each transfer. Mr. Putnam did not stop transfers from the Brite Business restricted account or question Mr. Ullom about them; no one at Raymond James called for more information on transfers of more than a million dollars from a restricted account to non-restricted accounts at Raymond James, and then to accounts outside Raymond James. (Tr. 1139-41, 1158, 1160-61, 1163-67, 1169-71, 1202.)

### 3. The Fingessa letter

On March 9, 2000, Mr. Herula sent a letter to Fingessa, S.A., Lugano, Switzerland, (Fingessa letter) on Raymond James letterhead, stating that:

> (1) Raymond James had received irrevocable instructions from Brite Business concerning Fingessa's deposit of $12.5 for the purpose of completing a purchase of U.S. Treasury Bills, Notes, or Bond;
> (2) Raymond James will follow these instructions with the full faith and credit of the company to assure that funds deposited by Fingessa will not be withdrawn from the account without written instructions from Fingessa;
> (3) Raymond James will return the funds in full, without delays or encumbrances, upon the maturity of the instruments; and
> (4) The maturity of the T-Bill, Note or Bond will be 90 days unless specific instructions are received from Fingessa within 10 days of maturity to roll over the treasury instrument.(Div. Ex. 44.)

### 4. Additional Unauthorized Correspondence and Disturbing Information

On April 10, 2000, Mr. Herula sent a letter sent from the Cranston branch office on Raymond James letterhead, which acknowledged wiring Vince Farrugia, Jr., J.C. Bradford & Co., $4.5 million from an attorney escrow account at Raymond James on behalf of his unnamed client. (Tr. 1467-68; R.J. Ex. 2338.) If no transaction took place between his client and Capital Dynamics Corporation, Mr. Herula instructed that the funds were to be returned to First Union National Bank, Mary Lee Capalbo, Esq., Special Client Account. (Id.) This correspondence was not in the files of the Cranston branch office. (Tr. 1463-64.) Mr. Herula's April 10

letter followed a letter on April 6, 2000, to Jude Onukwugha in which Mr. Herula requested the coordinates to transfer funds to J.C. Bradford, pursuant to a conversation with Dorian Brisbois (Mr. Brisbois). (Tr. 1469-70.) Mr. Ullom denied knowing of the subject matter of Mr. Herula's April 6 and 10, 2000, letters; however, Mr. Ullom wrote five letters between June 28 and December 28, 2000, attempting to collect on a personal loan to Mr. Brisbois from Mr. Herula. (Tr. 1466-71; R.J. Ex. 2075.) In those letters, Mr. Ullom refers to his review with Mr. Herula "of any deals with Martin that might have life in them" and noting that the " Bradford/Jude" deal is dead for all practical purposes. (R.J. Ex. 2075.) Mr. Ullom did not provide Mr. Putnam with any information on these matters. (Tr. 1471.)

*29 On April 12, 2000, Mr. Herula and Dana Sherman (Mr. Sherman), administrative assistant at the Cranston branch office, sent by facsimile to Brite Business a signed letter, on Raymond James letterhead, confirming, "with full banking responsibility and liability," that specific United States Treasury bonds were held in a custodial account in Brite Business's name, and that the cash value was $110,860,000.[FN41] (R.J. Ex. 2071.) On June 1, 2000, Mr. Herula and Mr. Sherman, sent by facsimile to Brite Business a signed letter on Raymond James letterhead confirming that certain treasury bills that matured on June 8, 2000, would be replaced, and that the market value on June 8, 2000, would be approximately $112 million. (R.J. Ex. 2073.) The information in both letters was false. Brite Business did not have treasury bills with a cash value of $110 million on deposit with Raymond James. (Tr. 1463-64.) This correspondence was not in the files of the Cranston branch office. (Tr. 1468.)

On July 7, 2000, the Cranston branch office received a letter by facsimile from Lewis P. Blackburn (Mr. Blackburn) requesting that Mr. Herula provide him with an accounting of his position with Brite Business. Mr. Blackburn noted the long wait and happiness at seeing "it come to fruition." (R.J. Ex. 2077.) Mr. Ullom did not inform anyone at Raymond James. (Tr. 1473.)

### 5. Brite Business's Solicitation to Michael McCue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Ness informed Mr. Putnam on May 3, 2000, that a Raymond James employee in Cleveland, Tennessee, reported that Brite Business representatives had offered a local attorney, Michael McCue, participation in a transaction where banks would borrow from a $100 million fund at Raymond James Trust at a discount, and the attorney, acting as a middleman, would place the debt with an investor at par and pocket the spread. (Tr. 1173-74, 2724; Div. Ex. 275.) Mr. Ness told Mr. Putnam:

> What bothers me here is someone may be out there using [Raymond James Trust Company's] name without our knowledge and involving us in a transaction or using our name to give legitimacy to a potentially questionable situation. As I recall, the folks at First Union had a similar reaction when we spoke to them.(Div. Ex. 275.)

Mr. Putnam responded to Mr. Ness that "absent a retail account we have no current dealings with [Brite Business]." (Id.) On inquiry by Mr. Putnam, Mr. Ullom reported that the persons named were not representatives of Brite Business. (Tr. 1972-73.) Mr. Putnam did not send Mr. Ness's communication to the Compliance Department. (Tr. 1972.) Mr. Putnam suggested to Mr. Ullom that Brite Business should be more circumspect in its statements. (Id.)

## 6. Mr. Cohn and Four Star Financial Services, LLC

On or about July 10 and 12, 2000, Mark Cohn, representing Four Star Financial Services, LLC (Four Star), informed Mr. Ullom that Four Star was "the real party in interest" to $12 million in the Brite Business account and demanded that Raymond James not allow transfers out of the account until Four Star's claim was satisfied. (Tr. 1207-09; Div. Exs. 149-152.) Mr. Cohn provided Mr. Ullom with materials that described deposits from Larry Taggart and Lewis P. Blackburn in January and February 2000 made in connection with Brite Business's purchase of Treasuries. (R.J. Ex. 2082.) The materials included a letter dated March 10, 2000, that stated Raymond James would provide safekeeping for the transaction and provided instructions and coordinates for depositing $5.5 million in a Brite Business account at Raymond James. (Tr. 1213; Div. Ex. 151 at 98.)

Also included were letters, on Raymond James letterhead, to Mr. Blackburn dated March 8, 9, and 22, 2000, and May 16, 2000, one of which repeated some of the unauthorized representations contained in the Lanciano letter. (Tr. 1226, 1536-37; Div. Ex. 149.) Based on his review of the materials, it was clear to Mr. Ullom that Mr. Herula had written the letters. (Tr. 1475; Div. Ex. 506.)

*30 Mr. Ullom called Mr. Putnam and claims he forwarded Mr. Cohn's letter and maybe some of the materials he received from Mr. Cohn to Mr. Putnam. (Tr. 1474-75, 1538, 1546-47, 1579; investigative testimony July 16, 2002 at 191-93.) Given Mr. Ullom's lack of credibility, I accept Mr. Putnam's position that: (1) he never asked to see the letter and materials because initially he was in Alaska where there was with limited facsimile capability and when he returned on July 19, Mr. Ullom told him the issue was resolved; and (2) Mr. Ullom told him that the Four Star correspondence was unlike the Lanciano letter, as it did not commit Raymond James to anything; and (3) he did not ask to see the Four Star correspondence when he returned because Mr. Ullom told him the matter had been resolved. (Tr. 1596, 1993-2002.)

On July 13, 2000, Mr. Putnam informed Mr. Augenbraun and Mr. James that Mr. Cohn had a letter written by Mr. Herula and that: (1) he was nervous that Raymond James's name was mentioned; (2) he had instructed Mr. Ullom to inform Mr. Fife that Raymond James was closing the Brite Business account; and (3) "since this is the second time that this has taken place," he wanted "[Mr. Herula] out of here after [Mr. Ullom] gets every piece of paper that he ever wrote on this subject back as well as a debrief."[FN42] (Tr. 1216; Div. Ex. 506.) Mr. Augenbraun's solo focus was dealing with the demand for funds in a Raymond James account. He did not request to see the correspondence, which was the basis for Mr. Putnam's statement that, "this is the second time that [unauthorized correspondence on Raymond James letterhead] has taken place." (Tr. 2225-27, 2230; Div. Ex. 506.) Neither Mr. Putnam nor Mr. Augenbraun informed the Compliance Department of the Four Star correspondence. (Tr. 2001, 2229.)

Mr. Augenbraun advised Mr. Putnam to wait for Mr. Fife and Mr. Cohn to resolve their dispute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

before disbursing any funds from the account. (Tr. 1477-78; Div. Ex. 506.) Mr. Putnam followed that advice. At that time, Mr. Augenbraun did not opine on whether Mr. Herula should be terminated. (Tr. 2226.)

Mr. Putnam did not request that Mr. Fife move the Brite Business account, and all related accounts out of Raymond James. (Tr. 1222, 1245-46, 1250; Div. Exs. 277, 435, 506.) Mr. Putnam did not fire Mr. Herula because he believed: (1) the issue was resolved rapidly; (2) the unauthorized letter on Raymond James letterhead was not of the same nature as the Lanciano letter; and (3) Mr. Herula did not understand that this type of letter had to be approved. (Tr. 2018, 2105.) Mr. Putnam believed he and Mr. Ullom had educated Mr. Herula after the Lanciano letter but that, perhaps, he was not clear enough about correspondence so he gave him Mr. Herula another chance. (Tr. 2018.) Mr. Putnam did not prohibit Mr. Herula from sending out correspondence, examine the Brite Business account, or restrict Mr. Herula's activities with Brite Business. (Tr. 2019.) Mr. Putnam had Mr. Ullom tell Mr. Herula that he would be fired if there were any more unauthorized correspondence. (Tr. 2017, 2105.) On July 19, 2000, with Mr. Putnam and Mr. Augenbraun's knowledge, Mr. Ullom approved an LOA that transferred $1.5 million and $5.5 million from the Brite Business account to Mr. Blackburn that would "retire Cohen's interest with Blackburn." (R.J. Ex. 2651, July 19, 2000, e-mail at 2:26 p.m.) Mr. Ullom was the only person at Raymond James, other than Mr. Herula, who had any contact with Mr. Cohn. (Tr. 1485.) Mr. Putnam approved the transfer believing it was part of resolving the Four Star situation. (Tr. 2023-24; Div. Ex. 203.) On July 19, 2000, Mr. Ullom represented to Mr. Augenbraun that the Four Star matter was resolved. (Tr. 2264; R.J. Ex. 2085.)

*31 Mr. Ullom did not tell Mr. Putnam or Mr. Augenbraun, that Mr. Cohn complained again, in August 2000, that significant funds in the Brite Business account belonged to Four Star. (Tr. 2264; Div. Exs. 155, 156, 157.) Mr. Cohn included a March 8, 2000, letter on Raymond James letterhead that made the same commitments to Mr. Blackburn as were contained in the Lanciano letter. (R.J. Ex. 2087.) Mr. Ullom did not inform Raymond James that he had received an August 10 letter from Mr.

Cohn, but he sent the letter to Mr. Fife and discussed it with Mr. Fife and Mr. Cohn. (Tr. 1487.) On November 16, 2000, Mr. Ullom approved an LOA transferring $850,000 from the Mary Lee Capalbo, Esq., Special Account to Mr. Cohn. (Div. Ex. 93; R.J. Ex. 2089.) Mr. Ullom did not inform Raymond James that he entered a new independent contractor agreement with Mr. Herula on November 9, 2000, increasing the pay outs to Mr. Herula and adding a new category, "Financing Deals and Fees of $250,000 or more," which referenced Brite Business and others. (Tr. 1506; R.J. Ex. 2007.)

On January 10, 2001, Mr. Cohn made a third demand that Raymond James hold funds of Brite Business and affiliates until Four Star's claims were satisfied. In this letter, Mr. Cohn noted that Mr. Herula had represented that Raymond James was making partial payments. (R.J. Ex. 2097.) With the letter, Mr. Cohn sent a November 1, 2000, communication from Mr. Herula stating that he was transmitting $1.5 million from the Brite Business account to Abbot Capital, a Four Star subsidiary. (R.J. Exs. 2092, 2097.)

No one told Mr. DiGirolamo that Four Star had made a claim on funds in a Raymond James account, and he was not involved in discussion on whether Mr. Herula should been terminated. (Tr. 2484.)

### 7. Seaview Development & Holdings Ltd. (Seaview) 2000 Letter

On October 17, 2000, Mr. Herula provided Mr. Fife with a letter, on Raymond James letterhead, stating that Seaview had been a substantial nine-figure asset management account with Raymond James. (R.J. Ex. 2090.) The representation was false. Seaview never had an account with assets in nine figures, nor was it engaged in trading or other asset management activities. (Tr. 1508.) Mr. Herula did not submit a copy of the letter to the correspondence file of the Cranston branch office. (Tr. 1508-09.) On October 18, 2000, Ms. Capalbo, as agent for Mr. Fife and Brite Business, transferred $25,000 from the Mary Lee Capalbo, Esq., Special Client account to the Seaview account. (Tr. 1509; R.J. Ex. 2091.) Mr. Ullom approved the transfer and received ninety

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                    Page 26

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

percent of the $25,000, which was used to pay Seaview's IMPAC fee. (Tr. 1509.)

Brite Business Accounts at Raymond James

Mr. Fife and others used the following five brokerage accounts at Raymond James to conduct fraudulent activities:

Brite Business Corp. Account, No. 58003682 (Brite Business account);

Brite Business Special, Account, No. 58005252;

*32 Mary Lee Capalbo, Esq., Special Client Account, No. 4911444;

Seaview Development & Holding Ltd., Account, No. 53902669; and

Seaview Development & Holding Ltd., Special Account, No. 57038258.Mr. Herula was the account executive on each of these accounts.[FN][FN43] (Tr. 1140-41, 1569-70, 2965-69; Div. Ex. 403.) All the transfers from these Raymond James accounts had properly executed LOAs. (Tr. 965-66.) Trudy Bixby, vice president of the Customer Accounts Department (Customer Accounts) at R.J. & Associates during the relevant period, testified that Customer Accounts followed the procedures in place at the time for all disbursements from the Brite Business account and related accounts. (Tr. 2751, 2790-91.) The multi-million dollar size of the deposits and transfers did not give Mr. Putnam pause, because Brite Business was a large entity doing financing. (Tr. 2100.)

According to the Division, during the relevant period, these five accounts disbursed over $47 million as follows: Mr. Herula and Ms. Capalbo received over $8.5 million; Mr. Fife received almost $7.5 million; Mr. Sullivan received $350,000; over $29 million went back to investors; and Raymond James received almost $1.8 million in margin interest and about $51,156 in charges and fees.[FN][FN44] (Tr. 946-52; Div. Exs. 99, 484.) The funds that were disbursed to Mr. Herula and Ms. Capalbo went to personal bank accounts and were used for personal and business expenses. (Tr. 951.)

According to Raymond James, the five accounts received total inflows of $69,056,826 and had total outflows, not including income/expenses and fees, of $69,012,288. (Tr. 2946; R.J. Ex. 2422 at 2.) Almost $51 million of the total outflows went to non-Raymond James accounts, $17 million went to Raymond James accounts and approximately $54,000 in cash disbursements went to non-Raymond James entities. (R.J. Ex. 2422.)

**1. Brite Business Corp. Account, No. 58003682 (Brite Business account)**

According to the Division, the Brite Business account received $46 million in investor funds from the following sources: (Tr. 900; R.J. Ex. 2422.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| Mr. Al Bloushi | $5 million on October 19, 1999; |
| Beehive/Britt | $10 million on December 7, 1999; |
| Four Star | $7 million on March 9 & 10, 2000; |
| Trigon | $10 million on March 23, 2000; |
| Rheaume/Mr. Fitzhenry | $12.5 million on March 28, 2000; and |
| Other | $1.5 million on October 10, 2000. |

*33 (Div. Ex. 99.)

Funds were transferred from the Brite Business account to the following accounts within Raymond James: (1) the Mary Lee Capalbo, Esq., Special Client account; (2) the Seaview Development & Holdings Ltd. account; (3) the Seaview Development & Holdings Ltd. Special account; and (4) the Brite Business Corp. Special account 5800-5252.[FN][FN45] Mr. Monlezun's $1 million investment went first into the Malcolm & Ursula Monlezun account 4490-2174, and then into the Mary Lee Capalbo, Esq., Special Client account. [FN][FN46] (Id.) Mr. Fife authorized disbursements from the Brite Business account and the Seaview accounts and from the Mary Lee Capalbo, Esq., Special Client account. (Tr. 936.)

The Brite Business account disbursed $25,000 on November 19, 1999, and $225,000 on November 29, 1999. (R.J. Ex. 2342 at FW 012844.) Raymond James received $25,000, and sent ninety percent to Foxhill. (Tr. 1413.) Mr. Ullom testified that the IMPAC fee was $25,000, yet he co-signed a letter with Mr. Herula to Brite Business on November 29, 1999, acknowledging receipt of a $250,000 IMPAC fee.[FN][FN47] (Tr. 1369; R.J. Ex. 2031.) Mr. Ullom did not disclose to Raymond James that Brite Business paid Foxhill $250,000. (Tr. 1414.) Mr. Ullom approved Mr. Fife's LOA for transfer of

$225,000 to the Mary Lee Capalbo Attorney at Law account at Fleet Bank for legal and advisory services. (Tr.1373; R.J. Ex. 2033.) On the same day, the same Mary Lee Capalbo Attorney at Law account at Fleet Bank sent Foxhill $90,000, which Mr. Ullom testified was forty percent due under the terms of Mr. Herula's employment contract. (Tr. 1373-74; Div. Ex. 123, R.J. Ex. 2033.) Mr. Ullom does not recall "putting the two together": (1) his approval of a $225,000 disbursement from the Brite Business account on November 29, 1999; and (2) a $90,000 check dated November 29, 1999, to Foxhill, a company he co-owned.[FN][FN48] (Tr. 1375.)

### 2. Mary Lee Capalbo, Esq., Special Account, No. 4911444

On March 28, 2000, shortly after Mr. Putnam placed restrictions on the Brite Business account, Ms. Capalbo opened the Mary Lee Capalbo, Esq., Special Client account, 49114444, at Raymond James. (Div. Ex. 142.) An account number that began with No. 4911 indicated that the principal party opening the account had a relationship with an employee of Raymond James (employee related account). (Tr. 1151.)

The Mary Lee Capalbo, Esq., Special Client account received and disbursed a total of

$21,441,665. (Div. Ex. 486A.) Raymond James received proper LOAs for all transfers from the Mary Lee Capalbo, Esq., Special Client account. (Tr. 965.)

### 3. Seaview Development & Holding Ltd., Account No. 53902669

The Seaview Development & Holdings Ltd. account received and disbursed $36,699. Some $35,000 was received from the Mary Lee Capalbo, Esq. Special Client account at Raymond James, and $35,990 was disbursed to a Seaview account controlled by Mr. Fife at Bank of America. (Tr. 922-23; Div. Ex. 103, 487.)

### 4. Seaview Development & Holding Ltd., Special Account, No. 57038258

*34 The Seaview Development & Holdings Ltd Special account received and disbursed almost $1.2 million. (Div. Ex. 488A.) The account received deposits of $675,000 from the Mary Lee Capalbo, Esq. Special Client account and $513,305 from the Brite Business Special account at Raymond James. (Div. Exs. 104, 488.) Mr. Fife approved transfer of $1.2 million to a Seaview account at Chase Manhattan bank and $150,000 to International Fisheries.

### 2000 Audit of the Cranston Branch Office

During the relevant period, Raymond James conducted a surprise compliance audit at its branch offices annually and at its satellite offices every other year. Raymond James's records did not show that the Cranston branch office had any satellite offices. (Tr. 3090.) Neither Raymond James's internal auditors nor any compliance representative visited the Cranston branch office between the audit conducted on November 15, 1999 (1999 audit) and the audit on September 19, 2000 (2000 audit). (Tr. 1278.)

Thomas Wegner (Mr. Wegner) conducted the 2000 audit of the Cranston branch office. Mr. Wegner was a registered representative with Raymond James and worked for Independent Auditing & Consulting (IAC). (Tr. 3054.) IAC is an independent contractor hired by Raymond James to conduct audits. (Tr. 3055.) In 2000, IAC charged

Raymond James a flat fee of $475 per branch office audit. IAC could request additional compensation if an audit went longer than one day or if the audit involved unforeseen circumstances. (Tr. 3093.) IAC took a $50 override and paid Mr. Wegner $425 FN[FN49] Typically a branch office audit takes five or six hours. (Tr. 3024.) Mr. Wegner completed the Cranston branch office audit in one day. Mr. Wegner submitted his report to the Compliance Department, which issued a final report to Mr. Ullom. A copy of the final report was also sent to Mr. Putnam. (Tr. 3091-92; R.J. Ex. 2563 at 3762-63.)

Through IAC, Mr. Wegner received a pre-audit packet from Raymond James in preparation for the audit. Mr. Wegner's audit had three components: (1) the compliance interview with the branch manger or the person in charge the day of the audit; (2) review of information made public; and (3) suitability of transactions. Another emphasis was to examine the flow of funds. (Tr. 3024-25.) Mr. Wegner also reviewed the MARS reports to assess whether the branch manager was reviewing them. (Tr. 3171.)

Mr. Ullom was absent, so Jason Ullom, deputy branch manager, met with Mr. Wegner. (Tr. 1565-66, 3028; Div. Ex. 302.) Mr. Wegner used a checklist of questions in conducting the audit. (Tr. 3020; R.J. Ex. 2563 at 3764.) The Audit Summary consisted of eight pages of questions with boxes for answers under columns headed "S" for satisfactory, "U" for unsatisfactory, and "N" for not applicable. (Tr 3030.) Jason Ullom answered the Audit Summary. The Audit Summary used in the 2000 audit did not contain the questions about rogue brokers that had been part of the 1999 audit summary. (Tr. 3134-35; R.J. Exs. 2560, 2563.)

*35 Auditors do not interview individual registered representatives as part of an audit. (Tr. 2926.) The audit includes a four-page Financial Advisor Annual Compliance Interview that has forty-six questions. (R.J. Ex. 2563.) Mr. Wegner left Financial Advisor Annual Compliance Interview questionnaires for David Ullom, James Crowley, Dennis Herula, and Jeffrey Toth, because they were not in the office on the day of the audit. (Tr. 3033-35; R.J. Ex. 2563 at 3772.) The forms were to be filled out and returned to the Compliance Department. Mr. Toth, Mr. Crowley and Mr. Ullom

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

returned their forms, but Mr. Herula did not. (Tr. 3035.) It is not Mr. Wegner's responsibility to check on the accuracy of the representations made by the branch manager or deputy branch manager. (Tr. 3074.)

Mr. Wegner did not know where Mr. Herula, Mr. Crowley, or Mr. Toth regularly worked. (Tr. 3090-91.) Jason Ullom told Mr. Wegner that all the registered representatives worked from the branch office, which was false. (Tr. 990-91, 2016-17, 2464, 3030-31; R.J. Ex. 2563 at 3770.) Mr. Wegner knew that Mr. Ullom, Mr. Crowley, and Mr. Herula had outside activity forms on file with Raymond James. Mr. Herula's form was for fund raising consultation for a charitable foundation, Angels of the Sea. (R.J. Ex. 2563 at 3653.) Neither Jason Ullom nor anyone else at Raymond James informed Mr. Wegner that Mr. Herula was conducting outside business activity for Brite Business. (Tr. 3051-52, 3076, 3080; R.J. Ex. 2563 at 3753.)

The Cranston branch office's correspondence files, one by client and one by branch, contained a couple of pieces of correspondence for each month. (Tr. 2505, 3041.) The files did not have copies of any of the unauthorized correspondence sent by Mr. Herula in 2000. (Tr. 3043, 3092-93.) Raymond James relied on the representations by registered representatives and branch managers, and customer feedback, to assure that the branch office files contained all business correspondence from registered representatives who worked outside the branch office. (Tr. 2346-48.) Based on what he saw in the correspondence files, Mr. Wegner determined that the Cranston branch office was keeping correspondence for a three-year period. This included hard copies of e-mails. (Tr. 3044, 3055-56.)

An NASD Regulatory and Compliance Alert, promulgated in June 1997, recommended the review of all operational bank accounts maintained in branch offices as a "best practice." (Tr. 3152-53; Div. Ex. 337.) In keeping with Raymond James's procedures in place at the time, Mr. Wegner did not review the Cranston branch office operating account so he was unaware of the 2000 bank statements for the Foxhill account. (Tr. 1042, 1047, 1280-81, 1570-71, 2345, 3037.) Because of this omission, Raymond James did not know that Mr. Herula gave

Mr. Ullom: a check from Ms. Capalbo's account at Fleet Bank, payable to Foxhill, for $90,000 on November 29, 1999; a check payable to Foxhill for $50,000 from the Mary Lee Capalbo Special Client Account on August 18, 2000; and that Mr. Herula wired $50,000 to the Foxhill account on October 12, 2000. (Tr. 1038-39; Div. Exs. 123, 160, 232 at FXHL 40.) Mr. Ullom deposited the checks in the Foxhill account that was used to operate the Cranston branch office. (Tr. 1040; Div. Exs. 229 at FXHL 115, 232 at FXHL 34.) Mr. Ullom received some, or all of the money, when Foxhill declared a bonus. (Tr. 1301.)

*36 In the 2000 audit, Mr. Wegner, following Raymond James procedures, did not examine the computers used by registered representatives or look at e-mail accounts.[FN50] (Tr. 3081.) Raymond James's surprise audit of the Cranston branch office on September 19, 2000, did not raise any concerns about Mr. Herula's activities.

**Expert Testimony**

**1. Thomas P. Forde (Mr. Forde)**

Raymond James presented Mr. Forde as an expert on the propriety of Raymond James's systems of supervision.[FN51] (Tr. 3186.) In Mr. Forde's opinion, Raymond James and Robert Thomas (Mr. Forde used Raymond James collectively): (1) satisfied the requirements of NASD's Rule 3010, which required, among other things, that Raymond James have written supervisory procedures in place that address how it reasonably supervised the activities of registered representatives; (2) reasonably implemented those supervisory procedures; and (3) had an appropriate system of supervision, which it implemented with respect to enhanced or special supervision. (R.J. Ex. 2665 at 11-14.) Mr. Forde testified that Raymond James had policies in place for heightened supervision and it acted appropriately in terms of heightened supervision for Mr. Herula and Mr. Ullom. (R.J. 2665 at 14-16.) He believes that "Mr. Herula's activities did not rise to the level that [Raymond James] felt it was necessary to place him on enhanced supervision because at the time the full seriousness of the situation was not known." (R.J. Ex. 2665 at 16.) Mr. Forde acknowledges that Raymond James learned of Mr. Ullom's conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                    Page 30

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

due to the Commission's investigation and based on this information, it put Mr. Ullom on heightened supervision and ultimately fired him. (R.J. Ex. 2665 at 15.)

Mr. Forde believes that an account holder has an unfettered right to funds in the account and a broker-dealer cannot reject an account holder's request to transfer assets. (Tr. 3173; R.J. Ex. 2665 at 17-18.) Mr. Forde has never heard of any broker-dealer with procedures that protect the clients of account holders at the broker-dealer, and he believes it would be inappropriate for Raymond James to question the purpose of fund transfers. (R.J. Ex. 2665 at 19.) Mr. Forde finds that, from 1999 through the present, Raymond James had reasonable procedures in place for the disbursement of funds to third-party and related accounts, and it reasonably implemented those procedures. [FN52] (R.J. Ex. 2665 at 16, 21.) An LOA existed for, and Mr. Ullom approved, every transfer of funds that Mr. Forde reviewed. (R.J. Ex. 2655 at 17, 19.) Mr. Forde knows of few firms that contact the account holder twice to confirm a transfer to a third-party account. (R.J. Ex. 2665 at 17.)

Mr. Forde believes that Raymond James appropriately supervised Mr. Herula. He believes that Mr. Herula was absent from the Cranston branch office and wrote unauthorized correspondence, but Mr. Forde does not agree that Mr. Herula worked at an off-site location because he was not conducting Raymond James business. (Tr. 3117; R.J. Ex. 2665 at 24.) Mr. Forde finds Raymond James's procedures, past and present, for determining whether a registered representative is working off-site to be reasonable. (R.J. Ex. 2665 at 24, 27.)

*37 Mr. Forde considers it reasonable that the 2000 audit did not examine the operating account of the Cranston Branch office. In his view, there was no regulatory requirement that the operating account be reviewed, and Robert Thomas's audit procedures did not require such review. However, when the compliance departments merged, Raymond James adopted the procedure that had been in place at IMR. (R.J. Ex. 2665 at 29.)

Mr. Forde believes that during the relevant period, Raymond James had supervision policies

and procedures in place that exceeded the industry standard in many areas, and he knew of no firm that had more stringent disbursement procedures. (Tr. 3160-62.)

## 2. Harold F. Corrigan (Mr. Corrigan)

Raymond James presented Mr. Corrigan as an expert on the propriety of the conduct of Raymond James's management in discharging their supervisory responsibilities.[FN53] (Tr. 3186.) Mr. Corrigan saw nothing in the materials he reviewed that would have informed Raymond James of Mr. Herula's conduct. (R.J. Ex. 2666 at 25.) Mr. Corrigan believes that a system of supervision cannot function when a branch manager deliberately acts to circumvent the firm's procedures. (R.J. Ex. 2666 at 23-24.) Mr. Corrigan believes Raymond James's management, above the branch manager level, acted appropriately and reasonably with respect to Raymond James's treatment of: Brite Business's original proposal; Brite Business's purchase of Treasuries on margin; and handling of the Lanciano letter.

Mr. Corrigan finds it reasonable for Raymond James to have left to Mr. Ullom the tasks of investigating the Lanciano letter and assuring that similar unauthorized correspondence did not occur. (R.J. Ex. 2666 at 17.) Mr. Corrigan finds that Raymond James acted reasonably in May 2000 to reports that representatives of Brite Business were touting a transaction to investors that involved a $100 million fund in a Raymond James Trust. His reason is that Raymond James could not supervise the statements of persons outside the company. (R.J. Ex. 2666 at 19.) Mr. Corrigan does not fault Raymond James's conduct in response to the Four Star letter.

Mr. Corrigan testified that Raymond James had a very strong system of approving disbursements because it required approval beyond the branch manager. (R.J. Ex. 2666 at 25.) Mr. Corrigan considers that no misappropriation of funds occurred because all transfers were authorized by the account owner.

## 3. Lorena J. Kern (Ms. Kern)

Mr. Putnam presented expert testimony from Ms.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                    Page 31

(Cite as: Release No ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

Kern.FN[FN54] (Putnam Ex. 1118.) Ms. Kern testified: (1) that it was reasonable for Mr. Putnam to rely on Mr. Ullom; and (2) that Raymond James had a reasonable system of supervision to supplement the branch manager's front-line supervision. That supplemental supervisory system consisted of written supervisory procedures, an effective and functioning compliance department, and a method of effective and substantive review for exception reports. (Tr. 3454-55; Putnam Ex. 1118.) Ms. Kern considered it critical that senior management knew of Mr. Herula's outside activity concerning Brite Business. Mr. Kern testified that Mr. Putnam responded reasonably to the red flag raised by the unauthorized correspondence discovered in March 2000, and that there were no other red flags to alert Mr. Putnam to Mr. Herula's illegal activities. (Tr. 3461, 3484; Putnam Ex. 1118.) Ms. Kern knows of no way Mr. Putnam could have checked that Mr. Ullom was in fact reviewing Mr. Herula's business correspondence. (Tr. 3481-82.) Ms. Kern's position is that no reasonable system of supervision would have revealed this fraud where the registered representative and branch manager acted in concert. (Putnam Ex. 1118.)

### Record Retention for Broker-Dealers

*38 During the relevant period, Raymond James's written procedures on advertising and communications provided that copies of correspondence with Branch Manager approval should be maintained in the branch's correspondence file, as well as the client file, for a minimum of three years. (Tr 2392-93, 2448; R.J. Ex. 2640 at 011961.)

Eugene Fredriksen (Mr. Fredriksen) was the assistant vice president of information security at R.J. & Associates from May 1999 through 2000. FN[FN55] (Tr. 3208.) R.J. & Associates operates the centralized Information Technology Department (IT) for all units of the holding company. (Tr. 3200.) Mr. Fredriksen testified that it was Raymond James policy for each registered representative to receive a Raymond James e-mail account. (Tr. 3268, 3316-17.)FN[FN56] Registered representatives could use their Raymond James e-mail address to access their e-mail accounts from home computers.FN[FN57] (Tr. 3326.) Raymond

James's policy was that all business should be conducted using a Raymond James account. However, there was no technology to prevent a registered representative from using a personal e-mail account to conduct business, or to copy and send Raymond James e-mails via a personal account. (Tr. 3363-64.) In 1999 and 2000, there was no technology available to prevent someone from using a personal e-mail account to conduct Raymond James business on a computer in a Raymond James branch office. (Tr. 3268-69.)

Mr. Fredriksen believes that the Commission's 1997 Release on Rule 17a-4 was: a codification of information given in a 1993 no-action letter; expanded the scope of the term "business records"; and marked the first written Commission directive that broker-dealers were required to retain. (Tr. 3219-22; R.J. Ex. 2618 at 10.) According to Mr. Fredriksen, in 1999 persons in the industry were concerned about: (1) the scope of the requirement in terms of "[w]hich e-mail in which context;" and (2) while the ability to store the material existed, the "front-end" technology of monitoring, scanning, cataloging, indexing, and archiving a thousand e-mails a minute did not exist or was still in its infancy.FN[FN58] (Tr. 3232, 3236-37, 3239, 3244-45.) Raymond James generates approximately 150 million e-mails annually. (Tr. 3228-29.)

From 1997 until May 1999, Raymond James's controls over the retention of e-mails consisted of: (1) backup tapes on its e-mail servers; and (2) a policy that required the branch manager to review, and to save at the branch office, all business-related e-mails generated in the branch. (Tr. 3283-84.) These two measures continue in 2005; however, the home office in St. Petersburg, Florida, did not, and does not, print out e-mails. (Tr. 3285, 3288.)

E-mails sent from computers in the Cranston branch office are handled by one of about twenty e-mail servers at R.J. & Associates's data center in Florida. (Tr. 3261, 3264.) Similarly, all incoming e-mails to a Raymond James's e-mail account are received and held by one of these servers, until they are opened by the addressee. (Tr. 3621.) These servers were used for all of the holding company's business units. (Tr. 3366.) The backup tape system Raymond James used in 1999 and 2000 did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

capture e-mails that were received after 6:00 a.m. and opened before 6 p.m.[FN59] (Tr. 3323-24.) E-mails sent by registered representatives using personal accounts or e-mails sent to registered representatives' personal accounts from non-Raymond James accounts are not backed up. (Tr. 3329.) In October 1998, Raymond James suspended its policy of overwriting or recycling e-mail server back-up tapes every ninety days and began saving back-up tapes for three years in a secure location. (Tr. 3259, 3262.) Since October 1998, Raymond James has had three years of e-mails back-up tapes preserved and organized.[FN60] (Tr. 3281.) Mr. Fredriksen considers that in 1998 this was the most robust e-mail retention system available. (Tr. 3362.) Raymond James's back-up tapes were not WORM compliant, because Raymond James believes the technology did not exist in 1998. (Tr. 3276.) Mr. Fredriksen did not see corruption of back-up tapes as a problem; however, Raymond James informed the Division in 2003 that:

*39 Inherent in the restoration process is the probability that some of the database on any given day will be corrupted. We are told that 90 percent of the time the database is corrupted. This requires the IT Department to run a utilities program to fix the corruption.(Tr. 3375-76; Div. Ex. 308.)

Raymond James knew during 1999 and 2000 that the Commission required retention of business-related correspondence for three years, either in hard copy or electronically, and that the Commission never formally relaxed or modified the 1997 Release. (Tr. 3236, 3350.) The problem, in Mr. Fredriksen's view, was either archiving all e-mails, which was thought to be prohibitively expensive, or seeking guidance on the meaning of the term "business as such." (Tr. 3347.) Mr. Fredriksen thought the Commission was committed to working with the industry to deal with the issues and that the Commission indicated flexibility in the timetable for implementing the 1997 Release because of industry concerns. (Tr. 3242, 3248.) Mr. Fredriksen believes that the Commission caused the industry to believe that it would not enforce Rule 17a-4, as interpreted in the 1997 Release, while dialogue with the industry was ongoing. For example, in May 2001, high-level brokerage industry representatives met with the Commission's staff to discuss the compliance burdens imposed by

Rule 17a-4. (Tr. 3250, 3349; R.J. Ex. 2661.)

However, in November 2002, five securities firms paid fines totaling $8.3 million to settle allegations of deficient e-mail retention. (Tr. 3251-52; R.J. Ex. 2662.) At the time, the Director of the Commission's Division of Market Regulation acknowledged some expectation of prosecutorial discretion while the Commission engaged in talks with industry representatives but, according to the Director, the five firms in the settlement were egregious situations, in that some of them had no e-mail retention policies whatsoever. (R.J. Ex. 2662.)

Mr. Fredriksen notes that Raymond James has spent over $2.5 million from 1999 to the present on tapes to comply with the 1997 Release.[FN61] (Tr. 3273-75.)

In 1999, Raymond James instructed Mr. Fredriksen to take steps to address the 1997 Release and he did so. (Tr. 3256-57.) In May 2000, at Mr. Fredriksen's recommendation, Raymond James contracted with Syntegra, formerly Control Data, at a cost of more than $1.4 million to centrally manage e-mail traffic; assure that what was being saved was virus free; and archive e-mails and route them to a disk in a WORM format that satisfied the 1997 Release. (Tr. 3288-300; R.J. Ex. 2582.) In Mr. Fredriksen's opinion, there was no better technology to retrieve e-mails that fit Raymond James's needs in 2000 than Syntegra. (Tr. 3378.) By the end of 2000, Raymond James had a fully automated e-mail archival system in place. (Tr. 3259.) Implementation of the Syntegra systems in December 2000, gave Raymond James three "redundant" or partially duplicative systems of e-mail retention. (Tr. 3301-03.) These consisted of: (1) back-up tapes; (2) the firm policy that required that business e-mails be printed out in hard copy and filed; and (3) Syntegra. (Tr. 3302-04.) Mr. Fredriksen believes Raymond James was the first broker-dealer to archive e-mails firm-wide in a WORM technology. (Tr. 3301.) According to Mr. Fredriksen, there was no technology available in 1999-2000 that would have prevented an individual from deleting an e-mail from the system by "double deleting." (Tr. 3362.)

*40 In 2004, Raymond James contracted with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Centra at a cost of $1.5 million for a second-generation e-mail retrieval system in response to business needs and new technology. The progression from back-up tapes to Syntegra to Centera has cut the time for retrieving e-mails from days to minutes. (Tr. 3377.)

Raymond James estimates it has spent approximately $6 million solely to accomplish e-mail retention. Raymond James has spent considerably more to comply with the 1997 Release than firms who chose not to comply and entered settlements or firms that waited until 2003 to comply. (Tr. 3309-30.)

### Salvatore Pallante (Mr. Pallante)[FN62]

Mr. Pallante, who retired in 2004 as the New York Stock Exchange's (NYSE) Executive Vice President, Member Firm Regulation, testified for Raymond James. (R.J. Ex. 2667 at 4.) Even before the 1997 Release, the NYSE took the position that any record that pertains to a broker-dealer's business, including e-mails, had to be retained. (Tr. 3386.) Mr. Pallante believes the 1997 Release was the first time the Commission stated in writing that e-mails relating to business must be retained. (Tr. 3384-85; R.J. Ex. 2618 at 14.) The NYSE and the Commission received a lot of "push-back" from the industry for taking this position. (Tr. 3386.) In Mr. Pallante's view, the issue has been how the regulators were going to enforce Exchange Act Rule 17a-4. (Tr. 3386-95.)

In the fall of 2000, NYSE examiners observed that a large broker-dealer was not retaining electronic communications, and the e-mails that were being retained were not in a WORM format. This was a violation of Exchange Act Rule 17a-4 and the Commission's 1997 Release. Following its standard operating procedures, the NYSE contacted the firm and was told that Commission examiners had brought similar findings to the firm's attention and that the firm had responded to the Commission. (R.J. Ex. 2667 at 15-16.) Mr. Pallante then called the Associate Director of the Commission's Division of Compliance, Inspections, and Examinations (OCIE), who told him that OCIE was not recommending enforcement action based on such findings. He was also told that the Commission's policy group in the Division of

Market Regulation was looking into e-mail issues and discussing them with the industry. (Tr. 3399; R.J. Ex. 2667 at 17.) Mr. Pallante was aware that the industry was seeking relief from the requirements of Rule 17a-4 from the Commission and that the Commission's staff appeared sympathetic. (Tr. 3391-92.)

Between the fall of 2000 and the end of 2001, the NYSE's Division of Member Firm Regulation referred about twelve instances of e-mail retention deficiencies to the NYSE's enforcement division. [FN63] (Tr. 3390.) Mr. Pallante was somewhat taken aback when the Director of the Commission's Division of Market Regulation called him in the spring of 2001 and requested that the Division of Member Firm Regulation withhold making any enforcement referrals on e-mail findings and record retention; and withdraw any referrals that it had made to the NYSE's enforcement division because she wanted to be acting in good faith with the industry while discussions were ongoing. (Tr. 3393, 3401-04; R.J. Ex. 2667 at 21-23.) Mr. Pallante believes that the industry was annoyed by the NYSE's aggressive attempts at enforcement and complained to the Commission. (Tr. 3390, 3401; R.J. Ex. 2667 at 21.)

*41 Mr. Pallante confirmed that the Director of OCIE agreed with the information he had received from the Director of Market Regulation because Mr. Pallante was concerned that OCIE examiners might be critical if the NYSE stopped referring findings of violations to the NYSE's enforcement unit. (Tr. 3402-04; R.J. Ex. 2667 at 23-24.) To memorialize the understanding, Mr. Pallante wrote a letter to the Director of Market Regulation, with a copy to the Director of OCIE, stating that consistent with the request he would not refer future e-mail retention violations to enforcement and he would withdraw the referrals he had already made. (Tr. 3405; R.J. Ex. 2667 at 24-25.) In public statements following these events, Mr. Pallante would state that the NYSE was finding violations but was not taking enforcement action pending the outcome of discussions the Commission was having with the industry. (Tr. 3406-08.) Later, Mr. Pallante received a draft proposal to relax the rules on retaining records pertaining to business records, such as e-mails. The draft was never implemented. (R.J. Ex. 2667 at 26.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 34

In Mr. Pallante's view, the Commission's posture changed and it began taking an aggressive approach with respect to e-mails and missing records after e-mails provided the "smoking gun" in New York Attorney General Eliot Spitzer's legal action, joined in by other regulators, against five Wall Street firms in late 2002. (Tr. 3409-10; R.J. Ex. 2667 at 27-28.) Mr. Pallante considers it unreasonable for the Division to bring an enforcement action alleging e-mail retention in 1999 and 2000 in view of the directions Commission staff gave the NYSE and the industry. (Tr. 3411-13; R.J. Ex. 2667 at 29.)

### Charles Weeden (Mr. Weeden)

Mr. Weeden, an expert called by the Division, testified that the fact that a communication was in e-mail format did not change the existing retention obligation. The obligation that broker-dealers maintain copies of e-mails in a hard-copy document, on microfiche or microfilm, predated, and was not changed by, the 1997 Release.[FN64] (Tr. 3553-54.) The 1997 Release, with twelve required elements, was the first Commission release that addressed e-mails. (Tr. 3553, 3559-60.) According to Mr. Weeden, in 1999 and 2000, most compliance officers did not distinguish e-mails from hard copy communications; however, some in the industry argued that e-mails were not covered by Rule 17a-4 because they were akin to phone calls. (Tr. 3555.)

Mr. Weeden determined that in the late 1990s, the marketplace provided products from well-established vendors that allowed broker-dealers to fully comply with the 1997 Release with respect to e-mail retention. (Tr. 3516.) Mr. Weeden's testified that in August 1997 there were at least three credible software products available to electronically archive e-mails in WORM technology. (Tr. 3588.) Those products were: Assentor from SRA; Enterprise Vault originated by Digital Equipment and, later acquired by Compaq and then KVS; and XVMail or XVault now known as EMailXtender. (Tr. 3525, 3532, 3599, 3602-03, 3636.) SRA and Compaq were supported by established public companies, while EMailXtender was a recent start- up. Mr. Weeden thinks it was unreasonable to expect one product to accomplish three functions; however, he acknowledges that Assentor would not solve virus problems and management, as well as archiving. (Tr. 3613-14, 3616.) However, Assentor was a viable e-mail retention product available in 1999 that could have been used to comply with Rule 17a-4. (Tr. 3635.) According to Mr. Weeden, most of the industry people he spoke with did not consider the three vendors Raymond James considered in 1999. (Tr. 3616.) Mr. Weeden does not consider back-up tapes an archiving method because archiving involves saving to a non-rewriteable media. (Tr. 3619.)

*42 Mr. Weeden does not know which Microsoft Exchange version that Raymond James used in 1999-2000, although a journaling capability was an option on the Microsoft Exchange platform and it would have allowed Raymond James to archive e-mails without buying an expensive new software product.[FN65] (Tr. 3535, 3623.) Journaling would not accomplish full text indexing that Rule 17a-4 required, however, and Raymond James would have had to purchase additional software to satisfy that requirement. (Tr. 3541.)

Mr. Weeden believes that Raymond James could have preserved e-mails that were opened during the business day on the server by exercising another configuration option available on the Microsoft Exchange software (Tr. 3543-44.)

In December 2002, Mr. Weeden was of the view that a majority of broker-dealers had something in place to address e-mail archiving but he estimated that less than half were compliant with Commission regulations. (Tr. 3548; R.J. Ex. 2671.) On February 24, 2005, Mr. Weeden opined that Raymond James was partially, but not fully, compliant with Rule 17a-4 from 1999 through 2000. (Tr. 3544.) Mr. Weeden is complimentary of the Commission's efforts and considers that Rule 17a-4 has established a model for compliance within numerous regulated industries. (Tr. 3632.)

### CONCLUSIONS OF LAW

I deny Raymond James's contention that an administrative law judge does not have authority to order sanctions because the Commission's appointment procedures violate the Appointments Clause of the U. S. Constitution, art. II, clause 2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.