# APPENDIX

# Part 3

(R.J. Post-Hearing Br. 2 n.1; R.J. Prehearing Br. § III.G.)

The Constitutional arguments are perhaps more properly addressed to the Commission who assigned the case to an administrative law judge. However, pursuant to Section 4A of the Exchange Act, the Commission can delegate authority to an administrative law judge to make an initial decision, which includes sanctioning, in any proceeding in which the administrative law judge presides in which a hearing is required to be conducted in conformity with the Administrative Procedure Act, 5 U.S.C. § 557, unless all the parties waive the initial decision and the Commission does not order that one be prepared, and in any other proceeding in which the Commission directs the judge to make an initial decision. 17 C.F.R. § 200.30-9. The OIP ordered that a hearing be held before an administrative law judge who shall also issue an initial decision. The Commission is not bound by the initial decision. Under the Commission's Rules of Practice, the Commission may affirm, reverse, modify, or set aside or remand an initial decision and may make any findings or conclusions that, in its judgment, are proper on the basis of the record. 17 C.F.R. § 201.411.

**1. Supervision of Mr. Herula**

<u>Arguments of the Parties</u>

*43 The Division maintains that Raymond James failed to adequately supervise Mr. Herula because its agent, Mr. Ullom, failed to do so. The Division argues that it is insufficient for a broker-dealer to establish a system of supervisory procedures that relies solely on supervision by branch managers, and that Raymond James was required to provide checks to ensure that the first-line supervisor was functioning adequately. The Division contends that broker-dealers conducting business through off-site offices cannot adequately discharge their supervisory obligations when there is no inspection of off-site locations. The Division charges that Raymond James had essentially no policies or procedures in place for supervising registered representatives working outside the branch office. (Div. Post-Hearing Br. 91.) It claims that Raymond James failed to keep track of who was working off-site, or how they were being monitored. The

Division claims that Raymond James had no systems in place to ensure that Mr. Ullom was examining Mr. Herula's off-site office, monitoring Mr Herula's correspondence, or providing additional scrutiny once red flags were discovered as to Mr. Herula's unauthorized activities. (Div. Post-Hearing Br. 87.)

The Division further alleges that Raymond James acted unreasonably by failing to take adequate steps to investigate or terminate Mr. Herula's illegal activities until approximately $16.4 million in investor funds were misappropriated or otherwise dissipated. The Division faults Raymond James for: (1) not reviewing the operating account as part of the Cranston branch office audit; (2) not having written procedures for placing registered representatives on heightened supervision, and for not placing Mr. Herula on heightened supervision; and (3) not investigating transfers from the Brite Business account to the employee-related Mary Lee Capalbo Esq., Special Client account. (Div. Post-Hearing Br. 93-95.)

The Division views the three procedures that Raymond James claims to have used to ensure compliance - the internal audit, the monthly compliance reports, and exception reports - as largely ineffective. It notes that: (1) the internal audit and the monthly compliance reports place undue reliance on self-reporting; (2) the internal auditor lacked information or resources necessary to perform a meaningful audit; and (3) no one in the compliance department reviewed the exceptions reports for accuracy and there is no evidence that the majority of suspicious trades that appeared on the exceptions reports were reviewed. (Div. Post-Hearing Br. 87.)

Next, the Division argues that Mr. Putnam, Mr. Ullom, and other Raymond James executives failed to respond reasonably to the following events that raised red flags suggesting that Mr. Herula was engaged in inappropriate activities. (Div. Post-Hearing Br. 29, 88-90.)
    1. Expressions of concern by Mr. James, Mr. Augenbraun, Mr. DiGirolamo, Mr. Ness, Mr. Maynard, Mr. Walsh, and unnamed members of the C&S Committee about Raymond James's involvement with Brite Business. (Div. Post-Hearing Br. 5-8.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

\*44 2. The negative reaction of the ad hoc committee following the meeting in October 1999, as to participation in a proposal by Brite Business. (Div. Post-Hearing Br. 8-12.)

3. The fact that Mr. Herula continued to urge Raymond James to stay involved and consider proposals from Brite Business after the ad hoc group came to a consensus that it would not do the transaction Brite Business proposed. (Div. Post-Hearing Br. 12-13.)

4. The suspicions of persons at Raymond James and affiliates in November 1999 on learning that Mr. Herula and Mr. Ullom had falsely represented that First Union Bank had agreed to the Brite Business transaction. (Div. Post-Hearing Br. 13-17.)

5. The purchase on margin of approximately $115 million of U.S. Treasuries by Brite Business in December 1999 that made no economic sense. (Div. Post-Hearing Br. 17-22.)

6. Expressions of concern by members of the C&S Committee, in particular Mr. James and Mr. DiGirolamo, when the committee considered the Brite Business purchase of U.S. Treasuries on margin in December 1999. (Div. Post-Hearing Br. 22-25.)

7. The skepticism of Mr. Putnam and Mr. Augenbraum following the meeting with Brite Business in January 2000, and their recommendation that Raymond James not become involved further in the transaction that Brite Business was proposing. (Div. Post-Hearing Br. 25-26.)

8. In January 2000, Mr. Ullom became aware that Mr. Herula had sent an e-mail from his Raymond James account soliciting an investor to deposit $100 million at Raymond James. Mr. Herula signed the e-mail as a Raymond James representative and stated that Brite Business agreed to ensure a ten percent return on the investment.

9. In January 2000, Mr. Putnam learned of the Provident letter that Mr. Herula wrote in December 1999 on Raymond James letterhead stationery seeking Provident's involvement in a reverse-repurchase agreement for Brite Business. Mr. Putnam considered the use of letterhead questionable. (Div. Post-Hearing Br. 26-27.)

10. On or about February 29, 2000, a week prior to their maturity, Mr. Herula sold the $115 million in Treasury bills for Brite Business. The timing of the transaction made no sense to Mr. Putnam or Mr. Zank of R.J. & Associates. (Div. Post-Hearing Br. 27-29.)

11. Beginning in December 1999, until he was fired in December 2000, Mr. Herula worked out of an apartment in Cranston that had a computer, a fax machine, a copier, a scanner, telephones, and copies of correspondence. No one at Raymond James ever inspected this office. Beginning in October 2000, Mr. Herula began working at an office he set up in his home in Tiburon, California. (Div. Post-Hearing Br. 30- 32.)

12. From January 2000 through March 2000, Mr. Herula signed an e-mail as a Raymond James registered representative using his Raymond James account, soliciting an investor to deposit $100 million at Raymond James in connection with Brite Business. Mr. Herula forwarded the e-mail to Mr. Ullom. In the same period, Mr. Herula engaged in correspondence with Mr. Al Bloushi in which he made false representations. (Div. Post-Hearing Br. 32-36.)

\*45 13. In March 2000, Mr. Putnam, Mr. Ullom, and others at Raymond James and its affiliates, learned that Mr. Herula was sending or had sent the Lanciano letter, a misleading piece of correspondence on Raymond James stationery, to a potential investor soliciting funds for deposit at Raymond James. In this same period, Mr. Herula authored similar correspondence to Mr. Fitzhenry. (Div. Post-Hearing Br. 37-41.)

14. The unexplained activity in the Brite Business and Mary Lee Capalbo accounts, which included multi-million dollar deposits promptly followed by transfers to related and third-party accounts, coupled with the suspicious nature of Brite Business's balance sheet enhancement program, and its purchase of Treasuries, constitute indicia of money laundering that should have triggered further investigation. (Div. Post-Hearing Br. 30-32.)

15. In May 2002, Mr. Putnam and others at Raymond James and its affiliates learned through Mr. Ness at R.J. Trust that individuals in Cleveland, Tennessee, supposedly associated with Brite Business were, misrepresenting Raymond James's role in Brite Business's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activities. (Div. Post-Hearing Br. 48-49.)

16. In July and August 2000, Raymond James received notice from Four Star demanding return of approximately $12 million it claimed to have deposited in the Brite Business account. Mr. Putnam and Mr. Ullom also learned that contrary to his representations, Mr. Herula had sent additional unauthorized correspondence on Raymond James letterhead, the Blackburn letter, making similar representations to the Lanciano letter, as a means of soliciting funds for Brite Business. (Div. Post-Hearing Br. 49-54.)

17. Mr. Putnam considered terminating Mr. Herula and closing the Brite Business account no later than July 13, 2000, but he did not do so until December 2000. (Div. Post-Hearing Br. 90.)

Finally, the Division argues that Mr. Putnam had actual knowledge of multiple red flags that alerted him to Mr. Herula's suspicious activities, yet he failed to respond to them. (Div. Post-Hearing Br. 96.) The Division argues that Mr. Putnam cannot excuse his failure to supervise Mr. Herula by claiming that he relied on Mr. Ullom because: (1) Mr. Putnam did not develop a system to ensure that Mr. Ullom was monitoring Mr. Herula; (2) Mr. Putnam should have known that Mr. Ullom's supervision of Mr. Herula was deficient; and (3) as the president of a corporate broker-dealer Mr. Putnam was ultimately responsible for all the firm's requirements. (Div. Post-Hearing Br. 98.)

Raymond James represents that throughout the relevant period it had procedures and systems in place that were reasonably designed to prevent and detect securities law violations. Raymond James insists that these supervisory procedures were in accord with NASD Conduct Rule 3010-Supervision. Raymond James argues that the failure to detect wrongful conduct does not by itself establish a failure to supervise. Raymond James maintains that it reasonably discharged its supervisory duties and obligations and had no reasonable cause to believe that the procedures and systems were not being followed. Raymond James argues, further, that a broker-dealer's branch manager is its first line of defense and that its reliance on Mr. Ullom was reasonable. (R.J. Post-Hearing Br. 34-35.) According to one

Raymond James expert, the branch manager is responsible for making sure that everything is done properly and that nothing unauthorized is released. (R.J. Ex. 2666 at 22.) Raymond James notes that when it hired Mr. Ullom to manage the Cranston branch office, he had no prior record of supervisory problems. Mr. Ullom was an experienced manager, and Mr. Putnam had known him for many years. Raymond James cites expert testimony to support its position that broker-dealers customarily rely on branch managers to enforce their supervisory rules and regulations.

*46 Raymond James insists that it had no cause to believe that its supervisory procedures were being violated. It cites various written materials such as operations manuals, newsletters, an Intranet digest that addressed compliance, a dedicated compliance staff, and training for its twenty-eight compliance professionals. (R.J. Post-Hearing Br. 35-39.) Raymond James stresses its efforts at oversight including over seventy types of exception reports, branch office compliance reports, and branch audits.

Raymond James denies the existence of any red flags that would have put it on notice of Brite Business's prime bank scheme. Raymond James rejects the Division's inference that Raymond James let Brite Business pursue the balance sheet enhancement program it proposed in October 1999 when it allowed Brite Business to purchase United States Treasuries in December 1999. Raymond James argues that the Division has mischaracterized both the reactions of the ad hoc committee and the C&S Committee's questions about Brite Business. According to Raymond James, if Mr. Putnam had been present at the C&S Committee meeting, he would have been able to answer the questions.

Raymond James insists that, during the relevant period and at present, its procedures for: (1) supervising off-site locations; (2) reviewing branch office operating accounts; (3) disbursing or transferring funds from accounts; and (4) placing registered representatives on heightened supervision, met or exceeded industry standards. (R.J. Post-Hearing Br. 44-56.) Raymond James reiterates, as it did throughout the hearing, that a broker-dealer's duty of supervision is imposed to protect the investing public and is owed only to its customers, not to third parties. In support, it refers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to NASD Rule 3010.

Raymond James maintains that it was deceived about the nature of Mr. Herula's outside business activities, that these activities did not involve Raymond James's business, and did not trigger any supervisory responsibility for the firm. (R.J. Post-Hearing Br. 60.) It notes that the NASD has addressed the issue of "non-member business conducted by an associated person" in Rules 3030 and 3040. An associated person may be involved in non-member business in two categories: outside business activities and private securities transactions. According to Raymond James, by definition then, a registered representative's outside business activity is not the business of the member firm. (R.J. Post-Hearing Br. 61.)

Mr. Putnam maintains that the Division's so-called red flags did not suggest the fraud that occurred. Mr. Ullom, the key in a reasonable system of supervision, was actively involved in the fraud and withheld critical information from Mr. Putnam and Raymond James.

Mr. Putnam argues that several issues must be considered when assessing the reasonableness of his supervision of Mr. Herula. Mr. Putnam denies that he was responsible for the adoption and implementation or design of Raymond James's supervisory procedures in his position as president and chief operating officer. The CEO of Raymond James did not delegate responsibility for the adoption and implementation of the firm's compliance procedures or responsibility for the firm's supervisory system to him. Second, Mr. Putnam delegated to Mr. Ullom the job of gathering all Mr. Herula's correspondence, placing Mr. Herula under close scrutiny, and reporting any problems. Mr. Putnam had a reasonable expectation that Mr. Ullom would do as he was directed.

*47 Mr. Putnam argues that Brite Business's balance sheet enhancement program and strategy described in October 1999 did not give him reasonable cause to understand that Mr. Herula was associated with a suspicious business entity. Mr. Putnam maintains that no one at Raymond James expressed a view that Brite Business was acting illegally or fraudulently, or that Raymond James should not consider doing any kind of business with

Brite Business. (Putnam Post-Hearing Br. 49.)

Mr. Putnam contends that, given the circumstances, his actions fell within the zone of reasonableness at all times. Mr. Putnam denies the existence of any red flags other than the Lanciano letter. He argues that he did not ignore Mr. Herula's unauthorized communications; rather, he maintains that he took significant steps to prevent any recurrence.

## Conclusions

Section 15(b) of the Exchange Act provides that the Commission may sanction any person associated with a broker or dealer or the broker-dealer itself, if it finds that such person or broker-dealer "failed reasonably to supervise, with a view to preventing violations of [the securities laws], another person who commits such a violation, if such other person is subject to their supervision" Exchange Act Section 15(b) further provides that no person shall be deemed to have failed reasonably to supervise if: (1) procedures, and a system for applying those procedures, have been established, which would reasonably be expected to prevent and detect any such violation; and (2) the person has reasonably discharged the duties and obligations incumbent upon him by reason of [his firm's] procedures and system and had no reasonable basis for believing that those procedures were not being followed. Arthur James Huff, 50 S.E.C. 524, 526- 28 (1991). Ultimately, the test is whether the supervision was reasonable under the circumstances. Kevin Upton, 52 S.E.C. 145, 153 (1995); Albert Vincent O'Neal, 51 S.E.C. 1128, 1135 (1994). Section 203(f) of the Advisers Act, incorporating Section 203(e)(6) by reference, contains similar language.

The fact that Raymond James's CEO did not formally delegate to Mr. Putnam responsibility for the design, adoption and implementation of Raymond James's supervisory procedures does not change the fact that Mr. Putnam was responsible for supervising Mr. Herula. Mr. Putnam controlled Mr. Herula's activities. From August 1999 until at least February 2000, Mr. Carreno reported to Mr. Putnam. Raymond James's Compliance Manual showed Mr. Putnam had responsibility for hiring financial advisers within branch offices, and for sales management branch management oversight.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                                                                          Page 39

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

(Div. Ex. 325 at 5978, 5980.) Mr. Putnam had the power to fire Mr. Herula, which he did, finally, in December 2000. (Tr. 1623, 1993.) I find that Mr. Putnam was Mr. Herula's supervisor throughout the relevant period. Huff, 50 S.E.C. at 532, (the most probative factor as to whether a person is responsible for actions of another is the power to control another's conduct); John H. Gutfreund, 51 S.E.C. 93, 111 n.21, 113, (1992) (president of a broker-dealer is responsible for compliance and supervisor is person with authority or ability to affect employee's conduct) (settled order).

*48 During the relevant period, Raymond James did not have procedures in place which would reasonably be expected to prevent and detect antifraud violations by its registered representatives or a system for applying those procedures. Furthermore, neither Raymond James nor Mr. Putnam reasonably discharged the duties and obligations incumbent upon them by reason of the procedures and systems that existed.

At the time Robert Thomas and IMR merged in January 1999, each company had separate and different compliance programs. After the firms merged, Raymond James operated two separate compliance programs for several months. During these months, the separate programs were headed by two different compliance directors. The two compliance departments merged in March or April 1999, under the leadership of Mr. DiGirolamo. A new compliance manual for the merged company was not produced until May 2000. (Tr. 2361-62.) It appears that in March 2000, Raymond James did not have specific heightened supervision policies but it did have procedures to deal with extraordinary situations, which Mr. Carreno called enhanced supervision. (Tr. 2339, 2362.) Mr. Putnam indicated that under Raymond James's procedures at the time of the Lanciano letter, the branch, not the individual, was placed on heightened supervision. (Tr. 2020.) A meeting was held every quarter to review either the individual or branch where someone was in heightened supervision status (Tr. 1962, 2021-22.) The process is not structured to disclose outside business activities. (Tr. 2021.) The evidence is that Raymond James's first written heightened supervision polices for registered representatives occurred in October 2001. (Tr. 2936- 38; Div. Ex.

508, R.J. Ex. 2536E.)

Mr. Forde, an expert witness for Raymond James, testified that after January 1999, Robert Thomas and IMR retained their individual compliance procedures until "the firms' compliance departments reviewed and tried to get the compliance functions and supervisory procedures together, which probably didn't happen until sometime - I think it was '01." (Tr. 3133.) As a result, for at least four or five months during the relevant period, Raymond James did not have in place clear, reasonably effective supervisory policies and procedures, or a system for implementing those policies and procedures, for supervising its registered representatives. My conclusion is derived from the totality of the evidence, but in particular: (1) Mr. DiGirolamo's testimony that he implemented a policy of auditing branch operating accounts; however, Mr. Wegner testified that he did not audit the operating account at the Cranston branch office in October 2000 because the policy did not become effective until the 2001 Cranston branch audit; [FN66] (2) general confusion among the witnesses as to whether Raymond James had policies to deal with rogue brokers and procedures for placing registered representatives in heightened supervision status, and, if any policies and procedures existed, what they were; and (3) similar general confusion on what was required of people who worked regularly away from their assigned office. (Tr. 2461-62, 2516.)

*49 The evidence does not support Raymond James's and Mr. Putnam's position that they reasonably relied on Mr. Ullom to carry out their supervisory responsibilities. The Commission has repeatedly warned that procedures that rely solely on supervision by branch managers are insufficient. Rita H. Malm, 52 S.E.C. 64, 70 (1994); Donald T. Sheldon, 51 S.E.C. 59, 79 (1992), aff'd, 45 F.3d 1515 (11th Cir. 1995); Prudential-Bache Sec., Inc., 48 S.E.C. 372, 400 (1986).

Raymond James retained Mr. Ullom as a supervisor knowing that he settled a proceeding with the Commission in which Mr. Ullom was found to have: (1) given false information to a state securities examiner; (2) directed an employee of an investment adviser he co-owned to alter documents that Mr. Ullom submitted to state authorities; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

(3) filed a Form ADV with the Commission that contained false information. (R.J. Ex. 2022.) The settlement found that Mr. Ullom violated the Advisers Act; willfully aided and abetted violations by the investment adviser; and caused the investment adviser's violations. It was patently unreasonable for Raymond James to rely on Mr. Ullom in a position, which the experts agree was Raymond James's "first line of defense," and someone Raymond James relied on to make sure everything was done properly, when in 1995 Mr. Ullom deliberately submitted false information to securities regulatory agencies. See Consol. Inv. Servs., Inc., 52 S.E.C. 582, 587-88 (1996) (hiring registered representative subject to NASD complaint required heightened supervision); O'Neal, 51 S.E.C. at 1129-33 ("disquieting history" of registered representative relevant in failure to supervise case).

In addition to adopting effective procedures for supervision, broker-dealers must also "provide effective staffing, sufficient resources, and a system of follow up and review to determine that any responsibility to supervise delegated to compliance officers, branch managers, and other personnel is being diligently exercised." Mahon, Nugent & Co., 47 S.E.C. 862, 867 (1983) (settled order). The system must provide sufficient checks "to insure that the first line of compliance, the branch manager, [is] functioning adequately." Shearson Lehman Brothers, Inc., 36 SEC Docket 1075, 1083 (Sept. 24, 1986) (settled order). "The need for central control increases, not decreases, as the branch offices become more numerous, dispersed, and distant." Shearson, Hamill & Co., 42 S.E.C. 811, 843 (1965)

*50 Raymond James's Compliance Department relied on the branch manager's monthly compliance reports, the annual internal audit, and exception reports as tools to accomplish supervision. Each of these instruments is a valid means of supervision, but Raymond James failed to use them in a reasonable or effective manner. Mr. Ullom submitted compliance reports monthly to the Compliance Department. There is no evidence that Raymond James independently verified the contents of the reports. This case provides ample evidence that a monthly compliance report submitted by the branch manager representing that he has discharged his responsibilities, which is not subject to any verification, is a self-serving document without any value. It was unreasonable for Raymond James to accept that the information in Mr. Ullom's monthly compliance report was true without any type of verification.

Under the circumstances, Raymond James's internal compliance audit of the Cranston branch office in 2000 was not an effective procedure to prevent and detect violations. Raymond James's characterization of the process as "an audit" is a misnomer. Raymond James did not reasonably prepare Mr. Wegner for the audit. According to Mr. Wegner, who I find to be a knowledgeable and credible witness, much of the audit was "just a review of procedures and systems in place at the branch." (Tr. 3025.) Mr. Wegner testified that he would have liked to have known any concerns regarding the branch office he was auditing and would have given emphasis to those areas during the audit. Raymond James did not inform Mr. Wegner that Mr. Herula had a business relationship with Brite Business, that Mr. Herula had sent out unauthorized correspondence, or that Mr. Herula worked outside the Cranston branch office throughout 2000. (Tr. 3065- 66, 3079.) Mr. Wegner testified that he would have liked to have known that Mr. Herula was working for Brite Business. (Tr. 3080.) In addition, Mr. Wegner was not aware that: (1) a third party had made a claim for the funds in an account where Mr. Herula was the registered representative (the Four Star letter); (2) the president of Raymond James had put a restriction on the Brite Business account where Mr. Herula was the registered representative; or (3) Mr. Herula was almost fired in July 2000 for sending unauthorized correspondence. (Tr. 3066-67.) Mr. Wegner believes that anything that resembles a complaint should be in the branch office compliant file, however; the Four Star correspondence was not in the file. (Tr. 3080.)

Because Mr. Wegner did not know that Mr. Herula did not come to the office throughout 2000, he accepted Jason Ullom's false answer that no registered representatives worked outside the Cranston branch office. Mr. DiGirolamo did not think notice of problems with unauthorized correspondence was necessary if the branch manager believed the problem had been resolved.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN[FN67] (Tr. 3078, 3080.) Mr. Wegner was unaware, and could not report, that Mr. Herula never returned the Financial Advisor Annual Compliance Interview questionnaire he left for him because, under Raymond James's procedures, Mr. Wegner's responsibility for the audit ended when he submitted his report to the Compliance Department. (Tr. 3033- 35, 3068.)

*51 Raymond James did not follow NASD Notice to Members 98-38 (Notice 98-38), issued May 1998, which states that a member's supervisory responsibility includes maintaining a record of the location of all unregistered offices. Notice 98-38 cites NASD Rule 3010(c) as requiring that members conduct inspections of unregistered locations in accordance with a regular schedule. (Div. Ex. 336.) Raymond James's expert testified that he saw nothing to indicate that Raymond James had an inspection schedule. (Tr. 3127.) The evidence is that Raymond James did not have accurate information about the actual work locations of the approximately five or six registered representatives assigned to the Cranston branch office. Jason Ullom told Mr. Wegner that there were no registered representatives working outside the office. (Tr. 3030) Mr. Ullom, however, testified that three of the six registered representatives, excluding Mr. Herula, did not regularly work at the Cranston branch office. (Tr. 1031-32.) Even accepting that NASD's notices to members are advisory, given Raymond James's large number of widely dispersed registered representatives, I find that it should have maintained a record of those who operated regularly from unregistered locations and inspected those locations on a regular schedule.

At a minimum, the following matters should have alerted Raymond James to possible illegal conduct and required more investigation than Raymond James provided: (1) the Provident letter in January 2000; (2) the Lanciano letter in March 2000; FN[FN68] (3) oral reports from sources outside Raymond James in May 2000, that Brite Business representatives were using Raymond James's name in solicitations; and (4) the Four Star correspondence received in July/August 2000. The Commission has stated that "it is especially imperative in organizations that those in authority exercise particular vigilance when indications of irregularity reach their attention." Shearson Lehman

Hutton, Inc., 49 S.E.C. 1119, 1124 (1989) (citing Wedbush Sec., 48 S.E.C 963, 967 (1988)). The evidence, however, does not support the Division's position that some of the other situations were red flags. The unanimous evidence is that no one at Raymond James, except Mr. Ullom who is not credible, saw a connection between the transactions Brite Business proposed and Brite Business's purchase of Treasuries, or suspected that Brite Business was an illegal enterprise.

Based on his demeanor and responses to cross examination, I find that Mr. Putnam gave credible, candid testimony. The record, however, contains no reasonable explanation why Mr. Putnam excused Mr. Herula's violations of Raymond James's rules against unauthorized correspondence as naïve errors when Mr. Herula had more than twenty years of experience in the securities industry. In addition, Mr. Putnam knew that Mr. Herula was raising funds for Brite Business. Given this knowledge, it was unreasonable for Mr. Putnam to accept Mr. Herula's representation that he would not write any additional letters like the Provident and Lanciano letters; to rely completely on Mr. Ullom to ensure that Mr. Herula was in compliance; and to accept, without verification, Mr. Ullom's representations that the oral reports in May 2000 did not involve Brite Business representatives and that the Four Star correspondence was unlike the Lanciano letter. See Shearson Lehman Bros., Inc., 36 SEC Docket 1075, 1085 (Sept. 24, 1986) (the Commission has often expressed its views that a system of supervisory procedures which rely solely on the branch manager is insufficient); Charles Schwab & Co., Inc., Admin Proc. 3-6222 (Dec. 28, 1983), final, 29 SEC Docket 1070 (Jan. 26, 1984) (It is unacceptable to take an employee's words or explanations when questionable events are looked into).

*52 Mr. Putnam and Mr. DiGirolamo held widely different views on the role of the Compliance Department. These differences prevented implementation of Raymond James's supervisory procedures. Mr. Putnam appears to believe that the Compliance Department operated independently without input from him (Tr. 2022-23.) In contrast, Mr. DiGirolamo, viewed the Compliance Department's role as a support function for senior management, and that senior management had to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approve any disciplinary action. (Tr. 2543-44, 3441; Div. Ex. 325 at 5981.) Mr. Putnam intended to send Mr. DiGirolamo a copy of the Lanciano letter; however, Mr. DiGirolamo never received it. (Div. Ex. 272; Tr. 1962.) Mr. Putnam never told the Compliance Department to place Mr. Herula on heightened supervision because if the Compliance Department "had wanted to put him on heightened supervision, [Mr. DiGirolamo] could do so, you know, if he felt it was appropriate." (Tr. 1962.)

Well, what normally happens is if compliance finds something that they are concerned enough with, they will want to put someone on heightened supervision. If someone gets a major complaint, you know, the compliance people will put people on heightened supervision. If they want to discuss that with us as sales supervisors, they'll come and discuss it with us. (Tr. 1962.) Mr. Putnam does not explain how the Compliance Department would have been alerted to the facts showing that Mr. Herula required heightened supervision if he, as Mr. Herula's supervisor, did not inform the Compliance Department of Mr. Herula's conduct.

Mr. Putnam did not inform Mr. DiGirolamo, or anyone in the Compliance Department, about Mr. Herula's unauthorized letters that were in the Four Star correspondence. Mr. Putnam did not suggest closer scrutiny of Mr. Herula's activities because " the internal auditors don't report to me. That is a compliance function, so I would not be telling the internal auditors anything." (Tr. 2022-23.) As a result, Raymond James's Compliance Department was unaware of any questions or concerns regarding Mr. Ullom's supervision of Mr. Herula during the relevant period. (Tr. 2536.) From January through August 2000, Mr. Putnam and Mr. Ullom knew that Mr. Herula sent unauthorized e-mails and at least three pieces of unauthorized correspondence, and Mr. Putnam knew of one suspect oral representation by Brite Business. The Compliance Department detected none of these happenings through its compliance efforts and Mr. Herula's supervisors did not provide it with this information.

The restrictions Mr. Putnam placed on the Brite Business account following the Lanciano letter were meaningless. Mr. Putnam expert viewed them as " simply an informational check." (Tr. 3479.) The

record shows nothing that would cause Mr. Putnam to be so confident that he would not seek confirmation that Mr. Herula was being closely supervised. On these facts, Mr. Putnam did not act reasonably. He should have asked the Compliance Department to investigate whether Mr. Herula was acting legitimately and whether Mr. Ullom was closely supervising Mr. Herula.

*53 It is impossible to reconcile the evidence in this record and the expert opinions of Mr. Corrigan, Mr. Forde, and Ms. Kerns, that Raymond James's system of supervision met or exceeded industry standards and/or Raymond James exercised reasonable supervision.[FN69] The overwhelming evidence requires a different conclusion. Mr. Herula sent out many pieces of unauthorized correspondence on Raymond James letterhead in 1999 and 2000 that went undetected. The head of the Compliance Department was unaware of Mr. Herula or Brite Business. Raymond James knew Mr. Herula was working for Brite Business, yet it took no effective action despite five unauthorized pieces of correspondence and one oral report that Brite Business was using Raymond James's name in solicitation efforts for Brite Business.[FN70] Mr. Herula never received a letter of caution or a fine for sending unauthorized correspondence even though those sanctions were called for by Raymond James's standards for the treatment of infractions (Tr. 2565, 2636- 37.) Mr. Herula worked at the Cranston branch office infrequently in the first half of 2000 and not at all in the second half of the year, yet the Cranston branch audit conducted in October 2000 indicated he did not work outside the office. The deficiencies in Raymond James's supervisory procedures also include: (1) Mr. DiGirolamo's failure to receive a copy of the Lanciano letter, a significant matter to which there was no follow up; and (2) the Compliance Department's lack of knowledge that Mr. Herula never filed a request to do outside work for Brite Business and never returned the Financial Advisor Annual Compliance Interview questionnaire that the auditor left for him in 2000.

The record contradicts Mr. Helck's claim that Raymond James has higher standards than many broker- dealer firms and terminates registered representatives for a variety of reasons, including unprofessional behavior and low production. (Tr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3433-35.) Mr. Herula worked for Raymond James for over a year with few clients, he was unprofessional and, according to Raymond James, the firm did not profit financially from his endeavors. (R.J. Ex. 2422.)

For all the reasons stated, I find in these circumstances that Raymond James and Mr. Putnam failed to reasonably supervise Mr. Herula, a person subject to their supervision, with a view to preventing or detecting Mr. Herula's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5.

### 2. Alleged Antifraud Violations

#### Arguments of the Parties

The Division argues that Raymond James is liable for Mr. Herula's fraudulent actions because Mr. Herula was "acting within the apparent authority of his position as a [Raymond James] representative." (Div. Post-Hearing Br. 78; Div. Reply Br. 1-24.)

Raymond James responds that it did not violate Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b-5. (R.J. Post-Hearing Br. 1-29; R.J. Proposed Findings 162-71.) Raymond James argues that the antifraud charge is: (1) inconsistent with Commission policy; (2) unwarranted because Raymond James did not commit securities fraud in that it did not engage in the offer or sale of Brite Business securities and did not make representations to defraud investors; (3) barred by Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994) (Central Bank ); (4) barred because federal courts refrain from creating liability that is not specified in the securities statute; and (5) barred because no corporate officers of Raymond James were actors or participants in the fraud. In addition, Raymond James argues that general agency theories do not provide for liability by Raymond James for Mr. Herula's criminal conduct. It contends that the Division failed to prove the requirements of the legal doctrines of respondeat superior and apparent authority.

#### Conclusions

*54 I reject Raymond James's position that

Central Bank eliminated respondeat superior liability and that, in this administrative proceeding, the only liability theory available to the Division is aiding and abetting. I find these arguments to be without merit. Central Bank eliminated the ability of private litigants to bring civil claims for aiding and abetting under the securities laws and, therefore, its holding is limited to private civil actions. See 511 U.S. at 191. For these reasons, it is wholly inapplicable to whether, on these facts, Raymond James violated the antifraud provisions of the securities statutes in a Commission administrative proceeding.

I conclude that the law of agency and the doctrine of respondeat superior are available to find Raymond James liable for Mr. Herula's illegal actions.[FN71] I conclude that Central Bank did not invalidate the existing law on agency, the doctrine of respondeat superior, or the legal theory of apparent authority. Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001); Dinco v. Dylex Ltd., 111 F.3d 964, 968 (1st Cir. 1997); AT&T Co. v. Winback Conserve Program, Inc., 42 F.3d 1421, 1430-31 (3rd Cir. 1994).

I reject Raymond James's argument that it would be inconsistent with Commission policy to hold it liable for Mr. Herula's actions. Raymond James fails to cite to any authority that directly supports its position that the Commission has "reserved the use of direct fraud charges against a broker-dealer to those instances in which principals are senior managers of the firm involved in the fraud and the entity is essentially acting as a fraudulent enterprise. " (R.J. Post-Hearing Br. 9.) In fact, as the Division correctly points out, corporations, including broker-dealers, have frequently been held liable for the actions of lower-level employees (Div. Reply Br. 6-7.) (citing AT&T Co., 42 F.3d at 1438 (independent contractor sales representatives); Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1567, 1578-79 (9th Cir. 1990) (registered representative); Hunt v. Miller, 908 F.2d 1210, 1216 n.15 (4th Cir. 1990) (broker); King v. Horizon Corp., 701 F.2d 1313, 1314, 1318-19 (10th Cir. 1983) (sales representative); Henricksen v. Henricksen, 640 F.2d 880, 881, 887-88 (7th Cir. 1981) (registered stockbroker); Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1118-19 (5th Cir. 1980) (registered representative); Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 715-17 (2d Cir. 1980) (broker-trainee); Holloway v. Howerdd, 536 F.2d 690, 694, 696 (6th Cir. 1976) (registered agent); Lewis v. Walston & Co., Inc., 487 F.2d 617, 625 (5th Cir. 1973) (registered representative); Armstrong, Jones & Co. v. SEC, 421 F.2d 359, 362 (6th Cir. 1970) (salesmen); SEC v. Currency Trading Int'l, No. CV 02-05143PA, 2004 WL 2753128, at *11 (C.D. Cal. Feb 2, 2004) (brokers); Kravitz v. Pressman, Frohlich & Frost, Inc., 447 F. Supp 203, 207, 215 (D. Mass. 1978) (broker/registered representative); Merrill Lynch, Pierce, Fenner & Smith, Inc., 13 SEC Docket 646, 651 n.13 (Nov. 9, 1977) (account executives) (settled order).

*55 Finally, Raymond James argues that it cannot be held liable because Mr. Herula's actions were criminal. As authority for this proposition Raymond James cites Restatement (Second) Agency § 231. However, Section 231 states that "an act may be within the scope of employment although consciously criminal or tortious." (R.J. Post-Hearing Br. 23.) Section 231 also states, an employer will not be "responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result." Restatement (Second) Agency § 231(a) (1958). Thus, if Mr. Herula's acts, although criminal, were in the scope of his employment or foreseeable in the accomplishment of an authorized result, Raymond James should be held liable. (Id.)

I take official notice of the Memorandum and Order by U.S. District Court Judge Mary M. Lisi holding Mr. Herula liable for violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5. 17 C.F.R. § 201.323 ; SEC v. Herula, C.A. No. 02-154 ML (D.R.I. Oct. 17, 2002).[FN72] Mr. Herula committed these antifraud violations while he was associated with Raymond James as a registered representative. (R.J. Answer; Div. Ex. 82; Putnam Ex. 1116; R.J. Post-Hearing Br. 2.)

It is a well-established principle that a corporation may be held liable for the acts of its agents. See American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 565-66 (1982) Specifically, a principal is liable for the tortious acts

of its agent, even though not authorized, if the agent was acting within the scope of his employment or with apparent authority. Id.; see also Hollinger, 914 F.2d at 1576 & 1577 n.28; Armstrong, Jones & Co., 421 F.2d at 362; Merrill Lynch, Pierce, Fenner & Smith, Inc., 13 SEC Docket 646, 651 n.13 (Nov. 9, 1977); Restatement (Second) of Agency §§ 219, 229 , 257, 261, 265 (1958). The Commission has long held the position "that a broker-dealer may be sanctioned for the willful violations of its agents through [common law principles of agency]." Armstrong, Jones & Co., 421 F.3d at 362 (collecting cases); see also Merrill Lynch, 13 SEC Docket at 651 n 13 (citing several Commission enforcement proceedings wherein common law principles of agency were applied); SEC v. Cooper, 402 F.Supp. 516, 525 n.31 (S.D.N.Y. 1975) (" [r]egistrant as a firm can only act through its employees and agents").

*56 For an agent's conduct to be within the scope of employment, it must be the same general nature as that authorized, or unauthorized but similar or incidental to authorized conduct. Restatement (Second) Agency § 229 (1958). An agent's conduct is "incidental" to his authorized duties if it is " foreseeable," meaning it was "a direct outgrowth of the employee's instructions or job assignment." Haddon v. United States, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (quoting Boykin v. District of Columbia, 484 A.2d 560, 562 (D.C. 1984)). Even when an agent acts outside the scope of their employment, a principal may still be held responsible for the agent's actions if a third party relied on the agent's apparent authority. Restatement (Second) § 219(2)(d) (1958).

Liability arises under apparent authority when a principal allows or causes a third person to believe that the agent acted with the principal's authorization. See American Soc'y of Mech. Eng'rs, 456 U.S. at 566; First Interregional Equity Corp. v. Haughton, 805 F. Supp. 196, 201-02 (S.D.N.Y. 1992); Moro-Romero v. Prudential Securities, Inc., 1991 WL 494175, *3 (S.D. Fla. 1991) (unpublished); Restatement (Second) Agency § 261 (1958). The appearance of authorization may be created through silence by the principal, and the principal's authorization or knowledge of the agent's misrepresentations is irrelevant. Moro-Romero, 1991 WL 494175, at *3. The fact that the agent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

acted entirely for his or her own benefit does not absolve the principal of liability, so long as the third party justifiably relied on the agent's apparent authority. Id. However, the third party has a duty of inquiry if a reasonable person would inquire given the same factual setting. Id.

The initial factual consideration is determining whether Mr. Herula's actions were within the scope of his employment, or whether Raymond James positioned Mr. Herula to portray himself as acting on behalf of Raymond James when he violated the antifraud provisions of the securities statutes.

Purchasing securities and opening accounts for customers at Raymond James was within the scope of Mr. Herula's employment with Raymond James as a registered representative. Raymond James also allowed Mr. Herula to conduct other business activities. The Registered Representative Agreement that established Raymond James's business relationship with Mr. Herula gave him "the right to solicit and engage in the purchase and sale for [Raymond James] approved securities with the general public, and engage in other business activities, except to the extent such activities are subject to the rules, regulations and interpretations of the Regulatory Authorities." (Div. Ex. 111 at 2; Tr. 1036.) Raymond James failed to follow its procedures for approving Mr. Herula's other business activity, which was raising funds for Brite Business. However, Raymond James tacitly approved of Mr. Herula engaging in this "other business activity" because Mr. Putnam and Mr. Ullom, Mr. Herula's supervisors, and Mr. Carenno became aware in approximately October 1999, that Mr. Herula was raising funds for Brite Business and never directed him to cease.

*57 It is rare for a broker-dealer firm, where the registered representatives are employees, to allow registered representatives to engage in any outside business activities.[FN[FN73]] (Tr. 1898.) On its face, Raymond James's allowing Mr. Herula to raise funds for Brite Business created a potential conflict with Raymond James's activities as a broker-dealer. For example, it was not clear to Mr. Putnam whether Mr. Herula wrote the Provident letter acting on behalf of Raymond James or Brite Business. (Tr. 1902.) Mr. Putnam characterized the Provident letter as covering a gray area. (Id.)

Soliciting people to open accounts at Raymond James was within the scope of Mr. Herula's employment. Mr. Herula continually held out to Raymond James the possibility that people with substantial assets associated with Brite Business were going to do business with Raymond James.

Mr. Putnam and Mr. Ullom testified that they thought Mr. Herula was raising funds for Brite Business from commercial institutions. The evidence is that Mr. Putnam's and Mr. Ullom's beliefs were wrong and unfounded. There was no written authorization, and thus there is no record of any limitation. Mr. Herula's oral representations and the correspondence in the record indicate that Mr. Herula attempted to raise funds for Brite Business from any source, be it a financial institution or an individual. (Tr. 89-93, 707, 710, 742- 43; Div. Exs. 44, 45, 272.) Raymond James did not authorize Mr. Herula to represent that he was acting on behalf of Raymond James when raising funds for Brite Business; however, he did so. Raymond James enabled Mr. Herula to make representations to investors that appeared to be representations by Raymond James.

Raymond James gave Mr. Herula substantial credibility by entering an employment agreement with him in August 1999. Mr. Herula was able to use his status and title as a representative of a major broker-dealer to hold himself out to the public as a person with a position with Raymond James. The evidence is that in 2000 Raymond James depicted itself in advertisements and on the Internet as a diversified financial services holding company managing over $15 billion in assets. (Tr. 232, 453; Div. Ex. 22.) Mr. Herula was allowed to use various means for conducting business that portrayed him as a representative of Raymond James, such as an e-mail address and a desk in a space identified to the public as the offices of Raymond James. Raymond James also supplied Mr. Herula with letterhead stationery that described Raymond James as member of the NASD and the Securities Investor Protection Corporation and listed the address, and telephone and facsimile numbers for the Cranston branch office.

Raymond James's name appeared on the window of the Cranston branch office, which was located in a small commercial mall. (Tr. 90.) Mr. Curl met

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with Mr. Herula in the Cranston branch office and Mr. Herula sat at a desk that had a sign with his name. (Tr. 91.) Mr. Herula assured Mr. Curl that Mr. Fitzhenry's funds would be safe in a Raymond James account and that they would be invested in United States Treasuries. (Tr. 89-93.) Mr. Curl passed these representations on to Mr. Fitzhenry. (Tr. 230-35.) Mr. Curl received two copies of a letter dated March 10, 2000, on Raymond James letterhead, signed by Mr. Herula as Investment Manager, addressed to Mr. Fitzhenry that made the unauthorized representations and guarantees on behalf of Raymond James as to Mr. Fitzhenry's $12.5 million deposit in the Brite Business account at Raymond James. Mr. Curl received one copy from Mr. Herula at the meeting at the Cranston branch office. He received a second copy by facsimile. (Div. Exs. 45, 498; Tr. 94-95.) Mr. Fitzhenry viewed Mr. Herula's March 10, 2000, letter as being, in fact, from Raymond James. (Tr. 233.)

*58 Mr. Fitzhenry thought his investment was safe because his funds were being deposited with Raymond James to be used to purchase United States Treasuries and Raymond James would return his funds at his request.[FN74] (Tr. 238-39.) Mr. Fitzhenry thought, at a minimum, he would receive the interest rate on "T-bills" and anything above that would be extra. (Tr. 285.) Mr. Fitzhenry would not have invested $12.5 million without assurances that his funds would be safe at Raymond James and would be returned at his request. (Tr. 233.) This letter, along with another letter from Brite Business, persuaded Mr. Fitzhenry that his funds would be one hundred percent safe. (Tr. 235.) The evidence is that Mr. Fitzhenry and Rheaume Holdings invested $12.5 million in Brite Business on March 27, 2000, based on the false representations Mr. Herula made as a Raymond James Investment Manager. Mr. Fitzhenry had a reasonable basis for his belief that Mr. Herula acted with authorization from Raymond James.

Mr. Herula confirmed information Mr. Monlezun received from people in Texas that he could participate in a pool of funds which would result in a high-yield transaction. (Tr. 711.) Mr. Herula was allegedly an expert, having done similar transactions many times for Raymond James. (Tr. 707.) Mr. Herula contacted Mr. Monlezun and

promised fantastic returns and a safe investment. (Tr. 711-12, 729.) Mr. Monlezun transferred $1 million to the Mary Lee Capalbo, Esq., Special Client Account at Raymond James to invest in Brite Business based on false representations and guarantees made by Mr. Herula as a Raymond James Investment Manager. Among other things, Mr. Herula falsely represented that Mr. Monlezun's funds would be safe and that transfers from the account would occur only with Mr. Monlezun's written permission. The fact that Mr. Monlezun believed that high-yield transactions existed, that he had been trying to participate in one for several years, and that he tried to gather other investors to participate, does not change the fact that Mr. Herula, acting with apparent authority from Raymond James, committed fraud in connection with Mr. Monlezun's investment of $1 million in Brite Business.[FN75]

The evidence is that Mr. Fitzhenry and Mr. Monlezun reasonably believed that Mr. Herula was authorized to act for Raymond James and relied on his fraudulent representations and guarantees apparently made on behalf of Raymond James in making their decisions to invest in Brite Business. Mr. Herula's association with Raymond James gave him the ability: to establish brokerage accounts related to Brite Business; to use Raymond James letterhead stationery to make unauthorized representations and guarantees; to use Raymond James's name, reputation, business address, and communication networks to make his representations appear legitimate and on behalf of Raymond James; and at the same time Raymond James allowed Mr. Herula to raise money for Brite Business. For all the reasons stated, I find Raymond James liable for Mr. Herula's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5.

### 3. E-Mail Retention

#### Arguments of the Parties

*59 The Division claims that Raymond James violated Section 17(a)(1) of the Exchange Act and Rule 17a-4 because prior to January 2001, Raymond James's systems did not systematically preserve all its branch offices' electronic mail. The Division contends the system omitted: (1) branch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                                                                 Page 47

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

office personnel to whom Raymond James did not assign an e-mail account/mailbox; and (2) branch office personnel with mailboxes who opened the message the same day the message was received or who deleted items from their delete file (double delete) the same day the item was sent or received. In the alternative, the Division faults Raymond James for failing to have adequate policies and procedures for making and filing hard copies of business related e-mails. (Div. Post-Hearing Br. 101.)

Raymond James advances five major arguments why the Division has not shown that it willfully committed the alleged books-and-records violations during the relevant period. According to Raymond James, it used the best available methods to comply with the 1997 Release by adopting a paper printout policy, retaining daily e-mail server back-up tapes, and implementing a first-generation computerized e-mail retention and storage system. (R.J. Post-Hearing Br. 64.) Raymond James contends it reasonably relied on Commission staff assurance that the Division would not enforce the 1997 Release in view of discussions, which the participants thought would result in guidance or relief. The technology needed to achieve compliance with the 1997 Release was not available. The 1997 Release is invalid because: (1) the Commission did not comply with the Administrative Procedures Act, the Paperwork Reduction Act, and the Regulatory Flexibility Act; and (2) it conflicts with the Electronic Signatures in Global National Commerce Act. (R.J. Post-Hearing Br. 69-72.)

Conclusion

Section 17(a)(1) of the Exchange Act provides that each member of a national securities exchange, broker, or dealer "shall make and keep for prescribed periods such records, furnish copies thereof, and make and disseminate such reports as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this title." Exchange Act Rule 17a-4(b)(4), which requires broker-dealers to " preserve for a period of not less than three years, the first two years in an easily accessible place ... [o]riginals of all communications received and

copies of all communications sent ... by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such, " has been in place for many years. 17 C.F.R. § 240.17a-4(b)(4).

On February 5, 1997, the Commission issued the 1997 Release titled a Final Rule, Reporting Requirements for Brokers or Dealers Under the Securities Exchange Act of 1934. 63 SEC Docket 2298 (Feb. 5, 1997) (1997 Release). The 1997 Release made clear that Rule 17a-4 includes electronic communications and that:

> *60 the content of the electronic communication is determinative, and therefore broker-dealers must retain only those e-mail and Internet communications (including inter-office communications) which relate to the broker-dealer's "business as such."Id.

The persuasive evidence is that Raymond James assigned mailboxes to all registered representatives and had a policy that all business should be conducted using a Raymond James account. (Tr. 1271, 3268, 3316- 17, 3363-64.) The Division's information from Raymond James that "[p]rior to January 1, 2001, only some branch office personnel were assigned RJFS mailboxes" was erroneous. (Tr. 3320; Div. Ex. 313 at 27.)

The evidence is that Raymond James supervisory manuals required that branch offices retain three years' worth of correspondence. (Tr. 2448-50; R.J. Ex. 2533 at 8663.)

It is undisputed that in the relevant time period Commission's staff was (1) informing the industry that Rule 17a-4(b)(4) would be modified, and (2) requesting that the NYSE not enforce the rule. The undisputed testimony of Mr. Pallante, which corroborates Mr. Fredriksen's testimony, is that in 1999 and 2000, senior staff members of the Commission represented to the broker-dealer industry generally and openly that the Commission would likely modify and make less stringent the requirements of the 1997 Release. In these circumstances, it would be patently unfair and unacceptable in view of the senior staff's actions and representations to find that Raymond James did not take steps to comply with Rule 17a-4(b)(4). My ruling does not violate the well settled principle that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individual Commission staff members cannot speak for the Commission.

I observed Mr. Fredriksen and find that he gave credible testimony. Nothing in the record contradicts Mr. Fredriksen's representation that Raymond James instructed him as assistant vice president of information security in May 1999 to take steps to have Raymond James comply with the 1997 Release. Furthermore, the evidence is that Raymond James implemented what Mr. Fredriksen recommended as the most appropriate actions to accomplish that objective. (Tr. 3256-57, 3378.) The Division's expert, Mr. Weeden, also gave thoughtful, credible testimony. Mr. Weeden would have made different decisions than Mr. Fredriksen, in terms of software purchases and other actions to comply with the 1997 Release, but he acknowledged that Raymond James had been partially compliant. (Tr. 3544.) The testimony of Mr. Fredriksen and Mr. Weeden is that Raymond James made a good faith effort to comply. It could probably have done more, but there is no evidence of bad faith or lack of effort.

For these reasons, I find that Raymond James did not willfully violate Section 17(a) of the Exchange Act and Rule 17a-4 during the relevant period.

## SANCTIONS

The Division requests (1) a disgorgement order, plus prejudgment interest, against Raymond James; (2) imposition of civil penalties against Raymond James and Mr. Putnam; (3) a cease-and-desist order against Raymond James; (4) an order barring Mr. Putnam from associating in a supervisory capacity, or otherwise, with any broker or dealer or investment adviser; and (5) an order requiring Raymond James to retain an independent compliance consultant and prohibiting Raymond James from opening any new branch offices or hiring any new registered representatives until it takes remedial measures. (Div Post-Hearing Br. 103-19, Div. Reply Br. 59-71.)

## Disgorgement and Prejudgment Interest

*61 Section 8A(e) of the Securities Act and Section 21C of the Exchange Act provide for disgorgement, including reasonable interest, in any

cease-and-desist proceeding. Section 203(j) of the Advisers Act contains similar language. Disgorgement is an equitable remedy whose purpose is "to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). It is settled that the disgorgement figure need only be a reasonable approximation of profits causally connected to the violations and not an exact number. First City, 890 F.2d at 1231. Once the Division shows that its disgorgement figure reasonably approximates the amount of unjust enrichment, the burden shifts to the respondent to clearly demonstrate that the Division's disgorgement figure is not a reasonable approximation. SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996). Any risk of uncertainty as to the disgorgement amount falls on the wrongdoer whose misconduct created the uncertainty. First City, 890 F.2d at 1232.

The Division requests that Raymond James, as Mr. Herula's principal, be held jointly and severally liable for Mr. Herula's antifraud violations and should also be liable for failing to supervise Mr Herula, thereby failing to prevent those violations. According to the Division, Raymond James should be ordered to disgorge $13,873,858.34, the amount of funds the Division alleges was under Raymond James's control that was not returned to investors. (Div. Post-Hearing Br. 105.) If an insufficient basis exists for disgorgement of this amount, the Division requests disgorgement of $8,530,842.65, the amount Mr. Herula and Ms. Capalbo misappropriated for their personal benefit while the funds were under Raymond James's control. (Div. Reply Br. 61.)

The Division also requests that Raymond James be ordered to disgorge $1,840,976.98 in margin interest, fees, and commissions that Raymond James and its affiliates received from Brite Business investors. (Div. Post-Hearing Br. 107.) Included in this amount is $1,789,820.58 of margin interest earned by R.J. & Associates (R.J. Ex. 2422.) Finally, the Division cites Rule 600(a) of the Commission's Rules of Practice, 17 C.F.R. § 201.600, that requires payment of prejudgment interest on disgorged sums. (Div. Post- Hearing Br. 107-08.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Raymond James argues that disgorgement is not available because it received no illegal profits and no unjust enrichment. Raymond James contends that the Division's disgorgement amount is inappropriate because R.J. & Associates, a separate entity, extended the margin loan to Brite Business and earned most of the margin interest. Raymond James claims that it received no financial benefit from the transaction. (R.J. Post-Hearing Br. 77.) Raymond James also contends that the net margin interest received by R.J. & Associates was $471,823. (R.J. Ex. 2422.) Raymond James arrives at this figure by claiming that R.J. & Associates would have earned $1.2 million on these funds by investing in overnight securities. It also argues that the net total was further reduced because R.J. & Associates borrowed funds from an unrelated bank at a cost of $45,173 and Raymond James paid out an additional $35,603 to the Cranston branch office. FN[FN76] (R.J. Ex. 2422.)

*62 From November 2, 1999, through December 15, 2000, the Brite Business and related accounts generated total gross commissions of $54,875.00. (Tr. 2833-34; R.J. Ex. 2660.) Of this amount, $49,008.75 went to the Cranston branch office for distribution to Foxhill, Mr. Ullom and Mr. Herula, Raymond James retained $5,866.25, and R.J. & Associates retained $313.50. (Id.) Raymond James argues that none of these funds came from an illegal transaction. Raymond James concludes that after considering the $2.5 million settlement reached with Rheaume Holdings/Mr. Fitzhenry, it lost almost $2.5 million as a result of the activity in Brite Business and related accounts. (R.J. Ex. 2422.)

The undisputed evidence is that Raymond James retained $5,866.25 in commissions and fees from the Brite Business accounts and that it earned this amount as a result of the fraud in which Mr. Herula participated. (Tr. 2834.) I find that $5,866.25 can be considered as ill-gotten gains or unjust enrichment and Raymond James should disgorge this amount, plus prejudgment interest beginning January 1, 2001, the first day of the month after it terminated Mr. Herula.

I reject the Division's position that as to Raymond James either the $13,873,858.34 or the $8,530,842.65, funds in the Brite Business accounts at the broker-dealer, come within the accepted definitions of ill-gotten gains or unjust enrichment. To gain or be enriched by something, you have to receive a benefit or use it in some way. Raymond James did neither with respect to these funds. Rather, it acted as custodian and followed the directions of Mr. Fife or Ms. Capalbo and transferred the funds to others. Raymond James did not use these funds or receive any benefit from them.

I also find that Raymond James should not be ordered to disgorge the $1,789,821 paid to R.J. & Associates as a result of Brite Business's purchase of Treasuries on margin. The margin loan was made by R.J. & Associates, not Raymond James. (Tr. 2821-22.) R.J. & Associates, a separate business entity, is not a named respondent. There is no evidence that Raymond James made a profit from the transaction. (Tr. 2958; R.J. Ex. 2422.) Moreover, the record does not show that the purchase of Treasuries on margin by Brite Business involved fraud by Mr. Herula. Despite the various creative theories advanced by the Division, there is no legal basis for ordering Raymond James to disgorge margin interest received by R.J. & Associates and not Raymond James.

### Civil Penalties

Section 21B of the Exchange Act provides that in any proceeding instituted under Section 15(b) of the Exchange Act, the Commission may impose a civil penalty against a person if it finds that the person has willfully violated a provision of the Securities Act or the Exchange Act, or the rules thereunder, or has failed reasonably to supervise within the meaning of Section 15(b) of the Exchange Act. FN[FN77] The Commission must also find that such a penalty is in the public interest. Section 203(i) of the Advisers Act contains similar language.

*63 Section 21B of the Exchange Act and Section 203(i) of the Advisers Act identify the following factors for determining whether a penalty would be in the public interest: (1) whether the act or omission involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; (2) the resulting harm to others; (3) unjust enrichment, taking into account any restitution made; (4) prior violations; (5) need for deterrence; and (6) such other matters as justice may require.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The maximum amount per act or omission is set out in Section 21B(b) of the Exchange Act and Section 203(i)(2) During the relevant period, the maximum penalty for each act or omission at the first tier was $5,500 by a natural person and $55,000 by any other person; $55,000 for each act or omission by a natural person and $275,000 by any other person at the second tier; and $110,000 for each act or omission by a natural person and $550,000 by any other person at the third tier. FN[FN78] 17 C.F.R. § 201.1001. A second- tier penalty is permissible if the act or omission involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. A third-tier penalty is permissible for an act or omission that not only must have involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, but also must have "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission."

The Division recommends imposition on Raymond James of a civil penalty at the third- tier level for each of "at least [twenty-seven] misleading letters" and [one] e-mail that Mr. Herula sent on Raymond James letterhead, or, alternatively, for each of "at least [sixteen] categories of red flags" that Raymond James ignored and "for each of the [six] general bases" the Division cited as Raymond James's failure to supervise. (Div. Post-Hearing Br. 110.)

The Division recommends imposition on Mr. Putnam of a reasonable civil penalty at the third-tier level. The Division suggests a penalty for each of " at least [fifteen] categories of red flags" that Mr. Putnam allegedly ignored. At a minimum, the Division would impose a civil penalty for each of the three unauthorized pieces of correspondence that Mr. Putnam knew about. (Div. Post-Hearing Br. 111.)

Raymond James argues that the Division has not shown that it committed a willful violation, a requisite for the assessment of a civil penalty. It maintains that it is not in the public interest to impose a civil penalty at any level, but certainly not at the third-tier level where: (1) Raymond James

was not involved in any fraud, deceit, or manipulation and did not deliberately or recklessly disregard any regulatory requirement; (2) no individual was harmed by its actions; and (3) it was not enriched. Raymond James argues that the Commission should not impose a penalty on Raymond James because the district court and the Commission have assessed penalties against Mr. Herula and Mr. Ullom, the individuals who participated in and perpetuated the fraud.

*64 Mr. Putnam argues that no civil penalty is justified in that his actions were reasonable at the time. Mr. Putnam contends that even if he failed to supervise Mr. Herula, his conduct did not meet the criteria for a penalty at the second or third tier. Mr. Putnam argues that failure to supervise involves a course of conduct, not a discrete violation, and that distinction makes the Division's proposed method of calculating a penalty inapplicable.

This Initial Decision finds Raymond James liable for willful violations of the Securities Act and Exchange Act and rules thereunder, and that Raymond James and Mr. Putnam failed reasonably to supervise, within the meaning of Section 15(b)(4)(E) with a view to preventing violations of the antifraud provisions by a person who was subject to their supervision. Addressing the six factors used to analyze whether a civil penalty is in the public interest, I conclude the following: Mr. Herula's violations, for which Raymond James is liable, involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements. The significant financial losses suffered by investors were a result of Mr. Herula's actions for which Raymond James is liable. It is probable that Raymond James's and Mr. Putnam's failures to supervise Mr. Herula contributed to investor losses. Raymond James evidenced a low regard for supervision and compliance during the relevant period because it had from 1,100 to 4,000 registered representatives operating in small offices throughout the country without uniform policies and a restructured compliance program that was inadequately staffed for a new merged entity. Raymond James's failure to supervise Mr. Herula was such that he was able to participate in a large-scale fraud using his position at Raymond James for over a year. This fact, which occurred despite some red flags, indicates that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Raymond James had serious problems with supervision during the relevant period. This finding is confirmed by the fact that Mr. Putnam only learned that Mr. Ullom knew about Mr. Herula's correspondence and received funds from Mr. Herula as a result of the Commission investigation. FN[FN79] (Tr. 1595.) An important purpose of sanctions is to serve as a deterrent against further violations by the individuals involved and for others in the securities industry. See Meyer Blinder, 53 S.E.C. 250, 253 (1997); Kenneth Sonken, 48 S.E.C. 832, 836 (1987). For all the reasons cited, in these circumstances, I find a strong penalty is warranted.

Civil penalties should be assessed at the third-tier level because the violations involved fraud, deceit, or deliberate or reckless disregard of the regulatory requirements and resulted in substantial losses to investors. I will not apply the maximum amounts allowed at the third-tier level because, except for the events at issue, the record does not show that Raymond James and Mr. Putnam have a poor record of compliance. In making this judgment, I have considered the twelve arbitration awards over the past three years cited by the Division and the fact that Raymond James requires that its customers agree to binding arbitration. The number of arbitration awards seems low given that Raymond James had over 500,000 accounts during this period. (Tr. 2788.) I have also considered that Mr. Putnam's prior violations occurred more than twenty-five years ago.

*65 I find that Raymond James should pay a civil penalty of $300,000 for each of twenty-three unauthorized pieces of correspondence that Mr. Herula sent on Raymond James letterhead in connection with his fraudulent activities that are in evidence, and which were part of Raymond James's failure to reasonably supervise Mr. Herula with a view to preventing Mr. Herula's antifraud violations. FN[FN80] I find that Mr. Putnam should pay a civil penalty of $50,000 for each of four occurrences where he failed to reasonably supervise Mr. Herula with a view to preventing Mr. Herula's antifraud violations. The four occurrences are the Provident letter, the Lanciano letter, the Four Star correspondence, and the oral information from Mr. Ness that persons were using Raymond James's name when raising funds for Brite Business.

Proposed amendments to the Commission's Rules of Practice state that one purpose is to make clear that an administrative law judge has authority under Rule 1100, 17 C.F.R. § 201.1100, to create a Fair Fund under Section 308 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7246(a). See Commission Release No. 34-51595 (April 21, 2005). I will use Rule 1100 to create a Fair Fund to benefit Mr. Fitzhenry and Mr. Monlezun, the investors harmed by the violations.

## Cease-and-Desist Order

The Division argues that Raymond James should be ordered to cease and desist from committing any future violations of Sections 17(a) of the Securities Act and Sections 10(b) and Rule 10b-5 FN[FN81] The Division contends that Mr. Herula's antifraud violations, which are attributable to Raymond James, were egregious, recurrent and demonstrated a high degree of scienter. The Division contends that in the last three years Raymond James has been found liable in twelve arbitrations indicating that there is a risk of future violations by Raymond James's agents. (Div. Post- Hearing Br. 113.) The Division argues that Raymond James has failed to acknowledge its wrongdoings and has not offered any persuasive assurances against future violations. (Div. Post-Hearing Br. 114.)

Raymond James contends that a cease-and-desist order is unjustified because there is no risk of any future violation. (R.J. Post Hearing Br. 90.) None of the managers involved in these matters continue to hold supervisory positions. Since December 2000, Raymond James has made large-scale changes to its management structure and added compliance personnel. Raymond James's CEO is committed to making compliance and supervision one of Raymond James's highest operational priorities. (R.J. Post Hearing Br. 91-92.)

Sections 8A of the Securities Act and 21C of the Exchange Act provide that the Commission may issue a cease-and-desist order when it finds that a person is violating, has violated, or is about to violate any provision of the statutes or rules thereunder. The Commission's standard for ordering someone to cease and desist is as follows:

*66 Along with the risk of future violations, we will continue to consider our traditional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

factors in determining whether a cease-and-desist order is an appropriate sanction based on the entire record. Many of these factors are akin to those used by courts in determining whether injunctions are appropriate, including the seriousness of the violation, the isolated or recurrent nature of the violation, the respondent's state of mind, the sincerity of the respondent's assurances against future violations, the respondent's recognition of the wrongful nature of his or her conduct, and the respondent's opportunity to commit future violations. In addition, we consider whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceedings. KPMG Peat Marwick, LLP, 74 SEC Docket 384, 436 (Jan. 19, 2001).

I conclude that this record will not support imposition of a cease-and-desist order. The evidence is that traditional factors like egregious conduct, recurrent violations over an extended period, serious harm to investors, and opportunity for future violations are all present. However, there are other significant factors that show that the risk of future violations is slight. See WHX Corp. v. SEC , 362 F.3d 854 (D.C. Cir. 2004). Raymond James has fired Mr. Herula and Mr. Ullom. In deference to what it believed are the Commission's wishes, Raymond James took action so that Mr. Putnam is no longer at Raymond James nor a supervisor. (Tr. 3441-42.) I found the several witnesses associated with Raymond James and affiliated companies to be knowledgeable and committed to complying with the applicable statutes and regulations. I conclude, therefore, that the violations shown in this record do not reflect the corporate culture at Raymond James. I accept the sworn testimony of Mr. Helck that Raymond James is embarrassed that these events occurred and that it will give more scrutiny to the day-to-day activities of persons associated with the firm. (Tr. 3439, 3443.) Most important, I give significant weight to Mr. Helck's testimony that Raymond James is in the process of carrying out the request of the audit committee of the holding company that it retain an outside consultant to evaluate its compliance and supervision systems and report its conclusions to the audit committee.

(Tr. 3438-39.)

For all these reasons, I conclude that a cease-and-desist order is not necessary for the future protection of public investors and the capital markets.

### Bar from Association on Mr. Putnam

The Division recommends that the Commission bar Mr. Putnam from associating with a broker-dealer or investment adviser in a supervisory capacity, or otherwise. The Division alleges that Mr. Putnam's failure to reasonably supervise Mr. Herula was egregious, continued over an extended period, and that Mr. Putnam's failure to act appropriately "was responsible, in part, for the success, magnitude and duration of Herula's fraudulent scheme." (Div. Post-Hearing Br. 116.) The Division notes that Mr. Putnam remains convinced that neither he nor Raymond James failed to supervise Mr. Herula.

*67 Mr. Putnam argues that a bar is unjustified based on his conduct. Moreover, Mr. Putnam does not supervise sales personnel any longer and he has no plans to do so in the future. (Putnam Post-Hearing Br. 67-70.)

Sections 15(b)(6) of the Exchange Act and 203(f) of the Advisers Act provide that the Commission may censure, place limitations on the activities or functions, or suspend for a period of up to twelve months or bar a person who was associated with a broker-dealer or investment adviser at the time she committed wrongdoing. The factors for assessing whether a sanction is appropriate pursuant to Section 15(b)(6) of the Exchange Act and Section 203(f) of the Advisers Act are very similar to those detailed in the discussion of a cease-and-desist order. Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981). Mr. Putnam's conduct was serious. He was president of Raymond James and was Mr. Herula's supervisor. Mr. Putnam acknowledges being aware of unauthorized correspondence by Mr. Herula in March 2000, and he did not terminate Mr. Herula until nine months later. The evidence is that Mr. Putnam, a man of great accomplishment and integrity, failed reasonably to supervise Mr. Herula, a fact he fails to recognize. In these circumstances, I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

find it necessary to suspend Mr. Putnam from associating with a broker or dealer or investment adviser in a supervisory capacity for ninety days.

**Requiring an Independent Assessment**

The Division contends that Raymond James is unable to establish, implement, and then objectively assess whether its compliance policies and procedures are appropriate. The Division argues, therefore, that it is necessary that an independent consultant be mandated to ensure that appropriate changes are made. The Division would prohibit Raymond James from hiring new registered representatives and opening new branch offices until it follows the recommendations of the independent consultant. (Div. Post-Hearing Br. 118-19.)

Raymond James characterizes this proposal as draconian and unwarranted. It maintains that Raymond James, on its own initiative, is in the process of retaining an outside consultant to evaluate its systems and report on their effectiveness. (R.J. Post-Hearing Br. 98.)

Intervention of the type the Division proposes is an extreme measure warranted when it appears that the broker-dealer will not, or cannot, take remedial action on its own initiative. The evidence does not show that to be true in this situation. I accept the representation of Mr. Helck that Raymond James has taken positive steps to remedy the regulatory deficiencies shown to have existed during the relevant period, and that it is in the process of carrying out the request of the holding company's audit committee for an outside consultant's evaluation of its compliance and supervision systems. Furthermore, almost all the persons associated with Raymond James and affiliated companies who testified were credible and displayed a positive attitude about conscientiously observing the regulatory requirements of a broker-dealer firm. For the reasons stated, I deny the request that Raymond James be required to hire an outside consultant and be prohibited from opening offices and from hiring additional registered representatives.

**RECORD CERTIFICATION**

*68 Pursuant to Rule 351(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.351(b), I hereby certify that the record includes the items set forth in the revised record index issued by the Secretary of the Commission on July 28, 2005.

**ORDER**

Based on the findings and conclusions set forth above:

I ORDER, pursuant to Section 8A(e) of the Securities Act of 1933, Section 21C(e) of the Securities Exchange Act of 1934, and Section 203(j) of the of the Investment Advisers Act of 1940, that Raymond James Financial Services, Inc., shall disgorge $5,866.25, plus prejudgment interest at the rate established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), compounded quarterly, pursuant to 17 C.F.R. § 201.600. Prejudgment interest is due from January 1, 2001, through the last day of the month preceding the month in which payment is made.

I FURTHER ORDER, pursuant to Section 21B of the Securities Exchange Act of 1934 and Section 203(i) of the Investment Advisers Act of 1940, that Raymond James Financial Services, Inc., shall pay a civil penalty of $6,900,000.

I FURTHER ORDER, pursuant to Section 21B of the Securities Exchange Act of 1934 and Section 203(i) of the Investment Advisers Act of 1940, that J. Stephen Putnam shall pay a civil penalty of $200,000.

I FURTHER ORDER, pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, that J. Stephen Putnam is suspended from association with any broker, dealer, or investment adviser in any supervisory capacity for a period of ninety days.

I FURTHER ORDER, that a Fair Fund pursuant to Rule 1100 of the Commission's Rules of Practice shall be established.

I FURTHER ORDER, that the allegation that Raymond James violated Section 17(a)(1) of the Securities Exchange Act of 1934 and Exchange Rule 17a-4 is dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

I FURTHER ORDER, that the Division's request that Raymond James be ordered to cease and desist from violations of Sections 17(a) of the Securities Act of 1933 and Sections 10(b) and 17(a) of the Securities Exchange Act of 1934 and Exchange Act Rules 10b-5 and 17a-4 is denied.

Payment of disgorgement, prejudgment interest, and civil penalties shall be made on the first day following the day this initial decision becomes final. Payment shall be made by certified check, United States Postal money order, bank cashier's check, or bank money order, payable to the U.S. Securities and Exchange Commission. The disgorgement, prejudgment interest, and civil money penalties shall be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 (Fair Fund distribution). The payment, and a cover letter identifying the Respondent and the proceeding designation, shall be delivered to the Comptroller, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0- 3, Alexandria, Virginia 22312. A copy of the cover letter and instrument of payment shall be sent to the Commission's Division of Enforcement, directed to the attention of counsel of record.

*69 This Initial Decision shall become effective in accordance with and subject to the provisions of Rule 360 of the Commission's Rules of Practice, 17 C.F.R. § 201.360. Pursuant to that Rule, a party may file a petition for review of this Initial Decision within twenty-one days after service of the Initial Decision. A party may also file a motion to correct a manifest error of fact within ten days of the Initial Decision, pursuant to Rule 111 of the Commission's Rules of Practice, 17 C.F.R. § 201.111. If a motion to correct a manifest error of fact is filed by a party, then that party shall have twenty-one days to file a petition for review from the date of the undersigned's order resolving such motion to correct a manifest error of fact. The Initial Decision will not become final until the Commission enters an order of finality. The Commission will enter an order of finality unless a party files a petition for review or a motion to correct a manifest error of fact or the Commission determines on its own initiative to review the Initial Decision as to a party. If any of these events occur, the Initial Decision shall not become final as to that party.

Brenda P. Murray
Chief Administrative Law Judge

FN1. Mr. Ullom was barred: (1) from association in a supervisory capacity with any broker, dealer, or investment adviser; and (2) from association in any capacity with any broker, dealer, or investment adviser, with the right to reapply for association in a non-supervisory capacity after one year. Mr. Ullom was also ordered to pay a civil penalty of $100,000. Div. Ex. 480; 84 SEC Docket 2866 (Jan. 28, 2005). As a result of the conduct underlying this proceeding, on December 6, 2004, the district court entered a Final Judgment as to Relief Defendant David L. Ullom in SEC v. Dennis S. Herula, No. CA 02-154 ML (D.R.I. Dec. 12, 2004), which ordered Mr. Ullom liable for disgorgement of $190,000, but waived payment of all but $10,000. (Div. Ex. 182.)

FN2. Citations to the transcript of the hearing will be noted as "(Tr. __.)." Citations to the Division's exhibits will be noted as "(Div. Ex. __.)." Citations to Raymond James's and Mr. Putnam's exhibits will be noted as "(R.J. Ex. __)," and "(Putnam Ex. __.), " respectively. Citations to the Division's Proposed Findings of Fact and Conclusions of Law and its Post-Hearing Brief will be noted as "(Div. Proposed Findings __.)" and "(Div. Post-Hearing Br. __.)," respectively. Citations to Raymond James's and Mr. Putnam's Proposed Findings of Fact and Conclusions of Law and Post-Hearing Briefs will be noted as "(R.J. Proposed Findings __.)" and "(R.J. Post-Hearing Br. __.)," and "(Putnam's Proposed Findings __.)" and "(Putnam Post-Hearing Br. __.)," respectively. Citations to the Division's Reply Brief will be noted as "(Div. Reply Br. __.)."

FN3. I have considered and rejected all arguments and proposed findings and conclusions that are inconsistent with this Initial Decision. I deny Raymond James's contention that clear and convincing evidence is required to show that a respondent has violated Section 10(b) of the Exchange Act and Rule 10b-5. (R.J. Post-Hearing Br. 6 n.7.) The cases that Raymond James cites, Collins v. SEC, 562 F.2d 820, 824 (D.C. Cir. 1977) and Whitney v. SEC, 604 F.2d 676, 681 (D.C. Cir. 1979), were overruled by Steadman, supra.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. According to Brite Business, Mr. Fife, a Lehigh University graduate, was a trustee of each of the Dreyfus Funds and one of the most respected investment bankers in South Africa. Mr. Clarke gained extraordinary marketing expertise in the telecommunications industry as an area manager for British Telecom. Mr. Wachtel, Brite Business's representative for North, South, and Central America, "converted, leveraged, compounded and traded assets for some of the most well-known and influential industrialists, financial magnates such as the world-renowned gold trader, Mr. Jack Lazar." Mr. Sullivan served for eight years as Chairman of the National Football League. (R.J. Ex. 2210.)

FN5. All amounts are in United States dollars.

FN6. In February 2005, the holding company had about twenty subsidiaries or affiliates. (Tr. 1830.) These included Raymond James, Raymond James & Associates, Raymond James Trust Company, Raymond James Insurance, and Raymond James Bank. (Tr. 1618, 1830-31, 3423-24.)

FN7. The expert testimony is that many brokerage firms operate with independent contractors, persons who have other businesses or sell products other than securities. The major self-regulatory organizations do not encourage independent contractors. (Tr. 2036; R.J. Ex. 2665 at 9.) In the "wire house" model, used by older national firms such as Merrill Lynch, Salomon Smith Barney, and Dean Witter, all registered representatives are employees and they are strongly discouraged from engaging in outside activities. The term comes the fact that years ago broker-dealers with branch offices communicated by Western Union's wire system. (Tr. 1619, 2040.)

FN8. Raymond James's other divisions are the financial institutions division, the investment management division, and the business development division. (Tr. 2297.)

FN9. Prior to joining Raymond James, Mr. Ullom had a net capital violation and was involved in a dispute over the sale of a limited partnership. (Tr. 1287.)

FN10. Mr. Ullom failed to produce the Foxhill check register for 2000 in response to a

Commission subpoena. (Tr. 1522.)

FN11. As branch manager, Mr. Ullom was entitled to a percentage of the commissions earned by the branch. He assigned that amount to Foxhill. (Tr. 1310.) Foxhill paid out to the registered representatives forty-five percent of gross commissions on stocks/bonds, fifty percent on mutual funds and unit investment trusts, and fifty-five percent on insurance, variable and fixed annuities, and fifty-five percent on financial planning and advisory services. (Tr. 1310; Div. Ex. 109.)

FN12. The Rhode Island criminal proceeding was transferred to Colorado.

FN13. In 1999, the average account at the Cranston branch office had assets of $1 or $2 million; a few accounts exceeded that amount, and no accounts had assets in excess of $4 million. (Tr. 1009, 1050.) This was the first meeting Mr. Ullom had ever arranged. (Tr.1349.) Mr. Fife was allegedly referred to Mr. Herula by a Canadian investment advisor.

FN14. Mr. Maynard, a graduate of Miami University in Oxford, Ohio, and the University of Wisconsin Law School, has over thirty years experience in the area of trusts. He served in Vietnam with the Marine Corps. (Tr. 2639-40.)

FN15. Mr. Julien was controller for the holding company and Mr Kritsas was a vice president at R.J. & Associates. (Tr. 1681-82.)

FN16. Mr. Ullom claims not to have seen a facsimile Mr. Herula sent from the Cranston branch office to Brite Business dated December 9, 1999, on Raymond James's letterhead confirming the purchase, but omitting that the purchase was made on margin. He also claimed not to have seen facsimiles of Treasuries confirmations to Mr. Hertzog or "BB Brit, Beehive Int'l." (Tr. 1385, 1390; R.J. Exs. 2040-43.)

FN17. Mr. Ullom testified that Mr. Herula gave Raymond James advanced notice of the purchase but this appears to be erroneous. (Tr. 1068-72.)

FN18. Mr. Putnam understood that as part of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

repurchase agreement, the Bank of New York would buy the Brite Business Treasuries held at Raymond James. Brite Business would receive any amounts over the amounts owed in margin interest, and Brite Business would agree to repurchase the Treasuries from the Bank of New York at a later date at a fixed price. (Tr. 2128-29.)

FN19. Mr. Putnam was referring to the situation where an outside investment adviser provides the advice and Raymond James provides the record keeping. This is one of Raymond James's principal businesses, and is different from IMPAC where the financial adviser advises the client. (Tr. 1790.)

FN20. Mr. Putnam came away thinking that balance sheet enhancement was used in the bidding process, but he remained uncomfortable, especially with the litigation that could result if something went wrong. (Tr. 1821-22.) Mr. Doidge provided copies of his resume on Arthur Andersen letterhead. (Tr. 2259; R.J. Ex. 2423.)

FN21. Mr. Augenbraun believed that Mr. Putnam was going to inform Mr. Fife to wind down the Brite Business account so that Raymond James was not extending credit on the purchase of Treasuries. (Tr. 2211-12.)

FN22. Mr. Ullom did not tell Mr. Putnam that, on the same day, he had approved a letter of authorization (LOA) transmitting $10 million from the Brite Business account to Beehive International, LLC (Beehive), and a LOA transmitting $100,000 to Bill Britt representing "interest and is final payment to close out Britt/Beehive investment." (Div. Ex. 136, R.J. Exs. 2059, 2060.) Raymond James's Customer Accounts notified Mr. Putnam of the $10 million transfer to Beehive because it was a third-party distribution and it was unable to verbally confirm with Mr. Fife. (Div. Ex. 470.)

FN23. Benjamin L. Moss, III (Mr. Moss), a resident of Halton City, Texas, and graduate of Louisiana State University, is one of three ECCE owners. (Tr. 2972-74.) According to his sworn testimony, Mr. Morse believes that ECCE is legitimate. (Tr. 2974-75, 2997.)

FN24. The Manager Account Review System (MARS) report mistakenly omitted this $1 million

dollar transfer. (Tr. 2533-34; Div. Ex. 81 at 2461.) However, the underlying records show that Raymond James followed its internal procedures and called Mr. Monlezun to confirm that he wanted the transfer made. (Tr. 1512; R.J. Exs 2132, 2390, 2391, 2593-95.)

FN25. In March 4, 2002, Mr. Monlezun gave a more detailed and slightly different version of these events in a sworn statement. (Tr. 847; R.J. Ex. 2191.) The major difference is that in the written statement, Mr. Monlezun recalled that Herula transferred his $1 million to the Capalbo account at Charles Schwab in early 2001, and Mr. Monlezun agreed to participate in European trading programs initiated by Herula in February and March 2001. (Id.) Mr. Monlezun testified at the hearing that he did not authorize the transfer of his $1 million from the Mary Lee Capalbo, Esq., Special Client Account at Raymond James. (Tr. 755, 804-05.)

FN26. These events occurred before enactment of the United States Patriot Act and before major changes were made to the anti-money laundering statutes (Tr. 2778-79.)

FN27. According to one of Raymond James's experts, Mr. Forde, Customer Accounts contacted the customer on transfers to third-party or related accounts to confirm that the account holder authorized the transfer. (R.J. Ex. 2665 at 17.) Both Customer Accounts and Operations confirmed with account holders transfers of more than $50,000. (Tr. 3162; R.J. Ex. 2665 at 17.)

FN28. The Operations Department maintained a list of every third-party LOA that it approved. (Tr. 2768-69; R.J. Ex. 2408.)

FN29. Mr. Carreno, a graduate of the U.S. Air Force Academy and the University of Denver Law School, became chief compliance officer at Robert Thomas in 1994. Mr. Carreno assumed a position with Raymond James in England in March 2000. (Tr. 2350-52, 2295.)

FN30. Persons in Operations and New Accounts at R.J. & Associates had compliance responsibilities and reported serious items to the Compliance Department. (Tr. 2325.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

FN31. Division Exhibit 321 contains the internal supervisory policies in effect at Raymond James's securities division and financial institutions division between April 1999 and March or April 2000. (Tr. 2311; Div. Ex. 309.) Mr. Zaharadnick replaced Mr. Carreno until the compliance departments of Robert Thomas and IMR merged. (Tr. 2058, 2061, 2352-53.)

FN32. Mr. DiGirolamo has been with Raymond James since graduating from the University of Florida in 1984. He has spent almost his entire career in compliance. (Tr. 2490-01.)

FN33. The Compliance Department continued to use "Robert Thomas Securities, Inc. Supervisory Procedures," which it had used before the merger. (Tr. 2361-62; Div. Ex. 321, R.J. Ex. 2529.) That document has a seven-page section on Rogue Brokers, which was a response to the Commission's concern about the supervision of registered representatives with a history of poor compliance. (Tr. 2363; Div. Ex. 2559 at 4102.) Before April 2000, the rogue broker provisions of Robert Thomas applied to the securities division and financial institutions division (Tr. 3133, 3167.)

FN34. Mr. Carreno estimates that thirty percent of Raymond James's registered representatives are employed outside for compensation and therefore, should, submit an Outside Activity form. (Tr. 2331.)

FN35. One person worked out of an office of Robert Thomas in Westerly, Rhode Island, and two people, who were primarily active in insurance type products and financial planning, worked from home offices. (Tr. 1031-32.)

FN36. This change was required by NASD's Notice to Members 0221, prompted by the United States Patriot Act.

FN37. Mr. Ullom denied seeing the e-mails Mr. Herula sent and received at the Cranston branch office concerning Brite Business on January 12 and 13, and February 23, 2000. (Div. Exs. 132, 133, 135.)

FN38. The facsimile cover sheet indicates Mr. DiGirolamo was sent a copy, but he denies that he saw it. (Tr. 2483-84; Div. Ex. 272.)

FN39. In this situation, ACATING meant that no positions in the account were to be transferred to another broker-dealer or bank without contacting Mr. Putnam. (Tr. 1455.)

FN40. Mr. Putnam knew Ms. Capalbo was married to Mr. Herula when he authorized the transfers from the Brite Business account. (Tr. 1952.)

FN41. The facsimile was sent from Mr. Herula's home number.

FN42. It would have been significant for Raymond James to close a "good account like Brite Business." (Tr. 2006.) Mr. Putnam sent a copy to Mr. James because Mr. Cohn's correspondence incorrectly indicated that Mr. Cohn sent Mr. James a copy of his letter. (Div. Ex. 506.) Mr. Ullom did not send Mr. Putnam a second letter from Mr. Cohn dated July 12, 2000, or his response to the letter. (Tr. 1213-24; Div. Ex. 153.)

FN43. The Malcolm & Ursula Monlezun Account, No. 44902174 was also involved, in that it transferred funds into the Mary Lee Capalbo, Esq., Special Client Account.

FN44. The Division's witness was unaware that Mr. Monlezun received $4,207 in 1999, apparently interest while his funds were in a money market fund. (Tr. 976; Div. Ex. 81.) 37

FN45. Mr. Ullom approved Mr. Fife's application to open the Seaview account on August 17, 2000. (Div. Ex. 157.) Mr. Ullom did not inform Mr. Putnam that he had approved opening another account for Mr. Fife. (Tr. 1497.) The Division maintains that Mr. Fife also carried out a fraudulent trading program through Seaview. (R.J. Ex. 2642.)

FN46. Mr. Fife opened the Seaview Development & Holdings, Ltd. account in the Cranston branch office on August 17, 2000. (Div. Ex. 159.)

FN47. A letter on Foxhill letterhead bearing Mr. Ullom's signature was sent by facsimile from the Cranston branch office on March 6, 2000. Mr. Ullom believes the letter is a forgery. (Tr. 1445.) The letter stated that Mr. Herula, a financial consultant in good standing with Foxhill, had been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

paid the first installment under an IMPC financial agreement with Brite Business. (R.J. Ex. 2064.) Mr. Ullom testified that two letters stating that Mr. Herula earned a quarterly IMPAC fee of $250,000 sent by facsimile from the Cranston office were also forgeries but he admits signing a letter on March 10, 2000, approving the transfer of $10,000 from Mr. Herula's account to purchase a house. (Tr. 1447, 1450; R.J. Exs. 2065, 2066, 2067.)

FN48. Mr. Ullom signed a branch office compliance report on November 30, 1999, in which he verified that "no personnel in [the Cranston] branch office have accepted client checks made payable to a Financial Advisor or FA's support company." (R.J. Ex. 2553 at FW 025196.) Mr. Ullom made the same representation following receipt by Foxhill of two $50,000 checks: in August 2000, and the other in October or November 2000. Mr. Ullom acknowledges that it was inappropriate for a registered representative to receive funds from a client where the broker-dealer had no knowledge and the registered representative had not filed an outside activity report. (Tr. 1404-05.)

FN49. Mr. Wegner, age thirty-nine, holds a degree in finance from Mercer University and a Masters in Business Administration from the University of Denver. (Tr. 3014.) Mr. Wegner conducted about 250 audits for Raymond James prior to the 2000 audit of the Cranston branch office. (Tr. 3043.) Mr. Wegner, a resident of Atlanta, Georgia, pays his expenses, including travel. (Tr. 3063.) Conducting audits for Raymond James is Mr. Wegner's primary source of income. (Tr. 3062.)

FN50. As the result of new policies: (1) beginning in 2001, auditors began reviewing the branch operating account; (2) beginning in 2002 or 2003, auditors began looking at the contents of computers of registered representatives; and (3) beginning in 2003, Raymond James began examining unregistered locations where registered representatives conducted business activities (Tr. 2516, 2939-40, 3037, 3061, 3154.)

FN51. Mr. Forde, a 1965 graduate of St. John's University, was a supervisor with the NASD from 1968 until 1991. He was Compliance Director at First Union Brokerage Services, Inc., from 1991 to 1994. From 1994 to 2000, Mr. Forde was Director, Regulatory Compliance Consulting Group at PricewaterhouseCoopers LLP. (R.J. Ex. 2665.)

FN52. Mr. Forde characterizes Raymond James's procedures as more stringent than those employed generally in the industry. (R.J. Ex. 2665 at 18, 21.)

FN53. Mr. Corrigan graduated from Adelphi University, served in the U.S. Marine Corps, and worked at Merrill Lynch for thirty-five years, retiring as First Vice President and Managing Director. Mr. Corrigan now owns and operates Candlewood Consultants Corp. (R.J. Ex. 2666.)

FN54. Ms. Kern has a Bachelor of Arts from Randolph-Macon Women's College, a Master of Arts from the University of North Carolina, and a Juris Doctor from Fordham Law School. From 1983 to 1988, Ms. Kern was with Dean Witter Discover Co., and from 1989 until 2003, she was Director of Compliance at Morgan Stanley Dean Witter. Ms. Kern is currently a partner with Ferguson Pollack Kern Consulting. (Tr. 3449; Putnam Ex. 1119.)

FN55. Mr. Fredriksen became the holding company's chief security officer and Vice President, Technology Risk Management in February 2005. He graduated from Southwestern University in Tucson, Arizona, and has twenty years experience with the Eaton Corporation and the American Family Insurance. (Tr. 3195, 3200-01, 3205-06.) The 2004 Computer Security Institute's annual conference named Mr. Fredriksen one of the top five information executives. (Tr. 3196.)

FN56. According to Mr. Ullom, each registered representative in the Cranston branch office had an assigned Raymond James e-mail address and was assigned a computer owned by Foxhill. Mr. Ullom also testified that the registered representatives and others in the Cranston branch office had private e-mail addresses, but they were not approved for use in the office. (Tr. 1271.)

FN57. Mr. Fredriksen's testimony contradicts the following information that the Division received from Raymond James concerning e-mail retention.

Prior to January 1, 2001, only some branch office personnel were assigned RJFS mailboxes. Others

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)                                          Page 59

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

maintained mailboxes with other e-mail service providers and any e-mail sent to or received from such persons would not be captured on the backup tape. E-mails sent by branch office personnel who had been assigned a RJFS mailbox would be saved on the backup tape; however, e-mails they received that had been opened and downloaded from the server to their desktop were automatically deleted from the server and, therefore, not saved on the daily backup tape (any e-mails sent to or received from the home office, however, would still be maintained on the server and captured). (footnote omitted.)

(Tr. 3320; Div. Ex. 313 at 27.)

FN58. The "back-end" technology of storing e-mails had been around for only a couple of years. (Tr. 3236.) The 1997 Release required that the storage be done in a write once, read many times format (WORM), which had been available for some time. (Tr. 3237-38.)

FN59. The servers are backed up daily between 6:00 p.m. and 6:00 a.m. Technology existed that would have saved the e-mails that came into the server and were opened during business hours, but either Raymond James's software did not have the functionality or, if it did, Raymond James did not utilize it. (Tr. 3325.)

FN60. The tapes are kept in an off-site location in Florida, under a twenty-four-hour monitoring system, access is limited, and they are numbered and bar coded. Raymond James has a master documentation system and can recall a tape in twenty-four hours. (Tr. 3270-71.)

FN61. According to counsel, settlements with firms who did not comply have been in the $500,000 to $800,000 range.

FN62. Mr. Pallante, a graduate of Brooklyn College, worked for New York Stock Exchange (NYSE) from 1973 until he retired in 2004. From 1990 until 2004, Mr. Pallante was Executive Vice President, Member Firm Regulation. (R.J. Ex. 2667 at 4.) With 360 people, Member Firm Regulation is the largest of the NYSE's three regulatory divisions. The NYSE works very closely with the Commission and the NASD and considers that it takes an

aggressive approach to regulation. (R.J. Ex. 2667 at 8.)

FN63. Mr. Pallante knew that the Commission's staff was speaking with the industry, and that the NASD was not addressing the issue. (R.J. Ex. 2667 at 18-19.) He does not recall that any firms were retaining documents in an electronic format. (R.J. Ex. 2667 at 19-20.)

FN64. Mr. Weeden is an expert on the issue of the e-mail retention requirements of Exchange Rule 17a-4 and the technology available in 1999 and 2000 (Tr. 3523-24.) Mr. Weeden is the president of 17n-4, LLC, an e-mail consulting company. (Tr. 3514.) Mr. Weeden graduated from the University of California at Berkeley, California, in 1974 and attended Fordham Law School. He began his career with Weeden & Company, an equity and fixed-income trading company. (Tr. 3505-06.) In 1978, Mr. Weeded helped form a start-up company, QV Trading Systems, that marketed the electronic trading system. In 1991, he began a second start up, Document Technologies, a company that developed software to support filing reports electronically with the Commission. Document Technologies developed a software product, EdgarEase, that Mr Weeden estimates was used by half the filings submitted to Electronic Data Gathering and Retrieval (EDGAR). (Tr. 3506-13.)

FN65. Journaling sends a copy of every e-mail that goes to a server to a separate mail box. (Tr. 3535.) It is superior to backing up the servers because it copies all e-mails that are opened during business hours, and does not permit someone to double delete. (Tr. 3535.) The journaling mailbox gets large so the contents are usually stored on tape or to a WORM device. (Tr. 3538-40.)

FN66. I reject Mr. Forde's expert opinion that it was reasonable for Raymond James not to have included a review of the operating account for the Cranston branch office as part of its branch audit procedures in 2000. It is common sense that a broker-dealer needs to review the objective evidence contained in the operating account for the branch office when assessing whether an independent contractor who conducted branch operations has observed correct supervisory procedures.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)

(Cite as: Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.))

Page 60

FN67. According to Mr. DiGirolamo, senior management would not involve compliance where it had resolved an issue. (Tr. 2541.) Mr. DiGirolamo and Mr. Runkle testified that where managers believe they have solved problems of registered representatives sending out unauthorized correspondence, the managers do not necessarily have to mention the problems to the Compliance Department so that auditors would be aware of the situation. (Tr. 2505-06, 2512, 2928.) Mr. Runkle, a graduate of the University of South Florida, was associate director of Raymond James's Compliance Department from December 1999 until he became the chief compliance officer in May 2004. (Tr. 2865-66.)

FN68. Raymond James's expert Mr. Forde admits that the Lanciano letter raised a red flag about Mr. Herula's conduct and was the second occasion in which Mr. Herula made highly inappropriate representations on behalf of Raymond James. (Tr. 3141.) 60

FN69. Mr. Corrigan claims that Raymond James's systems and procedures were working because Raymond James's senior management was involved in the Lanciano letter. (R.J. Ex 2666 at 17.) However, Mr. Putnam and Mr. Augenbraun were only involved in the Lanciano letter because an outside person sent a copy to the head of compliance at R.J. & Associates who then forwarded the letter to Mr. Putnam. (Div. Ex. 272.)

FN70. The five letters are: the Provident letter, the Lanciano letter, the Fingessa letter, the Fitzhenry letter, and the Four Star correspondence.

FN71. Raymond James did not challenge the Division's assertions that Mr. Herula's independent contractor status is not relevant to whether he was acting within the apparent scope of his authority, and that the Commission does not recognize the concept of independent contractor for purposes of the Exchange Act, William V. Giordano, 61 SEC Docket 453, 458 (Jan. 19, 1996) (settled order). (Div. Reply Br. 16 n.19.) The NASD applies the same supervisory standards to all registered representatives, employees or independent contractors.

FN72. Section 17(a) of the Securities Act and

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder proscribe fraudulent conduct in connection with the offer, purchase, and sale of securities. These provisions prohibit essentially the same type of conduct. See United States v. Naftalin, 441 U.S. 768, 773 n.4 (1979). To establish violations of Sections 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, the Division must establish: (1) misrepresentations or omissions of material facts or other fraudulent devices; (2) made in connection with the offer, sale, or purchase of securities; and (3) that the respondent acted with scienter. Scienter is not required for violations of Sections 17(a)(2) or 17(a)(3) of the Securities Act; rather, negligence is sufficient to establish liability. Aaron v. SEC, 446 U.S. 680, 697 (1980); SEC v. Solucorp Indus., 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003); SEC v. Scott , 565 F. Supp. 1513, 1525-26 (S.D.N.Y. 1983).

Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). The scienter requirement may be satisfied by a showing of recklessness. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990); David Disner, 52 S.E.C. 1217, 1222 & n.20 (1997) (citation omitted). Recklessness is defined as "an extreme departure from the standards of ordinary care ... presenting a danger of misleading buyers or sellers that is either known to the [respondent] or is so obvious that the [respondent] must have been aware of it." Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir. 1977) (citation omitted), cert. denied, 434 U.S. 875 (1977).

FN73. Ms. Kern, an expert, testified that at Morgan Stanley Dean Witter, employees were only allowed to work outside on matters that were completely unrelated to the work of the firm. (Tr. 3458.) Morgan Stanley Dean Witter viewed anything that had a financial connection as posing a potential conflict down the road and as a distraction from the business. (Tr. 3458, 3500-01.)

FN74. I found Mr. Fitzhenry's testimony to be candid and highly credible. I reject Respondents' assertions that Mr. Fitzhenry's testimony should not be given full credit because Mr. Curl relayed some of the information, and that when he made his investment, Mr. Fitzhenry doubted Brite Business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would pay the projected ten percent weekly return. (Tr. 283.)

FN75. Raymond James cannot be held liable for Mr. Herula's actions with respect to Mr. Al Bloushi because Mr. Al Bloushi did not rely on representations by Mr. Herula in making his investment in Brite Business

FN76. R.J. & Associates had to borrow funds for four days until it could release funds from its reserve account. R.J. & Associates paid Raymond James $35,603 as a result of the borrowing because it had an agreement with Raymond James to pay it 375 basis points on any borrowings in balances carried in its client accounts. Raymond James in turn paid the $35,603 to the Cranston branch office where presumably it was divided among Foxhill, Mr. Ullom and Mr. Herula. (Tr. 2825-28; R.J. Ex. 2659.)

FN77. Willfully under Section 15(b) of the Exchange Act means no more than intentionally committing the act that constitutes the violation. Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965); C. James Padgett, 64 SEC Docket 319, 331 n.34 (Mar. 20, 1997).

FN78. As required by the Debt Collection Improvement Act of 1996, the Commission increased the maximum penalty amounts for violations occurring after December 9, 1996, and, again for violations occurring after February 2, 2001. 17 C.F.R. §§ 201.1001, .1002. 73

FN79. Raymond James put Mr. Ullom under heightened supervision in August 2002 as the result of a customer complaint. (Tr. 2033.) 74

FN80. Div. Exs. 12, 14, 16, 18-20, 24, 44, 45, 52, 53, 55, 56, 57, 149 (four letters included), 272, 282, 362, 498, and R.J. Ex. 2035. One exhibit cited by the Division is not in evidence and the other four exhibits are not examples of unauthorized correspondence. (Div. Post-Hearing Br. 110.)

FN81. I have found that Raymond James did not violate Section 17(a) of the Exchange Act and Rule 17a-4 and, therefore, will not consider the Division's request for a cease-and-desist order as to these provisions. 75

Release No. ID - 296, 2005 WL 2237628 (S.E.C. Release No.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.