# APPENDIX

# Part 2

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
In re Safeguard ScientificsE.D.Pa.,2004.Only the
Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
In re: SAFEGUARD SCIENTIFICS
No. Civ.A. 01-3208.

Nov. 17, 2004.

Allan H. Gordon, Kalsby, Gordon, Rabin, Shore &
Rathweiler, Philadelphia, PA, Daniel A. Osborn,
Beatie & Osborn LLP, New York, NY, for Plaintiff.
Steven B. Feirson, Michael S. Doluisio, Dechert,
Price & Rhoads, H. Robert Fiebach, Cozen and
O'Connor, Philadelphia, PA, William K. Dodds,
Dechert Price & Rhoads, New York, NY, for
Defendants.

### MEMORANDUM AND ORDER
JOYNER, J.
*1 Via the motion now pending before this Court,
Defendants move to strike and preclude the
testimony of Plaintiffs' expert as presented in an
affidavit filed August 30, 2004. For the reasons
which follow, this motion shall be granted as to the
testimony addressing loss causation in the context
of Plaintiff's market manipulation claim, and denied
as to the remaining testimony in the affidavit.

### Factual Background

Plaintiffs, investors in Safeguard Scientifics, Inc.,
filed this action under Rule 10b-5 of the Securities
Exchange Act, alleging two bases of liability. *See*
17 C.F.R. 240.10b-5. Plaintiffs claim, first, that
Defendants failed to disclose material information
regarding Safeguard CEO Warren Musser's
changing financial position (the "omission claim").
Second, Plaintiffs allege that Defendants purchased
stock in Safeguard's partner companies, including
eMerge Interactive, Inc., with the intent of inflating

and fraudulently manipulating Safeguard stock
prices (the "market manipulation claim")

On May 18, 2004, this Court entered an Amended
Scheduling Order setting the deadline for expert
discovery for July 9, and the deadline for
dispositive motions for July 30. Plaintiffs timely
filed a Preliminary Report of Anticipated Testimony
by Mr. R. Alan Miller (the "Preliminary Report") as
well as a later supplemental report. Mr. Miller was
deposed on June 29 regarding his expert opinions as
presented in these reports.

On July 30, Defendants filed a Motion for Summary
Judgment challenging Plaintiffs' omission and
market manipulation claims on various grounds,
including a lack of evidence with respect to loss
causation, a key element of both claims. Plaintiffs'
response to the motion was accompanied by a
supporting Declaration by Mr. Miller (the "Miller
Declaration") setting forth his opinions regarding
loss causation. Defendants now move to strike the
Miller Declaration as untimely, alleging that it is an
improper expert report filed in violation of this
Court's scheduling order. Alternatively, Defendants
contend that the Miller Declaration must be stricken
because it directly contradicts Mr. Miller's earlier
sworn testimony.

### Relevant Legal Standards

Parties are required to disclose the identity of
potential expert witnesses, accompanied by a
written expert report containing "a complete
statement of all opinions to be expressed and the
basis and reasons therefor" and "the data or other
information considered by the witness in forming
the opinions," within the time frames set out in
Federal Rule of Civil Procedure 26. Fed.R.Civ.P.
26(a)(2)(B). Where additional relevant information
becomes available such the initial expert report is
rendered "incomplete or incorrect," a party is
obligated to supplement or correct the initial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

disclosure by filing a supplemental report before the deadline for pretrial disclosures. Fed.R.Civ.P. 26(e). If the court's scheduling order provides for rebuttal reports, a party may also submit an expert report to " contradict or rebut evidence" identified by the opposing party within the deadlines set by the court Fed.R.Civ.P. 26(a)(2)(C). Finally, a party opposing a motion for summary judgment may serve opposing affidavits, including sworn statements by potential expert witnesses, at any point prior to the date of the hearing. Fed.R.Civ.P. 56(c), 56(e).

*2 Rule 37 of the Federal Rules of Civil Procedure provides for exclusionary sanctions where parties fail to comply with Rule 26 discovery requirements. With respect to timeliness, a court may prohibit a party from introducing matters in evidence where the party has failed to obey a scheduling order entered under Rule 26(f). Fed.R.Civ.P. 37(b)(2)(B). With respect to the substance of discovery disclosures, a party will not ordinarily be permitted to use information at trial or on a motion if the information should have been disclosed pursuant to Rule 26(a), and the party offers no substantial justification for failing to do so. Fed.R.Civ.P. 37(c)(1); Fed.R.Civ.P. 26, Notes of Advisory Committee on 1993 Amendments. Thus, if an expert's initial report does not include a complete statement of opinions to be expressed and the basis for these opinions, a court may prohibit the expert from later testifying on issues or opinions not addressed in the initial report. *Johnson v. Vanguard Mfg., Inc.*, 34 Fed.Appx. 858, 859 (3rd Cir.2002) (upholding district court's exclusion under 37(c)(1) of expert testimony on accident causation, a subject not addressed in his expert report).

Given that exclusionary sanctions under Rule 37 are extreme in nature, a court may not impose them unless it first finds that the party: (1) revealed previously undisclosed evidence when trial was either imminent or in progress; or (2) acted in bad faith, which is more than a mere lack of diligence. *Stein v. Foamex Int'l, Inc.*, No. 00-2356, 2001 U.S. Dist. LEXIS 12211 at 8-9, 2001 WL 936566 (E.D.Pa.2001) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-93 (3rd Cir.1994)). When making these determinations, a court should consider: (1) the prejudice or surprise of the party

against whom the excluded evidence would have been offered, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of Rule 37 sanctions would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to make a required disclosure or comply with a court order. *Stein*, 2001 U.S. Dist. LEXIS 12211 at 8-9 (citing *In re Paoli*, 35 F.3d at 791).

Where sanctions under Rule 37 are not appropriate, the Third Circuit has held that a court deciding a motion for summary judgment may disregard or strike a 56(e) opposing affidavit if it directly contradicts the affiants's prior testimony without a satisfactory explanation. *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3rd Cir.1991); *see also Martin v. Merrell Down Pharm., Inc.*, 851 F.2d 703, 705 (3rd Cir.1988). If an issue raised in the 56(e) affidavit had never been directly addressed at deposition, or the prior testimony was ambiguous, the affidavit will typically be viewed as a permissible clarification. *See Giancristoforo v. Mission Gas & Oil Prods., Inc.*, 776 F.Supp. 1037, 1043 (E.D.Pa.1991); *Videon Chevrolet, Inc. v. General Motors Corp.*, 992 F.2d 482, 488 (3rd Cir.1993). However, where the new affidavit offers so many new opinions that it dramatically changes the " flavor and theory" of the case, it must be disregarded, even absent a Rule 37 finding of bad faith. *Stein*, 2001 U.S. Dist. LEXIS 12211 at 11, 20 (quoting *Pellegrino v. McMillen Lumber Prods. Corp.*, 16 F.Supp.2d 574, 583 (W.D.Pa.1996)).

### Discussion

#### I. *Timeliness of the Miller Declaration*

*3 Defendants move to strike the Miller Declaration as untimely pursuant to Rule 37(b)(2)(B), alleging that it is an impermissible expert report filed after the July 9, 2004 deadline for expert discovery set forth in this Court's Amended Scheduling Order.

While variously described by Plaintiffs as a "rebuttal " or "supplemental" report, we find that the Miller Declaration qualifies as neither. Because this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Court's Amended Scheduling Order did not provide for Rule 26(a)(2)(C) rebuttal reports, the Miller Declaration cannot be characterized as such. *See Aveka LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C.2002). Likewise, as plaintiffs do not contend that Mr. Miller's original report was incomplete or incorrect, the Miller Declaration does not qualify as a Rule 26(e) supplemental report.

The Miller Declaration is instead governed by Rules 56(c) and 56(e), which establish that a party opposing a motion for summary judgment may serve opposing affidavits at any point prior to the date of the hearing. The Miller Declaration, filed as an accompaniment to Plaintiffs' memorandum of law in opposition to Defendants' motion for summary judgment, falls within this basic description of a 56(e) opposing affidavit, and was timely filed. Because it was presented as an opposing affidavit, rather than a rebuttal or supplemental expert report, the Miller Declaration does not run afoul of this Court's Amended Scheduling Order and may not be stricken on those grounds.

## II. *Impermissible Supplements and Contradictory Affidavits*

Defendants have identified three portions of the Miller Declaration that allegedly contradict or impermissibly supplement Mr. Miller's Preliminary Report and deposition testimony. We find that the portions of the Miller Declaration addressing loss causation in the context of Plaintiffs' market manipulation claim must be stricken, as they untimely supplement and directly contradict Mr. Miller's prior testimony. The remainder of the Miller Declaration does not appear to violate the discovery requirements of Rule 26(a) or the Rule 56(e) standards for opposing affidavits.

### A. *The Causal Impact of eMerge Purchases on Safeguard Stock Prices*

Mr. Miller's Preliminary Report begins with a list of subjects on which Plaintiffs' counsel requested Mr. Miller's opinion. This list covers various aspects of

Plaintiffs' omission claim, referring repeatedly to the "omissions and misstatements" described in the Complaint, but does not mention Plaintiffs' market manipulation claim directly. Preliminary Report, ¶ 1. Indeed, within the Preliminary Report, Mr. Miller present *no opinion* at all regarding the causation aspect of the market manipulation claim, specifically, whether the eMerge trades had any causal impact on Safeguard's stock price. The subsection of the Preliminary Report entitled "Loss Causation" is only two paragraphs long, and does not address causation with respect to the manipulation claim, referring only to the causal effect of "the omissions and misstatements described in the Complaint and/or discussed heretofore." Preliminary Report, ¶ 26, 27. In fact, Mr. Miller states in ¶ 13 of the Preliminary Report that he had "not yet separately calculated the effect" of the eMerge purchases on Safeguard stock prices.

*4 Despite the fact that Mr. Miller's Preliminary Report gave no opinion on loss causation in the market manipulation context, and on its face established that no relevant calculations had been done, Defendants' counsel later questioned Mr. Miller extensively during his deposition to confirm his position (or lack thereof) on this issue:
Q: In your report at paragraph 13, you indicate, Mr. Miller, that you have not yet separately calculated the effect of the undisclosed eMerge purchases by Musser and associated entities on eMerge and/or Safeguard's stock prices. Does that remain true as of the current date?
...
Q: So at this juncture, regardless of the intent of the parties making those purchases, you have not formulated an analysis as to whether or not those purchases had an impact on the stock price of either eMerge or Safeguard?
...
Q: Do you make any assumption one way or the other that those purchases had an impact on the stock price of either eMerge or Safeguard's stock?
A: Yes. In the trading sense?
Q: Yes
...
Q: You could do a statistical analysis to determine the impact of these purchases on Safeguard's stock and in turn-I'm sorry-on eMerge's stock and in turn

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

on Safeguard's stock, correct, one could do that?

..

BY MR. DODDS: Well, did you do a separate analysis of the market manipulation alleged with respect to the purchases in eMerge stock?
MR. COLLINS: I'm sorry, separate from what?
MR. DODDS: Separate from his other damage analysis?
(Miller Deposition, p. 208-213)
BY MR. QUINN: There's no calculation to support that allegation?
MR. COLLINS: Which portion of the allegation?
MR. QUINN: That there was a market effect of favorably impacting or distorting the performance of eMerge in the aftermarket.
Q: There's no calculation to support that, correct?
MR. COLLINS: Vague and ambiguous.
Q: Is there a calculation to support that?

..

Q: So there is no calculation as to any impact on eMerge stock prices?
(Miller Deposition, p 339-340)

In response to these questions, Mr. Miller consistently responded that, "as a separate item" apart from the calculation of damages for the non-disclosure claim, he had not analyzed the effect of the allegedly manipulative eMerge purchases on eMerge or Safeguard stock prices. (Miller Deposition, p 209, 213-14, 339-340) Mr. Miller did, however, "hesitatingly" admit that one could do such a statistical analysis. He also stated that "we made the observation that [the eMerge purchases] very likely did on at least certain days or certain weeks have a positive impact on those prices due to the proportion of volume that those purchases made up at the times they were made." (Miller Deposition, p. 210-211). To this Court, at least, Mr. Miller's responses at deposition seem clear-while Mr. Miller believed, based on the volume of eMerge purchases, that the trades likely had a positive impact on stock prices, he had performed no more detailed calculations or analyses to determine whether there was a true causal impact.

*5 The Miller Declaration, however, asserts that "[W]e did indeed analyze the impact of trading in eMerge stock by Musser, Grinker, Safeguard and

the Foundations prior to Plaintiffs' submission of the Answers to Interrogatories. We concluded that there was considerable market impact that necessarily inflated the price of eMerge stock and thereby inflated or propped up the price of Safeguard stock.." Miller Declaration, ¶ 16.

*Rule 37 Exclusionary Sanctions are Appropriate*

Plaintiffs, in bringing this action for market manipulation, are well aware that loss causation is one of the elements of the claim. If Plaintiffs intended at any time to present Mr. Miller's expert opinion as to the causation element of the market manipulation claim, they were obligated to timely submit or supplement an expert report presenting this opinion and its basis pursuant to Rule 26(a)(2)(B). Because the Preliminary Report did not include a statement of Mr. Miller's opinion regarding causation in the market manipulation context, and because evidence of related calculations or analyses was presented for the first time in the Miller Declaration, we find that Plaintiffs have failed to comply with expert witness disclosure requirements.

This Court further finds that preclusion of this evidence under Rule 37(c)(1) is appropriate because the Miller Declaration was filed in bad faith, prejudicing Defendants and disrupting the efficient trial of this case. *Stein,* 2001 U.S. Dist. LEXIS 12211 at 8-9. In *Stein,* the plaintiff timely filed an expert report identifying five specific areas of concern regarding environmental contaminants on Plaintiff's property. *Id.* at 3. After defendants moved for summary judgment, plaintiff introduced a 56(e) opposing affidavit by the same expert identifying a new area of concern, vinyl chloride contamination, on which the expert had not opined in his initial report. *Id.* at 4-5. This Court found that the affidavit was filed in bad faith because it was "carefully tailored, by [Plaintiff's] counsel, to dovetail with the statutory requirements the Defendants claimed [Plaintiff] had failed to prove." *Id.* at 19. This Court struck the portions of the affidavit expressing opinions that should have been disclosed in the preliminary expert report, finding that any other result "would effectively circumvent the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

requirement for the disclosure of a timely and complete expert report." *Id.* at 18

Plaintiffs' use of the Miller Declaration to present a new expert opinion on the causal impact of the eMerge purchases is equally concerning. The fact that Mr. Miller's Preliminary Report did not even touch on an issue so central to Plaintiffs' claim exceeds a "mere lack of diligence" on counsel's part. *Id.* at 19. Plaintiffs have offered no justification for this delay, which comes after months of discovery, and their suggestion that Defendants cure any prejudice by re-deposing Mr. Miller is without merit. As this Court emphasized almost nine months ago, "nearly three years have elapsed since [the case's] inception, discovery has closed and the matter is now trial-ready." *In Re Safeguard Scientifics.* 220 F.R.D. 43, 49 (E.D.Pa.2004). Allowing Plaintiffs to rely on Mr. Miller's opinions regarding loss causation for the market manipulation claim, either in their response to Defendants' summary judgment motion or at trial, would be unfair to Defendants and would disrupt the efficient disposition of this case. Accordingly, this Court must exercise its discretion under Rule 37(c)(1) to preclude this evidence.

*Exclusion Under Rule 56 is Also Appropriate*

*6 Furthermore, this Court finds that the new opinions presented in Plaintiffs' 56(e) opposing affidavit regarding the causal impact of eMerge trading must be stricken because they directly contradict Mr. Miller's prior testimony. *See Hackman,* 932 F.2d at 241.

Plaintiffs contend that there is an ambiguity in the apparent contradiction between the Miller Declaration and the statement at ¶ 13 of the Preliminary Report (later affirmed at deposition) that no analysis had been done regarding the impact of the eMerge trades. Plaintiffs allege that the relevant portions of the Preliminary Report and the deposition testimony referred only to calculations of damages, and were not intended to suggest that no calculations had been made with respect to loss causation, a key element of the market manipulation claim. Plaintiffs further contend that this ambiguity

was exacerbated by Defendants' tactical decision not to ask deposition questions regarding loss causation "in order to clear the decks for their summary judgment motion." (Plaintiffs' Response, p. 10-11).

Given the sheer number of times Defendants' counsel asked Mr. Miller about his opinions and analyses regarding the causal effect of the eMerge trades, we find Plaintiffs' allegation baseless. Under the circumstances, we "do not believe that defense counsel can reasonably be held accountable for having failed to uncover" a hidden meaning behind testimony that otherwise seemed abundantly clear. *Pellegrino,* 16 F.Supp.2d at 583-84 (granting defendants' motion to strike an opposing affidavit where defense counsel had attempted to exhaust the factual bases of plaintiff's claim during deposition but plaintiff had been "purposely evasive" regarding facts necessary to establish her claim). This Court finds no ambiguity in Mr. Miller's testimony in response to defense counsel's deposition questions. Because of the direct contradiction between this testimony and the Miller Declaration, in deciding the pending motion for summary judgment, this Court will disregard, in deciding the pending motion for summary judgment, all information in the Miller Declaration relating to loss causation of the market manipulation claim.

*2. Disclosure Events Relevant to Causation Analysis*

The section of Mr. Miller's Preliminary Report entitled "Loss Causation" indicates that a review was done of Safeguard stock prices and market movements in connection with news articles, analyst reports, SEC filings and other disclosure events from October 1, 1999 to April 30, 2001. Preliminary Report, ¶ 26, Exhibit G. Mr. Miller concludes that the declines in Safeguard stock prices "which occurred after the relevant disclosures were substantially related to the issues raised in the Complaint," but does not identify specifically which of the hundreds of disclosures in Exhibit G he considered "relevant" for the purposes of determining loss causation. Preliminary Report, ¶ 26.

In an earlier section of the Preliminary Report

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C28

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

addressing damage calculations, Mr. Miller explains that he calculated the true value of Safeguard stock by looking at price movements after three "relevant disclosures" relating to Mr. Musser's margin loan agreement-a Dow Jones Business News article dated December 18, 2000, a Wall Street Journal Article dated February 9, 2001, and a Fortune Magazine article dated February 20, 2001. Preliminary Report, ¶ 12, ¶ 14, Exhibit C. In the same paragraph, however, Mr. Miller emphasizes that his approach to calculating damages is conservative, and that "[t]here is some evidence to suggest that there could be additional relevant declines in Safeguard stock price which we have not taken into account for calculating damages at this time," including the three trading days after Mr. Musser's November 29, 2000 sale of 6.5 million Safeguard shares. Preliminary Report, ¶ 14. Mr. Miller also refers to the December 5, 2000 disclosure which revealed for the first time that Mr. Musser had to sell his Safeguard shares to meet a margin loan arrangement. Preliminary Report, ¶ 14.

*7 At deposition, Defendants' counsel questioned Mr. Miller extensively about the market impact of various disclosures in connection with Plaintiffs' omission claim. Mr. Miller first noted that, while " we often do differentiate" between market impact and damage analyses, "that's not to imply that they're not connected under some measures of damages." Miller Deposition, p. 75. Mr. Miller stated that the three disclosure occasions used to calculate damages were not necessarily "exhaustive in terms of market impact." Miller Deposition, p. 78. In fact, Mr. Miller indicated that his market impact analysis was based on his observations of " quite a number of statements" made during the period in question, including the December 5, 2000 announcement and the trading activity between November 29 and December 4, 2000. Miller Deposition, pp. 78-80. Mr. Miller admits that his team has continued to look at those two additional disclosures to determine what effect, if any, they had on Safeguard prices. Miller Deposition, p. 80, 111.

The Miller Declaration, under the heading "Loss Causation," identifies five occasions on which disclosures of material information caused Safeguard's stock price to react negatively. Miller Declaration, ¶ 14. Defendants object to the inclusion of two of these disclosure occasions (December 5, 2000 and the trading days following November 29, 2000), as the Preliminary Report did not cite these dates in its damages calculation.

### Sanctions Under Rule 37 or 56 are Inappropriate

Plaintiffs have satisfied the requirements of Rule 26(a)(2)(B) with respect to Mr. Miller's opinions on loss causation for the five disclosure occasions in the Miller Declaration. The Preliminary Report clearly states Mr. Miller's opinion that Safeguard stock prices dropped in connection with public disclosures of information allegedly withheld or misreported by Defendants, and establishes that this opinion was based on a review of stock prices and disclosure events. Mr. Miller's failure to identify with specificity the disclosures he focused on in establishing loss causation is not fatal, particularly as Defendants' counsel questioned him extensively during deposition to identify the relevant disclosure events behind his market impact analysis. For the purpose of determining damages, however, Plaintiffs are obviously limited to the three disclosure dates identified in ¶ 14 of the Preliminary Report.

We likewise refuse to strike the Miller Declaration pursuant to Rule 56(e), as it does not directly contradict Mr. Miller's prior testimony. Both the Preliminary Report and Mr. Miller's testimony established that the analysis of causal impact was based on a number of disclosure events. Neither sworn statement limited Mr. Miller's analysis of loss causation to the three disclosure events highlighted as relevant to the damages analysis.

### 3. The Dow Jones Article as Evidence of Loss Causation

In the Preliminary Report, Mr. Miller identifies three dates when a "decline in Safeguard's stock price [was] attributable to" relevant disclosure events. Preliminary Report, ¶ 12, ¶ 14. On one of these dates, Monday, December 18, 2000, a Dow

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 7

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Jones Business News article was published discussing Mr. Musser's recent trading activity, and Safeguard's price dropped approximately 17%. The article, which was published late in the day, reported that Safeguard's stock prices had dropped sharply "as focus apparently returned to the firm's chairman selling 7.5 million shares earlier this month." The article cited one analyst's suggestion that some investors may not have known about the sales "until Monday," [FN1] when details of Mr. Musser's SEC filings were published.

> FN1. It is unclear from the wording of the Dow Jones article whether "until Monday" refers to the date that the article was published, Monday, December 18, or the previous Monday, December 11.

*8 In their Motion for Summary Judgment, Defendants rightly point out that the December 18 drop in Safeguard's stock price, which occurred well before the Dow Jones article was released, could not have been caused by the disclosures in the article. The Miller Declaration admits this fact, and clarifies that the Dow Jones article itself was not a cause of the price drop, but rather "evidence of loss causation." Miller Declaration, ¶ 4-C. Defendants now challenge this statement as contradicting Mr. Miller's earlier position.

### Sanctions under Rule 37 or 56 are inappropriate

We find no inherent contradiction between Mr. Miller's current position and his earlier statement that declining Safeguard prices on December 18 could have been attributed to certain relevant disclosures. Appendix C to the Preliminary Report clearly indicated that the Dow Jones article was a summary, rather than news itself, and Mr. Miller never claimed that the article itself caused the December 18 price drop. If Defendants wish to further contest Mr. Miller's selection of December 18 as a relevant disclosure date, this Court reminds them that they will have ample opportunity to do so at trial.

### III. Violations of the Daubert Standard

Defendants also move to strike the Miller Declaration as violative of the standards for expert testimony set forth in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As we have above found that the portion of the Miller Declaration addressing loss causation in the market manipulation context must be stricken, Defendants' *Daubert* challenge to this section appears moot.

Defendants likewise claim that Mr. Miller's conclusion regarding the market impact of a December 5, 2000 disclosure violates *Daubert* standards because it is not supported by verifiable scientific analysis. While we withhold judgment on this issue at this point in time, Plaintiffs may petition this Court for a full *Daubert* hearing if they wish to further pursue this challenge.

An appropriate Order follows.

### ORDER

AND NOW, this 17th day of November, 2004, upon consideration of Defendants' Motion to Strike and Preclude Testimony of Plaintiffs' Expert, R. Alan Miller, and for Costs (Docs. No. 64, 65) and all responses thereto (Docs. No. 66, 67, 68), it is hereby ORDERED that the Motion is GRANTED in part and DENIED in part, as follows:

1. Defendants' Motion to Strike is GRANTED ONLY with respect to paragraphs 16 through 19 of the Miller Declaration. These paragraphs shall be stricken from the record in this case.

2. Defendants' Motion to Preclude is GRANTED ONLY with respect to Mr. Miller's testimony regarding the matters and opinions contained in paragraphs 16 through 19 of the Miller Declaration. Mr. Miller is precluded from presenting expert testimony regarding his opinions on loss causation in the context of Plaintiff's market manipulation claim inasmuch as those opinions are not contained in his Preliminary Report, dated February 6, 2004, or his Supplemental report, dated March 15, 2004.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 8

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

\*9 3. Defendants' request for costs and expenses incurred in connection with their Motion to Strike and Preclude Testimony is DENIED.

E.D.Pa.,2004
In re Safeguard Scientifics
Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1357734 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum Regarding Notice of the Individual Settlements (Apr. 7, 2006) Original Image of this Document (PDF)
• 2001 WL 34131699 (Trial Pleading) Class Action Complaint (Jun. 26, 2001)
• 2:01cv03208 (Docket) (Jun. 26, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C31



Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

▷
Van de Walle v. Unimation, Inc.Del.Ch.,1991.Only
the Westlaw citation is currently available.
UNPUBLISHED   OPINION   CHECK   COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Charles R. VAN DE WALLE, Plaintiff,
v.
UNIMATION, INC., a Delaware Corporation,
CONDEC CORPORATION, a New York
Corporation, NORMAN I. SCHAFLER, JOSEPH
F. ENGELBERGER, GERALD ROSENBERG,
RICHARD M. CION and R. SCOTT SCHAFLER,
Defendants.
**Civ. A. No. 7046.**

Submitted: Jan. 30, 1990.
Decided: March 7, 1991.

William Prickett, Michael Hanrahan, and Elizabeth
M. McGeever, Esquires of Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, Leonard Barrack of
Barrack, Rodos & Bacine, Philadelphia, Pa., Barry
Schwartz, of Wolf, Block, Schorr & Solis-Cohen,
Philadelphia, Pa., for plaintiff.
Peter M. Sieglaff of Potter Anderson & Corroon,
Wilmington, Allen Kezsbom, William H. Freilich,
and A. Ross Pearlson of Fried, Frank, Harris,
Shriver & Jacobson, New York City, for defendant
Condec Corporation and the Individual defendants.
R. Franklin Balotti, Kevin G. Abrams, and David L.
Finger, of Richards, Layton & Finger, Wilmington,
Irwin H. Warren of Weil, Gotshal & Manges, New
York City, for defendant Unimation, Inc.

MEMORANDUM OPINION
JACOBS, Vice Chancellor.
*1 On December 22, 1982, this class action was
commenced on behalf of all public common
shareholders of Unimation, Inc. ("Unimation"),
challenging a merger between Unimation and a
wholly-owned subsidiary of Westinghouse Corp. ("
Westinghouse") which occurred on February 15,

1983. In that merger, Westinghouse acquired all
outstanding common shares of Unimation for $107
million, or $21 per share. Before the merger,
Condec Corporation ("Condec") was Unimation's
majority stockholder, owning 78.4% of Unimation's
common stock; the remaining 21.6% was publicly
held. Named as defendants were Unimation,
Condec, and the Unimation directors at the time of
the merger. The complaint alleged, *inter alia,* that
the merger terms were unfair, that the defendants
did not make an informed decision in negotiating
and approving the merger terms, and that the proxy
statement disseminated in connection with the
merger contained omissions of material fact.

On February 14, 1983, this Court denied the
plaintiff's motion to preliminarily enjoin the merger.
*Van de Walle v. Unimation,* Del.Ch., C.A. No.
7046, Hartnett, V.C. (February 14, 1983).
Following extensive discovery, a trial on the merits
took place (with several interruptions) between
February 7, 1989 and May 2, 1989.

This is the decision of the Court, after trial and
post-trial briefing, on the merits of this action.

*I. THE FACTS*

The pertinent facts are largely undisputed. Where
disputes exist, however, the facts are as found
herein.

Condec, a New York corporation founded in 1942,
was engaged in the design, manufacture, and sale of
machinery, equipment, and other products for
industrial, commercial, and government
applications. Condec was a publicly owned
company whose shares were traded on the
American Stock Exchange.

Unimation was a Delaware corporation
headquartered in Danbury, Connecticut, and
engaged in the design, manufacture, and sale of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

industrial robots and robotics systems. Unimation's primary products were large heavy-duty hydraulic robots used for applications such as spot welding in the automobile industry. The individual defendants were directors of Unimation as well as officers and/or directors of Condec. Norman Schafler was Condec's Chairman of the Board and Chief Executive Officer; Joseph Engelberger was a Condec director, a member of Condec's executive committee, and the President of Unimation; Gerald Rosenberg was a director and President of Condec; Richard Cion was General Counsel of both Condec and Unimation; and R. Scott Schafler was a Condec Vice President.

Until November, 1981 Unimation was a wholly-owned subsidiary of Condec. On November 25, 1981, Condec conducted a public offering of Unimation common stock to alleviate a liquidity problem. In that offering Unimation sold 1.1 million shares (21.6%) of its outstanding common shares at $23 per share. The holders of those shares as of the merger date constitute the plaintiff class. Thus, from November, 1981 until the merger in February, 1983, Condec controlled the Unimation board, through its ownership of a 78.4% controlling interest, i.e., 4 million of Unimation's 5.1 million outstanding common shares.

*2 After the public offering, Unimation's stock traded slightly above the $23 offering price for three days, but thereafter the stock price steeply declined. From November 27, 1981 to July 7, 1982, Unimation's market price plummeted from $25.25 to a low of $10.75 per share. After July 7, 1982 Unimation's market price steadily began to rise as part of an overall stock market recovery.

During the spring of 1982, Condec determined that it needed additional cash and began exploring various ways to raise it. A principal reason was that the 1981-1982 recession was adversely affecting Condec's industrial businesses, particularly Unimation's principal automobile industry customers. For fiscal year ("FY") 1982 ending July 31, 1981, Condec reported a $16.5 million loss which, except for 1973, represented Condec's only loss year in its entire thirty-year

history. Similarly, Unimation's FY 1982 net income dropped to $1,177,000 ($.24 per share), down from $1,945,000 ($.48 per share) for FY 1981.

Those losses, while creating a need for cash, did not amount to a "liquidity crisis": Condec had over $100 million in working capital and its debt was all long-term. What Condec was experiencing was a short-term, relatively minor, liquidity problem that $10 to $20 million of new capital would readily alleviate.

Accordingly, in April, 1982, Condec consulted its investment banker and underwriter for the 1981 public offering, Drexel Burnham Lambert, Inc. (" Drexel"), for advice concerning how to raise $10 to $20 million of capital. Mr. Cion, on behalf of Condec, suggested three alternatives to Drexel: a sale of (i) additional Condec long-term debt or of Condec long-term debt with warrants to buy Condec stock, or (ii) a package of Condec long-term debt and Unimation stock, or (iii) an additional 20% block of Unimation's stock. A sale of Condec's entire 78.4% stock interest in Unimation, or of Unimation as an entire company, were not envisioned alternatives, because the dollar amount that Condec needed to raise was relatively small.

Drexel responded that given the general state of the economy and the credit markets, a sale of additional Condec long-term debt would be difficult and prohibitively expensive. Moreover, a sale of an additional 20% block of Unimation stock would further depress Unimation's already depressed stock market price (by then it had fallen to $16), and likely would produce only $13 to $14 per share. Instead, Drexel suggested that Condec either sell its entire controlling interest in Unimation or cause a sale of Unimation as a whole. Drexel advised that both approaches would generate approximately $110 to $120 million.

Mr. Cion reported Drexel's proposal to Condec's senior management, which was skeptical that $110 to $120 million could be realized for Unimation as an entire company. Nonetheless, management felt they owed the company's stockholders a duty to explore whether a sale at that price was achievable.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 3

Accordingly, Condec authorized Drexel to explore whether a sale, at a full and fair price, of either its 78.4% interest in Unimation or of the entire company could be obtained. Unimation would be sold only if a truly premium price could be realized. On April 29, 1982, Mr. Cion formally retained Drexel for that purpose. All parties understood that at this stage, Drexel's mandate was limited to soliciting prospective purchasers to ascertain if a buyer could be found at a fair price.

*3 Drexel was engaged only on behalf of Condec (as distinguished from Unimation), but that representation was not thought to create a conflict of interest. The defendants intended from the outset that in any sale of the entire company, Unimation's public stockholders and Condec would receive the same consideration for their shares. Nor was Drexel's contingent fee arrangement viewed as creating a conflict, because that arrangement gave Drexel an incentive to obtain the best available price for all Unimation stockholders. FN1

As part of Drexel's retention, Condec management established certain ground rules for Drexel to follow in soliciting prospective purchasers. First, Unimation would not be sold unless a full and fair price could be obtained. Thus, to avoid conveying a sense of urgency to prospective buyers, Drexel was instructed not to proceed on an expedited timetable. Second, because Condec wanted to discourage potential buyers that could not afford (or were not genuinely interested in) a $120 million transaction, Drexel was to approach only the senior management level of those potential buyers most likely to be seriously interested in Unimation. FN2 Third, Drexel was instructed that all discussions with prospective purchasers must remain confidential. Should Drexel's market explorations " leak out" but no acceptable offer materialize, Unimation would be viewed as "a piece of distressed merchandise that nobody wanted to buy." (Tr.Vol. 12, at 39-40). Employee morale would be adversely affected, potential buyers might be tempted to lure away key Unimation employees, and Unimation's stock price could drop even further.

Fourth, Drexel was told to keep Condec and

Unimation's management informed of all significant developments on an ongoing basis. Accordingly, Messrs. N. Schafler, Rosenberg, Engelberger, and R. Scott Schafler were regularly apprised of Drexel's and Mr. Cion's progress in seeking out potential acquirors. From the time Drexel was retained in April, 1982 until serious negotiations with Westinghouse began in November, 1982, these gentlemen would discuss Drexel's activities and progress at least once a week. And while the Westinghouse negotiations took place during November and early December, 1982, Condec's inside directors (who also comprised the entire Unimation board) discussed the progress of those negotiations almost every day. FN3

Finally, Drexel was instructed to quote an asking price of $120 to $150 million dollars. Drexel and Condec did not seriously believe that Unimation would command that amount. However, by starting out at that level, they would send a clear message to prospective buyers that Unimation was not for sale at a bargain price.

Over the next seven months, Drexel, in consultation with Condec and Unimation management, systematically contacted 50 to 60 prospective purchasers. Mr. Cion and Drexel's representatives would make an initial presentation to any potential buyer that expressed serious interest. Only eight of the companies that were initially contacted received that presentation and expressed serious interest in possibly acquiring Unimation. Those companies were Geosource, Schlumberger's Applicon division, Litton, Computervision, I N I. (a Spanish company), Matra (a French company), General Electric ("GE" ), and Westinghouse. Of those companies only Westinghouse ultimately submitted a satisfactory offer. Geosource and Drexel engaged in preliminary negotiations, and Geosource later advised Drexel that it intended to propose a transaction. However, in early August, Condec was told that Geosource's corporate parent, Aetna, had rejected the proposed transaction.

*4 General Electric first approached Condec in 1980, when it made an unsolicited $50-60 million offer for Unimation. That offer was rejected. When Drexel contacted GE in the spring of 1982,

C34

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

GE adhered to its position that Unimation was worth only $50-60 million. When the negotiations with Westinghouse began in mid-November, Drexel contacted GE a second time, in the hope of triggering a bidding contest between GE and Westinghouse, who were traditional rivals. However, GE offered only $65 million for Unimation, which Mr. Engelberger rejected as inadequate. After Westinghouse made its $107 million offer, GE representatives contacted Mr. Engelberger and told him that if their Chairman approved, GE might be prepared to offer as much as $85-90 million for all of Unimation. Mr. Engelberger responded that Condec was looking for $110 million. Thereafter, GE made no offer for Unimation at $90 million or any other price.

While Drexel conducted these explorations, various economic developments were adversely affecting Unimation's current business and future prospects. The deepening recession caused the entire capital goods market to weaken. It also caused the automobile industry-Unimation's primary source of robot sales-sharply to curtail production. Moreover, corporate giants such as IBM, GE, DEC, United Technologies, Bendix, and others, announced their intention to enter the robotics market. That development was disquieting, because it augured significant competition for Unimation for the first time in its history. Unimation had been the undisputed leader in the robotics industry for the past 15 years. The entry of these major competitors-all with ample financial resources to back major research and development, production, and marketing efforts-posed a material threat to Unimation's long-term market position. Particularly significant was General Motor's ("GM") announcement of a joint robotics venture with Fanuc, a Japanese firm. GM had historically represented approximately 35% of Unimation's total sales and was Unimation's largest customer. If GM purchased its robots from the new joint venture, Unimation's ability to maintain even its then-prevailing level of business would be jeopardized.

Finally, of long-term importance was that consumer preferences were moving away from hydraulic robots (which constituted almost all of Unimation's entire product line) towards an entirely new technology-electric robots.[FN4] Although Unimation's management believed that electric robots were not technologically superior to its line of hydraulic products, its new competitors were beginning to (and ultimately did) influence the market's perception that electric robots were the " wave of the future."

To cope with this shift in consumer preferences, Unimation developed a two-pronged business strategy: to enhance the market position of its then-existing robot products, and to persuade the market that its hydraulic product line was superior to its competitors' electric products. However, by late 1982 the continued decline in Unimation's financial performance raised serious doubts that that strategy would work.

*5 These factors combined to cause a significant decline in Unimation's financial performance during FY 1982. As previously noted, Unimation's earnings per share for FY 1982 (ending July 31) were $.24 per share (including an extraordinary credit of $.10), as compared with $.48 per share for FY 1981. In July, 1982, Unimation's management projected FY 1983 sales at only $55 million-25% less than the level achieved during the prior fiscal year. By late calendar 1982, Unimation's order backlog had declined to a fraction of the levels achieved in prior years. And on December 9, 1982 (only three days after Condec had signed its agreement in principle with Westinghouse), Unimation announced an $.11 per share loss for the first quarter of FY 1983 (ending October 31, 1982).

The merger agreement with Westinghouse was negotiated against this background. Drexel first contacted Westinghouse in late September or early October, 1982. Further discussions and a tour of Unimation facilities by Westinghouse officials followed. Condec then heard nothing from Westinghouse for several weeks. Then, in mid to late November, contacts resumed and serious negotiations began. Those negotiations were at all times conducted at arm's length-by Drexel and Mr. Cion on behalf of Condec and Unimation, and by Westinghouse officials and its investment banker, Lehman Brothers, Kuhn, Loeb ("Lehman"), on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

behalf of Westinghouse

As with other prospective bidders, Drexel opened with an asking price of $150 million. Lehman opined to its client, Westinghouse, that Unimation was worth approximately $40 to $60 million on a stand-alone basis, but that if certain synergies with Westinghouse could be achieved, a price of up to $110 million might be justified. To achieve those synergies Westinghouse would have to integrate its operations with Unimation's, which meant that Westinghouse would have to acquire 100% of Unimation. Thus, from the outset Westinghouse decided and advised Condec-that it was interested in acquiring 100% of Unimation's outstanding shares.FN5 Although Westinghouse did negotiate for the right to pay for Condec's controlling interest in a different form, it was always understood that the value per share of the consideration to be paid to Condec and to Unimation's public shareholders would be identical.

Westinghouse responded to the $150 million asking price by offering to purchase all of Unimation's outstanding shares for approximately $85 million, or $17 per share. That amount would be payable in cash to the public shareholders and in a combination of cash and notes to Condec.FN6 After further negotiations Westinghouse upped its offer to $19 per share, payable to the public shareholders in cash and to Condec in a combination of cash and a series of contingent royalty payments based upon Unimation's future robotics sales. Westinghouse proposed that latter form of consideration, because the adverse business developments made it concerned about Unimation's future sales performance. Therefore, Westinghouse wanted Condec to share the business risks of the transaction going forward.

*6 Mr. Cion and Drexel rejected both offers as inadequate, and counterproposed $22 per share. Under that counterproposal, Condec and the public shareholders would both receive the equivalent of $22 in value, payable to the public shareholders in cash and to Condec partly in cash and partly in notes or warrants. Westinghouse did not immediately respond to that proposal. After further discussions, the negotiations were adjourned to

what would ultimately become the most critical negotiation-the meeting held at the Danbury Hilton Hotel on December 3, 1982.

At the December 3 meeting, all parties understood that in any transaction the minority shareholders would receive cash for their shares; the problem was what form the payment to Condec would take. Accordingly, Westinghouse requested that the discussions focus upon the purchase of Condec's 78.4% interest. After extensive negotiations, Westinghouse and Condec ultimately reached a " handshake" agreement whereby Westinghouse would pay $107 million-$21 per share-for 100% of Unimation's shares. Condec's interest would be sold to Westinghouse for $84 million, payable, at Westinghouse's option, either all in cash or $74 million in cash and $10 million in contingent royalty payments. The following day, December 4, 1982, a written agreement in principle was executed, and on Monday, December 6, 1982, that agreement was publicly announced. Shortly thereafter, formal merger and related agreements were drafted and executed.

As part of the transaction, Condec was required to make various representations and warranties and to enter into a series of ancillary agreements under which Condec (as distinguished from Unimation's public shareholders) undertook certain obligations. For example, under a special services agreement, Condec undertook to pay all costs over $500,000 in connection with servicing certain spot welding robots that had been shipped to GM's plant in Zaragoza, Spain, and that subsequently encountered major problems. Condec also entered into a lease for a Waterbury, Connecticut facility in mid-construction. Other ancillary agreements included a lease of Unimation's Bethel facility, a supply contract under which Condec would continue to supply Unimation with encoders, and an agreement under which Westinghouse would ultimately purchase $200,000 worth of Unimation preferred stock.FN7

On January 6, 1983, Condec's board of directors-and immediately thereafter those same persons acting as the Unimation board-met formally to consider and approve the proposed transaction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

and to recommend its approval by Unimation's public stockholders. As ultimately approved by both boards, the transaction took the form of a merger of a subsidiary of Westinghouse into Unimation for $21 per share cash. As part of the transaction, Condec and Westinghouse executed a separate stock purchase agreement under which Condec agreed to vote its Unimation shares in favor of the merger at a special Unimation stockholders' meeting to be held in February, 1983. Immediately after that meeting, Condec would sell its Unimation stock to Westinghouse, and the merger would close.

*7 Before convening to approve the merger, the Unimation directors had conferred on almost a daily basis to discuss the transaction's evolving terms. They based their decision to approve the merger upon several factors, all of which they had considered at length.

First, the $107 million merger price had been arrived at by arm's-length negotiations and was by far the best offer received for Unimation after an eight-month canvass of the market. It exceeded the next best offer by over $40 million, and closely approximated the $110 million goal Condec had initially established in April, 1982.

Second, to reject the merger proposal would have created the quite real, and unacceptable, risk that any future price offered for Unimation would be considerably lower. Unimation's actual (and its potential future) financial performance was declining. So concerned was Westinghouse about the impact of recent marketplace developments on Unimation's value that it asked Unimation's management to furnish revised financial projections for FY 1983. That request-which Unimation's directors viewed as a dark cloud threatening the deal-resulted in a downwardly revised forecast. The new forecast projected reduced earnings for FY 1983 (the last six months of calendar 1982 and the first half of calendar 1983). Specifically, a $.14 per share loss (down from the positive $.55 per share projection of July, 1982) was anticipated.[FN8]

Third, the directors considered the fairness of the $21 per share price in light of Unimation's recent stock market prices. Between November, 1981 and mid-July, 1982, those prices had plummeted from a high of $25.25 to a low of $10.75 per share.[FN9] During that same period, securities analysts were cautioning investors against buying Unimation stock because of the decline in Unimation's profit picture and the uncertainties in the robotics industry. In a report dated December 28, 1982, L.F. Rothschild, Unterberg & Towbin stated that Westinghouse was "paying up" for Unimation, whose hydraulic robots "are considered technologically outdated." First Boston Research, in a report dated December 9, 1982, stated that at 150 times fiscal 1982 earnings and 3.7 times book value, "Unimation was not cheap," and that "if the robot market grows at 30% per year and Westinghouse is able to rejuvenate a flagging Unimation with money and technology, then it is a good deal. If not, the purchase is a mistake."

At the January 6, 1983 Condec board meeting, Drexel opined to the directors that the $21 per share price was fair to Condec. In support of that conclusion, Drexel advised the Condec board that the previously discussed market, economic, and product line developments had caused Unimation to become a less valuable company. Drexel's advice confirmed the directors' conclusion, independently arrived at, that this was the time to sell Unimation, and that to delay would only lessen the prospects for achieving a sale at a favorable price.

*8 On January 25, 1983, a proxy statement was disseminated to Unimation's stockholders, soliciting their approval of the merger at a special stockholders' meeting to be held on February 15, 1983. The transaction was not conditioned upon the approval of the majority of the minority stockholders, and the proxy statement disclosed that Condec intended to vote its controlling stock interest to approve the merger. The merger was approved at a special Unimation stockholders' meeting, with Condec voting its 4 million shares in favor of the transaction.[FN10]

## II. THE CONTENTIONS

In support of his claims, the plaintiff contends that: (1) in these circumstances the defendants had the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

burden of proving that the merger was intrinsically fair to the Unimation minority shareholder class, (2) the defendants failed to prove that they dealt fairly with the minority shareholders or that the $21 per share price was fair, (3) even if the business judgment standard of review were applicable, it does not protect the defendants, because they (a) breached their duties of care and loyalty during the merger negotiation and approval process, and (b) breached their duty of entire candor by disseminating to the minority shareholders a materially false and misleading proxy statement. As a consequence, plaintiff argues that the defendants are liable to the class for the difference between the $21 per share merger price and Unimation's fair value, which (plaintiff contends) ranged from $28 to $35 per share.

Central to plaintiff's intrinsic fairness argument is his position that even though the merger was structured to take the form of an arm's-length transaction with an independent third party, in fact and substance the merger was a self-dealing transaction as far as Unimation's minority shareholders were concerned. Moreover, plaintiff contends, Condec, whose interests were adverse to the minority, negotiated a transaction that was beneficial to it but harmful to the minority. Therefore, the liability standard to be applied should be that of intrinsic fairness, under which the defendants have the burden of proving that they dealt fairly with the minority and achieved a fair price for them. Plaintiff argues that the minority was not dealt with fairly, because the merger was timed to occur under the most unfavorable circumstances (a recession), and without procedural safeguards (such as independent bargaining representatives or a "majority of the minority" veto power) needed to protect the minority. In addition, plaintiff claims that $21 was not a fair price, as evidenced by Unimation's then-current market price (which was $20), and by the opinion of plaintiff's valuation expert that Unimation was worth from $28 to $35 per share.

Finally, plaintiff argues that even if the intrinsic fairness standard of review does not apply, the defendants are nonetheless liable for damages, because the Unimation directors (i) were grossly negligent in negotiating and approving the merger, (ii) breached their duty of loyalty by trading in Unimation's stock while they possessed material nonpublic information (*i.e.*, knowledge of the ongoing merger negotiations) and (iii) violated their fiduciary duty of candor to the minority stockholders by disseminating a materially false and misleading proxy statement.

*9 The defendants ardently dispute these claims. Essentially, they contend that (a) the interests of Condec and the Unimation minority were identical and were fully and adequately represented throughout the entire process, (b) the transaction should therefore be scrutinized under the business judgment standard that governs arm's-length negotiated transactions, (c) the directors violated no duties of any kind, whether of loyalty, care, or disclosure, and (d) even if reviewed under the entire fairness standard, the merger was entirely fair because the minority shareholders were dealt with fairly and the merger price was fair.

These contentions are now addressed.

### III. *THE APPLICABLE LIABILITY STANDARD*

The parties dispute at great length the appropriate standard under which the legality of the merger and the propriety of the defendants' conduct should be evaluated. The plaintiff contends that the appropriate standard is entire fairness-a standard normally applied in parent-subsidiary mergers and other situations where the fiduciary stands on both sides of the transaction and derives a benefit to the exclusion of and detriment to the stockholders. Under that standard, Condec and its directors would have the burden of establishing, after careful scrutiny by the Court, that the merger was entirely fair to the Unimation minority. *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 109-110 (1952); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983); *Citron v. E. I. Du Pont de Nemours & Co.,* Del.Ch., C.A. No. 6219, Jacobs, V.C. (June 29, 1990), Mem.Op. at 23. As our Supreme Court has stated:

The concept of fairness has two basic aspects: fair

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

*Weinberger v. UOP, Inc.*, 457 A.2d at 711.

Although the merger was negotiated at arm's length between Condec and Westinghouse, the plaintiff insists that it was a self-dealing transaction as far as the Unimation minority was concerned. The argument goes as follows: Condec, as Unimation's majority stockholder, represented the minority stockholders' interests during the merger negotiations. Condec's interests and the minority stockholders' interests were not identical. The minority's interest was to receive the highest possible price. Condec's interest was not to obtain the highest price, but only to raise cash in an amount sufficient to alleviate its acute financial distress. That conflict of interest imposed upon the defendants a fiduciary obligation to secure separate representation (in the form of independent legal counsel and/or investment bankers) for the minority during the merger negotiations. Instead, however, the defendants represented the minority's interests, subordinating them to the defendants' own, and as a result, derived certain benefits to the minority's detriment.

*10 Plaintiff's thesis that the intrinsic fairness standard must be applied is said to be especially compelling, because while the merger was given the form and appearance of an arm's-length transaction, in substance it was a parent-subsidiary merger. The plaintiff argues that this case is substantively indistinguishable from a scenario in which Condec first sells its 78.4% stock interest in Unimation to Westinghouse for $21 per share, and Westinghouse then eliminates the 21.6% minority in a cash-out merger at the same price. The plaintiff argues that since the intrinsic fairness standard would apply if

the transaction had taken that form, the Court should look to the substance and disregard the merger's formal, cosmetic appearance as a transaction negotiated by truly unconflicted fiduciaries.

The defendants vehemently contest these positions. They argue that Condec was not under financial distress and that it was not motivated to sell its prime asset for less than a fair price. Therefore, Condec had no interest that was adverse to or distinct from that of the Unimation minority. All Unimation stockholders, including Condec, desired-and were motivated-to obtain the best possible transaction at the highest available price. The defendants further maintain that Condec represented the shareholders' combined interests vigorously and adequately, and that Condec's representatives negotiated with Westinghouse at arm's length to further that objective. Finally, the defendants insist that they derived no benefits from the transaction that were not shared proportionately with the minority. They therefore conclude that this transaction should be treated no differently from any other third party merger negotiated at arm's length. In such circumstances, the applicable standard is the business judgment rule. *Citron v. Fairchild Camera & Instrument Corp.*, Del.Supr., 569 A.2d 53, 64 (1989); *Sinclair Oil Corp v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971); *see David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427, 430 (1969). Under that standard, judicial review is limited to whether the transaction amounted to waste, with the burden of proof upon the party attacking the transaction. *Marciano v. Nakash*, Del.Supr., 535 A.2d 400, 405 n. 3 (1987).

Having carefully considered these conflicting positions and the facts relating to them, I conclude that the plaintiff's position must be rejected as not supported by the evidence. The rationale for employing the intrinsic fairness standard is that where corporate fiduciaries, because of a conflict, are disabled from safeguarding the interests of the stockholders to whom they owe a duty, the Court will furnish compensatory procedural safeguards by imposing upon the fiduciaries an exacting burden of establishing the utmost propriety and fairness of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 9

their actions. *See Pinson v. Campbell-Taggart, Inc.*, Del.Ch., C.A. No. 7499, Jacobs, V.C. (February 28, 1989), Mem.Op. at 14.

*11 That rationale is not implicated here, because no credible showing was made that the interests of Condec and its directors on the one hand, and of the Unimation minority on the other, conflicted in any way, or that the defendants were disabled by a conflict from representing all Unimation stockholders during the negotiations. Condec was not selling Unimation because of any financial distress, nor was it willing to accept anything less than a fair price for that asset. The defendants' conduct throughout their eight-month market search and their negotiations with Westinghouse established that they were motivated to (and did) obtain the best possible transaction for all Unimation stockholders. In short, there is no colorable, let alone persuasive, evidence that Condec stood on both sides of the transaction vis-a-vis the Unimation minority, or that it derived a benefit at their expense. Because in substance and in form the merger was a *bona fide* arm's-length transaction negotiated with a third party, the business judgment rule is the appropriate standard for evaluating its legality and the claims against the defendants.

Despite that conclusion, I have chosen, nonetheless, to evaluate the transaction and the plaintiff's claims as if intrinsic fairness were the governing standard. I have done that because in my view a determination of the merits ought not to turn upon the standard of review or burden of proof, except where that standard or burden is truly outcome determinative. In this case it does not matter what standard is applied, because even if measured by the exacting standard of entire fairness, the challenged merger easily passes muster.

An evaluation of entire fairness normally takes the bifurcated form of separate analyses of fair dealing and fair price. That format is followed here. Part IV, *infra*, of this Opinion addresses the fair dealing issues, and Part V, *infra*, treats the issues of fair price. The plaintiff has also advanced, independently of the entire fairness analysis, certain breach of fiduciary duty claims. For ease of clarity,

those claims are addressed in the context of the entire fairness analysis, rather than being treated separately.

## IV. *FAIR DEALING*

The plaintiff contends that the defendants dealt unfairly with the minority stockholders in numerous respects. Those contentions lack merit.

### A. Timing and Initiation *of the Transaction*

The plaintiff contends that the merger was timed and initiated for Condec's sole benefit, thereby forcing the minority stockholders to liquidate their investment in Unimation under maximally disadvantageous conditions. Specifically it is argued that the exploration of a possible sale of Unimation was timed solely by Condec's internal need to "deleverage" its balance sheet during the worst operating year in its history. While a sale would be advantageous to Condec because it could shelter its capital gain by offsetting it against tax loss carry forwards and other business losses, the minority would enjoy no such tax advantage.

*12 Plaintiff emphasizes that the transaction could not have come at a worse time for the minority stockholders. In November, 1981, the public had been invited to invest in Unimation at $23 per share on the strength of a prospectus that touted the favorable long-term prospects for Unimation and the robotics industry. Now, only months later, Condec was planning to dispose of Unimation and thereby to deprive the minority of the opportunity to enjoy those promised benefits.[FN11] That transaction, moreover, took place during a recession and bear market in which Unimation's stock price had severely declined.

The argument is factually and legally flawed. Factually, the defendants had a valid reason to believe that postponing a sale of Unimation would create a significant risk that any future sale would be at a much lower price than the $107 million offer then in hand. And legally Condec, *qua* shareholder, had discretion as to when to dispose of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

its Unimation shares. *See Freedman v. Restaurant Associates Industries, Inc.*, Del.Ch., C.A. No. 9212, Allen, C. (September 19, 1990), Mem.Op. at 14; *Bershad v. Curtis-Wright Corp.*, Del.Supr., 535 A.2d 840, 845 (1987). That discretion, to be sure, was not absolute. Because Condec had majority control and was selling its stock in a transaction involving shareholder approval, Condec, *qua* fiduciary, was not free to time the transaction so as to financially injure the minority and correspondingly benefit itself. *Jedwab v. MGM Grand Hotels, Inc.*, Del.Ch., 509 A.2d 584, 599 (1986). The plaintiff insists that the timing of the merger had that precise effect, but the record shows otherwise. There is no evidence that the merger, as timed, financially injured the minority shareholders or enabled Condec to receive value at the minority's expense.

B. Structure and Negotiation *of the Transaction*

The plaintiff next contends that the manner in which the merger was structured and negotiated demonstrates that the Unimation minority was treated unfairly. The argument runs as follows: Because Condec was not motivated to seek the highest possible price for Unimation, Condec (and Drexel) had interests that conflicted with those of minority stockholders. Therefore, Condec was obligated to (but did not) provide independent representation for the minority during the negotiations, which enabled Condec to make a deal favorable for itself but far less favorable for the minority. Specifically, (i) Condec received benefits from the ancillary agreements with Westinghouse in which the minority did not share; (ii) Condec was allowed to retain an equity interest in Unimation by continuing to hold the preferred stock that remained outstanding after the merger, but the minority received only cash; and (iii) Condec received payment immediately after the merger, but the minority did not receive payment until 2 to 3 weeks later. These arguments are not persuasive.

To begin with, the contention that Condec was not motivated to seek the highest achievable price for its (and the minority's) Unimation stock merely restates arguments already rejected. As the Court has found, Condec decided not to sell Unimation unless a fair price could be obtained. Condec decided to sell only after it had thoroughly canvassed the market and successfully negotiated the highest price obtainable. Thus, Condec had no conflicting interest that disabled it from speaking or negotiating for Unimation's minority shareholders or that obligated it to secure separate representation for the minority.

*13 The undisputed facts also rebut any suggestion that Condec made a more favorable deal for itself than for the minority. The merger yielded the same per share price for the minority as for Condec.[FN12] Admittedly, Condec did enter into side agreements (including a Share Purchase Agreement) with Westinghouse to which the minority stockholders were not parties. However, the evidence does not support the contention that those contracts were a disguised diversion of the merger consideration from the minority to Condec. To the contrary, those agreements had a valid business rationale and they required Condec to assume financial obligations to which the minority were not subjected. Those agreements were part of a larger negotiated business package of which the merger was an integral part. No showing was made that they bestowed any *net* benefits upon Condec that the public shareholders did not also receive.

Nor did Condec's continuing to hold the Unimation preferred shares that it owned before the merger establish unequal or unfair treatment. The minority was not entitled to those shares, and by continuing to hold them Condec simply remained in the same position that it had always occupied.

The only arguably pertinent respect in which the minority stockholders were treated differently in the merger is that they received payment for their shares some 2 to 3 weeks later than Condec. Why there was a delay in payment to the minority shareholders was not explained. Conceivably, the significant paperwork involved in processing thousands of checks was a reason. In any event, there is no showing that the delay was intended to, or did, result in any financial harm. While it may be that all the Unimation shareholders should have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

been treated equally in this regard, I am not persuaded that this *de minimis* departure from that standard amounts to an actionable breach of fiduciary duty for which the individual defendants should respond in damages.

### C. Director Approval

The plaintiff's next argument is actually a breach of fiduciary duty claim clothed in "fair dealing" terminology. It is urged (again) that the Unimation minority was treated unfairly because the persons charged with representing their interests were Unimation directors who were conflicted. That conflict is said to have been most pronounced in the case of Mr. Engelberger, whose employment contract with Condec was being "bought out" for $1.68 million, and whose newly-negotiated Westinghouse employment contract provided a $155,000 annual salary and a $500,000 five-year noncompetition clause. Additionally, the plaintiff argues that Unimation's directors breached their duty to exercise due care in safeguarding the minority's interests, because they failed (i) to appreciate the minority's need for independent representation and to assure that such representation was afforded, and (ii) to inform themselves adequately of the merits of the transaction that they approved at a short, perfunctory meeting.

*14 To the extent these arguments restate plaintiff's earlier position that the minority's interests should not have been represented by the Condec defendants, the short answer is that there was no disabling conflict. Accordingly, the Unimation directors breached no fiduciary duty, whether of due care or of loyalty, by allowing Condec's representatives to speak for the minority in the negotiations.

The remaining claims are, analytically speaking, independent claims for breach of fiduciary duty. And while their appearance in this context tends to confuse the "fair dealing" analysis, those claims, whether viewed as independent causes of action or merely as elements of a fair dealing analysis, fail in all events for lack of evidentiary support.[FN13]

As for the due care claim, the record conclusively establishes that Unimation's directors were fully informed and knowledgeable of the eight-month market search for potential buyers and of Unimation's business, prospects, and value. Those directors discussed the potential Westinghouse merger almost daily between the execution of the merger agreement and the board meeting at which the agreement was approved. Moreover, the Unimation directors' meeting was preceded by an extensive meeting of the same persons, sitting as the Condec board, at which Drexel discussed the basis of its opinion that the merger was financially fair to Condec and the Unimation minority. In those circumstances, the fact that the formal Unimation directors' meeting was short is of no moment, because for months Unimation's directors had been kept fully apprised of all relevant facts on an ongoing basis, and they had already fully considered those facts before their formal meeting was convened.

Finally, assuming without deciding that Mr. Engelberger had a disabling conflict of interest, there was no showing that his participation in the merger negotiations and decision-making caused any actionable wrong or harm. Unimation had five directors. There is no claim or evidence that Mr. Engelberger dominated or controlled any of the remaining four, nor was it shown that his participation otherwise influenced the Unimation board to act other than in the minority stockholders' best interests.

### D. Stockholder Approval

The plaintiff also contends that the defendants' failure to endow the minority stockholders with a "majority of the minority" veto power evidences unfair dealing. The presence of such a veto power typically constitutes an indicium of fairness; its absence, however, does not of itself establish any breach of duty. The ultimate question is always whether the terms of the self-interested transaction, taken as a whole, were fair. *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d at 599-600; *see American General Corporation v. Texas Air Corporation*, Del.Ch., C.A. Nos. 8390, 8406, 8650

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                    Page 12

Not Reported in A 2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

and 8805, Hartnett, V.C. (February 5, 1987), Mem.Op. at 17

Although no "majority of the minority" approval was required for this merger, under one formulation of such a requirement that approval was, nonetheless, granted. One formulation of such a veto requirement (assuming it was in force) would call for the approval of a majority of all minority shares entitled to vote. In this case that would be 561,000 shares (51% x 1,100,000). Under that formulation the requisite approval was not obtained, because only 41% of the total outstanding minority shares were voted in favor of the merger (451,768 / 1,100,000 = 41%). If, however, the requirement had called for the approval of a majority of the minority shares actually voted, [FN14] that approval clearly was obtained. A majority of the shares actually voted would have been 257,751 votes cast in favor (51% x 505,394 = 257,751) In this case the merger was overwhelmingly approved by almost 90% of the total minority shares that were actually voted (451,768 / 505,394 = 90%).

*15 In all events, however, there was no showing that the absence of a "majority of the minority" veto power resulted in any unfair treatment of the minority shareholders

E. *Disclosure Claims*

Finally, the plaintiff contends that there was unfair dealing because the proxy statement issued in connection with the merger failed to disclose facts material to the transaction The relevant standard requires:

[a] showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Industries Inc v*

*Northway, Inc.,* 426 U.S. 438, 449 (1976)). The defendants respond by arguing that the proxy disclosures were complete and fully adequate in all respects.

(i) The plaintiff contends that the proxy statement was defective because it omitted to disclose certain facts relating to the merger negotiations, namely that: (a) Westinghouse offered to pay more for the minority's shares than Condec's shares, (b) Condec made a counteroffer in which it sought more for itself than the minority, (c) the final (December 3) negotiating session involved only Condec's Unimation shares, the minority's shares having been included only after Condec had first struck its deal, and (d) the terms of the December 4 Letter Agreement and Option Agreement were not described.

The first two "facts" were not disclosed because they were not facts. The record establishes that although Westinghouse originally offered Condec and the public stockholders *different forms* of consideration for their Unimation shares, it never offered to pay Condec and the minority *different values* for their shares. Condec never made (nor were its representatives authorized to make) an offer whereby Condec would receive greater per share consideration than the minority. At all times the intent was for Condec and Unimation's public shareholders to receive consideration of equivalent value for their shares

With respect to the December 3 negotiations and the December 4 Letter and Option Agreements, the plaintiff asserts-but makes no reasoned effort to show how or why such information would have been material to a stockholder considering whether to approve the merger. Where, as here, " arm's-length negotiation has resulted in an agreement which fully expresses the terms essential to an understanding by shareholders of the impact of the merger, it is not necessary to describe all the bends and turns in the road which led to that result." *Repairman's Serv. Corp. v. National Intergroup Inc.,* Del.Ch., C.A. No. 7811, Walsh, V.C. (March 15, 1985), Mem.Op. at 21. Moreover, the December 4 Letter Agreement was later superseded by the definitive Share Purchase Agreement

© 2006 Thomson/West. No Claim to Orig. U S. Govt. Works

Not Reported in A.2d                                                                Page 13

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

executed on January 7, 1983, the terms of which were fully described in the proxy statement.

*16 (ii) The plaintiff argues that the proxy statement should have disclosed that Condec was financially distressed. That fact is claimed to be material, because the public shareholders might have concluded from it that the defendants' sole motivation was to serve Condec's financial needs and goals, rather than the interests of all Unimation shareholders. This argument does not improve by successive repetitions. As previously found, Condec was not financially distressed, and it was not motivated to sell Unimation by financial necessity. Rather, as an outgrowth of strategic discussions about raising a relatively minor amount of capital, the defendants decided to explore (and ultimately to avail themselves and Condec of) a unique and not-likely-to-be-repeated opportunity to sell Unimation at a fair and quite attractive price.

(iii) Next challenged is the adequacy of the proxy disclosures relating to Drexel and its fairness opinion. It is claimed that the proxy statement should have disclosed that (a) Drexel was not retained to render a fairness opinion which included the minority stockholders until January 6, 1983, the same day the Unimation board approved the merger agreement, and (b) Drexel was already contractually obligated to give Condec a fairness opinion, and merely expanded that opinion to include Unimation. That information is said to be material, because the minority shareholders "were entitled to know about the haste within which Drexel's opinion was obtained and the reasons why it was sought in order to assess its reliability and value." (Pl. Opening Br., pg. 71)

In other circumstances facts of this kind might well be material. See Weinberger v. UOP, Inc., 457 A.2d at 712; Joseph v. Shell Oil Co., Del.Ch., 482 A.2d 335, 343 (1984). In this case, however, they were not, and their disclosure would have been misleading. Although Drexel's fairness opinion was expanded at the last minute to include Unimation, that fact, in these particular circumstances, did not evidence that the opinion was prepared in haste. It is undisputed (and the proxy statement disclosed) that Drexel had been

Condec's investment banker and financial advisor. In this particular transaction, the interests of Condec and of the Unimation minority were completely aligned. Initially, Drexel's fairness opinion was to be furnished to Condec alone, and there is no evidence that Drexel prepared its opinion for Condec other than diligently. The fairness opinion that Drexel ultimately furnished to both Condec and Unimation was virtually identical, in form and substance, to that which was originally to be furnished to Condec alone. Accordingly, to disclose in the proxy statement facts suggesting that Drexel had prepared its opinion hurriedly would have been misleading.

The plaintiff also argues that the proxy statement should have disclosed certain "comparable company " data that Drexel considered in arriving at its fairness opinion. But that information is immaterial, because neither Drexel nor the Unimation directors relied on such data in determining the fairness of the merger price. A proxy statement need not disclose all the wealth of detail presented to or considered by the corporation's directors and advisors, whether or not material. Margolies v. Pope & Talbot, Inc., Del.Ch., C.A. No. 8244, Hartnett, V.C. (December 23, 1986), Mem.Op. at 18.

*17 (iv) Lastly, the plaintiff asserts that the proxy statement should have disclosed that Drexel had originally advised Condec that it might expect to receive $110 to $120 million for Unimation, and that Drexel and Unimation had established an asking price of $120 to $150 million. The plaintiff offers no reasoned support for his conclusory argument that these facts were material. I conclude that they were not. The $110 to $120 million figures were an informal estimate, not a formal valuation of Unimation. Moreover, Drexel suggested them before the decline in Unimation's business prospects and financial condition had become pronounced. Likewise, the $120 to $150 million figures were not intended as the board's opinion of the company's value. They were merely an asking price, deliberately set high enough to discourage "tire kickers" during Drexel's market search.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C44

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

To be the subject of a disclosure obligation, information relating to value must be considered reliable. *Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 128-29 (1986). In determining the reliability of such information, the Court must consider several factors, including the purpose for which the information was originally prepared and intended to be used. *Id; In Re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680, 692 (1986). Because neither set of figures was intended to serve as a valuation of the company, they were not sufficiently reliable evidence of value to be the subject of mandated disclosure to stockholders.

In summary, the defendants have established that the minority shareholders were dealt with fairly in the merger. Accordingly, I next turn to the plaintiff's challenges to the fairness of the merger price.

## V  FAIR PRICE

In addition to his fair dealing claims, the plaintiff contends that $21 per share was not a fair price for Unimation, and that a fair price was no less than $28 to $35 per share. After careful scrutiny of the record and the parties' submissions, I find that $21 was a fair price and that the plaintiff's contrary contentions are incorrect and not supported by credible evidence.

### A  The Fairness of *The Merger Price*

The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller (Condec and Unimation) was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available.

The fact that a transaction price was forged in the crucible of objective market reality (as

distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair. As our Supreme Court has observed, albeit in a different context:

Particularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.

**\*18** *Weinberger v. UOP, Inc.,* 457 A.2d at 709-710 n.7.

It is also recognized that where a unique asset such as corporate control (or the corporation itself) is being sold, an auction market (or its equivalent, in the form of an effective market canvass) can provide important, highly reliable, evidence of the best available transaction for such a sale. *In Re RJR Nabisco, Inc. Shareholders Litigation,* Del.Ch., C.A. No. 10389, Allen, C. (January 31, 1989), Mem.Op. at 50; *see In Re Envirodyne Industries, Inc. Shareholders Litigation,* Del.Ch., C.A. No. 10702, Hartnett, V.C. (April 20, 1989), Mem.Op. at 9-10; *In Re Formica Corp. Shareholders Litigation,* Del.Ch., C.A. No. 10598, Jacobs, V.C. (March 22, 1989), Mem.Op. at 33; *Gilbert v. El Paso Co.,* Del.Ch., C.A. Nos. 7075, 7079, Jacobs, V.C. (November 21, 1988), Slip Op. at 29-30, *aff'd,* Del.Supr., 575 A.2d 1131, 1136 (1990); *In Re Fort Howard Corp. Shareholders Litigation,* Del.Ch., C.A. No. 9991, Allen, C. (August 8, 1988), Mem.Op. at 32-33.

The $21 price being challenged here was the product of two months of arm's-length negotiations with Westinghouse. Those negotiations were preceded by an extensive and diligent market test of over six months' duration. That market exploration confirmed that the Westinghouse $21 offer was by far the best price available.[FN15] The next highest bid (GE's $65 million offer) was for $40 million less, and no other bids, solicited or unsolicited, were made. More pointedly, there were no bids at the $28-$35 per share price that plaintiff claims Unimation was worth.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

In assessing the fairness of the merger price, the defendants also considered four commonly used valuation criteria, namely, multiples of the transaction price to earnings, to sales, to book value, and to market price. These valuation measures provided additional confirmation that the $21 purchase price was fair.

As for earnings, $21 per share represented a multiple of 91 times earnings for FY 1982 (or 150 times 1982 operating earnings before an extraordinary credit), and 122 times average yearly earnings for the five-year period 1978 through 1982. Those multiples far exceeded the multiples prevailing at that time to assess value in any industry. They also exceeded the multiples achieved in high technology company acquisitions between 1979 through mid-1982. As noted by a December 9, 1982 First Boston Research report discussing the merger, "at 150 times fiscal 1982 operating earnings or 3.7 times book value ... Unimation was not cheap." (Def.Exh. 34, p. 1)

With respect to sales, the Westinghouse $21 per share purchase price represented a multiple of 1.5 total sales for FY 1982, and 2.5 the average yearly sales for the period 1978 through 1982. Those multiples also exceeded those achieved in high technology company acquisitions for that same period, including multiples that Drexel had considered and presented to the Condec and Unimation boards. For FY 1983, the price/earnings and price/sales ratios would have been even higher, because they had been projected to decline significantly from the comparable FY 1982 results.

*19 With respect to book value, $21 per share represented a price-to-book value multiple of approximately 3.8. That multiple exceeded the book value multiples for the high technology acquisitions described above. Indeed, the purchase price was $78 million above Unimation's book value, which required Westinghouse to account for a large percentage (73%) of the purchase price as goodwill.

The only arguably problematic value criterion was the premium over market price. It is undisputed

that the $21 per share merger price represented a premium of 95% over the Unimation's stock market price as of July, 1982 (five months before the announcement of the merger), a premium of 32% over the average of Unimation's high and low trading prices for 1982, a premium of 17% over the market price one month before the announcement of the Westinghouse transaction, and a premium of 8% over the market price the day before the announcement. What is disputed is the reliability of Unimation's market prices during the period beginning in mid-July, 1982 and continuing up to the December 6, 1982 announcement of the merger. Because of the importance the parties have accorded this issue, I address it at this point.

The plaintiff contends that Unimation's July through December 6 stock prices were fully "unaffected," and that the market price would have reached levels well above $21 if the merger announcement had not "capped" the price at $21. For that reason, it is claimed that $21 represented no market premium at all, because Unimation's market price had already climbed to $20-21 per share shortly before the merger was announced.[FN16]

The defendants ardently disagree, contending that Unimation's market prices from July through December 6, 1982 must be disregarded, as having been influenced by leaks or rumors of a possible acquisition of Unimation. That conclusion, defendants argue, is compelled because Unimation's stock price increases from July through December could not be justified on the basis of Unimation's operating performance or the trend of the market generally. Between July and December, 1982, Unimation's business prospects and financial performance progressively deteriorated. Yet, during that same period, Unimation's stock price increased by over 84% but the Standard & Poor's (S & P) 500 Index rose by only 30%. Further evidence that the market price rise was influenced by leaks or rumors of a possible sale is that Messrs. Cion, N. Schafler and Engelberger received telephone calls inquiring if Unimation was for sale. Since Unimation's market prices from and after mid-July were not "unaffected", defendants conclude that they cannot be considered in determining the extent of any above-market

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

premium

Having considered the arguments and evidence, I am persuaded that the post-July stock market prices were influenced by leaks or rumors that the company might be for sale. Given Unimation's worsening financial condition, the highly cautious (if not negative) evaluation of Unimation's stock by securities analysts, the fact that the market generally was rising at a much lower rate than was Unimation's stock price, and the fact that Condec officials had personally received telephone inquiries concerning whether Unimation was for sale, it is difficult to conclude that Unimation's dramatic post-July stock price rise was not influenced by such information.

*20  The only evidence to the contrary is the plaintiff's expert's trial testimony that Unimation's trading profile did not exhibit the volume or price " spikes" that, if depicted on a graph, are characteristic of price increases influenced by acquisition rumors. That fact, however, is not conclusive or sufficient to outweigh the evidence on the other side. That testimony presupposes that buyers trading on acquisition speculation will always buy stock in blocks large enough to represent "spikes" on a standard graph. While that may occur in many cases, particularly in an active market for control, it was not shown that that practice is invariable. Indeed, where the corporation whose stock is being acquired is a majority-controlled subsidiary, it is plausible that less aggressive acquisition strategies might be employed.

The record does not show at what point Unimation's stock market price began to react to acquisition-related speculation. It is therefore impossible to determine a specific "uninfluenced" market price, and, consequently, a specific uninfluenced market premium represented by the $21 transaction price. What is clear, however, is that the merger price represented an above-market premium of some magnitude. In terms of a "fair price" analysis, that market premium was at worst a neutral factor, but most likely the premium was at least 17% or higher, which would evidence that the $21 merger price was fair.[FN17]

Finally, the plaintiff argues that in all events, none of the foregoing facts and evidence demonstrate that $21 was a fair price, because (i) Condec's willingness and decision to sell Unimation for a " fire sale price at the wrong time" invalidated the market test, (ii) Drexel's fairness opinion was not based upon any financial analysis that adequately justified the $21 price, (iii) the defendants called no qualified expert witness at trial to validate that price, and (iv) the trial testimony of Westinghouse employees about Unimation's post-status and performance was inadmissible and highly prejudicial.

These arguments are either contrary to the adjudicated facts and the overwhelming weight of the credible evidence, or are immaterial. The Court has found as fact that a valid market test was conducted and that Condec's decision to accept the $21 price was not motivated by financial distress or necessity. Further, this Court did not rely upon the Drexel fairness opinion as such in arriving at its fairness conclusions; nor did it consider or rely upon the testimony of the Westinghouse witnesses relating to Unimation's post-merger performance. The Court did consider certain aspects of Drexel's underlying financial analysis, namely, the above-described ratios of purchase price to earnings, sales, book value, and market price. However, those ratios consist of objective, historically verifiable, "hard" dollar figures. Finally, David Kay, Condec's trial expert and a Drexel managing director, was amply qualified to testify about the particular subjects for which he was called, viz., to describe the work performed by Drexel, the basis for Drexel's fairness opinion, and the flaws in the valuation testimony of the plaintiff's trial expert.

*21  In short, the objective facts confirm the fairness of the $21 merger price. The contrary evidence, upon which the plaintiff primarily relies in attacking the fairness of the merger price, consists of the valuation opinion testimony of his trial expert. I turn to that evidence.

B. The Plaintiff's Affirmative *Valuation Evidence and Contentions*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C47

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

The plaintiff's trial expert, R. Alan Miller, testified that the fair value of Unimation at the time of the merger was between $28 and $35 per share. Mr. Miller based his opinion upon five valuation methods: (1) a stock market price analysis, (2) a premium analysis, (3) a price/earnings and other ratios analysis, (4) a "market expectation" analysis, and (5) a "venture capital" or "rate of return" analysis. The defendants assiduously contend that Mr. Miller's analysis is defective on its merits. They further argue that his entire opinion and supporting testimony should be excluded under Rule 703 of the Delaware Rules of Evidence, as being unsupported by the record and not based upon facts or data of a type reasonably relied upon by experts in the investment community.

For the reasons now discussed, that latter contention need not be reached, because Mr. Miller's valuation analysis is found to be flawed in several critical respects and must be rejected on its merits.

### 1) The Stock Market Price Analysis

It is undisputed that as of the merger date (February 15, 1983), Unimation's stock market price was $21 per share. Mr. Miller's market price analysis represented his effort to ascertain what that market price would have been had it not been "capped" at $21 by the merger announcement.

Starting with the November 25, 1981 initial public offering (IPO) price of $23, Mr. Miller graphed Unimation's stock price movement from that time forward up to the merger date. He similarly graphed the price movements of three selected market indices: the S & P 500 Index, the S & P 400 Index, and a group of four companies in the machine tool industry. From this data Mr. Miller concluded that the Unimation stock prices had moved generally parallel with the market indices during that period. He computed the percentage increases for each index over the relevant period, and then applied those percentages to Unimation's $23 initial public offering price, to arrive at a price of $27. Mr. Miller opined that $27 was the price at which Unimation would have traded on the merger date had it not been capped by the merger

announcement. To that price Mr. Miller added a premium of 35% (which he testified was customary in cash-out transactions during early 1983) to arrive at a value of $36 per share.

I find this valuation and the methodology that produced it to be unsound and a product of pure speculation. First, no basis was shown for choosing the $23 IPO price as a starting point, no connection having been made between the IPO price and the merger that occurred 15 months later. The $23 price was a near all-time high for Unimation that never found acceptance in the market place or became established as a stable market value. Only three days after the Unimation stock began to be publicly traded, it embarked upon a steep price decline from $25 to an ultimate low of $10.75 by July, 1982.

*22 Second, the arbitrariness of the November, 1981 starting date bespeaks a flaw in the methodology itself: its results are highly sensitive to and depend significantly upon the starting date being selected. Thus, if instead of the $23 IPO price, one started with Unimation's stock price as of July 1, 1982 ($11), Mr. Miller's approach would generate a value of $12.82 per share (based upon the four machine tool company index), or $14.44 per share (based upon the S & P 500 Index). Both values are far less than $27 per share.

Third, the analysis rests upon the assumption that Unimation's price movement paralleled that of the S & P indices and the four machine tool companies [FN18] That premise is critical to Mr. Miller's conclusion that Unimation's stock price would have risen by the same percentage as the indices during the relevant period. In fact, however, Unimation's stock price did not move "parallel" to the S & P indices or to the machine tool companies: it moved much more steeply and rapidly. To reiterate, although Unimation's financial performance continued to decline during the second half of 1982, during that same period its stock price rose by 84%, as contrasted with only 30% for the S & P 500 and an average of 17% for the four machine tool companies.

Finally, even if Unimation's stock price had moved

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

parallel to the indices, Mr. Miller's conclusion that Unimation's stock price would have increased by that exact same percentage and reached $27 by February, 1983, was still speculation.[FN19] And to increase that $27 price by applying to it a 35% premium that was demonstrably unattainable in the marketplace, was arbitrary.

For these reasons, the market price valuation must be rejected.

### 2) The Premium Analysis

Mr. Miller's second approach was a premium analysis also based on Unimation's stock market price. Having concluded that $20.50 was the unaffected market price of Unimation stock, Mr. Miller applied a 35% premium to that price to arrive at a fair value of $28 per share. The fallacy in that approach (in addition to its application of an unattainable premium) is that it assumes that the $20.50 per share market price was "unaffected". As previously discussed, Unimation's post-July market price was affected by leaks or rumors of a possible sale. Accordingly, the premium valuation analysis rests upon a faulty premise.

### 3) The Ratio Analyses

Mr. Miller's third analysis consisted of determining various ratios, all based upon multiples derived from the November, 1981 IPO price. The $23 IPO price represented a price/earnings ratio of 48, which Mr. Miller applied to Unimation's 1983 projected earnings of $.55 per share to arrive at a base price of $26 per share. That price was then adjusted to $32, to reflect the percentage change in the S & P market indices between the November, 1981 IPO and the February, 1983 merger. To that figure Mr. Miller then applied a 35% premium to arrive at a value of $43 per share.

**\*23** Using a similar methodology, Mr. Miller next performed a price/book value analysis, starting with the price/book value ratio of 4.31 represented by the $23 IPO price. He then applied that 4.31 multiple to Unimation's book value as of October 31, 1982,

to arrive at a value of $24 per share. That value was adjusted to $28 to reflect the stock market index percentage increases, and once again to $38-$39 per share by adding the 35% premium.

Mr. Miller also performed a price/sales ratios analysis. Using the public offering price/sales ratio as adjusted by the stock market index, he arrived at a $29 per share price to which he added a 35% premium. The end result was a value of $39 per share.

Finally, Mr. Miller reviewed acquisition data contained in Drexel's report to the Unimation directors, and concluded that the MDS/Schlumberger acquisition was most comparable to the Westinghouse acquisition of Unimation. He then determined the MDS/Schlumberger ratios of price to sales, earnings, and book value, and applied those ratios to Unimation to arrive at a value of $38. (No premium was added, since a premium was already built into the MDS/Schlumberger ratios.)

These valuations have no persuasive force, because they are based upon data that is either incorrect or immaterial. Mr. Miller's ratios were all derived from the $23 per share IPO price which, for the reasons earlier discussed, had no demonstrated relevance to Unimation's value as of the merger date. Moreover, all but one of the ultimate values were attained by adding two premiums (the market index premium and the 35% premium), the infirmities of which have already been noted. The invalidity of the resulting values is most graphically highlighted by their unreality. Under Mr. Miller's price earnings ratio approach, Unimation was worth $43 per share ($215 million); under his price/book value ratio and other analyses, Unimation's value was $38-39 per share ($167 million). There is no evidence that any potential acquiror was prepared to pay sums of that magnitude for Unimation. The evidence clearly established that no one was.

Finally, the ratios themselves were based upon highly questionable assumptions. Mr. Miller based his price/earnings ratio valuation upon projected FY 1983 earnings of $.55 per share. In fact, as of the merger date the $.55 figure was outdated and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                           Page 19

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

incorrect, because it had been revised significantly downward. That error was material to the value ultimately derived by application of this method. Thus, assuming the validity of the 1981 IPO price/earnings multiple of 48, if that multiple were applied instead to Unimation's FY 1982 earnings of $ 24 per share, the resulting value would have been only $11.52 per share. And if applied to Unimation's average earnings for the five years preceding the merger (an earnings period far more representative than FY 1982), the resulting value would have been only $14 95 per share.

The price/sales and the MDS/Schlumberger ratios analyses were similarly flawed They were based upon FY 1982 sales, but no credible showing was made that FY 1982 sales were sufficiently representative to serve reliably as a basis to predict Unimation's fair value as of the merger date. Indeed, the facts known before and on the merger date indicate that FY 1982 sales levels were not representative The July, 1982 projection (upon which Miller relied for his price/earnings analysis) forecast that FY 1983 sales would be $20 million less than FY 1982 sales. By early 1983 (but before the merger), even that projection had already been downwardly revised.

#### 4) The Market Expectation Analysis

*24 Mr. Miller's market expectation valuation was, by his own admission, not a mathematical analysis or a methodology that had ever been reduced to textbook description. Mr Miller selected two public filings and one analyst report from a plethora of available public information about Unimation. On the basis of that selective information, he determined that an appropriate value for Unimation over the long term would be in the range of $27 to $29 per share, or, if a 35% premium were added, $36 to $39 per share. There was no evidence that this method of valuation is generally accepted by the investment community However, even if an evidentiary foundation had ever been laid that was technically sufficient to admit this opinion into evidence, the analysis underlying it is unpersuasive. It amounts to little more than an expert's "bottom line" opinion of a corporation's value, with no

supporting rationale or analytical framework against which to evaluate the conclusion.

#### 5) The Venture Capital Analysis

Mr. Miller's final valuation method, the venture capital analysis, was not an analytical method used to establish a value for Unimation's stock Rather, it was a corroborative check of his other analyses It involved "working backwards", by first inserting a price of $30 (a figure within the ranges of values derived from Mr. Miller's other analyses) and then dividing that figure by the projected earnings of $ 55 per share. Mr. Miller then checked the fairness of the $30 price by comparing the multiple computed in the above-described manner to the rate of return that a venture capitalist would expect on his investment in Unimation. On that basis Mr. Miller concluded that $30 per share was a fair price.

This analysis is unpersuasive, because (i) Unimation was not a "venture capital" company, (ii) the analysis was based upon the outdated and incorrect $.55 projected earnings figure, and (iii) the valuations that the venture capital analysis were intended to corroborate have independently been found not to be credible.

In summary, the evidence taken as a whole establishes that the $21 per share merger price was fair. None of the higher valuations proposed by the plaintiff are credible or worthy of acceptance, nor do they otherwise provide a basis to call into question the fairness of the merger price.

#### VI. CONCLUSION

Although the entire fairness standard of review is not applicable to the merger challenged here, the Court has evaluated that transaction as if it were governed by that standard, i.e., as if the defendants had the burden of establishing the entire fairness of the merger. Based upon a careful scrutiny of the contentions and the evidence, I have found that (1) the Unimation minority shareholders were dealt

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                          Page 20

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

with fairly, (2) the merger price was fair and (3) the defendants breached no fiduciary duties owed to the minority.

Accordingly, judgment shall be entered in favor of the defendants and against the plaintiff. Counsel shall submit an appropriate form of order.

> FN1. Because Drexel was being retained to explore only a possible sale of Unimation, Condec's directors were unwilling to pay Drexel a fixed fee. Rather, Condec agreed to compensate Drexel on a contingent fee basis, which was a conventional arrangement in transactions of that kind. The retention agreement provided that upon any sale (defined broadly to include a sale of Condec's shares in Unimation, the entire company, or any equity participation), Drexel would be paid a fee equal to one percent (1%) of the consideration received by Condec for its Unimation shares. Thus, the higher the price received by Condec for its Unimation shares, the greater would be Drexel's compensation.

> FN2. The universe of potential buyers for Unimation consisted of a relatively small group of companies that were known to both Condec and Drexel.

> FN3. All of these persons, except for Mr. Engelberger, worked in close proximity to each other. They had offices along the same corridor at Condec headquarters and would normally meet for lunch every day to discuss this and other related business. Mr. Engelberger, who was located only one-half hour away at Unimation's offices in Danbury, Connecticut, would drive down once a week to join the other Condec directors for lunch and to discuss Unimation's affairs and business activities.

> FN4. Although Unimation had developed two small electric robots, it had no heavy duty robot in the market or at any

advanced stage of development in 1982. Nor did any of Unimation's licensees have a heavy duty electric robot in production at that time.

> FN5. Plaintiffs contend that Westinghouse was negotiating solely for Condec's controlling interest in Unimation but at the last moment decided to acquire the entire company. I find that Westinghouse, while reserving the option of buying Condec's interest alone, desired from the beginning to acquire the entire company. If Westinghouse acquired only 78.4% of Unimation, it would have to operate the publicly-held subsidiary on an arm's-length basis and would be unable to enjoy the full strategic benefits of the synergies that Westinghouse could bring to the combination.

> FN6. Plaintiffs contend that Condec sought to receive a greater price per share for itself than for the public shareholders. Having reviewed the evidence, I am satisfied that Condec never authorized Drexel or Mr. Cion to seek a higher per share price for itself, nor in fact did Condec ever attempt to do so.

> FN7. There is no evidence that these ancillary agreements created any benefits for Condec at the expense of Unimation's public shareholders. The only benefit that Condec did receive (but that the public shareholders did not) was its ability to realize a significant tax savings by utilizing a substantial tax loss carry forward. That benefit was not obtained, however, at the expense of the minority stockholders.

> FN8. Computed as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

| | | | |
|---|---|---|---|
| 1st quarter | | | (S.11) |
| 2nd quarter | | | .08 |
| 3rd quarter | | | ( .05) |
| 4th quarter | | | ( .06) |
| Total | | = | (S.14) |

FN9. Market price proved to be a two-edged sword. Between July and December, 1982, Unimation's stock price rose by 84%, so that by the time of the Westinghouse negotiations the stock price was $20 + per share. By contrast, during that same period the Standard & Poor's Index rose by only 30%. Plaintiff argues that that fact evidences the unfairness of the $21 merger price and that, but for the public announcement of that price, Unimation's market price would have risen to the high twenties. The defendants counter that the abrupt rise in Unimation's stock price could not be attributed to the company's operating performance or its position in the robotics industry, both of which were worsening. Therefore, defendants argue, the most plausible explanation is that the stock market price was affected by leaks or rumors of a possible sale or acquisition of Unimation. As discussed more fully in Part V, *infra*, of this Opinion, the defendants' argument is found to be more persuasive.

FN10. Of the 1,100,000 publicly owned Unimation shares, only 505,394 shares were voted. Of those shares, 451,768 (representing approximately 41% of all publicly held shares) voted in favor of the merger agreement and 45,140 shares (representing approximately 4%) voted against.

FN11. Plaintiff asserts no claim, nor seeks any relief, based upon the disclosures

(actual)
(July 1982 projection)
(new calendar 1983 projection)
(new calendar 1983 projection)

contained in the November, 1981 Prospectus

FN12. As defendants point out, because Condec was obligated to pay Drexel's fee ($840,000) out of its own share of the merger proceeds, and also to pay Mr. Engelberger's employment contract at a cost of $1,680,000, Condec "netted" $.63 per share less than the public shareholders

FN13. The plaintiff does advance one contention as a separate fiduciary duty claim, apart from his fair dealing argument. The claim is that defendants Cion and R. Scott Schafler bought Unimation stock on the basis of nonpublic information, namely, the confidential knowledge that Unimation would be sold. If, in fact, these directors did profit from their use of confidential corporate information, that would constitute a breach of fiduciary duty. *Brophy v. Cities Service Co.*, Del.Ch., 70 A.2d 5, 7-8 (1949). However, Mr. Cion's purchase of 1,000 shares occurred on March 17, 1982, before Drexel was even retained. Mr. Cion wanted to transfer those shares to his retirement account, but was told that for tax reasons, the 1,000 shares would have to be sold and then repurchased within six months by the retirement account. That is precisely what was done six months to the day of the March 17 purchase. Mr. Schafler purchased his 100 shares in early September, 1982. That purchase (which represented a post-merger profit of $800) occurred at a point in time when a sale of Unimation was highly problematic and Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Schafler doubted that Unimation would in fact be sold. Even if these transactions were found to constitute an unintended fiduciary violation, no relief can flow from them, because no relief is being sought as a specific consequence of these alleged violations. Plaintiff seeks only damages resulting from the allegedly unfair merger itself, *i.e.*, damages measured by the difference between $21 and what plaintiff contends to be the fair price. Thus, there is no legal nexus between this claim and the relief plaintiff seeks from this Court.

FN14. That latter formulation of "majority of the minority" veto power was employed in at least one decided case. *Citron v. E.I. Du Pont de Nemours & Co., supra,* Mem Op. at 5.

FN15. Plaintiff argues that there was no valid market test, because there was no public invitation to bid for Unimation However, there is no rule requiring Unimation's directors to sell the company according to a standard formula. *Mills Acquisition Co. v. MacMillian, Inc.,* Del.Supr., 559 A.2d 1261, 1286 (1988). To publicly announce that Unimation was for sale would have created no added benefit and could well have been detrimental. (*See* pages 6-7, *supra.*).

FN16. The plaintiff also points to the fact that on November 26, 29, 30 and December 1, the stock price had closed at $21.

FN17. Because Drexel began to canvass the market in April, it is not unrealistic to suppose that acquisition-related leaks or speculation began to influence Unimation's market price sometime during the summer, and continued until the merger was officially announced on December 6. The precise point at which this would have occurred is indeterminable However, a most conservative (and the least likely) scenario would be that Unimation's market

price began to be influenced in mid-November, when the Condec-Westinghouse negotiations began in earnest. On that basis, the uninfluenced market price would have been $18 per share, and the premium above market price would have been $3 ($21 - $18), or 17%. Making the more plausible assumption that the market price first became influenced in late September after Westinghouse was first approached, the last uninfluenced market price would have been $16, and the premium would have been $5, or 31%. And if the market price first became influenced at some point between those two dates, the premium would fall somewhere between 17% and 31%. A premium at even the 17% level is evidence supportive of the fairness of the merger price.

FN18 None of these four companies were involved in the robotics business except for Cincinnati-Milacron, and that company's robotics component represented only a small portion of its total business.

FN19. The $27 figure was not the result of any mathematical calculation, but, rather, was one of six figures Mr. Miller derived from the S & P indices and the four machine tool companies. The $27 figure apparently fell near the high end of that six number range.

Del.Ch.,1991.
Van de Walle v. Unimation, Inc.
Not Reported in A.2d, 1991 WL 29303 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.