# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: ADAMS GOLF, INC., <br> SECURITIES LITIGATION | § <br> § <br> § <br> § | CIVIL ACTION NO. 99-371-KAJ <br> (CONSOLIDATED) |

## ADAMS GOLF DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc., B.H.
Adams, Richard H. Murtland, Darl P. Hatfield,
Paul F. Brown, Jr., Roland E. Casati, Finis F.
Conner, and Stephen R. Patchin

Dated: October 30, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.      DEFENDANTS HAVE PROVED THEIR NEGATIVE-CAUSATION DEFENSE ............... 2

      A.     Defendants properly isolated the gray-market disclosures and proved that they did not cause stock-price declines ............................................................................. 3

            1.    The class-period gray-market disclosures were stale ..................................... 3

            2.    The class-period disclosures about a gray-market risk did not cause statistically significant stock-price declines ................................................. 5

            3.    The stock-price decline following the October 22, 1998 press release is not attributable to the alleged omission ....................................................... 6

            4.    Plaintiffs cannot create a genuine fact issue with unfounded criticisms of Dr. James ..................................................................................................... 7

      B.     The undisputed evidence shows that the class-period price decline was caused by the loss of market share and an industry-wide slowdown ................................... 8

      C.     Plaintiffs' speculation that gray-market disclosures "leaked" or "seeped" into the market is not competent summary-judgment evidence ......................................... 9

            1.    Adams Golf's stock traded on an efficient market ....................................... 9

            2.    Plaintiffs' "leakage" theory is contrary to an efficient market ..................... 10

            3.    Plaintiffs cannot avoid summary judgment with Miller's inadmissible opinion ........................................................................................................ 12

II.     THERE IS NO EVIDENCE OF ANY QUESTIONABLE SALES PRACTICES ............... 13

III.    ADAMS GOLF HAD NO DUTY TO DISCLOSE A GRAY-MARKET RISK IN THE PROSPECTUS ...................................................................................................................... 14

      A.     There was no duty to disclose under Regulation S-K ............................................ 14

      B.     There was no duty to disclose because the information was already in the public domain .................................................................................................................. 15

      C.     Adams Golf disclosed the very risks posed by gray marketing ............................ 17

      D.     The absence of a specific gray-market risk factor did not render any other statements misleading ........................................................................................... 17

i

IV.    GRAY MARKETING WAS NOT A MATERIAL RISK AT THE IPO ...................................18

    A.    The gray-market risk was immaterial as a matter of law ...................................18

    B.    Plaintiffs cannot raise a genuine fact issue in light of the de minimis number of
        Tight Lies that Costco sold...................................18

        1.    There were few complaints about gray marketing ...................................20

        2.    Adams Golf lost no significant sales to gray marketing ...................................20

        3.    Retailer margins did not decline due to gray marketing ...................................21

    C.    Ochoa does not raise a genuine fact issue on materiality ...................................22

    D.    Dr. Gary Frazier has discredited Ochoa's opinions ...................................23

V.    PLAINTIFFS HAVE FAILED TO REFUTE THE INDIVIDUAL DEFENDANTS'
    DUE-DILIGENCE DEFENSE ...................................24

    A.    Each of the insider Individual Defendants conducted a reasonable investigation
        based on their respective positions...................................25

    B.    Each of the outside directors conducted a reasonable investigation and reasonably
        relied on management's assessment of the gray-market issue ...................................26

VI.    PLAINTIFFS' SPOLIATION ARGUMENT IS SPECIOUS—IT IS A DESPERATE
    ATTEMPT TO DIVERT ATTENTION FROM THEIR LACK OF COMPETENT
    SUMMARY-JUDGMENT EVIDENCE ...................................26

    A.    Plaintiffs have not been prejudiced—they had access to all the information they
        now claim was destroyed...................................26

    B.    Adams Golf did not anticipate litigation in January 1999 and thus had no duty to
        preserve documents...................................27

    C.    Striking portions of a motion for summary judgment is not an appropriate remedy ...................................29

CONCLUSION ...................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................... 19

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................... 11

*Feit v. Leasco Data Processing Equip. Corp.*,
    332 F. Supp. 544 (E.D.N.Y. 1971) ....................................................................... 25

*Glassman v. Computervision Corp*,
    90 F.3d 617 (1st Cir. 1996) ................................................................................... 19

*Goldkrantz v. Griffin*,
    1999 WL. 191540 (S.D.N.Y. April 6, 1999) ......................................................... 9

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3rd Cir. 2004) ............................................................................ 4, 17

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .......................................................................... 18, 19

*In re Convergent Tech. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ................................................................................ 19

*In re Enron Corp. Deriv. & "ERISA" Litig.*,
    439 F. Supp. 2d 692 (S.D. Tex. 2006) ................................................................. 11

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................ 19

*In re Initial Public Offering Sec. Litig*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005) ................................................................. 13

*In re Kulicke & Soffa Indus. Inc. Sec. Litig.*,
    697 F. Supp. 183 (E.D. Pa. 1988) ........................................................................ 15

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ............................................................................. 6, 18

*In re NTL, Inc. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. Feb. 14, 2006) ..................................... 11

*In re Polymedica Corp. Sec. Litig.,*
    2006 WL. 2776669 (D. Mass. Sept. 28, 2006) ............................................................9, 12

*In re Software Toolworks, Inc. Sec. Litig.,*
    50 F.3d 615 (9th Cir. 1995) ..............................................................................................24

*In re Xcelera.com Sec. Litig.,*
    430 F.3d 503 (1st Cir. 2005) ............................................................................................10

*Klein v. Gen. Nutrition Cos., Inc.,*
    186 F.3d 338 (3d Cir. 1999)..............................................................................................19

*Kronisch v. United States,*
    150 F.3d 112 (2d Cir. 1998)..............................................................................................22

*Kumho Tire Co. Ltd. v. Carmichael,*
    526 U.S. 137 (1999)...........................................................................................................12

*MOSAID Techs. Inc., v. Samsung Elec. Co., Ltd.,*
    348 F. Supp. 2d 332 (D.N.J. 2004) ................................................................................30

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000)........................................................................................14, 19

*Parnes v. Gateway 2000, Inc.,*
    122 F.3d 539 (8th Cir. 1997) ............................................................................................19

*RMED Int'l Inc. v. Sloan's Supermarkets,*
    2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. March 24, 2000) ..........................................8, 12

*Sailors v. Northern States Power Co.,*
    4 F.3d 610 (8th Cir. 1993) ................................................................................................15

*Schmid v. Milwaukee Elec. Tool Corp.,*
    13 F.3d 76 (3rd Cir. 1994) ................................................................................................30

*Swack v. Credit Suisse First Boston,*
    230 F.R.D. 250 (D. Mass. 2005)......................................................................................11

*Tracinda Corp v. DaimlerChrysler,*
    364 F. Supp. 2d 362 (D. Del. 2005)..................................................................................17

*Wieglos v. Commonwealth Edison Co.,*
    892 F.2d 509 (7th Cir. 1989) ......................................................................................15, 16

*Weinberger v. Jackson,*
    1990 U.S. Dist. LEXIS 18394 (N.D. Cal. Oct. 11, 1990)...........................................25, 26

iv

*Whirlpool Fin. Corp. v. GN Holdings, Inc.,*
    67 F.3d 605 (7th Cir. 1995) .................................................................................16

*Zubulake v. UBS Warburg LLC,*
    220 F.R.D. 212 (S.D.N.Y. 2003) .......................................................................27

## STATUTES

15 U.S.C. § 77k(b)(3)(A) .........................................................................................24

17 C.F.R. § 230.176 (2006) .....................................................................................25

## INTRODUCTION

This should be, at long last, the end of this case. Plaintiffs are no longer entitled to any presumptions or the benefit of any doubts—they were required to offer admissible evidence demonstrating a triable issue of fact, but they did not meet their burden. Plaintiffs did what they could with rumors, speculation, watercooler hearsay, exaggeration, misleading record citations, and faux science, almost everything but competent evidence; it is simply not nearly enough to avoid summary judgment.

The Adams Golf Defendants proved their negative-causation defense. That is, factors *other than* the disclosure of a gray-market risk caused the stock price to decline during the class period. Dr. James, a nationally renowned financial economics scholar whose statistical techniques are supported by peer-reviewed journals—and by the very scholar who plaintiffs unwittingly chose to mischaracterize—isolated the public gray-market disclosures and proved that they did not cause any stock-price declines. Plaintiffs criticize Dr. James's analysis, but the criticism is unfounded—especially in comparison to the untested, unreliable, non-peer-reviewed, "I know it when I see it" approach their expert used.

The essence of plaintiffs' response is that nonpublic information about the gray market "leaked" or "seeped" into the market at the same time the stock price declined in July 1998. But they have absolutely *no proof* of this, nor could they, as there is no legal or economic support for the notion that nonpublic information can move stock prices in an efficient market. And the decidedly late affidavit from plaintiffs' expert—filed in bad faith after another court rejected the very same ploy—is a testament to the need for gatekeeper cases like *Daubert* and *Kumho Tire*. Plaintiffs cannot create a genuine issue of material fact by playing with their numbers and using unfounded theories.

There are additional, independent reasons why defendants are entitled to summary judgment. There was no duty to disclose in the Prospectus a specific gray-market risk, either under Regulation S-K or otherwise to correct any misleading statements. Moreover, Adams Golf actually did disclose the risks that plaintiffs claim gray marketing posed to the Company, it just did not—and need not—use the words "gray market." There is no better proof that the gray-market risk was not material at the time of the IPO

than to look at the actual gray-market sales at the time. They were *de minimis*—1% to 2% of Adams Golf's total sales. The cases are legion that this is immaterial as a matter of law.

The Individual Defendants (Barney Adams, Richard Murtland, Darl Hatfield, Paul Brown, Roland Casati, Finis Conner, and Stephen Patchin) have established their due-diligence defense as a matter of law. Each of them conducted reasonable due diligence into IPO matters that was appropriate for a reasonably prudent person in their respective positions. They need not prove that they investigated the gray-market risk, but they did—Barney Adams and other members of management conducted a reasonable investigation into the gray-market issue and the other defendants (both insiders and outside directors) reasonably relied on management to assess and address the issue. This is more than enough to establish reasonable grounds for their belief that the Prospectus was true and complete.

Finally, plaintiffs' spoliation claim is specious and should be rejected out of hand for the simple reason that plaintiffs had access to the very information they claim was destroyed. Plaintiffs cannot argue spoliation because the data does not exist in a format they find convenient. Moreover, Adams Golf was under no duty to preserve documents in January 1999 when it converted to a new accounting software system and transferred only certain data to the new system—this litigation would not appear on the horizon for another six months and nothing had happened to cause the Company to anticipate litigation. Plaintiffs' requested sanction, which is a desperate attempt to avoid summary judgment, must be rejected.

## ARGUMENT

### I.    DEFENDANTS HAVE PROVED THEIR NEGATIVE-CAUSATION DEFENSE

Defendants have proved as a matter of law that factors *other than* the disclosure of a gray-market risk caused the stock price to decline during the class period. Dr. James, using accepted economic methodology and competent summary-judgment evidence, proved this point three different ways: (1) the gray-market risk was incorporated into the IPO price; (2) it was otherwise reflected in the stock price on the first day of trading; and (3) class-period disclosures about the risk did not cause the stock price to decline. Plaintiffs have not met their burden to rebut these points with competent summary-judgment evidence.

2

### A. Defendants properly isolated the gray-market disclosures and proved that they did not cause stock-price declines

Dr. James considered all of the public disclosures about gray marketing and isolated their effect (or lack thereof) on Adams Golf's stock price after removing the price effects from market and industry factors. This is the accepted economic methodology when determining cause-and-effect relationships on stock price. None of these disclosures had a statistically significant effect on the stock price. This means, for a stock traded in an efficient market—like Adams Golf stock—that the information in these disclosures was either stale or immaterial, or both.[1] As shown below, the undisputed evidence shows it was both.

#### 1. The class-period gray-market disclosures were stale

##### a. The IPO price had already incorporated the gray-market risk

Class-period disclosures about a gray-market risk did not cause a statistically significant stock-price decline because the information was stale. That is, it was already part of the total mix of information. The unrebutted evidence is that the information about gray marketing was known and considered in the IPO pricing process. (Ex. 336 at 12-14 ¶¶ 26-29; Ex. 90: Pulido-Crowe Dep. Tr. 22:14-23:23, 26:1-9, 27:12-28:10, 29:15-30:12, 78:18-79:1: Teklits Dep. Tr. 16:7-18.) This has nothing to do with the fact that the stock was not yet publicly traded, as plaintiffs suggest (D.I. 328 at 33-34), but rather what information was considered in setting the IPO price. (Ex. 336 at 14 ¶ 29.) The underwriters discussed the Costco issue with Adams Golf's management, knew about the steps management was taking to address the issue, and considered this as part of the total mix of information during the IPO price-setting process. (D.I. 292 at A.1121 (Response No. 38), A.946-54, A. 968-70, A.1006, A.1129, A.985-88, A.1020, A.1042-44, A.932-34.) Plaintiffs have *no* competent summary-judgment evidence to rebut this.

---

[1] Dr. James has opined that Adams Golf stock traded in an efficient market, and plaintiffs do not (and cannot) dispute this fact. This is important as many of plaintiffs' arguments, including their untenable "leakage" theory, are directly contrary to an efficient market. (Ex. 337 at 2, 11, 25 ¶¶ 3, 33, 66-67; D.I. 325 ¶ 6; Affidavit of Professor Christopher M. James, filed on October 30, 2006 ("James Aff II") at 2-3 ¶¶ 4-8.)

3

Plaintiffs resort to arguing that the Third Circuit "has already dispensed with this argument." (D.I. 328 at 33). But the Third Circuit did no such thing. It considered only whether the June 9, 1998 press release sufficed to inform the public about the gray-market risk such that no disclosure was necessary in the Prospectus. *See In re Adams Golf Sec. Litig.*, 381 F.3d at 277 n.10. There was no discussion, let alone any ruling, about how the IPO price was set and what information was considered in setting the price.

### b.    The stock price reflected the gray-market risk on the first day of trading

The stock price reflected the gray-market risk at the latest on the first day of trading—and the stock price *closed higher* that day. This means no damages can result from its alleged omission from the Prospectus. As explained in the Opening Brief, in an efficient market, all publicly available information—even information released *before* an IPO—is reflected in the stock price.[2] (D.I. 280 at 24; Ex. 336 at 14 ¶ 30, 16-17 ¶¶ 36-37.) This is the economic reality of an efficient market, and plaintiffs have no evidence to the contrary. When trading in Adams Golf's stock began, the market incorporated the total mix of available information, including the June 9 press release, into the stock price. (Ex. 336 at 14 ¶ 30.)

Plaintiffs argue that because defendants deleted the gray-market risk from the Prospectus, reasonable investors would believe it was not material. (D.I. 328 at 35.) The Prospectus did not—and need not—use the words "gray market," but it did disclose the risks that plaintiffs claim the gray market posed to the Company. (D.I. 280 at 39-40; *see also* Part III.C., *infra*.) Furthermore, no reasonable investor could assume that the litigation announced by the Company on June 9 would have been resolved favorably—with no further announcement—by July 10. The unrebutted fact is that the July 10 closing stock price incorporated the total mix of information about Adams Golf, including the gray-market risk, and the closing price was $2 higher than the IPO price. (Ex. 336 at 14 ¶ 30.) Thus, any post-IPO stock-

---

[2] Defendants do not contend that investors sat on the gray-market risk disclosure from the June 9 press release and waited to sell the stock after the Company went public, as plaintiffs suggest. (D.I. 328 at 35 n.16.) The point is that on the first day of trading, July 10, the stock price reflected all available public information.

4

price decline cannot have resulted from the alleged omission.

### 2.    The class-period disclosures about a gray-market risk did not cause statistically significant stock-price declines

There were two public class-period disclosures about a gray-market risk, and neither one caused a statistically significant stock-price decline. (Ex. 336 at 4 ¶ 6(c)). This alone proves that any alleged omission of a gray-market risk from the Prospectus could not have caused plaintiffs' losses.

### a.    The proper event date for the *Golf Pro* article is August 1, 1998

Plaintiffs argue that August 1, 1998 is not the proper event date for the *Golf Pro* article. (D.I. 328 at 38-39.) They twist Dr. James's words and speculate that the article may have been available earlier.[3] But such musings do not raise a genuine fact issue. The cover date of the article is August 1, and a *Factiva* search shows that all references to the monthly issues of *Golf Pro* magazine occurred after the publication date, demonstrating that the information became publicly available on the cover date. (James Dep. Tr. 254:22-257:7.) Even plaintiffs' expert, Miller, identified the date as August 1, 1998 until plaintiffs' counsel told him to change it to an undisclosed and unsupported telephone call with some unidentified person. (Miller Dep. Tr. 125:15-126:10, 136:3-13.) Plaintiffs have no competent summary-judgment evidence to the contrary.

### b.    The proper event date for the Lehman Brothers analyst report is August 28, 1998

Plaintiffs' arguments regarding the August 28, 1998 Lehman Brothers report are even weaker. (D.I. 328 at 39-40.) They contend that Brian Lantier, a Lehman Brothers analyst, testified that the report may have been mailed to Lehman clients after August 28. (D.I. 328 at 40.) This proves nothing. Lantier explained that there is a "very specific procedure by which [the report is] released" (although he could not recall the exact 1998 procedure) and that "[t]he release of a report is something that is done to insure fairness among all investors, so it would have gone out to everyone at the same time." (Lantier Dep. Tr. 132:4-17.) He testified that it would have come back from the printer on August 28 and then been

---

[3] In fact, read in context, Dr. James stated that he conducted the Factiva search in response to Miller's conjecture that the *Golf Pro* article was available before August 1 because the *Golf Pro* publisher could not confirm whether that was true. (James Dep. Tr. 256:6-257:7.)

5

"available to all the salespeople and to all of our investors at the same time." (Lantier Dep. Tr. 133:5-14.) The subsequent mailing of the report to Lehman clients means only that Lehman clients received personal copies by mail after August 28. (Ex. 336 at 15-16 ¶ 34.) The Lehman analyst report was published and publicly available on August 28. *Cf. In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270-71 (3d Cir. 2005) (noting that analysts closely follow companies and that an efficient market for good news is an efficient market for bad news).

All plaintiffs say in response is that a reasonable jury might conclude that the report was not absorbed into the stock price because Adams Golf's board, based on October meeting minutes, may not have seen it. (D.I. 328 at 40.) This is nonsense—whether or not the directors saw the analyst report when it was issued (which is not at all clear from the notes) says *nothing* about when it became publicly available and reflected in the stock price through the efficient-market mechanism. Plaintiffs have utterly failed to rebut that August 28 is the appropriate event date for the Lehman report.

### 3.    The stock-price decline following the October 22, 1998 press release is not attributable to the alleged omission

Plaintiffs contend that the October 22 disclosure revealed the information that should have been disclosed in the Prospectus—"the risk that gray marketing would materially affect results." (D.I. 328 at 43.) That is not possible, unless one ignores the reality of time as plaintiffs apparently do. Gray marketing did not have *any* effect on Adams Golf's sales pre-IPO or in the second or third quarters of 1998. There was *no risk* to disclose in the Prospectus.[4] The risk only materialized in late September, as the evidence plaintiffs themselves cite shows,[5] and the Company then promptly disclosed it on October 22. (Ex. 245.) The projected Q4 sales decline, due to the combination of a widespread industry slowdown and some gray marketing, was *new* information that did not exist until months *after* the IPO

---

[4] Plaintiffs misleadingly claim that "the Company admitted that gray marketing was dragging down current, ongoing results." (D.I. 328 at 37.) Adams Golf did no such thing. The October 22 press release discusses the *anticipated* impact of gray-market distribution on *fourth-quarter* sales. (Ex. 245 ("At this time, we expect our fourth quarter sales will be affected by continuing weakness in the golf equipment market. In addition, we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club.").)

[5] Adams's October 8 memo to the Board explains that the Costco issue had "greatly escalated in the last two weeks and will be very difficult in Q4 (Christmas)." (D.I. 329 at A.55.)

and could *not* have been disclosed in the Prospectus.[6]

The severe drop off in demand drove the lowered earnings estimates for Q4. (Ex. 336 at 26 ¶ 62.) Plaintiffs cannot avoid summary judgment by speculating that these revised earnings estimates *might* have been due to gray-market concerns because Barney Adams talked to the analysts and *might* have discussed gray marketing. (D.I. 328 at 44 n.21.) There is no evidence that the analysts received any new gray-market information before they revised their earnings estimates, as the gray-market risk was unquestionably stale by that time. The *only new* information was the vastly lowered demand. (Ex. 336 at 4, 16, 24-26 ¶¶ 6(c), 37, 56-62.)

> ### 4.    Plaintiffs cannot create a genuine fact issue with unfounded criticisms of Dr. James

Dr. James is a nationally renowned financial economics scholar whose statistical techniques are supported by peer-reviewed journals and by the very scholar who plaintiffs unwittingly chose to mischaracterize. (Ex. 336; D.I. 325 ¶¶ 1-20.) Plaintiffs argue that a reasonable jury might place no weight on Dr. James's event-study regression analysis because he (1) used imprecise event dates (D.I. 328 at 40); (2) finds no statistically significant price declines during the class period (D.I. 328 at 41); and (3) did not use a base or control period to estimate his regression (D.I. 328 at 42). Each of these criticisms is unfounded.

The event dates Dr. James used were precise: there are publication dates and there were secondary indicia that indicated these dates were accurate. (*See supra* Part II.A.2.) Plaintiffs cite to A. Craig MacKinlay and assert that an event-study is improper where event dates are difficult to identify. As Dr. MacKinlay himself explains, however, this is not such a case: the event dates for gray-market disclosures were clear and identifiable. (D.I. 325 ¶ 7.) Plaintiffs imply that Dr. MacKinlay adopts

---

[6] Plaintiffs again ignore market-efficiency principles when they claim that a "jury could reasonably conclude that the risk reflected in the increased tempo of gray marketing activity in July… was related to or the same as gray market risk disclosure that defendants concede drove the market price down in October." (D.I. 328 at 44.) That is simply not possible in an efficient market. The two prior class-period disclosures about the gray-market risk did *not* cause any price declines because that risk by itself was already stale or immaterial. The *new* information about the drop off in demand is what drove the lower earnings estimates.

plaintiffs' unsupported leakage theory, but that is incorrect also. (D.I. 328 at 41 & n.20.) Dr. MacKinlay expressly denies that his academic work supports this erroneous theory, noting that plaintiffs' assertion is incompatible with the generally accepted efficient-market theory. (D.I. 325 ¶ 9.) Importantly, Dr. MacKinlay notes that "[e]ven if, in the case at hand, there are some other instances in the class period beyond the event dates where information becomes available, if the public was truly unaware of the gray market issue one would expect a price reaction on the identified dates." (D.I. 325 ¶ 9.)

Plaintiffs next suggest that the lack of statistically significant price declines "simply makes no sense." (D.I. 328 at 41.) While plaintiffs may be disappointed that the lack of statistically significant price declines proves they have no case, that does not undermine the generally accepted statistical results. Merely asserting that verifiable statistical evidence "makes no sense" does not raise a genuine fact issue upon which to deny summary judgment.

Finally, Dr. James properly estimated his regression and verified the result with a rolling regression. Plaintiffs assert that a jury could find that James's daily regressions are flawed by his use of an arbitrary and unscientific estimation or base period. (D.I. 328 at 42.) No reasonable jury could make that finding. Financial economic theory supports using a rolling regression (whereby each day's stock-price return is excluded from the model), and the only scholar plaintiffs misleadingly cite to support their criticism, Dr. MacKinlay, has clarified that Dr. James used the correct approach for an IPO case. (D.I. 325 ¶¶ 10-12.) Plaintiffs' citation to a single unreported case from another jurisdiction cannot undermine a generally accepted practice in the field of financial economics. *Compare RMED Int'l Inc. v. Sloan's Supermarkets*, 2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. March 24, 2000) *with* D.I. 325 ¶¶ 10-12.[7]

### B.    The undisputed evidence shows that the class-period price decline was caused by the loss of market share and an industry-wide slowdown

Section 11(e)'s negative-causation defense does not require defendants to prove what caused the stock-price decline; it only requires proof that factors *other than* plaintiffs' allegations caused the decline.

---

[7] For a further discussion of the robustness of Dr. James's statistical work in this case, see Defendants' Answering Brief in Opposition to Plaintiffs' Motion to Exclude the Expert Testimony of Christopher James (D.I. 323).

Nevertheless, defendants have proved that the loss of market share and an industry-wide slowdown actually caused the stock-price decline. (D.I. 280 at 28.) This evidence is uncontroverted and alone entitles defendants to summary judgment.

Plaintiffs offer no contrary evidence, only criticism—that "monthly regression analyses do not satisfy defendants' burden." They again rely on a misapplication of Dr. MacKinlay's work. (D.I. 328 at 42-43.) As Dr. MacKinlay explained, Dr. James used monthly data properly when he analyzed the relationship between market share and stock price. (D.I. 325 ¶¶ 13-17, 19.) Indeed, the risk MacKinlay described and plaintiffs cite is that using monthly returns makes it *less likely* that a researcher will find a statistically significant relationship. (D.I. 326 ¶ 9.) The highly statistically significant relationship that Dr. James found between Adams Golf's loss of market share and its stock price is thus even more powerful. Plaintiffs also ignore the fact that market-share data is available only monthly, not daily. And, they offer ***no evidence*** to dispute that much of Adams Golf's stock-price decline was caused by an industry-wide slowdown. This is similar to *Goldkrantz v. Griffin*, 1999 WL 191540, at *3-6 (S.D.N.Y. April 6, 1999), where the court granted summary judgment on negative causation because defendants' expert showed that the stock price did not decline in response to disclosures about the alleged omission and the decline was caused by factors *other than* the allegations. Plaintiffs' expert conclusorily claimed that defendants' statistical analysis was insufficient, but he failed to conduct an independent statistical analysis and did not explain why a 95% confidence interval was inappropriate. *Id.* Just as in *Goldkrantz*, defendants have affirmatively proved their negative causation defense and plaintiffs have failed to rebut it.

> **C.** **Plaintiffs' speculation that gray-market disclosures "leaked" or "seeped" into the market is not competent summary-judgment evidence**
>
> **1.** **Adams Golf's stock traded on an efficient market**

Dr. James's scientific analysis establishes market efficiency as a matter of law. Plaintiffs offer ***no*** evidence, factual or expert opinion, to the contrary. In an efficient market, stock price responds immediately to new, material information. (Ex. 336 at 15 ¶ 34.) Any analysis of Adams Golf's stock-price movements, therefore, must be made in this context. *In re Polymedica Corp. Sec. Litig.*, -- F. Supp.

9

2d --, 2006 WL 2776669, *13 (D. Mass. Sept. 28, 2006) (noting that stock prices may respond within hours or minutes); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (utilizing same-day price reaction).

### 2. Plaintiffs' "leakage" theory is contrary to an efficient market

Plaintiffs claim that "information about gray marketing at Costco and elsewhere seeped into the market" at the same time the stock price declined in July 1998. (D.I. 328 at 36-37.) This, they contend, shows a correlation between a gray-market risk and stock-price movement that precludes summary judgment. Plaintiffs are absolutely wrong.

Plaintiffs suggest that "the golf industry is close knit" and "persons who golf, and persons who work in the industry, tend to invest in golf stocks," (D.I. 328 at 36), and it was likely these market participants that must have learned about the gray-market activity and sold Adams Golf stock. But plaintiffs have ***no proof***, nor could they, as there is no legal or scientific support for the proposition that nonpublic information moves stock prices in an efficient market.[8] Plaintiffs try to distinguish between information that is nonpublic versus nonpublished. (D.I. 328 at 37-38.) But there is no distinction. Public information moves stock prices—not private information.[9] The form of disclosure of the public information may affect the speed of incorporation into the stock price, but the information has to be public.

The cases plaintiffs cite agree. In all of them, the courts referenced rumors or leaked information that was public and reflected in the press—the same type that Dr. James identified in his deposition. For example, in *Enron*, before Enron made a curative disclosure, there were news reports announcing its

---

[8] The nonpublic information plaintiffs point to includes: (1) the number of post-IPO orders and sales made by Costco—neither of which was known by anyone other than Costco employees until discovery in this litigation; (2) Miller's speculation that members of the golfing community and golf industry invested in the IPO and sold their stock after seeing clubs in Costcos; and (3) an internal Lehman memo drafted in preparation for an upcoming analyst call discussing potential concerns about gray marketing—which were not raised by a single investor in the actual call. (D.I. 328 at 12-13, 35-36 & n.16.)

[9] Even the three public disclosures about the gray market plaintiffs point to: (1) the August 4, 1998 NationsBanc report, (2) the August 1, 1998 *Golf Pro* article, and (3) the August 28, 1998 Lehman report—resulted in statistically *insignificant* stock-price declines. (D.I. 328 at 36-37; Ex. 337 at 13-15 ¶¶ 38, 42, 44.)

imminent collapse (and thus revealing the alleged fraud)—plaintiffs here do not point to *any* such news

reports or public disclosures. *In re Enron Corp. Deriv. & "ERISA" Litig.*, 439 F. Supp. 2d 692, 698-701

(S.D. Tex. 2006) (analyzing allegations at the pleading stage). They merely speculate about rumors and

sightings of Tight Lies in certain Costco stores. In *In re NTL, Inc. Securities Litigation*, there were

several public "disclosing events" throughout the class period that gradually revealed different problems

in the company's business—here, there is no evidence that internal Costco purchase orders became public

knowledge. 2006 U.S. Dist. LEXIS 5346, *8, 32 (S.D.N.Y. Feb. 14, 2006) (evaluating at the class-

certification stage, where a less rigorous showing is required). The only comparable disclosures are the

August 1, 1998 *Golf Pro* article and the August 28, 1998 Lehman Brothers analyst report, neither of

which resulted in a stock-price decline. Finally, in *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250,

270-71 (D. Mass. 2005), the court allowed plaintiffs to use Miller's "leakage theory" to support a loss-

causation theory that has now been explicitly rejected by the Supreme Court in *Dura Pharm., Inc. v.*

*Broudo*, 544 U.S. 336, 346 (2005). And that was at the class-certification stage, where the evidentiary

standard is much "less rigorous" than here at summary judgment. Miller's hypothetical speculation about

rumors and leakage, without any evidence whatsoever, cannot raise a genuine fact issue on defendants'

negative-causation defense.[10]

  To save their inadequate theory, plaintiffs improperly submit a late-filed affidavit from Miller. In

it, he attempts to establish statistically significant price declines by using an analysis that has no basis in

financial economics. (D.I. 329 at A.80.) He cherry-picks an absurd *twelve-day* event window just so he

can establish a statistically significant stock-price decline. (James Aff. II at 3-4 ¶¶ 9-11.) His unorthodox

analysis is unreliable, unsupported by financial economic literature, and when performed correctly yields

statistically insignificant results. (James Aff. II & James Exs. 17-19.) This untimely and unsupported

---

[10] This is also far different from the merger situation described in MacKinlay's article where he explained that merger rumors are often reported in the *public press* before the companies' official announcement. (D.I. 325 ¶¶ 4-5.) Here, the only public reports of gray marketing resulted in statistically *insignificant* stock-price movements. In his deposition, Dr. James clarified that there are some instances where rumors may in fact become public (as reflected in the public *press*) and that these publicly disclosed rumors may affect the stock price. (James Dep. Tr. 125:14-23.)

analysis should be stricken for failure to comply with the Federal Rules of Civil Procedure.[11] Just as it was criticized in *Krogman*, Miller's unscientific, biased selection of dates has been criticized by other courts: "[i]t may be true, as Miller suggests, that one 'can observe a lot just by watchin', but Yogi Berra is hardly a competent expert in market efficiency." *Polymedica*, 2006 WL 2776669, *7 (internal citation omitted).

### 3.     Plaintiffs cannot avoid summary judgment with Miller's inadmissible opinion

Plaintiffs assert that Miller conducted a "fundamental analysis" that is appropriate in this IPO case.[12] (D.I. 328 at 45.) They try hard to dress up Miller's speculation as science, but it meets none of the criteria for admissibility—it has not been tested or subject to peer review and it has no known rate of error and no standards of control. In short, his analysis lacks any general acceptance in the field of financial economics and is unreliable.[13] *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (requiring that an expert's testimony be "relevant to the task at hand"); *Polymedica*, 2006 WL 2776669, *6-7 (noting that Miller's analysis "comes nowhere close" to the empirical facts required).

Plaintiffs argue that a jury could give it credit because both Adams Golf and Lehman analyzed the market the same way. This is more nonsense. (D.I. 328 at 45.) Witnesses from Lehman Brothers and Adams Golf are fact witnesses: they are able to testify about the market conditions as they perceived them. Miller, however, is offered as an expert witness and therefore his speculation about what caused the stock-price decline eight years ago is unhelpful and inadmissible since he has no first-hand knowledge and uses no techniques that qualify him as an expert.

---

[11] *See* Adams Golf Defendants' Motion to Strike the Affidavit of R. Alan Miller and the Testimony of Sandra Brooks ("Mot. to Strike") at 5-7 for a discussion of untimeliness and at 6 n.4 for a discussion about how Dr. James did *not* offer any new or amplified positions.

[12] Plaintiffs' citation to *RMED*, 2000 U.S. Dist. LEXIS 3742, *24, is inapposite: the *RMED* court only allowed the expert's testimony because he at least attempted to do a proper event-study-type analysis, accounting for stock-price movements caused by factors other than the alleged misstatements or omissions. Miller's analysis does not even meet this minimum threshold of reliability. (James Aff. II at 6-7 ¶¶ 17-20.)

[13] For a detailed discussion of the methodological errors and inadmissibility of Miller's opinion, see Defendants' Memorandum in Support of Motion to Exclude Miller (D.I. 286), James Aff. II and Ex. 337.

## II.    THERE IS NO EVIDENCE OF ANY QUESTIONABLE SALES PRACTICES

Plaintiffs claim that the Company's questionable sales practices "provided a pool of clubs potentially available for the gray market." (D.I. 328 at 46.) They offer absolutely no proof of this, only the unfounded speculation of an expert witness who is unqualified to opine either on the existence of questionable sales practices or their potential effect on the gray market.[14] (D.I. 328 at 46.) This is insufficient to raise a genuine fact issue.

There is no evidence that questionable sales practices existed, caused any losses or had *any* effect on gray marketing. There is no competent summary-judgment evidence to show that anyone at Adams Golf engaged in double shipping or consignment sales.[15] Ochoa's speculation that questionable sales practices may have contributed to gray marketing is unfounded. Moreover, even if plaintiffs could somehow demonstrate a link between the Company's sales practices and the gray-market distribution of its clubs—which they have not—they cannot overcome the crucial fact that there was no public disclosure about questionable sales practices and thus no resulting losses. A curative disclosure, by definition, must disclose the fact that plaintiffs allege was concealed. *See In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005). That is because the market, logically, cannot adjust for facts it does not know. *See id.* (explaining that "a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect" because "[i]t does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme"). Plaintiffs cannot show that any questionable sales practices actually existed or that a curative disclosure of these practices caused any of their alleged losses.

---

[14] As discussed in detail in defendants' briefing in support of their Motion to Exclude the Expert Report of Christiana Ochoa, she lacks the requisite qualifications to testify as a gray-marketing expert. In forming her opinion, Ochoa did not analyze whether the questionable sales practices existed but rather appears to have taken plaintiffs' allegations at face value (Ex. 304 at 8-9 ¶ 16), and she takes Chris Beebe's memo out of context. The memo does not discuss double shipping—it is a letter to distributors asking them to monitor large orders. (Ex. 51).

[15] *See* D.I. 280 at 48-54; Mot. to Strike at 11.

13

III.    **ADAMS GOLF HAD NO DUTY TO DISCLOSE A GRAY-MARKET RISK IN THE PROSPECTUS**

A.    **There was no duty to disclose under Regulation S-K**

Plaintiffs' entire argument about Item 503(c) is a red herring.[16] There is only one standard for determining the information a company must disclose in its prospectus: Item 303. Item 303 requires disclosure *only* when a company objectively and reasonably determines at the time of the IPO, from then-existing information, that an event or trend either (1) is having a material effect on the company's future financial results, or (2) is reasonably likely to have such an effect in the future. *Oran v. Stafford,* 226 F.3d 275, 287-88 (3d Cir. 2000). Plaintiffs have not offered any competent summary-judgment evidence showing that Adams Golf had a duty under Item 303 to disclose a gray-market risk.

At the time of the IPO, based on then-existing information, Adams Golf's management did not know and could not have known that gray marketing was or could become material to the Company's future financial results. As soon as Tight Lies clubs appeared in Costco stores in March 1998, Adams Golf's management educated themselves about the best methods to handle it. (Exs. 6, 7, 86, 258.) They also sought information from distributors, retailers, attorneys and even Costco itself to ascertain how Costco was acquiring the clubs and how many clubs they had. (Exs. 6, 19, 51, 77, 86, 407, 409, 411-413; D.I. 329 at A.26.) Adams Golf received very few retailer complaints,[17] especially considering the heavy demand for Tight Lies in the spring of 1998—clubs were flying off the authorized retailers' shelves in high-margin sales to consumers, which minimized any motivation to gray market. (Adams Dep. Tr. 101:13-18; Pratt Dep. Tr. 13:9-14:7.)

Adams Golf also reasonably and objectively believed that gray marketing would not become

---

[16] Item 503(c) merely sets out a formatting requirement for a company's prospectus: that potential material risks to the company's future financial results be grouped together and highlighted with the title "Risk Factors" so as to make these risks more obvious and self-explanatory to potential investors. Item 503(c) does not in any way dictate what information a company must disclose.

[17] Although the call log only documents calls to the accounts-receivable department, this department likely fielded the most calls about gray marketing because the complaining retailers would blame gray marketing as a reason for their slow sales and thus an excuse for their late payment or non-payment. (Ex. 406.) The only other documented complaints came from Adams Golf's Canadian distributor, WDC Mackenzie, which handled the Canadian market that represented 2.5% of the Company's total sales. Even these complaints did not suggest a material issue or trend to the Company. (Exs. 402, 403.)

14

material to the Company's financial results after the IPO. Adams Golf adopted the same methods other golf manufacturers used to successfully handle gray marketing, including a price-matching program it implemented in Canada in June 1998 to prevent margin pressure from Costco's lower price. (Ex. 10.) Adams Golf sought legal advice and did everything it could do legally to enforce its marketing agreements with retailers and distributors: monitored all orders for unusually large ones, stopped suspect shipments, and threatened to completely cut off anyone discovered diverting product.[18] The Company also proactively filed a Bill of Discovery to force Costco to disclose its source of Tight Lies. (Ex. 411.) Plaintiffs characterize these efforts as evidence that the situation was severe, but they prove only that Adams Golf took appropriate steps to prevent gray marketing from becoming significant to its retailers.[19] Plaintiffs have failed to raise a genuine fact issue.

### B.    There was no duty to disclose because the information was already in the public domain

There is no duty under the federal securities laws to disclose information that is already publicly known at the IPO.[20] The only information Adams Golf knew at the IPO and could have disclosed in its Prospectus was that Costco had obtained some Tight Lies. But as plaintiffs contend in their "leakage" theory, this information was not new to potential investors because it had been available since March 1998 to those market participants who saw Costco selling Tight Lies. (D.I. 328 at 5, 8-9, 15.) According to plaintiffs, the word that Costco was carrying Adams Golf clubs spread quickly among golfers, who plaintiffs assert were the most likely investors in the Adams Golf IPO. (D.I. 328 at 15, 36.) Thus, plaintiffs' own version of events places the gray-market information in the public domain three months

---

[18] (Exs. 6, 51, 255, 412, 413; Pratt Dep Tr. 74:22-75:12, 93:13-94:8; Beebe Dep. Tr. 20:25-21:16; Gonsalves Dep. Tr. 26:17-27:6.)

[19] Plaintiffs cannot credibly claim that management's reaction to the gray-marketing issue was severe, or indicative of materiality, without comparing it to management's reactions to other issues facing the Company.

[20] *See, e.g., Sailors v. Northern States Power Co.,* 4 F.3d 610, 613 (8th Cir. 1993) (no duty to disclose "public information that could have easily been obtained by any investor"); *Wieglos v. Commonwealth Edison Co.,* 892 F.2d 509, 517 (7th Cir. 1989) ("It is pointless and costly to compel firms to reprint information already in the public domain."); *In re Kulicke & Soffa Indus. Inc. Sec. Litig.,* 697 F. Supp. 183, 186 (E.D. Pa. 1988) ("It is clear that defendants owed no duty to disclose information already available to the public which is part of the total mix of information available to the reasonable investor.").

before the IPO. (D.I. 328 at 15.)

The gray marketing that Adams Golf encountered indeed was endemic to the industry—a chronic phenomenon for most golf manufacturers.[21] Courts have ruled consistently that a company cannot be held liable for failing to disclose an issue that affects the entire industry because such information is in the public domain and therefore "available to any and all who take the time to discover it." *See, e.g.,* *Whirlpool Fin. Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 608-09 (7th Cir. 1995).

It is true, as plaintiffs point out, that industry-wide issues such as gray marketing can impact companies to different degrees, and that at times some companies can encounter abnormally high levels of gray marketing. But the low number of Tight Lies sold by Costco shows that Adams Golf experienced the kind of gray marketing typical of the golf-manufacturing industry and familiar to the public—the kind of gray marketing that there is no duty to disclose.[22] (*See* Frazier Dep. Tr. 281:4-282:4.)

Adams Golf also issued its own press release on June 9, 1998, which disclosed that Costco, an unauthorized retailer, was selling Adams Golf clubs and the Company was taking legal action to determine Costco's source. (Ex. 77.) The securities laws do not require a company's prospectus to thoroughly educate the utterly ignorant about a company and its industry; they require only that a company release information for "absorption by professional traders and investors" who should be able and willing to research the public information available about a firm's industry and history. *Wielgos,* 892 F.2d at 518. "What these professionals need is new information specific to the issuer," and thus, only information that is not already public must be disclosed in a prospectus. *Id.* This press release served to alert these professional investors to what those in the golf industry already knew—that Costco had

---

[21] (D.I. 180 Ex. A ¶¶ 66-70; *see also* Ex. 303 at 4-5 ¶¶ 11-13, 9 ¶¶ 18-19, 15 ¶ 23(a), 15-16 ¶ 24, 17 ¶ 28, 21 ¶ 30; Ex. 331 at 4, 10 ¶¶ 11, 31; Exs. 6, 42, 258; Ex. 416 at Response No. 39 ("[B]etween 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing[.]"); Magnussen Dep. Tr. 61:23-62:12; Pulido-Crowe Dep. Tr. 26:1-9, 78:18-79:1; Teklits Dep. Tr. 16:7-18; Adams Dep. Tr. 14:10-15:5, 217:17-219:3.)

[22] Indeed, Adams Golf's level of gray marketing was likely well below the industry norm. As Dr. Frazier points out, gray marketing was "more of an issue for the many well-established and well-financed companies with popular brand names." (Ex. 331 at 10 ¶ 31.) Callaway, Taylor Made, Titleist, Cobra and Ping Golf all were more established and had larger total market shares than Adams Golf, and therefore likely were experiencing higher levels of gray marketing than Adams Golf. (Ex. 331 at 10 ¶ 31.)

16

obtained Tight Lies through the gray market. The Company had no obligation to disclose this public information in its Prospectus.

C.    **Adams Golf disclosed the very risks posed by gray marketing**

Adams Golf disclosed in its Prospectus the potential for its brand image to decline, its retailer margins to decrease, and that competition (whether inter- or intra-brand) could decrease sales prices—these are precisely the risks that plaintiffs claim gray marketing posed to the Company. (Ex. 72 at 8-9, 20, 32; Ex. 303 at 4-5, 9 ¶¶ 12, 13, 18.) Plaintiffs argue, in a single, conclusory sentence devoid of citation, that disclosure could not be sufficient without mentioning the specific words "gray marketing." (D.I. 328 at 60.) Plaintiffs are wrong, and they do not even attempt to distinguish or refute defendants' cited cases that say disclosure is adequate if the prospectus lays out the potential adverse effects of a particular risk.[23] Therefore, Adams Golf's disclosure of the risks from the gray market was sufficient.

D.    **The absence of a specific gray-market risk factor did not render any other statements misleading**

Plaintiffs claim that the gray-market omission rendered the Company's description of its selective distribution network misleading. Their argument relies on the Third Circuit's ruling on the Motion to Dismiss (D.I. 328 at 4-5, 51-52), but that reliance is misplaced. The Third Circuit merely said that this issue could not be decided on a motion to dismiss because the facts developed in discovery would determine whether the descriptions of the selective distribution network in the Prospectus were misleading:

> [The omission of gray marketing] may have... led a reasonable investor to conclude that the selective distribution model was functioning properly, i.e., that this method was exclusive, and therefore that unauthorized retailers were not selling significant quantities of Adams Golf merchandise.

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 278 (3rd Cir. 2004). The facts have been developed, and all of the evidence shows that the description was accurate.

---

[23] *See, e.g., Tracinda Corp v. DaimlerChrysler,* 364 F. Supp. 2d 362, 414 (D. Del. 2005) (holding that "sufficient information was provided to the investors in a reasonable format so as to enable investors to draw their own conclusions as to the risks of the transaction").

17

The selective distribution network was functioning just as it was described in the Prospectus. A healthy, functioning exclusive distribution network is an essential prerequisite for some gray marketing—if any retailer can easily buy product direct from the Company at wholesale prices, then gray marketing would no longer be a profitable enterprise.[24] (Ex. 331 at 3-4, 11-14 ¶¶ 7-11, 33-44.) The undisputed facts also show that Costco was not selling "significant quantities" of Tight Lies, particularly compared to Adams Golf's total sales, either at the time of the IPO or after.[25] Thus, the uncontroverted, developed facts plainly show that the alleged omission did not render the description of the selective distribution network, or any other statements in the Prospectus, misleading.

## IV.    GRAY MARKETING WAS NOT A MATERIAL RISK AT THE IPO

### A.    The gray-market risk was immaterial as a matter of law

The Third Circuit has consistently held that for a company whose stock trades in an efficient market, like Adams Golf, information is immaterial as matter of law if its disclosure does not move the company's stock price. *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997); *Merck*, 432 F.3d at 269. As discussed in Part I.A.2. above, Adams Golf's stock price did not decline in response to either of the public class-period disclosures about gray marketing. Therefore, under settled Third Circuit precedent, the gray-market risk was immaterial as a matter of law.

### B.    Plaintiffs cannot raise a genuine fact issue in light of the de minimis number of Tight Lies that Costco sold

To sustain a section 11 claim, plaintiffs must show that the gray-market risk was material—"that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

---

[24] In fact, small amounts of gray marketing can enhance an exclusive distribution network by reaching consumers in certain demographics that would otherwise not be served by the authorized (and usually high-end) retailers, thereby increasing brand exposure and validating that the brand and product are highly sought after. (Ex. 331 at 5-6 ¶¶ 12-17.) Dr. Frazier opined that this was exactly the case with Adams Golf. (Ex. 331 at 11 ¶ 33.)

[25] Before the IPO, Costco sold only 3,915 clubs in all of North America—only 0.86% of Adams Golf's total sales for the six months before the IPO. (Exs. 402, 419 at COST 24, 41, 50-52, *see also* Ex. 310 at Ex. VII.) For 1998, Costco sales made up only 1.68% of Adams Golf's total sales. (Exs. 402, 419 at COST 24, 41, 50-52; *see also* Ex. 310 at Ex. VII.) Plaintiffs do not and cannot dispute these numbers.

18

significantly altered the 'total mix' of information made available."[26] *Basic, Inc. v. Levinson*, 485 U.S.
224, 231-32 (1988). This Court can rule on materiality as a matter of law, if the "omissions are so
obviously unimportant to an investor that reasonable minds cannot differ on the question. . . ." *Klein v.
Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 342 (3d Cir. 1999). The Court should consider both the
probability and the magnitude of the effect when assessing materiality. *Wielgos*, 892 F.2d at 517.

Many federal courts, including the Third Circuit, have found that if an alleged omission impacts a
Company's sales or revenue by only a few percent, it is immaterial as a matter of law because it "would
have had no more than a negligible impact on a reasonable investor's prediction of the firm's future
earnings." *Burlington*, 114 F.3d at 1427 (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st
Cir. 1996) (holding that a 3%-9% impact was immaterial as a matter of law)).[27] Here, as plaintiffs admit,
the undisputed evidence from Costco shows that it purchased and sold a small number of clubs,
particularly compared to Adams Golf's total sales—Costco's sales represented .86% of Adams Golf's
unit sales for 1998 before the IPO, and its gray-market purchases for the same period were 1.83% of
Adams Golf's total unit sales. (D.I. 328 at 51.) These numbers are so small that this Court can find as a
matter of law that no reasonable investor would have believed that the gray market altered the total mix of
available information. To divert attention from these de minimis sales, plaintiffs try to raise a fact issue
on materiality by pointing to hearsay, speculation, and misleading citations about alleged customer
complaints, lost sales and declining retailer margins. The tactic is unpersuasive because they cannot point
to any competent summary-judgment evidence.

---

[26] Although plaintiffs imply that the duty to disclose under Regulation S-K is a separate cause of
action under section 11 (D.I. 328 at 50), this is incorrect. *Oran*, 226 F.3d at 287. To impose liability
under section 11, plaintiffs must show not only that Adams Golf had a duty to disclose under Regulation
S-K, but also that gray marketing was material at the time of the IPO under the "reasonable investor"
standard. *Id.*

[27] *See also, Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (finding that an alleged
2% overstatement of assets was immaterial as a matter of law); *In re Convergent Tech. Sec. Litig.*, 948
F.2d 507, 514, 517 (9th Cir. 1991) (revenues 10% below projections were immaterial as a matter of law);
*In re First Union Corp. Sec. Litig.*, 128 F. Supp.2d 871, 895 (W.D.N.C. 2001) (finding that a 2.8% impact
on earnings was immaterial as a matter of law).

### 1.    There were few complaints about gray marketing

Plaintiffs declare that "complaints rolled in" during early June 1998, but they cite only two complaints out of the hundreds of customer calls that Adams Golf logged during that period. (D.I. 328 at 10.) Adams Golf's records indicate that only ten retailers or distributors complained about Costco before the IPO. (Ex. 406; *see also* Ex. 310 at Ex. VII.) So plaintiffs resort to describing hearsay and hypothetical evidence they wish existed: complaints made to other salespeople that Sandra Brooks heard about second-hand in "watercooler talk," purported calls to Mark Gonsalves that went unrecorded and unremembered, and reports to the Company's sales people and regional account coordinators that were never memorialized in emails, notes, or human memory.[28] (D.I. 328 at 8-9, 57-58.) Speculation such as this is not competent summary-judgment evidence and cannot raise a genuine fact issue.

### 2.    Adams Golf lost no significant sales to gray marketing

Adams Golf lost no significant sales to gray marketing. Plaintiffs point to the July 1998 fall-off in Canadian sales, but this was nothing more than a normal seasonal fluctuation. (D.I. 328 at 7; Pratt Dep. Tr. 83:22-84:3.)[29] So, of course, Canadian sales were lower in July than they were in June—by July, the Canadian golf market was in the midst of its normal seasonal decline. Plaintiffs also imply that salesperson Sandra Brooks testified that she worked with retailers who refused to carry Adams Golf products as a result of gray marketing. (D.I. 328 at 9.) But Brooks never said any retailer stopped carrying Adams Golf clubs, and she is unable to name any retailer that even cut back its orders and does not know by how much those orders might have been reduced. (Brooks Dep. Tr. 16:16-17:18, 64:15-65:6; *see also* Mot. to Strike at 9-10.) None of this is competent summary-judgment evidence of a

---

[28] Plaintiffs cite Eddie Tate's testimony that he believed Manatee Golf was the guilty gray marketer because he became aware of an order that he thought was too large for Manatee Golf to handle. (D.I. 328 at 11.) The undisputed evidence from Costco shows that Tate was wrong—Manatee Golf never gray marketed Tight Lies to Costco. (Ex. 419 ¶ 13.) Plaintiffs know this but cite Tate's testimony anyway.

[29] Plaintiffs misleadingly quote Chris Beebe's impression in May 1998 (after he had been Adams Golf's head of international sales for only two months) that "July is usually the largest sales month in Canada." (D.I. 329 at A.10.) But Greg Pratt, the sales manager for WDC Mackenzie, who made his career in Canadian sports retail, is a more reliable source on seasonal Canadian sales patterns. (Pratt Dep. Tr. 4:6-4:18.) Pratt testified that the Canadian golf season peaks on Father's Day, the second weekend in June. (Pratt Dep. Tr 83:22-84:3.)

20

material decrease in sales.

Plaintiffs likewise cannot show that Adams Golf lost market share to Orlimar due to gray marketing. Plaintiffs' only "evidence" comes from misconstruing the notes Chris Beebe made while researching the Costco issue in May 1998. (D.I. 328 at 6-7; D.I. 329 at A.12.) It appears that two retailers had started carrying Orlimar products, but nothing in the notes shows that these retailers did so because of Costco. (D.I. 329 at A.12.)[30] This evidence shows Orlimar's increasing popularity, and thus increasing competition for Adams Golf—it does not speak to the reason for Orlimar's success or qualify as competent summary-judgment evidence that Adams Golf lost sales due to gray marketing.

### 3. Retailer margins did not decline due to gray marketing

Plaintiffs argue that Adams Golf's retailer margins suffered materially as a result of gray marketing, hoping that this will suggest that the magnitude of the risk raises a fact issue on materiality. (D.I. 328 at 20.) The only evidence plaintiffs offer is Adams Golf's reduction of wholesale prices for its products in January 1999—long after the IPO and the end of the class period. This says *nothing* about materiality in July 1998.

Plaintiffs also exaggerate the rationale for the price change, claiming the Company instituted it entirely to compensate for lower retail margins as a result of gray marketing. (D.I. 328 at 20.) This is simply untrue—KPMG described the real reasons for the price reduction in its 1998 year-end audit work papers: "In response to competitive pressures that existed during the latter half of 1998 and to establish a price distinction between the original Tight Lies product line and the new Tight Lies product line to be introduced in 1999...Adams Golf...communicated to retailers a decrease in the suggested retail price of

---

[30]Plaintiffs carefully quote the clause "promises it won't get into Costco stores." This clause has an ambiguous subject—it could mean either that Orlimar promises its product will not get into Costcos, or that the retailer promises he will refrain from gray marketing product to Costco. (D.I. 329 at A.12.) Plaintiffs similarly misinterpret Beebe's single sentence, "Nevada Bob's move to Orlimar has hurt, and what part of this was caused by Costco?" (D.I. 328 at 6-7.) On its face, this question makes evident that even Beebe himself does not know what, if any, impact Costco had on Nevada Bob's decision to begin carrying Orlimar products. These notes are plaintiffs' sole evidence for declaring that "Adams Golf's gray market problem was helping Orlimar grab market share from Adams Golf." (D.I. 328 at 7.)

21

its Tight Lies clubs." (Ex. 440.)[31]

### C.    Ochoa does not raise a genuine fact issue on materiality

Plaintiffs' so-called "expert" does not have sufficient knowledge of gray marketing to offer sound

conclusions on the significance of the pre-IPO gray-market risk to Adams Golf. As detailed in

defendants' briefing on their motion to exclude her testimony, Ochoa is not qualified to evaluate the

reliability of the eight articles she cites in her report or to accurately apply their principles to the specific

facts of this case.[32]

For example, Ochoa posited that Adams Golf should have known its business model—in

particular, its high profit margins, the desirability of its new product, and its international sales

distribution model—made it "particularly vulnerable to gray marketing." (Ex. 303 ¶¶ 19-26; D.I. 328 at

54-55.) She has no basis for this conclusion. Neither high profit margins nor the desirability of a new

product is cited as a cause of gray marketing in any of the eight articles she read.[33] (Defs.' Ochoa Reply

at 5-6.) Ochoa opined that the negative consequences of gray marketing, like low morale, were "obvious

to Adams Golf management by the time of the IPO." (D.I. 328 at 55.) But she admitted that she had no

knowledge whether the low morale at Adams Golf had anything to do with gray marketing. (Ochoa Dep.

---

[31] *See also* Ex. 440 ("Adams will be introducing a second generation of Tight Lies during 1999 and in an effort to prevent returns of the original Tight Lies from wholesalers...Adams has established a margin protection agreement to help wholesalers turn existing inventory."); Ex. 58 (announcement to retailers that Adams Golf was "introducing dramatic new sales policies and programs designed to enhance and protect your margins" for two reasons: first because "misleading advertising from both legitimate competitors and knockoffs" had reduced the company's market share, and second, because of gray marketing through Costco). Plaintiffs ignored these documents, choosing instead to look to an early draft of the Company's quarterly financial report. (D.I. 328 at 20.) As Adams Golf CFO Darl Hatfield explained at his deposition, "the Costco portion of [the decision to change the Company's pricing structure] was a very, very small portion, because...if I remember correctly, there were, you know, a few thousand clubs that were in the Costco stores. I think the bigger aspect of it was just the weakness in demand for clubs in general." (Hatfield Dep. Tr. 104:5-11.)

[32] *See* D.I. 288 at 6-7; Defs' Reply in Support of Their Motion to Exclude Ochoa at 6-9.

[33] Moreover, the literature actually explains that a company's international sales distribution model exacerbates gray marketing only when the cost is less than the currency or product-price differentials between the markets. Ochoa, however, offered no evidence that Adams Golf clubs were arbitraged in this way. *See, e.g.*, Brannen Decl. III Ex. 439 at 53 ("Havoc is wreaked particularly when a gray market product's retail price is less than the wholesale costs for that distributed through authorized channels, or when the gray market wholesale price is less than the price charged to an authorized reseller."); Brannen Decl. III Ex. 435 at 26; Brannen Decl. III Ex. 436 at 77.

Tr. 217:22-219:18.) Ochoa's entire opinion is based on this kind of conclusory application of the articles she has read, limited, if any, competent factual support, and blatant speculation.

### D.    Dr. Gary Frazier has discredited Ochoa's opinions

Ochoa's opinion is also insufficient to create a genuine issue of fact on materiality because it has been thoroughly refuted by Dr. Frazier, defendants' well-qualified gray-marketing expert whose decades of marketing experience have equipped him to understand and apply the theory and principles of marketing and gray marketing to the case facts. (Ex. 331 at 1 ¶ 1.) Dr. Frazier found that gray marketing was not a material threat to Adams Golf's financial performance at any point in the class period. (Ex. 331 at 3 ¶ 6.) Its magnitude was extremely small (Ex. 331 at 11 ¶ 34), and there was no evidence that this low-level of gray marketing damaged Adams Golf's brand image or its relationships with its retailers. (Ex. 331 at 12-14 ¶¶ 37-43.) There also was no reason Adams Golf's management should have been concerned at the time of the IPO about gray marketing increasing and becoming material after the IPO. Dr. Frazier noted that based on his extensive research and experience, although gray marketing is a chronic issue in any manufacturing industry, including the golf industry, Adams Golf was not particularly susceptible:

> The companies who are most susceptible to damage from gray market sales are large firms with global brands that are indistinguishable across markets and those that license to a large number of competing distributors. This was not the position of Adams Golf, which was a relative newcomer with a hot product. If anything... gray market sales were potentially more of an issue for the many well-established and well-financed companies with popular brand names [such as] Callaway Golf... Taylor Made Golf... Fortune Brands' Titleist and Cobra, and Ping Golf...

(Ex. 331 at 10 ¶¶ 30-31.) Contrary to Ochoa's unsubstantiated theory, Adams Golf's business model served to insulate it from gray marketing and make it one of the golf manufacturers least likely to encounter substantial gray marketing.

Dr. Frazier also disagreed with Ochoa's assertion that gray marketing could not be limited or controlled. Dr. Frazier noted that the scholarly marketing literature cites a variety of ways a company can

23

control gray marketing. (Ex. 331 at 7-9 ¶¶ 18-26.) Adams Golf took all of these steps before the IPO.[34]
(Ex. 331 at 7-9, 14 ¶¶ 18-26, 44.) Thus, Dr. Frazier opines that Adams Golf's management had no reason
to think gray marketing would pose a material risk to the Company in the future. (Ex. 331 at 14-15 ¶¶ 44-
46.)

Most significantly, Dr. Frazier found that Ochoa was wrong in her assertion that gray marketing
always and inevitably harms any company it affects. (Ex. 331 at 2 ¶ 6.) As mentioned in section III.D.,
gray marketing can be good for a company because product reaches consumer demographics not served
by its current authorized retailers, thereby increasing sales and brand popularity. (Ex. 331 at 5-6 ¶¶ 12-
16.) Dr. Frazier found that Adams Golf most likely benefited in this way from the class-period gray
marketing because bargain shoppers willing to buy golf clubs at Costco were highly unlikely to overlap
much with serious golfers who shopped at the full-service, high-end pro shops authorized to sell Tight
Lies. (Ex. 331 at 12 ¶ 37.)

## V.    PLAINTIFFS HAVE FAILED TO REFUTE THE INDIVIDUAL DEFENDANTS' DUE-DILIGENCE DEFENSE

Plaintiffs have no competent summary-judgment evidence that refutes the reasonableness of the
Individual Defendants' investigation and grounds for their belief that the Prospectus contained no
material omissions. They misstate the legal standard and the summary-judgment evidence about what the
Individual Defendants must show to meet the due-diligence defense.[35] (D.I. 328 at 61- 63.) There is no
requirement to show an investigation into the specific omission at issue. The Individual Defendants need
only show that their overall investigation related to the IPO was reasonable. 15 U.S.C. § 77k(b)(3)(A);

---

[34] These methods of controlling gray marketing, Dr. Frazier notes, do not necessarily require great
expense to the company as Ochoa claims. (Ex. 331 at 7 ¶ 19.) Indeed, Adams Golf did not find
implementing these programs particularly taxing, in contrast to what plaintiffs assert—Scott Blevins, who
headed up Adams Golf's most labor- and resource-intensive effort to combat gray marketing during the
class period, tracking Costco's inventory of Tight Lies by checking the stock at various stores, found that
he spent only "an hour or two a day" investigating Costco, and that his staff of traveling account
coordinators spent much less time than that on the project, only stopping into a Costco if it was
convenient to their normal sales route. (Blevins Dep. Tr. 71:5-24.)

[35] Courts routinely "resolve questions of due diligence in those cases where no rational jury could
conclude that the defendant had not acted reasonably." *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d
615, 622, 629 (9th Cir. 1995) (collecting cases and granting summary judgment for underwriter
defendants on certain issues).

24

*Weinberger v. Jackson*, 1990 U.S. Dist. LEXIS 18394, at *3-6 (N.D. Cal. Oct. 11, 1990).

### A.    Each of the insider Individual Defendants conducted a reasonable investigation based on their respective positions

Both Rule 176 and the courts that have interpreted the statutory defense hold that it is reasonable for individual defendants to rely on "officers, employees, and others whose duties should have given them knowledge of the particular facts (in light of the functions and responsibilities of the particular person with respect to the issuer and the filing)." 17 C.F.R. § 230.176 (2006). While inside directors must "make a more complete investigation and have more extensive knowledge of facts supporting or contradicting inclusions in the registration statement than outside directors," their investigation need only be that "which a reasonably prudent man in that position would conduct," as plaintiffs note. *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 578 (E.D.N.Y. 1971); (D.I. 328 at 62). The summary-judgment evidence demonstrates that each of the insider Individual Defendants here satisfies that standard.

The documentary evidence shows that Barney Adams knew of Tight Lies clubs appearing in certain Costco stores. (Exs. 10, 77, 85, 407-413.) Plaintiffs misconstrue his testimony about his memory of the details eight years later hoping to paint him as being out of touch with the issue (D.I. 328 at 62), but they cannot ignore the ample evidence that Adams knew about the gray-marketing issue and actively addressed it. Both Hatfield and Murtland acted appropriately, given their respective positions at the Company. As CFO, Hatfield had no direct connection with the sales department and no reason to be involved with the assessment of gray marketing. (Hatfield Dep. Tr. 31:23-33:4.) As Vice President of Operations, Murtland's role in manufacturing meant that his only role was assisting in determining whether Costco had real or counterfeit Tight Lies and marking suspect orders before they went out. (D.I. 281 ¶¶ 3-5.) Gray marketing was an issue that affected and could most effectively be managed by the sales department, so it is reasonable for Hatfield and Murtland to have relied on Adams, Gonsalves, and Beebe to address the issue. There is no requirement that an officer personally investigate every issue, including those that are outside his normal role at the Company, before signing the Prospectus.

25

*Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *11 ("Plaintiffs argue that [the outside director] did not make specific inquiries of the company's management with respect to the [alleged misrepresentations] contained in the prospectus. But he had no duty to do so as long as the prospectus statements were consistent with the knowledge of the company which he had reasonably acquired in his position as director.") Read in conjunction with Rule 176, the principle expressed in *Weinberger* applies with equal force to officers who have conducted a reasonable inquiry under the circumstances, based on their roles in the Company.

B.    **Each of the outside directors conducted a reasonable investigation and reasonably relied on management's assessment of the gray-market issue**

Plaintiffs similarly misconstrue the outside directors' role and testimony, asserting that because they did not specifically investigate the materiality of gray marketing (which management had informed them was immaterial), their investigation was unreasonable. (D.I. 328 at 63.) This is not the law—it is completely reasonable for them to rely on management's representations regarding a particular issue as long as their overall conduct with regard to the IPO process is reasonable. And plaintiffs do not dispute that their overall conduct was reasonable. The outside directors knew of the issue, knew that the Company had taken steps to manage the issue and did not believe it was material, and knew that this issue, like the rest of the Company's business issues, was vetted by the underwriters, their counsel, and the Company's counsel. (D.I. 280 at 55-57.) They acted reasonably in connection with the IPO process, and that is all that is required for the due-diligence defense.

VI.    **PLAINTIFFS' SPOLIATION ARGUMENT IS SPECIOUS—IT IS A DESPERATE ATTEMPT TO DIVERT ATTENTION FROM THEIR LACK OF COMPETENT SUMMARY-JUDGMENT EVIDENCE**

A.    **Plaintiffs have not been prejudiced—they had access to all the information they now claim was destroyed**

Plaintiffs' spoliation argument is another diversion. They have no competent summary-judgment evidence, so they speculate that it must have been destroyed. Plaintiffs argue that they could prove their case if only they had certain sales information (D.I. 328 at 24, 26-29), but in reality they had access to all the information they claim is lost. Plaintiffs say they want to see a "sales register" that will

26

show "every sale, by customer, date and amount." (D.I. 328 at 26; D.I. 329 at A.17) This information exists, albeit in the more cumbersome format of thousands of hard-copy purchase order invoices stored in a warehouse, rather than in a software system.

Plaintiffs suffered no prejudice when Adams Golf converted its accounting software from Platinum to Peoplesoft in January 1999. (D.I. 328 at 31-32.) Plaintiffs spent days in Adams Golf's warehouse examining and photocopying whatever they wanted of Adams Golf's thousands of purchase order receipts, which document not only the date the order was placed, the customer, the quantity and type of clubs ordered, and the cost of the order, but also the salesperson that handled the order, and the date on which the order shipped. They had an opportunity, which they declined, to return to the warehouse to examine documents a second time. (Exs. 441, 442.) Plaintiffs had all the information—and more—that they claim they need to make their case. Any discovery failures are their own.

## B. Adams Golf did not anticipate litigation in January 1999 and thus had no duty to preserve documents

Plaintiffs are unable to cite any evidence suggesting that Adams Golf "anticipated litigation" in January 1999, and therefore they cannot show that the Company had any duty to preserve documents at that time. The duty arises only "when the party has notice that the evidence is relevant to litigation— most commonly when suit has already been filed..." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998). It does not arise simply because litigation is *possible.* A party must actually anticipate—or have reason to anticipate—*probable* litigation. *See Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("Merely because one or two employees contemplate the possibility that a fellow employee might sue does not generally impose a firm-wide duty to preserve. But in this case, it appears that almost everyone associated with Zubulake recognized the possibility that she might sue.")

The mere fact that Adams Golf was not sued until June 1999 demonstrates that the Company did not anticipate litigation in January 1999 or earlier. The Company had not been threatened with litigation or received a demand letter from any potential plaintiff. Plaintiffs' theory is based on out-of-context statements from three documents, the Company's decision to increase its directors and officers ("D&O")

27

insurance coverage, and its largest shareholder's unhappiness with its stock-price drop. (D.I. 328 at 28-29.) This is simply not credible.

Plaintiffs cite Barney Adams's statements to the sales department in an August 14, 1998 memo and claim that this shows he anticipated litigation. (D.I. 328 at 28; Ex. 57.) The memo was not written in reaction to any impending lawsuit. Adams testified that he wanted to ensure that the sales department would continue to meet his high standards,[36] and this memo was a pep-talk of sorts, in Adams's unique style.[37] (Adams Dep. Tr. 139:12–145:1.) Adams explained that he included the phrase "sales falsely reported" because "it's a very egregious example, something we would never do. But I'm trying to make a point [to the sales staff] here: You guys get your act together." (Adams Dep. Tr. 145:15-18.) This memo does not show that Adams Golf anticipated litigation or had any reason to anticipate litigation—it shows only that Barney Adams was determined to maintain high sales standards and that he would use extreme examples to make a point.

Plaintiffs also misconstrue an October 1998 letter from Barney Adams to an authorized retailer, written to assure him that Adams Golf did not sell to Costco. (D.I. 329 at A.62 ("First is Costco. We do not sell to them .... If we sold to them and did not make an announcement, we would be subject to litigation.").) The letter shows that the Company did not anticipate litigation because it did not sell to Costco.

Plaintiffs also select two cryptic, incomplete sentences from several pages of hand-written notes from the October 19 board meeting and declare that they "could only mean" that Adams Golf was anticipating litigation. (D.I. 328 at 29.) The notes actually show an effort to prevent lawsuits—not anticipation of them. Management updated the board on a number of issues, including gray marketing and the announced stock buy-back. (D.I. 329 at A.59.) Adams explained to the board that his October 8

---

[36] "I had expectations for the sales group: Morale, efficiency, and in a personal visit, I did not encounter that. I encountered an environment I didn't care for...disarray, bickering, finger-pointing, you know, childish stuff going on...It wasn't the image I had of the sales department... It's just a general lack of professionalism I felt I saw."

[37] Adams explained the accusing tone of the memo as "an over-the-top, guilty-until-proven-innocent response," (Adams Dep. Tr. at 139:12-19), and Gonsalves concurred, as he testified that Adams had a hyperbolic management style. (Gonsalves Dep. Tr. 123:3-6.)

28

memo, which stated that gray marketing had increased recently and might have a 20-25% impact on

fourth-quarter sales, was based on a "purely subjective" estimate of Costco's potential impact on fourth-

quarter results. (D.I. 329 at A.59 at ADAMS 2238.) Even without knowing what impact, if any, Costco

might have on sales, the board nevertheless decided to warn investors about the issue before the Company

implemented its buy-back program. (D.I. 329 at A.59 at ADAMS 2241.) A plain reading of these notes

reveals a diligent, conscientious board seeking to comply with both the word and spirit of the securities

laws and to avoid litigation while making the best business decisions possible.

Plaintiffs then distort Adams Golf's decision to increase its D&O insurance coverage in October

1998, claiming this proves that the Company anticipated litigation. Before the increase, however, Adams

Golf had only $7.5 million in D&O insurance, and as Darl Hatfield, then the Company's CFO, explained,

"I just felt it was low for a public company, and when we had the insurance consultant review all of our

policies, he felt that it was low also." (Hatfield Dep. Tr. 117:10-13.) Hatfield noted that there were no

concerns unique to Adams Golf as a company that caused them to buy more insurance at that time—the

decision was made entirely based on the advice that a public company needed more insurance than a

private company. (Hatfield Dep. Tr. 117:17-21.)

Finally, plaintiffs cite the fact that Adams Golf's largest shareholder, Scudder Stevens, was

unhappy with the Company's performance. The cited email discusses the need for Adams Golf to go "tell

their story" and "keep the faith with one of the largest holders." (D.I. 329 at A.77) There is nary a

suggestion that Scudder Stevens was threatening litigation; instead, it was looking for some assurance that

the Company's fundamental business plan was strong, that the stock price was not a true indicator of the

Company's health or prospects, and that Scudder Stevens should retain the investment rather than cutting

its losses. (D.I. 329 at A.77.) At most, this email suggests that a large shareholder was disappointed with

the stock-price performance, a rather common occurrence that does not necessarily mean litigation is

near.

    **C.**    **Striking portions of a motion for summary judgment is not an appropriate remedy**

    At the very least, the Court should deny plaintiffs' request that it strike portions of Adams Golf's

summary-judgment motion because such a sanction is unreasonably excessive. Striking Adams Golf's arguments would essentially result in the suppression of defense evidence, a "drastic sanction." *Schmid v. Milwaukee Elec. Tool Corp.* 13 F.3d 76, 79 (3rd Cir. 1994). It is well established that "[d]ismissal or suppression of evidence are the two most drastic sanctions ... [and] should only be imposed in the most extraordinary of circumstances." *MOSAID Techs. Inc., v. Samsung Elec. Co., Ltd.,* 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Such a sanction is plainly inappropriate here.

## CONCLUSION

For all these reasons, the Court should grant the Adams Golf Defendants' Motion for Summary Judgment.

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc., B.H. Adams, Richard H. Murtland, Darl P. Hatfield, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, and Stephen R. Patchin

Dated: October 30, 2006

30

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2006, I have caused the foregoing to be served by Hand Delivery which has also been filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE  19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on October 30, 2006, I have sent by electronic mail the foregoing document(s) to the following non-registered participants:

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA  19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY  10017

Jeffrey L. Moyer (#3309)