# EXHIBIT 435

# The Long-term Dangers of Gray-Market Sales

JAMES M. MASKULKA
and CHARLES S. GULAS

*The gray market has come into existence due in large part to an absence of marketing channel control and to recent marketing decisions by manufacturers.*

As you review last quarter's sales reports, you notice that a foreign subsidiary's product shipments to the Far East have doubled for no apparent reason. Probing the matter further, you discover that the serial numbers of products associated with a rash of U.S. customer complaints (such as products with no instructions or warranty cards) match serial numbers on the products shipped to the Far East. Welcome to the gray market! An Asian distributor working either independently or for a U.S. dealer has diverted goods manufactured for distribution in a foreign market to U.S. discount retailers who have, in turn, sold them in the U.S. market.

This problem is confronted daily by many U.S. companies. The size of the gray market has been estimated to be as large as $7 billion. Some retailers, such as K mart, are reported to have spent $100 million on gray-market imports in 1984 alone.[1] In selected industries, such as cameras, electronics, and perfume, gray-market sales have been estimated to account for as much as one-third of all industry sales. But these facts are merely the tip of the gray-market iceberg.

Gray-market sales indicate loss of market channel control by manufacturers as well as the deterioration of valuable trade relationships. Furthermore, as the consumer's ability to discriminate between legitimate goods, gray-market goods, and counterfeit goods becomes blurred, the importance of maintaining marketing channel control has taken on added importance. While dollar figures and other considerations have captured the attention of management at many firms, few executives have really understood the strategic importance of the gray market.

Dr. Maskulka is Assistant Professor of Marketing at Lehigh University, Bethlehem, Pennsylvania and Mr. Gulas is a graduate student at Youngstown State University, Youngstown, Ohio.

This article provides an overview of the gray-market problem, examines its implications, and proposes a series of recommendations.

### What Is the Gray Market?

*The Gray Market:* This is a channel of distribution that exists through the unauthorized importation into the United States of a manufacturer's brand name goods. These goods are not manufactured for sale in the United States and are typically not warranted by the manufacturer.

> "The U.S. market . . . represents the upper price point on the pricing schedules of many global firms."

Gray market goods have appeal because they are brand name products at significantly lower-than-normal prices. A term often used interchangeably with the term gray market is parallel importation. The description of the gray market and parallel importing specifically excludes situations where products are manufactured and distributed in the United States through unauthorized channels. This practice is more precisely known as transshipment. While this practice is sometimes mistakenly referred to as a gray-market transaction, it nonetheless represents the loss of marketing channel control and is therefore discussed here.

### Reasons for the Gray Market

The appreciation of the U.S. dollar has not caused the gray market. While it certainly has played a major role in adding vitality to the gray market, other factors have had an impact as well. In particular, many practices by multinational corporations (MNCs) have inadvertently created an environment favorable to a flourishing gray market.

Many MNCs, for example, maintain multiple price schedules for selected products, based on what different foreign markets will bear. The U.S. market, in particular, represents the upper price point on the pricing schedules of many global firms. Multiple pricing has been very lucrative for MNCs using it, but more important, it has created the profit incentive that allows the gray market to flourish. The concept of global advertising has inadvertently contributed to the growth of the gray market. In trying to overcome the inefficiencies of creating a new campaign for each foreign market, MNCs have pursued the concept of a global brand.[2] Intended for sale in Europe or other foreign markets, these brands are frequently indistinguishable from brands manufactured and intended for sale in the United States. While substantially reducing the production costs associated with developing separate campaigns, this practice has unfortunately facilitated diversion of goods from one market to another by gray marketers.

The gray market has also emerged as a by-product of the push by manufacturers to increase licensing opportunities for their well-known brand names. Examples of this increase in licensing activity are Porsche tobacco pipes, Yves St. Laurent cigarettes, and Coca-Cola clothing. However, as more firms attempt to leverage their brand names through offshore licensing, they surrender much of the control needed to protect their brand images; thus they open the door for the gray-market diverters.

The dynamic nature of the gray market has also been a factor in its continuation. Once established, the gray market tends to exhibit a "snowball effect," forcing traditional marketing channel members to participate in order to compete. Even those firms that would normally be geographically removed from the center of gray-market activity are drawn into direct competition with the gray market because many gray marketers initially penetrate markets through mail order or other direct marketing methods. Thus, gray marketers can reach all markets. The disturbing consequence for domestic marketers is that all legitimate channels are subject to price pressure from the gray market.

Even the macroeconomic policies of governments have played a role in extending the life of the gray market. The U.S. government, for example, anxious to avoid charges of protectionism, has been reluctant to interpret trademark legislation in a manner that could eradicate the gray market at the port of entry.[3] On the other hand, the protectionist policies of many nations, in particular Japan, have resulted in many diverted products finding their way into the United States. Developing nations in Asia that find themselves virtually closed out to the Japanese markets gladly act as diverters to earn much needed currency.[4]

The gray market has also persisted because of the large variety of legal remedies sought out by legal counsel representing manufacturers in gray market cases. Depending on the product involved and the strategy of the legal counsel retained by the affected parties, laws on trademarks, copyrights, tariffs, antitrust, and contracts are currently being considered as potential remedies to the problem of the gray market.[5] Unfortunately none of these legal solutions have been effective

OCH0046

to date. Moreover, they may be hindering the emergence of managerial solutions to the gray-market problem. (See Exhibit 1.)

## The Marketing Implications of the Gray Market

Success in business has long been attributed to maintaining and nurturing both trade and customer relations. Once established, trade and customer relations often provide a differential advantage against competitive threats.[6] More important, once these relations are rerouted they are difficult to win back. The success that the Japanese automobile industry has had in the United States is a case in point. The Japanese auto manufacturers, realizing that long-run success in the United States would depend on an effective nationwide dealer network, have slowly assembled one. Now firmly entrenched, the Japanese distribution system presents formidable competition to U.S. auto manufacturers. Similar examples in the electronics and steel industries also painfully illustrate this point.

Even more than marketing channel relationships may be at stake for a firm facing the threat of the gray market. When one considers that the gray market is primarily a "free ride" on brand names or brand images, the future earnings potential of company brand names may be seriously jeopardized. Today's consumer is very brand conscious, perhaps more so than ever before. This brand-oriented society has been created in part by promotional activities that seek to differentiate brands and create unique product images. The development of a brand image can take years and cost millions of dollars. Recent studies have shown, however, that in today's competitive climate, brand images are becoming increasingly difficult to establish.[7] This situation has led many firms to purchase companies with well-known brand names rather than undertake the difficult, uncertain, and costly task of establishing a new product.[8]

Brand images are a fragile asset and can easily be tarnished by gray market activities. Since gray marketers have no investment in the brand name, they have no incentive to protect it. Thus management must be far more aggressive in managing marketing channel relationships in order to defend established brand images.

## A Complex Issue

Unfortunately, early attempts to control the gray market have not been successful. The gray market is a complex issue, involving many participants with diverse viewpoints, a general lack of consumer awareness, and no international coordination and enforcement. Participants in the gray market have individual perspectives of its value. On the supply side are the diverters or the gray-market merchants—the catalysts in the development and growth of the gray market. Since their very existence depends on the gray market, diverters obviously want it to continue. On the demand side, consumers seeking a bargain have provided the dollar flow that fuels the gray market. Consumers see the gray market as a way to extend their short-term budgets. They generally perceive the gray market as a source of "bargains" unless they have had a bad experience. Even manufacturers are not totally blameless. In fact, much of the early success of the gray market can be attributed to the belief of some multinational manufacturers that the "correction factor" in the U.S. foreign exchange market would ultimately resolve the problem.

This do-nothing strategy, however, is misguided. Permitting the random fluctuations of the foreign exchange market to determine the level of "control" for the brand's image is at best myopic. What U.S. manufacturers fail to understand is the strategic importance of their brand images. The concept of a brand image has become increasingly important for a number of reasons—

- Life cycles for brands are growing shorter.
- More brands, especially competitive foreign brands, are entering the U.S. market each year.

Exhibit 1: Relationship between relative importance of legal and marketing implications of gray markets



* Brands permit increasingly time-conscious consumers to simplify their decision process.

Actually, currency fluctuations alone have not created the gray market nor will corrections in the currency markets eliminate it. The gray market has come into existence due in large part to an absence of marketing channel control and to recent marketing decisions by manufacturers.

### Responses to the Gray Market Problem

The most popular approach to the problem of the gray market has been legal in nature. To date, the most celebrated example has been the Duracell battery case. The International Trade Commission (ITC) found unauthorized shipments of Duracell (Belgium) batteries into the United States were in violation of section 337 of the Tariff Act of 1930. (Section 337 essentially addresses trademark infringement.) Duracell USA, the parent, charged that its Belgian subsidiary was illegally shipping batteries to the United States that were made,

> "... try to imagine Coca-Cola or IBM permitting consumers to make an informed choice about an inferior, illegitimate product."

packaged (including labels with several European languages), and intended for sale in the European market. Legal counsel for Duracell USA argued that the Belgian-made batteries were "free-riding" on the advertising investment of Duracell USA. They argued further that the goodwill of the Duracell brand name was subject to harm because the gray-market batteries were not as fresh, had a limited shelf-life because of improper handling and storage, and offered inapplicable warranties.

Section 337 of the Tariff Act, however, contains a provision that permits the president to overrule the commission's decision for policy reasons. On 4 January 1985 President Reagan reversed the ITC's findings on the grounds that it was protectionist in sentiment. Duracell USA has appealed the presidential action on the grounds that the president had exceeded his authority, but no resolution has yet been reached.

While the Duracell case attempted to stop the gray market at the port of entry, two states—New York and California—have taken steps to stem the gray market at the retail level. Both states have actively pursued legislation pertaining to the gray market. Both states have addressed the problem of the gray market on the legal grounds that a consumer has the "right to know." In New York State the law requires that stores selling gray-market goods must inform consumers that manufacturers' warranties may be invalid. As New York State attorney Robert Abrams states, "It (the legislation) advised consumers that in exchange for a substantially cheaper price on brand name goods, they will not receive the manufacturer's warranty, be eligible for a manufacturer's rebate and may not have instructions in English."[9] The law would require all stores selling gray-market goods to inform consumers, either through in-store signs or in their advertising, that the source of the merchandise is the gray market. Furthermore, the law also requires a statement by the retailer that gray-market merchandise is not covered by a manufacturer's warranty unless the seller offers a warranty equal to or better than the manufacturer's warranty.

An interesting point to note is that California legislators had their version of gray-market legislation vetoed by Governor Deukmejian. His response was that the issue of the gray market was a federal problem and not a state problem. Clearly, legal remedies have so far been inadequate.

### Recommendations for Management

Solutions to the gray-market problem depend largely on management's qualitative assessment: the type of product in question, how management views the gray market (as a legal or as a marketing problem), and the degree of importance management attaches to the gray market. In the case of gray-market pharmaceuticals, a serious problem is recognized because of the direct, visible impact on human health. Fortunately, the consequences of using gray-market pharmaceuticals has heightened monitoring efforts by drug companies and government agencies such as the FDA.[10] The diversion of pharmaceuticals represents a special case of gray-market imports because of the potentially insidious consequences. An article in the *Wall Street Journal* reports that drug diversion is a growing problem facing many U.S. drug manufacturers. Furthermore, retail druggists face increasing pressures to participate in drug diversion programs in order to remain competitive. Drug diversion can take on many forms. One form occurs when drug diverters approach nonprofit organizations, such as hospitals and medical

OCH0048

clinics. Because these institutions are able to purchase pharmaceuticals at drastically reduced prices, drug diverters encourage them to overbuy and resell the excess to them. While the pharmaceuticals in question may be of good quality initially, problems often arise when they are improperly repackaged, held beyond expiration dates, or mixed with counterfeit lots.[11] These events have resulted in an ongoing investigation by the House Energy and Commerce subcommittee to determine how widespread drug diversion has become and what steps can be taken to alleviate it.

While these efforts are meritorious, they are not typical for all industries affected by the gray market. Furthermore, legislation drafted to deal with the problem of the gray market has not been effective. As mentioned earlier, the state of New York has a gray-market law requiring "full disclosure at the point of sale," so that the consumer can make an informed choice. While the state of New York is to be commended for taking at least some action against gray-market transactions, we feel this legislation is inadequate. Confronting the problem of the gray market at the point of sale is analogous to putting one's finger in a dam that is about to burst. This observation is based on the knowledge that enormous cooperation by retailers as well as rigorous enforcement by appropriate government agencies is required. We feel the point-of-purchase remedy is flawed because it has permitted the product to move too far along the distribution channel.

As an example, try to imagine Coca-Cola or IBM permitting consumers to make an informed choice about an inferior, illegitimate product. Never! Executives at Coca-Cola and IBM have long maintained that the real strength of their organizations lies in their brand names. Both of these organizations recognize the strategic importance of this asset and have assembled impressive legal staffs that take a vigilant and aggressive posture to protect brand names and related trade secrets.[12] Why other firms that rely heavily on the strength of a brand image for their success fail to monitor their brand images in a similar manner remains a mystery. Our focus, therefore, is on prescriptions for management in industries without the benefit of a watchdog agency such as the FDA.

One legal remedy suggested by the Coalition to Preserve the Integrity of American Trademarks (COPIAT), the industry group mentioned earlier, is a more favorable interpretation of existing trademark laws. As a compromise strategy COPIAT suggests "demarking" as a solution to the problem of gray markets. This solution calls for removing the trademark or obscuring it in some way on all gray-market goods entering the U.S. According to COPIAT, the removal or obscuring of the trademark would give the consumer a choice, thus eliminating the potential for deception. Although a possible alternative, demarking is certainly not the optimal solution.[13] (Even the most informed consumers will be fooled on occasion—caveat emptor).

Recognizing that changes in the legal system often take years to bring about (whether they are effective is another issue altogether), management must take quicker action in the interim and, more important, must establish a strategic plan for brand images. There are several alternatives available.

> "Drug diversion can take on many forms. One form occurs when drug diverters approach nonprofit organizations..."

One response by manufacturers to the problem of gray markets would be to eradicate the gray market by simply adopting a one-price strategy worldwide. Most manufacturers are unlikely to pursue this strategy, however, because they may be profiting from the gray market in the short run. A more viable strategy would be to temporarily match the gray-market prices in those markets most affected by the gray market.

Manufacturers may also attempt to stop shipments to the offending dealers/retailers by tracing the serial numbers on merchandise which has found its way into their market. While some manufacturers employ this tactic, it is administratively time consuming and costly. Furthermore, it fosters a "we against them" mentality that marketing-oriented manufacturers continually strive to overcome. Finally, it has for the most part proved ineffective because diverters as a group are resourceful. Some diverters, for example, have been able to duplicate the laser etching identification process adopted by some brand name manufacturers that hoped to make diverting more difficult. Laser etched identification, therefore, is not recommended as a viable long-term solution.

One innovative response aimed at reducing the impact of the gray market is for manufacturers to market their prestige products through duty-free airports, cruise ships, and ports-of-call throughout the world. This approach is recommended because it meets the gray market on its own terms—price—without compromising a brand's quality image or the consumer's satisfaction in any way. Furthermore, the manufacturer remains in control of the distribution channel.

The emphasis on marketing channel management cannot be overemphasized. Manufacturers should monitor channels more closely. Perhaps an entire review of marketing channel policy is in order. Management at IBM and Coca-Cola understands the relationship of brand image to success in the marketplace. As competition for market share intensifies and as it becomes clearer that brand image is integral to obtaining that market share, firms may wish to bring marketing channel members under more direct control. Whether through outright ownership, contracts, or close supervision, the additional expense is warranted as the strategic importance of brand images continues to increase.

Another step manufacturers can take toward resolving the gray market problem is to tighten up licensing policies that have allowed control of products and their images to drift from the hands of the manufacturer to the licensee. In many instances management should rethink its current policy on licensing, especially when brand investment figures and the strategic importance of brand names are fully considered.

> "Consumers' long-term interests are also not served by the gray market."

Affected manufacturers can also address the problem of gray markets by purchasing excess supplies of inventory in overseas markets before diverters can purchase these products and ship them to the U.S. market. Diverters who purchase products at close-out prices without the burden of marketing and advertising expenses have a substantial cost advantage over authorized U.S. dealers.

Manufacturers can also advertise to protect their brand images. This can be accomplished by developing advertising strategies aimed at creating customer awareness of the importance of purchasing a product through an authorized dealer. Ferrari, the Italian auto manufacturer, has effectively countered gray-market sales in the United States by running the following copy in their print advertisements: "A Ferrari is an investment in pride, in excellence, in achievement. Protect your investment by purchasing and maintaining your Ferrari through an authorized Ferrari dealer. Only he can provide full factory warranty, service and parts."[14]

Manufacturers can also help their cause by correcting some of the situations that tempt domestic retailers when approached by a diverter. For example:
* Be less demanding of distributors for participation in buy-in programs.
* Offer greater flexibility for servicing "fill-ins."
* Simplify paperwork.
* Make every effort to distribute the "hot-selling" items equitably among distributors.

Finally, affected manufacturers may choose to retain the services of gray-market consulting firms to provide recommendations about gray-market competition on a case-by-case basis.

Conclusion

In the short term, the gray market may not seem to be harmful and may even be seen as beneficial to some of its participants. For example, consumers can immediately experience the benefits of the gray market in the form of substantially lower prices for brand name merchandise. Manufacturers also may not be adversely affected in the short term because the lower margins from gray-market sales may well be offset by an increase in total sales volume worldwide.

In the long term, however, the gray market will harm both manufacturers and consumers. As it functions today, the gray market allows free-riding merchandise diverters to sell trademarked goods. The gray marketers have no reason to protect the integrity of brand names, since they have no investment in promoting brand recognition. Furthermore, if the reputation of certain brand name merchandise becomes tainted through gray-market activities, the gray marketer merely targets another reputable brand name and continues to operate profitably. On the other hand, the manufacturer and its legitimate dealers are left with a tarnished reputation that may require a substantial investment of time and money to correct.

Perhaps the most unsettling strategic concern of the gray market for brand name manufacturers is the potential loss of their customer franchise. Once they permit consumers to believe that an inferior product/service package is as good as a genuine product/service package, the manufacturers are—in essence—tacitly approving counterfeit goods. In fact, it is possible that many of the so-called gray-market goods are in fact high-quality counterfeit goods.[15]

Consumers' long-term interests are also not served by the gray market. Lower profit margins and lack of trademark protection provide no incentive to manufacturers to undertake product improvements or to develop new products. Consequently, the gray market inadvertently suppresses innovation.

In conclusion, the gray market represents an in-

adequate response by manufacturers to develop strategic plans for the distribution of products and to promote specific brand images. As the gray market grows, it exerts pressures on traditional marketing channels and weakens the control management has over its products. If left unattended, the gray market may set a precedent that will ultimately usurp management's prerogative.

1. "The $7 Billion Gray Market: Where It Stops Nobody Knows," *Business Week*, 15 April 1985, 86–87.

2. Theodore Levitt, "The Globalization of Markets," *Harvard Business Review* (May-June 1983).

3. James B. Treece, "Japan's Protectionism Diverts Asian Goods to the U.S.," *Wall Street Journal*, 4 March 1985, 27.

4. Anthony Baldo, "Score One for the Gray Market," *Forbes*, 25 February 1985, 74.

5. David Bender and David Gerber, "Gray Markets and Parallel Importation: Protectionism vs. Free Trade," *Practicing Law Institute*, 1986.

6. Thomas Bonoma, "Planning the Marketing Mix," *Harvard Business Review* (July-August 1980): 120–137.

7. Bill Saporito, "Has Been Brands Go Back to Work," *Fortune*, 28 April 1986, 123–124.

8. "What's in a Name?" *Newsweek*, 21 October 1985, 64.

9. Geoffroy Taylor, "N. Y. Law Confronts 'Gray Market' Risks," *The Morning Call*, 22 October 1985, B3.

10. Walt Bogdanich and Hank Gilman, "Gray Market: Sale of Drugs Bought from Hospitals Raises Worries About Safety," *Wall Street Journal*, 6 August 1985, 1.

11. Ibid.

12. Gary Hamel and C. K. Prahalad, "Do You Really Have A Global Strategy?" *Harvard Business Review* (July-August 1985): 139–148.

13. Vineta Anand, "No Black and White Solutions to Gray Market Imports," *Global Trade Executive* (September 1985): 16.

14. Ferrari advertisement, *Wall Street Journal*, 12 November 1985, 16.

15. "The $7 Billion Gray Market: Where It Stops Nobody Knows," *Business Week*, 15 April 1985, 86–87.

## NOW AVAILABLE FROM THE BUSINESS STRATEGY SERIES




**Volume 1, MANAGEMENT: Planning, Analysis, Strategy** contains eleven articles that are designed to help managers find more effective and creative approaches to strategic management.

Titles and contents of Volume 1: Can Business Survive Its New Environment?/George A. Steiner—Constraints to Effective Problem Solving/Harvey J. Brightman—Don't Plan on Business as Usual/William L. Shanklin—Environmental Forecasting: Key to Strategic Management/John A. Pearce, II and Richard Robinson, Jr.—Futures Research for Managers/Robert F. Lusch and Gene R. Laczniak—GE, PIMS, BCG, and the PLC/Ben M. Enis—Perspectives on Planners and Planning/Milton Leontiades—Strategic Management and Planning/Benjamin B. Tregoe and John W. Zimmerman—Strategic Planning Under Resource Constraints/Jacob Naor—Strategic Planning: Challenging New Role for Corporate Staff/George S. Odiorne—The New Strategic Manager/Benjamin B. Tregoe and John W. Zimmerman.
8½x11—78 pages—Spiral—$21.95—ISBN 0-88406-178-7

**Volume 2, MARKETING: Planning, Analysis, Strategy** of the *BUSINESS Strategy Series*, contains twelve articles that provide the analytical tools and framework you need to improve your competitive situation.

Titles and contents of Volume 2: A Framework for Retail Planning/Robert F. Lusch and Michael G. Harvey—Don't Forget the Product Life Cycle for Strategic Planning/Lester A. Neidel—Environmental Forecasting: Key to Strategic Management/John A. Pearce, II and Richard Robinson, Jr.—GE, PIMS, BCG, and the PLC/Ben M. Enis—Marketing in the 1980s—Back to Basics/Keith K. Cox—Sales Forecasting: A Manager's Primer/N. Carroll Mohn and Lester C. Sartorius—Sales-Forecasting Models: How to Select Them/Lester C. Sartorius and N. Carroll Mohn—Strategic Management: A Marketing Segmental Approach/Wm. Theodore Cummings and James M. Daley—Strategic Planning Under Resource Constraints/Jacob Naor—The Dilemma of the Dirty Shirts/Thomas W. Steiger—The Mission Statement: A Key Step in Strategic Planning/Vern J. McGinnis—Three Strategic Planning Techniques for Retailers/Glenn S. Omura and M. Bixby Cooper.
9½x11—79 pages—Spiral—$20.95—ISBN 0-88406-179-5

To order, contact Fulfillment Department, Business Publishing Division, College of Business Administration, Georgia State University, Atlanta, Georgia 30303-3083. (404) 658-4253.