# EXHIBIT 436

*How to deal with this $7 billion to $10 billion problem — or opportunity*

# Gray Markets: Causes and Cures

by FRANK V. CESPEDES, E. RAYMOND COREY, and V. KASTURI RANGAN

An estimated $7 billion to $10 billion worth of products are sold every year in the United States outside manufacturers' authorized distribution channels. For these producers, controlling gray market distribution presents a serious problem. Or does it? Is it always a problem? When is it a symptom of more fundamental marketing issues? Can it also be an opportunity for a manufacturer?

Let's look at one situation. Some customers of a leading disk drive maker buy the computer component at volume discounts. But instead of "adding technical value to the products" (as the purchase agreement requires), the customers resell "raw" drives to major computer dealers, systems houses, OEMs, and end users. The manufacturer calls these customers "pseudo-OEMs" because they buy on OEM volume discount terms, operate on low gross margins, and undercut prices set by its authorized distributors.

In interviews, people at several levels in the company voiced concerns about the gray market, but often for different reasons. One person doing liaison work with distributors said, "When one of our distributors loses a sale to a pseudo-OEM, two things happen. First, the branch manager lets me know about it in seven different languages. Second, that distributor loses motivation to push our product."

A district manager expressed another viewpoint: "I get different stories from salespeople about pseudo-OEMs because some salespeople depend on them for a big portion of their quotas, and some do not. The result is tension in the office, often between people who share the same cubicle.

"Also, there's a vicious circle. In a business with short product life cycles, excess product can soon become a write-off if not sold. The result is that many salespeople feel pressure to sell to anybody, including



> When a distributor loses a sale to a gray marketer, the manufacturer hears about it in seven languages.

pseudo-OEMs, and this further erodes prices, fueling the whole thing all over again. I sometimes feel I'm being shafted by my own people, and I don't like it."

And this from a product manager: "Some of these gray marketers buy drives, stock them in a garage, and sell the lot to whoever they can find. But others are legitimate, important customers for our products who may be selling just 10% to 20% of their purchased drives without adding value. It's a tough situa-

*The authors teach marketing at the Harvard Business School. For their forthcoming book on distribution-channel design and management, Going to Market: Distribution Systems for Industrial Products (Harvard Business School Press), they did research at more than 60 companies, including IBM, GE, Becton-Dickinson, Control Data, and USX.*

HARVARD BUSINESS REVIEW  July-August 1988    75

OCH0063

for business development in the form of advertising, sales calls on potential customers, and demonstrations to showcase the product and its uses—only to find their accounts buying from a gray marketer who sells at a lower price but offers no services.

On the other hand, authorized distributors often supply gray marketers. Usually these distributors have taken advantage of the manufacturer's volume discount pricing schedules to order in quantities sufficient to qualify for the lower price. Then, having an oversupply, they sell some units to gray marketers outside their territories. In so doing, the distributors can continue to qualify for the volume discounts, thus lowering their cost of goods sold and inventory carrying costs, but create problems for other distributors in the manufacturer's network.

## What Causes the Problem?

What factors allow unauthorized resellers to prosper? The answers are various, making generalizations from one industry to the next difficult. But certain patterns do emerge, and understanding these patterns is essential to crafting an appropriate response.

*Supplier pricing policies* are probably the most commonly cited factor. But for many manufacturers there are good reasons for pricing in favor of large orders. In disk drives, this policy partly reflects the scale and learning-curve economies inherent in large orders as well as the strategic importance of large customers for the company's cost structure, product development plans, and after-market replacement sales. Intense competition among drive vendors for big customers makes competitive pricing based on order size imperative, and the supplier that refuses to offer volume discounts will find itself left out in the cold.

In most industrial markets negotiated or "bid" prices, lower than the manufacturer's book price, are common, especially for large orders. Bid customers often sell some of the merchandise to gray marketers, who in turn sell to other customers who would otherwise buy at the higher, book price. This is another way that price differentials, set for competitive reasons for different classes of accounts, help gray markets flourish.

International exchange rate fluctuations can cause price differentials and create arbitrage opportunities for gray marketers. In 1984 and 1985, when the dollar was strong and getting stronger against most other currencies, many products initially sold in one country found their way via agents to other countries as "parallel imports." For instance, into the United States gray marketers regularly imported Caterpillar excavators and loaders built in Scotland, Belgium, and Japan and priced to sell in local currencies. Even after shipping and insurance charges, these resellers won hosts of buyers among Caterpillar's U.S. dealers, who were paying 15% more for the same equipment made in Cat's domestic plants. At prices exceeding $200,000 for a single excavator, these price differentials sustained a thriving gray market.

Conversely in 1987 and 1988, with the dollar weak and the yen surging, a flourishing gray market formed in Japan based on some distributors' unauthorized reimportation of Japanese products from the United States and other countries, like Canon cameras and Panasonic cordless phones.

As more manufacturers adopt global product strategies, with uniform goods and even multilingual packaging for world markets, international gray markets in many goods may have a bright future. Batteries and other devices are a case in point.

*Reseller cost differentials* can be of two kinds: differences between the operating costs of full-line, full-service franchised resellers versus narrow-line, low-service discounters; and cost differences created by a product line's place in a reseller's strategy.

Franchised resellers usually offer important services like advertising, product demonstrations, and point-of-sale as well as postsale services. These functions cost the franchised reseller money, of course. Gray marketers enjoy a free ride on these services; many even honor manufacturers' discount coupons and coordinate their activities with manufacturers' promotions as a means of skimming the benefits generated by the regular channel's marketing efforts.

Ironically, a manufacturer's commitment to customer service sometimes aggravates the situation. In



> Supplier pricing policies, especially discounts, often open the way to the graying of a market.

the early 1980s, IBM imposed stringent requirements on its authorized PC dealers; they had to allocate a certain amount of store space for product demonstrations, keep a certain number of store personnel trained in its equipment, and maintain stock parts sufficient to sustain an acceptable level of customer service. IBM's aim was to build a store of value in its product franchise and, through value-added services, encourage brand preference and win repeat business.

### Situation in Flux

As this article went to press, developments had surfaced in Washington that could affect a manufacturer's ability to terminate authorized dealers for certain reasons. These developments, however, tug in opposite directions.

The Supreme Court ruled in May that a manufacturer that stops selling to a cut-price outlet, in response to complaints from competing, full-price stores, does not necessarily violate antitrust laws. This ruling seemingly introduces an important caveat to a 1911 ruling that since then has generally guided manufacturer-distributor relations in the United States. That ruling called resale price maintenance policies by a supplier "per se" (that is, automatically) illegal.

The 1988 ruling doesn't overturn the 1911 ruling and is limited to nonprice agreements between producers and distributors. But the majority opinion held that it is sometimes "legitimately and competitively useful" for manufacturers to curb competition among resellers when circumstances like free-rider effects inhibit the provision of necessary product services to full-price resellers.

Gray market operators are, of course, unauthorized distributors and so already stand outside the province of this decision. But it may affect manufacturers' ability to drop some authorized dealers in order to bolster their full-service dealers.

A bill in the U.S. Senate (a companion to the one already passed by the House) tugs the other way. It would make it easier for discounters to bring price-fixing cases against manufacturers and full-price retailers. The Justice Department announced its opposition, but the bill reportedly has substantial support in Congress.

At any rate, as this article argues, gray markets usually encompass factors other than pricing policies. While changes in the legal framework that govern channel relations are indirectly relevant, gray markets are likely to remain a real challenge for manufacturers of many kinds of industrial and consumer goods.

---

Retailers like 47th Street Photo in New York City, however, did not meet IBM's conditions, while other unsanctioned resellers of IBM products ran essentially cash-and-carry operations. Through their low-service/low-price selling strategy, they appropriated a big portion of the value IBM and its dealers had built, thus lowering the worth of the franchise for authorized distributors. As one dealer lamented, "It's tough to compete with someone whose major selling expense is a phone bill."

Differences in distributors' selling strategies can also sustain a gray market. A reseller that views a product as an incremental addition to its line may not allocate overhead in pricing the product, whereas a reseller that considers the product a staple of its line is likely to account for such costs in its pricing. Loss leaders are an extreme instance of this situation. Heavy advertising of a cut-rate price for a popular brand can be a big drawing card to get customers into the store. There the lure of regularly marked-up merchandise (often unbranded) awaits them. Loss-leader tactics to build traffic are common among gray marketers, if only because they often cannot count on frequent availability of the particular brand.

*Supplier franchise practices* can also foster gray markets. When demand is strong, suppliers often discourage intrabrand price competition among their accredited resellers. This creates a price umbrella likely to draw unfranchised dealers into the market.

Sometimes suppliers allow "block" franchising of their products, in which a franchisor in turn franchises all dealers in that chain. But the larger franchisees often want to buy direct from the manufacturer, which is obliged to honor the agreement with the parent and refuse them. To avoid the markup the parent generally takes in selling products to its dealers, the larger franchisees may buy on the gray market. IBM and other computer makers have encountered this situation in PCs.

*Contract terms* by which manufacturers rationalize production scheduling or smooth inventory levels can sustain gray markets. A common feature of industrial contracts is a returns penalty. In standard industry fashion, for example, the disk drive maker's contracts call for delivery of a given quantity of drives over a specified period (usually one to two years) and a charge of 40% of the order price for cancellation of an order less than 45 days before the scheduled shipment date, or 15% for cancellation 46 to 90 days before shipment.

In this business, lot size is important to production costs, and the company enforces these stiff stipulations to keep its scheduling efficient and its production costs competitive. But disk drives are a business in which demand fluctuates widely from quarter to quarter and new product introductions are frequent. So customers often find it hard to forecast precisely over a one- to two-year span. Therefore, some cus-

tomers ship "excess" drives to gray marketers as a way to avoid cancellation charges.

In some industries, including disk drives, dynamic product performance improvements go hand in hand with downdrafts in prices caused by hot competition among suppliers. Falling prices make customers, as well as distributors, more price sensitive as they try to protect their cost structures against competition. So they willingly sign large-order contracts that qualify for the biggest discounts. At the same time, the fast pace of product introductions is increasing the risk of perceived product obsolescence over the one- or two-year lives of the purchase contracts. So customers try to find ways—perhaps through gray marketers—to escape the cancellation charges.

As for the manufacturer, this situation puts pressure on product management, operations staff, and especially the sales force to move the factory's output fast. Consequently, they may be inclined to condone sales to gray marketers, and the result can be a vicious circle. Note, however, that gray markets arise out of sound business practices and distribution strategy designed to respond to the manufacturers' constraints and opportunities: rationalization of production schedules, selective distribution to maintain the value and integrity of the sales network, block franchising to gain access to powerful distributors, and quantity discount schedules.

When the sparring between manufacturer and distributor becomes intense—the pages of trade publications often ring with accusations and counteraccusations—it is useful to recognize the irony of the situation. Even though good business practices can lead to a very undesirable outcome, they should not necessarily be abandoned when the manufacturer is evaluating the options for dealing with the problem.

## What Are the Options?

In answer, manufacturers generally adopt one or more of the following responses. Each has its logic and its limitations.

Disenfranchisement of offenders is a stock (and emotionally satisfying) response. In an effort to identify suppliers to unauthorized dealers, Lotus Development Corporation recorded the bar-code numbers of its popular 1-2-3 software packages as they were shipped out. Meanwhile, Lotus operatives checked print ads to locate unauthorized dealers and occasionally had shoppers buy the company's products from mail-order houses and other gray outlets. Eventually Lotus eliminated from its list those distributors doing business with gray marketers and put a temporary freeze on agreements with new distributors.

Such moves send loud signals of commitment to distributors who abide by the terms of the franchise agreement. These signals often are a response to complaints from them. In the case of full-service dealers, the manufacturers will listen to those complaints, for they may need the distributors' market development help.

Tracking down offenders, however, costs money. Lotus spent more than $100,000 on the system to label the product and monitor its sales. Moreover, the manufacturer that selectively disenfranchises dealers runs the risk of being sued.

A one-price-for-all policy can eliminate an important source of arbitrage and allow the supplier to reassert a measure of channel control. Here is how one manager in the disk drive situation rationalized the policy: "Since it's different prices for different quantities that fuel the gray market, let's eliminate the differences. The distribution channel that's most efficient, and that can sell our product at the lowest realizable gross margin, should gain strength over time. And that's the channel we want to use to get our products to market."

But this policy often means sale of most of the output at lower prices to *all* customers, big or small, regardless of transaction costs. Furthermore, this strategy often forecloses valid price discrimination opportunities among classes of customers who are buying very different benefits in the same product. While price may be the main criterion for some customers, for others continuity of supply and aid in application development may be more important.

A meaningful one-price-for-all strategy must also include a way to reward the full-service dealers in the network. They usually have other supply options available. Most systems for direct payment to these dealers for the extra services they furnish are as financially and administratively cumbersome as procedures for tracking sales to unauthorized dealers.

Finally, as the disk drive managers' comments indicate, this strategy is a Darwinian "survival of the fittest" approach. While it may be the answer in the short term, in the long term it can limit the manufacturer's access to new and growing market segments and discourage distributors from supporting a manufacturer that refuses to recognize differences in distributors' market power. This strategy also may not eliminate arbitrage opportunities (since cost differentials and differing reseller strategies also give rise to gray markets) and may make it harder for the manufacturer to alter its distribution strategy as changing market conditions require.

OCH0066

Adding distributors (perhaps former gray market distributors) to the network can be a solution. By limiting circulation of a popular item to a few dealers, the supplier may inadvertently have created demand that can be satisfied only through transshipment to gray outlets. Or the supplier's dealer service criteria may be unnecessarily (or unrealistically) high, discouraging dealers that service price-sensitive market segments from joining the supplier's network. Franchising more distributors may give the supplier better control over the flow of its product to market.

The supplier must be careful, however, not to put itself in the middle of disputes among distributors over turf. Moreover, when customer bases overlap, the supplier's franchise loses value, and dealers lose incentive to provide service and sales support. Important dealers may switch to a competing line with less intensive distribution. Tinkering with relationships with channel mainstays by adding distributors can be a very dangerous business.

## What Can You Do?

For the manufacturer, every option has costs and risks but the status quo is also unacceptable. What, then, to do?

First, get accurate and timely *information*. In our research we found that managers were often woefully uninformed about the magnitude or channel dynamics of gray markets for their goods. As we have seen, the standard sources of market information, field salespeople and distributors, can be unreliable. Recall the district sales manager for the disk drive maker who reported that salespeople in the same branch office gave him different stories. And, as we have seen, distributors often have a foot on each side of the street.

Therefore, the supplier often must create, or bolster, alternative data sources. Product serial numbers, warranty cards, and factory rebate programs can help track the product's movement to unsanctioned resellers and generate information valuable in gauging the magnitude of these sales. As transaction volume rises, collection of such data on a timely basis can become costly. But the information is likely to be helpful to the company's other marketing programs, and the expense of gathering the information should be viewed in this light.

Another thing to do is reexamine the company's *distribution patterns* and agreements. Unlike Gertrude Stein's unvarying rose, a distributor is not a distributor is not a distributor. The networks of most suppliers have distributors that perform various functions—which implies different operating costs for the distributor and different value-added opportunities for the particular product line.

Recognizing these differences, some manufacturers classify their distributors into "A," "B," and "C" categories, using criteria like level of sales performance, share of the local market, number of the supplier's product lines carried, services provided, and proportion of the reseller's total sales attributable to the supplier's product (a rough measure of the distributor's stake in providing needed support services).

In turn, the suppliers structure franchise agreements that extend higher levels of support to their full-service, broad-line distributors in product allocation, merchandising support, lead referrals from the supplier's salespeople, and discounts reflecting different levels of value added by the distributor. These suppliers look to full-service distributors to support product introductions and to service the high end of the market, while relying on low-service distributors for those market segments that are concerned mostly with price.

These manufacturers also generally avoid block franchising on the grounds that what they gain at first in lower selling expenses (usually for a new product line) they can soon lose in the form of gray market action and dilution of channel effectiveness. Square D, the supplier of electrical equipment, refuses to make block franchising agreements with big retail chains or industrial distributors. Instead, it franchises distributors on a location-by-location basis, even when working with large, multilocation distributors. Square D stresses big inventory commitments by a select number of channel elements and pull-through selling efforts by its own sales force aimed at generating end-user demand to be serviced by a particular distributor. This strategy is easier to carry out with one-outlet franchises.

The manufacturer should also reexamine the parts of its franchise agreements covering *reseller service support*. There are two related questions to be answered: What added operating costs does the reseller take on in furnishing the point-of-sale or postsale services called for in the agreement? What are the options, and what would be the costs, in shifting these services to other points in the channel? After analysis, the manufacturer may find that after-sale maintenance and repair service can be performed more efficiently at locations it owns or by third-party service providers—instead of at dealer locations—because these services demand large parts inventories and specially trained people.

*Pricing* is another area needing close attention. The objective should be to fashion quantity discount schedules that don't create incentives for customers

OCH0067

to overorder and later sell on the gray market. This is easier said than done, but attention to quantity schedules can help. For example, manufacturers give gray marketers a welcome opening when the pricing brackets in a schedule are wide (that is, a single price holds for a wide range of order quantities).

The disk drive manufacturer—pricing mainly on the basis of production costs—sets the same unit price (about $500 each) on orders ranging from 1,000 to 2,500 units and contracts ranging from $525,000

> One possible outcome of facing up to the problem: rethinking your marketing strategy.

to $1.3 million. The wide price breaks permit some customers to buy in quantity, use many of the drives for legitimate purposes, and still sell a large number on the gray market at prices higher than the purchase price but lower than authorized distributors' prices. In such a situation, narrower pricing brackets tying unit prices more closely to order volumes can mitigate the problem.

Coordinated administration of bid and book pricing is also essential in preventing arbitrage opportunities. This requires accurate, timely information about competitors' pricing and resellers' market (not just list) prices, and the ability to handle price-exception requests efficiently. One major manufacturer of electrical equipment receives 30 to 40 price requests daily, usually for quotations on materials for large construction projects. Pricing in this highly competitive marketplace demands a fast response and, since most orders are filled through distributors, coordination between bid and list price. The company maintains a headquarters telemarketing group of specialists who, with the aid of computer programs, calculate job requirements, monitor prices in various markets, and send quotes to field salespeople or distributors bidding on projects.

Listen to the manager of this group: "We maintain current records on all pricing actions by trading area, whether we won or lost each order, and the price received or we know of. We check to see who is the competition. We decide whether the price multiplier is out of line for that size of order. Finally, and this is especially important, we look at the product mix. If it includes items where we've got a low cost position and extra plant capacity, we're inclined to be aggressive. Also, when we respond to price-exception requests initiated through our distributors, we always quote the same price to two or more distributors bidding on the same project."

Through this procedure, the company coordinates bid and book prices, minimizes arbitrage opportunities for big customers or distributors, and monitors activity on big orders (those most vulnerable to gray market activity). The company can also tailor distributors' price-exception requests to the level of value-added support they are expected to supply, and thus protect its full-line, full-service distributors on large, price-sensitive orders.

Another thing management can do is reassess its *marketing priorities* in light of the gray market question. If the reassessment confirms, say, that increasing market share is a key objective, then the extent to which the gray market makes the product more available and augments volume becomes important in responding (or not) to distributors' complaints.

One company, intending to introduce several products through its normal channels, decided to place special weight on maintaining good dealer relations and so adjusted its pricing to dealers—despite the healthy volume represented by gray market sales.

It goes without saying that the manufacturer's *internal measurements* for evaluating employees' performance should promote pursuit of the organization's objectives. But when a gray market intrudes on the normal channels, the measurement system can sow internal discord. At the disk drive company, sales bonuses are based on achieving quotas. Depending on whether a particular salesperson sold to pseudo-OEMs, the gray market is a help or a hindrance in reaching quota. The same holds true for district sales managers, whose bonuses are based on total district volume. Manufacturing managers are measured on plant efficiency, and to them gray market sales often represent desirable incremental volume. Since manufacturing, marketing, and sales are all affected, all these functions should be represented in setting priorities and choosing a course of action.

## What Are Customers Saying?

Because a gray market causes turmoil internally and in distribution channels, a manufacturer can lose sight of the ultimate arbitrator in this situation: the customer. When a substantial gray market develops, what are customers saying to the manufacturer about its product? The answer may force management to revise its marketing and distribution strategy.

A gray market often reflects the maturation of a product in its life cycle. As customers become famil-

iar with a product category; they tend to place less value on the support programs offered by the manufacturer or its distributors. In their buying they become increasingly price sensitive. What they once purchased as a system they may unbundle into discrete purchases and then seek out channels that sell on price while furnishing little product support.¹ A gray market often signals the emergence of this group of customers. If authorized resellers require customers to buy a package of product and support features, the gray market gets added impetus.

Meanwhile, the manufacturer is trying to keep its distribution network intact. For the producers as well as distributors, exclusive or highly selective distribution arrangements have been advantageous, the former getting support service (often vital in a technical product like disk drives) and the latter enjoying limited competition. Small wonder that changes in distribution arrangements lag behind changes in customers and customer behavior.

Any move the manufacturer makes at this point is risky. If, say, it wants to boost direct sales to large, price-sensitive buyers or reach new market segments that purchase differently, it will run headlong into the interests of its existing channels. If the same distributors handle a manufacturer's product portfolio, action taken to deal with a gray market in one product line can affect the whole portfolio.

In this respect, gray markets often point to a larger issue: the limiting commitments at the heart of many distribution strategies. When a market is entered or a product introduced, elements of distribution strategy tend to cohere around the particular market circumstances and corporate objectives held at the time. As markets evolve, new distribution strategies are required. But each dimension of the existing arrangement tends to cement established patterns, making it difficult for the manufacturer to alter its channel strategy.

Yet inaction can be worse for the manufacturer—as the disk drive company was discovering at the time of our investigation. A fundamental alteration in distribution strategy is often necessary to attack the root causes of a gray market. Timely information about gray market activity, close attention to franchising and pricing policies, and coherent internal measurement systems can give an organization the managerial tools required to distinguish symptom from cause and stimulate efforts to make the hard choices implied by a gray market.

Reprint 88403

<sub>1. For an analysis of changing buyer behavior over the product life cycle, see F. Stewart DeBruicker and Gregory L. Summe, "Make Sure Your Customers Keep Coming Back," HBR, January-February 1985, p. 92.</sub>



Harvard Business Review and Harvard Business School Publishing content on EBSCOhost is licensed for the individual use of authorized EBSCOhost patrons at this institution and is not intended for use as assigned course material. Harvard Business School Publishing is pleased to grant permission to make this work available through "electronic reserves" or other means of digital access or transmission to students enrolled in a course. For rates and authorization regarding such course usage, contact permissions@hbsp.harvard.edu

OCH0070