# EXHIBIT 438

The Emerald Research Register for this journal is available at http://www.emeraldinsight.com/researchregister



The current issue and full text archive of this journal is available at http://www.emeraldinsight.com/0309-0566.htm

EJM 37,10

1332

Received June 2001
Revised November 2001

# Brand equity and brand vulnerability

## The impact of gray marketing/parallel importing on brand equity and values

Lynne Eagle
*Department of Commerce, Massey University at Albany, Albany, New Zealand*
Philip J. Kitchen
*The Business School, University of Hull, Hull, UK, and*
Lawrence Rose and Brendan Moyle
*Department of Commerce, Massey University at Albany, Albany, New Zealand*

**Keywords** *Brand equity, Marketing, Imports, New Zealand*

**Abstract** *Brand equity has received significant academic attention since the mid-1990s. This has been driven partly by changes in international accounting standards as they relate to the reporting of the financial value of intangible assets. A more prominent driver concerns the impact of marketing, and of marketing communication activity in particular, on brand performance. Much of the academic debate, however, has centered on conflicting definitions of brand equity and on seeking ways of measuring or quantifying the value of equity. Attention is now turning to examining the nature of equity and of factors that may threaten it. This paper examines the potential impact of parallel importing on brand equity and provides a substantive theoretical background. The paper then reports the findings from an exploratory study involving depth interviews with New Zealand brand managers whose brands have been affected by this activity.*

## Introduction

Parallel importing may have a substantive impact on brand equity and value. The impact of marketing communications activity on brand equity/value is receiving significant attention, both as a result of changes to international accounting standards relating to the reporting of the financial value of intangible assets, and as a result of increased focus on the impact of marketing – particularly marketing communication – activity on brand performance (Eagle and Kitchen, 2000). However, the marketing activities of parallel importers falls outside the control of authorized distributors and often may not project images consistent with those planned by manufacturers and their authorized distributor network. It is necessary to attempt to determine whether

The authors wish to express their gratitude to two anonymous *EJM* reviewers for their helpful comments on an earlier version of this paper.

Emerald

European Journal of Marketing
Vol. 37 No. 10, 2003
pp. 1332-1349
© MCB UP Limited
0309-0566
DOI 10.1108/03090560310487130

the impact of parallel importing activity on brand equity is either positive or negative – and what the magnitude of this impact might be.

**Brand equity revisited**

Brand valuation is not a new concept, but has focused in the past on financial measurement for brand acquisition, franchising or royalty calculations. Feldwick (1996) notes that, prior to the 1990s, the concept of brand image was seen as a somewhat vague theory, primarily used when describing advertising objectives rather than converting prospects or making sales. Perceptions changed rapidly when brands started to change hands for considerable sums. The difference between balance sheet valuations and the prices actually paid for companies or brands was attributed to "the value of brands".

The focus on the impact of promotional activity on brand equity is much more recent and can be seen as part of a wider drive for marketing accountability (see, for example, Aaker, 1997). Brand equity thus immediately became the focus of academic and practitioner debate. Schultz and Gronstedt (1997, brackets added), for example, provided a cynical rationale for the focus on non-financial brand equity/values when they asserted (Schultz and Gronstedt, 1997) "since we have so much difficulty relating marketing and communications expenditure to [actual] returns, we must be doing something else ...".

Marketing activity may impact adversely on brand value. Aaker (1997, p. 137) reviews the dangers of repositioning brands and the impact on brand image and equity of sustained price discounting. He suggests that if price alone becomes the basis for competition, such a move may only nullify any other form of differentiation and impact adversely on brand equity. Advertising alone rarely creates brands, however advertising communicates and positions the brand. Ambler (2001) extends this argument by asserting that companies are successful largely because they increase the value of their brands. He cautions that the individual metrics such as market share or customer satisfaction may require to be calculated differently in various sectors such as packaged goods markets compared to the services sector. He also stresses the value of viewing these metrics not in isolation, but in relation to those of competitors.

The question regarding the impact of marketing communications activity on these metrics that is implied but rarely explicitly stated in the advertising/marketing communications literature is as follows. Advertising can be considered to have a positive effect on brand equity/valuation if the brand's value and changes in that value over time are measurable and if advertising can be shown to be a major contributor to that change. Evidence of a cause-effect relationship appears to be somewhat elusive.

Yoo and Donthu (2000), in their recent review of brand equity research, stressed the potential positive relationship between brand equity and financial

performance, by noting that there is evidence that a product's brand equity positively affects future profits, long-term cash flow and consumer willingness to pay premium prices. They did not, however, consider potential negative impacts. Dawar and Pillutla (2000) also acknowledged the potential positive value of brand equity, but cautioned that "it is fragile", "not well understood" because "it is founded in consumer beliefs and can be prone to large and sudden shifts outside of management control". Buchanan *et al.* (1999) highlight a major aspect of brand vulnerability, noting that it is retailers rather than manufacturers who often control a brand's final presentation to customers.

The unexpected impact of branding and brand equity became evident in New Zealand after a legal move to parallel importing in mid-1998. The legislative purpose was to "allow the New Zealand consumer to benefit from lower prices for goods as a result of competition that parallel importers were expected to provide to otherwise exclusive importers" (Ewart, 1998, p. 2). Predictions of a "flood" of cheap, designer products onto the market and threats of trade sanctions by major international organizations (particularly those based in the USA) were made (e.g. Rotherham, 1999). Neither appears to have occurred yet, although some sectors such as sportswear and cosmetics/toiletries appear to have been specifically targeted by parallel importers. Given the relative recency of the New Zealand legislative changes, there is an opportunity to examine the impact of parallel importing on brands in this market since its approval. Lessons learned can then be applied to other markets, particularly those experiencing similar levels of market freedom.

### Gray marketing/parallel importing

Gray marketing/parallel importing has been a widespread international practice, and one of concern to manufacturers and retailers since the mid-1980s (e.g. Baldo, 1985; Barlass, 1988; Mitchell, 1998). Estimates of the size of international gray markets range from US$7 billion to US$10 billion (Mathur, 1995). We are unable to locate any more recent estimates of market size. There is evidence of tensions between attempts to remove any restrictions on the practice and attempts by organizations such as the European Union to protect its members from its impact (e.g. Mitchell, 1998).

Parallel importing is not counterfeiting. However, the use of the term synonymously with "gray marketing" suggests that there is something suspect about the practice. Duhan and Sheffet (1998, p. 75) suggest that "gray" may imply an "almost black market". Gray marketing involves the selling of trademarked goods through channels of distribution that are not authorized by the trademark holders (Duhan and Sheffet, 1998, p. 76). When gray marketing occurs across markets, such as in an international setting, the term most commonly used is parallel importing. It provides the opportunity for companies, usually major retailing chains, to bypass official franchise holders or agents for particular, usually high-priced, branded goods and to source them

direct from overseas suppliers. It is only illegal when gray market goods violate either product regulations or a licensing contract for the trademark's use in a specific country, or where the trademark owner is based in the country into which parallel imports are shipped. A non-licensed distributor cannot use the brand trademark in the "official" stylized trademark form other than by a photograph of the label on the product or a photograph of the product itself if it bears the logo (for example, the Nike "swoosh").

The practice of parallel importing represents an uneasy balance between the protection of intellectual property rights such as trademark and patent rights and the liberalization of trade in goods and services promoted by organizations such at the World Trade Organization (e.g. Bronckers, 1988). For gray markets to operate there must be a source of supply, easy access from one market to another, and price differentials that are large enough to make the venture financially viable. Much of the debate in the academic literature centers on whether parallel importing is a legitimate response to discriminatory pricing strategies or a free rider problem (see, e.g. Malueg and Schwartz, 1994).

**Perceived benefits of gray marketing/parallel importing**

In the international context, parallel export channels may assist in penetrating foreign markets or in increasing overall market share (e.g. Mitchell, 1998). Domestically, Tappell (1998) reports the leading New Zealand parallel importer, the discount retail chain "The Warehouse", as being unequivocal about the future of the practice in boosting growth prospects for the organization. This is consistent with Buchanan *et al.* (1999), who conclude that retailers often prefer to display high equity brands in close proximity to lesser or unknown brands in order to leverage the value of the high-equity brand across other brands. Conversely, manufacturers who have built equity in their brands want them to be displayed with brands of similar position and stature. "Proximity to lesser or unknown brands, they believe, may cause the consumer to question the brand" (Buchanan *et al.*, 1999, p. 345). Consumers may then also question the "normal" pricing structure for a brand in its official retail outlets versus the often substantially lower price in parallel importers' outlets.

Protecting parallel importers is perceived as providing a check on the near monopoly held by many large manufacturers, and as acting in the interests of consumers, resulting in lower prices, better products and, in developing countries at least, a higher quality of life (e.g. Chang, 1993). Indeed, much of the evidence to support the legalization of parallel importing came from examination of cases where a small number of companies were claimed to be extracting excessive profits from consumers (e.g. Davison, 1992).

Malueg and Schwartz (1994) support the view that parallel importing has arisen primarily as a response to international price discrimination. They contend that consumers view parallel imports as perfect substitutions for authorized goods. Tan *et al.* (1997) take a slightly different view and suggest

that parallel importing may represent an unusual approach to market segmentation, with low priced goods from parallel importers generally not offering the same warranties as those (higher priced) goods available through official channels. Risk-averse consumers will thus be prepared to pay higher prices for the security of warranties and after sales service. Risk-preferring consumers will purchase parallel imports in the knowledge that they do not have the same level of security.

The New Zealand experience is somewhat different, with The Warehouse actively promoting its own warranties for electronic products, arranged through independent servicing contractors and/or a money back guarantee on all merchandise sold.

### Perceived disadvantages of gray marketing/parallel importing

Consumers may purchase parallel imported trademarked goods without being aware of the difference between these goods and those purchased through "official" distribution channels. If problems arise, and customers find that they do not get the expected post-sale service and warranty protection, it may be the goodwill established by the "official" distributor/trademark owner which will suffer (see Krieger and Tanouhaj, 1988; Duhan and Sheffet, 1988).

Brands are rarely created by marketing communication activity alone, however, advertising and other related marketing communications activity help communicate and position brands (Schultz and Kitchen, 2000; Kitchen and Schultz, 2001; Kitchen, 2002). Tan *et al.* (1997) and Michael (1998) claim that parallel importers gain a free ride on the market demand and brand image of the product created by the authorized distributor, without sharing in the marketing communications efforts and expenses which have built the demand and associated image. Thus parallel importers are not concerned with developing and expanding the market, but rather with acquiring a share of the market developed by (and at the expense of) authorized channels.

It could, of course, be claimed that the authorized distributor also benefits from the advertising and promotional activities undertaken by the parallel importer. However, given that parallel importers, in New Zealand at least, promote their products primarily on the basis of substantially lower prices, it is unlikely that such activity could in reality be construed as aiding brand image.

Brand value lies in the ability of a brand to translate brand reputation and loyalties into enduring profit streams. The realization of this has brought brand equity management into focus, both as a result of changes to international accounting standards relating to intangible assets, and a result of renewed focus on the impact of marketing communication on brand performance (e.g. Eagle and Kitchen, 2000). This has led to increased focus on the strategic integration of all elements of marketing communication in order to provide clarity and consistency of communication messages.

However, the marketing communications activity of a parallel importer does not fall within the coordination and control ambit of integrated brand communication. It is possible that brand image communication may focus on quality while the marketing communications of a parallel importer may focus on discount prices – thus potentially creating confusion and conflicting "value" messages for the consumer and thus adversely affecting the brand image. As a result, the future earnings potential of brand names impacted by parallel imports may be seriously jeopardized (e.g. Maskulka and Gulas, 1987).

The practice of parallel importing, if seen as openly condoned by the manufacturer, may strain manufacturer/"official" distributor relationships. Loss of goodwill may be accompanied by a loss of marketing channel support as some "official" channel members lessen promotional efforts put behind a product which is also parallel imported, cease to promote it or perhaps drop it entirely.

Opponents of parallel importing suggest, in calling for the imposition of restrictions on distribution, that selective distribution enables the guarantee of high levels of product and service quality. Mitchell (1998) argues that such a stance is a specious argument – if customers want the "better" service and advice provided by a specialist outlet, they will go there – artificially restricting distribution merely denies choice. He argues that marketers who want to protect a brand's name and exclusivity should restrict production rather than distribution!

Parallel importing, while broadening distribution, appears to have also helped the counterfeiting industry that pass fake goods off as parallel imports. It is illegal to parallel import counterfeit or pirated goods, although liberalization of the parallel importing law has made it more difficult to identify "fakes". The problem appears to be a massive one. In New Zealand alone, Rotherham (1999) notes that NZ$15 million of fake goods branded under the Microsoft name have been seized by Customs in the most recent 12 months – up from NZ$9 million for the previous year.

### The Internet: the ultimate parallel importing channel

The Internet allows the opportunity for a wide range of products and services to be purchased on-line, thus competing with traditional distribution channels. The growth of virtual bookstores such as Amazon.com has been well documented. Of concern is the growth in on-line pharmacies, Internet sites that write drug prescriptions without face-to-face medical evaluation for drugs such as Viagra, Propecia and a range of homeopathic remedies (e.g. West, 1998). This raises the possibility of consumers gaining access to medications that would not necessarily be available domestically. Wood and Rupright (1997) observe that the FDA is monitoring such activity with a view to instituting some form of regulation. The ability of the Internet to transcend national

borders, coupled with difficulties in synchronizing international laws makes international regulation a distant prospect.

Internet pharmacies are of particular concern in New Zealand – but not the only Internet operational concern. The Ministry of Health introduced new regulations in November 2000 to prohibit sales overseas of prescription medicines to individuals who do not have a prescription from a New Zealand authorized prescriber. This extends the protection already provided to New Zealand consumers to also cover overseas-based consumers. This regulation links to the requirement of the Medical Council of New Zealand that the doctor and patient must have met (face to face) on at least one occasion, and for the patient to be under the care of that doctor. This action has been supported by the Pharmaceutical Society of New Zealand which has banned at least one cyber-chemist from practicing as a pharmacist (through a physical location or a cyber-pharmacy) and imposed substantial fines for breaching the Society's Code of Ethics, i.e. there is seen to be a higher standard of behavior expected of a pharmacist than merely what action is "legal" (Booth, 2001).

Problems have arisen with other products and the use of the Internet to bypass "conventional" distribution chains. Samiee (1998, p. 16) reviews problems encountered by recording companies who have attempted to compete with their established distribution channels by distributing recordings over the Internet. He suggests that channel intermediaries "must constantly economically justify their presence in the channel, otherwise other channel members will eventually bypass the structure or develop their own, more efficient channels and processes".

### Moves to counter the impact of parallel imports

Speakman (1990) somewhat idealistically suggests that the practice can be countered by implementing programmes to educate end users regarding the benefits of purchasing from authorized resellers – particularly with regard to after-sales service and warranties. This is likely to be effective only where parallel importers offer no after-sales support, and, as previously noted, the New Zealand experience indicates that the major parallel importer of consumer goods is offering both support and a money back guarantee in lieu of warranties.

Michael (1998) reports that more pragmatic solutions, such as reducing export prices to authorized distributors have commonly been used to counter parallel imports. The main problem encountered with this strategy appears to be that price discounts intended as a temporary tactical measure have become expected permanent strategy.

Tan *et al.* (1997) review a number of reactive and proactive strategies. These center primarily on pricing adjustments and on the restructuring of manufacturer/distributor agreements in order to prohibit gray marketing/parallel importing. Their pricing strategies include engaging in price wars and scaling down promotional activity to regain cost advantages. The success of

such strategies would of course be dependent on the ability to withstand the loss of profits through a price war period – and/or whether competitors were able to capitalise on reduced promotional activity in order to grow competing brands at the expense of the embattled marketer.

Moves to cut off supplies to the parallel exporter have met with varied success – largely dependent on the terms of manufacturing and licensing contracts between the trademark holder and offshore manufacturers and distributors. In spite of strategies to restrict/cut off supplies and to counter parallel import activity through pricing and promotional tactics, the phenomenon of parallel importing appears strangely persistent.

## Research objectives and method

There are many unanswered questions concerning parallel importing or gray marketing. For example, there is little research of an empirical nature concerning parallel importing or its effect – positive or negative – on brand equity and values. Admittedly, the issue of brand valuation is somewhat of a red herring. The real issue is the relationship of brand equity with gray imports and how this impacts on equity. In the USA, academics are muddling over terminology in terms of elaborating with ever-greater variability on the marketing asset theme (Ambler, 2001). As we have seen in the preceding literature review, there is a marked steer toward conjecture and opinion rather than providing objective, quantitative analysis of the impacts of the practice on brands, markets and individual market segments. Palia and Keown (1991) claim that, although parallel importing does not appear harmful in the short term, both consumers and manufacturers are adversely affected in the long run. However, they do not offer any empirical evidence for this claim. Thus, it is time for a study to be carried out to tackle at least some of the issues in this domain. Given the somewhat unclear theoretical foundations, our objectives for the interview process were straightforward and twofold:

(1) To explore perceptions of parallel importing among senior marketing executives who are responsible for the "official" marketing/distribution of brands which have also been parallel imported into New Zealand, and among senior executives within retail chains actively involved in the parallel importing activity.

(2) To determine what actions, if any, have been taken to counter the perceived impact of parallel imported goods on the "official" distributors and what success is claimed for these actions.

In this paper, parallel importing activity is explored only in the consumer goods sector of the New Zealand economy. For later studies, we plan to consider industrial markets, and alcohol products.

In-depth interviews, either face to face or via telephone were conducted with 15 marketing managers/directors identified as being responsible for the official

marketing of brands which have also been parallel imported into New Zealand. In-depth interviews were also conducted with the two major retail chains actively involved in parallel import activity of consumer goods and with three other major retail chains impacted by this activity. In the case of both respondent groups, the interview schedule was developed in conjunction with able commentators. The research utilized an interview checklist where a number of open-ended questions were used to determine perceptions on the issues identified in the above objectives. The use of open-ended questions allowed respondents to structure the topic themselves rather than follow a narrower perspective that would be forced by closed-ended questions. Responses were recorded verbatim and then compared/categorized in order to identify common themes. Comments have been related back to the literature, allowing a measure of generalizability from the findings, although in a more restricted form than more traditional, randomly sampled surveys. Wherever possible we have included verbatim comments to illustrate points more forcefully.

**Research findings for consumer goods: the retailers**

Both Deka and The Warehouse are discount department stores. The Warehouse has 67 stores throughout New Zealand and recorded 1998 sales of NZ$750 million, 1999 sales of NZ$933 million and 2000 sales of NZ$1,075. They accounted for 99 per cent of the growth in department store sales and achieved a market share (department store sales) of 36 per cent in 1998 (The Warehouse Group, 1998, 1999, 2000). Deka has 60 stores. Neither sales data nor market share data are available, although industry estimates place their turnover as being approximately half that of The Warehouse. The two chains together can therefore be assumed to account for approximately 50 percent of the department store sector.

There are some differences between the philosophies of the two chains, and in their strategies for parallel imports. Deka have taken a considered approach, having extensively researched overseas market trends prior to commencing parallel importation. The practice constitutes a small part of the business, being used primarily to complement their existing product range. The Warehouse has taken a more aggressive approach, epitomized by the following extract from their *1998 Annual Report* (The Warehouse, 1998, p. 11):

> Parallel importing opens up a number of exciting new opportunities for growth. We can now import directly from overseas if we cannot agree on satisfactory terms with local distributors. For our customers, it means that the "brand tax" inherent in some branded products will be reduced thus allowing us to continue to ensure that our customers come first.

New Zealand distributors had made a number of products unavailable to these retail chains in the past. Both chains note that, since they began to parallel import these products, several distributors have reconsidered the situation and have offered previously "unavailable" products to these chains.

Deka acknowledges a certain amount of free rider effect. They contend, however, that authorized distributors are seen as having historically created not only "a rod for their own backs" because of their restrictive distribution policies regarding who could stock product, but also because of excessive markups ... "parallel importing has made them review the quantum".

The Warehouse suggests that the reality is that companies create demand, parallel import retailers such as The Warehouse help fulfil those plans and grow market share, the parent company receives the requisite royalty – therefore parallel import retailers are not riding on the back of the efforts of others. This may be cold comfort for the official brand controllers whose promotional budgets are based on sales only through official distribution channels. Thus, any loss of market share to parallel importers will see a corresponding reduction in funds available for reinvestment in the brand by the official brand controllers via their marketing communications activity.

Discriminatory pricing was not seen as a deliberate international policy, with exchange rates fluctuations seen as presenting greater problems in maintaining profit levels. The lack of strong domestic price competitiveness, which operates in larger markets, was noted.

Both companies claim to treat parallel imported products as lead lines, but *not* as loss leaders (but then this statement would be expected). While they endeavor to make a profit on these products, it may not be as high as product sourced through conventional channels. Pragmatically, both chains acknowledge a preference for dealing with New Zealand distributors who then must deal with issues such as inventory control. The criteria used for assessing potential imports are consistency of quality, continuity of supply, brand names, realistic pricing and stock that is likely to move quickly. Not considered are one-off lots, unknown brands and quantities that would be unrealistic for the size of the New Zealand market. In achieving successful importation, relationship building with the official distributor source is seen as important. Several important caveats apply – trademark ownership and clean paper trails are seen as essential – including making sure that the people selling the product are legally entitled to do so.

Parallel importing has opened the way to source other products compatible with the chains' product ranges in selected sectors. For example, Deka has imported a number of household linen lines from the US "Martha Stewart" label, which have not previously been available in this country. Generally, these are not international brands, but rather retailer house brands. The same distributors who organize parallel imports often handle these products. Such products must meet the same criteria as apply to parallel imports. Both chains believe that consumer have gained significantly in specific areas. Deka suggest that consumers are "entitled to the best product at the best price", however they caution "that it is always *caveat emptor*". The Warehouse notes that much of their parallel imported stock is outgoing models (about to be replaced by new

models). They criticize suppliers for complacency and a tendency to "wait until something happens to make them change their methods". To illustrate this, they suggest that official distributors can always get first releases and could preempt The Warehouse strategies by using more aggressive marketing strategies such as "trade in your old model ...".

Overall, from the two cases given here, the outcome of parallel importing is, by and large, positive. Let us now turn to findings from marketers impacted adversely by parallel importing.

### Research findings for consumer goods: the brands

Experiences are as varied across the 15 brand owners interviewed. Several organizations noted substantial losses in sales (up to 30 percent) as the direct result of parallel import activity. Others, generally where there was a high element of rapidly changing technology or fashion, reported minimal impact. All respondents believed that parallel import activity of their products into discount retail stores was negatively impacting, or had the potential to impact on their brands' perceptions. The major concerns related to the lowering of prestige images by the brands' placement in what the brand controllers perceived to be an incompatible retail environment. Concerns were also expressed regarding inferior quality product (i.e. of standards below that which were set for officially distributed product) being brought in by the parallel importers. The overall consensus was that these two factors would detract from their brands' quality perceptions. However, none of the brand controllers have conducted quantitative research to measure this impact, relying instead on informal feedback from retailers and, in some instances, from consumers. The comments shown below are not substantiated by any further evidence of market research:

> Parallel importing is often substandard branded product of extremely questionable authenticity (Resp5).

> There is a disappointing lack of support from overseas head office – they will not act until they see the financial impact (Resp9 (this respondent took a 30 percent drop in sales as a result of PI activity)).

> Shows up gaps in the system which creates opportunity for parallel importers (Resp11).

> We will not bring on board any new products for the NZ range unless the supplier can guarantee protections (in terms of assignment of trademark etc) (Resp13 (this was a multi-line importer distributor, not a NZ MNC distributor)).

Thus, there is a strong degree of negativity and certainly in some cases evidence of action to be taken which over time would impact on brand equity and values.

Concerns were noted that, in the case of electrical and electronic goods, parallel imported products (it is alleged) did not appear to be accompanied by the normal certificates of compliance with New Zealand electrical and radiation

regulations that are required by the Ministry of Commerce. Such certification is a normal cost of production for products sourced for the New Zealand market through official channels. When this was queried with the New Zealand Commerce Commission, the organization charged with overseeing the investigation of breaches of much of the consumer protection legislation, the response was that such activity would become an issue for them only if the parallel imported stock was represented as having been checked for compliance when it had not, or that it met New Zealand safety standards when it did not. Thus, the New Zealand Commerce Commission would investigate behavior that was held to be misleading and deceptive conduct or which constituted false representation under the *Fair Trading Act* (1986), Part 1, Sections 10 and 13. It would appear that there might be a potential consumer safety issue that requires further investigation to verify the extent of any potential for serious harm and to determine what regulatory or legislative action might be appropriate.

The official brand controllers vary widely in terms of their attempts to counter parallel imports (see Table I), from attempting to reestablish original price points, to aggressively countering with an integrated marketing strategy aimed at making specific brands unattractive for parallel importers. Several brand owners expressed concern that parallel imports had originated from within their own international organization, stemming largely from inventory control/excess stock problems. Others expressed disappointment that their international controllers had not been proactive in assisting their endeavors to prevent further "attacks". Others reported rapid and effective synchronized international action to locate the source of parallel imported product and to prevent future activity.

The reaction from retailers of official product has also been varied. Obviously, none have welcomed the competition which parallel imports have introduced. Most of the brand owners indicated that their retailers were

| Intended action | Respondents No. | % |
|---|---|---|
| Able to stop future parallel import activity from occurring | 1 | 6 |
| Tighter international controls in place to minimize future parallel import "attacks" | 2 | 13 |
| Cannot take any action – problem stems from company's own inventory control internationally | 3 | 21 |
| Aggressive marketing reaction planned to counter parallel imports each time they are introduced | 2 | 13 |
| Increased promotion of "value added" official product packages to counter "basic" parallel imported offering | 3 | 21 |
| No major action intended/reestablish original price points | 2 | 13 |
| Unsure | 2 | 13 |
| Total | 15 | 100 |

**Table I.** Brand owners/controllers' intended marketing reaction to counter the impact of parallel importing on their brands

concerned, and might reduce promotional support if the practice continued, but were not likely to take drastic action – unless their profits were seriously impacted in the long term. In two cases, however, the retail chains affected by the activity of parallel importers have indicated that they will reduce promotional support of the affected product and that, if the products continue to be subject to parallel importing, the channel members will drop the products entirely. This would leave the products available only through the parallel imported sources, with potentially serious adverse effects on brand equity and profitability.

Generally, the more proactive a brand was in its strategy for countering parallel import activity, and the closer the retailers were involved in both defense and counter-attacking maneuvers, the less likely retailers were to be considering reducing their brand support. However, several retail chains have flagged the possibility that, should the practice continue, they would not rule out becoming involved directly in parallel importing themselves in order to be able to compete.

Discriminatory pricing is not seen as a deliberate tactic by brand owners, who cited New Zealand's weak exchange rate relative to the major international currencies, freight costs from the point of manufacture and/or government imposed duty and goods and services taxes (the latter two making up to 50 percent of the retail price of some products) as the main reasons for the price differences between New Zealand and markets such as the USA and Australia. However, one respondent remarked that:

> Parallel importers are totally price-driven. There is very little consideration of individual brands. I have seen them take brands *out of which they have sucked equity – then discarded the brands* (emphasis added).

In Table II, we record perceptions concerning the price variable. Notably, however, the raw numeric data do not reflect the unease represented by "official" retailers at the incursion of parallel imports.

All brand owners supported the notion that parallel importers gain a free ride on market demand and brand image generated by the official brand controllers. They noted that only high profile brands, and generally key models/lines within brands, had been targeted. They also cautioned that brands could be destroyed in the long term because declining sales through official channels would result in declining promotional support. If this was coupled with reduced support at the retail level, there would be a point at which a brand might become uneconomic for the official agent and/or the retailer to stock. Several respondents referred to brands whose distribution had been taken over by one of the discount store chains in recent years and which had since ceased to exist.

Marketing communication by the parallel importers was also seen as a major concern, being entirely price based, although one respondent noted that, while they believed that The Warehouse added no value to their brand, neither

Brand equity and brand vulnerability



| Factors driving parallel importing | Respondents No. | % |
|---|---|---|
| *a) Respondents who disagree that international price discrimination is a major factor* | | |
| NZ pricing is similar to Australia/other markets but may be impacted by exchange rates | 6 | 40 |
| Price differences due to duties/GST | 2 | 13 |
| Price differences due to NZ's small volumes | 5 | 33 |
| Price differences due to transport costs | 1 | 7 |
| Subtotal: disagree that international price discrimination is a major factor | 14 | 93 |
| *b) Agree that that international price discrimination is a major factor in driving parallel importing* | | |
| NZ pricing is not competitive – needs more competition | 1 | 7 |
| Total | 15 | 100 |

**Table II.** Brand owners/controllers' perceptions of whether international price discrimination is a factor driving parallel importing

did most official retailers. However, almost all respondents as a major concern noted the negative impact of conflicting "value" and brand image messages. Comments such as those below were reiterated again and again during the interviews:

> Impact for the brand is that investment in the brand via its promotion has ceased entirely (Resp1).

> Parallel importers market solely on price – in the long term this not good for anybody because money for R&D and promotion will be dramatically reduced as margins decline (Resp5).

> What parallel importers do in terms of marketing communication simply lowers the image of the brand (Resp9).

Finally distribution via official channels was impacted by parallel imports. Not only did official regular distributors feel "betrayed", 'vulnerable' and "frustrated", but also several respondents echoed the sentiment in the following statement:

> Channel members are hotly against parallel importing – threats have been made to not stock any manufacturers brands for anyone who allows it. Retailers will wipe their hands of product if parallel importing is not minimized.

From a consumer perspective, Fisher (1999) recommends a number of consumer protection legislative amendments, largely directed at ensuring that all parties have full information about parallel imported products. These amendments include:

- Clear labeling of all parallel imported goods. He notes that this recommendation was made in the NZIER (1998, p. 19) report prior to the law change that permitted parallel importing, i.e. where "quality differences could arise, appropriate labeling of the product as originating in the authorized or unauthorized channel should overcome the difficulties".

- Disclosure to customers of parallel importers and their distributors that they are not authorized dealers and that the product is not sourced through the authorized channel. Therefore, the unauthorized agent does not guarantee the goods.

Fisher's recommendations would appear to warrant further investigation.

## Discussion

Table III summarizes those factors which appear, from this exploratory study, to affect the success or otherwise of parallel import activity from the perspective of the parallel importers. In particular we include positive and negative factors stating by interviewees as impacting on specific components of the four Ps of the marketing mix.

## Conclusion: potential brand equity/valuation impact

In terms and of potential brand equity and valuation impact it remains unclear whether consumers will be better or worse off, both in the short and longer term, as a result of parallel importing. What is also unclear is what the impact of parallel importing on consumer perception and the concomitant value of

| Marketing factor | Most successful when: | Least successful when: |
|---|---|---|
| Product | Parallel imported product is positioned/perceived as directly substitutable for official product | Parallel imported product is seen as being old stock/out of fashion/out of date |
| | Quality inferred as being equivalent or consumer is unable (or not given information to allow them) to differentiate between parallel product and official product | Quality of parallel product is able to be observed as inferior to official product |
| Pricing | Parallel imported product is at a substantially lower price (1/2-1/3 of official product) | Parallel product price differential is minimal |
| | | "Value added" by official distributors prevents direct product/price comparison |
| Promotion | Promotional activity centers on image rather than on complexity of technology | Promotional activity centers on technology/continual improvement/rapidly changing technology or the requirement of expert knowledge by retail staff |
| Distribution | No defensive action is undertaken with by the brand owner/controller in conjunction with official retailers | Aggressive defensive action to counter parallel imported product is undertaken by the brand owner/controller in conjunction with official retailers |

**Table III.** Factors affecting the success of parallel importing activity

brands might be. But, one aspect is pronounced and that is that brand values and brand valuation are now receiving far greater scrutiny from official marketers and significant academic and practitioner attention. For example, the Interbrand organization has become a major supplier of brand valuation services. The methodology used by Interbrand to calculate brand value includes financial analysis of brand earning, analysis of the market and key drivers, and analysis of risk factors impacting on brand strength. Risk factors include trend analysis of market stability and brand loyalty. Other factors include the strength of market share, international acceptance and appeal, consistent investment in and focussed support of the brand, and the basis of legal protection such as trademarks (see, for example, Andrew, 1997).

We include the Interbrand factors deliberately at this stage. For, as we have seen in this paper, parallel importing can potentially impact many of Interbrand factors and thus seems likely to impact negatively on brand valuation, where the phenomenon of parallel importing take place. Where brand value is included on balance sheets, or as a note included with balance sheet data, a decline in brand valuation could presage a fall in shareholder value and thus investor attractiveness. It is worth noting that accountant organizations worldwide are still examining the issue of accounting for intangibles (including brand value/valuation), but have as yet failed to reach consensus. Many accountant organizations seem to be divided on the issue.

Clearly, parallel importing and its [perceived] effects on existent brand equity are issues that need wider exposure and research in the marketing and the accountancy literature.

**References**

Aaker, D.A. (1997), "Should you take your brand where the action is?", *Harvard Business Review*, September-October, pp. 135-43.

Ambler, T. (2001), "What does marketing success look like?", *Marketing Management*, Vol. 10 No. 1, pp. 12-18.

Andrew, D. (1997), "Brand strength analysis", in Perrier, R. (Ed.), *Brand Valuation*, 3rd ed., Premier Books, London.

Baldo, A. (1985), "Score one for the gray market", *Forbes*, Vol. 135 No. 4, p. 4.

Bariasa, S. (1988), "Gray marketing war escalates", *Marketing News*, 26 September, pp. 8-9.

Booth, H. (2001), Correspondence regarding disciplinary action against a New Zealand cyber-pharmacy from Deputy Registrar, Pharmaceutical Society of New Zealand, Wellington.

Bronckers, M.C.E.J. (1988), "The exhaustion of patent rights under WTO laws", *Journal of World Trade*, October, pp. 137-59.

Buchanan, L., Simmons, C.J. and Bickart, B.A. (1999), "Brand equity dilution: retailer display and context brand effects", *Journal of Marketing Research*, Vol. XXXVI, pp. 345-55.

Chang, T.Z. (1993), "Parallel importing in Taiwan. A view from a newly emerged country and a comparative analysis", *International Marketing Review*, Vol. 10 No. 6, pp. 30-41.

Davison, M.J. (1992), "The market for sound recordings: open or closed", *Australian Business Law Review*, February, pp. 30-40.

Dawar, N. and Pillutla, M.M. (2000), "Impact of product-harm crises on brand equity: the moderating role of consumer expectations", *Journal of Marketing Research*, Vol. XXXVII, pp. 215-26.

Duhan, D.F. and Sheffert, M.J. (1988), "Gray markets and the legal status of parallel importing", *Journal of Marketing*, Vol. 52, July, pp. 75-83.

Eagle, L.C. and Kitchen, P.J. (2000), "Building brands or bolstering egos? A comparative review of the impact and measurement of advertising on brand equity", *Journal of Marketing Communications*, Vol. 6 No. 2, pp. 91-106.

Ewart, D. (1998), "Parallel importing – threat or opportunity?", paper presented to the Employers and Manufacturers' Association Seminar on Parallel Importing, Auckland, 20 November.

Feldwick, P. (1996), "What is brand equity anyway and how do you measure it?", *Journal of the Market Research Society*, Vol. 18 No. 2, pp. 85-104.

Fisher, S. (1999), "The impact of parallel importing on consumer law", Bachelor of Laws (Hons) dissertation, The University of Auckland, Auckland.

Kitchen, P.J. (2002), "Integrated marketing and corporate communications", Editorial, *Corporate Communications: An International Journal*.

Kitchen, P.J. and Schultz, D.E. (2001), *Raising the Corporate Umbrella: Corporate Communications in the 21st Century*, Palgrave, Basingstoke.

Krieger, R.H. and Tansuhaj, P.S. (1988), "Gray marketing. Not all black and white", *Marketing News*, Vol. 19 No. 18, p. 7.

Malueg, D.A. and Schwartz, M. (1994), "Parallel imports, demand dispersion and international price discrimination", *Journal of International Economics*, Vol. 37, pp. 167-95.

Maskulka, J.M. and Gulas, C.S. (1987), "The long-term dangers of gray-market sales", *Business*, Vol. 37, January-March, pp. 25-31.

Mathur, L.M. (1995), "The impact of international gray marketing on consumers and firms", *Journal of Euro-marketing*, Vol. 4 No. 2, pp. 39-59.

Michael, J. (1998), "A supplemental distribution channel? The case of US parallel export channels", *Multinational Business Review*, No. Spring, pp. 24-35.

Mitchell, A. (1999), "Customer rights a gray area in distribution ban", *Marketing Week*, 23 July, pp. 30-1.

NZ Institute of Economic Research (NZIER) (1998), "Parallel importing: a theoretical and empirical investigation", Report to Ministry of Commerce, Working Paper 98/4 98/4, New Zealand Institute of Economic Research, Wellington.

Palia, A.P. and Keown, C.F. (1991), "Combating parallel importing views of US exporters to the Asia-Pacific region", *International Marketing Review*, Vol. 8 No. 1, pp. 47-56.

Rotherham, F. (1999), "Prophets of parallel importing doom proved wrong", *The Independent*, 10 March, pp. 24-5.

Samiee, S. (1998), "The Internet and international marketing: is there a fit?", *Journal of Interactive Marketing*, Vol. 12 No. 4, pp. 5-21.

Schultz, D.E. and Gronstedt, A. (1997), "Making Marcom an investment", *Marketing Management*, Vol. 6 No. 3, pp. 40-9.

Schultz, D.E. and Kitchen, P.J. (2000), *Global Communications: An Integrated Marketing Approach*, NTC Business Press and Palgrave Business, Chicago, IL and Basingstoke.

Sookman, B. (1990), "Can gray marketing be stopped?", *Computing Canada*, Vol. 16 No. 4, p. 48.

Tan, S.J., Lim, G.H. and Lee, K.S. (1997), "Strategic responses to parallel importing", *Journal of Global Marketing*, Vol. 10 No. 4, pp. 45-66.

Tapsell, S. (1998), "The Deloitte/Touche management executive of the year", *Management*, December, pp. 32-5.

(The) Warehouse Group (1998), *Annual Report*, The Warehouse Group.

(The) Warehouse Group (1999), *Annual Report*, The Warehouse Group.

(The) Warehouse Group (2000), *Annual Report*, The Warehouse Group.

West, D. (1998), "On-line prescriptions have adverse reactions", *Pharmaceutical Executive*, Vol. 18 No. 11, p. 28.

Wood, J. and Rupright, P. (1997), "Erosion of the learned intermediary rule", *Pharmaceutical Executive*, Vol. 17 No. 10, pp. 104-10.

Yoo, B. and Donthu, N. (2000), "Developing and validating a multidimensional consumer-based brand equity scale", *Journal of Business Research*, Vol. 52, pp. 1-14.

**Further reading**

Ambler, T. (2000), *Marketing and the Bottom Line: The New Metrics of Corporate Wealth*, FT Prentice-Hall, London.

Blackston, M. (2000), "Observations: building brand equity by managing the brand's relationships", *Journal of Advertising Research*, November/December, pp. 101-5.

Cavusgil, S.T. and Sikora, E. (1988), "How multi-nationals can counter gray market imports", *Columbia Journal of World Business*, Vol. 23, Winter, pp. 75-85.

Ministry of Health (2000), "New regulations controlling internet drug sales", Press Release 2, Ministry of Health, Wellington, November.

New Zealand Government (1993), *Consumer Guarantees Act*, New Zealand Government.

Picard, J. (1996), "The legality of international gray marketing. A comparison of the position in the United States, Canada and the European Union", *Canadian Business Law Journal*, Vol. 26, pp. 422-36.

Weigand, R.E. (1991), "Parallel import channels – options for preserving territorial integrity", *Columbia Journal of World Business*, Spring, pp. 53-60.