EXHIBIT 439

# Strategies to combat the sale of gray market goods

**Barry Berman**
*Walter H. "Bud" Miller Distinguished Professor of Business, Hofstra University, Hempstead, New York (mktbxb@hofstra.edu)*

**The gray market may result in increased competition to consumers, but the huge price differences between gray market goods and those distributed through authorized channels can badly disrupt** a firm's established distribution channels. Other related problems are the erosion of traditional pricing strategies, problems in getting support from authorized resellers, and difficulty in developing and maintaining a global image. By understanding the causes of gray markets, a firm can develop proactive and reactive strategies to reduce the level of this troublesome activity. The checklist provided here can assess the firm's readiness to engage in such a fight.

In contrast to black market, stolen, or counterfeit goods, gray market goods are genuine in terms of their manufacture. Their controversial nature stems from their being sold through distribution channels that have not been authorized by the product's manufacturer or trademark owner. The goods can be either domestic or foreign. With domestic goods, an authorized reseller sells them to an unauthorized channel that resells them domestically. In contrast, foreign gray market goods that bear a valid US trademark are imported into the United States without the approval of the US trademark owner. They are purchased abroad and are never intended for sale in the US. The distribution channels for both domestic and foreign gray market goods are also referred to as parallel channels, product diverting, and even arbitrage since at least one reseller in the distribution channel is not an authorized distributor.

No single study has estimated total gray market activity, but a number of studies have made the attempt in selected industries. It is difficult to combine the estimates because of the different time horizons, the use of varying methodologies, and the overlapping product categories. However, a glimpse at the current size of the problem can be seen by taking a look at the following examples.

- A study of manufacturing exporters by Myers and Griffith (1999), published in *Business Horizons*, found that every one of the world's eight major export regions had experienced gray market activity detrimental to operations. While the extent of the activity varied by region, 13 percent of firms in North America, including Mexico, reported some degree of it.

- There are published reports of gray marketing in quite a wide variety of product categories: pharmaceuticals, cosmetics, consumer electronics, photography equipment, clothing, information technology (IT) products, automobiles, industrial and commercial machinery, coaxial cable, and telecommunication equipment.

- One trade group, the Anti-Gray Market Alliance, in conjunction with a 2003 study by KPMG, estimates the

gray market for IT products alone to be over $40 billion. The KPMG study was based on reports from 43 IT-authorized distributors and resellers: 23 in the Americas, 15 in Europe, and five in the Pacific Rim, as well as 10 organizations engaged in brokerage activities. The report states that IT manufacturers can lose up to $5 billion in profits on an annual basis due to the gray market.

- In the automotive industry, according to the National Traffic Safety Administration, some 200,000 gray-market vehicles were exported from Canada to the United States in 2001—up from only 16,000 in 1996, reports Kurylko (2002b, c).

- Although there are no concrete data on the gray market demand for textbooks, a recent front page *New York Times* article by Lewin (2003) states that gray market sales of textbooks are "taking off on campuses." One Web-based company now specializes in selling textbooks to students from abroad. Students have also begun to compare textbook prices posted on American websites such as amazon.com, with lower prices for the same textbooks offered by amazon.co.uk.

This article examines the current magnitude of the gray market, the potential for increased activity in it, and the risks of such activity to marketers and consumers alike. It will also discuss several sources of the problem, as well as strategies to combat gray market sales.

# The potential for increased gray market activity

**D**espite the size of the gray market in many industries, there is high potential for still greater activity. Several recent legal cases in the United States and Europe have lessened the ability of trademark owners to restrict foreign goods from being resold to unauthorized resellers. The increased popularity of the Web as an informational and transactional mechanism will substantially facilitate gray market transactions. And free trade areas such as NAFTA lower transfer costs among members.

## Legal cases that stimulate gray market activity

Several court cases have recently reduced the impact of legal strategies that in the past were successful in stopping foreign gray market goods from entering the United States. In a landmark case in 1993, *Lever Brothers v. US* established the legal principal that a company may ask the US Customs Service to stop imports at the port of entry if there are drastic differences between the goods sold in the United States and abroad. In 1999, the Customs Service

adopted a new gray goods rule that now allows for importing "physically and materially" different goods, provided a label is affixed to them stating that "[t]his product is not the product authorized by the US trademark owner for importation and is physically and materially different

*Web-based gray marketers can also advertise merely by using the product's brand name or model number on their websites and waiting for search engines to direct consumers there.*

from the authorized product." While such a label may deter a consumer from purchasing a foreign gray market good, trademark owners can no longer bar goods based on physical differences among products.

In the heavily cited case *Quality King v. L'anza*, the Supreme Court unanimously ruled in March 1998 that gray marketers that have acquired lawful title to goods manufactured in the United States are protected by the "first-sale" doctrine. Prior to the *L'anza* decision, there were conflicting court rulings on whether copyrighted products exported to the United States could be barred from resale there. Under the first-sale doctrine, once a copyright owner initially sells its US-manufactured goods, it no longer has the legal right to control their distribution. As a consequence of this case, manufacturers can no longer use copyright protection as a means of preventing a product from being exported from the US and then reimported back. Clarke and Owens (2000) note that this ruling does not apply to cases in which the potentially infringing product was manufactured abroad.

Legal cases in Europe have also raised the potential for gray marketing. A major European case involved Levi Strauss & Co. attempting to stop UK-based Tesco, a major supermarket chain, from selling gray market Levi's jeans. According to Rhine (2001), the European Court of Justice ruled in directive 89/104 that Levi Strauss cannot restrict how Tesco acquires jeans within the EU, but can prohibit Tesco from acquiring goods from elsewhere (such as the United States). This opens the door for European merchants to increase gray market activity providing that the origin of goods is within the European Community.

B. Berman / Strategies to combat the sale of gray market goods

## The Web's potential to stimulate gray market activity

The World Wide Web has also drastically increased the gray market potential for both domestic and foreign goods. As an information medium, it raises a customer's awareness of special offers that were initially designed to be limited to specific regions, countries, or classes of customers such as OEMs. Web-based gray marketers can also advertise merely by using the product's brand name or model number on their websites and waiting for search engines to direct consumers there.

Gray marketers can pay for presence on shopping bots, such as mysimon.com, cnet.com, shopping.yahoo.com, or bottomdollar.com, which present price quotations from multiple merchants. Most of these shopping bots include dealer ratings as a means for a potential customer to assess each merchant. For example, a consumer seeking to buy a $5,000 watch can price it around the world. Some electronic distributors have even set up online trading communities, such as spotmarket.com and NCEX.com, to help sell surplus inventory.

A good example of the Web's potential as a distribution medium for gray market goods is www.yesmoke.com, a site that sells popular tobacco brands produced overseas at half the American price. The site's low prices are due to the nonpayment of state and city excise cigarette taxes that can be as high as $3 per pack. According to Byrnes and France (2002), Forrester Research predicts online tobacco sales to grow from $750 million in 2001 to around $5 billion in 2005.

## NAFTA's potential to stimulate gray market activity

The free flow of goods among NAFTA countries with no tariffs or duties, and the geographic closeness of Canada and Mexico to major US markets, reduce transfer costs between these markets. Moreover, currency valuation differences among these countries often provide the impetus for foreign gray market activity. Myers and Griffith found that 87 percent of the firms indicating high unauthorized import activity in NAFTA markets identified Mexico as the country of origin, versus 13 percent identifying Canada.

The low prices on cars in Canada have also created a significant gray market in the United States. According to the North American Automobile Trade Association, reports Brent (2002), cars are 20 to 35 percent cheaper, or an average of $4,000 less in Canada than in the United States. This accounts for the 200,000 gray market vehicles exported from Canada to the US in 2001, as noted earlier.

# Gray market risks

**M**any managers and such academics as Prince and Davies (2000) argue that from a consumer perspective, the gray market results in increased competition, offers consumers lower-priced alternatives, and sells goods of equal quality to those sold through authorized channels. From a common managerial perspective, however, price differences can be so large that they cause considerable disruption within a firm's established distribution channels. Havoc is wreaked particularly when a gray market product's retail price is less than the wholesale cost for that distributed through authorized channels, or when the gray market wholesale price is less than the price charged to an authorized reseller. The KPMG study cited earlier reports that the size of the price advantage among IT goods can be significant. Among IT distributors with an average profit margin of 2 percent, price differences of gray market goods can be 30 percent or more. KPMG found that 35 percent of distributors reported receiving price benefits of at least 30 percent.

Large price differences have also been reported in gray market vehicles and microprocessors. "There is too much of a difference to ignore," said an auto dealer that regularly sells Canadian gray market Chryslers in the US (Kurylko 2002a). He reported that a loaded Dodge Grand Caravan Sport with a sticker price of $28,600 in the United States cost US$18,700 in Canada. Recently, a former regional Intel distributor noted that it was able to purchase a Pentium 4 processor from a gray market distributor for almost $50 less than what it would have paid through Intel as an authorized distributor. As a result, reports Moltzen (2003), the distributor quit representing Intel.

While the gray market can lead to additional short-run sales revenues for manufacturers, the potential disruption is generally long-term in nature. **Figure 1** lists a few of the long-term channel-related difficulties associated with gray market sales. Again, the low prices offered by gray mar-

**Figure 1**
**Difficulties associated with gray market sales**

- Erosion of a firm's traditional pricing strategy
- Problems in obtaining support from authorized resellers who "play by the rules"
- Erosion of a brand's image
- Difficulty in developing and maintaining a global image
- Less control over a firm's overall marketing strategy

keters may cause consumers to view the authorized re-seller's price as being too high. And while an authorized dealer may be contractually obliged to run a complete service facility, purchase a manufacturer's full product line, participate in cooperative advertising, and handle product recall responsibilities, gray marketers typically do not bear any of these obligations. Unfortunately, such augmented services may mean little to a price-conscious consumer. Continued low prices on gray market goods can also devalue a brand name whose image is associated with premium prices, as well as undermine a manufacturer's established list price and discount structure.

The gray market can generate difficulty in obtaining support from authorized dealers, who are particularly resentful of the pricing structure differences if a significant degree of free riding occurs. With free riding, customers visit authorized dealers for product information and then buy cheaper goods from gray market dealers. As a result, the latter benefit from the advertising, display, and sales support of the authorized dealers. According to the KPMG study, 81 percent of the IT distributors surveyed said their competitive position would improve if all gray market activity were eliminated. Likewise, the head of the Dodge dealer council stated, "It burns me that someone right down the street with no franchise and no technicians—who hasn't made the investment I have—can sell the same car I do for $3,000 or $4,000 less than I do" (Kurylko 2002c).

The erosion of a brand's image due to gray market activity may be the result of frequent sales at a low price, the existence of instructions in a foreign language, the absence of replacement parts for foreign goods, poor product quality (due to problems in the way foreign goods are stored and handled), and no manufacturer control over reseller selection. Because gray market sales are made through unauthorized channel members that have never been evaluated by their suppliers, some gray marketers can engage in unscrupulous behavior, such as selling factory-remanufactured goods as new, repairing goods with parts manufactured by independent firms, selling supplies not made by the manufacturer, and improperly adapting products to meet US safety standards.

Gray marketing can generate problems for firms seeking to build a global brand. With traditional channels, a marketer controls which product version is sold in a given country. In contrast, with gray market goods, products with different tastes, consistencies, and sizes may be sold in a country where the product was never intended to be resold. For example, chocolate made for the UK market tends to be sweeter than chocolate sold in the rest of Europe. In other European markets with very warm climates, chocolate contains chemicals to retard melting, which also affects taste. Thus, says Benady (2003), two chocolate bars sold in the same country—one on the gray market, the other through traditional channels—may have different tastes.

Finally, the gray market can result in a firm having less control over its marketing strategies. As stated earlier, because gray marketers are unauthorized dealers, manufacturers have no control over their selection or continuance. The traditional rewards and sanctions used by a firm to control its distributors are not present. Gray market activity can also affect other areas of market planning, such as a firm's new product introduction plans. For example, Coca-Cola was recently forced to move up the product launch date for Vanilla Coke in the UK after dis-

---

**Figure 2**
**Some examples of the causes of domestic gray market activity**

To boost sales, a manufacturer develops an especially attractive quantity discount structure. To get the added discount, major resellers must purchase more goods than they can possibly sell. They then sell excess quantities to unauthorized dealers—generally at less than wholesale, but still enough to secure a small profit. RLM, a regional Intel distributor, recently quit when gray market distributors were able to outprice it by obtaining goods that received quantity discounts (Moltzen 2003).

A disk drive maker sells components to a manufacturer based on volume targets with the expectation that its goods will be incorporated into the manufacturer's final product. The manufacturer may commit to purchasing just enough to get the discount, even though the level is above its sales expectations. The manufacturer then sells the excess inventory to unauthorized resellers (MacInnes and Kunert 2002).

A grocery manufacturer, participating in a month-long promotion offers low prices to resellers that agree to pass on the savings to final consumers during the promotion. In a practice known as forward buying, resellers order large quantities during the final days of the promotion with the expectation of selling some of the excess inventory to other retailers.

A manufacturer sells goods to a government agency or a nonprofit organization at an especially attractive price. Some of these goods may be resold by the customer to compete with the manufacturer's traditional goods.

A marketer that improperly forecasts sales on a key item needs a way to sell excess inventory quickly. Even Cisco Systems, a founding member of the Anti-Gray Market Alliance (AGMA), sold off billions of dollars in excess inventory to gray market resellers after the collapse of the networking market in 2000 (MacLellan 2003).

---

covering that the product had been sold in London and the Southeast six months prior to its official launch date. The goods, says Benady, had been imported from Canada via the gray market.

## Risks to gray market consumers

Due to nontraditional channels handling the products, gray markets have a greater chance of selling damaged, counterfeit, and out-of-date goods. According to the KPMG study, more than three-quarters of the IT distributors surveyed said they were concerned about selling gray market products because of poor quality and support issues, whereas 92 percent were concerned that the products could be counterfeit.

The New Jersey Parking Authority's experience highlights one of the risks of gray market products to an experienced consumer. Recently, the NJPA purchased $70,000 worth of Motorola two-way radios. Many did not work well; some quit working altogether, while others picked up messages between New York City Police Department officers in Brooklyn. After contacting Motorola, the NJPA found out that the radios had never been certified by the FCC for use in the United States because they were made in Asia for use in Asia, Europe, and Latin America.

# Whence gray markets and their products?

The conditions necessary for gray market activity are similar to those in arbitrage, in which the same financial security is sold at the same time at different price levels in different financial markets. In either foreign or domestic gray marketing, the price differentials across markets must be great enough to justify the costs associated with buying a good in one market and selling it in another. However, unlike financial securities, a gray marketer may have significant transportation and holding costs and deal with goods that have different brand names, are labeled in different languages, and need to be modified to meet a country's safety standards. The basic principle is that significant price differences between markets is the stimulus for gray marketing.

Through an understanding of the causes of gray markets, a firm can develop strategies to reduce the level of such activity. The causes are somewhat different for the domes-

> **Figure 3**
> **Some examples of the causes of global gray market activity**
>
> There are major differences between prices for goods between two countries due to exchange rates, economic conditions, wealth, and competitive conditions. As a result of different price levels across markets, resellers transship goods. For example, automakers defend low prices to the Canadian market on the basis of Canada's lower incomes and higher sales and excise taxes. According to Chrysler's vice president of business operations, "If we priced the same way in Canada [as in the United States], all we would sell would be Neons and regular-line vehicles" (Kurylko 2002a). A Ford spokesman defended its lower prices in Canada, stating, "Pricing varies by regions and markets around the world based on different content, marketing strategies, and the competitive environment" (Kurylko 2003).
>
> Pharmaceutical marketers in the EU are constrained by regulated prices that open up opportunities for gray marketers (Chen 2002).
>
> A manufacturer that is stuck with excess inventory decides to sell it abroad so as not to "spoil the domestic marketplace." Some of these goods are then transshipped back to the United States.

tic and global varieties. The KPMG study found that IT distributors and brokers obtain products to sell to the gray market by violating distribution agreements, misrepresenting customer identity in special discount programs, or using fraudulent documentation to acquire the goods from authorized sources to sell on the gray market. Of the manufacturers surveyed, 62 percent identified situations in which products that were discounted for a specific use were not delivered to the appropriate end user.

**Figure 2** outlines some of the major causes of domestic gray marketing. These include quantity discount schedules, volume targets, forward buying by resellers, low prices to special classes of customers, and the need to liquidate large inventories due to overly optimistic sales projections and bloat. Four of the five domestic causes relate to price differentials designed to increase sales to authorized channel members. Ironically, a firm's internal sales force is typically rewarded for the increased sales that lead to gray marketing.

The sources of foreign gray marketing are somewhat different (see **Figure 3**). They are based largely on the need to charge different prices to different countries or regions based on wealth, excise taxes, competitive environments, or government price caps in certain markets (such as on pharmaceutical products in the EU). Unfortunately, some of the goods exported to foreign countries are transshipped back to the United States. Unauthorized resellers can purchase goods from authorized resellers or manufacturers in a foreign country. Foreign wholesalers or manufacturers are unaware that goods will be shipped to the United States.

**Figure 4**
**Proactive channel strategies to reduce the impact of gray market goods**

PROACTIVE SUPPLY SIDE STRATEGIES

- Evaluate the quantity discount schedule and price strategy by market area to reduce gray marketing incentives. Reduce price differentials to be so small that gray marketing would not be profitable. For example, keep the differential less than the cost of shipping and inventory holding costs.

- Differentiate·products sold to different markets. Have products tailored to meet a region's unique regulatory requirements. Use foreign labels. Assign unique product numbers and names to foreign products. This provides legal rights in foreign gray market cases and reduces the consumer attraction of gray market goods. Set up a cross-border program.

- Carefully check out existing and new distributors. Be wary of new accounts, especially a new overseas distributor that wants all instructions printed in English. Make distributors sign agreements restricting their right to resell goods. Use compliance audits on a routine basis.

- Use the Web to facilitate surveillance. By searching the Web, a marketer can determine the extent of sales by unauthorized resellers, the nature of price discounts, and the names and locations of gray marketers.

- Deter diversion through labeling with holograms, lasers, microthreads, polarized glass, and electronic chips. This serves as both a deterrent and a reactive strategy to identify transshippers.

PROACTIVE DEMAND SIDE STRATEGIES

- Make customers aware of the risks of buying gray market products.

- Offer rebates on authorized goods to reduce the price differential between them and gray market goods. The amount of the rebate should be based on price differences across global markets.

# Channel strategies for limiting gray market activity

Despite the pervasiveness of gray marketing, the KPMG study found that only 33 percent of manufacturers surveyed have resources fully dedicated to handling gray market issues. Moreover, management of those issues is typically left to sales and marketing groups, in which compliance is not the first order of business. For example, only slightly more than half of the survey respondents use advisers to help perform audits of channel partners. Likewise, Myers and Griffith concluded that "despite the tremendous amount of gray market activity going on in the global marketplace, few firms have instituted strategies to minimize that vulnerability."

In an effort to control gray marketing, IT companies such as 3Com, Cisco Systems, Compaq, Hewlett-Packard, Jupiter Networks, Nortel Networks, and Xerox have formed the Anti-Gray Market Alliance (AGMA). Comprising members with combined annual revenues of over $140 billion, AGMA conducts educational seminars, is a contact point for resellers to report unauthorized gray market sales, and serves as a public policy advocate.

There are two kinds of strategies companies can take to discourage gray marketing. Proactive strategies are designed to limit the activity before it starts. In contrast, reactive strategies consist largely of legal action to stop it once it has begun.

## Proactive strategies

As shown in **Figure 4**, proactive strategies consist of reducing price differences across markets, differentiating products sold to different markets, checking out new and existing distributors carefully, using the Web to facilitate surveillance, deterring diversion through labeling, educating consumers, and developing rebate programs. The first five of these are supply-side based, meaning they are designed to limit the quantity of gray market goods. The last two are demand-side based, focusing on consumers and rebates. Many reseller strategies aimed at limiting the presence of gray market goods are applicable to both domestic and foreign products.

Because both domestic and foreign gray market activity are forms of market arbitrage, one obvious deterrent is to reduce the price differentials between market areas and adjust a firm's quantity discount schedule to thwart transshipping. For example, there is no economic reward for gray marketing when the price difference between two market areas is so small that it is less than shipping and

inventory holding costs. An extreme example of a strategy to eliminate gray market activity is the Moët Hennessy Louis Vuitton (LVMH) decision to price its TAG Heuer and Christian Dior watches the same worldwide. According to the firm's chairman, the strategy "will dry out temptations for the gray market" ("Top Swiss..." 2002).

A second strategy is to differentiate products sold to different markets. Thus, products in markets with historically low pricing can have unique specifications, model numbers, and brand names. This makes it easy for customers to recognize transshipping. For example, AMD bundled its processors with heat sync, thermal interface, and an installation manual. Each configuration and box is unique to a specific traditional channel. Canon uses different names and model numbers for cameras sold in lower-priced European and Asian markets. In contrast, Epson uses the same product configuration. According to a UK dealer of Epson printers, "Epson knows about the [gray market] problem, but tells us to carry on and it will try and sort the situation out. The problem is the products are identical, with the same software manuals and even U.K. power leads" (MacInnes and Kunert 2002). Other firms also contribute to the gray market by using switching power supplies that can operate at any line voltage without converters.

Manufacturers can deter gray market goods by carefully checking their new and existing distributors. For example, they can employ cargo inspection firms to verify that foreign shipments actually are delivered to their specified location. They can also conduct compliance audits on an unscheduled basis to verify that goods have actually been sold to local final consumers.

Ironically, even as the Web stimulates gray market activity, it also makes surveillance relatively easy. For example, manufacturers can easily search the Web to determine the extent of sales by unauthorized resellers and the nature of price discounts, as well as the names and locations of gray marketers. They can also purchase gray market goods on the Web to determine their condition and possibly trace their origin.

Manufacturers can use their marketing information system to monitor above-average purchases by specific wholesalers and retailers. Some manufacturers even hire investigators to approach wholesalers and retailers with offers to buy merchandise for diversion; www.investigation.com and www.pica.net are two sites that offer information and services for such a tactic. Despite the importance of these deterrents, audits of channel partners are apparently rarely done. For example, only slightly more than half of the KPMG survey respondents use advisers to help perform such audits.

Product labeling with holograms, lasers, microthreads, polarized glass, and electronic chips can also serve to

deter gray marketing by tracing diverted products to specific resellers. Sebastian International has an anti-diversion holographic labeling program that can track down distributors and salons that sell its hair care products to unauthorized retailers. "We have the ability to trace every pallet, carton, and case to our distributors and to our salons," says Mark Riedel, Sebastian's general counsel. "So when our product is being sold in an unauthorized location, we're able to record the codes and find out where the leak in the system was" (Baginski 2003).

*Manufacturers can easily search the Web to determine the extent of sales by unauthorized resellers and the nature of price discounts, as well as gray marketers' names and locations. They can also buy gray market goods on the Web to determine their condition and possibly trace their origin.*

Manufacturers can also track down transshippers through a product's serial numbers, warranty card information, and factory rebate data. Some manufacturers and wholesalers take a more aggressive position and employ "shoppers" to purchase products from unauthorized resellers. Manufacturers and wholesalers should make resellers aware that they carefully monitor all reselling activity and will take away distributor or dealer status from authorized representatives that transship goods.

Consumer education and the use of rebates are two demand-side means of reducing gray market activity. Wella warns consumers of buying its products outside of professional beauty supply stores and licensed beauty salons. According to its website (www.wellausa.com), "diverted products usually pass through so many hands, travel great distances, have been marked up 5 to 6 times before they finally make their way onto the retailer's shelves." As a result, the product is often old or damaged. Likewise, Kodak uses its website (www.kodak.com) to report that it is "unable to govern the conditions under which these products are shipped. Film is very sensitive to heat and humidity, which means by the time a gray market film reaches you, it may be an inferior product."

Olympus (www.olympus.com) warns consumers about conflicting standards (PAL in Europe vs. NTSC in the United States), lack of warranty coverage, and absence of technical support. The Olympus website also provides details on how to recognize American products.

Manufacturers can also selectively use rebates to lower the price differential between goods sold through authorized dealers and gray market goods. Canon USA and Nikon USA each sell to dealers that sell both types of imports,

> *In addition to the sales force, finance personnel can be on the lookout for increased potential global gray market sales due to currency valuation shifts, the legal department can explore the firm's legal options to deter transshipping, and production personnel can evaluate other measures to trace diversion.*

and they both employ rebates that make the price differential so small that many final consumers, advanced amateurs, and professional photographers would be reluctant to purchase gray market products. For example, rebates on Nikon cameras and lenses range from $25 to $400; on Canon products, they range from $15 to $150. These rebates are so attractive that in some cases US imports after rebates are the same price or within $10 of the price for comparable gray market goods.

The attraction of a rebate over a reduction in list price is that the rebate is flexible; the amount and duration can change with market conditions. Moreover, the rebate does not reduce a reseller's inventory value. Some manufacturers also offer special financing plans, leasing options, and warranty programs that are not applicable to gray market products.

## Reactive strategies

The reactive strategies for fighting gray marketing once it has occurred are largely legal in nature. Many defenses are best applicable when gray marketers sell goods that differ

materially from the manufacturer's domestic goods, or when they seek to confuse customers. Trademark and state consumer protection laws can provide a basis for protecting manufacturers in such cases.

A firm that differentiates products across markets also receives additional legal protection. According to the Lanham Act, gray marketers are free to use a product's trademarked name as a means of describing products they sell. However, if goods are materially different from manufacturers' domestic goods, note Viscounty, Risher, and Smyser (2001), manufacturers can claim that the advertising confuses customers.

Customs officials permit the seizure of any gray market product import under the Lanham Act when there are physical and material differences between it and authorized distributors' goods. The gray marketers can retrieve the product only after adhering a label stating that it is unauthorized and is physically and materially different. In addition, state consumer protection laws in California, New York, and other states require retailers to disclose to consumers such product information as incompatibility with US standards, lack of a manufacturer's warranty, and lack of instructions in the English language. Manufacturers can determine whether gray marketers have complied with these regulations.

Legal actions, of course, may be quite costly and are not always successful. Suing transshippers for breach of contract, warns Rubenstein (1998), is difficult to enforce for two reasons. First, some gray market distributors may also be good customers for authorized products. Second, in breach-of-contract cases, lost income due to diminished sales or lower prices must be proved. In the case of Canadian cars transshipped to the United States, Ford Motor Company has sought to charge back the price difference between US and Canadian dealer invoice prices to Canadian dealers whose cars are sold to US residents. However, several dealers have successfully challenged these chargebacks in Canadian courts.

**H**ow ready are companies to fight the battle of the gray markets? **Figure 5** is a checklist that enables managers to assess corporate readiness in this regard. By answering each question objectively, managers can determine where their firm's specific strengths and weaknesses lie.

Gray markets need constant vigilance because they can grow very quickly due to shifts in currency valuations, economic conditions, and so on. For example, the proper time to deter the gray market activity for vehicles from Canada was in 1996, when the market was relatively small, was not as well organized as in 2001, and had less impact on sales through authorized channels.

B. Berman / Strategies to combat the sale of gray market goods

Companies must develop an organizational structure to identify and then seek to limit both domestic and global gray market sales. They should be wary of placing responsibility solely within the sales organization. Although the sales force knows the current distributors best and is closest to the market, it is rewarded by sales results. It may be reluctant to lose, say, quantity discounts and forward buying that increase sales at the expense of greater exposure to gray market activity.

One approach is to use a team with members from the sales, finance, legal, and manufacturing departments. In such a format, finance personnel can be on the lookout for increased potential global gray market sales resulting from currency valuation shifts, the legal department can explore the firm's legal options to deter transhipping, and production personnel can evaluate alternative measures to trace diversion.

Firms also need to consider whether the same organization structure should be employed for both domestic and global gray marketing activity, since the causes and legal remedies are so different. Finally, they need to consider whether to outsource some of the functions to investigative services that identify transhippers and to legal firms that specialize in stopping foreign gray market activity using such defenses as Lanham Act violations. ○

**Figure 5**
**Assessing a firm's readiness to combat gray market sales**

*Answer yes or no to each of the following questions:*

☐ Do you study price differences across markets?
☐ Do you examine your quantity discount schedule to evaluate opportunities for gray marketers?
☐ Do you differentiate products sold to different markets?
☐ Do you train employees to help them recognize potential gray market sources?
☐ Do you check out new and existing distributors carefully?
☐ Do you make distributors sign agreements restricting their right to resell goods beyond specific regions or to different customer classes?
☐ Do you use compliance audits to verify that distributors have not trans-shipped goods?
☐ Do you periodically audit channel partners to verify that goods are sold to local customers?
☐ Do you periodically search the Web to determine the extent of sales by unauthorized resellers, the nature of price discounts, and the names and locations of gray marketers?
☐ Do you use "shoppers" or private investigators to seek to purchase goods from unauthorized resellers?
☐ Do you examine your marketing information system to monitor for above average purchases from suspect distributors or retailers?
☐ Do you seek to deter diversion through product labeling (e.g., with holograms, lasers, microthreads, polarized glass, and electronic chips)?
☐ Does your firm have an appropriate organization for handling the gray market?
☐ Do you seek to deter diversion through consumer education?
☐ Do you seek to deter diversion through the use of selective rebates?
☐ Do you monitor legal cases involving gray marketing to better understand deterrents?
☐ Are you prepared to sue gray marketers using the Lanham Act?
☐ Do you seek to stop gray market activity through use of state consumer protection laws?

## References and selected bibliography

B&H ad. 2003. *Shutterbug* (November): 18-19.

Baginski, Laura. 2003. Label helps curb diversion. *Packaging World.* @ www.packworld.com/articles/Features/9916.html (14 July).

Benady, David. 2003. Uncontrolled immigration. *Marketing Week* (20 February): 24*ff.*

Brent, Paul. 2002. Auto dealers in push to stamp out grey market. *Financial Post* (12 September): FP1.

Byrnes, Nanette, and Mike France. 2002. Suddenly, Philip Morris isn't smoking. *Business Week* (2 December): 50*ff.*

Chaudhry, Peggy E., and Michael G. Walsh. 1995. Gray marketing of pharmaceuticals. *Journal of Health Care Marketing* 15/3 (Fall): 18-23.

Chen, Hsiu-Li. 2002. Gray marketing and unfair competition. *Atlantic Economic Journal* 30/2 (June): 196-204.

Clarke, Irvine III, and Margaret Owens. 2000. Trademark rights in gray markets. *International Marketing Review* 17/3: 272-286.

The global economy's gray-market boom. 2000. *Business Week OnLine.* @ www.businessweek.com (30 November).

Guilford, Dave. 2002. GM takes hard line on gray market. *Automotive News* (22 July): 1, 9.

Horowitz, Ethan, and Karin Segall. 1998. Preventing grey goods after Quality King. *Managing Intellectual Property* 83 (October): 17-21.

KPMG. 2003. The grey market: A KPMG study in cooperation with the Anti-Gray Market Alliance. @ www.unternehmens restrukturierung.com/library/english_language_publications/pdf/greymarket.pdf

Kunert, Paul. 2002. AMD makes dent in grey sales. *MicroScope* (9 July): 8.

Kurylko, Diana T. 2002a. DCX hits back at gray market; warranties won't be honored on '03 models. *Automotive News* (20 May): 1.

———. 2002b. Ford can't fine dealer in gray case. *Automotive News* (4 March): 1*ff.*

————. 2002c. Gray market yields gold. *Automotive News* (25 February): 1, 35.

————. 2003. Suit blasts gray market restrictions. *Automotive News* (24 February): 1*ff.*

*Lever Brothers Co. v. US.* 1993. 981 F2d 1330 (D.C. Cir.).

Lewin, Tamar. 2003. Students find $100 textbooks cost $50, purchased overseas. *New York Times* (21 October): A1, A18.

MacInnes, Billy, and Paul Kunert. 2002. Channel suffers while vendors turn a blind eye. *MicroScope* (2 April): 21.

MacLellan, Andrew. 2003. The gray market may have its problems, but coming up with a viable alternative isn't easy. *EBN* (10 March): 26.

Moltzen, Edward F. 2003. No gray area: RLM quits as Intel distributor. *CRN* (26 May): 6, 14.

Myers, Matthew B., and David A. Griffith. 1999. Strategies for combating gray market activity. *Business Horizons* 42/6 (November-December): 2-8.

Prescribing authentication. 2001. *Security Management* 45 (May): 1C*ff.*

Prince, Melvin, and Mark Davies. 2000. Seeing red over international gray markets. *Business Horizons* 43/2 (March-April): 71-74.

*Quality King Distributors, Inc. v. L'anza Research International.* 1998. 118 S.Ct. 1125 (March).

Rhine, Jon. 2001. Levi Strauss unravels Tesco's "gray market" for cheap jeans. *San Francisco Business Times* (30 November): 12.

Rubenstein, Bruce. 1998. Gray market goods protected by Supreme Court decision. *Corporate Legal Times* (July): 30-31.

Sullivan, Laurie. 2003. Gray market foes claim billions lost to independent channel. *EBN* (24 February): 4.

Top Swiss watch brands to cost same worldwide: LVMH gears to check grey market. 2002. *Asia Africa Intelligence Wire* @ www.blonnet.com/2002/10/05/stories/2002100500410600.htm (6 October).

Viscounty, Perry J., Jeff C. Risher, and Collin G. Smyser. 2001. Cyber gray market is manufacturer's headache. *The National Law Journal* (20 August): C3.

Websites available as of May 2004:
www.investigation.com/anti_diversion.htm
www.kodak.com/global/en/service/faqs/faq0051.shtml
www.olympusamerica.com/innards/productadvisory.htm
www.pica.net/services/product_diversion.htm

**Available online at www.sciencedirect.com**

SCIENCE @ DIRECT®