**Miller, Alan**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE ADAMS GOLF, INC.  : CONSOLIDATED
                        :
SECURITIES LITIGATION   : C.A. No. 99-371 KAJ

--------------------------
Friday, August 11, 2006
--------------------------

Oral deposition of R. ALAN MILLER, taken

pursuant to notice, was held at the offices of AKIN,

GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison

Avenue, 18th Floor, New York, New York 10022-2524

commencing at 8:50 a.m. on the above date, before Beth

A. Barkocy, Certified Shorthand Reporter and Notary

Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA   19103
(215)241-1000     (888)777-6690

Page 42

1    THE WITNESS: I am familiar with
2  event studies and the methodology of
3  conducting event studies, including in, I
4  suppose, the broadest sense, the methodology
5  suggested by Mr. James here in the sense of
6  using a regression analysis based tool in
7  order to measure statistical significance and
8  those sorts of things.
9    Having said that, these paragraphs
10 set forth a general description of that tool
11 or of the use of that tool but leave open
12 gaping sorts of questions as to the
13 application and construction of the tool and
14 analysis, which problems and questions
15 persist, then, as Mr. James proceeds
16 thereafter to apply what he describes here in
17 a general way.
18    MR. BESSETTE: I've got a line of
19 questions here, so we might as well take a
20 break. Thank you.
21    (Recess.)
22 BY MR. BESSETTE:
23    Q.    Mr. Miller, leaving aside your
24 reservations about the application of the event study
25 as described by Mr. James in Paragraphs 17 to 22, you

Page 43

1  agree that's an accurate description of the general
2  methodology of an event study; is that right?
3    MR. LEWIS: Objection to the form
4  and foundation.
5    Excuse me for a moment.
6    (Discussion held off the record.)
7    THE WITNESS: The reason I'm taking
8  so long with this question is that there's a
9  lot of extraneous information in these
10 paragraphs that's like commentary as opposed
11 to simply setting forth how an event study
12 might be structured or established or
13 conducted or something like that, that I
14 don't think are either necessary to the event
15 study or, in fact, may be wrong, were overly
16 assumptive about things that an event study
17 can tell you. That's why I'm thinking more
18 about this than maybe I intended. I'll let
19 it go with that.
20 BY MR. BESSETTE:
21    Q.    As between Paragraphs 17 to 22, what
22 in those paragraphs do you find either extraneous to a
23 description of an event study or, I think you said,
24 maybe even wrong?
25    MR. LEWIS: Compound.

Page 44

1    Go ahead; do the best you can.
2    Also, I think that misstated his
3  testimony a little bit.
4    Answer it anyhow.
5    THE WITNESS: I'm okay on 17, 18,
6  and 19. On 20, the problem I have here is
7  that the second sentence says the relatively
8  smaller movements on other days are typically
9  the result of normal volatile trading
10 activity and do not represent the pricing
11 dash effects of material firm-specific
12 information semicolon such small movements
13 are not statistically distinguishable from
14 zero firm-specific movement.
15    I think that assigns a level of
16 meaning and certainty to the term
17 statistically significant that doesn't
18 comport with the real world; that is, I don't
19 argue that this interpretation is incorrect
20 from a purely academic standpoint and from
21 the interpretation of the meaning of those
22 terms by some pure academicians, at least in
23 recent years. The problem is in applying
24 this methodology for the purposes described
25 in the preceding three paragraphs, it implies

Page 45

1  that it has these real world uses and effects
2  when the bright line nature of the
3  statistically significant factor is
4  artificial and, in fact, smaller movements
5  can occur as a result of information reaching
6  the market which might be weaker sorts of
7  information which might reach the market in
8  ways that are less distinct than a Wall
9  Street Journal announcement or Dow Jones
10 Business Wire announcement, for example, or
11 which might simply have less import than an
12 announcement that causes a reaction to rise
13 above the statistically significant
14 threshold, so I have that sort of problem
15 with that paragraph.
16 BY MR. BESSETTE:
17    Q.    Before you move on to another
18 paragraph, is there anything more you want to say
19 about that sentence in Paragraph 20?
20    MR. LEWIS: Objection to form.
21    THE WITNESS: This also implies a
22 one-day, or less, event window, which is the
23 term that's used in event studies as well,
24 and that is artificial as well. It's also
25 not necessarily standard even in the academic

Page 50

1    Q.    If I understand correctly, your
2  issue, I guess, with event studies not being
3  appropriate in the real world is because there are too
4  many subjective factors like what confidence level
5  you're going to use, what event window is going to be
6  used, so is it fair to say that because of those
7  subjective elements, you don't think that an event
8  study methodology accurately captures all
9  firm-specific information translated into price
10  movements?
11          MR. LEWIS: Objection to form.
12  BY MR. BESSETTE:
13    Q.    You're using statistical
14  significance because there are too many variables?
15          MR. LEWIS: Objection to form,
16      overbroad; misstates his answer, lack of
17      foundation.
18  BY MR. BESSETTE:
19    Q.    Do I have that right, generally?
20    A.    Yeah, I think partially so. I think
21  I'd say this, though: I don't have any problem with
22  the use of event studies and we use them all the time
23  to do our work, and I'm using event study -- I don't
24  know whether that's -- whether to make it uppercase or
25  lower case -- in the broader sense of putting all of

Page 51

1  the information that you think is relevant onto a
2  template or piece of paper, a chart, a format, that
3  contains significant pieces of information to review
4  along with the information to make some sorts of
5  determinations that we're talking about making.
6  That's a process in a much broader sense that I think
7  is fine.
8          Using the event study as narrowly
9  defined in the purely academic world and including the
10  results of a regression analysis with fixed event
11  windows with artificially set thresholds, ignoring,
12  for example, the factor of trading volume, which most
13  academic event studies ignore, ignoring nonprinted
14  electronically data-retrievable sources of information
15  that probably existed at the time, and those sorts of
16  things, are some of the problems I have with the
17  narrower academically-oriented event studies as
18  described here and used by Mr. James.
19          In fact, if the event study in the
20  much broader sense is used properly and does include
21  all of the information that affects pricing, which is,
22  on a practical basis, very difficult to do, but if it
23  does that, includes trading volume data and stock
24  price movement data, the movement of comparable stock
25  prices, comparable indices, market indices and all

Page 52

1  those other factors, and then can be reviewed in a
2  flexible way to allow for multiple event window and
3  flexible event window review with no preset
4  thresholds, I think it can be a very useful tool and
5  we use it all the time for that.
6    Q.    Mackinley, to whom you referred,
7  you're familiar that he uses event studies to test
8  whether stock reactions are different from zero for a
9  particular event window?
10          MR. LEWIS: Objection to form and
11  foundation.
12          THE WITNESS: Yeah, I think part of
13  Mackinley's work -- I'm trying to remember if
14  it's in the same article or not, and I can't.
15          In part of Mackinley's work, he does
16  make that definitional use of the event study
17  setting the academic conditions of threshold
18  and event window length and then makes the
19  statement, I believe, something to the effect
20  that anything under the threshold is
21  statistically the same as zero, or something
22  like that.
23          That's consistent with the academic
24  application of the tool, but Mackinley also,
25  I believe, in discussing how to do the event

Page 53

1  studies, talks about selection of window,
2  talks about selection of base period, which
3  is a major issue I've not discussed yet but
4  which also factors into all this and which is
5  also covered in the Dunbar and Tabak article,
6  and those are important factors that are not
7  covered in this description and which
8  Mr. James deviates from in his application of
9  the event study methodology going forward;
10  that is, all the practitioners say, and
11  Mr. James says, that the first step in
12  creating the Formula A relationship between
13  the variables is to use a clean base period
14  or control period or estimation period, I
15  think are the terms I've seen used to
16  describe it, to establish the relationship
17  between the variables.
18          Based on that, the predicted path of
19  the stock price or the dependent variable is
20  projected into the class period, the actual
21  stock price movement is then subtracted from
22  the predicted movement to determine what's
23  called a residual. That's tested against the
24  statistically significant threshold and the
25  academic version of the event study to

## Page 54

1 determine whether you have a meaningful
2 movement or not under that definition.
3     In the case of an IPO, of course,
4 you can't do that because there's no clean
5 base period by definition.
6 BY MR. BESSETTE:
7   Q.  Do you know what a rolling
8 regression is?
9   A.  Yes.
10   Q.  What is that?
11   A.  It basically picks up from each
12 period -- we use day because it's commonly done in
13 days. It picks up from each day going forward and
14 eliminates the results of previous time periods. It's
15 an attempt to eliminate or -- I think it's an attempt,
16 if I remember this correctly, to eliminate
17 autocorrelation.
18     MR. LEWIS: Before you go on, I want
19     to raise something I should have raised at
20     the beginning of the deposition. Could you
21     identify your colleagues here for the record?
22     MR. BESSETTE: Sure. We have Amir
23     Rozen of Cornerstone with us, along with
24     counsel for the underwriters, who should, I
25     guess, identify themselves.

## Page 55

1     MR. LEWIS: No, that's fine. I was
2     just wondering whether Mr. Rozen had actually
3     done any of the work on the James' report
4     because I thought part of our --
5     MR. BESSETTE: No.
6     MR. LEWIS: Okay.
7 BY MR. BESSETTE:
8   Q.  The use of a rolling regression, can
9 that be used to sort of make up for a base period as
10 you described it, sort of a substitute?
11     MR. LEWIS: Objection to form.
12     THE WITNESS: That's an interesting
13     factor. If you -- it doesn't get you there
14     and it probably corrects, to some degree, for
15     not having a clean base period. I think
16     because you're at a higher base level than
17     you would otherwise be, assuming a class
18     period that contains fraud and an inflated
19     stock price, so that the application of the
20     threshold gets you too high a trigger point.
21     There's still problems with not having a
22     correct base period. It probably does
23     correct to some degree for it, I think, but
24     I'm sure not completely.
25 BY MR. BESSETTE:

## Page 56

1   Q.  Did Dr. James use a rolling
2 regression in his work?
3   A.  I believe he did do a -- one of his
4 alternatives involved a rolling regression. As I
5 recall, his results weren't very different with the
6 rolling regression, if I recall that correctly.
7   Q.  Let's go back to event studies for a
8 second. You made reference several times to the
9 academic version, so why don't we just call the
10 academic version of the event study and then a real
11 world, which you've described as well.
12   A.  Sure.
13   Q.  Certainly, there are legions of
14 published peer-reviewed articles on the academic
15 version of the event study and its use on measuring
16 stock price movement, right?
17     MR. LEWIS: Objection to form.
18     THE WITNESS: There are a lot. It
19     certainly is done. The procedure is done
20     quite a lot in the finance field in academia
21     and, sure, there have been a lot of articles
22     involving the use of it.
23     We subscribe, for example, to at
24     least half a dozen finance-type journals,
25     Journal of Finance, Journal of Financial

## Page 57

1 Economics, Review of Financial Studies, those
2     kinds of things that often have articles in
3     them, very often containing academic event
4     study work.
5 BY MR. BESSETTE:
6   Q.  Are there any peer-reviewed articles
7 that you're aware of that use the real world version
8 of the event study as you've described it here today
9 to measure stock price movements?
10     MR. LEWIS: Object to the form and
11     foundation.
12     THE WITNESS: The principles of the
13     real world approach are set forth in the
14     articles I referenced previously.
15 BY MR. BESSETTE:
16   Q.  From NERA?
17   A.  Two from NERA and, to some degree,
18 Mackinley's article, the one article, at least, by
19 Mackinley. Mackinley has written a lot of stuff. At
20 least, I think, the one article that I think he may
21 have been the sole author of discusses having a clean
22 base period, having an appropriate event window
23 length.
24     NERA particularly uses several
25 different levels of threshold for statistical

Page 74

1      Trading volume appears, actually, on
2  both segments. There are two parts to Exhibit B.
3  There's a part that has simply price and percent
4  change data along with Adams' volume for Adams' six
5  other golf companies and what's called a peer group,
6  which is a blended index of those companies. That has
7  Adams' volume data on it and it's also contained in
8  the second part of this exhibit which has Adams'
9  volume price, percent price change, and then a listing
10 of news items in the second part.
11     When we can, we try to put all this
12 on one page but we couldn't get there.
13     Q.    Did you employ any tests to
14 determine whether the volume data was statistically
15 significant --
16     MR. LEWIS: Objection to form.
17 BY MR. BESSETTE:
18     Q.    -- as part of your event study?
19     A.    When we went through this data,
20 yeah, we noted what normal or average trading volume
21 was over a period of -- I think it was weeks at the
22 beginning of the class period, and then used that as a
23 base to observe how trading volume occurred daily
24 throughout the class period and thereafter.
25     Q.    Where do you indicate in Exhibit B,

Page 75

1  if anywhere, the normal trading volume and how you
2  characterize the deviations from normal; is that
3  reflected here in Exhibit B anywhere?
4      A.    No, we were doing that just as we
5  went along reviewing the data and the news information
6  after this was assembled.
7      Q.    Was this sort of a subjective
8  analysis of how much deviation you or your team saw in
9  what you considered -- away from what you considered
10 normal trading volume for Adams Golf?
11     MR. LEWIS: Objection to form.
12     THE WITNESS: No, I wouldn't call it
13 subjective because we didn't have any -- I
14 can't think of what the right word would be
15 -- any purpose or bias to the review; that
16 is, I call it objective because we were
17 simply looking at the data to see what
18 happened to it as we went through it
19 chronologically.
20 BY MR. BESSETTE:
21     Q.    Did trading volume -- deviating from
22 normal trading volume to any degree, how did that
23 impact your opinion that there was news about gray
24 marketing on that day, on any given day?
25     MR. LEWIS: Objection to form and

Page 76

1  foundation.
2      THE WITNESS: (No response.)
3      MR. LEWIS: Do you understand the
4  question?
5      THE WITNESS: I think so. When we
6  first look at the information, we don't know
7  what we're going to find until we look at it,
8  so it's sort of the other way around in a
9  sense; that is, we tend to look at the
10 trading volume information as it develops
11 over time and then look to the right and see
12 is there anything obvious that that was
13 associated with in price change or news that
14 we know about, then we sometimes go backwards
15 when we get information and say, okay, here's
16 some information that may have become known
17 to market participants, was there any
18 noticeable change in the trading volume, so
19 it's sort of iterative in that sense.
20     We start out with knowing nothing
21 and seeing what you learn by looking at it,
22 and then you start going back as you're
23 filling in the news items and learn things
24 and say, you know, what was the effect of
25 this sort of thing. I'm not sure it's quite

Page 77

1  as clean as you're asking me.
2  BY MR. BESSETTE:
3      Q.    You agree that stock prices can move
4  because of general market conditions?
5      MR. LEWIS: Objection, vague and
6  overbroad.
7      THE WITNESS: I think there are --
8  yeah, in general, I think that's true. The
9  stock prices can move because of factors that
10 affect companies similarly which would also
11 affect a particular company's expected future
12 earnings.
13 BY MR. BESSETTE:
14     Q.    A stock price can move because of
15 general industry conditions as well?
16     MR. LEWIS: Objection to form.
17     THE WITNESS: Same answer.
18 BY MR. BESSETTE:
19     Q.    Do you agree that a stock price can
20 move because of company-specific conditions which are
21 unrelated to, for example, in this case, the specific
22 allegations in this case, so in other words, do you
23 agree that Adams Golf's stock price moved during the
24 class period because of company-specific information
25 that was unrelated to any of the allegations in the

Page 78

1  second amended complaint?
2         MR. LEWIS:  Objection to form and
3  foundation.
4         THE WITNESS:  Can I have that back,
5  please?
6         (The pending question was read
7  back.)
8         MR. LEWIS:  Note my objection to
9  form and foundation.
10        THE WITNESS:  Sure.  Generally
11 speaking, stock prices move in reaction to
12 company-specific information as a general
13 matter.  In this case, Adams may have moved
14 in response to company-specific information
15 other than related to the allegations in the
16 complaint, if I understand your question
17 correctly.  I don't believe that Mr. James
18 has demonstrated that that occurred in any
19 way and, although it's possible, it occurs to
20 me in the analysis we did that the most
21 likely cause of the overall movement during
22 the period was related to the allegations in
23 the complaint.  I think I'll leave it at
24 that.
25 BY MR. BESSETTE:

Page 79

1      Q.     Did you test whether Adams Golf
2  stock price moved in the class period in response to
3  company-specific information unrelated to plaintiff's
4  allegations in the case?
5         MR. LEWIS:  Objection to form.
6         THE WITNESS:  Sure.  We took a look
7  at all the information we've presented here
8  as well as information I described in my
9  report and were aware of all that as it fit
10 into the chronology of the stock price
11 movements and volume changes in Adams through
12 the period.
13 BY MR. BESSETTE:
14     Q.     Did you find as a result of your
15 testing that Adams Golf stock price moved in the class
16 period as a result of firm-specific information
17 unrelated to plaintiff's allegations?
18        MR. LEWIS:  Objection to form,
19 overbroad.
20        THE WITNESS:  Our retention in this
21 matter focuses on a couple of things with
22 respect to that topic, and one is the
23 determination of whether Mr. James has
24 demonstrated that that occurred, that is,
25 that the movement during the class period was

Page 80

1  related to information other than the
2  allegations in the complaint, and he has, in
3  my opinion, not established that at all.
4  That's the topic about -- one of the topics
5  about which I was asked to examine the
6  information and opine.
7         During the course of my review, I
8  determined that overall during the class
9  period, the most likely cause of the stock
10 price decline was related to the allegations
11 in the complaint.  I don't recall whether I
12 established with respect to other
13 company-specific information on certain days
14 in each specific instance whether there may
15 have been reaction to other news as well that
16 was separable from the reaction to
17 information complained of, and that wasn't
18 necessary in order to accomplish the purpose
19 for which we were retained.
20 BY MR. BESSETTE:
21     Q.     You didn't see any evidence, is it
22 fair to say, in all of your work that the Adams Golf
23 stock price movement during the class period was a
24 result of firm-specific information unrelated to
25 plaintiff's allegations?

Page 81

1         MR. LEWIS:  Objection to form.
2         THE WITNESS:  No, I just gave you a
3  much more complete answer than that.
4  BY MR. BESSETTE:
5      Q.     Did you see any evidence?
6      A.     That's my answer, that I have seen
7  no evidence that Mr. James established that that was
8  the case.
9      Q.     I didn't ask, though, what he
10 established.  I want to know from the tests you said
11 you did, did you see any evidence that the price moved
12 as the result of firm-specific information unrelated
13 to plaintiff's allegations?
14        MR. LEWIS:  Objection to form and
15 foundation.
16        THE WITNESS:  The second part of
17 what I answered with respect to that was that
18 I believe the most likely overall cause of
19 the stock price decline during the period was
20 related to the plaintiff's allegations.
21 Having said that, when we went through and
22 reviewed each day's trading results in terms
23 of price movement, volume, associated it with
24 news that was printed or published on days
25 when we could identify that, and considered

Page 82

1 the availability to the market of information
2 connected with plaintiff's allegations, we
3 didn't attempt to separate out whether each
4 day's movement related solely to one or the
5 other nor did we think we could based on the
6 types of information dissemination that
7 appeared to be occurring with respect to
8 plaintiff's allegations and the information
9 that related to that. It appeared that the
10 overall new sort of information that was
11 reaching the market during the class period
12 that would likely cause the observed market
13 effect was related to plaintiff's
14 allegations.
15 BY MR. BESSETTE:
16    Q.    What statistical tests did you
17 perform in your event study, sir?
18        MR. LEWIS: Objection, asked and
19    answered, vague and ambiguous.
20        THE WITNESS: Just the ones we've
21    talked about so far where we reviewed the
22    volume changes on an ongoing basis throughout
23    the class period and thereafter, the price
24    changes on an absolute and percentage basis
25    in Adams' stock price, the changes in the

Page 83

1    various index and comparable company
2    movements that we've talked about on an
3    absolute and percentage basis, on each day
4    going through the period and, in a couple of
5    cases, on intraday data as well.
6 BY MR. BESSETTE:
7    Q.    When you say absolute and percentage
8 change, you're talking about the raw dollar draw on
9 any given day translated into a percent, right?
10    A.    Correct.
11    Q.    Are you aware of any case law that
12 says one cannot properly show causation with just raw
13 dollar or raw percentage stock price draws on any
14 given day?
15        MR. LEWIS: Objection to form,
16    overbroad.
17        THE WITNESS: I'm not sure -- I
18    don't think I've seen one that's that clear
19    about that. I've seen a couple of cases that
20    discuss that issue that I can recall to some
21    degree. I'm not sure that I've seen one that
22    takes that position on that firm a basis.
23 BY MR. BESSETTE:
24    Q.    Do you think there's any validity to
25 the criticism of using raw dollar or raw percentage

Page 84

1 stock price drops in trying to show causation or
2 association with specific information; do you see any
3 validity in the criticism of using that?
4        MR. LEWIS: Objection to form,
5    overbroad, lack of foundation.
6        THE WITNESS: Of using raw price
7    data and percentage changes?
8 BY MR. BESSETTE:
9    Q.    Right, to draw conclusions about
10 association or causation with specific information.
11        MR. LEWIS: Objection to form,
12    foundation.
13        THE WITNESS: Trying to think as a
14    general matter, if I can. I don't think so,
15    at least not in the sense that we do, and I'm
16    trying to then extend this as to whether
17    there's a more general case, that is, having
18    the benefit of being able to observe data
19    over flexible event windows or for multiple
20    days prior to, during, and after a study day,
21    for example, and seeing the same data for
22    index and comparable company movements, being
23    able to consider the type of information, the
24    way it reaches the market, its degree of
25    complexity, which is another topic, since you

Page 85

1    jogged my thinking about this, that I would
2    add to the morning's discussion about event
3    studies in general and their limitations;
4    that is, the complexity of information can be
5    a significant factor in the speed of reaction
6    to news. There's a good paper on that that's
7    footnoted in my report or my rebuttal report
8    that deals with that topic.
9        I don't see any problem with using
10    that type of data for your analysis,
11    especially if the comparison is a purely
12    academic version of an event study that sets
13    some sort of a threshold based on nothing but
14    academic convention and based on fixed data,
15    fixed event windows or fixed reaction times,
16    not taking into consideration the types of
17    information or the method of dissemination to
18    market participants and those kinds of
19    factors.
20 BY MR. BESSETTE:
21    Q.    Did market and/or industry factors
22 affect Adams Golf stock price during the class period?
23        MR. LEWIS: Objection to form,
24    foundation, compound.
25        THE WITNESS: I've seen a couple of

22 (Pages 82 to 85)

Page 86

1    types of information about that in the
2    materials we've reviewed and in the data.
3    First off, I don't believe Mr. James has
4    established that that occurred at all.
5    Secondly, I think the contemporaneous
6    information about that was somewhat
7    conflicting in various ways; that is, there
8    was some discussion of whether market index
9    decline or industry condition decline may
10   have affected Adams' stock price by people
11   contemporaneously, and then there was other
12   discussion that it didn't in that, for
13   example, Callaway's decline was due at least
14   partly to the success of Adams and Orlimar
15   and Barney Adams' assessment at one point
16   that Orlimar's performance was overblown and
17   peaked and all sorts of things, so I've seen
18   all sorts of assessments of that factor in
19   the information we've come across so far.
20   BY MR. BESSETTE:
21       Q.    My question was what's your opinion;
22   did market and/or industry factors, in your opinion,
23   affect Adams Golf stock price during the class period?
24       MR. LEWIS: Objection.
25   BY MR. BESSETTE:

Page 87

1       Q.    What's your opinion?
2       MR. LEWIS: Vague, overbroad, lack
3    of foundation, and beyond the scope of his
4    work as a rebuttal expert.
5       THE WITNESS: My opinion is what
6    I've given you so far on this topic plus
7    what's set forth in my report, is that based
8    on Mr. James' work, based on our review of
9    the data, including market and industry data,
10   Adams' stock price data, comparable company
11   data, and the information we've reviewed, the
12   most likely explanatory factor for Adams'
13   overall decline during the period was related
14   to the information in the complaint.
15   BY MR. BESSETTE:
16       Q.    As you sit here, do you have an
17   opinion whether market or industry factors affected
18   Adams Golf stock price during the class period?
19       MR. LEWIS: Objection.
20   BY MR. BESSETTE:
21       Q.    That's a yes or no.
22       MR. LEWIS: Vague, ambiguous, lack
23   of foundation, beyond the scope.
24       THE WITNESS: No, my opinion on that
25   is what I've given you on it, that the most

Page 88

1    likely explanatory factor for Adams' stock
2    price decline was associated with the items
3    complained of in the complaint.
4    BY MR. BESSETTE:
5       Q.    I understand. I'm not asking you to
6    rank what caused the stock drop. I know you think the
7    most likely factor is plaintiff's allegations.
8       My question is did market or
9    industry factors affect Adams Golf stock price. I
10   don't want you to have to quantify it right now or
11   tell me whether it's more or less than something else.
12   In your opinion, did it affect Adams Golf stock price,
13   market and industry factors, that is, during the class
14   period?
15       MR. LEWIS: All the same objections
16   as before, asked and answered, beyond the
17   scope of his engagement.
18       MR. BESSETTE: If it's beyond, he
19   can say he has no opinion. What I'm asking
20   is do you have an opinion.
21       MR. LEWIS: You're asking the word
22   opinion -- there are all kinds of meanings to
23   opinions. Does he have a personal view based
24   on --
25       MR. BESSETTE: I understand.

Page 89

1       MR. LEWIS: Let me finish.
2       MR. BESSETTE: I got the objection.
3    Just state your objection. We don't need to
4    go into a lot of explanation here.
5       MR. LEWIS: You don't need to cut me
6    off. I don't normally cut you off.
7    BY MR. BESSETTE:
8       Q.    As an expert, do you have an opinion
9    that --
10       MR. LEWIS: Same objection, asked
11   and answered.
12       THE WITNESS: Not beyond what I've
13   given you on this; that is, I think as we've
14   discussed, as a general matter, I'm not
15   prepared to say the general market and
16   industry factors do not affect a stock price
17   or any stock price in any way over any period
18   of time.
19       Specifically related to Adams during
20   the class period, I've reached the opinions
21   that I've given you so far and that are
22   contained in my reports and haven't gone
23   beyond that as to answer your question any
24   further in that I've been retained to study
25   whether negative loss causation has been

Page 90

1    established by Mr. James, to put that in
2    shorthand, and to otherwise study the factors
3    that I've been asked to study and render
4    opinions on, which I've given you.
5        MR. LEWIS: When you get to a good
6    point, I'd like a five-minute break.
7  BY MR. BESSETTE:
8    Q.    Have you quantified the effect, if
9  at all, that market and/or industry factors had on
10 Adams Golf stock price during the class period?
11       MR. LEWIS: Same objections;
12    misstates his testimony.
13       THE WITNESS: I think that was part
14    of what I've answered in the last couple of
15    answers. I've noted that in connection with
16    my retention, I've opined that Mr. James has
17    not established any such relationship or
18    cause or effect and have expressed what I
19    believe to be the most likely factor that
20    affected Adams' stock price during the class
21    period. I'll refer you to my previous
22    testimony on that.
23 BY MR. BESSETTE:
24    Q.    In your work in this case, have you
25 made any effort to consider the effect of market or

Page 91

1  industry factors on Adams Golf stock price during the
2  class period?
3        MR. LEWIS: Objection, asked and
4    answered, vague and ambiguous.
5        THE WITNESS: Sure.
6  BY MR. BESSETTE:
7    Q.    Beyond having the opinion that
8  Mr. James has not established that causal
9  relationship, you have no opinion, as you sit here, to
10 what extent, if at all, market or industry factors
11 actually affected Adams Golf stock price during the
12 class period; is that right?
13       MR. LEWIS: Objection, form,
14    foundation; misstates prior testimony.
15       THE WITNESS: No, I don't think
16    that's what I said.
17 BY MR. BESSETTE:
18    Q.    Can you clarify that?
19    A.    Hopefully. I believe the most
20 likely effect that caused -- the most likely
21 information or factor that caused Adams Golf stock
22 performance over the class period was related to the
23 allegations in the complaint. That opinion was
24 reached after observing Adams' stock price movement
25 over the class period as we have discussed along with

Page 92

1  its volume activity, its absolute and percentage price
2  changes at various times and dates and groups of dates
3  throughout the class period, the movements of other
4  industry companies on those dates and groups of dates
5  throughout the period, the movement of overall market
6  indexes and comparable company indexes throughout the
7  class period and on each date and groups of dates
8  during the class period. Having reviewed all that
9  information in the flexible way that we've discussed
10 earlier today, I've come to the opinions that I came
11 to, and also having reviewed Mr. James' work in this
12 area in his report and his rebuttal report, I've come
13 to the opinions that I've given you and set forth in
14 my reports.
15       MR. BESSETTE: It's time for a
16    break.
17       (Recess.)
18 BY MR. BESSETTE:
19    Q.    Mr. Miller, how do you define
20 materiality as used in this case?
21       MR. LEWIS: Objection to form.
22       THE WITNESS: I tend to follow the
23    definition set forth in TSC versus Northway
24    of materiality being information which would
25    likely be important to a reasonable investor

Page 93

1    in considering an investment decision.
2  BY MR. BESSETTE:
3    Q.    That's the operating definition that
4  you use?
5    A.    Right.
6    Q.    What's your methodology for
7  determining whether information is material to
8  investors?
9        MR. LEWIS: Generally or in this
10    case or both?
11 BY MR. BESSETTE:
12    Q.    If it differs, you can tell me.
13    A.    Generally and in this case, but
14 generally first, I start with how securities prices
15 are formed and created and what type of information
16 goes into that process and why, and it sort of evolves
17 from that; that is, based on, I suppose, beginning
18 with investment theory, corporate finance theory in
19 texts, articles, and that sort of thing, representing
20 the value of a security as embodying the expected
21 future earnings and cash flows to be derived for that
22 security and following that through, then my work
23 experience we went through briefly this morning, has
24 informed me as to what factors are important to
25 participants in the investment community, and they are

Page 106

1    it that gives you a clue as to the other
2    questions I raised, for example, and whether
3    it would therefore likely affect future
4    earnings and cash flows.
5  BY MR. BESSETTE:
6    Q.    Is there an objective test you would
7  utilize?
8         MR. LEWIS: Object to the form.
9         THE WITNESS: Yeah, I think that our
10   whole conversation here has been about
11   objective testing and observation, and that
12   would be whether it would reasonably be
13   expected to have an impact on future earnings
14   and cash flows.
15 BY MR. BESSETTE:
16   Q.    How would you determine that?  If
17 you had this information and you were trying to
18 determine whether it was material, how would you go
19 about doing it?
20        MR. LEWIS: Vague, ambiguous,
21   speculative.
22        THE WITNESS: I may have
23   misunderstood you before.
24        I'd try to find out the answers to
25   those questions you give me.  If this was,

Page 107

1    for example, contemporaneous and I was an
2    analyst following the stock, I'd probably
3    call the company and ask them what's with the
4    new process here or new technology, why are
5    you doing it, what do you hope to accomplish,
6    what's it costing you, what's the return on
7    the investment, what effect does it have on
8    the clubs, does it do anything for your
9    marketing.
10        You'd run through, basically, the
11   business plan effects of that information to
12   determine whether it was going to likely have
13   an effect on future cash flows and earnings.
14 BY MR. BESSETTE:
15   Q.    Would you test that the stock price
16 of the company moved because of the release of that
17 information?
18        MR. LEWIS: Objection to form.
19        THE WITNESS: If you're looking
20   backwards? Yeah, that would be one factor
21   you'd look at to see whether there was
22   anything else suggested by that because that
23   news in itself, if that's all the news you
24   got and the stock price moved on that day,
25   you'd have to look beyond that to see why

Page 108

1    somebody bought or sold in enough volume to
2    move the market price based on that
3    information, and the implication would be
4    that somebody thought something further about
5    it than what it is you learned.
6  BY MR. BESSETTE:
7    Q.    Would your materiality determination
8  take into account the raw dollar stock price movement
9  or would you have to see a statistically significant
10 stock price movement?
11        MR. LEWIS: Objection to form and
12   foundation, incomplete.
13        THE WITNESS: The way we analyze
14   things and most market participants tend to
15   analyze things involves raw stock price
16   movement and percentage movement and very
17   often relative to some other information such
18   as market data, comparable company data and
19   that sort of the thing as we've discussed
20   earlier today.  I think I'll leave it at
21   that.
22 BY MR. BESSETTE:
23   Q.    As part of your materiality
24 determination, you would test to see if the broad
25 market or industry which the company was part of moved

Page 109

1  on the day of that released information?
2         MR. LEWIS: Objection to form;
3    mischaracterizes the testimony.
4         THE WITNESS: In the sequence of
5    things that you've asked me and I've
6    answered, if you're looking backwards at
7    information like that historically, and
8    that's a piece of information you're looking
9    at, one of the things that you would do is to
10   look at the market movement, as with all
11   information like this that we've been talking
12   about, but your primary focus on materiality
13   is importance to investors and in the context
14   of generation of future earnings and cash
15   flows, and that's the primary way that I
16   would look at that information as well.
17 BY MR. BESSETTE:
18   Q.    Did you determine in this case,
19 Mr. Miller, that information about the gray market was
20 material to investors in Adams Golf?
21   A.    Yeah, I think I've always viewed
22 this in a slightly different time context.  I think I
23 determined it would have been material to investors in
24 Adams Golf at the time of the IPO and became material
25 to them as they learned of it over time.

28  (Pages 106 to 109)

**Page 110**

1  Q.   What's the basis for that
2  determination?
3  A.   The would have been important is in
4  the context we've just been discussing because the
5  existence, risk, and impact of the gray marketing is
6  something that can have a significantly negative
7  effect on a company's ability to maintain margins and
8  sales going forward and, therefore, would directly
9  affect the generation of earnings and cash flow, so
10 it's a pretty direct connection in that sense to the
11 earnings and cash flow testing or modeling or
12 examination that we've been talking about in this
13 context.
14      It became important, I think,
15 including the materials I've reviewed in this matter,
16 including Mr. Adams' commentary on the importance of
17 gray marketing and its effects on the company during
18 the class period, toward the end of the class period
19 and thereafter, as quoted in some trade publications
20 after the class period but referring back to the class
21 period, and as discussed by analysts during and toward
22 the end of the class period. I think those were all
23 indicators contemporaneously that people found it to
24 be an important issue. I think Mr. Magnussen's
25 declaration and testimony to that effect demonstrated

**Page 111**

1  that. I think Ms. Ochoa goes into some significant
2  detail about that, and all those, I think, are reasons
3  why I believe that it would have been important at the
4  outset and became important as various market
5  participants appeared to learn of it.
6      MR. BESSETTE: O-c-h-o-a.
7      MR. LEWIS: M-a-g-n-u-s-s-e-n.
8  BY MR. BESSETTE:
9  Q.   Looking at your report,
10 Paragraph 13, which starts on Page 7, the first
11 sentence says there can be no question that the risk
12 and impact of gray marketing were material to
13 investors or potential investors in Adams Golf. Is
14 that as of the time of the IPO, sir?
15      MR. LEWIS: Objection to form.
16      THE WITNESS: I tend to think of
17 this topic in the time frames I explained
18 before. I think when I wrote this, I was
19 probably thinking first of IPO, then of
20 aftermarket. The way this reads, it could be
21 either, and as it goes forward in the
22 paragraph, it looks like it gets into
23 aftermarket, so this probably applies to
24 both.
25 BY MR. BESSETTE:

**Page 112**

1  Q.   At least, then, it's your opinion
2  that the risk and impact of gray marketing was
3  material to investors or potential investors in Adams
4  Golf at the time of the IPO?
5  A.   Right.
6  Q.   Did you do any statistical tests to
7  test your opinion that it was material at the time of
8  the IPO?
9  A.   If I understand your question
10 correctly, I don't know that you can, that is, with
11 respect to the stock price as opposed to the potential
12 future impact on earnings and cash flows. The
13 statistical test wouldn't be able to be done on the
14 stock price because there isn't any at the time of the
15 IPO. You have, at the instant of the IPO and
16 thereafter, a stock price that exists that is in
17 response to all information then in the market. What
18 was then in the market, apparently, was the prospectus
19 as the dominant piece of information which did not
20 contain a risk disclosure about gray marketing
21 specifically, and you had the June 9 press release
22 about the Costco matter in the market, about gray
23 marketing on a widespread basis, so that the
24 prospectus, in my view, clearly trumping the month-old
25 press release at that time which was ambiguous about

**Page 113**

1  gray marketing anyway and its effect on the company
2  would lead you to not have a testable situation there
3  with respect to the stock price.
4  Q.   Did you or did you not perform a
5  statistical test or observation to support your
6  opinion that at the time of the IPO, the risk and
7  impact of gray marketing was material to Adams Golf's
8  investors?
9      MR. LEWIS: Objection to form, asked
10     and answered; ambiguous.
11     THE WITNESS: In the sense of the
12     impact on likely future earnings and cash
13     flows, I thought that the impact was likely
14     substantial and didn't need to be tested in
15     that sense statistically. In terms of any
16     stock pricing, you couldn't do so for the
17     reasons I just said. I did observe Mr. James
18     has made the case that a statistical test
19     could be done on the IPO price and its
20     movement thereafter and believe that there's
21     no basis for that at all for the reasons I
22     just said.
23 BY MR. BESSETTE:
24 Q.   You did not perform a statistical
25 test to support your opinion, A, because you don't

Page 114

1  think one is valid or, B, could be done, but the
2  bottom line is you did not perform one to support your
3  opinion; do I have that right?
4       MR. LEWIS: Objection to form.
5       THE WITNESS: For the reasons I
6       said, yes.
7  BY MR. BESSETTE:
8       Q.    The sentence that is at the end of
9  Page 7 and going over to Page 8 that says lower
10  retailers' margins often translate into lower sales,
11  what's the basis for that opinion, sir?
12      A.    As a general statement, I think
13  that's an obvious factor from observing the conduct of
14  business over 30-some years, that businesses tend to
15  succeed -- businesses that are sales-oriented,
16  particularly with consumer goods, if we can narrow it
17  down somewhat, tend to succeed largely based on their
18  ability to generate sales and maintain successful
19  channels of distribution and lowering retailers'
20  margins reduces their incentive to sell. Very few
21  products enjoy monopolies and are subject to
22  competition and that sort of thing and usually suffer
23  from lowering retailers' margins.
24          There's a significant SBA study that
25  was done on this topic about ten or 15 years ago, 20

Page 115

1  years ago, exploring the premise that most small
2  businesses failed for lack of capital. What they
3  found instead was most small businesses failed for
4  costs and problems in establishing distribution
5  channels, particularly allowing retailer margins and
6  distributor margins as well, so I think that's a
7  pretty obvious business factor.
8          It's also, I think, part of the
9  information that I observed from Mr. Magnussen and I
10  think from other industry commentators who suggested
11  that part of the Orlimar sales growth occurred through
12  their ability to increase retailer incentive or
13  margins over a short period of time in the spring
14  of '98. That was consistent with the overall view I
15  have about that.
16      Q.    You've given me the basis for that
17  statement. The last statement there, earnings are
18  therefore reduced directly by the existence of gray
19  marketing, do you have any analysis supporting that
20  statement?
21      MR. LEWIS: Objection to form.
22      THE WITNESS: Partially general on
23      the same sort of basis that when gray
24      marketing occurs, companies generally feel
25      obliged to make the retailers feel

Page 116

1  well-supported and make them whole in terms
2  of their margins. If the retailer has to
3  lower the price, the only way the
4  manufacturer can do that is to lower his
5  price or provide an incentive at some cost to
6  generate replacement sales or incentivize the
7  retailer. Again, that also appeared to be
8  the case with Adams where they felt the need
9  to provide free golf bags as part of their
10  program to counter gray marketing.
11  BY MR. BESSETTE:
12      Q.    Did you have any evidence that Adams
13  Golf's earnings were reduced directly by the existence
14  of gray marketing?
15      MR. LEWIS: Objection to form,
16      foundation.
17      THE WITNESS: Yeah, I think the most
18      direct evidence I can think of is Mr. Adams'
19      October 8 or 10 memo -- can't remember which
20      day -- in which he discusses the expected
21      impact on fourth-quarter sales of
22      approximately 20, 25 percent. Anytime you
23      reduce sales, you almost always reduce
24      earnings.
25  BY MR. BESSETTE:

Page 117

1      Q.    How about at the time of the IPO,
2  any evidence that you saw?
3      MR. LEWIS: Objection to form.
4      THE WITNESS: That earnings were
5      reduced by gray marketing?
6  BY MR. BESSETTE:
7      Q.    Yes.
8      MR. LEWIS: Objection to form.
9      THE WITNESS: I think at the IPO, I
10      was focused more on the likely expected
11      effect of gray marketing on future earnings
12      in sales as a risk factor. As it turns out,
13      I believe Mr. Magnussen cited instances, and
14      in Mr. Grace's report there is an exhibit, I
15      think it was, to Mr. Grace's report or his
16      rebuttal report -- I'm sorry, I can't
17      remember -- that set out a listing of
18      customer complaints about gray marketing and
19      what the various retailers were trying to do
20      to counter that, and at some time period
21      which I'm pretty sure was prior to the IPO,
22      Adams was making some retailers whole for
23      supplying customers at reduced prices for
24      clubs that were appearing in Costco, so to
25      the extent that they had to undertake that,

Page 122

1  type of disclosure of the issue of gray
2  marketing.
3       By the way, I would suggest that the
4  entire press release was new information, not
5  just the portion of it you asked me about,
6  and it would be taken by the market in its
7  entirety. That doesn't say that there
8  weren't some people who knew in the spring of
9  '98, and I think it was April and May, that
10 there was some level of gray marketing going
11 on.
12      I'm thinking of some of the
13 references in Mackenzie's work, and some of
14 the complaint letters, I think, referenced in
15 Mr. Grace's work, that there was some level
16 of knowledge about some of it, but I think in
17 terms of public information to the market,
18 that this is the first such piece, but when I
19 say "to the market" here, we have to remember
20 there was no public stock at that time, so
21 even though it was released to the market and
22 to the public, there would have been no
23 community of stockholders or analysts, for
24 example, to follow this at the time.
25 BY MR. BESSETTE:

Page 123

1       Q.     This press release was
2  contemporaneous with the IPO roadshow, was it not?
3            MR. LEWIS: Objection to form,
4  foundation.
5            THE WITNESS: Yeah, I believe that's
6  right.
7  BY MR. BESSETTE:
8       Q.     Let me show you what's been marked
9  as Exhibit-233 (indicating). This is the Golf Pro
10 article that you reference in your report at
11 Paragraph 13A?
12      A.     Right.
13      Q.     On Page 3 of the article, it states
14 that the company joined the ignominious ranks of the
15 big boys in another way this year; Tight Lies started
16 showing up in Costco, prompting a lawsuit from Adams
17 with two different aims. Do you see that?
18      A.     Yes.
19      Q.     Was this information released on or
20 about August 1, 1998 publish date?
21      A.     I haven't seen any reason to think
22 so.
23      Q.     Is this information in this report
24 new information --
25           MR. LEWIS: Object to the form.

Page 124

1  BY MR. BESSETTE:
2       Q.     -- or old information?
3            MR. LEWIS: Object to the form.
4  BY MR. BESSETTE:
5       Q.     The part I just read.
6            MR. LEWIS: Same objection.
7            THE WITNESS: I think the --
8  BY MR. BESSETTE:
9       Q.     Let me withdraw it and make the
10 question a little more precise.
11           The information about Tight Lies
12 showing up in Costco, prompting a lawsuit, is that new
13 information or old information?
14           MR. LEWIS: Objection to form and
15 foundation.
16           THE WITNESS: That's a good
17 question. It's technically old information
18 by that point because they refer to
19 information that had occurred sometime
20 previously and had been discussed in the
21 press release sometime previously, but it's
22 the type of information in the form of
23 distribution that would fit into the messier
24 category we talked about earlier as opposed
25 to the clean, simple major national

Page 125

1  impact-type release or earnings-type
2  information for a large-cap company followed
3  widely by Wall Street or whatever the
4  examples were that we were talking about;
5  that is, you've got this article appearing to
6  the trade, as my understanding goes, in, most
7  likely, mid July, as best I can tell, and
8  that's not -- I don't think there's any
9  certainty as to the dates when this thing
10 actually reached people.
11 BY MR. BESSETTE:
12      Q.     You're just guessing when it reached
13 people, right?
14           MR. LEWIS: Objection to form.
15           THE WITNESS: No. My understanding
16 is there has been work done on that issue
17 that the best information is that it was most
18 likely the middle of July, and if you analyze
19 the text of the article, it appears to make
20 sense that it would be out sometime in the
21 middle of July.
22 BY MR. BESSETTE:
23      Q.     What work has been done?
24      A.     My understanding is contact had been
25 made with -- I think it was the circulation director

Page 126

1  of the magazine, who indicated a likely distribution
2  date of mid month before the cover date.
3      Q.    Who is that person?
4      A.    I don't know.
5      Q.    Who made the contact?
6      A.    Counsel.
7      Q.    Which one?
8      A.    I'm sorry, I don't know which one of
9  plaintiff's counsel.
10     Q.    Which one told you?
11     A.    I think it was Mr. Collins.
12          There had been other contact that it
13  might have been the middle of August with another
14  person with some role, I believe, at Fairchild
15  Publications, not positive of that but I think that's
16  right, but the weight of that information seemed to go
17  to the middle of July and our general experience about
18  magazine release dates, and I think most people's, is
19  that they come out before the cover date, not after.
20     Q.    Do you have any actual evidence that
21  it came out in the middle of July?
22          MR. LEWIS:  Objection to the form.
23  BY MR. BESSETTE:
24     Q.    That's a yes or no.  Do you have any
25  evidence that it came out in the middle of July?

Page 127

1          MR. LEWIS:  Same objection.
2          THE WITNESS:  I'm not sure what you
3      mean by evidence because in my view if you
4      analyze the text, it looks to be likely that
5      it came out earlier than later, that is, in
6      July as opposed to in August, and we looked
7      at the text pretty closely for that and we
8      looked at the text of an article that
9      appeared in the September issue of Golf Pro,
10     and it appeared as though that most likely
11     was written to come out in August.
12          Having said all that, I am certainly
13     not certain of that distribution date.
14  BY MR. BESSETTE:
15     Q.    What text are you referring to?
16     A.    I'd have to try to go through this
17  and pick it all out, but if there's some reference in
18  here that indicates it was written before the IPO,
19  which occurred around the beginning of January.
20          MR. LEWIS:  You said January.
21          THE WITNESS:  July, I'm sorry.
22          Thanks.
23  BY MR. BESSETTE:
24     Q.    I'd like to at least see what text
25  you're talking about that leads you to the conclusion

Page 128

1  that it's likely it came out in mid July.
2      A.    This may take a while because I did
3  this a while ago, but I'll go through it and see if I
4  can find it.
5      Q.    Let's do it on the lunch break.
6      A.    That's fine with me.
7      Q.    The information about Tight Lies
8  showing up in Costco, prompting a lawsuit, I think you
9  said that was old information but also -- you started
10  to go through some explanation about how it was messy
11  as well.  I'm not sure I understand.  Is that
12  information, whether it came out in July or on the
13  publish date, is that old or new information?
14          MR. LEWIS:  Objection to form.
15          THE WITNESS:  I think what I said
16      about that is that although it's technically
17      old information in the sense that it refers
18      to information that it occurred previously,
19      that is, the lawsuit and the fact of the
20      clubs showing up in Costco, but that it's not
21      of the clean, simple national impact type of
22      information we had discussed earlier when you
23      asked me a general question about this sort
24      of thing, which came out on Monday, repeated
25      on Wednesday, would likely not have an effect

Page 129

1      on Wednesday.
2          This is in the category, to me, of
3      messier information, that is, in a trade
4      publication, to my understanding distributed
5      primarily to the trade, and following an
6      earlier disclosure of the information in the
7      form of a press release into a market in
8      which there was no publicly traded stock for
9      market participants to follow.
10  BY MR. BESSETTE:
11     Q.    Do you think that information as
12  conveyed in this article is material?
13          MR. LEWIS:  Objection to form,
14      foundation.
15          THE WITNESS:  Yes.
16  BY MR. BESSETTE:
17     Q.    How do you determine that?
18     A.    I think that taking the paragraph
19  you focused on, the use of the words join the
20  ignominious ranks of the big boys would suggest that
21  for a small growth company to join the ranks of the
22  big boys would be an important event.  The ignominious
23  suggests potentially important just by the use of the
24  word.  The fact that Tight Lies started showing up in
25  Costco, I think would be important for the reasons we

## Page 134

1 very likely arrived at different people's places of
2 business at different times, that is, over a period of
3 at least several days, if not a couple of weeks.
4       Once it arrives there and is picked
5 up and read by different people, if it sits around
6 golf pro shops, for example, its impact on the readers
7 may well spread further than the length of time it
8 takes for it to get to the various participants, so
9 even if you knew what date it started to be mailed on,
10 you'd have to take an event window approach to this
11 that is much more than a day or two and try to
12 determine what effect that might have.
13       It also appeared to coincide with
14 the known dates of Costco purchase orders and sales at
15 Costco from other data that we looked at, all of which
16 tended to center around the middle of July, so we
17 looked at it in that context but, no, we could not
18 identify specific dates to measure, and any
19 measurement without knowledge of the specific dates is
20 meaningless.
21     Q.    The information in the Golf Pro
22 article is old information but material information
23 that you believe affected Adams Golf stock price?
24       MR. LEWIS: Objection to form,
25       foundation; mischaracterizes his testimony.

## Page 135

1 BY MR. BESSETTE:
2     Q.    Do I have that right?
3     A.    No, I can't say the end of that
4 sentence with any certainty; I can't say I believe it
5 affected the price on certain days in certain amounts
6 or anything like that. It appears likely that it was
7 a piece of information in the marketplace of
8 interested golf people, probably about the middle of
9 July, consistent with the time frame of Costco
10 purchase orders and Costco sales. I'd refer you back
11 to the last couple answers on this. That's all I can
12 say.
13     Q.    A couple more questions, then we'll
14 take a lunch break.
15       Turn to your rebuttal report,
16 Exhibit-335, the Exhibit B that we looked at.
17     A.    Right.
18     Q.    If you go to Page 61 of 92, that
19 date is August 3, 1998, the date I want you to look
20 at, at the bottom.
21     A.    Okay.
22     Q.    Actually, go to August 1.
23     A.    Right.
24     Q.    Go across to the news item, second
25 one down, GP, Barney Adams -- Barney's Army. GP, is

## Page 136

1 that Golf Pro?
2     A.    Yeah.
3     Q.    Why are you dating the Golf Pro
4 article August 1?
5     A.    Because the convention that we
6 sometimes follow, although we're trying to fix this as
7 we go along wherever we can, is to put magazines with
8 cover dates of a month on the first day of the month
9 in which the cover date is. What we've begun doing
10 when we think to do it is to put an undated category
11 for the month at the beginning of the month to show
12 stuff that doesn't have a known publication date on
13 it, but we didn't do that here. It's a tough thing to
14 do when you're putting it in this kind of a display
15 because you don't want to imply something from putting
16 it there that you can't, but it ended up there for
17 that reason.
18     Q.    The first trading day after August 1
19 is August 3, which is the last day you show on Page 61
20 of Exhibit B?
21     A.    Right.
22     Q.    That volume of 251,400, is that
23 above or below the normal volume you say you
24 calculated for Adams Golf during the class period?
25       MR. LEWIS: Objection to form.

## Page 137

1       THE WITNESS: As I sit here, I don't
2       remember exactly. I think it's slightly
3       above but I don't recall exactly.
4 BY MR. BESSETTE:
5     Q.    As part of your work in looking at
6 the volume, did you have a normal volume that you
7 calculated and then looked at deviations from that on
8 any given day?
9       MR. LEWIS: Object to the form.
10       THE WITNESS: Yeah, we did. We have
11       sort of a normal volume and we looked at each
12       day's data with that normal volume in mind,
13       so yeah.
14       We also, just for completeness
15       because it may come up at some other point,
16       we do something that looks more quantitative
17       than that in our market simulation
18       methodology for aggregation of damages. I'm
19       not referring to that and I don't think you
20       were referring to that, so if that comes up
21       later, it's not part of this discussion.
22 BY MR. BESSETTE:
23     Q.    Would you, at the lunch break, find
24 any reference that you can or tell me, check your
25 office, but what is the normal volume that you

Page 146

1      MR. LEWIS:  Takes his testimony out
2  of context.
3      THE WITNESS:  I think if I remember
4  her opinions correctly, that's a portion of a
5  sentence she may have said, that it was -- my
6  understanding is she said it was known to be
7  a problem in the industry but not certainly
8  equally to all companies in the industry, or
9  something to that effect.
10 BY MR. BESSETTE:
11     Q.    Do you have any knowledge one way or
12 the other about how extensive or common gray marketing
13 was in the golf club manufacturing industry in 1998?
14     MR. LEWIS:  Objection to form.
15     THE WITNESS:  At a very detailed
16 level, I'd say no.  I do know or I remember
17 that Callaway discussed it as a risk factor
18 or as a factor in its 10-K published in 1998
19 and that one of the other manufacturers, I
20 believe, had a press release or something to
21 that effect about gray marketing in May of
22 1998 and that it was a known issue which
23 could happen to companies, for example, as
24 set forth by Mr. Magnussen in his testimony
25 in his declaration.

Page 147

1  BY MR. BESSETTE:
2      Q.    You're not a gray marketing expert,
3  are you?
4      MR. LEWIS:  Objection.
5      THE WITNESS:  No, I wouldn't
6  describe myself as a gray marketing expert in
7  the marketing sense of that certainly.  With
8  respect to its impact on the financial
9  results of companies and how that might be
10 perceived in the marketplace for stocks and
11 the value of stocks and that sort of thing, I
12 think I have expertise on that.
13 BY MR. BESSETTE:
14     Q.    Expertise on how any factor affects
15 stock prices; is that what you're saying?
16     MR. LEWIS:  Objection to form.
17     THE WITNESS:  That isn't what I
18 said, but in the context of things that do
19 affect stock prices, the expectation of
20 future earnings and cash flows, effects on
21 business plans and that sort of thing, those
22 are areas in which I have expertise.
23 BY MR. BESSETTE:
24     Q.    That's what I understood, and gray
25 marketing is just one of those things along with any

Page 148

1  other factor that could impact future cash flows, so
2  is it to that extent you have familiarity with gray
3  marketing?
4      MR. LEWIS:  Objection to form.
5      THE WITNESS:  Yeah, that's the
6  context in which gray marketing would affect
7  areas in which I have expertise.
8  BY MR. BESSETTE:
9      Q.    The Golf Pro article again, the one
10 in front of you, did you undertake any analysis to
11 determine whether the information reported in that
12 article was ever cited in the public press before the
13 cover date of August 1, 1998?
14     MR. LEWIS:  Objection to the form.
15     THE WITNESS:  I don't recall that we
16 did see that.  I think we had recalled more
17 that there were events mentioned in this
18 article and in the September Golf Pro article
19 that had either not occurred yet or which had
20 already occurred and were referenced in the
21 article which gave you some orientation
22 toward dates, at least with respect to when
23 it was written, and when it was then either
24 edited or not edited as a result of the dates
25 of the intervening events.

Page 149

1  BY MR. BESSETTE:
2      Q.    My question --
3      A.    I don't think I remember seeing
4  press coverage of this article or events of this
5  article, that I can recall.
6      Q.    How do you determine, Mr. Miller,
7  when information has entered the public market just as
8  a general proposition?
9      MR. LEWIS:  Objection to form and
10 foundation.
11     THE WITNESS:  Generally, if you're
12 fortunate with information such as appears in
13 things that you know the distribution dates,
14 you can identify it that way, that is,
15 articles that appear in dated Wall Street
16 Journals, business wires have time and date
17 stamps on them, other publications, you know
18 when they come out, so that's the easy ones.
19     Other than that, you can try to get
20 indications from dates that are on releases,
21 such as analysts' reports and that sort of
22 thing, although with analyst reports you have
23 the problem that it's not uncommon for the
24 contents of an analyst report to be released
25 to certain parties that communicate with the

Page 158

1      A.      There was a memoranda prepared
2  either by corporate finance or equity capital market
3  person at Lehman. I'm not sure it was clearly
4  identified who it was. I think it was one of those
5  two groups, communicating to Adams to prepare for an
6  investor conference call indicating concerns being
7  expressed by customers about gray marketing and
8  expecting to have to answer questions about that topic
9  on the conference call.
10      Q.      Is it your recollection that that
11  document was reflecting actual concerns by investors?
12      A.      I don't remember the wording of the
13  document specifically enough, but I remember having
14  the impression that the author expected the topic to
15  come up at the conference call and that, for some
16  reason, I remember thinking that was based on investor
17  contact, and it may have, to some degree, reflected my
18  understanding of the equity capital market person's
19  function at Lehman with respect to monitoring the
20  price of underwritings and customer activity after the
21  IPO and that kind of stuff.
22      Q.      (Indicating.)
23          I just handed you Exhibit-177. Is
24  that the document you're referring to?
25      A.      Yeah, I believe this is.

Page 159

1      Q.      This document is from Patrick
2  Walravens at Lehman. Do you know who that is?
3      A.      Yeah, he was a corporate finance
4  person.
5      Q.      Was he involved in the underwriting?
6      A.      Yes, he was the -- trying to
7  remember his title. I think he was the associate on
8  the underwriting, if I remember correctly.
9      Q.      The third page says concerns to
10  expect from investors. Is there something on this
11  page that leads you to believe that these are concerns
12  actually expressed by investors to Lehman?
13      A.      Not other than the heading
14  suggesting that investors are likely to have these
15  concerns, at least with respect to this document. I
16  think this document clearly says what it says.
17      Q.      Do you know whether investors --
18  actually, this is for the Adams Golf conference call.
19  This is dated July 29. Do you know the date of the
20  conference call being referred to?
21      A.      I think it was early August. I
22  don't remember exactly.
23      Q.      Do you know whether there were any
24  concerns expressed on the conference call from
25  investors about discounting or gray marketing or

Page 160

1  Costco?
2      A.      No, I don't; I don't recall that.
3      Q.      You don't recall whether they did or
4  did not or you just don't recall at all?
5      A.      I don't recall whether they did or
6  didn't.
7      Q.      These concerns are in boxes,
8  Orlimar, recent performance, Callaway, new products,
9  domestic sales, and discounting. Would it surprise
10  you to learn that of all of those concerns, the only
11  one not expressed on the conference call was gray
12  marketing or Costco or discounting?
13          MR. LEWIS: Objection to form and
14      foundation.
15          THE WITNESS: No, it wouldn't
16      surprise me one way or the other. I just
17      don't recall whether it occurred or not.
18  BY MR. BESSETTE:
19      Q.      Did you review the conference call
20  transcript as part of your work in this case to see if
21  investors had expressed concern in August on the
22  conference call about discounting or gray marketing?
23      A.      I don't believe I reviewed the
24  conference call transcript.
25      Q.      Did you not think it was important

Page 161

1  to do that?
2      A.      No, I didn't.
3      Q.      Why?
4      A.      Because given all the other
5  indicators we're talking about and given the
6  identification of the issue in this memo, it indicated
7  knowledge of the issue, certainly at Lehman, and it
8  was identified by Lehman as a concern to expect from
9  investors. I don't know why they would have had some
10  thought it was a concern to expect from investors
11  unless they thought exactly that.
12      Q.      What's more important to your
13  analysis, what Lehman thought or what, actually,
14  investors thought?
15          MR. LEWIS: Objection to form and
16      foundation. Which analysis of what?
17          THE WITNESS: (No response.)
18          MR. BESSETTE: I'll withdraw that.
19  BY MR. BESSETTE:
20      Q.      Turn to Paragraph 22 of your
21  rebuttal report, if you would, please.
22      A.      (Witness complies.)
23      Q.      In Paragraph 22A, you discuss Costco
24  national purchase orders for the purchase of Adams
25  Golf clubs, right?

Page 306

1  BY MR. GLUCKOW:
2      Q.    Do you know whether there were any
3  discussions between the underwriters and Adams'
4  management concerning gray marketing or Costco in
5  connection with the Adams' press release in early June
6  concerning the Costco issue?
7          MR. LEWIS: Object to the form.
8          THE WITNESS: Again, I recall that
9      there was some discussion about that in
10     connection with the Costco issue as presented
11     in the press release and limited to that as
12     opposed to the overall problem of gray
13     marketing and sale of clubs through Costco
14     and the implications that that had for the
15     company.
16 BY MR. GLUCKOW:
17     Q.    What's the basis for your last
18 answer?
19     A.    My understanding of the conversation
20 -- the conversations that occurred around the Hoffman
21 letter with respect to addressing the SEC's inquiry
22 about whether the issue discussed in the Hoffman
23 letter had been investigated or examined by the
24 company according to materiality standard.
25         MR. LEWIS: We have to shut it down

Page 307

1      at this point. We're just at the time
2      lengths -- we're way past. This was
3      scheduled in this fashion at your guy's
4      request. There was no anticipation of going
5      after six o'clock on a Friday afternoon. We
6      all have different plans and travel plans.
7          I have one question, possibly the
8      famous one question, for Mr. Miller to get on
9      the record before we terminate.
10         MR. GLUCKOW: I'm going to object to
11     your shutting down the deposition because I
12     have not finished my examination, and I will
13     reserve all my rights.
14         MR. COLLINS: Any idea how much
15     more? We've been through this before and
16     asked you that question.
17         MR. GLUCKOW: Part of the problem is
18     every time I ask more questions, I'm getting
19     new opinions from the witness that are not
20     reflected in his written opinions in the
21     case.
22         MR. LEWIS: Because you're asking
23     him for them, you're asking what opinions he
24     may have formed aside of the opinions that he
25     has been engaged to express, and so if you

Page 308

1      keep asking someone for views they have, it's
2      not going to be surprising if they have
3      views.
4          MR. GLUCKOW: If you were willing to
5      tell me he isn't going to offer any opinions
6      concerning the underwriters' due diligence
7      beyond that which is contained in his written
8      reports, I told you a long time ago this
9      could have been completed much sooner, but
10     you won't give me that, and because you won't
11     give me that, I need to know what opinions he
12     has formed on that topic.
13         MR. LEWIS: You still haven't
14     answered Todd's question of how much longer
15     do you have to go. We're talking about
16     travel arrangements at this point for people,
17     including the witness.
18         MR. GLUCKOW: Quite honestly, based
19     on this last exchange, I think I have
20     probably another half an hour, at least.
21         MR. COLLINS: Why don't you proceed
22     with your questioning.
23 BY MR. LEWIS:
24     Q.    Mr. Miller, aside from the opinions
25 that have been expressed in your various reports about

Page 309

1  underwriters' due diligence, are there any other
2  opinions that you have formed and believe you may
3  express in the litigation on the subject of due
4  diligence?
5      A.    If asked about the topic of due
6  diligence with respect to other parties besides the
7  underwriters, I would offer the same sort of opinion
8  with respect to the conduct of due diligence by other
9  parties being signatories or defendants in this matter
10 as well.
11     Q.    Can you describe briefly what the
12 basis of that opinion would rest upon?
13     A.    Basically, my understanding that the
14 opportunity afforded for the due diligence defense is
15 the same, or essentially the same, under Section 11,
16 that is, that a party can establish that he performed
17 a reasonable and adequate investigation and thereafter
18 had a reasonable basis to believe that the prospectus
19 was not misleading, and that that would be the primary
20 basis, that is, that the same essential standard
21 applies and the same result occurred here.
22     Q.    Have you formed any views,
23 preliminary or otherwise, as to whether the officer
24 and director defendants in this litigation are
25 entitled to avail themselves of the due diligence

Page 310

1  defense?
2      A.     As I said, my understanding is that
3  that defense is available to them if they can
4  establish it.
5      Q.     Have you seen any facts that lead
6  you to believe they have established it or could
7  establish it?
8      A.     I have not seen any indication so
9  far that they have established it or, from what I have
10 seen, could do so.
11         MR. LEWIS:  I have no further
12 questions.
13         MR. GLUCKOW:  I'll note for the
14 record that notwithstanding the supposed
15 constraints on our time, Mr. Lewis just asked
16 far more than his one question and he asked
17 it without counsel for said director and
18 officer defendants being here, and that, as I
19 said, I have a lot more to cover and I'm sure
20 that my colleagues in the defense side would
21 like to speak to Mr. Miller about the topics
22 that have just been testified to which, as
23 far as I know, have not been covered in any
24 of the written reports.
25         MR. LEWIS:  The record will reflect

Page 311

1  my questions took about two minutes or less,
2  and the record will reflect Mr. Bessette,
3  without prior notice, absented himself from
4  the deposition without saying he wasn't
5  coming back, so I think we should close it
6  down for the day.
7         MR. GLUCKOW:  Again, for the record,
8  as far as I am concerned, this deposition has
9  not concluded, remains open, and we reserve
10 all of our rights.
11
12         - - -
13         (Witness excused.)
14         - - -
15 (Deposition concluded at 6:27 p.m.)
16         - - -
17
18
19
20
21
22
23
24
25

Page 312

1         C E R T I F I C A T E
2
3      I hereby certify that the witness was
4  duly sworn by me and that the deposition is a true
5  record of the testimony given by the witness.
6
7
8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
9      BETH A. BARKOCY, CSR
10     Dated:  August 16, 2006
11
12
13      (The foregoing certification of this
14 transcript does not apply to any reproduction of the
15 same by any means, unless under the direct control
16 and/or supervision of the certifying shorthand
17 reporter.)
18
19
20
21
22
23
24
25

Page 313

1      INSTRUCTIONS TO THE WITNESS
2
3      Please read your deposition over carefully
4  and make any necessary corrections.  You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7      After doing so, please sign and date the
8  errata sheet.
9      You are signing same subject to the changes
10 you have noted on the errata sheet, which will be
11 attached to your deposition.
12      It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the transcript by you.  If you
15 fail to do so, the deposition transcript may be deemed
16 to be accurate as submitted and may be used in court.
17
18
19
20
21
22
23
24
25