Pulido-Crowe, Olga

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

In Re Adams Golf, Inc.           )

Securities Litigation            )   No. 99-37 KAJ

                                 )

_____  )

DEPOSITION OF OLGA A. PULIDO-CROWE

WEDNESDAY, MAY 17, 2006

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(888) 777-6690   (215) 241-1000

Page 22

1    A. Under this category specifically, I --
2  I don't recall. I believe most of them are
3  all-encompassing under the major strategic issues.
4  But we would have looked at, you know, can they get
5  enough employees? You know, what does the market look
6  like here in terms of people that they might be able
7  to hire if their demand was increasing? Could they
8  get the labor, the workforce to do so? Would the
9  workforce be trained efficiently enough? Because to
10 handle the call centers, to handle the custom-made
11 golf-type things, what do they have?
12     That would be some of the things that we
13 would look at.
14    Q. Do you recall if the topic of gray marketing
15 came up under this category or in any other context?
16    A. Gray marketing came -- the topic of gray
17 marketing did come up during our discussions. It
18 wasn't a primary term, you know, that we use. But the
19 issues of gray marketing did come up and was looked at
20 under these categories.
21    Q. Who looked at them?
22    A. Our -- myself and our team. It's all part
23 of, you know, what is out there in terms of the --
24 what the company is facing and what's material.
25     And I think, for Adams, the primary risk was

Page 23

1  new product introduction and competition from
2  competitors, competitive lines of golf clubs. That
3  was one of the primary risks and most material.
4     Q. When you say that you and your team looked at
5  gray marketing, what exactly did you do in looking at
6  gray marketing?
7     A. Well, we did a number of things. Gray
8  marketing was not -- we weren't saying, "Let's look at
9  gray marketing." We were saying, "Let's look at the
10 issues surrounding the market for the clubs and how
11 Adams distributes them."
12     And so we did numerous things. We spoke, of
13 course, to the company and their sales force and their
14 salespeople. We did due diligence with their
15 customers, their dealers. We talked to, you know,
16 other -- I guess I have a lot of anecdotal evidence
17 that I would do personally as well and when we look at
18 all of these issues facing Adams.
19     So besides looking at information provided by
20 the company and talking to the company and talking to
21 third parties and verifying what we were learning,
22 there was other anecdotal evidence, I guess you might
23 say, that I know I personally did.
24    Q. Okay. Let me go back to a couple of things.
25    A. Okay.

Page 24

1    Q. You said you spoke with the company and their
2  sales force.
3    A. Mm-hmm.
4    Q. Who did you speak with?
5    A. Well, as part of the due diligence process,
6  you know, we speak with management of the company.
7  And that would have been, I think -- well, I was going
8  to refer to one of the documents we have here, a list
9  of names.
10   Q. Feel free to refer back.
11   A. Okay. Well, if we look at the agenda --
12   Q. Are you looking at Exhibit 143?
13   A. Yeah, Page -- is this 153? Yes. Page 8724.
14   Q. Okay.
15   A. So we spoke with Barney Adams, Jim Farrell,
16 Walt DeVault, Mark Gonsalves -- and I'm just reading
17 from this list -- Dick Murtland, Steve Sanozaro. And
18 those were the formal discussions.
19     We would also speak to people when we --
20 when we were present at the site. You know, as you're
21 there, you would talk to people that you would run
22 into, basically, and ask them, "How do you like" --
23 "What do you think?" "What's going on?" There were
24 random discussions that we would have that were off
25 the official list of people.

Page 25

1    Q. When you spoke with the folks on the official
2  list, did the topic of gray marketing ever come up?
3    A. In the -- in the context of what are the
4  risks facing the company and in the context of what --
5  looking at the dealers and the sales process.
6     Again, it wasn't -- gray marketing itself,
7  we didn't -- it's not something that -- it was part of
8  it. We definitely talked about it, but it wasn't a
9  significant, material issue. There were a lot of
10 other terms used for that in looking at that issue.
11 I -- my term is "stuffing the channels," that kind of
12 thing. What are we doing -- that was one of the ways
13 that we would look at that. And a lot of that would
14 be explored also when we spoke to the -- the retailers
15 and did our due diligence of customers.
16     Am I answering that?
17   Q. I think so, and I -- I know you're trying,
18 and you're doing a great job.
19   A. Okay.
20   Q. When you spoke with the people listed on
21 Page 2 of the memo, 8724, did any of them tell you
22 that gray marketing was affecting Adams Golf or that
23 it wasn't affecting Adams Golf? Just trying to get
24 the idea of the nature of the communications.
25   A. Was affecting? I mean, I wouldn't use that

Page 26

1  term, "affecting." Gray marketing is a factor in --
2  in manufacturing and retailing. It's something that
3  everybody faces. How do the products get to
4  unauthorized markets? It's in the newspapers every
5  day. We see it with videos and CDs and, you know,
6  rip-offs here and there of -- how did that movie
7  get -- you know, DVD get out there on a movie that
8  hasn't been released yet? It's an issue that just
9  about everybody faces.
10      So, yes, it was discussed and mentioned in
11 that respect.
12      Q. When you were doing your work with Cobra,
13 was gray market an issue back then?
14      A. It's not -- I don't like the term "issue."
15 It's a -- something that's present definitely in the
16 market.
17      So I would say, for Cobra, you know, where
18 the clubs were showing up, yes, that was discussed and
19 how would people get them. It was more in the context
20 of, Are these knockoffs? You know, what is it that's
21 out there? And are there knockoffs being made or
22 fakes? You know, that kind of thing, that -- and
23 who's doing it, and is that a huge problem? How do
24 you protect your name, your brand from these rip-offs,
25 like the Gucci bags that are not real Gucci bags, that

Page 27

1  kind of thing?
2      You know, that was a lot of the context that
3  was -- that we discussed that kind of thing.
4      Q. And at the time that you were working with
5  Cobra, did they actually have product in the gray
6  market?
7      A. I don't -- I don't recall. I would --
8  I guess I don't recall. I would assume, because
9  almost everybody has that issue.
10     Q. Okay. At the time of the Adams IPO -- let me
11 rephrase that.
12     At the time you were working with Adams to do
13 the underwriting, were you aware of any Adams product
14 in the gray market?
15     A. We were -- we discussed the Costco issue,
16 that clubs had appeared at a Costco. I don't remember
17 the location, but someone had seen some -- what were
18 purported to be Adams Golf clubs at a Costco.
19     Q. Do you recall when this discussion occurred?
20     A. I don't recall exactly, but it was during
21 our -- probably one of our drafting sessions or one of
22 our due diligence calls.
23     Q. And these drafting sessions occurred in April
24 of 1998; is that correct?
25     A. I would have to refer back to the schedule to

Page 28

1  confirm that it was April 19 --
2      Q. And I think I've got some documents in here
3  somewhere.
4      A. Okay.
5      Q. Do you recall who it was from Adams who
6  advised you that the clubs were at Costco?
7      A. My recollection of exactly whom it was is
8  unclear. I can't say if it was Barney, if it was
9  Mark, if it was Jim. I don't remember who exactly it
10 was, but I do remember discussing the issue.
11     Q. Can you take a quick look back at
12 Exhibit 152 --
13     A. Okay.
14     Q. -- at Page 3 of the memo, which is
15 Bates-number Page 6028.
16     A. Okay.
17     Q. Paragraph D, "Due diligence."
18     A. Okay.
19     Q. Could you go ahead and read that.
20        (Witness examines document.)
21     A. March 24th. Okay.
22        (Witness examines document.)
23        Okay.
24     Q. Does that paragraph refresh your
25 recollection --

Page 29

1      A. Yes.
2      Q. -- concerning --
3         MR. CHEPIGA: Let her finish the question.
4         THE WITNESS: Oh.
5  BY MS. LELAND:
6      Q. In looking at this, can you now pinpoint a
7  date when the discussion of gray marketing that you
8  just mentioned occurred?
9      A. I can't pinpoint an exact date other than to
10 say it might have been March 24th, April 21st,
11 April 27th.
12     Q. Do you believe it was at one of these
13 meetings identified here?
14     A. Yes.
15     Q. Okay. And what exactly, to the best of your
16 recollection, was discussed concerning the gray
17 marketing?
18     A. There was -- the focus was Costco, that the
19 clubs found at -- believed to have been found at
20 Costco. And we asked, "How did they get to Costco?
21 Do you know how they got to Costco?"
22        And the company thought they -- thought they
23 might know how they got there, but they weren't sure
24 and they were going to look into it. It wasn't a
25 large number of clubs. They thought they knew who --

**Page 30**

1  how they got there, and they were going to put a stop
2  to that, that dealer/distributor. And we talked about
3  filing some type of motion or suit -- and I apologize
4  I don't know the correct term -- with Costco to -- to
5  stop that or find out where they got it, that kind of
6  thing.
7      Q. Do you recall what dealer/distributor the
8  Adams Golf people thought was selling the clubs to the
9  gray market?
10     A. No, I don't. I don't recall. But it seemed
11 like they suspected it might be one, but I don't
12 remember.
13     Q. Does King Par ring a bell?
14     A. No, I'm sorry. I don't know who.
15     Q. That's perfectly fine. I want you to answer
16 to the best that you can. Don't try to guess.
17     A. Okay.
18     Q. Do you recall what customers were interviewed
19 concerning Adams gray marketing?
20     A. I recall what customers we interviewed when
21 we did -- as part of our due diligence process and
22 discussing with them their entire relationship with
23 Adams Golf.
24     Q. Which -- can you give me the names of any of
25 those customers?

**Page 31**

1      A. I would have to refer to --
2      Q. That's fine.
3      A. -- actually, our -- actually, I'm not sure
4  where they would be listed here -- other than our
5  notes. But I remember Golfsmith being one, because
6  that was another client that we were -- potential
7  client we were talking to. And there were numerous
8  others, but I have to refer to a list --
9      Q. Okay.
10     A. -- to remember names other than Golfsmith.
11     Q. Okay. That's fine. I'm sure somewhere in
12 here, I've got a list.
13         Quickly, off the top of your head, do you
14 recall ever speaking with anyone at WDC Mackenzie?
15     A. I don't think so.
16     Q. Okay. They were the Canadian distributors of
17 the Adams Golf product.
18     A. Yes. I do not remember talking to them.
19     Q. Okay.
20     A. Canada wasn't a big market. We were looking
21 at Europe and Asia.
22     Q. When you were talking with folks at
23 Adams Golf, did you ever talk with Chris Beebe?
24     A. Chris Beebe? I have to look at the list of
25 names.

**Page 32**

1      Q. Sure.
2      A. It's back in this; right?
3      Q. I believe so.
4      A. I don't -- I would have to be reminded.
5  I don't -- I don't recall.
6      Q. I believe his official title was director of
7  international sales.
8      A. I don't recall. Most likely we would, but I
9  don't recall.
10     Q. Okay. And for something on that level, was
11 that the type of thing that you had your assistants or
12 people working with you --
13         MR. CHEPIGA: Excuse me. What type of thing?
14         MS. LELAND: In talking with the Adams Golf
15 staff as part of the due diligence.
16         THE WITNESS: It depends. It could be me.
17 It could be my team. It could --
18 BY MS. LELAND:
19     Q. Mr. Walravens, perhaps?
20     A. It could have been.
21     Q. Okay.
22     A. And I might have as well. I just don't
23 recall.
24     Q. That's perfectly fine.
25     A. Okay.

**Page 33**

1      Q. I'm just trying to get an idea --
2      A. Who's who. If I saw their face, maybe I
3  could remember.
4      Q. I could pretty much guarantee you, I don't
5  think I have photos. Maybe some of Barney, but
6  that's, I think, about it.
7          I guess let me segue a little bit since we're
8  on the topic of the team and the staff.
9      A. Okay.
10     Q. In Exhibit 53, there is a list of the --
11         MR. CHEPIGA: 153?
12         MS. LELAND: 153.
13     Q. -- list of the working group.
14         Can you take a look at that and tell me if
15 that's a correct list of the people in the working
16 group and what the working group entailed?
17         MR. CHEPIGA: Do you want to go through all
18 the pages of that document? Starting where?
19         MS. LELAND: I think that the working group
20 list begins on Page 6 of the document, which is
21 No. 8728. Lists some folks at Adams, then Lehman.
22         MR. CHEPIGA: Okay. And what is the
23 question? I'm sorry.
24 BY MS. LELAND:
25     Q. Is this -- to the best of your knowledge,

## Page 78

1  Costco in June of '98.
2     A. Okay.
3     Q. Did you have any discussions with anyone at
4  Adams concerning the litigation between June 9th
5  of '98 and July 9th of '98?
6     A. I believe I did.
7     Q. Who did you have discussions with?
8     A. I don't recall. I can recall conversations.
9  I don't remember who was actually there, but I recall
10 conversations.
11    Q. And what was said in these conversations?
12    A. My recollection was discussions to determine
13 whether or not this was a significant issue and
14 whether or not it was -- it was a significant issue.
15 And I remember concluding that it wasn't.
16    Q. On what basis did you conclude that this was
17 not a significant issue?
18    A. This type of thing happens all the time with
19 companies. Costco was not -- it wasn't a big problem.
20 There weren't lots of clubs at Costco's; it was an
21 isolated incident, and it was protection that is done
22 in the normal course of business for -- that
23 Adams Golf would do. So other golf clubs
24 manufacturers have -- do the same, protecting their
25 patent, that type of thing. It's not anything

## Page 79

1  different that -- so -- it's not anything different.
2     Q. Do you know how the suit turned out?
3     A. Not specifically. I would have to be
4  prompted. I believe it was a nonissue.
5     Q. Would you be surprised to hear the suit was
6  dismissed?
7       MR. CHEPIGA: Object to the form of the
8  question.
9       THE WITNESS: What does that mean?
10      MR. CHEPIGA: It means answer the question,
11 but I think it's a defective question.
12      THE WITNESS: Would I be surprised to find
13 out that --
14      MS. LELAND: -- the suit was dismissed.
15      THE WITNESS: I don't know.
16 BY MS. LELAND:
17    Q. Have you ever heard that the suit was
18 dismissed?
19    A. I don't recall. I just remember it not being
20 a significant issue.
21    Q. Were people at Adams taking the position that
22 this was not a significant issue?
23    A. We discussed it thoroughly. We -- so it
24 was -- it was something that was discussed. Anytime I
25 hear "legal action," it has to be discussed and

## Page 80

1  vetted. And so the issue was taken seriously; it
2  wasn't, you know, just dismissed. It was -- but it
3  was fully discussed and vetted with the company and
4  with the underwriters, and we felt it wasn't a
5  significant issue. I do recall that.
6       I -- I mean, when there is a legal issue,
7  I want to know, you know, what's going on? Is it
8  something that could impact the company significantly?
9  And we pursue that. You know, typically they're
10 around patent issues, and this one was not one that
11 was significant. There were other -- many other
12 factors that were significant, or material.
13    Q. And those factors being the ones you
14 identified previously that appear in those first
15 couple of exhibits we talked about?
16    A. Yes, to talk about competition.
17    Q. Exactly.
18    A. What's happening there.
19    Q. Do you recall how you received a copy of that
20 press release?
21    A. No, I don't. No, I don't. But I do remember
22 talking about it and discussing it.
23    Q. Could you have received it directly from
24 Adams Golf?
25      MR. CHEPIGA: Object to the form.

## Page 81

1       THE WITNESS: Could I have?
2       MR. CHEPIGA: That's what I'm objecting to.
3  BY MS. LELAND:
4     Q. Just trying to find out if it came through
5  your in-house research or if Barney sent it to you.
6       Do you recall seeing a draft of the press
7  release?
8     A. I don't know if I saw it. I don't know if I
9  saw a draft. But Barney contacted us frequently. You
10 know, he was discussing -- he was one of the most --
11 he talked to us a lot. We had lots of calls from
12 Barney. And so I know we discussed a lot of these
13 issues.
14    Q. What, to your knowledge, was the Adams-Costco
15 litigation intended to accomplish?
16    A. What was it intended to accomplish? Repeat
17 that question again.
18    Q. What was the litigation intended to
19 accomplish?
20    A. To stop the distribution of clubs wherever
21 they might be at Costco.
22    Q. In going through the due diligence process,
23 who had the final say on whether or not the presence
24 of clubs in Costco was material?
25    A. Who had the final say?