Teklits, Joseph

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - -

IN RE ADAMS GOLF, INC.   : CONSOLIDATED
                         :
SECURITIES LITIGATION    : C.A. No. 99-371 KAJ


------------------------
          Wednesday, June 7, 2006
------------------------


        Oral deposition of JOSEPH D. TEKLITS, taken

pursuant to notice, was held at the offices of

SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington

Avenue, 28th Floor, New York, New York 10017,

commencing at 10:07 a.m. on the above date, before

Beth A. Barkocy, Certified Shorthand Reporter and

Notary Public.




                    - - -


        RSA/VERITEXT COURT REPORTING COMPANY
            1845 Walnut Street, 15th Floor
              Philadelphia, PA   19103
            (215)241-1000      (888)777-6690

Page 14

| | | |
|---|---|---|
| 10:20:03 | 1 | remember? |
| 10:20:04 | 2 | A.    During that time, I don't remember |
| 10:20:15 | 3 | specifically. |
| 10:20:18 | 4 | Q.    You don't remember any of them? |
| 10:20:22 | 5 | A.    During those specific years -- |
| 10:20:32 | 6 | Q.    '97 and '98. |
| 10:20:34 | 7 | A.    During those specific years, I don't |
| 10:20:37 | 8 | recall exactly what stocks I was covering at that |
| 10:20:39 | 9 | time. |
| 10:20:39 | 10 | Q.    How long were you at Ferris Baker |
| 10:20:43 | 11 | Watts? |
| 10:20:44 | 12 | A.    Four years. |
| 10:20:44 | 13 | Q.    If you take the whole four years, do |
| 10:20:47 | 14 | you remember any other golf companies other than Adams |
| 10:20:51 | 15 | Golf? |
| 10:20:51 | 16 | A.    Yes. |
| 10:20:51 | 17 | Q.    Which ones? |
| 10:20:52 | 18 | A.    Callaway Golf, Ashworth, Cutter and |
| 10:20:59 | 19 | Buck, Family Golf Centers, Lesco, L-e-s-c-o.  That's |
| 10:21:17 | 20 | all I recall. |
| 10:21:18 | 21 | Q.    Some of those you had been analyst |
| 10:21:22 | 22 | for in your job before Ferris Baker; is that right? |
| 10:21:26 | 23 | A.    Yes. |
| 10:21:26 | 24 | Q.    Did you, so to speak, bring those |
| 10:21:30 | 25 | with you? |

Page 15

| | | |
|---|---|---|
| 10:21:31 | 1 | MR. McEVOY:  I'll object to the |
| 10:21:33 | 2 | form. |
| 10:21:34 | 3 | You can answer. |
| 10:21:39 | 4 | THE WITNESS:  I'm not clear what |
| 10:21:40 | 5 | that means. |
| 10:21:41 | 6 | BY MS. FOX: |
| 10:21:41 | 7 | Q.    Why was it that if you were an |
| 10:21:43 | 8 | analyst at one company, that you then became an |
| 10:21:47 | 9 | analyst for the same public company when you moved? |
| 10:21:56 | 10 | A.    My expertise.  One of the areas that |
| 10:22:01 | 11 | I focused on was the golf industry as an analyst at my |
| 10:22:09 | 12 | previous firm, Ladenburg Thalmann, so when hired at |
| 10:22:13 | 13 | Ferris Baker Watts, one of my duties was to also |
| 10:22:18 | 14 | continue coverage of the golf industry. |
| 10:22:21 | 15 | Q.    At your previous firm, had you had |
| 10:22:25 | 16 | any contact with Adams Golf? |
| 10:22:27 | 17 | A.    I can't recall. |
| 10:22:29 | 18 | Q.    Who is David Turner? |
| 10:22:46 | 19 | A.    My associate at Ferris Baker Watts. |
| 10:22:49 | 20 | Q.    What was his role in this IPO? |
| 10:22:54 | 21 | A.    He worked for me as an associate |
| 10:22:57 | 22 | research analyst, so he supported me. |
| 10:23:00 | 23 | Q.    Doing research? |
| 10:23:01 | 24 | A.    Yes. |
| 10:23:02 | 25 | Q.    Did he do drafting as well? |

Page 16

| | | |
|---|---|---|
| 10:23:06 | 1 | A.    Drafting of what? |
| 10:23:08 | 2 | Q.    Drafting of the reports that you |
| 10:23:10 | 3 | did. |
| 10:23:10 | 4 | A.    The research reports? |
| 10:23:11 | 5 | Q.    Yes. |
| 10:23:12 | 6 | A.    Yes. |
| 10:23:17 | 7 | Q.    By 1998, were you familiar with the |
| 10:23:24 | 8 | term gray marketing? |
| 10:23:26 | 9 | A.    Yes. |
| 10:23:27 | 10 | Q.    What was your understanding of that? |
| 10:23:37 | 11 | A.    I can't recall at the time what my |
| 10:23:38 | 12 | understanding of it was. |
| 10:23:39 | 13 | Q.    Why were you familiar with it at |
| 10:23:46 | 14 | that point? |
| 10:23:46 | 15 | A.    It's pretty common in covering |
| 10:23:50 | 16 | consumer brands, covered apparel brands, covered golf |
| 10:23:57 | 17 | brands.  It's pretty common for that term to be part |
| 10:24:02 | 18 | of any discussion of a company's fundamentals. |
| 10:24:12 | 19 | Q.    Did you know of Costco at that |
| 10:24:15 | 20 | point, beginning of 1998? |
| 10:24:20 | 21 | A.    Yes. |
| 10:24:21 | 22 | Q.    Did you associate Costco with gray |
| 10:24:24 | 23 | marketing? |
| 10:24:25 | 24 | A.    I don't recall exactly. |
| 10:24:30 | 25 | Q.    Is it your understanding of gray |

Page 17

| | | |
|---|---|---|
| 10:24:36 | 1 | marketing that at the beginning when a company is |
| 10:24:42 | 2 | having its goods in the gray market, that the |
| 10:24:45 | 3 | company's sales will increase? |
| 10:24:48 | 4 | MR. McEVOY:  Object to the form. |
| 10:24:49 | 5 | You can answer if you understand the |
| 10:24:52 | 6 | question. |
| 10:24:54 | 7 | THE WITNESS:  Can you restate it? |
| 10:24:57 | 8 | BY MS. FOX: |
| 10:24:57 | 9 | Q.    Yes.  At the beginning when gray |
| 10:24:59 | 10 | marketing begins, is it your understanding that sales |
| 10:25:06 | 11 | of the company who is being gray-marketed will |
| 10:25:09 | 12 | increase to feed the gray market? |
| 10:25:10 | 13 | MR. McEVOY:  I'm just going to |
| 10:25:12 | 14 | object to the form again. |
| 10:25:13 | 15 | You can answer if you can. |
| 10:25:13 | 16 | THE WITNESS:  No. |
| 10:25:13 | 17 | BY MS. FOX: |
| 10:25:32 | 18 | Q.    What is your understanding of the |
| 10:25:34 | 19 | effect, the ultimate effect, of gray marketing? |
| 10:25:36 | 20 | MR. McEVOY:  Object to the form. |
| 10:25:42 | 21 | THE WITNESS:  That somebody is |
| 10:25:51 | 22 | buying a product cheaper than they could find |
| 10:25:54 | 23 | it somewhere in a regular retail format. |
| 10:25:58 | 24 | BY MS. FOX: |
| 10:25:58 | 25 | Q.    What effect will that have on the |

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE INDEX NO. 99-371-KAJ

_____x                    09:38:48 AM

IN RE:  ADAMS GOLF, INC.                                     09:38:48 AM

CONSOLIDATED SECURITIES LITIGATION                           09:38:48 AM

_____x                    09:38:48 AM

                                                             09:38:48 AM

              DEPOSITION OF MARK GONSALVES                   09:38:48 AM

                 (Taken by Plaintiff)                        09:38:48 AM

                    June 6, 2006                             09:38:48 AM

                      9:30 AM                                09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

                                                             09:38:48 AM

Reported by:  Arne' Davis, CCR-Huseby No: 7299              09:38:48 AM

Page 26

1  authorized retailer of Adams; is that correct?    10:33:18 AM
2     A.  That is correct.                10:33:21 AM
3     Q.  How many clubs did MVP Sports receive    10:33:26 AM
4  by way of this trans-shipment, please?        10:33:31 AM
5     A.  I don't remember.            10:33:39 AM
6     Q.  In view of the fact that, according to    10:33:47 AM
7  this memo, MVP Sports was advertising it must    10:33:49 AM
8  have been more than a handful of clubs, I gather;    10:33:55 AM
9  is that your understanding?            10:34:00 AM
10       MR. BESSETTE:  Calls for speculation.    10:34:02 AM
11    A.  I can't go there only because retailers    10:34:04 AM
12  are fairly notorious for advertising a product    10:34:06 AM
13  they have very limited quantity to provide    10:34:11 AM
14  traffic to their store.  I'm not sure of the    10:34:14 AM
15  intent of that advertisement.        10:34:17 AM
16    Q.  That's fine.            10:34:20 AM
17       In this paragraph you say:  We called    10:34:30 AM
18  them to task, that is, King Par, for the    10:34:33 AM
19  trans-shipping.                10:34:37 AM
20       What does that mean?        10:34:38 AM
21    A.  Having that been my words, I would say    10:34:46 AM
22  what I was doing at that time was addressing our    10:34:50 AM
23  non trans-shipment policy to King Par.    10:34:59 AM
24    Q.  When you say, addressing to King Par,    10:35:09 AM
25  do you mean you simply informed King Par of that    10:35:11 AM

Page 27

1  policy?                    10:35:14 AM
2     A.  That would be correct.  I informed    10:35:15 AM
3  them.  I'm not sure at this point who at King Par    10:35:20 AM
4  I would have spoken with, but that would have    10:35:24 AM
5  been correct.  It would have been their buyer, I    10:35:30 AM
6  would say.                10:35:37 AM
7     Q.  Do you know who that was?        10:35:39 AM
8     A.  I think he was a large fat man.  I'm    10:35:42 AM
9  not good with the names but really good with    10:35:56 AM
10  physical traits of people.            10:35:58 AM
11    Q.  How did the large fat man react?    10:36:01 AM
12    A.  Nothing I can recall was any behavior I    10:36:06 AM
13  thought was unusual.            10:36:12 AM
14    Q.  This large fat man, I gather he was the    10:36:15 AM
15  buyer on behalf of King Par, correct?    10:36:20 AM
16    A.  That would be correct.        10:36:23 AM
17    Q.  That was an employee of King Par?    10:36:24 AM
18    A.  I believe so.            10:36:29 AM
19    Q.  Did the buyer, when you called him to    10:36:29 AM
20  task, express surprise at the existence of any    10:36:33 AM
21  such no trans-shipment policy?        10:36:39 AM
22    A.  I can't remember the specifics of the    10:36:42 AM
23  conversation.                10:36:43 AM
24    Q.  Now, you referred a moment ago to the    10:36:46 AM
25  no trans-shipment policy.  When was that policy    10:36:53 AM

Page 28

1  created?                    10:36:57 AM
2     A.  As a company, we have or had -- I don't    10:36:58 AM
3  know what they do now, but there was a document    10:37:05 AM
4  that we would provide to customers in regard to    10:37:08 AM
5  our policies, pricing and the fact that they're    10:37:13 AM
6  selling to the end user, the golfer, but they're    10:37:20 AM
7  not to be re-sold in a trans-shipment type    10:37:24 AM
8  manner.  When that document became a formal    10:37:27 AM
9  document, that I don't recall, but it would have    10:37:32 AM
10  been -- I don't recall.            10:37:38 AM
11       There was a document.  When it came    10:37:46 AM
12  into being, I'm not sure.  It would have been as    10:37:48 AM
13  we were starting to develop our brand.  Prior to    10:37:51 AM
14  that, there was no need for a document because we    10:37:54 AM
15  had no customers.  At some point, it came into    10:37:57 AM
16  being so that we were able to be clear with our    10:38:01 AM
17  customer base.                10:38:05 AM
18    Q.  Was this document in being as March    10:38:10 AM
19  27th, 1998?                10:38:15 AM
20    A.  That is a good question.        10:38:18 AM
21    Q.  Was it in being as of July 9th, 1998?    10:38:20 AM
22    A.  I don't remember when the document came    10:38:25 AM
23  into being.                10:38:26 AM
24    Q.  Was the document relayed or transmitted    10:38:31 AM
25  to authorized retailers once it came into being?    10:38:35 AM

Page 29

1     A.  That would have been correct.    10:38:42 AM
2     Q.  How would that transmission have gone?    10:38:43 AM
3     A.  To my recollection, we did a mailing to    10:38:48 AM
4  our customers, and I believe and you may want to    10:38:50 AM
5  check with the credit department on this, but I    10:38:57 AM
6  believe our invoices at one point in time created    10:38:59 AM
7  that document.                10:39:04 AM
8     Q.  By that document, you're referring to a    10:39:05 AM
9  statement that trans-shipment of sales to anyone    10:39:07 AM
10  other than an end user is prohibited?    10:39:13 AM
11    A.  That would have been one of the points    10:39:17 AM
12  in that document, words to that effect.    10:39:18 AM
13    Q.  Now, as of March 27th, 1998, was there    10:39:21 AM
14  any policy as to what would be what Adams Golf    10:39:26 AM
15  would do if an authorized retailer trans-shipped?    10:39:32 AM
16    A.  Because I don't remember when that    10:39:54 AM
17  document came into being, that's a difficult    10:39:55 AM
18  question to answer.  I don't know the timeline of    10:39:57 AM
19  that.                    10:40:02 AM
20    Q.  Once the document you referred to came    10:40:09 AM
21  into being what, if anything, was the sanction,    10:40:10 AM
22  if an authorized dealer trans-shipped?    10:40:13 AM
23    A.  We would have addressed what we    10:40:18 AM
24  perceived to be the trans-shipment and restate    10:40:21 AM
25  our policy.  To my knowledge, we would have -- I    10:40:27 AM

Page 122

1    Q.  Did you encourage them to take         02:36:48 PM
2    advantage of that opportunity and make a    02:36:50 PM
3    purchase?                                   02:36:52 PM
4    A.  Again, I think, it's kind of like       02:36:54 PM
5    picking your wife: It's got to be an individual  02:36:57 PM
6    decision.                                   02:37:01 PM
7        All I was simply providing was the      02:37:02 PM
8    opportunity for them to participate if they so  02:37:04 PM
9    chose.                                      02:37:08 PM
10       (Whereupon a break ensued at 2:39 PM    02:42:07 PM
11   to 2:45 PM)                                 02:42:01 PM
12   Q.  (By Mr. Collins) I have given Mr.       02:42:07 PM
13   Gonsalves the Exhibit 57, and I presume you've  02:45:32 PM
14   seen it before but I'll ask you to take a moment  02:45:35 PM
15   to look over it.  Let me know when I can ask a  02:45:39 PM
16   question.                                   02:45:43 PM
17   A.  Okay.                                   02:48:41 PM
18   Q.  Have you seen these two pages before?   02:48:42 PM
19   A.  Yes.                                    02:48:44 PM
20   Q.  Was this memo sent to you on or about   02:48:45 PM
21   August 14, 1998?                            02:48:48 PM
22   A.  Yes.                                    02:48:51 PM
23   Q.  May I ask your reaction to this when    02:48:57 PM
24   you received it?                            02:48:59 PM
25   A.  My reaction was taken in context with   02:49:00 PM

Page 123

1    the person who sent it to me.               02:49:04 PM
2    Q.  Which means what?                       02:49:09 PM
3    A.  Which means, Barney is at times able to  02:49:11 PM
4    allow his emotions to distort his thinking on  02:49:23 PM
5    certain topics.  So I took that in context as  02:49:31 PM
6    related to the content of the memo.         02:49:38 PM
7    Q.  Did you make any writing in response to  02:49:41 PM
8    this?                                       02:49:43 PM
9    A.  Not that I know of.  I'm sure I spent    02:49:45 PM
10   time with him in regard to this memo.       02:49:48 PM
11   Q.  Do you know George Klaus?               02:49:56 PM
12   A.  I know of him; I don't know him.        02:49:59 PM
13   Q.  Did you talk to George Klaus about this  02:50:01 PM
14   memo or the subject matter?                 02:50:03 PM
15   A.  Not to my knowledge.                    02:50:06 PM
16   Q.  On Point A on Page 1, that's a          02:50:12 PM
17   subjective statement but it says: The department  02:50:18 PM
18   staff, presumably refers to Inside Sales staff,  02:50:21 PM
19   has very low morale.                        02:50:28 PM
20       Was that accurate statement as of       02:50:31 PM
21   August 1998.                                02:50:32 PM
22   A.  I believe that for certain individuals  02:50:34 PM
23   that may have been an accurate statement.   02:50:37 PM
24   Q.  Why, please.                            02:50:41 PM
25   A.  I think that for a few reasons.  I      02:50:42 PM

Page 124

1    think one is the commission plans were changed a  02:50:49 PM
2    number of times as the company continued to gain  02:50:58 PM
3    more and more momentum.  So I think that    02:51:02 PM
4    potentially had something to do with it.    02:51:05 PM
5        I think Number 2, is that prospectus    02:51:08 PM
6    pretty clearly illustrates who is going to gain  02:51:12 PM
7    what.  A the time, people could take out a  02:51:20 PM
8    calculator and figure out what people's newfound  02:51:23 PM
9    paper wealth was, and I think there may have been  02:51:26 PM
10   some feelings because of that and I think,  02:51:29 PM
11   thirdly, I think there was some friction between  02:51:35 PM
12   departments and sales.                      02:51:39 PM
13   Q.  The second point, were you referring to  02:51:50 PM
14   the decline in the stock price post IPO, to pull  02:51:52 PM
15   out a calculator and determine -- I didn't  02:51:58 PM
16   understand?                                 02:52:01 PM
17   A.  When the IPO came out, it showed the    02:52:01 PM
18   holdings of the individuals, the officers and so  02:52:05 PM
19   on.  So a person could determine their newfound  02:52:10 PM
20   worth of those individuals.                 02:52:13 PM
21   Q.  I understand.                           02:52:16 PM
22       So --                                   02:52:18 PM
23   A.  Everything I just told you is           02:52:19 PM
24   speculation on my part, but it's what I believe.  02:52:21 PM
25   Q.  The third point you raised was a        02:52:24 PM

Page 125

1    conflict between departments and sales?     02:52:27 PM
2    A.  Yes.                                    02:52:29 PM
3    Q.  What did you mean?                      02:52:30 PM
4    A.  I think in most companies there is a    02:52:31 PM
5    natural conflict between Sales and Credit as an  02:52:33 PM
6    example, Sales and Order Entry.  Sales is viewed  02:52:38 PM
7    as a more lucrative profession by those that are  02:52:45 PM
8    not necessarily in it.                      02:52:50 PM
9    Q.  Point C: They know cheating, at least   02:52:59 PM
10   in the form of double shipments occurs and our  02:53:08 PM
11   concern is quietly endorsed.                02:53:13 PM
12       What is your reaction to that           02:53:18 PM
13   statement?                                  02:53:19 PM
14       MR. BESSETTE:  At the time?             02:53:23 PM
15       MR. COLLINS:  Yes.                      02:53:24 PM
16   A.  At the time, I knew of no activity.     02:53:24 PM
17   There was no evidence that has ever been    02:53:27 PM
18   presented to me that would make me believe Letter  02:53:29 PM
19   C was correct.                              02:53:32 PM
20   Q.  Jay Graeney was an Inside Sales         02:53:36 PM
21   associate?                                  02:53:40 PM
22   A.  Yes.                                    02:53:41 PM
23   Q.  Were there complaints from customers    02:53:42 PM
24   about his activities?                       02:53:43 PM
25   A.  I think there were complaints that      02:53:52 PM