**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION | § § § § | CIVIL ACTION NO. 99-371-KAJ (CONSOLIDATED) |

## ADAMS GOLF DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION TO EXCLUDE THE
## EXPERT TESTIMONY OF R. ALAN MILLER

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated:   October 30, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................1

ARGUMENT..................................................................................................................1

I.      PLAINTIFFS HAVE FAILED TO SHOW THAT MILLER'S TESTIMONY IS
        ADMISSIBLE UNDER FRE 702 ..........................................................................1

II.     NUMEROUS METHODOLOGY FLAWS RENDER MILLER'S OPINION
        UNRELIABLE AND INADMISSIBLE.....................................................................3

        A.      Miller's methodology is incompatible with efficient market theory ......................3

                1.      Miller improperly asserts that information already released to the
                        market will continue to impact stock price each time it is repeated ...........3

                2.      Miller's reliance on nonpublic information contravenes market
                        efficiency...........................................................................................4

                3.      Miller erroneously incorporates spurious dates into his analysis by
                        using improperly long event windows .........................................................5

        B.      Anecdotal use of raw dollar and percentage stock-price changes is
                fundamentally flawed: it is not a generally accepted or testable
                methodology for assessing materiality and damages.................................................7

        C.      Miller's failure to consider all evidence affecting the stock price decline
                justifies exclusion...................................................................................................9

III.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE ANY VERIFIABLE
        FACTS THAT SUPPORT MILLER'S LEAKAGE THEORY ........................................9

IV.     MILLER'S UNDISCLOSED AND UNSUPPORTED OPINIONS MUST BE
        STRICKEN ...........................................................................................................11

CONCLUSION...........................................................................................................13

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bell v. Ascendant Solutions, Inc.*,
2004 WL 1490009 (N.D. Tex. July 1, 2004) .................................................................5

*Blue Dane Simmental Corp. v. Amer. Simmental Assoc.*,
178 F.3d 1035 (8th Cir. 1999) ......................................................................................9

*Bonesmo v. The Nemours Found*,
253 F. Supp. 2d 801 (D. Del. 2003) ............................................................................12

*Carpe v. Aquila, Inc.*,
2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) .............................................................9

*Cavallo v. Star Enterprise*,
892 F. Supp. 756 (E.D. Va. 1995),
*rev'd on other grounds*, 100 F.3d 1150 (4th Cir. 1996) ...............................................7

*Cuffari v. S–B Power Tool Co.*,
80 Fed. Appx. 749 (3d Cir. 2003) .........................................................................10, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...............................................................................................1, 13

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ......................................................................................................5

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) .........................................................................................1

*Goldkrantz v. Griffin*,
1999 WL 191540 (S.D.N.Y. April 6, 1999) ..................................................................2

*In re Enron Corp. Sec., Deriv., & ERISA Litig.*,
439 F. Supp. 2d 692 (S.D. Tex. 2006) ..........................................................................4

*In re Imperial Credit Indus., Inc. Sec. Litig*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003) ........................................................................2

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) .........................................................................................6

*In re NTL, Inc. Sec. Litig.*
2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. Feb. 14, 2006) ...............................................4

*In re Paoli R.R. Yard PCB Litig*,
    35 F.3d 717 (3d Cir. 1994)...................................................................................7

*In re Polymedica Corp. Sec. Litig*,
    -- F. Supp. 2d --, 2006 WL 2776669 (D. Mass. Sept. 28, 2006) ...................3, 6, 7

*In re Safeguard Scientifics*,
    2004 WL 2644393 (E.D. Pa. Nov. 17, 2004) ...................................................13

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)..............................................................................6

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................3, 5, 7

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).......................................................................................2, 3, 7

*RMed Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. March 24, 2000) ...........................2, 3, 9

*SEC v. Lipson*,
    46 F. Supp. 2d 758 (N.D. Ill. 1998) ...................................................................9

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D. Mass. 2005)..........................................................................5

*Three Crown Ltd. Partnership v. Salomon Brothers, Inc.*,
    906 F. Supp. 876 (S.D.N.Y. 1995) ....................................................................10

## RULES

Fed. R. Civ. P. 26, Advisory Committee Notes...................................................12

Fed. R. Civ. P. 26(a)(2)(B) ...............................................................................11

Fed. R. Civ. P. 26(a)(2)(C) ...............................................................................11

## OTHER AUTHORITIES

*D. Michael Risinger, Defining The Task at Hand': Non-Science Forensic Science After*
    *Kumho Tire Co. v. Carmichael*,
    57 Wash. & Lee L. Rev. 767 (2000)....................................................................7

## INTRODUCTION

Plaintiffs have failed to meet their burden of proving that the opinions of R. Alan Miller are reliable. Miller's methods of analyzing materiality and damages do not meet any one of the eight factors this Court may consider to determine reliability. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000). The record demonstrates that Miller's opinions (1) are untested, (2) are not subject to peer review, (3) have no known rate of error, (4) have no standards controlling their application, (5) are not generally accepted, (6) are inconsistent with the event study method that has been established as reliable, (7) are not supported by Miller's purported qualifications, and (8) have no demonstrable non-judicial use. Miller has abandoned the method plaintiffs acknowledged to be the only neutral method for analyzing materiality and damages (an event study) for an ad hoc method he's dubbed the "leakage" theory. And the only academic or judicial support that Miller cites for this theory actually undermines it. In short, Miller's opinions are baseless, flawed and inadmissible.

## ARGUMENT

## I. PLAINTIFFS HAVE FAILED TO SHOW THAT MILLER'S TESTIMONY IS ADMISSIBLE UNDER FRE 702

Plaintiffs try to read defendants' burden on the negative loss-causation defense in a way that eliminates their own burden to establish Miller's reliability under *Daubert*. Plaintiffs' logic goes something like this—Miller asserts that Dr. James's testimony is unreliable and cannot be used to disprove materiality or establish the negative loss-causation defense, so Miller's opinions on materiality and damages must prevail. This circular argument misses the point—plaintiffs cannot use Miller's testimony unless they meet their own burden to show that his opinions are independently reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993) (requiring the moving party to establish reliability by a preponderance of the proof).

Miller's report contains two basic conclusions, neither of which is based on sound principles of financial economics: (1) "the gray marketing issue was material to investors or potential investors in Adams Golf," and (2) the entire stock price decline during the class period is attributable to plaintiffs' allegations. (Ex. 335 at 3; Ex. 334 at 23-24.) Defendants do not claim (as plaintiffs suggest) that every expert must utilize a "scientific methodology"—of course, experts may testify based on "technical and other specialized knowledge." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Because there is no clear line that divides one type of expert from another, however, *Daubert*'s general principles apply to all expert opinions described in Rule 702. *Id.* at 149. The test of reliability is clear—an expert may testify *only* if his opinion has a "reliable basis in the knowledge and experience of [the relevant] discipline." *Id.*

Plaintiffs have offered no evidence to show that Miller's ad hoc personal assessment, which he calls a "fundamental analysis," is a proper method of assessing materiality. Nor have they demonstrated that Miller's proportional trading model can accurately calculate damages.[1] In fact, neither of his methods is based on accepted principles of financial economics, and the overwhelming majority of courts require financial experts to use event studies or a similar method to determine materiality and measure damages.[2] Even the court in *RMed Int'l, Inc. v. Sloan's Supermarkets, Inc.*, which plaintiffs claim supports the admission of Miller's testimony,

---

[1] *See* Ex. 337 at 29-31 ¶ 76 (noting that Miller's trading model overestimates the number of shares, erroneously models subperiods, and creates a manually adjusted decline curve). Moreover, the purported consistency of his trading model with actual claims data has no basis in the summary judgment record: Miller nowhere discloses his results or the data supporting this hypothesis. (D.I. 316 at Ex. G.)

[2] *See, e.g., In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003) (citing "a number of courts [who] have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar"); *see also Goldkrantz v. Griffin*, 1999 WL 191540, at *3-6 (S.D.N.Y. April 6, 1999) (granting summary judgment on defendants' negative loss-causation defense under Section 11(e) where plaintiffs' expert did not conduct an independent statistical analysis, failed to explain why he thought a 95% confidence interval was inappropriate, and ultimately provided only a conclusory critique of defendants' statistical analysis).

required that the expert's non-statistical methodology "eliminate information specific to the defendant other than the alleged fraud that might have influenced the stock's price." 2000 U.S. Dist. LEXIS 3742, at *21-22 (S.D.N.Y. March 24, 2000). Miller has utterly failed to consider any of the other factors that affected Adams Golf's stock price during the class period. (Miller Dep. Tr. 77:19-82:14.) Of course, Miller claims his method is accurate, but the *ipse dixit* of the expert is not sufficient to demonstrate reliability. *Kumho*, 526 U.S. at 157. As explained further below and in defendants' opening brief, Miller's methods are not based on reliable principles of financial economics and, therefore, should be excluded.

## II.   NUMEROUS METHODOLOGY FLAWS RENDER MILLER'S OPINION UNRELIABLE AND INADMISSIBLE

### A.   Miller's methodology is incompatible with efficient market theory

Miller labels his analysis as consistent with market efficiency in the hope that the Court will believe he is espousing efficient market theory. This is like labeling a container of pepper "sugar" and expecting it to taste sweet. Labels cannot change the facts.[3]

Miller relies on three premises that are utterly inconsistent with market efficiency: (1) stale information affects stock price; (2) nonpublic rumors affect stock price; and (3) event windows may be extended over long periods of time.

#### 1.   Miller improperly asserts that information already released to the market will continue to impact stock price each time it is repeated

Miller's analysis hinges on the premise that information about the gray market, which is already known to the market, will nevertheless continue to impact stock price each time it is

---

[3]Plaintiffs also suggest that this Court should accept Miller's testimony because he has been an expert in many other cases. (D.I. 316 at 5.) But the number of times plaintiffs have retained Miller has no bearing on admissibility. This Court must determine that Miller's opinions are reliable before they can be admissible. And, notably, Miller's opinions in this case are more unsupportable than those he has given (and that have been starkly criticized by courts) in the past. (*Compare* Exs. 334, 335; D.I. 329 at A.80 *with Krogman v. Sterritt*, 202 F.R.D.467, 477 n.14 (N.D. Tex. 2001) and *In re Polymedica Corp. Sec. Litig.*, -- F. Supp. 2d --, 2006 WL 2776669 (D. Mass. Sept. 28, 2006) )

repeated. (Ex. 335 at 15, 20-21 ¶¶ 14, 22.) As defendants noted in their opening brief, efficient markets respond *only* to new, material information. (D.I. 286 at 7.) Plaintiffs do not, and cannot, credibly dispute this fact.

### 2. Miller's reliance on nonpublic information contravenes market efficiency

Plaintiffs obscure Miller's second premise—that nonpublic rumors can affect stock price—by claiming it is the "leakage" theory. But there is a critical mistake in plaintiffs' theory—what "leaks" must be ***public*** information. None of plaintiffs' cases hold (or even imply) that "leakage" can occur in the way Miller suggests. In *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 439 F. Supp. 2d 692 (S.D. Tex. 2006), the district court analyzed whether a series of *public* disclosures that revealed the true nature of Enron's financial statements (but did not specifically admit that certain executives had schemed to conceal debt and create fictitious revenue) was adequate to *plead* loss causation related to scheme liability under Rule 10b-5(a) and (c). *Id.* at 723-24. The *Enron* court held that the disclosures were adequate and did not need to specify the details of the fraudulent scheme because the risk that Enron would be unable to service its debt (which was concealed by the scheme) materialized when Enron *publicly disclosed* that it had declared bankruptcy. *Id.*

The district court's unpublished opinion in *In re NTL, Inc. Sec. Litig.* also fails to support Miller's theory. 2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. Feb. 14, 2006). The *NTL* court held that plaintiffs adequately *pled* loss causation by alleging that there were several *public* "disclosing events" throughout the class period, which gradually alerted investors to the truth about a *number* of problems regarding the status of NTL's businesses. *Id.* at *7-9, 32. Neither of these opinions discussed what must be proven at summary judgment to establish materiality or

loss causation, and ***neither*** of them subscribed to Miller's implausible notion that nonpublic information can create non-statistical, yet somehow still "material," stock-price declines.

Finally, the court's decision in *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250 (D. Mass. 2005) is also not instructive here. In *Swack*, the court applied a version of loss causation that has been ***expressly rejected*** by the Supreme Court in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Moreover, the *Swack* court did not find leakage theory reliable or even persuasive for that matter—in fact, the court noted that "as to [plaintiff's] likelihood of eventual success . . . her burden is a steep one" and the odds against her were long. *Id.* at 273. The *Swack* court specifically distinguished the "some showing" class-certification requirement from the "most rigorous" summary-judgment standard. *Swack,* 230 F.R.D. at 273.

Moreover, financial economics literature and the courts have specifically rejected the idea that nonpublic information can affect stock prices. (Ex. 337 at 11 ¶ 33); *see e.g., Krogman*, 202 F.R.D. at 477 n.14; *Bell v. Ascendant Solutions, Inc.*, 2004 WL 1490009, at *3 n.3 (N.D. Tex. July 1, 2004). And contrary to plaintiffs' assertion, Dr. James does not endorse Miller's theory. (D.I. 330 at 12.) Dr. James replicated Miller's peer group to analyze Miller's leakage theory— and found that "the decline in Adams Golf during [July] was certainly in line with the decline experienced by its -- the firms identified by Mr. Miller as being peers to Adams Golf, and that consistent with the discussion in [his] report, the decline appears to be a result principally of softness in the golf industry. . . ." (James Dep. Tr. 91:20-94:11.)

Miller's leakage theory is entirely inconsistent with the standard definition of market efficiency, other sound principles of financial economics and the applicable case law.

### 3.   Miller erroneously incorporates spurious dates into his analysis by using improperly long event windows

Miller's third premise has been expressly rejected by the Third Circuit itself:

5

> [O]ur Court has resolved how 'quickly and completely' public information is
> absorbed into a firm's stock price. We have decided that this absorption occurs
> 'in the period immediately following disclosure.'

*In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). Miller's opinions have

become progressively more absurd: his event windows have inexplicably grown from two days,

to five days, and now to ***twelve days***. (Ex. 335 at 7 ¶ 9 (2 days); Ex. 335 at 20 ¶ 22(A) (5 days);

Miller Aff., D.I. 329 at A.80 at 3 ¶ 8 (12 days).) While Dr. James acknowledges that a two-day

window may be appropriate where the time or disclosure date is uncertain, ***no*** academic

literature supports extending the window to twelve days.[4] (James Aff. II at 2-3 ¶¶ 3-7.) Indeed,

even at the motion-to-dismiss stage—where plaintiffs' allegations are accepted as true—the

Third Circuit has refused to look at stock-price declines past four or five days. *Merck*, 432 F.3d

at 269. The financial economics literature and case law are clear: in an efficient market the

stock-price responds immediately (*i.e.,* within a day or two) to new, material information. *In re*

*Polymedica Corp. Sec. Litig.*, -- F. Supp. 2d --, 2006 WL 2776669, *3 (D. Mass. Sept. 28, 2006)

(noting that stock prices may respond within hours or minutes); *In re Xcelera.com Sec. Litig.*,

430 F.3d 503, 513 n.11 (1st Cir. 2005) (utilizing same-day price reaction). The very academic

support cited by plaintiffs in support of Miller's theory in fact rejects it. (James Aff. II at 2-3 ¶

6.)

The reason for Miller's shifting analysis is transparent: Miller cherry-picks the specific

twelve days in July that just happen to reflect the ***largest combined dollar decline*** in the class

period. (James Aff. II at 3-4 ¶¶ 9-11 & James Ex. 17.) He begins his analysis on July 13,

1998—a date where no supposed leaked information reached the market. (D.I. 329 at A.80 at 9;

---

[4] Notably, Dr. James tested 9-day, 10-day, and 11-day windows and found that *none* of these
windows were statistically significant. (James Aff. II at 4 ¶ 11.) This suggests that Miller simply selected
the first window that yielded statistically significant results under his flawed model. As noted by Dr.
James, however, Miller's model is not, in fact, statistically significant. (James Aff. II at 5-6 ¶¶ 14 &
James Exs. 18-19.)

James Aff. II at 3-4 ¶ 9.)  His previous analysis included five or six day windows surrounding completely different days (July 21, 1998, July 22, 1998, July 29, 1998, August 19, 1998, and September 10, 1998)—beginning "two days before the [Costco] purchase order dates to two days after to allow for gradual leakage of information."  (Ex. 335 at 20 ¶ 22(A).)  His original analysis used two-day windows—the day the information was released and the day after.  (Ex. 335 at 7 ¶ 9.)

Miller's unscientific, biased selection of dates has been criticized by other courts:  "[i]t may be true, as Miller suggests, that one 'can observe a lot just by watchin', but Yogi Berra is hardly a competent expert in market efficiency."  *Polymedica*, 2006 WL 2776669, *7 (internal citation omitted); *Krogman v. Sterritt*, 202 F.R.D. 467, 477 n.14 (N.D. Tex. 2001).  The premises underlying Miller's opinion are inconsistent with market efficiency and inherently unreliable.

**B.    Anecdotal use of raw dollar and percentage stock-price changes is fundamentally flawed: it is not a generally accepted or testable methodology for assessing materiality and damages**

To be admissible, Miller's opinion must be "relevant to the task at hand."  *See Kumho,* 526 U.S. at 141 (requiring that an expert's testimony be "relevant to the task at hand"); D. Michael Risinger, *Defining 'The Task at Hand': Non-Science Forensic Science After Kumho Tire Co. v. Carmichael*, 57 WASH. & LEE L. REV. 767 (2000).  Here, Miller purports to be an expert in financial economics yet he performs no statistical tests and ignores the requirements of statistical significance. [5]

---

[5] Although Miller makes a last-minute attempt to avoid exclusion by running an "event study" after the close of discovery, as discussed in defendants' motion to strike Miller's new affidavit, that report should be excluded as untimely.  In any event, Miller's alterations to the "event study" are based on his unsupported "leakage" theory, and an improper application of an otherwise accepted method is just as unreliable as the application of an unaccepted one.  *See supra* Part III.A.2; James Aff. II; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*"); *Cavallo v. Star Enterprise*, 892 F. Supp. 756, 762-63 (E.D. Va. 1995), *rev'd on other grounds*, 100 F.3d 1150, 1159

7

Plaintiffs cite to no case law or academic authority that supports using raw dollar and percentage stock-price changes to analyze materiality and damages. Instead, plaintiffs in one breath say that an event study is "simply inadequate," (D.I. 316 at 13), but later admit that "[t]he most important reason to consider the use of an event study is that it is likely to provide a highly objective methodology for calculating the magnitude of damages and the materiality of the event that may have caused damages."[6] (D.I. 300 at 13.) Plaintiffs' misapplication of the "leakage" theory is no excuse for failing to conduct a reliable statistical analysis.

Miller actually argues that *no* financial analysis can assist the jury in this case. (Miller Dep. Tr. 42:1-45:15, 51:8-18 ("Using the event study as narrowly as defined in the purely academic world and including the results of a regression analysis with fixed event windows with artificially set thresholds . . . are some of the problems I have with the narrower academically-oriented event studies as described here and used by Mr. James.").) So Miller uses a "fundamental analysis," which is nothing more than his own personal view of materiality.[7] For example, Miller concluded that gray marketing was material because: (1) he personally believes that the lack of disclosure in the Prospectus was more significant than the actual disclosure in the June 9th press release;[8] and (2) the raw dollar and percent stock-price declines during the class

---

(4th Cir. 1996). Moreover, although Miller purports to use residual returns in his new affidavit, his analysis is fundamentally flawed. (James Aff. II.)

[6] Miller Dep. Tr. 56:13-22 ("Q: Certainly, there are legions of published peer-reviewed articles on the academic version of the event study and its use on measuring stock price movement, right? . . . A: There are a lot. It certainly is done. The procedure is done quite a lot in the finance field in academia and, sure, there have been a lot of articles involving the use of it.").

[7] And Miller admits that he has no expertise—other than his purported expertise in financial economics—that would qualify him to opine on the importance of events and disclosures about gray marketing in this case. *See* Miller Dep. Tr. 147:2-12 (admitting he is not an expert on gray marketing).

[8] *See* Miller Dep. Tr. 112:6-113:3; 113:4-22 ("Q: Did you or did you not perform a statistical test or observation to support your opinion that at the time of the IPO, the risk and impact of gray marketing was material to Adams Golf's investors? A: In the sense of the impact on likely future earnings and cash flows, I thought that the impact was likely substantial and didn't need to be tested in that sense statistically.").

8

period looked significant to him.[9]   (Miller Dep. Tr. 77:3-80:19; 88:8-90-4.)   Miller is simply

substituting his own personal opinion about the weight of particular evidence for that of the jury.

His opinions will not assist the jury's analysis—they will just replace it. *SEC v. Lipson*, 46 F.

Supp. 2d 758, 763 (N.D. Ill. 1998) ("Expert testimony may not be used merely to repeat or

summarize what the jury independently has the ability to understand."). Consequently, Miller's

hindsight and entirely subjective analysis of what was significant or material to the market

should be excluded.

### C. Miller's failure to consider all evidence affecting the stock price decline justifies exclusion

Miller attributes the entire decline in Adams Golf's stock price solely to gray marketing.

He does so despite the overwhelming evidence that there was an industry wide slow down during

the class period, that new competitive products were introduced that decreased Adams Golf's

market share, and that Adams Golf announced that it expected fourth quarter sales would be

affected by general weakness in the golf equipment market. (Ex. 336 at 4-5 ¶ 6(d), (f).) This

alone justifies exclusion of his report. *Blue Dane Simmental Corp. v. Amer. Simmental Assoc.*,

178 F.3d 1035, 1040-41 (8th Cir. 1999); *Carpe v. Aquila, Inc.*, 2005 WL 1138833, *4 (W.D. Mo.

Mar. 23, 2005); *see also RMed*, 2000 U.S. Dist. LEXIS 3742, at *21-22 (expert "eliminate[d]

information specific to the defendant other than the alleged fraud that might have influenced the

stock's price").

## III.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE ANY VERIFIABLE FACTS THAT SUPPORT MILLER'S LEAKAGE THEORY

Perhaps most importantly, Miller has not provided any verifiable facts to support his

misapplication of the "leakage" theory. Miller provides a laundry list of "partial disclosures"

---

[9] *See* Miller Dep. Tr. 108:7-21 ("The way we analyze things and most market participants tend to analyze things involves raw stock price movement and percentage movement and very often relative to some other information such as market data, comparable company data and that sort of the thing. ...").

9

that he claims could have caused Adams Golf's stock price to decline, even though none of them actually caused a statistically significant stock-price drop. (Ex. 335 at 20 ¶ 22; Ex. 337 at 11-14, 22 ¶¶ 32-42, 69.) Nevertheless, Miller repeatedly speculates—without any support in the record—that these disclosures caused the entire price decline:

- Miller posits that Costco personnel, the distributors who sold to Costco, members of the golfing community (who happened to see clubs at Costco), sales and marketing personnel at Adams Golf, and industry personnel (1) were investors in Adams Golf, (2) knew about the gray marketing of Adams Golf's clubs, (3) decided to sell their stock, and (4) therefore, caused the stock price to drop gradually as more and more of them found out and sold their stock. (Ex. 335 at 20-21 ¶ 22 A, B, C, I.) But plaintiffs have *no proof* for *any* of this. Miller can only **guess** what may have occurred. Plaintiffs rely on one email and the testimony of one witness, both of which only speculate that golfers may have been interested in buying the Company's stock. (Ex. 190; Walravens Dep. Tr. 179:13-180:13.)

- Miller also claims that the *Golf Pro* article was released at some unknown date before its cover date of August 1—but he offers no verifiable fact to cast doubt on defendants' logical reliance on the magazine's cover date. (Ex. 335 at 21 ¶ 22 E.) Miller does not purport to have any experience in the magazine publishing business, and he admits that plaintiffs' counsel told him it was published earlier. (Miller Dep. Tr. 125:15-126:19.) The only verifiable facts in the record are (1) the magazine's cover date; (2) the fact that no other publication cited an article in this issue until after August 1; and (3) the fact that no *Golf Pro* article appears to have been released before its cover date based on a review of secondary citations. (Ex. 337 at 12 ¶ 36; James Dep. Tr. 256:6-257:7.)

- Miller speculates that Callaway's July 23 press release and NationsBanc's August 4 analyst report also contributed to the stock price decline. (Ex. 335 at 21 ¶ 22 D, J.) Dr. James demonstrated that neither of these public disclosures caused a statistically significant stock price decline. (Ex. 336 ¶¶ 39-42.)

- Miller opines that a July 29 internal, nonpublic Lehman memo drafted in preparation for an upcoming analyst call "indicates market participants' concern" about gray marketing and that Lehman and some of its clients were trading based on Lehman's knowledge. (Ex. 334 ¶ 22 G, H.) Notably, Miller admits that he did not review the actual conference call transcript, which shows that not one question was asked about gray marketing during the analyst call. (Miller Dep. Tr. 160:19-161:2.)

An expert may not testify about assumptions unsupported by the facts. *Three Crown Ltd. Partnership v. Salomon Brothers, Inc.*, 906 F. Supp. 876, 894 (S.D.N.Y. 1995); *Cuffari v. S–B*

*Power Tool Co.*, 80 Fed. Appx. 749, 750 (3d Cir. 2003).  Miller simply does not identify a shred of evidence to support his untenable theory.

## IV.   MILLER'S UNDISCLOSED AND UNSUPPORTED OPINIONS MUST BE STRICKEN

Miller was given three separate opportunities to provide his opinion about the due diligence of Adams Golf's officers and directors, but to this day, he has not done so, much less provide any reliable basis or reason for any such opinion.

Miller should have indicated in his initial report that he planned to testify about the Adams Golf defendants' due diligence.  He did not.  (Ex. 334 at 1 ¶ 1.)  Miller thereafter should have given his opinion and any rebuttal of Dr. Grace's opinion in his rebuttal report.  Defendants filed Dr. Grace's report on July 14, 2006, which set forth his opinion that "the company, its officers and directors satisfactorily addressed and fulfilled their responsibilities and conducted a reasonable investigation" in preparation for the IPO.  (Ex. 310 at 5.)  Miller reviewed the Grace report in preparation for his rebuttal report and was asked to opine about "any opinions" he had in rebuttal of defendants' experts.  (Ex. 335 at 1 ¶ 1.)  But, as Miller explained, "[t]he reports which address the areas of [his] anticipated testimony [were only] those of Messrs. James and Necarsulmer."  (Ex. 335 at 1 ¶ 1.)  The Court's May 15, 2006 Scheduling Order required the parties to file rebuttal reports by July 28, 2006.  (D.I. 243.)  Miller was required to disclose his opinion and any rebuttal of Dr. Grace's opinion *no later* than this date.  FED. R. CIV. P. 26(a)(2)(C) (compelling disclosure of all matters required under Rule 26(a)(2)(B) for rebuttal experts by the Court's deadline); FED. R. CIV. P. 26(a)(2)(B) ("The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions . . . .").  Again, he did not.

11

Miller then should have disclosed his opinion, any rebuttal of Dr. Grace's opinion, and the reasons and basis therefore, at his deposition.[10]  Once again, he did not.  Miller stated at his deposition—after counsel for the Adams Golf defendants had left and after plaintiffs' counsel had cut off defendants' questioning—that he would testify at trial about the due diligence of the Adams Golf defendants.  (Miller Dep. Tr. 308:24-309:10.)  Miller stated that the basis for this opinion was his [*mistaken*] understanding that the due-diligence defense for the other defendants is essentially the same standard as that applied to the underwriters, and that he had "not seen any indication so far that [the officer and director defendants] have established it, or from what [he's] seen, could do so."  (Miller Dep. Tr. 309:11-310:10; *see also* D.I. 280 at 54-60.)  This vague—I haven't done anything to form my own opinion but I can tell you that their guy is wrong even though I don't have a basis to explain why—attitude that pervades Miller's entire opinion does not satisfy the clear mandate of Rule 26.  Miller's purported opinion and the factual basis and reasons therefore *remain undisclosed.*  Even if defendants had the opportunity to depose Miller on this issue—which they did not—they would have had no idea what to even ask him.

Plaintiffs' attempt to circumvent Rule 26 would undermine the whole point of its full-disclosure requirement: to shorten or eliminate expert depositions through full disclosure of their opinions in their written reports.  *See* Fed. R. Civ. P. 26, Advisory Committee Notes.[11]  That is precisely why "revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a

---

[10] Plaintiffs argue that defendants had the opportunity to question Miller about any undisclosed opinions at his deposition.  (D.I. 316 at 32-33.)  But Rule 26 does not impose the burden on defendants to elicit unknown theories from plaintiffs' expert.  This Court has specifically stated that "[t]he opposing party is not required to depose the expert to develop what his opinion is or the reasons for it."  *Bonesmo v. The Nemours Found.*, 253 F. Supp. 2d 801, 811 (D. Del. 2003) (clarifying the requirements of Rule 23(a)(2)(B)).

[11] "Paragraph (2)(B) requires that [a proposed expert] must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor.  The information disclosed under the former rule in answering interrogatories about the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness."

12

party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed." *Id.* This Court should exercise its power under Rule 37(c)(1) and strike plaintiffs' purported expert testimony on the due diligence of Adams Golf's officers and directors. *See In re Safeguard Scientifics*, 2004 WL 2644393, at *2 (E.D. Pa. Nov. 17, 2004).

The Court can also strike Miller's testimony on this issue under its power to enforce Rule 702. Plaintiffs have not even attempted to meet their burden to show that Miller is qualified to opine on this issue or that his testimony will be reliable. As discussed in detail in the underwriter defendants' motion to exclude his testimony, Miller has not demonstrated that he has sufficient (either recent or relevant) knowledge to qualify him as an expert on due diligence issues, much less due diligence in relation to IPOs. (D.I. 294 at 4-7.) Nor has Miller presented any facts or data to support his conclusory opinion about the Adams Golf defendants' due diligence. It is plaintiffs' burden to demonstrate that their expert is qualified and his testimony reliable. *See Daubert*, 509 U.S. at 592 n.10. They have not done so. Therefore, Miller's untimely and unsupported opinion about the Adams Golf's defendants due diligence must be excluded.

## CONCLUSION

Plaintiffs bear the burden of proving the reliability of their expert's testimony by a preponderance of the evidence. They have failed. The Court is then left with plaintiffs' bald assertion that some unspecified, nonpublic information changed the price of Adams Golf stock. Plaintiffs' tenuous position is underscored by the lack of a single case where nonpublic information was deemed to have caused a stock price decline. They have built their case for materiality and damages by using an unreliable expert opinion, and now they must live with the result—exclusion.

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas  78701

/s/ Jeffrey L. Moyer
_____
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated:  October 30, 2006

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2006, I have caused the foregoing to be served by Hand Delivery which has also been filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on October 30, 2006, I have sent by electronic mail the foregoing document(s) to the following non-registered participants:

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017



Jeffrey L. Moyer (#3309)