**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION | §<br>§<br>§<br>§ | CIVIL ACTION NO. 99-371-KAJ (CONSOLIDATED) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE <u>THE EXPERT TESTIMONY OF CHRISTIANA OCHOA</u>**

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

On Behalf of All Defendants

Dated: October 30, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. OCHOA IS NOT QUALIFIED TO BE AN EXPERT WITNESS ON GRAY MARKETING .......... 2

A. Ochoa's purported knowledge does not meet the minimum threshold required of an expert witness .......... 2

B. Reading other people's published work does not substitute for real expertise .......... 5

C. Ochoa lacks the expertise to apply the principles gleaned from her reading to the facts of this case, and thus her unsupported conclusions—based on speculation and conjecture—will only confuse the jury .......... 6

II. OCHOA IS NOT QUALIFIED TO TESTIFY ON ADAMS GOLF'S DISCLOSURE REQUIREMENTS .......... 9

CONCLUSION .......... 9

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Boucher v. United States Suzuki Motor Co.*,
73 F.3d 18 (2d Cir. 1996) ..... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ..... 2, 3

*Higginbotham v. Volkswagenwerk Aktiengesellschaft*,
551 F. Supp. 977 (M.D. Pa. 1982) ..... 2

*O'Conner v. Commonwealth Edison Co.*,
13 F.3d 1090 (7th Cir. 1994) ..... 2, 3

*Smith v. Rasmussen*,
57 F. Supp. 2d 736 (N.D. Iowa 1999) ..... 5

*Surace v. Caterpillar, Inc.*,
111 F.3d 1039 (3d Cir. 1997) ..... 2

*United States v. Paul*,
175 F.3d 906 (11th Cir. 1999) ..... 6

*Waldorf v. Shuta*,
142 F.3d 601 (3d Cir. 1998) ..... 2

*Wilkinson v. Rosenthal & Co*,
712 F. Supp. 474 (E.D. Pa. 1989) ..... 3, 6

*Wilson v. City of Chicago*,
6 F.3d 1233 (7th Cir. 1993) ..... 6

**INTRODUCTION**

Plaintiffs' expert, Christiana Ochoa, has no education on gray marketing or marketing in general. She has never taken a class on either subject, much less conducted scholarly or field research or published an article or book on either topic. She has no practical or consulting experience with gray marketing's effects. Plaintiffs dispute none of this—indeed, they concede that Ochoa has absolutely *no education, training, relevant skills or experience* in gray marketing. Plaintiffs nevertheless contend that Ochoa is qualified to be a gray-marketing expert because she has taught a law-school course (once a year for the last three years) that discusses gray marketing for a few days a year, and she has reviewed *eight* articles from the universe of literature on gray marketing for her assignment here. Plaintiffs cannot point to a single case where such marginal qualifications met Rule 702's standard of admissibility.

Plaintiffs have the burden to show that Ochoa's testimony will be helpful to the jury, and they have failed to carry that burden. Despite the undisputed fact that the number of Adams Golf clubs in Costco stores pre-IPO was insignificant,[1] Ochoa nevertheless opines that there are qualitative reasons why these insignificant sales could pose a material risk to Adams Golf. Ochoa does so by forcing analogies between selected facts from the record and hand-picked excerpts from the eight articles she read. Sometimes, she admits, she just speculates. Ochoa's "expert" opinion, which is based almost entirely on unsupported conclusions and speculation, is not admissible and will confuse, rather than assist, the jury.

Also, plaintiffs concede that Ochoa has no specialized knowledge about the Securities & Exchange Commission's disclosure requirements, yet she repeatedly opines that Adams Golf

---

[1] Ex. 303 at 5 ¶ 15 ("the absolute number of Adams Golf's clubs sold through Costco stores may seem relatively small when compared to total sales . . . ."). Unless otherwise noted, Exhibits are attached to the Declaration of Jennifer R. Brannen in Support of the Adams Golf Defendants' Motion for Summary Judgment (D.I. 284).

failed to satisfy its duty to disclose gray-marketing risks in the Prospectus. These opinions, and indeed, all of Ochoa's unfounded lay opinions, should be excluded.

## ARGUMENT

### I. OCHOA IS NOT QUALIFIED TO BE AN EXPERT WITNESS ON GRAY MARKETING

#### A. Ochoa's purported knowledge does not meet the minimum threshold required of an expert witness

Plaintiffs claim that extensive reading on a subject qualifies a witness to testify as an expert, and that only if the witness's knowledge is completely unrelated to the subject should her testimony be excluded. (D.I. 313 at 6-7.) That is not the proper standard for admissibility under Rule 702. The Third Circuit unequivocally requires an expert to possess *sufficient* knowledge of the subject matter on which she plans to testify. *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1056 (3d Cir. 1997); *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (recognizing that "[n]umerous district court opinions within this circuit provide examples of witnesses disallowed from providing expert testimony" when their experience or training was only "limited" or "minimal"). A number of circuit courts also have affirmed the exclusion of proffered expert testimony from witnesses who have some—but not enough—specialized education or experience in the relevant field. *See, e.g.*, *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F. Supp. 977, 982-83 (M.D. Pa. 1982)[2] (excluding testimony from a police officer with experience in accident investigations regarding the movement of a person inside a car involved in a head-on collision because the officer only had ***minimal*** training in accident reconstruction, physics, and the movement of bodies), *aff'd*, 720 F.2d 662 (3d Cir. 1983); *O'Conner v. Commonwealth*

---

[2] Contrary to plaintiffs' suggestion, the Third Circuit has recognized that principles from pre-*Daubert* cases are still binding precedent on questions of admissibility. (D.I. 313 at 8, 11.) In fact, in *Waldorf v. Shuta*, the Third Circuit cited the pre-*Daubert* decision in *Higginbotham* as one of "[n]umerous district courts' opinions within this circuit [that] provide examples of witnesses disallowed from providing expert testimony." 142 F.3d 601, 625 (3d Cir. 1998). If the Third Circuit still finds these cases to be authoritative after *Daubert*, then this Court should too.

*Edison Co.*, 13 F.3d 1090, 1107 & n. 19 (7th Cir. 1994) (holding that a physician's testimony that plaintiff's cataracts were radiation-induced was properly excluded when the only basis for his opinion was that, before the plaintiff, he had treated only five cases of radiation-induced cataracts).

This principle is not remarkable. The Supreme Court warned in *Daubert* that expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Therefore, district courts act as gatekeepers to ensure that purported experts have some meaningful threshold of expertise before they are allowed to testify. This is precisely why the district court in *Wilkinson v. Rosenthal & Co*, 712 F. Supp. 474 (E.D. Pa. 1989), excluded the testimony of Dr. Jaffe on excessive trading of commodities futures.

Plaintiffs spend a considerable portion of their Answering Brief trying to distinguish *Wilkinson*, but their selective citation to portions of the opinion cannot obscure the basic fact that, like Ochoa, the professor in *Wilkinson* had ***some but not sufficient*** knowledge of the relevant subject area. *Id.* at 478. The salient facts plaintiffs ignore include that Dr. Jaffe taught one course that included, "among other subjects, introductory principles of what commodity future contracts are, how they are traded, and basic trading strategies" that indirectly dealt with excessive trading, he previously conducted a study on agricultural commodity-futures contract price cycles and returns, and he once taught a half-day seminar involving speculative strategies in the stock market, including stock-index futures contracts. *Id.* at 475-76. The Court properly excluded Dr. Jaffe's testimony because his knowledge of basic principles of commodities investing ("by reason of his academic credentials and teaching experience") did not provide him with "sufficient knowledge of what constitutes excessive trading in a commodities account." *Id.* at 478.

Reading some articles on gray marketing, similarly, does not provide Ochoa with sufficient knowledge to opine on whether gray marketing was a material risk to Adams Golf under the securities laws. She admittedly has *no education, training, skill or experience* in gray marketing, marketing in general, or the golf industry. (Ex. 303 at 24-27; Ochoa Dep. Tr. 28:2-10, 29:4-7, 37:10-13; 38:20-23; 78:9-79:3, 109:7-12, 306:5-8.)

Plaintiffs go to great lengths to exaggerate Ochoa's qualifications, but her inadequacies are plain. Ochoa's "expertise" is based on a review of self-selected literature to prepare to teach an international business transactions law-school course (once a year for three years) that touches on gray marketing. (Ochoa Dep. Tr. 20:1-3; 53:7-10, 60:9-18.) This class, according to the syllabus, focuses on "introduc[ing] students to the mechanics of international business transactions and to the commercial law environment within which those transactions are negotiated and executed." (Ex. 400 at 1.) The gray-marketing related assignment ("[t]he problem of counterfeit and gray market goods") is a small subsection within the module dealing with license agreements and other international contracts. (Ex. 400 at 2-4.) And, contrary to plaintiffs' puffing, Ochoa does ***not*** "'teach the course' on gray marketing and its impact on the golf industry" or "its effect on manufacturers"—she teaches at most three or four sessions once a year on the legal aspects of gray marketing as it relates to license agreements. (D.I. 313 at 7.)

Plaintiffs have not shown how Ochoa's knowledge about the problems caused by counterfeit and gray-market goods as they relate to license agreements and other international contracts is any more applicable to Adams Golf's business model than Dr. Jaffe's knowledge of commodities trading was to excessive trading of commodities futures in *Wilkinson*. Only one page of Ochoa's twenty-two-page report discusses how Adams Golf's international distribution model made it "particularly vulnerable to gray marketing." (Ex. 303 at 15-17 ¶¶ 24-26.) So the bulk of her opinions—about, among other things, how a company's brand name, profit margins



RLF1-3076318-1

and high demand for its product precipitate gray marketing and how gray marketing negatively affects a company's pricing policy, relationships with its distributors, product desirability and future sales—come exclusively from reading other people's articles. (Ex. 303 at 5-7, 9-15, 17-21 ¶¶ 15, 19-23, 27-29.) That is not a proper basis upon which to offer expert opinions.

**B. Reading other people's published work does not substitute for real expertise**

To further bolster her credentials, plaintiffs exaggerate both the extent of Ochoa's reading and its relevance to gray marketing in the golf industry. Ochoa cannot even claim that the gray-marketing articles she has read—whatever that number may be—make up a significant portion of the existing literature, because she has no idea how many academic articles even exist about gray marketing. (Ochoa Dep. Tr. 44:1-7; 47:1-14.)

Plaintiffs ask this Court to believe, without ***any*** factual foundation whatsoever, that the eight articles Ochoa chose to review for her assignment somehow enable her to draw accurate conclusions about the significance of the pre-IPO risk to Adams Golf posed by gray marketing. And, if Ochoa indeed "researches and teaches exactly what is at issue in this case"[3]—then why doesn't she refer to a single article on the golf industry to support her opinion? Even if those eight articles were, as plaintiffs suggest, the "most relevant [articles] to the task at hand,"[4] Ochoa has no basis to evaluate their reliability or to apply their principles to the facts of this case.

A number of circuit courts have specifically affirmed the exclusion of proffered expert witnesses whose knowledge is premised solely or primarily on a literature review. *See, e.g.*, *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 766-67 (N.D. Iowa 1999) (excluding testimony of an experienced, board-certified psychiatrist on the diagnosis and treatment of gender-identity

---

[3] D.I. 313 at 9.

[4] D.I. 313 at 10 n.4. (We cannot know because Ochoa is not qualified to assess this.) The eight articles are attached as Exhibits 433-39 and 443 to the Declaration of Jennifer R. Brannen in Support of the Adams Golf Defendants' Reply Brief in Support of Their Motion for Summary Judgment ("Brannen Decl. III").

disorder where a literature review was his only real contact with the field), *aff'd in relevant part*, 249 F.3d 755, 758-59 (8th Cir. 2001) ("We have found no abuse of discretion in the limitation of the testimony of witnesses who, although considered experts in certain areas, were not well-versed in the particular discipline relevant to their testimony."); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238-39 (7th Cir. 1993) (excluding testimony of pathologist, who spent several hours every week studying torture and had interviewed a number of electroshock victims, because he failed to show that he had the requisite medical or scientific knowledge to support his conclusion).[5] Like that of the proffered experts in these cases, Ochoa's testimony should be excluded.

### C. Ochoa lacks the expertise to apply the principles gleaned from her reading to the facts of this case, and thus her unsupported conclusions—based on speculation and conjecture—will only confuse the jury

Ochoa's purported "expert" opinion, which is based entirely on her application of handpicked snippets from eight articles to selective excerpts from the record, lacks proper foundation. Many of Ochoa's conclusions are based on scant support from the record. For example, the only corroborating evidence for one of Ochoa's critical findings—that Adams Golf should have known "gray marketing sales were likely to continue or intensify" after the IPO—are Costco records that *were not available* to Adams Golf's management before the IPO. (Ex. 303 at 5-7 ¶ 15.) It is black-letter law that opinions based on unsupported conclusions, such as this one, should be excluded.[6] *Wilkinson*, 712 F. Supp. at 479 ("[I]nformation which is contrary

[5] *Accord United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (excluding testimony of law professor on the limitations of handwriting analysis when his knowledge was limited to reviewing literature in the field seven years prior and co-authoring a law-review article critical of forensic document examiners' ability to reach the correct conclusion in questioned document examinations). The *Paul* court held that the professor's "skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles." *Id.*

[6] This is another reason why *Wilkinson* provides a useful analogy to this case. As plaintiffs correctly note, the court in *Wilkinson* also based its exclusion of Dr. Jaffe's testimony on the fact that his

to the established facts of the case cannot be the type of information 'reasonably relied on' to reach a sound opinion by experts in any field.")

Ochoa repeatedly miscites and omits relevant excerpts of the eight articles she read and otherwise misconstrues them to reach a desired conclusion:[7] (1) Ochoa posits that Adams Golf's "high retailer profit margins .... made its golf clubs especially attractive to gray marketers" (Ex. 303 at 13 ¶ 22), but neither article she points to cites high profit margins as a cause of gray marketing;[8] (2) Ochoa claims that Adams Golf's new brand name made it particularly susceptible to damage from gray marketing (Ex. 303 at 11-12 ¶ 21.C.)—but one article she cites actually says that a more mature product is more likely to be gray marketed;[9] (3) Ochoa insists that gray marketing could degrade Adams Golf's brand name and image (Ex. 303 at 10-13 ¶ 21), while one article she relies upon explains that the impact parallel importing may have on consumer perception and brand value is far from clear;[10] and (4) Ochoa claims that the Company took "no deliberate proactive steps to prevent gray marketing from gaining a foothold at Adams" (Ex. 304 at 14 ¶ 29)—but the idea of using "proactive" steps to combat gray marketing was not

---

opinion advanced unsupported analyses and conclusions. 712 F. Supp. at 479-81. (D.I. 313 at 10.) Similarly, Ochoa's unfounded conclusions should be excluded.

[7] This is not surprising as she does not possess the expertise to properly assess, evaluate or apply the marketing principles discussed in those articles, five of which are authored by marketing professors (Brannen Decl. III Exs. 433, 434, 435, 436, 437) and at least one of which specifically references the "four Ps of marketing" (*i.e.*, the basic marketing principles that Ochoa admitted she was unfamiliar with). (Brannen Decl. III Ex. 438 at 1346).

[8] Instead, both articles discuss how divergent profit margins—received by companies because of the different prices charged between international markets—can create a gap for gray-marketing arbitrage. (Brannen Decl. III Ex. 439 at 55 ("The basic principle is that significant price differences between markets is the stimulus for gray marketing."); Brannen Decl. III Ex. 433 at 3 (Figure 1), 7 (citing "wide price margins" between customers in different markets as a cause of gray marketing).)

[9] (Brannen Decl. III Ex. 436 at 81-82 (stating that "[a]s customers become familiar with a product category ... they become increasingly price sensitive" and more likely to purchase a good from gray-market channels).)

[10] (Brannen Decl. III Ex. 438 at 1346-47 ("In terms of potential brand equity and valuation impact it remains unclear whether consumers will be better or worse off, both in the short and longer term, as a result of parallel importing. What is also unclear is what the impact of parallel importing on consumer perception and the concomitant value of brands might be.").)

even discussed in the academic literature until 2004, *and*, even so, Ochoa admitted in her testimony that Adams Golf did, in fact, use a number of these "proactive" strategies to manage gray marketing.[11]

Finally, Ochoa's testimony should be excluded because her limited background only allows her to speculate on the risk gray marketing posed to Adams Golf. *See Boucher v. United States Suzuki Motor Co.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural. . . ."). Ochoa repeatedly forces selected facts from the record to fit her predetermined conclusions, entirely confuses correlative relationships with causative ones, and ignores altogether any other factors that may have caused what she emphatically declares was caused by gray marketing. Not surprisingly, Ochoa had to admit that a number of her conclusions involve "a certain amount of speculation." (Ochoa Dep. Tr. 218:21-219:18; 259:10-20; 269:9-19.) In fact, however, they all do.

Ochoa's testimony amounts to simply taking handpicked references to "problems" at Adams Golf and concluding that, since some of these same problems were cited in the articles she read, they must have been caused by gray marketing. For example, Ochoa testified that to conclude that gray marketing caused some of the decline in Adams Golf's sales, she "applied the academic literature on gray marketing studies, the business strategies that Adams Golf employed, [] superimposed that on the academic literature on the causes of gray marketing, the various invitations that companies can make to gray marketers, and then saw that, in fact, Adams Golf had experienced a gray market problem and made a determination based on those factors." (Ochoa Dep. Tr. 72:12-73:5.) This is not an expert analysis at all. She is merely associating business issues at Adams Golf with gray-marketing problems because they were mentioned in

[11] (Brannen Decl. III Ex. 439 at 56-58; Ochoa Dep. Tr. 102:10-17 ("Q. Did Adams Golf take any proactive steps to manage the gray marketing that was appearing? MR. COLLINS: Asked and answered several times. A. After the gray marketing occurred, yes."); 94:4-106:10.)

the articles. She does not analyze other factors that may have caused the purported sales decline or other "problems" at the Company.[12] This speculation and conjecture should not be considered at summary judgment or at trial.

## II. OCHOA IS NOT QUALIFIED TO TESTIFY ON ADAMS GOLF'S DISCLOSURE REQUIREMENTS

Plaintiffs admit that Ochoa is not qualified to testify about Adams Golf's disclosure requirements. (D.I. 313 at 12-13.) But that is exactly what she does. Ochoa claims that Adams Golf should have included gray marketing as a risk factor in its Prospectus based on her unfounded assertion that "in determining whether a given disclosure is necessary it is common to consult the risk factors described by others in a given market segment" and on her opinion that Adams Golf was not effectively responding to the gray-market risk. (Ex. 303 at 21 ¶ 30; Ex. 304 at 14 ¶ 27-29.) She also opines that Adams Golf should have disclosed "the extent to which Adams retailer profit margins exceeded competitors' retailer profit margins" and "just how detrimental the gray market could be to this Company business strategy." (Ex. 304 at 7 ¶ 12.) Ochoa is plainly not qualified to give these opinions. All of her testimony about Adams Golf's purported duty to disclose should be excluded.

## CONCLUSION

For the foregoing reasons, Ochoa lacks the requisite threshold of expertise to testify as an expert in this case. Her unsupported assertions and speculation, masquerading as an expert opinion, should be excluded.

[12] *See* Defendants' Opening Brief in Support of Their Motion to Exclude Ochoa (D.I. 288) at 6-7 (revealing the fact that Ochoa's conclusion that Adams Golf's alleged low sales-force morale was caused by gray marketing was based entirely on one memo from Barney Adams (Ex. 57), which does not mention gray marketing in relation to the perceived low morale). Contrary to plaintiffs' assertion that defendants dispute the materiality of low morale, defendants dispute Ochoa's unfounded conclusion about its causation. *Compare* D.I. 313 at 12 n.5 *with* D.I. 288 at 6-7.

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

On Behalf of All Defendants

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

Dated: October 30, 2006

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2006, I have caused the foregoing to be served by Hand Delivery which has also been filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on October 30, 2006, I have sent by electronic mail the foregoing document(s) to the following non-registered participants:

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Jeffrey L. Moyer (#3309)