**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------x
                                        :
IN RE ADAMS GOLF , INC.,                :          CONSOLIDATED
SECURITIES LITIGATION                   :          C.A. NO. 99-371-KAJ
-------------------------------------------------x

**PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO**
**ADAMS GOLF DEFENDANTS' MOTION TO STRIKE**
**MILLER AFFIDAVIT AND BROOKS**
**DEPOSITION TESTIMONY**

**ROSENTHAL, MONHAIT & GODDESS P.A.**

Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE   19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**

Todd Collins
Elizabeth Fox
Neil Mara
Shauna Itri
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

**LAW OFFICES OF DONALD B. LEWIS**

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

**KELLER ROHRBACK, LLP**

Juli F. Farris
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA  98101

Dated: November 14, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.    NATURE AND STATE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    THE MILLER AFFIDAVIT IS ADMISSIBLE . . . . . . . . . . . . . . . . . . . . 4

            1.    The Miller Affidavit Does Not Implicate Fed. R. Civ.P. 26.  . . . . 4

            2.    The Miller Affidavit Does Not Supplement Miller's
                  Opinion or Rebut James's Expert Reports, But Only
                  Addresses James's New Opinions Presented at Deposition
                  and on Summary Judgement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            3.    The Miller Affidavit Does Not Contradict Miller's
                  Prior Opinions.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            4.    The Statistical Analysis Contained in the Miller Affidavit
                  Further Illustrates Material Factual Disputes As to
                  Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    BROOKS'S DEPOSITION TESTIMONY IS ADMISSIBLE  . . . . . . . . 13

            1.    Brooks's Testimony is Non-Hearsay . . . . . . . . . . . . . . . . . . . . . . 13

            2.    Brooks Proffered Opinion Testimony Based on Personal
                  Knowledge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bohannon v. Pegelow*,
   652 F.2d 729 (7th Cir. 1981) ......................................................................... 17

*In re: CITX Corporation*,
   448 F.3d 672 (3d Cir. 2006) ............................................................................ 9

*CalMat Co. v. United States Department of Labor*,
   364 F.3d 1117 (9th Cir. 2004) ..................................................................... 14

*Fun-Damental Too, Ltd. v. Gemmy Industrial Corp.*,
   111 F.3d 993 (2d Cir. 1997) ................................................................... 13, 14

*Hart v. O'Brien*,
   127 F.3d 424 (5th Cir. 1997) ....................................................................... 17

*John Hancock Mutual Life Insurance Co.*,
   585 F.2d 1289 (5th Cir. 1978) ..................................................................... 17

*Mahlandt v. Wild Canid Survival & Research Center, Inc.*,
   588 F.2d 626 (8th Cir. 1978) ....................................................................... 15

*Prudential Prop. & Cas. Ins. Co. v. Remed Recovery Care*,
   136 Fed. Appx. 489 (3d Cir. 2005) ............................................................. 16

*In re: Safeguard Scientifics*,
   2004 WL 2644393 (E.D. Pa. 2004) ........................................................... 4,7

*Suter v. General Accident Ins. Co.*,
   2006 U.S. Dist LEXIS 51853 (D.N.J. 2006) ................................................ 16

*United States v. Lake*,
   150 F.3d 269 (3d Cir. 1998) ......................................................................... 17

# FEDERAL STATUTES

Fed. R. Civ. P. 26 ......................................................................................... *passim*

Fed. R. Civ. P. 37 ................................................................................................ 6

Fed. R. Civ. P. 56 ......................................................................................... *passim*

Fed. R. Ev. 602 ................................................................................... 16, 17, 18

Fed. R. Ev. 801 ............................................................................................ 13, 15

# MISCELLANEOUS

Larry Y. Dann and Christopher M. James, *An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions*, 37 J. Fin. 1259 (Dec. 1982) .......................................................................... 10

W. Greene, Econometric Analysis, (4th ed. 2000) ................................................ 12

A. Craig MacKinlay, Event Studies in Economics and Finance, Journal of Economic Literature (March 1997), p. 37 ...................................................... 8

Mark L. Mitchell and Jeffrey M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, The Business Lawyer ................................................ 8

Stephen A. Saltzburg et al., FEDERAL RULES OF EVIDENCE MANUAL, VOL. 4 (9th ed. 2006) .................................................................................. 13

## I. NATURE AND STAGE OF THE PROCEEDING

Summary judgment briefing has been completed. On October 30, 2006, the

Adams Golf defendants ("defendants") filed their Motion to Strike Miller Affidavit and

Brooks Deposition Testimony ( the "motion") (D.I. 351). This is plaintiffs' Answering

Brief in response to the motion.

## II. SUMMARY OF ARGUMENT

1.   The admissibility of the Miller Affidavit, which plaintiffs submitted with

their Answering Brief to the Adams Golf Defendants' Motion for Summary Judgment

(D.I. 328, Ex. 80)( hereinafter "Miller Affidavit"), is governed by Fed. R. Civ. P. 56(c)

and 56(e). Rule 56 permits a party opposing a motion for summary judgment to serve

affidavits at any point prior to the date of the hearing. The admissibility of the Miller

Affidavit has nothing to do with expert disclosure, but rather is governed by summary

judgment practice. Thus, Fed. R. Civ. P. 26 is inapplicable – the Miller Affidavit is

neither a rebuttal expert report, nor a supplement to Miller's existing expert opinions.

2.   The Miller Affidavit addresses new opinions that James expressed, for the

first time, at his deposition. This was on the very last day of the discovery period. James

opined at deposition, for the first time, that during July 1998, the stock price of Adams

Golf tracked competitors' stock prices. Defendants then used these new opinions from

James on summary judgment in an effort to meet their burden as to negative loss

causation. Accordingly, the opinions set forth in the Miller Affidavit could not have been

advanced at an earlier stage.

3.   The Miller Affidavit contradicts none of the prior opinions or testimony

offered by Miller in this case. Instead, it further substantiates an opinion Miller has

consistently advanced throughout: the opinion that defendants fail in attempting to show that gray marketing disclosures had no effect on Adams Golf's stock price. The Miller Affidavit also is consistent with Miller's previously-expressed opinions regarding the limitations of statistical regression analysis in "leakage" cases such as this case. Indeed, the Miller Affidavit demonstrates the particular limitations of the regression analysis that defendants' expert, James, employs. The Miller Affidavit does so by establishing the statistical significance of Adams Golf's stock movements during July 1998. As Miller has consistently opined, it was a result of flawed methods and bias that James's regressions failed to detect the statistical significance of Adams Golf stock returns.

4.     Defendants offer yet another affidavit from James, this time attempting to discredit the results of Miller's regression analysis as set forth in the Miller Affidavit. Miller's statistical analysis shows that Adams Golf's price moved in reaction to gray marketing disclosures in July 1998 in a statistically significant manner. This new James affidavit fails in its purpose. Among other things, James attacks Miller's use of a 12-day "event window" even though in analogous circumstances involving "leakage" (but not when James was hired by defendants' counsel in securities litigation), James used a 26-day "event window".

5.     Defendants set forth no grounds for striking Sandra Brooks' testimony. None of Brooks' disputed testimony is hearsay. Her testimony is based on personal knowledge.

2

## III.    STATEMENT OF FACTS

Plaintiffs incorporate by reference the Statement of Facts in their Answering Brief
to Adams Golf Defendants' Motion for Summary Judgment (D.I. 328, pp. 4-24).

Miller submitted his Expert Report (D.I. 258) and his Rebuttal Expert Report (D.I.
266, hereinafter "Miller Rebuttal Report") in a timely manner, according to this Court's
May 15, 2006 Amended Scheduling Order. Miller was deposed on August 11, 2006,
which was the last day of the expert discovery period in this case. That deposition
testimony, along with his reports, constitutes the sum of Miller's expert opinion.

James testified on the same day as Miller. James's deposition had originally been
scheduled to take place prior to Miller's deposition, since defendants bear the burden to
establish negative loss causation. It was only at defendants' insistence that the schedule
was changed, so that James and Miller testified simultaneously. This precluded Miller
from addressing at his deposition the new opinions that (as described below) James set
forth for the first time at his deposition.

In their summary judgment papers, defendants cited to and relied upon the new
opinions James enunciated at deposition. D.I. 280, p. 30 (hereinafter "Defendants'
Opening Summary Judgment Brief"). In response, as part of their papers in opposition to
summary judgment, plaintiffs included the Miller Affidavit. The Miller Affidavit
addresses James's new opinions. While reiterating Miller's prior opinions regarding the
severe limitations of regression analysis in a "leakage" case such as this, the Miller
Affidavit establishes that statistical analysis, if properly conducted, refutes James's new
opinions that Adams Golf's July 1998 returns tracked relevant competitors and indices.

3

## IV.  ARGUMENT

### A.  THE MILLER AFFIDAVIT IS ADMISSIBLE.

1.  The Miller Affidavit Does Not Implicate Fed. R. Civ.P. 26.

Because the Miller Affidavit is not a supplemental or rebuttal report, Rule 26 does

not apply. Instead, the Miller Affidavit, submitted in response to defendants' Motion for

Summary Judgment, is a proper and timely submission under Rule 56, and it is that rule

that governs the analysis. *See In re: Safeguard Scientifics*, 2004 WL 2644393, at *3

(E.D. Pa. 2004) ("Because [the expert affidavit] was presented as an opposing affidavit,

rather than a rebuttal or supplemental expert report, the [affidavit] does not run afoul of

this Court's Amended Scheduling Order and may not be stricken on those grounds").[1]

2.  The Miller Affidavit Does Not Supplement Miller's Opinion or Rebut James's Expert Reports, But Only Addresses James's New Opinions Presented at Deposition and on Summary Judgement.

It is ironic that *defendants* complain about alleged untimely identification of

expert opinion evidence. In fact, it was defendants' expert, James, who, in the course of

his deposition on the final day of the expert discovery period, admitted that he had

undertaken several new analyses, entirely unknown to plaintiffs, after the filing of

James's Rebuttal Report. (James Dep Tr., pp. 82-83; 84; 93; 95; 99; 105; 113; 164-165;

255-256 (attached hereto as Ex. A). Plaintiffs' counsel were blindsided at the James

---

[1] "A party opposing a motion for summary judgment may serve opposing affidavits, including sworn statements by potential expert witnesses, at any point prior to the date of the hearing." *Id.* at *1; Fed. R. Civ. P. 56 (c), (e).

deposition by the surprise production of several new exhibits prepared by James.[2] These exhibits, attached hereto as Ex. B, formed the basis for previously undisclosed opinions attempting to undermine Miller's opinion by (for the first time) focusing on Adams Golf's July 1998 returns. James opined that an analysis using the indices Miller had applied revealed that Adams Golf's 1998 returns tracked relevant competitors and indices and did not impact his overall analysis. Ex. A, pp. 105-106. This July 1998 period, during which Adams stock fell precipitously (and during which James claims no statistically significant drop in Adams Stock price occurred), is at the very heart of the negative loss causation analysis.[3]

Thus, at James's deposition, plaintiffs, prejudiced by the lack of warning that James would offer new opinions, were forced to depose James on his new opinions on July 1998 returns without any preparation. Defendants then used these last-minute expert opinions in their summary judgment papers to attempt to meet their negative loss causation burden, claiming that, according to James's analysis, "during late July 1998, when plaintiffs claim that Adams' Golf stock was declining because of 'leaked' gray market information– Adams Golf's stock price virtually tracked the stock price of its competitors identified by plaintiffs' expert, Alan Miller." Defendants' Opening Summary

---

[2] James failed to produce other documents that he identified at deposition, which allegedly supported the new analyses, claiming they were unavailable. Ex. A. pp. 84, 257-258.

[3] In addition, James presented the following new opinions at his deposition: that it is possible for rumor, oral communication, or observation to materially affect stock prices, and that under some circumstances it is permissible to use event windows of two days. James Dep. Tr., pp. 116, 121-22, 126-131, 221-22.

Judgment Brief, p. 30.

In view of these new opinions, plaintiffs were required to counter with evidence of their own when responding to summary judgment. Plaintiffs' response was the Miller Affidavit. The Miller Affidavit does not rebut James's Rebuttal Report. Instead, the Miller Affidavit focuses solely on James's new opinions regarding whether Adams Golf returns tracked relevant indices during July 1998. Using statistical analysis, Miller concludes in the Miller Affidavit that Adams Golf's returns varied from the returns of the NASDAQ index to a statistically significant degree. Miller Affidavit, ¶ 8.

Given James's new opinions, incorporated into defendants' summary judgment papers, it was proper for plaintiffs to file the Miller Affidavit under Rule 56 to underline the existence of material facts concerning negative loss causation. Because Rule 26 does not apply here, defendants' demand that the Miller Affidavit be stricken pursuant to Fed. R. Civ. P. 37(b)(2)(B) should be denied.

3.    The Miller Affidavit Does Not Contradict Miller's Prior Opinions.

Defendants argue that the Miller Affidavit must be stricken under Rule 56 because it allegedly contradicts his Report and Rebuttal Report. Yet the Miller Affidavit contradicts none of the prior opinions or testimony offered by Miller in this case. In fact, it embraces Miller's earlier opinions, further substantiating that defendants cannot bear their burden of establishing that the decline in Adams Golf's stock price was unrelated to "leaking" disclosures regarding gray marketing. *Compare* Miller Affidavit, *with* Miller Report ¶ 16; Miller Rebuttal Report ¶¶ 14-22; Miller Dep. Tr., pp. 42-49.

Moreover, the Miller Affidavit reiterates Miller's "serious reservations regarding

6

the usability and appropriateness of event study regression analyses in a case such as this." Miller Affidavit, p.2, ¶5. Miller's opinion as expressed in the Miller Affidavit is unchanged – while the use of a regression analysis in general is questionable in a case such as this involving "leakage" of information, James's regression analyses in this case are uniquely and thoroughly flawed. Miller has consistently asserted that a regression analysis *as performed by James on the facts of this case* is of little or no value. This opinion is in his Rebuttal Report (Miller Rebuttal Report, ¶¶ 14-22) and his deposition transcript. Miller Dep. Tr., pp. 40-56 (attached hereto as Ex. C). However, nowhere in his work in this litigation has Miller precluded the use of regression analysis in a "leakage" case, provided the researcher employs the proper statistical tools.

In his Affidavit, Miller assumes *arguendo*, that as James and defendants assert, a statistical analysis may be a viable tool in this context, but Miller insists that any such statistical analysis must be conducted properly. Having consistently opined that James's use of a one day event window is inappropriate here because material information "leaked" into the market over a period of time that is not precisely determinable (Ex. C, pp. 42-52); (Miller Rebuttal Report, ¶14), Miller shows in his Affidavit that a more appropriate statistical analysis, using a 12-day event window, reveals statistically significant results attributable to gray marketing in July 1998. Miller Affidavit, ¶8. Accordingly, Miller's statistical analysis, as set forth in his Affidavit, does nothing to change the "flavor and theory" of the case so as to merit exclusion[4].

---

[4] Defendants' reliance on *In re: Safeguard Scientifics*, 2004 WL 2644393, is misplaced. In *Safeguard*, the court refused to strike the affidavit submitted by plaintiffs with their summary judgment response, except for one portion the court concluded was

Miller has hardly, as defendants argue, suddenly embraced regression analysis. On the contrary, Miller's opinions are rooted, and always have been, in fundamental securities analysis. *See* D.I. 330. Miller's statistical analysis, as set forth in his Affidavit, merely refutes James's new opinions regarding specifically the significance of price movements in July 1998. It is defendants' burden, not plaintiffs', on negative loss causation. It is defendants' burden, not plaintiffs', on summary judgment. Miller's statistical analysis shows that, in their own ball park of statistical regressions as opposed to fundamental analysis, defendants cannot meet their burdens.

Similarly, Miller has never insisted that the length of the window period, for purposes of statistical analysis, must be of any particular length. Ex. C, p. 46. He has also never specified the exact dates on which leakage did or did not occur during July 1998 or during any part of the Class Period. *See* Miller Rebuttal Report, ¶22; Miller Affidavit, ¶7. As the authorities acknowledge, in a "leakage" case, it is sometimes impossible to pinpoint exactly when the market absorbs material new information. See A. Craig MacKinlay, Event Studies in Economics and Finance, Journal of Economic Literature (March 1997), p. 37, attached hereto as Ex. D (in some cases it is difficult "to identify precisely the date of the event"); Mark L. Mitchell and Jeffrey M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, The Business Lawyer, p. 559 (February 1994), attached hereto as

---

new *and* contradicted the expert's prior testimony in the case. No such contradiction exists here. Also, plaintiffs in *Safeguard,* unlike plaintiffs here, were not responding to new opinions provided by defendants' expert on the last day of the discovery period and weeks after the expert's submission of his rebuttal report.

Ex. E ("For those events that are subject to leakage, defining the beginning of the event window can be problematic.")

Thus, the Miller Affidavit is anything but a "sham affidavit". It does not contradict, and it accords with, all of Miller's prior opinions and testimony in this case.[5]

4.    The Statistical Analysis Contained in the Miller Affidavit Further
      Illustrates Material Factual Disputes As to Loss Causation.

In support of their motion, defendants cite to yet another Affidavit of Professor Christopher M. James ("James Affidavit"). The James Affidavit sets forth illusory and misleading grounds for seeking to exclude the Miller Affidavit.

James ignores the fact that Miller prepared an event study in connection with his work in this case long before he presented the statistical analysis set forth in the Miller Affidavit. *See* James Affidavit, ¶ 4, attached hereto as Ex. F. This event study, set forth at Exhibit B to Miller's Rebuttal Report, identifies critical events regarding Adams Golf during the Class Period of July-October 1998, allowing the researcher to make judgments regarding whether any particular stock price movement might have been related to plaintiffs' allegations of gray marketing.

James goes on to attack Miller's use of a 12-day event window as "inconsistent with market efficiency." ¶5. He claims: "I have never seen a peer-reviewed paper or other research that would support the use of a 12-day window to determine stock price reaction to the release of new information." ¶7.

_____

[5] Defendants rely on inapposite cases to suggest that the Miller Affidavit is a "sham affidavit." For example, in *In re: CITX Corp.*, 448 F.3d 672, 678 (3d Cir. 2006), the court found the affidavit offered in response to summary judgment was "ineffective" because the affiant later "virtually disavowed the affidavit" at his deposition.

9

In making these statements, James overlooks his own article, which he prepared

when not employed by defendants in securities litigation. *See* Larry Y. Dann and

Christopher M. James, *An Analysis of the Impact of Deposit Rate Ceilings on the Market*

*Values of Thrift Institutions*, 37 J. Fin. 1259 (Dec. 1982), attached hereto as Ex. G. In this

article, James ran regressions using the common stock daily returns for 34 savings and

loan institutions. These 34 S&L's constituted all "actively traded" S&L's included

during the period in question in the Data Resources DRI-SEC file. *Id.*, p. 1262. The 34

S&L's were not, however, all of the S&L issues contained in the DRI-SEC file. As

James himself stated in the article: "four [S&L's] were eliminated because of infrequent

trading (5 or more non-trading days during the analysis period)." *Id.,* p. 1263 n. 14.

The importance of excluding these four S&L's, retaining only the 34 "actively

traded" S&L's, turned on the very same efficient market theory that, according to James

in this case, precludes an event window as long as 12 days. According to James in his

article: "substantial and compelling evidence exists which suggests that security prices

'efficiently' impound changes in expected future cash flows." *Id.*, p. 1263.

Of course, as noted in plaintiffs' Opening Brief in Support of Plaintiffs' Motion to

Strike and Exclude Testimony of Christopher James (D.I. 300), papers in support of their

motion to exclude the opinions of James, in this article James made use of a 26-day event

window. *Id.*, p. 1266. There, as here, new material information "leaked" into the

market. Surely, if a 26-day event window is appropriate for James to employ in a

"leakage" case involving efficient markets, then James should hardly complain about the

12-day event window that Miller used in his regression in this "leakage" case.

10

James proceeds in his Affidavit to continue his past practice of misreading of Miller's opinions. Miller nowhere stated, as James suggests in paragraph 9 of his affidavit, that leakage with respect to gray marketing began on July 21, 1998 or any other specific date. That is the whole point. In the present case it is difficult to determine precisely when leakage with regard to gray marketing began. That is the reason it was necessary for the event window to be at least 12 days. Miller Affidavit, ¶7. By the same token, it was difficult to determine when leakage occurred regarding possible regulatory action in James's 1982 study of S&L stock price returns. It was for that reason that James used an event window period in that instance more than twice the length of the event window period used by Miller in his regressions in the present case.

James goes on to attack Miller for "data mining" or "cherry picking" the event window. ¶12. The basis of James's attack in this regard arises from the fact that a 12-day event window - or, James admits, a 13 or 14-day event window - yields statistically significant results. *Id.* ¶11.

What James misses in this regard is that an event window stretching from the first trading day after the IPO on July 10 through approximately the end of July is precisely the period that James himself identified in the new opinions that he set forth at his deposition. In his testimony, James attacked Miller for having suggested that price movement in July 1998 could not be explained by industry-wide or general market price movements. See James Dep. Tr., pp. 93-94. It was in order to address this very point that Miller, refuting James's opinions first presented at his deposition, undertook the statistical analyses contained in the Miller affidavit.

11

Far from Miller engaging in "data-mining", Miller simply established through his analyses that statistically significant price movement occurred during July once trading began on July 10. In his affidavit attacking Miller's statistical analyses, James has merely confirmed that -- contrary to James's new opinions at his deposition -- Adams Golf prices moved in a statistically significant fashion from July 10, 1998 through the end of July 1998. *See* Ex. F, ¶11 ("the first event window that yields significant results is the 12-day event window. Furthermore, examining 13 and 14 days as an event window also yield [sic] significant results.").

It must also be said that James stands on shaky ground when he accuses some other expert in this case of "data mining" or "cherry picking." It was James who used an 18-month period to measure, allegedly, movements over the three and one half month class period. Why did James do so? Since the Class Period was so short, "I did not have a sufficient number of monthly data points to conduct a reliable statistical analysis." James Expert Report, p. 30 n. 29, attached hereto as Ex. H.

The remainder of James's attacks on Miller's regression do not go to the issue of whether the Miller Affidavit should be struck, but instead concern James's criticism of Miller's statistical approach regarding the second of Miller's two statistical models.[6]

---

[6] James's criticism is baseless. For example, James used the Chow test (*see* James Affidavit, ¶15) improperly. The text on which James relied cautioned as follows:

> An important assumption made in using the Chow test is that the disturbance variance is the same in both (or all) regressions. In the restricted model, if this is not true . . . [it will be] heteroscedastic, and our results for the classical regression model no longer apply.

W. Greene, Econometric Analysis, (4th ed. 2000), p. 292 (emphasis added). The

12

Such criticism hardly matters since, as noted, James admits statistical significant using

12, 13 and 14 day event windows. James Affidavit, ¶11. In other words, James

essentially concedes that – contrary to his new opinions at deposition – there exist

material factual issues with respect to whether Adams Golf's returns deviated from

relevant competitors and indices in a statistically significant manner. If such factual

issues exist, defendants cannot sustain their burden on negative loss causation and, of

course, they are not entitled to summary judgment.

## B.    BROOKS'S DEPOSITION TESTIMONY IS ADMISSIBLE.

Defendants' argument that portions of the deposition of Sandra Brooks ("Brooks

Deposition") are "plainly inadmissible hearsay," is incorrect. *See* Def. Br., pp. 9-10. The

testimony is not hearsay because it is not offered to prove the truth of the matter asserted

(the existence of gray marketing), but rather to show that Adams Golf had knowledge and

was on notice of the customer complaints. Furthermore, defendants' motion should be

denied because Brooks had personal knowledge of all statements plaintiffs offered into

evidence.

### 1.    Brooks's Testimony is Non-Hearsay.

Hearsay is a statement, other than one made by the declarant, "offered in evidence

to prove *the truth of the matter asserted.*" Fed. R. Ev. 801(c) (emphasis added).

"Statements are not hearsay if offered to prove that because they were made, listeners had

notice or knowledge of the information related in the statements." STEPHEN A.

_____

disturbance, or error term, that James uses in his two regressions were not the same (and
in fact quite different), rendering the validity of James's application suspect. *See* James
Affidavit, ¶15.

13

SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL, VOL. 4 (9th ed. 2006)

(stating "[i]f a statement is offered for its effect on the listener, in order to explain the

listener's conduct, it does not matter whether the declarant was telling the truth"). *See,*

*e.g., Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993 (2d Cir. 1997)

(holding evidence of dealer complaints that the infringing product was being sold at a

lower price to other retailers was not hearsay because the evidence indicated the dealers'

state of mind and was being offered to prove the existence of customer confusion, not

differential sales prices); *CalMat Co. v. United States Dep't of Labor*, 364 F.3d 1117 (9th

Cir. 2004) (holding that testimony about racially offensive name-calling and reporting the

incident to employee's supervisor was not hearsay because it was not offered for the truth

of the statements but merely to show the statements were made to show notice to the

employer).

Here, Brooks's testimony is not offered to show that gray marketing existed, but

instead to prove that defendants had knowledge and/or notice of the customer complaints

of gray marketing.[7] D.I. 328, pp. 8-9 (hereinafter "Pl. Br."). In fact, defendants concede

in their Motion, "[p]laintiffs cite all of this rampant hearsay to support their argument that

Adams Golf *knew* about extensive gray marketing before the IPO and disregarded it."

---

[7] Defendants argue that "[a]lthough Brooks admits she cannot identify with any
certainty or specificity which retailers were complaining to her about the presence of
Tight Lies in Costco, plaintiffs still cite her quotes about what these unknown retailers
told her." Def. Br., p. 9. To support this argument they string cite deposition transcript
excerpts. However, as stated above, plaintiffs are not offering this evidence to show gray
marketing existed, and therefore which retailers made the statements is irrelevant.
Plaintiffs are offering the evidence to show Adams Golf was on notice of and had
knowledge of customer complaints regarding gray marketing.

Def. Br., p. 10 (emphasis added).

Furthermore, even if this Court were to find that the statements were introduced for the truth of the matter asserted, the statements are non-hearsay party admissions pursuant to Federal Rule of Evidence 801(d)(2). The rule states that, "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Ev. 801(d)(2)(D). *See, e.g.*, *Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626, 630-31 (8th Cir. 1978) (citing Weinstein's discussion of Rule 801(d)(2)(D), "Rule 801(d)(2)(D) adopts the approach . . . which, as a general proposition, makes statements made by agents within the scope of their employment admissible . . . . Once agency, and the making of the statement while the relationship continues, are established, the statement is exempt from the hearsay rule so long as it relates to a matter within the scope of the agency.").

Here, Brooks's testimony regarding statements by Mark Gonsalves, the Adams Golf director of sales, and Katherine East, another Adams Golf salesperson, are party admissions. The statements were offered against Adams Golf; East and Gonsalves were both agents of Adams Golf; and their statements concerned matters within the scope of their employment, during the existence of the employment relationship.[8] Thus, the

---

[8] Defendants point to Brooks' testimony that Gonsalves said, "keep working on it", and "I don't know," in response to Brooks notifying him of the gray marketing issue. Defendants assert that this is inadmissible hearsay. Def. Br. 10. For the reasons stated above, this is a party admission. Defendants also state in their brief, "plaintiffs resort to double hearsay, citing Brooks quoting Katherine East . . . purportedly describing the complaints East received from retailers." Def. Br., p. 10. However, because East was an Adams Golf salesperson at the time, and the statements she made were made within the

15

statements are non-hearsay party admissions, and they are admissible.

Additionally, statements made by customers to Brooks are admissible under the present sense impression and excited utterance exceptions. Sandra Brooks testified that "a big client of mine called up complaining that he was at Costco and saw Adams clubs at Costco . . .. That's how I first found out about it." Brooks Dep. Tr., p. 12, attached hereto as Ex. I. When she was asked by counsel "what did they say to you?" she replied "well he was pretty mad. He was pretty mad, like: Why are these clubs showing up in Costco? Why are you -- why are you-all giving these clubs to Costco?" Brooks Dep. at 13. Later Brooks testified that "some green-grass accounts [country club proshops] would call and they say the same thing and they'd get upset." *Id.* at p. 15.

The comments of the "big client" and the green-grass accounts as quoted by Brooks are present sense impression "he was at Costco and saw Adams Clubs at Costco" and excited utterances "he was pretty mad." *See, e.g., Prudential Prop. & Cas. Ins. Co. v. Remed Recovery Care,* 136, Fed. Appx. 489, 494 (3d Cir. 2005) (admitting utterances under Fed. R. Evid. 803(2)); *Suter v. General Accident Ins. Co.*, 2006 U.S. Dist LEXIS 51853, at * 9-10 (D.N.J. 2006) (admitting a memo concerning a telephone conversation with declarant of the same date as a present sense impression). Thus, they are admissible for the truth that the clubs were in Costco in Seattle.

2.   Brooks Proffered Opinion Testimony Based on Personal Knowledge.

Federal Rule of Evidence 602 ("Rule 602") provides in pertinent part, "[a] witness

---

scope of her employment during the existence of the relationship, the statements are party admissions and thus admissible.

16

may not testify to a matter unless evidence is introduced sufficient to support a finding

the witness has personal knowledge of the matter. Evidence to prove personal knowledge

may . . . consist of the witness' own testimony." Fed. R. Ev. 602. Under Rule 602, lay

witnesses may offer opinion testimony about matters of which they have personal

knowledge. This may include the motivation or intent of another person, if the witness

has an adequate basis for his or her opinion, such as personal knowledge or an

opportunity to observe the surrounding circumstances. *Hart v. O'Brien*, 127 F.3d 424,

438 (5th Cir. 1997). The District Court has discretion to decide whether this burden of

personal knowledge has been met. *See United States v. Lake*, 150 F.3d 269, 273 (3d Cir.

1998).

In their brief, plaintiffs state Brooks felt Gonsalves "blew her off" in response to

her reporting customer complaints. Pl. Br., p. 8. This is admissible opinion testimony of

how Gonsalves reacted to being notified of reports of customer complaints of gray

marketing. Clearly, Brooks had personal knowledge of how Gonsalves responded to her

reports, and thus her opinion testimony is admissible. *See, e.g., John Hancock Mut. Life

Ins. Co.*, 585 F.2d 1289, 1294 (5th Cir. 1978) (allowing witness who observed altercation

first hand to testify to victim's belief that his wife would never shoot him); *Bohannon v.

Pegelow*, 652 F.2d 729, 732 (7th Cir. 1981) (permitting witness who had observed arrest

to testify that she believed arrest was motivated by racial prejudice).

Defendants then mischaracterize plaintiffs' argument, stating "[t]o show that

Costco sold large numbers of Tight Lies, plaintiffs cite Brooks saying essentially that she

had no personal knowledge of how many Tight Lies Costco sold." Def. Br., pp. 10-11.

17

However, plaintiffs did not offer Brooks's testimony as evidence of the exact amount of clubs that existed at Costco. Rather, plaintiffs offered her testimony to show Adams Golf had knowledge of customer complaints regarding gray marketing. As a senior salesperson of Adams Golf, Brooks had personal knowledge of the customer complaints, and Rule 602 does not bar admission of her testimony.

Finally, defendants mischaracterize plaintiffs' argument and Brooks's deposition testimony regarding double shipping. Plaintiffs did not offer Brooks's testimony as evidence of double shipping. Instead, plaintiffs offered Brooks's testimony to show that Adams Golf had knowledge of double shipping and/or suspicions that it was occurring. Pl. Br. 23 ("Brooks . . . confirmed at her deposition that 'all of that double-shipping business was going on with Jay . . . I'm pretty sure Mark Gonsalves knew about that.'") This is opinion testimony-- Brooks opined that Adams Golf had knowledge of double-shipping and/or suspicions of double-shipping. Brooks's opinion testimony is based on personal knowledge of conversations regarding double-shipping among Adams Golf sales representatives.

Because defendants mischaracterize plaintiffs' arguments and Brooks had personal knowledge of all statements offered by plaintiffs, Federal Rule of Evidence 602 does not bar the admission of deposition testimony, and therefore the testimony can be considered on summary judgment.

18

## V.    CONCLUSION

For all the reasons discussed herein, the Adams Golf Defendants' Motion to

Strike Miller Affidavit and Brooks Deposition Testimony should be denied.

Dated: November 14, 2006

### ROSENTHAL, MONHAIT & GODDESS, P.A.

By:    /s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE   19801
(301) 656-4433
ckeener@rmgglaw.com

*Liaison Counsel for Plaintiffs and the Class*

### BERGER & MONTAGUE, P.C.

Todd Collins
Elizabeth Fox
Neil Mara
Shauna Itri
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

### LAW OFFICES OF DONALD B. LEWIS

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

### KELLER ROHRBACK, LLP

Juli F. Farris
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA  98101
*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 14th day of November, 2006, I caused

**PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO ADAMS GOLF DEFENDANTS' MOTION TO STRIKE MILLER AFFIDAVIT AND BROOKS DEPOSITION TESTIMONY** to be electronically filed with the Clerk of Court using CM/ECF,

which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the

following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com