# EXHIBIT A

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3                        - - -
4      IN RE: ADAMS GOLF, INC. :
5      SECURITIES LITIGATION    :
6

                             X
7

                      ORAL DEPOSITION
8

                            OF
9

                    CHRISTOPHER M. JAMES
10

                Friday, August 11, 2006
11

                        - - -
12

            Oral deposition of CHRISTOPHER M.
13

       JAMES, held at the offices of AKIN GUMP
14

       STRAUSS HAUER & FELD, LLP, 590 Madison Avenue,
15

       New York, New York, commencing at 8:30 a.m.,
16

       reported by Pamela Harrison, RMR, CRR, CSR and
17

       Notary Public.
18

                        - - -
19
20
21
22

            RSA/VERITEXT COURT REPORTING COMPANY
23              1845 Walnut Street, 15th Floor
                  Philadelphia, PA   19103
24              (215) 241-1000   (888) 777-6690

CHRISTOPHER M. JAMES

Page 82

1      A.   Yes.                          11:06:41a
2      Q.   Any other indices that you used      11:06:42a
3   in this case?                         11:06:44a
4      A.   Yes. In response to the report    11:06:44a
5   of Mr. Miller, I believe his rebuttal report, I   11:06:51a
6   also undertook the analysis utilizing the S&P    11:06:57a
7   small cap and the S&P small cap together with    11:07:02a
8   the -- his peer group.                 11:07:10a
9      Q.   Am I missing something or is       11:07:19a
10  this something I haven't seen yet?      11:07:21a
11     A.   I don't know whether it's been    11:07:25a
12  produced to you, but it was something that I did   11:07:26a
13  subsequent to my rebuttal report because it was    11:07:29a
14  in response to Mr. Miller's.           11:07:34a
15        MR. COLLINS: Okay.              11:07:39a
16        MS. REED: I haven't seen it.     11:07:40a
17  BY MR. COLLINS:                        11:07:46a
18     Q.   Okay. So that work you did in     11:07:46a
19  response to Mr. Miller's rebuttal; correct?   11:07:50a
20     A.   That's right.                  11:07:54a
21     Q.   Any other work you did in        11:07:54a
22  response to Mr. Miller's rebuttal?      11:07:57a
23     A.   Yes. When I reviewed his        11:08:01a
24  rebuttal report, I investigated and prepared    11:08:08a

Page 83

1   responses to -- I thought about -- and that's   11:08:19a
2   what I meant by prepared -- I thought about    11:08:25a
3   responses to and tried to assess the validity of   11:08:30a
4   some of the issues that he raised.      11:08:36a
5         I also undertook an analysis,     11:08:39a
6   which I believe is in -- which has been marked    11:08:44a
7   as Exhibit 339 and 340, which addresses an    11:08:47a
8   issue that Mr. Miller raised in his report    11:08:53a
9   regarding his contention that the price    11:08:56a
10  decline principally in late July was    11:09:00a
11  attributable to issues concerning the gray    11:09:05a
12  market.                                11:09:11a
13     Q.   Anything else?                  11:09:13a
14     A.   I think that's -- as I sit here,   11:09:15a
15  that's a summary of the things that I did.   11:09:19a
16     Q.   Okay. Now, the work that you      11:09:21a
17  did in response to or in connection with the    11:09:23a
18  Miller rebuttal report, that work is reflected    11:09:27a
19  in part by Exhibits 339 and 340, if I heard you    11:09:34a
20  correctly.                             11:09:39a
21     A.   Yes, some of it -- some of the    11:09:39a
22  analysis that I just referred to is contained in   11:09:42a
23  339, 340.                              11:09:46a
24     Q.   Okay. Any other pieces of paper   11:09:50a

Page 84

1   or computer programs or documents of any nature   11:09:54a
2   reflect any of the work you did in response or    11:10:03a
3   in connection with the rebuttal report of    11:10:06a
4   Mr. Miller?                            11:10:08a
5      A.   I don't have any other -- I      11:10:15a
6   don't have any other paper or -- I reviewed the    11:10:22a
7   output of a market model analysis using the S&P   11:10:29a
8   small cap and the peer group from the data that    11:10:38a
9   Mr. Miller provided --                 11:10:44a
10     Q.   Okay.                          11:10:46a
11     A.   -- that I reviewed that output    11:10:48a
12  on a computer screen. I don't believe -- I    11:10:51a
13  don't think I printed it out.           11:10:54a
14     Q.   Okay. Could you do so for us,    11:10:55a
15  please.                                11:10:57a
16     A.   I believe I can recreate it.     11:11:03a
17     Q.   If you would, please.           11:11:05a
18        How long would it take you to     11:11:09a
19  recreate it?                          11:11:10a
20     A.   The estimation wouldn't take     11:11:19a
21  long.                                 11:11:21a
22     Q.   Could you ask someone to do      11:11:21a
23  that, say, at the next break or lunch and have    11:11:22a
24  it sent to us so we can take a look at it before    11:11:25a

Page 85

1   you go home?                           11:11:29a
2      A.   I'll take it under advisement.    11:11:29a
3   I would have to ask the attorneys what the    11:11:31a
4   protocol is, and if those people are available.    11:11:34a
5   I'll certainly try to look into it.     11:11:38a
6      Q.   Good. Thank you.                11:11:40a
7         And what is the nature of that    11:11:50a
8   material that's on the computer that you just    11:11:51a
9   described?                             11:11:55a
10     A.   Just so you are clear, one issue   11:11:55a
11  that I wanted to address was whether the    11:12:00a
12  conclusions that I reached with respect to the    11:12:03a
13  statistical significance of the days that I    11:12:08a
14  identify, those conclusions would differ if I    11:12:14a
15  used an S&P small cap as opposed to the NASDAQ,   11:12:20a
16  or if I used the peer group as opposed to the    11:12:26a
17  industry index in combination with the NASDAQ or   11:12:30a
18  S&P small cap.                         11:12:35a
19     Q.   Okay. And by the peer group,      11:12:36a
20  you are referring to what?             11:12:42a
21     A.   Mr. Miller's peer group.        11:12:44a
22     Q.   And what Mr. Miller was using    11:12:49a
23  was the peer group that appeared in the company    11:12:51a
24  proxy statement?                       11:12:55a

22 (Pages 82 to 85)

CHRISTOPHER M. JAMES

Page 90

1    Q.    Adams declined some, and the S&P    11:19:10a
2  small cap and Callaway declined more -- is that    11:19:14a
3  right so far? -- on or about July 23rd.    11:19:20a
4    A.    If you said Callaway and the    11:19:23a
5  peer group?    11:19:26a
6    Q.    Yes.    11:19:27a
7    A.    I think you may have said --    11:19:27a
8    Q.    You know what, let me start    11:19:29a
9  again. You are quite right.    11:19:30a
10   Am I reading this correctly    11:19:31a
11 that on July 23rd both Callaway and the peer    11:19:33a
12 group went down sharply and roughly in tandem?    11:19:36a
13   A.    Yes. I think if you go to the    11:19:42a
14 next exhibit, it might be easier.    11:19:45a
15   Q.    Okay.    11:19:49a
16   A.    340.    11:19:49a
17   Q.    Okay.    11:19:50a
18   A.    Which has the dates and the    11:19:51a
19 price decline. So on 7/23/1998; Adams is down    11:19:57a
20 13 percent -- about roughly 13 percent; Callaway    11:20:05a
21 is down 33 percent; and Miller's peer group is    11:20:08a
22 down 28.2 percent.    11:20:12a
23   Q.    I see.    11:20:14a
24   Now, Miller's peer group, do    11:20:19a

Page 91

1  you know whether it included Callaway?    11:20:22a
2    A.    It did.    11:20:23a
3    Q.    And was the peer group -- the    11:20:24a
4  peer group was comprised of how many companies?    11:20:26a
5    A.    I believe it was -- it consisted    11:20:37a
6  of Callaway, Teardrop, Aldila --    11:20:42a
7    THE COURT REPORTER: Callaway,    11:20:54a
8  comma Teardrop?    11:20:54a
9    THE WITNESS: It might help,    11:20:54a
10 it's on the top line on the first page of    11:20:54a
11 Mr. Miller's report.    11:21:02a
12 BY MR. COLLINS:    11:21:04a
13   Q.    Okay.    11:21:04a
14   A.    I can read these off, but it may    11:21:04a
15 be helpful for the court reporter just to look    11:21:08a
16 at them.    11:21:10a
17   It would be Callaway, Teardrop,    11:21:10a
18 Aldila, Coastcast, Arnold Palmer, and Golden    11:21:14a
19 Bear.    11:21:18a
20   Q.    Now, as you used the peer group    11:21:27a
21 on Exhibits 339 and 340, was it a weighted group    11:21:41a
22 or was it unweighted, based on the size or the    11:21:51a
23 market caps or some other characteristics of the    11:22:01a
24 companies making up the peer group?    11:22:06a

Page 92

1    A.    I used the peer group return as    11:22:08a
2  reported by Mr. Miller in his rebuttal report.    11:22:13a
3    My recollection is I could come    11:22:18a
4  close but not exactly match the peer returns    11:22:21a
5  by taking the -- the peer group return by    11:22:26a
6  taking a value weighted average of the    11:22:31a
7  individuals within the group.    11:22:37a
8    Q.    What do you mean by "value    11:22:39a
9  weighted average"?    11:22:42a
10   A.    I was responding to the question    11:22:43a
11 you just asked, was it a value weighted average    11:22:44a
12 or an equally weighted average of the returns.    11:22:49a
13   I can come close to, if I use    11:22:54a
14 value weights, come close to the returns that    11:22:56a
15 he had.    11:22:57a
16   Q.    That's fine. And I'm just    11:22:58a
17 asking you what you did in using the value    11:23:00a
18 weights, what process did you go through and    11:23:01a
19 what specifically, specifically what value did    11:23:03a
20 you weight.    11:23:07a
21   A.    The market value of the common    11:23:09a
22 stock.    11:23:12a
23   THE WITNESS: And I apologize,    11:23:20a
24 but I need to take a short break.    11:23:20a

Page 93

1    MR. COLLINS: Off the record.    11:23:24a
2    (A recess was had from    11:33:46a
3    11:23 a.m. to 11:33 a.m.; and then the    11:33:46a
4    proceedings continued as follows:)    11:33:46a
5  BY MR. COLLINS:    11:33:46a
6    Q.    Exhibit 339.    11:33:46a
7    A.    Okay.    11:33:48a
8    Q.    Why did you do this just for the    11:33:49a
9  month of July?    11:33:56a
10   A.    Because Mr. Miller indicated in    11:33:59a
11 his rebuttal report that it is his conjecture    11:34:05a
12 that the price decline, particularly in the    11:34:11a
13 latter part of July, was attributable to, I    11:34:15a
14 think he refers to it as leakage regarding gray    11:34:20a
15 market activities.    11:34:26a
16   Q.    Is there something about Exhibit    11:34:27a
17 339 or Exhibit 340 that leads you to question    11:34:28a
18 that conclusion on his part?    11:34:33a
19   A.    I think that -- yes, I think    11:34:35a
20 that this analysis demonstrates, using his data,    11:34:41a
21 that the decline in Adams Golf during this    11:34:43a
22 period of time was certainly in line with the    11:34:51a
23 decline experienced by its -- the firms    11:34:55a
24 identified by Mr. Miller as being peers to Adams    11:35:01a

24 (Pages 90 to 93)

CHRISTOPHER M. JAMES

Page 94

1    Golf, and that consistent with the discussion in    11:35:07a
2    my report, the decline appears to be a result    11:35:18a
3    principally of softness in the golf industry as    11:35:25a
4    reflected by the earnings miss and discussion of    11:35:29a
5    difficulties in the market that Callaway    11:35:36a
6    disclosed, and then the peer group -- I think    11:35:44a
7    Coastcast has a news article during that same    11:35:48a
8    period of time indicating same weakness in    11:35:53a
9    product demand, which I think is consistent with    11:36:00a
10    the announcement of Callaway, since Coastcast is    11:36:06a
11    a major supplier to Callaway.    11:36:09a
12    Q.    Did you undertake -- the    11:36:15a
13    analysis of these various stock prices, did you    11:36:20a
14    do any work taking it out beyond July 31st?    11:36:25a
15    A.    No. I -- you mean --    11:36:33a
16    Q.    Did you run the chart beyond    11:36:37a
17    July 31st?    11:36:39a
18    A.    No, I just focused on the dates    11:36:41a
19    in -- the dates that he identified as being    11:36:43a
20    associated with price declines in late July that    11:36:53a
21    he contends may be associated with information    11:36:59a
22    disclosures regarding -- or leakage of    11:37:03a
23    information regarding, say, purchase orders by    11:37:07a
24    Costco.    11:37:10a

Page 95

1    Q.    And in that regard you are    11:37:16a
2    referring to the information he has -- perhaps    11:37:17a
3    other places as well, but you are referring to    11:37:21a
4    the information he has in Paragraph 22(A) of his    11:37:23a
5    rebuttal report?    11:37:26a
6    A.    22(A), yes.    11:37:28a
7    Q.    Now, how long ago did you    11:37:39a
8    prepare exhibits or did you create the documents    11:37:41a
9    that are now 339 and 340?    11:37:43a
10    A.    Within the last week.    11:37:49a
11    Q.    Did counsel ask you to do so?    11:37:55a
12    A.    No.    11:37:58a
13    Q.    Did you tell counsel you were    11:37:58a
14    doing this?    11:38:00a
15    A.    Yes.    11:38:00a
16    Q.    Did you run any other charts    11:38:10a
17    beyond 339 either within the last week or since    11:38:13a
18    the rebuttal report?    11:38:18a
19    A.    I don't believe so. I don't    11:38:24a
20    recall doing any.    11:38:26a
21    Q.    And did you undertake an    11:38:28a
22    analysis of peer performance with respect to    11:38:30a
23    August or September?    11:38:35a
24    A.    No, my focus was only on late --    11:38:39a

Page 96

1    late July, is the period that he focuses in on    11:38:45a
2    his report.    11:38:49a
3    Just to add that he -- and the    11:38:51a
4    other reason is that he has a chart, I believe    11:38:55a
5    it's -- if you don't mind, I'll take it off.    11:39:00a
6    (The witness takes the clip off    11:39:08a
7    the document.)    11:39:10a
8    BY MR. COLLINS:    11:39:10a
9    Q.    Please.    11:39:10a
10    A.    That is a -- that has a somewhat    11:39:15a
11    different pegging in the sense that it's pegged    11:39:23a
12    to 1. It's his Exhibit A. It's entitled ADGO    11:39:28a
13    versus XLC(4), Adams Golf versus Comparable    11:39:35a
14    Index. He carries it out to -- 12/23/1999 is    11:39:43a
15    the last date.    11:39:55a
16    Q.    You are referring to the page    11:39:57a
17    immediately after the page that says Exhibit A,    11:40:01a
18    or are you referring to a later?    11:40:07a
19    Which chart are you referring    11:40:17a
20    to, please?    11:40:18a
21    A.    I know this is -- it doesn't    11:40:24a
22    make the record look particularly good because    11:40:26a
23    I'm holding something up, but it is this chart    11:40:30a
24    (indicating), and I believe you are looking at    11:40:34a

Page 97

1    it.    11:40:36a
2    MS. FOX: Let me just check    11:40:37a
3    that. I'll come around and see whether    11:40:39a
4    it's the same.    11:40:42a
5    THE WITNESS: Just so you are    11:40:45a
6    clear, there appears to be two charts    11:40:46a
7    in his Exhibit A. One is -- it looks    11:40:48a
8    like they are the same chart. One is    11:41:00a
9    simply, in my version, a smaller    11:41:03a
10    version of the other.    11:41:06a
11    BY MR. COLLINS:    11:41:09a
12    Q.    Okay. Well, the chart --    11:41:09a
13    A.    This you can identify --    11:41:23a
14    Q.    Not a problem.    11:41:24a
15    A.    Okay.    11:41:26a
16    Q.    Do you see the page that says on    11:41:26a
17    it Exhibit A? It's probably in your left hand.    11:41:28a
18    A.    Yeah, the problem I'm having is    11:41:35a
19    that there are a number of pages that say    11:41:37a
20    Exhibit A on it. Okay? Maybe we can make this    11:41:40a
21    easier.    11:41:43a
22    This is Exhibit A (indicating),    11:41:44a
23    it only has Exhibit A on it. Then there is a    11:41:46a
24    page that follows it which is a --    11:41:50a

25 (Pages 94 to 97)

Page 98

1    MS. FOX: Comparables?    11:41:57a
2    THE WITNESS: Comparables. But    11:41:58a
3    it's not pegged to 1. It has -- it's    11:42:00a
4    not -- the individual series are not    11:42:05a
5    pegged to a particular number.    11:42:11a
6    BY MR. COLLINS:    11:42:13a
7    Q.    Okay.    11:42:13a
8    A.    Okay?    11:42:14a
9    That's followed by a smaller    11:42:17a
10    version of the same chart and then data.    11:42:18a
11    Okay?    11:42:22a
12    Q.    Okay. I'm with you now.    11:42:22a
13    A.    Then following that is another    11:42:24a
14    colored chart in my version that is referred to    11:42:30a
15    as Exhibit A and it says Adams Golf versus    11:42:35a
16    Comparables indexed to 1 at 7/10/98. So it's    11:42:40a
17    similar to the chart that I prepared where there    11:42:46a
18    is -- it's pegged at a particular point in    11:42:48a
19    time. He's pegging 1 pegged to 16.    11:42:52a
20    Q.    Just so we are clear, the last    11:42:58a
21    document that you referred to is a chart that    11:43:01a
22    says "Exhibit A" on it and it follows a page    11:43:06a
23    which gives information on the last line,    11:43:13a
24    "19991231," for Adams and the small cap index,    11:43:24a

Page 99

1    Callaway, Teardrop, Aldila, and Coastcast?    11:43:33a
2    A.    Yes, but what will be    11:43:35a
3    distinguishable from the other chart that has    11:43:38a
4    similar information is that it should say up at    11:43:41a
5    the top Adams Golf, Inc., indexed to 1 on    11:43:43a
6    7/9/98, and then there are three asterisks.    11:43:47a
7    Q.    Okay. Great.    11:43:51a
8    Now, so I now know what    11:43:53a
9    document you are referring to and I thank you.    11:43:58a
10    Do I understand that this chart    11:44:00a
11    that we are now referring to, which says    11:44:05a
12    indexed to 1, motivated you to prepare Exhibit    11:44:08a
13    339 and 340?    11:44:17a
14    A.    What -- not the chart -- not    11:44:21a
15    necessarily the chart itself, but the discussion    11:44:24a
16    in Mr. Miller's report regarding what he    11:44:30a
17    conjectures to be leakage regarding gray    11:44:47a
18    marketing activity, particularly in the mid to    11:44:53a
19    late part of July. I believe he mentions that    11:44:57a
20    in his first report, and then he expands on it    11:45:02a
21    in the current report by contending, as in    11:45:08a
22    Paragraph 22: "In fact, information concerning    11:45:14a
23    gray marketing activity which existed in the    11:45:17a
24    marketplace was available to various parties    11:45:20a

Page 100

1    including the following."    11:45:22a
2    That's on Paragraph 22 of his    11:45:27a
3    report.    11:45:28a
4    Q.    Okay. You are quite right.    11:45:29a
5    Now, if I understand correctly,    11:45:31a
6    Exhibits 339 and 340 include in the Miller's    11:45:39a
7    peer group Teardrop, Aldila, Coastcast, and    11:45:46a
8    Callaway --    11:45:54a
9    A.    Right.    11:45:56a
10    Q.    -- together with Arnold Palmer    11:45:56a
11    and Golden Bear.    11:45:59a
12    A.    That is my understanding.    11:46:00a
13    Q.    Okay.    11:46:01a
14    And it's your understanding    11:46:02a
15    that the Miller's peer group included Arnold    11:46:03a
16    Palmer and Golden Bear?    11:46:08a
17    A.    I would have to go back and    11:46:10a
18    check that.    11:46:12a
19    Q.    Well, it is what it is. You are    11:46:22a
20    not responsible for what he included in Miller's    11:46:24a
21    peer group, I'm just asking what you included in    11:46:29a
22    yours. So let me just ask you.    11:46:31a
23    In 339 and 340 you included in    11:46:33a
24    what you referred to as Miller's peer group or    11:46:37a

Page 101

1    Miller peer group, you include Arnold Palmer    11:46:41a
2    and Golden Bear; correct?    11:46:44a
3    A.    No, I think it would be    11:46:47a
4    incorrect to refer to that as my peer group. My    11:46:48a
5    recollection is that --    11:46:51a
6    Q.    Let me stop you. Yeah, let me    11:46:52a
7    stop you because I didn't mean to mislead you on    11:46:54a
8    the question.    11:46:57a
9    There is a reference on 339 to    11:46:57a
10    Miller's peer group, and then there's a line    11:46:59a
11    that runs across this page, not that I as a    11:47:02a
12    color-blind person can read it, but there's a    11:47:05a
13    line that runs across this page for peer    11:47:08a
14    group.    11:47:11a
15    A.    That is Mr. Miller's peer    11:47:14a
16    group.    11:47:16a
17    Q.    Okay. Does that peer group    11:47:16a
18    include or exclude, as set forth on 339, Arnold    11:47:18a
19    Palmer and Golden Bear?    11:47:23a
20    A.    My recollection is that the peer    11:47:26a
21    group returns that were used in constructing 339    11:47:28a
22    and 340 are the returns as reported in    11:47:36a
23    Mr. Miller's report.    11:47:43a
24    Q.    You and I can argue about a    11:47:44a

26 (Pages 98 to 101)

CHRISTOPHER M. JAMES

Page 102

1  lot. Let's not argue about this. This is very    11:47:47a
2  simple.                                          11:47:49a
3         Whether it came from James,               11:47:50a
4  Miller, McEvoy, Fox, Page 339, peer group,       11:47:54a
5  does it include or does it exclude Arnold        11:48:00a
6  Palmer and Golden Bear?                          11:48:03a
7      A.    And the answer to that question        11:48:06a
8  is I was unable to replicate exactly the returns 11:48:08a
9  on his peer group by taking a value weighted     11:48:11a
10  average of the returns of the companies that he 11:48:15a
11  reports as part of the peer. As a result, and   11:48:18a
12  to be able to use his own data, I did not        11:48:22a
13  construct a peer group for purposes of preparing 11:48:27a
14  339, 340. The best recollection -- my best      11:48:31a
15  recollection is the peer group returns are as   11:48:36a
16  reported in Mr. Miller's report. Okay?          11:48:39a
17      Q.    Okay.                                  11:48:43a
18      A.    So if he included or excluded          11:48:43a
19  Palmer and Golden Bear, then they would be       11:48:49a
20  included or excluded in the peer group return as 11:48:54a
21  reported in 340 and 339, as best -- is my best   11:48:58a
22  recollection.                                    11:49:04a
23      Q.    Okay. Now, before the break I          11:49:04a
24  had asked you, if you would, to get delivered to 11:49:06a

Page 103

1  us during the course of the deposition the       11:49:09a
2  material that's on your computer. Can I ask,     11:49:15a
3  has that been accomplished?                       11:49:18a
4      A.    It has not been accomplished as         11:49:19a
5  of this point in time.                            11:49:21a
6      Q.    Okay. I presume you've                   11:49:22a
7  consulted with counsel and you will be good       11:49:26a
8  enough to supply that. Correct?                   11:49:29a
9      A.    I will endeavor to try to supply        11:49:32a
10  that.                                             11:49:34a
11      Q.    Okay. Thank you.                         11:49:35a
12         In time for us to talk about it           11:49:38a
13  today; correct, sir?                              11:49:39a
14      A.    Again, I will try to do that. I        11:49:44a
15  -- first of all, I don't have my computer with   11:49:50a
16  me; and second, the person then whom I would     11:49:52a
17  call to obtain the data on which I did the       11:49:58a
18  analysis is currently not available. So I am     11:50:04a
19  endeavoring to undertake that.                    11:50:08a
20      Q.    Thank you.                               11:50:11a
21         Well, I'll tell you what I'm              11:50:31a
22  confused about because it's a pretty simple      11:50:32a
23  matter.                                           11:50:34a
24      A.    Okay.                                   11:50:35a

Page 104

1      Q.    I understand that you don't know       11:50:35a
2  whether 339 and 340 include Arnold Palmer and    11:50:38a
3  Golden Bear. Am I right so far? As you sit       11:50:43a
4  here now, you don't remember whether those two   11:50:46a
5  companies are included in peer group?            11:50:48a
6      A.    Right.                                 11:50:50a
7      Q.    But I thought I also heard you         11:50:51a
8  say that peer group, as used in 339 and 340,     11:50:54a
9  consist of whatever it is that Miller referred   11:50:59a
10  to as peer group at some point in his report.    11:51:01a
11      A.    No, I think that's -- I                11:51:04a
12  understand your confusion now.                   11:51:06a
13         My recollection is that I used           11:51:08a
14  the return for the peer group as reported in     11:51:13a
15  Mr. Miller.                                       11:51:17a
16      Q.    Fine.                                  11:51:18a
17      A.    In other words, he has a column       11:51:19a
18  in his report that has the returns for the peer  11:51:23a
19  group. Okay? However he calculated them. And     11:51:26a
20  my recollection is that's what I utilized.        11:51:32a
21      Q.    Okay. Can you show me that             11:51:34a
22  column you are referring to?                      11:51:36a
23      A.    Yes. It's in his Exhibit --            11:51:39a
24         MS. REED: "A."                            11:51:44a

Page 105

1         THE WITNESS: "A."                         11:51:45a
2  BY MR. COLLINS:                                   11:51:47a
3      Q.    Right.                                  11:51:47a
4      A.    Actually, Exhibit B --                  11:51:51a
5      Q.    Right.                                  11:51:58a
6      A.    -- you see peer group?                  11:52:00a
7      Q.    I do.                                   11:52:04a
8      A.    My recollection is that's what I        11:52:05a
9  utilized.                                         11:52:08a
10      Q.    Okay. Okay. Good.                      11:52:09a
11         Now, I think you said that              11:52:42a
12  following the receipt of Mr. Miller's rebuttal   11:52:45a
13  report, you used the S&P small cap together      11:52:47a
14  with Miller's peer group and examined whether    11:52:54a
15  your conclusions regarding statistical          11:53:01a
16  significance with respect to particular days    11:53:03a
17  was changed if those were the indices you used  11:53:08a
18  as opposed to the indices that you had used     11:53:12a
19  previously. Correct so far?                       11:53:15a
20      A.    Yes.                                   11:53:17a
21      Q.    And when you did so, what did          11:53:20a
22  you find?                                         11:53:23a
23      A.    My recollection is that the            11:53:24a
24  conclusions regarding days of statistical        11:53:29a

27 (Pages 102 to 105)

CHRISTOPHER M. JAMES

Page 106

1  significance would be unaffected by utilizing        11:53:32a
2  the S&P small cap and the Miller peer group as        11:53:38a
3  part of a market model.        11:53:50a
4      Q.    With regard to NASDAQ, for        11:54:04a
5  example, the 17 percent was the explanatory        11:54:05a
6  power of NASDAQ? Is that what the 17 percent        11:54:08a
7  was, with regard to daily returns?        11:54:14a
8      A.    The daily -- the amount of the        11:54:17a
9  daily variability explainable by changes in the        11:54:19a
10  NASDAQ was I believe 17 or 18 percent.        11:54:23a
11      Q.    Sure.  Well, whatever, but can        11:54:27a
12  we call that the -- how do you refer to that in        11:54:29a
13  shorthand?  Explanatory power?        11:54:34a
14      A.    Let's use what -- the precise        11:54:38a
15  terms, the R-squared.        11:54:40a
16      Q.    Okay.  Good.        11:54:42a
17      A.    Adjusted R-squareds were, I        11:54:43a
18  believe, 17 or 18 percent.        11:54:48a
19      Q.    Perfect.        11:54:50a
20          What were the adjusted        11:54:50a
21  R-squareds of the S&P small cap?        11:54:52a
22      A.    What I recall is the S&P small        11:54:56a
23  cap and the industry peers, the explanatory        11:54:57a
24  power was virtually identical to the explanatory        11:55:05a

Page 107

1  power of the -- or the R-squareds of the model        11:55:08a
2  that I used.        11:55:13a
3          Sorry.  The R-squareds were        11:55:14a
4  virtually the same.        11:55:25a
5      Q.    Now, you just changed terms on        11:55:27a
6  me and I was so careful to get them down so we        11:55:30a
7  were talking about the same thing.        11:55:32a
8          Do I understand that the        11:55:33a
9  adjusted R-squareds are virtually the same        11:55:34a
10  whether you use your NASDAQ index or whether        11:55:47a
11  you use the S&P index or whether you use the        11:55:51a
12  Miller peer index?        11:55:56a
13      A.    The R-squareds are -- if I        11:55:59a
14  replicate the regressions that I discuss in my        11:56:06a
15  report -- remember, I discuss a single-factor        11:56:13a
16  and a two-factor model.  If I replicate the        11:56:18a
17  single- and two-factor models, utilizing,        11:56:25a
18  instead of the NASDAQ and the Bloomberg modified        11:56:30a
19  index, the S&P small cap and the peer group as        11:56:35a
20  identified by Mr. Miller, the R-squareds are        11:56:43a
21  virtually the same.        11:56:48a
22      Q.    Perfect.        11:56:49a
23          Does it matter whether we talk        11:56:52a
24  about R-squareds or adjusted R-squareds?        11:56:54a

Page 108

1      A.    For these purposes -- the        11:56:58a
2  purposes of these proceedings, I don't think it        11:57:01a
3  will make a difference.        11:57:03a
4      Q.    Okay.  Good.        11:57:03a
5          You ran --        11:57:10a
6      A.    Just so you know, an R-squared        11:57:10a
7  will always increase as you add explanatory        11:57:15a
8  variables.  An adjusted R-squared is an        11:57:21a
9  R-squared that is adjusted for the number of        11:57:26a
10  explanatory variables and it will not always        11:57:29a
11  increase, so it's -- it utilizes a measure of        11:57:32a
12  the additional explanatory power, if you will,        11:57:38a
13  of adding explanatory variables.        11:57:41a
14      Q.    The adjusted R-squared of NASDAQ        11:57:59a
15  combined with the golf index you used was        11:58:09a
16  approximately equal to the adjusted R-squared of        11:58:16a
17  using small cap plus Miller's peer group;        11:58:19a
18  correct?        11:58:25a
19      A.    Could she read it back to me,        11:58:28a
20  please --        11:58:30a
21      Q.    You know what, I just want to        11:58:31a
22  get over it, so let me just ask it again.        11:58:33a
23          You compared the adjusted        11:58:35a
24  R-squareds of NASDAQ plus golf to the adjusted        11:58:37a

Page 109

1  R-squareds of Miller peer plus S&P small cap;        11:58:45a
2  correct?        11:58:51a
3      A.    Yes.        11:58:51a
4      Q.    Okay.  Did you compare the        11:58:52a
5  adjusted R-squareds of NASDAQ to Miller peer        11:58:54a
6  group?        11:59:03a
7      A.    I don't recall.        11:59:05a
8      Q.    Did you compare the adjusted        11:59:07a
9  R-squareds of NASDAQ to S&P small cap?        11:59:10a
10      A.    I believe I did.        11:59:21a
11      Q.    What did you find when you did        11:59:23a
12  that?        11:59:25a
13      A.    My recollection is that they        11:59:25a
14  were virtually identical.        11:59:26a
15      Q.    Did you compare the adjusted        11:59:32a
16  R-squared of your modified Bloomberg golf index        11:59:43a
17  to the adjusted R-squared of Miller's peer        11:59:50a
18  group?        11:59:54a
19      A.    I don't recall -- I don't        11:59:59a
20  believe I did.  I just did -- just -- I did        12:00:00p
21  exactly what I indicated in the answer a couple        12:00:05p
22  of questions ago, which is, the analyses that I        12:00:09p
23  report in my report of NASDAQ and NASDAQ plus        12:00:17p
24  industry, the one- and two-factor models which I        12:00:26p

28 (Pages 106 to 109)

CHRISTOPHER M. JAMES

Page 110

1 think are in Exhibit 4, I believe I did the same  12:00:29p
2 thing with respect to -- I simply -- my  12:00:40p
3 recollection -- here's what I can recall.  12:00:47p
4     I did one-factor and two-factor  12:00:50p
5 models to see if the explanatory power was any  12:00:53p
6 different or the R-squareds were any  12:00:57p
7 different, that's what I recall. And I recall  12:00:59p
8 concluding based on that analysis that there  12:01:03p
9 weren't any difference, that my results would  12:01:05p
10 not change if I substituted the S&P index for  12:01:07p
11 the NASDAQ, for example.  12:01:15p
12     Q.    In constructing an index, one of  12:01:20p
13 the things a researcher does is try to find a  12:01:23p
14 good fit; correct?  12:01:26p
15     A.    That -- that depends on the  12:01:28p
16 purpose. I mean, typically it is not -- if  12:01:35p
17 you're simply looking for a good fit without any  12:01:46p
18 a priori reason for including a variable in a  12:01:52p
19 regression, then that is thought of as data  12:01:59p
20 mining and is not generally accepted as a  12:02:05p
21 scientific inquiry.  12:02:13p
22     One begins with a hypothesis  12:02:16p
23 about what relationship should be expected and  12:02:18p
24 then empirically tests that relationship and  12:02:24p

Page 111

1 set up the experiment in a way that can be  12:02:29p
2 replicated by a third party utilizing the  12:02:32p
3 techniques that you have described.  12:02:35p
4     Q.    Okay. Why did you use NASDAQ?  12:02:38p
5     A.    Well, because Adams was trading  12:02:42p
6 on the OTC or NASDAQ.  12:02:52p
7     Q.    Any other reason?  12:03:04p
8     A.    It's my practice if you want to  12:03:05p
9 look at general market movements, the index you  12:03:07p
10 use where you would expect to see a relationship  12:03:13p
11 would be companies that are trading on a similar  12:03:18p
12 exchange.  12:03:24p
13     Q.    And it's true that the NASDAQ,  12:03:24p
14 as Mr. Miller pointed out in his rebuttal, it's  12:03:27p
15 true that at the time the NASDAQ was dominated  12:03:30p
16 by high tech companies; correct?  12:03:33p
17     A.    I don't know what he means by  12:03:35p
18 "dominated." Certainly the NASDAQ is more  12:03:37p
19 heavily weighted towards growth companies at  12:03:41p
20 this particular point in time, which was before  12:03:47p
21 the '99 run-up in tech stocks. It was -- I  12:03:49p
22 mean, certainly the NASDAQ is more heavily  12:03:58p
23 weighted towards tech and growth stocks than,  12:04:00p
24 say, the Dow Jones Industrial Average or the  12:04:02p

Page 112

1 NYCE index.  12:04:10p
2     Q.    In your last answer you referred  12:04:11p
3 to growth stocks. Did you consider Adams to be  12:04:14p
4 a growth stock?  12:04:16p
5     A.    Yes, I think it was generally  12:04:17p
6 considered to be a type of stock that would be  12:04:19p
7 considered to be a growth stock.  12:04:23p
8     Q.    Did you consider it to be a tech  12:04:25p
9 stock, a high tech stock?  12:04:27p
10     A.    No, I think I considered it to  12:04:29p
11 be a growth stock.  12:04:30p
12     Q.    Now, at the time you used  12:04:33p
13 NASDAQ, did you consider any other index besides  12:04:35p
14 this modified Bloomberg golf?  12:04:37p
15     A.    No.  12:04:41p
16     Q.    Did you -- you didn't consider  12:04:42p
17 the Dow Jones?  12:04:46p
18     A.    Industrial?  12:04:47p
19     Q.    Yes.  12:04:47p
20     A.    No.  12:04:48p
21     Q.    You didn't consider S&P 500 or  12:04:49p
22 S&P small cap?  12:04:52p
23     A.    I didn't consider S&P 500, I  12:04:54p
24 didn't consider the Dow Jones, I didn't consider  12:04:58p

Page 113

1 the S&P small cap.  12:05:00p
2     Q.    Okay. Apart from NASDAQ,  12:05:01p
3 modified Bloomberg golf, and apart from the two  12:05:07p
4 of those together, did you do runs or  12:05:12p
5 regressions on using any other indices?  12:05:18p
6     A.    Other than the -- no, other than  12:05:21p
7 the analysis that we were just talking about a  12:05:26p
8 moment ago.  12:05:29p
9     Q.    And by that analysis you are  12:05:30p
10 referring to the analysis done after  12:05:32p
11 Mr. Miller's rebuttal report --  12:05:37p
12     A.    Yes.  12:05:39p
13     Q.    -- using the Miller peer group,  12:05:40p
14 or what you call that, and the S&P small cap?  12:05:43p
15     A.    Yes.  12:05:49p
16     Q.    Okay. Let's talk about event  12:05:50p
17 windows. What is an event window, please?  12:06:06p
18     A.    I'm sorry?  12:06:10p
19     Q.    What is an event window?  12:06:11p
20     A.    An event window and is commonly  12:06:19p
21 referred -- the most common definition of an  12:06:26p
22 event window is the time period over which  12:06:30p
23 someone undertaking an event study investigates  12:06:38p
24 the impact of information on stock prices or  12:06:42p

CHRISTOPHER M. JAMES

Page 114

1  stock returns.                              12:06:49p
2      Q.    Now, you used an event window or    12:06:50p
3  event windows in this work; correct?         12:06:53p
4      A.    Yes.                        12:06:59p
5      Q.    And the event window you used,      12:07:00p
6  for all aspects of your work here, was one day?   12:07:01p
7      A.    No.                         12:07:08p
8      Q.    Okay.  You used, at least in      12:07:09p
9  some parts of your work, a one-day event window;   12:07:14p
10  is that --                             12:07:18p
11      A.    That is correct.              12:07:18p
12      Q.    Okay.  In what part of your work    12:07:19p
13  did you use a one-day event window?          12:07:24p
14      A.    As is indicated in my report,     12:07:26p
15  when I was able to identify when a piece of     12:07:36p
16  information was either published or became      12:07:42p
17  available to market participants, I utilized --   12:07:46p
18  I used the day on which that information was     12:07:53p
19  first available during trading hours.        12:07:55p
20      Q.    Okay.                       12:07:58p
21      A.    Now, on -- the one I remember in    12:07:59p
22  particular was the April -- I'm sorry, the April   12:08:07p
23  -- the August 28th Lehman Brothers report.      12:08:09p
24  has a date on it, but not a time stamp, so then   12:08:15p

Page 115

1  the question becomes is it a -- was it available   12:08:19p
2  to market participants during trading hours.     12:08:26p
3  And, as I indicate in my report, I look at both   12:08:33p
4  the 28th and the 31st and see whether either one   12:08:37p
5  of those days is statistically significant.     12:08:41p
6  Now --                                12:08:43p
7      Q.    Can I stop you?  Forgive me.      12:08:46p
8           With regard to that, when you      12:08:48p
9  did that work regarding the Lehman report and    12:08:49p
10  you looked at the 28th and you looked at the     12:08:52p
11  31st, you looked at each on a one-day event     12:08:54p
12  window basis; correct?                   12:08:57p
13      A.    And I also calculated the        12:08:59p
14  statistical significance on a two-day basis.     12:09:04p
15      Q.    Okay.  With respect to Lehman,    12:09:07p
16  that Lehman August 28th report?              12:09:12p
17      A.    Yes.                        12:09:14p
18      Q.    All right.  And why with regard    12:09:20p
19  to the Lehman report did you use a two-day event   12:09:23p
20  window?                               12:09:26p
21      A.    Well, I think it would be a mis    12:09:28p
22  -- it would be a mischaracterization to say that   12:09:31p
23  -- I investigated a two-day event window to      12:09:37p
24  determine whether the conclusions that I was     12:09:40p

Page 116

1  reaching regarding the materiality of that      12:09:41p
2  information would be changed if I used a broader   12:09:44p
3  window than one day.                     12:09:51p
4      Q.    Okay.  How did you investigate?   12:09:56p
5      A.    In the manner that I just        12:09:59p
6  described, that I looked at each day          12:10:00p
7  individually in the combination of those two     12:10:02p
8  days.                                 12:10:06p
9           In addition, even though the       12:10:06p
10  Lehman report has no time stamp on it, I       12:10:10p
11  believe, both in reading Mr. Lantier's         12:10:14p
12  deposition, and it's my understanding, having    12:10:18p
13  worked with buy and sell side analysts, that     12:10:21p
14  typically the written report will be disclosed   12:10:25p
15  to market participants and the content would     12:10:33p
16  be disclosed to the market participants in the   12:10:36p
17  day -- on the day on which the report is        12:10:39p
18  dated, during trading hours, or before the      12:10:42p
19  start of trading on the day that it is dated.    12:10:51p
20           Consistent with that, I also      12:10:51p
21  looked at what the closing price was referred    12:10:52p
22  to in the August 28th report for Adams Golf to   12:10:55p
23  determine whether the closing price pertained   12:11:01p
24  to the 28th or the day before, and it          12:11:04p

Page 117

1  pertained to the day before, which is          12:11:10p
2  consistent with the report being published on    12:11:13p
3  the 28th.                             12:11:16p
4      Q.    I asked you a question a moment    12:11:19p
5  ago about what you did to investigate a two-day   12:11:22p
6  event window and you said you already answered   12:11:26p
7  that.                                 12:11:28p
8      A.    Yes.                        12:11:29p
9      Q.    Tell me, again, what you did to   12:11:29p
10  investigate a two-day event window consisting of   12:11:32p
11  the 28th and the 31st.  Did you run regressions   12:11:37p
12  on it?                                12:11:41p
13      A.    I aggregated the abnormal        12:11:44p
14  returns or the residual returns.             12:11:46p
15      Q.    Okay.                       12:11:49p
16      A.    And then used -- and then tested   12:11:51p
17  whether they were significant based upon a      12:11:53p
18  standard error that was estimated to be        12:11:57p
19  consistent with a two-day return.  So this -- I   12:12:01p
20  have used and others use in published work an    12:12:07p
21  estimate of the two-day standard error is simply   12:12:12p
22  the square root of two times the daily standard   12:12:16p
23  error.                                12:12:19p
24      Q.    When you did so, what did you     12:12:27p

CHRISTOPHER M. JAMES

Page 118

1  come up with; a lack of statistical significance    12:12:29p
2  on the two-day basis?    12:12:32p
3    A.   Yes.    12:12:33p
4    Q.   That work with regard to the    12:12:34p
5  two-day event window analysis or investigation,    12:12:37p
6  does that appear somewhere in your report or    12:12:42p
7  your rebuttal report, with respect to the Lehman    12:12:44p
8  August 28th report?    12:12:46p
9    A.   I don't -- as I sit here, I    12:12:57p
10  don't recall. I believe in the report I discuss    12:13:00p
11  both the return on the 28th and the 31st.    12:13:04p
12    Q.   Can you retrieve, please, the    12:13:20p
13  investigation you did of the two-day event    12:13:23p
14  window with respect to the Lehman August 28    12:13:26p
15  report?    12:13:31p
16    A.   I don't know whether I still    12:13:41p
17  have it. I think that you could get very close    12:13:42p
18  to that result by -- actually, by going to my    12:13:50p
19  report.    12:14:03p
20    I believe on Paragraph 59, as I    12:14:28p
21  outline, the residual return was less than one    12:14:43p
22  percent on the 28th and the residual return on    12:14:53p
23  the 31st was minus 5.2, so the cumulative    12:14:59p
24  residual would be somewhere around 6.2. The    12:15:05p

Page 119

1  one-day -- so that that's -- that would be    12:15:12p
2  the two-day abnormal return, would be 6.2    12:15:18p
3  percent.    12:15:22p
4    Since neither return is    12:15:23p
5  statistically significant on a one-day basis,    12:15:25p
6  combining the two, given that the standard    12:15:29p
7  error for a two-day return is bigger than the    12:15:31p
8  one-day return, is not going to result in the    12:15:37p
9  6.2 percent return or something less than 6.2    12:15:39p
10  percent return to be statistically    12:15:47p
11  significant.    12:15:49p
12    Q.   Okay. Tell me about the    12:15:50p
13  standard error with regard to how the standard    12:15:51p
14  error changes depending upon the event -- the    12:15:54p
15  length of the event window. Would you describe    12:15:57p
16  to me how that works.    12:16:01p
17    A.   Generally the longer the event    12:16:03p
18  window, the larger the standard error because    12:16:06p
19  the volatility of two-day returns is generally    12:16:18p
20  higher than one-day returns under the assumption    12:16:25p
21  of independence in the returns.    12:16:27p
22    Now, some analysts, when    12:16:30p
23  looking at two or -- two-day abnormal returns    12:16:32p
24  or three-day abnormal returns will also    12:16:38p

Page 120

1  compute, based on the data, the    12:16:41p
2  autocorrelation in the return series and try    12:16:44p
3  to include that in the calculation of the    12:16:47p
4  standard error.    12:16:50p
5    Q.   What does autocorrelation mean?    12:16:52p
6    A.   It refers to -- if you think    12:16:55p
7  about correlation as being how two series move    12:16:59p
8  together, autocorrelation refers to how a series    12:17:06p
9  is related to the series lagged one day or one    12:17:14p
10  month.    12:17:20p
11    Q.   What's the effect of    12:17:26p
12  autocorrelation that some analysts use in this    12:17:28p
13  context?    12:17:33p
14    A.   It depends on the size of the    12:17:34p
15  autocorrelation. If the autocorrelation is    12:17:36p
16  positive, it tends to make the standard error    12:17:40p
17  somewhat bigger than the standard error that you    12:17:44p
18  would get, assuming independence.    12:17:47p
19    Q.   And what do you mean by    12:17:51p
20  "assuming independence"?    12:17:53p
21    A.   Assuming independence means that    12:17:54p
22  you are assuming that the autocorrelation is    12:17:58p
23  zero on a one-day lag period.    12:18:01p
24    Q.   Okay. So, now, the regression    12:18:05p

Page 121

1  you ran, if any, with regard to the two-day    12:18:08p
2  period, I hope I have the presence of mind to    12:18:13p
3  ask you to be good enough to produce that to us    12:18:17p
4  if you can so retrieve it.    12:18:19p
5    A.   I'll take it under    12:18:23p
6  consideration.    12:18:24p
7    Q.   I appreciate it.    12:18:24p
8    Now, other than that, that is,    12:18:27p
9  other than with respect to the August -- wait    12:18:30p
10  a minute, one other thing. You mentioned a    12:18:34p
11  few minutes ago that it's your experience that    12:18:37p
12  sometimes where there is a written report by    12:18:40p
13  an analyst -- did I hear you correctly, that    12:18:44p
14  it's your experience that sometimes the    12:18:48p
15  contents of that written report are    12:18:50p
16  disseminated orally prior to the issuance?    12:18:54p
17    A.   In the morning conference call    12:18:58p
18  on the day that the report is issued.    12:19:00p
19    Q.   Okay. Is it your experience    12:19:03p
20  that the contents are sometimes disseminated    12:19:05p
21  prior to that on an oral basis?    12:19:09p
22    A.   I'm not sure what you mean by    12:19:14p
23  "the contents disseminated."    12:19:19p
24    Q.   An analyst calls up a good    12:19:21p

31 (Pages 118 to 121)

CHRISTOPHER M. JAMES

Page 122

1  client and says, "I'm going to issue an analyst        12:19:24p
2  report tomorrow that is going to have an impact         12:19:26p
3  on the stock price. I just wanted you to know           12:19:28p
4  what I'm going to say."                         12:19:31p
5       A.    That -- I'm not familiar with            12:19:33p
6  that practice.                         12:19:35p
7       Q.    You are familiar with the             12:19:36p
8  occurrence that stock prices move sometimes on         12:19:40p
9  the basis of oral information being disseminated        12:19:45p
10 into the marketplace?                     12:19:51p
11      A.    Are you saying --                12:19:55p
12      Q.    Rumors move stock prices             12:19:58p
13 sometimes, don't they?                    12:20:00p
14      A.    If they are material and -- if        12:20:02p
15 they are material, they certainly can move stock       12:20:13p
16 prices, and there are scientific methods for the       12:20:15p
17 determination of whether a specific rumor or           12:20:21p
18 conjecture is disseminated to the market.             12:20:31p
19      Q.    What are those scientific            12:20:36p
20 methods?                          12:20:37p
21      A.    Let me give a couple of            12:20:42p
22 examples.                         12:20:44p
23            There is academic literature        12:20:45p
24 that looks at the impact of, say, chat room           12:20:50p

Page 123

1  information, and that literature asks the            12:21:02p
2  question of whether chat room information is          12:21:10p
3  viewed as material to investors.                12:21:12p
4           Now, what that literature           12:21:19p
5  recognizes is that a reference in a chat room         12:21:21p
6  to a particular company, whether that is            12:21:25p
7  favorable or unfavorable, is likely to be a          12:21:32p
8  subjective evaluation. So those studies            12:21:39p
9  provide objective measures of the extent to          12:21:41p
10 which there is discussion within a chat room         12:21:46p
11 and objective measures as to whether that --         12:21:51p
12 those discussions are favorable or unfavorable       12:21:54p
13 and then attempts to test whether that             12:21:59p
14 information is viewed by market participants         12:22:04p
15 as being material.                     12:22:07p
16      Q.    What are these objective            12:22:11p
17 measures determining whether the information is      12:22:18p
18 favorable or unfavorable?                  12:22:20p
19      A.    The -- and I'm going by            12:22:26p
20 recollection, this is an article published in        12:22:27p
21 the Journal of Finance maybe five years ago --       12:22:29p
22 the researchers set up a text-based search of        12:22:36p
23 chat room information and identify certain words     12:22:42p
24 that would be considered to be unambiguous with      12:22:5p

Page 124

1  favorable such as "buy" --                 12:22:59p
2       Q.    "Hot"?                    12:23:01p
3       A.    Something like that.             12:23:03p
4            -- and "negative," and then         12:23:09p
5  try to come up with a quantitative measure of        12:23:09p
6  the frequency on a particular day in which          12:23:12p
7  those words appear, and then to use that           12:23:14p
8  quantitative measure to examine whether on          12:23:20p
9  that day there is a significant stock price          12:23:24p
10 movement, and so what the researcher is doing       12:23:29p
11 is setting up a -- an experiment that can be         12:23:34p
12 replicated by a third party that is testing,         12:23:37p
13 using objective scientific measures, the            12:23:43p
14 significance of a piece of information.             12:23:49p
15      Q.    And you said Journal of Finance      12:23:55p
16 five years ago or thereabouts?                12:23:58p
17      A.    Or thereabouts, yes.             12:24:00p
18      Q.    Who wrote it?                 12:24:01p
19      A.    My recollection is a guy -- at       12:24:04p
20 least one of the authors was at the University       12:24:06p
21 of British Columbia. I don't recall, as I sit        12:24:09p
22 here, who the authors are.                  12:24:13p
23      Q.    That article dealt with chat         12:24:14p
24 room --                           12:24:16p

Page 125

1       A.    Right.                    12:24:17p
2       Q.    -- communication.               12:24:18p
3            Did it deal with oral rumors?       12:24:19p
4       A.    I don't recall.                12:24:25p
5       Q.    Rumor or other forms of oral         12:24:28p
6  communication can, if material, affect stock         12:24:34p
7  price; correct?                      12:24:37p
8       A.    If that information is material       12:24:40p
9  and becomes available to market participants.        12:24:43p
10      Q.    And how in that case does one        12:24:46p
11 objectively measure, if at all, as to whether        12:24:48p
12 the information has materially affected the          12:24:53p
13 market?                           12:24:56p
14      A.    The procedure that I think I've       12:24:57p
15 used and would use is to first provide             12:25:01p
16 information -- to ascertain whether the            12:25:05p
17 information that is characterized as -- you are       12:25:09p
18 characterizing as rumor or opinion is publicly       12:25:15p
19 available. So there is a news report, an           12:25:21p
20 analyst report, a company disclosure, a            12:25:27p
21 disclosure, say, of a government regulatory          12:25:33p
22 agency, some objective way of determining           12:25:37p
23 whether the information is publicly available.        12:25:39p
24            And then the second step would       12:25:45p

32 (Pages 122 to 125)

CHRISTOPHER M. JAMES

Page 126

1  be, in terms of identifying the materiality of    12:25:46p
2  that information, to examine the stock price    12:25:49p
3  movements on the day that or days in which the    12:25:56p
4  analyst has been able to determine the    12:26:01p
5  information was publicly available.    12:26:06p
6      Q.    And in your last answer, when    12:26:09p
7  you referred to the date on which the    12:26:11p
8  information was publicly available, do you mean    12:26:13p
9  by means of some writing or do you mean,    12:26:16p
10  instead, by means of a rumor process?    12:26:21p
11      A.    I think one needs to determine    12:26:25p
12  that it was available to market participants.    12:26:30p
13  Let me see if I can make a distinction, and I    12:26:39p
14  think it's an important one.    12:26:41p
15          If -- would I consider as I    12:26:43p
16  walk back to my hotel tonight or this    12:26:50p
17  afternoon --    12:26:52p
18          MR. COLLINS:    Off the record.    12:26:54p
19          (Discussion off the record.)    12:26:54p
20          THE WITNESS:    As I walk back    12:26:57p
21  early this afternoon to my hotel, and I    12:26:59p
22  were to pass someone that said, "Gosh,    12:27:03p
23  I think Google is overvalued," okay,    12:27:09p
24  that would be a rumor.    Okay?    12:27:14p

Page 127

1          Now, how would I as a scientist    12:27:16p
2  determine whether that rumor was    12:27:21p
3  material and was available -- was    12:27:25p
4  reflected in the information that the    12:27:28p
5  market was using to value the stock?    12:27:35p
6  Well, I first would have to say, is    12:27:41p
7  there any indication that market    12:27:45p
8  participants are aware of that opinion    12:27:48p
9  and view it as new information?    What    12:27:56p
10  would I do?    12:28:01p
11          I would not rely necessarily    12:28:02p
12  completely on written documents, but    12:28:05p
13  certainly I would look for press    12:28:06p
14  releases, I would like for company    12:28:09p
15  releases, I would look for analyst    12:28:11p
16  discussion, I would go to the -- I    12:28:14p
17  would review perhaps the e-mails that    12:28:17p
18  come to the investor relations    12:28:22p
19  department of a company, I would review    12:28:27p
20  the conference calls that the company    12:28:28p
21  holds with investors and analysts to    12:28:30p
22  determine whether the information that    12:28:33p
23  I, quote, heard on the street was    12:28:35p
24  information that market participants    12:28:38p

Page 128

1  were considering in valuing the stock.    12:28:41p
2          And then I would look to the time    12:28:49p
3  at which that were available to market    12:28:50p
4  participants, and then I would do the    12:28:54p
5  next step, which would be assess its    12:28:57p
6  materiality by examining whether it    12:29:00p
7  changed the total mix of information as    12:29:02p
8  measured by did it move the stock in a    12:29:06p
9  significant way.    12:29:12p
10  BY MR. COLLINS:    12:29:13p
11      Q.    Okay, that is very interesting.    12:29:13p
12          So let's assume you are walking    12:29:14p
13  to your cab this afternoon to get a ride to    12:29:16p
14  the airport and the person who tells you    12:29:19p
15  Google is overvalued is the CEO of Google.    12:29:23p
16          Let's further assume that you    12:29:29p
17  can find no writing, analyst report, press    12:29:32p
18  report, news story suggesting or stating that    12:29:37p
19  the CEO of Google believes Google to be    12:29:45p
20  overstated.    12:29:48p
21          And let's further assume, going    12:29:49p
22  to your next step as you called it a moment    12:29:50p
23  ago, there is a statistically significant    12:29:53p
24  movement on the day that the CEO of Google    12:29:55p

Page 129

1  shared with you this information.    12:30:02p
2          Under those circumstances,    12:30:04p
3  would you conclude that it was impossible that    12:30:06p
4  -- or highly unlikely that oral communication,    12:30:13p
5  in this case in the form of rumor, materially    12:30:19p
6  affected the market price?    12:30:23p
7      A.    Well, I mean, I think that if,    12:30:28p
8  under your hypothetical, if the CEO of Google    12:30:32p
9  conveyed that information of overvaluation to me    12:30:41p
10  in the cab and on the same day there was a    12:30:45p
11  change in the stock price, I would -- first of    12:30:49p
12  all, under the hypothetical, if I were the one    12:30:51p
13  that received that information -- and I was the    12:30:57p
14  only one -- and I didn't trade on it, then    12:30:58p
15  there's no reason to expect that that    12:31:00p
16  conversation would have -- that that would be    12:31:03p
17  causally linked to the stock price movement.    12:31:06p
18          Now, if, in fact, the CEO of    12:31:09p
19  Google were -- that we undertook an    12:31:15p
20  investigation and concluded that in fact on    12:31:20p
21  the day that I got into the cab and heard that    12:31:25p
22  Google was overvalued, the CEO had also    12:31:32p
23  communicated to Black Rock and other    12:31:37p
24  institutional investors that it was his view    12:31:41p

33 (Pages 126 to 129)

CHRISTOPHER M. JAMES

Page 130

| | |
|---|---|
| 1 | that the stock was overvalued, would I expect | 12:31:45p |
| 2 | then there to be a price reaction? Yes, I | 12:31:51p |
| 3 | would. | 12:31:53p |
| 4 | Would I expect also that there | 12:31:53p |
| 5 | would be some discussion, public information, | 12:31:56p |
| 6 | that would be indicative of the CEO's comments | 12:32:02p |
| 7 | to that effect? I certainly would think so. | 12:32:08p |
| 8 | Because it would be viewed by market | 12:32:10p |
| 9 | participants and powers of the stock as being | 12:32:15p |
| 10 | something that was material and significant to | 12:32:19p |
| 11 | them. | 12:32:22p |
| 12 | MS. REED: I don't want to stop | 12:32:23p |
| 13 | things, but I was just looking at the | 12:32:25p |
| 14 | clock and we are at about 12:36, so | 12:32:26p |
| 15 | whenever this line -- | 12:32:29p |
| 16 | MR. COLLINS: Just a couple more | 12:32:30p |
| 17 | minutes. | 12:32:31p |
| 18 | MS. REED: Okay. | 12:32:32p |
| 19 | BY MR. COLLINS: | 12:32:32p |
| 20 | Q.   Very interesting. Time for | 12:32:32p |
| 21 | lunch. | 12:32:34p |
| 22 | It is not necessary in every | 12:32:36p |
| 23 | case for there to be a writing in order for | 12:32:39p |
| 24 | the stock price to move materially; correct? | 12:32:43p |

Page 131

| | |
|---|---|
| 1 | A.   I think that's correct. For | 12:32:45p |
| 2 | example, stock prices might move because of | 12:32:47p |
| 3 | information conveyed during a conference call | 12:32:54p |
| 4 | with the company. Their stock prices could | 12:32:56p |
| 5 | move, and I would expect there to be discussion | 12:33:05p |
| 6 | of the -- linking the stock price movement to | 12:33:08p |
| 7 | information that, say, an analyst gathers from | 12:33:12p |
| 8 | discussing a particular stock with the brokerage | 12:33:18p |
| 9 | network. | 12:33:22p |
| 10 | MR. COLLINS: Let's break for | 12:33:23p |
| 11 | lunch at the moment. | 12:33:24p |
| 12 | THE WITNESS: Okay. | 12:33:25p |
| 13 | (A luncheon recess was had from | 12:33:26p |
| 14 | 12:33 p.m. to 1:40 p.m.; and then the | 12:33:26p |
| 15 | proceedings continued as follows:) | 12:33:26p |
| 16 | BY MR. COLLINS: | 01:40:47p |
| 17 | Q.   Dr. James, if you do a rolling | 01:40:47p |
| 18 | regression, are you going to get the same result | 01:40:49p |
| 19 | you will get if your examination period begins | 01:40:52p |
| 20 | prior to the class period? | 01:40:59p |
| 21 | A.   I'm not sure what you mean by | 01:41:05p |
| 22 | "same result." | 01:41:07p |
| 23 | Q.   Same R-squared. | 01:41:08p |
| 24 | A.   There's no reason to expect that | 01:41:13p |

Page 132

| | |
|---|---|
| 1 | they would be the same.  One could be higher or | 01:41:17p |
| 2 | lower, there's no reason to expect -- there's no | 01:41:22p |
| 3 | reason necessarily to expect them to differ, but | 01:41:29p |
| 4 | there's nothing that would lead me to believe | 01:41:32p |
| 5 | that they would be the same either.  I mean, | 01:41:38p |
| 6 | there's no -- | 01:41:41p |
| 7 | Q.   Because they are two different | 01:41:42p |
| 8 | analyses? | 01:41:44p |
| 9 | A.   No.  It would -- I think the | 01:41:47p |
| 10 | issue would be -- sort of a more general issue | 01:41:54p |
| 11 | would be, if I -- I would expect them to be very | 01:41:59p |
| 12 | similar if the underlying characteristics of the | 01:42:02p |
| 13 | company were similar.  I would expect them to | 01:42:09p |
| 14 | differ if, say, the fundamentals of the company | 01:42:13p |
| 15 | differed or there was reason to believe that | 01:42:19p |
| 16 | market conditions were materially different | 01:42:24p |
| 17 | during a contemporaneous period versus, say, a | 01:42:27p |
| 18 | period prior to an analysis. | 01:42:33p |
| 19 | Q.   Did you consider in your work in | 01:42:35p |
| 20 | this case whether there was a marked change in | 01:42:36p |
| 21 | market conditions affecting Adams Golf during | 01:42:39p |
| 22 | the class period; that is, when you created your | 01:42:46p |
| 23 | rolling regression in this case and you went | 01:42:51p |
| 24 | about this assignment using a rolling | 01:42:54p |

Page 133

| | |
|---|---|
| 1 | regression -- | 01:42:56p |
| 2 | A.   Right. | 01:42:57p |
| 3 | Q.   -- did you take into the fact, | 01:42:57p |
| 4 | into consideration, the possibility that there | 01:43:00p |
| 5 | was a marked change in market conditions during | 01:43:02p |
| 6 | the class period? | 01:43:04p |
| 7 | A.   During the class period? | 01:43:05p |
| 8 | Certainly the model will capture the extent to | 01:43:07p |
| 9 | which that occurs. But I used the | 01:43:11p |
| 10 | contemporaneous period, as I indicated before, | 01:43:21p |
| 11 | because I didn't have a period that preceded the | 01:43:24p |
| 12 | class period in which the company was publicly | 01:43:27p |
| 13 | traded because it is an initial public offering. | 01:43:30p |
| 14 | Q.   So, so this was the best you | 01:43:34p |
| 15 | could do? | 01:43:36p |
| 16 | A.   I think that this is -- that | 01:43:36p |
| 17 | what I've done is a reasonable approach and I | 01:43:39p |
| 18 | think it is, under the circumstances, the best | 01:43:44p |
| 19 | approach to take, yes. | 01:43:49p |
| 20 | Q.   Were there other approaches | 01:43:50p |
| 21 | considering the fact that it was an IPO? | 01:43:51p |
| 22 | A.   I'm not sure what you mean by | 01:43:54p |
| 23 | "other approaches." | 01:43:56p |
| 24 | Q.   Well, could you have used as the | 01:43:57p |

34 (Pages 130 to 133)

CHRISTOPHER M. JAMES

Page 162

| | | |
|---|---|---|
| 1 | MS. REED: Todd, I would just | 02:26:48p |
| 2 | like to -- I'm struggling with the word | 02:26:50p |
| 3 | possible here, what you mean by | 02:26:52p |
| 4 | possible and to the extent you're | 02:26:54p |
| 5 | asking if anything is possible. I | 02:26:55p |
| 6 | mean, I think that's been objected to | 02:26:57p |
| 7 | you on numerous occasions in our | 02:26:59p |
| 8 | deposition. So you keep going down | 02:27:02p |
| 9 | this line of possibility and I think | 02:27:03p |
| 10 | it's not possible to answer. | 02:27:05p |
| 11 | MR. COLLINS: Fair enough. | 02:27:07p |
| 12 | BY MR. COLLINS: | 02:27:07p |
| 13 | Q.   Go ahead. | 02:27:07p |
| 14 | A.   Can I have the question back. | 02:27:16p |
| 15 | (The court reporter read the | 02:27:17p |
| 16 | record as follows: | 02:27:17p |
| 17 | "QUESTION: Where there is | 02:27:17p |
| 18 | observation of a trend -- let me give | 02:27:17p |
| 19 | you another hypo. | 02:27:17p |
| 20 | Do you think it is possible that | 02:27:17p |
| 21 | market participants in July, August, | 02:27:17p |
| 22 | September observed Adams Golf clubs | 02:27:17p |
| 23 | being removed from the shelves and | 02:27:17p |
| 24 | Orlimar clubs being put in their place | 02:27:17p |

Page 163

| | | |
|---|---|---|
| 1 | in prestige golf stores and that market | 02:27:17p |
| 2 | participants on the basis of that | 02:27:17p |
| 3 | observation could have been influenced | 02:27:17p |
| 4 | with regard to their view of any | 02:27:17p |
| 5 | investment in Adams Golf?") | 02:27:17p |
| 6 | THE WITNESS: I haven't seen any | 02:28:00p |
| 7 | -- as I sit here, I don't recall any | 02:28:03p |
| 8 | evidence or commentary or discussion or | 02:28:06p |
| 9 | anything in the record that was said -- | 02:28:10p |
| 10 | that suggests that Adams Golf clubs | 02:28:15p |
| 11 | were being removed and replaced by | 02:28:19p |
| 12 | Orlimar Golf clubs during this period | 02:28:22p |
| 13 | of time, so I'm not sure how you are -- | 02:28:25p |
| 14 | your hypothetical is related to this | 02:28:29p |
| 15 | issue. | 02:28:31p |
| 16 | I do recall seeing discussion by | 02:28:35p |
| 17 | analysts and commentary in conference | 02:28:37p |
| 18 | calls regarding the competitive | 02:28:41p |
| 19 | position of Adams relative to Orlimar, | 02:28:48p |
| 20 | so I do see an observation of a trend | 02:28:56p |
| 21 | by market participants with regard to | 02:29:01p |
| 22 | Orlimar. | 02:29:04p |
| 23 | I do also see discussion amongst | 02:29:11p |
| 24 | market participants about the | 02:29:13p |

Page 164

| | | |
|---|---|---|
| 1 | importance of Adams Golf market share | 02:29:15p |
| 2 | as it pertains to its valuation. So I | 02:29:19p |
| 3 | see that. I don't see a -- and I think | 02:29:24p |
| 4 | that that certainly is consistent with | 02:29:31p |
| 5 | the notion that market participants | 02:29:33p |
| 6 | were considering that in valuation. | 02:29:36p |
| 7 | To the extent that I investigated | 02:29:44p |
| 8 | information regarding whether | 02:29:48p |
| 9 | announcements concerning Orlimar's | 02:29:52p |
| 10 | market position, say by Adams Golf, | 02:29:55p |
| 11 | were significant in moving the stock | 02:29:59p |
| 12 | price, I did investigate that issue, | 02:30:04p |
| 13 | and unlike the gray market in which I | 02:30:09p |
| 14 | was unable to find a statistically | 02:30:13p |
| 15 | significant reaction to information | 02:30:16p |
| 16 | coming to the market regarding gray | 02:30:20p |
| 17 | market activities at the 95 or 90 | 02:30:25p |
| 18 | percent significance level, I was able | 02:30:29p |
| 19 | to find at the 90 percent significance | 02:30:32p |
| 20 | level information regarding Orlimar's | 02:30:37p |
| 21 | relative market position. Okay? | 02:30:40p |
| 22 | BY MR. COLLINS: | 02:30:45p |
| 23 | Q.   Is this work you also did after | 02:30:45p |
| 24 | Mr. Miller's rebuttal? | 02:30:48p |

Page 165

| | | |
|---|---|---|
| 1 | A.   Yes. | 02:30:49p |
| 2 | Q.   You need to let me know | 02:30:50p |
| 3 | everything you did after Mr. Alan's -- | 02:30:52p |
| 4 | Mr. Miller's rebuttal. I thought we were | 02:30:55p |
| 5 | through that and apparently there is more stuff. | 02:30:57p |
| 6 | A.   Actually, I take that back. | 02:31:00p |
| 7 | It's not work that I did before Mr. -- or after | 02:31:03p |
| 8 | Mr. Miller's rebuttal, it's work that I did | 02:31:12p |
| 9 | before. | 02:31:14p |
| 10 | Q.   Good. Well, we'll come back to | 02:31:15p |
| 11 | that, your use of the 90 percent level. | 02:31:16p |
| 12 | A.   It's reflected in the price | 02:31:29p |
| 13 | movement on 9/29/98. | 02:31:30p |
| 14 | Q.   Thank you. | 02:31:37p |
| 15 | What are you looking at, | 02:31:38p |
| 16 | please? | 02:31:39p |
| 17 | A.   It's the integrated chronology. | 02:31:39p |
| 18 | MS. REED: Exhibit 341. | 02:31:45p |
| 19 | MR. COLLINS: Which we got today. | 02:31:47p |
| 20 | MS. FOX: Yes. | 02:31:49p |
| 21 | BY MR. COLLINS: | 02:31:49p |
| 22 | Q.   And what page did you say it's | 02:31:49p |
| 23 | on? | 02:31:51p |
| 24 | Oh, you are referring to 9/28. | 02:31:53p |

42 (Pages 162 to 165)

CHRISTOPHER M. JAMES

Page 218

```
 1      Q.    Stock return.                04:09:25p
 2            And how do you choose what    04:09:26p
 3   stock return you use?                  04:09:29p
 4      A.    Over the month?               04:09:32p
 5      Q.    For each month.               04:09:33p
 6      A.    It's from the close of the prior  04:09:37p
 7   month to the close of the current month, so it  04:09:40p
 8   would be the cumulative return over the month,  04:09:44p
 9   so all of the returns in the month are used.  04:09:49p
10   All the daily returns are incorporated into the  04:09:53p
11   monthly return.                        04:09:57p
12      Q.    And for the monthly observation  04:09:57p
13   for the industry index, how did you determine  04:10:00p
14   that?                                  04:10:02p
15      A.    The same, the same way. So you  04:10:02p
16   take each component of the industry -- I think  04:10:05p
17   the index -- the Bloomberg index is on -- you  04:10:08p
18   can -- I think -- I think I recall seeing it on  04:10:12p
19   a level basis, you just take level prior month  04:10:15p
20   -- level at the end of the month plus level at  04:10:22p
21   the prior month divided by level at the prior  04:10:25p
22   month will give you the return over that month,  04:10:28p
23   the same way you calculate a return over the  04:10:30p
24   month.                                 04:10:32p
```

Page 219

```
 1      Q.    Why did you perform the        04:10:33p
 2   regression in Exhibit 10; what did that add to  04:10:35p
 3   the work you were doing otherwise?     04:10:37p
 4      A.    I think we touched on this topic  04:10:40p
 5   this morning when we had a discussion of why  04:10:43p
 6   market participants and researchers utilize,  04:10:52p
 7   say, monthly returns. Remember I said if you  04:10:56p
 8   look at Ibbitson or Barra or other vendors of  04:11:01p
 9   what are called betas, how stock moves with the  04:11:08p
10   market, those vendors may also have how stock  04:11:11p
11   moves with industry comparables; that generally  04:11:15p
12   that analysis -- not always, but typically that  04:11:19p
13   analysis is done to figure out the influence of  04:11:22p
14   general industry factors, is done on a monthly  04:11:26p
15   basis as opposed to a daily basis for the  04:11:28p
16   reasons I gave you before, which is that on a  04:11:34p
17   monthly basis you are basically taking out a lot  04:11:35p
18   of noise that occurs, what a statistician would  04:11:40p
19   refer to as noise, on the daily returns due to  04:11:45p
20   randomness.                            04:11:48p
21      Q.    So, again, with regard to      04:11:51p
22   Exhibit 10, if there were volatility in either  04:11:52p
23   the index on an intramonth basis or in Adams  04:11:56p
24   Golf stock on an intramonth basis, that would  04:11:59p
```

Page 220

```
 1   not be reflected; that would be washed out by  04:12:03p
 2   your monthly observation?              04:12:07p
 3      A.    Yes, but it would be only       04:12:10p
 4   looking at how one could explain monthly  04:12:12p
 5   variations in the stock return relative to  04:12:17p
 6   monthly variations in the industry index.  04:12:22p
 7      Q.    Why was the period under study  04:12:28p
 8   in Exhibit 10, why did that cut off at June 11?  04:12:31p
 9      A.    You know, I looked at Exhibit 10  04:12:34p
10   and I knew you were going to ask that question,  04:12:36p
11   and I don't recall. I think it, frankly, might  04:12:38p
12   be an oversight.                       04:12:42p
13      Q.    "An oversight" meaning what?   04:12:43p
14      A.    On my part. So I need to go     04:12:46p
15   back -- in just assembling this, as I sit here,  04:12:48p
16   I don't recall why it ended in June of 1999.  04:12:55p
17      Q.    Did you consider -- and I       04:12:58p
18   understand, I respect people that forget things,  04:13:02p
19   I do that, too. But did you consider, if you  04:13:04p
20   know, running the regression at Exhibit 10  04:13:06p
21   through December '99 as you ran the regressions  04:13:09p
22   in Exhibit 12?                         04:13:18p
23      A.    I don't recall making a        04:13:24p
24   distinction between June of 1999 and December of  04:13:27p
```

Page 221

```
 1   1999, so as I sit here I don't recall making any  04:13:35p
 2   conscious decision to cut one analysis at 6/99  04:13:44p
 3   and the other analysis at year-end 1999.  04:13:48p
 4      Q.    I want to go back to a couple of  04:13:58p
 5   points you raised earlier. First, you said that  04:14:00p
 6   you did consider a two-day event window in  04:14:03p
 7   response to the August 28, 1998, Lehman analyst  04:14:07p
 8   report; correct?                       04:14:14p
 9      A.    Right.                         04:14:15p
10      Q.    Did you consider a three-day   04:14:15p
11   event window?                          04:14:17p
12      A.    No.                           04:14:18p
13      Q.    Did you consider a two-day event  04:14:18p
14   window with regard to any other periods of the  04:14:21p
15   class period?                          04:14:25p
16      A.    I don't recall that I did.      04:14:29p
17            I do recall, as we mentioned    04:14:34p
18   earlier today, doing an analysis in response  04:14:37p
19   to something which was in Mr. Miller's report,  04:14:43p
20   and that was he indicated -- he made two  04:14:50p
21   points: First, that, you know, while I looked  04:14:55p
22   at statistical significance at a 95 percent  04:15:00p
23   level, I didn't look at the significance at  04:15:04p
24   other levels. And, as I indicated in my  04:15:06p
```

56 (Pages 218 to 221)

CHRISTOPHER M. JAMES

Page 222

1  report, the 95 percent level is the          04:15:08p
2  conventional level; although, some researchers    04:15:11p
3  will report significance at a 10 percent       04:15:17p
4  level. And so I examined whether there were     04:15:21p
5  days that were significant at a 90 percent      04:15:31p
6  level and what information was coming to the     04:15:36p
7  market on those days.                  04:15:47p
8        Second is in response to a          04:15:49p
9  comment in his report concerning looking at the   04:15:51p
10 returns over multiple days. I asked the        04:16:01p
11 question of whether if the results and my       04:16:03p
12 conclusions regarding statistical significance    04:16:11p
13 and the information coming to the market on     04:16:16p
14 those days would be altered if I used a two-day   04:16:18p
15 window, and concluded that -- my conclusions     04:16:25p
16 were the same whether I used a two-day window or  04:16:33p
17 a one-day window for each of the events that I    04:16:36p
18 analyzed.                       04:16:43p
19       So if you take the Golf Pro         04:16:44p
20 August 1st article and say, well, look at a      04:16:47p
21 two-day window around that, would that alter     04:16:50p
22 your conclusion regarding the statistical      04:16:53p
23 significance, would using a 90 percent        04:16:58p
24 confidence interval as opposed to a 95 percent    04:17:05p

Page 223

1  confidence interval impact the conclusion, and    04:17:08p
2  the answer to both of those questions is no.     04:17:11p
3      Q.   Which events or which time        04:17:19p
4  periods during the class period did you consider   04:17:21p
5  using a multiple-day event window for?        04:17:25p
6      A.   Every day.                04:17:29p
7      Q.   Okay. And which events did you      04:17:31p
8  consider using the 90 percent confidence level    04:17:33p
9  for?                          04:17:37p
10     A.   Every day.                04:17:38p
11     Q.   And how did you apply that using     04:17:40p
12 every day? For example, if I can turn you to     04:17:42p
13 Page Exhibit 5?                    04:17:46p
14     A.   Mm-hmm.                 04:17:54p
15     Q.   With regard to using a          04:17:55p
16 multiple-day event window, what did you mean by   04:18:00p
17 that; three days or five days?             04:18:03p
18     A.   Two days.                 04:18:04p
19     Q.   Okay. You didn't look at         04:18:05p
20 anything more than two days, did you?         04:18:06p
21     A.   No, I had no information that       04:18:08p
22 would indicate to me that the market would not    04:18:10p
23 operate in an efficient way and I had no       04:18:15p
24 information to me that indicated any uncertainty   04:18:18p

Page 224

1  regarding -- there would be no reason to use a    04:18:22p
2  multiple-day window more than two days for this   04:18:28p
3  analysis because you would use that if you were   04:18:34p
4  uncertain as -- you have a news announcement --   04:18:37p
5  we talked about this earlier today; if you had a   04:18:40p
6  news announcement and you weren't sure whether   04:18:44p
7  that news announcement was made -- you know what  04:18:46p
8  day it was made on, but you don't know whether    04:18:48p
9  it was during trading hours or not.          04:18:54p
10     Q.   Sure.                  04:18:54p
11       But you might also have new          04:18:54p
12 information enter in the market or allegedly      04:18:55p
13 new information enter in the market that might    04:18:58p
14 be in the form of rumor or oral communication    04:19:01p
15 which would be another situation in which you    04:19:03p
16 were uncertain as to what the disclosure date    04:19:06p
17 is. Correct?                      04:19:08p
18     A.   No, I would certainly think that     04:19:09p
19 if there was an allegation that a rumor or oral   04:19:11p
20 communication were material, that you would be    04:19:18p
21 able to identify the date at which that        04:19:25p
22 information became available to the market. I    04:19:30p
23 would also say that -- and be able to relate it,   04:19:33p
24 as I talked about earlier today, in an objective  04:19:37p

Page 225

1  scientific manner, to the price reaction.       04:19:44p
2        As I have indicated, oral           04:19:48p
3  communication, as it would be in the context     04:19:51p
4  of a conference call with investors, you would    04:19:52p
5  look at the day on which that conference call     04:19:57p
6  occurred, that oral communication, for        04:19:59p
7  purposes of determining whether that         04:20:03p
8  communication was material.              04:20:07p
9      Q.   If it were a rumor, however, you     04:20:09p
10 might not know when the rumor first started     04:20:11p
11 circulating; correct?                 04:20:15p
12     A.   I think that's -- I mean, again,    04:20:19p
13 it's -- and we went through this before -- I     04:20:22p
14 would -- if I were asked to assess the         04:20:25p
15 materiality of an alleged rumor, the first step   04:20:28p
16 I would take is to try to determine when that    04:20:33p
17 rumor was being utilized by market participants   04:20:35p
18 for purposes of pricing or valuing the stock.    04:20:45p
19       I would also think that --          04:20:48p
20 there's certainly -- and I would -- I would      04:20:54p
21 expect to see, if it was a rumor that was       04:20:59p
22 material and significant to investors, that --    04:21:02p
23 as I indicated before, that there would be      04:21:06p
24 some commentary on it, in some source.        04:21:08p

57 (Pages 222 to 225)

CHRISTOPHER M. JAMES

Page 254

1  Q.   Are there models that can be    05:21:20p
2  used that test materiality on the basis of    05:21:21p
3  volume or some combination of volume and price    05:21:25p
4  movement?    05:21:29p
5  A.   I mean, I have not seen that    05:21:37p
6  analysis done in the context of, say, a damage    05:21:40p
7  analysis. I have seen some academic studies    05:21:43p
8  that ask the question of whether information has    05:21:49p
9  an effect on trading volume.    05:22:01p
10  Q.   And do you have any opinion as    05:22:11p
11  to the usability or appropriateness of those    05:22:13p
12  models?    05:22:17p
13  A.   I think the appropriateness    05:22:20p
14  would depend on the purpose of their being    05:22:23p
15  used. I would have to go back and look at some    05:22:31p
16  of those papers. Most of the paper -- the    05:22:36p
17  academic literature in finance is more focused    05:22:40p
18  on how information impacts value as opposed to    05:22:48p
19  trading volume. Although, there are a few    05:22:53p
20  papers out there that look at trading volume. I    05:22:55p
21  just don't recall what the conclusions are.    05:22:58p
22  Q.   The famous Golf Pro article    05:22:59p
23  allegedly of August or August 1, 1998, when was    05:23:03p
24  that available to the market?    05:23:08p

Page 255

1  A.   As I indicate in my report, it's    05:23:10p
2  my opinion that it's available to the market on    05:23:16p
3  August 1st.    05:23:19p
4  Q.   Well, surely you're not offering    05:23:19p
5  an opinion on that now, Dr. James, are you?    05:23:21p
6  A.   Yes, I am.    05:23:23p
7  Q.   You might be making an    05:23:24p
8  assumption, but you are offering -- are you an    05:23:26p
9  expert with regard to when Golf Pro appeared in    05:23:29p
10  1998?    05:23:32p
11  A.   I'm not representing myself to    05:23:33p
12  be an expert in when Golf Pro appeared. I am    05:23:35p
13  representing myself to be an expert, in, first of    05:23:40p
14  all, knowing what the publication date and the    05:23:43p
15  convention of using publication dates. I    05:23:50p
16  believe your own expert uses the publication    05:23:52p
17  date as the date referenced in his chronology.    05:23:55p
18  Second, I undertook an    05:23:59p
19  investigation to determine whether there was    05:24:01p
20  any evidence that suggests that the Golf Pro    05:24:03p
21  article was available prior to the cover day    05:24:06p
22  and concluded based on that analysis that    05:24:12p
23  there was none.    05:24:14p
24  Q.   Okay. Do you know of any    05:24:15p

Page 256

1  evidence, apart from what you've put in your    05:24:16p
2  reports, to indicate when that Golf Pro article    05:24:21p
3  was available?    05:24:24p
4  A.   Yes.    05:24:26p
5  Q.   When?    05:24:26p
6  A.   In response to the Miller report    05:24:28p
7  where he conjectures that it might have been    05:24:32p
8  available earlier, I performed the following    05:24:37p
9  test. Based upon communications that I'm aware    05:24:40p
10  of between Cornerstone and the publishers of    05:24:46p
11  Golf Pro, which is now not currently published,    05:24:53p
12  they were unable to answer the question as to    05:25:04p
13  whether it was available before or after the    05:25:05p
14  cover price -- cover date.    05:25:08p
15  So I conducted a Factiva search    05:25:11p
16  between 1995 and 2000 in which I used the    05:25:15p
17  keywords "Golf Pro magazine," and then I    05:25:22p
18  looked at all of the articles that were    05:25:26p
19  available on Factiva that reference Golf Pro    05:25:29p
20  magazine and asked the question of whether    05:25:34p
21  there was any reference in the public press to    05:25:36p
22  a Golf Pro magazine article prior to the    05:25:41p
23  stated publication date on the cover, and I    05:25:46p
24  was able to identify several instances in    05:25:50p

Page 257

1  which there is a reference to a particular    05:25:53p
2  issue of Golf Pro magazine, and all of the    05:25:57p
3  references were after the publication date    05:26:01p
4  which is consistent with -- which is    05:26:04p
5  inconsistent with the conjecture by Mr. Miller    05:26:09p
6  that the information was available to the    05:26:13p
7  market prior to the cover date.    05:26:19p
8  Q.   Did you save those searches?    05:26:27p
9  A.   No.    05:26:29p
10  Q.   Did you communicate with your    05:26:30p
11  office about providing us information with    05:26:34p
12  regard to the additional regressions you said    05:26:35p
13  you would have?    05:26:38p
14  A.   I have -- it's not my office.    05:26:41p
15  Q.   Cornerstone. Whomever you had    05:26:43p
16  to communicate with.    05:26:44p
17  A.   Yes, and the individual that is    05:26:46p
18  available -- the individual who undertook that    05:26:53p
19  analysis is not available, he's -- that's Amir    05:26:59p
20  Rosen, and I believe he's attending a deposition    05:27:07p
21  today.    05:27:10p
22  Q.   Not in this case?    05:27:11p
23  A.   Yes, I believe he's downstairs,    05:27:12p
24  two stories down.    05:27:14p

65 (Pages 254 to 257)

CHRISTOPHER M. JAMES

Page 258

1    Q.    Have you spoken to him about        05:27:17p
2  this?                                       05:27:18p
3    A.    I have spoken to him and said I     05:27:20p
4  don't have my computer with me.  He did not have    05:27:24p
5  his computer with him either, so...         05:27:27p
6         MR. COLLINS:  Okay, counsel and I    05:27:31p
7    will have to talk about that, but we      05:27:32p
8    can in a moment off the record.           05:27:33p
9  BY MR. COLLINS:                             05:27:37p
10   Q.    Apart from what you have said       05:27:37p
11 today and apart from what is in your rebuttal,    05:27:40p
12 do you have any further criticisms of Miller's    05:27:43p
13 report?                                     05:27:46p
14   A.    I think my rebuttal report is a     05:27:52p
15 fair summary of the criticisms that I had of    05:27:59p
16 Mr. Miller's report.                        05:28:02p
17   Q.    Apart from what you put in both     05:28:03p
18 reports and apart from what you said today, are    05:28:07p
19 you going to opine on anything else in this    05:28:10p
20 case?                                       05:28:13p
21   A.    I think the deposition questions    05:28:17p
22 and my expert reports have covered the general    05:28:24p
23 areas that I expect to opine on.            05:28:27p
24   Q.    Are there any specific areas        05:28:31p

Page 259

1  that have not yet been covered?             05:28:33p
2    A.    I don't -- as I sit here, I         05:28:36p
3  can't think of anything.  I can't represent to    05:28:41p
4  you that there is not some specific issue or    05:28:43p
5  fact that I might not utilize, but it's a    05:28:49p
6  summary of the issues that I will address -- I    05:28:55p
7  expect to address in my testimony.          05:28:58p
8         There is one, actually, and         05:29:01p
9  that has to do with in reviewing my report, I    05:29:06p
10 became aware that in some sense -- in certain    05:29:16p
11 instances I state there are no Section 11    05:29:23p
12 damages, and I make reference to an analysis    05:29:30p
13 of Section 11 damages, and just for the sake    05:29:35p
14 of completeness, I was referring to -- because    05:29:38p
15 Section 11 and Section 12 damages are computed    05:29:44p
16 in the same way, that I was covering under    05:29:48p
17 that umbrella both Section 11 and Section 12.    05:29:54p
18   Q.    That's fine.                        05:29:59p
19        We're going to break.  While we      05:30:00p
20 are on the break, if you can think about     05:30:00p
21 whether there is anything else you expect to    05:30:02p
22 opine on, I would appreciate it.            05:30:04p
23   A.    Sure.                              05:30:07p
24        MR. COLLINS:  Let's break.          05:30:07p

Page 260

1         (A recess was had from 5:30 p.m.     05:30:13p
2    to 5:36 p.m.; and then the proceedings     05:30:13p
3    continued as follows:)                     05:30:13p
4         MR. COLLINS:  No further            05:36:42p
5    questions.  Thank you.                     05:36:43p
6         (Deposition concluded at
7    5:36 p.m.)
8         ----0----

Page 261

1         C E R T I F I C A T E
2         I, Pamela Harrison, a Notary
3  Public, do hereby certify:
4         That CHRISTOPHER M. JAMES, the
5  witness whose testimony is hereinbefore set
6  forth, was duly sworn by me and that such
7  testimony given by the witness was taken down
8  stenographically by me and then transcribed.
9         I further certify that I am not
10 related to any of the parties to this
11 action by blood or marriage, and that I am in
12 no way interested in the outcome of this
13 matter.
14
15
16        Pamela Harrison
          Registered Merit Reporter
17        Certified Realtime Reporter
          CSR-NJ # 30XI00221600
18        Notary Public
          Date: August 11, 2006
19
20        (The foregoing certification of
   this transcript does not apply to any
21 reproduction of the same by any means, unless
   under the direct control and/or supervision of
22 the certifying shorthand
   reporter.)
23
24

66 (Pages 258 to 261)

# EXHIBIT B

CMJ 0560





**Adams Golf Inc.**
**Closing Stock Price vs. Callaway, Miller's Peer Group and S&P SmallCap Index**
**7/9/98 – 7/31/98**
Source: Bloomberg, CRSP

Stock
Price

— Callaway
— S&P SmallCap
— Peer Group
— Adams Golf Inc.

$24.00
$20.00
$16.00
$12.00
$8.00
$4.00
$0.00

07/09/98  07/11/98  07/13/98  07/15/98  07/17/98  07/19/98  07/21/98  07/23/98  07/25/98  07/27/98  07/29/98  07/31/98

Note: Callaway, Miller's Peer Group and the S&P SmallCap Index are pegged to $16 on 7/9/98, as $16 was the IPO stock price of Adams Golf, at which it began trading on 7/10/98.

# Analysis of Peer Performance Around July Purchase Order Dates

Source: Mr. Miller's Rebuttal Report; CRSP; Bloomberg

| Purchase Orders | Date | CRSP ADGO Return | CRSP Callaway Return | ADGO Callaway-Adjusted Return | Miller Peer Group Return | ADGO Miller Peer Group-Adjusted Return |
|---|---|---|---|---|---|---|
| **7/21 & 22/98** | | | | | | |
| 1 Day Prior | 07/20/98 | -5.3% | -2.1% | | -2.1% | |
| Purchase Order Date | 07/21/98 | -10.5% | -3.7% | | -4.1% | |
| Purchase Order Date | 07/22/98 | 2.1% | -1.6% | | -0.8% | |
| 1 Day After | 07/23/98 | -12.7% | -32.9% | | -28.2% | |
| 2 Days After | 07/24/98 | -3.3% | 7.4% | | 5.6% | |
| **Cumulative** | | **-27.0%** | **-33.2%** | **6.3%** | **-29.4%** | **2.4%** |
| | | | | | | |
| **7/29/1998** | | | | | | |
| 1 Day Prior | 07/28/98 | -13.1% | -4.4% | | -3.8% | |
| Purchase Order Date | 07/29/98 | 0.0% | -7.0% | | -6.4% | |
| 1 Day After | 07/30/98 | 0.9% | -2.0% | | -1.1% | |
| 2 Days After | 07/31/98 | -0.9% | -2.0% | | -2.0% | |
| **Cumulative** | | **-13.1%** | **-14.7%** | **1.6%** | **-12.7%** | **-0.4%** |

Δ π EXHIBIT 340
Deponent C Janes
Date 8/1/06 Rptr
www.depobook.com

MJ 0561

# EXHIBIT C

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
2                            -   -   -
3

  IN RE ADAMS GOLF, INC.  : CONSOLIDATED
4                          :

  SECURITIES LITIGATION    : C.A. No. 99-371 KAJ
5
6                   -------------------------
                    Friday, August 11, 2006
7                   -------------------------
8
9           Oral deposition of R. ALAN MILLER, taken
10    pursuant to notice, was held at the offices of AKIN,
11    GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison
12    Avenue, 18th Floor, New York, New York 10022-2524
13    commencing at 8:50 a.m. on the above date, before Beth
14    A. Barkocy, Certified Shorthand Reporter and Notary
15    Public.
16
17
18
19
20
21
22                       -  -  -
23          RSA/VERITEXT COURT REPORTING COMPANY
                 1845 Walnut Street, 15th Floor
24                  Philadelphia, PA    19103
                (215)241-1000      (888)777-6690
25

R. ALAN MILLER

Page 38

1 opinions on negative loss causation spring
2 primarily from the review of Mr. James' work
3 and the other information that I provide in
4 my reports on that topic, and the adequacy of
5 due diligence opinions, I actually don't
6 recall what the complaint said about that but
7 those opinions I formed based upon my review
8 of the information that I've seen and that
9 I've listed here. I think that probably
10 covers it.
11 BY MR. BESSETTE:
12     Q.    You're familiar with event studies,
13 correct?
14         MR. LEWIS: Objection to form.
15         THE WITNESS: Yeah, I'll say correct
16 and note that that word is used differently,
17 perhaps, by different people, but I am
18 familiar with that term generally and with at
19 least several uses of it.
20 BY MR. BESSETTE:
21     Q.    What is beta in connection with an
22 event study?
23         MR. LEWIS: I'm sorry?
24         MR. BESSETTE: Beta.
25         THE WITNESS: Beta actually

Page 39

1 sometimes -- a beta measurement typically
2 measures the degree of volatility that a
3 particular stock experiences compared with
4 some base measurement statistic like an index
5 or market index or an industry index or
6 something like that; that is, it measures
7 what percent, for example, a particular stock
8 will move when an index moves 1 percent, is
9 one way to explain it. That sometimes finds
10 its way into event study work and sometimes
11 doesn't.
12 BY MR. BESSETTE:
13     Q.    Are there, in your experience, types
14 of stocks that are more sensitive to market movements
15 than other types of stocks, I guess having a higher
16 beta?
17         MR. LEWIS: Objection, vague and
18 overbroad.
19         THE WITNESS: Sure. There are
20 individual stocks -- let me start over.
21         Individual stocks react differently
22 to market movements as a general matter, and
23 there are probably ways to categorize certain
24 types of stocks that move more volatilly than
25 other types of stocks.

Page 40

1 BY MR. BESSETTE:
2     Q.    Let me ask you to look at what's
3 been marked as Exhibit-336 (indicating). This is the
4 expert report of Chris James. I believe you've seen
5 that?
6     A.    Yes.
7     Q.    At Paragraph 17 to 22 of Dr. James'
8 report --
9         MR. LEWIS: Do you have an extra?
10         MR. BESSETTE: Do you have Chris
11 James' report? I'm not going to get detailed
12 on it.
13         MR. LEWIS: Then I will lean over.
14         MR. BESSETTE: I have copies for you
15 of everything else.
16 BY MR. BESSETTE:
17     Q.    In those paragraphs, Dr. James sets
18 out a methodology for an event study. Are you
19 familiar with that general methodology as he has set
20 forth in those paragraphs?
21         MR. LEWIS: Objection to form.
22         You're talking about --
23         MR. BESSETTE: Seventeen to 22 is
24 where he sets out the general methodology.
25         MR. LEWIS: The question is whether

Page 41

1 he is familiar that that's what James did or
2 whether --
3 BY MR. BESSETTE:
4     Q.    I want to know if you're familiar
5 with the general methodology of an event study as
6 Dr. James has laid it out in those paragraphs.
7         MR. LEWIS: Same objection, form,
8 foundation, and vagueness.
9         THE WITNESS: Did you say 17 to 21?
10 BY MR. BESSETTE:
11     Q.    Twenty-two.
12         MR. LEWIS: After he answers this
13 question, would it be a good time for a
14 break?
15         MR. BESSETTE: Sure.
16         THE WITNESS: Could I have the
17 question back?
18 BY MR. BESSETTE:
19     Q.    I'll restate it.
20         Now that you've reviewed
21 Paragraphs 17 to 22 of Dr. James' report, are you
22 familiar with the general methodology of an event
23 study as he has laid out in those paragraphs?
24         MR. LEWIS: Same objection to form,
25 foundation, vagueness, and overbreadth.

11 (Pages 38 to 41)

R. ALAN MILLER

Page 42

1    THE WITNESS: I am familiar with
2  event studies and the methodology of
3  conducting event studies, including in, I
4  suppose, the broadest sense, the methodology
5  suggested by Mr. James here in the sense of
6  using a regression analysis based tool in
7  order to measure statistical significance and
8  those sorts of things.
9    Having said that, these paragraphs
10  set forth a general description of that tool
11  or of the use of that tool but leave open
12  gaping sorts of questions as to the
13  application and construction of the tool and
14  analysis, which problems and questions
15  persist, then, as Mr. James proceeds
16  thereafter to apply what he describes here in
17  a general way.
18    MR. BESSETTE: I've got a line of
19  questions here, so we might as well take a
20  break. Thank you.
21    (Recess.)
22  BY MR. BESSETTE:
23    Q.    Mr. Miller, leaving aside your
24  reservations about the application of the event study
25  as described by Mr. James in Paragraphs 17 to 22, you

Page 43

1  agree that's an accurate description of the general
2  methodology of an event study; is that right?
3    MR. LEWIS: Objection to the form
4  and foundation.
5    Excuse me for a moment.
6    (Discussion held off the record.)
7    THE WITNESS: The reason I'm taking
8  so long with this question is that there's a
9  lot of extraneous information in these
10  paragraphs that's like commentary as opposed
11  to simply setting forth how an event study
12  might be structured or established or
13  conducted or something like that, that I
14  don't think are either necessary to the event
15  study or, in fact, may be wrong, were overly
16  assumptive about things that an event study
17  can tell you. That's why I'm thinking more
18  about this than maybe you intended. I'll let
19  it go with that.
20  BY MR. BESSETTE:
21    Q.    As between Paragraphs 17 to 22, what
22  in those paragraphs do you find either extraneous to a
23  description of an event study or, I think you said,
24  maybe even wrong?
25    MR. LEWIS: Compound.

Page 44

1    Go ahead; do the best you can.
2    Also, I think that misstated his
3  testimony a little bit.
4    Answer it anyhow.
5    THE WITNESS: I'm okay on 17, 18,
6  and 19. On 20, the problem I have here is
7  that the second sentence says the relatively
8  smaller movements on other days are typically
9  the result of normal volatile trading
10  activity and do not represent the pricing
11  dash effects of material firm-specific
12  information semicolon such small movements
13  are not statistically distinguishable from
14  zero firm-specific movement.
15    I think that assigns a level of
16  meaning and certainty to the term
17  statistically significant that doesn't
18  comport with the real world; that is, I don't
19  argue that this interpretation is incorrect
20  from a purely academic standpoint and from
21  the interpretation of the meaning of those
22  terms by some pure academicians, at least in
23  recent years. The problem is in applying
24  this methodology for the purposes described
25  in the preceding three paragraphs, it implies

Page 45

1  that it has these real world uses and effects
2  when the bright line nature of the
3  statistically significant factor is
4  artificial and, in fact, smaller movements
5  can occur as a result of information reaching
6  the market which might be weaker sorts of
7  information which might reach the market in
8  ways that are less distinct than a Wall
9  Street Journal announcement or Dow Jones
10  Business Wire announcement, for example, or
11  which might simply have less import than an
12  announcement that causes a reaction to rise
13  above the statistically significant
14  threshold, so I have that sort of problem
15  with that paragraph.
16  BY MR. BESSETTE:
17    Q.    Before you move on to another
18  paragraph, is there anything more you want to say
19  about that sentence in Paragraph 20?
20    MR. LEWIS: Objection to form.
21    THE WITNESS: This also implies a
22  one-day, or less, event window, which is the
23  term that's used in event studies as well,
24  and that is artificial as well. It's also
25  not necessarily standard even in the academic

12 (Pages 42 to 45)

R. ALAN MILLER

Page 46

1   application of event studies.  Event windows
2   typically should be designed to comport to
3   the events being studied, and 9:30 to four
4   o'clock on a particular day is an artificial
5   window which may or may not have any meaning
6   in a particular case.
7           Event window lengths of longer or --
8   well, or arguably shorter periods are
9   appropriate in some cases and there's no
10  reason to think that a consistent event
11  window length applied over a period of time
12  makes any sense; that is, event windows may
13  change in size during a study period to
14  reflect the source of the news, the type of
15  news, how it is transmitted to market
16  participants, and those sorts of factors.
17  All these things are discussed in some fairly
18  standard works on event study construction.
19          There's one by Dunbar and Tabak that
20  refers to these types of factors.  There's
21  one by Mackinley, and I think it may be just
22  by Mackinley; he often writes with several
23  other people, but I think it might be just
24  him.  There's, I think, another one with
25  Tabak and three other people from National

Page 47

1   Economic Research Associates.  These sorts of
2   articles describe in more detail various
3   steps to go about performing event studies
4   but address issues like event window length,
5   threshold for statistical significance, and
6   those kind of factors I've referred to here.
7   I think that might take care of 20.
8   BY MR. BESSETTE:
9       Q.      Before we move on, on 20, just to
10  make sure I understand, to boil, I guess, the first
11  issue down, it's your opinion that relatively small
12  price movements that are not statistically significant
13  in a particular event study analysis could represent
14  the pricing effects of material firm-specific
15  information in your opinion based on the real world,
16  and that's why you take objection to this statement;
17  do I understand that right?
18          MR. LEWIS:  Objection to form.
19          THE WITNESS:  Yeah, that's part of
20  what I said.
21  BY MR. BESSETTE:
22      Q.      The part after the semicolon, these
23  small -- relatively small, not statistically
24  significant price movements based on a particular
25  event study, are they or are they not distinguishable

Page 48

1   from zero --
2           MR. LEWIS:  Objection to form.
3   BY MR. BESSETTE:
4       Q.      -- in an event study?
5           MR. LEWIS:  Objection to form and
6   foundation.
7   BY MR. BESSETTE:
8       Q.      Did I not frame that right?
9       A.      I'm wrestling with that.
10          In an event study as academically
11  defined in recent years by many academicians, once you
12  set your threshold for statistical significance, any
13  movement underneath that is viewed as not
14  statistically significant and therefore
15  indistinguishable from zero in its effect.
16          I think in the event study world of
17  pure academia, that is probably correct.  In the real
18  world, there's no reason for that to be correct
19  because there are too many subjective assumptions in
20  establishing the threshold, the length of the event
21  window, and then those kinds of things I referenced
22  earlier, to make that true; that is, taking Mr. James'
23  work, he sets a threshold of 95 percent confidence
24  level, ignoring the impact of the relatively low
25  R-squared factor in the first place, says that that

Page 49

1   translates into a 12.3 percent stock price movement
2   and sets that as the threshold for statistical
3   significance, underneath which anything is essentially
4   equal to zero.
5           Simply by looking at his chart, you
6   can see that that doesn't make much sense in the real
7   world suggesting that an 11 percent movement in stock
8   price is indistinguishable from zero, A, on its face,
9   B, not considering the source or type of information,
10  C, assuming that all information affecting market
11  participants' view of a company's earning prospects is
12  equal or is subject to the same minimum threshold, D,
13  ignoring that the 95 percent confidence level is one
14  choice that is made.
15          Ninety percent confidence levels are
16  often used by many practitioners of event study
17  methodology, and at that, there's no reason, 90 or 95
18  or wholly, other numbers or not, except academic
19  convention.  It doesn't deal with the possibility of
20  seepage or leakage-type information in which you'd
21  have to have multiple day event windows which are
22  essentially additive arithmetically; they're not quite
23  additive statistically but they are essentially
24  additive in their effect.  I think those are some of
25  the issues anyway that relate to this topic.

13 (Pages 46 to 49)

R. ALAN MILLER

Page 50

1    Q.    If I understand correctly, your
2  issue, I guess, with event studies not being
3  appropriate in the real world is because there are too
4  many subjective factors like what confidence level
5  you're going to use, what event window is going to be
6  used, so is it fair to say that because of those
7  subjective elements, you don't think that an event
8  study methodology accurately captures all
9  firm-specific information translated into price
10  movements?
11    MR. LEWIS:  Objection to form.
12  BY MR. BESSETTE:
13    Q.    You're using statistical
14  significance because there are too many variables?
15    MR. LEWIS:  Objection to form,
16    overbroad; misstates his answer, lack of
17    foundation.
18  BY MR. BESSETTE:
19    Q.    Do I have that right, generally?
20    A.    Yeah, I think partially so.  I think
21  I'd say this, though: I don't have any problem with
22  the use of event studies and we use them all the time
23  to do our work, and I'm using event study -- I don't
24  know whether that's -- whether to make it uppercase or
25  lower case -- in the broader sense of putting all of

Page 51

1  the information that you think is relevant onto a
2  template or piece of paper, a chart, a format, that
3  contains significant pieces of information to review
4  along with the information to make some sorts of
5  determinations that we're talking about making.
6  That's a process in a much broader sense that I think
7  is fine.
8    Using the event study as narrowly
9  defined in the purely academic world and including the
10  results of a regression analysis with fixed event
11  windows with artificially set thresholds, ignoring,
12  for example, the factor of trading volume, which most
13  academic event studies ignore, ignoring nonprinted
14  electronically data-retrievable sources of information
15  that probably existed at the time, and those sorts of
16  things, are some of the problems I have with the
17  narrower academically-oriented event studies as
18  described here and used by Mr. James.
19    In fact, if the event study in the
20  much broader sense is used properly and does include
21  all of the information that affects pricing, which is,
22  on a practical basis, very difficult to do, but if it
23  does that, includes trading volume data and stock
24  price movement data, the movement of comparable stock
25  prices, comparable indices, market indices and all

Page 52

1  those other factors, and then can be reviewed in a
2  flexible way to allow for multiple event window and
3  flexible event window review with no preset
4  thresholds, I think it can be a very useful tool and
5  we use it all the time for that.
6    Q.    Mackinley, to whom you referred,
7  you're familiar that he uses event studies to test
8  whether stock reactions are different from zero for a
9  particular event window?
10    MR. LEWIS:  Objection to form and
11    foundation.
12    THE WITNESS:  Yeah, I think part of
13  Mackinley's work -- I'm trying to remember if
14  it's in the same article or not, and I can't.
15    In part of Mackinley's work, he does
16  make that definitional use of the event study
17  setting the academic conditions of threshold
18  and event window length and then makes the
19  statement, I believe, something to the effect
20  that anything under the threshold is
21  statistically the same as zero, or something
22  like that.
23    That's consistent with the academic
24  application of the tool, but Mackinley also,
25  I believe, in discussing how to do the event

Page 53

1  studies, talks about selection of window,
2  talks about selection of base period, which
3  is a major issue I've not discussed yet but
4  which also factors into all this and which is
5  also covered in the Dunbar and Tabak article,
6  and those are important factors that are not
7  covered in this description and which
8  Mr. James deviates from in his application of
9  the event study methodology going forward;
10  that is, all the practitioners say, and
11  Mr. James says, that the first step in
12  creating the Formula A relationship between
13  the variables is to use a clean base period
14  or control period or estimation period, I
15  think are the terms I've seen used to
16  describe it, to establish the relationship
17  between the variables.
18    Based on that, the predicted path of
19  the stock price or the dependent variable is
20  projected into the class period, the actual
21  stock price movement is then subtracted from
22  the predicted movement to determine what's
23  called a residual.  That's tested against the
24  statistically significant threshold and the
25  academic version of the event study to

14 (Pages 50 to 53)

R. ALAN MILLER

Page 54

1  determine whether you have a meaningful
2  movement or not under that definition.
3         In the case of an IPO, of course,
4  you can't do that because there's no clean
5  base period by definition.
6  BY MR. BESSETTE:
7      Q.    Do you know what a rolling
8  regression is?
9      A.    Yes.
10     Q.    What is that?
11     A.    It basically picks up from each
12  period -- we use day because it's commonly done in
13  days. It picks up from each day going forward and
14  eliminates the results of previous time periods. It's
15  an attempt to eliminate or -- I think it's an attempt,
16  if I remember this correctly, to eliminate
17  autocorrelation.
18         MR. LEWIS: Before you go on, I want
19  to raise something I should have raised at
20  the beginning of the deposition. Could you
21  identify your colleagues here for the record?
22         MR. BESSETTE: Sure. We have Amir
23  Rozen of Cornerstone with us, along with
24  counsel for the underwriters, who should, I
25  guess, identify themselves.

Page 55

1         MR. LEWIS: No, that's fine. I was
2  just wondering whether Mr. Rozen had actually
3  done any of the work on the James' report
4  because I thought part of our --
5         MR. BESSETTE: No.
6         MR. LEWIS: Okay.
7  BY MR. BESSETTE:
8      Q.    The use of a rolling regression, can
9  that be used to sort of make up for a base period as
10  you described it, sort of a substitute?
11         MR. LEWIS: Objection to form.
12         THE WITNESS: That's an interesting
13  factor. If you -- it doesn't get you there
14  and it probably corrects, to some degree, for
15  not having a clean base period. I think
16  because you're at a higher base level than
17  you would otherwise be, assuming a class
18  period that contains fraud and an inflated
19  stock price, so that the application of the
20  threshold gets you too high a trigger point.
21  There's still problems with not having a
22  correct base period. It probably does
23  correct to some degree for it, I think, but
24  I'm sure not completely.
25  BY MR. BESSETTE:

Page 56

1      Q.    Did Dr. James use a rolling
2  regression in his work?
3      A.    I believe he did do a -- one of his
4  alternatives involved a rolling regression. As I
5  recall, his results weren't very different with the
6  rolling regression, if I recall that correctly.
7      Q.    Let's go back to event studies for a
8  second. You made reference several times to the
9  academic version, so why don't we just call the
10  academic version of the event study and then a real
11  world, which you've described as well.
12     A.    Sure.
13     Q.    Certainly, there are legions of
14  published peer-reviewed articles on the academic
15  version of the event study and its use on measuring
16  stock price movement, right?
17         MR. LEWIS: Objection to form.
18         THE WITNESS: There are a lot. It
19  certainly is done. The procedure is done
20  quite a lot in the finance field in academia
21  and, sure, there have been a lot of articles
22  involving the use of it.
23         We subscribe, for example, to at
24  least half a dozen finance-type journals,
25  Journal of Finance, Journal of Financial

Page 57

1  Economics, Review of Financial Studies, those
2  kinds of things that often have articles in
3  them, very often containing academic event
4  study work.
5  BY MR. BESSETTE:
6      Q.    Are there any peer-reviewed articles
7  that you're aware of that use the real world version
8  of the event study as you've described it here today
9  to measure stock price movements?
10         MR. LEWIS: Object to the form and
11  foundation.
12         THE WITNESS: The principles of the
13  real world approach are set forth in the
14  articles I referenced previously.
15  BY MR. BESSETTE:
16     Q.    From NERA?
17     A.    Two from NERA and, to some degree,
18  Mackinley's article, the one article, at least, by
19  Mackinley. Mackinley has written a lot of stuff. At
20  least, I think, the one article that I think he may
21  have been the sole author of discusses having a clean
22  base period, having an appropriate event window
23  length.
24         NERA particularly uses several
25  different levels of threshold for statistical

15 (Pages 54 to 57)