# EXHIBIT I

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

5    SECURITIES LITIGATION     :    C.A. NO. 99-371 KAJ

6    _____X

7

8            ORAL DEPOSITION OF SANDRA BROOKS

9                Friday, June 30, 2006

10

11        The oral deposition of SANDRA BROOKS was

12    held at the law offices of Akin Gump Strauss Hauer

13    & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

14    Dallas, Texas, from 10:38 a.m. to 12:09 p.m.,

15    before Jamie K. Israelow, a Certified Shorthand

16    Reporter in and for the State of Texas, Registered

17    Professional Reporter, Certified Realtime Reporter

18    and Certified LiveNote Reporter.

19

20

21        RSA/VERITEXT COURT REPORTING COMPANY

22            1845 Walnut Street, 15th Floor

23              Philadelphia, PA  19103

24           (215)241-1000    (888)777-6690

1  Parrish was like, I think, under him and I would
2  report to him. He took over for a while, but Mark
3  was ultimately the --
4      Q    Okay. And how often did you -- say,
5  in '96 and '97, how often did you see Mark
6  Gonsalves? Was it --
7      A    Every day. Every day. We had a
8  morning meeting every day.
9      Q    Okay.
10     A    From the beginning of time, we had a
11 meeting -- the whole inside sales group and Mark,
12 we'd have a meeting and talk about goals and --
13 what did we call them? -- objections and how to
14 get around objections.
15     Q    Okay.
16     A    Yeah. So every day we had a meeting,
17 and it was a way to start off our day.
18     Q    And did that practice continue
19 throughout your employment at Adams Golf?
20     A    Yes.
21     Q    Okay. You testified that in the
22 beginning of your employment, and correct me if
23 I'm wrong, I don't want to misquote the record,
24 there were six members of the inside sales staff.

1  Is that --
2      A    When I started, correct.
3      Q    And then -- so I assume your regions,
4  then, were -- were greater than the ones you've
5  described here, Seattle, Miami, Arkansas,
6  New Orleans, Connecticut --
7      A    Right. For instance, I had the
8  entire state of Washington.
9      Q    I see.
10     A    Then when we added more people, we
11 were asked: What territories do you want to get
12 rid of? And I was like: Well, you can have
13 Arkansas, and you can also have the east half of
14 Washington.
15     Q    Yep. Yep. Spokane?
16         MR. BESSETTE: Lucky folks.
17     Q    (By Mr. Mara) Okay. So and are you
18 able to recall when -- but you retained -- I'm
19 sorry. Strike that.
20         So you retained Seattle,
21 Miami, throughout your tenure at Adams Golf?
22     A    Yeah.
23     Q    Are you aware of the concept of gray
24 marketing?

1      A    I am now.
2      Q    And what do you understand it to
3  mean? What does it mean to you?
4      A    I guess when people get ahold of a
5  product, like a golf club, and I guess they're not
6  really supposed to have it, like an
7  unauthorized -- like they get the golf club --
8  somebody gets the golf club and sells it to
9  somebody else who isn't really supposed to be
10 selling it.
11     Q    I see. Okay. Now, during 1997, did
12 you have an occasion to experience anything like
13 that in your sales regions?
14     A    Yes.
15     Q    And can you describe what that was?
16     A    It started off in Seattle where a big
17 client of mine called me up complaining that he
18 was at Costco and saw Adams Golf clubs at Costco.
19 And I wasn't really sure about Costco because we
20 didn't have Costcos there, but he explained to me,
21 a big warehouse wholesale-type place like Sam's.
22 I know what Sam's is, so he explained that to me.
23 That's how I first found out about it.
24     Q    And are you able to recall who the

1  account was?
2      A    I think -- I think it was Pro Am
3  Golf. Is that it? It's -- it's -- big, giant --
4  it's like the biggest one in Seattle.
5      Q    Okay. They're in Seattle?
6      A    Uh-huh.
7      Q    And are you able to recall what, if
8  anything -- if it was Pro Am Golf, I know you're
9  trying to remember. What did they say to you?
10 Are you able to recall what they --
11     A    Well, he was pretty mad. He was
12 pretty mad, like: Why are these clubs showing up
13 in Costco? Why are you -- why are you-all giving
14 these clubs to Costco? That was pretty much
15 his --
16     Q    Okay.
17     A    -- take on it.
18     Q    And did he describe what quantity or
19 how many clubs he --
20     A    He said there were a bunch. I mean,
21 I don't think he actually gave me a number or
22 anything, but he said there was a bunch in there,
23 and that was his concern. I think if he saw like
24 one or two, he probably wouldn't care, but there

Page 14

1   were a bunch in there.
2       Q       And what, if anything, did you do
3   after you had this conversation --
4       A       I told -- I told Mark.
5       Q       And can you describe what happened
6   there?  What did you say to Mark and --
7       A       I went in and I told him my concerns
8   and he just kind of blew me off, so to speak.
9       Q       And --
10      A       He just said that was another
11  objection that I had to get over and figure out
12  how to work around that.
13      Q       Did you say anything else to Mark
14  Gonsalves at that time or --
15      A       Well, I went to him more than once.
16  It wasn't just one time I let go.  It kept
17  happening and my people kept calling me.  They
18  were -- they were mad at me for somehow having
19  fault at the clubs getting into Costco.
20      Q       I see.
21      A       They were mad, just:  Why are you --
22  why are these people having golf clubs?
23      Q       And are you able to recall -- now,
24  when you say they were mad and my people were

Page 15

1   calling me, was that from Washington?
2       A       Uh-huh.  That's where it started.  It
3   wasn't just the one big retailer, some green-grass
4   accounts would call and they'd say the same thing
5   and they'd get upset.
6       Q       I see.  And by green-grass accounts,
7   do you mean --
8       A       Like country clubs.
9       Q       -- like pro shops and --
10      A       Yeah, pro shops and country clubs,
11  stuff like that.
12      Q       And now -- and that was occurring --
13  are you able to recall when that was occurring in
14  1997?
15      A       It was -- it was early in the year,
16  because we were in the first building in Plano.
17      Q       Uh-huh.  Are you able to estimate, or
18  if you can recall, how many times do you think you
19  went to Mark Gonsalves relaying these complaints
20  about clubs in Costco?
21      A       I'm what is known as a squeaky wheel,
22  so I went often.  I can't remember -- I can't tell
23  you how many times, but I do know I went multiple
24  times to him.

Page 16

1       Q       And did -- was his reaction
2   consistent each time or --
3       A       Pretty much.
4       Q       -- or did he just keep saying:  Work
5   on it?
6       A       Yeah, work on it.  You'll get over
7   it, or you know, he really just kind of blew me
8   off.
9       Q       And when you went to him, did --
10  well, can you describe the level -- was the level
11  of frustration growing from the accounts?
12      A       Yes.
13      Q       Okay.  And can you describe what that
14  was like?  What -- how do you know the level of
15  frustration was growing?
16      A       They would stop ordering clubs.  They
17  didn't trust me anymore.  Because when you're
18  calling people on the telephone, they've never
19  seen you, they've never met you, just some woman
20  from Texas is calling me trying to sell me a whole
21  bunch of golf clubs.  It took a long time.  You
22  build the trust, you have a rapport, you have a
23  relationship with these people, and they trust
24  you.

Page 17

1           And this is their business, so
2   they're trusting you to help them grow their
3   business, and all of a sudden, they feel as though
4   you stabbed them in the back, so there's a lot of
5   trust that -- they didn't trust us anymore.  Us,
6   I'm saying us as a whole, as a company.  It wasn't
7   just me.
8       Q       Right.
9       A       Because they saw the clubs and they
10  quit ordering them.  The country clubs and stuff
11  got to the point where they wouldn't -- it's not
12  like they ordered a million clubs.  They would
13  order maybe a dozen or a half a dozen to keep them
14  on hand.  They wouldn't do that anymore.  They
15  would just order like one special order or some
16  guy came in and wanted a specific Adams club, they
17  would order that and just kind of didn't want
18  anything else.
19      Q       I see.  And -- okay.  And did they
20  tell you it was because of the clubs in Costco --
21      A       Yeah.
22      Q       -- that this trust had been breached?
23      A       Uh-huh.
24      Q       What you just testified to, did you

# EXHIBIT J

Service: **Get by LEXSEE®**
Citation: **136 Fed. Appx. 489**

*136 Fed. Appx. 489, \*; 2005 U.S. App. LEXIS 11168, \*\**

PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY, Appellant v. REMED RECOVERY CARE; JEFFREY J. CASHEN, As Legal Guardian for Robert Cashen, An Incompetent; DORTHY CASHEN, As Legal Guardian for Robert Cashen; ROBERT CASHEN, An Incompetent

No. 04-1727

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

136 Fed. Appx. 489; 2005 U.S. App. LEXIS 11168

April 18, 2005, Argued
June 13, 2005, Filed

**NOTICE: [\*\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 02-cv-00963). District Judge: Honorable Michael M. Baylson.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff insurer sued defendant insureds, seeking a declaratory judgment that it was not obligated to pay for the costs of treating one of the insureds for injuries he sustained as the result of a fall. The United States District Court for the Eastern District of Pennsylvania ruled in favor of the insureds, rejecting the insurer's arguments that it was not responsible for the costs of the insured's care. The insurer appealed.

**OVERVIEW:** The district court properly interpreted the Pennsylvania No-Fault Motor Vehicle Insurance Act (No-Fault Act), 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), to require the insurer to pay the insured's medical costs given its finding that the fall was the direct result of injuries he sustained in an automobile accident. As such, the fall arose out of the use of an automobile under the interpretation of that phrase adopted by Pennsylvania courts. Although the insured's later injuries were far removed in time from his automobile accident, that fact alone did not justify denying coverage under the No-Fault Act given Pennsylvania precedent holding a party responsible for injuries which left the victim in a weakened conditions. Moreover, in close cases the Pennsylvania courts erred on the side of coverage. Thus, even if the case was close, the district court did not err in siding with the insureds. The district court did not err in admitting the insured's statements made immediately after the fall as they qualified as excited utterances under Fed. R. Evid. 803(2). The district court also properly admitted the testimony of two experts.

**OUTCOME:** The judgment was affirmed.

**CORE TERMS:** utterance, excited, automobile accident, admitting, declarant, doctors, minute, motor vehicle, bodily harm, startling, coverage, illness, disease, car accident, impairment, surgery, insurer, admissible, fabricate, weakened, treating, bush, motor vehicle accident, amount in controversy, automobile insurance, provide coverage, hospitalized,

interpreting, proximately, personally

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Insurance Law > Claims & Contracts > Policy Interpretation > General Overview 

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview

*HN1* Under the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), any victim is entitled to receive basic loss benefits, defined to include benefits for the net loss sustained, including professional medical treatment and care. 40 Pa. Stat. Ann. tit. 40, §§ 1009.103, 1009.201(a). The term "victim" is defined as an individual who suffers injury arising out of the maintenance or use of a motor vehicle. 40 Pa. Stat. Ann. tit. 40, § 1009.103. More Like This Headnote

Insurance Law > Claims & Contracts > Policy Interpretation > General Overview

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview 

Transportation Law > Commercial Vehicles > Licensing & Registration 

*HN2* In interpreting an insurance policy with language similar to that in the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), the Pennsylvania Supreme Court holds that the phrase "arising out of" in the policy means casually connected with, not proximately caused by. The court thus determines that, in such cases, "but for" causation, i.e., a cause and result relationship, is enough. More Like This Headnote

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview

*HN3* The Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), does not require an insured to prove that his injuries were proximately caused by the use of an automobile; in most cases, it is sufficient to demonstrate that the automobile's use was the "but for" cause of his injuries. More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > Simple Offenses > General Overview

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview

*HN4* Under the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), if the relevant injury is caused by an instrumentality or external force other than the motor vehicle itself, the insurer is not required to provide coverage. Thus, in a case in which a driver was assaulted following a car accident, the Pennsylvania Superior Court holds that the injuries from the assault do not arise out of the use of an automobile. Similarly, the Superior Court denies coverage in a case in which a motorist was shot by a pursuing police officer, finding that there must be some causative factor between the use or maintenance of the vehicle and the injuries sustained and that even the "but for" standard was not met under the facts of that case. More Like This Headnote

Civil Procedure > Federal & State Interrelationships > Erie Doctrine 

HN5⭑ When the federal district court interprets Pennsylvania law, its task is to determine how Pennsylvania courts would rule if faced with a similar set of facts. More Like This Headnote

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview 

HN6⭑ Pennsylvania courts hold that a party responsible for injuries which leave the victim in a weakened condition is liable under the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), for injuries sustained in subsequent accidents caused by the victim's weakened state. More Like This Headnote

Governments > Legislation > Expirations, Repeals & Suspensions 🔖

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview 🔖

HN7⭑ Under the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), injury is defined as accidentally sustained bodily harm to an individual and that individual's illness, disease, or death resulting therefrom. 40 Pa. Stat. Ann. tit. 40, § 1009.103. More Like This Headnote

Governments > Legislation > Expirations, Repeals & Suspensions 🔖

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview 🔖

HN8⭑ Under the plain language of the Pennsylvania No-Fault Motor Vehicle Insurance Act (No-Fault Act), 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), the essential question in determining whether a given injury is covered is whether that injury arises out of the use of an automobile. That question is answered by the extensive caselaw interpreting the No-Fault Act. More Like This Headnote

Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > General Overview 🔖

HN9⭑ In close cases, Pennsylvania courts applying the Pennsylvania No-Fault Motor Vehicle Insurance Act (No-Fault Act), 40 Pa. Stat. Ann. tit. 40, § 1009.101 et seq. (repealed 1984), err on the side of coverage. The Pennsylvania Supreme Court notes that it consistently holds that the No-Fault Act must be liberally construed to effectuate its purposes, erring in favor of coverage for the insured in close or doubtful cases. More Like This Headnote

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion 🔖

Evidence > Procedural Considerations > Rulings on Evidence 🔖

HN10⭑ An appellate court reviews a district court's evidentiary decisions for abuse of discretion. More Like This Headnote

Evidence > Hearsay > Exceptions > Spontaneous Statements > Criminal Trials 🔖

Evidence > Hearsay > Exceptions > Spontaneous Statements > Elements 🔖

HN11⭑ Under the Federal Rules of Evidence, an excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of

excitement caused by the event or condition. Fed. R. Evid. 803(2). The United States Court of Appeals for the Third Circuit holds that a statement can qualify as an excited utterance if the following four conditions are satisfied: (1) a startling occasion; (2) a statement relating to the circumstances of the startling occasion; (3) a declarant who appears to have had opportunity to observe personally the events; and (4) a statement made before there has been time to reflect and fabricate. <u>More Like This Headnote</u>

Evidence > Testimony > Experts > General Overview 🔍

*HN12* The United States Court of Appeals for the Third Circuit holds that an expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation. <u>More Like This Headnote</u>

Evidence > Testimony > Experts > General Overview 🔍

*HN13* An expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. <u>More Like This Headnote</u>

**COUNSEL:** DAVID M. McCORMICK (Argued), JARED T. HAY, McCormick & Priore, Philadelphia, PA, Attorneys for Appellant.

DOUGLAS H. RIBLET (Argued), Curtin & Heefner, Morrisville, PA, Attorney for Appellee.

**JUDGES:** Before: ROTH, FUENTES, and BECKER, Circuit Judges.

**OPINION BY:** BECKER

**OPINION: [*490]** OPINION OF THE COURT

BECKER, *Circuit Judge.*

Prudential Property and Casualty Insurance Company ("Prupac") filed this diversity action seeking a declaratory judgment that it was not obligated to pay for the costs of treating Robert Cashen for injuries he sustained as a result of a fall on October 30, 2000. Following a non-jury trial, the District Court for the Eastern District of Pennsylvania ruled in favor of defendants, rejecting Prupac's argument that it was not responsible for the costs of Cashen's care. On appeal, Prupac challenges the District Court's interpretation of Pennsylvania **[**2]** law and argues that the court erred in admitting certain evidence relating to the circumstances of Cashen's fall. We will affirm the judgment of the District Court.

I.

In 1976, Cashen, then a student at Pennsylvania State University, was involved in a car accident and sustained serious and permanent brain damage. Thirteen years after the accident, he was moved to a treatment facility managed by Remed Recovery Care Centers so that his condition could be monitored more closely. Prupac, Cashen's automobile insurer at the time of the accident, paid for his medical treatment and his care at the facility.

Like others who suffer from similar neurologic injuries, Cashen had poor balance and was extremely impulsive. As a result, he fell frequently, particularly while reaching for things. On October 30, 2000, Cashen fell from a smoking porch at Remed and seriously injured his spine. While he was being treated for his injuries from the fall, doctors observed that a previously diagnosed degenerative spinal condition that Cashen suffered from had worsened.


In order to prevent further injury, doctors performed surgery on Cashen's spine. The surgery, unfortunately, worsened Cashen's condition, **[\*\*3]** necessitating a second procedure. As a result of the two surgeries, he is now confined to a wheelchair.

**[\*491]** After learning of the facts surrounding the fall, Prupac filed suit in federal court seeking a declaratory judgment that Cashen's injuries sustained in his fall and surgery were not causally related to his automobile accident and that Prupac was therefore not obligated to pay for his treatment relating to the fall. n1 The District Court, which had jurisdiction pursuant to 28 U.S.C. § 1332, n2 held a non-jury trial on January 16, 20, and 21, 2004. On March 1, 2004, it issued an opinion ruling in favor of Cashen. Prupac then filed a timely notice of appeal.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


N1 Prupac originally filed suit against Remed Recovery Care Centers and Jeffrey Cashen, Robert Cashen's brother and legal guardian. Remed has since reached a settlement with Prupac.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


n2 The parties are citizens of different states, and the amount in controversy is over $ 75,000. See _Hunt v. Washington State Apple Advertising Comm'n_, 432 U.S. 333, 347, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.").


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*4]**

Prupac raises two issues on appeal. First, it challenges the District Court's interpretation of the Pennsylvania No-Fault Motor Vehicle Insurance Act. Second, it argues that the District Court erred in admitting certain pieces of evidence relating to the cause of Cashen's fall. We will address each in turn.

A.

At the time of Cashen's car accident, Pennsylvania automobile insurance law was governed by the Pennsylvania No-Fault Motor Vehicle Insurance Act. See Act of July 19, 1974, P.L. 489, 40 P.S. § 1009.101 et seq. (repealed 1984). _HN1_ Under the No-Fault Act, "any victim is . . . entitled to receive basic loss benefits," defined to include benefits "for the net loss sustained," including "professional medical treatment and care." _Id._ § 103; 201(a). The term "victim" is defined as "an individual who suffers injury _arising out of_ the maintenance or use of a motor vehicle." _Id._ § 103 (emphasis added).

In _Manufacturers Casualty Insurance Co. v. Goodville Mutual Casualty Co._, 403 Pa. 603, 170 A.2d 571 (Pa. 1961), the Pennsylvania Supreme Court interpreted an insurance policy with language similar to that **[\*\*5]** in the No-Fault Act. n3 _HN2_ The Court held that the phrase "arising out of" in the policy meant "casually connected with, not proximately caused by." _Id. at 573_. The Court thus determined that, in such cases, "'but for' causation, i.e., a cause and result relationship, is enough." _Id._

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 The policy in *Manufacturers Casualty* obligated Goodville Mutual to pay "for damages caused by accident and *arising out of* the ownership, maintenance or use of the automobile or trailer." 170 A.2d at 572 (emphasis added).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Subsequent Pennsylvania decisions have applied this interpretation to the language of the No-Fault Act. *See, e.g., Alvarino v. Allstate Ins. Co.*, 370 Pa. Super. 563, 537 A.2d 18, 20-21 (Pa. Super. Ct. 1988) (*Manufacturers Casualty*'s "construction of a requirement that an injury arise out of the maintenance or use of a motor vehicle has been carried over into interpretation of the No-Fault Act's use of the same phrase."). Thus, *HN3* the No-Fault Act does not require an [**6] insured to prove that his injuries were proximately caused by the use of an automobile; in most cases, it is sufficient to demonstrate that the automobile's use was the "but for" cause of his injuries.

This principle is subject to an important limitation. *HN4* If the relevant injury is caused by "an instrumentality or external force other than the motor vehicle itself," the insurer is not required to provide coverage. [*492] *See Lucas-Raso v. American Mfrs. Ins. Co.*, 441 Pa. Super. 161, 657 A.2d 1, 3 (Pa. Super. Ct. 1995). Thus, in a case in which a driver was assaulted following a car accident, the Pennsylvania Superior Court held that the injuries from the assault did not "arise out of" the use of an automobile. *See Day v. State Farm Mut. Ins. Co.*, 261 Pa. Super. 216, 396 A.2d 3 (Pa. Super. Ct. 1978). Similarly, the Superior Court denied coverage in a case in which a motorist was shot by a pursuing police officer, finding that "there must be some causative factor between the use or maintenance of the vehicle and the injuries sustained" and that "even the 'but for' standard" was not met under the facts of that case. *See Erie Ins. Exchange v. Eisenhuth*, 305 Pa. Super. 571, 451 A.2d 1024, 1025 (Pa. Super. Ct. 1982). [**7]

Two additional cases are particularly relevant to the facts of this appeal. In *Varner v. Nationwide Mutual Insurance Co.*, 340 Pa. Super. 211, 489 A.2d 918 (Pa. Super. Ct. 1985), a hospitalized victim of a motor vehicle accident sustained a serious infection, which was shown to be caused by a doctor's negligence. The Superior Court nonetheless found that the motorist's no-fault insurance carrier was liable for the costs of treating the infection. It distinguished cases such as *Day*, observing that "it is much more probable that an individual will be hospitalized than assaulted as a result of operating a motor vehicle." *Id.* at 920. Similarly, in *Smith v. Pennsylvania General Insurance Co.*, the District Court, applying the No-Fault Act, found that an insurer was liable for the costs of treating an accident victim's addiction to pain medication. 1991 U.S. Dist. LEXIS 12279, No. 91-2452, 1991 WL 172164 (E.D. Pa. Aug. 30, 1991). The court found that "the medical expenses for which the plaintiff seeks reimbursement would not have been incurred had the accident never happened" and thus required the automobile insurance carrier to provide coverage, even though the expenses [**8] at issue were incurred almost nine years after the relevant accident. *Id.* at *3.

*HN5* Since we interpret Pennsylvania law, our task is to determine how Pennsylvania courts would rule if faced with a similar set of facts. While the circumstances of this case are highly unusual, we think that a Pennsylvania court, applying these principles, would find in favor of Cashen. The District Court found that Cashen's fall was the direct result of the injuries he sustained in his automobile accident. As such, it "arose out of" the use of an automobile, under the interpretation of that phrase adopted by Pennsylvania courts. This case is readily distinguishable from cases such as *Day* and *Erie Insurance Exchange* in which the relevant injuries were caused by an intervening act of a third party and had almost no causal connection to the use of an automobile. While Cashen's later injuries were far removed in

time from his automobile accident, we agree with the District Court in _Smith, supra,_ that this fact alone does not justify denying coverage under the No-Fault Act . In other contexts, _HN6_ Pennsylvania courts have held that a party responsible for injuries which leave the victim in a [**9] weakened condition is similarly liable for injuries sustained in subsequent accidents caused by the victim's weakened state. _See, e.g., Nikisher v. Benninger,_ 377 Pa. 564, 105 A.2d 281, 284 (Pa. 1954) ("If in truth and in fact the second accident was caused by the weakened condition of the leg due to the original accident, the second injury may properly be referred back to the original injury.")

Prupac nonetheless argues that, under the definition of "injury" in the No-Fault Act, it is not liable for the harm Cashen suffered as a result of his fall. _HN7_ Injury is defined in the Act as "accidentally sustained bodily harm to an individual and that individual's illness, disease, or [*493] death resulting therefrom." § 103. Prupac argues that this phrasing represents a conscious decision on the part of the legislature to distinguish between "bodily harm" and "illness, disease, or death." It suggests that "illness, disease, or death" are the only future consequences of an automobile accident that a no-fault insurer is obligated to cover; future "bodily harm" falls outside the scope of the statute.

We disagree. _HN8_ Under the plain language of the statute, the essential question in determining [**10] whether a given injury is covered by the No-Fault Act is whether that injury "arises out of" the use of an automobile. That question is answered by the extensive caselaw interpreting the No-Fault Act, none of which supports Prupac's argument. Had the legislature wished to make such a seemingly arbitrary distinction, it could have done so in more explicit terms. Since it did not, we are not inclined to conclude that the addition of the phrase "illness, disease, or death" to the definition of injury was intended to limit the types of bodily harm covered by the No-Fault Act.

Finally, we agree with the District Court that, _HN9_ in close cases, Pennsylvania courts err on the side of coverage. In _Drake v. Pennsylvania National Mutual Casualty Insurance Co._, the Pennsylvania Supreme Court noted that it has "consistently held . . . that the No-Fault Act must be liberally construed to effectuate its purposes, erring in favor of coverage for the insured in close or doubtful cases." 529 Pa. 44, 601 A.2d 797, 800 (Pa. 1992). Thus, even if we accept that this case is close, the District Court was clearly correct in ruling for Cashen.

For these reasons, while we recognize the extraordinary nature [**11] of this case, we agree with the District Court that the No-Fault Act requires Prupac to provide coverage for Cashen's injuries. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Because this case is so unusual, and because the Pennsylvania courts have set forth clear principles for interpreting the No-Fault Act, we decline to certify the question of coverage to the Pennsylvania Supreme Court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

B.

Prupac also objects to the District Court's decision to admit evidence relating to the cause of Cashen's injuries. _HN10_ We review a District Court's evidentiary decisions for abuse of discretion. _General Electric v. Joiner,_ 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997); _Stecyk v. Bell Helicopter Textron, Inc.,_ 295 F.3d 408, 412 (3d Cir. 2002).

The District Court found that the injuries Cashen sustained in his fall "arose out of" his automobile accident. In reaching this conclusion, it relied in part on the testimony of experts concerning the likely cause of the fall. These experts testified that the injuries Cashen sustained in **[\*\*12]** his automobile accident made him significantly more prone to falls of the type that occurred here. In so concluding, the experts relied on testimony by two Remed employees as to statements Cashen made shortly after his fall.

Prupac argues that the District Court erred in admitting the evidence of Cashen's statements. At trial, the defense called Courtney Killian, a Remed employee and the first person to discover Cashen after his fall. She testified that she heard Cashen crying for help and found him lying on his back in a bush. On cross-examination, Killian testified that Cashen told her he had fallen after "leaning over to pick something up." She also testified that she observed a partially-smoked cigarette on the ground near where Cashen had fallen. A second Remed employee, Sam Callison, testified that he arrived on the scene shortly after Killian and that Cashen made a similar comment to him.

**[\*494]** Cashen himself did not have any memory of the fall at trial, so his statements were the only evidence as to its cause. Prupac objected to the statements, arguing that they were inadmissible hearsay. The District Court overruled Prupac's objection, finding that the statements were admissible **[\*\*13]** under the "present sense impression" or "excited utterance" exceptions to the hearsay rule. See Fed. R. Evid. 803(1); 803(2). n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 Although Pennsylvania substantive law governs this case, we apply the Federal Rules of Evidence. See Salas v. Wang, 846 F.2d 897, 904 (3d Cir. 1988).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -



HN11⊁Under the Federal Rules, an excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). We have held that a statement can qualify as an excited utterance if the following four conditions are satisfied:

> (i) a startling occasion; (ii) a statement relating to the circumstances of the startling occasion; (iii) a declarant who appears to have had opportunity to observe personally the events; and (iv) a statement made before there has been time to reflect and fabricate.

United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001). **[\*\*14]**

We conclude that the District Court did not abuse its discretion in admitting Cashen's statements. The fall was certainly a "startling occasion," Cashen's statement clearly related to the circumstances of that fall, and Cashen himself personally perceived the fall. Prupac argues that the statements made by Cashen "lack immediacy," but we disagree. Killian, who was the first person to discover Cashen, testified that it took her "maybe 30 seconds or so" to reach him after she first heard his screams. She was later asked whether Cashen "told her [that he was trying to pick something up] within a few minutes of his calling from the bush

and [her] going out to him from the kitchen," and she responded that he had.

At most, a few minutes elapsed between Cashen's fall and his statement. In *Brown*, this Court found that a statement made by an out-of-court declarant who had observed the defendant waiving a gun qualified as an excited utterance, even though "approximately one minute" had elapsed between when the declarant saw the defendant and when he made the statement. 254 F.3d at 459. The Court observed, "Under factual circumstances comparable to those here, where the [**15] temporal gap was only a matter of one or a few minutes, courts have often admitted the asserted excited utterance." *Id.* at 460. In some cases, a passage of a few minutes may be sufficient to give the declarant "time to reflect and fabricate." Cashen, however, was lying in a bush, unable to move and in apparent pain. Under these facts, it seems clear that he spoke before he had time "to reflect and fabricate." Therefore, the District Court did not abuse its discretion in finding that the statements were excited utterances. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Because we find that the statements were admissible as excited utterances, we need not address the District Court's conclusion that they were also admissible as present sense impressions.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, Prupac argues that the District Court erred in admitting the testimony of two expert witnesses who testified concerning the likely cause of Cashen's fall. Dr. David Pleasure and Dr. Barry Snyder both testified that Cashen's fall was the result of injuries he suffered in the [**16] car accident. For instance, Dr. Snyder testified:

> His [Cashen's] history is voluminous as I have said. It documents repeatedly, difficulty [*495] with falls, balance and gait. This is a man who just before this injury was a professional-a professional student entering into a profession, I believe the legal profession. And he, over these period of years, had shown that he was having more and more difficulty. With this fall, it is another episode on this continuum that was demonstrated even just days earlier where he was unable to maintain a normal balance.

> And so the cause for his fall, from everything that is documented and what he has told me as well with my conversation with him, is based on his neurologic impairment that resulted from a 1976 motor vehicle accident.

Prupac does not challenge either experts' qualifications to render an opinion on Cashen's impairments; rather, it argues that the doctors' opinions were based entirely on conjecture.

*HN12* We have held that an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) [**17] (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)). That standard is clearly satisfied in this case. While none of the witnesses was present for Cashen's fall, the evidence showed that Cashen, like other individuals with similar impairments, fell frequently while reaching for things. Thus, when presented with testimony that Cashen said that he fell while reaching for something, it was perfectly reasonable for

these experts to conclude that Cashen fell as a result of his impairment. The Supreme Court has held that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. Thus, we conclude that the District Court did not abuse its discretion in admitting the doctors' testimony.

Because we agree with the District Court's interpretation of the No-Fault Act, and we conclude that it did not abuse its discretion in admitting evidence relating to Cashen's fall, we will affirm the judgment of the District Court.

Service:  **Get by LEXSEE®**
Citation:  **136 Fed. Appx. 489**
View:  Full
Date/Time:  Tuesday, November 14, 2006 - 1:11 PM EST

**LexisNexis®**    About LexisNexis  |  Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT K

Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.
In re: SAFEGUARD SCIENTIFICS
No. Civ.A. 01-3208.
Nov. 17, 2004.

Allan H. Gordon, Kalsby, Gordon, Rabin, Shore & Rathweiler, Philadelphia, PA, Daniel A. Osborn, Beatie & Osborn LLP, New York, NY, for Plaintiff.
Steven B. Feirson, Michael S. Doluisio, Dechert, Price & Rhoads, H. Robert Fiebach, Cozen and O'Connor, Philadelphia, PA, William K. Dodds, Dechert Price & Rhoads, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

JOYNER, J.

*1 Via the motion now pending before this Court, Defendants move to strike and preclude the testimony of Plaintiffs' expert as presented in an affidavit filed August 30, 2004. For the reasons which follow, this motion shall be granted as to the testimony addressing loss causation in the context of Plaintiff's market manipulation claim, and denied as to the remaining testimony in the affidavit.

*Factual Background*

Plaintiffs, investors in Safeguard Scientifics, Inc., filed this action under Rule 10b-5 of the Securities Exchange Act, alleging two bases of liability. *See* 17 C.F.R. 240.10b-5. Plaintiffs claim, first, that Defendants failed to disclose material information regarding Safeguard CEO Warren Musser's changing financial position (the "omission claim"). Second, Plaintiffs allege that Defendants purchased stock in Safeguard's partner companies, including eMerge Interactive, Inc., with the intent of inflating and fraudulently manipulating Safeguard stock prices (the "market manipulation claim").

On May 18, 2004, this Court entered an Amended Scheduling Order setting the deadline for expert discovery for July 9, and the deadline for dispositive motions for July 30. Plaintiffs timely filed a Preliminary Report of Anticipated Testimony by Mr. R. Alan Miller (the "Preliminary Report") as well as a later supplemental report. Mr. Miller was deposed on June 29 regarding his expert opinions as presented in these reports.

On July 30, Defendants filed a Motion for Summary Judgment challenging Plaintiffs' omission and market manipulation claims on various grounds, including a lack of evidence with respect to loss causation, a key element of both claims. Plaintiffs' response to the motion was accompanied by a supporting Declaration by Mr. Miller (the "Miller Declaration") setting forth his opinions regarding loss causation. Defendants now move to strike the Miller Declaration as untimely, alleging that it is an improper expert report filed in violation of this Court's scheduling order. Alternatively, Defendants contend that the Miller Declaration must be stricken because it directly contradicts Mr. Miller's earlier sworn testimony.

*Relevant Legal Standards*

Parties are required to disclose the identity of potential expert witnesses, accompanied by a written expert report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions," within the time frames set out in Federal Rule of Civil Procedure 26. Fed.R.Civ.P. 26(a)(2)

(B). Where additional relevant information becomes available such the initial expert report is rendered "incomplete or incorrect," a party is obligated to supplement or correct the initial disclosure by filing a supplemental report before the deadline for pretrial disclosures. Fed.R.Civ.P. 26(e). If the court's scheduling order provides for rebuttal reports, a party may also submit an expert report to "contradict or rebut evidence" identified by the opposing party within the deadlines set by the court. Fed.R.Civ.P. 26(a)(2)(C). Finally, a party opposing a motion for summary judgment may serve opposing affidavits, including sworn statements by potential expert witnesses, at any point prior to the date of the hearing. Fed.R.Civ.P. 56(c), 56(e).

**\*2** Rule 37 of the Federal Rules of Civil Procedure provides for exclusionary sanctions where parties fail to comply with Rule 26 discovery requirements. With respect to timeliness, a court may prohibit a party from introducing matters in evidence where the party has failed to obey a scheduling order entered under Rule 26(f). Fed.R.Civ.P. 37(b)(2)(B). With respect to the substance of discovery disclosures, a party will not ordinarily be permitted to use information at trial or on a motion if the information should have been disclosed pursuant to Rule 26(a), and the party offers no substantial justification for failing to do so. Fed.R.Civ.P. 37(c)(1); Fed.R.Civ.P. 26, Notes of Advisory Committee on 1993 Amendments. Thus, if an expert's initial report does not include a complete statement of opinions to be expressed and the basis for these opinions, a court may prohibit the expert from later testifying on issues or opinions not addressed in the initial report. Johnson v. Vanguard Mfg., Inc., 34 Fed. Appx. 858, 859 (3 Cir.2002) (upholding district court's exclusion under 37(c)(1) of expert testimony on accident causation, a subject not addressed in his expert report).

Given that exclusionary sanctions under Rule 37 are extreme in nature, a court may not impose them unless it first finds that the party: (1) revealed previously undisclosed evidence when trial was either imminent or in progress; or (2) acted in bad faith, which is more than a mere lack of diligence. Stein v. Foamex Int'l, Inc., No. 00-2356, 2001 U.S. Dist. LEXIS 12211 at 8-9, 2001 WL 936566 (E.D.Pa.2001) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791-93 (3 Cir.1994)). When making these determinations, a court should consider: (1) the prejudice or surprise of the party against whom the excluded evidence would have been offered, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of Rule 37 sanctions would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to make a required disclosure or comply with a court order. Stein, 2001 U.S. Dist. LEXIS 12211 at 8-9 (citing In re Paoli, 35 F.3d at 791).

Where sanctions under Rule 37 are not appropriate, the Third Circuit has held that a court deciding a motion for summary judgment may disregard or strike a 56(e) opposing affidavit if it directly contradicts the affiants's prior testimony without a satisfactory explanation. Hackman v. Valley Fair, 932 F.2d 239, 241 (3 Cir.1991); see also Martin v. Merrell Down Pharm., Inc., 851 F.2d 703, 705 (3 Cir.1988). If an issue raised in the 56(e) affidavit had never been directly addressed at deposition, or the prior testimony was ambiguous, the affidavit will typically be viewed as a permissible clarification. See Giancristoforo v. Mission Gas & Oil Prods., Inc., 776 F.Supp. 1037, 1043 (E.D.Pa.1991); Videon Chevrolet, Inc. v. General Motors Corp., 992 F.2d 482, 488 (3 Cir.1993). However, where the new affidavit offers so many new opinions that it dramatically changes the "flavor and theory" of the case, it must be disregarded, even absent a Rule 37 finding of bad faith. Stein, 2001 U.S. Dist. LEXIS 12211 at 11, 20 (quoting Pellegrino v. McMillen Lumber Prods. Corp., 16 F.Supp.2d 574, 583 (W.D.Pa.1996)).

Discussion

I. *Timeliness of the Miller Declaration*

**\*3** Defendants move to strike the Miller Declaration as untimely pursuant to Rule 37(b)(2)(B), alleging that it is an impermissible expert report filed after the July 9, 2004 deadline for expert discovery set forth in this Court's Amended Scheduling Order.

While variously described by Plaintiffs as a "rebuttal" or "supplemental" report, we find that the Miller

Declaration qualifies as neither. Because this Court's Amended Scheduling Order did not provide for Rule 26(a)(2)(C) rebuttal reports, the Miller Declaration cannot be characterized as such. *See Aveka LLC v. Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C.2002)*. Likewise, as plaintiffs do not contend that Mr. Miller's original report was incomplete or incorrect, the Miller Declaration does not qualify as a Rule 26(e) supplemental report.

The Miller Declaration is instead governed by Rules 56(c) and 56(e), which establish that a party opposing a motion for summary judgment may serve opposing affidavits at any point prior to the date of the hearing. The Miller Declaration, filed as an accompaniment to Plaintiffs' memorandum of law in opposition to Defendants' motion for summary judgment, falls within this basic description of a 56(e) opposing affidavit, and was timely filed. Because it was presented as an opposing affidavit, rather than a rebuttal or supplemental expert report, the Miller Declaration does not run afoul of this Court's Amended Scheduling Order and may not be stricken on those grounds.

## II. *Impermissible Supplements and Contradictory Affidavits*

Defendants have identified three portions of the Miller Declaration that allegedly contradict or impermissibly supplement Mr. Miller's Preliminary Report and deposition testimony. We find that the portions of the Miller Declaration addressing loss causation in the context of Plaintiffs' market manipulation claim must be stricken, as they untimely supplement and directly contradict Mr. Miller's prior testimony. The remainder of the Miller Declaration does not appear to violate the discovery requirements of Rule 26(a) or the Rule 56(e) standards for opposing affidavits.

### A. *The Causal Impact of eMerge Purchases on Safeguard Stock Prices*

Mr. Miller's Preliminary Report begins with a list of subjects on which Plaintiffs' counsel requested Mr. Miller's opinion. This list covers various aspects of Plaintiffs' omission claim, referring repeatedly to the "omissions and misstatements" described in the Complaint, but does not mention Plaintiffs' market manipulation claim directly. Preliminary Report, ¶ 1. Indeed, within the Preliminary Report, Mr. Miller present *no opinion* at all regarding the causation aspect of the market manipulation claim, specifically, whether the eMerge trades had any causal impact on Safeguard's stock price. The subsection of the Preliminary Report entitled "Loss Causation" is only two paragraphs long, and does not address causation with respect to the manipulation claim, referring only to the causal effect of "the omissions and misstatements described in the Complaint and/or discussed heretofore." Preliminary Report, ¶ 26, 27. In fact, Mr. Miller states in ¶ 13 of the Preliminary Report that he had "not yet separately calculated the effect" of the eMerge purchases on Safeguard stock prices.

**\*4** Despite the fact that Mr. Miller's Preliminary Report gave no opinion on loss causation in the market manipulation context, and on its face established that no relevant calculations had been done, Defendants' counsel later questioned Mr. Miller extensively during his deposition to confirm his position (or lack thereof) on this issue:

Q: In your report at paragraph 13, you indicate, Mr. Miller, that you have not yet separately calculated the effect of the undisclosed eMerge purchases by Musser and associated entities on eMerge and/or Safeguard's stock prices. Does that remain true as of the current date?

...

Q: So at this juncture, regardless of the intent of the parties making those purchases, you have not formulated an analysis as to whether or not those purchases had an impact on the stock price of either eMerge or Safeguard?

...

Q: Do you make any assumption one way or the other that those purchases had an impact on the stock price of either eMerge or Safeguard's stock?

A: Yes. In the trading sense?

Q: Yes.

...

Q: You could do a statistical analysis to determine the impact of these purchases on Safeguard's stock and in turn-I'm sorry-on eMerge's stock and in turn on Safeguard's stock, correct, one could do that?

...

BY MR. DODDS: Well, did you do a separate analysis of the market manipulation alleged with respect to the purchases in eMerge stock?

MR. COLLINS: I'm sorry, separate from what?

MR. DODDS: Separate from his other damage analysis?

(Miller Deposition, p. 208-213)

BY MR. QUINN: There's no calculation to support that allegation?

MR. COLLINS: Which portion of the allegation?

MR. QUINN: That there was a market effect of favorably impacting or distorting the performance of eMerge in the aftermarket.

Q: There's no calculation to support that, correct?

MR. COLLINS: Vague and ambiguous.

Q: Is there a calculation to support that?

...

Q: So there is no calculation as to any impact on eMerge stock prices?

(Miller Deposition, p. 339-340)

In response to these questions, Mr. Miller consistently responded that, "as a separate item" apart from the calculation of damages for the non-disclosure claim, he had not analyzed the effect of the allegedly manipulative eMerge purchases on eMerge or Safeguard stock prices. (Miller Deposition, p. 209, 213-14, 339-340). Mr. Miller did, however, "hesitatingly" admit that one could do such a statistical analysis. He also stated that "we made the observation that [the eMerge purchases] very likely did on at least certain days or certain weeks have a positive impact on those prices due to the proportion of volume that those purchases made up at the times they were made." (Miller Deposition, p. 210-211). To this Court, at least, Mr. Miller's responses at deposition seem clear-while Mr. Miller believed, simply based on the volume of eMerge purchases, that the trades likely had a positive impact on stock prices, he had performed no more detailed calculations or analyses to determine whether there was a true causal impact.

**\*5** The Miller Declaration, however, asserts that "[W]e did indeed analyze the impact of trading in eMerge stock by Musser, Grinker, Safeguard and the Foundations prior to Plaintiffs' submission of the Answers to Interrogatories. We concluded that there was considerable market impact that necessarily inflated the price of eMerge stock and thereby inflated or propped up the price of Safeguard stock ···" Miller Declaration, ¶ 16.

## Rule 37 Exclusionary Sanctions are Appropriate

Plaintiffs, in bringing this action for market manipulation, are well aware that loss causation is one of the elements of the claim. If Plaintiffs intended at any time to present Mr. Miller's expert opinion as to the causation element of the market manipulation claim, they were obligated to timely submit or supplement an expert report presenting this opinion and its basis pursuant to Rule 26(a)(2)(B). Because the Preliminary Report did not include a statement of Mr. Miller's opinion regarding causation in the market manipulation context, and because evidence of related calculations or analyses was presented for the first time in the Miller Declaration, we find that Plaintiffs have failed to comply with expert witness disclosure requirements.

This Court further finds that preclusion of this evidence under Rule 37(c)(1) is appropriate because the Miller Declaration was filed in bad faith, prejudicing Defendants and disrupting the efficient trial of this case. *Stein*, 2001 U.S. Dist. LEXIS 12211 at 8-9. In *Stein*, the plaintiff timely filed an expert report identifying five specific areas of concern regarding environmental contaminants on Plaintiff's property. *Id.* at 3. After defendants moved for summary judgment, plaintiff introduced a 56(e) opposing affidavit by the same expert identifying a new area of concern, vinyl chloride contamination, on which the expert had not opined in his initial report. *Id.* at 4-5. This Court found that the affidavit was filed in bad faith because it was "carefully tailored, by [Plaintiff's] counsel, to dovetail with the statutory requirements the Defendants claimed [Plaintiff] had failed to prove." *Id.* at 19. This Court struck the portions of the affidavit expressing opinions that should have been disclosed in the preliminary expert report, finding that any other result "would effectively circumvent the requirement for the disclosure of a timely and complete expert report." *Id.* at 18.

Plaintiffs' use of the Miller Declaration to present a new expert opinion on the causal impact of the eMerge purchases is equally concerning. The fact that Mr. Miller's Preliminary Report did not even touch on an issue so central to Plaintiffs' claim exceeds a "mere lack of diligence" on counsel's part. *Id.* at 19. Plaintiffs have offered no justification for this delay, which comes after months of discovery, and their suggestion that Defendants cure any prejudice by re-deposing Mr. Miller is without merit. As this Court emphasized almost nine months ago, "nearly three years have elapsed since [the case's] inception, discovery has closed and the matter is now trial-ready." *In Re Safeguard Scientifics*, 220 F.R.D. 43, 49 (E.D.Pa.2004). Allowing Plaintiffs to rely on Mr. Miller's opinions regarding loss causation for the market manipulation claim, either in their response to Defendants' summary judgment motion or at trial, would be unfair to Defendants and would disrupt the efficient disposition of this case. Accordingly, this Court must exercise its discretion under Rule 37(c)(1) to preclude this evidence.

## Exclusion Under Rule 56 is Also Appropriate

**\*6** Furthermore, this Court finds that the new opinions presented in Plaintiff's 56(e) opposing affidavit regarding the causal impact of eMerge trading must be stricken because they directly contradict Mr. Miller's prior testimony. *See Hackman*, 932 F.2d at 241.

Plaintiffs contend that there is an ambiguity in the apparent contradiction between the Miller Declaration and the statement at ¶ 13 of the Preliminary Report (later affirmed at deposition) that no analysis had been done regarding the impact of the eMerge trades. Plaintiffs allege that the relevant portions of the Preliminary Report and the deposition testimony referred only to calculations of damages, and were not intended to suggest that no calculations had been made with respect to loss causation, a key element of the market manipulation claim. Plaintiffs further contend that this ambiguity was exacerbated by Defendants' tactical decision not to ask deposition questions regarding loss causation "in order to clear the decks for their summary judgment motion." (Plaintiffs' Response, p. 10-11).

Given the sheer number of times Defendants' counsel asked Mr. Miller about his opinions and analyses regarding the causal effect of the eMerge trades, we find Plaintiffs' allegation baseless. Under the circumstances, we "do not believe that defense counsel can reasonably be held accountable

for having failed to uncover" a hidden meaning behind testimony that otherwise seemed abundantly clear. *Pellegrino,* 16 F.Supp.2d at 583-84 (granting defendants' motion to strike an opposing affidavit where defense counsel had attempted to exhaust the factual bases of plaintiff's claim during deposition but plaintiff had been "purposely evasive" regarding facts necessary to establish her claim). This Court finds no ambiguity in Mr. Miller's testimony in response to defense counsel's deposition questions. Because of the direct contradiction between this testimony and the Miller Declaration, this Court will disregard, in deciding the pending motion for summary judgment, all information in the Miller Declaration relating to loss causation of the market manipulation claim.

### 2. *Disclosure Events Relevant to Causation Analysis*

The section of Mr. Miller's Preliminary Report entitled "Loss Causation" indicates that a review was done of Safeguard stock prices and market movements in connection with news articles, analyst reports, SEC filings and other disclosure events from October 1, 1999 to April 30, 2001. Preliminary Report, ¶ 26, Exhibit G. Mr. Miller concludes that the declines in Safeguard stock prices "which occurred after the relevant disclosures were substantially related to the issues raised in the Complaint," but does not identify specifically which of the hundreds of disclosures in Exhibit G he considered "relevant" for the purposes of determining loss causation. Preliminary Report, ¶ 26.

In an earlier section of the Preliminary Report addressing damage calculations, Mr. Miller explains that he calculated the true value of Safeguard stock by looking at price movements after three "relevant disclosures" relating to Mr. Musser's margin loan agreement-a Dow Jones Business News article dated December 18, 2000, a Wall Street Journal Article dated February 9, 2001, and a Fortune Magazine article dated February 20, 2001. Preliminary Report, ¶ 12, ¶ 14, Exhibit C. In the same paragraph, however, Mr. Miller emphasizes that his approach to calculating damages is conservative, and that "[t]here is some evidence to suggest that there could be additional relevant declines in Safeguard stock price which we have not taken into account for calculating damages at this time," including the three trading days after Mr. Musser's November 29, 2000 sale of 6.5 million Safeguard shares. Preliminary Report, ¶ 14. Mr. Miller also refers to the December 5, 2000 disclosure which revealed for the first time that Mr. Musser had to sell his Safeguard shares to meet a margin loan arrangement. Preliminary Report, ¶ 14.

*\*7* At deposition, Defendants' counsel questioned Mr. Miller extensively about the market impact of various disclosures in connection with Plaintiffs' omission claim. Mr. Miller first noted that, while "we often do differentiate" between market impact and damage analyses, "that's not to imply that they're not connected under some measures of damages." Miller Deposition, p. 75. Mr. Miller stated that the three disclosure occasions used to calculate damages were not necessarily "exhaustive in terms of market impact." Miller Deposition, p. 78. In fact, Mr. Miller indicated that his market impact analysis was based on his observations of "quite a number of statements" made during the period in question, including the December 5, 2000 announcement and the trading activity between November 29 and December 4, 2000. Miller Deposition, pp. 78-80. Mr. Miller admits that his team has continued to look at those two additional disclosures to determine what effect, if any, they had on Safeguard prices. Miller Deposition, p. 80, 111.

The Miller Declaration, under the heading "Loss Causation," identifies five occasions on which disclosures of material information caused Safeguard's stock price to react negatively. Miller Declaration, ¶ 14. Defendants object to the inclusion of two of these disclosure occasions (December 5, 2000 and the trading days following November 29, 2000), as the Preliminary Report did not cite these dates in its damages calculation.

### *Sanctions Under Rule 37 or 56 are Inappropriate*

Plaintiffs have satisfied the requirements of Rule 26(a)(2)(B) with respect to Mr. Miller's opinions on loss causation for the five disclosure occasions in the Miller Declaration. The Preliminary Report clearly states Mr. Miller's opinion that Safeguard stock prices dropped in connection with public disclosures of information allegedly withheld or misreported by Defendants, and establishes that this opinion was

based on a review of stock prices and disclosure events. Mr. Miller's failure to identify with specificity the disclosures he focused on in establishing loss causation is not fatal, particularly as Defendants' counsel questioned him extensively during deposition to identify the relevant disclosure events behind his market impact analysis. For the purpose of determining damages, however, Plaintiffs are obviously limited to the three disclosure dates identified in ¶ 14 of the Preliminary Report.

We likewise refuse to strike the Miller Declaration pursuant to Rule 56(e), as it does not directly contradict Mr. Miller's prior testimony. Both the Preliminary Report and Mr. Miller's testimony established that the analysis of causal impact was based on a number of disclosure events. Neither sworn statement limited Mr. Miller's analysis of loss causation to the three disclosure events highlighted as relevant to the damages analysis.

### 3. The Dow Jones Article as Evidence of Loss Causation

In the Preliminary Report, Mr. Miller identifies three dates when a "decline in Safeguard's stock price [was] attributable to" relevant disclosure events. Preliminary Report, ¶ 12, ¶ 14. On one of these dates, Monday, December 18, 2000, a Dow Jones Business News article was published discussing Mr. Musser's recent trading activity, and Safeguard's price dropped approximately 17%. The article, which was published late in the day, reported that Safeguard's stock prices had dropped sharply "as focus apparently returned to the firm's chairman selling 7.5 million shares earlier this month." The article cited one analyst's suggestion that some investors may not have known about the sales "until Monday," [FN1] when details of Mr. Musser's SEC filings were published.

> FN1. It is unclear from the wording of the Dow Jones article whether "until Monday" refers to the date that the article was published, Monday, December 18, or the previous Monday, December 11.

**\*8** In their Motion for Summary Judgment, Defendants rightly point out that the December 18 drop in Safeguard's stock price, which occurred well before the Dow Jones article was released, could not have been caused by the disclosures in the article. The Miller Declaration admits this fact, and clarifies that the Dow Jones article itself was not a cause of the price drop, but rather "evidence of loss causation." Miller Declaration, ¶ 4-C. Defendants now challenge this statement as contradicting Mr. Miller's earlier position.

### Sanctions under Rule 37 or 56 are inappropriate

We find no inherent contradiction between Mr. Miller's current position and his earlier statement that declining Safeguard prices on December 18 could have been attributed to certain relevant disclosures. Appendix C to the Preliminary Report clearly indicated that the Dow Jones article was a summary, rather than news itself, and Mr. Miller never claimed that the article itself caused the December 18 price drop. If Defendants wish to further contest Mr. Miller's selection of December 18 as a relevant disclosure date, this Court reminds them that they will have ample opportunity to do so at trial.

### III. Violations of the Daubert Standard

Defendants also move to strike the Miller Declaration as violative of the standards for expert testimony set forth in Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As we have above found that the portion of the Miller Declaration addressing loss causation in the market manipulation context must be stricken, Defendants' Daubert challenge to this section appears moot.

Defendants likewise claim that Mr. Miller's conclusion regarding the market impact of a December 5, 2000 disclosure violates Daubert standards because it is not supported by verifiable scientific analysis. While we withhold judgment on this issue at this point in time, Plaintiffs may petition this

Court for a full *Daubert* hearing if they wish to further pursue this challenge.

An appropriate Order follows.

### ORDER

AND NOW, this 17th day of November, 2004, upon consideration of Defendants' Motion to Strike and Preclude Testimony of Plaintiffs' Expert, R. Alan Miller, and for Costs (Docs. No. 64, 65) and all responses thereto (Docs. No. 66, 67, 68), it is hereby ORDERED that the Motion is GRANTED in part and DENIED in part, as follows:

1. Defendants' Motion to Strike is GRANTED ONLY with respect to paragraphs 16 through 19 of the Miller Declaration. These paragraphs shall be stricken from the record in this case.

2. Defendants' Motion to Preclude is GRANTED ONLY with respect to Mr. Miller's testimony regarding the matters and opinions contained in paragraphs 16 through 19 of the Miller Declaration. Mr. Miller is precluded from presenting expert testimony regarding his opinions on loss causation in the context of Plaintiff's market manipulation claim inasmuch as those opinions are not contained in his Preliminary Report, dated February 6, 2004, or his Supplemental report, dated March 15, 2004.

**\*9** 3. Defendants' request for costs and expenses incurred in connection with their Motion to Strike and Preclude Testimony is DENIED.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works E.D.Pa.,2004.
In re Safeguard Scientifics
Not Reported in F.Supp.2d, 2004 WL 2644393 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2006 WL 1357734 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum Regarding Notice of the Individual Settlements (Apr. 7, 2006) 🗎 Original Image of this Document (PDF)
• 2001 WL 34131699 (Trial Pleading) Class Action Complaint (Jun. 26, 2001)
• 2:01cv03208 (Docket) (Jun. 26, 2001)
END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.