IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| F. KENNETH SHOCKLEY, et al. | : |
| | : Civil Action No. 99-371-GMS |
| Plaintiffs, | : (CONSOLIDATED) |
| | : |
| v. | : |
| | : |
| ADAMS GOLF INC., et al. | : |
| | : |
| Defendants | : |

## STATEMENT OF UNDERWRITER DEFENDANTS REGARDING THEIR PENDING MOTION FOR SUMMARY JUDGMENT

1.  Pursuant to this Court's order dated February 8, 2008, Defendants Lehman

Brothers Inc., Bank of America Corporation (formerly Nationsbanc Montgomery) and Ferris,

Baker Watts, Inc. (the "Underwriter Defendants" or "Underwriters") submit this statement of (a)

the material facts as to which there are no genuine issues to be tried and (b) the legal issues upon

which the Underwriter Defendants are entitled to summary judgment as a matter of law.  The

Underwriter Defendants also hereby join and incorporate herein the arguments asserted in the

Summary Statement in Support of the Adams Golf Defendants' Motion for Summary Judgment.

2.  The Underwriter Defendants respectfully submit that the undisputed facts

show they performed more than sufficient due diligence to support their reasonable belief that

the Prospectus issued by Adams Golf in connection with its 1998 initial public offering did not

contain any material misstatement or omission.  Accordingly, the Underwriter Defendants are

entitled to summary judgment on Plaintiffs' claims under Sections 11 and 12(a)(2) of the

Securities Act of 1933.

3.  Plaintiffs' claims against the Underwriter Defendants rest solely on the

absence of a reference in the offering Prospectus to unauthorized "gray market" sales of Adams

1

clubs by the Costco Warehouse chain. Even assuming Plaintiffs could prove that this alleged omission was material, the Underwriters are nonetheless entitled to Summary Judgment. Section 11 of the Securities Act states that — even if there *is* a material omission — the Underwriters are not liable if they had, "after reasonable investigation, reasonable ground to believe and did believe . . . that there was no omission to state a material fact . . . ."[1] As the following undisputed facts clearly show — based on the results of their comprehensive due diligence investigation — the Underwriters "reasonably believed" that the Costco sales were not material to Adams Golf.

### Undisputed Facts

**A.     The Underwriters' General Due Diligence**

4.     Beginning in March 1998, Lehman Brothers, Nationsbanc Montgomery and Ferris Baker Watts formed a due diligence team of more than 15 experienced financial professionals to conduct due diligence in connection with the Adams Golf initial public offering (the "Adams IPO"), including members of their equity research departments, who provided an independent analysis of Adams Golf for the Underwriters. Br. at 6-7.[2]

5.     On March 24, 1998, the Underwriters held an initial due diligence meeting with Adams Golf's management. Adams Golf's management was given a 7-page Due Diligence Outline/Request that listed detailed areas of due diligence, documents that would need to be provided by Adams Golf and a due diligence schedule. Due diligence began at that meeting with several presentations by Adams Golf's management. Br. at 8.

---

[1]     15 U.S.C. § 77k(b)(3). Section 12(a)(2) contains a similar "exercise of reasonable care" standard. 15 U.S.C. § 77l(a)(2).

[2]     "Br." references the Opening Brief in Support of Underwriter Defendants' Motion for Summary Judgment, filed on September 11, 2006. The Opening Brief contains references to the record evidence, which is included in Appendix A and cited as "A___."

6. By April 1, Lehman had prepared a research memorandum surveying a variety of articles about Adams Golf. None of the articles mentioned any gray market issues in connection with Adams Golf. Br. at 8.

7. On April 8, the diligence team, including attorneys retained by the Underwriters, received documents including financial projections, organization charts, Auditor's management letters, and sales data for 1995 to 1997, broken down by product and geographical area, from Adams Golf. The documents also included revenue recognition policies and an inventory analysis. Br. at 9.

8. From April 22 through 24 additional documents were provided by Adams Golf and reviewed by the diligence team, including attorneys. None of the documents received from April 8 to April 24 identified gray marketing or Costco as a material issue for Adams Golf. Br. at 9.

9. The Underwriters attended a number of formal diligence meetings and calls with Adams Golf's management, including meetings and calls on April 13, April 21 and April 27. The Underwriters conducted formal interviews of members of Adams Golf's management, including the CEO and executives in operations, finance and sales. Br. at 10-11.

10. Members of the Underwriters' due diligence team reviewed Adams Golf's manufacturing capacity, contacted major Adams Golf's suppliers, interviewed major customers, and interviewed Mark Berry, a custom club fitter for Adams Golf who traveled throughout Adams Golf's markets offering advice on fitting clubs to individual purchasers. None of these interviews raised any concerns about Adams Golf in general, or gray marketing in particular. Br. at 11.

3

11. In addition to the investigation conducted by the investment bankers, the research analysts from the Underwriters conducted their own separate and independent review of the company. None of these analysts identified any significant problems with Adams Golf, or any significant risks that were not in the Prospectus. Br. at 12.

12. The due diligence team interviewed KPMG, the independent outside auditors for Adams Golf. KPMG represented to the Underwriters that it audited the 1996 and 1997 financial statements attached to the Prospectus and those financial statements "compl[ied] as to form in all material respects with the applicable accounting requirements of the Act and the related published rules and regulations adopted by the SEC." Br. at 12-13.

13. The Adams Golf IPO was a "firm commitment" underwriting, meaning that the Underwriters committed to purchase the Adams Golf shares with their own funds. The Lehman Equity Commitment Committee, comprising Lehman's most senior and experienced bankers, was provided with a 14-page memorandum including a forecast of Adams Golf's market share, prepared by Lehman Equity Research, and over two pages of risk factors (with no mention of gray marketing or Costco). Br. at 13.

14. In May 1998 Lehman and Nationsbanc analysts each prepared an analysis of Adams Golf that included projected income statements. These forecasts accurately predicted Adams Golf's actual results for the 2nd and 3rd quarters of 1998. Br. at 13.

15. On July 9, 1998, the Underwriter Defendants conducted their final "bringdown" due diligence session and Adams Golf specifically represented and warranted that the registration statement did not contain any materially misleading statements or omissions. Adams Golf's auditors also issued a letter confirming that the results of the audited financials had not changed. Br. at 14.

4

**B.    The Underwriters' Investigation of the Costco Sales**

16. Gray markets in golf clubs were well known to the Underwriters as a part of the industry, and Plaintiffs have admitted that "at differing times between 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing, but that such gray marketing impacted each company in different ways, at different times, and triggered different responses." Br. at 16.

17. During the due diligence process, Adams Golf's management and the Underwriters discussed the presence of Adams clubs in certain Costco stores in spring of 1998. Br. at 16-17.

18. The Underwriters were aware that in the spring of 1998 Adams Golf had received complaints that Adams clubs were appearing for sale in Costco stores in Canada. Those sales were discussed with Adams Golf's management. Br. at 17-18; Reply at 16.[3]

19. The Canadian market, as a whole, was only approximately 3% of Adams Golf's overall sales in 1998, and the Underwriters knew that Canada was less important for Adams Golf than other foreign markets, such as Asia. Br. at 18.

20. Adams Golf's management informed the Underwriters that it did not think the Costco sales were a significant issue. Br. at 17.

21. The Underwriters were aware that Adams Golf had contacted Costco asking for information, and that Costco refused to provide any information about where it obtained the Adams clubs. Br. 19.

---

[3]    "Reply" references the Reply Brief in Support of Underwriter Defendants' Motion for Summary Judgment, filed October 30, 2006. The Reply references additional record evidence, which is contained in Appendix C and cited as "C___."

22. The Underwriters were aware that Adams Golf was actively dealing with the Costco sales. Br. 17. The Underwriters were aware that Adams Golf sent a letter to distributors informing the distributors that they were not allowed to sell to discount stores, and that Adams Golf had filed suit against Costco on June 9 (which Adams Golf announced in a press release that same day), seeking the information that Costco refused to provide. Br. 19-20.

23. After learning that some Adams clubs appeared in Costco stores in Canada, one of the underwriters even checked for Adams clubs in Costco stores in the San Francisco Bay area and southern California, and did not find any Adams clubs. Br. 19.

24. The Underwriters received a list of Adams Golf's top 10 retail customers and in April and May 1998 conducted interviews of customers on the list by telephone using detailed questionnaires. None of these customers identified gray marketing or sales to Costco as an issue. Br. at 9-10.

25. The interviewed customers did not disclose any problems, including problems regarding double shipping, with Adams Golf. Br. at 10, 28.

26. After their investigation of the Costco sales and general due diligence, the Underwriters reached their own conclusion that the Costco sales were not material. Br. 17.[4]

27. On June 25, the SEC gave oral comments on the draft registration statement for the Adams IPO, which included a question about Adams Golf's filing of a lawsuit against Costco and whether some statement about Costco should be included in the registration statement. Br. at 20.

---

[4]    Plaintiffs have conceded that the reasonableness of the Underwriters' due diligence must be evaluated based on the facts that existed at the time of the IPO. Br. at 14. Even assuming that post-IPO events could be relevant, Adams Golf's recognition that Costco sales might have a discernable effect on Adams Golf's earnings did not occur until more than three months after the IPO. Br. at 14-15, 21.

6

28. Adams Golf concluded that there was no reason to put any statements about Costco in the registration statement since it was not a significant issue. Br. at 20. This position was discussed with the Underwriters, who agreed with that position. Br. at 20.

29. Adams Golf's counsel spoke to the SEC, and on July 6 Adams Golf responded to the SEC with a letter that did not address the Costco issue. The SEC allowed the registration statement to become effective.

## C.    The Underwriters' Document Production

30. The Underwriters produced over 11,000 pages of documents to Plaintiffs, including 374 pages of emails and electronically stored documents. Reply at 1, 4.

31. Lehman produced various emails and electronic documents to Plaintiffs despite the destruction of its main computer systems on September 11, 2001. Reply at 5-6.

32. Each of the Underwriter Defendants provided affidavits with respect to their preservation of and search for electronic and non-electronic documents. Reply at 8.

33. Plaintiffs deposed Lehman with respect to electronic document production issues. Reply at 8.

34. Plaintiffs did not depose any Underwriter Defendant with respect to non-electronic document production issues. Reply at 4. Plaintiffs did not depose Bank of America or Ferris Baker Watts on any topic. Reply at 8.

35. Plaintiffs did not move for additional production of non-electronic documents. Rely at 4.

36. Plaintiffs did not serve interrogatories relating to the creation or retention of non-electronic documents. Reply at 4.

37. The Initial Public Offering at issue in this litigation took place on July 9, 1998.

38. Plaintiffs did not commence their suit until June 11, 1999.  Reply at 7.

## Legal Issues

A.    **The Underwriters' Due Diligence Defense**

39. Section 11 of the Securities Act state that — even if there is a material omission[5] — the Underwriters are not liable if they prove that they had, "after reasonable investigation, reasonable ground to believe and did believe . . . that there was no omission to state a material fact . . . ."[6]  Therefore, there are two main legal issues presented by the Underwriters' Motion for Summary Judgment: (1) the reasonableness of the Underwriters' investigation; and (2) the reasonableness of the Underwriters' belief that the Costco sales were not material.  Courts have awarded summary judgment when the undisputed facts show, as here, that the Underwriters are entitled to the due diligence defense.[7]

40. Due diligence by an underwriter in connection with an IPO must be "reasonable, not perfect."[8]  Courts analyzing the reasonableness of due diligence list various factors that comprise reasonable due diligence.  Br. at 25.  Combining the various sets of factors together, the Underwriters met every single requirement for reasonable due diligence.  Br. 25-26.

---

[5]    As set forth in the Adams Golf Defendants' Motion for Summary Judgment, the Costco issue was *not* material.  The Underwriters join and incorporate the arguments asserted in the Adams Golf Defendants' Motion for Summary Judgment.

[6]    15 U.S.C. 77k(b)(3).

[7]    *See, e.g., Picard Chemical Inc. v. Perrigo Co.*, No. 1:95-CV-141, 1:95-CV-290, 1998 L 513091, *16 (W.D. Mich. June 15, 1998);  *In re International Rectifier Sec. Litig.*, No. CV91- 3357-RMT (BQRX), 1997 WL 529600, *11 (C.D. Cal. Mar. 31, 1997);  *Weinberger v. Jackson*, No. C-89-2301-CAL, 1990 WL 260676 (N.D. Cal. Oct. 11, 1990).

[8]    *In re International Rectifier Sec. Litig.*, No. 1997 WL 529600, *7.

8

Courts have found that due diligence was adequate in other cases even where underwriters failed to uncover certain facts. In this case, by contrast, the due diligence investigation uncovered the facts relating to the Costco sales. Br. at 26. Thus, the first issue for this Court to decide is whether the investigation was reasonable — not whether it was flawless. It was reasonable as a matter of law. Indeed, based on the undisputed facts, the actual investigation far exceeded the requirements of Sections 11 and 12(a)(2).

       41. In determining "what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property."[9] This benchmark requires looking at the reasonableness of the decision at the time, rather than with the perspective of hindsight.[10] Here, the Underwriters' belief that the Costco sales were not material was entirely reasonable. This is not a case where underwriters blindly accepted management's representation. The undisputed facts show that the Underwriters fully vetted management's representation regarding Costco's sales: the Underwriters knew about the Costco sales, knew those sales were limited to individual Costco stores, knew that the sales were a very small percentage of Adams Golf's overall sales, and knew that Adams Golf was taking steps to manage the gray market sales. Even the SEC allowed the registration statement to go effective without any discussion of Costco.[11] The undisputed facts

---

[9]    15 U.S.C. §77k(b)(3)(c).

[10]   *Coates v. Heartland Wireless Communications, Inc.*, 55 F. Supp. 2d 628, 635 (N.D. Tex. 1999).

[11]   The SEC does not approve securities documents, but that fact that the SEC did not insist on such disclosure offered further assurance that the Costco issue was not material.

show that the Underwriters knew all available information regarding the Costco sales, and reasonably determined that the Costco sales were not material.[12]

### B. Plaintiffs' Spoliation Argument is Baseless and Does Not Preclude Granting Summary Judgment for the Underwriters

42. Plaintiffs desperately attempt to avoid summary judgment for the Underwriters by contending that they cannot oppose the Underwriters' motion because the Underwriters must have destroyed documents that would provide some support for Plaintiffs' case. The Third Circuit requires that a party charging spoliation prove an intentional destruction of documents in order to hide the truth.[13] The party charging spoliation must also prove prejudice, which requires Plaintiffs to show "a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the [lost material] would have produced evidence favorable to his cause."[14] Plaintiffs cannot meet this burden with respect to either paper or electronic documents.

43. Plaintiffs' spoliation argument regarding paper documents is based on mere speculation regarding certain notes that may have never existed. Plaintiffs have done nothing to

---

[12]   Plaintiffs added a claim to their second amended complaint that there should have been disclosure that some salesmen at Adams Golf allegedly booked shipments of clubs that had not been ordered by customers. The Underwriters rely on and incorporate the Adams Golf Defendants' demonstration of the lack of merit of this claim. Adams Golf Defendants' Opening Br. at 48-54. Additionally, the Underwriters interviewed Adams Golf's top customers — the parties that would have received the alleged double shipments — and none of them stated that they had an issue regarding double shipments. Further, this is a revenue recognition issue in connection with Adams Golf's financial statements, which are the province of Adams Golf's independent outside auditors, KPMG, and, as such, are "expertised" documents upon which the Underwriters were entitled to rely. Br. at 28-29.

[13]   *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

[14]   *In re DaimlerChrysler AG Sec. Litig.*, No. Civ. A. 00-993-JJF, 2003 WL 22951696, at *2 (D. Del. Nov. 25, 2003) (internal quotations omitted).

pursue evidence regarding the notes in question, and if they did pursue the issue, they would have been told that the most likely reason those notes were missing — if they ever existed — was that they were destroyed along with many other documents on September 11, 2001. Reply at 4-5. Plaintiffs' spoliation argument with respect to electronic documents is also deficient. The law does not require eternal storage of all electronic documents.[15]  The Underwriters were not required to maintain documents indefinitely pursuant to the rules in place during the relevant period. Underwriters' emails and other electronic documents were eliminated in the ordinary course of business or through the impact of September 11. Reply at 6-7.

*Of Counsel:*

Michael J. Chepiga
Paul C. Gluckow
Theodore J. McEvoy
Ryan A. Kane
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
Telephone: (212) 455-2831
Facsimile: (212) 455-2502

POTTER ANDERSON & CORROON LLP

By: _____
    Robert K. Payson (No. 274)
    John E. James (No. 996)
    Hercules Plaza – Sixth Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Telephone: (302) 984-6000
    Facsimile:  (302) 658-1192

*Attorneys for Underwriter Defendants*

Dated: February 22, 2008

---

[15]    *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 548 (Del. 2006).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, John E. James, hereby certify that on February 22, 2008, the within document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following attorneys of record stating that the document is available for viewing and downloading from CM/ECF:

Carmella P. Keener, Esquire
Rosenthal Monhait Gross & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

Kelly E. Farnan, Esquire
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James (No. 996)
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
E-mail: jjames@potteranderson.com