UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION | § § § § | CIVIL ACTION NO. 99-371-GMS (CONSOLIDATED) |

**SUMMARY STATEMENT IN SUPPORT OF THE ADAMS GOLF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.   **INTRODUCTION**

1.   Pursuant to this Court's order dated February 8, 2008, defendants Adams Golf, B. H. (Barney) Adams, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, Darl P. Hatfield, Richard H. Murtland, and Stephen R. Patchin (the "Adams Golf Defendants") submit this statement of (a) the material facts as to which there are no genuine issues to be tried and (b) the legal issues upon which the Adams Golf Defendants are entitled to summary judgment as a matter of law. The Adams Golf Defendants also hereby join and incorporate herein the arguments asserted in the Statement of the Underwriter Defendants Regarding Their Pending Motion for Summary Judgment.

2.   This nine-year old case should end at summary judgment. Plaintiffs have no competent evidence to take to a jury on their section 11 claim that Adams Golf omitted from its 1998 IPO registration statement and prospectus ("Prospectus") the allegedly then-existing material risks of unauthorized distribution of Adams Golf's products (i.e., gray marketing) and "questionable sales practices." Several grounds support summary judgment. The most important is **negative causation**—Adams Golf's stock-price decline was caused by factors other than plaintiffs' allegations, including among others, market-share loss and an industry-wide decline in demand for golf equipment. The Company publicly disclosed the gray-market risk a

month before the IPO, so the risk was incorporated into the offering price and was part of the total mix of information available to the public on the first trading day. Just as important, the stock price did not decline during the class period in response to public disclosures about gray-market concerns—this alone proves the negative-causation defense.

3. On plaintiffs' claim that Adams Golf failed to warn that "questionable sales practices" posed a material risk to its future financial results, the summary-judgment argument is simple: there is absolutely **no evidence that questionable sales practices** existed at the time of the IPO, let alone posed any risk to Adams Golf or caused plaintiffs to suffer any losses. Summary judgment also should be granted in favor of the individual defendants on their **due-diligence** defense. The evidence shows that each of them conducted a reasonable investigation and had reasonable grounds to believe and did believe at the time the Prospectus became effective that it contained no material misstatements or omissions.[1]

## II. UNDISPUTED MATERIAL FACTS

### A. Adams Golf's product and sales

4. In 1996, Adams Golf introduced the Tight Lies, a revolutionary fairway wood with an inverted head and a resulting lower center of gravity that improved the accuracy and distance an average golfer could achieve. (Br. 5.)[2]

5. Adams Golf sold Tight Lies both directly through an infomercial and through wholesale sales to an exclusive network of on- and off-golf-course pro shops and international

---

[1] The Adams Golf Defendants also moved for summary judgment on other grounds, but in the interest of brevity, those additional arguments are not included in this Statement.

[2] "Br." refers to the Opening Brief in Support of Adams Golf Defendants' Motion for Summary Judgment. (D.I. 280.) "Reply" refers to Adams Golf Defendants' Reply Brief in Support of Their Motion for Summary Judgment. (D.I. 347.) "Pls.' Opp'n" refers to Plaintiffs' Answering Brief in Response to Adams Golf Defendants' Motion for Summary Judgment. (D.I. 328.) All other briefs are specifically identified. "¶" and "¶¶" indicate paragraphs in this Summary Statement.

distributors. (Br. 6.) Adams Golf did not sell through warehouse clubs like Costco. (Br. 6, 9.)

6.   The Tight Lies club proved to be a hot product, and sales grew exponentially in 1997 and 1998. (Br. 6.) The Company's sales grew from $1.1 million in 1994 to $3.5 million in 1996 to $36.6 million in 1997 and to $84.6 million in 1998. (Br. 6.)

**B.   Facts relevant to the due-diligence defense**

7.   Adams Golf received its first indication that its Tight Lies clubs were being gray marketed in March 1998 when its Canadian distributor complained that Tight Lies had appeared in a Costco store in Canada. (Br. 9.)

8.   As CEO, defendant Barney Adams worked with Mark Gonsalves, head of sales and marketing, and Chris Beebe, head of international sales, to investigate and address the gray-marketing issue. (Br. 9-11, 57.)

9.   Steps taken by management, led by Mr. Adams, to investigate and manage the Costco issue included obtaining estimates from WDC Mackenzie (the Company's Canadian distributor) of the numbers of clubs involved, monitoring large orders, stopping at least one suspiciously large order, marking some clubs, demanding in writing that Costco reveal its source of clubs, instituting a price-matching program in Canada, writing to suspected gray marketers to reaffirm their distribution agreement, and taking legal action against Costco. (Br. 9-11, 58.)

10.   On June 9, 1998, one month before its IPO, Adams Golf publicly announced over PR Newswire that it was experiencing some gray marketing and that it had taken legal action against Costco after learning that Costco was selling Tight Lies. (Br. 10.)

11.   The legal action against Costco served two purposes for the Company. It was an effort to identify the source of the gray marketing and also to strengthen the Company's relationship with its retailers and customers by reassuring them that Adams Golf was not selling clubs to Costco. (Br. 10.)

12. Adams and others in management testified that they believed that by taking these steps, they were appropriately managing the gray-marketing issue. (Br. 58.)

13. The outside directors (defendants Paul Brown, Roland Casati, Finis Conner, and Steve Patchin) were also aware of the Costco issue before the IPO. (Br. 56.) They testified that they relied on management's representations that they were addressing the issue and that it did not pose a material risk to the Company. (Br. 56.)

14. The outside directors knew that this issue, like the rest of the Company's business issues, was vetted by the underwriters, their counsel, and the Company's counsel, as well as the professionals and Company management who were involved in the IPO process. (Br. 56-58.)

15. No one involved in the IPO process, including the underwriters, their counsel, the Company, and its counsel, believed that gray marketing was a material risk to Adams Golf at the time of the IPO. Consequently, Adams Golf did not include a risk factor in the Prospectus for gray marketing. (Br. 58-59.)

16. The outside directors regularly attended board meetings and reviewed the Company's financial statements. (Br. 55-56.)

17. The outside directors reviewed the draft Prospectus and discussed it at length with management. (Br. 56.)

    C.    **Facts relevant to the negative-causation defense**

18. Adams Golf went public on July 9, 1998 at $16 per share. (Br. 11, 24.)

19. The closing price for Adams Golf stock on July 10, 1998 was $18.38. (Br. 24.)

20. Before the IPO, Adams Golf's underwriters knew about the June 9, 1998 press release about Costco, knew that gray marketing existed in the golf industry, and knew that Costco was selling Tight Lies. (Br. 22.)

21. On July 10, 1998, Adams Golf did not know that demand would sharply decline

in the fourth quarter of 1998. (Br. 26-27.)

22. On July 22, 1998, Callaway, the leading manufacturer in the golf industry, announced lower sales and profits due to a "softening of [U.S.] demand." (Br. 12.)

23. Adams Golf's stock price tracked the stock price of its competitors, even using plaintiffs' expert R. Alan Miller's peer-group comparison. (Br. 30; Opp'n to Pls.' Mot. Exclude James, D.I. 323, 3.)

24. Consistent with the industry-wide decline, Adams Golf's competitors' stock declined more as an absolute percentage than Adams Golf's stock did during the disputed period. (Opp'n to Pls.' Mot. Exclude James, D.I. 323, 3.)

25. Costco purchase orders that reflected Costco's purchases of Tight Lies were not available to Adams Golf or the public. (Reply 10-11.)

26. The date on the Costco purchase order corresponds to the date the clubs were ordered for the regional warehouse and not the date the clubs were in the Costco stores for sale to the public. (Pls.' Opp'n Ex. A-18 ¶¶ 3-6.)

27. The July 29, 1998 memorandum from Lehman Brothers to Barney Adams discussing potential questions regarding gray marketing that might be raised on the upcoming August 6th analyst conference call was not public information. (Reply 10-11.)

28. *Golf Pro* published an article on August 1, 1998, discussing Adams Golf and the gray market. (Br. 24-25.)

29. A search for references to *Golf Pro* magazine in the Factiva database shows that the magazine is distributed on or after its cover date. (Br. 24-25 n.8.)

30. Plaintiffs' expert, R. Alan Miller, identified the publication date of the *Golf Pro* article as August 1, 1998 in his original analysis. (Reply 5.)

31.    On Monday, August 3, 1998 (the first trading day after Saturday, August 1, 1998), there was no statistically significant price decline in Adams Golf stock. (Br. 25.)

32.    On August 4, 1998, Nationsbanc published an analyst report that stated, "Callaway shares were often volatile in response to concerns such as 'I saw a Big Bertha in Costco,' or 'some retailer offered a Big Bertha at $10 below an earlier price' **that proved to be irrelevant**. We expect Adams' stock to also be volatile." (Pls.' Opp'n 15 n.10.)

33.    On August 4, 1998 and August 5, 1998, there were no statistically significant price declines in Adams Golf stock. (Reply 10 n.9.)

34.    In the August 6, 1998 analyst conference call, no one asked a question about Tight Lies appearing in Costco or about the gray market. (Br. 14.)

35.    On August 28, 1998, Lehman Brothers published an analyst report that stated, "One concern that we should report is that Adams Tight Lies are appearing in Costco Wholesale stores with increasing regularity." (Br. 25.)

36.    Although the Lehman Brothers analyst report is mailed out to clients after its initial publication, it is available publicly (and to the market) on its initial publication date. (Reply 5-6.)

37.    On August 28, 1998 and August 29, 1998, there were no statistically significant price declines in Adams Golf stock. (Br. 25-26.)

38.    In summer 1998, Adams Golf lost significant market share to Orlimar, which had recently introduced a similar club to the Tight Lies. (Br. 30-31.)

39.    On October 22, 1998, Adams Golf announced lower future earnings prospects for the fourth quarter, and Adams Golf research analysts reduced fourth-quarter consensus earnings estimates. (Br. 26-27.)

40. Other than October 23, 1998, no date during the class period (which extends from July 10, 1998 to October 22, 1998) had a statistically significant stock-price decline. (Br. 28-29.)

41. Adams Golf stock traded in an efficient market. (Br. 24.)

42. An efficient market reflects all publicly available information, including information released before the IPO. (Br. 24; Reply 4.)

43. Private information cannot affect public stock price. (Reply 10.)

**D. Facts relevant to the alleged "questionable sales practices" and the due-diligence defense**

44. Adams Golf's top salesperson in 1998 was Jay Greaney. (Br. 15.)

45. Greaney was known to be an aggressive salesperson and was eventually terminated for, among other things, accosting a customer at a PGA show. (Br. 15.)

46. Sandra Brooks admitted that she did not have *any* personal knowledge regarding the truth of rumors about double shipping. (Br. 15; Mot. to Strike, D.I. 351, 11.)

47. No identified customers received double shipments. No overshipped amounts were ever identified.[3] (Br. 15-16, 48.)

48. Defendants Richard Murtland, as VP of Operations, and Darl Hatfield, as CFO, stayed apprised of issues related to returns and would have known if there were significant issues related to double shipping or consignment sales. (Br. 9, 59.)

49. The only time Hatfield ever heard a rumor about overshipping, he immediately brought it to Gonsalves's attention and addressed the sales staff at their next weekly meeting to confirm their awareness of SEC requirements and what constitutes a sale. (Br. 59.)

50. Murtland was aware of the returns coming in, and his staff alerted him to any out-

---

[3] Plaintiffs make a spurious spoliation argument to compensate for their lack of evidence supporting this and other points. As explained fully in the Summary-Judgment Reply Brief, they had access to all the information they complain about not having. (Reply 26-27.)

of-the-ordinary returns. (Br. 9, 59.) Murtland never saw any evidence of significant returns that were purported to be coming back because of a salesperson's overshipment on a retailer's order. (Br. 9, 59.)

51. CEO Adams wrote a memo on August 14, 1998 to Gonsalves expressing his disappointment with what he perceived to be unprofessionalism and low morale among the sales staff. (Br. 49.) In the memo, Adams stated that he had learned from sales people that "cheating (at least in the form of double shipments) occurs." (Br. 49.)

52. Adams testified that he wrote the memo as a motivational tool to inspire change in the sales department, not as an informational memo, and that he had no personal knowledge of the accuracy of the allegations he made in the memo. (Br. 49-50.) Adams testified that his intent in writing the memo was to cause the sales department to "prove [him] wrong" and to inspire change in the department. (Br. 50.)

53. Gonsalves did "prove [Adams] wrong." He verified Adams's original belief that the double-shipping allegations were "the result of backbiting and bickering and low morale," and they were not accurate or factual from the evidence he saw at the time. (Br. 50.)

54. Hatfield had no concerns about the issues raised in the memo regarding double shipping or returns because he had heard only rumors and had seen no evidence of double shipping. The rumors he heard described only minor, immaterial incidents of double shipping, which would have been "very insignificant to the financial statements." (Br. 59.)

55. Greaney, Hatfield, and current CEO Brewer, all provided undisputed testimony that Adams Golf did not sell clubs on consignment at any time near or after the IPO. (Br. 52.)

56. Greaney testified that Adams Golf had only sold clubs on consignment "really early on in the company, when there was really not enough demand for anyone to even accept the

product in their store." (Br. 52.)

57.    For most Adams Golf club sales, customers had no rights of return. (Br. 52.) The only exceptions were (1) the 90-day, "no-questions-asked" policy for direct-response sales (which represented a very small percentage of the Company's total sales) that the Company disclosed in its Prospectus, and (2) returns that were allowed only under extenuating circumstances to maintain customer or retailer relationships. (Br. 52.)

58.    Adams Golf's auditors approved its return-reserve methodology. (Br. 7-8, 53.)

59.    In July 1998, after the IPO, Adams Golf experienced merchandise returns that were higher than the Company had predicted. (Br. 52.) This increase in returns was due to issues with Telegolf, the third-party vendor to whom Adams Golf had outsourced its direct-response calls. (Br. 53.) The number of clubs returned in the third quarter of 1998 represented a less than ten percent increase over returns in the prior quarter. (Br. 53-54.)

60.    Adams Golf maintained a conservative return reserve and actually overaccrued for commercial sales returns during the class period. (Br. 7-8, 53.)

61.    Adams Golf disclosed its return-reserve policy in the Prospectus, including the caveat that "actual returns could differ from those [reserve] estimates." (Br. 54.)

III.   **SUMMARY LEGAL ISSUES**

   A.   **Defendants have proven negative causation—all of plaintiffs' losses resulted from factors other than the alleged omission**

62.    Plaintiffs cannot recover damages under section 11 to the extent that defendants can show that something other than the alleged omission caused the stock-price decline. 15 U.S.C. § 77k(e). The undisputed facts prove that defendants have satisfied their burden in proving this affirmative defense and summary judgment is proper. *See Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 578-82 (N.D. Tex. 2007) (granting summary judgment where defendants proved

the alleged omission did not cause any investment losses). <u>**The stock-price decline in this case was not caused by the gray-market omission.**</u>

63. First, the alleged risk of gray marketing was incorporated into the offering price. Adams Golf publicly announced a month before its IPO that Costco, which was not an authorized Adams Golf retailer, was selling Tight Lies. (¶ 10.) Even though Adams Golf stock was not yet publicly traded, the underwriters knew about the issue when they priced the Adams Golf stock for the offering. (¶ 20; Br. 22-23; Reply 3-4.) The supply-and-demand conditions of the IPO price-setting process reflected the gray-market issue. (Br. 22-23; Reply 3-4.)

64. Second, at the latest, the gray-marketing risk was reflected in the stock price on the first day of trading and the price did not decline. Adams Golf stock traded in an efficient market where the price reflects all publicly available information, including information released before an IPO. (¶¶ 41-43.) The June 9, 1998 Adams Golf press release disclosing the Costco gray-market issue was part of the total mix of information available to investors when the stock began trading publicly. (¶ 10.) The stock did not decline on the first day of trading—it rose from an IPO price of $16 to close at $18.38. (¶¶ 18-19; Br. 24; Reply 4-5.)

65. Third, the class-period disclosures about the gray market did not cause stock-price declines. There was no statistically significant stock-price reaction to the August 1, 1998 *Golf Pro* magazine article that discussed Adams Golf and the gray market for Tight Lies. (¶¶ 28-31.) There was no statistically significant stock-price reaction to the August 28, 1998 Lehman Brothers analyst report that expressed concern about Tight Lies appearing in Costco. (¶¶ 35-37.) If the alleged gray-marketing omission had been material or unknown to investors, then the stock price would have decreased when that risk became public information. (Br. 24-26; Reply 5-6.)

66. There are no statistically significant stock-price reactions on any class-period day

associated with a gray-market disclosure and therefore no section 11 losses. To attribute a stock-price decline to an alleged omission, there must be a statistically significant price movement in response to new, material information about the alleged omission. (Br. 28-29); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). Thus, an event-study analysis such as that performed by defendants' expert, Dr. Chris James, is appropriate here, and even Dr. Craig MacKinlay, the scholar whose work is miscited and misinterpreted by plaintiffs' expert, agrees. (Reply 7-8.)

67.     The stock-price reaction following Adams Golf's October 22, 1998 earnings warning was *not* caused by information allegedly omitted from the Prospectus. The press release conveyed new information (*e.g.*, lower future earnings prospects and associated analyst revisions to fourth-quarter consensus estimates), and this caused the stock-price decline. (¶ 39.) Moreover, the information about the gray market contained in the press release—that it was expected to impact Q4 results in combination with the sharp drop in demand—could *not* have been included in the Prospectus because it only ripened into a material risk in October 1998. (¶¶ 21-22, 39; Br. 26-27; Reply 6-7.)

68.     Although it is not defendants' burden to prove why the stock price declined, they have so proven: **<u>Adams Golf's stock price declined because of market-share loss and an industry-wide decline in demand.</u>**

69.     During the class period, the entire golf industry suffered from an undisputed and unexpected decline in demand, which caused Adams Golf's stock price to decline along with its competitors. (¶¶ 22-24; Br. 30-31; Reply 8-9.) Plaintiffs have produced no evidence to the contrary and have only quibbled with the judicially accepted methodology of defendants' expert, Chris James. (Opp'n Pls.' Mot. Exclude James, D.I 323.)

70.     Adams Golf's market-share loss to Orlimar, a competitor, also caused Adams Golf's stock price to decline. (¶ 38.) Adams Golf's loss of market share is statistically significantly correlated to Adams Golf's stock-price decline. (Br. 30-31; Reply 8-9.)

71.     Plaintiffs' speculation that information about the gray market *may* have "leaked" or "seeped" into the market and *may* have been "associated with" Adams Golf's stock-price decline is *not* competent summary-judgment evidence. No single date in the class period is associated with a statistically significant negative price change. (¶ 40.) Plaintiffs cannot identify any specific information about the gray market that was released on any particular day (other than August 1 and August 28, which did *not* cause any price declines). Thus, their leakage argument fails for lack of evidence. (Br. 31-32; Reply 9-10.) Plaintiffs' baseless leakage argument is also contrary to the Third Circuit's accepted market-efficiency theory and the Supreme Court's loss-causation analysis in *Dura*. (Reply 10-11); *Merck*, 432 F.3d at 269; *see Flowserve*, 245 F.R.D. at 575 (rejecting plaintiffs' "leakage" arguments, holding use of "undisclosed internal knowledge to impute implicit market knowledge undermines the "actual effect" requirements"); *see In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1266, 1294-95 (N.D. Okla. 2007) (rejecting "leakage" theory and granting summary judgment). And plaintiffs' use of an arbitrary twelve-day event window in their "statistical" study to show significant stock-price drops is rejected by efficient-market theory and corresponding case law. *Merck*, 432 F.3d at 269; *In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 269-70 (D. Mass. 2006) (noting that stock prices may respond within hours or minutes); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (utilizing same-day price reaction); (Reply Mot. to Exclude Miller, D.I. 352, 6).

**B.    There is no evidence that any "questionable sales practices" existed, much less that they caused any losses, or had *any* effect on gray marketing**

72.  There is no competent summary-judgment evidence to show that anyone at Adams Golf engaged in the alleged "questionable sales practices" of double shipping or consignment sales or that the Company underreserved for returns. (Br. 48-53; Reply 13.) Defendants' expert testified that any alleged questionable sales practices were immaterial, and plaintiffs have not offered an expert on this issue. (Br. Ex. 302.) Nor have plaintiffs demonstrated any link between these non-existent practices and gray marketing. (Reply 13.) Most importantly, there was no disclosure about the alleged practices and thus no resulting losses by plaintiffs. (Reply 13.)

73.  **There is no evidence of double shipping.** Plaintiffs focus on a single Adams Golf salesperson, Jay Greaney, but there is no evidence that he was ever involved in double shipping. (¶¶ 46-50; Br. 48-51.)

74.  A single salesperson's actions could not possibly, and did not, have a material impact on the Company's results as a whole. (¶¶ 6, 54; Br. 7-8, 48.)

75.  **There is no evidence of consignment sales or sales with unlimited rights of return at the time of the IPO or thereafter.** (Br. 51-52.) The undisputed evidence is that consignment sales did not occur anywhere near the time of the IPO; if at all, such sales may have occurred only in the very early days before demand for Tight Lies exploded. (¶¶ 55-56; Br. 52.)

76.  Adams Golf never had an unlimited return policy. All of the Company's return policies were carefully and accurately disclosed to investors. (¶¶ 57, 61; Br. 52.)

77.  **There is no evidence that Adams Golf's reserve was inadequate.** (Br. 52-54.) Adams Golf's return reserve was a "reasonable estimate of sales returns during the class period." (¶ 58; Br. 53.) In fact, it was overreserved at the end of 1998. (¶ 60; Br. 53.)

### C. The Adams Golf officers and directors satisfied their affirmative due-diligence defense

78. Reasonable investigation and belief provide an absolute defense for the individual defendants. No section 11 liability exists if defendants can demonstrate that after a reasonable investigation, they had reasonable grounds to believe, and did believe, that the non-expertised portions of the Prospectus contained no material omissions. 15 U.S.C. § 77k(b)(3)(A). Defendants' expert testified that the pre-IPO conduct of all of the individual defendants satisfied this standard, and plaintiffs have offered no expert report on this issue. (Br. Ex. 310.)

79. There is no requirement to show an investigation into the specific omission at issue—only that defendants' overall investigation related to the IPO was reasonable. (Br. 55; Reply 24-25.) Courts routinely "resolve questions of due diligence in those cases where no rational jury could conclude that the defendant had not acted reasonably." *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 622 (9th Cir. 1995).

80. The standard for reasonableness (of both investigation and grounds for belief) is "that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c). Additional factors related to reasonableness include the individual's office held and reasonable reliance on others whose duties should have given them knowledge of the particular facts. 17 C.F.R. § 230.176 (2006).

81. Thus, the standard regarding reasonable investigation differs for outside directors and for inside directors and officers. (Br. 55). The undisputed facts demonstrate that each of the Adams Golf defendants satisfied the appropriate standard for their respective positions, and thus, summary judgment is proper. *See Weinberger v. Jackson*, No. C-89-2301-CAL, 1990 U.S. Dist. LEXIS 18394, at *10-*12 (N.D. Cal. Oct. 11, 1990).

82. For the **outside directors**, a reasonable investigation does not require an

independent investigation into the accuracy of all the statements contained in the Prospectus; they can "rely upon the reasonable representations of management, if [their] own conduct and level of inquiry were reasonable under the circumstances." *Id.*

83. The outside directors reasonably relied on management's representations that management was addressing the Costco issue and that it did not pose a material risk to the Company. (¶¶ 8-13, 15; Br. 56.) Like the outside director in *Weinberger*, they were "also given comfort by the fact that the prospectus and the information in it were reviewed by underwriters, counsel, and accountants." *Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *11-12; (¶¶ 14-15; Br. 56-57.)

84. The statements in the Prospectus were consistent with the outside directors' knowledge of the Company. Thus, they were not required to conduct an independent investigation of either gray marketing or the alleged questionable sales practices. (¶¶ 16-17; Br. 55-57; Reply 26.)

85. **Inside directors** must "make a more complete investigation and have more extensive knowledge of facts supporting or contradicting inclusions in the registration statement than outside directors," but their investigation need only be that "which a reasonably prudent man in that position would conduct." *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 578 (E.D.N.Y. 1971).

86. There is no requirement that an officer personally investigate every issue, including those outside his normal role at the Company, before signing the Prospectus. (Reply 25-26.) It is reasonable for individual defendants to rely on "officers, employees, and others whose duties should have given them knowledge of the particular facts (in light of the functions and responsibilities of the particular person with respect to the issuer and the filing)." 17 C.F.R.

§ 230.176 (2006).

87.     Given their respective positions as VP of Operations and CFO, both Murtland and Hatfield acted appropriately with regard to the gray-marketing issue. Gray marketing could most effectively be managed by the sales department. It is reasonable for Hatfield and Murtland to have relied on Adams, Gonsalves, and Beebe to address this issue. (¶¶ 8-12; Br. 57; Reply 25-26.)

88.     As CEO, Adams worked with the sales department to address the gray-marketing issue. (¶¶ 8-12; Br. 57.) They performed a reasonable investigation of the issue and made a good-faith business judgment that the issue was not material. (¶¶ 8-12, 15; Br. 58-59.)

89.     Adams, Hatfield, and Murtland reasonably believed that they had gray marketing under control and that there was no practice of double shipping, consignment sales or unlimited rights of return. Thus, they all reasonably believed at the time of the IPO that the Prospectus was true and complete. (¶¶ 8-12, 44-61; Br. 60.)

90.     The officers performed a reasonable investigation of the contested issues and made a good-faith business judgment that the issue was not material. Therefore, they should not be held liable. To hold otherwise eliminates any reason for a due-diligence defense to exist at all for insiders. (Br. 59-60.)

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas  78701

Dated:  February 22, 2008

*Kelly E. Farnan*
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton, and Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
Attorneys for Defendants Adams Golf, Inc., B.H. Adams, Richard H. Murtland, Darl P. Hatfield, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, and Stephen R. Patchin

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

**BY HAND DELIVERY AND E-MAIL**

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on February 22, 2008, the foregoing document was sent to the following non-registered participants in the manner indicated:

**BY E-MAIL**

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

*Kelly E. Farnan*
Kelly E. Farnan (#4395)
farnan@rlf.com

RLF1-3095846-1