IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,           :        CIVIL ACTION NO. 99-371-GMS
SECURITIES LITIGATION              :        (CONSOLIDATED CLASS ACTION)


**PLAINTIFFS' RESPONSE TO THE SUMMARY STATEMENT
IN SUPPORT OF THE ADAMS GOLF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**


## I.    <u>INTRODUCTION</u>

1.      Pursuant to the Court's February 8, 2008 Order, plaintiffs, on behalf of the

certified Class of persons who purchased shares of Adams Golf ("Adams") stock pursuant to the

July 9, 1998 Initial Public Offering ("IPO"), submit this response to the Adams Golf Defendants'

Summary Statement in Support of Their Motion for Summary Judgment.  Plaintiffs incorporate

by reference their responses to the Statement by the Underwriter Defendants.  The amended

complaint alleges that defendants violated Sections 11 and 15 of the Securities Act of 1933 by

making material misstatements and omissions in the Registration Statement and Prospectus

("Prospectus").  Plaintiffs allege that the Prospectus failed to disclose the fact that Adams' hot

product, the Tight Lies golf club, was selling across the United States and Canada at Costco and

other discount stores at prices close to wholesale, and that this "gray market" problem posed a

material risk to Adams' continued profitability.  Gray marketing endangered Adams by

threatening its purportedly "exclusive" dealer network.  In the Prospectus, Adams stated that it

did "not sell its products through price sensitive general discount warehouses, department stores

or membership clubs", when in fact at the very time of the IPO,  thousands of Adams clubs were

on sale in such discount warehouses and membership clubs. Likewise, the Prospectus failed to

explain that Adams's allegedly high sales volume was in part a result of a practice called

"double-shipping", whereby Adams routinely shipped twice as many clubs as had been ordered.

This practice created a risk that excess clubs would be available to gray marketers, and that

reported sales would decline materially after the IPO.

> 2.    Just as the Third Circuit rejected defendants' arguments on their motion to

dismiss, *In Re Adams Golf Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004), this Court should also deny

defendants' motions for summary judgment. These motions are grounded on contested issues of

fact concerning materiality, loss causation, competing expert opinions, and other issues ordinarily

left to a fact finder. Defendants' negative causation argument rests on the shaky basis of the

opinion of defendants' supposed expert on loss causation, Christopher James.[1] James used

regression analysis that courts have identified as inappropriate for use in IPOs and relies on faulty

and highly debatable assumptions as to when particular disclosures became available to the

market. PB 39 and n. 18, 19, 42, 45, 47.[2]  (In any event, even James admits that Adams' stock

price declined in a statistically significant amount on Adams' disclosure on October 22, 1998,

which included the disclosure that gray marketing was materially hurting Adams' sales.  PB 41.)

Highlighting the facts in dispute, plaintiffs' expert Alan Miller opines that as gray marketing

problems became known to the market after the IPO, Adams  stock dropped significantly.

Likewise, plaintiffs strongly dispute defendants' incorrect and entirely speculative argument that

---

[1]    Plaintiffs have filed a Daubert motion to strike the opinions of James as "junk" science.

[2]    PB refers to Plaintiffs' Answering Brief in Response to Adams Golf Defendants' Motion for Summary Judgment.

a press release *before* the IPO about Costco, which was discounting Adams' clubs, was incorporated into the IPO price of Adams stock. Market participants understand that a registration statement and prospectus are required by law to contain everything about the company that is material, including risks. A press release before the IPO was irrelevant unless it was repeated in the Prospectus -- and it was not. PB 34. The Third Circuit specifically rejected defendants' arguments in this regard. *Adams Golf*, 381 F.3d at 277 n. 10 (no indication of an efficient market in Adams shares before the IPO). *See also, In re Merck Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005) (noting lack of efficient market before Adams IPO).

        3.      There is ample evidence, both documentary and through deposition testimony, that Adams engaged in double shipping and other questionable sales practices. Adams' lead salesman routinely shipped and billed for twice as many clubs as retail shops ordered. PB 22-24. This could only exacerbate gray marketing, according to plaintiffs' expert on gray marketing. PB 46,56. Another risk of retailers having extra clubs was that the retailers would not place new orders after the IPO. Whether Adams' officers and directors, who are defendants, conducted a reasonable due diligence investigation is also a contested issue of fact. Plaintiffs will show that none of the officers and directors conducted any real investigation at all, let alone a reasonable and adequate investigation. Reasonable investigation would have shown that Adams clubs were for sale in Costcos at almost wholesale prices across the United States and Canada before the IPO. PB 61-63.

## II.    <u>DISPUTED AND UNDISPUTED MATERIAL FACTS</u>

### A.    <u>Adams' Product and Sales.</u>

        4.      Admitted that Adams introduced the Tight Lies golf club in 1996.

5.      Admitted that Adams sold Tight Lies directly through an infomercial, to on and off course speciality shops and to international distributors. However, beginning in March 1998, Costco and other discounters began to sell Tight Lies in the United States and Canada, at well below Adams' retail prices. PB 5,8. Accordingly, contrary to representations in the Prospectus, sales of Tight Lies were neither "exclusive" nor restricted to selected retail outlets.

6.      Admitted that the Tight Lies club was a hot product. However, part of the sales growth was caused by gray marketing and double-shipping .

**B.      Facts Relevant to the Due Diligence Defense.**

7.      Admitted that Adams first experienced gray marketing in March 1998 in both Canada and the United States. PB 5, 8, 9.

8.      Denied. According to his testimony at deposition, all Barney Adams knew of gray marketing before the IPO "was a very small quantity in Canada." PB 62. He claimed he was unaware of complaints about Costco or gray marketing by United States retailers before the IPO. PB 62-63. There is little evidence that the head of sales and marketing, Gonsalves, made any investigation, or worked with Barney Adams on any such investigation. Indeed, there is testimony that Gonsalves actively ignored his salespeople who reported that Adams' authorized dealers were complaining bitterly about gray marketing. PB 8-9. The only person at Adams who did any investigation of gray marketing before the IPO was Chris Beebe, the new Adams International Sales Director, who investigated the issue in Canada. PB 5-7.

9.      Denied in part. There was no comprehensive investigation or attempt to manage gray marketing before the IPO. The steps listed by defendants were ineffective. The

malta434920-032.wpd                         4

written demand to and lawsuit against Costco were unsuccessful in discovering where Costco

had obtained the Tight Lies. PB 10, n.6, App. 30. [3] Price matching failed to assuage retailers or

to prevent or even minimize gray marketing. PB 7. Marking clubs occurred only after the IPO.

Adams was consistently unable to keep its dealers from selling to Costco. PB 20.

      10.     Admitted that Adams announced it had filed a "Bill of Discovery" against

Costco over PR Newswire on June 9, 1998. At this time, Adams was a privately-held company,

with no publicly held common stock, and therefore no efficient market existed for its stock.

      11.     Denied. The legal action was completely ineffective and was not a real or

sincere attempt to identify the source of gray marketing. PB 10 n.6. Adams filed the case in a

court that lacked jurisdiction over Costco, and dismissed the case of its own accord. PB 18. In

both Canada and the United States, the Bill of Discovery was too late to assuage angry authorized

dealers, who were already defecting to Adams' competitors. PB 6-7.

      12.     Denied as stated. Since management did not make a reasonable

investigation, and since the existence of and grave risk of gray marketing were not disclosed in

the Prospectus, defendants' after-the-fact, self-serving testimony as to their purported beliefs is

irrelevant. Moreover, as the Third Circuit noted, "a company's effort to manage a problem does

not by itself discharge its obligation to inform investors of that problem." *Adams Golf*, 381 F.3d

at 276 n.9.

      13.     Denied as stated. There is no contemporaneous evidence that before the

IPO any of the outside directors made any inquiry or investigation regarding the extent or

importance of gray marketing of Tight Lies. PB 63.

---

[3]     The Appendix to Plaintiff's Summary Judgment Brief is denoted as "App.".

14.    Denied as stated.  The outside directors made no serious effort to test or investigate what they were told by Barney Adams, Richard Murtland and Darl Hatfield, the inside directors.  PB 63.  Neither Beebe nor Gonsalves was summoned before the Board to discuss gray marketing before the IPO.  In fact, according to the Board minutes, the Board never discussed gray marketing or Costco before the IPO.

15.    Denied as stated.  Neither the Underwriters, nor their counsel, nor the Company, nor its counsel undertook an adequate investigation before the IPO to determine the actual scope and effect of, and risk posed by, gray marketing.  PB 21, 22, 66.  *See also* Plaintiffs' Response to the Underwriters' Statement.  It was not until months <u>after</u> the IPO that the Company established the so-called Costco Buster Team, which attempted unsuccessfully to find out where Costco acquired the Tight Lies.  PB 18, 20.

16.    Admitted that the outside directors attended Board meetings and purportedly reviewed Adams' financial statements, at least cursorily.

17.    Admitted that the outside directors purportedly reviewed and discussed the draft Prospectus in April 1998, before the IPO.  There is no evidence that they were told that, in June 1998, the SEC asked about the significance of the "Bill of Discovery" against Costco, nor is there evidence that the outside directors addressed anything about gray marketing in connection with the Prospectus.

**C.    Alleged facts relevant to the negative causation defense.**

18.    Admitted that Adams went public on July 9, 1998, at $16.00 per share.

19.    Admitted that the closing price of Adams stock on July 10 was $18.38.

20.    Denied in part.  It is admitted that the Underwriters were aware of Adams'

press release.  They thought gray marketing of Adams products at Costco was limited to a single,

isolated incident in Seattle.  As set forth in Plaintiffs' Response to the Underwriters' Statement,

the Underwriters did not diligently investigate gray marketing and lacked knowledge of the

actual facts surrounding gray marketing of Adams products before the IPO. ¶¶ 5, 10, 17, 18, 23.

21.    Denied as stated.  While Adams could not be certain of future

performance, reasonable investigation would have highlighted the grave threat to future

performance posed by gray marketing.  PB 5-12.

22.    Denied as stated.  It is admitted that on July 22, 1998, Calloway

announced lower sales and profits due to "softening of U.S. demand and loss of . . . market share

to competitors."  The type of Calloway product for which demand had softened was much

different from Adams' products, and one factor in the price decline was Calloway's loss of

market share to Adams.  PB 14, n.9.

23.    Denied as stated.  It is admitted that on some occasions, Adams' stock

price to some loose extent tracked the price of other golf manufacturers.  However, the only real

"comparable" to Adams was Calloway, and many of Adams' competitors were not even public

companies at relevant times.  Defendants' own expert in examining movements in Adams stock

found it more appropriate to examine Adams' movement as against the NASDAQ index than to

compare it to an index of golf manufacturers.  PB 47.  Finally, while Adams stock sometimes fell

at times when Calloway stock was falling, Adams' stock  did not rise when Calloway stock rose.

Further, even defendants' loss causation expert, James, admits that on at least two occasions, July

1998 and October 1998, Adams price drops were statistically significant -- that is, significantly

different from its competitors.  PB 43, 47, Plaintiffs' Opposition to Adams Defendants' Motion

to Exclude the Expert Testimony of R. Alan Miller, p. 11.

24.    Denied as stated. Different golf club manufacturers' shares declined different amounts for different reasons at different times during 1998-1999.

25.    Denied. Although Costco purchase orders were not themselves publicly available, the fact of the orders was known to participants in the golf industry (the distributors ordering the products) and to Costco (the recipient of the orders). Further, the existence and sales of Tight Lies clubs at Costco stores in every section of the United States and Canada, which peaked during July just after the IPO, was publicly available and known to the public, including golf industry analysts and golfers. PB 13, 14.   Many of Adams' stockholders and persons interested in the stock  were golfers or members of the golf industry . PB 15, 36.

26.    Admitted that the dates on the purchase orders corresponded to the date Costco placed the orders, but that fact is of little significance, since Costco sales records reflect that during July, while Adams' stock price began to plunge, Costco sold more Adams Tight Lies clubs (over 2,100 clubs) than during any other four-week period, and also ordered more than 3,600 clubs. PB 13-14, 36.

27.    Admitted that the July 29, 1998  memorandum in which Lehman Brothers said that it expected investor concerns about gray marketing to be aired was not publicly distributed. However, the document evidences that by late July 1998, gray marketing was so substantial, widespread and publicly visible that knowledgeable securities analysts anticipated that the public would raise questions about it. PB 36.

28.    Denied as stated. *Golf Pro* published an article about Adams that touched on gray marketing, but the date of distribution of the article is a disputed fact. The magazine

itself has no date except "August 1998." PB 36-37. Because this magazine was a trade publication not sold to the general public, plaintiffs believe that it reached different persons in the golf industry at different times both before and during August 1998. PB 16 and n. 11, 17, 38, 39 and n. 18. Like most magazine publications, it may have been first distributed before its cover date. Tending to establish this fact, the content of the article shows that *Golf Pro* interviewed Barney Adams before July 22, 1998. PB 16 and n. 11. Defendants have not met their burden of establishing the date and nature of the *Golf Pro* article dissemination, as their expert James admitted at deposition. PB 16 n. 11. Even if the article was first distributed on or after August 1, 1998, it contained positive assessments of Adams, did not disclose the full extent of gray marketing and was not the type of article that could be expected to have the impact of a company announcement. PB 17.

29.    Denied as stated. The Factiva database, which was not submitted with defendant's expert report or made part of the record, simply shows references by other articles to the *Golf Pro* article in August. PB 39. Defendants' expert James purported to draw certain conclusions from the purported Factiva database, but his conclusions did not relate to, bear upon, or provide any information about the particular *Golf Pro* edition or article in question. It is for the jury to assess the significance, if any, of the Factiva database.

30.    Denied. Plaintiff's expert, Miller, explained at his deposition that because the article did not bear a specific date, he listed the report on a database under the date of August 1, 1998, following a convention he generally used with respect to listing of undated material. The listing of the document with this date had no independent significance, and did <u>not</u> indicate the article was made public on this date. Plaintiff's expert explained his belief, based on the

article itself, that the interview of Barney Adams described in the article had taken place before July 22, 1998, when Adams announced its June quarter results. PB 16 n. 11.

31.    Denied as stated. Since there is no evidence that the *Golf Pro* article reached or was absorbed by the investing public on August 1, 1998, and since the fact of gray marketing was leaked to the investing public during July, the lack of specific market reaction on August 3, 1998 is of dubious significance. Even so, Adams stock price dropped by 6.92% on that date.

32.    Admitted that the quoted words were contained in a Nationsbanc report, except that the report did not emphasize or state in bold face the words "that proved to be irrelevant."

33.    Denied as stated. Plaintiffs deny that "statistical significance" has any validity in this context. Further, the August 4 analyst report was published by one of the Underwriters for the IPO in connection with recommending the stock and minimizing the importance of gray marketing. The significance of the report is that it demonstrates that public knowledge of otherwise undisclosed gray marketing can be expected to impact a stock price. PB 36.

34.    Admitted that, although knowledgeable analysts and Company officials expected the public to raise questions about extensive gray market distribution of Adams products, none of the few persons on the analyst conference call actually raised the question in the course of the taped portion of the call.

35.    Admitted in part. The quoted language was part of a discussion of gray marketing that appeared on the 27th page of a 28 page analyst report that recommended to

investors that they purchase Adams stock. PB 17.

36.    Denied as stated. The extent to which the report was available to anyone on August 28 is unclear, as its author testified that it was sent to the printer on August 28. PB 40. If it was available electronically on that date in 1998, and the record is not clear that it was, there is no evidence of who, if anyone, had immediate access to the report and when it was assimilated by a substantial number of market participants. Tellingly, as late as October 1998 none of Adams' outside directors was even aware the report had been published, and none had read its comments about gray marketing on the next-to-last page. PB 17.

37.    Denied as stated. Because of the question of the date or dates of distribution of the August 28 report, the nature of the market for Adams stock, and the fact that the negative information about gray marketing was accompanied by an underwriter's buy recommendation, the price movement on August 28 is of uncertain significance. Nonetheless, on August 28 (a Friday), the price of Adams stock declined 5.66%, and the next trading day, August 31, the price declined another 17%.

38.    Denied as stated. It is admitted that Adams lost some market share to Orlimar, but denied that the comparable performance of Adams and Orlimar was known to the public until well after the fact, as industry data was not available for months following the results. Further, at least some of the loss of market share to Orlimar was the result of gray marketing, as there were two reports that Adams distributors were so angry about the low price at which Costco offered Adams clubs that they stopped carrying Adams clubs and sold Orlimar's instead. PB 6-7.

39.    Denied as stated. Admitted that on October 22, 1998, Barney Adams

publicly announced for Adams, for the first time, that "we anticipate our sales will be <u>further</u>

impacted by recent gray market distribution of our products to a membership warehouse club."

(Emphasis added.) On this announcement, Adams stock declined by 16.23%., a negative price

reaction which even defendants' expert James admitted is "statistically significant". PB 19, 37,

40. On October 22 or 23, Adams prepared a letter to many of its dealers which admitted that

Costco was the primary problem ("first is Costco") which caused the disappointing results, and

was a "serious problem for both Adams Golf and our customers." PB 19.

      40.    Denied as stated. October 23 was the only <u>single day</u> with a statistically

significant price decline. However, there were groups of 12, 13 and 14 days during July 1998

when Adams' stock price declined a statistically significant amount, as admitted by defendants'

expert James. In earlier published work, James also admitted that there are occasions when

periods or "event windows" of such duration or even longer are appropriately examined. The

statistically significant price decline in July almost exactly coincided with heavy and publicly

visible gray marketing of Adams products, a period when Costco sold more Adams clubs than at

any time before or since (and when the *Golf Pro* article mentioning gray marketing of Adams

clubs may have become available). PB 13, 39. In addition, as set forth above, although no

Company announcement of gray marketing was made between the IPO date and October 22,

Adams stock price dropped significantly close on the heels of the August 28, 1998 Lehman

report, despite the fact that that report was generally positive as to Adams' prospects.

      41.    Admitted in part. After the IPO, Adams stock traded in an efficient

market in the sense that the market reacted to material new information about the stock .

However, not all efficient markets have identical characteristics with respect to the speed with

which information is absorbed, especially where the information comes from sources other than

Company announcements or comes accompanied by offsetting or confusing news.  The market

for Adams stock  could not be expected to react to leakage and other forms of equivocal

disclosure as rapidly as would the stock of a larger company followed by numerous independent

analysts.

42.    Denied. Plaintiffs incorporate their response to paragraph 41. In addition,

when no stock is available to the public, there is no market for the stock, which by definition

cannot be efficient. See In Re Adams Golf, 381 F.3d at 277 n. 10; In re Merck, 432 F.3d at 275.

PB 33-34. Here, the pre-IPO release of information that Adams had filed a bill of discovery

against Costco was followed by silence in the Prospectus regarding any gray marketing problem.

Even the Underwriters were not aware of the extent of gray marketing when they priced the IPO.

Thus,  the market could not possibly reflect the existence of gray marketing based on Adams'

pre-IPO disclosures.

43.    Denied as stated. While truly concealed "private information" cannot

ordinarily affect a stock price, information known to actual or potential market participants,

including the existence of Costco orders for Adams clubs and the existence of clubs for sale in

Costco outlets throughout the United States and Canada, can and did affect the stock price, given

that many of the holders of Adams stock were in the golf business or avid golfers who could

directly observe the Costco distribution.  PB 15, 36.

**D.    Facts relevant to the questionable Sales Practice claims and the Due
Diligence Defense.**

44.    Admitted.

45.    Admitted in part, but Greanay was also terminated for his "aggressive" sales practices, including his consistent practice of "double-shipping," a practice that Adams condoned if not encouraged before the IPO.  PB 22, 23.

46.    Admitted in part.  Sandra Brooks had information regarding the subject, and her testimony about double-shipping is corroborated by many other sources, including Barney Adams and other members of Adams management.  PB 22-23.

47.    Denied.  For instance, in the *Golf Pro* article, a golf pro from New Jersey stated that he had received twice as many clubs as he had ordered.   To cite another example, Yamamoto Golf in Hawaii returned extra clubs to Adams that it had not ordered.  PB 24, n. 13.

48.    Denied.  Defendants' factual claim is mere speculation.  Once Barney Adams made a study of the sales department and learned about the widely condoned, improper sales practices, Gonsalves "left" Adams after receiving what Barney Adams called "the worst performance assessment that I've ever written ...."  PB 23.

49.    Admitted that Hatfield so testified, but Hatfield was very new  to the Company at that time.  Gonsalves and the salesmen knew that pre IPO sales figures were very important to the Company.  PB 11, n.7.  Indeed, after the IPO Barney Adams made an investigation of the sales department and questioned whether those sales figures were "the big lie."  PB 23-24.

50.    Denied as stated.  Murtland's observation is of no significance, for it was more profitable for Adams' dealers to sell their extra clubs to Costco than to return them to Adams.  PB 46.

51.    Admitted that part of the memo is accurately quoted.  the memo also

stated: "I cannot accurately describe the degree of upset that accompanies this memo. My concern is how deep do our problems go, and have we been presenting a false image?" Evaluating the Company's sales practices, Barney Adams had come in for "a shock . . . . What I learned is so upsetting that it has made me physically ill, a discouragement equal to any time since the start of Adams Golf." According to Barney Adams' memo, sales persons knew "cheating (at least in the form of double shipments) occurs and are concerned that such action is quietly endorsed . . . Apparently we've made a lot of sales that have been falsely reported (as sales) and are little more than consignments." He further wrote: "I don't think I need to write any more; the issue is squarely on the table and I'll clarify what is making me sick. Are we living the big lie? Did we present Road Show numbers for '98, '99 that we have no idea we can attain? Is the big lie catching up with us and the reason our people are upset is that they know it?" In coming to these conclusions and posing these questions, Barney Adams had undertaken "an in depth evaluation." He added: "I've researched this to the point where I know that [the above issues] have become reality." PB 22-23.

52.     Admitted, that Barney Adams so testified at a deposition, for which he had been carefully prepared by his attorneys. It is not surprising that in hindsight Barney Adams attempted to explain away his contemporaneous and candid memo from 1998. This is a jury issue.

53.     Denied. Gonsalves' self-serving testimony, which concerns a matter of fact for the jury to decide, is not believable in light of the fact that both he and Greanay ceased to be employed by Adams soon after Barney Adams' "in depth evaluation". *See* ¶51. Adams did not produce any contemporaneous document showing that Barney Adams later corrected, or

amended, with respect to Gonsalves, the "worst performance assessment" that he had ever written.

      54.     Admitted that Hatfield so testified. Defendant Hatfield, hired just before the IPO, had no idea what was going on with respect to gray marketing and double-shipping. Hatfield did not take into consideration that customers who received excess clubs and who were not permitted to return them to Adams, may have sold them to Costco. PB 46.

      55.     Admitted, but a Barney Adams contemporaneous memo admitted that consignment sales had occurred. PB 22-23. *See* ¶51. What actually occurred is an issue of fact for the jury.

      56.     Admitted, that Greanay so testified. Plaintiffs repeat their response to paragraph 55.

      57.     Admitted, except that the "extenuating circumstances" exception was completely undefined. In any event, in lieu of returning excess clubs to Adams, dealers could sell to the flourishing gray market in Adams clubs. PB 46.

      58.     Admitted.

      59.     Admitted that third quarter 1998 returns increased over prior periods.

      60.     Admitted that Adams over-accrued for certain returns with respect to certain periods.

      61.     Admitted.

## III.    SUMMARY LEGAL ISSUES

### A.    Defendants have failed to meet their burden to prove that all plaintiffs' losses were caused by factors other than gray marketing/Costco.

62.    It is correct that it is defendants' burden to prove that something other than the alleged misstatements and omissions caused the stock price decline. 15 U.S.C. § 77k(e). Here, it is a jury issue regarding whether defendants can discharge their burden to show that the stock price did not decline because of: 1) the "leakage" caused by the appearance of thousands of Adams clubs for sale at Costco stores located all over North America, as well as other discounters; 2) partial disclosure about gray marketing during July 1998, after the IPO, when analysts were observing investor concern about gray marketing and, as defendants expert James admits, the decline in the stock price over 12, 13 and 14 day periods from July 10 to July 28, 1998 was statistically significant; and 3) the Company's announcement on October 22, 1998 that Adams would have a very poor fourth quarter because of the gray marketing of its clubs, causing what defendants' expert James admits to have been a statistically significant price decline the very next day.  Further, defendants must refute that gray marketing revelations sent the stock price down after the October 22 announcement even though CEO Barney Adams admitted repeatedly that Costco was causing Adams' problems.  For example, on October 8, 1998, Barney Adams wrote to the Board, "one thing that is hurting us badly is Costco." PB 18, 56.  Barney Adams admitted to his Board of Directors on October 28, 1998, that the primary cause of the plunge from $16 to $3 per share over the span of three months was the market's reaction to one particular factor: "Costco". PB 20.

Defendants' cite to *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 578-82 (N.D. Texas,

2007), is misplaced.  In *Flowserve*, plaintiffs were not able to point to any stock price decline

following any disclosure relating to the alleged material misstatements or omissions.  *Id.* at 572.

Here, a direct Company announcement on October 22 that gray marketing was impacting the

Company's sales sent the stock down a statistically significant amount.  PB 37, 40.  In addition,

the stock price declined a statistically significant amount from July 10 to July 28, 1998, when

Costco gray marketing sales shot up and analysts warned of growing investor concern about gray

marketing.  Even if underguendo other problems may have contributed to this price decline, it is

defendants' burden on summary judgment to prove negative causation as a matter of law, and

they have not done so.  It is a jury question as to how much, if any, of the price decline was

caused by issues other than gray marketing.

        63.    Defendants claim the risk of gray marketing was incorporated into the IPO

offering price.  There is not a shred of contemporaneous evidence that the underwriters took gray

marketing into account when they set the IPO price of the stock.  PB 34.  The market does not set

the price in an IPO, as it does after the shares are publicly owned and an efficient market

develops.  *See Adams Golf*, 381 F.3d at 77 n. 10 (no indication of an efficient market before the

IPO).  *See also, Merck*, 432 F.3d at 275.

        64.    There is no evidence that any investor in the IPO incorporated the month-

old Bill of Discovery announcement into the price they were willing to pay.  Investors understand

that the securities laws require a company to reveal every material fact and risk in the Prospectus.

Investors do not check back to see if the new registrant issued a press release or put some news

on a newswire while it was still a private company.  Only events or information revealed after the

IPO -- when there is stock to buy or sell -- will cause the price to rise or fall.  PB 35.  In a word,

before the IPO there was no efficient market for Adams stock. According to plaintiffs' expert on

loss causation, Alan Miller, reasonable investors would surmise that whatever material risks

existed, gray marketing was not among them, since the Prospectus did not include it. PB 35.

      65.    Defendants claim that disclosures about gray marketing after the IPO did

not cause the stock to go down. Contrary to defendants' claim, their own expert, James, agreed

that the price declines over the period of July 10th to July 28th were statistically significant, at

the time when Costco had on display and sold thousands of Tight Lies. The stock price also

declined the day after the first Adams public announcement that gray marketing was hurting

Adams' sales. As to the *Golf Pro* article, since defendants cannot meet their burden to show

when it was available to the market, it is unknown when, and over what period of time, it may

have affected the stock price. Again, it is a jury question as to whether, when and how the *Golf*

*Pro* article affected Adams' stock price. On Friday, August 28th, when the Lehman analyst

report went to the printer (but may not have been available to the public), the stock price went

down, and on the next trading day it declined again, even though the Lehman article was very

positive with respect to Adams, urging investors to buy the stock, and hiding the Costco concern

on the 27th page of the 28- page article.

      66.    Denied. Both experts agree that the stock price reaction to the October 22,

1998 announcement was statistically significant. PB 43. The stock went down 16 2/3 percent

when Adams stated that "we anticipate our sales will be further impacted by the recent gray

market distribution of our product to a membership warehouse club." *See Adams Golf*, 381 F.3d

at 277 n. 11 (after disclosure, the number of shares traded increased and the stock declined 17%).

This meets the *Merck* standard, 432 F.3d at 269 (stock price generally must decline "in the period

immediately following disclosure"). Relying on their expert James' event study, defendants

claim that because the price of Adams stock did not decline sufficiently on the days they assume

the *Golf Pro* article and the Lehman article became public, the omission of the risks of gray

marketing in the Prospectus did not cause the price of Adams stock to decline. However, an

event study is inappropriate where the exact date of the disclosure is unknown. PB 40, 42, 45.

James's study and its conclusion are therefore meaningless. Here, where information leaked into

the market from various sources, including the sales of Tight Lies in Costco stores in the United

States and Canada, the only way an event study can be used is to examine a group of days when

leakage is known to have occurred, in this case July 10 to July 28, and determine whether the

price decline was significant.   Plaintiffs' expert Miller concluded that the stock price fell as

news of Adams' gray market problems became partially known to the public through "leakage".

    67.    Denied. It is a jury question whether the information referred to in

paragraph 66 above caused the stock price to go down, or whether the so-called "new"

information regarding fourth quarter 1998 expectations caused the price drop. Defendants cannot

meet their burden to prove, as a matter of law, that the gray market announcement did not cause

the stock drop. Costco was selling Adams clubs continuously from March 1998 through the IPO

and through and beyond the end of the Class period. Adams did not warn investors of the risks

posed by gray marketing in the Prospectus. Those risks -- that sales would decrease as golfers

could buy Tight Lies at almost wholesale prices, and that shop owners would become dissatisfied

because their margins were decreasing and choose to sell other brands -- had become reality, as

finally admitted by Adams on October 22, 1998. Thus, there is a direct causal connection

between not warning of the risks of gray marketing and the price of the stock plummeting on the

day the Company admitted the risks had become reality.  It is for a jury to decide whether the material omissions in the Prospectus caused the price of Adams stock to decline and the Class to suffer loss.

68.     Denied.  It is defendants' burden to prove, as a matter of law, that Adams stock did not decline because of gray marketing.  Defendants have not so proven.  Clear jury issues remain.

69.     Whether or not the golf industry declined during the Class Period, defendant Barney Adams attributed Adams' spectacular price decline to the unauthorized sales by Costco of the Tight Lies.  PB 18-20.  It is defendants' burden to prove not that the golf industry declined, but that gray marketing was not a cause of the Adams' stock price decline. James has failed in this proof, as explained above.  A jury will have to determine whether or not gray marketing contributed to plaintiffs' loss.

70.     Adams' loss of market share to Olimar was caused at least in part because retailers dropped Adams and bought Olimar because Olimar clubs were not on sale at Costco, ruining the retailers' sales and margins.  PB 6-7.  More importantly, the market data that purports to show that Adams lost market share to Olimar were not fully available during the Class Period, and thus could not have caused the stock to go down.  As defendants have contended elsewhere, only public information can cause the price of stock to go down.

71.     Defendants mischaracterize plaintiff's leakage evidence.  There was no known printed or broadcast evidence about gray marketing of Adams clubs during July, 1998 unless the *Golf Pro* article came out before August.  However, between July 10th and August 2nd 1998, Costco sold 2,104 clubs.  PB 13.  Those clubs were on public display in Costcos in

Washington State, Massachusetts, New Jersey, Virginia, Arizona, Florida, California, Idaho and

Michigan, as well as in eight Canadian Provinces. PB 12. Further, during this same period,

Costco bought 3,611 clubs from Adams dealers who had excess clubs, many of whom may have

purchased Adams stock in the IPO. Since many of the Adams stockholders were golfers or in the

golfing business, the public availability of Tight Lies in Costco stores would have leaked

information to persons who were interested in Adams stock concerning Costco sales of Tight

Lies. PB 15, 36. This availability of information occurred at the same time that Adams' stock

price dropped dramatically, and statistically significantly. Analysts stated that investors had

become concerned about gray marketing, and Lehman analysts knew and informed investors that

gray marketing was extensive in July 1998, post-IPO. Market prices may move on leaked

information, even if that information is not written and cannot be identified as being released on

a specific date. *See In re Enron Corp.*, 439 F. Supp. 2d 692, 698-701 (S.D. Tex. 2006) (market

may learn of fraud through numerous sources, and economic loss may occur as "relevant truth

begins to leak out"); *In re NTL Sec. Litig.*, 2006 U.S. Dist. LEXIS 5346 (S.D.N.Y., Feb. 14,

2006) (truth may reach market through "'dribbled' disclosures or 'leakage'"); *Swack v. Credit*

*Suissse First Boston*, 230 F.R.D. 250, 270-271 (D. Mass. 2005). Indeed, even defendants' expert

James agreed that material information could "leak" into the market, whether by rumor or oral

communication or observation, and thereby materially affect stock prices. PB 37-38. Moreover,

where information gradually filters into the market following an IPO, statistical analysis such as

James' is not meaningful, and the kind of fundamental economic analysis that Miller performed

is not just acceptable but preferred. *RMED Int'l., Inc., v.. Sloan's Supermarkets,* 2000 U.S. Dist.

LEXIS 3742 (statistical analysis not available when information is leaked closely following an

IPO).

In *Flowserve*, no company statement correcting the misstatement caused the price to drop. In *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1294-95 (N.D. Okla. 2007), plaintiffs bore the burden of proof of loss causation, unlike this case. Also, in *Williams*, the alleged leakage occurred each day over <u>21 months</u>, not a few days. <u>Id</u>. at 1256-7. Moreover, in *Williams* the alleged leakage was not something specific like sales of Adams clubs at Costco stores or comments in analyst reports, but very general, concerning defendants' deteriorating financial condition and the industry as a whole. None of the leaks cited corresponded with defendants' stock declines. <u>Id</u>. The judge found that plaintiffs' expert had not shown a "causal connection between the material misrepresentation and the loss", quoting <u>Dura Pharms, Inc. v. Broudo</u>, 544 U.S. 336, 342 (2005). The expert had not demonstrated that "the stock price decline was fairly attributable to the announcement of the alleged fraud." <u>Id</u>. at 1264. In contrast here, the highest sales by Costco of Adams clubs happened during the period of 12-14 days in July when the Adams stock went down a statistically significant amount. Defendants can show no other cause for the price decline over those 12-14 days. Defendants cite <u>Merck</u>, 432 F.3d at 269, which merely looks to the "movement, in the period immediately following disclosure of the price of the firm's stock." Here, the sales by Costco of Adams clubs occurred during the same period of 12-14 days as Adams stock dropped a statistically significant amount. And, of course, the Company's revelation of truth about gray marketing on October 22nd caused the stock to drop "immediately following disclosure". Finally, any criticism of the use of a twelve day "event window" by plaintiffs' expert in this leakage case is misplaced. Defendants' expert Christopher

James made use of a 26 day event window in a leakage situation in an article he wrote in 1982.[4]

**B.     There is ample evidence that double-shipping existed and that it made if easy for Costco to acquire thousands of Tight Lies**

72.     The evidence about double-shipping is explained at ¶¶ 3, 45-55, *supra*.  A consequence of the double-shipping culture at Adams before the IPO was that retailers found themselves with excess inventory, so that when approached by Costco, they were willing to sell at just above the wholesale price rather than hold onto the excess clubs.  PB 56.  Adams was not able to find out who sold the clubs to Costco even though Costco acquired more than sixteen thousand Tight Lies between February 16, 1998 and October 25, 1998.  PB 13, 22-23, 56. Plaintiffs' marketing expert Ochoa opined that double-shipping "provides a pool of clubs potentially available for the gray market."  PB 46.

73.     The evidence of double-shipping is listed at ¶¶ 3, 45-55, *supra*.  Both CEO Barney Adams and his successor Chip Brewer, wrote memos about double-shipping.  PB 22, 23.

74.     Sixteen thousand Tight Lies sold at wholesale prices could well have a material impact on the Adams dealer network, dealers' margins and continued loyalty to Adams. The only place the Tight Lies could have come from is from Adams dealers who had excess to clubs that they sold to Costco.

75.     The evidence of consignment sales comes from an August, 1998 memo by defendant Barney Adams. PB 22-23.  According to the memo, "Apparently we've made a lot of sales that have been falsely reported (as sales) and are little more than consignments.  Barney

---

[4] Plaintiffs' Opposition to Adams Defendants' Motion to Exclude the Expert Testimony of R. Alan Miller at 10.

Adams claimed to have made an in depth evaluation before he made that statement.  PB 23.

76.   Admitted.  Since Adams would not take excess clubs back, retailers were effectively forced to sell them on the gray market.  PB 46.

77.   Admitted.  Since the excess clubs were sold to Costco, they were not returned to Adams.

## C.   The Adams officers and directors failed to establish their due diligence defense

78.   The due diligence defense requires reasonable investigation and belief. Such a standard ordinarily cannot be established as a matter of law, but must be decided by a fact-finder.  In this case, making virtually no investigation of gray marketing and the extent of clubs for sale in Costco stores all over North America cannot be considered reasonable.  There is no evidence that anyone at Adams other than Chris Beebe, who is not a defendant, made any investigation.

79.   The court in In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 621 (9th Cir. 1995), found that "summary judgment is generally an inappropriate way to decide questions of reasonableness..."  However, "When only one conclusion about the conduct's reasonableness is possible," summary judgment may be appropriate.  Id. at 622.  The court notes that several courts have absolved outside directors and underwriters on summary judgment, but certainly not "routinely."  Ultimately Toolworks found that trial on the merits in that case was necessary.  Id. at 626.

80.   Admitted.

81.   Denied.  Plaintiffs dispute that either the outside or inside directors of

Adams made any meaningful investigation of gray marketing.  There is virtually no contemporaneous record of any investigation, only self-serving deposition testimony, none of which is corroborated by contemporaneous minutes or memoranda.  Indeed, the directors reviewed the Prospectus on April 29, 1998, and never re-evaluated it as the risk of gray marketing grew through May and June, though they were obligated to conduct due diligence through the effective date of the IPO in July.

82.    Admitted that the outside directors may to some extent rely on management assertions, but they must first at least ask management questions about unexplained matters such as the Bill of Discovery filed against Costco in June, 1998.  The outside directors did not do so.

83.    Here, the outside directors who presumably knew about the Bill of Discovery filed by Adams made no further inquiry about why an issue important enough to engender a lawsuit was not mentioned in the Prospectus, especially when they knew Barney Adams would personally receive millions of dollars from the IPO and thus was highly motivated to keep the price high — and the disclosure of risks low.

84.    The outside directors who were aware of the Bill of Discovery were under a duty to investigate why that problem was not disclosed in the Prospectus.  The Bill of Discovery was filed, and the press release was issued, in June, but there is no record of any outside director asking whether Costco posed a material risk or asking to review the Prospectus again, given this new development.

85.    Admitted that this is one formulation of the standard.

86.    Admitted that not every issue must be personally investigated.  But since

Adams filed the Bill of Discovery, the inside directors should have made a reasonable investigation to find out how bad the Costco situation was. There is no contemporaneous evidence of such an investigation. PB 63.

      87.    Denied. Murtland and Hatfield each came across evidence of gray marketing before the IPO. In the case of Beebe, they did not rely on him, but basically ignored him. As to Gonsalves, they should have questioned him much more carefully, and they would have found out the same things Barney Adams discovered after the IPO – double-shipping, pressure to increase numbers before the IPO, and complaints of retailers about having to compete with Costco. Neither of them made any such investigation. It is for the jury to decide whether these defendants acted reasonably and diligently. PB 63.

      88.    Defendant Barney Adams was so busy on the road show, and trying to satisfy the SEC that the Bill of Discovery was not material, that he never made a full or reasonable investigation of the clubs in Costco before the IPO, which would have been sobering. His eagerness to pass off the Costco problem as nothing is exemplified in his deposition answer that "the only incident [of gray marketing] I was aware of, or purported incident, was a very small quantity in Canada." PB 62. He claimed he did not know if any United States retailers had complained about gray marketing before the IPO. PB 63. Since Costco had bought 9,739 Adams clubs before the IPO, and since there is ample evidence of the problem in the documents produced by the Company, PB 5-12, Barney Adams simply avoided discovering the bad news before the IPO.

      89.    Denied. Barney Adams, Hatfield and Murtland did not perform a sufficient investigation before the IPO to know the facts about gray marketing, or they would

have known it was expanding, not under control. Barney Adams stood to make millions in the
IPO. He had ample reason to avoid investigation until after the IPO. Murtland and Hatfield
simply avoided the problems.

        90.    Denied. The three inside directors avoided any investigation of gray
marketing. It is a jury question whether the little they did satisfied their due diligence
obligations.

Dated: March 7, 2008

                    **ROSENTHAL, MONHAIT & GODDESS, P.A.**

                By: Carmella P. Keener /s/
                   Carmella P. Keener (DSBA No. 2810)
                    919 Market Street, Suite 1401
                   Citizens Bank Center
                   Wilmington, DE   19801
                   (301) 656-4433
                   ckeener@rmgglaw.com

                  *Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, L.L.P.**
Lynn L. Sarko
Juli F. Farris
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA  98101

*Counsel for Plaintiffs and the Class*