IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,            :        Civil Action No. 99-371-GMS
SECURITIES LITIGATION               :        (CONSOLIDATED CLASS ACTION)

## PLAINTIFFS' RESPONSE TO STATEMENT OF
## UNDERWRITER DEFENDANTS REGARDING THEIR
## PENDING MOTION FOR SUMMARY JUDGMENT

1.      Pursuant to this Court's Order dated February 8, 2008, plaintiffs submit this

response to the Statement of the Underwriter Defendants ("Underwriters") of: (a) material facts

as to which the Underwriters contend there are no genuine issues to be tried and; (b) the legal

issues upon which the Underwriters claim they are entitled to summary judgment. Plaintiffs

incorporate by reference their separate Response to the Summary Statement in Support of the

Adams Golf Defendants' Motion for Summary Judgment ("the Adams Statement").

2.      The record discloses a clear factual dispute as to whether the Underwriters

performed adequate due diligence to support a reasonable belief that the Prospectus and

Registration Statement ("Prospectus") issued in connection with the 1998 initial public offering

("IPO") of Adams Golf, Inc. ("Adams") stock did not contain any material misstatements or

omissions.  The test of due diligence is not whether defendants went through motions set forth

on a checklist, but whether they actually performed a searching, independent investigation,

independently verifying facts supplied by management and reviewing appropriate source

materials.  Further, "due diligence" is an affirmative defense as to which the Underwriters bear

the burden of proof.  On this record the Underwriters are not entitled to summary judgment on

any of plaintiffs' claims, and the sufficiency of their diligence must be submitted to a jury.

3.      Plaintiffs' claims against the Underwriters do not rest solely on the absence of a

mere "reference" in the Prospectus to "unauthorized 'gray market' sales of Adams clubs by

Costco." As set forth and detailed in 49 paragraphs of the Second Consolidated and Amended

Class Action Complaint (¶¶ 22-70), plaintiffs' claims arise from a Prospectus rendered false and

misleading by defendants' failure to disclose:  (1) that Adams' reported profits and revenues had

been distorted by, and its future results were severely threatened by, "gray market" distribution of Adams' premier "Tight Lies" clubs in discount outlets, and that Adams had not taken reasonable steps to protect its purported "selective retail distribution"; (2) that the risk factors set forth in the Prospectus failed to include the material risk posed by gray marketing; and (3) that Adams' post-IPO results would be materially impacted by pre-IPO sales practices amounting to double-shipping of orders. The failure to disclose the extent of and risks posed by the gray marketing also rendered misleading statements in the Prospectus regarding the selectivity of Adams' product distribution. As set forth in Plaintiffs' response to the Adams Statement, there is an issue for the jury regarding the extent to which the omissions from the Prospectus caused damage to the Class.[1]

## Response to Statement of Purportedly Undisputed Facts

### A. The Underwriters' "General Due Diligence"

4.     Denied as stated. Plaintiffs admit that at the beginning of the IPO process in March 1998, 15 individuals with various levels of financial experience were formally designated part of a "working group" for the IPO. U. App. 549-62. Defendants' own citations to the record show that actual due diligence with respect to the accuracy of the Adams Prospectus was conducted almost exclusively by only two representatives of Lead Underwriter Lehman Brothers ("Lehman"), investment banking Vice-President Olga Pulido-Crowe and her assistant Patrick Walravens (U. App. 942-43; 956-64). Other Lehman analysts and research analysts from other firms conducted separate so-called "due diligence," for the purpose of following, and promoting the sale of Adams stock after the IPO. There is no evidence that any significant results of such activities were timely shared with investment bankers preparing the Prospectus, and such

---

[1] The Adams defendants have not even included in their Statement their prior contention that summary judgment should be granted on the grounds that omissions from the Prospectus were not material. Although the Underwriters claim to adopt that argument, none of the defendants has provided any support for such argument in their required statements of their purported basis for summary judgment. This is no doubt because plaintiffs' opposition to defendants' summary judgment motions showed that the issue cannot be resolved on summary judgment.

2

activities do not properly form the basis for the asserted "due diligence" defense. AB 12-14.[2]

5.      Denied as stated. The Underwriters' "due diligence" outline, U. App. 123-30, did not even mention gray marketing. The Underwriters also requested no documents from Adams regarding gray marketing, even though the Underwriters had knowledge of the negative effects of prior gray marketing in the golf industry and even though Adams Golf's unusually high profit margins, which could and would be eroded by discounting of its products through gray market outlets, were of signal importance to Adams' future results. AB 8, 10-11.

6.      Admitted, except that both U.S. and Canadian gray marketing, which had been reported to Adams in March 1998, had not been publicly disclosed by Adams in any fashion by the time the documents were reviewed.

7.      Admitted that the Underwriters' "due diligence" team looked at some financial documents, organization charts and sales information.

8.      Denied as stated. It is admitted that a number of additional documents on diverse topics were received by the "due diligence" team in mid-to-late April 1998 and that Pulido-Crowe testified the team "looked at" such documents. It is admitted that it appears that none of these documents addressed gray marketing, although documents addressing gray marketing existed at Adams Golf by late April 1998. App. A. 27. No documents concerning gray marketing were ever sought from Adams in the course of the Underwriters' "due diligence," even though the Underwriters knew of the risks of gray marketing and knew or should have known that Adams and/or Adams' competitors had experienced gray marketing. AB 10-11.

9.      Denied as stated. Plaintiffs admit that meetings occurred on these dates, but deny that adequate due diligence actually occurred at them. Pulido-Crowe, the Vice President in charge of Lehman's "due diligence," testified that she believed that by April 27, 1998, she had

_____

[2] "AB" refers to the Answering Brief in Opposition to the Underwriters' Motion for Summary Judgment, filed by plaintiffs on October 9, 2006. Other references are either to Plaintiff's Appendix to their opposition to the Underwriters' motion for summary judgment (App. A. __); to the Underwriters' Appendix to their motion (U. App. __); or to the separate Appendix filed with the Underwriters' Reply Brief in support of their motion. (UC __).

3

learned of the existence of gray marketing of Adams' products by Costco, yet not one document produced by Lehman from its "due diligence" investigation made any mention of, much less analyzed the facts regarding, gray market issues. Pulido-Crowe's testimony also showed that she had failed to uncover the essential facts regarding gray marketing affecting Adams, as reflected by her incorrect belief that any gray marketing had occurred in Seattle in an isolated incident. AB 9-11; App. A14, p. 50.

10.    Admitted, except that it is denied that the "due diligence" team interviewed a proper or reasonable selection of Adams' major customers or that it conducted adequate interviews. The team failed to contact W D C MacKenzie ("WDC"), Adams' second largest individual account in 1998, which had in March 1998 informed Adams of gray market distribution which threatened materially to undercut WDC's sales and profits, and had asked Adams Golf for assistance in halting the problem. Further, the Underwriters' interviews, which relied upon voluntary cooperation by the individuals who were telephoned, did not ask any specific questions regarding gray marketing. Even after learning of Costco's distribution of Adams Golf's clubs, Pulido-Crowe -- who had a previous business relationship with Costco -- made no effort to contact Costco, because Barney Adams requested that she not do so. AB 11. There is no evidence that the "due diligence" team reviewed a May 1998 issue of Golf Pro, which addressed the significance of Costco's gray marketing of other golf products. The team did not conduct any investigation of gray marketing in Canada or in the Pacific Northwest. AB 10-11, 14-16. It also failed to interview Chris Beebe, the Adams international sales manager who was particularly knowledgeable about gray marketing. U. App. 713-14.

11.    Denied as stated. The research analysts at Lehman conducted a separate form of "due diligence" because of Lehman's plans to follow and recommend Adams stock for sale following the IPO. An August 28, 1998 report principally prepared by one of these analysts, Brian Lantier, revealed a significant problem and risk not disclosed in the Prospectus. The report disclosed that based on calls Lantier had made over a period of several months -- since before

4

the IPO -- Costco was "flooding" the market with discounted Adams clubs, and his report indicated that this was a trend which had begun before August. Lantier made and kept notes, which would have pinpointed the sources from which this information was obtained. The notes continued to exist months after this litigation was filed, but have never been produced, giving rise to an inference of spoliation. AB 3-4, 12-14, 20-26.

12. Admitted.

13. Admitted, except that the Underwriters' purchase of the Adams Golf shares was for immediate resale to the public in the IPO.

14. Denied as stated. While the actual results were not wide from the analysts' estimates or projected income statements, the actual results were not predicted with complete accuracy. More importantly, by October 22, 1998 Adams had to disclose that gray marketing would further impact its results. AB 18.

15. Denied as stated. It is admitted that some purported "additional due diligence" took place in a telephone call conducted on July 9, 1998. However, the session was so cursory that the only record of the occasion is a single page of sketchy handwritten notes which managed to include the words "Bring down due diligence." App. A. 29. There is no evidence that any specific questions were posed by the Underwriters about the then-expanding state of gray marketing. In fact, the record shows that had Lehman asked for detail regarding the episodes of gray marketing known to Adams by the effective date of the IPO, it would have learned of distribution which before the IPO was increasing and spreading not only through Canada, but throughout the U.S., including at least in Washington (state), Massachusetts, California, Idaho, Virginia and Michigan. AB 16-17, 36; App. A. 28.

## The Underwriters' "Investigation" of the Costco Sales

16. Admitted.

17. Denied as stated. There is no evidence of any discussion that was significant enough to be recorded in a note or memorandum. All the record reflects is the unspecific,

5

undocumented and self-serving testimony that Adams on one occasion made Lehman aware of the existence of some gray marketing, which Lehman then essentially ignored. There is no evidence of anything other than the most superficial discussion of the presence of Adams clubs in Costco stores. AB 9-10.

18.    Denied. These asserted facts are based upon a terse post-discovery "affidavit" of Pulido-Crowe U. App. 1129. The document is not actually an affidavit, as it is not given under penalties for perjury or in compliance with 28 U.S.C. §1746. Further, it conflicts directly with Pulido-Crowe's deposition testimony that she was told that the gray marketing had occurred in a single instance and that she believed it took place in Seattle. AB 9-10. There is no proper evidence of any pre-IPO Underwriter knowledge of Canadian gray marketing. If in fact the Underwriters were aware of the Canadian gray marketing, this "fact" further highlights the insufficiency of their "due diligence." There is no evidence that the Underwriters made any efforts whatsoever to verify the extent or importance of such gray marketing by contacting WDC, Adams Golf's Canadian distributor, which had complained bitterly on the subject; by reviewing correspondence between WDC and Adams discussing the problem; by seeking Adams' internal analysis of gray marketing; or by otherwise investigating gray marketing in Canada. AB 10-18.

19.    Denied as stated. It is admitted that at the time of the IPO the Canadian market as a whole represented approximately 3% of Adams Golf's sales for 1998. However, WDC, which was experiencing a devastating loss of sales due to gray marketing, represented Adams' second largest customer, with over 2.8% of Adams' sales for a recent period, and the proximity of the Canadian gray marketing to the Northern United States represented a broader threat to distribution within the United States. AB 15; UC 1, App. A. 28.

20.    Denied. The Underwriters' citations do not show that Adams management stated that the gray marketing was "not a significant issue." They show at most that by April 1998, Adams management stated that Costco sales were not large and were an isolated incident. The

6

Underwriters purportedly reached the decision that the sales were insignificant, but they did so without adequate investigation or independent verification, including any examination of the expansion of gray marketing between April and the July 9 IPO date.

21.    Denied as stated. Pulido-Crowe had a prior relationship with Costco and thought that she might be able to obtain relevant information from Costco, but she made no efforts to contact Costco after Barney Adams asked her not to do so. None of the Underwriters attempted to obtain information from Costco prior to the IPO. AB 11-12. Brian Lantier, a Lehman research analyst who testified that Costco was "close-lipped" about how it obtained clubs when he called them, made his calls to Costco only after the IPO, as part of his effort to follow the company. AB 13-14.

22.    Denied as stated. The Underwriters knew or should have known that Adams' efforts to deal with Costco sales were insufficient to eliminate the problem of gray marketing. Adams did not until later in 1998 even begin serializing its clubs so that it could try to detect and eliminate gray marketing, and by 1999 was forced to admit that the problem could never be eliminated. AB 10.

23.    Denied. As set forth in ¶ 18, the "facts" set forth in this paragraph were submitted through an improper "affidavit" from Pulido-Crowe, who at her deposition testified that she thought gray marketing was an isolated incident in Seattle (which she claimed she personally investigated by looking at a few stores in San Francisco or LA). U. App. 971. Her assistant, Patrick Walravens, could recall no discussion whatsoever of gray marketing during due diligence. AB 10. Even assuming the facts set forth in Pulido-Crowe's "affidavit" to be true and competent evidence, they are further evidence of inadequate due diligence. Knowledge of the Canadian gray market distribution should have caused the Underwriters to focus systematic due diligence upon Canadian sales and sales in the Northern United States, rather than anecdotal exploration of a few stores in San Francisco and Southern California. AB 10-18.

24.    Denied as stated. Plaintiffs incorporate their response to ¶ 10. The Underwriters

7

were not fully informed as to Adams' top customers. If they were, they failed to exercise due diligence when they failed to contact WDC, Adams' second largest account in 1998. There was no justification for failing to contact it on grounds that it was not a "retailer." Because the brief questionnaires posed no direct questions to the interviewees on the subject of the existence, scope, impact or threat of gray marketing, the failure to elicit information regarding it was of no consequence. AB 14-16.

25.    Plaintiffs incorporate by reference their response to paragraph 24. No specific questions were posed to the interviewees regarding double shipping. AB 14-16.

26.    Denied as stated. Plaintiffs admit that the Underwriters claim that they decided for themselves that gray marketing was immaterial, but there is no document that records this purported decision or any thought process preceding it. In any event, if such a decision was made, it is immaterial. Due diligence investigations may not rest solely upon information supplied by corporate management, but require independent verification and review of source documents. The Underwriters did not utilize sufficient verification procedures to assess the extent, impact or threat of gray marketing. Even a conclusion that the "Costco sales were not material" at some time did not address or dispose of the real issue of whether the existence of and risks posed by the gray marketing should be disclosed to investors. The Prospectus was required to disclose all material risks, and as defendants admit the effects of gray marketing materially affected results within months of the IPO. At a minimum, the materiality of the risk posed by gray marketing at the time of the IPO is a jury question. AB 26-35.

27.    Denied as stated. It is admitted that the SEC provided comments and asked Adams to consider whether disclosure of the "Costco matter," a legal proceeding (a bill of discovery) which the company had filed against Costco, should be included in the Prospectus. U. App. 563.

28.    Denied as stated. Adams chose not to make any disclosure of the bill of discovery that it had filed against Costco on the reasoning that the litigation was not material, and the

8

Underwriters did not question that decision. Regardless of whether the disclosure decision with respect to the bill of discovery may arguendo have been technically correct (because Adams had filed an ineffectual legal proceeding in a Court that lacked jurisdiction against Costco), that decision did not begin to answer the question of whether the underlying facts of gray marketing that had precipitated Adams' suit against Costco, as well as subsequent developments (including gray market distribution which was expanding throughout the country before the IPO became final, App. A. 28), required disclosure of the existence, risk, and actual and possible consequences of gray marketing.

29.     Denied as stated. It is admitted that the SEC took no action, but the Underwriter Defendants admit that the SEC approval does not mean that the nondisclosure regarding the Costco suit was approved by the SEC. Further, the SEC did not raise the question of the materiality of the underlying gray market activity or its impact or risks.

## C.    The Underwriters' Document Production

30.     Denied as stated. The Underwriters produced the number of documents stated, but they admitted that the electronic documents did not represent a complete production of the e-mails and other electronic documents that had existed either at the time of the IPO or at the time of the inception of this litigation. AB 3-7; UC 45, 50.

31.     Denied as stated. It is admitted that some electronic evidence was produced late in the discovery period. The only e-mails produced by any of the three Underwriter Defendants were produced by Lehman, and were generated by reviewing 32 of 200 existing data tapes, which in turn represented a small subset of the data tapes once existing. Significantly, very few e-mails created during the critical period of June-August 1998 were produced. AB 5-7; UC 50. No evidence has been supplied that the "destruction of [Lehman's] main computer systems" occurred on September 11, 2001. The evidence at most suggests that, as a consequence of damage to Lehman's building at 3 World Financial Center resulting from the attack on the World Trade Center, an indeterminate number of electronic and paper documents were either lost or

9

inaccessible as of November 9, 2001. UC 45, 50. The Underwriters did not raise the purported loss of Lehman's "main computer systems" as an issue when plaintiffs successfully moved Judge Jordan to order a deposition regarding electronic document destruction.

32.    Denied as stated. It is admitted that certain affidavits were provided. However, despite an agreement to avoid depositions and discovery motions regarding the non production of electronic documents by providing affidavits regarding document production and document preservation policies, defendants Lehman and Bank of America Securities provided only unsworn documents on the subject, UC 26, 44, 47, and despite plaintiffs' request refused to provide proper affidavits.

33.    Denied as stated. Plaintiffs admit that a deposition of Lehman was conducted with respect to certain electronic document production issues. That deposition was Ordered by Judge Jordan over Lehman's objection, and at the deposition the designated witness was unprepared to and could not answer many questions on subject matters specified in the deposition notice, including questions on Lehman's efforts to locate and preserve documents relevant to this case. A motion to compel discovery or for sanctions was avoided because of an agreement that was reached by the parties, which Lehman later refused to fulfill by providing unsworn (as opposed to sworn) affidavits.

34.    Denied as stated. In part because of deposition time limits established for this case, plaintiffs did not conduct any Rule 30(b)(6) corporate depositions solely on the subject of non-electronic document production. However, plaintiffs deposed present and former representatives of Lehman (including analysts Bernard Picchi and Brian Lantier) as to documents which had once been in existence. Though no deposition of Ferris Baker Watts was taken, a deposition was taken of its former analyst Joseph Teklits. App. 3, 4, 23.

35.    It is admitted that plaintiffs did not move for additional production of non-electronic documents. However, any non-electronic documents which form the basis for plaintiffs' contention that they are entitled to a sanction were identified at depositions and fell

10

within defendants' obligations to produce. AB 3-4. When documents were first requested, plaintiffs specifically sought analyst reports, notes and research (Doc. Reqs. 5, 7, 9, 13) and also made specific requests for the production of Underwriter documents concerning the loss or destruction of documents relating to this litigation (Doc. Req. 2). The Underwriters agreed to produce responsive documents that would have included both notes and evidence of lost documents, and did not state that non-electronic evidence relevant to this litigation was lost on September 11, 2001 until their reply brief in support of summary judgment. The unsworn "affidavits" which they claim support that proposition do not demonstrate that the loss of any relevant paper document was in fact the result of the September 11 attacks. C45, C50.

36.    Denied as stated. In addition to serving document requests relevant to the destruction of files, plaintiffs also included instructions in their document requests that required defendants, in the case of any document that had been lost or destroyed, to state the circumstances regarding such loss or destruction. No paper documents relevant to plaintiffs' claims were ever timely identified by the Underwriters as having been destroyed by any means.

37.    Admitted.

38.    Denied as stated. Plaintiffs commenced this litigation on June 11, 1999, less than a year following the IPO. Prior to the filing of suit, an SEC regulation, 17 C.F.R. § 240.17a-1, generally required the Underwriters to preserve their documents regarding their business for six years without regard to whether they were electronic or non-electronic, and Lehman's own document preservation policy was in general conformance with the SEC regulation. The filing of suit triggered defendants' legal obligation under the Private Securities Litigation Reform Act ("PSLRA") to preserve all relevant documents. AB 4-5, 23.

### Legal Issues

### A.    The Underwriters' Due Diligence Defense

39.    Section 11 contains what has come to be known as a "due diligence" defense. Plaintiffs admit that the reasonableness of the Underwriter investigation of relevant facts, a

11

mixed factual-legal issue, was presented by the Underwriters' motion for summary judgment, but deny that the reasonableness of the Underwriters' "belief that the Costco sales were not material" is a relevant inquiry. As set forth in ¶ 3, plaintiffs' case has never been premised on the narrow claim that the amount of pre-IPO sales of Adams clubs at Costco was material. Further, while a few courts in extreme factual circumstances not present here granted summary judgment to underwriters, grants of summary judgment have been rare because the law is exacting, and does not permit the Underwriters to excuse significant flaws in their due diligence by claiming that they had mechanically completed all the items on a checklist. "[S]ummary judgment is generally an inappropriate way to decide questions of reasonableness because 'the jury's unique competence in applying the "reasonable man" standard is thought ordinarily to preclude summary judgment.'" Unless no rational jury could find that the defendants did not act unreasonably, the motion must be denied. In Re Software Toolworks Inc. v. PaineWebber, Inc., 50 F.3d 615, 621 (9th Cir. 1994)(quoting, TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 n. 12 (1976); see In re Worldcom, Inc. Sec. Litigation, 346 F. Supp. 2d 628 (S.D.N.Y. 2000).

40.    Denied. The courts have held that the key to reasonable investigation is independent verification of a registration statement by reference to appropriate source documents. Escott v. Barchris Construction Corp., 283 F. Supp. 643 (S.D.N.Y. 1968); Feit v. Leasco Data processing Equipment Corp., 332 F. Supp. 544 (E.D.N.Y. 1971). Further, the courts have held that where an underwriter becomes aware of negative facts that serve as "red flags" or "storm warnings," a reasonable investigation requires even more extensive verification of management representations. University Hill Foundation v. Goldman Sachs & Co, 422 F. Supp. 879, 902 (S.D.N.Y. 1976). Here, the Underwriter defendants now claim they had knowledge of storm warnings, but there is no evidence of the most basic verification, in the form of contacting the Canadian distributor with first-hand knowledge of the worsening problem. Furthermore, the Underwriters breached their obligation to seek and examine information available to them

12

through the effective date of the Prospectus, which in this case would have demonstrated expanding gray marketing. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1201-1211 (1st Cir. 1996); In re Software Toolworks, 50 F.3d at 625-26; Escott, 283 F. Supp. At 690.

41.     It is admitted that the Underwriters have correctly quoted one portion of 15 U.S.C. § 77k. It is denied that any conclusions reached by the Underwriters with respect to the disclosure of gray market facts or risks were reasonable, either at the time of the conclusions or by hindsight, given the facts the Underwriters could have learned had they exercised true "due diligence."

As set forth in ¶ 3, the issue before the Underwriters was not simply whether sales of Adams clubs at Costco were "material." The record shows that the Underwriters not only had prior knowledge of the potential importance of gray marketing, but should have been aware of a recent article in which one of Adams' customers had stated that once golf clubs reached the shelves of department stores, they had lost their image and thus "lost everything." The Underwriters themselves emphasized, in their later efforts to sell Adams' stock to the public in a "road show", the importance of Adams maintaining unusually high profit margins and avoiding discount distribution of its clubs. Despite these facts, as set forth above, the Underwriters failed to question Adams management regarding gray marketing in any detail, to probe management's statements about gray marketing, or to independently verify the assertions of Adams management or investigate gray marketing. See ¶¶ 8-10, 24. The Underwriters had no reasonable or informed basis for believing that any steps that Adams was purportedly taking to "manage" gray marketing could eliminate gray marketing, and indeed Adams eventually admitted that it could not be eliminated. In addition, the Underwriters knew that the SEC had asked Adams to consider disclosure of the bill of discovery directed to Costco, yet this fact did not spur the Underwriters to make any independent investigation of gray marketing or to see to it that Adams made proper disclosure regarding gray marketing. The record also clearly shows that the Underwriters did not seek or obtain all available information regarding the extent of Costco

13

sales or gray marketing prior to the effective date of the IPO, and had no reasonable basis for determining that no disclosure was necessary regarding the facts and risks of gray marketing. Nor did the Underwriters make any informed decision with respect to the issue of "double shipping," an issue which bore directly on the integrity of Adams' sales reporting. AB 8-18.

## B.    Response to Underwriter Defendants' Assertion That Plaintiffs' Spoliation Argument is Baseless and Does Not Preclude Granting Summary Judgment for the Underwriters

42.    Defendants have misstated the facts and legal principles regarding plaintiffs' claim that defendants either destroyed or simply did not produce centrally relevant documents. Plaintiffs have never contended that they "cannot oppose" the Underwriters' motion in many respects, and have in fact vigorously opposed the motion on its merits. AB 7-16, 26-38. Plaintiffs pointed out that the failure to preserve and produce relevant evidence supplies an independent ground for denial of defendants' motion because it deprived plaintiffs of relevant and presumably helpful evidence. AB 1. The case law shows that the court within its discretion may devise remedies to protect a party from prejudice resulting from a defendant's failure to fulfill its obligations to preserve relevant evidence, without regard to the specific intent of the defendants in allowing the loss or destruction of the documents, where as here the defendant was under special legal obligations to preserve the lost documents. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). Denial of a motion for summary judgment is a modest remedy compared to the sanctions that have been issued in other instances of spoliation, which have included dismissal of defenses, preclusion orders, orders deeming specified facts to be established, adverse inference instructions, and monetary awards.    AB 3-6, 20-26.

43.    Denied as stated. Plaintiffs' "spoliation" arguments are well-founded. A primary reason for plaintiffs' decision to raise the issue of spoliation is the loss of notes taken by Lehman analyst Brian Lantier of his contacts with retailers between May 1998 and August 28, 1998. On

14

the basis of these notes, he publicly revealed approximately six weeks after Adams' IPO (without even investigating what was occurring in Canada and the Northwestern United States) that Costco was "flooding the market with Adams clubs at $149" and that this was "an extremely serious issue" for Adams because of its impact on sales margins. The deposition testimony of this witness revealed that such notes still existed and were left in the care of Lehman when he terminated his employment in 1999, after this litigation had commenced. AB 3-4.

Whether or not any of the Underwriters was "confused" on the subject, the fact remains that an SEC regulation generally required brokers to retain all documents concerning their business for at least six years (without regard to whether they were electronic or hard copy), and Lehman's internal document preservation policy was in general conformance with the regulation. Further, once this litigation was commenced in June 1999, defendants were obliged to preserve relevant documents under the PSLRA. AB 4-5, 23. The missing documents fell clearly within plaintiffs' document requests. Whether these documents were destroyed or lost, they were unquestionably not produced.

The contention that any of Lantier's notes were likely destroyed as the result of 9/11 is unsupported by any evidence, other than an unsworn assertion by a document manager that Lantier (who had left Lehman by 1999) once had offices in 3 World Financial Center. As set forth above, despite many opportunities in the course of the litigation to state that relevant hard copy documents had been lost as the result of the 9/11 attacks, defendants failed to raise that claim until plaintiffs raised the issue of spoliation, and the Underwriters then based such a claim on unsworn speculation.

Not only were important analyst notes never produced, but much other evidence that should have existed has not been produced, and its non-production has not been explained. These facts add support to plaintiffs' spoliation claims. Just for example, none of the Underwriters produced any documents concerning purported investigation of gray marketing before the IPO; any documents relating to a conclusion in a Nationsbanc August 1998 research report that Adams' stock price was likely to be volatile in response to the appearance of its clubs at Costco; or any documents related to conclusions by Lehman by July 28, 1998 that gray

15

marketing had already become an investor concern that would have to be addressed on an

upcoming investor relations call. App. 30. Direct evidence that the Underwriters lost or

destroyed relevant documents is provided by the fact that Adams did, but the Underwriters did

not, turn over a copy of a script for the August 6, 1998 investor relations call, which recognized

that Adams clubs were turning up frequently at Costco stores. App. A.9, p. 9. Further, Lehman's

senior analyst, Bernard Picchi, testified that he probably destroyed all his notes regarding his

work on Adams when he left Lehman in 1999 (after this litigation had been filed). AB 4.

Dated: March 7, 2008

**ROSENTHAL, MONHAIT & GODDESS, P.A.**

By: ____*/s/ Carmella P. Keener*____
Carmella P. Keener (DSBA No. 2810)
919 N. Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE 19801
(301) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, L.L.P.**
Lynn L. Sarko
Juli F. Farris
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA 98101

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 7th day of March, 2008, I caused **PLAINTIFFS' RESPONSE TO STATEMENT OF UNDERWRITER DEFENDANTS REGARDING THEIR PENDING MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Kelly E. Farnan, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

*/s/ Carmella P. Keener*
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com